**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Criminal Action No. 19-cr-00243-CMA-GPG

UNITED STATES OF AMERICA,

      Plaintiff,

v.

1. MICHAEL TRACY McFADDEN,

      Defendant.

---

**GOVERNMENT'S NOTICE OF INTENT TO INTRODUCE EVIDENCE**
**PURSUANT TO FEDERAL RULES OF EVIDENCE 414, 404(b), AND 807**

---

The United States of America, by and through Jeremy Chaffin and Andrea Surratt, Assistant United States Attorneys, hereby notifies the Court and the defendant of its intent to introduce evidence pursuant to Federal Rules of Evidence 414, 404(b), and 807, as well as a proffer of the evidence it will seek to introduce at trial. While some case law is provided in support of its various theories of admissibility, this is not intended as a full briefing. Instead, this is intended as notice. *See* Fed. R. 414 (requiring disclosure of 414 evidence); Fed R. 404(b)(2)(A)-(B) (requiring pretrial notice of 404(b) evidence); Fed. R. 807(b) (requiring reasonable notice); *see also* ECF # 13, p. 4 (requiring notice of 404(b) evidence at least 21 days before trial).

**BACKGROUND**

On May 17, 2019, the defendant was indicted by the Grand Jury for five counts involving acts of child molestation. ECF # 1.

Counts One and Two of the Indictment relate to an incident, occurring sometime between Christmas 2012 and January 3, 2013, in which the defendant took a minor, identified in the Indictment as K.W., and two of his siblings on a commercial truck trip. During this trip, K.W. reported that the defendant and he slept in the sleeper compartment of the truck. During the night, K.W. woke up when he felt the defendant's penis touching his butt. K.W. said that the defendant put his penis inside K.W.'s butt and that it hurt. K.W. described the defendant moving up against him and then stopping after a few minutes. Throughout this, the defendant had his hands around K.W.'s waist. K.W. explained that he did not cry out because he was scared and that neither of his siblings awoke during the assault. After the assault, K.W. said that his butt hurt "pretty bad" for a few days. K.W. was eleven years old at the time of this assault. The defendant was previously charged, as part of a pattern of abuse count, and convicted for this incident during a prior state court proceeding.[1]

Counts Three and Four relate to an incident, occurring sometime between December 1, 2010, and January 1, 2011, in which the defendant took a minor, identified in the Indictment as J.W., on a commercial truck trip. J.W. reported that the defendant took him on a multi-day trip travelling between Telluride, CO, and Farmington, NM. J.W. explained that the commercial loads were picked up from an area near the

---

[1] Although the government does not intend to introduce such facts during its presentation of evidence, the government makes note, throughout this notice, of instances in which charges were brought in prior state court proceedings and whether a conviction resulted. The government does this to assist the Court in evaluating the admissibility of the proffered evidence. Some of the convictions referenced herein were later overturned based on a speedy trial violation. Notably, however, the appellate decision overturning the conviction did not raise any question as to the validity of the jury's determination of guilt. A copy of this appellate decision can be provided to the Court if this Court so requires.

Telluride airport. Business records establish that these trips occurred during the charged time period.

J.W. described a particular instance of child molestation that occurred during one of the nights of this trip. J.W. explained that they had stopped at a location in New Mexico and were sleeping in the sleeper compartment of the truck. J.W. described the defendant sodomizing him. After the assault, J.W. explained that he urinated and defecated on himself and the defendant had to clean J.W. up with wipes the defendant kept in the front cab of the truck. On what J.W. believed was another night during the trip, J.W. awoke to the defendant licking his anus. J.W. explained that it did not feel like a penis and that he felt what he described as the defendant's mustache touching his bottom. J.W. was approximately ten years old at the time of these assaults. The defendant was previously charged in a prior state court proceeding, as part of a pattern of abuse count, related to assaults occurring on semi-truck trips and was subsequently convicted.

Count Five relates to another instance in which the defendant took J.W. on a commercial truck trip. J.W. was unsure of the precise time frame of this assault. As a result, the charged time period in the Indictment encompasses the approximate time period during which the defendant subjected J.W. to sexual assaults. J.W. reported that, during this specific instance, they were transporting goods to or from Arizona. J.W. recalled stopping at a Love's truck stop and sleeping in the sleeper compartment of the truck. J.W. described the defendant placing his penis into J.W.'s butt during the night. During the charged time period J.W. was 12 years-old or younger. As referenced above, the defendant was previously charged in a prior state court proceeding, as part

of a pattern of abuse count, related to assaults occurring on semi-truck trips and was subsequently convicted for that conduct.

The charged victims, J.W. and K.W., reported multiple other acts of child molestation committed by the defendant.  Additionally, during the time periods during which J.W. and K.W. were assaulted by the defendant, other victims reported acts of child molestation committed by the defendant.  Finally, in 1990 the defendant was convicted of committing an act of child molestation on another victim.

The government provides notice of its intent to introduce evidence of these other acts of child molestation committed by the defendant, as detailed below.  The government also provides notice of its intent to introduce additional evidence, as detailed below, pursuant to Federal Rules of Evidence 404(b) and 807.

