1

DISTRICT COURT, COUNTY OF MESA, STATE OF COLORADO

CASE NOS. 2013 CR 000027, 2013 CR 000339, and
2013 CR 000342, DIV. 5

---

REPORTER'S TRANSCRIPT (Motions Hearing)

---

IN THE MATTER OF

THE PEOPLE OF THE STATE OF COLORADO,

    Plaintiff,

v.

MICHAEL TRACY MCFADDEN,

    Defendant.

---

    The above-entitled matter came on for hearing
on Monday, April 28, 2014 at 10:49 a.m. before the
HONORABLE THOMAS DEISTER, District Judge.


APPEARANCES:

FOR THE PLAINTIFF:          DAVID WAITE

FOR THE DEFENDANT:          KARA SMITH
                                  SCOTT BURRILL

ALSO PRESENT:              MICHAEL MCFADDEN
                                  ED PRESCOTT

INV_TRAN_00000785

1          THE COURT:  These are three cases, 13CR27, 339,

2    and 342, all captioned, People v. Michael McFadden.

3          Mr. McFadden is here with counsel, Ms. Smith and

4    Mr. Burrill.  Mr. Waite is here for the People.  I think

5    Detective Prescott is here as an advisory witness.  Ms.

6    Bridges is here as the legal assistant for the D.A.

7          We have a number of motions, and I think they're

8    pretty identical in each case, is that right?

9          MS. SMITH:  Yes.

10          MR. WAITE:  Yeah, for the most part I think that's

11    probably true, Judge.

12          THE COURT:  I know that there is -- actually, just

13    seeing some -- well, there are these in camera review

14    things.  I've already issued an order concerning that.  Have

15    you all received copies of all those documents?

16          MS. SMITH:  I think so, yeah.

17          THE COURT:  That's been accomplished in all three

18    cases.  So you have a preference as to the order in which we

19    do these?  I don't know what witnesses you have available.

20          MR. WAITE:  Well, Judge, I have Detective Prescott

21    here who is going to be talking about the child hearsay

22    motions to introduce child hearsay, and also with respect to

23    the motion to suppress that's been filed in, I believe it's

24    13CR27.

25          So I guess my preference would be to get those

INV_TRAN_00000786

```
 1   items taken care of first.  I think they're going to take a
 2   chunk of time I think probably to get those all the way
 3   through.  I don't know that we're going to get them through
 4   -- I'd be surprised if we get through all the motions today
 5   but we might.  That would be my preference.
 6          THE COURT:  Why don't we get started with -- is
 7   that all right with you all?  Because I know we have -- I
 8   think we have a motion to suppress Mr. McFadden's statements
 9   too?
10          MS. SMITH:  Uh-huh.
11          THE COURT:  So that's -- so we're looking at the
12   13-25-129 motions -- or notices and the suppression motion.
13   Is that right?
14          MR. WAITE:  Yes.
15          THE COURT:  Let's do that.
16          MR. WAITE:  Okay, call Detective Prescott to the
17   stand, please.
18          THE COURT:  Do you swear or affirm, under penalty
19   of law, that the testimony you give here today will be the
20   truth, the whole truth, and nothing but the truth?
21          THE WITNESS:  I do.
22     Whereupon,
23                        ED PRESCOTT
24     was duly sworn.
25          THE COURT:  Please be seated.
```

INV_TRAN_00000787

Exhibit B

4

```
 1              MR. BURRILL:  Your Honor?

 2              THE COURT:  Yes, sir?

 3              MR. BURRILL:  We have a request.  Could we get one

 4   handcuff removed from Mr. McFadden so he can take notes?

 5              THE COURT:  Yes, you may.  That request is

 6   granted.

 7              MR. WAITE:  Are we set?

 8              MS. SMITH:  Yes.

 9              MR. WAITE:  Okay.

10                      DIRECT EXAMINATION

11   BY MR. WAITE:

12      Q.   Good morning.

13      A.   Good morning, sir.

14      Q.   Would you state your name, please, and spell your

15   last name for the record?

16      A.   My name is Ed Prescott; it's P-R-E-S-C-O-T-T.

17      Q.   And how are you employed?

18      A.   I'm employed as a criminal investigator with the

19   Grand Junction Police Department.

20      Q.   And how long have you been so employed?

21      A.   Over 20 years.

22      Q.   And during the course of that is one of your

23   duties to investigate sexual assault on a child cases?

24      A.   Yes, sir, it is.

25      Q.   Did you get involved in investigating a sexual
```

INV_TRAN_00000788

1    assault on a child case involving multiple victims with

2    respect to a defendant by the name of Michael McFadden?

3         A.   Yes, sir, I did.

4         Q.   And in fact I think you spoke with Mr. McFadden at

5    one point, and we'll come back to that, but I think you

6    spoke to him at one point?

7         A.   I did.

8         Q.   Can you identify him in the courtroom by where

9    he's sitting and what he's wearing, please?

10        A.   He's sitting to your left at the counsel's table.

11   He's wearing yellow pants, orange shoes and a brown short

12   sleeve shirt.  He has somewhat of a beard, full beard and

13   short hair, brown hair.

14             MR. WAITE:  Your Honor, I'd ask the record to

15   reflect he has identified the defendant, Mr. McFadden.

16             THE COURT:  The record will so reflect.

17        Q.   (By Mr. Waite)  During the course of investigating

18   these cases, did you have occasion to speak to a number of

19   children about allegations that were being made against Mr.

20   McFadden?

21        A.   I did.

22        Q.   And with respect to each of those, did you do

23   forensic interviews with respect to all of those children?

24        A.   I did.

25        Q.   Let's start with I.S.  Was I.S. one of the

INV_TRAN_00000789

6

1    children that you spoke to?

2         A.   He is.

3         Q.   Is he one of the alleged victims in these cases?

4         A.   He is.

5         Q.   And did you do I think two interviews with the

6    I.S.?

7         A.   I did.

8         Q.   And were those interviews recorded?

9         A.   They were.

10        Q.   Where did you do those interviews?

11        A.   Both interviews with I.S. were at Western Slope

12   Center for Children.

13        Q.   Okay.  And for the record what is -- is Western

14   Slope Center for Children an advocacy center?

15        A.   It is.

16        Q.   And is that a place that's available for law

17   enforcement agencies to sit down with a child and do a

18   recorded forensic interview?

19        A.   That's one of its purposes, yes.

20        Q.   Okay.  And do they have a specific room or several

21   rooms that you could do those interviews in?

22        A.   Yes, they do.

23        Q.   Okay.  And as you indicated with respect to I.S.

24   that you -- those interviews occurred there within the

25   center?

INV_TRAN_00000790

7

1    A.    They did.

2    Q.    Who brought I.S. to the interviews?

3    A.    It would be his grandmother, Diane.

4    Q.    Okay.  Is she his custodian?

5    A.    She is.

6    Q.    Okay.  And when she brings -- she would bring them

7    to the interviews, bring him to the interviews?

8    A.    She did.

9    Q.    And was she inside -- was she in the interview

10   during the time you were talking with I.S.?

11   A.    She was not.

12   Q.    Okay.  Do you have a brief discussion with her

13   prior to going into the interviews?

14   A.    I did.

15   Q.    And did you indicate to her what the purpose of

16   the interviews were?

17   A.    I did.

18   Q.    Was I.S. within earshot of that during the time

19   that you talked to her about that?

20   A.    I actually spoke with Diane over the phone and met

21   with her in person prior to those interviews.  So we set

22   that stage prior to them arriving at Western Slope Center.

23   Q.    Okay.  And when you spoke with her prior to this,

24   I believe she wrote out a statement for you as well as to

25   some of the things that I.S. had been saying?

INV_TRAN_00000791

Exhibit B

8

```
 1        A.    Actually that statement was written out for
 2   Officer Woods.
 3        Q.    Okay.  But one of the officers took a statement
 4   from Ms. ▮▮▮▮▮▮▮ [phonetic]?
 5        A.    Yes, he did.
 6        Q.    Okay.  Going back to I.S.'s interviews, you
 7   indicated that they were both recorded?
 8        A.    Yes, they were.
 9              MR. WAITE:  And, Your Honor, may I approach the
10   witness?
11              THE COURT:  You may.
12        Q.    (By Mr. Waite)  I'd like to show you what has been
13   marked as People's exhibits MH-1 and 2 and ask if you can
14   identify those exhibits, please?
15        A.    MH-1 is the first interview with I.S.  I watched
16   this interview in its entirety on 4-24-14.  MH-2 is the
17   second interview with I.S.  I watched the entire interview
18   on this particular CD or DVD on 4-24-14.
19        Q.    Okay.  When you indicate that you watched those,
20   did you watch those in preparation for this hearing?
21        A.    I did.
22        Q.    To determine whether or not those were accurate
23   recordings of those interviews?
24        A.    That is correct.
25        Q.    And were they in fact accurate recordings of the
```

INV_TRAN_00000792

9

1    interviews?

2         A.   Yes, they were.

3              MR. WAITE:  Your Honor, I would offer People's MH-

4    1 and 2 into evidence at this point.

5              THE COURT:  Any objections?

6              MS. SMITH:  Yes, Your Honor, I am going to object

7    to at least the introduction of one of them.  The district

8    attorney in his notice provides notice of one interview.  He

9    doesn't specify which one, but he doesn't indicate that both

10   interviews, both sets of statements will be attempted to be

11   introduced in his motion on paragraph nine, subsection (b),

12   which addresses I.S.

13             It states that Detective Prescott, statements made

14   to Detective Prescott, a copy of the DVD of the interview

15   will be provided at hearings and a copy of the report

16   summarizing that interview is attached as exhibit A

17   indicating that there is one interview.

18             MR. WAITE:  Well, Judge, first of all, counsel

19   knows that there are two interview.  There have been two

20   interviews in this case forever.  There's no surprise to

21   counsel that there are two different interviews.  We are

22   putting both interviews in because both interviews were done

23   at different times, different recordings, and there is

24   certainly notice that those two interviews exist not only in

25   my pleading but also just in the discovery that's been

INV_TRAN_00000793

1   provided in this case.

2          So I guess I'm a little at a loss as to why we're

3   getting this now especially in light of the fact that the

4   defense had a chance to file a response to this and didn't

5   file any kind of response saying anything about one versus

6   two interviews.

7          THE COURT:  Ms. Smith?

8          MS. SMITH:  I have no followup.

9          THE COURT:  the objection is overruled.  I think

10  what would happen is that the People would then -- if I

11  denied it at this time, they could go back and file a new

12  motion with reasons why it wasn't filed the first time, I

13  probably would grant it.

14         So given the fact that defense has notice of these

15  statements, do you have a copy of the DVD?

16         MS. SMITH:  Yes.

17         THE COURT:  I find that there's no prejudice.

18  Therefore, the objection is overruled and the People may

19  proceed on both of the interviews.

20         MR. WAITE:  And, Judge, then are they admitted at

21  this point?

22         THE COURT:  They are admitted.

23         MR. WAITE:  Thank you, Judge.

24         And, Judge, I apologize to the court.  We're going

25  to leave the court I think with a lot of work after today

INV_TRAN_00000794

11

1    just to watch all of these obviously, but this is necessary,

2    so.

3         Q.    (By Mr. Waite)  Did you also speak with a young

4    man by the name of E.M. as a part of this investigation?

5         A.    Yes, sir, I did.

6         Q.    And did you speak E.M. a couple of different

7    times?

8         A.    Yes, sir, I did.

9         Q.    And were those interviews, were those forensic

10   interviews as well?

11        A.    Yes, sir.

12        Q.    And were those interviews recorded?

13        A.    Yes, sir.

14        Q.    And do you recall where those interviews took

15   place?

16        A.    The first interview with E.M. was held at the

17   Western Slope Center for Children.  The second interview was

18   held at Grand Junction Police Department.

19        Q.    And so did you record both?

20        A.    One is -- yes, both of them are recorded.

21        Q.    Okay.

22             MR. WAITE:  And if I can approach the witness?

23             THE COURT:  Yes.

24        Q.    (By Mr. Waite)  I'm showing you what's been marked

25   as People's exhibits MH-3 and MH-4 and ask you if you can

INV_TRAN_00000795

1    identify what those disks are, please?

2         A.    Do you want the note on the back of this?

3         Q.    Oh, probably not.  I don't know, let's see.

4         A.    MH-3 is my first interview with E.M.  That would

5    have been the interview that was conducted at Western Slope

6    Center for Children.  I watched the entirety of this

7    interview on April 24th, 2014.

8              MH-4 is my second interview with E.M.  It occurred

9    at Grand Junction Police Department.  I watched this entire

10   interview on this DVD on April 24th, 2014.

11        Q.    You watched both of those in preparation for this

12   hearing?

