1

DISTRICT COURT, COUNTY OF MESA, STATE OF COLORADO

CASE NOS. 2013 CR 000027, 2013 CR 000339, and
2013 CR 000342, DIV. 5

---

REPORTER'S TRANSCRIPT (Motions Hearing)

---

IN THE MATTER OF

THE PEOPLE OF THE STATE OF COLORADO,

    Plaintiff,

v.

MICHAEL TRACY MCFADDEN,

    Defendant.

---

    The above-entitled matter came on for hearing
on Friday, June 6, 2014, at 8:10 a.m., before the
HONORABLE THOMAS DEISTER, District Judge.

APPEARANCES:

FOR THE PLAINTIFF:          DAVID WAITE

FOR THE DEFENDANT:          KARA SMITH
                            SCOTT BURRILL

WITNESS:                    ED PRESCOTT

INV_TRAN_00001132

```
 1                  P R O C E E D I N G S
 2              THE COURT:  Please be seated.  These are three
 3     cases:  13CR27, 339, and 342, all captioned People v.
 4     Michael McFadden.  Mr. McFadden is here with one of two
 5     Counsel, Ms. Lewis [phonetic].  I'm sorry, Ms. Smith, and
 6     then Mr. Waite is here for the People.
 7              And I think we're back today to, for the Defense to
 8     put on evidence, at least for the Defense to put on some
 9     evidence regarding, their desire to put on evidence under
10     807, Rule 807 of the Colorado Rules of Evidence.  And then,
11     whatever else we can get done.  And so, Ms. Smith were you
12     ready to do that?
13              MS. SMITH:  Yes.  And Mr. Burrill, I believe, is on
14     his way.  He had an 8:00 sentencing in a different courtroom.
15     They must be going late.  So, he will arrive shortly.  And
16     Mr. McFadden is okay with proceeding, and I think we ought
17     to.
18              THE COURT:  I think we discussed that on Wednesday
19     did we not?
20              MS. SMITH:  But, that was for a different --
21              MR. WAITE:  Me, too.
22              MS. SMITH:  -- Court.  That was for another
23     setting, another motions hearing setting.
24              THE COURT:  Okay, well --
25              MS. SMITH:  But --
```

INV_TRAN_00001133

Exhibit C

3

```
1              THE COURT:  So, do we need to wait for
2    Mr. Burrill?
3              MS. SMITH:  No, no not now.
4              THE COURT:  Okay.  Then, you may proceed.
5              MS. SMITH:  Okay.  The Defense calls
6    Detective Prescott.  Yeah, and can Mr. McFadden's right arm
7    be unshackled for note-taking?
8              THE COURT:  Yes.  Do you swear, or affirm, under
9    penalty of law, that the testimony you give here today will
10   be the truth, the whole truth, and nothing but the truth?
11             DETECTIVE PRESCOTT:  I do.
12             THE COURT:  Okay.  Please have a seat.
13   (Asides)
14   Whereupon,
15                        ED PRESCOTT
16   Was called as a witness, and after having been first duly
17   sworn, was examined and testified as follows:
18                     DIRECT EXAMINATION
19             BY MS. SMITH:
20        Q    Detective Prescott, can you please state your name
21   and spell your last name for the record?
22        A    It's Detective Ed Prescott, P-R-E-S-C-O-T-T.
23        Q    And are you the Investigator involved in the cases
24   before the Court this morning?
25        A    I am.
```

INV_TRAN_00001134

Exhibit C

4

1      Q    And as a part of those investigations, how many

2    children, in total, did you interview?

3      A    I'll have to list them off by name.

4      Q    Sure.

5      A    I'm sorry.  I've just been counting them.  I.S.,

6    E.M., D.O., L.W., J.W., Lo.W., and K.H.W. and his sister

7    S.L.W.

8      Q    And --

9      A    Also D.R. and one more, I'm sorry.

10     Q    -- was it T.M.?

11     A    Yes.

12     Q    And some of these children were -- were some of

13   these children interviewed more than one time?

14     A    Yes, they were.

15     Q    So, if you just listed 10 children, it's fair to

16   say that you actually conducted probably more than 10

17   interviews, even?

18     A    Yes.

19     Q    And did some of these interviews result in

20   allegations of sexual abuse?

21     A    They did.

22     Q    And did some of them not result in allegations of

23   sexual abuse?

24     A    They did.

25     Q    And in each of these interviews, which I know

INV_TRAN_00001135

5

1    you've already testified to several of them, extensively, did

2    you generally follow your training in how to conduct

3    interviews of children, Victims of sexual assault?

4         A    For the most part, yes.

5         Q    And does your training include following a certain

6    protocol?

7         A    To some extent, yes.

8         Q    And did you follow that protocol?  Is that protocol

9    somewhat flexible or fluid?

10        A    It is.

11        Q    And did you follow that protocol to some extent in

12   each of the interviews you conducted in this case?

13        A    Some of the interviews were witness interviews.  It

14   initially started out that way.  Some of the interviews were

15   follow-up interviews.  So, it wasn't exactly per protocol, as

16   far as the RATAC at the time.

17        Q    Uh-huh.

18        A    CornerHouse protocol, there was follow-up

19   interviews that occurred, when, in one instance, was

20   spontaneous statements that I was totally unaware of came

21   out.  We conduct the interview right on the spot.

