1

DISTRICT COURT, COUNTY OF MESA, STATE OF COLORADO

CASE NOS. 2013 CR 000027, 2013 CR 000339, and
2013 CR 000342, DIV. 5

---

REPORTER'S TRANSCRIPT (Jury Trial)

---

IN THE MATTER OF

THE PEOPLE OF THE STATE OF COLORADO,

    Plaintiff,

v.

MICHAEL TRACY MCFADDEN,

    Defendant.

---

    The above-entitled matter came on for jury trial
on Wednesday, July 15, 2015, at 9:39 a.m., before the
HONORABLE VALERIE ROBISON, District Judge.

APPEARANCES:

FOR THE PLAINTIFF:          DAVID WAITE

FOR THE DEFENDANT:          KARA SMITH
                                  SCOTT BURRILL

WITNESSES:                 DEBRA BAILEY
                                  CHERYL YOUNG

INV_TRAN_00003058

```
 1                        CHERYL YOUNG
 2   Was called as a witness, and after having been first duly
 3   sworn, was examined and testified as follows:
 4                        DIRECT EXAMINATION
 5        BY DAVID WAITE:
 6        Q     Good morning.
 7        A     Good morning.
 8        Q     Would you state your name and spell it for the
 9   record please?
10        A     Cheryl Young, C-H-E-R-Y-L Y-O-U-N-G.
11        Q     And, and how are you employed?
12        A     I'm an owner and partner of Behavioral Health and
13   Wellness in Grand Junction, Colorado.
14        Q     And, and what is Behavioral Health and Wellness?
15        A     It's a private psychological counseling practice.
16   There's approximately 18 Clinicians, Neuropsychologists,
17   Psychologists, Licensed Clinical Social Workers,
18   Licensed Professional Counselors, and licensed marriage and
19   family Therapists.
20        Q     How long have you done that work?
21        A     I've done, you know, behavioral health counseling
22   since I completed my Graduate degree in '84.  But, I've been
23   with Behavioral Health and Wellness since 1992, 1992.
24        Q     Would you describe your job for us please?
25        A     So, I'm a licensed marriage and family Therapist.
```

INV_TRAN_00003107

EXHIBIT F

51

 1    My practice has changed over the last year.  Approximately

 2    maybe 60 percent of my clinical time, three days a week is

 3    spent embedded into a family practice clinic or a pediatric

 4    clinic where I do consultations and brief treatment within

 5    the, the primary care practice.

 6            Two days a week my practice is pretty traditional.

 7    I see children and families.  I would say the larger

 8    percentage of my practice is probably related to trauma and

 9    the larger percent of my -- both -- actually I would say both

10    the family practice pediatric hours, as well as my regular

11    outpatient hours, trauma adjustment, divorce adjustment,

12    child maltreatment.

13            And a very small part of my practice these days is

14    perhaps more forensic in nature, evaluations,

15    court-appointed evaluations, court testimony, those types of

16    things.

17        Q    Well, just describe for us please your training and

18    the education that you've been to get to this point?

19        A    I have a Bachelor's degree in Social Work with an

20    emphasis in child welfare and child development from Colorado

21    State University.  I have a Master's degree in marriage and

22    family therapy from United States International University in

23    San Diego, California.  And I am licensed in the State of

24    Colorado as a marriage and family Therapist.

25        Q    Does some of your education and some of your

INV_TRAN_00003108

1   experience deal with -- and I think you said child

2   maltreatment over -- earlier, but deal with Victims of sexual

3   assault?

4       A   Yes.

5       Q   And, and can you describe for us please what

6   training you've had in that area and, and, and what type of

7   experience you've had with Victims of child sexual assault?

8       A   Well, my Bachelor's degree in Social Work was on

9   what was then called the child welfare track.  I think they

10   call it now the child and family track where the focus is on,

11   you know, family systems, healthy family systems, family

12   systems with pathology, child development, and child

13   maltreatment, child protection, abuse, neglect, sexual abuse,

14   educational neglect, medical neglect, coursework in those

15   types of areas.

16         My Master's degree was more specific to a clinical

17   psychology and marriage and family therapy.  So, I had

18   traditional psych classes in abnormal psychology,

19   developmental psychology and then my specialization in

20   marriage and family therapy.

21         And that, again, included pathological family

22   dynamics, child mental treatment, families with different

23   cultural backgrounds and that's what prepared me for the

24   licensure exam in marriage and family therapy.

25       Q   What professional boards or professional

1    organizations do you belong to?

2        A    Currently, I'm a Clinical Fellow of the American

3    Association of Marriage and Family Therapists.  I belong to

4    the -- locally, I'm a member of the Mesa County Child

5    Fatality Review Team with the Coroner and Pathologist,

6    District Attorney's Office, Department of Human Services, Law

7    Enforcement.

8            I'm their mental health representative.  I'm also a

9    member of the Mesa County Child Sexual Assault Review Team

10   which includes many of those same agencies.  I'm on the

11   Advisory Council of the Western Slope Center for Children.

12           I am a member of the Advancing Care Together

13   Project out of the University of Colorado Health Sciences and

14   the Colorado Health Foundation which has been a

15   three-year study I've been working on with primary care

16   partners.

17           Those are the ones -- oh, and I'm also a member of

18   the Association of Family and Conciliatory Courts which is

19   more divorce, custody, child abuse, forensic side of working

20   with families and children.

21       Q    Ms. Young, do you train, educate or supervise

22   others in your field as well?

23       A    I do.

24       Q    What types of things do you do in that area?

25       A    I provide supervision to Clinicians who are

INV_TRAN_00003110

```
 1   unlicensed and who are working towards licensure that could
 2   be in our practice typically.  I also do trainings for a
 3   variety of different agencies, usually more around
 4   developmental concerns in terms of forensic interviewing or
 5   interviewing children in high conflict custody or
 6   interviewing children where there are allegations of abuse or
 7   neglect or maltreatment.
 8           So, I've done trainings for different Law
 9   Enforcement Agencies, different Department of Human Service
10   agencies in western Colorado and some in eastern Colorado, as
11   well.
12       Q    You indicated earlier that you have counseled with
13   children that are sex assault Victims.  Is that right?
14       A    Yes.
15       Q    Can you, can you give us a rough idea of how many
16   over the course of the last number of years?
17       A    Since 1984.  I mean I've talked with hundreds of
18   children who have victimization including sexual assault.
19   You know, when you practice full time for as many years as
20   I've practiced and you specialized in child trauma, that's
21   going to be a large percentage.  So, I, I, I have no idea the
22   number of -- about I would say hundreds.
23       Q    Hundreds?  Okay.  How many cases of sexual assault
24   have you reviewed?
25       A    So, I mean if we talk in terms of more
```

INV_TRAN_00003111

55

1   comprehensive reviews where I might see the entire case file,

2   as well as videotaped interviews, I'd say I've probably

3   conducted probably 35 to 40 of those.

4          More cursory, less intense reviews or consultations

5   on cases, I would say any given year I've probably done I

6   don't know, 15 to 20 of those with both Prosecution as well

7   as Defense Counsel and that would be not just Mesa County but

8   in counties all over western Colorado and some also in

9   eastern Colorado in the front range.

10      Q    Have you ever been qualified as an Expert in child

11   sexual assault trials?

12      A    I have.

13      Q    How many times have you testified as an Expert

14   would you say?

15      A    In child sexual abuse trials, just over 90 since

16   1996.

17      Q    Can you tell us roughly the jurisdictions?  I mean

18   is that mainly here in Mesa County?

19      A    No, but I'm very bad with the jurisdictions --

20      Q    Okay.

21      A    -- by number but I can tell you sort of by county.

22   So, I've testified in Mesa County, Delta County, Montrose

23   County, Montezuma County, La Plata County, I can't remember

24   what Minturn is in or Leadville.  I've testified in Rio

25   Blanco, Garfield, Moffat, Routt, Aurora, and that's all I can

INV_TRAN_00003112

56

 1    think of off the top of my head.

 2         Q    You indicated earlier that you've done that --

 3    you've consulted with the Prosecution.  You've also -- have

 4    you ever testified for Defense Counsel?

 5         A    I have much less frequently.  I've only testified

 6    for Defense approximately three times, once in Mesa County,

 7    once in Delta County and once in Meeker, Rio Blanco County,

 8    or Moffat County.

 9              My policy is that I will consult with either

10    District Attorney's or Prosecution or Respondent's Attorney

11    in D and N cases or the County Attorney.  That I try to keep

12    a very open door policy.

13              MR. WAITE:  Your Honor, at this time I'm going to

14    move -- I would tender Ms. Young as an Expert in the areas of

15    dynamics of child sexual abuse --

16              THE COURT:  Okay, go slow.  Hang on.

17              MR. WAITE:  Disclosure patterns, disclosure

18    dynamics, Victim/Offender relations, memory and factors that

19    might impact child sexual assault Victims.

20              THE COURT:  Mr. Burrill?

21              MR. BURRILL:  And Your Honor, we continue to object

22    to Ms. Young's testimony, as again, we think it really

23    amounts to credibility avouchment on her part.  So, we'd

24    renew our objection.  Some of this has been [indiscernible]

25    and we renew our objection to [indiscernible] today.

INV_TRAN_00003113

1          THE COURT:   That specific objection is overruled

2    based on earlier records that have been made, as well as the

3    record that has been made here today.   And at this time,

4    based on the only objection that has been propounded, I do

5    accept you as an Expert in the area of the dynamics of child

6    sexual assault Victims, disclosure patterns, disclosure

7    dynamics, Victim/Offender relationships, memory factors that

8    might impact child sex assault Victims and you'll be allowed

9    to express Expert opinions in those areas.

10          BY MR. WAITE:

11     Q    As we start into this, I want to, I want to make

12   this clear for the jury.   Have you done any work to prepare

13   for this case?   In other words have you been given any of the

14   facts of this case?

15     A    No.

16     Q    Okay.   You haven't talked to the Victim in this

17   case?

18     A    No.

19     Q    Haven't interviewed the Victim?

20     A    No.

21     Q    Okay, so you're here kind of as a blind expert, if

22   you will?

23     A    Yes.

24     Q    Okay.   All right.   I want to talk to you about

25   disclosure dynamics.   Let's talk first about what is an

INV_TRAN_00003114

1    outcry statement?

2         A    So, when we think of an outcry statement, we think

3    of it as the first process or step in a disclosure.  So, an

4    outcry is either made by a child to a parent, more typical

5    the mother than anybody else.

6              Also it can be to other people, older children,

7    teenagers are also pretty likely to disclose to friends,

8    friends of families, sometimes school personnel, youth

9    ministers, that sort of thing.

10             So, the first stage of disclosure is outcry.  The

11   goal of an outcry being different than a formal disclosure to

12   Law Enforcement.

13        Q    So, what is a disclosure then and what are the

14   differences between those two?

15        A    So, an outcry typically by a child is, is you know,

16   prompted for different reasons.  But, it's -- the goal by in

17   large is to get some sort of emotional support to relieve

18   some sort of emotional distress.

19             A formal disclosure or interview to Law Enforcement

20   has different goals, not child directed necessarily but

21   directed by the agencies conducting an interview, which is

22   more of a forensic fact-finding.  Were any laws broke?  Are

23   there specific needs to protect a child?

24             And so the process often starts with the outcry to

25   someone the child trusts.  And then if it gets reported to

59

1     agencies, it then culminates in a formal disclosure.

2         Q     What factors affect how a child discloses?

3         A     There are a variety of factors.  Age certainly is

4     one we would have to consider.  Younger children, if we're

5     talking preschool are more likely to make an excited

6     utterance or to have certain behaviors that draw attention of

7     an adult, sexually acting out, inappropriate knowledge for a

8     child that's three or four, sexualized behaviors.

9              Elementary school children it could be prompted by

10    a variety of factors.  It's a little bit more of a planned

11    but not -- I should say intentional outcry but necessarily

12    well planned.

13             They can still somewhat blurt something out under

14    some -- certain factors of distress and I can go into a few

15    more of those.  Adolescents tend to be more intentional and a

16    little bit more planned.

