1                    IN THE UNITED STATES DISTRICT COURT

2                      FOR THE DISTRICT OF COLORADO

3    Criminal Action No. 19-cr-00243-CMA-GPG-1

4

5     UNITED STATES OF AMERICA,

6            Plaintiff,

7            vs.

8     MICHAEL TRACY MCFADDEN,

9            Defendant.

10   ----------------------------------------------------------------

11                    PARTIAL REPORTER'S TRANSCRIPT
                      Jury Trial - Testimony of K.W.
12
     ----------------------------------------------------------------
13
             Proceedings before the HONORABLE CHRISTINE M.
14   ARGUELLO, Senior Judge, United States District Court for the
     District of Colorado, commencing on the 9th day of
15   November, 2022, in United States Courthouse, Grand Junction,
     Colorado.
16
                               APPEARANCES
17
     For the Plaintiff:
18   JEREMY L. CHAFFIN, U.S. Attorney's Office, 205 North 4th St.,
     Ste. 400, Grand Junction, CO 81501
19
     ANDREA L. SURRATT, U.S. Attorney's Office, 1801 California
20   St., Ste. 1600, Denver, CO 80202

21   For the Defendant:
     SEAN M. MCDERMOTT, McDermott Stuart & Ward, LLP, 140 East 19th
22   Ave., Ste. 300, Denver, CO 80203

23   BEN LABRANCHE, Benjamin R. LaBranche PLLC, 1544 Race St.,
     Denver, CO 80206
24

25       Sarah K. Mitchell, RPR, CRR, 901 19th Street, Room A252,
                    Denver, CO 80294, 303-335-2108
           Proceedings reported by mechanical stenography;
                  transcription produced via computer.

1                          I N D E X

2

   GOVERNMENT'S WITNESS                                    PAGE
3
   K.W.
4     Direct Examination By Ms. Surratt                      3
      Cross-Examination By Mr. McDermott                     47
5     Redirect Examination By Ms. Surratt                    59

6

7               GOVERNMENT'S
                EXHIBITS                    RECEIVED
8
                13-1                            4
9
                13-2                            6
10
                227                            31
11
                228                            31
12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              *        *        *        *        *

2         (This portion of proceedings commenced at 9:26 a.m.)

3         THE COURT:  The Government may call its next witness.

4         MS. SURRATT:  Your Honor, the Government calls K.W.

5         THE COURTROOM DEPUTY:  Can you please stand and raise

6    your right hand.

7                              K.W.

8    was called as a witness and, having been duly sworn, was

9    examined and testified as follows:

10        THE COURTROOM DEPUTY:  Thank you.  Please be seated,

11   and then please state your name and spell your first and last

12   name for the record.

13        THE WITNESS:  My name is K////////, K-////////////, last

14   name W///////////, W-/////////////////////.

15                       DIRECT EXAMINATION

16   BY MS. SURRATT:

17   Q.  Good morning.  Can I call you K.W.?

18   A.  Yes.

19   Q.  K.W., how old are you now?

20   A.  I am 21 years of age.

21   Q.  What is your date of birth?

22   A.  April 23rd, 2001.

23   Q.  April 23rd, 2001?

24   A.  Yes.

25   Q.  So in January of 2013, were you 11 years old?

19-cr-00243-CMA-GPG-1   Testimony of K.W.                11/09/2022    4

1   A.  I was, indeed.  No, 2013 of January I would have been --

2   yes, I would have been 11.

3   Q.  Not quite 12 yet?

4   A.  Not quite 12 yet.

5   Q.  K.W., there's a binder in front of you.  Can you look in

6   the binder and find what's marked as Exhibit 13-1.

7   A.  I have it.

8   Q.  What is that?

9   A.  That's going to be my -- me and my two little siblings.

10  Q.  Is that a photograph?

11  A.  It is, indeed.

12  Q.  And you said you recognize the people in that photograph?

13  A.  I do, indeed.

14  Q.  And you said it's you and your siblings?

15  A.  Yes.

16  Q.  Is that a photograph that fairly and accurately represents

17  what you and your siblings looked like around that time?

18  A.  Yes, it does.

19          MS. SURRATT:  The Government offers 13-1.

20          THE COURT:  Any objection?

21          MR. MCDERMOTT:  No objection, Your Honor.

22          THE COURT:  13-1 is admitted.  You may publish.

23      (Government's Exhibit 13-1 received.)

24  Q.  (By MS. SURRATT) K.W., who is the tallest boy on the far

25  left?

                    Sarah K. Mitchell, RPR, CRR

1   A.   That would have been me at the time.

2   Q.   Do you know approximately how old you are in this photo?

3   A.   I would have been around 11 years old.

4   Q.   Who is the girl in the middle?

5   A.   That would be my little sister.

6   Q.   And what's your sister's name?

7   A.   S.J.W.

8   Q.   About how old was S.J.W. in this photograph?

9   A.   8, 8 years old at the time.  7 or 8 around that time.  I

10  think she would have been 7 at the time because her birthday

11  is in May.

12  Q.   And who is the little boy in the darker blue shirt on the

13  right side of the photograph?

14  A.   That would be my little brother L.We.

15  Q.   And do you know approximately how old L.We. would have

16  been in this photograph?

17  A.   He would have been 3 or 4 years old.

18  Q.   K.W., do you know where this photo was taken?

19  A.   That was taken at the D 1/2 Road house.

20  Q.   Okay.  And we'll talk about the places that you lived in

21  Grand Junction in a moment.

22  A.   Okay.

23  Q.   Could you turn to the next exhibit, which is Government's

24  Exhibit 13-2 in the binder.

25  A.   14-2?

19-cr-00243-CMA-GPG-1  Testimony of K.W.          11/09/2022    6

1   Q.  13.  Sorry, K.W.  13-2, the very next exhibit.

2   A.  Got it.

3   Q.  Do you recognize that?

4   A.  I do, indeed.

5   Q.  What is it?

6   A.  That is me -- that is also me.

7   Q.  Is it a photograph of you?

8   A.  It is a photograph of me, yes.

9   Q.  And is that a photograph that fairly and accurately

10  represents what you looked like around the time it was taken?

11  A.  Yes.

12        MS. SURRATT:  The Government offers Government's

13  Exhibit 13-2.

14        THE COURT:  Any objection?

15        MR. MCDERMOTT:  No objection, Your Honor.

16        THE COURT:  13-2 is admitted.  You may publish.

17     (Government's Exhibit 13-2 received.)

18  Q.  (By MS. SURRATT) About how old were you in this photo,

19  K.W.?

20  A.  So at D 1/2 Road house I was 11, 11 to 12 about the entire

21  time.  So this one I would have been 11.

22  Q.  And where was this photo taken?

23  A.  This was taken inside the home at D 1/2.

24  Q.  You've mentioned two of your siblings.  Do you have any

25  other siblings?

 1   A.  Yes.  I do have one step-brother.  He's older than me.

     His name is S.W. Jr.

 3   Q.  Your older step-brother is S.W. Jr.?

 4   A.  Yeah.

 5   Q.  About how old is he?

 6   A.  He's almost 30 now.  He's 29.

 7   Q.  Where do you currently live?  Just the city and state.

 8   A.  Cedar City, Utah.

 9   Q.  About how long have you lived in Cedar City, Utah?

10   A.  I moved to Cedar City, Utah, when I was 14 years old.  So

11   from 14 to now, which is roughly eight years.

12   Q.  Who do you live with in Cedar City?

13   A.  I live on my parents' property.

14   Q.  And do you live with anyone on your parents' property?

15   A.  I live with my fiancée and my little daughter.

16   Q.  How old is your daughter?

17   A.  My daughter is a year and two months.

18   Q.  What do you do for work?

19   A.  I am assistant manager at Zaxby's.

20   Q.  What is Zaxby's?

21   A.  Zaxby's is just a chicken place.  It's very similar to

22   Chick-fil-A.

23   Q.  And you said you're an assistant manager there?

24   A.  I am, indeed.

25   Q.  About how long have you worked at Zaxby's?

1    A.   I will be there two years in May.

2    Q.   K.W., do you have any felony adjudications in your past?

3    A.   I do, indeed.

4    Q.   Just very broadly, what are they for?

5    A.   I have a few for gun theft.  I have a few burglaries.

6    Q.   And were these all juvenile adjudications?

7    A.   They were all juvenile adjudications, yes.  In Cedar City,

8    Utah, Iron County.

9    Q.   And at this point have all of your juvenile adjudications

10   been resolved?

11   A.   They have been, yes.  I was successfully terminated from

12   juvenile parole.

13   Q.   You were successfully terminated from juvenile parole?

14   A.   Yes.

15   Q.   Do you have any pending cases?

16   A.   I have two.

17   Q.   And are those misdemeanors?

18   A.   They are, indeed.  They're Class 3s.

19   Q.   Do those pending misdemeanors have anything to do with

20   your testimony here today?

21   A.   They do not, no.

22   Q.   And are you expecting any benefit in your misdemeanor case

23   from me or any another representative of the Government here

24   today?

25   A.   I do not, no.  Those are my mistakes.  Those are for me to

19-cr-00243-CMA-GPG-1   Testimony of K.W.                11/09/2022      9

1    deal with.

2    Q.   What places did you live before you lived in Cedar City,

3    Utah?

4    A.   I've only -- so my entire life I've only lived in Grand

5    Junction, Colorado; Montrose, Colorado; and Cedar City, Utah.

6    Q.   So Grand Junction; Montrose, Colorado; and Cedar City,

7    Utah?

8    A.   And Enoch, Utah, but they're very closely -- like a mile

9    apart.

