**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Criminal Action No. 19-cr-00243-CMA-GPG

UNITED STATES OF AMERICA,

      Plaintiff,

v.

1.  MICHAEL TRACY McFADDEN,

      Defendant.

---

**GOVERNMENT'S SENTENCING STATEMENT**

---

    The United States of America, by and through Andrea Surratt, Assistant United States Attorney, respectfully submits this Sentencing Statement as required by District of Colorado Local Rule 32.1(a).  As discussed below, after consideration of the factors set forth in 18 U.S.C. § 3553(a), the Government believes that a sentence of life imprisonment is the only appropriate sentence in this case.  The Government may submit additional materials and argument in support of the appropriate sentence in this case after reviewing the Probation Office's Presentence Investigation Report.

## I.    <u>PROCEDURAL HISTORY</u>

    In January 2013, Michael McFadden was charged by the 21st Judicial District Attorney's Office in Mesa County in 19 counts, alleging that he sexually abused six children: J.W., K.W., I.S., E.S., S.J.W., and D.R.  *People v. McFadden*, 2013CR27, 2013CR339, 2013CR342; *see also People v. McFadden*, 15CA1925 (Co. Ct. App. June 22, 2017).  The charges were consolidated for trial, and the defendant was convicted on all counts after a jury trial in July 2015 and, at a later hearing, was determined to be a

habitual sexual offender.  Each of these six children testified at trial.

The defendant was sentenced in state court on October 1, 2015, to an indeterminate sentence of 324 years to life in the Department of Corrections.  *People v. McFadden*, 2013CR27, 2013CR339, 2013CR342, Oct. 1, 2015, Habitual/Sentencing Hearing Transcript ("Tr.") at 73-75.  The sentencing judge remarked that, though she had not added up the total time of the consecutive sentences at the time of the sentencing hearing, it is "very unlikely that [the defendant] will be out during his lifetime." Tr. at 75.

The defendant appealed, alleging that his statutory speedy trial rights had been violated. The Colorado Court of Appeals agreed, noting that "[t]he crimes of which defendant was convicted are indeed heinous. But the General Assembly has enacted a statute that dictates dismissal of the charges under the circumstances of this case." *People v. McFadden*, 15CA1925, at 21.  On June 22, 2017, the Court of Appeals remanded the case to the trial court with instructions to dismiss all charges.  *Id.* at 1. On February 12, 2018, the Colorado Supreme Court denied the subsequent petition for a writ of certiorari.  *People v. McFadden*, No. 17SC573, 2018 WL 827272 (Co. Sup. Ct. Feb. 12, 2018).  On February 12, 2018, the Mesa County district court dismissed all charges against the defendant, and he was released from custody.

On or about May 17, 2019, a grand jury in the District of Colorado returned an indictment charging the defendant in five counts.  ECF #1. Counts One and Two of the indictment related to the defendant's sexual abuse of K.W. and Counts Three, Four, and Five related to his sexual abuse of J.W.  After extensive pretrial litigation, a jury trial commenced in this matter on November 7, 2022.  ECF #143.  On November 14, 2022, the jury returned a guilty verdict on all five counts of the indictment.  ECF #147.

Sentencing is scheduled for March 7, 2023, at 3:00 p.m. in Grand Junction.  ECF #147.

## II.   **OFFENSE CONDUCT**

The Government proved at trial that the defendant sexually abused two boys—J.W. and K.W.—while on long-haul truck trips that crossed state lines.  He also abused J.W. and K.W. for years at the defendant's various homes in Grand Junction.  In addition, the Government has shown by a preponderance of the evidence that, during the same timeframe he was abusing J.W. and K.W., the defendant also sexually abused I.S., E.S., S.J.W., D.R., and L.W.  Finally, it is also relevant for sentencing that the defendant sexually abused eight-year-old M.S. in 1990—an offense to which the defendant pled guilty.

Although the Court presided over the trial, the Government provides a detailed recitation of facts below, in part, for the benefit of the Probation Office.

A. Offense Conduct Proved at Trial

    *i.  Background*

Michael McFadden, who lived in Grand Junction during all of the relevant conduct in this matter, was a truck driver who hauled loads within Colorado and out of state.  While in Grand Junction and on truck trips, the defendant sexually abused two boys by anally raping them.  The defendant drove trucks owned by another individual, but the defendant was responsible for deciding what loads to accept and when to accept them.  There was never any business-related purpose for bringing children on truck trips.

