

# Clinical Psychology Associates, LLC

clinicpsych.com • P: 262-763-9191 • F: 262-763-7767
197 W. Chestnut St., Burlington, WI 53105

February 16, 2023

Sean McDermott
McDermott Stuart & Ward LLP
One Sherman Place
140 E. 19th Avenue, Suite 300
Denver, CO 80203

Re: United States of America v. Michael Tracy McFadden
Case No. 19-cr-00243-CMA-GPG (District of Colorado)

Dear Attorney McDermott:

At the time of my review, Michael McFadden was charged in the United States District Court for the District of Colorado with two counts of Crossing State Lines with Intent to Engage in a Sexual Act with a Minor Under 12 Years of Age, and three counts of Transportation of a Person Over State Lines with the Intent to Engage in a Sexual Act that is a Crime. The alleged victim in counts one and two is KW, and in counts three, four, and five the alleged victim is JW.

You requested that I review file documents in the above-referenced matter for the purpose of identifying factors related to memory that may affect the alleged victim's testimony at trial. I did not personally interview or evaluate any of the parties in this matter, including the alleged victim. To do so would not have added significantly to the information available to me in this case, and might potentially have increased the distress of the children and affected the reliability of their subsequent reports or testimony.

During the course of my evaluation I reviewed the following material:

Doc. 34 - Amended Protective Order
Affidavit in Support of Arrest Warrant Case No. 13CR27 (Mesa County, Colorado)
Affidavit in Support of Arrest Warrant Case No. 13CR339 (Mesa County, Colorado)
Affidavit in Support of Arrest Warrant Case No. 13CR342 (Mesa County, Colorado)
Indictment Case No. 19-cr-00243-GPG (Federal District of Colorado)
Video recorded 12/20/2012 interview of Cindy Ricks INV_GJPD352 (52:50)

Exhibit 2

United State v. McFadden
Case No. 19-cr-00243-CMA-GPG (District of Colorado)

Transcript of 12/20/2012 video recorded interview of Cindy Ricks
Colorado Department of Human Services records INV_GJPD_1045-1113
Handwritten statement of Dian Stauter 12/15/2012
Report regarding Dian Stauter INV_GJPD_17-18
Written summary of 12/21/2012 interview of JW INV_GJPD_147
Recorded 12/21/2012 interview of Crystal McFadden INV_GJPD_306 (33:14)
Transcript of video recorded interview 12/21/2012 INV_GJPD 1430-1450
Video recorded 12/21/2012 interview of EM INV_GJPD_307 (28:10)
Transcript of 12/21/2012 interview of EM
Video recorded 1/3/2013 interview of EM INV_GJPD_315 (49:36)
Transcript of 1/3/2013 interview of EM
Video recorded 1/16/2013 interview of KW (INV_GJPD_317 (32:40)
Transcript of 1/16/2013 interview of KW
Judge in GJ statement regarding March 2013 interview INV_TRAN_1429-1430
Transcript of 3/21/2013 interview of IS
Video recorded 12/18/2012 interview of IS INV_GJPD_357 (31:36) & 304 (2:55)
Transcript of 12/18/2012 video recorded interview of IS 12/18/12
E-mail from Nicole Surad to Ed Prescott dated 1/2/2013 GG APD 0147
Recorded 2/7/2013 interview of Michelle Ricks INV_GJPD_313 (26:45)
Transcript of 2/7/2013 interview of Michelle Ricks
Recorded 2/7/2013 interview of JW INV_GJPD_310 (38:08)
Transcript of 2/7/2013 interview of JW
Recorded 3/21/2013 interview of IS INV_GJPD_305 (22:15)
Transcript of 3/21/2013 interview of IS
Pinal County Sheriff's Office report No. 081215153 INV_GJPD_86-88
Grand Junction Police Department case report No. 2008-077914
Grand Junction Police Department case report No. 2012-00060954
Stacy Wesolowski telephone call with Det. Prescott 1/15/2013 INV_GJPD_316 (23:58)
Transcript of 1/15/2013 telephone call with Investigator Prescott and Stacy Wesolowski
Transcript of 5/22/2018 interview of KW
Transcript of 8/8/2018 interview of JW
Doc. 39 - Other Acts Motion filed 12/2/2020
Doc. 81 - Second Motion to Compel Production filed 9/26/2022

**Synopsis**

In December 2012, the Grand Junction Police Department opened an investigation into allegations that Mr. McFadden had engaged in sexual behavior with several young boys. IS reported during a recorded forensic interview that Mr. McFadden gave him touches he didn't like. Other children were interviewed but did not report sexual contact. A number of charges were issued in the state case, which eventually resulted in a jury trial, convictions, and reversal at the appellate level due to speedy trial violations.