### RULE 414 EVIDENCE

To the extent it is not *res gestea* evidence, the government provides notice of its intent to introduce the following evidence pursuant to Federal Rule of Evidence 414.

<u>Other acts of child molestation related to J.W.</u>

The first act of molestation that J.W. has consistently recalled involved a trip to a funeral in AZ when J.W. was approximately eight-years-old.  JW recalls the defendant giving him a drink with what J.W. described as a lump of substance inside.  At the time, J.W. thought it was a clump of sugar because the defendant overheard him asking a cousin about it and told him that was what the substance was.  J.W. now believes the substance was a sleep aid that the defendant placed in his drink.  In a prior interview when J.W. was twelve-years-old, J.W. explained that the defendant put his penis inside J.W.'s butt while they were sleeping in a hotel.  In a more recent interview, conducted approximately seven years after the prior interview, J.W. stated that he does not

specifically recall any sexual acts committed by the defendant, but does recall waking up naked in a bed next to the defendant (during this recent interview investigators did not direct J.W. to his prior statement or otherwise attempt to refresh J.W.'s recollection). In the more recent interview, J.W. explained that even though he does not now specifically recall being sexually assaulted during this incident, he believes that this was the first time he was molested by the defendant.

Following this, J.W. reports that the defendant began sexually assaulting him on a frequent basis. Indeed, J.W. explains that he was assaulted hundreds of times—far too many for him to count—and that the defendant rarely allowed three or four days to pass without molesting him. These assaults did not stop until the defendant was arrested when J.W. was twelve years old. J.W. describes these assaults as always occurring at night, typically after he had received a drink he believed had something put in it or some sort of medication to help him sleep. These assaults occurred either in the defendant's bed or in a semi-truck driven by the defendant while they slept. In a prior trial, J.W. testified that he would typically wake up to his shorts coming down. When his shorts would come down, J.W. would feel something he described as a penis. Sometimes it seemed to J.W. that the defendant was testing to see if he was awake. At times J.W. would act like he was sleeping, other times he would roll over or try to get away. J.W. explained that many times the defendant put his penis into J.W.'s butt. But occasionally, the defendant would not sodomize J.W., and would just stop trying after J.W. rolled over. J.W. stated that the assaults made him feel scared and would cause his "rear-end" to hurt.[2]

---

[2] The incident in Arizona at the hotel, the description of the ongoing assaults, and a final "normal" assault in approximately December 2012 at the defendant's home were the

Although most of these assaults blend together for J.W., and are difficult for him to describe with precise detail, several instances of child molestation stand out. Two of these instances form the basis of charges in this case. In addition, J.W. recalls a separate specific instance that occurred in a semi-truck driven by the defendant. J.W. had accompanied the defendant on a trip and they had returned the night before J.W. was supposed to attend school. They had parked the truck down the street from J.W.'s home and slept in the truck. J.W. recalls sleeping near an air vent in the truck and being assaulted in the morning before school. J.W. described this as a "normal" assault, where the defendant inserted his penis into J.W.'s butt. J.W. explains that this instance stands out for him because the assault put him in a "bad mood" and he had to go to school afterwards. J.W. also recalls needing to frequently use the restroom that day during school because he had "really bad diarrhea" which he attributed to the assault, and used different restrooms in the school because he had already used the closest restroom several times. J.W. also recalls instances in which "normal" assaults occurred during trips to Texas and Yellowstone National Park. However, J.W. is unsure in which states, or the specific time frames when, these assaults occurred.

Finally, J.W. recalls instances in which he was present when he believes other children were molested by the defendant. One of the first instances J.W. describes occurred in a home in Grand Junction in the defendant's bed. J.W. and at least one other child, K.W., were sleeping in the defendant's bed. J.W. awoke to K.W. screaming at the defendant to "get off of me." J.W. explains that both K.W. and the defendant had their clothes on, but this instance is when J.W. realized that other children were also being assaulted by the defendant.

basis of the charges related to J.W. in the prior state proceedings for which the defendant was convicted.

J.W. described another instance in which he believes K.W. was actually molested. J.W. was on a semi-truck trip with K.W. and the defendant. J.W. does not recall the specific details of the trip, but recalls waking in the night to a "painful grunting" noise he believed K.W. was making. J.W. also recalls smelling a "fecal smell" during this instance, which led him to believe K.W. was being sexually assaulted by the defendant.

J.W. also recalls a similar instance in which he believes that his cousin D.O. was molested by the defendant. The three were on a trip to someplace in Texas; J.W. recalls he and his cousin placing pennies on some railroad tracks and sleeping the night in the sleeper cab of the semi-truck at a truck stop. J.W. slept on the top bunk of the sleeper compartment while the defendant and D.O. shared the bed below. During the night, J.W. was awakened by some movement and groaning. J.W. also smelled a "musky fart smell" that lead him to believe D.O. was being subjected to "something sexual" by the defendant. J.W. recalled opening a nearby air vent to get fresh air because of the smell.