13        A.    I did, sir.

14        Q.    And do both of those recordings accurately reflect

15   the forensic interviews that were done with E.M. on --

16        A.    They do, sir.

17        Q.    -- those two times.  Thank you.

18              MR. WAITE:  I would offer People's MH-3 and 4.

19              THE COURT:  Any objection?

20              MS. SMITH:  No objection.

21              THE COURT:  Both are admitted.

22        Q.    (By Mr. Waite)  Now was there a third interview

23   that was done with E.M. prior to the SANE examination?

24        A.    I met briefly with he and his mother prior to the

25   SANE exam, yes, for clarification of some points he made in

INV_TRAN_00000796

13

1    the interview.

2        Q.    And was he able to clarify some of those points as

3    well?

4        A.    Yes, he was.

5        Q.    Okay.  And was that recorded?

6        A.    Yes, it was.

7        Q.    I'm showing you what's been marked as People's

8    exhibit MH-5.

9            MR. WAITE:  Your Honor, may I approach?

10           THE COURT:  You may.

11       Q.    (By Mr. Waite)  And the same thing with respect to

12   that disk, can you tell us what that is, please?

13       A.    This is a recording that was taken on the day just

14   prior to the SANE exam that was done on E.M.  His mother and

15   he were present at Western Slope Center for Children.  We

16   were actually in a -- not the normal interview room but the

17   downstairs room office, something that was set up for

18   meetings.

19           It is a recording.  I watched the entirety of this

20   recording on April 25th, 2014.

21       Q.    And is that recording an accurate recording of

22   that discussion you had with E.M. at that point?

23       A.    Yes, sir, it is.

24           MR. WAITE:  Your Honor, I'd offer People's MH-5.

25           THE COURT:  Any objection?

INV_TRAN_00000797

1          MS. SMITH:  Yes, I am going to object on this one

2    based on the -- perhaps I should voir dire but I don't

3    believe there's any statements in that interview regarding

4    sexual abuse.  I believe that interview was just like

5    Detective Prescott testified to, clarifications, but that

6    there weren't any disclosures and outcries in that

7    interview.

8          THE COURT:  Mr. Waite?

9          MR. WAITE:  Judge, it's still going to be offered

10   for res gestae.  It could be offered for a number of

11   reasons, but it is still hearsay, and it's statements taken

12   from the child to clarify some points taken out of court and

13   subject I think to 13-25-129 as well.  I don't think the 13-

14   25-129 is limited necessarily to statements that only

15   incorporate allegations of sexual abuse.  I think that it

16   also talks about that the events surrounding that abuse and

17   I think that that's what this does.

18         THE COURT:  I'm going to grant admission.  I will

19   let the defense know that if after my review, there really

20   isn't any statements that would be admissible under the

21   statute, then at that time I will make an appropriate

22   ruling.  But frankly I think you say there's not -- I

23   haven't seen it.  I have to see it in order to make a ruling

24   on that regard.  So I'm going to admit it for that purpose,

25   but I'm not sure Mr. Waite is accurate in indicating that 13-

INV_TRAN_00000798

1    25-129 would allow a statement in that doesn't include

2    statements of abuse.  And so I'll just have to view to see.

3              MR. WAITE:  Okay, Judge, thank you.  So it's been

4    admitted at this point?

5              THE COURT:  It has.

6              MR. WAITE:  Thank you.

7         Q.   (By Mr. Waite)  And as you can see, Detective

8    Prescott, I'm kind of going with the different cases that

9    we've got, but I will ask you about J.W.  Was J.W. also one

10   of the individuals you spoke to and did a forensic interview

11   with?

12        A.   Yes, sir, he was.

13        Q.   Okay.  And where did that interview take place?

14        A.   That interview took place at his, it would be his

15   grandmother's residence in Glade Park.

16        Q.   Okay.  And was that a recorded interview as well?

17        A.   Audio recorded.

18        Q.   Okay.  And when you say his grandmother's, who was

19   present during the course of that interview?

20        A.   During the interview, it was just myself and

21   Detective Stogsdill.  We were in a separate bedroom from the

22   family.

23        Q.   Okay.  Other people were there at the residence?

24        A.   Yes, they were.

25        Q.   Okay.  And do you recall who all was there?

INV_TRAN_00000799

16

```
 1       A.    His mother, Michelle, and her other children.   And
 2   I don't believe the grandmother had arrived during the
 3   course of the interviews.  I think she came later.
 4       Q.    Okay.  You indicated that that interview was
 5   recorded although it was an audio recording?
 6       A.    That is correct.
 7            MR. WAITE:  And if I can approach?
 8            THE COURT:  Yes.
 9       Q.    (By Mr. Waite)  Can you tell us what MH-6 appears
10   to be?
11       A.    MH-6 appears to be a copy of my interview with
12   J.W.  I watched this or listened to this interview in its
13   entirety on a April 25th, 2014.
14       Q.    And did it appear to be an accurate rendition of
15   that interview that you did with J.W. at that point?
16       A.    Yes, sir, it was.
17            MR. WAITE:  Your Honor, I would move for admission
18   of MH-6.
19            THE COURT:  Any objection?
20            MS. SMITH:  No objection.
21            THE COURT:  MH-6 is admitted.
22       Q.    (By Mr. Waite)  Going back briefly to I.S., you
23   indicated you had done and we've already admitted DVD's of
24   interviews with I.S.  During the course of those interviews,
25   did you use diagrams with I.S. to ask him to describe body
```

INV_TRAN_00000800

1   parts and so forth?

2       A.   I did.

3       Q.   And did he also make a drawing with respect to --

4   during the course of one of those interviews with respect to

5   Mr. McFadden's residence and somewhat kind of a general,

6   general drawing?

7       A.   He did.

8       Q.   And did you help him with both of those things in

9   terms of if he would name something, then you would write on

10  the diagram so that most of it -- handwriting on the diagram

11  is yours?

12      A.   That is correct.

13      Q.   I'd like to show you what's been marked as

14  People's MH-8.

15          MR. WAITE:   Your Honor, may I approach?

16          THE COURT:   Yes.

17      Q.   (By Mr. Waite)   Those are two pieces of paper

18  stapled   together.   If you would describe each one both of

19  which comprise MH-8, please.

20      A.   This is the first one is a figure of a young male,

21  school age male and indicating the different body parts:

22  eyes or ears, nose, hands, that type of thing.   It was shown

23  to I.S. and used in my interview with him on December 18th,

24  2012 at Western Slope Center.   The second one is somewhat of

25  a layout as it was given to me by I.S. of the inside or the

INV_TRAN_00000801

18

```
 1   layout of the house at 2980 D-1/2 Road.

 2       Q.   And does that appear to be an accurate copy of the

 3   diagram, those diagrams that were prepared --

 4       A.   Yes, sir.

 5       Q.   -- out of the interviews?

 6            THE COURT:   What was the address again?

 7            THE WITNESS:   2980 D-1/2 Road.

 8            THE COURT:   Thank you.

 9       Q.   Is that 2980 D-1/2 Road is that here in Mesa

10   County, Colorado?

11       A.   It is.

12       Q.   Okay.

13            MR. WAITE:   Your Honor, I'd offer People's exhibit

14   MH-8.

15            THE COURT:   Any objection?

16            MS. SMITH:   No objection.

17            THE COURT:   MH-8 is admitted.

18       Q.   (By Mr. Waite)   As a result of the interviews that

19   you have just described, did you determine that there were

20   other, possibly other victims in these cases?

21       A.   Yes, during those interviews.

22       Q.   And as a result of that, did you speak with

23   another couple of children, S.J.WE. and K.WE.?

24       A.   I did.

25       Q.   And did you record those interviews as well?
```

INV_TRAN_00000802

19

1      A.   I did.

2      Q.   When you spoke with K.WE. and S.J.WE., did you do

3   so individually without the other one there?

4      A.   That is correct.

5      Q.   When you interviewed them, was anybody else

6   involved in the interview besides you and the child?

7      A.   Just myself and the child in the room.

8      Q.   And where did those interviews take place?

9      A.   In Montrose at their advocacy center.  It's called

10   the Dolphin House.

11     Q.   Okay.  Very similar to the Western Slope Center

12   for Children?

13     A.   Somewhat.

14     Q.   Okay.  And did they have the capabilities of

15   recording?

16     A.   Yes.

17     Q.   And so the interviews with S.WE. and with K.WE.

18   were recorded?

19     A.   Yes, sir, they were.

20          MR. WAITE:  Your Honor, may I approach the

21   witness?

22          THE COURT:  Yes.

23     Q.   (By Mr. Waite)  I'm going to show you what's been

24   marked as People's exhibits MH-9 and MH-10 and ask if you

25   can identify each of those by exhibit number and what they

INV_TRAN_00000803

1    are?

2         A.   MH-9 is the interview with S.J.WE.  I watched the

3    entirety of this interview on April 27, 2014.  It is a copy

4    of the original and contains all that the original did.

5              On MH-10 I watched this on April 25th, 2014 with

6    K.WE.  It's a copy of the interview I conducted with him and

7    is a copy of that interview.

8         Q.   Okay.  Do those both appear to be accurate copies

9    of those forensic interviews?

10        A.   Yes, they were.

11        Q.   Okay.

12             MR. WAITE:  Your Honor, I'd ask to admit People's

13   exhibits MH-9 and 10.

14             THE COURT:  Any objection?

15             MS. SMITH:  No objection.

16             THE COURT:  Nine and 10 are admitted.

17        Q.   (By Mr. Waite)  During the course of those

18   interviews, Detective Prescott, did S.J.WE. identify body

19   parts and put together a drawing as part of that?

20        A.   She did.

21             THE COURT:  Which child or just another child?

22             MR. WAITE:  This is J.WE. or S.J.WE.

23             THE COURT:  So this is S.J.W.?

24             THE WITNESS:  Yes.

25             THE COURT:  Okay.

INV_TRAN_00000804

21

1          MR. WAITE:  And if I could approach, I would show

2    you what's marked as People's exhibits MH-11 and 12.

3          MS. SMITH:  Okay.

4      Q.   (By Mr. Waite)  Starting with 11, can you tell us

5    what MH-11 is, please?

6      A.   MH-11 is a drawing of a school age girl.  It again

7    indicates the body parts as I would ask them to her, and she

8    would name them, giving the names that she used and then

9    places that she marked where people shouldn't touch her, she

10   marked with an X.  It is a copy of the original.

11         MH-12 is a copy of a diagram that S.J.WE. drew

12   with help of the residence, the McFadden residence at -- or

13   the residence at 2980 D-1/2 Road.

14     Q.   Okay.  When you say "drew with help," what does

15   that mean?

16     A.   Well, I believe I drew the outside box and she put

17   in the smaller boxes as to where different rooms were

18   located.  And the rooms aren't annotated on there.  They're

19   just blocks.

20     Q.   They're just kind of blocks and there's really --

21   they're not to scale --

22     A.   Yeah.

23     Q.   -- or anything?

24     A.   That is correct.

25     Q.   Okay.  Are those accurate copies of those

INV_TRAN_00000805

1    documents?

2         A.    They are.

3               MR. WAITE:   Your Honor, I'd ask to admit People's

4    exhibits MH-11 and 12.

5               MS. SMITH:   No objection.

6               THE COURT:   People's exhibits MH-11 and 12 are

7    admitted.

8         Q.    And during the course of K.WE.'s interview, did

9    K.WE. also make a kind of a drawing I guess if you will

10   regarding some of the things that you guys were talking

11   about?

12        A.    He did.

13              MR. WAITE:   I'd like to show you what's been

14   marked as People's exhibit MH-13.

15              MS. SMITH:   Okay.

16        Q.    (By Mr. Waite)   What is MH-13?

17        A.    It's not a very clear copy.   It's a copy of the

18   drawing that K.W. did while we were together talking.   And

19   this is actually what it is is a copy of the layout of

20   Michael McFadden's bedroom and the positions on the bed, I

21   believe.

22        Q.    Okay.   And as you indicated, it's not a very good

23   copy of this drawing?