22             In the witness interviews, I was unaware of any

23   circumstances of sexual abuse at the time.  But I was aware

24   that these children were affiliated with the other children,

25   and with Mr. McFadden.  So, in that instance, yes, they were

INV_TRAN_00001136

6

```
 1   conducted per protocol, but in the flexibility that it gives

 2   you.

 3        Q    Right, okay.  So, would you say that you did

 4   anything drastically different in the interviews where

 5   children made allegations, as compared to the interviews

 6   where children didn't make allegations?

 7        A    I'm not sure what you mean by "drastically

 8   different".  When a child made an allegation, of course, we

 9   delved into that quite extensively.

10        Q    Okay.

11        A    To obtain that information.  When there was no

12   allegation, the interview, at times, was a lot shorter.

13        Q    Sure.  I guess what I'm trying to ask is if you

14   think there was anything in the way you conducted the

15   interview that was somehow different, and resulted in a non-

16   allegation, as compared to the interviews that resulted in

17   allegations?

18        A    I'm sorry.  I --

19        Q    Do you feel like you deviated from the protocol in

20   a way that led to the children not disclosing in the

21   interviews where they didn't disclose?

22        A    Disclosure or nondisclosure, that's up to the

23   child.  So, no, I'm not sure that I can answer that

24   correctly.  But, if the child's not going to disclose, I

25   don't have any way of telling whether something happened or
```

INV_TRAN_00001137

7

1    didn't happen.

2          So, that's a choice, if something happened and they

3    don't want to disclose.  That's a choice they make.  I'm

4    there to elicit information, but not command them to tell me

5    something.  I don't know.  I'm sorry.  Maybe I'm not

6    answering your question right.

7      Q    I think you are.  So, you're not there to command a

8    disclosure, right?

9      A    No, my whole job is to have them provide the

10   information, without giving information to them.

11     Q    So, likewise --

12     A    Or leading them.  I'm sorry.

13     Q    So, similarly, you're not there to command a

14   nondisclosure, either?

15     A    That's correct.

16     Q    Okay.  So, I guess I'm trying to get at -- let me

17   ask this question.  In your training on how to talk to

18   children who are making allegations of sexual abuse, the idea

19   is to get a accurate statement from the child, right?

20     A    As much as possible.

21     Q    Okay.  And would you agree that your training from

22   CornerHouse and RATAC protocol is to try to get a reliable

23   statement from the child?

24     A    As much as possible.

25     Q    Okay.  And so, was there anything that you did, in

INV_TRAN_00001138

1   the interviews where the children didn't disclose, that made

2   the process less reliable than the interviews you conducted,

3   where the children did disclose?  For example, did you make

4   any big errors in the protocol, when you were talking to the

5   children who didn't disclose?

6      A   Let me answer your first question.  As --

7      Q   Okay.

8      A   -- as far as less reliable, again, it goes back to

9   if the child isn't going to disclose anything.  That's a

10   choice I can't change.

11      Q   Okay.

12      A   If I know ahead of time that there was a

13   disclosure, of course I want to attempt to elicit information

14   about that disclosure.  But if I don't know that there was a

15   disclosure previously, I'm in the unknown.

16      So, less reliable, more reliable, that's up to the

17   child.  I think the statements the child make is -- of

18   course, I'll try to pull information from them to try to

19   validate what they're saying.  But reliable, less reliable, I

20   think that's up to the child.

21      Q   Okay.  And then, my second question I asked was if

22   you feel like you made any fatal, or large errors, in the

23   interviews you conducted, where the children didn't disclose?

24      A   I don't know about fatal errors or large errors.

25   Just if there wasn't a disclosure, there wasn't a disclosure.

INV_TRAN_00001139

1    My job is not to force a disclosure, period.

2        Q    Right.

3        A    My job is to elicit the child to speak freely on

4    their own.

5        Q    Okay.  And when you are interviewing children who

6    are making allegations of sexual abuse, would you describe

7    that interview as fairly detailed?

8        A    At times.

9        Q    And would you describe it as comprehensive?

10       A    And your question, to answer that, it depends on

11   the child.  If you get a very young child, or something that

12   happened years ago, sometimes it's not as detailed, and

13   sometimes it is.

14            I know there's always more questions that, when you

15   leave an interview, you think back.  Well, I could have asked

16   this.  Or I could have asked that better.

17            That's every interview you do, all interviews.  So,

18   you try to pull as much as you can to get the most

19   comprehensive account that you can.  But, again, there are

20   details that just don't get.

21       Q    Would you describe the interview with a child who's

22   making an allegation of sexual assault as a process?

23       A    For them, and for me, if they're making the

24   allegation, the process starts with when the incident

25   happened.  And they, in that process of making the

INV_TRAN_00001140

1　disclosure, then come in contact with me.　And then, my job

2　is to pull that information out of them as best as possible,

3　without leading them in any way, and helping them to build

4　the account, in their words, of what happened.　So, it's a

5　process.　Yes.

6　　　Q　And would you say, even leading up to the stage in

7　the interviews where a child discloses, or not disclose, as a

8　process, like, for example, of rapport building?