17             So, in terms of one of the factors, development is

18    one.  Another factor is gender.  Female children are more

19    likely to outcry as compared to male children, particularly

20    if the Offender is of the same sex because of concerns about

21    being labeled as homosexual or having people look down at

22    them.

23             A really significant factor is the closeness that

24    the child has to the Offender.  If the Offender is somebody

25    within the family who the child is in a dependent

INV_TRAN_00003116

60

1    relationship, it, it's harder for that child to disclose.

2              If the Offender is a, a stranger it's actually

3    much, much more likely that it'll be an immediate and rapid

4    outcry.  But, the closer and more dependent the child is

5    and/or the mother is on an Offender, the less likely to get a

6    very quick outcry.

7              Another factor can be to prompt an outcry, or I

8    guess we're talking more about delaying an outcry is if the

9    child has experienced any sense of threat or perceived threat

10   if they make an outcry.  That can obviously be another factor

11   that will delay it.

12        Q    So, are there -- there are delays in disclosure?

13        A    Yes.

14        Q    Are there, and, and, and those occur because of

15   some of the things you just talked about?

16        A    Those are some of the things that we just know that

17   statistically it's very quite likely --

18              MR. BURRILL:  Your Honor, I'm going to object to

19   any sort of statistics that are introduced to explain, you

20   know, behaviors.  Again, I think that that goes into the area

21   of vouching on credibility.

22              MR. WAITE:  And Judge --

23              MR. BURRILL:  I also, I also -- and I'm sorry,

24   Mr. Waite, I just wanted to clarify this one point.  I'd add

25   that that would be shifting the burden of proof under both

INV_TRAN_00003117

1    United States and Colorado Constitutions, thank you.

2           MR. WAITE:  Judge, I don't think her answer in

3    terms of the statistics was talking about -- it was talking

4    mainly about delay and disclosure.  It has really nothing to

5    do with a credibility issue.

6           THE COURT:  The objections are overruled.

7           THE WITNESS:  By the way I think social scientists

8    try to learn about human behavior are retroactive studies,

9    meaning that we go back and we attempt to interview in, in

10   terms of child sexual assault, you know, conduct research on

11   people who are committing these offenses or Victims who have

12   experienced these types of things.

13          And so the secrecy or the outcry piece is a

14   complicated, complicated set of dynamics.  And so what we

15   have learned in some of the social sciences research, and

16   it's kind of a summary of about 11 or 12 different studies is

17   that about 32, maybe to 40 --

18          MR. BURRILL:  Your Honor, I'm, I'm going to object

19   again.  If we're citing specific statistics about how often

20   something was disclosed, I think this is inappropriate Expert

21   testimony.  I think it vouches for the credibility of the

22   alleged Victims in this can and I, I believe it's shifting

23   the burden of proof.

24          THE COURT:  I understand the objection.  The

25   objection is overruled.  Go ahead.

INV_TRAN_00003118

1          BY MR. WAITE:

2      Q    Go ahead.

3      A    Thirty-two to 42 percent will outcry sometime

4  within a year of the last offense.  We will go 42 to maybe 52

5  percent sometime in childhood.

6          So, sometime before the age of 18.  And so what

7  that tells us is that anywhere between you know, 52 to maybe

8  sometimes as high as 70 percent don't outcry in childhood.

9  And some don't outcry at all, ever.

10          Maybe researching these, being part of a research

11  study was the first time that they have made this disclosure

12  outcry about their childhood history.  So, when we, when we

13  know that and when we see that you know, anecdotally as, as

14  Clinicians or, or individuals who work with child Victims, we

15  recognize that the outcry to disclosure process is slow.

16          And we are trying to identify those, those events

17  that help us understand it more.  Why is it that it's so hard

18  to make that outcry?  And those are the things we've know is

19  all these fears, you know, the fear of being labeled in terms

20  of our male Victims, the fear of the court process, the fear

21  of being rejected by family members who won't perhaps believe

22  or who perhaps are aligned with the Offender.

23          The fear of being taken, removed from the home or,

24  or losing the regular contact of a loved one.  The other one

25  that is kind of an interesting one for children is a reason

INV_TRAN_00003119

63

1   for delay is something we call racket emotional awareness.

2          That sometimes it takes until late in middle school

3   to early high school to recognize that what happened when you

4   were younger was sexual in nature.  When you're six you might

5   think it's kind of icky and it's kind of funny and it's kind

6   of weird.

7          But, the fact that it was sexual and what it may

8   represent at 13, 14 or 15 is going to be different than what

9   it represented at four, five, and six.  And so what we see

10  with child Victims is that the events often are more

11  distressing as they're older, even if the events have stopped

12  because of what they now understand that type of experience

13  means; that it was a sexual violation.

14     Q    What are victor Offender, Victim/Offender

15  relations?  What is that?

16     A    So, that's the other thing we've tried to

17  understand is, is what are the circumstances that allows

18  these types of relationships to start in, in a Victim or an

19  Offender, the actual uniqueness of that relationship.  And

20  some of the things that happen are pretty normal things that

21  should happen between adults and children.

22          And one is attention and affection.  You know, we,

23  we laugh about children being resource seekers and they are

24  seeking resources, usually from adults.  And one of those

25  fundamentally important ones is attention, the seeking the

INV_TRAN_00003120

1    attention and affection.

2         So, it doesn't look inappropriate until

3    retrospectively if you're talking about sexual offense.  So,

4    attention and affection.

5         Another one that we see that's very common is a

6    very slow, subtle exposure to the concept of sexual behavior,

7    tickling, back rubs, wedgies, patting, rubbing, it, it's very

8    slow.  And it moves to certain parts of the body that the

9    child may not quite understand, if it's a younger child, what

10   that intention is.

11        There can be another thing we call

12   misrepresentation of moral values.  So when an Offender is in

13   a relationship with a child and maybe would say things like

14   this is okay because I love you.  Or this is okay because God

15   wanted that -- this for us so that there's a

16   misrepresentation to the child that somehow what is being

17   done is acceptable.

18        There's mislabeling the activity which you can do

19   with younger children as part of that dynamic.  So, telling

20   the child you need to check their breasts for tumors or check

21   their bottoms for sores or cleanliness or you know, those

22   sites -- sort of things.

23        Another one is threats, which can be explicit or

24   implicit.  You know, the, the more common ones are that if

25   you tell, you know I could have to go away from the family

INV_TRAN_00003121

65

1    forever.  I could go to jail.

2         The less common, but they do happen are ones where

3    the child is personally threatened that something bad will

4    happen to them or their family or their pets if they tell.

5    And then there's also a common one of just rewards and bribes

6    which are you know, for younger children could be candy or

7    activities.

8         For adolescents it can be drugs or alcohol or

9    cigarettes or money.  So, that's another one of those

10   dynamics.

11    Q    What type of relationships affect discloser and

12   whether or not it's delayed?

13    A    In terms of the type of Victim Offender

14   relationship that the way that it, again, that the more

15   access, the longer the Victimization is gone through and, and

16   actually whether and how much the child feels that they've

17   been a participant.

18        So, the more that children participate in not just

19   having sexual acts performed on them, but also performing

20   sexual acts then makes it even harder for them to make the

21   outcry because of their own guilt and shame and confusion

22   about now participating.

23        So, that would be one of them.  And certainly the

24   isolation that a child might experience if it's a type of

25   family abuse where they're more isolated.

INV_TRAN_00003122

1          Perhaps things like living more rural, not having

2     very many friends or family that ever come to the homes, home-

3     schooling as the intention to socially isolate children,

4     those things also can slow down an outcry or inhibit one.

5          Q     Is it common to have delays in disclosure when it's

6     either a family member or a, a friend of the family?

7          A     It's the most common to have delays if the Offender

8     is close to the family, a member of the family and trusted by

9     the family.

10         Q     Okay.  Thank you.  Let's move to a different area

11    at this point.  I want to talk about memory and specific,

12    specifically children's member.  What is memory?

13         A     So, memory is a, a pretty complicated process.

14    It's a neurological process.  It, it actually involves some

15    structural parts of the brain.

16         But, it involves like really what the mind does

17    with information.  There's lots of memory domains.  There's

18    the, the fact domain, like we know the world is round and we

19    know two times two is four and we don't have to relearn those

20    things.

21         And we have skill memory.  If you operate a table

22    saw, you don't have to re-teach yourself every time.  Every

23    time you get in the car to drive, it's a skill memory.  You

24    just know how.

25         There's face recognition memory.  There's all sorts

INV_TRAN_00003123

 1   of memory domains and then the -- the type of memory I

 2   believe you're talking about here is what we call events

 3   memory or autobiographical memory.

 4       Q    So, what are the parts of memory?

 5       A    So, a, a autobiographical or event memory, those

 6   are things specifically that we've experienced.  We have

 7   three stages of memory and the first stage is encoding.  The

 8   second stage is storage and the third stage of memory is

 9   retrieval.

10       Q    And so how does memory work?  As we go through

11   those three things, how, how does memory work?

12       A    So, the, the way that our minds encode an, an

13   experience is based on our five senses.  What we see, smell,

14   hear, taste and touch, tactile experiences are being encoded

15   or encoding the event while the event is happening.

16           So, we're hearing something, we're seeing

17   something.  Sometimes we're smelling something while an event

18   is happening.

19           Any kind of event.  And once that event is over the

20   brain has to be able to pay attention to the next thing.  And

21   it's kind of like on a computer, you know, on a desktop.

22           You can minimize your desktop on your PC and then

23   you can look at the next thing.  So, that's what we have to

24   do kind of for our brains as well, is we have to move on.

25           And so then that we do is we begin this process of

INV_TRAN_00003124

68

```
 1   storage; very complicated process.  We start with kind of the
 2   fluid consciousness while an event is happening.  It then
 3   goes to short term memory.
 4          And then actually in our deepest stage of sleep it
 5   moves parts of it or, or most of it or some of it moves into
 6   long term storage in our, in our brain.  And different parts
 7   of our brain, the hippocampus is particularly involved in
 8   memory.
 9          And then the, the last stage is the, the having to
10   retrieve it.  And so what we call the retrieval part of
11   memory is a reconstructive memory.  We don't think of it as
12   reproductive.  We think of it as reconstructive.
13     Q    Why do we think of it in that, in those terms?
14     A    Well, we think of the concept of reproductive might
15   think of like a videotape.  You know, you just play something
16   back and that's not how memory works.
17          Plus, videotape doesn't include smell.  It doesn't
18   include tactile experience.  So, when we talk about the
19   reconstructive aspects of memory, that when we retrieve an
20   actual memory of something we've experienced, it doesn't
21   happen in exactly the same way every time.
22          It can be -- we're -- as we reconstruct it, you
23   think of a puzzle.  Every time you put a puzzle together, you
24   don't put it together in exactly the same order and exactly
25   the same pieces.
```

INV_TRAN_00003125

 1          You put it together a piece fits here, a piece fits

 2     there.  And that's probably my best example of how we

 3     reconstruct memory.  So, the sequencing could be a little bit

 4     different.

 5          The amount and the richness of details can change

 6     with time but what we should see in any actual experienced

 7     event is what we call the salient details.  The salient

 8     details should be present consistently across time.

 9     Q    And what are salient details?

10     A    So, what we think of in terms of memory of events,

11     salient details are who was there during the event, what were

12     the basic transactions and interactions between the, the

13     Parties during this memory and where physically like

14     geographically, what were the surroundings during that event,

15     that you know, visually a person encoded.

16          So, who was present, what are the transactions and

17     where physically.  When isn't something our memory store

18     unless it's truly anchored in some way like it was our

19     birthday, like it was a holiday or it happened, you know, the

20     day after you know, a surgery, something like that.

21          Our brains will anchor the when.  But, other than

22     that we don't store when something happened with our

23     memories.  We have to infer it.

24     Q    So, what is an episode specific memory?

25     A    So, the brain has to be pretty effici9ent too when

INV_TRAN_00003126

 1    you think about all the material it's exposed to day in and

 2    day out.  And so how the mind manages that is that some

 3    things are so unique and stand out, that they end up with

 4    their own episode specific memory.

 5            So, I guess in -- if we make it like an example is

 6    like it's in its own file.  It stands alone.  And then we

 7    also have what's called script memory and those are memories

 8    that for the sake of efficiency and management, our minds

 9    will script together or put in the same file things that are

10    highly similar and repeated.