10   Q.   And Enoch, Utah, as well?

11   A.   Yes.

12   Q.   K.W., did you know someone named Michael McFadden?

13   A.   I do, indeed.

14   Q.   What did you call him when you knew him?

15   A.   Mike.

16   Q.   Do you see Mr. McFadden in the courtroom here today?

17   A.   I do, indeed.

18   Q.   Can you identify him by an article of clothing he's

19   wearing?

20   A.   Gray suit jacket.

21   Q.   What color shirt is he wearing?

22   A.   Blue.

23          MS. SURRATT:  Your Honor, may the record please

24   reflect that the witness has identified the defendant?

25          THE COURT:  It will so reflect.

                    Sarah K. Mitchell, RPR, CRR

 1    Q.  (By MS. SURRATT) K.W., how did you first meet

 2    Mr. McFadden?

 3    A.  My mom ran into him at the North Avenue Walmart, I

 4    believe.  As I'm here in Junction, I'm kind of remembering

 5    locations.

 6    Q.  And you said she ran him into at the North Avenue --

 7    A.  Walmart.

 8    Q.  -- Walmart?

 9    A.  Yeah.

10    Q.  And when did you first start spending time around

11    Mr. McFadden?

12    A.  About a couple weeks after that point.

13    Q.  So shortly after your mom ran into him?

14    A.  Yes.

15    Q.  Are you aware of where Mr. McFadden lived when you first

16    met him?

17    A.  I don't know the exact street name, but I do remember

18    mostly the picture of the house.

19          MS. SURRATT:  Your Honor, may we please publish

20    Government's Exhibit 3-1?

21          THE COURT:  You may.

22    Q.  (By MS. SURRATT) K.W., do you recognize this house?

23    A.  I do, indeed.

24    Q.  What is it?

25    A.  It's the house that I first went to.  Mike used to live

19-cr-00243-CMA-GPG-1   Testimony of K.W.            11/09/2022    11

1   with two other adults.  One was -- their names were John and

2   Phyllis.  They lived with their son named S.H.

3   Q.  And you said that Mr. McFadden lived with John and

4   Phyllis.  Do you know --

5   A.  So kind of how it worked, they were kind of like

6   downstairs.  Mike was upstairs.  It was a split duplex kind

7   of.

8   Q.  So John and Phyllis lived downstairs.  Do you remember

9   John and Phyllis's last name?

10  A.  Not by heart.

11  Q.  Okay.  And you said they had a son; is that right?

12  A.  Yeah, his name is S.H.

13  Q.  Do you know approximately how old S.H. was at the time?

14  A.  I don't remember.  I lost contact with S.H.  I've

15  forgotten how old he is, so forth and so on.

16  Q.  Was he about your age or older or younger?

17  A.  I believe he's a little bit older than me.  I'm not

18  100 percent sure or certain.

19  Q.  Did you ever go to this house where Mike lived in

20  Government's Exhibit 3-1?

21  A.  I did, indeed.

22  Q.  About how old were you when you started going over there?

23  A.  I think I was around 10 years old at this time.

24  Q.  And how would you get there?

25  A.  Mike would pick me up or my mom would drop me off.

                        Sarah K. Mitchell, RPR, CRR

1   Q.  What kinds of things would you do over at this home?

2   A.  Things we would do is just kind of like play around.  At

3   this time -- I don't know how it looks like now, but at the

4   time there was a field across the street.  Me and J.W. would

5   always go over there and play, like, just have some fun.  They

6   would have, like, these little electric crotch rockets that

7   were in the garage.  We would ride around the neighborhood and

8   just stuff like that.

9   Q.  A couple questions.  What is a crotch rocket?

10  A.  A crotch rocket is just like a motorcycle.

11  Q.  And you mentioned someone named J.W.  Who is J.W.?

12  A.  J.W., his name is J.W.  Me and him used to be very close.

13  Q.  Was he a friend of yours?

14  A.  Yeah, he was.

15  Q.  And how old was J.W.?  Was he older than you, about the

16  same age, or younger?

17  A.  He's a year older than I am.

18  Q.  So you occasionally went to this house.  Sometimes J.W.

19  was there.  Was anyone else there when you went over?

20  A.  Yes.  It would be myself, J.W., his brothers, sometimes

21  his little sister, and then S.H.  That's all I can remember.

22  Q.  Do you remember who J.W.'s brother and sister were?

23  A.  I know -- yeah.  L.Wr. and B.W.

24  Q.  L.Wr. and B.W.?

25  A.  Yeah.

Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1  Testimony of K.W.          11/09/2022   13

 1   Q.  Do you remember any other kids going over to this house?

 2   A.  Not necessarily.

 3   Q.  About how often would you go over to this house?

 4   A.  Almost every weekend.

 5   Q.  When you were there almost every weekend, did you

 6   sometimes spend the night at this house?

 7   A.  Yes.  I would stay there during the weekend.

 8   Q.  So you'd stay during the weekend and spend the night?

 9   A.  Uh-huh.

10   Q.  When you spent the night, where did you sleep?

11   A.  At first I would sleep on like -- kind of like a sleeping

12   bag right next to Mike's bed, and then over time it just

13   turned into me sleeping on the bed with Mike.

14   Q.  And did Mike have a bedroom?

15   A.  He did.

16   Q.  And so when you were sleeping on the sleeping bag next to

17   the bed, was that in Mike's bedroom?

18   A.  Yes, it was.

19   Q.  And then you said eventually you just started sleeping in

20   the bed with him?

21   A.  Uh-huh.

22   Q.  Did anyone else spend the night?

23   A.  Yes.  J.W. lived there, as well as L.Wr. lived there.  So

24   they would kind of stay in the same room.

25   Q.  And where would they sleep?

                        Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1  Testimony of K.W.           11/09/2022   14

1   A.  J.W. would sleep on the bed.  Don't remember where L.Wr.

2   would sleep.

3   Q.  At some point do you remember if Mr. McFadden moved to a

4   different house?

5   A.  He did.  At that time, after this house I think we went a

6   little bit without contact, and then just kind of met back up

7   with him after.  I don't remember much after this house until

8   about right around Clifton time and D 1/2.

9   Q.  Do you remember where Mr. McFadden moved after this house?

10  A.  No.

11  Q.  Do you remember him moving to a house on D 1/2?

12  A.  That would be it, yes.

13        MS. SURRATT:  Your Honor, may I please publish

14  Government's Exhibit 4-1?

15        THE COURT:  You may.

16  Q.  (By MS. SURRATT) K.W., do you recognize this house?

17  A.  I do, indeed.

18  Q.  What is this?

19  A.  That was the house he lived at on D 1/2.  It's a big old

20  22-acre plot of land at the time.

21  Q.  This is the house where Mr. McFadden lived?

22  A.  Yes.

23  Q.  And at some point did your family also move to a house on

24  D 1/2 Road?

25  A.  Yes.  We moved to the two-story right across the field.

Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1  Testimony of K.W.          11/09/2022   15

1   Q.  You moved to a two-story house across the field?

2   A.  Yeah, it was like an old brown two-story home right across

3   the field on D 1/2.

4   Q.  And just so we're clear, these are both in Grand Junction,

5   right?

6   A.  Yes.

7           THE COURT:  Ms. Surratt, I'm going to ask you to slow

8   down just a little bit.

9           MS. SURRATT:  Yes, Your Honor.

10          Your Honor, may I please publish what's marked as

11  Government's Exhibit 4-4?

12          THE COURT:  You may.

13  Q.  (By MS. SURRATT) K.W., do you recognize this aerial view?

14  A.  Yes, I do.

15  Q.  Could you indicate on this where Mr. McFadden lived when

16  he was on D 1/2 Road?

17  A.  On D 1/2 he would be, like, where all these kind of cars

18  and storage containers and trailers were at the time.  And

19  then the house that we moved into is like this little one

20  right down here in the corner.

21  Q.  Let me see if I can verbalize where I believe you were

22  just pointing.  When you described Mr. McFadden's property

23  with cars and other items around it, were you pointing to that

24  cluster of structures in the very middle of the photograph?

25  A.  In the middle of the screen, yeah.

                        Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1   Testimony of K.W.        11/09/2022    16

1    Q.  And when you were describing your two-story home, were you

2    pointing at that small structure in the very lower right-hand

3    corner of the screen?

4    A.  Yes.

5           MS. SURRATT:  Your Honor, may I please publish what's

6    marked as Government's Exhibit 4-2?

7           THE COURT:  You may.

8    Q.  (By MS. SURRATT) What is this, K.W.?

9    A.  That would have been our house at the time.

10   Q.  Where you lived with your family?

11   A.  Yes.

12   Q.  Who lived there with you at the time you lived at this

13   house on D 1/2 Road?

14   A.  Everyone that lived at this home in particular would have

15   been, off the top of my head that I can remember, would be me

16   myself, S.J.W., L.We., my mom, my dad, S.W. Jr., and then one

17   of Ray Fluke's -- I think Ray used to live there.  We've had

18   people come and go from this house, but the main people that

19   lived there was the immediate family.

20   Q.  You mentioned a name Ray Fluke.  Who is that?

21   A.  That's like an adopted uncle of ours.  We just -- he lives

22   in Cedar with us now.  He's been close to our family ever

23   since we met him.