    *ii.  J.W.*

One of the defendant's victims was a boy named J.W.  J.W. was first abused by

the defendant on a family trip to Arizona to attend a funeral.  J.W. stayed in a hotel room with the defendant and slept in the same bed as the defendant.  J.W. woke up one night with his pants lowered to his ankles and a wet sensation in his butt.  J.W. got out of bed and changed his clothes.  When J.W. got up, he saw that the defendant was also up and out of bed.  J.W. did not realize it at the time—he put the pieces together only later—but this was the first time that the defendant inserted his penis into J.W.'s anus.

Around this same time, J.W. was abused by the defendant at a house near the Colorado National Monument.  J.W. and his cousins, D.O. and E.S., would regularly visit the defendant at that house.  While at the defendant's house, J.W. and his cousins enjoyed playing in the large backyard and riding a small electric motorcycle.

J.W. spent nights at the Monument house and slept on an air mattress with the defendant.  One night, while J.W. was sick with a fever, the defendant had to change J.W.'s clothes.  J.W. realized that the defendant was not simply changing his clothes, however, when J.W. felt pressure and a wet sensation in his butt.  J.W. realized that, while he was laying on his side and the defendant was spooning him, the defendant put his penis in J.W.'s anus.  J.W. was around eight years old at the time of this abuse.  Subsequent to this abuse, J.W. attempted to position himself at night in a way that would make it difficult for the defendant to access his butt and, consequently, this was the only time the defendant abused J.W. at the Monument house.

J.W. was next abused by the defendant when the defendant lived at a house on Glen Road.  The defendant lived at the Glen Road house with Phyllis and John H. and their son S.H., who had his own bedroom.  J.W., however, stayed in the defendant's bedroom with the defendant.  J.W. recalled that D.O, E.S., and some friends would come over to the Glen Road house, and the boys would play on a motorcycle, go in the

hot tub, and make dirt jumps for their bicycles.

J.W. was around nine years old when he was sexually abused by the defendant at the Glen Road house.  J.W. slept in a bed in a bedroom that he shared with the defendant.  The defendant repeatedly anally raped J.W.  On these occasions, J.W. would feel painful pressure as the defendant inserted his penis into J.W's anus.  Shortly thereafter, J.W. would feel same the wet sensation, which J.W. described as fluid coming from his own butt—specifically, a "poop fluid" that had a distinct smell. Sometimes, J.W. would toss and turn in an attempt to keep the defendant from abusing him, but other times J.W. would simply let it happen and allow the defendant to "finish." This type of abuse happened two to three times a week at the Glen Road house.

The defendant next moved to a house on D ½ Road, and he sexually abused J.W. there for many years, until the defendant was arrested.  Phyllis and John H. moved to D ½ Road with the defendant and, throughout the years, other children and adults lived there as well.  John Foxx—"Papa John"—stayed in the living room, and helped out with cooking and cleaning.  J.W.'s mother, M.R., and J.W.'s aunt, C.M., lived in trailers outside of the D ½ Road house, sometimes with boyfriends.  Once Phyllis and John moved out, the defendant moved into the master bedroom, and J.W. moved into the bedroom with the defendant shortly thereafter.  Other boys also slept in the bed with the defendant, including D.R. (a friend), E.S., I.S. (a cousin), and K.W. (a friend and neighbor).

Like his other homes, the defendant made D ½ Road a fun place for boys.  The boys engaged in BMX racing, motocross, paintball, and airsoft.  They built forts and used the vehicles and machinery that were on the property.  The defendant also took the boys on trips to places like Elich Gardens and local amusement parks.  The

defendant paid for all of these activities—activities many of the boys' families never would have been able to afford otherwise.

The sexual abuse at the D ½ Road house was similar to the abuse that J.W. had already been enduring.  The abuse first occurred at D ½ Road in a utility room that the defendant used as a bedroom, and then transitioned into the master bedroom that J.W. shared with McFadden.  During the years of abuse at the D ½ Road house, the defendant was drugging J.W. and other boys with melatonin to make them sleepy.  One time, J.W. found a partially dissolved pill in a soda that McFadden had given to J.W.