The current indictment stems from allegations that in December 2012 and January 2013, Mr. McFadden transported KW across a state line on two occasions with the intent to engage in sexual activity with the child. The indictment also alleges that between December 1, 2010 and

Exhibit 2

United State v. McFadden
Case No. 19-cr-00243-CMA-GPG (District of Colorado)                    Page 3 of 16

January 1, 2011, on two occasions, Mr. McFadden knowingly crossed the state line with the intent to engage in a sexual act with JW, and that between January 1, 2007 and January 3, 2013, Mr. McFadden knowingly transported JW in interstate commerce with the intent to engage in sexual activity with the child.

The purpose of my report is to describe a variety of factors present in this case that extensive research has shown affect an individual's memory. As the determination of the credibility of either child's statements is a matter for the trier of fact, I cannot and will not offer an opinion on the ultimate question regarding whether their statements are true.

In order to place the information below in proper context, it is important to understand some basic processes regarding how human memory works. Research on human memory has been conducted for over 100 years, and I will not review that body of literature in this report. For a readable review of memory research, please see Loftus (1988). Memory is reconstructive in nature, and generally consists of three different stages: acquisition, storage, and retrieval. Memories are acquired through sensory input such as touch, hearing, or sight, as well as through imagination. Memory is stored in traces, called gists. When we recall (retrieve) a memory, we retrieve the stored traces and we combine them with post-event information (things that we have learned or experienced after the original memory experience) and reconstruct the event in question. This new memory (new because it has been reconstructed using post-event information) is then returned to our memory storage different than when it was retrieved.

Research has identified a number of factors that can affect an individual's memory. In the following sections I will briefly review research in specific areas that may impact the accuracy of memory, and I will apply that research to the facts of this individual case.

Repeated Conversations.[1] Research studies have shown that when children are repeatedly questioned about non-events (e.g., Ceci, Crotteau-Huffman, Smith, & Loftus, 1994), they report such events at a relatively high rate and vigorously hold to those memories despite evidence to the contrary (that these memories are inaccurate). Similar effects have been demonstrated with older children and adults (e.g., Loftus, Coan, & Pickrell, 1996; Pezdek & Hodge, 1999). Research has also shown, though, that under some circumstances, the repeated questioning of children can be a useful tool and can result in additional accurate information from the child (e.g., Orbach, Lamb, La Rooy, & Pipe, 2012). It is extremely important to point out, however, that this assertion is only accurate when unbiased interviewers using appropriate interviewing techniques have conducted all of the interviews (LaRooy, Katz, Malloy, & Lamb, 2010). Under such circumstances, multiple interviews can be useful in retrieving additional information, particularly given the reconstructive nature of memory. This same advantage has not been demonstrated in situations where one or more of the repeated interviews, including informal

---

[1] Both this evaluator and the authors of published research papers define interviews as including conversations the child has with formal interviewers, such as those conducted at child advocacy centers, as well as less structured or informal conversations in which the child is questioned by or otherwise talks with other persons such as siblings, relatives, parents, teachers, therapists and counselors, law enforcement investigators, police officers, social workers, physicians, nurses, district attorneys, and victim witness coordinators, to name a few. See, e.g., Lamb, Brown, Hershkowitz, Orbach, & Esplin (2018).

Exhibit 2

United State v. McFadden  
Case No. 19-cr-00243-CMA-GPG (District of Colorado)  
Page 4 of 16

conversations with others, utilized either a biased interviewer or questioning techniques that are contrary to best practice.