D.O. was later interviewed by agents. D.O. recalled a trip in which he woke up and was told by J.W. that the defendant had been "touching his privates." D.O. stated that he was on prescription medications that made him sleep at the time and wasn't awake when anything happened. D.O. also recalled a trip in which he and J.W. put pennies on railroad tracks, but was not sure if it was the same trip in which J.W. told him that he had been assaulted.

Other acts of child molestation related to K.W.

In addition to the specific instance charged in this matter, K.W. reported that he was molested by the defendant "a lot." K.W. explained that it would typically occur at

night in the defendant's bed, after the defendant had given K.W. melatonin or something else to make K.W. sleepy.  K.W. stated that he would feel the defendant put his hand inside K.W's. pants and touch K.W.'s penis.  K.W. explained that this touching is what typically occurred, but there were some occasions when the defendant would rub his penis on K.W.'s butt, but did not put it inside.  Based on these instances, the defendant was charged and convicted in a prior state court proceeding.  All of these instances occurred when K.W. was eleven years old or younger.

K.W. also described an instance in which he observed what he believed to be the defendant touching J.W.'s penis.  This occurred on a night when K.W. was staying at the defendant's home.  Early in the morning, K.W. walked into the defendant's room to ask for some milk—which K.W. explained the defendant kept locked up in a fridge.  As he entered, K.W. observed the defendant jerk his hand out from under a blanket from the area of J.W.'s penis.  K.W. stated that J.W. was asleep when this occurred and he did not say anything about what he observed.

Acts of child molestation involving I.S.

In December 2012, officers from the Grand Junction Police Department received a report of a sexual assault of a minor, identified herein by the initials I.S., committed by the defendant.  A detective interviewed I.S. in a forensic interview.  During the interview, I.S. explained that the defendant rubbed I.S.'s "pee pee" while I.S. was sleeping at the defendant's house.  I.S. stated that he "lost count" of the number of times that this had happened.  I.S. described these acts as occurring in the defendant's bed, while I.S. was sleeping there.  I.S. said that the defendant would put his hand inside I.S.'s underwear and rub his penis, causing I.S. to wake up.  I.S. would try to stop the defendant by trying to "grab his hand and put it in his lap."  I.S. said that the defendant persisted until I.S.

rolled over.  I.S. reported that other boys slept in the defendant's bed as well, but I.S. was not sure if this was happening to them.

After this report, state authorities initiated an investigation in which they discovered much of the conduct described above and below.  In addition, in a subsequent interview, I.S. disclosed that the defendant put his penis into I.S.'s butt on at least one occasion.  I.S. stated that this occurred when he was approximately 8 years old, and that it occurred during the night in the defendant's bed.  The defendant was eventually charged with the acts of child molestation reported by I.S. in a prior state court proceeding and ultimately convicted by a jury.

Acts of child molestation related to E.S.

Based on the report from I.S. described above, the detective conducted a forensic interview of another child present in the defendant's home, identified herein by the initials E.S. (but who was identified in the prior state court proceeding by the initials E.M.).  During the interview, E.S. initially expressed anger at I.S. for reporting and said that the defendant told him that it was all lies.  E.S. did not initially disclose any sexual contact.

A few days later, E.S.'s family contacted the detective because E.S. indicated there was something he wanted to tell the detective.  In the subsequent interview, E.S. described multiple instances of molestation committed by the defendant.  E.S. explained that on several occasions—which E.S. identified by which dog in the home was sleeping with him at the time—the defendant touched E.S.'s penis with the defendant's hand under E.S.'s clothing.  In several of these instances, the defendant moved E.S. to the defendant's bed, lowered E.S.'s clothing, and stroked E.S.'s penis.

When asked if this occurred anywhere else, E.S. said that it also happened down by the river.  E.S. then described two instances where the defendant took E.S. to an area near some roller dams on the Gunnison River, in Mesa County, Colorado.  At this location, the defendant bent E.S. over and put his "pee pee" in E.S.'s "butt."  In the first instance, E.S. explained that his brother was present, but sleeping in the cab of the defendant's truck.  In the second instance, E.S. was alone with the defendant.  E.S. described pain and difficulty defecating for several days after these instances.  A Sexual Assault Nurse Examination revealed a possible healed laceration in E.S.'s anus consistent with his description of the assaults.  E.S. was approximately eight years old or younger when these assaults occurred.

The defendant was eventually charged related to these instances in a prior state court proceeding.  A jury found the defendant guilty of these offenses.

Acts of child molestation involving S.J.W.

The prior described investigation identified J.W. and K.W. as victims and many of the acts related to them described above.  The detective then interviewed K.W.'s sibling, identified herein by the initials S.J.W., during a forensic interview.  S.J.W. described one incident of child molestation that occurred while she was sleeping on a couch at the defendant's home.  S.J.W. awoke to the defendant grabbing her by the waist.

S.J.W. reported that the defendant then stuck his finger in her butt.  She turned over onto her back to get away from the defendant, but the defendant turned her back over onto her stomach.  The defendant then put his finger in her butt again.  S.J.W. said that this repeated about five times, explaining that each time the defendant put his finger in her butt and she would turn away.  S.J.W. said that she knew it was the

defendant because he walked away to go wash his hand and she peeked through a slit in her eyelids and saw the defendant.  S.J.W. was approximately nine years old when this occurred.