24        A.    No.   No, it's not real clear.

25        Q.    Is it an accurate copy though despite the fact

INV_TRAN_00000806

23

```
 1   that it's a little unclear?

 2       A.   That's correct.

 3            MR. WAITE:  Your Honor, I would ask to admit

 4   People's MH-13.

 5            MS. SMITH:  No objection.

 6            THE COURT:  It's admitted.

 7       Q.   (By Mr. Waite)  As a part of this investigation as

 8   the investigation progressed, did you also talk with another

 9   young man who was an alleged victim of Mr. McFadden by the

10   name of D.R.?

11       A.   I did.

12       Q.   How did you come across D.R.'s name; do you

13   recall?

14       A.   Yes, I do.  The Hawkenberry's, John and Phyllis

15   Hawkenberry lived at the residence at four -- yeah -- it's

16   on Glenn Road, on the corner of Glenn and Gunnison, the

17   northeast corner of that intersection.  They lived there

18   with Michael McFadden.  During my interviews with them, they

19   identified D.R. as a subject that had visited the house on

20   numerous occasions, a friend of their young son, S.H.

21            And I then called D.R.'s mom, Leslie

22   [phonetic] and spoke with her.  She agreed to meet with me

23   with her son, and I did interview D.R.  That's 467 Glenn

24   Road.

25       Q.   And so you interviewed D.R.?
```

INV_TRAN_00000807

24

```
1        A.   I did.

2        Q.   And was that interview also recorded?

3        A.   That interview was recorded.  It was conducted at

4   the Grand Junction Police Department.  It was not a forensic

5   interview.

6        Q.   Okay.  So that interview was more of a what?  Well

7   how would you describe that interview?

8        A.   Just one on -- well his mom was present during the

9   interview and just a normal interview.

10       Q.   Okay.  And did Mr. D.R. or how old is D.R.?

11       A.   He was, I think he was 15 at the time I did the

12   interview, 15 or 16.

13       Q.   And was he able to relate -- do you know how old

14   he was?

15       A.   I believe he was 15 --

16       Q.   Okay.

17       A.   -- at the time of the interview.

18       Q.   Okay.  And was he able to relate to you during the

19   course of that interview some allegations and things that

20   had happened to him at the hands of Michael McFadden?

21       A.   He did.

22       Q.   You said that interview was recorded?

23       A.   Yes, sir, it was.

24       Q.   I'm showing you what's been marked as People's

25   exhibit MH-14.  Can you tell me what that disk is?
```

INV_TRAN_00000808

25

```
 1        A.    This is a DVD copy of my interview with D.R. in
 2    its entirety conducted at the Grand Junction Police
 3    Department.   I watched this interview through its entirety
 4    on this DVD or CD on April 25th, 2014.
 5        Q.    And is that an accurate copy of that interview
 6    that took place?
 7        A.    Yes, sir, it is.
 8             MR. WAITE:   Your Honor, I'd ask to admit People's
 9    exhibit MH-14.
10             MS. SMITH:   No objection.
11             THE COURT:   It's admitted.
12        Q.    (By Mr. Waite)  And during the course of his
13    interview with you, did D.R. also make some drawings of kind
14    of a description of the Glenn Road address there as well as
15    a description of Mr. McFadden's bedroom?
16        A.    He did.
17             MR. WAITE:   And if I could approach the witness,
18    Your Honor?
19             THE COURT:   You may.
20        Q.    (By Mr. Waite)  That exhibit consists of two
21    pieces of paper.   If you could describe each for us, please?
22        A.    It's marked MH-15.   The top page is a layout of
23    the room at the Glenn Road address, and the position on the
24    bed that they would have been sleeping or laying according
25    to D.R.
```

INV_TRAN_00000809

```
 1            The second one is a map.  I actually drew the map
 2    based on D.R.'s description on how to get to the residence.
 3    He didn't know the address, but he knew how to get there
 4    from North Avenue.
 5         Q.   And are those accurate copies of the diagrams that
 6    D.R. prepared the day you were interviewing him?
 7         A.   That both he and I prepared, yes.
 8         Q.   Yes.
 9              MR. WAITE:  I would offer to admit People's 15.
10              MS. SMITH:  No objection.
11              THE COURT:  It's admitted.
12              MR. WAITE:  Judge, those are all of the DVD's and
13    all of the child hearsay interviews that were done by
14    Detective Prescott.  What I can indicate to the court is
15    that they are also attached to my motions, SANE reports that
16    were prepared either by SANE nurses or in a couple of cases
17    doctors who had examined the two WE. children.  Those are
18    attached to motions as offers of proof.
19              We would ask to proceed in that manner with
20    respect to those documents.  That includes statements by
21    Diane          and then the court will see that those are
22    attached to my motion.
23              With respect to I.S. the SANE report is attached.
24    With respect to E.M. the SANE report from Cheryl Roy is
25    attached.  With respect to J.WR. the SANE interview with Sue
```

INV_TRAN_00000810

```
 1   Goebel is attached.  With respect to K.WE. a Dr. Greg
 2   Souchen [phonetic] saw him and those medical reports are
 3   attached.  With respect to S.J.WE., Dr. Mary Rader saw her
 4   and those reports are attached as well, and I would ask to
 5   proceed with those as offers of proof.
 6          And with that I don't know if the court wants me
 7   since Detective Prescott's already on the stand, we could
 8   launch into the motion to suppress or we could simply deal
 9   with these separately.  I don't know how the court or
10   counsel wants to proceed.
11          THE COURT:  Well let me find out if the defense is
12   willing to accept the documents attached to the motion as
13   offers of proof concerning the statements made by the SANE
14   examiners and Diane ▮▮▮▮▮▮
15          MS. SMITH:  Not Diane ▮▮▮▮▮▮.  [inaudible]
16          MR. WAITE:  I'm sorry?
17          MS. SMITH:  What about Diane ▮▮▮▮▮▮ [inaudible]
18          MR. WAITE:  No, I -- well [inaudible].
19          MS. SMITH:  Your Honor, I do object by proceeding
20   to -- by offer of proof.
21          First of all, in terms of the SANE exams, those
22   aren't -- the interviews done as a part of the SANE is not
23   recorded.  There is no way for the court or the defense to
24   evaluate the factors that need to be found by People versus
25   District Court just from the offer of proof, just from the
```

INV_TRAN_00000811

1    paperwork.

2           Two of the reports -- what's a little bit

3    confusing is three of the children, the children in 13-CR-

4    27, were evaluated by SANE's who I think the court is

5    relatively familiar with here in Grand Junction at Western

6    Slope Center for Children.

7           The WE. kids were evaluated by I think essentially

8    doctors.  I don't think they're actually SANE's in Montrose

9    and did not -- they particularly do not document in really

10   any way their conversation what was asked, what was said in

11   response.  It's more of a medical report.

12          So there is no way to gather again from just the

13   offer of proof from just those reports the factors that the

14   court has to find to make a reliability determination

15   pursuant to People versus District Court, the El Paso

16   factors as they're colloquially known.

17          But likewise even with the SANE exams that were

18   done here, again there's just not any information about how

19   those were conducted, how the questions -- I think some of

20   the nurses do put a mini-transcript in their report, but

21   there's also a lot of information that is gleaned in those

22   interviews that those nurses don't document how it was found

23   out.  And so we would object to the offer of proof on that.

24          Likewise --

25          THE COURT:  I think if you object to the offer of

INV_TRAN_00000812

1    proof, we're going to have to hear the witnesses.

2               MS. SMITH:  Oh, okay.  Okay, I didn't know that.

3               THE COURT:  And so the offer of proof has not been

4    accepted, and so we're going to have to go through each of

5    those witnesses to get the statements in.

6               MR. WAITE:  Okay, well, Judge, we'll --

7               THE COURT:  And I know that means we're going to

8    have to reschedule.

9               MR. WAITE:  Yeah, it does.  Yeah, we've done that

10   that way before so I plan on going that way again obviously

11   then.  So with respect to the motion to suppress, do we want

12   to go forward with that?

13              THE COURT:  Sure, let's go ahead and do that.

14        Q.    (By Mr. Waite)  As part of your investigation,

15   Detective Prescott, did you also speak with Michael McFadden

16   in this case?

17        A.    Yes, sir, I did.

18        Q.    And can you recall kind of the circumstances

19   surrounding your interview with Mr. McFadden?

20        A.    After my interview with I.S. and then I met with

21   L.WE. briefly at his -- actually I met with L.WE. at his

22   school.

23              And then I called Michael McFadden that afternoon.

24   I requested to meet with him.  We actually met I believe it

25   was the next day, and he met me at the Grand Junction Police

INV_TRAN_00000813

30

 1    Department.  He came in of his own free will, and I

 2    conducted an interview with him.

 3           During that interview, we also conducted a CVSA on

 4    him.  Sergeant Ancell was in the interview with me on that.

 5       Q.   Okay.  Do he came down to the Grand Junction

 6    Police Department to do the interview?

 7       A.   He did.

 8       Q.   Came down there on his own?

 9       A.   He did.

10       Q.   When he got there, did you meet him at the door?

11    How does he get into the facility?

12       A.   He came to the front door.  I was called down from

13    my office.  I came downstairs, escorted him up to the

14    interview room which is upstairs at the other end of the

15    building by my office.  We conducted the interview from that

16    point on.

17       Q.   Okay.  Was he in cuffs?

18       A.   He was not.

19       Q.   Was he under arrest?

20       A.   He was not.

21       Q.   Did you do anything to place him into custody or

22    to restrict his movements?

23       A.   No, sir, I did not.

24       Q.   Okay.  Was the interview recorded?

25       A.   It was.

INV_TRAN_00000814

Exhibit B

31

```
 1      Q.   Okay.  During the course of the interview did you
 2   Mirandize Mr. McFadden?
 3      A.   He was not in custody; I did not need to Mirandize
 4   him.
 5      Q.   Okay.  And was he informed of the fact that he
 6   wasn't in custody?
 7      A.   He was told that -- I believe one of the
 8   statements I made to him and not word for word, that the
 9   door wasn't locked.  He was here of his own free will.  And
10   then later on I told him that I'd try to get him out of here
11   as soon as I could.  He was not detained, not in custody.
12      Q.   Okay.  I'm going to show you what's been marked as
13   People's MH-7.  Can you tell us what that is?
14      A.   MH-7 is a copy of my interview with Michael
15   McFadden.  I watched this interview on this DVD in its
16   entirely on April 25th, 2014.
17      Q.   Okay.  And did that appear to be an accurate
18   recording of the interview with Mr. McFadden?
19      A.   Yes, sir, it did.
20      Q.   Is there any part of the interview that took place
21   outside of what's recorded on that disk?  In other words,
22   did the whole interview get recorded?
23      A.   Yes, it did.
24      Q.   Okay.  Did you do any interviewing or anything
25   else with respect to escorting him from the front door up to
```

INV_TRAN_00000815

1    the place where he was going to be interviewed?

2        A.   No.  Small talk, I believe he was driving a truck

3    at the time.  And we talked about that.  He's a mechanic

4    also working on -- some type of work on our vehicles we

5    discussed that as we were walking up.

6        Q.   As you were walking up.  And then once the

7    interview was done, was he free to leave; did he leave?

8        A.   He was.  During the interview, I mentioned earlier

9    we conducted a CVSA.  I asked him if he would be willing to

10   stick around to do that.  He voluntarily stuck around,

11   agreed to stay and complete that.

12       Q.   Okay.  What is a CVSA?

13       A.   Computerized Voice Stress Analysis.  Instead of

14   the polygraph, we conduct CVSA's at the Grand Junction

15   Police Department.

16       Q.   Okay.  Who conducts that test?

17       A.   In this course, Sergeant Ancell did.

18       Q.   Okay.  And you indicated that Sergeant Ancell was

19   there during the course of the interview with Mr. McFadden

20   with you?

21       A.   From that point, yes.  I conducted the first part

22   of the interview alone.

23       Q.   Okay.  Was the CVSA part, is it recorded as well?

24       A.   Yes, it is.

25       Q.   Okay.  And you indicated that was an accurate

INV_TRAN_00000816

33

1    recording?

2         A.    It is.

3               MR. WAITE:   Your Honor, I'd ask to admit People's

4    MH-7.

5               MS. SMITH:   No objection.

6               THE COURT:   Exhibit 7's admitted.

7               MR. WAITE:   And, Judge, at this time I don't have

8    any other questions for Detective Prescott.

9               THE COURT:   Ms. Smith?

10              MS. SMITH:   Yes, thank you.

11                        CROSS-EXAMINATION

12       BY MS. SMITH:

13        Q.    Detective Prescott, as a part of your

14   investigation in these cases, you spoke with numerous

15   children?

16        A.    That is correct.

17        Q.    And some of those children you spoke to more than

18   one time?

19        A.    That is correct.

20        Q.    So I just want to begin by clarifying all of the

21   interviews that you conducted.  Starting with I.S., you

22   indicated I think that you first spoke with him December

23   18th of 2012?

24        A.    That would be correct.

25        Q.    And then again March 21st of 2013?

INV_TRAN_00000817

34

1      A.    That is correct.

2      Q.    And in terms of J.WR. he was first interviewed by

3   Nickie Surrad [phonetic] on December 21st, 2012?

4      A.    I believe that date's correct.  I'm not positive.

5   But Nickie Surrad was the first one that contacted him.

6      Q.    Okay.  And you reviewed her report from that

7   interview; right?

8      A.    I actually contacted her later.  I wasn't aware

9   that J.WR. was actually at the PD that day.  And I spoke

10  with her later to find out what J.WR. had actually told her.

11  So in reviewing her report, I can't testify to that.  I

12  believe our phone conversation that he made no admissions at

13  that point and no disclosures.

14     Q.    Okay.  So the information you gathered about that

15  interview was from speaking with Ms. Surrad on phone?