9　　　A　Well, the rapport building is the initial contact

10　with them.　It goes into the interview.　So, yes, you're

11　building rapport with that child.

12　　　　They met you, as a stranger.　They don't know who I

13　am, when I first meet them.　And they have to overcome those

14　fears.　So, it is a process.

15　　　Q　Okay.　And in the process of the interview, are you

16　trying to elicit a free narrative from the child?

17　　　A　For the most part, but that depends on the child,

18　again.　A lot of children will not talk.　They will answer

19　questions.

20　　　　But they will not give a free narrative.　So, you

21　always don't have that luxury of, like, an older child, a

22　teenager.　You'll ask them a question.

23　　　　They will give you a narrative answer, where a

24　younger child may answer you yes or no, or say yeah.　So, you

25　don't always have that luxury of a free narrative.

INV_TRAN_00001141

1    Q    But that's the goal, or that's the best-case

2    scenario?

3    A    That's best-case scenario, in a perfect life.  Yes.

4    Q    And then, if you're not getting a free narrative,

5    do you have to try to elicit details from the child in other

6    ways?

7    A    You wouldn't get any details unless you tried.

8    Q    Okay.  And you mentioned the protocol you're

9    trained in as being the RATAC protocol.  Is that right?

10    A    CornerHouse.

11    Q    And can you just say what that abbreviation stands

12    for?

13    A    Rapport building, Anatomy ID, Touch inquiry, Abuse

14    scenario, and the Closing.

15    Q    And those describe, with some flexibility, the

16    different stages of the interview, right?

17    A    That's correct.

18    Q    You already referenced this a little bit earlier.

19    But I want to be clear.  How did you choose which children to

20    interview?

21    A    Initially, the case began with I.S.  He was the

22    initial disclosure that opened up this case.  The report was

23    made, initially, solely on him.

24    While talking with I.S., I, then, through his

25    interview, intended to meet with E.M.  I met with L.W.  He

INV_TRAN_00001142

```
 1    was available that day, or the next day that we did the

 2    interviews.

 3         Q    Can I stop you one second?

 4         A    Yes, you can.

 5         Q    Well, why did you decide to interview L., then?

 6         A    I don't know if I can tell you exact answer.  It's

 7    just I had been advised that L.W. and J.W. both slept with

 8    Michael McFadden, in his bed, by, I believe it was

 9    Dian Stauter had provided that information to me.

10         Q    So, --

11         A    Go ahead.

12         Q    -- so J.W. and L.W. had similar access, or spent

13    similar time with Mr. McFadden, as did I.S.  Is that fair to

14    say?

15         A    No.

16         Q    Okay.  All right, would you describe it as more or

17    less access to Mr. McFadden?

18         A    J.W. had spent over, I believe it was six years

19    with Mr. McFadden, I.S. just a short time.

20         Q    Okay.  What about L.W.?

21         A    L.W. is about the same amount as J.W., as like L.W.

22         Q    And what about E.M.?

23         A    E.M. had gone to Arizona for a time period, and,

24    when he returned, had been with McFadden quite a bit.

25         Q    Okay.
```

INV_TRAN_00001143

13

```
 1       A     He didn't sleep in the same bed, for the most part.

 2       Q     But, all three of these young boys spent time with

 3   Mr. McFadden?

 4       A     All four of them, yes.

 5       Q     Okay.  The fourth being I.S.?

 6       A     Well, there's more.

 7       Q     Okay.  All right, but is it fair to say that you

 8   directed your investigation and you talked to the children

 9   you talked to because they had access to Mr. McFadden?

10       A     Definitely.

11       Q     And that they spent a lot of time with

12   Mr. McFadden?

13       A     That is correct.

14       Q     Okay.  And is it true that -- I think you already

15   indicated this, but is it true that some of the children

16   actually lived with Mr. McFadden at different periods of

17   time?

18       A     That is correct.

19       Q     Okay.

20             MS. SMITH:  All right, may I approach the Witness?

21             THE COURT:  You may.

22   (Asides)

23             MS. SMITH:  Okay.

24             THE WITNESS:  Okay.

25             BY MS. SMITH:
```

INV_TRAN_00001144

```
 1      Q    Okay.  Now I want to turn with a little bit more
 2   specificity to the interviews you did with L.W.  You
 3   conducted two interviews with L.W., correct?
 4      A    Actually, three.
 5      Q    Three.  Okay.  When were the three?
 6      A    I'm sorry.  Let me back that up.  Two, you're
 7   correct.
 8      Q    Okay.  When was the first one?
 9      A    One was at the school.  I believe it would be the
10   19th of December.  I'm not positive on that date.  But I
11   believe that's correct.
12      Q    Of which year?
13      A    Would have been 2010, what?  Or I'm getting my
14   years mixed up, '12, I believe.
15      Q    Okay.  And what were the circumstances of this
16   interview?
17      A    Detective Stogsdill and myself went to the school,
18   where L.W. was attending, and met with him in an office
19   there.  The initial part of the interview, he was a witness,
20   per se, to I.S., and I.S.'s contact with Michael McFadden at
21   the house.
22           He would have known that I.S. slept in the bed, or
23   not, or any contact that he had seen with I.S.  We discussed
24   with L.W., during that interview, why we were there.
25           We went through a rapport-building with him,
```

INV_TRAN_00001145

1    anatomy ID-type setting. And asked him about any good/bad

2    touches, touches that made him comfortable or uncomfortable,

3    and discussed those with him. And it was our intent, if

4    there was any type of disclosure, to stop and take him to

5    Western Slope Center for Children. Contact his, I'm sorry,

6    mother, and have her meet us at Western Slope Center for

7    Children.

8       Q   As a part of that interview, did you ask him about

9    whether anybody had touched him inappropriately?