11            And so the best example I've heard, it wasn't one I

12    came up with.  It was at a training was you know, when

13    somebody asks any of us where were you when you learned or

14    saw the Twin Tower bombing?

15            And the vast majority of people can -- they'll

16    react that's an event episode specific memory that they knew

17    where they were at when they saw or heard that event.  Now if

18    you ask any of us, what were you doing on September 4th of

19    that same year or September 14th?

20            You know, then we would have to probably go into a

21    script memory and we would say something like well, if it was

22    a workday I probably got up around 6:00.  I let the dogs out.

23    I made some coffee.  I went in and turned the shower on to

24    get the water hot.

25            And so we then have scripted that memory.  And so

INV_TRAN_00003127

1   when children are in interview and you, and you listen to

2   them, you can hear them move between script and episode

3   specific in certain cases.

4           And script memory will typically have words like

5   most of the time it would happen whatever they might say.

6   Usually when it happened we would be.  Whereas an episode

7   specific is going to have unique details to that one episode.

8       Q    So, what do you expect to be -- as we, as we

9   retrieve these memories, what, what do you expect to be

10  inconsistent in memory?

11      A    I guess I would say that inconsistencies that are

12  not unusual would be the sequencing, like what order it gets

13  said in.  Across time what you'll see is maybe the richness

14  of the details changes.

15          So, if it's a memory from a month ago, you know,

16  you might have a child be able to say that they were in their

17  pajamas and it was their Hello Kitty pajamas.  Okay.

18          But, if it's something that was a year ago or two

19  years ago, or three years ago, they might say, well, I was in

20  my pajamas.  But, they wouldn't necessarily recall that

21  superfluous detail of it was my Hello Kitty.

22          So, you're just seeing the less, less richness.

23  And in some cases where you talk about multiple, multiple

24  episodes, sometimes you have situations where a child has not

25  recalled or doesn't remember recalling one particular event.

INV_TRAN_00003128

1          And then later it comes up in another interview but

2     they haven't previously disclosed it so it's an inconsistency

3     in that it's not previously disclosed.  But, if there are

4     multiple, multiple incidents then that wouldn't necessarily

5     be something that I would be surprised at.

6          Q    So, do children disclose sex assault all at once?

7          A    They can.  It's more likely if it is -- it goes

8     back to that, that degree of connection to an Offender.  If

9     an Offender is very close or a member of the family, or the

10    child's in a dependent relationship with them, you will often

11    see a little bit more of the tip of the iceberg because

12    they're not sure if their world is going to fall apart by

13    making the outcry and certainly the formal disclosure.

14         It's not unusual to see kids not readily discuss

15    the events they participated in, the sexual acts that they

16    performed.  It's a little bit easier for them to outcry

17    initially about the things that were done to them.  It's

18    harder to discuss the things that perhaps they've done.

19         Q    But it's, but it's not unusual for a child, for

20    instance to, as you indicated, tell a little bit about an

21    event and then perhaps tell more about what happened to them

22    over time?

23         MR. BURRILL:  Objection; leading.

24         THE COURT:  The objection is overruled.  She can

25    answer yes or no.

INV_TRAN_00003129

1            THE WITNESS:  That is not unusual.  That's -- and I

2    should have been more specific when I said the tip of the

3    iceberg is I'm going to just see how safe I'm feeling.

4            And if anything more horrible is happening to my

5    family as a result of talking about this, then you will see

6    that begin to increase in terms of their -- plus, keeping in

7    mind sometimes children are referred into therapy and they

8    are now talking about these experiences now.  And that too

9    increases their retrieval of, of events that they may not

10   have previously discussed.

11           MR. WAITE:  If I could have just a moment, Judge.

12           THE COURT:  Yes.

13           BY MR. WAITE:

14   Q    I, I guess, you know, in, in kind of response to

15   that then, are, are memories ever reconstructed perfect,

16   perfectly?  Is that something that's reconstructed perfectly

17   during the course of retrieval?

18   A    I'm not sure if I would understand the word

19   "perfectly".  I guess if I am interpreting that to mean

20   exactly --

21   Q    Um-hmm.

22   A    -- yes.  We, any of us talk about events and it

23   doesn't have to be a traumatic event.  But, there are actual

24   events we might have experienced, maybe it was hunting or

25   fishing or a vacation.  And you know, each time we might

INV_TRAN_00003130

1    discuss it with somebody, it may not be in exactly the same

2    order.

3           We might include a detail that might be just unique

4    to that friendship of who we're talking about our vacation to

5    for example.  So, the, the fact of it being inconsistent in

6    terms of the Order things come out isn't unusual.

7           The reconstructive process should be pretty

8    unconstructed [phonetic] anyway because that's normally how

9    we talk about things in this unstructured kind of casual

10   manner we might jump around and say, oh, but wait, I got to

11   tell you this part first.

12          You know, so that's just how the human retrieval

13   part of memory works.  And so it's, it's a little bit -- it's

14   efficient but it's not exact or perfect that, that it --

15   something was actually experienced.

16          A detail might be left out, might be forgotten.

17   Maybe it's not salient or relevant whether it was the morning

18   or the afternoon.  Those kinds of things, if it wasn't

19   relevant or salient, it often does not come back up in the

20   retrieval process.  Perhaps it didn't actually store.

21   Q    And so there may be details, certainly in the

22   script memories that you talked about, there may be details

23   that kind of get lost?  Is that a fair statement?

24   A    Definitely when kids are in that scripted memory

25   that, that a rich, specific detail that was unique to that

INV_TRAN_00003131

1    one event would put it into an episode specific.  But, if

2    everything else is so highly similar then that less unique

3    detail just kind of falls out and it just becomes more

4    scripted.

5        Q    Thank you, Ms. Young.

6             MR. WAITE:  I don't think I have anything else at

7    this time.

8             THE COURT:  Mr. Burrill.

9             MR. BURRILL:  Your Honor, can we just approach

10   [indiscernible]?

11            THE COURT:  Sure.

12            (Proceedings at the bench)

13            MR. BURRILL:  Do you want me to do -- well it's

14   going to be a lot longer than 15 minutes to, to start.  And

15   then do you want me to just, when I [indiscernible] raise my

16   hand/or should we stop and do lunch now?  What do you want --

17   I can do whatever.

18            THE COURT:  I presume that we're going to be done

19   with the Prosecution's case today after Ms. Young is over.  I

20   really don't care either way.  So, probably --

21            MR. WAITE:  I'll, I'll leave it up to you.

22            MR. BURRILL:  I'll start and I'll get close to noon

23   and then if I see a convenient place I'll just stop.

24            (Proceedings return to open court)

25            THE COURT:  Mr. Burrill.

INV_TRAN_00003132

1          MR. BURRILL:  Thank, Your Honor.

2                    CROSS EXAMINATION

3          BY MR. BURRILL:

4     Q    Hello, Ms. Young.

5     A    Hello.

6     Q    How you doing?

7     A    Fine, thank you.

8     Q    I wanted to first touch on a couple of the things

9     that Mr. Waite talked to you about, just so I don't forget to

10    touch on any of these things.  One thing that you did is you

11    described something called script memory, correct?

12    A    Yes.

13    Q    One of the examples that you used was to describe

14    kind of the difference between your memory of the World Trade

15    Center issue and then, you know, maybe, you know, what you

16    had for lunch around that time.  Right?

17    A    I, I think my example was what would you have been

18    doing at that same time of the morning, like let's say

19    September 4th or September 14th.  I gave that example I

20    think.

21    Q    Okay.

22    A    What you'd been doing at the same time in the

23    morning.

24    Q    Okay.  So, okay.  Just, you know, what you might've

25    been doing same time but not on that specific date, same time

INV_TRAN_00003133

1    though that you found out about the World Trade Center,

2    right?

3        A    Yes.

4        Q    And you'd agree that actually you just don't

5    remember at all really what you were doing that morning,

6    right?

7        A    Which morning?

8        Q    The morning that was not the World Trade Center

9    morning.

10       A    Oh, the morning that wasn't?  No, I would probably

11   be scripting it.  I mean I, I don't know exactly of September

12   4th was a workday or, or not specifically.

13       Q    Okay, but that's not really script memory, it's a

14   guess, right?

15       A    It's an, it's a -- well, I would say it would be

16   scripted in the example I'm trying to use and maybe that

17   wasn't the best example, using something that's not sexual

18   abuse specific.

19       Q    Okay.

20       A    But, you know, if, if in the month of September, I

21   went to work all but about eight days, because I'll take the

22   weekends out, then I would be able to go back and say that

23   that would be scripted.

24            Now, if I would have happened to have had a baby on

25   September 9th of that same year, then my scripting would be

INV_TRAN_00003134

78

1   different as a result.  I would have said those mornings were

2   very different because I had just had a baby, etc, etc.  So,

3   that's how I intended to explain script memory.

4       Q    But, but yeah, under your example for what we're

5   talking about right now, that would be a guess.  You'd be

6   asking someone to guess as to what they were doing that same

7   time of day, but just not on the World Trade Center day.

8   Right?

9       A    I'm asking to use memory --

10      Q    Okay.

11      A    -- to tell me what they would likely have been

12  doing any other morning besides September 11th.

13      Q    Which would be a guess, correct?

14      A    I mean I -- you can use that word.  I would -- I

15  mean that's not how I'm intending it but that's okay if you

16  use that word.

17      Q    Okay.  Another thing that you talked about was some

18  factors related to how likely someone is to disclose with

19  Mr. Waite.  Do you recall that?

20      A    I recall some of that, yes.

21      Q    Okay.  And one of the things that you mentioned was

22  that children are less likely to discuss acts that they

23  participated in, correct?

24      A    That those may come, often come later --

25      Q    Okay.

INV_TRAN_00003135

1      A    -- than the acts that were committed by them.  If

2  we're talking about multiple acts and a close relationship.

3      Q    Right, but again you told Mr. Waite that children

4  would be less likely to disclose acts that they had

5  participated in, right?

6      A    Right.

7      Q    Okay.  And so what you mean by that is sort of,

8  rather than being I guess not acting at all, that person was

9  maybe -- I guess doing something more than just laying there

10  or something, right?

11      A    Right, is that, the delaying disclosure as the

12  result of their guilt and shame --

13      Q    Right.

14      A    -- is stronger if there are acts that they have

15  actually initiated or participated in, in terms of conducting

16  this, performing a sexual act on somebody as compared to

17  having it performed on them.

18      Q    Okay.  I just want to make sure that distinction is

19  clear.  You mentioned too that people don't store when,

20  correct?

21      A    Yeah.  When is typically inferred --

22      Q    Okay.

23      A    -- unless it's anchored and I think I gave a couple

24  of examples.

25      Q    And by inferred, you mean you can logically figure

INV_TRAN_00003136

80

1    out when, correct?

2        A    Right.  And the older we are, we're better at it

3    except in maybe the later years but generally the older we

4    are as adults, we're better at inferring as compared to a six

5    year old or a ten year old.

6             And that's because we manage our time and we have a

7    cognitive ability to manage our schedule and our time and to

8    be more aware of time.  And six and 10 year olds for example

9    or three to 12 year olds aren't as responsible for time.

10       Q    Right, but the question was human beings can

11   logically put together when, when is, correct?

12       A    Again, I want to be specific too that younger

13   children are not as competent as adolescents and adults are

14   in that area --

15       Q    Okay.

16       A    -- but typically we can kind of go through and

17   infer some of that.

18       Q    Okay.

19       A    Deduce it maybe is the better word.

20       Q    Children are still people.  Right?

21       A    Yes, they are.

22       Q    Okay.

23       A    But, they have different cognitive -- they're on a

24   different cognitive developmental pace than adults and even

25   adolescents.

INV_TRAN_00003137

1    Q    Okay.  Another thing that you talked about a little

2    bit that can influence disclosure is social isolation,

3    correct?

4    A    Yeah, it can be one of the things that delays

5    disclosure.

6    Q    And by social isolation you sort of mean when -- I

7    guess like a family doesn't have kind of people outside the

8    family over and things like that?

9    A    Yes.

10   Q    Okay.  You also mentioned like when they could be

11   maybe in a more rural setting or something like that.  Was

12   that something that you mentioned?