24   Q.  What is your mom's name?

25   A.  My mom's name is Stacy W.

                    Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1  Testimony of K.W.          11/09/2022    17

1    Q.  And what is your dad's name?

2    A.  Scott W. Sr.

3              MS. SURRATT:  Your Honor, may I please publish

4    Government's Exhibit 4-3?

5              THE COURT:  You may.

6    Q.  (By MS. SURRATT) Is this another view of the same house?

7    A.  It is, indeed.

8    Q.  K.W., could you describe for the jury what this house was

9    like when you lived there?

10   A.  At the time of us moving in I was just a little kid, so it

11   was a big house, kind of excited about it.  The more we lived

12   on, like, the more things I noticed such as like holes in the

13   laundry room area, like, through the floor.  The stairs were

14   kind of creaky and loud at times.  And it's just at the time

15   my dad -- because of upstairs, my mom didn't like going up and

16   down the stairs, my dad built -- kind of sectioned off the

17   living room and cut it in half and kind of built a room right

18   there off the living room on the back of the house.  It was

19   ran down when we moved in, and kind of like what you see here,

20   just take off the wood on the windows, that's what we lived

21   in.  Everything else was pretty much the same.

22   Q.  So to be clear, when you lived there the house had

23   windows, not plywood?

24   A.  Yeah, not plywood.

25             MS. SURRATT:  Mr. Graber, you can take that down,

                    Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1   Testimony of K.W.          11/09/2022   18

1   please.

2   Q.   (By MS. SURRATT) Turning back to Mr. McFadden's house on D

3   1/2 Road, do you remember who lived there with him?

4   A.   Yeah.  It would have been John and Phyllis, Mike himself,

5   L.Wr. and J.W.

6   Q.   Do you remember anybody else living there?

7   A.   I believe S.H. lived there as well, but I think that's

8   about -- oh, and someone by the name John Foxx.

9   Q.   Did you ever go to Mr. McFadden's house on D 1/2 Road?

10   A.   I did.  As soon as he moved into D 1/2, I was there almost

11   every day and stayed on the weekend nights.

12   Q.   About how old were you when you started going over to

13   Mr. McFadden's house on D 1/2?

14   A.   About 11 years old.

15   Q.   What kind of things would you do over at that house?

16   A.   He had a lot of stuff to do, so just whatever I could get

17   my hands on at the time.

18   Q.   What kinds of things?

19   A.   He would have, like, airsoft guns, paintball guns.  He

20   would have, like, side-by-side quads, trampolines, video game

21   systems.  He had a lot of stuff to do at that house.

22   Q.   When you went over there, were there other kids to play

23   with?

24   A.   Yeah.  So there was always -- L.Wr. and J.W. were always

25   there.  We would have a couple other kids come over as well.

Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1  Testimony of K.W.          11/09/2022    19

1   Off the top of my head, one kid was named D.R.  Like, another

2   kid I keep forgetting the name of, but he would always come

3   over too.  B.W. would come over.  My little brother would come

4   over too, L.We. would come over.  So kind of how we distinct

5   the two would be big L.Wr. and little L.We.  It was just easy

6   how it was because they have the same name, just different

7   spellings.

8   Q.  Let me back up a second.  You mentioned a big --

9   A.  So L.Wr. --

10  Q.  K.W., I apologize.  I know you want to answer my

11  questions.  Can you try to wait for me to finish my questions?

12  A.  Sorry.

13  Q.  Mostly for the -- so the court reporter can take down what

14  each of us are saying, which is also why I need to slow down.

15  A.  Sorry.

16  Q.  You mentioned a big L.Wr. and a little L.We.

17  A.  Yeah.

18  Q.  Who is big L.Wr.?

19  A.  Big L.Wr. would be L.Wr.

20  Q.  And you said earlier that's J.W.'s brother?

21  A.  J.W.'s brother.

22  Q.  Who is little L.We.?

23  A.  My little brother L.We.

24  Q.  And why were they called big L.Wr. and little L.We.?

25  A.  Because big L.Wr. was a few years older.  He was taller.

                    Sarah K. Mitchell, RPR, CRR

1  My brother was shorter, a lot shorter because he was a lot

2  younger at the time.  I think my little brother was 3 or 4 at

3  the time.  L.Wr. was 6 or 7, right around those age periods.

4  So we would just distinctly call them that so we could easily

5  just say who we want, because calling L.Wr., they would both

6  just run over.

7  Q.  Okay.  You mentioned a moment ago having lots of fun

8  things to do at Mr. McFadden's, toys and video games and such.

9  Were those all things that you liked to do?

10  A.  Yes.  Still to this day I am a heavy gamer.

11  Q.  Did you enjoy going to Mr. McFadden's house?

12  A.  At the time, yes.

13  Q.  Who owned all this fun stuff?

14  A.  It was a mix between John and Mike.  They just owned

15  different things together.

16  Q.  Did Mr. McFadden ever buy you anything?

17  A.  Not necessarily bought me personally anything that I could

18  remember, but things he bought I was free to use.

19  Q.  Things he bought you were free to use?

20  A.  Things he bought I was just free to use.

21  Q.  Okay.  You said a moment ago that you -- once you were

22  living next door, you were often over at Mr. McFadden's house,

23  right?

24  A.  Yes.

25  Q.  Did you ever spend the night at the house on D 1/2 Road?

19-cr-00243-CMA-GPG-1  Testimony of K.W.          11/09/2022    21

1   A.  I did quite frequently.

2   Q.  Do you know about how frequently?

3   A.  Almost every weekend.

4   Q.  Where did you sleep when you spent the night at D 1/2

5   Road?

6   A.  At D 1/2 Road I would either sleep on the futon couch they

7   had in the living room or on Mike's bed.

8   Q.  Did you sometimes fall asleep in one place and wake up

9   somewhere else?

10  A.  Yes.

11  Q.  Could you tell the jury about that?

12  A.  So over a course of time Mike starting giving me melatonin

13  in lots of amounts.  At some points when I'd take melatonin

14  I'd fall asleep playing Black Ops II at the time which was the

15  new Call of Duty on PS3.  And then I'd wake up in the bed next

16  to Mike.  It freaked me out every time.  I just ignored it.

17  Q.  You said you would fall asleep somewhere else and then

18  wake up in the bed next to Mike; is that right?

19  A.  I'd fall asleep mainly on the futon, and then I'd end up

20  waking up on the bed.

21  Q.  Okay.  You said some letters and a number.  PS3, what is

22  that?

23  A.  PS3 is the PlayStation 3.  At the time it was like the new

24  PlayStation game they had out.

25  Q.  You mentioned a game you played.  What was that?

1   A.  Call of Duty Black Ops II.  Still one of my favorite Call

2   of Duties of all time.

3   Q.  Whose PlayStation was that?

4   A.  That would have -- I don't remember -- actually, I don't

5   remember exactly whose PS3 that was.

6   Q.  When you spent the night at Mr. McFadden's, were there

7   other people also spending the night?

8   A.  Yeah.  Quite frequently kids would stay at the house.

9   It'd be, like, the same group of kids, but it would be

10  frequent.

11  Q.  Where would the other kids sleep?

12  A.  J.W., myself, and L.Wr. -- L.Wr. would normally sleep on

13  the bed.  Other kids would just -- there was two other rooms

14  the other kids would sleep in.

15  Q.  And when you said you would sleep on the bed, whose bed

16  was that?

17  A.  Mike's.

18  Q.  And you said that there were also other rooms.  Who would

19  sleep in these other rooms?

20  A.  I know B.W. had her own room, and then John and Phyllis

21  had their own room.

22  Q.  Is this the same John and Phyllis that lived with

23  Mr. McFadden in the first house that we talked about?

24  A.  Yes.

25  Q.  You mentioned a moment ago, K.W., that Mr. McFadden gave

1    you melatonin.

2    A.  Yes.

3    Q.  Can you tell the jury a little bit more about that?

4    A.  Melatonin is a natural sleep aid that you can take.  It

5    just helps you fall asleep if you can't.  That's pretty much

6    all I can explain about it.  It's just a sleep aid.

7    Q.  Can you describe the circumstances when Mr. McFadden gave

8    you melatonin?

9    A.  It would be in heavy amounts.  It would be five or six

10   capsules at a time.

11   Q.  Were they pills or some other form?

12   A.  Sometimes they'd be pills.  Sometimes they'd be gummies.

13   Like, melatonin comes in all forms really.  Comes in like --

14   well, nowadays they come in drinks.  But at the time it was

15   just pills and gummies.

16   Q.  What time of day generally would Mr. McFadden give you the

17   melatonin pills or gummies?

18   A.  7:30, 8 o'clock at night.

19   Q.  After Mr. McFadden gave you the melatonin, what effect did

20   it have on you?

21   A.  At that time I was kind of little, so it would put -- it

22   would make me fall asleep fairly quickly.  And I don't

23   remember much about that, because when I sleep -- because

24   nowadays -- like, I have insomnia nowadays.  I have to take a

25   medication called Trazodone, which is a heavy sleep aid.  I

| | |
|---|---|
| 1 | don't -- when I fall asleep under, like, medications I sleep |
| 2 | hard, so I don't remember much when I'm asleep. |
| 3 | Q.  Did you ever see Mr. McFadden give any of the other kids |
| 4 | anything to help them sleep? |
| 5 | A.  Yes. |
| 6 | Q.  What did you see? |
| 7 | A.  Same bottle of melatonin or pills.  He would just give it |
| 8 | to almost everyone at that house. |
| 9 | Q.  K.W., I want to talk to you now about something that's a |
| 10 | little bit uncomfortable, if that's okay? |
| 11 | A.  Yeah. |
| 12 | Q.  Was there ever a time when Mr. McFadden did anything to |
| 13 | you that made you uncomfortable? |
| 14 | A.  Yes. |
| 15 | Q.  What did he do? |
| 16 | A.  It started out kind of like in the D 1/2 Road house. |
| 17 | Every so often I'd wake up, and I would just feel him on top |
| 18 | of me.  His -- he would be hard.  Like, down low he would be |
| 19 | hard.  He would just rub against me, and then -- I was little. |
| 20 | I didn't want to deal with it, so I would just fall back |
| 21 | asleep. |
| 22 | Q.  K.W., when you said he would be hard, are you talking |
| 23 | about his penis? |
| 24 | A.  Yes. |
| 25 | Q.  When is the first time that you remember something like |

1    this happening?