The defendant also took J.W. and other boys on trips in his semi-truck.  When J.W. went on trips with the defendant, he slept with the defendant on the mattress in the truck's sleeper compartment.  When J.W. was around nine years old, McFadden took J.W. on a trip to Arizona.  One night during the trip, they stopped at a truck stop that J.W. remembers specifically because it was a particularly nice truck stop with interesting toys.  That night, J.W. awoke to a wet sensation and pressure on his butt, caused by the defendant putting his penis into J.W.'s anus.  J.W. tossed and turned until the defendant stopped.[1]

In late 2010, when J.W. was around 10 years old, the defendant took J.W. on trips in the semi-truck between Telluride, CO and Farmington, NM.  One night, J.W. went to bed in the sleeper compartment of the semi and awoke to the defendant pulling down his pants.  J.W. pretended to be asleep and did not fight when the defendant anally raped him.  This instance of abuse, unlike some other instances, caused a mess of J.W.'s "poop juice" that had to be cleaned up.  The defendant had to use wet wipes from the truck to clean J.W. and help J.W. with a change of clothes.  J.W. did not let the

[1] This sexual abuse endured by J.W. on this semi-truck trip to Arizona forms the basis for Count Five of the Indictment.

defendant know he had been fake-sleeping during this incident because he was afraid that the defendant would find out that J.W. sometimes pretended to sleep through the abuse.[2]

On one of the same trips between Telluride and Farmington, the defendant parked the semi-truck down the street from J.W.'s house.  It was early in the morning, so rather than dropping J.W. off at home, the defendant allowed J.W. to finish sleeping on the mattress in the cab of the truck.  The defendant woke J.W. up by putting his tongue on J.W.'s butt.  J.W. remembers this incident specifically because it was not a "normal assault" where the defendant put his penis into J.W.'s anus.

The defendant's anal assaults of J.W. were painful and made him feel sick and nauseated.  They also resulted in difficulties using the restroom.  One day, J.W. went to school after such an assault, and wiped blood from his butt in the bathroom.  J.W. described having trouble pooping and recalled that pooping "hurt really bad."  When J.W. was in third or fourth grade, he went to school after being assaulted by the defendant and had "really bad diarrhea," requiring him to change his clothes at school. He went to the restroom so many times that day that his teacher asked if he was ok.

J.W. believed that K.W. was also being sexually assaulted by the defendant. Specifically, J.W. remembers being in bed with the defendant and K.W. and feeling the bed moving around and smelling a "musty smell" that reminded J.W. of his own "poop juice" smell.

Despite the years of abuse—which lasted from the time J.W. was around six years old until he was twelve years old—J.W. chose to stay with the defendant rather than live with his mom, M.R.  J.W.'s biological dad was never in his life.  M.R. had an

---

[2] The sexual abuse endured by J.W. on these trips to Farmington forms the basis of Counts Three and Four of the Indictment.

abusive boyfriend who would beat M.R. and break bottles over her head.  The boyfriend was rough with J.W.'s baby sister and would slam J.W. against walls.  M.R. abused drugs such as methamphetamine and alcohol.  While she was high and drunk, M.R. was often unaware of what her children were doing or where they were; to this day, she does not know what trips J.W. went on with the defendant.  There was not always enough to eat at M.R.'s house.  The family did not have much money, and because J.W. and his siblings got fed at school, M.R. and her boyfriend would eat the food at home.  J.W.'s sister sometimes snuck him food, but he often went to bed hungry.

By contrast, J.W. always had enough to eat at the defendant's house.  The defendant took J.W. to school and took him to the doctor.  McFadden bought J.W. clothes and made sure he had prescription eyeglasses that he needed.  For J.W., it was a relief to not have to worry about whether he would have to call the police because M.R. and her boyfriend got into a fight.  J.W. loved the defendant and called him "dad."

Consequently, J.W. never told anyone about the abuse while it was ongoing.  In addition, he was afraid of what the defendant might do to him if he told, in part because he saw the defendant react very negatively to K.W. when K.W. attempted to resist being abused.

iii.  *K.W.*

Before he began abusing K.W., K.W.'s family had known the defendant for many years.  K.W.'s mom, S.W., knew the defendant through her ex-husband, but then reconnected with the defendant when K.W. was in elementary school.  One day when S.W. was dropping K.W. off at school, she ran into the defendant also dropping off a child at school (presumably J.W.).  At the time, S.W. was separated from her current husband, S.W. Sr., and when the defendant offered to help bring K.W. to school, S.W.

was grateful and relieved.  Like the families of many of the other children that the

defendant abused, the W. family did not have much money.  S.W. and her family trusted

the defendant and considered him a friend.

At the time the defendant came back into the W. family's lives, he was living at

the house on Glen Road.  And it was at the Glen Road house that K.W. began spending

time with the defendant, when K.W. was around 10 years old.  The Glen Road house

was fun for K.W.  He played with his friend J.W. and rode electric motorcycles around

the neighborhood.  K.W. went to the Glen Road house nearly every weekend and spent

the night.