The following table describes events that relate to repeated conversations with JW:

| Date | Event | Details |
|---|---|---|
| 12/16/08 | Mom | JW was questioned by his mother about being touched by McFadden. No disclosure was made during this discussion. |
| 1/21/09 | Police | Det. Crocker interviewed JW at Western Slope CAC. No disclosure was made during this interview. |
| "Years ago" | Cousin | JW told reportedly cousin DOS that Mr. McFadden touched his pee pee. |
| 12/21/12 | CPS | DHS caseworker Surad interviewed JW alone at GJPD. No allegations made. |
| Before 2/7/13 | "The Cops" | JW reported to detectives that "the cops" had talked to him previously about the allegations. |
| 2/7/13 | Police | Dets. Prescott and Stogsdill interviewed JW at his home. |

The following table describes events that relate to repeated conversations with KW:

| Date | Event | Details |
|---|---|---|
| 1/3/13 | Mom | Enroute home from a truck stop in NE after Mr. McFadden's arrest, KW told mom about "sexual issues" between "[McFadden] and someone." |
| Before 1/15/13 | Brother | KW's brother said that Mr. McFadden "humped" him. |
| 1/15/13 | Counselor | KW saw a counselor and reported abuse allegations by Mr. McFadden. |
| January 2013 | Sister | KW and sister SJW discussed "sexual issues which concerned [McFadden]." |
| 1/16/13 | Police | Det. Prescott interviewed KW. |
| 1/18/13 | Parents | Parents awakened KW, who reported nightmares of sexual assault (audio-recorded by parents). |
| 1/18/13 | Physician | Physical examination performed yielding no signs of anal sexual abuse. |

<u>External influences can affect a child's reports.</u> Research with children and adults tells us that factors external to the child can have a significant impact on the accuracy of the child's memory (Poole & Lindsay, 1995). For example, research on negative stereotype induction (e.g., Leichtman & Ceci, 1995; Lepore & Sesco, 1994) tells us that simply over-hearing other people talk in a negative manner about an individual can lead to the child making reports consistent with the negative characteristics attributed to the person in question. In a similar vein, family discussions (Poole & Lindsay, 2001) or family pressure can influence the child's memory or event reports in a variety of ways. Pressure to minimize or not report observations can occur in situations where doing so may cause disruption or financial hardship for the family, and pressure

Exhibit 2

United State v. McFadden
Case No. 19-cr-00243-CMA-GPG (District of Colorado)                                Page 5 of 16

to make negative statements about an individual can occur in situations where the family is angry with or hostile toward the person in question. Even older children have been shown to make implausible event reports in the presence of false prevalence information (Otgaar, Candel, Merckelbach, & Wade, 2009).

In the current case, there are a number of factors that raise concerns about external influences on the reliability of the children's memories and event reports. Very broadly, the extensive investigations conducted by Mesa County authorities and the Colorado Department of Human Services resulted in many discussions between both adults and the alleged victims as well as other youth and the alleged victims, any one of which are sufficient to serve as the foundation for injecting unreliability into the investigation. More specifically, however, the following occurred:

- The Colorado DHS investigator Surad told Michelle Ricks to tell the children that "other kids are saying stuff happened." This tactic is known to produce inaccurate information from children (Ceci & Bruck, 1995).
- Twice during the 1/16/2013 interview of KW, Det. Prescott told KW that he had already talked with other kids that KW knew. Again, this tactic is known to produce inaccurate information from children (Ceci & Bruck, 1995).

The potential for negative stereotype induction in this matter is significant.

- During Cindy Rick's interview with DHS, she reported that she was "always worried" that Mr. McFadden was hurting the kids. DHS records, INV_GJPD_1062.
- KW's mother "had [a] feeling" that KW had been the victim of sexual assault. DHS records, INV_GJPD_1106.

To the extent that these feelings were communicated to the alleged victims or their peer contacts prior to the allegations in this case the children's reports are likely to have been influenced by such information. There was evidence that the youth viewed Mr. McFadden in such negative terms, as evidenced by JW's comment during a forensic interview that Mr. McFadden was "a bad person." DHS records, INV_GJPD_1068.

Forensic Interviews: Because of the extensive published research in the area of child forensic interviewing and the ease with which such interviews can be improperly conducted and thereby taint the information obtained, a variety of authors (some affiliated with specific organizations and others with research programs or governmental bodies) have developed specific guidelines or protocols for conducting child forensic interviews. These approaches seek to inform the interviewer on the relevant research and guide the interviewer in the conduct of the evaluation so as to most effectively and reliably elicit and preserve accurate information. These guidelines, for the most part, contain the same basic instructions for interviews although the specific timing of various interview components may differ among the approaches (see Poole, 2016, for a more comprehensive discussion of this area). Research has demonstrated that when these techniques are properly applied in child forensic interviews, even very young children are able to provide reliable and relevant information (Walker, Kenniston, & Inada, 2013). When interview guidelines are ignored or improperly applied, however, the resulting information obtained during the interview (and often subsequent to the interview) is of questionable reliability. Research has

Exhibit 2

United State v. McFadden
Case No. 19-cr-00243-CMA-GPG (District of Colorado)

Page 6 of 16

shown that despite proper training, child forensic interviewers often deviate from proper interviewing procedures. For these reasons it is important to carefully examine the interviewer's interaction with the child interviewee on a case-by-case basis.