The defendant was eventually charged in a state court proceeding related to this incident.  A jury found the defendant guilty of this offense.

Acts of child molestation related to D.R.

During the same investigation described above, the detective interviewed a minor, identified herein by the initials D.R., in a forensic interview.  D.R. reported that the defendant touched D.R.'s penis while D.R. was sleeping in the defendant's bed. D.R. said that he slept in the defendant's bed along with the defendant, J.W., and another boy one night for a sleepover.  D.R. explained that he went to bed with shorts and a pull-up on and woke up when he felt the defendant's hand down his shorts, fondling D.R.'s penis.  D.R. said he pushed the defendant's hand away and went back to sleep.  Later that night, D.R. woke up again to the defendant's hand down his shorts, on D.R.'s penis again.  D.R. then moved off the bed and slept under the bed the remainder of the night.  This occurred when D.R. was approximately eleven years old.

The defendant was eventually charged in a state court proceeding related to this incident.  A jury found the defendant guilty of this offense.

Acts of child molestation related to L.W.

More recently, another child has disclosed that the defendant had molested him. L.W. is K.W. and S.J.W.'s younger brother.  He reports that beginning when he was approximately 6 years old, the defendant molested him on five or six occasions. He explained that the defendant would frequently give him melatonin when he, along with friends or siblings, stayed over at the defendant's home.  L.W. typically slept on the

couch, but would awake to the defendant carrying him into the defendant's bed. Once there, the defendant would pull down L.W.'s clothes and rub spit from his hand onto L.W.'s butt. The defendant would then put his penis into L.W.'s butt.

Acts of child molestation related to M.S.

Finally, prior to the present allegations, the defendant molested another child. Around Christmas 1989, the defendant was staying at a friend's home. During the night, the defendant entered the room of an eight-year-old boy, identified herein as M.S., living in the home. The defendant picked M.S. up and then took him to the basement. M.S. reported that he thought his grandmother had woken up his mother, because his mother came downstairs and saw him and the defendant in the basement. M.S. explained that the defendant told his mother that they were moving some things around and, after that, M.S.'s mother left the two alone again (a description of events later corroborated by M.S.'s mother).

Once alone, M.S. said that the defendant told him to "shut up" and covered M.S.'s mouth with the defendant's hand. The defendant then laid M.S. on a carpet on his stomach and got on top of him. At that point, M.S. stated that the defendant "stuck his private up [M.S.'s] butt" and "moved around a little." When asked how he knew it was the defendant's private, M.S explained that "it hurt and it was not soft." He also explained that one of the defendant's hands was covering his mouth and the other was visible on the floor when M.S. felt pain in his rectum. M.S. later identified a "private" as a penis.

Sometime later M.S. disclosed to his mother that the defendant had put his private in M.S.'s butt, but M.S.'s mother took no action. M.S. then disclosed to a babysitter what had occurred. The babysitter took M.S. to the hospital to be evaluated

and reported the matter to law enforcement.  After an investigation,  law enforcement interviewed the defendant.  The defendant denied the entire incident, claiming that he was never in the basement with M.S. and did not assault him.  The defendant was then arrested.

The defendant later pled guilty in this matter to sexual assault on a child and initially received a probation sentence.  Ultimately, the defendant admitted to the conduct M.S. described.

## RULE 404(b) EVIDENCE

To the extent it is not *res gestea* evidence or otherwise included in the evidence described above, the government provides notice of its intent to introduce the following evidence pursuant to Federal Rule of Evidence 404(b).

### Use of Sleep Aids

As described above, all, or nearly all, of the children the defendant molested reported that he frequently provided them with sleep aids that made them drowsy. Several other children, who have not reported that the defendant molested them, also have reported that the defendant provided them with sleep aids.  Some children described finding pills or clumps in drinks the defendant gave them.  Others reported receiving melatonin or other medications from the defendant that caused them to become drowsy.  All of the children are consistent in their reports that the defendant frequently gave all of the children in the home something to help them sleep.

### Additional Grooming Behaviors

Many of the children and their families reported conditions and behaviors consistent with grooming of sexual assault victims. The defendant's home was designed to largely cater toward the interests of children, and young boys in particular.

The children reported that there were televisions and gaming consoles in nearly every room of the house.  The defendant also purchased trampolines, dirt bikes, and four-wheelers that were used by the children.  As a result of these items, the defendant frequently had many children at his home.

The defendant would also take the children on fun and exciting trips.  He would frequently suggest that children accompany him on long-distance trucking trips to other states, taking several children to the ocean on one trip.  He also took several children to an amusement park in Denver in a limousine.  Simply put, the defendant's home and the defendant were fun for the children—at least when they were not being molested.  Even the sexual acts the defendant inflicted upon his victims were not without their own associated grooming behaviors.  Indeed, several of the children reported that the defendant would frequently buy them gifts after assaults had occurred.  And that it was common place for the defendant to otherwise shower the children with gifts.