16     A.    That's correct.

17     Q.    And then J.WR. was re-interviewed by you and

18  Detective Stogsdill on February 7th at his grandparents'

19  home?

20     A.    That is correct.

21     Q.    And then in regard to E.M., E.M. was interviewed

22  December 21st, 2013?

23     A.    The first time I believe that's correct.

24     Q.    And that was by you; right?

25     A.    That is correct.

INV_TRAN_00000818

```
 1        Q.   And then you interviewed him again January 2nd,

 2   2013?

 3        A.   When he came to the PD, yes.

 4             THE COURT:  Excuse me, I think you said that E.M.

 5   was interviewed first on December 21st in 2013?

 6             MS. SMITH:  Oh, yeah that would be 2012.

 7             THE WITNESS:  2012.

 8             THE COURT:  Oh, `12, yeah.

 9             MS. SMITH:  I'm sorry.

10             THE COURT:  And then the second one was in

11   January, January 2nd of `13?

12             MS. SMITH:  Correct, yeah.

13             THE WITNESS:  That's correct.

14             THE COURT:  All right, thank you.

15        Q.   (By Ms. Smith)  And then again you spoke with E.M.

16   and his mother, Crystal McFadden January 8th, 2013?

17        A.   When he came in for the SANE, yes.

18        Q.   Then you went on to speak to the two WE. children?

19        A.   That is correct.

20        Q.   And then you also spoke with D.R.?

21        A.   That is correct.

22        Q.   And you spoke with other children in this case

23   that you suspected might be victims of sexual assault as

24   well; right?

25        A.   I did.
```

INV_TRAN_00000819

1      Q.   And you -- for example, you spoke with L.WE.;

2   right?

3      A.   That is correct.

4      Q.   And L.WE. is J.WR.'s brother?

5      A.   That is correct.

6      Q.   And you interviewed him twice; correct?

7      A.   That is correct.

8      Q.   And he never made any disclosures?

9      A.   At that point no.

10     Q.   And likewise there's a child by the name of D.O.?

11     A.   That's correct.

12     Q.   And he is E.M.'s half brother?

13     A.   Correct.

14     Q.   And he -- you interviewed him on January 2nd,

15   2013?

16     A.   That is correct.

17     Q.   And he made no disclosure; right?

18     A.   That is correct.

19     Q.   Then there was a young man by the name of T.M.

20   that you spoke to?

21     A.   I did.

22     Q.   And you spoke to him in April of 2013?

23     A.   That sounds correct.

24     Q.   Oh, about a year ago?

25     A.   Yes.

INV_TRAN_00000820

37

```
 1      Q.    And he made no disclosures as well?

 2      A.    That is correct.

 3      Q.    And you had mentioned the        ███████ again.

 4   They have a son who is S.H.?

 5      A.    That is correct.

 6      Q.    And you talked to John █████████ the father;

 7   right?

 8      A.    I actually talked to him and Phyllis.

 9      Q.    Okay.  And they indicated that S.H. had made no

10   disclosure to them?

11      A.    That is correct.

12      Q.    How come you didn't interview S.H. individually?

13      A.    I don't know that I had the need for it at that

14   point.

15      Q.    Okay, because you had spoken to his parents?

16      A.    Right.

17      Q.    And then there's a third young WE. child; right?

18      A.    L.WE., little L.WE.

19      Q.    Yes.  And you interviewed him at the Dolphin House

20   on January 16th of `13 as well?

21      A.    I don't know that I'd call it an interview, an

22   attempt.

23      Q.    Okay.  Why was it only an attempt?

24      A.    He's very young and very talkative but not about

25   what I needed to discuss.  So there wasn't any useful
```

INV_TRAN_00000821

38

1   information.

2       Q.   Okay.  And he made -- in the course of the

3   interview for whatever reason, he made no disclosure?

4       A.   That is correct.

5       Q.   L.WE. and J.WR. have two sisters; right or one

6   sister?

7       A.   They have two, I believe.  Is it ████████ and ██████

8   I think.

9       Q.   And is ████████ a child?

10      A.   She's an adult now.

11      Q.   Okay.  But ██████ is a child; right?

12      A.   Yes.

13      Q.   And you didn't interview ██████

14      A.   I did not.  And I could have the name mixed up,

15   because I know there's two young girls.

16      Q.   What about ████████?

17      A.   Crystal's daughter, ████████ is who I meant, not

18   ████████

19      Q.   Oh, okay, ████████.

20      A.   Yeah.

21      Q.   So there's three young girls; right: ██████, ████████

22   and ████████?

23      A.   Well ████████ not a young girl.  She was an older

24   teenager --

25      Q.   Oh, okay.

INV_TRAN_00000822

39

```
 1      A.   -- at the time.
 2      Q.   So there's ▮▮▮ and ▮▮▮▮▮▮ right?
 3      A.   That's correct.
 4      Q.   And you knew from your investigation that they
 5   also had some contact with Mr. McFadden?
 6      A.   They lived in the same house.
 7      Q.   And you didn't interview them; right?
 8      A.   At this point, no.
 9      Q.   Okay.  Now you indicated that some of the
10   interviews were what's called forensic interviews; right?
11      A.   Correct.
12      Q.   And what does that mean?
13      A.   A forensic interview is where the investigator is
14   trained to interview and not to lead or mislead a child and
15   draw information out from them and not introduce information
16   to them.
17      Q.   And you mentioned it's an interview where the
18   interviewer is trained.  Have you undergone such training?
19      A.   Yes.  I attended Corner House in I believe it was
20   in the summer of 2010.
21      Q.   And was that your first forensic interview
22   training?
23      A.   Yes, it was.
24      Q.   Was it your last?
25      A.   I've been through other training.  As far as the
```

INV_TRAN_00000823

1  forensic interview training, we do peer reviews, so if you

2  want to consider that part of the forensic interview

3  training.  So that was my -- the major training.  That was

4  where I went through the full interview process training.

5      Q.   Okay.

6      A.   But the rest of it's just educational for upkeep.

7      Q.   Okay.  And does Corner House keep you updated on

8  evolving protocols and research?

9      A.   They do.

10     Q.   And was the summer 2010 training a week long?

11     A.   It was.

12     Q.   When was the last time you got an update from

13  Corner House on training?

14     A.   They come periodically.  The major one I can't

15  tell you the exact dates.  I know there was one that came

16  out recently where they revamped their training and changed

17  their protocols.  But that was after these interviews.

18     Q.   Okay.  Do you recall was there an update after

19  your 2010 training but before the interviews in this case?

20     A.   I couldn't tell you that.

21     Q.   And are these updates via email?

22     A.   They are.

23     Q.   And does the Corner House forensic interviewing

24  training trains on a specific protocol; right?

25     A.   They do.

INV_TRAN_00000824

41

1    Q.   And what is that protocol called?

2    A.   It's called RATAC.  It's abbreviations, or if you

3    want for Report Building is the R.  The A is for Anatomy.

4    And the T for Touch Scenario and then the other A for the

5    Abuse scenario and then the Closure.

6    Q.   And so each of those letters stand for a certain

7    stage in the protocol?

8    A.   They do.

9    Q.   And there's a few what are called guiding

10   principles to the Corner House protocol.  Are you familiar

11   with those?

12   A.   Somewhat.  I couldn't tell that to you right now.

13   Q.   Do you recall that one of them is to be person

14   centered?

15   A.   Okay.

16   Q.   Okay, you don't quite recall.  Would it refresh

17   your recollection to look at their guiding principles?

18   A.   It might.

19   Q.   Okay.

20        MS. SMITH:  May I approach the witness?

21        THE COURT:  You may.

22   Q.   (By Ms. Smith)  Okay, so did you -- you just got

23   done reviewing the guiding principles of the Corner House

24   protocol?

25   A.   I did.

INV_TRAN_00000825

42

1    Q.   And did these seem familiar to you on what you've

2  been trained on?

3    A.   They were.

4    Q.   And one of them is to afford the individual an

5  opportunity to communicate about their experience in their

6  own way?

7    A.   You want them to somewhat discuss it in a

8  narrative if at all possible.

9    Q.   Okay.

10   A.   That doesn't always happen.  Sometimes kids won't

11 talk in the narrative form, and you have to prompt them with

12 questions.

13   Q.   And then when that's necessary to prompt the

14 child, another principle is then to revert back to the open-

15 ended questions as soon as possible.

16   A.   As much as possible, yes.

17   Q.   And a lot of that has to do with where the child

18 is at developmentally; right?

19   A.   It does.

20   Q.   And verbally?

21   A.   And verbally.

22   Q.   And cognitively?

23   A.   Correct.

24   Q.   And another principle is to have an unbiased

25 perspective; right?

INV_TRAN_00000826

1      A.    As much as possible.

2      Q.    And what does that mean?

3      A.    Some things are obvious; some things aren't.

4      Q.    And so when things are obvious, then you can

5   change your bias?

6      A.    As a criminal investigator, when there is evidence

7   that a person's involved in something, you want to remain

8   unbiased in the child's perspective as far as possible, but

9   there are sometimes that questions come out that you're

10  attempting to get information from the child to support or

11  that may develop evidence you've already got from other

12  interviews.

13     Q.    Okay.  So let me make sure I understand is it that

14  as you're investigating a case and there's more and more

15  evidence, then you might start to have a bias or have a

16  decision about what might have happened?

17     A.    In my mind.

18     Q.    Okay.

19     A.    I'm human.

20     Q.    And is the idea then that you not communicate that

21  bias to the child?

22     A.    As much as possible, yes.

23     Q.    Okay.  But again you're human; right?

24     A.    Uh huh.  That's correct.

25           THE COURT:  It's an admission.  We finally find

INV_TRAN_00000827

1   out it to be true.

2       Q.   Okay.  And I think you already touched on this a

3   little bit, but definitely part of the protocol is to use as

4   few -- to not be leading; right?

5       A.   And that is correct.  That is probably the most

6   important, one of the most important.

7       Q.   And what does that mean?

8       A.   It means that the child gives you the answers.

9   You do not give them the answers in your questions.  You're

10  eliciting the information to flow directly from them and not

11  from your bias or from foreknowledge of events that took

12  place.

13      Q.   Okay.  And then another big principle is to not be

14  suggestive; right?

15      A.   That is correct.

16      Q.   And what does that mean?

17      A.   Kind of the same thing in your leading.  When

18  you're asking a question, you're not trying to suggest an

19  answer.  There are -- that would lead the child to answer a

20  question.

21      Q.   And what are some of the techniques that you're

22  trained on to do to conduct a non-leading, non-suggestive

23  interview?

24      A.   The narrative form is one where the open-ended

25  questions, the multiple choice, sometimes you can't get them

INV_TRAN_00000828

45

1    to conduct a narrative where they free flow with

2    information.  You've got to ask in multiple answers or try

3    to get them to choose the most correct answer.

4            The questions, when you close the question, you

5    want them "tell me more" to try to get them to answer

6    further about a particular topic or subject they might have

7    mentioned.  So you're continually trying to elicit the

8    information from them.

9        Q.   So when you have to give a multiple choice

10   question -- let me start over.  Sometimes if the child is --

11   if you're not being able to elicit a free narrative,

12   sometimes you have to provide the child with a multiple

13   choice question?

14       A.   Correct.

15       Q.   And in these interviews with these children, you

16   did have to sometimes provide multiple choice questions?

17       A.   I actually use that probably quite frequently.

18       Q.   And how come that is?

19       A.   Especially with the younger children, just a

20   simple fact of over and under, you know, was the ball on top

21   of the table or under the table.  You've got to give them a

22   choice for them to answer a simple question a lot of times.

23       Q.   And with these -- when you were using the multiple

24   choice questions in your interviews, did you do any testing

25   to make sure that the child wasn't just going with the first

INV_TRAN_00000829

1    thing in the list?

2         A.   I don't know about the testing as you're referring

3    to it, but when I ask them a multiple choice question, a lot

4    of times I like to know ahead of time what the answer is and

5    know that they are going to give a correct answer.  You

6    could ask a rather young child "did it happen in the house,

7    a hotel or a church."   You know you're giving them three

8    opportunities in what's the logical one and see if they

9    choose the logical one.

10        Q.   Okay, so that's the sort of test for accuracy you

11   do is that --

12        A.   Well the common sense answer you know I try to,

13   depending on their age level.  The older they are the less

14   you have to do that, the more free narrative you get from

15   the child normally.

16        Q.   At your Corner House training, were you trained in

17   doing any testing of alternate hypotheses or ruling out

18   alternate

19   explanations for why the child is making accusations?

20        A.   You want to determine whether they have been

21   coached.  You're watching for that during your interview to

22   see if there is any coaching going on that the conversation

23   that they're having with you is free flowing and not

24   something that has been ingrained in them.  That it is not

25   something that a parent has introduced to them.

INV_TRAN_00000830

1         Was there anybody else involved in this case.

2    They named a particular individual, Michael McFadden, having

3    known him by face and by name, having been associated to

4    him.  So in these interviews it was pretty much singled out

5    who the perpetrator was, alleged to be and actually what

6    took place.