10      A   I did.

11      Q   And what did he say?

12      A   He indicated they had not.

13      Q   And did you record this interview?

14      A   I did, audio.

15      Q   And did you book this into evidence as EP-3?

16      A   That would appear to be so. I don't have my

17    Property Report in front of me. But that's what you have

18    here as EP-3. So, I'm taking your word for it that that's

19    the correct one.

20      Q   And is it also marked as Exhibit MH-C?

21      A   It is.

22       MS. SMITH: The Defense moves to admit MH-C, per a

23    stipulation with the District Attorney.

24       MR. WAITE: Yeah, no objection for purposes of this

25    hearing, Judge.

INV_TRAN_00001146

1          THE COURT:  All right, MH-C is admitted.

2     (Exhibit MH-C admitted.)

3          BY MS. SMITH:

4     Q     And I'm sorry.  Did L.W. make any statements as to

5     whether he had witnessed any child sexual abuse against I.S.?

6     A     He indicated he had not.

7     Q     And what about any other children?

8     A     He had not.

9     Q     Okay.  In this interview with L.W. at the school,

10    did you or Detective Stogsdill use leading questions?

11    A     There might have been a leading question.  But, for

12    the most part, no.

13    Q     Okay.  So, you were trying to conduct a non-

14    leading, non-suggestive interview, as you --

15    A     We were trying.  Yes.

16    Q     Okay.  To the best of your -- is it the same to

17    best of your ability as when you're speaking with any child

18    who you think might be a Victim of a child sexual assault?

19    A     I would say that's correct.

20    Q     Okay.  Now, turning to the second interview of

21    L.W., what date was that?

22    A     I'm sorry.  I can't tell you a date.  I know it was

23    in 2013.  We were up on Glade Park at his grandmother's

24    house.

25    Q     And was this --

INV_TRAN_00001147

```
 1      A    And it's --

 2      Q    -- the same date and place that you interviewed his

 3  brother, J.W.?

 4      A    That is correct.

 5      Q    Okay.  If I told you it was February 7th of 2013,

 6  would you have any reason to dispute that?

 7      A    I would have no reason to dispute that.

 8      Q    And what were the circumstances of this interview?

 9      A    I had not met with J.W. up until that point.  I

10  actually, in my prior investigation, had not met J.W. that I

11  was aware of.

12           I found out, during my investigation, he had

13  actually been at the Police Department the same day that I

14  met with E.M. for my first interview with E.M., and that the

15  Child Protective Services Worker had met with J.W.

16           I obtained her interview with J.W.  There were

17  issues that caused me to believe that both L.W. and J.W. had

18  been perpetrated on, at this point in the investigation.  And

19  it was my intent to meet with both of them again, especially

20  J.W., as a witness, and also as a possible Victim of child

21  sexual assault.

22           So, I met with J.W.  One of the children, it was

23  K.H.W., had told me that, at one point, he -- and I believe

24  during the night he was there, he woke up to some movement

25  between
```

INV_TRAN_00001148

18

```
 1    Michael McFadden and J.W.  And he had seen that.
 2            He indicated that to me.  He didn't describe what
 3    it was, in detail.  So, my intent was to meet with J.W. and
 4    see if there was any disclosure, on his part, at that point.
 5            I had a sense that both he and L.W. had been
 6    victimized.  And our purpose was to do an interview with J.W.
 7    We had trouble arranging for interviews at Western Slope
 8    Center with J.W. and his mother, Michelle.  And so, we told
 9    them that we would just meet them at the house.  Make it easy
10    for them.
11    Q    And what is the relationship between J.W. and L.W.?
12    A    Brothers.
13    Q    Okay.  And so, since you were there to follow up on
14    an -- okay.  Never mind.  And which child did you interview
15    first?  Do you remember?
16    A    Would have been J.W.
17    Q    Okay.  And in J.W.'s interview, does he make an
18    allegation against Mr. McFadden?
19    A    He does.
20    Q    And then, you interviewed L.W. after that, right?
21    A    I believe that's correct.  I believe that we
22    interviewed J.W. first.  I'm --
23    Q    It's --
24    A    I'd have to refer to my notes to be positive on
25    that.  The other reason we were there is I had not met with
```

INV_TRAN_00001149

1   Michelle.  And so, we had actually three issues there that we

2   needed to take care of.

3        Q    Okay.  Well, I guess I don't think it matters that

4   much which child you interviewed first.  But I think my

5   question is:  was your interview with J.W. and L.W. conducted

6   in, essentially, the same fashion?

7        A    I'm not sure what you would mean "the same

8   fashion".  We interviewed J.W. in the master bedroom at the

9   residence, so the bedroom that's on the east side of the

10  house, if my directions are right.  And behind a closed door,

11  the family was home in other rooms.