13   A    Right.  Home-schooling, and I'm talking more about

14   incest cases you know, where that use -- social isolation is

15   used as a mechanism to inhibit disclosure and outcry.

16   Q    Okay.  One of the things that Mr. Waite touched on

17   with you at the very beginning was just that, you know, you

18   don't know any of the case details in this particular case,

19   right?

20   A    That's true.  I don't.

21   Q    I mean you're here to be sort of an Expert in jury

22   education.  Right?

23   A    That's my understanding, yes.

24   Q    Okay.  And that's something that you routinely do

25   with this Prosecution's office, right?

INV_TRAN_00003138

1     A    I do it with other District Attorney Offices as

2  well.

3     Q    Okay.  But, you also do it with this District

4  Attorney's Office, right?

5     A    Yes, this one as well.

6     Q    And in fact, I saw you talking to Mr. Waite out in

7  the hallway before your testimony, right?

8     A    Yes.

9     Q    And was that the first time you'd even talked to

10  him about this particular case?

11     A    I think so.

12     Q    Okay.

13     A    I mean I don't -- I, I, I have to tell you, usually

14  I do know something like how, because I don't want to waste

15  anybody's time, how old the alleged Victim is, what's the

16  relationship between the alleged Victim and the accused.

17  And, and this is a case where I, I actually don't know

18  anything.

19         I'm, I'm -- so I may be talking about preschoolers

20  and shouldn't be.  I just don't know anything about this

21  case.

22     Q    All right, so literally five minutes before you

23  testified, that was your first time even talking to the

24  district Attorney?

25     A    No --

INV_TRAN_00003139

83

```
 1      Q    On this case.

 2      A    -- the first time I've ever talked him --

 3      Q    Right, right, right.

 4      A    The first time on this case that I recall talking

 5    to him, yes.

 6      Q    Okay.  So, you'd agree that generally the District

 7    Attorney has a pretty good idea of what you're going to say.

 8    Right?

 9      A    Oh, I think they do, yes.

10      Q    Okay.  Now, kind of building on that, again, you

11    didn't get any sort of detail or social detail about the

12    families at issue in this case, right?

13      A    I did not.

14      Q    So, no details about Mr. McFadden over here, right?

15      A    No, none.

16      Q    So, no detail about the W█████ family, right?

17      A    No.

18      Q    Or the R███ family?

19      A    No.

20      Q    The W█████ family?

21      A    No.

22      Q    The R██ family?

23      A    No.

24      Q    Okay.  We were touching just a little bit just upon

25    your interaction with this DA's office.  It would be fair to
```

INV_TRAN_00003140

84

1    say that generally you come and testify for this District

2    Attorney's Office about once a month.  Would that be fair?

3         A    That's the more typical, yes.

4         Q    Okay.  And I notice that you meant more typical and

5    I was going to ask of [indiscernible] on that.  Lately you've

6    had a lot of trials that you've been testifying in, right?

7         A    I think I've had four in -- since February.

8         Q    Okay.  And I think at least one of those was with

9    me, correct?

10        A    Yes.

11        Q    And I think there was actually two in March that

12   you did, right?

13        A    Or maybe it was March, not February.

14        Q    Right.  So, I think there was two in March that you

15   did, right?

16        A    Yes.

17        Q    There was Mr. Short and Mr. Pfifer.

18        A    I don't usually know the Accused names.

19        Q    Okay, okay, but you remember that there was at

20   least one that you did with me, right?

21        A    I do.  I, I'll go with that.

22        Q    Okay.  And then recently you've been in a lot of

23   trials as well, right?

24        A    I think I've only been in one last week and this

25   week.  There might have been -- I don't -- I, I would have to

INV_TRAN_00003141

1    look at my schedule but I don't think I was here in April or

2    May, or June.  I could have been, I just don't recall.

3        Q    Okay.  Do you recall a trial that would have been

4    with Mr. Jeremy Savage and John Burkey as the Defense

5    Attorney?  Do you recall that at all?

6        A    I think that they've had more than just that one --

7    more than one trial.  I, I, I don't recall any specifics

8    about their trial.

9        Q    Okay.  All right, so at least like this year what

10   you're saying is you've testified about four times or so, is

11   that correct?  Since February?

12       A    That's my recollection.  I would have to look at my

13   schedule in my billing -- my office's billing records to know

14   for sure.

15       Q    Okay.  And you're paid for your time.  You

16   discussed this Mr. Waite, but you're paid for your time for

17   testifying on these cases, right?

18       A    Yeah.  The clinic bills and there is a state

19   capitated rate and they -- I'm assuming the District

20   Attorney's Office pays their bills but they reimburse the

21   clinic I work for, Behavioral Health and Wellness.

22       Q    Okay.  And that's at $100 an hour, correct?

23       A    Actually I think it is.  I think that those rates

24   went up from like 80 something to $100 recently or sometime

25   in the last year or two, last year.

INV_TRAN_00003142

86

1      Q    Okay.  And you can also -- you get paid for your

2  wait time as well, correct?

3      A    Yeah, but I think that's at like $50.

4      Q    Yes, correct, it's a lower rate, $50 an hour,

5  right?

6      A    Yes.

7      Q    Okay.  Now, one thing that you touched on with

8  Mr. Waite is that you are on a couple different review teams,

9  correct?

10     A    Yes.

11     Q    You're on the Mesa County Sexual Assault Review

12 Team?

13     A    I am.

14     Q    Okay.  And you're also on -- I think it was -- I

15 didn't remember the exact term that you used, but it was

16 child --

17     A    Fatality Review Team.

18     Q    Fatal -- okay, child fatality one.  Okay.  And both

19 of those review teams work with a couple different agencies,

20 correct?

21     A    Actually there are a variety of agencies that are

22 on both of those teams.

23     Q    Right.  There's Department of Human Services.

24 That's one of them.

25     A    Yes.

INV_TRAN_00003143

1      Q    Okay.  The District Attorney's Office, that's

2  another one.

3      A    Yes.

4      Q    And then there's a variety of Law Enforcement

5  agencies, right?

6      A    Yeah, Fruita, Palisade, Junction, Mesa, yeah.

7      Q    So, those are the people on that team, correct?

8      A    And SANE Nurses.

9      Q    Okay.  And you'd agree that those are all

10  investigative bodies, correct?

11      A    Yes.

12      Q    Okay.  And in fact, a lot of those cases involve

13  criminal prosecutions, correct?

14      A    Yes.

15      Q    Okay.  And again, you're on that team that

16  coordinates that.

17      A    I don't, I don't think I'm on a team that

18  coordinates it.  I don't know what that means.  Like, my,

19  like, my involvement on that team is really just to sort of

20  track cases and make sure that cases don't fall in the cracks

21  and are not heard of, that kids get referred appropriately.

22  But, decisions about prosecution and what to investigate, I

23  don't have any say in any of that.

24      Q    Okay.  But, you again, you make sure that these

25  cases don't fall through the cracks, correct?

INV_TRAN_00003144

1      A     The team does, not me personally.

2      Q     Okay.  But, you as a member of that team have a say

3   in that right?

4      A     Yeah, I guess we would.

5      Q     Okay.  One of the things that you also mentioned is

6   that you're on -- I don't remember your exact term for this

7   but it was, it wasn't Board of Western Slope Center for

8   Children but what was it?

9      A     Oh there's an Advisory Council.

10     Q     Advisory Council, okay.  Advisory Council, so

11  you're obviously, you're aware of the memorandum of

12  understanding with Western Slope Center for Children, right?

13     A     I'm familiar that the Western Slope Center for

14  Children has memorandums of understanding with different

15  agencies.  I don't know the specifics of those.

16     Q     Okay.  So, you don't know anything about the

17  memorandum of understanding with Law Enforcement on the part

18  of Western Slope Center for Children?

19     A     No.  I, I just know that there are some types of

20  agreements in all counties that have advocacy or some center

21  similar to the Western Slope Center for Children where there

22  is an agreement about what types of services are provided.

23        Like, what type of setting that they provide for

24  the forensic interviews.  I don't know the specifics but I

25  know that that's a standard for all of these types of

INV_TRAN_00003145

1    advocacy centers.

2        Q     But, there's actually an agreement or a memorandum

3    of understanding about how they investigate some of these

4    types of cases, correct?

5        A     Oh, I don't know about that, that's an agreement

6    about investigation.

7        Q     Okay.  But, where the forensic interview is going

8    to take place, right?

9        A     Yes.

10       Q     Who's going to pay for the SANE examination, right?

11       A     I think they have some of that in those.

12       Q     Yeah, okay.

13             MR. BURRILL:  Now, Your Honor I think actually it's

14   a convenient place to stop right now.

15             THE COURT:  Okay.  Ladies and gentlemen, we're

16   going to go ahead and break for the noon hour.  We will be

17   back together at 1:30.  Please remember the admonishments

18   that I've given you before and have a nice lunch.  I'll see

19   you back here at 1:30.  Please rise for the jury.

20   (Asides)

21             THE COURT:  You may be seated.  We are now outside

22   the presence of the jury.  Anything before we break,

23   Mr. Waite?

24             MR. WAITE:  No, Your Honor, thank you.

25             THE COURT:  Ms. Smith, Mr. Burrill?

INV_TRAN_00003146

90

1          MR. BURRILL:  I think I'm good.

2          MS. SMITH: We have nothing [indiscernible].

3          THE COURT:  Okay, see you at 1:30.

4                  (Off the record at 11:58 a.m.)

5                  (Off the record at 1:37 p.m.)

6          THE COURT:  Please be seated.  Good afternoon.  We

7    are once again back on the record in 13CR27, 13CR339 and

8    13CR342.  All Parties and Attorneys are present.  Anything

9    before we bring the jury in, Mr. Waite?

10          MR. WAITE:  No, Your Honor.

11          THE COURT:  Ms. Smith, Mr. Burrill?

12          MS. SMITH:  No.

13          MR. BURRILL:  No, Your Honor.

14          THE COURT:  Okay.  Ms. Young, if you'll come back

15   up on the witness stand and we will go ahead and call the

16   jury in.

17   (Asides)

18          THE COURT:  Please rise.  Please be seated.  Once

19   again, welcome back ladies and gentlemen.  Mr. Burrill.

20          MR. BURRILL:  Thank you, Your Honor.

21          BY MR. BURRILL:

22   Q    Hello again, Ms. Young.

23   A    Hello.

24   Q    Okay.  So, I think we were kind of switching gears

25   when we left off but I wanted to touch on the salient detail

INV_TRAN_00003147

EXHIBIT F

```
 1    issue with you again.  You mentioned that salient details

 2    should always be present, correct?

 3         A    Yes.

 4         Q    Okay.  And by salient details we mean who, you

 5    know, who was involved, right?

 6         A    Yes.

 7         Q    What, which are kind of the basic transactions,

 8    right?

 9         A    Yes.

10         Q    And that would involve where on the body someone

11    was touched and things like that?

12         A    I, I would agree with that.

13         Q    Okay.  And then where geographically, so like in a

14    bedroom or at a certain location?

15         A    Yeah, the, the, the physical surroundings.

16         Q    Okay.  Now in fact, in cases that involve

17    inconsistencies across salient details, there's greater

18    concern, right?

19         A    Yes.

20         Q    Okay.  You'd also agree that, you know, allegations

21    that lack free narrative should include investigating whether

22    or not there's motive for a child to fabricate abuse or look

23    for coaching?

24         A    I would say that a standard of forensic

25    interviewing is that regardless of whether there's a
```

INV_TRAN_00003148

1   substantial of free narrative or not, you should always still

2   investigate whether there is a motive for a false report --

3        Q    Okay, yeah.

4        A    -- not just based on whether there's free

5   narrative.

6        Q    Okay.  So, something that you should always be

7   looking for, right?

8        A    Right.

9        Q    And especially if there's free narrative though,

10  maybe it's a reason to even look at that even more.  Right?

11       A    I guess I wouldn't disagree with that.  I think

12  that the, the free narrative kind of concern a question would

13  also depend if you were talking like a four-year-old.  There

14  would be certainly much less free narrative and would involve

15  lots of cuing and prompting with questions as compared to a

16  13-year-old.