2    A.  The first time I remember something happening was the

3    first house you showed on the screen.

4    Q.  The house that we looked at, the white house?

5    A.  Yes.

6    Q.  What do you remember happening at that house?

7    A.  The first -- the only thing I remember from that house

8    happening was when I slept on the floor.  Other than that,

9    like, that memory is kind of faded as I've tried to push a lot

10   of these memories away, so a lot of my memories kind of -- a

11   lot faded, but I do remember a lot.  I don't remember much

12   about that house specifically.

13   Q.  Why have you tried to push some of these memories out?

14   A.  I just want to move on with my life.  This shit's been

15   going on too long.  Sorry for my language.

16   Q.  How does it make you feel to talk about this today, K.W.?

17   A.  Same way I talked to you in Cedar.  Just I don't want to

18   -- I don't want to.

19   Q.  After you moved to the D 1/2 Road house, and Mr. McFadden

20   was also living on D 1/2, did anything like this happen there?

21   A.  Yes.  That's the -- that's the story about me waking up on

22   the bed was at the D 1/2 Road house.

23   Q.  Did Mr. McFadden ever touch you at the D 1/2 Road house?

24   A.  Yes, he did.

25   Q.  Where did you he touch you?

1    A.  He would grope me in my joint areas and stuff like that.

2    Again, I don't like talking about this.

3    Q.  Did he touch your penis?

4    A.  Yes.

5    Q.  Did it happen during the daytime or the nighttime?

6    A.  It always happened at night.

7    Q.  It always happened at night?

8    A.  Uh-huh.

9    Q.  Do you remember about how many times it happened?

10   A.  No.  It happened frequently -- it didn't happen a lot, but

11   it happened often to where I could remember it.

12   Q.  When did it stop?

13   A.  It stopped after he was picked up in North Platte,

14   Nebraska, from the police there.

15   Q.  So it occurred basically until he was arrested?

16   A.  Yes.

17   Q.  How did it make you feel when Mr. McFadden touched you

18   like that?

19   A.  It made me feel small.  I don't know.  I started to hate

20   myself for a long time.  When I moved to Utah, I kind of

21   didn't know how to handle myself, so that's when I started

22   doing things I did in Utah because I didn't know how to handle

23   it.  After that I started seeking therapy.  Certain types of

24   therapy helped me deal with the trauma.  My -- because at the

25   time when I was younger, no one knew that I was autistic.  I'm

19-cr-00243-CMA-GPG-1  Testimony of K.W.            11/09/2022    27

1   on the spectrum.  And in Utah I was sent to pretty much

2   juvenile prison, so the JJYS custody Secure Care systems, so

3   pretty much I was in a cell most of the day.  And then at that

4   time they hired a psychiatrist for me, and that's when they

5   found out I'm like a one and a half on the autism spectrum, so

6   I'm extremely high functioning, but I have slight motor

7   dysfunctions.

8   Q.  K.W., in addition to doing things that made you feel

9   uncomfortable at his house, did Mr. McFadden ever take you

10  anywhere in his semi-truck?

11  A.  Yes.  He would take a lot of -- like, he would take me,

12  J.W., and big L.Wr. a lot on trips.

13  Q.  Did he ever do anything on a semi-truck trip that made you

14  feel uncomfortable?

15  A.  Yes.

16  Q.  What happened?

17  A.  I remember one time very specific -- not specifically, but

18  he would start touching me, groping me and stuff like that.

19  That's mostly what happened on the semis is just a lot of

20  touching, but that's about it.  He still made me feel

21  uncomfortable.

22  Q.  K.W., was there a semi-truck trip that ended in Nebraska

23  in 2013?

24  A.  Yes.

25  Q.  Did Mr. McFadden do anything on that trip specifically

Sarah K. Mitchell, RPR, CRR

1   that made you uncomfortable?

2   A.  Yes.

3   Q.  What did he do?

4   A.  He tried to stick his thing in me.

5   Q.  By stick his thing in you, did Mr. McFadden put his penis

6   in your butt?

7   A.  He tried to, yes.

8   Q.  What do you mean he tried to?

9   A.  It just wouldn't go in necessarily, so he just tried to,

10  and then after a while he just gave up.

11  Q.  Where were your pants at the time?

12  A.  He pulled my pants down, so they just fell on the floor.

13  And then after a while I just got up and picked it back up and

14  put them back on.

15  Q.  When you say he tried to put his penis in you, did he put

16  his penis into your butt?

17  A.  Yes.

18  Q.  How did that feel?

19  A.  It hurt, because I was little at the time.  It hurt a lot.

20  Again, I don't remember a lot.  Again, I've tried to suppress

21  most of these memories, just try to fade them out.

22  Q.  Did you feel pressure against your anus?

23  A.  Yes.

24  Q.  Is that what hurt?

25  A.  Yes.

19-cr-00243-CMA-GPG-1  Testimony of K.W.          11/09/2022    29

1   Q.   Where did you leave from to go on that truck trip?

2   A.   Montrose, Colorado, where I was living at the time.

3   Q.   You left from Montrose, Colorado?

4   A.   So not like -- so he picked us up in Montrose, Colorado.

5   We went to get his truck in Junction.  That's where we left.

6   Q.   When you say he picked you up, do you mean Mr. McFadden?

7   A.   Mr. McFadden picked me up in Montrose.  He picked me

8   myself up, S.W. Jr. and L.We.  At that time he came up for

9   Christmas because he told my mom that he had no one to spend

10  Christmas with, so he came up there.  And then he asked my

11  parents and myself and S.W. Jr. if we wanted to go on a truck

12  trip.

13  Q.   And so he picked up you and your older brother S.W. Jr.?

14  A.   And then my younger brother.

15  Q.   And your younger brother L.We.; is that right?

16  A.   Yes.

17         MS. SURRATT:  And, Your Honor, may we please publish

18  Government's Exhibit 2-1?

19         THE COURT:  You may.

20  Q.   (By MS. SURRATT) K.W., do you recognize this truck?

21  A.   I do, indeed.

22  Q.   And what is it?

23  A.   That is a Kenworth semi.

24  Q.   And whose truck is that?

25  A.   That would have been Mike's at the time.

                        Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1  Testimony of K.W.          11/09/2022    30

1   Q.  Is that the truck in which you went on that final trip

2   that you're talking about?

3   A.  Yes.

4   Q.  About how old were you on that final trip?

5   A.  13, 12 or 13 at the time.

6   Q.  Do you remember when the trip was, K.W.?

7   A.  It was in December, Montrose, Colorado.  It was two years

8   before we moved to Utah, so I think I was, yeah, 11 or 12, not

9   12 or 13.

10  Q.  And where was your family living at the time?

11  A.  It was a small little trailer in the middle of Montrose,

12  Colorado.  I believe the address was 5636 Eider Road, I

13  believe.  I don't remember the exact house name, but it was on

14  Eider Road in Montrose, Colorado.

15  Q.  Do you recall how you got invited to go on this trip with

16  Mr. McFadden?

17  A.  He asked me if I wanted to go after I believe he asked my

18  parents.

19  Q.  You believe Mr. McFadden asked your parents?

20  A.  Yes, I believe he did.  I don't remember.  I was just a

21  little excited little kid to go on a truck trip.

22  Q.  Did you like going on truck trips as a little kid?

23  A.  I did.  Oh, I loved -- I still to this day love seeing the

24  country, and I was excited to go.  I believe it was from Idaho

25  to Florida, so I was excited to take that trip.

Sarah K. Mitchell, RPR, CRR

1   Q.  You mentioned -- you just mentioned that the trip was

2   supposed to be from Idaho to Florida.  Do you remember where

3   you went when you left Colorado?

4   A.  After looking at maps a little bit more I do.  We went --

5   so we left, I believe, Junction, right around the Junction

6   area.  We went through Salt Lake to get to Idaho.  That's

7   where we loaded up -- we went through Utah to get to Idaho.

8   That's where we loaded up on potatoes, the company that loaded

9   potatoes.  Then from there we started to go towards the Coast,

10  and we stopped finally in Nebraska at a Love's truck stop.

11          MS. SURRATT:  Your Honor, the Government offers

12  Government's Exhibits 227 and 228 by stipulation.

13          THE COURT:  227 and 228 are stipulated.  They are

14  admitted.  You may publish.

15      (Government's Exhibits 227 and 228 received.)

16          MS. SURRATT:  Mr. Graber, can you publish 228 only.

17  Q.  (By MS. SURRATT) So, K.W., if I understood you correctly,

18  you left from western Colorado, correct?