The defendant's sexual abuse of K.W. started at the Glen Road house.  At trial,

however, K.W. struggled to describe what happened to him at the Glen Road house

because he has "tried to push a lot of these memories away."

While the defendant lived on Glen Road, K.W. and his family lived in a trailer

park on North Avenue in Grand Junction.  But, after the defendant moved to D ½ Road,

K.W. and his family moved in next door, into a house across a field, also on D ½ Road.

Like the defendant's house on Glen Road, the house on D ½ Road was also extremely

fun for K.W. and his friends and siblings.  The defendant had airsoft guns, paintball

guns, trampolines, videogames, and side-by-sides, all of which K.W. was free to use.

Although K.W. lived right next door, he often spent the night at the defendant's

house.  K.W. slept in various places, including on a futon in the living room or with the

defendant in the defendant's bed.  Like he did with J.W., the defendant also gave K.W.

melatonin.  The defendant gave K.W. high doses of the sleep aid—five or six pills or

gummies at a time.  The melatonin would cause K.W. to fall asleep quickly.  Sometimes,

after being dosed with melatonin, K.W. would fall asleep in one place and wake up in

the defendant's bed, with the defendant.

The defendant's sexual abuse of K.W. continued at the D ½ Road house.  One night, K.W.  woke up and the defendant was top of K.W. rubbing his erect penis on K.W.  The defendant also frequently molested K.W. by touching K.W.'s penis, something that always occurred at night.  This abuse was ongoing until the defendant was finally arrested in January 2013.  K.W. described that the abuse made him feel "small" and "hate [himself] for a long time."

K.W. accompanied the defendant on semi-truck trips.  On these trips, the defendant molested K.W. by touching and groping K.W.  In late 2012, the defendant invited K.W. and his brothers, L.W. and S.W. Jr., on a truck trip that would eventually take them through Utah and Idaho and end in Nebraska with the defendant's arrest.  Although the W. family lived in Montrose at the time, prior to this trip, the defendant spent Thanksgiving and Christmas with the W. family.  On this final trip, the defendant tried to force his penis into K.W.'s butt.  Specifically, the defendant pulled K.W.'s pants down and anally raped K.W., which caused K.W. pain.  K.W. was 11 years old at the time of this trip.[3]

### iv.  The Defendant's Arrest

By the time K.W. and his brothers left Colorado on their final semi-truck trip with the defendant, the Grand Junction Police Department was already investigating the defendant for abusing other children in Grand Junction.  On January 3, 2013, Detective Ed Prescott obtained a warrant for the defendant's arrest based on disclosures of abuse made by I.S. and E.S.

Detective Prescott learned that the defendant was with K.W. and his siblings and,

---

[3] The abuse that K.W. endured on this trip that ended in Nebraska formed the basis for Counts One and Two of the Indictment.

with S.W. Jr.'s help, located the defendant at a truck stop in North Platte, Nebraska. Detective Prescott alerted the North Platte police department, who took the defendant into custody on the warrant on January 3, 2013.

B.  Other Relevant Conduct

In addition to J.W. and K.W, each of I.S., E.S., and S.J.W testified at the state trial in this matter about the sexual abuse to which the defendant subjected them as well.  As to each child, the jury believed their testimony beyond a reasonable doubt and convicted the defendant of sexually abusing each child.  Accordingly, the Court can and should easily find by a preponderance of the evidence that the defendant abused these children.

L.W.—the younger sibling of K.W. and S.W. Jr.—disclosed the defendant's abuse subsequent to the state trial.  He was quite young at the time of the offense conduct, and as Cheryl Young explained to the jury, it is not uncommon for very young children to disclose later on, as they get older and realize more fully what had happened to them.  L.W. spent time around the defendant like the rest of the children, and the abuse he describes fits the defendant's sexual *modus operandi*.  Finally, L.W., who is now 16 years old, was prepared to testify at the federal trial as a victim pursuant to Federal Rule of Evidence 414, has no motivation to lie.  Accordingly, the Court should also find that the defendant's abuse of L.W. is relevant to sentencing in this matter.