I reviewed the 8/8/2018 video recorded interview of JW and rated each utterance by Stephanie Knapp as a non-query (a simple restating of what the child said to verify accuracy or utterances referred to as "facilitators," such as "Yes," "Go on," or "Uh-huh"), an invitation, a directive, an option-posing query, or a suggestive statement. I used the following guide to classify Ms. Knapp's utterances:

Invitations. Questions, statements, or imperatives, prompting free-recall responses from the child. Such utterances do not delimit the child's focus except in a general way (for example, "Tell me everything that happened"), or use details disclosed by the child as cues (for example, "You mentioned that he touched you. Tell me everything about the touching").

Directives. Directive inquiries refocus the child's attention on details or aspects of the alleged incident that the child has already mentioned, providing a category for requesting additional information using "Wh-" questions (cued recall). For example, "When did it happen?" (when the child disclosed that something happened), or "What color was his t-shirt?" (when the child said he was wearing a t-shirt).

Option-posing utterances. These focus the child's attention on details or aspects of the alleged incident that the child has not previously mentioned, asking the child to affirm, negate, or select options provided by the investigator using recognition memory processes, but do not necessarily imply that a particular response is expected. For example, "Did he say anything to you?" or "Did he touch you over or under your clothes?" (when the child mentioned that he touched him/her).

Suggestive utterances. These are stated in such a way that the interviewer strongly communicates what response is expected (e.g., "He forced you to do that, didn't he?") or they assume details that have not been revealed by the child (for example: Child: "We laid on the sofa." Interviewer: "He laid on you or you laid on him?"). Suggestive utterances, which communicate to the child what response is expected, are strongly discouraged. The contaminating effects of option-posing and suggestive utterances are aggravated when they are repeated.

I used the same coding guidelines to review and analyze the 2/7/2013 interview of JW conducted by Detectives Prescott and Stogsdill, the 1/16/2013 interview of KW conducted by Detective Prescott, and the 5/22/2018 interview of KW conducted by A. Howard & A. Zappe. The results of these analyses are provided below.

Best Practices for Forensic Interviewers: Researchers have addressed the concept of best practices in child forensic interviewing (see, e.g., Brubacher, Peterson, La Rooy, Dickinson, & Poole, 2019; Lamb, Brown, Hershkowitz, Orbach, & Esplin, 2018; Newlin et al., 2015; Saywitz, Lyon & Goodman, 2018). A child forensic interview seeks to gather factual information from a child in a sensitive and legally sound manner while also preserving the integrity of the child's

Exhibit 2

United State v. McFadden  Page 7 of 16
Case No. 19-cr-00243-CMA-GPG (District of Colorado)

memories of the alleged events. A methodologically sound coding system[2] has been developed for the purpose of identifying and measuring the content of investigative interviews. Hershkowitz et al. (2017) reported the rates of question types used by well-trained child forensic investigators: Five sixths of all questions focused on the recall memory of the child (invitations and directives), one sixth of questions were follow-up for details not mentioned (option-posing questions), and there were almost no suggestive questions. Well-trained, unbiased interviewers who work hard to obtain details from children's recall memory rather than from recognition memory use almost entirely invitation and directive questions. The following figure, based on the Hershkowitz et al. (2017) data, demonstrates the rates of question types in an example of best practice child forensic interviewing:



The research in child forensic interviewing (e.g., Ceci & Bruck, 1995; Thompson, Clarke-Stewart, & Lepore, 1997; Poole & Lamb, 1998) also consistently identifies a number of inappropriate interviewing techniques that result in inaccurate reports. The use of leading and Yes/No questions, social reinforcement for specific statements, or disapproval for specific statements all can have a significant impact on the accuracy of a child's reports. Research studies have shown that younger youth are disproportionately more vulnerable than older children to suggestive post-event questioning (Ceci & Bruck, 1993).