The defendant's grooming behavior was not limited to just the children, the defendant groomed the parents as well.  Many of the parents of the children the defendant molested struggled with substance abuse.  The defendant was aware of this and provided somewhat stable housing, and a seemingly stable environment for their children, while the parents continued to use controlled substances.  The defendant would frequently "help out" these parents by providing money, equipment for repairs, or food.  For most of the families involved, the defendant was a trusted friend or family member, allowing him far greater access to the children he victimized.  Indeed, several of the victims in this matter considered the defendant their primary caregiver during the period of assault.

## RULE 807 EVIDENCE

The government provides notice of its intent to introduce the following evidence pursuant to Federal Rule of Evidence 807

On January 16, 2013, K.W. was forensically interviewed by a detective at the Dolphin House Child Advocacy Center in Montrose, Colorado.  The interview was audio and video recorded and is approximately 33 minutes long.  A transcript of the interview is included with this filing as Exhibit 1.  Should the Court wish, a copy of the recording of the interview can be provided to the Court as well.

During the interview, K.W. and the detective first spent a few minutes discussing television shows and the classes that K.W. likes at school in the 6th grade.  K.W. expressed an understanding of telling the truth and telling lies.  K.W. then told the detective that "Mike touched [him] in the no-no."  K.W. explained that the "no-no" is the "butt."  K.W. told the detective that the "other no-no" is his "penis."

K.W. then went into more detail about the assaults, and told the detective that "Mike touched [him] in the butt . . . the night before he got arrested."  K.W. explained that he was "asleep" in a bed in the semi-truck in Nebraska when this assault happened.  K.W. elaborated that Mike touched him "with his penis" under his pajama pants and that the defendant put "his penis up [K.W.'s] butt" and moved around up against K.W.  The defendant held K.W. "in place so [he] couldn't move" even though K.W. was trying to move away.  K.W. explained that this "hurt . . . badly" and that it hurt for a couple of days.  K.W. said the assault lasted a "couple minutes" and made him "upset and crying at the same time."

K.W. told the detective that the defendant had assaulted him "a lot" of times before, starting when K.W. first started going to the defendant's house.  The assault

began with McFadden's "hand on [K.W.'s] no-no," meaning penis.  K.W. explained that when the defendant touched K.W.'s penis, the defendant held his hand still.  K.W. explained that the incident in the semi-truck was the first time that the defendant had put his penis in K.W.'s anus.

K.W. told the detective that the defendant "was overdosing [him] with pills, to sleep with" and that the defendant gave K.W. pills "every time [he was] there."  K.W. elaborated that the defendant would give K.W. "five to six pills of sleep medicine" every night and they caused K.W. to be "out cold" after three minutes.

K.W. also explained that he knew that the defendant assaulted other boys because he witnessed what he believed to be an assault against his friend, J.W. while J.W. was asleep.  K.W. said that he saw the defendant's "hand jerked from under the blanket" and that the defendant's hand was near where J.W.'s "no-no was."

K.W. told the detective that although the defendant repeatedly assaulted him, K.W. never told anyone because he was "afraid" and "really scared."  K.W. expressed that he was afraid that if he told someone, he would no longer be allowed to go "over there" and see his friend, J.W.

**ARGUMENT**

It is the government's position that any and all acts of child molestation committed upon J.W. and K.W., charged victims in this case, as well as the provision of sleep aids and other grooming behaviors regarding them is *res gestea* evidence.  The Tenth Circuit has explained that res gestae evidence is "part and parcel of the proof of the offense charged in the indictment."  *United States v. Kimball*, 73 F.3d 269, 272 (10th Cir. 1995) (citations omitted).  The Tenth Circuit has approved using res gestae evidence "when it provides the context for the crime, is necessary to a full presentation

of the case, or is appropriate in order to complete the story of the crime on trial by proving its immediate context or the res gestae." *Id.* The conduct described above with regard to the charged victims in this case is inextricably intertwined with the substantive charges in this matter. *United States v. Green*, 175 F.3d 822, 831 (10th Cir. 1999) (direct or intrinsic evidence of the crime charged does not fall within the ambit of Rule 404(b)). Indeed, these victims cannot fully explain the specific instances of assault charged in this matter without providing the context of the ongoing and consistent sexual assaults the defendant inflicted upon them.

In any event, the government hereby provides notice of its intent to admit the evidence of the defendant's molestation of J.W., K.W., I.S., E.S., S.J.W., D.R., L.W., and M.S. during it is case-in-chief at trial. The government submits that all of this evidence is admissible pursuant to Federal Rule of Evidence 414, but also notices this evidence under Federal Rule of Evidence 404(b) in an abundance of caution. In addition, and to the extent such evidence is not considered *res gestea* evidence of the charged offenses and the acts of molestation described above, the government provides notice of its intent to introduce evidence of the defendant's provision of sleep aides to children staying in his home on a frequent basis, and the previously discussed grooming behaviors the defendant engaged in, during the government's case-in-chief at trial.

The government further provides notice of its intent to admit K.W.'s video-taped January 16, 2013, statement regarding the defendant's assaults of him, the description of the sleeping pills the defendant administered to him, and K.W.'s observation of the defendant's assault on J.W.