7         Q.   Okay.  In the RATAC protocol there's not

8    necessarily a phase for determining whether the child can

9    tell the difference between a truth and a lie; right?

10        A.   There is somewhat.  You want to determine that's

11   part of my questioning in the beginning of my talk with most

12   of the children.  We discuss things that are real and things

13   that aren't.  We agree to talk about only things that are

14   real and sometimes that comes up such as in S.J.WE.'s

15   interview she mentioned being four years old and I talked to

16   her later and questioned her about that, and she says I was

17   just joking or that wasn't real rather.

18        We also discuss truth and a lie.  I try to discuss

19   with each one of them being honest and what the difference

20   is between the truth and a lie so it's something that, yes,

21   I use.

22        Q.   And in determining if they know the difference

23   between the truth and a lie, it seems that you use maybe

24   what color somebody's wearing or what color the wall is,

25   things like this; right?

INV_TRAN_00000831

48

```
 1        A.    Similar things, yes.

 2        Q.    And how in -- and then if you say if you're

 3   wearing a blue shirt and you say -- if I said I was wearing

 4   a red shirt, would that be a truth or a lie, and the child

 5   says "lie," how do you test for the element of deceit in

 6   there?

 7        A.    I'm sorry?

 8        Q.    Well what I'm saying, let me step back.  Wouldn't

 9   you say that a lie has an element of deceit in it?

10        A.    Maybe I don't understand your question.  Obviously

11   a lie has an element of deceit, but what -- I don't know

12   what you're getting at.

13        Q.    So then how do you test for the child knowing --

14   it seems like you're definitely doing a lot of testing about

15   whether the child can perceive reality accurately; right?

16        A.    Uh huh.  That is correct.

17        Q.    And so then how do you do the additional test to

18   see if they really know what a lie is?

19        A.    You mentioned the color of the shirt.  I asked him

20   if were to say to you that your mother's name is Betty when

21   it's really not Betty, is that the truth or a lie, and they

22   would tell me that's a lie.

23              In the case of the WE.'s it was minus seven when

24   they went to work that morning, you know, and it was a sunny

25   day.  I asked them if it was snowing outside.  Or if I told
```

INV_TRAN_00000832

49

```
 1    them it was snowing outside right now, is that a truth or a
 2    lie, and they would tell me -- they told me that was not the
 3    truth; that was a lie, because it was in fact a bright,
 4    sunny day.
 5              So I'm looking for I guess to answer your question
 6    is I'm looking for deception in their statements.  If I feel
 7    that they were being deceptive to me, I would probably
 8    question them further about the answer to their questions.
 9        Q.   Okay.  Because would you agree that if you're
10    saying what the weather is and you're misstating what the
11    weather is, that could just as easily that you're mistaken
12    rather than you're actually lying?
13        A.   Either/or.
14        Q.   Okay.  So that weather description, a misstatement
15    of the weather doesn't necessarily test for the deceit
16    element; would you agree?
17        A.   It depends on how I phrased it.
18        Q.   Okay.
19        A.   If I told you the weather was it was storming
20    outside and it was a sunny day and I told you it was
21    storming outside, would I be telling you the truth.  So it
22    would depend on how you're stating it.  I'm not sure where
23    you're going besides.
24        Q.   Okay.  I'm going to my next section.
25              We'd already discussed this a little bit that part
```

INV_TRAN_00000833

50

1    of conducting a good, forensic interview is knowing where

2    the kid is developmentally; right?

3        A.    That is correct.

4        Q.    What training do you have in child development?

5        A.    Other than Corner House, I don't have any training

6    other than the work that I've done on the street.

7        Q.    Okay.

8        A.    And raising my own kids.

9        Q.    And -- oh, I know.  I did skip one part I wanted

10   to clarify.  Do you describe all of the interviews with the

11   children that have been admitted into evidence today as

12   forensic interviews except D.R.'s?

13       A.    I would say that they're pretty much forensically

14   sound.

15       Q.    Okay.

16       A.    The interviews that I did at Western Slope the

17   first interviews followed pretty much the protocol as close

18   as I could.  The interviews that were conducted, the

19   followup interviews, were just basically that, followup

20   interviews.

21       Q.    Okay.  So to be clear, the two interviews of I.S.

22   would you describe those as forensic interviews?

23       A.    As much as possible, yes.

24       Q.    And would you describe the interview with you and

25   J.WR. and Detective Stogsdill at his grandma's home to be a

INV_TRAN_00000834

1   forensic interview?

2       A.   Yes.   Not all forensic interviews follow the exact

3   protocol.

4       Q.   Okay.   And why do you describe that one of J.WR.'s

5   to be forensic?

6       A.   Because we conducted it.   We asked him the

7   questions, determined where he was as far as his age level.

8   He started right off telling us exactly the purpose for the

9   interview and went right into his free narrative as to what

10  happened.   And following his free narrative we asked

11  followup questions.   So you don't have the RATAC protocol if

12  you want to call it that.   He went right into the narrative

13  when we asked him if he knew why we were there.

14      Q.   Okay.

15      A.   So we were not leading J.WR. in any questions that

16  was so forensically yes.

17      Q.   And E.M's first interview at Western Slope Center

18  for Children you would describe that as a forensic

19  interview?

20      A.   Yes.

21      Q.   And what about the one at the police department?

22      A.   That was also a free narrative on E.M's part

23  initially, and then we went into an interview, so it was a

24  followup interview with him.   Again, we didn't need to go

25  back over what we'd done in the forensic interview.

INV_TRAN_00000835

```
 1          Q.   Okay.  And so D.R.'s interview you described --
 2    you testified was not a forensic interview; is that correct?
 3          A.   He's 15 years old.  He came in.  He knew exactly
 4    why he was there and began telling me that right off the
 5    bat.  After I had actually -- actually D.R. came in as a
 6    witness initially because I didn't know that he had been
 7    victimized and his mother didn't know.  He had never told
 8    anybody that he'd been victimized by Mr. McFadden.  And it
 9    was after that point, after during the interview process
10    when I started asking him some personal questions that he
11    introduced that he had been in fact victimized by Mr.
12    McFadden.
13          Q.   And in D.R.'s interview, how come you switched it
14    from a witness interview to a potential victim interview?
15          A.   He switched it for me.  When I asked him a couple
16    of personal questions, he answered those accordingly to
17    indicate he was a victim.
18          Q.   Okay.  So in each of these interviews what did you
19    assess I.S.'s development to be?
20          A.   Age appropriate.
21          Q.   Why?
22          A.   Just his ability to speak, communicate with me,
23    his ability to differentiate colors, his ability to describe
24    situations.  In a discussion that I had with him concerning
25    his -- what he likes and dislikes during the introduction
```

INV_TRAN_00000836

53

```
 1    phase and then his ability to identify body parts and then

 2    describe situations that took place.

 3        Q.    What about E.M.'s?

 4        A.    E.M.'s initial interview, same age appropriate.

 5        Q.    Was his second one different?

 6        A.    The second interview with E.M.?

 7        Q.    Yes.

 8        A.    He was a little more open, talkative, although the

 9    interview was a little more subdued.

10        Q.    But in the course of those interviews, you

11    assessed E.M. to be age appropriate; is that what you said?

12        A.    I did.

13        Q.    What about J.WR.?

14        A.    The same thing with J.WR.

15        Q.    And when you say "age appropriate" meaning that

16    they're cognitive, verbal, emotional development is on par

17    with their age?

18        A.    For what I would expect it to be, yes.

19        Q.    What about K.WE.?

20        A.    K.WE. was also age appropriate in his

21    communication and the ability he had to communicate with me

22    to talk with me freely, clearly and his understanding of the

23    questions that I gave to him.

24        Q.    And S.J.WE?

25        A.    S.J.WE. is the same way in her ability to describe
```

INV_TRAN_00000837

54

1    the residence where they lived and her staying back --

2    moving back and forth between the houses and her ability to

3    understand my questions and communicate clearly.

4         Q.    And what about D.R.?

5         A.    And D.R. was an older young man and very capable

6    of handling himself in communication describing situations

7    and circumstances.

8         Q.    And would you say D.R. even helped you put

9    together some of the details that the younger kids couldn't?

10        A.    Somewhat, although his was from a different time

11   period.

12        Q.    Right, okay.  When you interviewed I.S., did you

13   know that Mr. McFadden had a prior conviction for sex

14   assault on a child?

15        A.    I believe I became aware of that directly after my

16   interview the next day.  And I think it was the next day,

17   the 17th or 18th, afternoon of the 18th, I think I found

18   that out the next day.

19        Q.    Okay.

20        A.    Because I did a criminal history and found out his

21   priors.

22        Q.    Okay.  So you knew it when you did all the rest of

23   the subsequent interviews?

24        A.    Everything from that point on, yes.

25        Q.    Okay.  When did you learn about the allegation

INV_TRAN_00000838

55

1    that Detective Crocker investigated in 2008?

2         A.    I believe it was during my talk with Cindy.  I'm

3    sorry, I just went blank with her last name.  She would be

4    the grandmother.  I'm sorry.

5         Q.    Wright or Rick?

6         A.    Ricks, Cindy Ricks.  During my talk with her, one

7    of my initial talks with her, I believe she mentioned the

8    incident that or allegations from Arizona, and that's when I

9    contacted the Arizona authorities and found their case or

10   their investigation of that.

11        Q.    Okay.  So when you had one of your first contacts

12   with Cindy Ricks, you learned about the Arizona issue?

13        A.    It was during my early contacts with her, yes.

14        Q.    Okay.  And the Arizona allegations involve Mr.

15   McFadden; right?

16        A.    That is correct.

17        Q.    And the two -- oh, boy -- E.M. and his brother?

18        A.    No, initially they involved D.  D. was the one

19   that made the allegation in --

20        Q.    Okay.

21        A.    -- or disclosure to the officer when he came to

22   the door in Arizona, and then the family acted on that,

23   contacted the family up here in Grand Junction and Officer

24   Crocker.  They contacted law enforcement.  Officer Crocker

25   did the interviews with J.WR. and L.WE.

INV_TRAN_00000839

56

```
 1      Q.   Okay, I see.  And obviously as your investigation

 2   proceeds and unfolds, you're hearing more and more

 3   allegations against more and more children; right?

 4      A.   You could put it that way, yes.

 5      Q.   When you're doing your interviews -- I'm trying to

 6   think back, but in at least some of your interviews, maybe

 7   most of your interviews, in the closing part of your

 8   interview, you encouraged the kids to report abuse and

 9   report sexual assault; right?

10      A.   I do.

11      Q.   And you indicated to a couple of the kids that

12   it's not okay what Mr. McFadden did; right?

13      A.   After they had told me what he had done to them,

14   yes.

15      Q.   And so at that point you're believing the little

16   kids; right?

17      A.   Yes.

18      Q.   And you gave them, you brain stormed with them

19   ideas of who they could tell if they ever had any

20   victimization in the future?

21      A.   I always do that, yes.

22      Q.   Is that part of your training to do that?

23      A.   I don't recall Corner House, but it is one of the

24   things that you're encouraging the child to be free to talk

25   to people if someone were to approach them or contact them
```

INV_TRAN_00000840

1    in a like manner to talk with their parents.

2              And sometimes if a disclosure is not made, it's

3    whether or not if anyone that they don't feel comfortable

4    with or comfortable around, you know tell your parents, tell

5    your teacher, tell the police, call the police if you need

6    to.  So that's a normal part of my interviews, the closing

7    part of the interviews.

8        Q.    Okay.  Even though it's maybe not necessarily part

9    of the Corner House protocol?

10       A.    I believe part of the closing with Corner House

11   they encouraged us in my training down there that you know

12   let the kids know that it's okay to call.  It's okay to talk

13   to their parents.

14       Q.    In your interview with E.M., you indicated to him

15   that it's time to make him stop meaning Mr. McFadden; right?

16   Do you recall that?

17       A.    That would be his second interview I believe.

18       Q.    Okay.  The one where he discloses?

19       A.    Yeah.  That was after his disclosure.

20       Q.    And then you also indicated to E.M. that you'll

21   make sure that Mr. McFadden stops?

22       A.    As much as possible, yes.

23       Q.    You never -- as a part of your investigation, you

24   spoke to a lot of the children's parents and family members?