12       We could hear muffled voices in the other rooms.

13  Of course, you've got kids.  So, you have loud talking.  And

14  I believe they were watching TV at the time, too.

15       That was the same room we had interviewed Michelle

16  on, who we interviewed first, while we were there.  The

17  interview with J.W. was pretty extensive.

18       He was pretty descriptive, as far as what had taken

19  place, the abuse that he suffered, where he was at, locations

20  where that happened.  The interview with L.W. was very short.

21       We didn't go back and re-interview him over what

22  we'd discussed previously.  We just asked if there was other

23  information that he wanted to talk to us about.  I think we

24  weren't with L.W. more than probably five minutes.

25       Q    And when you say you didn't go back over other

INV_TRAN_00001150

20

```
1    information you'd already discussed, you mean information

2    that you talked to him about at school?

3        A    Yes.

4        Q    And where in the house was the interview with L.W.?

5        A    The same room, it was --

6        Q    Okay.

7        A    -- it was after we had interviewed J.W.  I believe

8    it was after we interviewed J.W.  We had J.W. leave.  And

9    L.W. came in and talked to us.

10       Q    Okay.  So, the interview with L.W. was L.W., you,

11   and Detective Stogsdill?

12       A    That is correct.

13       Q    Now, I know that the interviews were different

14   because of what the children were saying, or not saying, to

15   you.  But was there anything different in what you and

16   Detective Stogsdill did, at least initially?  Do you think

17   that you and Detective Stogsdill conducted the interviews in

18   a very different way, between J.W. and L.W., at least

19   initially?

20       A    Yes.  J.W., I hadn't met before.  And I mean, it

21   was pretty much right off the bat.  He knew why we were

22   there.  And he indicated he wanted to talk to us about that.

23   And --

24       Q    Okay.

25       A    -- we went with L.W.  It was, L.W., is there
```

INV_TRAN_00001151

1   anything else you want to talk to us about?  Is there

2   anything you can tell us, other than what we talked about the

3   last time?

4           He knew why we were there.  He mentioned

5   [indiscernible].  I believe we discussed why we're there.  He

6   remembered.

7           We went and talked about I.S. and about Mike last

8   time we talked to him.  And that he indicated there wasn't

9   anything else is could tell us.

10      Q    Okay.  Do you think that there was anything about

11  the circumstances under which you interviewed L.W. that

12  caused him to not disclose?

13      A    That's, again, up to the child.  If they disclose

14  or not disclose, that's not an issue I can force.

15      Q    Okay.

16      A    Or would want to.

17      Q    So, in retrospect, do you think that there's

18  anything that you or Detective Stogsdill did, in speaking

19  with L.W., that was erroneous or problematic?

20      A    No.

21      Q    And did you record this interview?

22      A    It was.

23      Q    And is it there before you, as MH-B?

24      A    That is correct.

25      Q    And it also is marked -- is it also marked as

INV_TRAN_00001152

22

1    EP-16?

2        A    That is correct.

3        Q    Is that likely consistent with how you booked it

4    into evidence?

5        A    Without looking at my Property Reports, again, I'll

6    have to go on your word.

7        Q    Okay.

8        A    That it is EP-16, copy.  I have not listened

9    directly to these CDs.  So, --

10       Q    Right.

11            MS. SMITH:  The Defense would move to admit MH-B,

12   per stipulation with the District Attorney.

13            MR. WAITE:  No objection, Judge.

14            THE COURT:  MH-B's admitted.

15   (Exhibit MH-B admitted.)

16            BY MS. SMITH:

17       Q    And just to be clear, I think it is, at this point.

18   But let me make sure.  Did L.W. make any allegations of

19   sexual abuse against Mr. McFadden toward any child?

20       A    No, he did not.

21       Q    At Glade Park.

22       A    No, he did not.

23       Q    Okay.  Now, did you interview D.O.?

24       A    I did.

25       Q    And why did you interview D.O.?

INV_TRAN_00001153

23

```
 1      A    As part of the investigation.

 2      Q    What's the relationship between D.O. and E.M.?

 3      A    D.O. and E.M. are brothers with different fathers.

 4      Q    Okay.  Same mother, then?

 5      A    Yeah.

 6      Q    And is their mother, Crystal McFadden?

 7      A    Yes.

 8      Q    And did E.M. disclose abuse by Mr. McFadden?

 9      A    E.M. did.

10      Q    Okay.  As a part of your investigation, did you

11   learn whether E.M. and D.O. spent similar amounts of time

12   with Mr. McFadden?

13      A    They were around him for similar amounts of time.

14   Yes.

15      Q    And did they both live with Mr. McFadden?

16      A    At one point, yes.

17      Q    Okay.  And when did you interview D.O.?

18      A    When I initially met with E.M., D.O. had gone to

19   Boulder, Colorado, to see his grandparents.  So, he was not

20   available for the interview.

21           So, when he returned, I conducted an interview with

22   him.  I believe it was some time after the first of the year.

23   In fact, it was the same day that I interviewed E.M. on the

24   second interview that E.M. made his disclosure.

25      Q    Does January 2nd, 2013 --
```

INV_TRAN_00001154

1        A       That is the date.

2        Q       Okay.  And where was this interview?

3        A       Interview was conducted at Grand Junction Police

4    Department.

5        Q       And did you also re-interview E.M. that same day at

6    the Grand Junction Police Department?