17       Q    Okay, or even like an eight-year-old, right?

18       A    By age, yeah would --

19       Q    Yeah.

20       A    -- graduate with greater free narrative as children

21  age.

22       Q    Okay.  One thing that I know that you have a lot of

23  experience is in forensic interviewing, right?

24       A    Yes.

25            MR. WAITE:  Judge, can we approach?

INV_TRAN_00003149

1           THE COURT:  Yes.

2           MR. BURRILL:  Yeah.

3           (Proceedings at the bench)

4           MR. WAITE:  I did not ask to have her an Expert in

5    forensic interviewing, stayed very specifically away from any

6    questions involving the forensic interviewing.  This is not

7    only beyond the scope of direct but beyond the scope of her

8    expertise as she's been tendered to the Court.

9           THE COURT:  Mr. Burrill.

10          MR. BURRILL:  Yeah, Your Honor, I disagree.  In

11   fact the whole disclosure process actually culminates in a

12   report to Law Enforcement that typically involves a, a

13   forensic interview.  And in fact, Cheryl Young did testify

14   about the fact that you know, a report to Law Enforcement is

15   part of the disclosure process.  So, first of all I think it

16   was absolutely touched upon during the direct examination.

17          Second of all, I'd point out the fact that you

18   know, we have the right to confront and cross examine the

19   witnesses against Mr. McFadden here in this case and that is

20   relatively expansive right, that can only be curtailed under

21   certain specific circumstances.

22          We want to get into issues related to forensic

23   interviewing and the suggestibility of children, which I

24   think is something that's absolutely proper based on her

25   testimony about disclosure rates and other things that she

INV_TRAN_00003150

94

1    brought up during her direct testimony.

2              THE COURT:  Anything else?

3              MR. WAITE:  Well, Judge, I think she can talk about

4    forensic interviewing being a part of the disclosure process.

5    I don't think she's been tendered as an Expert though in the

6    area of what is a proper forensic interview as opposed to

7    what is not a proper forensic interview.

8              And, and, and so I don't -- I, I don't think she

9    can testify in that area.  It's, it's, it's certainly beyond

10   the scope of my direct.  She is, she is my Expert Witness.

11             MR. BURRILL:  Can I go grab something really quick?

12   I think the Court wrote down the exact things that she was

13   tendered in.  I have down that it would be -- sorry --

14             THE COURT:  I'll tell you what she was tendered --

15   well I don't know why she was tendered, but she was qualified

16   in the area of dynamics of child sex assault, disclosure

17   patterns, disclosure dynamics, Victim/Offender relations,

18   memory factors that might impact child sex assault Victims.

19   Those are the areas.

20             MR. BURRILL:  So, first of all issues related to

21   forensic interviewing implicate memory, child suggestibility

22   implicates memory.  That's something that she's been endorsed

23   in.

24             The generic factors that might impact child sexual

25   assault Victims is clearly forensic interviewing.  And the

INV_TRAN_00003151

1   disclosure that's made to Law Enforcement, the manner in

2   which questions are asked, the manner in which that occurs,

3   that's all a factor that might impact a child sexual assault

4   Victim or you know, whether or not that person is a child

5   sexual assault Victim.

6          So, all those things, and including the disclosure

7   issues I've already raised are implicated by my question and

8   that's why I think it's appropriate under both the United

9   States and Colorado Constitutions, the right to confront and

10  cross examine the witnesses against my Client, Mr. McFadden.

11  Thank you.

12         THE COURT:  The objection is sustained.  She's not

13  been qualified as an Expert in the area of forensic

14  interviewing.

15         The only information and testimony that was

16  presented on direct examination was that forensic

17  interviewing is part of the disclosure process or talking to

18  them.  She didn't go into any details as far as what a

19  forensic interview is or any details regarding that.

20         You can certainly get into areas that may be that,

21  but not anything specific to a forensic interview itself.

22  So, again, the objection is sustained.

23         (Proceedings return to open court)

24         THE COURT:  Mr. Burrill.

25         MR. BURRILL:  If I could just have one second,

INV_TRAN_00003152

96

1    Your Honor.

2              THE COURT:  Certainly.

3              MR. BURRILL:  Okay.

4              BY MR. BURRILL:

5        Q    Ms. Young, during your direct examination you

6    testified that disclosure is a process, correct?

7        A    Yes.

8        Q    And in fact it can start out with an outcry

9    statement, right?

10       A    Yes.

11       Q    And then it moves -- well it doesn't have to, but

12   it can move towards a formal report to Law Enforcement,

13   right?

14       A    It doesn't always.

15       Q    Okay, but it can, right?

16       A    It can.

17       Q    And you know, once it rises to that level, there's

18   often somebody who speaks to the child, right?

19       A    Yes.

20       Q    And that person is well, can be a forensic

21   interviewer, right?

22       A    Law enforcement officer, Department of Human

23   Services Caseworker and some agencies actually employ

24   forensic interviewers.

25       Q    And you'd agree that the purpose of the interview

INV_TRAN_00003153

97

1    when it gets to that point, is to get factual information,

2    right?

3        A    It's always been my opinion that it's sort of

4    twofold.  One is, of course, it's fact finding around whether

5    there were laws broken.  And the other is that it is intended

6    to help make decisions about the protective needs of a child.

7        Q    Okay.  But, you, you make those decisions based on

8    the factual information you receive from the child, right?

9        A    That's what the professionals that do the

10   assessments, yes.

11       Q    So, it's important to get as much accuracy as

12   possible out of that interview?

13       A    Yes.

14       Q    And you would agree that those type of interviewers

15   should try to obtain those facts in an unbiased way, right?

16       A    Yes.

17       Q    You're familiar with the term confirmation bias?

18       A    Yes.

19       Q    Okay.  And confirmation bias is the tendency to

20   search for, interpret or recall information in a way that

21   confirms one's own beliefs, right?

22       A    Yes.

23       Q    Now you'd agree that confirmation bias can be

24   present in these type of interviews, right?

25       A    I would say that they were -- was a significant

INV_TRAN_00003154

98

1    concern, particularly in the '80s which developed the

2    protocols --

3        Q    Right.

4            MR. WAITE:  Judge, again I'm going to object.

5    Again we're going into the area I just asked the Court to

6    rule on.  With respect to forensic interviewing, that's

7    exactly where this is going.

8            THE COURT:  Anything else?

9            MR. BURRILL:  Your Honor, I'm talking about I guess

10   confirmation bias in the context of the disclosure patterns

11   and the process of disclosure which was elicited on direct

12   examination from the District Attorney.

13           THE COURT:  The objection is overruled.

14           MR. BURRILL:  Okay.

15           BY MR. BURRILL:

16       Q    I don't remember the exactly question I asked.  I

17   think it was something about how confirmation bias can be

18   present within those interviews and then you were talking

19   about some of the things back in the '80s.

20       A    The, the greater concern in the '80s was that the

21   lack of protocols and good training, there were concerns that

22   confirmation bias in people who were, the whole field was

23   untrained in the '80s.  And so out of those circumstances,

24   the McMartin preschool case, some of those high profile cases

25   throughout the late '80s, '90s and for -- since then has been

INV_TRAN_00003155

1    the development of protocols that are based on you know,

2    forensic interviewing, investigative interviewing techniques.

3        Q    Right.  And you'd agree that in some of those

4    interviews that were conducted, you could see confirmation

5    bias in the way that they asked questions, right?

6        A    I -- I've not actually seen any --

7        Q    Okay.

8        A    -- of the interviews but I, I do know that that was

9    the concern.

10       Q    Right.  And sometimes like you know, there are both

11   I guess, verbal and nonverbal cues that can be given in

12   interviews with children.  Right?

13       A    I, I, I guess I, -- you -- I wouldn't disagree with

14   that.  I think that, that the difficulty that happens in

15   these sorts of cases is that you know, the development of

16   building rapport is an important part of forensic interview

17   that you develop some kind of rapport with the child.

18            And so I've seen cases where you know, one side

19   believes that the process of developing rapport and being you

20   know, kind and respectful to a child is a confirmation bias.

21   They're overly friendly.  So, I, I, I have to know specifics

22   but --

23       Q    Okay.

24       A    -- you know, we have to differentiate building

25   rapport from confirmation bias.

INV_TRAN_00003156

100

1      Q    Right, right.  There, there should be a difference

2    right --

3      A    There is, yes.

4      Q    -- that you should be able to see.  Okay.  And

5    sometimes you can see confirmation bias in the way that

6    certain questions are not asked in an interview, right?

7      A    Oh, in a forensic interview if certain questions

8    don't get asked that, that on retrospect should be?  And I --

9    and forensic interviews are pretty dynamic and fluid.

10          And so sometimes that's why you see a follow-up

11    interview is to clear up some confusion.  And sometimes it's

12    not the question that's asked that's the problem, it's the

13    child's interpretation of the question.

14          Younger children have a more difficultly, like this

15    is an example I've seen a few times in interviews where an

16    interviewer ask a child where did that happen.  And the

17    interviewer intends to mean where was the geographic

18    location.

19          And the child interprets it as where on their body.

20    So, you know, they'll -- the, the nature of younger children

21    also can create some misunderstandings in interviews.

22      Q    Okay.  Now, you would agree that as compared with

23    adults, children are more suggestible than adults.

24      A    They are in, in terms of there's indication that

25    younger, preschool children, if there is coercive

INV_TRAN_00003157

1    questioning, do have a higher incidence of suggestibility

2    than older children and/or coercive interviewing.

3           The, the key piece is, is the interviewer highly

4    coercive and suggestive and saying questions and asking

5    questions in such a way that prompts the child to be led into

6    making statements that weren't part of actual researched

7    events.

8    Q    Okay.  And there's, there's really no dispute the

9    younger the child, the more suggestible, right?

10   A    The -- again, the younger the child with coercive

11   questioning, the greater the degree of suggestibility.

12   Q    Okay.  And you keep saying coercive questioning.

13   What do you mean by coercive questioning?

14   A    So, how it's been used in, in terms of child sexual

15   abuse us an open-ended question would be something like I

16   understood you came in to talk to me about some things

17   happening in your life.  It's a very broad, open-ended, non

18   leading question.

19          A leading question would be, is an example, I

20   understand you're here to talk to me about the things that

21   have happened with your stepfather or your uncle or whatever

22   it might be.  And a coercive question is your stepfather

23   touched you on your private parts didn't he?

24          Didn't your stepfather touch you on your private

25   parts?  He did, didn't he?  That's the coercive questioning

INV_TRAN_00003158

1    that we have talked about in the research that we saw then

2    that preschool children have a greater percentage of folding

3    into and not standing their ground on.

4            And it wasn't those kinds of questions.  It was

5    questions about doctor visits and did the doctor kiss you?

6    And those kinds of things where they researched that kind of

7    questioning.

8        Q    Okay, and you keep using this term coercive

9    questioning.  Are you getting that from social science

10   research?  Is that what you're going at?

11       A    That would be the term that were used by the

12   researchers, yes.

13       Q    Okay, and --

14       A    Coercive, highly coercive, highly suggestive

15   questioning.

16       Q    Highly coercive and highly suggestive is your

17   testimony, okay.  So, you'd agree that there acts --

18   absolutely has been research into these issues before, right?

19       A    I think the research has been ongoing, and

20   particularly since the '90s and early 2000 but I think it's a

21   field of research for a variety of reasons, not funded as

22   well as it should be but --

23       Q    Okay.

24       A    -- yes.

25       Q    And you know, there are some pretty famous

INV_TRAN_00003159

1   researches on these topics that we're talking about, right?

2        A    There are a variety of people that have published

3   more frequently, yes.

4        Q    Okay.  And for example, some of those people are

5   Stephen Ceci and Maggie Brock, right?

6        A    Out of Cornell, yes.

7        Q    Yep.  And they're some of the foremost researchers

8   on child suggestibility, right?

9        A    Memory and suggestibility, yes.

10        Q    And disclosure, which we've talked about as well,

11   right?

12        A    Yes.

13        Q    Okay.  And there's somebody that you actually cite

14   in your Expert opinion letter that you send out in these type

15   of cases, right?