19  A.  Yes.

20  Q.  And you said you went up through Utah and Salt Lake City?

21  A.  Yeah, we took I-70 -- so we took I-70, and then right at

22  that, like, kind of like where it makes a Y in the crossroad

23  in Utah from I-70 to I-15, that road from Provo to St. George,

24  that's I-15.  We took that exit and went up into Idaho.

25  Q.  So you went up into Idaho, and you said you picked up a

                        Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1  Testimony of K.W.          11/09/2022    32

1    load of potatoes; is that right?

2    A.   Yes.  After talking, I think, with you guys yesterday, it

3    kind of like brought -- sparked more knowledge of what the

4    trip was about.

5    Q.   And then you made your way east from Idaho eventually

6    ending up in Nebraska; is that right?

7    A.   Yes.

8    Q.   Do you remember precisely where you stopped for the nights

9    on this trip?

10   A.   I do not.

11   Q.   Did you stop for the nights?

12   A.   We stopped -- I think we stopped one night in Idaho and

13   then stopped again in Nebraska.

14   Q.   When you stopped in the night, where did you sleep?

15   A.   I slept right next to Mike.

16   Q.   And was this in the truck?

17   A.   This was in the sleeper of the truck, yes.

18         MS. SURRATT:  Your Honor, may we please publish

19   Government's Exhibit 2-6?

20         THE COURT:  You may.

21   Q.   (By MS. SURRATT) What is this?

22   A.   That is the back of the semi.

23   Q.   And is this the area in which -- in which you slept when

24   you spent the night in the semi?

25   A.   Yes.

                    Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1  Testimony of K.W.          11/09/2022    33

1              MS. SURRATT:  Your Honor, may we also publish 2-7?

2              THE COURT:  You may.

3    Q.  (By MS. SURRATT) Is this another view of the sleeper

4    compartment?

5    A.  It is.

6    Q.  And you said that you slept in the sleeper compartment,

7    correct?

8    A.  Yeah, on that bed right there.

9    Q.  On that bed?

10   A.  Yeah.

11   Q.  Who slept in that bed with you?

12   A.  So on this trip specifically it was myself, my little

13   brother L.We., and Mike.  And then up front laid across the

14   seats was my older brother S.W. Jr.

15   Q.  Let me unpack that a little bit.  So in that bed was you

16   and Mr. McFadden and your little brother L.We., correct?

17   A.  Yes.

18   Q.  And then did you also say your older brother S.W. Jr.

19   would sleep across the front seats?

20   A.  Like, he would kind of like lay his head on the passenger

21   -- like his head on the passenger window and have his legs

22   across the seat.

23   Q.  Can you explain the sleeping arrangements between you,

24   your little brother L.We., and Mr. McFadden on that mattress?

25   A.  So Mike would sleep against the wall on that back

                    Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1  Testimony of K.W.          11/09/2022    34

1    cushioned wall.  I would sleep right in front by the seats,

2    and L.We. would lay sideways at the very back by our feet.

3    Q.  So you would sleep right next to Mr. McFadden on that

4    mattress?

5    A.  Yes.

6          MS. SURRATT:  May we please publish, Your Honor,

7    Government's Exhibit 2-9?

8          THE COURT:  You may.

9    Q.  (By MS. SURRATT) Are these the front seats you described

10   that your older brother sort of laid himself across?

11   A.  Yes.

12         MS. SURRATT:  You may take that down, Mr. Graber.

13   Q.  (By MS. SURRATT) K.W., was it on that mattress where

14   Mr. McFadden put his penis right up to your anus as you

15   described earlier?

16   A.  Yes.

17   Q.  K.W., did you ever see Mr. McFadden do anything to anyone

18   else that made you uncomfortable?

19   A.  I did not, no.

20   Q.  What do you remember from the night that Mr. McFadden was

21   arrested in Nebraska?

22   A.  All I remember that night was not a lot necessarily.  I

23   just remember police knocking on the door, him being put into

24   handcuffs, and if it wasn't for my older brother S.W. Jr., we

25   would have been taken somewhere -- me and my little brother

                      Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1  Testimony of K.W.          11/09/2022    35

1   would have been taken somewhere because there wouldn't have

2   been an adult.  Because S.W. Jr. was there, we were allowed to

3   stay with S.W. Jr. in the truck.

4   Q.  How old was S.W. Jr. during that trip?

5   A.  18 years old.

6   Q.  And so because S.W. Jr. was 18, you were allowed to stay

7   in the truck?

8   A.  With S.W. Jr., yeah.

9   Q.  Even after Mr. McFadden was arrested?

10  A.  Uh-huh.

11  Q.  How did you get home to Colorado from Nebraska?

12  A.  So how everything happened, the load of potatoes still

13  needed to be, like, shipped out to Idaho -- or to Florida, not

14  Idaho.  So my mom, Ray Fluke, which finished the drive -- I

15  believe at the time he was driving as well, and I don't

16  remember if it was Ray or someone else, but someone along that

17  lines.  But then someone who used to live with us by the name

18  of Mike Eggers.

19  Q.  So let me unpack that a little bit, K.W.  So somebody, you

20  think maybe Ray Fluke, had --

21  A.  I believe Ray finished the drive.  I believe that's the

22  case.  Don't quote me on that part, but I believe that's who

23  finished the trip, the truck order.  Someone picked up the

24  semi from North Platte.

25  Q.  Someone had to take the semi where it was going with the

Sarah K. Mitchell, RPR, CRR

1   load of potatoes?

2   A.  Someone picked it up.  I don't remember who exactly it

3   was.  I believe it was Ray.  I don't remember exactly.

4   Q.  Okay.

5   A.  And then Mike Eggers and Stacy W., my mom, and then

6   someone I looked up to as my grandpa came and got me and L.We.

7   and S.W. Jr.

8   Q.  So your mom and a man named Mike Eggers came and got you

9   and your brothers and brought you home to Colorado?

10  A.  Yes.

11  Q.  K.W., when that police officer came to arrest Mr. McFadden

12  in Nebraska, did you tell him what Mr. McFadden had been doing

13  to you?

14  A.  I don't remember.

15  Q.  As far as you do remember, what was the first time you

16  told anyone about what Mr. McFadden had been doing to you?

17  A.  It was a detective at the Dolphin House, I believe.

18  Q.  Why didn't you tell your mom or dad?

19  A.  I don't know.  I honestly don't.

20  Q.  Why didn't you tell anybody for all those years while it

21  was happening?

22  A.  I didn't know how to -- I was young.  At the time every

23  doctor I went to just -- therapist I went to at the time just

24  diagnosed me with everything, so I wasn't a fully, like,

25  functional child.  I wasn't perfect.  So I don't remember -- I

19-cr-00243-CMA-GPG-1  Testimony of K.W.                11/09/2022    37

1    honestly don't know why I didn't say anything.

2    Q.  Even back then how did talking about this make you feel?

3    A.  It still makes me feel the same way.  It just makes me

4    feel small.

5            MS. SURRATT:  One moment, please, Your Honor.

6    Q.  (By MS. SURRATT) So a few clarifying questions, K.W.  You

7    mentioned someone named John Foxx.  Who is that?

8    A.  Used to be a really good family friend.  My dad still

9    talks to him to this day a little bit here and there.  I don't

10   remember much about him.  I don't remember much about -- oh,

11   John Foxx.  Sorry.  I was thinking of someone else.  John

12   Foxx, he was my -- everyone called him Papa John.

13   Q.  Okay.

14   A.  He was a great, great family friend.  I was thinking -- I

15   forget his name -- S.H.'s dad, I thought you were talking

16   about him.  John Foxx.  So he was a great family friend.  He

17   actually passed away in our home in Cedar.  Everyone loved

18   him.  He was a great guy.  Just he was a great all-around

19   person.

20   Q.  Where did he live during the events we've been talking

21   about?

22   A.  He lived at D 1/2, I believe.

23   Q.  With Mr. McFadden?

24   A.  Yes.

25   Q.  Where did he sleep at the home on D 1/2 Road?

                        Sarah K. Mitchell, RPR, CRR

 1   A.  I don't remember.

 2            MS. SURRATT:  Your Honor, I have no further

 3   questions, but at this time I would move to admit Government's

 4   Exhibit 6 pursuant to Federal Rule of Evidence 807.

 5            THE COURT:  Put on the earphones, please.

 6        (Bench conference on the record and out of the

 7        hearing of the jury:)

 8            THE COURT:  Can you hear me?

 9            MS. SURRATT:  I can hear you, Your Honor.

10            THE COURT:  Can you hear me?  All right.  In light of

11   the fact that the witness testified that he did remember the

12   truck assault, what is the purpose of the video?

13            MS. SURRATT:  Your Honor, the video, nevertheless,

14   remains the most probative evidence on that point.  As the

15   Court saw, K.W., while he did discuss the events in question,

16   did so reluctantly and often after my prompting and after I

17   used the words that he seemingly cannot.  And so I think the

18   video that was taken shortly after his disclosure of the

19   events in question is both relevant because it is closer in

20   time to the events in question, it's probative as to this

21   exact point, and it is the most probative given his extreme

22   reluctance to discuss the events today in court.

23            THE COURT:  All right.  Mr. LaBranche, what's your

24   response?  I'm sorry.  Mr. McDermott.

25            MR. MCDERMOTT:  Your Honor, the witness has testified

19-cr-00243-CMA-GPG-1  Testimony of K.W.          11/09/2022    39

1  he was able to recall the events.  I don't see the purpose of

2  admitting the video.

3          THE COURT:  All right.  Are you going to attempt to

4  impeach him with statements from that video?

5          MR. MCDERMOTT:  Not that video.  I will be impeaching

6  with other statements that he made.