Finally, the Court can and should easily find that the defendant's 1989 abuse of eight-year-old M.S. is relevant to sentencing.  McFadden admitted to this offense conduct in 1990.

i.  *I.S., E.S., S.J.W., and L.W.*

In late 2012, I.S. was the first boy to disclose the defendant's abuse.  During his

forensic interview, I.S. explained that the defendant rubbed I.S.'s "pee pee" while I.S. was sleeping at the defendant's house in the defendant's bed.  I.S. "lost count" of the number of times this happened.  I.S. described the defendant putting his hands in I.S.'s underwear and rubbing I.S.'s penis while I.S. was sleeping, which would cause I.S. to wake up.  I.S. tried to stop the defendant by trying to "grab his hand and put it in his lap," but the defendant persisted until I.S. rolled over.  In a subsequent interview, I.S. disclosed that the defendant anally raped I.S. on at least one occasion when I.S. was approximately eight years old.

Because of I.S.'s disclosure, Detective Prescott next interviewed I.S.'s cousin E.S., who at first did not disclose any sexual abuse, and said that the defendant told him that I.S. was lying.  A few days later, E.S. disclosed and described multiple instances of molestation committed by the defendant.  E.S. explained that the defendant touched E.S.'s penis under E.S.'s clothing.  In several of these instances, the defendant moved E.S. to the defendant's bed, lowed E.S.'s pants, and stroked E.S.'s penis.  E.S. also described two instances where the defendant took E.S. to an area near the roller dam on the Gunnison River in Mesa County.  At this location, the defendant bent E.S. over and put his "pee pee" in E.S.'s anus, causing E.S. pain and difficulty defecating.

S.J.W., K.W.'s sister, was interviewed as part of the Grand Junction Police Department's investigation.  S.J.W. described an incident that occurred while she was sleeping on a couch at the defendant's house at D ½ Road.  S.J.W. awoke one night to the defendant grabbing her by the waist.  The defendant then stuck his finger in S.J.W.'s anus.  S.J.W. turned away, but the defendant flipped her back over and put his finger in her anus again.  This occurred around five times in a row before the defendant stopped.  S.J.W. was approximately nine years old at the time.

Detective Prescott also interviewed D.R. as part of his investigation. D.R. reported that the defendant touched D.R.'s penis while D.R. was sleeping in the defendant's bed. D.R. said that he slept in the defendant's bed along with the defendant, J.W., and another boy one night. D.R. went to bed with shorts and a pull-up on and woke up when he felt the defendant's hand down his shorts fondling D.R.'s penis. D.R. pushed the defendant's hand away and went back to sleep. Later that same night, D.R. woke again to the defendant's hand down his shorts on D.R's penis. D.R. moved off the bed and slept under the bed the rest of the night. D.R. was approximately 11 years old at the time.

More recently, and subsequent to the defendant's state trial, L.W.—K.W. and S.J.W.'s younger brother—disclosed that the defendant molested him. L.W. told law enforcement that beginning when he was approximately six years old,[4] the defendant molested him on five or six occasions. L.W. explained that the defendant frequently gave him melatonin when he, along with friends or siblings, stayed at the defendant's house. L.W. typically slept on the couch, but would awaken to the defendant carrying him to the defendant's bed. Once there, the defendant pulled down L.W.'s clothes and rubbed spit from his hand onto L.W.'s butt. The defendant would then anally rape L.W.

ii.   *1990 Victim: M.S.*

Prior to the more recent abuse, the defendant molested another child. On around January 25, 1990, the defendant was staying at a friend's home. During the night, the defendant entered the room of an eight-year-old boy, M.S., living in the home. the defendant picked M.S. up and then took him to the basement. M.S.'s mother came downstairs and saw him and the defendant in the basement. M.S. explained that the

---

[4] Since L.W. is 16 years old now, and the defendant was arrested ten years ago, it is likely that L.W. was younger than six when he was abused by the defendant.

defendant told his mother that they were moving some things around and, after that, M.S.'s mother left the two alone again (a description of events later corroborated by M.S.'s mother).

Once alone, M.S. said that the defendant told him to "shut up" and covered M.S.'s mouth with the defendant's hand.  The defendant then laid M.S. on a carpet on his stomach and got on top of him.  At that point, M.S. stated that the defendant "stuck his private up [M.S.'s] butt" and "moved around a little." When asked how he knew it was the defendant's private, M.S explained that "it hurt and it was not soft."  He also explained that one of McFadden's hands was covering his mouth and the other was visible on the floor when M.S. felt pain in his rectum.  M.S. later identified a "private" as a penis.

Sometime later, M.S. disclosed the anal rape to his mother, but M.S.'s mother took no action.  M.S. then disclosed to a babysitter. The babysitter took M.S. to the hospital to be evaluated and reported the matter to law enforcement.  After an investigation, law enforcement interviewed the defendant.  The defendant denied the entire incident, claiming that he was never in the basement with M.S. and did not assault him. The defendant was arrested.