I reviewed the video recorded interviews and transcripts several times to carefully characterize each statement by the interviewers on each date as either a non-query (restatement or facilitator) or a query (invitation, directive, option choosing, or suggestion).

2013 Interview of JW

In all there were 160 queries by Detectives Prescott and Stogsdill. Only six (four percent) of these queries were invitations for JW to report what happened to him. Thirty-eight (about 24 percent) of the queries were requests for details from JW. One hundred nine (68 percent) of the

---

[2] NICHD's Quality of Interview Analyses

Exhibit 2

United State v. McFadden
Case No. 19-cr-00243-CMA-GPG (District of Colorado)                                    Page 8 of 16

queries from the detectives were option-posing queries, asking JW to confirm or disconfirm choices presented to him by the interviewers. A total of seven (four percent) of the queries met the strict definition for suggestive questioning. The following graph compares the two detectives' rate of queries to a sample of best practice.[3]



## 2018 Interview of JW

JW was interviewed a second time on 8/8/2018 by Stephanie Knapp for a total of 97 substantive queries. Thirteen (13 percent) of these queries were invitations for JW to report what happened to him. Forty-five (about 46 percent) of the queries were requests for details from the child. Thirty-six (37 percent) of the queries from the detectives were option-posing queries, asking JW to confirm or disconfirm choices presented to him by Ms. Knapp. A total of three (three percent) of the queries met the strict definition for suggestive questioning. The following graph compares Ms. Knapp's rate of queries to a sample of best practices:

---

[3] The summed percentages on this and other graphs in this report may reflect minor rounding error.

Exhibit 2



## 2013 Interview of KW

Detective Prescott interviewed KW on January 16, 2013. Out of a total of 127 substantive queries, only one (one percent) was an invitation for the child to report what happened to him. Forty-nine (38 percent) of the queries were requests for details, while fully 72 constituted option-posing questions. A total of five queries met the strict definition for suggestive questioning. The following graph compares Detective Prescott's rate of queries to a sample of best practice:



## 2018 Interview of KW

KW was interviewed a second time on 5/22/2018, this time by interviewers A. Howard and A. Zappe. Out of a total of 204 substantive queries, 34 (17 percent) were invitations for KW to

Exhibit 2

report what happened to him. Eighty-seven (about 42 percent) of the queries were requests for details from KW. Eighty-one (39 percent) of the queries from the interviewers were option-posing queries, asking KW to confirm or disconfirm choices presented to him by them. Three (one percent) of the queries met the strict definition for suggestive questioning. The following graph compares the two interviewers' rate of queries to a sample of best practice.



It is important to note that these data should not be considered in isolation from other information obtained during my review of the investigation material. The presence or absence of misinformation provided to the children is crucial to an understanding of the likely impact of the various questioners' interviewing styles.

The recorded forensic interviews in this matter were uniformly poor. Two of the four interviews featured two interviewers simultaneously meeting with a child, which is outside of proper interviewing protocol and is not recommended. The questioning styles in all four interviews consistently reflected the interviewers' marked departure from best practice techniques.

Bias: Interviewers at times engage in what is called "confirmatory bias" (Faust & Faust, 2012; Festinger, 1957). This type of bias occurs when an interviewer approaches an interview with a preconceived notion of what may have occurred. The interviewer then tends to pay attention to or assign greater weight to information or statements that confirm the interviewer's preconceived ideas, while simultaneously paying less attention to or giving less weight to statements that refute the interviewer's preconceived notion. This bias has been shown in research studies to be quite insidious and to greatly affect the outcome of the interview. The presence of interviewer bias can be inferred from interviews where the interviewer misses opportunities to test alternative hypotheses (other explanations) for the statements made by the child being interviewed.

Interviewer bias can be assessed in several ways. First, it can be inferred by a lack of alternative

Exhibit 2

United State v. McFadden  
Case No. 19-cr-00243-CMA-GPG (District of Colorado)                              Page 11 of 16

hypothesis testing on the part of the forensic interviewer. In at least some of the above recorded interviews the interviewer appeared to consider alternative hypotheses, although minimally so.

The second way that interviewer bias can be assessed is by watching the nonverbal interaction between an interviewer and interviewee. Research has demonstrated that subtle nonverbal communication can have a powerful effect on the reports of the individual interviewee. The camera placement in the above interviews was generally poor, such that I was unable to observe the presence or absence of nonverbal communications.