**A. LEGAL STANDARDS**

In Counts One and Three of the Indictment, the government must prove, among other things, that the defendant crossed a state line with the intent to engage in a sexual act with the victim. 18 U.S.C. § 2241(c). In Counts Two, Four, and Five of the Indictment, the government must prove, among other things, that the defendant transported the victim with the intent that the victim engage in any sexual activity for which any person could be charged with a criminal offense. 18 U.S.C. § 2423(a).

**B. FED. R. EVID. 414**

Rule 414 provides as follows:

> In a criminal case in which the defendant is accused of an offense of child molestation, evidence of the defendant's commission of another offense or offenses of child molestation is admissible, and may be considered for its bearing on any matter to which it is relevant.

Fed. R. Evid. 414. The Tenth Circuit has held that for a prior crime of child molestation to be admissible under this rule, the trial court must determine that: 1) the defendant is accused of an offense of child molestation; 2) the evidence proffered is evidence of the commission of another offense of child molestation; and 3) the evidence is relevant. *United States v. Sturm*, 673 F.3d 1274, 1282 (10th Cir. 2012). All of these factors are met here.

Child molestation means a crime under federal or state law involving 1) any conduct prohibited by 18 U.S.C., Chapter 109A and committed with a child; 2) contact between any part of the defendant's body and a child's genitals or anus; or 3) any attempt to engage in such conduct. Fed. R. Evid. 414(d)(2)(A)-(C). A "child" means a person below the age of 14. Fed R. Evid. 414(d)(1).

The offenses charged in Counts One and Three of the Indictment involve conduct prohibited by 18 U.S.C., Chapter 109A and the victims involved were less than 14.  Counts Two, Four, and Five of the Indictment are federal crimes involving alleged contact between a part of the defendant's body—namely his penis or tongue—and a child's anus, and the victims involved were less than 14.  Thus, the first factor is met.

Similarly, the proffered evidence involves the commission of other offenses of child molestation.  For nearly all of these offenses, the defendant was previously charged and convicted of a state criminal offense.  And all of these prior offenses involves contact or attempted contact between a part of the defendant's body—namely his penis or his hand—and a child's genitals or anus.  Finally, all of the offenses involve victims who were less than 14 at the time of the conduct.  Thus, the second factor is also met.

The last factor is likewise met.  Child molestation evidence may be considered on any matter to which it is relevant.  Fed. R. Evid. 414(a).  The Tenth Circuit stated that in cases involving child molestation, Rule 414 "replaces the restrictive Rule 404(b), which prevents parties from proving their cases through 'character' or 'propensity' evidence." *United States v. Castillo*, 140 F.3d 874, 879 (10th Cir. 1998).  The Tenth Circuit has repeatedly held that evidence of this nature is properly admissible under Rule 414 in child molestation cases.  It has held that Rule 414 allows for evidence of child molestation for any matter to which it is relevant, "including the defendant's 'propensity to commit . . . child molestation offenses, and assessment of the probability or improbability that the defendant has been falsely or mistakenly accused of such an offense.'" *Sturm*, 673 F.3d at 1285, 1287 (quoting 140 Cong. Rec. H8968–01, H8991 (daily ed. Aug. 21, 1994) (statement of Rep. Molinari)); *see also Castillo*, 140 F.3d at

881-82 (explaining that Rule 414 incorporates Congress's view that this evidence is "typically relevant and probative." *Citing* 140 Cong. Rec. S12990 (daily ed. Sept. 20, 1994) (statement of Sen. Dole)).  Rule 414 favors liberal admission of propensity evidence even with the required Rule 403 balancing.  *Id.*; *United States v. Enjady*, 134 F.3d 1427, 1433 (10th Cir. 1998); *United States v. LeCompte*, 131 F.3d 767, 769 (8th Cir. 1997) (noting "the strong legislative judgment that evidence of prior sexual offenses should ordinarily be admissible").

Consequently, in the context of this case, the Rule 414 evidence is highly probative.  As noted, Rule 414 is allowed to prove propensity, this as well as the additional purposes discussed below, render this evidence highly relevant to the crimes charged in this case.  *United States v. Meacham*, 115 F.3d 1488, 1492 (10th Cir. 1997).

### C. FED. R. EVID. 404(b)

"Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."  Fed. R. Evid. 404(b)(1).  However, such evidence may be admissible for other relevant purposes.  Fed. R. Evid. 404(b)(2).  In weighing the admissibility of Rule 404(b) evidence, the Tenth Circuit considers four factors: (1) whether the evidence is offered for a proper purpose, (2) whether the evidence is relevant, (3) whether the probative value of the evidence is substantially outweighed by its prejudicial effect, and (4) whether a limiting instruction is given if the defendant requests it.  *United States v. Parker*, 553 F.3d 1309, 1313-14 (10th Cir. 2009), *citing Huddleston v. United States*, 485 U.S. 681, 691 (1988).  The standard of review is abuse of discretion.  *Parker*, 553 F.3d at 1313.  The standard for admissibility under Rule 404(b) is "permissive: '[I]f the other act evidence is relevant and tends to prove a

material fact other than the defendant's criminal disposition, it is offered for a proper purpose under Rule 404(b) and may be excluded only under Rule 403." *Id.* at 1314, *citing United States v. Tan*, 254 F.3d 1204, 1208 (10th Cir. 2001).