25       A.    I did.

INV_TRAN_00000841

58

```
 1        Q.    Did you ever speak directly to a Ryan ███████

 2        A.    You know what I didn't.  I was trying to think.  I

 3   talked to Mike and I was thinking got the names transpired

 4   [sic] but Michael███████but not Ryan ████████  no.

 5        Q.    Okay.  All right, now.

 6              THE COURT:  Would this be a good time to break?

 7   It's 12:10.

 8              MS. SMITH:  Oh.  Yeah, I'm fine with that.

 9              THE COURT:  Is that okay with everybody?

10              MR. WAITE:  That's fine, Judge.

11              THE COURT:  Why don't we go ahead and take a lunch

12   break now and resume at 2:00.

13              MS. SMITH:  Okay.

14              MR. WAITE:  Thank you.

15              THE COURT:  We'll be in recess.

16              MR. WAITE:  Can we just leave all of this stuff

17   here?

18              THE COURT:  Yes.  We're the only folks here for

19   the rest of the day.

20              MR. WAITE:  Thank you.

21              (Hearing recessed 12:10 p.m. to 2:02 p.m.)

22              THE COURT:  Please be seated.  Okay, we're back on

23   the record in these three cases: 13-CR-27, 339 and 342.

24              The parties are here and we're ready to resume.

25   Detective Prescott, if you'd be kind enough to take the
```

INV_TRAN_00000842

```
 1   stand again.  You are reminded that you are under oath, and
 2   --
 3              MR. BURRILL:  And, Your Honor, could we get --
 4              THE COURT:  Yes.  That right hand certainly,
 5   unless it's his left hand he needs to use to write.
 6              And, Ms. Smith, you're up.
 7                   CROSS-EXAMINATION (RESUMED)
 8     BY MS. SMITH:
 9      Q.   All right, I was going to, I was just about to
10   turn to the individual interviews and talk a little bit more
11   specifically about each interview.
12              Turning first to I.S.'s interview, you had
13   mentioned to Mr. Waite that you had spoken on the phone with
14   Diane, I.S.'s grandmother custodian prior to I.S.'s
15   interview; is that right?
16      A.   That's correct.
17      Q.   And what did you discuss with her?
18      A.   I arranged the SANE, or the not SANE but the
19   forensic interview with her, set up a date and time.  She
20   agreed to meet me the next day, I believe it was the 18th of
21   December, 2012 at Western Slope Center for Children.
22              I described the purpose of the interview and what
23   to expect; that I would be conducting the interview solely
24   with her grandson and that afterwards I would meet with her
25   after the interview, but we would meet there at Western
```

INV_TRAN_00000843

60

1    Slope at a certain time.  I don't recall the times we met

2    for that interview.

3         Q.   And what did you tell her the purpose was?

4         A.   To conduct a forensic interview on I.S. and

5    attempt to determine what had happened and to get a

6    statement from him.

7         Q.   And did you give Diane ▆▆▆▆▆▆any directives on

8    what to discuss or not to discuss with I.S.?

9         A.   I don't recall directly but I believe I told her

10   not to discuss anything with him.

11        Q.   Okay.

12        A.   And I think that is what she had been told earlier

13   by the officers.

14        Q.   Okay.  But this -- I.S.'s allegations were first

15   reported to Officer Wood; right?

16        A.   As law enforcement, yes.

17        Q.   Yes.  And did you review Officer Wood's reports?

18        A.   I did.

19        Q.   And so you knew from that that I.S. had discussed

20   the allegations with both Diane and Ryan ▆▆▆▆▆▆

21        A.   That's how -- yes.

22        Q.   And what were you going to say that's how it all

23   got to law enforcement?

24        A.   Well I had to start somewhere.

25        Q.   Right.  In I.S.'s interview you say to -- you ask

INV_TRAN_00000844

61

1   him, I'm sorry.  In I.S.'s interview you do the touch

2   inquiry phase of the protocol; right?

3       A.    I believe I did.

4       Q.    And you asked him "who gives you touches you don't

5   like?"

6       A.    I believe I did.

7       Q.    And doesn't that introduce to him the idea of

8   touches he doesn't like or bad touches?

9       A.    Normally.

10      Q.    Would you say normally?

11      A.    Yes, that's correct.

12      Q.    And after he made the disclosure, you asked

13  several followup questions; is that right?

14      A.    That's correct.

15      Q.    You were trying to get details about whether --

16  whose clothes were on and off?

17      A.    That's my job, yes.

18      Q.    Okay.  And there was I think I.S. first indicates

19  that he was asleep?

20      A.    He did.

21      Q.    And you asked a series of questions to try to

22  figure out if he was asleep how he would actually know?

23      A.    I did.

24      Q.    And -- okay.  And when you say it's your job to

25  get more details, isn't it actually your job to just make

INV_TRAN_00000845

1   sure the child produces a free narrative?

2       A.    That's one and the same thing I think.

3       Q.    Okay.  But in I.S.'s interview, you were having to

4   ask a lot of questions to get those details; right?

5       A.    That happens, yes; that's correct.

6       Q.    And sometimes when you're having to ask very

7   specific questions to get those details, it disrupts the

8   free narrative wouldn't you say?

9       A.    I would say that if the child is not making a free

10  narrative, I have to ask those questions.  Otherwise, I do

11  not get the details.

12      Q.    Okay.  And isn't it -- what is the protocol or

13  what does your training say about asking repetitive or

14  repeated questions about the same topics?

15      A.    Part of the process in the introduction and I

16  don't recall if I did this with I.S., but if I ask the child

17  a question a second time, it's not because they got the

18  questions right or wrong, it's just that I'm trying to

19  clarify.

20      Q.    Okay.

21      A.    And I don't recall specifically describing that to

22  him, but I do recall on I.S.'s part talking about his being

23  asleep or awake and how he would have felt that if he was

24  asleep.  And in trying to have him describe that in his

25  words or that type of situation, so yes I did ask repeated

INV_TRAN_00000846

63

```
 1   questions about that to clarify that.

 2       Q.   To try to clarify, okay.  In I.S.'s first

 3   interview, you left the room; right at one point?

 4       A.   I did.

 5       Q.   And you went and talked to Joy Thompson?

 6       A.   I did.

 7       Q.   And did she provide any feedback to you about that

 8   interview?

 9       A.   You know I don't specifically recall what her

10   comments were on I.S.'s interview.

11       Q.   Okay.  Was I.S.'s interview peer reviewed?

12       A.   No it was not.

13       Q.   Do you recall a part in your interview with I.S.

14   where you asked him, I think you asked him a series of

15   questions about why he stayed in Mr. McFadden's bed; do you

16   remember that?

17       A.   I did and I do.

18       Q.   And I.S.'s response was that he didn't know; was

19   that it?  Or he wasn't giving you a response to that

20   question at first; right?

21       A.   I don't recall him not giving me a response to

22   that question.  I recall that he was friends with the kids

23   and he wanted to stay near them.

24       Q.   Okay.

25       A.   And those are my words, not his, so I can't --
```

INV_TRAN_00000847

```
 1        Q.   Do you recall you suggesting to him that maybe it
 2   was because the bed had nice pillows?
 3        A.   I might have used that in a multiple choice
 4   answer, but I don't recall telling him that, suggesting that
 5   to him.
 6        Q.   Okay.  And then you remember that I.S. agreed that
 7   it was he had nice pillows?
 8        A.   I don't recall that; I'm sorry.
 9        Q.   Okay.  That's fine.  And then as we've already
10   established, you had a second interview with I.S. about
11   three months later?
12        A.   December, January, February, March I believe it
13   was; so two and a half months, three months.
14        Q.   Okay.  And what prompted that second interview?
15        A.   I was contacted by Diane and she said that I.S.
16   had additional information he wanted -- had disclosed to
17   her, and she requested I do a followup interview with him.
18        Q.   And you agreed to do that?
19        A.   Yes.
20        Q.   And what does your training say about doing
21   multiple interviews?
22        A.   You don't go back over the information you've
23   already been over.  You start from the fresh point instead
24   of reviewing the old information and go from there.
25        Q.   But in the second interview with I.S., you did ask
```

INV_TRAN_00000848

```
 1    him if he remembered what you guys had talked about during
 2    the first interview; right?
 3         A.   I did.
 4         Q.   And you started that second interview by
 5    indicating to him, trying to illustrate to him that
 6    sometimes you don't have all the pieces or people -- of the
 7    puzzle or that people remember more details later on; do you
 8    remember that part of your conversation?
 9         A.   I do.
10         Q.   And so that is suggesting to him that there might
11    be more pieces of information out there that you're looking
12    for; right?
13         A.   I don't know if it's suggesting to him.  It's
14    indicating to him I guess we need -- there's a reason why
15    we're together this time.  There would be no further reason
16    to meet otherwise.  So I'm trying to elicit if there is
17    additional details of what I need to know.
18         Q.   And you indicated that you only ask a question
19    more than once if it's just to clarify; right?
20         A.   Sometimes.  I can't say that's in cement.
21         Q.   Okay.  But generally would you say if you're
22    asking a question to a child repeatedly, that that is
23    suggestive in and of itself?
24         A.   Not necessarily if you're asking repeatedly is
25    because you don't understand or they don't understand the
```

INV_TRAN_00000849

```
 1   question you're trying to clarify with the child what they
 2   are saying or the type of question you're asking.  Sometimes
 3   kids don't understand.  You ask them a question and they
 4   don't understand what the question is so you need to clarify
 5   it with them, so.
 6        Q.   Okay.  And in I.S.'s second interview is when he
 7   discloses the anal penetration; right?
 8        A.   That is correct.
 9        Q.   And he references -- he calls it rape; right?
10        A.   He did.
11        Q.   And you asked him what he means by rape; right?
12        A.   I did.
13        Q.   And you asked him that and then he told you after
14   the first time?
15        A.   He did.
16        Q.   And then you asked him again?
17        A.   There was I think some other questions in between
18   that, but yes I did ask him again.
19        Q.   So if he'd already clearly defined it for you, why
20   did you ask again?
21        A.   I think there were questions in between that that
22   I needed to confirm that that's what he actually meant.
23   There were -- if I recall correctly, there were questions in
24   between the first time he described what rape was and the
25   second time, and I did it for clarification purposes.
```

INV_TRAN_00000850

67

1    Q.   And in the interview I.S. indicates that his

2    therapist had told him to tell you too; right?  Do you

3    remember that part?

4    A.   I believe I did, and he did.

5    Q.   And his therapist is Joan?

6    A.   Milady, yes.

7    Q.   At one point in the second interview with I.S.,

8    you tell him that you have to ask him a bad question; do you

9    remember that?

10   A.   I do.

11   Q.   And that suggests to the child that the question

12   you're about to ask is bad; right?

13   A.   It prepares him for something that's a little more

14   serious than what's normal: what color is your house, what's

15   your mom's name.

16   Q.   And is that part of your protocol and training to

17   preface --

18   A.   I don't know that that's in the training or

19   protocol.

20   Q.   Just more your style would you say or --

21   A.   That would be correct.

22   Q.   And in I.S.'s interview, the second interview, do

23   you remember asking him several times what made it stop?

24   A.   I don't know about several times.  I think I

25   recall asking him at least more than once what made it stop,

INV_TRAN_00000851

68

```
 1    and I don't think that he understood me, my question.  I
 2    could have worded it a little better, but I don't think he
 3    understood what I meant.
 4         Q.   Right, because he indicates that it stopped when
 5    Mr. McFadden was arrested?
 6         A.   Yes.
 7         Q.   And so you followed up trying to clarify what made
 8    the specific incident stop; right?
 9         A.   The act correct.
10         Q.   And I.S. doesn't give an answer to that really
11    does he?
12         A.   I don't recall him giving a solid answer to that,
13    no.
14         Q.   Throughout the interview, you asked him multiple
15    times about how many times the rape occurred; do you
16    remember that?
17         A.   I do.
18         Q.   And he indicates to you one time; right?
19         A.   He did.
20         Q.   And then you kept asking him how many times?
21         A.   I don't believe I kept asking him.  There was a
22    part of that questioning he had mixed up the contact, sexual
23    contact with the penile penetration, and I needed to know
24    that he understood what I was asking, because just like he
25    was asleep/he was awake, I needed to clarify that that's
```

INV_TRAN_00000852

1    what he meant.

2         Q.    But there is a time in which it's clear he's

3    saying that the rape only occurred one time, and then you

4    asked him at least one time after that how many times it

5    occurred?

6         A.    I did.   Right at the end I asked him that the last

7    or I guess it would be a second time.

8         Q.    And at that point I.S. says: "I'll go with you."

9         A.    He did.

10        Q.    Okay, now turning to E.M.   We touched on this a

11   little bit, but you had a traditional forensic interview at

12   the Western Slope Center for Children on December 21; right?

13        A.    That sounds correct.

14        Q.    And you followed your protocol in that interview;

15   right?

16        A.    Pretty much.

17        Q.    What do you mean "pretty much?"

18        A.    As closely as practical.   So it was a normal

19   interview for me.   The first time that I had met with E.M.

20   and pretty much there's a kind of the RATAC series that we

21   go through, and there was no disclosure.   And so --

22        Q.    Okay.   So nothing stands out to you in retrospect

23   that that was a terrible interview or you made some glaring

24   mistakes; right?

25        A.    I don't recall making any glaring mistakes.   It

INV_TRAN_00000853

70

1    was a pretty much normal interview with no disclosure.