7        A       That's the date that E.M. made spontaneous

8    statements to me.

9        Q       And after making those spontaneous statements, did

10   you conduct a full interview with E.M. at the Police

11   Department?

12       A       I did.

13       Q       Okay.  And then, after speaking with E.M., did you

14   interview D.O.?

15       A       I did.

16       Q       And were the circumstances between your interviews

17   with E.M. and D.O. similar?

18       A       No, E.M.'s was a spontaneous statement to me that

19   he told me he had lied, and that he needed to talk to me.

20   That was when I first walked into the lobby of the Police

21   Department.

22              He told me that.  I told him, okay.  Let's go

23   upstairs and we will talk.  We did a follow-up interview,

24   because I had already conducted a interview, per protocol,

25   with him.  So, the follow-up interview was to obtain direct

INV_TRAN_00001155

25

```
 1   information from him about the abuse that he said occurred to
 2   him, from Michael McFadden.
 3        Q    I think what I mean in circumstances is more
 4   specifically, was it the same room?
 5        A    It was.
 6        Q    And did you use a similar approach to interviewing
 7   both children?
 8        A    I hadn't met D.O.  So, I went through touch
 9   scenario-type thing with D.O.  And there was no disclosure on
10   that part.  The issue I did have with D.O. was the incident
11   in Arizona, where he'd made an initial disclosure to a Law
12   Enforcement Officer down there.
13        Q    Okay.
14        A    That was in 2009.
15        Q    And did D.O. deny making that disclosure in
16   Arizona?
17        A    I don't know if he denied it.  He didn't recall --
18        Q    Okay.
19        A    -- making it.  So, --
20        Q    And then, did he deny any bad touches, or sexual
21   touches, by Mr. McFadden?
22        A    There were no further disclosures by him.
23        Q    Okay.  And would you describe that interview you
24   had with D.O. as a forensic interview, then?
25        A    For the most part, yes.
```

INV_TRAN_00001156

Exhibit C

26

```
 1      Q    I forgot to ask you this, when we were talking
 2   about L.W.'s second interview at Glade Park.  Would you
 3   describe that as a forensic interview?
 4      A    We had, for the most part, yes, follow-up
 5   interview.
 6      Q    Okay.  So, again, I know that each child's
 7   different, and then you react to what the child does or
 8   doesn't do?
 9      A    That's correct.
10      Q    But I guess my question is:  in your general
11   overall approach to both E.M. and D.O. that day, at the
12   Police Department, was it similar in terms of trying to get a
13   reliable, non-leading interview from both children?
14      A    All interviews are.  You're trying to be
15   non-suggestive to the child, to elicit information from him.
16   So, pretty much that's the same with every interview.
17      Q    Okay.  So, nothing in your approach was drastically
18   different with D.O. that could explain why he didn't
19   disclose?
20      A    Again, that's up to the -- disclosure's up to the
21   child.  I can't force that issue --
22      Q    Okay.
23      A    -- with a child.  They have to make that --
24      Q    Okay.
25      A    -- decision.  If it didn't happen, it didn't
```

INV_TRAN_00001157

27

1   happen.  I can't --

2       Q    So, in retrospect, do you think that you made any

3   major mistakes in your interview with D.O. that could

4   possibly explain why he didn't disclose?

5       A    Are you telling me he should have disclosed?

6       Q    No, I'm asking you if, just in thinking back on

7   that interview, if you think you made a major mistake in the

8   protocol, for D.O.?

9       A    Again, that disclosure's up to the child.  There

10  are questions I could have asked.  I mean, you always can

11  think of questions you could have asked.

12           But, if that child's not going to make a

13  disclosure, they're not going to make a disclosure.  I don't

14  know whether I made a mistake or not.  Again, it's up to the

15  child.

16      Q    Okay.  All right, I think I'm just trying to get

17  at, I mean, it's true that, I mean, you've testified numerous

18  times that there is a protocol that you follow, correct?

19      A    There is.  But that protocol is open.

20      Q    Right.

21      A    And you follow that protocol to the extent

22  possible.  There are questions that you're asking that child,

23  and especially on a re-interview.

24           You don't go back and start over with anatomy ID.

25  That's already been accomplished.  You don't go back on touch

INV_TRAN_00001158

1    scenario.

2         That's already been accomplished.  They're already

3    making the disclosure.  So, you go from there.  If you go

4    into a interview, and the first thing the child blurts out is

5    I lied to you, you don't go back over that.

6         Q    Okay.

7         A    You go straight to your questioning as to the abuse

8    scenario.  So, maybe I don't understand what you're trying to

9    get at.

10        Q    In your interview with D.O., did you leave out one

11   of the major parts of the protocol?

12        A    In my interview with D.O.

13        Q    Or do you think, in your interview with D.O., you

14   deviated from the protocol in a -- deviated too far from the

15   protocol in a way that didn't make the interview a forensic

16   interview?

17        A    Do I think?  No.

18        Q    Okay.  Now, before you, do you have MH-A?

19        A    I do.

20        Q    And is that also marked as EP-11?

21        A    It is.

22        Q    And as D.O.'s January 2nd, 2013 interview?

23        A    It's just marked Interview with D.O.  There's no

24   date on there.