16        A    I'm sure there's more than one.

17        Q    Okay.  At least to your knowledge, the Expert

18   opinion letter that you send out includes citations to

19   Stephen Ceci and --

20        A    Oh yes.  I'm sorry.

21        Q    -- Maggie Brock.

22        A    I didn't understand your question.

23        Q    Okay.

24        A    Yes, he would be one of them.

25        Q    Okay.  In fact, in the Expert opinion letter that

INV_TRAN_00003160

104

1    we got in this case, you cite them four separate times in

2    your reference section, correct?

3        A    I don't disagree with that.

4        Q    Okay.  I, I think you mentioned they're out of

5    Cornell, right?

6        A    I don't think Maggie Brock's at Cornell anymore.

7    Stephen Ceci I believe still is.

8        Q    Yeah, I think Maggie is at McGill University,

9    right?

10       A    Yes.

11       Q    Okay.  So, you'd agree that they provide some

12   reliable authority that we're talking about relating to the

13   suggestibility of children, right?

14       A    Yes.

15            MR. BURRILL:  Okay.  If I may approach, Your Honor?

16            THE COURT:  Yes.

17            BY MR. BURRILL:

18       Q    And Ms. Young, I'm handing you an article by

19   doctors Ceci and Brock on the suggestibility of children's

20   memory.  It looks like that article was published in the

21   Annual Review of Psychology, right?

22       A    Yes, in '99.

23       Q    Okay.  And the Annual Review of Psychology is a

24   publication that's been in existence since about 1950, right?

25       A    I wouldn't disagree with that.

INV_TRAN_00003161

1           THE COURT:  Mr. Burrill, I'm sorry, could you tell

2    me the exhibit --

3           MR. BURRILL:  Oh, it's --

4           THE COURT:  -- number or letter?

5           MR. BURRILL:  -- it's labeled as Exhibit C.

6           THE COURT:  C, thank you.  I'm sorry, go ahead.

7           MR. BURRILL:  Is it -- yeah it was C.  Sorry, I'm

8    just trying to make sure because mine doesn't have the

9    marking on it.  Okay.

10          BY MR. BURRILL:

11     Q    And the American -- or the Annual Review of

12   Psychology covers significant developments in psychology,

13   right?

14     A    Yes.

15     Q    And they're rely -- it's a reliable publication

16   that Psychologists and Therapists in your field rely upon for

17   research, right?

18     A    Yes.

19     Q    And you'd agree that this article is a reliable

20   authority by Dr. Brock and Dr. Ceci into the area of child

21   suggestibility, right?

22     A    I wouldn't -- I have not read it in years but I

23   wouldn't disagree with that.

24     Q    Okay.  But, again, still, they're a reliable

25   authority regarding child suggestibility right?

INV_TRAN_00003162

1      A    Yes.

2      Q    Okay.  So, let's talk a little bit just about some

3   of these principles.  One of the, the first things, and we've

4   kind of already been talking about this, but one of the first

5   things that Dr. Ceci and Brock mentioned as important

6   regarding suggestibility is interviewer bias.  Right?

7      A    Yes.

8      Q    So, they sort of agree with some of the things

9   we've been talking about, right?

10     A    I, I think that the, the training for forensic

11  interviewers is to, to try to protect and that is that you

12  need to start with as many hypothesis as possible.  And that

13  your forensic interview, your goal is to rule out as many of

14  those possibilities that could, could exist in any given

15  case.

16     Q    Right.  And they talk about how you know,

17  interviewer bias, one of those hallmarks is gathering only

18  confirmatory evidence and avoiding all avenues that may

19  produce disconfirmatory evidence, correct?

20     A    They would say that, yes.

21     Q    Okay.  And Your Honor, also I'd actually move at

22  this point to admit Defense Exhibit C.

23          THE COURT:  Mr. Waite?

24          MR. WAITE:  And I, I object, Judge.  Can we

25  approach?

INV_TRAN_00003163

1          THE COURT:  Yes.

2          (Proceedings at the bench)

3          MR. WAITE:  Defense Exhibit C includes an awful lot

4     of information here that's not been talked about by this,

5     this Witness, that's not been confronted with her.  I mean to

6     go through this and confront her with line by line; we're

7     going to be here another two, two weeks.

8          Judge, this is, you don't, you don't get to admit

9     these.  You get to ask her questions about them.  To admit

10    this would be to talk about all of the stuff that's in here,

11    specific versus open-ended questions, interviewer bias, all

12    of which I've already objected to with respect to this.

13         We've already got into the forensic interviewing

14    process further than this Court said they -- the Defense was

15    allowed to get into.  At this point we're not -- we're no

16    longer talking about disclosures.

17         We are talking about the interviews themselves and

18    the bias that the interviewers have.  And again, we're way

19    beyond the scope of direct, way beyond her, her tendered

20    expertise and, so, for all of those reasons I object to this.

21         In addition to that, this has a lot of information

22    here that has nothing to do with what her testimony just was.

23    So, I just, I mean we can, we can start admitting studies,

24    but we're going to, we're going to have this jury looking at

25    studies.

INV_TRAN_00003164

1          Because I can -- I can come up with 100 studies.

2     And I -- quite frankly I think it's irrelevant and

3     inappropriate to admit these studies.

4          He can question her about them to the extent, I

5     guess, that the Court's allowed him to do so.  But, I don't

6     think you get to admit this Exhibit.  It is not evidence.

7          MR. BURRILL:  Your Honor, I guess in response,

8     first of all it's irrelevant how long this is going to take.

9     Mr. McFadden has the right to confront and cross examine the

10    witnesses against him, a Witness that we deem very, very

11    critical in this case.

12         We've been talking about child suggestibility.

13    We've been talking about, as part of the disclosure, you

14    know, reports that are made to DHS, to Law Enforcement, and

15    this goes into the influence that those people can have on

16    disclosure.

17         So it's 100 percent relevant to what was both

18    discussed on direct and earlier during cross examination.

19    She's now testified that the only reason that these children

20    are suggestible is because of these really, really coercive

21    questions and things like that, which is 100 percent false.

22         This is something that she testified to as reliable

23    authority in her field, the field regarding both child

24    suggestibility, regarding disclosure.  I am drawing her

25    attention to it and essentially asking her questions about

INV_TRAN_00003165

1   it.

2          You know, she can say what she will regarding the

3   research that's here, but we can contend that this is 100

4   percent vital to our case, pursuant to C.R.E. 803.18.  This

5   is a learned treatise.

6          I think I've laid an adequate foundation for that

7   showing that this is the type of research that's relied upon

8   in this area, that this is reliable authority and she's

9   admitted that it is so.

10         So, I think it's appropriate that both its, both

11  can be admitted and that I can ask questions about it at this

12  point.  And I certainly -- that is what I intend to do.

13  Again, this all goes down towards the disclosure of these,

14  these allegations of child sexual abuse and the influence

15  that things can have on that disclosure.

16         THE COURT:  If the article in question is the

17  suggestibility of children's memory, it has a whole host of

18  sections that are contained in here.  Some of which have been

19  discussed during the course of the trial, some of which have

20  not.

21         Some of those that have not include the

22  anatomically detailed dolls, multiple suggestive techniques.

23  As I go through this it also talks about the effective

24  suggestive interviews on children's credibility, etc.

25         The exhibit is not going to be admitted.  You can

INV_TRAN_00003166

1    continue your questioning, but I'm not exhibit -- admitting

2    Exhibit C at this time.

3              MR. BURRILL:  So, I can still ask questions

4    concerning it as long as --

5              THE COURT:  [Indiscernible] considering the

6    objection that you could ask.

7              (Proceedings return to open court)

8              THE COURT:  The objection is sustained.  Exhibit C

9    will not be admitted.

10             MR. BURRILL:  Okay.

11             BY MR. BURRILL:

12        Q    Well, Ms. Young, I still wanted to ask you some

13   questions about that.  So, I think where we had left off was

14   we were talking about interviewer bias and how Dr. Ceci and

15   Dr. Brock were essentially talking about that.

16             Right?  And you mentioned it's always important to

17   explore alternative hypothesis for the allegation of abuse,

18   right?

19        A    Yes.

20        Q    And some of the things that they mention that

21   should be pursued as questions like did your mommy tell you

22   to say this or did you see it with your own eyes?  Right?

23        A    That would be an example of one -- if, if there was

24   a, a reason to ask that type of a question.  But, that

25   specific question but to try to explore the possible reasons

INV_TRAN_00003167

1    for the allegations that could be one of the questions.

2        Q    Okay.  And let me give some other examples too.

3    Like, who besides your teacher touched your private parts?

4    Did your brother touch them too?  Those are other types of

5    questions that show a lack of interviewer bias, right?

6        A    Well, who besides your teacher touched you is

7    pretty suggestive.

8        Q    Okay.

9        A    I, I wouldn't recommend that one.  I would

10   recommend something at -- if you're talking about an

11   interview where a child's made some allegations, it would be

12   also appropriate to say is there any other time in your life

13   when anybody else has done something that made your body

14   uncomfortable or made your feelings uncomfortable.  I would

15   ask it broader than who else, because who else implies

16   somebody else has touched you.

17       Q    Okay.  So, I guess you would disagree then with

18   Dr. Ceci and Brock regarding that?

19       A    I'm not sure that they would still use that

20   question now.  That was maybe 1999.

21       Q    Okay.  Okay, so you think --

22       A    But, the example of exploring other possible

23   offenders or perpetrators is a, a good practice.

24       Q    Okay.  And they mentioned too like another good

25   thing to ask would be something like did this really happen.

INV_TRAN_00003168

1    Right?  That's something that you should certainly ask,

2    right?

3         A    There, questions around is this something that you

4    remember happening or is this something that somebody talked

5    with you about?  Those kind of questions can be appropriate.

6         Q    Okay.  You would agree too, that another thing they

7    note that shows interviewer bias is a tendency to ignore

8    inconsistent or bizarre evidence that comes from the child

9    making an allegation of abuse, right?

10        A    The, I -- I'm not sure if you mean like fantastic

11   statements or --

12        Q    Yeah.  Yeah.  Yeah, like fantastic statements or

13   things that just don't seem to add up.

14        A    Right.  Those, those should be explored.  Not

15   always --

16        Q    Right.

17        A    -- necessarily with the child but with somebody

18   that has access to the child.  Or sometimes it's appropriate

19   to not explore it right at that moment in that interview, if

20   you hear something very fantastic or unusual, or

21   unbelievable, but to then follow-up with additional

22   interviews with people who know the child.

23             Maybe the person that the out cried to, and then

24   come back.  So, sometimes it doesn't happen in the same

25   interview.

INV_TRAN_00003169

1    Q    Okay.  Another thing that I know that we've talked

2    about beforehand, not in this trial but another one is that

3    another alternative hypothesis to explore is whether or not

4    the child has serious psychiatric issues, right?

5    A    Yes.

6    Q    Okay.  According to some of the research,

7    interviewer bias can influence the entire structure of an

8    interview with a child, right?

9    A    Right, which is why the protocols have been

10   developed over the last 20 to 25 years is in an effort to set

11   the train to go from broad to more narrow, to formulate --

12   start with your hypothesis, formulate your interview and then

13   go beyond to more specific questions to clarify at the end of

14   the interview and not at the start.  So, the protocols were

15   designed, in part, to help control for that.

16   Q    Okay.  One of the things that you touched on a

17   little bit beforehand was this coercive, repeated

18   questioning, right?

19   A    Yes.

20   Q    Now, according to some of the research that's been

21   done, they don't, they don't use that terminology, do they?

22   A    That word is used in this article you gave me.

23   Q    Okay.  Well, what page are you looking at?

24   A    Might take me a minute to find it.

25   Q    Yeah, it's okay.  Don't worry.

INV_TRAN_00003170

1      A    I'm sorry.  I saw it when I was scanning.

2      Q    It's --

3      A    It's, it's in here somewhere.

4      Q    Yeah, I'm, I'm sure.  I'm, -- I have no reason to

5    doubt that either.  But, but let me go -- what -- if you

6    could go to page 425, I wanted to ask you some questions

7    about this.

8           One of the concerns that Dr. Ceci and Dr. Brock

9    talk about is concerns about using specific questions versus

10   open-ended questions, right?