7          THE COURT:  Let me have a moment.

8          MS. SURRATT:  Your Honor, I have one more thing to

9  add, if I may.

10          THE COURT:  All right.

11          MS. SURRATT:  Your Honor, I would also like to add

12  that as the Court noted today on the witness stand, K.W. was

13  pretty equivocal about penetration.  In the video,

14  Government's Exhibit 6, he was not equivocal about the

15  penetration that occurred.  It's clear that today on the stand

16  that was the particular assault that gave him the most

17  difficulties in terms of describing to the jury.  Although on

18  the video he is also clearly uncomfortable, he was unequivocal

19  about what happened to him.

20          THE COURT:  All right.  Federal Rule of Evidence 807

21  provides that a statement that would otherwise be prohibited

22  as hearsay may nevertheless be admitted if, one, the statement

23  is supported by sufficient guarantees of trustworthiness,

24  after considering the totality of the circumstances under

25  which it was made and evidence, if any, corroborating the

1   statement; and, second, it is more probative on the point for

2   which it is offered than any other evidence that the proponent

3   can obtain through reasonable efforts.

4        In this case, the defendant -- I'm sorry -- the

5   victim did respond, but he was reluctant.  It was apparent

6   that he only answered with prompting and he was equivocal

7   about the penetration, which he was not in the video.

8   Therefore, the Court finds that the video evidence is more

9   probative on the point for which it is offered than any other

10  evidence that the Government can obtain through reasonable

11  efforts.

12       At the hearing the Court previously heard -- at the

13  previous hearing the Court heard testimony from Detective

14  Prescott regarding the circumstances of the forensic interview

15  with the witness at the Dolphin House on January 16, 2013.

16  Detective Prescott went through his experience, his training

17  on forensic interview techniques.  It is from the video he

18  attempted to determine that the witness did know the

19  difference between a truth and a lie.  The Court finds that

20  his previous testimony weighs in favor of a finding of

21  trustworthiness.

22       The Court has also carefully reviewed the video in

23  light of relevant facts made under the -- and the statement

24  under Rule 807 and *Idaho vs. Wright*, 497 U.S. 805, a 1990

25  case.  The Court finds that K.W.'s statement is supported by

19-cr-00243-CMA-GPG-1  Testimony of K.W.                11/09/2022    41

1    sufficient indicia of reliability such as to be admissible

2    with respect to the first prong of the Rule 807 inquiry.

3    Regarding the second prong of the 807 inquiry, the Court finds

4    that the statement is more probative on the point for which it

5    is offered than the evidence that the Government was able to

6    elicit from the witness live on the stand which they attempted

7    to do so with reasonable effort.

8         For these reasons the Court finds that this case

9    presents extraordinary circumstances and the Court is

10   satisfied that the evidence offers guarantees of

11   trustworthiness and is material, probative, and necessary in

12   the interest of justice pursuant to *United States vs. Tome*,

13   T-o-m-e, 61 F.3d 1446, a Tenth Circuit 1995 case.  Therefore,

14   the Court will admit the video.

15        Does the defense wish to make any statements for

16   purposes of appeal?

17        MR. MCDERMOTT:  Yes, Your Honor.  I believe I gave

18   the reasons for my objection.  I am now saying we do object.

19   I would note that the witness is available.  He was able to

20   testify to the events.  The fact that some time has gone by

21   and he may not testify with as much clarity as what occurred

22   with the video I don't think is sufficient for admission.  I

23   would also note that at the hearing there was some testimony

24   elicited about statements that I believe Detective Prescott

25   had made to the parents that I think do impact the reliability

                         Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1  Testimony of K.W.          11/09/2022    42

1   of the statement that he testified to today and the video

2   itself.

3          THE COURT:  Does the Government wish to put anything

4   on the record?

5          MS. SURRATT:  Yes, Your Honor.  Obviously K.W.'s on

6   the stand and can be cross-examined about all these issues.

7   Stacy W., his mother, is expected to testify next and can also

8   be cross-examined as to these issues.  The Government expects

9   that both of them would be cross-examined as to those and

10  other topics whether or not Government's Exhibit 6 is played

11  at this trial.

12         THE COURT:  All right.  I'm going to allow the video.

13  Does the defense have an explanatory instruction to the jury?

14  Or the Government, do you have one that you wish me to give at

15  this time?

16         MS. SURRATT:  Your Honor, although we haven't crafted

17  a particular instruction, given that the proposed Instruction

18  No. 9 that the jury will hear at the conclusion of this trial

19  instructs them that prior statements of witnesses will

20  otherwise be introduced for impeachment purposes and they

21  can't consider them for the truth, I would ask that they be

22  instructed that they can, in fact, consider this video for the

23  truth of the matter.

24         And, Your Honor, one more thing.  We are going to ask

25  that Government's Exhibit 6-1 be passed out to the jury as an

                        Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1   Testimony of K.W.          11/09/2022    43

1    aid.  There are portions of the video that are somewhat

2    difficult to hear.  6-1 is a transcript to which authenticity

3    has been stipulated.  We do not intend to introduce it as an

4    exhibit, only as an aid to the jury as they're watching the

5    video.

6          THE COURT:  All right.  And how long is this?  I

7    think we should take a break at this point.

8          MS. SURRATT:  Your Honor, it's 33 minutes long.

9          THE COURT:  All right.  I think we're going to go

10   ahead and take a break.  I'll give you time to craft the

11   instruction you want me to give and clear it with the

12   defendant, and then we will reconvene at about 10:30.

13      (The following proceedings were held in open

14      court:)

15          THE COURT:  Ladies and gentlemen, we're going to take

16   a mid-morning break at this time.  We will be in recess until

17   approximately 10:30.  Remember, you're not to discuss the case

18   among yourselves or with anyone else.  You're not to conduct

19   any research.  Court will be in recess until approximately

20   10:30.

21          THE COURTROOM DEPUTY:  All rise.

22      (Jury left the courtroom at 10:18 a.m.)

23      (Break was taken from 10:18 a.m. to 10:32 a.m.)

24

25

Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1  Testimony of K.W.          11/09/2022    44

1          THE COURT:  Counsel, would you please put on the

2     headsets.

3         (Bench conference on the record and out of the

4         hearing of the jury:)

5          THE COURT:  Counsel, I have an instruction, but I

6     understand it has not been stipulated; is that correct?

7          MR. MCDERMOTT:  It's not stipulated, Your Honor.

8     That's correct.

9          THE COURT:  Mr. McDermott, do you wish to make your

10    record or objection to this?

11         MR. MCDERMOTT:  Yes, Your Honor.  Just we continue

12    our objection about the admission of this under 807, and we're

13    not going to offer our own instruction.

14         THE COURT:  All right.  And you don't -- you're just

15    blanket objecting?

16         MR. MCDERMOTT:  Blanket objection.

17         THE COURT:  Not necessarily to the instruction, but

18    to admission of the recording under 807.

19         MR. MCDERMOTT:  Correct, Your Honor.

20         THE COURT:  Very good.  I think that the instruction

21    as tendered is appropriate.  However, I do not believe that

22    the video itself should be admitted into evidence.  I think it

23    should be treated the same way that you treat a deposition.

24    So they will hear it.  They will see the transcript, but it

25    will not go back as an exhibit.

                        Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1  Testimony of K.W.        11/09/2022   45

1           MS. SURRATT:  Yes, Your Honor.

2           THE COURT:  All right.  Then are we ready to bring

3   the jury back?

4           MS. SURRATT:  Yes, Your Honor.

5       (The following proceedings were held in open

6       court:)

7           MR. LABRANCHE:  Your Honor, also for clarification,

8   is the transcript going to be allowed to be admitted in

9   evidence?

10          THE COURT:  No.  Neither of them will be admitted

11  into evidence.

12          MS. SURRATT:  So, Your Honor, I believe the last

13  question I asked before we broke was -- I offered Government's

14  Exhibit 6.

15          THE COURT:  Okay.  So I will -- essentially on that

16  offer I am admitting Exhibit 6 for purposes of showing it to

17  the jury.  It will not, however, come into evidence to go back

18  to the jury.  6-1 will be allowed, which is the transcript,

19  but it also will be more demonstrative, so it will not be

20  allowed to go back with the jury.

21          MS. SURRATT:  I'd like to put on the record, Your

22  Honor, prior to trial in this matter we asked defense counsel

23  if they wanted any redactions to the video, and they told us

24  the video was fine as is.  We agree.  But I just wanted that

25  to be on the record.

                    Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1  Testimony of K.W.          11/09/2022    46

1              THE COURT:  All right.

2              MR. MCDERMOTT:  Your Honor, just to clarify

3     Ms. Surratt's final record, I believe based on the Court's 404

4     ruling at our hearing, that based on that there's nothing

5     objectionable in the video.  I'll just leave it at that.

6              THE COURT:  All right.

7              MR. MCDERMOTT:  Okay.

8              THE COURT:  Ms. Myhaver, please bring in the jury.

9              THE COURTROOM DEPUTY:  All rise.

10         (Jury entered the courtroom at 10:35 a.m.)

11             THE COURT:  You may be seated.  Ladies and gentlemen,

12    you are going to see a video of K.W. when he was interviewed

13    on January 16, 2013.  You may consider this video and the

14    statements made by K.W. for any relevant purpose.  It is for

15    you to decide what weight, if any, to give to these

16    statements.  You are also given a transcript of this

17    recording.  Keep in mind that the transcript is not evidence.