Ultimately, on March 27, 1990, the defendant pled guilty and admitted to the conduct M.S. described.  He was originally sentenced to 60 days of incarceration, sex offense counseling, and required to get his probation officer's approval before having any contact with children under 18.  He was also required to register as a sex offender.

### III.    GUIDELINES CALCULATION AND STATUTORY PENALTIES

A. Statutory Penalties

Counts One and Three of the indictment, each charging a violation of 18 U.S.C. §

2241(c) (crossing state lines with intent to engage in a sexual act with a minor under 12), carry potential sentences of not less than 30 years imprisonment and not more than life; not more than a $250,000 fine; a term of supervised release of not less than five years and not more than life; and a $100 special assessment.

Counts Two, Four, and Five of the indictment, each charging a violation of 18 U.S.C. § 2423(a) (transportation of a minor with intent to engage in sexual activity), carry a potential sentences of not less than 10 years imprisonment and not more than life; not more than a $250,000 fine; a term of supervised release of not less than five years and not more than life; and a $100 special assessment.

B. Guidelines Calculation

The Government believes that the correct Guidelines calculation is as follows.

*Counts One and Two (K.W.)*

- Count One

    - Pursuant to U.S.S.G. § 2A3.1(a)(1), the base offense level for Count One is 38.

    - Pursuant to U.S.S.G. § 2A3.1(b)(3)(A), because the victim was in the custody, care, or supervisory control of the defendant, two levels are added.[5]

    - The adjusted offense level for Count One is therefore 40.

---

[5] Application Note 3 to U.S.S.G. § 2A3.1(b)(3)(A) states:

> Subsection (b)(3) is to be construed broadly and includes offenses involving a victim less than 18 years of age entrusted to the defendant, whether temporarily or permanently. For example, teachers, day care providers, baby-sitters, or other temporary caretakers are among those who would be subject to this enhancement. In determining whether to apply this enhancement, the court should look to the actual relationship that existed between the defendant and the minor and not simply to the legal status of the defendant-minor relationship.

Both K.W. and J.W. were in the defendant's custody, care, and control to varying degrees. Both, of course, spent nights with the defendant regularly. For times during the ongoing abuse, J.W.'s primary residence was with the defendant, who he called "dad" and relied on for his basic needs. Both boys went on multi-day truck trips with the defendant where the defendant was the only adult.

- Count Two

    o Pursuant to U.S.S.G. § 2G1.3(a)(3), the base offense level is 28.

    o Pursuant to U.S.S.G. § 2G1.3(b)(1)(B), because the minor was in the custody, care, or supervisory control of the defendant, two levels are added.

    o Pursuant to U.S.S.G. § 2G1.3(b)(2)(B), because the defendant unduly influenced a minor to engage in prohibited sexual conduct, two levels are added.

    o Pursuant to U.S.S.G. § 2G1.3(b)(4)(A), because the offense involved the commission of a sex act or sexual conduct, two levels are added.

    o Pursuant to U.S.S.G. § 2G1.3(b)(5), because the offense involved a minor who had not attained the age of 12 years, eight levels are added.

    o The adjusted offense level for Count Two is therefore 42.

- Pursuant to U.S.S.G. § 3D1.2(a), Counts One and Two group.  Pursuant to U.S.S.G. § 3D1.3(a), the offense level for the group is the offense level for the most serious of the counts comprising the group.  Accordingly, the offense level for the Group is 42.

*Counts Three, Four, and Five (J.W.)*

- Count Three

    o Pursuant to U.S.S.G. § 2A3.1(a)(1), the base offense level for Count One is 38.

    o Pursuant to U.S.S.G. § 2A3.1(b)(3)(A), because the victim was in the custody, care, or supervisory control of the defendant, two levels are added.

    o The adjusted offense level for Count Three is therefore 40.

- Counts Four and Five

    o Pursuant to U.S.S.G. § 2G1.3(a)(3), the base offense level is 28.

    o Pursuant to U.S.S.G. § 2G1.3(b)(1)(B), because the minor was in the custody, care, or supervisory control of the defendant, two levels are added.

    o Pursuant to U.S.S.G. § 2G1.3(b)(2)(B), because the defendant

unduly influenced a minor to engage in prohibited sexual conduct, two levels are added.

- o Pursuant to U.S.S.G. § 2G1.3(b)(4)(A), because the offense involved the commission of a sex act or sexual conduct, two levels are added.