<u>Therapy Effects:</u> Many appropriate psychotherapeutic techniques that are used to treat children that have experienced trauma, including various forms of abuse, can affect the child's recollections and reports (e.g., Branaman & Gottlieb, 2013). For example, trauma-focused cognitive behavioral therapy (TF-CBT) is an evidence-based treatment approach (Cohen, Mannarino, & Deblinger, 2006; Cohen, Mannarino, Deblinger, & Steer, 2004) for use with children and adolescents who have experienced traumatic events. It also includes a parent component. In general, the treatment approach involves a desensitization process that is characterized by the construction of what is called a trauma narrative, which is a written story composed by the child with the assistance of the therapist. This story helps the child review and process the traumatic events and to cope effectively with communication problems, misunderstanding and misinformation, and other potential complicating factors. It is important to note that TF-CBT involves the regular revisiting of and discussion about the alleged traumatic events. It is this regular discussion, involving both the child and the therapist (and eventually other persons) that allows the child to become desensitized to the reported trauma. Eye Movement Desensitization and Reprocessing (EMDR) therapy (Shapiro, 2007) is another example of such an evidence-based treatment approach that involves regular revisiting of the identified traumatic event.

The records that I reviewed very clearly indicated that the children were involved in various types of psychotherapy. The details were not provided. See my affidavit, executed 13 September 2022, for additional details and discussion. I have not been provided with records related to the children's therapy, but in the event that I receive those records I will be prepared to provide an addendum to this report.

When I review therapy records I am looking for several things. First, I am interested in the number of sessions in which the therapist and child discussed the abuse allegations. This is important due to the effects of repeated conversations (as discussed above), particularly when the therapist is using those discussions to desensitize the child to the alleged traumatic experiences (this is accomplished by helping the child think differently and react differently to his or her recollections). Second, I am looking for the application of treatment techniques that are known to affect a child's memory, such as TF-CBT and EMDR, described above. Finally, I am looking for indicators of the application of treatment methods or techniques that are known to be ineffective or even harmful. There are a number of such techniques that are unfortunately still utilized by uninformed or incompetent providers. See Koocher et al. (2014) for a more in-depth discussion and listing of these techniques. I am able to secure treatment records according to professional standards, and am likewise able to closely adhere to any Orders of Protection for those records that may apply.

Exhibit 2

United State v. McFadden  
Case No. 19-cr-00243-CMA-GPG (District of Colorado)

Page 12 of 16

<u>Source Misattribution Errors:</u>  Source misattribution errors (also referred to as source monitoring errors) are situations in which an individual (adult or child) identifies the incorrect source of a memory. The memory can be true or it can be false. Many different factors influence the ways in which people make source misattribution errors, and they can be compounded by the use of inappropriate interviewing techniques across situations. Indeed, the details provided by the child in such situations can be rich and varied, and the individual in error is completely convinced that he or she is accurately recounting a true experience. Source misattribution errors occur when persons have been influenced by other individuals (such as overhearing rumors or experiencing negative stereotype induction), have been subjected to leading questions or other inappropriate or suggestive interviewing techniques, and in situations in which a person actually had the experience being reported but under different conditions (for example, being sure that they placed their car keys on the kitchen counter when in reality they placed their keys on their nightstand). Research has shown that these source misattribution errors are not confined to "peripheral details," but can include erroneous reports of bodily touching, including reports of genital touching when children are interviewed with the use of anatomical dolls (Ceci et al., 1994).

The research on source misattribution errors demonstrates that children who experience this phenomenon are fully convinced that their memory is accurate, and some such children will not change their reports even when provided with information to the contrary. Furthermore, the more times the child repeats the story, the more it will be cemented in his or her memory as a memory the child believes is true.

An individual's ability to accurately recall the source of specific memories is affected by a number of factors, including the frequency with which he or she has discussed events with others, the impact of peer and family influence, the presence of negative stereotype induction, the passage of time, and the presence of various mental health factors. The inappropriate interviewing techniques utilized with the alleged victims in this case, as well as the likely presence of negative stereotyping, are in my opinion sufficient to form the foundation for source misattribution errors.

It is also important to point out that there is not a profile of an abused child that might be used to substantiate a history of or the presence of physical or sexual abuse. Children evidence a number of behaviors for many different reasons. Research (e.g., Kendall-Tackett, Williams, & Finkelhor, 1993) has concluded that there is no specific syndrome for children who have been sexually abused.