While the government asserts that the evidence regarding other acts of child molestation are either *res gestea* evidence or properly admissible pursuant to Federal Rule of Evidence 414, out of an abundance of caution, the government discloses the evidence involving the children discussed above under Rule 404(b). Such evidence reflects the defendant's sexual interest in minors, his intent, his knowledge, his identity, and his *modus operandi*; in addition it corroborates the descriptions of the charged victims and demonstrates that he did not engage in sexual contact with those children by mistake or accident. *United States v. Meacham*, 115 F.3d 1488, 1494 (10th Cir. 1997) (prior alleged molestations properly admitted to demonstrate intent, plan, and preparation under 404(b)); *United States v. Porter*, 881 F.2d 878, 886 (10th Cir. 1989) (corroborating the testimony of a prosecution witness is a proper purpose under Rule 404(b)).

The evidence that the defendant provided sleep aids to the children demonstrates his motive, opportunity, intent, preparation, and planning with regard to the acts of sexual molestation that he committed on these children. Such evidence will also assist the jury in understanding the difficulty some victims may have in describing the acts in precise detail. The evidence regarding the defendant's grooming behaviors, likewise, demonstrates his motive, opportunity, intent, preparation, and planning.

All of this evidence is relevant independent of any character or propensity inference. Indeed, the evidence demonstrates the defendant's motive, opportunity, intent, preparation, plan, knowledge, *modus operandi*, and lack of mistake or accident

as well as provides corroboration for the charged victims without need to resort to any inference regarding the defendant's character or propensity to commit acts of child molestation.

The evidence is highly probative in nature, and its relevance would not be substantially outweighed by the concerns articulated in Federal Rule of Evidence 403. While there is certainly some risk of "unfair" prejudice, *United States v. Isabella*, 918 F.3d 816, 837 (10th Cir. 2019) ("Unfair prejudice means an undue tendency to suggest a decision on an improper basis, commonly, though not necessarily, an emotional one."), any such concerns can be adequately addressed through the use of an appropriate limiting instruction.

### D. FED. R. EVID. 807

Federal Rule of Evidence 807 provides:

> (a) In General. Under the following conditions, a hearsay statement is not excluded by the rule against hearsay even if the statement is not admissible under a hearsay exception in Rule 803 or 804:
>
> (1) the statement is supported by sufficient guarantees of trustworthiness—after considering the totality of circumstances under which it was made and evidence, if any, corroborating the statement; and
>
> (2) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts.[3]

Courts have held that "[t]he residual hearsay exception is to be used rarely, and only in exceptional circumstances that generally exist when a child sexual abuse victim relates the details of the abusive events to an adult." *United States v. Gallardo*, 970

---

[3] Rule 807 was amended in December 2019. The Committee Notes, however, explain that Rule 807 was "amended to fix a number of problems that the courts have encountered in applying it." The amendment, therefore, does not appear to invalidate the body of pre-2019 caselaw interpreting the Rule.

F.3d 1042, 1046 (8th Cir. 2020); *see also United States v. W.B.*, 452 F.3d 1002, 1005 (8th Cir. 2006) ("[E]xceptional circumstances generally exist when a child victim of sexual abuse is unable or unwilling to testify to a material issue regarding the abuse."). Indeed, the Tenth Circuit has noted that though Rule 807 "should be used only in extraordinary circumstances where the court is satisfied that the evidence offers guarantees of trustworthiness and is material, probative and necessary in the interest of justice . . . courts regularly employ the residual exception in child abuse litigation." *United States v. Harrison*, 296 F.3d 994, 1003 (10th Cir. 2002).

In determining whether hearsay statements made by a child in a sexual assault case are reliable for purposes of Rule 807, the court should consider "the spontaneity of the child's statement, the consistent repetition of the child's allegation, the mental state of the child, the use of terminology unexpected of a child of a similar age, and the lack of a motive to fabricate" as well as the length of time that had passed between the abuse and the statement. *United States v. Tome*, 61 F.3d 1446, 1452-53 (10th Cir. 1995) (discussing admissibility under prior residual hearsay exception Rule 803(24)). In order to admit a child's hearsay statement regarding sexual abuse, the court must consider whether the child "was particularly likely to be telling the truth when the statement was made." *Id.* at 1452.