2         Q.   When at the second instance when you interview

3    E.M. at the police station, why didn't you arrange to meet

4    with him at the Western Slope Center for Children?

5         A.   E.M. came to the police department with his

6    grandmother and his mother.  I think he had his little

7    sister with them.  It was an interview that was set up for

8    D. at the time to meet with D.  D. was out of town earlier.

9    When E.M. walked into the police department, he told me:

10   "Mr. Ed, I need to talk to you.  I lied to you before."

11        That was -- he had mentioned that to his

12   grandmother I believe it was while they were on their way or

13   as they left the house that he needed to talk to me.  There

14   was no prior knowledge on my part that I was even going to

15   be seeing E.M. or interviewing him.

16        In the lobby when he first saw me, he ran up to me

17   and said: "Mr. Ed, I need to talk to you.  I lied."  And I

18   took him straight up with his mom and with D. and conducted

19   the interview right there on the spot, and it was late in

20   the afternoon I believe 5:30, something like that 5:00

21   o'clock, 5:30 when all of that started.

22        Q.   When you began the interview with E.M., his mother

23   ███████████ was in the room; right?

24        A.   She was.

25        Q.   And why didn't you have her excuse herself before

INV_TRAN_00000854

71

1    you began the interview?

2         A.    I actually did shortly into the interview.  Once

3    we got to talking, I asked E.M. if it was okay if Crystal

4    was in there, and left it up to her.  I asked Crystal the

5    same thing.  She opted to leave, and she left the interview

6    and I conducted the interview without her in there, the rest

7    of the interview without her.

8         Q.    But that's not normal; right?  You don't give kids

9    and parents a choice typically for a forensic interview if

10   they want the parent there?

11        A.    That depends.  On a forensic interview, no.  But

12   with a followup interview like that, I actually had no idea

13   what he was going to say, so.

14        Q.    And in this interview with E.M. you tried to get

15   from -- elicit from him a lot of details too about -- about

16   the pain that he felt; right?

17        A.    That's correct.

18        Q.    And so you asked a lot of followup questions to

19   try to get more details about that; right?

20        A.    That's how I normally get details, yes.

21        Q.    And so he wasn't describing the pain or giving

22   details about the pain in a free narrative format; you had

23   to ask questions?

24        A.    Yes, that's correct.

25        Q.    E.M. indicates in that interview both that he had

INV_TRAN_00000855

72

1    told his mom and not told his mom; right?  Do you remember

2    that?

3         A.    I do.  I believe initially he said he had told his

4    mom.  Then later in the interview he said I was actually the

5    first person that he had told about the sodomy.  He didn't

6    describe it as sodomy.

7         Q.    Right.  So did you followup with his mom or his

8    grandma on what he had actually told either of those people?

9         A.    They were unaware of what had happened.  They

10   didn't know the details of -- in fact Crystal I told her

11   during the SANE exam is when I met with them for the SANE

12   exam is when I actually disclosed to her what had happened,

13   what E.M. had disclosed rather.

14        Q.    And who is E.M.'s grandma?

15        A.    That is Cindy ██████

16        Q.    And did you followup with her on what he had told

17   her?

18        A.    At a later time.

19        Q.    And did she indicate that he had told her about

20   the sodomy?

21        A.    You know I need to back up a little bit.  I know

22   when I told Crystal was the first time I had told Crystal

23   was when we met just prior to the SANE exam.  When E.M. went

24   upstairs, I told her that E.M. had been sodomized and she

25   didn't know what that meant.  I had to explain that to her,

INV_TRAN_00000856

73

 1    and she had a hard time after that.

 2              As far as Cindy ▮▮▮▮▮ I don't recall when I

 3    specifically talked to her about that.  I discussed with her

 4    what actually had happened to E.M.  I'm sorry.

 5         Q.   Okay.  So you're not sure what he had discussed

 6    with his grandma?

 7         A.   Other than him telling me that I was the first

 8    person he had told; no, I'm sure.

 9         Q.   Okay.  All right, you asked E.M. -- do you recall

10    asking E.M. when did he -- when did he, meaning Mr.

11    McFadden, start touching people; do you recall asking him

12    that?

13         A.   Not specifically.  That specific question, no, I

14    don't.

15         Q.   Okay.  Do you recall talking to E.M. about trying

16    to get a time frame; right?

17         A.   Of when he touched him, yes.

18         Q.   And then E.M. indicates to you that he doesn't

19    know, that he can't really provide a time frame; right?

20         A.   Other than he recalls that he was four years old

21    when he was sodomize by Mr. McFadden.  So that would be it.

22    And then he was in Arizona for three years, so he knew that.

23         Q.   Okay.  But you don't recall asking E.M.

24    specifically about what he knows about when Mr. McFadden

25    started touching other people?

INV_TRAN_00000857

74

1       A.    I don't recall.

2       Q.    Okay.

3       A.    I'm sorry.

4       Q.    Oh, that's fine.  And then in terms of the third

5   interview with E.M. at the Western Slope Center for Children

6   prior to the SANE examination, you remember that interview;

7   right?

8       A.    I do.

9       Q.    Okay.  That interview E.M. doesn't make any

10  disclosures to you; correct?

11      A.    Not new disclosures.  We discussed the dogs and

12  when they had the dogs and which dogs he was in -- he would

13  been actually the time frame they would have had the dogs

14  because he referred to the dogs at events, particularly

15  events of sexual contact occurring when he was sleeping with

16  this dog on the couch and then again when he was sleeping

17  with this dog on the couch and again.  So that's what I was

18  attempting to clarify.  New disclosures, no.

19      Q.    But even -- you were trying to get a time frame

20  based on the dogs because of what E.M. had previously

21  disclosed; right?

22      A.    That is correct.

23      Q.    And so the conversation during the third interview

24  was just about what dogs they had when?

25      A.    That is correct.  And also at the river, I asked

INV_TRAN_00000858

1    him if D. had ever woke up while they were at the river --

2         Q.    Okay.

3         A.    -- during the sodomy.

4         Q.    So kind of just some questions for your -- to help

5    fill in some gaps in your investigation?

6         A.    That is correct.

7         Q.    Okay.  Now turning to J.WR.  We already discussed

8    that J.WR. prior to being interviewed by you was interviewed

9    by Nicole Surrad of CPS; right?

10        A.    That is correct.

11        Q.    And you weren't present for that interview?

12        A.    I was not.  In fact I didn't know that J.WR. was

13   even at the police department that day.

14        Q.    And so you don't know any of the circumstances of

15   how Ms. Surrad conducted that interview?

16        A.    I do not and it was not recorded that I'm aware

17   of.

18        Q.    Okay.

19        A.    I do know that he didn't make a disclosure to her.

20        Q.    Okay.  When you interviewed him at his house in

21   Glade Park, did you know that he had been interviewed by Ms.

22   Surrad?

23        A.    I did.

24        Q.    And why did you then interview him again?

25        A.    Because I was told that he was -- wanted to talk;

INV_TRAN_00000859

1    that there was more.

2        Q.   Who told you that?

3        A.   I believe it was his mother, Michelle.  Actually

4    Cindy ▇▇▇▇ was the one actually I was communicating with,

5    and she told me that Michelle had talked with her, and so I

6    contacted Michelle and set that up.

7        Q.   Okay.  And this interview took place in J.WR.'s

8    grandparents' home on Glade Park; right?

9        A.   That is correct.

10       Q.   And why did it occur at his home?

11       A.   That's where they would be, where I could arrange

12   to meet with them.  And probably the short time span, we

13   just agreed to meet up there in Glade Park with them.

14       Q.   Okay.  Like it was maybe the most convenient

15   thing?

16       A.   They had -- we had, I tried to set up other

17   interviews with them and it didn't work out, and I told

18   Michelle that I would just meet them up at the house.  That

19   would be the easiest thing, because she would be there; we

20   could get there.

21       Q.   And why did you bring Detective Stogsdill?

22       A.   Just for a second set of ears, set of eyes.  You

23   know someone else to listen.  She's also a forensic

24   interviewer, and she's kind of an office partner.  I kept

25   her up to breast on what was occurring in this case, so she

INV_TRAN_00000860

1    knew pretty much what was going on.

2        Q.   And when you had tried to set up other interviews

3    that fell through, were those at the Western Slope Center

4    for Children?

5        A.   I believe one of them was.

6        Q.   How many fell through?

7        A.   I think just the one and then we attempted to set

8    up another time and that didn't work, so we just said "we'll

9    meet you up at the house; that would be easiest."

10       Q.   And you indicated that you, J.WR. and Detective

11   Stogsdill were in a separate bedroom during the interview?

12       A.   That is correct.

13       Q.   And was the door open or closed?

14       A.   It was closed.

15       Q.   But you could still hear the other family members;

16   right?

17       A.   You could.

18       Q.   How far away were they?

19       A.   In the next room.

20       Q.   And what -- how all were you sitting in the

21   bedroom?

22       A.   J.WR. I think was sitting on a -- it was the

23   master bedroom I think at the residence.  Initially, Julie

24   and I were sitting on the bed and he was sitting on a --

25   there's a what do you call it, a cedar chest at the end of

INV_TRAN_00000861

 1    the bed type thing, and I moved to that and then I went and

 2    I sat on the floor because I was looking sideways at him.

 3    So I went and I sat on the floor in front of him and we did

 4    most of the interview that way.

 5        Q.    And what was his demeanor during the interview?

 6        A.    Solemn.

 7        Q.    And was he playing with anything or -- yeah, was

 8    he playing with anything?

 9        A.    He was sitting very still.

10        Q.    Okay.  Would you say that your training in the

11    Corner House protocol encourages interviews to be video

12    recorded?

13        A.    They do.

14        Q.    At the end of the interview both you and Detective

15    Stogsdill are asking J.WR. questions; right?

16        A.    During the interview, that's correct.

17        Q.    Oh, throughout the whole interview, you were both

18    asking questions?

19        A.    She interjects I think maybe halfway through.  I

20    looked to her "Julie, do you have anything," because I

21    needed to stop and think for a little bit, get my thoughts

22    clear, straightened out, and then she asked a question and I

23    followed up and continued for a while, and then she asked

24    questions.  That's part of the reason we have two people

25    there.  A lot of times it helps when someone else can step

INV_TRAN_00000862

79

1    in and maybe can fill in the spots that you miss, so.

2         Q.   Does the protocol or your training allow for two

3    interviewers to sort of tag team an interview like that?

4         A.   I don't know that it allows or disallows that.

5    I'm sorry, I can't answer your question there.

6         Q.   Okay.  Let's see so do you recall a time where

7    Detective Stogsdill asks J.WR. to describe Mr. McFadden's

8    penis?  Do you recall that part of the interview?

9         A.   I believe she did.

10        Q.   And J.WR. responds that he can't.  He says "no."

11        A.   I believe that's the case and she was attempting

12   to elicit was it hard or was it soft I believe was her

13   questioning to him.

14        Q.   So after J.WR. indicates "no, I can't describe

15   it," she asks the followup question providing multiple

16   choices?

17        A.   I believe that's the case.

18        Q.   And you did something similar right when you asked

19   J.WR. to explain how Mr. McFadden did that; right?  Do you

20   remember that part?

21        A.   Position-wise was he on his side I believe was my

22   questioning, line of questioning at that point.

23        Q.   And then you followed up with examples?

24        A.   Correct.  Because the question I asked you know

25   how did that happen is kind of broad, so I tried to narrow

INV_TRAN_00000863

80

```
 1    it down and, therefore, gave him a multiple choice type
 2    question to try to rein in the questions, focus him on them.
 3         Q.    And sometimes J.WR. answered the questions non-
 4    verbally; right?
 5         A.    That would be correct.  He shook his head or "uh
 6    huh" type thing.
 7         Q.    And obviously if he's shaking or nodding his head,
 8    that's not on the audio recording?
 9         A.    That is correct.
10         Q.    All right, now turning to K.WE.  Well, yes,
11    turning to K.WE.'s interview, you indicated to Mr. Waite
12    that the Dolphin House is somewhat similar to the Western
13    Slope Center for Children.  What is different about it?
14         A.    Purpose-wise it's a different building.  It's an
15    old house that they fixed up into --
16         Q.    Oh.
17         A.    -- the center.
18         Q.    I see.
19         A.    You know it's a regular business.  It looks like a
20    business when you walk in the door.  So and it's amongst a
21    neighborhood.  I means there's a residential housing area
22    all around it.
23         Q.    So structurally or architecturally it's different?
24         A.    Yes.
25         Q.    But its mission is similar?
```

INV_TRAN_00000864

1      A.    It serves the same purpose, yes.

2      Q.    Okay.  Now on K.WE.'s interview, although K.WE.'s

3  isn't the only one, you provide, you start out the interview

4  by talking to the children about putting together a puzzle.