25        Q    There's no date.  Okay.  I beg your pardon.

INV_TRAN_00001159

1           MS. SMITH:  The Defense moves to admit MH-A.

2           MR. WAITE:  For purposes of this hearing, Judge, I

3  don't object to that.

4           THE COURT:  It's admitted.

5  (Exhibit MH-A admitted.)

6           BY MS. SMITH:

7      Q    And in this interview with D.O., did he make any

8  allegations of sexual abuse against Mr. McFadden, towards

9  himself?

10     A    He did not.

11     Q    Did he make any allegations of sexual abuse against

12 Mr. McFadden, towards any other child?

13     A    He did not.

14     Q    Did you interview T.M.?

15     A    I did.

16     Q    Did you interview T.M. because you knew that his

17 mother dated Mr. McFadden?

18     A    I did.

19     Q    And did you know, from talking to that woman, that

20 Mr. McFadden spent time with T.M.?

21     A    I did.

22     Q    And when did you interview T.M.?

23     A    I'm sorry.  I don't have that date.  I think it was

24 in March of 2013.  But I can't tell you the date.

25     Q    Okay.  How does April 3rd of 2013 --

INV_TRAN_00001160

1       A    That --

2       Q    -- sound?

3       A    -- that would work, if that's what you have in your

4   records, from my records.

5       Q    Okay.  And where did that interview take place?

6       A    At Grand Junction Police Department.

7       Q    And how old was T.M. at the time of the interview?

8       A    I'm sorry.  I think he was 14 or 15.  I'm not

9   positive on that.

10      Q    Okay.  But he was an older child, then?

11      A    I believe he was.

12      Q    So, was your interview with T.M. similar to your

13  interview with D.O.?

14      A    No.

15      Q    Okay.  In your interview with -- was your interview

16  with T.M. as a -- was your approach that he could be a

17  Victim?

18      A    Initially as a witness, because he had been around

19  McFadden and around the other boys.  He was named by, I'm

20  sorry, John [phonetic] and Phyllis H          [phonetic].

21           His mother was named as a ex-girlfriend who had a

22  son and had been around McFadden.  My job, as an

23  Investigator, especially in this case where I have multiple

24  disclosures by multiple kids, over a period of multiple

25  years, was to uncover any other possible Victims.  So, T.M.

Exhibit C

31

1    was a witness, having been around these kids, as well as a

2    possible Victim.

3        Q    Would you say that your interview with T.M. was a

4    forensic interview?

5        A    It was an interview.  I was not leading Mr. T.M. in

6    the interview, as far as the same I would a young child,

7    since he was able to talk on his own, was able to provide

8    narrative.

9        Q    Did you conduct the interview in a suggestive

10   manner?

11       A    I did not.

12       Q    Did you, with some flexibility, given T.M.'s age,

13   adhere to the CornerHouse protocol with T.M.?

14       A    I can't tell you that I did.  I understand that I

15   did talk to him as a witness, initially.  But we also went

16   into -- I think I did talk to him using the touch scenario.

17   And then asked him about any abuse, or possible abuse to him

18   by any person, or if he witnessed any abuse to any other

19   persons.

20       Q    So, it sounds like you conducted a couple of the

21   stages of the RATAC with T.M.?

22       A    I did.

23       Q    And did he make any disclosures of sexual abuse?

24       A    He made no disclosures of sexual abuse, or

25   witnessing any sexual abuse.

INV_TRAN_00001162

```
 1     Q    Would you describe the interview with T.M. as
 2  suggestive?  Did I already ask you that?
 3          MR. WAITE:  You did.
 4          MS. SMITH:  I'm sorry.
 5          BY MS. SMITH:
 6     Q    I know.  You had explained, when you testified
 7  previously, that whether or not an interview occurs at the
 8  Police Station, or the Western Slope Center for Children,
 9  doesn't really matter.  Is that correct?
10     A    We're supposed to conduct them at Western Slope
11  Center for Children.  But there are times when -- as such as
12  with E.M. -- a spontaneous statement, and T.M.'s an older
13  child.
14          It was later in the day.  And I believed, if I'm
15  not mistaken, when I called his mother, they agreed to come
16  down that same afternoon.  I'm not positive on that.  But
17  I'm --
18     Q    So, nothing in the interviews that occurred at the
19  Grand Junction Police Department make them less reliable,
20  just because they occurred at the Police Department.  Would
21  you agree with that?
22     A    I would agree with that.
23     Q    Now, you recorded the interview with T.M., correct?
24     A    I did.
25     Q    And it's before you as MH-D, correct?
```

INV_TRAN_00001163

33

```
 1      A    MH what?

 2      Q    D, as in dog?

 3      A    That is correct.

 4      Q    And also marked as EP-18?

 5      A    That is correct.

 6           MS. SMITH:  And the Defense moves to introduce

 7   MH-D.

 8           MR. WAITE:  No objection for this hearing, Judge.

 9           THE COURT:  It's admitted.

10   (Exhibit MH-D admitted.)

11           BY MS. SMITH:

12      Q    Now, finally, we turn to the interview with Lo.W.

13   Is that how you pronounce that last name?

14      A    It's close enough.

15      Q    Okay.  Did you interview that young child, little

16   Lo.W.?

17      A    I will put, I attempted to interview young Lo.W.

18      Q    Okay.  And how old was Lo.W. when you interviewed

19   him?

20      A    I think he was four, but a very young four, if

21   that.  So, I'm not positive on that.  His mental capacity's

22   not the word for it I'm thinking of.  But, he was just very

23   young when I conducted the interview, or tried to.

24      Q    Okay.  And where did that interview occur?

25      A    That was at the Dolphin House down in Montrose,
```

INV_TRAN_00001164

1    which is Montrose County's sister for our CornerHouse.