11     A    Right, the goal being to start with as -- open-

12   ended questions as possible.  Keeping in mind that much

13   younger children may need a little bit more of a narrowed

14   question in order to understand more about what the goal of

15   the conversation is about.

16     Q    But, they know, in some of the studies that they've

17   conducted on children or that have been conducted on

18   children, that just asking specific questions themselves can

19   create some problems with accuracy, right?

20     A    Oh, you mean just like yes, no questions?

21     Q    Correct.

22     A    Yes.  And, and you can have interviews where

23   children you know, have what we call LVA which is Low Verbal

24   Ability and those children are the ones that struggle the

25   most with free narrative.

INV_TRAN_00003171

EXHIBIT F

115

```
 1      Q    Right.

 2      A    It's sort of a cognitive limitation they have.

 3      Q    Right.  And when they talk about specific

 4  questions, you know, Dr. Ceci and Dr. Brock too, they --

 5  they're talking just about, they don't, they don't label them

 6  as leading, they call them things like forced choice

 7  questions, right?

 8      A    Yeah, forced choice --

 9      Q    Um-hmm.

10      A    -- direct questions, the, the, the -- I think the

11  most important thing is not necessarily if a multiple choice

12  question is used but the context of the -- when it's used.

13  So, if a child is giving you a pretty good description of an

14  alleged event and you know, the one thing that they didn't

15  mention is whether that happened in the daytime or nighttime,

16  because there's not a lot of other choices for time besides

17  day and night.

18          That could be qualified as a forced choice

19  question, a multiple choice question.  But, I wouldn't have

20  as many concerns about that kind of a question after a, a

21  pretty good disclosure.

22      Q    Okay.

23      A    So, there's a lot of nuances and I, I don't want to

24  waste your time.  I don't know if that's helpful or not.

25      Q    Well, let me ask you this.  You'd agree that
```

INV_TRAN_00003172

1    Dr. Ceci and Brock caution against using things like forced

2    choice questions, right?

3        A    Certainly using them earlier in the interview,

4    absolutely, to avoid them if you can with younger children.

5    Practically, unfortunately, sometimes they're necessary but

6    it shouldn't be to substantiate an act.

7        Q    Um-hmm.

8        A    It should be to clarify daytime or nighttime,

9    something like that.  But not to confirm an act.

10       Q    Right, but for example, you keep saying the --

11   shouldn't use it earlier in the interview.  That's not what

12   Dr. Ceci and Dr. Brock note in this study, do they?

13       A    I, I don't know which study you're referring to.

14       Q    The one on page 425.  Where it discusses specific

15   versus open-ended questions.

16       A    Which particular section?

17       Q    Well, I think --

18       A    I mean, I'm reading that paragraph.  I didn't

19   remember that part of your question.  I apologize.

20       Q    Okay, it was just that they don't limit cautioning

21   against specific questions to the beginning of the interview,

22   do they?

23       A    Right, it, it indicates here that a biased

24   interviewer does not ask a child open-ended questions such as

25   can you tell me what happened.  But, instead, resort to a

INV_TRAN_00003173

1     barrage of specific questions, many which are repeated and

2     leading.  And that's a problematic strategy.

3          Q     Right.  And the study that they cite, they actually

4     talk about how children were first asked open questions, tell

5     me what happened, and then asked more specific questions,

6     right?

7          A     I didn't read all that.  I apologize.

8          Q     Well, go ahead --

9          A     I've not read the whole article -- that whole

10    section.

11         Q     Keep going down.

12         A     Do you want me to read it now?

13         Q     Yeah, go ahead.

14         A     Oh, okay.  So, I read the part on specific versus

15    open-ended.

16         Q     Right.  And they talk about how errors increase,

17    even with starting with those open-ended then moving to

18    specific, right?

19         A     Right, that, that if you can do an interview where

20    you never ask one, with a child of high verbal abilities.

21         Q     Um-hmm.

22         A     But, if you ask them, know why you're asking them

23    and, and be able to assess whether or not asking that

24    question was harmful or created more bias or any confirmation

25    bias.

INV_TRAN_00003174

1   Q    Okay.  And let me ask you this too, just because I
2   didn't know this before I started doing cases like this, but
3   what is a forced choice question?  Go ahead.
4   A    Well, I think that the example, the -- that they
5   gave there, which is was it black or was it White?  I think
6   they gave that example.
7        I don't know what they were referring to in this.
8   A forced choice question, was it black or was it white,
9   that's because there's also a lot of other colors besides
10  black and white --
11  Q    Right.
12  A    -- that it would be a forced choice.  And the third
13  option, or the third thing that they're referring to is if
14  you're going to say was it black or was it white or you might
15  also want to say, or do you not remember or do you not know.
16  I mean so giving one of your choices is that you don't know
17  and you don't remember is an okay answer, as well.
18  Q    And that's because children are reluctant to say
19  that type of answer right, that they don't know.
20  A    Yes.
21  Q    Okay.
22  A    They can be.
23  Q    All right.  Another thing that Dr. Ceci and Brock
24  talk about is being of concern is when someone repeats
25  specific questions to children, right?

INV_TRAN_00003175

1        A    It can be a concern.  I think that it's important

2    to explain why and sometimes what you have to say is I'm

3    still really confused and so I'm going to ask you this

4    question again.  And you often, you know, have already set

5    some parameters or rules.

6            It's okay to disagree with me.  It's okay to say

7    you don't remember.  But, I'm still really confused about

8    that time you talked about in the camper bus, whatever.

9        Q    Okay.  So, I think what you're saying though

10   generally is that you agree social science research is

11   concerned with asking children repeated, repeated specific

12   questions, right?

13       A    Right.  So, you want to clarify it as your problem,

14   it's not their -- there's not a problem with their answer,

15   there's a problem with you understanding it.

16       Q    And the reason why is because children feel like if

17   you keep asking the same question, they're giving the wrong

18   answer, right?

19       A    They can, yes.

20       Q    Right.  So, that's why you definitely want to avoid

21   those issues, correct?

22       A    Yes.

23       Q    You don't want the child to guess or anything like

24   that.

25       A    Yes.

INV_TRAN_00003176

120

1     Q    Okay.  You would agree too that interviewers can

2  have subtle cues in an interview with a child as part of the

3  disclosure process?

4     A    Like, you mean nonverbal?

5     Q    Yeah, it could even be nonverbal, right?

6     A    Yeah.  I don't -- I'm not sure I quite understand

7  what you're talking about but -- that do -- can interviewers

8  convey a message with non-verbals?  Yes.

9     Q    Right.  But, even just an emotional tone of an

10  interview can influence how a child discloses, right?

11     A    Yes.  You want to be professional and you do want

12  to be somewhat neutral about the subjects that are being

13  discussed.

14        You don't want to be effusive and excited based on

15  an answer of theirs but you also don't want to suggest to a

16  child that you're disinterested or you think they're talking

17  about something that makes you uncomfortable.  So, it's a

18  complicated balance.

19     Q    Okay.  Yeah, it's difficult but something to look

20  for when you're looking at an interview, right?

21     A    Yes.

22     Q    Okay.  Stereotype induction can be part of a

23  suggestive interview, right?

24     A    It can be.

25     Q    And that's when like you know, if a child's told

INV_TRAN_00003177

121

```
 1    that somebody's a bad person or some -- or does bad things,
 2    they might incorporate that belief into their report.  Right?
 3         A    They can.
 4         Q    Okay.  Sometimes, I guess, suggestibility can be
 5    kind of subtle, right?
 6         A    It can be.
 7         Q    Are you familiar at all with a Mr. Science study
 8    that was conducted?
 9         A    I need to know more about it.  That one doesn't
10    ring a bell.
11         Q    Okay.  If you want, you can look at page 429 on
12    this article.  They talk about it about halfway down the
13    page.  And maybe if you read that, it might refresh your
14    recollection about that specific study.
15         A    You say 429?
16         Q    Yes.
17         A    Oh, that's the wiping the mouth study, yes.
18         Q    Okay.  Yeah.  So, in that study, essentially what
19    happened was some children went and they played with a guy
20    named Mr. Science, right?
21         A    Yes.
22         Q    And some things happened and some things -- well,
23    I'll phrase it this way.  So, a story book was prepared about
24    the child's experience with Mr. Science, right?
25         A    Yeah.  If I recall, they watched him complete some
```

INV_TRAN_00003178

1   experiments but they didn't watch -- some of the kids didn't

2   see all of the experiment.  They only saw two of the four or

3   something like that.

4       Q    Exactly, exactly.  And so they gave the storybook

5   to the parents of the child, right?

6       A    To read to the children --

7       Q    Okay.

8       A    -- four months later.

9       Q    Right.  And the parents read that story to their

10  children three times, right?

11      A    I don't disagree with that.  I don't remember that

12  part.

13      Q    Okay.  And later on, the children actually told the

14  experiments, -- the -- or yeah, told the experimenters that

15  they had participated in demonstrations that they had

16  actually not participated in; they don't even mention in the

17  story, right?

18      A    Right.  They didn't actually participate in those

19  but the story that was --that their parents read to them

20  about their time there, talked as if they had participated in

21  those experiments.

22      Q    And that's another thing that Dr. Ceci and Brock

23  talk about is that children can actually come to believe that

24  they've experienced false events sometimes, right?

25      A    They can if a trusted sources suggests and leads

INV_TRAN_00003179

1    them into believing something that the examples that they're

2    using in here --

3        Q    Okay.

4        A    That somebody wiped their mouth with something

5    yucky.

6        Q    And that's -- I guess that has led to some problems

7    with professionals evaluating reports.  Right?

8        A    What has?

9        Q    I guess the fact that children can sometimes come

10   to believe that something happened to them when it did not.

11   Right?

12       A    I, I think that that's -- the question then goes to

13   one of the hypothesis is there evidence or indication in

14   cases like this that somebody is coaching a child into making

15   a false allegation.  So, that would be one of the hypothesis

16   that forensic interviewers should always start with.

17       Q    Okay.  Now you're also familiar with some of the

18   research that Dr. Ceci and Brock have talked about, about the

19   fact that professionals cannot tell what stories from

20   children are fabricated and which are, which are accurate.

21   Correct?

22       A    I would have to know what specific you're talking

23   about.

24       Q    I think that would be if you wanted to check it

25   out, it would be page 432 they really talk about this.  Maybe

INV_TRAN_00003180

1   just go ahead and read that first full paragraph and say

2   whether or not you agree or disagree with some of those

3   propositions.

4       A   And is -- if I recall this, that this -- these were

5   children that were interviewed that had previously

6   experienced repeated suggestive interviewing that included

7   false reports.

8           If I'm reading that correctly, that they were,

9   first of all suggestively, coercively interviewed about

10  events that didn't happen to them.  And that, that repeatedly

11  happened and then they were interviewed by some, I don't know

12  who they said did the interviews, some type of mental health

13  professionals.

14          Not, so -- that then the children appeared pretty

15  credible after these things were repeatedly suggested to them

16  that these things had happened to them.  Later when they were

17  interviewed by a mental health professional with child

18  development expertise that they could not discriminate

19  between which reports were accurate from those that were

20  inaccurate.  And I think the key piece is that there was

21  repeated, suggestive interviewing of the child --

22      Q   Okay.

23      A   -- or conversations with the child to try to

24  convince the child that an event had happened.

25      Q   But, you'd also agree that part of the problem is

INV_TRAN_00003181

1    source misattribution for children, right?

2        A    Source monitoring and source misattribution, yes.

3        Q    And by source misattribution is that the child

4    can't remember if the event was actually experienced or came

5    from the suggestion.  Right?

6        A    That's a concern with preschool children that --

7    and part of the concern is the questions from interviewers.

8    So, source monitoring is, there was the child know how it is

9    they know something.

10           You can ask a three year old how do you know that?

11   And they might say I just always knowed [phonetic] it.

12   Because they don't know where it is they learned it from.

13           It could be some skill they have or some new thing

14   that they've learned that they could do.  So, children who

15   are preschool age cannot monitor the source of where it is or

16   how it is they know something like older children and

17   certainly adults can.

18       Q    Okay.

19           MR. BURRILL:  If I can have just one second.

20           THE COURT:  Yes.

21           MR. BURRILL:  And Dr. Young, I just wanted to thank

22   you for your time.