18    It is given to you only as a guide to help you follow what is

19    being said.  The recording itself is the evidence.  If you

20    notice any differences between what you heard on the recording

21    and what you read in the transcript, you must rely on what you

22    heard, not what you read.  If you cannot hear or understand

23    certain parts of the recording, then you must ignore the

24    transcript as far as those parts are concerned.

25             All right.  The Government may show Exhibit 6.

                     Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1   Testimony of K.W.        11/09/2022    47

1           MS. SURRATT:  Thank you, Your Honor.

2           Mr. Graber, can you please play Government's

3    Exhibit 6.

4       (Video played.)

5           THE COURT:  Ms. Myhaver, will you please collect the

6    transcripts.  If you can all pass them down.

7           Ms. Surratt.

8           MS. SURRATT:  Your Honor, may I ask the witness if he

9    needs a short break?

10          THE WITNESS:  I'm all right.

11          THE COURT:  Do you have anything further,

12   Ms. Surratt?

13          MS. SURRATT:  No, Your Honor.

14          THE COURT:  Cross-examination.

15                    CROSS-EXAMINATION

16   BY MR. MCDERMOTT:

17   Q.  Good morning, K.W.

18   A.  Morning, sir.

19   Q.  The video we just watched, that was taken approximately

20   three weeks after you returned from Nebraska, right?

21   A.  I honestly don't remember, sir.

22   Q.  Okay.  Well, you were picked up in Nebraska on

23   January 2nd, 2013; is that right?

24   A.  Sounds -- I'm not going to answer.  I don't know.  I don't

25   know exactly when we were picked up.  I know it was somewhere

                    Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1  Testimony of K.W.          11/09/2022    48

1   around that time period.

2   Q.  Somewhere around that time, okay.  And it was your mother

3   who picked you up; is that correct?

4   A.  My mom and Mike Eggers, yes.

5   Q.  Okay.  And you had a relatively long drive back to

6   Colorado; is that right?  Eight hours or so?

7   A.  About, yeah.

8   Q.  Okay.  And you talked to your mom on the way back from

9   Colorado, right?

10  A.  I don't remember.

11  Q.  Okay.  Your mom on the ride back asked you if Mr. McFadden

12  had touched you or done anything sexually inappropriate; is

13  that right?

14  A.  She might have asked something like that, yeah.

15  Q.  K.W., when you say she might have asked you something like

16  that, are you telling me that you don't remember whether she

17  asked that?

18  A.  I don't necessarily remember that car trip home.  I had

19  little to no sleep that night.  I stayed up pretty much all

20  that entire ride, and I fell asleep almost as soon as I laid

21  in my bed at home.

22  Q.  Well, you have testified about that car road trip before;

23  is that right?

24  A.  Yes.

25  Q.  Okay.  And that was back on -- it's been a while, but that

19-cr-00243-CMA-GPG-1  Testimony of K.W.          11/09/2022    49

1   was on January 13, 2015; is that right?

2   A.  I believe so.

3   Q.  Okay.  And you should have a notebook up there that says

4   defendant's exhibits.

5         MR. MCDERMOTT:  Can we please get the one that has

6   Defendant's Exhibit E?

7   Q.  (By MR. MCDERMOTT) And, K.W., can you please open that

8   notebook, and can you open what is Exhibit E.  And could you

9   please turn to page 35 of that exhibit, and can you look at

10  lines 1 through 10.  And you were asked if Mike -- you were

11  asked whether your mother asked you whether Mike did anything

12  to you, and you told her that Mike had not done anything to

13  you; is that correct?

14  A.  Not necessarily -- that's not necessarily true.  At the

15  time of 14 years old, I was -- I just got out of a detention

16  facility in Utah.  I wasn't in the right mindset, because if

17  you look at all the other questions, I said yes to those as

18  well.  This one might have actually been a typo because I do

19  remember saying no to this.

20  Q.  Okay.  K.W. --

21  A.  Yes, sir.

22  Q.  -- I understand that back in 2015 you were a juvenile.

23  A.  Yeah, I was a juvenile, yes.

24  Q.  Yes.  But you were in court when you said these -- when

25  you testified, correct?

                    Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1  Testimony of K.W.          11/09/2022    50

1   A.  Yes.

2   Q.  And you took an oath just like you took an oath today?

3   A.  Yes, sir.

4   Q.  And you swore to tell the truth?

5   A.  Yeah, I'm telling the truth now.  I don't remember this

6   question actually.

7   Q.  Okay.  Well, I'm doing to ask you then can you please turn

8   to page 34, the page before, and you were asked -- and I'm

9   going to begin on line 11 -- you were asked, And you drove

10  back with your mom Stacy --

11          MS. SURRATT:  Your Honor, objection.

12          THE COURT:  What's the objection?

13          MS. SURRATT:  To the extent he's trying to impeach

14  with prior inconsistent statements, it's not clear to me what

15  the statement now is that would be inconsistent with what's in

16  this exhibit.

17          THE COURT:  Overruled.  You may proceed.

18  Q.  (By MR. MCDERMOTT) And beginning on line 11 the question

19  is, And you drove back with your mom Stacy?  And your answer

20  on that day was, Yes.  Correct?

21  A.  Yes, sir.

22  Q.  And the next question is, On the way back from the trip,

23  your mom told you about what people were saying Mike did,

24  right?  And you said, Yes.  Correct?

25  A.  Yes, sir .

                    Sarah K. Mitchell, RPR, CRR

1   Q.  And it says, She told you what the allegations were in

2   this case, correct?  And you answered, Yes.

3   A.  Yes.

4   Q.  And it says, And she started asking you questions about

5   it, right?  And you said, Yes.  Is that correct?

6   A.  Yes, sir.

7   Q.  And she started asking questions about whether or not Mike

8   ever did anything to you, right?

9   A.  Yes, sir.

10  Q.  And your answer was, Yes, or yeah.

11  A.  Yes, sir.

12  Q.  And then he asked you, And she asked you a bunch of

13  questions about that?  And your answer was, Yes.  Correct?

14  A.  Yes, sir.

15  Q.  And then the question was, And, in fact, you told her that

16  Mike had not done anything to you, correct?  And your answer

17  was, Yes.  Correct?

18  A.  I may have said yes.

19  Q.  Then the next question is, You never told her that Mike

20  ever stuck anything in your butt, correct?

21  A.  Yeah.

22  Q.  Your answer was, Yes.  And the next question is, And you

23  never told her that he ever touched you before, correct?  And

24  your answer was, Yes.

25  A.  Yes, sir.

1   Q.  Now, K.W., my understanding is that you have said and you

2   testified on this day that the first time you ever said that

3   Mike touched you was on January 16th in that interview that we

4   just watched; is that correct?

5   A.  Yes, sir.

6   Q.  Your mom has indicated to Detective Prescott that you --

7            MS. SURRATT:  Objection.

8            THE COURT:  Sustained.

9   Q.  (By MR. MCDERMOTT) Let me ask this.  Did you say anything

10  to a therapist the day before you spoke with Detective

11  Prescott?

12  A.  I don't remember.

13  Q.  You don't remember.

14  A.  I do not remember.

15  Q.  Okay.  K.W., in addition to that interview, you gave a --

16  still been a few years, but a more recent interview, and you

17  spoke with Investigator Zappe and an FBI agent named Amy

18  Howard on May 22nd, 2018; is that right?

19  A.  I believe so, yes, sir.

20  Q.  Okay.  And in that interview you were asked about this

21  incident with Mike in the truck?

22  A.  Yes, sir.

23  Q.  And at that time you told them that you did not remember

24  the incident, to be honest?

25  A.  I did say that, but the reason why I said that is I don't

1    like talking about this, and I'll find every loophole I can

2    possibly find not to talk about things like this.

3    Q.  You told them that it was a combination of it being a long

4    time ago and that it was something you didn't want to talk

5    about; is that right?

6    A.  Correct.  Correct, sorry.

7    Q.  Now, in that particular interview, you did remember things

8    about this trip; is that correct?

9    A.  Yes, sir.

10   Q.  You remember details such as Mike going to Grand Junction

11   to pick up his truck?

12   A.  Yes, sir.

13   Q.  You remembered going to Idaho to pick up potatoes?

14   A.  Yes, sir.

15   Q.  You remembered going to -- going to the Love's stop where

16   he was arrested?

17   A.  Yes, sir.

18   Q.  You remembered going to a weigh station because Mike's

19   truck was overweight; is that right?

20   A.  No.  He was trying to avoid it because he was overweight.

21   Q.  So you believe you remember him avoiding the weigh station

22   because he was overweight?

23   A.  Yes.  We never stopped at a weigh station.

24   Q.  You remember your mom calling your brother S.W. Jr., and

25   he was one of the people who was with you, right?

19-cr-00243-CMA-GPG-1   Testimony of K.W.              11/09/2022    54

1   A.  Yes, sir.

2   Q.  And you remember S.W. Jr. getting off the phone and, in

3   your words, looking pissed off?

4   A.  Yes, sir.

5   Q.  You remember that his face had gone from looking happy to

6   being pissed off?

7   A.  Yes, sir.

8   Q.  Now, as of this May 22nd, 2018, interview, you were still

9   friends with J.W.; is that right?

10  A.  I had stopped talking to J.W. after this incident.  I

11  haven't had contact with J.W. for a while.

12  Q.  Well, as of May 22nd, 2018, were you still friends with

13  J.W.?

14  A.  We contacted each other via Facebook every so often, so

15  more of acquaintances at the time.