- o Pursuant to U.S.S.G. § 2G1.3(b)(5), because the offense involved a minor who had not attained the age of 12 years, eight levels are added.

- o The adjusted offense level for Counts Four and Five is therefore 42.

- Pursuant to U.S.S.G. § 3D1.2(a), Counts Three, Four, and Five group. Pursuant to U.S.S.G. § 3D1.3(a), the offense level for the group is the offense level for the most serious of the counts comprising the group. Accordingly, the offense level for the Group is 42.

*Total Offense Level and Guidelines Calculation*

- Pursuant to U.S.S.G. § 3D1.4, one Group listed above is assigned one Unit.  The other Group is assigned an additional Unit, for a total of two units.  Accordingly, two levels are added to offense level 42 for a total offense level of 44.

- Regardless of his criminal history category, the defendant's Guidelines range is 360-life.

## IV.      18 U.S.C. § 3553 Factors and Sentencing Recommendation

Considering the 18 U.S.C. § 3553(a) factors, the only just sentence in this case is a sentence of life imprisonment, and the Government respectfully requests that the Court impose such a sentence.

### A.   Nature and Circumstances of the Offense

The sickening and heinous nature of the offense conduct in this case cannot be overstated.  To be sure, the defendant stole childhood away from each of his victims, but it is not an exaggeration to say that the defendant also destroyed lives.  His selfish and deliberate action inflicted a horror on his victims and their families that can never be truly remediated.

As the Court knows from trial, and is described above, the defendant laid the groundwork for his sexual abuse of J.W., K.W., and at least five other children for many years.  In each place that the defendant lived in Grand Junction, he made his home a haven for little boys.  Strikingly, there is no evidence at all that the defendant partook in the activities and toys that he kept around his house.  Rather, all evidence suggests that he deliberately turned his homes into a place where elementary school-aged boys would want to be.  Not surprisingly, therefore, numerous witnesses reported that the defendant always had boys around him.

In addition to grooming his victims by providing a fun place for them to play, the defendant also groomed his victims' families.  With rare exception, the defendant targeted children with difficult home lives, particularly children who did not have a biological father in the home.  J.W. is a good—and tragic—example.  J.W.'s biological father has never been part of his life, and even when Michael W. did come around, he largely ignored J.W.  J.W.'s mother was addicted to drugs and alcohol.  Before her abusive boyfriend died of an overdose, he was violent toward M.R. and the children. J.W.'s family did not have much money, and J.W. and his siblings often did not have enough to eat.  Even before the defendant began abusing J.W., J.W.'s life was heartbreaking.

Then the defendant stepped in.  He became a father figure for J.W. and provided the material things that M.R. could not.  But he also provided love, affection, and a feeling of safety that J.W. did not have anywhere else.  When the abuse first started, J.W. was so young, perhaps around six years old, he did not understand what was happening.  As he got slightly older, he put the pieces together and realized the painful and wet sensations he had been having at night was the defendant anally raping him.

The abuse continued for six years.  For those six years, not more than two or three nights would lapse before the defendant found J.W. at night and anally raped him.  But J.W. trusted and loved the defendant, and he did not tell anyone what was happening.

Perhaps the most heartbreaking thing of all is that for all of those six years, every single time the defendant raped him, J.W. made the choice to stay quiet and live with the pain of the defendant's abuse, rather than return to his mom's house and deal with the violence, drugs, and hunger.  For J.W., this must have felt like torture.

The defendant also groomed K.W. and his family.  Unlike J.W., K.W. lived with his parents and multiple siblings in a separate house.  But the W. family was not well-off financially, and the defendant provided the children things S.W. and S.W. Sr. could not. When S.W. and S.W. Sr. were separated, and the defendant offered to take K.W. to school, S.W. was appreciative—and did not for a moment think that the defendant had an ulterior motivation.  So, while J.W. went on truck trips without his mom's knowledge, the defendant integrated himself so well into the W. family that S.W. and S.W. Sr. encouraged their kids to go on road trips with the defendant.  In fact, this is a hallmark of the defendant's personality—everyone who knew the defendant liked him, trusted him, and considered him a friend.  This is one reason that the defendant's abuse was able to continue for so long undetected.

While J.W. was largely—and bravely—matter-of-fact on the witness stand, K.W. barely made it through his testimony.  K.W. has dealt with his pain and trauma by doing his best to forget.  He was able to tell the jury, however, how the defendant's constant abuse made him feel small and worthless, feelings that have persisted to this day. Although many of the defendant's victims are extremely reluctant to re-live their trauma by talking about it now, K.W.'s pain was on full display for the jury.  As the Court recalls,

it was apparent that the horror that the defendant inflicted upon K.W. for years is still with K.W., despite his best efforts to suppress his memories and feelings.