Finally, much of the information presented above concerning memory and the subtle yet powerful effects on recollection and reports of the vulnerabilities described above are beyond the understanding of the average juror. Research (e.g., Quas, Thompson, & Clarke-Stewart, 2005; Warren & Woodall, 1999) suggests that while some jurors may be aware of some of the concerns described in this report, significant gaps exist in the knowledge base of both individual jurors and collective juries, particularly as it relates to the extent and accuracy of their information. The provision of expert testimony may serve to reduce this variability and correct the misperceptions of a majority (or a large minority) of jurors. The researchers conclude that the knowledge

Exhibit 2

provided by experts might reduce both unwarranted skepticism and naïve trust in children's claims of sexual abuse.

**Opinion**

It is substantially likely that the factors described above negatively impacted the reliability of the alleged victims' memories and event reports. This impact is likely to extend to the reliability of the children's future testimony at trial.

**Evidence that Does Not Support My Opinion**

An individual's memory for an event is generally the most accurate closer to the date of the event, in the absence of intervening misinformation. Although in the current matter it appears that the various children involved in the investigation had contact with each other, there is little clear documentation that they discussed the allegations among themselves or that they directly or indirectly were exposed to the information by adults.

Therapy records for the alleged victims were requested but were not available to me. Although it is very likely that the therapists providing services to the children were trained to be sensitive to potential traumatic events in the lives of their clients and to use evidence-based treatment techniques to address such experiences, I am unable to be certain of their skills and training in the absence of the therapy records.

I am available to testify in this case as needed. Please contact me if you have questions concerning the above.

Sincerely,

*[signature]*

David W. Thompson, Ph.D., ABPP
Diplomate in Forensic Psychology
American Board of Professional Psychology
Clinical and Forensic Psychologist

References

Branaman, TF & Gottlieb, MC (2013). Ethical and Legal Considerations for Treatment of Alleged Victims: When Does It Become Witness Tampering? *Professional Psychology: Research and Practice, 44*, 299–306

Brubacher, SP, Peterson, C, La Rooy, D, Dickinson, JJ, & Poole, DA (2019). How children talk about events: Implications for eliciting and analyzing eyewitness reports. *Developmental Review 51*, 70-89.

Exhibit 2

United State v. McFadden                                          Page 14 of 16
Case No. 19-cr-00243-CMA-GPG (District of Colorado)

Ceci, SJ & Bruck, M (1993). Child Witnesses: Translating research into policy. SCRD Social Policy Reports, 7, No. 3.

Ceci, SJ & Bruck, M (1995). Jeopardy in the Courtroom: A Scientific Analysis of Children's Testimony. American Psychological Association, Washington, DC.

Ceci, SJ, Crotteau-Huffman, ML, Smith, E, & Loftus, E (1994). Repeatedly thinking about a nonevent: Source misattributions among preschoolers. *Consciousness and Cognition, 3,* 388-407.

Cohen, JA, Berliner, L, & Mannarino, A (2010). Trauma focused CBT for children with co-occurring trauma and behavior problems. *Child Abuse & Neglect, 34,* 215-224.

Cohen, JA, Mannarino, AP, Deblinger, E, & Steer, RA (2004). A multisite randomized controlled trial for children with sexual abuse-related PTSD symptoms. *Journal of the American Academy of Child and Adolescent Psychiatry, 43,* 393-402.

Faust, D., & Faust, K. A. (2012). Clinical judgment and prediction. In D. Faust (Ed.), Coping with psychiatric and psychological testimony (6th ed., pp. 147–208). New York, NY: Oxford University Press.

Festinger, L. (1957). A theory of cognitive dissonance. Stanford, CA: Stanford University Press.

Hershkowitz, I., Ahern, E. C., Lamb, M. E., Blasbalg, U., Karni-Visel, & Breitman, M. (2017). Changes in interviewer's use of supportive techniques during the Revised Protocol Training. *Applied Cognitive Psychology, 31,* 340-350.

Kendall-Tackett, KA, Williams,, LM & Finkelhor, D (1993). Impact of Sexual Abuse on Children: A Review and Synthesis of Recent Empirical Studies. *Psychological Bulletin, 113,* 164-180.

Koocher, G.P., McMann, M.R., Stout, A.O., & Norcross, J.C. (2014): Discredited Assessment and Treatment Methods Used with Children. *Journal of Child and Adolescent Psychology, 44,* 722-729.