K.W.'s video-recorded interview meets both requirements of Rule 807. First, K.W.'s video-recorded statements during the forensic interview are supported by sufficient guarantees of trustworthiness. Until recently, when, as described below, K.W. professed to have a lack of memory about the assaults, K.W.'s statements about the assaults have been consistent. Indeed, in the state prosecution in this matter, K.W. testified to the assault in the semi-truck and the local instances of molestation, albeit in

less detail than the forensic interview.[4]   The forensic interview was conducted close in time to the assaults, which ended approximately two weeks prior to the January 16, 2013 interview.   In the interview, K.W. uses terminology consistent with his age, such as "no-no" to describe both his penis and anus.   K.W. also described the abuse with detail, and distinguished between the assault that occurred in the semi-truck with the pattern of abuse that occurred at home.   *See Harrison*, 296 F.3d at 1005 (noting that "specificity and peculiarity" of the child's statement is relevant because "those features in themselves can suggest trustworthiness").   K.W. had no reason at all to fabricate during his forensic interview; rather, he explained that he did not want to have to stop visiting the defendant's home.   And, unlike many of the cases in which courts have introduced hearsay evidence of sexual assault on a child, K.W.'s statements were recorded, so the jury will have an opportunity to observe and evaluate K.W.'s demeanor.

While no one else witnessed the assaults themselves—common in sexual assault cases—K.W.'s statements are corroborated in other ways.   For instance, K.W. describes the sleeping arrangements in the semi-truck during the final assault in Nebraska.   J.W.'s older brother, S.W., corroborates J.W.'s account of the sleeping arrangements and also recalls that he (S.W.) did not wake up during the night.   K.W. also described the home where the defendant assaulted him repeatedly before the final semi-truck trip.   Though K.W. cannot recall the address, he describes the area and the home in some detail.

K.W.'s recorded forensic interview is also more probative as to the assaults than any other available evidence.   In 2018, when K.W. was 17, K.W. was interviewed by the FBI about the abuse by the defendant.   During this interview, which was audio recorded,

---

[4] The forensic interview was introduced as evidence at the state trial.

K.W. claimed that he does not remember a lot because the events in question were "forever ago."  K.W. explained that the defendant gave him melatonin to make him sleep and, occasionally, K.W. would wake up in the defendant's bed and he was "doing what he was doing."  K.W. explained, however, that he does not "remember anything" because he "pretty much shut that thought out of [his head] and locked it away."  K.W. said that the defendant "did something really bad," and explained that the defendant "was just pulling down [his] pants" and "started to do what he was doing."

In the 2018 interview, K.W. recalled that he travelled in the semi-truck with the defendant to places like South Dakota and California.  K.W. recalled being on melatonin during these trips and did not remember if anything happened, though he did state that when "stuff would happen," everyone would be "on the same bed, but it wouldn't be, like, very bad stuff."  K.W. stated that he convinced himself that "this will be fine" because he would get a reward in the morning.  K.W. claimed that, on the last trip around Christmas, he "[doesn't] remember it at all" and "something probably did but . . . a lot of memories has been (inaudible) or forgotten."

On May 3, 2019, K.W. was interviewed again by the FBI and the U.S. Attorney's Office.  In this interview, which was also recorded, K.W. recalled very little about the final truck trip with the defendant.  K.W. explained that he "kind of pushed out a lot of those [trips] from [his] mind."

K.W.'s memory of the abuse—and his willingness to speak about it—was much clearer in 2013 than it is now.  His 2013 forensic interview, which has all the indicia of truthfulness, is more probative than K.W.'s faded memory now.  And because of the secretive nature of the defendant's assault on K.W., there is no other evidence more probative than the 2013 forensic interview.  *See W.B.*, 452 F.3d at 1006 (admitting

video-taped forensic interview of child sexual assault victim under Rule 807 because child victim was "unable or unwilling to recall specific details regarding the abuse during her in-court testimony").

## CONCLUSION

Evidence of the defendant's uncharged acts of child molestation of J.W., K.W., I.S., E.S., S.J.W., D.R., L.W., and M.S. is admissible under Federal Rule of Evidence 414. This evidence is alternatively admissible pursuant to Federal Rule of Evidence 404(b) in relation to all of the crimes with which the defendant is charged. Furthermore, evidence regarding the defendant providing sleep aides to children and his other grooming behaviors is admissible pursuant to Federal Rule of Evidence 404(b). K.W.'s video-recorded January 16, 2013 forensic interview is admissible pursuant to Federal Rule of Evidence 807.

Respectfully submitted,

JASON R. DUNN
United States Attorney

*s/ Jeremy Chaffin*
JEREMY CHAFFIN
Assistant U.S. Attorney
U.S. Attorney's Office
205 North 4th Street, Suite 400
Grand Junction, CO 81501
Tel: (970) 257-7113
Fax: (970) 248-3630
E-mail: jeremy.chaffin@usdoj.gov

*s/ Andrea Surratt*
ANDREA SURRATT
Assistant U.S. Attorney
U.S. Attorney's Office
REST OF BLOCK

Attorneys for Government

## CERTIFICATE OF SERVICE

I hereby certify that on this 2nd day of December, 2020, I electronically filed the foregoing **GOVERNMENT'S NOTICE OF INTENT TO INTRODUCE EVIDENCE PURSUANT TO FEDERAL RULES OF EVIDENCE 414, 404(b), AND 807** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all parties of record.

s/ Cosandra Foster
COSANDRA FOSTER
Paralegal Specialist
U.S. Attorney's Office
205 N. 4th Street, Suite 400
Grand Junction, CO 81501
Telephone (970) 241-3843
Fax (970) 248-3630
E-mail: cosandra.foster@usdoj.gov