5  Do you know what I'm talking about?

6      A.    I do that a lot.

7      Q.    Okay.  And that is not necessarily part of the

8  Corner House protocol or training is it?

9      A.    It's my way of describing what I do, my job.

10     Q.    Okay.

11     A.    In a way that they can understand.

12     Q.    And this interview with K.WE. actually begins by

13  you telling him that there are things that we don't

14  understand and don't like; right?

15     A.    I believe that may be the case.

16     Q.    And that suggests to him that this interview is to

17  talk about things he doesn't understand or doesn't like?

18     A.    I think he was prepared for that.  He had a hard

19  time downstairs.  When I first got there, just in watching

20  him interact with the other kids and you know this wasn't

21  something he wanted to do or you know he was not overly

22  joyed at meeting me and being there for that purpose, put it

23  that way.

24     Q.    How was he exhibiting signs of having a had time

25  downstairs?

INV_TRAN_00000865

82

```
 1        A.    He was just quiet and reserved, not active like

 2   the other two kids.

 3        Q.    But you had never met K.WE. prior; right?

 4        A.    I had not.

 5        Q.    And then you begin after you tell or telling him

 6   that there are things we don't understand or don't like, you

 7   go straightaway to asking him to tell you about the incident

 8   and why you both were there.  Do you remember that?

 9        A.    I believe I asked him if he knew why we were

10   there, and he stated he did.

11        Q.    He did.

12        A.    And we went into tell me why -- can you tell me

13   about that, and he started to describe that.

14        Q.    When you tell a child like K.WE. "tell me about

15   the incident," that's suggesting that there is an incident

16   to tell about; right?

17        A.    Well I think we both knew there was an incident to

18   talk about.  Yes, it's suggesting there is.

19        Q.    And then K.WE. responds that Mr. McFadden has a

20   disease that makes him like little children; right?

21        A.    I believe he did.

22        Q.    That's not -- a disease that makes him like little

23   children is not something that normal children know about;

24   right?

25        A.    That is something that probably his parents had
```

INV_TRAN_00000866

1   mentioned to him, yes; not unexpectedly so in the

2   circumstances.

3        Q.   You didn't do body part diagrams with K.WE. did

4   you?

5        A.   I did not.  I don't believe I did.

6        Q.   And I forgot to ask you this, but you didn't do

7   the with J.WR. either; right?

8        A.   I didn't need to with J.WR.

9        Q.   Why didn't you need to with J.WR.?

10       A.   He's old enough to understand this is my hands,

11  these are my eyes, this is my nose.  He's not a little kid.

12       Q.   Okay.  But isn't it important to get the names for

13  the genitalia so that everybody's on the same page?

14       A.   I believe he understood what that was.

15       Q.   Okay.  What about K.WE., why didn't you do

16  diagrams with K.WE.?

17       A.   I think with K.WE. we went straight into -- when I

18  asked him if he knew why we were there, he went straight

19  into that and it was understood between me and him when he

20  was talking, he was pretty clear as to what had happened and

21  how it happened and what body parts were used, so I don't

22  believe that I needed it at that point.

23       Q.   Although you did suggest the words for penis and

24  anus to him; right?

25       A.   I believe he used the same word for both his penis

INV_TRAN_00000867

1   and anus.  He used the word "no-no" for both of them, and I

2   told him we had to differentiate between one or the other.

3   You know I needed for him to give one a name or the other

4   the name he named, so yes, so I would understand.

5       Q.   And you asked K.WE. how he, how Mister -- let's

6   see I think you asked K.WE. how -- oh, okay, I'm sorry.  I

7   think K.WE.  indicates to you that Mr. McFadden or the bed

8   was moving.  Do you remember that part?

9       A.   I do.

10      Q.   And I think you asked K.WE. to describe it or how

11  it was moving and he said "no, he couldn't" -- he indicated

12  he couldn't describe it.

13      A.   I recall I did.

14      Q.   And so then you pressed K.WE. and asked him if you

15  gave him two dolls if he could describe it better?

16      A.   Not about the bed moving, but about the act that

17  was involved.

18      Q.   And he said no, he didn't want to?

19      A.   That is correct.

20      Q.   But then you kept asking if Mr. McFadden was

21  moving up or against him or on top of him; remember that?

22      A.   I do.

23      Q.   So after K.WE. had said twice "I don't want to

24  talk about the moving," you asked him a third question about

25  it?

INV_TRAN_00000868

85

1        A.    There were details I needed to understand.

2   Instead of leaving it open, I needed to understand what he

3   meant and what he was saying in order for me to ask further

4   questions on that issue, so.

5        Q.    Okay.  Did you get any feedback or peer review on

6   the interview with K.WE.?

7        A.    No I did not.

8        Q.    What about the interview with S.J.WE.?

9        A.    No, I did not.

10       Q.    You referenced earlier, I am now turning to

11  S.J.WE.'s interview, that she first indicated to you during

12  the rapport-building stage that she's an adult?

13       A.    Yes.

14       Q.    And she said that she is 40?

15       A.    She did.

16       Q.    And that she said that she was as old as you?

17       A.    She did.

18       Q.    And when you asked her "why are we here," she said

19  "because of Mike;" right?

20       A.    That is correct.

21       Q.    And both -- oh never mind.

22            All right now, turning finally to D.R.'s

23  interview.  I can't remember if we already talked about this

24  -- well I don't think we did.

25            D.R. had previously reported to his mother no

INV_TRAN_00000869

86

1   allegations; right?

2       A.    That is correct.

3       Q.    And so you had explained before that the first

4   portion of your interview with D.R. was more as a witness

5   and then it changed to questions about him being a potential

6   victim; right?

7       A.    That is correct.

8       Q.    And what -- if you thought he was just a witness

9   and he hadn't made any prior disclosures, what made you turn

10  the interview to the personal questions?

11      A.    There was some suspicion that he might have been.

12  I wanted to draw that out to give him the opportunity to

13  talk to me about it if there was.

14      Q.    When you say there was some suspicion, you mean

15  you had some suspicion?

16      A.    Give me a second.  When I talked with -- do you

17  want the groundwork for that?

18      Q.    Yes.

19      A.    Okay.  When I talked with the Hawkenberry's, both

20  of them explained to me that D.R. was friends with their

21  son, S.H. initially.  That he and S.H. ran around together

22  buddy-buddy, did things together.  As that relationship

23  continued, D.R. began to go with Mike.  The

24  from their -- what I understand from them telling me that

25  they didn't allow S.H. to participate with the issues with

INV_TRAN_00000870

87

1    Mike as much as the other boys or he wasn't asked to go,

2    that type of thing, D.R. was moving away from S.H. towards

3    Mike and then that increased.

4              The ███████████s told me that D.R. spent time

5    with Mike and actually slept in his bed.  So I had prior

6    knowledge that D.R. might have been victimized since most of

7    the kids that had been in his bed had been victimized or

8    reportedly so, and, therefore, when I interviewed him

9    initially, it was from a witness standpoint because he had

10   been in the same bed with L.WE. and J.WR. and Mike at one

11   point or another.  So I had prior information that D.R. was

12   possibly victimized also.  He denied it with his mom.  His

13   mom had told me that she also had asked him about it and he

14   denied it to her.

15        Q.   Okay.

16        A.   So I did have prior knowledge.

17        Q.   Okay.

18        A.   Suspicion.

19        Q.   Yeah.  And that came from your talking to the

20   ███████████████

21        A.   That is correct.

22        Q.   Okay.  And the witness portion of the interview

23   lasted for about 30 minutes; right?

24        A.   I don't recall.  That sounds about correct though.

25        Q.   And during that portion, D.R.'s mother was

INV_TRAN_00000871

88

1    present?

2         A.    She was.

3         Q.    And during that part of the interview, she

4    participated; right in the interview?

5         A.    She did.  She asked the questions that she was

6    curious about too.

7         Q.    And helped D.R. maybe answer some questions?

8         A.    Maybe one or two.  I don't recall.  I think they

9    were maybe dates or something like that.  That's what I

10   don't recall specifically.

11        Q.    And you wouldn't say from D.R. given his age and

12   development that you were necessarily seeking a free

13   narrative from him; right?

14        A.    I actually would have expected it a little more

15   from him at his age, but at the same time it wouldn't be

16   unnatural for him not to give a free narrative.  It's not --

17   males tend to be a little more embarrassed than females as

18   far as opening up and because of the stigma or something.

19        Q.    But because -- but he was able to -- because of

20   his age, he was able to provide a level of detail that some

21   of the younger kids couldn't; right?

22        A.    That is correct.

23        Q.    Okay, you indicated that your forensic interview

24   Corner House training was a week long.  How many hours was

25   it?

INV_TRAN_00000872

1          A.    I think they classified it as 40 hours.

2          Q.    And not every law enforcement officer is trained

3    in forensic interviewing; right?

4          A.    No.   That's right.

5          Q.    Is every detective?

6          A.    Not every detective.

7          Q.    And the protocol is based on social science

8    research; right?

9          A.    Yes.

10         Q.    And the ideas about eliciting a free narrative,

11   how not to be leading, how not to be suggestive all comes

12   from -- it's research based; right?

13         A.    That is correct.

14         Q.    Okay.   Now I'm going to turn to the interview with

15   Mr. McFadden.   Let's see that interview lasted over two

16   hours; right?

17         A.    That sounds about right.

18         Q.    And I can't remember, Mr. McFadden was in the room

19   the entire time?

20         A.    We took a break and went out to the restroom.

21         Q.    Okay.

22         A.    And then came back.

23         Q.    So all but a couple of minutes he was in that

24   room?

25         A.    That is correct.

INV_TRAN_00000873

1      Q.    And are the dimensions?

2      A.    About 10 by 10 probably.

3      Q.    And the door was closed; right?

4      A.    It was.

5      Q.    And even when -- and he was left in there for

6  portions by himself; right?

7      A.    A short time, yes.

8      Q.    And even during those times, the door was closed?

9      A.    It was.

10     Q.    And you had mentioned earlier that you began the

11 interview and then Detective Ancell did the CVSA; right?

12     A.    That is correct.

13     Q.    And then Detective Stogsdill comes in and looks at

14 the CVSA at one point; right?

15     A.    It's called a blind analysis of the CVSA

16 procedure.

17     Q.    And then after that, both you and Detective

18 Ancell, Sergeant Ancell interrogate Mr. McFadden?

19     A.    We interviewed him.

20     Q.    And during the portion where it's you and Sergeant

21 Ancell, the confrontation gets a little heated wouldn't you

22 say?

23     A.    I would say probably so.

24     Q.    And you, the two of you indicated to him that it's

25 better to admit; right?

INV_TRAN_00000874

91

```
 1       A.    We did.
 2       Q.    That the DA would be more willing to work with
 3    him?
 4       A.    We did.
 5       Q.    And indicating that you know if he didn't talk to
 6    you, give his side of the story, he could be arrested?
 7       A.    I don't recall saying that specifically.
 8       Q.    Okay.  But implying that you guys had evidence
 9    against him that you guys knew the other side of the story;
10    right?
11       A.    I believe we did imply that, yes.
12       Q.    And I think at least Sergeant Ancell tells Mr.
13    McFadden that he does think that he did it?
14       A.    I believe he did.  In fact I know he did.
15       Q.    Okay.  And basically both you and Sergeant Ancell
16    indicate to Mr. McFadden that basically there's no cure,
17    right, because he has the conviction in 1990, you know, and
18    he's still doing this, that he's, you know, that he needs
19    help; right?
20       A.    I don't know about "no cure."  We did -- I believe
21    I did mention to him that he needs some help.
22       Q.    Okay.
23       A.    And we wanted to get him some help.
24       Q.    And after -- you indicated that he voluntarily
25    stuck around for the CVSA, but in fact he had asked if he
```

INV_TRAN_00000875

1    could arrange to do it a different day; right?

2        A.    There's two questions?

3        Q.    Sure.

4        A.    He wanted to do it another day.  I asked him if

5    he'd be willing to stick around to do it today; the Sergeant

6    was here to do the CVSA and he agreed to that.

7        Q.    Okay, let's see.

8                THE COURT:  MS. SMITH:  Okay, may I have just one second?

9                THE COURT:  Yes.

10               MS. SMITH:  All right, I have nothing else.  Thank

11   you.

12               THE COURT:  Mr. Waite?

13               MR. WAITE:  Judge, I don't have any followup based

14   on that.

15               THE COURT:  All right, thank you.  You're excused.

16   Mr. Waite, do you have another witness?

17               MR. WAITE:  No, Judge, I don't.

18               THE COURT:  I guess what we're going to need to do

19   though there is reschedule this portion of it to another

20   date.  Do you want to do that now and then we can start

21   working on other motions?

22               MR. WAITE:  That's fine, Judge.

23               MS. SMITH:  And Your Honor, I think now would also

24   be an appropriate time to let the Court know that we are

25   going to ask for a continuance.  I do apologize.  I know

INV_TRAN_00000876