2        Q    Okay.

3        A    Or our Western Slope Center for Children.

4        Q    And did you interview Lo.W. because he had similar

5    contact with Mr. McFadden, as his siblings, K.H.W. and

6    S.L.W.?

7        A    Somewhat similar, yes.

8        Q    And what was that contact that --

9        A    The W., originally they lived on North Avenue in a

10   what we'd call trailer park, not too far from the house on

11   Glen Road where Michael McFadden was living with John and

12   Phyllis H█████████████

13          I know that K.H.W. would frequent the H███████████████

14   and Mr. McFadden.  But I'm not sure that Lo.W. or S.L.W., I'm

15   sorry, per the H█████████'  statements to me.

16          They, then, moved to the D and a half road address,

17   2█ D and a half road.  And the W. moved into a house next

18   door to where McFadden and the H████████████  lived.  And the

19   W. children would frequent that residence.

20          So, in that respect, they had a somewhat similar

21   interaction with Mr. McFadden.  I just don't know how much

22   interaction Lo.W. actually had, because he was quite a bit

23   younger than the other kids.

24       Q    Okay.  But was Lo.W. also on the over-the-road

25   tractor-trailer trip with Mr. McFadden that his two

INV_TRAN_00001165

```
 1   siblings --

 2        A    He was.

 3        Q    Or his actually three siblings were.  Okay.  He

 4   was.  Okay.  So, you said you attempted to interview Lo.W. at

 5   the Dolphin House.  And was this the same date and place that

 6   you interviewed his brother, K.H.W., and his sister, S.L.W.?

 7        A    It was.

 8        Q    And did you use the CornerHouse protocol when you

 9   interviewed Lo.W.?

10        A    I tried.

11        Q    And did Lo.W. make any disclosures of sexual

12   abuse --

13        A    He did not.

14        Q    -- in the interview?  And about how long was that

15   interview?

16        A    I can't tell you.  It was pretty short.

17        Q    Okay.  Would you describe that interview as

18   suggestive?

19        A    No.

20        Q    Which parts of the protocol -- which stages of the

21   protocol did you get through with K.H.W.?

22        A    With K.H.W. or Lo.W.?

23        Q    I mean Lo.W., yes?

24        A    Initial introduction, then we started talking.  And

25   it didn't go very far from there.
```

INV_TRAN_00001166

36

1        Q      How come?

2        A      Because he's a very young child, and very active.

3    Moves around a lot, and it was hard to pull any information

4    out of him, as far as -- or elicit any information out of

5    him, as far as anything.  So, --

6        Q      Did you ask him if he had ever received bad

7    touches?

8        A      I think attempted to.  But, I don't believe we got

9    there.

10       Q      Okay.  Is Lo.W.'s interview before you as MH-E,

11   there on a disk?

12       A      It is, correct.

13       Q      And also marked as EP-5?

14       A      That is correct.

15       Q      And you recorded the interview with Lo.W., right?

16       A      I did.

17       Q      And booked it into evidence at --

18       A      I did.

19       Q      Okay.

20              MS. SMITH:  And the Defense moves to introduce

21   MH-E.

22              MR. WAITE:  No objection, Judge, for this motions

23   hearing.

24              THE COURT:  It's admitted.

25   (Exhibit MH-E admitted.)

INV_TRAN_00001167

```
 1            BY MS. SMITH:

 2       Q    Let me just ask a couple quick questions, and then

 3   I'm going to be done.  In your interviews with L.W., D.O.,

 4   and T.M., and Lo.W., did the children use age-appropriate

 5   language?

 6       A    Say the four names again.  I'm sorry.

 7       Q    L.W., D.O., T.M., and Lo.W.?

 8       A    Lo.W., no, the rest of them, yes.

 9       Q    Okay.  And in --

10       A    Well, I guess age-appropriate, other than he's

11   hyper ADHD, whatever, Lo.W., age-appropriate for him, yes.

12       Q    Okay, for his developmental age?

13       A    Yes.

14       Q    Okay.  And then, for the two interviews with L.W.

15   and the interview with D.O., would you describe those your

16   interviews of those children as suggestive?

17       A    I would not.

18       Q    Okay.

19            MS. SMITH:  All right, I have nothing further.

20   Thank you.

21            THE COURT:  Mr. Waite?

22            MR. WAITE:  I have no questions for the Detective.

23            THE COURT:  Okay.  Thank you, sir.

24            MS. SMITH:  Yeah, may I approach with the --

25            THE COURT:  You may.  Thank you.  Argument?
```

INV_TRAN_00001168