23           THE WITNESS:  Thank you.

24           THE COURT:  Mr. Waite.

25                         REDIRECT EXAMINATION

INV_TRAN_00003182

EXHIBIT F

126

1            BY MR. WAITE:

2        Q    So, Dr. Young, that -- there's something you just

3    testified about --

4        A    Yes.

5        Q    All came out of the 1990's correct?

6        A    Yes, but I want to clarify I'm not -- I don't have

7    a PhD.  So, thank you for giving me one but I really don't

8    have one.  Go ahead.

9        Q    But, all, all of these studies were done in the

10   1990's.

11       A    Yes, they were.

12       Q    And all of these were done pre forensic interview

13   protocols.

14       A    Right.  This is part of what galvanized the country

15   and the field of mental health and social sciences to develop

16   protocols so that we dramatically decrease the risk of, of,

17   of false allegation or a coaching or a suggestive interview.

18       Q    So, when we talked today about forensic

19   interviewers that are trained in forensic interviewing,

20   that's a result, those protocols and that training is a

21   result of these studies.

22       A    Right, these and many other studies but in

23   partially the ones from Cornell.

24       Q    Okay.  But, these were yet -- so these studies were

25   instrumental in making those changes.

INV_TRAN_00003183

1      A    Yes.

2      Q    Okay.  And some of the, some of the concerns as you

3   noted were things like repetitive, suggestive questions.

4      A    Yes.

5      Q    And, and, and they -- and there were a number of

6   studies that said, you know, that yes, if you repeat these

7   suggestive questions over and over again, eventually the

8   child will adopt those as their own.

9      A    Yeah, younger children can acquiesce to those,

10  certainly ahead of older children and adults.

11     Q    Okay.  And in fact, and I'll kind of go through

12  what Mr. Burrill just did.  But specific versus open-ended

13  questions, they said that really you should ask open-ended

14  questions such as what happened instead of resorting to a

15  barrage of specific questions, many of which are repeated and

16  many of which are leading.  And that's problematic.

17     A    That's problematic, yes.

18     Q    And we would agree with that.

19     A    Right, I think we would all agree with that.

20     Q    Okay, all right.  And so when we talk about forced

21  choice questions, forced kind of talks about what you were

22  talking about earlier, about coercive questioning.

23     A    Yeah.  It, it binds the child into having to choose

24  one of your options and ignores the fact that either A,

25  there's also other options or B, the child really may not

INV_TRAN_00003184

1    remember.

2            So, if you don't remember you should always be

3    either part of the conversation with the child in the --

4    early on or it should be an option in your question if you

5    have to ask a multiple choice question like that.

6        Q    And the children in these studies, most of these

7    studies were performed on young children.

8        A    A lot of them were -- there were some that were

9    performed on a little bit more elementary school children but

10   preschool children have, you know, anywhere that three to

11   six, three to five year range has always been the greater

12   concern.

13       Q    And that's where a lot of the studies come from are

14   -- is that age range.

15       A    Yes.

16       Q    Okay.

17       A    But, that -- and there are some studies though,

18   children that age range and then compared to elementary

19   school age compared to older.  But, yeah, I would say

20   certainly a lot of these were referencing the preschooler or

21   the younger children.

22       Q    Okay.  I'd draw your attention to page 429.  You

23   were looking for the word coercive and so I'm going to help

24   you with that.

25       A    Oh, guess you found it.

INV_TRAN_00003185

1    Q    Under subtle suggestive influences it, it reads:
2  many of the techniques that have been described seem quite
3  explicit and when used repeatedly can appear to be coercive.
4    A    Yes.
5    Q    Is, and, and, and so coercive is used in this, in
6  this --
7    A    In the social sciences research, yes.
8    Q    Okay.  And that was the Mr. Science study where
9  the, the kids went in and they experienced things.  And then
10  reports were sent to their parents and the parents read those
11  same things to them over and over and over again.
12    A    Three times.
13    Q    Three times.  And they're -- so they sent it to
14  their parents.  You know, would you agree that parents are
15  kind of an important part of a child's life?
16    A    Typically, usually, hopefully a trusted source.
17    Q    Okay, especially at that age, especially at that
18  three to five year range.
19    A    Yes.
20    Q    And so a trusted source read these things three
21  times over to these kids and then they did another test and
22  the kids has adopted some of those things that were said,
23  right?
24    A    Yeah.  They had adopted that they had participated
25  in some of the experiments or observed some that they hadn't.

INV_TRAN_00003186

1    And then the more suggestive statement was that their mouth

2    -- Mr. Science wiped their mouth with something really yucky

3    and it tasted really yucky.

4              And that was the question where that didn't

5    actually happen in any of the children's actual experience

6    but it was suggested to them repeatedly that their mouth had

7    been wiped with something yucky.

8         Q    So, when we talk about coaching, that's kind of

9    what we're talking about is a trusted source that tries to

10   convince them to tell a false story.

11        A    It could, it could be in that range, yes.

12        Q    Okay.  And turning to 432, Mr. Burrill asked you

13   then about suggestive interviews and children's credibility.

14   There was a study that was quoted there and it says wherein

15   children were repeatedly and suggestively interviewed about

16   true and false events, the children's narratives would become

17   more embellished in detail.  So, that by the third interview,

18   it was impossible to differentiate between them.

19        A    Yes.

20        Q    Okay.  So, repeatedly and suggestively interview

21   once again.

22        A    Yes.

23        Q    Yeah, we, we hear that a lot throughout these,

24   throughout these.

25        A    Yes.

INV_TRAN_00003187

 1      Q    Okay.  And that's where we started talking, started
 2  talking about source misattribution and things like that.
 3      A    Yes.
 4      Q    Okay.  So, would you agree that we've come a long
 5  way since the 1990's?
 6      A    Since the McMartin preschool case and those things,
 7  yes.  We've came a long way.
 8      Q    Okay.  And that the reason we have is because we
 9  now have training and protocols in place that help us with
10  those.
11      A    Yes.
12      Q    Thank you.
13           MR. WAITE:  I don't think I have anything else.
14           MR. BURRILL:  Your Honor, could we have one second?
15  I'm sorry.
16           THE COURT:  Yes.
17                    RE-CROSS EXAMINATION
18           BY MR. BURRILL:
19      Q    So, Ms. Young, one thing that you talked about is
20  sort of age ranges for some of these studies, right?
21      A    That -- some of the studies on suggestibility
22  highlighted kind of the preschool ages, but not only.  But,
23  that was kind of a key area of study.
24      Q    You'd agree that not every child is developmentally
25  where they are age-wise, right?

INV_TRAN_00003188

132

```
 1        A    Right.  We have --

 2        Q    Okay, and so --

 3        A    -- we call typical development and we have children

 4   who are ahead in some areas, behind in some areas and within

 5   normal limit.

 6        Q    And/or who might be delayed, right?

 7        A    Yes.

 8        Q    Right.  And that's something that you should be

 9   looking for as an interviewer with children because it's

10   important, right?

11        A    Yes.

12        Q    Okay.  One of the other things that -- I, I just

13   want to go back to the Mr. Science story.  It actually --

14   there was no trusted source trying to convince the children

15   that that is what occurred, correct?  Wasn't the whole

16   purpose of that study to be the subtle suggestive influences?

17        A    The -- if I'm interpreting Mr. Waite's questions

18   correctly that the, the, the parents being the trusted source

19   that are reading this information or misinformation to the

20   children --

21        Q    Um-hmm.

22        A    -- was what he was referring to.

23        Q    Right, but the parents didn't actually know what

24   happened with Mr. Science, right?

25        A    Yeah, they -- I don't think --
```

INV_TRAN_00003189

1      Q     Right.

2      A     -- they were informed of what experiments the kids

3  saw or any of that.

4      Q     Right.  That was the whole point of the study,

5  right?

6      A     Right.

7      Q     It was just --

8      A     It was still misinformation but I don't --

9      Q     Right.

10     A     -- believe the parents knew it was misinformation.

11     Q     Correct, so there was no attempt on their part to

12  suggest the children anything.

13     A     No, I think that was designed by the researchers

14  who wrote the story.

15     Q     Okay.  Okay, no further questions.  Thank you

16  doctor -- or [indiscernible] sorry.

17     A     That's fine.

18     Q     It's been a long day for me already.

19     A     That's okay.

20     Q     Ms. Young, I'm sorry.

21     A     That's fine.

22           THE COURT:  Mr. Waite, anything else?

23           MR. WAITE:  Nothing based on that, Judge.

24           THE COURT:  Okay.  And I know we have at least one

25  question from jury, couple of questions from the jury.  Thank

INV_TRAN_00003190

1    you.

2              (Proceedings at the bench)

3              THE COURT:  Oh --

4              MR. BURRILL:  [Indiscernible].

5              THE COURT:  Well, hang on just a second.  Let me --

6    I'm going to go to each of the questions.  Okay.

7              MR. BURRILL:  No objection to 12.  Said no

8    objection to 12.  Yeah.

9              THE COURT:  Okay, number 13.  Mr. Waite, I'm going

10   to go to you first since it's --

11             MR. WAITE:  I mean I'm not sure I answer -- I

12   understand the question so I -- I'm not sure I object to it

13   but I don't think that -- I mean if, if, if she knows.  I

14   mean I'm not sure if she knows but if she knows.

15             THE COURT:  Mr. Burrill?

16             MR. BURRILL:  I would object on grounds that I

17   don't think that we talked about any sort of studies where

18   children were coached nor am I aware of Norris, I guess.

19             There've been testimony from Ms. Young that she

20   knows about studies where children were coached.  And quite

21   frankly, I'd be objecting because based on her answer, it'd

22   be certainly something that I'd want to cross her on and

23   that's some sort of prior disclosure on.

24             I'd look through her, you know, like curriculum

25   [indiscernible] you know, studies that she knows and I'm not

INV_TRAN_00003191

1   familiar of any specifically where children were coached to

2   say anything.

3            So, the problem is if she says something, I'm in

4   the position where then I don't -- I'm not able to

5   cross-examine her on it.

6            So, I'd be objecting to the question.  It's outside

7   the scope of her Expert disclosures and outside the scope of

8   my questions and Mr. Waite's questions.

9            THE COURT:  Did you have anything else?

10           MR. WAITE:  I'll just leave it up to the Court.

11           THE COURT:  I'm not going to ask 13 but I will ask

12   12.

13           (Proceedings return to open court)

14           THE COURT:  Can children also be convinced that

15   something did not happen to them when in fact it did happen

16   to them?

17           THE WITNESS:  I mean, so, can children also be

18   convinced that something didn't happen when it did?  It's --

19   I would say that probably the more accurate answer to that is

20   children can be shot down in the sense of talking about

21   something.

22           So, if a child is making an outcry about something

23   and a parent is -- or a caregiver is trying to convince the

24   child that something didn't happen, my experience with, with

25   kids who've been in that situation is that it shuts down the

136

1   outcry or them talking about it.

2        I have not necessarily seen that it is something

3   that is forgotten or never remembered.  I think it's just no

4   longer talked about.

5        That's the best answer.  That I haven't seen a

6   situation where something happened to a child and they -- it

7   was completely extinguished from their memory because

8   somebody convinced them it didn't happen.  Not, not a

9   significant thing in their life anyway.

10       THE COURT:  Anything from that, Mr. Waite?

11       MR. WAITE:  No, nothing from that, Judge.

12       THE COURT:  Mr. Burrill?

13       MR. BURRILL:  No, nothing, Your Honor.

14       THE COURT:  You may step down.

15       THE WITNESS:  Thank you.

16       MR. BURRILL:  And Your Honor, may --

17       THE COURT:  Yes.  Thank you.  Mr. Waite?

18       MR. WAITE:  Judge, at this time the People would

19   rest.

20       THE COURT:  All right.  Ladies and gentlemen, we're

21   going to go ahead and take our mid-afternoon break at this

22   time.  We are going to take until five until so 2:55-ish.

23       So, just to give -- maybe a little bit longer than

24   that, but we will try to make it not any more longer than

25   that.  So, see you back here at 2:55.  Please rise for the

INV_TRAN_00003193