16  Q.  Well, on May 22nd, 2018, you were asked when the last time

17  you talked to him was, and your answer was, Before I came in

18  here.  Is that right?

19  A.  I don't remember that.

20  Q.  I want to talk about some of the other trips that you say

21  you went on with Mr. McFadden, okay?

22  A.  Yes, sir.

23  Q.  J.W. would go on the trips with you; is that right?

24  A.  He went on a couple.  J.W. went more often than most.

25  Q.  L.Wr. would go, wouldn't he?

Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1  Testimony of K.W.        11/09/2022    55

1    A.  Yes, sir.

2    Q.  D.R. would go?

3    A.  Yes, sir.

4    Q.  S.H. would go?

5    A.  Don't remember, sir.

6    Q.  Pardon me?

7    A.  I don't remember.

8    Q.  In this interview with Ms. Howard on May 22nd, 2018, did

9    you tell her that S.H. would go?

10   A.  I may have.

11   Q.  Your older brother would go, correct?

12   A.  S.W. Jr. went once.  That was the Idaho one.

13   Q.  Just this one that we're here in court about today?

14   A.  Yes, sir.

15   Q.  And you told Ms. Howard that when you went on the trips

16   you would make sure that J.W. went; is that right?

17   A.  Every so often I would see if he could go, yeah.

18   Q.  And you told her you didn't want to go on the trips unless

19   J.W. went because you would be bored out of your mind if it

20   was just you and Mike because Mike didn't talk much; is that

21   right?

22   A.  Yes, sir.  I would always like the extra company of

23   another kid.  I was a kid.  I liked the company of other kids.

24          MR. MCDERMOTT:  May we please display United States

25   Exhibit 206?

                    Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1   Testimony of K.W.        11/09/2022    56

1              THE COURT:  206 is a recording.  It's not been

2    admitted.

3              MR. MCDERMOTT:  I apologize, Your Honor.

4              THE COURT:  You mean 2-6?

5              MR. MCDERMOTT:  Yeah, that's what I meant.

6              THE COURT:  Yes, you may.

7    Q.  (By MR. MCDERMOTT) K.W., this is the cab of the truck from

8    this trip, correct?

9    A.  Yes, sir.

10   Q.  And in the video that we just watched, you said that your

11   head was close to the cab, correct?

12   A.  Close to the driver, yes, sir.

13   Q.  And your brother S.W. Jr. was seated in the front --

14   A.  Yes, sir.

15   Q.  -- correct?  And your brother S.W. Jr. at the time was 19?

16   A.  18, sir.

17   Q.  18 at the time?

18   A.  Yes, sir.

19   Q.  Okay.  And this is the same S.W. Jr. that when he got off

20   the phone with your mom he looked, in your words, pissed off,

21   right?

22   A.  Yes, sir.

23   Q.  And S.W. Jr. is within approximately three to five feet of

24   where you were sleeping, correct?

25   A.  Yes, sir.

                     Sarah K. Mitchell, RPR, CRR

 1          MR. MCDERMOTT:  Your Honor, at this time I don't have

 2    any more questions, but I would move for the admission of

 3    Defendant's Exhibit F, which is the recording of the interview

 4    that we just talked about.

 5          THE COURT:  Let's put on the headphones, please.

 6        (Bench conference on the record and out of the

 7          hearing of the jury:)

 8          THE COURT:  Mr. McDermott, what is the purpose of the

 9    recording?  Can you hear me?  Can you hear me?

10          MR. MCDERMOTT:  I can now, Your Honor.

11          THE COURT:  All right.  What is the purpose of the

12    recording?

13          MR. MCDERMOTT:  Your Honor, the -- can you hear me?

14          THE COURT:  Yeah.

15          MR. MCDERMOTT:  Okay.  The 807 motion was filed

16    because in that recording he says he couldn't remember the

17    events of this trip that had to do with Mr. McFadden touching

18    him.  That video has been admitted.  In fairness, I believe

19    that the recording that gave rise to the video should be

20    admitted.

21          THE COURT:  Response?

22          MS. SURRATT:  Your Honor, to respond to what

23    Mr. McDermott just said, the recording is not the reason that

24    Government's Exhibit 6 was admitted.  We articulated on the

25    record the reasons we asked for the recording to be admitted,

 1   and we did not rely on the recording in the defense exhibit.

 2   In addition, fairness is not a rule of evidence.  To the

 3   extent Mr. McDermott is relying on Rule 807, there's a reason

 4   we litigated that ahead of time.  It requires notice, and it

 5   also requires that the statement is supported by sufficient

 6   guarantees of trustworthiness and is probative on point.  What

 7   it appears that Mr. McFadden (sic) wants to do is impeach the

 8   witness based on that transcript, which he has already done

 9   and can continue to do if he feels he hasn't done it

10   adequately, but there's no basis to introduce into evidence

11   this recording.

12          THE COURT:  All right.  Mr. McDermott, if you had

13   wanted to have this in evidence, you needed to give prior

14   notice.  You have used it to impeach, and I see no basis for

15   it to come in under 807.  Therefore, I'm going to deny your

16   request.

17          MR. MCDERMOTT:  My position is that the witness was

18   unable to remember.  The witness therefore was unavailable.  I

19   did not plan on asking for the admission of this.  When I read

20   the trial prep materials, I, frankly, assumed that the video

21   was not going to be admitted into evidence since the witness

22   was going to be able to testify.  That is the reason that

23   there was no other pretrial mention of it.  And although I

24   wouldn't usually ask for the admission of something like this,

25   I believe under the circumstances it's proper.

                        Sarah K. Mitchell, RPR, CRR

1           THE COURT:  But you did not follow the steps that

2    needed to be followed in order to have an 807.  I would need

3    to have more of a background on the circumstances that this

4    statement was given, that there were sufficient guarantees of

5    trustworthiness, and that you gave the appropriate notice.

6    You made your record.  I'm not going to enter it.

7        (The following proceedings were held in open

8        court:)

9           THE COURT:  The request is denied.

10           Ms. Surratt, do you have any further cross?  I mean

11    redirect?

12           MS. SURRATT:  Very brief, Your Honor.

13           THE COURT:  You may proceed.

14                       REDIRECT EXAMINATION

15    BY MS. SURRATT:

16    Q.  K.W., I'd just like to clear up a few things you were

17    asked on cross-examination.  I'd like to talk first about the

18    trip home from Nebraska when your mom and Mike Eggers came out

19    to get you and your brothers, if that's okay.

20    A.  Yeah, that's fine.

21    Q.  You were asked on cross-examination what you remember

22    telling your mom on that trip home.  Do you remember telling

23    your mom anything about what Mr. McFadden had done to you?

24    A.  I -- as he -- as the defense lawyer brought it up, I do

25    remember my mom asking questions, but at the time I didn't

19-cr-00243-CMA-GPG-1   Testimony of K.W.                11/09/2022    60

1    want to talk about anything.  I didn't want to talk about it,

2    so I just told her no to pretty much her questions at the

3    time.

4    Q.  Okay.  And in response to one of my questions you recalled

5    that the first time that you told anyone was when you talked

6    to Detective Ed Prescott on the video we just watched.  Do you

7    remember that?

8    A.  Yes.

9    Q.  Is that still what you remember?

10   A.  That is still what I remember, yes.  I don't remember my

11   middle school therapist that I said I talked to in the video.

12   That actually caught me off guard.

13   Q.  So just sitting here today, you don't remember talking to

14   a counselor?

15   A.  I do not, no.

16   Q.  K.W., you were also asked some questions about an

17   interview that you gave in 2018 to Special Agent Zappe and

18   another woman named Amy Howard.  Do you remember that?

19   A.  I remember Zappe.  I don't remember the other girl.

20   Q.  Where were you for that interview in 2018?

21   A.  I believe I was in Secure at the time.

22   Q.  And what is that?

23   A.  That was the juvenile Secure system I was at.

24   Q.  So that's when you were serving time for your juvenile

25   adjudications; is that right?

                           Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1  Testimony of K.W.          11/09/2022   61

1    A.  Yes.

2    Q.  Was in custody at a juvenile detention facility a good

3    place for you to talk about being sexually assaulted?

4    A.  No, it was not.

5    Q.  K.W., while we played the video just now, I noticed you

6    had your head down on the table for the most part.  How did

7    hearing and seeing this video feel for you today?

8    A.  I didn't want to see it personally.  I don't want to hear

9    it.  So I just try to drown my head out, so just started

10   thinking about other things.

11          MS. SURRATT:  No further questions, Your Honor.

12          THE COURT:  All right.  Thank you very much, sir.

13   You may step down.

14          THE WITNESS:  Thank you.

15          (This portion of proceedings concluded at 11:35 a.m.)

16

17

18

19

20

21

22

23

24

25

1                           REPORTER'S CERTIFICATE

2

3          I, SARAH K. MITCHELL, Official Court Reporter for the

4    United States District Court for the District of Colorado, a

5    Registered Professional Reporter and Certified Realtime

6    Reporter, do hereby certify that I reported by machine

7    shorthand the proceedings contained herein at the time and

8    place aforementioned and that the foregoing pages constitute a

9    full, true and correct transcript.

10         Dated this 29th day of November, 2022.

11

12

13

14              _____ /s/ Sarah K. Mitchell _____

15                    SARAH K. MITCHELL
                    Official Court Reporter
16             Registered Professional Reporter
                 Certified Realtime Reporter
17

18

19

20

21

22

23

24

25


                     Sarah K. Mitchell, RPR, CRR