All of the defendant's victims are now teenagers and young adults.  Admirably, some of them have dealt with the trauma and are doing relatively well, holding down jobs and maintaining healthy relationships.  Others, like K.W. and E.S., began acting out in childhood, found themselves in a variety of legal trouble, and have had difficulty establishing a stable adult life.

Ultimately, because the defendant targeted vulnerable children, and sufficiently and thoroughly groomed those children and their families, he was able to continue sexually abusing seven children for years.  For some, most of their childhood was marred with active, ongoing, and physically painful abuse.  It is difficult to imagine offense conduct more deserving of a life sentence.

B.  <u>History and Characteristics of the Defendant</u>

The defendant is a man with few redeeming characteristics.  While he outwardly appeared to be a caring man who provided a safe and loving home for children who had no other place to go, this was all a smokescreen.  Instead, the defendant used his personality and resources to lure kids and their families into his fold, giving him the unfettered access to little boys that he craved.  He kept up the façade for years, likely abusing a child nearly every night, until 10 years ago when he was finally exposed.

The defendant's tactics also became more sophisticated with time.  In 1990, when the defendant was 18 years old, he sexually abused M.S. in M.S.'s mother's home.  In that case, however, the defendant physically carried M.S. to the basement and restrained M.S. so that the defendant could anally rape M.S. without M.S. escaping or crying out.  As far as we know, the defendant's abuse of M.S. occurred only once.

By contrast, before sexually abusing J.W., K.W., I.S., E.S., S.J.W., and D.R., he took time to groom them and their families—which Cheryl Young reported is almost universally a hallmark of a successful long-term abuser.  The victims at issue in the instant case do not report being physically restrained by the defendant.  Rather, his abuse was quiet and gentle enough that it could occur without waking other boys who were asleep in the same bed, thus enabling him to keep his abuse a secret for years.

C.  Reflect the Seriousness of the Offense and Provide Just Punishment

Only a sentence of life imprisonment will adequately reflect the seriousness of the defendant's crimes and provide just punishment.  Of course, no punishment will make the victims and their families whole or give them back what the defendant stole from them.  But a sentence that ensures the defendant will never be free in any community ever again will at least send the right message—that perpetrators of this kind of horrendous, unforgivable crime will die in prison.

D.  Provide Adequate Deterrence and Protect the Public

It is not clear that this defendant can be deterred.  Indeed, being convicted of felony sexual abuse of a child in 1990, followed by decades of sex offender registration, did nothing to deter the defendant from adopting a lifestyle that revolved around grooming and abusing children in Grand Junction.  So, it is the Government's position that deterrence is far outweighed as a Section 3553(a) factor when compared to the need for the sentence imposed to protect the public.  The defendant is a habitual, life-long sexual abuser of children who victimized nearly every child in his immediate orbit for years until his arrest in January 2013.  There is no question that the defendant needs to be incarcerated for the rest of his life in order to protect children in his community from his abuse.

To be sure, a sentence of life imprisonment will protect the community from this defendant.  In addition, however, it will serve to deter others.  A sentence of life imprisonment—even more than a sentence of a finite number of years—will send a message to others that sexual abuse of children is never tolerated, and individuals commit these atrocious acts upon the most vulnerable among us will live out their lives in a jail cell.

## V.  RESTITUTION

The Court must order restitution to victims for the harm caused by the conduct in Counts One and Three pursuant to 18 U.S.C. § 2248.  The Court must order restitution to victims for the harm caused by the conduct in Counts Two, Four, and Five pursuant to 18 U.S.C. § 2429.

The Government anticipates seeking restitution for victims in this case and will compile additional information for the Court prior to sentencing.

## VI.     <u>**CONCLUSION**</u>

Taking into account all of the Section 3553(a) factors, a life sentence is the only

sentence that is sufficient, but not greater than necessary, to satisfy the statutory

purposes of sentencing.


Respectfully submitted,

COLE FINEGAN
United States Attorney

<u>*/s Andrea Surratt*</u>
Andrea Surratt
Assistant U.S. Attorney
U.S. Attorney's Office
1801 California Street, Suite 1600
Denver, CO 80202
Tel: (303) 454-0124
E-mail: andrea.surratt@usdoj.gov
Attorney for the Government