Lamb, M.E, Brown, D.A., Hershkowitz, I., Orbach, Y., & Esplin, P.W. (2018). Tell Me What Happened: Questioning Children About Abuse (Second Edition). John Wiley & Sons, Ltd. Hoboken, NJ.

La Rooy, D., Katz, C., Malloy, L.C., and Lamb, M.E. (2010). Do we need to rethink guidance on repeated interviews? *Psychology, Public Policy, and Law, 16,* 373-392.

Leichtman, MD & Ceci, SJ (1995). The effects of stereotypes and suggestions on preschoolers' reports. *Developmental Psychology, 31,* 568-578.

Lepore, SJ & Sesco, B (1994). Distorting children's reports and interpretation of events through suggestion. *Applied Psychology, 79,* 108-120.

Exhibit 2

United State v. McFadden  
Case No. 19-cr-00243-CMA-GPG (District of Colorado)

Page 15 of 16

Loftus, EF (1988). Memory. Ardsley House, New York.

Loftus, E., Coan, J., & Pickrell, J. (1996). Manufacturing false memories using bits of reality. In L.M. Reder (Ed.) Implicit Memory and Metacognition, New York: Psychology Press.

Loftus, EF & Pickrell, BA (1995). The formation of false memories. *Psychiatric Annals, 25(12)*, 720-725.

Newlin, C., Steele, L.C., Chamberlin, A., Anderson, A., Kenniston, J., Russell, A., Stewart, H., and Vaughan-Eden, V. (2015). Child Forensic Interviewing: Best Practices. Office of Juvenile Justice and Delinquency Prevention Juvenile Justice Bulletin. http://www.ojjdp.gov/pubs/248749.pdf

Orbach, Y, Lamb, ME, La Rooy, D, & Pipe, ME (2012). A case study of witness consistency and memory recovery across multiple investigative interviews. *Applied Cognitive Psychology, 26*, 118–129.

Otgaar, H, Candel, I, Merckelbach, H, & Wade, K (2009). Abducted by a UFO: Prevalence information affects young children's false memories for an implausible event. *Applied Cognitive Psychology, 23*, 115–125.

Pezdek, K. & Hodge, D. (1999). Planting false childhood memories in children: The role of event plausibility. *Child Development, 70*, 887-895.

Poole, D. A. (2016). Interviewing children: The science of conversation in forensic contexts. Washington, D.C.: American Psychological Association.

Poole, DA & Lamb, ME (1998). Investigative Interviews of Children. American Psychological Association, Washington, DC.

Poole, DA & Lindsay, DS (2001). Children's eyewitness reports after exposure to misinformation from parents. *Journal of Experimental Psychology: Applied, 7*, 27-50.

Poole, DA & Lindsay, DS (1995). Interviewing preschoolers: Effects of nonsuggestive techniques, parental coaching, and leading questions on reports of nonexperienced events. *Journal of Experimental Child Psychology, 60*, 129-154.

Quas, JA, Thompson, WC, and Clarke-Stewart, KA (2005). Do jurors "know" what isn't so about child witnesses? *Law and Human Behavior, 29(4)*, 425-456.

Saywitz, K. J., Lyon, T. D., & Goodman, G. S. (2018). When interviewing children: A review and update. In B. Klika, & J. Conte (Eds.), APSAC handbook on child maltreatment (pp. 310–329). (4). CA: Sage: Newbury Park.

Exhibit 2

United State v. McFadden  
Case No. 19-cr-00243-CMA-GPG (District of Colorado)     Page 16 of 16

Shapiro, F. (2007). EMDR, adaptive information processing, and case conceptualization. *Journal of EMDR Practice and Research, 1,* 68–87.

Thompson, W, Clarke-Stewart, A, & Lepore, S (1997). What did the janitor do? Suggestive interviewing and the accuracy of children's accounts. *Law and Human Behavior, 21,* 405-426.

Walker, AG, Kenniston, J, & Inada, S (2013). Handbook on Questioning Children: A Linguistic Perspective (3rd Edition). American Bar Association, Washington, DC.

Warren, A. R., & Woodall, C. E. (1999). The reliability of hearsay: How well do interviewers recall their interviews with children? *Psychology, Public Policy, and Law, 5,* 456-472.

Exhibit 2