1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF COLORADO

3
   Criminal Action No. 19-cr-00243-CMA-GPG-1
4

5    UNITED STATES OF AMERICA,
                                        (Pages 182 - 343)
6         Plaintiff,

7         vs.

8    MICHAEL TRACY MCFADDEN,

9         Defendant.

10   ------------------------------------------------------------

11                     REPORTER'S TRANSCRIPT
                       Jury Trial - Day 2
12
     ------------------------------------------------------------
13
         Proceedings before the HONORABLE CHRISTINE M. ARGUELLO,
14   Senior Judge, United States District Court for the District of
     Colorado, and a jury of 12 and one alternate, commencing on
15   the 8th day of November, 2022, in United States Courthouse,
                       Grand Junction, Colorado.
16
                            APPEARANCES
17
     For the Plaintiff:
18   JEREMY L. CHAFFIN, U.S. Attorney's Office, 205 North 4th St.,
     Ste. 400, Grand Junction, CO 81501
19
     ANDREA L. SURRATT, U.S. Attorney's Office, 1801 California
20   St., Ste. 1600, Denver, CO 80202

21   For the Defendant:
     SEAN M. MCDERMOTT, McDermott Stuart & Ward, LLP, 140 East 19th
22   Ave., Ste. 300, Denver, CO 80203

23   BEN LABRANCHE, Benjamin R. LaBranche PLLC, 1544 Race St.,
     Denver, CO 80206
24

25      Sarah K. Mitchell, RPR, CRR, 901 19th Street, Room A252,
                    Denver, CO 80294, 303-335-2108
           Proceedings reported by mechanical stenography;
                  transcription produced via computer.

19-cr-00243-CMA-GPG-1 Jury Trial - Day 2        11/08/2022   183

1                              I N D E X

2       OPENING STATEMENTS                                      PAGE

3       By Ms. Surratt                                          185
        By Mr. McDermott                                        195
4

5       GOVERNMENT'S WITNESSES                                  PAGE

6       J.W.
            Direct Examination By Mr. Chaffin                   201
7           Cross-Examination By Mr. McDermott                  263
            Redirect Examination By Mr. Chaffin                 282
8       MICHELLE R.
            Direct Examination By Mr. Chaffin                   291
9           Cross-Examination By Mr. McDermott                  310
            Redirect Examination By Mr. Chaffin                 317
10      DARREN DAVIDSON
            Direct Examination By Ms. Surratt                   319
11          Cross-Examination By Mr. McDermott                  329
        PAUL DUNHAM
12          Direct Examination By Mr. Chaffin                   331
            Cross-Examination By Mr. McDermott                  340
13

14
                        GOVERNMENT'S
15                      EXHIBITS                    RECEIVED

16                      1                           205

17                      2-1 - 2-9                   225

18                      3-1 - 3-5                   213

19                      4-1 - 4-4                   217

20                      8-1                         206

21                      8-2                         208

22                      8-3                         210

23                      11-1                        303

24                      15-1 - 15-6                 335

25


                        Sarah K. Mitchell, RPR, CRR

1              *        *        *        *        *

2      (The proceedings commenced at 8:40 a.m.)

3          THE COURT:  You may be seated.  I understand that the

4   jury is lined up and ready to come in.  So, Ms. Myhaver, can

5   you bring them in, please.

6          THE COURTROOM DEPUTY:  All rise for the jury.

7      (Jury entered the courtroom at 8:41 a.m.)

8          THE COURT:  We're back on the record in 19-cr-00243.

9   Ladies and gentlemen, welcome back.  I hope you had a good

10  evening.  And when you come in, we stand out of respect for

11  you.  So when you come in, you may be seated immediately.

12  When I tell people to be seated, I'm talking to the rest of

13  the courtroom, all right?

14          All right.  I read to you the first jury instruction,

15  preliminary instruction, yesterday, so I'm going to skip that,

16  because it's very long.  You understand you don't talk, you

17  don't conduct any research.  You only decide this case on what

18  is presented within these four walls.

19      (Judge reads remaining preliminary instructions

20      to the jury.)

21          THE COURT:  And those are the preliminary

22  instructions.  Counsel, are you ready to proceed with opening

23  statements?

24          MS. SURRATT:  We are, Your Honor.

25          THE COURT:  You may proceed.

                    Sarah K. Mitchell, RPR, CRR

1          MS. SURRATT:  Over the next several days you're going

2    to hear some difficult and sometimes emotional testimony.

3    You're going to hear witnesses describe things that happened

4    to them a long time ago, and you're going to see how tough it

5    is for them to talk about it even today.  And that's because

6    this man, Michael McFadden, the defendant, took young boys

7    into his bed at night.  This man, the defendant, pulled down

8    their pajama pants, and this man put his penis in their butts.

9          The defendant did that so often that each of those

10   boys lost count of how many times it happened.  During this

11   trial you're going to hear from those two boys.  Their names

12   are J.W. and K.W., J.W. and K.W.  They're both adults now.

13   J.W. is 21 years old, and K.W. is 20.  They'll each tell you

14   that when they were kids, the defendant sexually abused them

15   over and over again in the bed at his house.

16         They'll also tell you how he sexually abused each of

17   them as they crossed state lines in a semi-truck, and that's

18   why we're here today.  We're here in federal court because the

19   defendant, who was a truck driver, sexually abused J.W. on two

20   different truck trips, one to Arizona and one to New Mexico.

21   On each of these trips, during the night in the sleeper

22   compartment of the truck the defendant put his penis in J.W.'s

23   butt.

24         And we're here because the defendant sexually abused

25   K.W. on a truck trip that ended in Nebraska.  During one of

1   the nights on this trip, K.W. fell asleep in the bed in the

2   sleeper compartment of the truck with the defendant.  K.W.

3   woke up that night to the defendant inserting his penis into

4   K.W.'s butt.  This is why we're here.

5          Over the next several minutes I'm going to first

6   describe what I expect the evidence in this case to show.

7   Then I'll briefly explain to you how the Government will prove

8   its case.  And, finally, I'll finish with some things that I

9   hope you'll keep in mind during this trial.  So let's start

10  with what the evidence will show.  You're going to learn that

11  J.W. lived in Grand Junction his whole life and the defendant

12  was his great-uncle by marriage.  When J.W. was a little boy,

13  no more than six years old, he started spending the night at

14  the defendant's house.

15         First J.W. remembers spending the night at a house

16  near the Colorado National Monument here in Grand Junction.

17  After that, the defendant moved to a house on Glen Road, and

18  then finally to a house on D 1/2 Road.  Again, all here in

19  Grand Junction.  J.W. spent time with the defendant at these

20  homes, and so did lots of other little boys.  You'll hear that

21  the defendant made his homes extremely fun places for little

22  boys.  He had video games, a TV, a trampoline, bikes, 4X4s,

23  trucks, animals, and places to build forts.  Boys loved going

24  over to the defendant's house to play, and wherever the

25  defendant lived, he was always surrounded by kids.

Sarah K. Mitchell, RPR, CRR

1          For a time J.W. lived with the defendant in the house

2     on D 1/2 Road.  J.W.'s mom, aunt, siblings, and cousins also

3     lived there sometimes.  But rather than sleep in a room with

4     bunk beds and other kids, J.W. slept in the defendant's bed

5     with the defendant.  You'll hear that it was common for the

6     defendant, back then a nearly 40-year-old man, to sleep in a

7     bed in his bedroom with one, two, or more

8     elementary-school-aged boys.  And the defendant always

9     molested J.W. at night.  You'll learn that the defendant never

10    let two or three nights go by without touching J.W.'s penis or

11    putting his own penis in J.W.'s butt.

12         J.W. remembers how it smelled when the defendant put

13    his penis into him.  He remembers it was musty like a fart.

14    The sexual abuse happened so often, so regularly that J.W.

15    describes it as normal, but J.W. will tell you even though it

16    became for normal -- became normal, it still really hurt to

17    have the defendant's penis in his butt.  J.W. also recalls a

18    time that the defendant put his penis in J.W.'s butt on a

19    school night.  J.W. went to school that next day and remembers

20    having diarrhea so badly that he almost had to go home and

21    change his clothes.

22         J.W.'s going to tell you about two separate truck

23    trips where the defendant sexually assaulted him.  You'll hear

24    that in the winter of 2010 J.W. went from Telluride, Colorado,

25    to Farmington, New Mexico, with the defendant hauling a load

 1   of rocks.  On one of the nights on that trip J.W. and the

 2   defendant went to sleep in the sleeper cab of the semi-truck

 3   on a small mattress.  J.W. awoke that night to the defendant

 4   putting his penis in J.W.'s butt.  This caused J.W. to urinate

 5   and defecate on himself.  You'll hear this is why J.W.

 6   remembers this particular assault and this particular trip.

 7   It stood out for him.  The defendant used some wipes that he

 8   had in the truck to clean up J.W. after the assault was done.

 9   In 2010 during this sexual assault, J.W. was only ten years

10   old.

11        J.W. will also tell you about a time that the

12   defendant took him on a truck trip to Arizona.  J.W. remembers

13   stopping at a big truck stop for the night, and he remembers

14   that night the defendant put his penis in J.W.'s butt.  For

15   J.W., this was a normal assault from the defendant.  So what

16   sticks out about this trip for J.W. wasn't the assault.  It

17   was the fact that they had stopped for the night at a

18   particularly nice truck stop with cool toys like a

19   remote-control truck.  That's what he remembers.

20        Back home in Grand Junction the defendant provided

21   something that J.W.'s family couldn't, stability.  You'll

22   learn that J.W.'s mom was a drug addict who spent time in

23   jail.  J.W. and his siblings often didn't have enough to eat.

24   Their house was falling apart.  No one was taking care of

25   them.  That is until the defendant stepped in to buy food, pay

1    the bills, buy presents, take J.W. to the doctor, and register

2    J.W. for school.

3         J.W.'s mom trusted the defendant.  And J.W., whose

4    biological father wasn't around, called the defendant dad.  So

5    you're going to learn that although the defendant molested

6    J.W. for years, J.W. never told anyone while the abuse was

7    ongoing.  You'll hear why.  J.W. will tell you that his life

8    at home with his mom and her abusive boyfriend was so bad that

9    he tolerated being molested by the defendant.  To J.W., being

10   molested wasn't as bad as it would have been to leave the

11   defendant's house and go live somewhere else with his mom.

12   This is the choice that J.W., a child, had to make over and

13   over again for years.

14        You're also going to learn that child victims of

15   sexual abuse are often reluctant to disclose the abuse,

16   especially boys, and especially when the perpetrator is also a

17   male.  You're going to hear that sometimes kids are afraid

18   they won't be believed.  Sometimes they're afraid of their

19   abuser.  Sometimes they're afraid of what it means for their

20   sexuality.  And sometimes they're afraid of what their

21   families might think.  Sometimes it takes time for abuse to be

22   disclosed.  Sometimes it's disclosed in bits and pieces, and

23   sometimes it's never disclosed at all.

24        So you'll hear that the defendant sexually abused

25   J.W. for years.  You'll also learn that J.W. heard and saw

1    some things during that time that made him think the defendant

2    may have been abusing another boy, and you'll hear J.W.'s

3    suspicions were right.  During the same periods of time that

4    the defendant was molesting J.W., he was also abusing J.W.'s

5    friend K.W.  Like J.W.'s family, K.W.'s family also struggled.

6    The family was big, and there never seemed to be enough money.

7    Things only got worse when K.W.'s parents split up for a time

8    and K.W.'s mom was trying to keep the house running by

9    herself.  So when K.W.'s mom ran into the defendant, and he

10   offered to drive K.W. to school, K.W.'s exhausted mom was

11   incredibly relieved.

12        K.W. started spending time with the defendant at the

13   house on Glen Road.  He remembers going over there

14   approximately every other weekend.  And K.W. remembers that it

15   was at this house on Glen Road that he was first molested by

16   the defendant.  Soon after the defendant moved to D 1/2 Road,

17   K.W.'s family moved in right next door.  And K.W. also

18   remembers how much fun the defendant's house was.  There were

19   always boys playing video games and jumping on the trampoline.

20   And once K.W. lived right next door, he started spending much

21   of his time at the defendant's house.

22        Like J.W., K.W. also often spent the night.  And like

23   J.W., K.W. would also sleep in the defendant's bed with the

24   defendant and other boys.  K.W. will tell you that sometimes

25   he fell asleep in another part of the house, but he would wake

1   up in the defendant's bed.  You'll learn that the defendant

2   gave K.W. and the other boys sleep aids in the evenings.  K.W.

3   remembers getting at least five melatonin gummies at a time.

4   He would take the gummies, and in less than an hour he would

5   be really sleepy and fall asleep.  The defendant also always

6   sexually assaulted K.W. at night.  K.W. would be in the

7   defendant's bed, groggy from the melatonin.  Sometimes the

8   defendant put his hand on K.W.'s penis.  Other times the

9   defendant put his penis in K.W.'s butt.

10          K.W. too went on truck trips with the defendant.

11  K.W. will tell you about the final trip he went on with the

12  defendant in January of 2013.  The defendant picked up K.W.

13  and his two brothers in Colorado, and they headed to Idaho and

14  then finally on to Nebraska.  You'll hear that K.W. was a

15  young boy at the time and doesn't remember the exact route

16  that they took in the truck, but he does remember that during

17  one of the nights K.W. and his younger brother were sleeping

18  in the truck sleeper compartment with the defendant in between

19  them.  K.W.'s older brother was asleep on the truck's front

20  seats.

21          During the night when K.W. was asleep, the defendant

22  edged up next to him, held onto K.W.'s waist, and put his

23  penis in K.W.'s butt.  K.W., who was 11 years old that night,

24  is going to tell you how much that hurt.  The defendant was

25  arrested in Nebraska in January of 2013 during the trip where

Sarah K. Mitchell, RPR, CRR

 1   he put his penis into K.W. for the final time.

 2        Let me pause very briefly on the charges in this

 3   case.  I mentioned earlier that we're here in federal court

 4   because the defendant took J.W. and K.W. across state lines

 5   and put his penis in each of their butts.  Count 1 of the

 6   indictment charges the defendant with crossing a state line

 7   with the intent to have anal sex with K.W. on the trip that

 8   ended in Nebraska.  Count 2 charges the defendant with

 9   transporting K.W. across state lines with the intent to have

10   anal sex with K.W. on that same trip.  Counts 3, 4, and 5

11   charge similar offenses, but with respect to the two trips,

12   the one to New Mexico and the one to Arizona, where the

13   defendant put his penis in J.W.'s butt.

14        Now that you've heard what the evidence will show and

15   the basics of the charges, how will the Government prove its

16   case to you?  You're going to hear from J.W. and K.W.  They

17   will both tell you about when the defendant molested them for

18   the first time and how the abuse went on for years.  And, of

19   course, they'll both describe for you the truck trips where

20   the defendant put his penis in each of their butts.  You're

21   going to hear from some of J.W. and K.W.'s family members.

22   J.W.'s mom will tell you that she was a drug addict and wasn't

23   always aware of what was going on at the defendant's house.

24   She'll tell you how the defendant took on the role of parent

25   for J.W. when she couldn't.

                    Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 2                          193

1        K.W.'s mom will also tell you that she was going

2   through a tough time and was grateful for the defendant's

3   help.  She'll explain that the defendant always had toys and

4   games for the boys, things she couldn't afford.  She'll tell

5   you that she was friends with the defendant and she trusted

6   him.  She even invited the defendant over to the family home

7   for Thanksgiving and Christmas.  K.W.'s older brother is also

8   going to testify.  He's going to talk about what he remembers

9   from that truck trip to Nebraska, and he's going to tell you

10  that he had no idea K.W. was being sexually abused for all

11  those years.

12        You're also going to hear from some law enforcement

13  officers.  The Grand Junction detective who investigated this

14  case starting in 2012 is going to tell you about some of the

15  steps he took in his investigation.  A police officer from

16  North Platte, Nebraska, is going to describe the arrest of the

17  defendant at a truck stop on January 3rd, 2013.  You're also

18  going to hear from some witnesses and see some records related

19  to the defendant's trucking business and the loads that he

20  hauled.  You'll see photos of the truck itself, including of

21  the mattress where the defendant sexually abused J.W. and K.W.

22  You'll see photos of some of the places where the defendant

23  lived in Grand Junction, including the house on Glen Road and

24  the house on D 1/2 Road.

25        Finally, you're going to hear from two specialists.

Sarah K. Mitchell, RPR, CRR

1   A psychologist with decades of experience of treating victims

2   of sexual abuse will tell you about some of the factors that

3   may influence how and when a victim discloses abuse.  She'll

4   talk to you about how offenders groom their victims, and

5   sometimes family members as well, to make them more

6   susceptible to sexual abuse.  You'll hear from the nurse

7   practitioner who conducted a medical examination of J.W. after

8   he disclosed the defendant's abuse.  You'll hear from this

9   nurse about what is involved in such an examination, and

10  you'll learn that J.W. told her about how he had been sexually

11  assaulted.

12          Before I sit down, I'll ask you to please do three

13  things during this trial.  First, carefully listen to Judge

14  Arguello's instructions on the law throughout the trial.

15  Second, pay close attention to the evidence, the testimony,

16  and the exhibits.  Pieces of evidence will come from different

17  witnesses at different times.  At the end we'll have an

18  opportunity to talk to you again and explain how all of the

19  pieces fit together.  Finally, use your common sense, the same

20  common sense that you use in your everyday lives.  It's your

21  common sense that will help you put together everything you

22  see and hear and reach a just result in this trial.

23          Ladies and gentlemen, if you do those three things --

24  listen to the evidence, follow the judge's instructions, and

25  use your common sense -- you'll reach the only verdict

Sarah K. Mitchell, RPR, CRR

1   consistent with the evidence in this case:  That the defendant

2   repeatedly sexually abused J.W. and K.W. both in Grand

3   Junction and on truck trips that crossed state lines and is

4   guilty as charged.

5          THE COURT:  Thank you, Ms. Surratt.

6          Does the defense wish to make an opening?

7          MR. MCDERMOTT:  Yes, Your Honor.

8          THE COURT:  All right.  You may proceed.

9          MR. MCDERMOTT:  This is my first opportunity to give

10   you a preview of what we believe this case will show, and it's

11   my opportunity to ask you to keep an eye on the issues and the

12   evidence that we believe will show that Mr. McFadden did not

13   do any of those horrific things that you just heard

14   Ms. Surratt outline for you.  And like Ms. Surratt did at the

15   end of her opening statement, I'm going to ask you to pay

16   attention to the judge's instructions, the law, and perhaps

17   most importantly, your common sense.  And I'm asking you to

18   apply the law and your common sense because in cases like

19   these when something is alleged that is so horrific, it is

20   often -- it shouldn't be, but it can be easy to put those

21   things aside and just believe the worst of what a human being

22   may or may not be capable of doing.

23          The allegations began, the timeframe, in 2007, and

24   this is where I'm going to begin to ask you to apply the law

25   and your common sense and to evaluate the testimony as it

1    comes from that witness stand.  Families involved in this

2    case, as Ms. Surratt stated, had problems.  There was

3    Department of Human Services involvement.  The families were

4    not any stranger to having unfortunate and bad things happen

5    to them, and as a result, there are interviews, and there are

6    interviews that happened well before the most recent

7    interviews that Ms. Surratt touched on in her opening

8    statement.

9            In 2007, January of 2007, at the beginning of the

10   year, J.W. was interviewed.  He was interviewed at the Western

11   Slope Center For Children, and you'll hear a lot about that

12   place.  That's a place where they do forensic interviews and

13   interview kids to hopefully determine whether abuse is

14   occurring or is not occurring.  At that interview, J.W. was

15   asked questions.  He was asked questions that he was able to

16   answer.  This is when J.W. is nine years old.  This is right

17   at the heart of the alleged time period that Ms. Surratt just

18   outlined for you.

19           They found out that J.W. was able to identify body

20   parts and private areas, that he understood everything that

21   was being said.  And they asked J.W. if anyone has touched him

22   in the private areas, and he said no.  J.W. was asked again if

23   anyone had ever touched him in his private areas and what

24   would he do if someone had.  J.W. said he would tell them to

25   stop and he would go and tell his mother.  J.W. was

1    interviewed again, this time in 2012 at the end of the year,

2    and this is right around the timeframe when Mr. McFadden ends

3    up getting arrested, and the same questions.  And they go and

4    they ask J.W. about his living environment.

5            He's able to tell them where he lives, how many

6    people live in the house, and that is one thing that I am

7    going to ask you to key on.  This house on D 1/2 Road is a

8    house where Mr. McFadden did live, and in this house

9    Mr. McFadden provided a safe environment for the families that

10   came there.  And you will find out and you will see that at

11   any particular time, because these families who were in

12   trouble would come to the house, there were approximately 18

13   and almost 20 people living in a very modest home.

14           There were times where the kids would sleep in their

15   own room, and then there were times when other relatives would

16   move into the home, such as J.W.'s mother, and during those

17   times the kids would go and they would stay in Mr. McFadden's

18   room.  And this house is crowded, and this is the house where

19   a lot of these horrendous things supposedly happened on a

20   daily basis.  You're going to hear that there were more than

21   one kid in a room at a time, and nobody, nobody ever sees

22   anything actually occur at the house.

23           J.W. goes back in later interviews, and K.W. does as

24   well, and they try and say that they might have some suspicion

25   of something happened, but like everything in this case, their

19-cr-00243-CMA-GPG-1 Jury Trial - Day 2                        198

1   story grows over time, and nobody sees anything concrete to

2   corroborate any of the horrific things that you just heard.

3   But these families, the W///////// family in particular, there

4   continues to be an investigation and an investigation.

5   Mr. McFadden is viewed through a lens of suspicion, and

6   finally he's arrested in Nebraska.  And when you get to the

7   point in Nebraska, and when you're being shown evidence about

8   that trip, we, again, ask you to apply your common sense.  And

9   you are going to see photos of the truck that Mr. McFadden was

10  driving.  You're going to see that this is a small cab.

11          You're going to know -- find out that there were

12  Mr. McFadden and three younger people, including S.W. Jr.,

13  who's a 19-year-old teenager, 19-year-old teenager, who's

14  traveling with Mr. McFadden, and he does not see or hear

15  anything.  And when you see the exhibit of the truck cab, I'm

16  asking you to apply your common sense.  K.W. says that this

17  occurred, and his teenager brother is literally within an

18  arm's reach of him, and his brother doesn't see or hear

19  anything.  He didn't see or hear anything, because, like all

20  the allegations in this case, it did not happen.  It simply

21  did not happen.

22          And you are going to see during the course of the

23  case that there are all sorts of things that just on their

24  face do not make any sense.  That there's a trip to Arizona

25  for a funeral.  The story that J.W. says with respect to that

Sarah K. Mitchell, RPR, CRR

1    changes and grows.  It continues to grow.  His story grows

2    from January 2009 where absolutely nothing happened to

3    December of 2012 where he says absolutely nothing ever

4    happened, and then finally after Mr. McFadden is arrested in

5    Nebraska, K.W. is brought in -- not K.W., excuse me -- J.W.,

6    J.W., is brought in for another interview, and then finally he

7    says, oh, yes, something happened.  And he makes that outcry

8    against this backdrop, and this was not mentioned in the

9    prosecution's opening statement.

10          When Mr. McFadden is arrested in Nebraska, there's no

11   mention from anyone in that truck of a sexual assault.

12   They're stopped by the police.  Mr. McFadden is arrested.

13   Nobody says anything about a sex assault on that trip.  On the

14   way back to Colorado, K.W.'s mother, Stacy W. says, and she

15   says this approximately two weeks later after they return to

16   Colorado, that K.W. was talking about sex stuff.  But he

17   wasn't talking about sex stuff that occurred between him and

18   Mr. McFadden.  He starts talking about how he would like to do

19   anything to put Mr. McFadden away because he believes that

20   Mr. McFadden had done something to J.W., J.W., the other

21   person who's named in the indictment.

22          Up to that point, J.W. had never made an allegation

23   against Mr. McFadden.  To the contrary, he had unequivocally

24   said multiple times that nothing had happened between him and

25   Mr. McFadden.  As this case unfolds, I believe a reasonable

                    Sarah K. Mitchell, RPR, CRR

1    inference for you to draw is that these stories -- emphasis on

2    stories -- became -- began because people other than the

3    children were saying that they were so, and that is why you're

4    not going to have any physical evidence corroboration, no

5    eyewitness corroboration where you would expect to have it.

6            And at the end of this case, you are going to have --

7    you only need one, but you will have multiple reasonable

8    doubts, and you will have multiple reasonable doubts because

9    what you are going to hear and see just does not add up.  And

10   at the close of the case we will ask you to find Mr. McFadden

11   not guilty because these things don't add up because he did

12   not do them.  Thank you.

13            THE COURT:  Thank you, Mr. McDermott.

14            All right.  The Government may call its first

15   witness.

16            MR. CHAFFIN:  Thank you, Your Honor.  The Government

17   calls J.W. to the stand, if we can have just a moment to set

18   up.

19            THE COURT:  Ms. Myhaver, will you please administer

20   the oath.

21            THE COURTROOM DEPUTY:  Please stand and raise your

22   right hand.

23                              J.W.

24   was called as a witness and, having been duly sworn, was

25   examined and testified as follows:

                    Sarah K. Mitchell, RPR, CRR

1        THE COURTROOM DEPUTY:  Please be seated.  And then

2   please state your name and spell your first and last name for

3   the record.

4        THE WITNESS:  J.W., and J//////////, W//////////.

5        THE COURT:  Mr. Chaffin, you may proceed.

6        MR. CHAFFIN:  Thank you, Your Honor.

7                        DIRECT EXAMINATION

8   BY MR. CHAFFIN:

9   Q.  Good morning, J.W.  Can you tell the jury how old you are?

10  A.  I am 23 years old.

11  Q.  When is your birthday?

12  A.  Or 22, sorry.  I just turned 22.

13  Q.  When is your birthday?

14  A.  October 25th.

15  Q.  What year?

16  A.  Can I lower this?

17  Q.  Sure.

18  A.  Now I can see you.

19  Q.  Is that a little better?

20  A.  Yeah.

21  Q.  What year were you born?

22  A.  2000.

23  Q.  Where do you live?

24  A.  In Grand Junction.

25  Q.  How long have you lived in Colorado?

                        Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 2                                    202

1   A.  Basically my whole life.

2   Q.  What do you do for work?

3   A.  I'm an Uber driver right now.

4   Q.  Can you tell the jury your mom's name?

5   A.  My mom's name is Michelle.

6   Q.  What's her last name?

7   A.  R////.

8   Q.  How about your dad?

9   A.  My dad is Thomas W////.  He goes by Mike.

10  Q.  Has your dad been in your life a significant portion of

11  growing up?

12  A.  No, he was not.

13  Q.  Why was that?

14  A.  He was always either in jail or not around, going around

15  to other of his friends' houses.  Even though he has kids, he

16  wouldn't really stop by or visit us much.  So he was either

17  always in jail or somewhere not to be known.

18  Q.  Did that upset you if he wasn't around?

19  A.  Kind of.

20  Q.  How about brothers and sisters, do you have any brothers

21  or sisters?

22  A.  Yes, I do.

23  Q.  What are their names?

24  A.  I have a brother.  His name is L.W.  And I have two

25  sisters named K.Wr. and B.W., and I also have some half

                        Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 2                                    203

1    siblings on my dad's side.

2    Q.   How about L.Wr., how old is L.Wr.?

3    A.   L.Wr. right now is 18.

4    Q.   And you said B.W., how old is she?

5    A.   B.W. is 16 now.

6    Q.   K.Wr.?

7    A.   I think K.Wr. is 26.

8    Q.   And their mom, same mom as you?

9    A.   Yes.

10   Q.   Okay.  Do you know a person named Michael McFadden?

11   A.   Yes, I do.

12   Q.   Do you see him here in the courtroom today?

13   A.   Yeah.

14   Q.   Would you point him out and describe an article of

15   clothing he's wearing?

16   A.   Yeah, he's wearing like a tuxedo suit with a blue

17   undershirt.

18   Q.   Hair, no hair?

19   A.   He's balding.

20   Q.   But he has hair?

21   A.   A little bit, yeah.

22           MR. CHAFFIN:  Your Honor, I ask that the record

23   reflect the witness has identified the defendant.

24           THE COURT:  It will so reflect.

25   Q.   (By MR. CHAFFIN) J.W., there should be a binder in front

                    Sarah K. Mitchell, RPR, CRR

 1    of you there.

 2    A.  Yes.

 3    Q.  Can you take a look at Government's Exhibit Number 1 for

 4    me.

 5    A.  Exhibit 1?

 6    Q.  Yeah.

 7    A.  Not 21?

 8            MR. CHAFFIN:  Can I approach, Your Honor?

 9    Q.  (By MR. CHAFFIN) It's on the chair right next to you, J.W.

10    Sorry about that.

11    A.  I see Exhibit 1 now.

12    Q.  What is that?

13    A.  This is a picture of Mike.

14    Q.  Is that Mr. McFadden?

15    A.  Yes, Michael McFadden.

16    Q.  Does that picture depict Mr. McFadden as you remember him

17    kind of growing up?

18    A.  Yes.

19    Q.  Does that fairly and accurately depict him during the time

20    that you spent time with him?

21    A.  Yes.

22            MR. CHAFFIN:  Your Honor, I move to admit

23    Government's Exhibit 1.

24            THE COURT:  Any objection?

25            MR. MCDERMOTT:  No objection, Your Honor.

 1              THE COURT:  Exhibit 1 will be admitted.  You may

 2    publish.

 3        (Government's Exhibit 1 received.)

 4    Q.  (By MR. CHAFFIN) J.W., when we talked before -- do you see

 5    the earring in Mr. McFadden's ear?

 6    A.  In the picture?

 7    Q.  Yes.

 8    A.  Yes.

 9    Q.  When we talked before you mentioned that you also had an

10    earring; is that right?

11    A.  Yeah, the exact same spike earring on my left ear.

12    Q.  Why did you get an earring like that?

13    A.  It was to look like him more.

14    Q.  Was that you -- was that your decision or somebody else's?

15    A.  Yeah, that was my decision.

16    Q.  What was your --

17              MR. CHAFFIN:  We can take Government's Exhibit 1

18    down.  Thank you.

19    Q.  (By MR. CHAFFIN) What was your relationship with

20    Mr. McFadden?

21    A.  He was like a -- almost like a dad to me.  He took care of

22    me and watched over me.

23    Q.  Was he related to you?

24    A.  He was my cousin's mom's uncle, so like my great uncle,

25    you could say.  So yes.

                        Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 2                                     206

1   Q.  Okay.  J.W., can you take a look at Government's

2   Exhibit 8, and there's a few of them, so let's start with 8-1.

3   Have you taken a look at that?

4   A.  Yes.

5   Q.  What is that?

6   A.  This is a picture of me.

7   Q.  And how old are you in that photo?

8   A.  About like eight years old.

9   Q.  Is that around the time that you started spending time

10  with Mr. McFadden?

11  A.  Yes.

12  Q.  Does that fairly and accurately depict you as an

13  8-year-old?

14  A.  Yes.

15          MR. CHAFFIN:  Your Honor, I move to admit

16  Government's Exhibit 8-1.

17          THE COURT:  Any objection?

18          MR. MCDERMOTT:  No objection to 8-1, Your Honor.

19          THE COURT:  8-1 is admitted.  You may publish.

20      (Government's Exhibit 8-1 received.)

21  Q.  (By MR. CHAFFIN) Can you just explain to the jury what

22  you're wearing in this photo?

23  A.  I'm wearing a flower collared shirt, short shorts that go

24  above my knees, and some sunglasses, prescription that shade

25  when you're in the sun.

                        Sarah K. Mitchell, RPR, CRR

1   Q.   Where did those clothes come from?

2   A.   Those clothes came from Mike.

3   Q.   Did he buy them for you?

4   A.   I can't remember if he bought them for me, but I know they

5   came from him because those are the type of clothes and

6   glasses he would like to wear.

7   Q.   Did you want to wear clothes like that when you were

8   eight?

9   A.   Yeah.

10  Q.   What about the glasses?  How did you get those?

11  A.   So they were prescription glasses.  I went and did an eye

12  test.  I needed some glasses, and I picked those especially

13  because Mike had the same exact glasses.  And I really when I

14  was young I kind of just copied him instead of finding my own

15  style, you could say.

16  Q.   Who took you to go get those glasses?

17  A.   Mike did.

18  Q.   We can take that exhibit down.  Can you take a look at

19  Government's Exhibit 8-2.  What are we looking at there?

20  A.   Looks like a picture of me at a birthday.

21  Q.   And do you know which birthday that was?

22  A.   I think, like, my 10th or 11th birthday.

23  Q.   Does that fairly and accurately depict you at your

24  birthday?

25  A.   Yes.

Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 2                          208

1        MR. CHAFFIN:  Your Honor, I move to admit

2   Government's Exhibit 8-2.

3        THE COURT:  Any objection?

4        MR. MCDERMOTT:  No objection, Your Honor.

5        THE COURT:  8-2 is admitted.  You may publish.

6     (Government's Exhibit 8-2 received.)

7   Q.  (By MR. CHAFFIN) J.W., can you just count for the jury the

8   number of candles that are on your birthday cake?

9   A.  Looks like there's 10 candles -- or 11 candles.  One more

10  was glowing.

11  Q.  So would that mean --

12  A.  That would be my 11th birthday, yes.

13  Q.  When would that picture have been taken then?

14  A.  2011.

15  Q.  And around October 25th?

16  A.  Yeah.

17  Q.  Do you remember this birthday?

18  A.  Somewhat, yes.

19  Q.  Was Mr. McFadden there?

20  A.  I believe not.

21  Q.  Was this during this timeframe when you are spending time

22  with Mr. McFadden?

23  A.  Yes.

24  Q.  So we had 8-1 when you were about 8, 8-2 when you're about

25  11.  Can you take a look at 8-3?  What is that?

                        Sarah K. Mitchell, RPR, CRR

1    A.   That is a picture of me.

2    Q.   And approximately how old are you in that photo?

3    A.   Looks like I'm about 12 here.

4    Q.   Do you remember when that photo was taken?

5    A.   I do not.

6    Q.   When we spoke before you mentioned that the clothes that

7    you were wearing in that photo in particular helped you

8    understand sort of when it was taken; is that right?

9    A.   Yeah, this is -- as I'm wearing these type of clothes,

10   this is where I started finding my own style instead of

11   copying.

12   Q.   What -- in those clothes in particular, where did you get

13   them or how did you get them?

14   A.   They are probably hand-me-downs from a cousin.

15   Q.   Did you grab them at some point in relation to something

16   that happened with Mr. McFadden?

17   A.   They were clothes that I had to go grab from the house

18   when I was told to only grab a couple things.

19   Q.   So when you were leaving Mr. McFadden's home?

20   A.   Yes.

21   Q.   Does this photograph fairly and accurately depict you

22   towards the end of when you spent time with Mr. McFadden?

23   A.   Yes, you could say that.

24        MR. CHAFFIN:   I move to admit Government's

25   Exhibit 8-3.

19-cr-00243-CMA-GPG-1 Jury Trial - Day 2                              210

1         THE COURT:  Any objection?

2         MR. MCDERMOTT:  No objection.

3         THE COURT:  8-3 is admitted.  You may publish.

4     (Government's Exhibit 8-3 received.)

5   Q.  (By MR. CHAFFIN) So this -- we had 8-1 sort of at the

6   beginning of your relationship with Mr. McFadden, 8-2 sort of

7   at the middle, and 8-3 towards the end; is that fair to say?

8   A.  Yes, that's correct.

9         MR. CHAFFIN:  Thank you.  We can take 8-3 down.

10  Q.  (By MR. CHAFFIN) J.W., do you remember some of the houses

11  where Mr. McFadden lived?

12  A.  Yes, I do.

13  Q.  What's the first house that you remember?

14  A.  The first house I remember was his house over at the

15  bottom of the Monument.

16  Q.  What do you remember about that house?  What did it look

17  like?

18  A.  It was like a duplex where there was, like, two units and

19  he was on the left side.  He had the left unit.  There was

20  also, like, a shed out front of the unit.

21  Q.  Do you recall who all lived there?

22  A.  I know Mike lived there, and us kids would go over there

23  and visit.

24  Q.  Who's "us kids"?

25  A.  Me and my cousins.

                    Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 2                          211

1    Q.   What are your cousin's names?

2    A.   D.O. and E.S.

3    Q.   D.O. and E.S.  Let's talk about them for a second.  How do

4    they fit in -- how are they your cousins?

5    A.   They were Crystal's kids, which is my aunt.

6    Q.   So Crystal is your aunt?

7    A.   Yes.

8    Q.   Do you know what Crystal's last name is?

9    A.   M////////.

10   Q.   And she -- is she related to Mr. McFadden?

11   A.   Yes.

12   Q.   D.O. and E.S. are her sons?

13   A.   Correct.

14   Q.   Do D.O. and E.S. have other siblings?

15   A.   They have a sister named Jade.

16   Q.   How old is D.O.?

17   A.   About my age, probably a year younger.

18   Q.   E.S., how old is he?

19   A.   He's more around L.Wr.'s age.  He's 17 or 18 now.

20   Q.   And Jade?

21   A.   She's like my younger sister's age.  She's probably around

22   15 to 16 now.

23   Q.   Would you see other people at that house in Monument?

24   A.   Just the people that we've named.  Like my Aunt Crystal

25   I'd see over there.  I'd see Mike over there.  I'd see my

                    Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 2                          212

 1  cousins over there.

 2  Q.  Would you spend time there?

 3  A.  Would I spend time over there?

 4  Q.  Yeah.

 5  A.  Yes.

 6  Q.  What sorts of things would you do when you would spend

 7  time at Mr. McFadden's house?

 8  A.  It was at the bottom of the Monument, so we liked going

 9  into the backyard, and it was huge.  You could go as far as

10  you could, and we would even hear bobcats growl sometimes, so

11  we always had fun in the backyard.  And my cousin D.O. had a

12  little electronic chopper motorcycle, and we used to play on

13  that a lot.

14  Q.  Would you spend nights there?

15  A.  Yes.

16  Q.  What's the next house that you remember Mr. McFadden

17  living in?

18  A.  It would be the Glen Road house.

19  Q.  Could you take a look at Government's Exhibit --

20          MR. CHAFFIN:  3 was by stipulation; is that correct?

21          MR. MCDERMOTT:  Yes.

22          MR. CHAFFIN:  Your Honor, I'd just move to admit

23  Government's Exhibits -- all of Government's Exhibits --

24          THE COURT:  1 through 5?

25          MR. CHAFFIN:  3-1 through 3-4.

                    Sarah K. Mitchell, RPR, CRR

 1            THE COURT:  Not 5?

 2            MR. CHAFFIN:  Yes, 5.

 3            THE COURT:  3-1 through 3-5 are all stipulated.

 4   Therefore they are all admitted.  You may publish.

 5       (Government's Exhibits 3-1 - 3-5 received.)

 6            MR. CHAFFIN:  Can we have 3-1 up, please.

 7   Q.  (By MR. CHAFFIN) J.W., what are we looking at here?

 8   A.  We are looking at that Glen Road house that I just

 9   described.

10   Q.  It's a two-story house, right?

11   A.  Yes.

12   Q.  How many rooms, do you recall?

13   A.  I'm not sure how many rooms, but I do know it was two

14   stories aboveground, and it also had, like, a basement.

15            MR. CHAFFIN:  Can we just quickly put up 3-2.

16   Q.  (By MR. CHAFFIN) What is this?

17   A.  This is a picture of the same house, but from a different

18   angle.

19            MR. CHAFFIN:  3-3, please.

20   Q.  (By MR. CHAFFIN) What is this?

21   A.  This is a picture of the side of the house, and you can

22   see the backyard and back porch -- well, the back fence.

23            MR. CHAFFIN:  Can we have 3-4, please.

24   Q.  (By MR. CHAFFIN) What are we looking at here?

25   A.  This looks like it's the house behind the house, the Glen

                    Sarah K. Mitchell, RPR, CRR

 1   house.

 2   Q.  And you can see sort of the backyard.  The Glen house is

 3   to the left?

 4   A.  Yeah, you can see the Glen house's porch back door.  You

 5   can see the swamp cooler on the roof and some snow on the

 6   roof.

 7              MR. CHAFFIN:  Can we have 3-5.

 8   Q.  (By MR. CHAFFIN) What are we looking at here?

 9   A.  This looks like a satellite image of the house.

10   Q.  Can you point out for the jury which house is the Glen

11   Road house?  Feel free to stand up.

12   A.  It would be this house.

13   Q.  So you're pointing at -- in the center of the photograph

14   there's like four houses, and you pointed to the bottom left?

15   A.  Yeah, bottom left house.  The one that's on the corner of

16   Glen and Gunnison.

17   Q.  Who all lived at the Glen Road house?

18   A.  Me and Mike lived in one of the bedrooms, and then Phyllis

19   and John Hockenberry were Mike's roommates.  And then their

20   son S.H. lived there as well.

21   Q.  Do you know how Phyllis and John Hockenberry became

22   Mr. McFadden's roommates?

23   A.  I think Mike McFadden somehow worked with John.

24   Q.  And you mentioned a S.H.?

25   A.  Yes.  S.H. was their son.

                        Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 2                          215

1    Q.  About how old was S.H.?

2    A.  He was about my age.

3    Q.  Did S.H. have his own room?

4    A.  Yes.

5    Q.  You mentioned that you lived there?

6    A.  Yes.

7    Q.  Did you have your own room?

8    A.  No, I did not.

9    Q.  Where did you stay?

10   A.  I stayed in Mike's bedroom.

11   Q.  Anybody else that would come to the house, the Glen Road

12   house?

13   A.  Cousins would come over.  We would watch WWE events at the

14   house, but it was mainly just us.

15   Q.  Which cousins would come over?

16   A.  My cousins would come over, D.O., E.S., even some friends

17   that we made in the neighborhood would come over.  We used to

18   have like a crotch rocket.  S.H. had some friends as well, and

19   I think S.H. had a brother that used to come over.

20   Q.  Do you remember any of the friends' names that would come

21   over?

22   A.  No, I do not.

23   Q.  You mentioned a crotch rocket.  What is that?

24   A.  A crotch rocket is like a mini motorcycle that goes really

25   fast.

                    Sarah K. Mitchell, RPR, CRR

1   Q.  How did you guys end up having a crotch rocket?

2   A.  I think one of the neighbor kids was like getting rid of

3   it or selling it, and we -- I don't think it ran at first, but

4   John or Mike or one of us got it to run for the kids.

5   Q.  Was that fun to use?

6   A.  Yeah, it was fun.

7   Q.  What other fun things would you do at the Glen Road house?

8   A.  We had a hot tub in the backyard that was always fun.  We

9   also had the hiddens we called it.  It was just a field across

10  from the house, and that's where we used to ride that crotch

11  rocket or just bicycles and make like dirt jumps.

12  Q.  Sounds like you would spend a lot of time at that house?

13  A.  Yes.

14  Q.  About how long were you at the Glen Road house, would you

15  say?

16  A.  I'd say over a year.

17  Q.  Okay.  About how old are you?

18  A.  I'm probably around nine years old.

19  Q.  Okay.  Do you remember the next house that Mr. McFadden

20  lived in?

21  A.  Yes.

22  Q.  What house was that?

23  A.  It was the D 1/2 Road house.

24          MR. CHAFFIN:  Your Honor, I would similarly move to

25  admit Government's Exhibits 4-1 through I think 4-4 .

1       THE COURT:  4-1 through 4-4 are stipulated.  They are

2  all admitted.  You may publish.

3       (Government's Exhibits 4-1 - 4-4 received.)

4       MR. CHAFFIN:  Can we have 4-1, please.

5  Q.  (By MR. CHAFFIN) J.W., what are we looking at here?

6  A.  This is that D 1/2 Road house.

7       MR. CHAFFIN:  Can we have 4-4.

8  Q.  (By MR. CHAFFIN) What are we looking at here?

9  A.  This is a satellite image of that D 1/2 Road house.

10  Q.  Which house is the D 1/2 Road house that Mr. McFadden

11  lived in?

12  A.  Would you like me to point?

13  Q.  If you would, please.

14  A.  It's going to be this house right here with all the junk

15  around it.

16  Q.  Just for the record, you pointed at the house in the

17  center of the image, correct?

18  A.  Yes.

19  Q.  Okay.  Who all lived at this house, at D 1/2 Road?

20  A.  At first John and Phyllis Hockenberry, Mike's roommates,

21  moved over with us to that house.

22  Q.  And do you know the address of that house?

23  A.  Yeah, it's 2980 D 1/2 Road.

24  Q.  So John and Phyllis Hockenberry lived there, Mr. McFadden

25  lived there.

Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 2                          218

1    A.  Correct.

2    Q.  Did you live there?

3    A.  Yes.

4    Q.  What about your siblings, were they there?

5    A.  Not at first.

6    Q.  You mentioned S.H. before.  Was John and Phyllis's son

7    S.H., was he --

8    A.  Yes, he moved over there with us.

9    Q.  About how long did John, Phyllis, and S.H. live at that

10   house?

11   A.  I'd say they lived there for about a year, a little over a

12   year before they ended up moving out.

13   Q.  Okay.  And when they moved out, did Mr. McFadden stay or

14   did he leave as well?

15   A.  He stayed.

16   Q.  What about you?

17   A.  I stayed as well.

18   Q.  At some point do other people move into the D 1/2 Road

19   house?

20   A.  Yes.

21   Q.  Who all moved in?

22   A.  John, we called him Papa John, he moved into the house.

23   Q.  Tell the jury, who's Papa John?

24   A.  Papa John was our neighborhood's mom -- or dad, sorry.

25   Q.  Okay.  And how did he come to live at the D 1/2 Road

19-cr-00243-CMA-GPG-1 Jury Trial - Day 2                           219

1   house?

2   A.  I remember our neighbor's mom, her name was Stacy, talking

3   with the folks over at our house, and I don't think they had

4   room over there at the neighbor's house for him, but we were

5   so close as neighbors Mike opened and offered his couch for

6   Papa John to stay at.

7   Q.  So when Papa John lived at the house on D 1/2 Road, where

8   would he stay?

9   A.  He would stay in the living room.

10  Q.  Always in the living room?

11  A.  Yeah.

12  Q.  What about you, where would you stay in this D 1/2 Road

13  house?

14  A.  At first when we first moved to the D 1/2 Road house I

15  would stay in a -- it was like a utility room at first, but

16  Mike added a wall to the utility room to make it two rooms.

17  And then one of the rooms was the laundry room, and then one

18  of the rooms turned into our bedroom.

19  Q.  Who all stayed in the bedroom near the laundry room?

20  A.  Me and Mike.

21  Q.  You and Mr. McFadden?

22  A.  Correct.

23  Q.  How long would you say that you stayed in that room kind

24  of off the laundry room?

25  A.  I'd say for about two years we stayed in that laundry

19-cr-00243-CMA-GPG-1 Jury Trial - Day 2                          220

1    room.

2    Q.  Okay.

3    A.  Room off the laundry room anyways.

4    Q.  At some point did that change?

5    A.  Yes.

6    Q.  Was that in relation to when John and Phyllis kind of

7    moved out?

8    A.  Correct.

9    Q.  What room -- well, did you change rooms at that point?

10   A.  At that point when John and Phyllis moved out, the room

11   they were staying in, which was the master bedroom, Mike moved

12   his stuff to the master bedroom and then turned the room we

13   were staying in into like a kid's room.  There were two

14   separate beds.  At one time we even had a bunkbed in there.

15   So it turned into a kids room, and he moved over to the master

16   bedroom.

17   Q.  What about you?

18   A.  At first I stayed in the utility room with the kids, but

19   it didn't take very long for me to go over to the master

20   bedroom with Mike.

21   Q.  Who all at that point was staying in the kids room?

22   A.  The kids room would be for my brother or my cousins, even

23   some of the neighborhood kids that would come and spend the

24   night.  That would be the room they would stay in.

25   Q.  And you said you moved into Mike's room.  Where would you

                        Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 2                          221

1   sleep?

2   A.   I'd sleep in his bed.

3   Q.   Would other kids sleep in Mr. McFadden's bed as well?

4   A.   Yes.

5   Q.   Who all do you recall staying in Mr. McFadden's bed?

6   A.   I remember my brother staying.  He would sometimes have to

7   stay on the floor, though, because he had a bed wetting

8   problem, so he would have to make up a cot on the side of the

9   bed.  But he would stay in the room with us.  D.R. would stay

10  in the bed with us.  E.S. would stay in the bed with us.  I.S.

11  would stay in the bed with us.  K.W. would stay in the bed

12  with us.  All the boys would jump up in the bed, watch a

13  movie, play some video games.

14  Q.   Talk about some of these boys, because I don't think we

15  talked about them yet.  So E.S., is that the same E.S. that

16  you said was a cousin?

17  A.   Yes.

18  Q.   Okay.  That's Crystal's son?

19  A.   Correct.

20  Q.   You mentioned a D.R.  Who's D.R.?

21  A.   D.R. was like a friend that came over.

22  Q.   Whose friend?

23  A.   He was a friend of S.H.'s at first, but once S.H. moved,

24  he already came around and knew us long enough so where we

25  became friends, so even after S.H. moved out he still came

Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 2                           222

1    over a lot.

2    Q.  And then you mentioned an I.S.?

3    A.  Yes.

4    Q.  Who's I.S.?

5    A.  I.S. I believe is E.S.'s either cousin or step-cousin or

6    step-brother.  I know he's related to my cousin E.S.

7    Q.  So does that make him your cousin as well?

8    A.  It would be like a second cousin, yes.  I didn't know I.S.

9    growing up, so...

10   Q.  Okay.  And then you mentioned a K.W.

11   A.  Yes.  K.W. was the neighbor.

12   Q.  You know K.W.'s last name?

13   A.  W///////////.

14   Q.  You said that K.W. was a neighbor.  Where did K.W. live?

15   A.  He lived to the right of the house next door.

16   Q.  Is that on Government's Exhibit 4-4?

17   A.  Yes, it is.

18   Q.  Could you point out for the jury where K.W.'s house was

19   at?

20   A.  K.W.'s house was this house all the way on the bottom

21   right corner.

22          MR. CHAFFIN:  Could we put up 4-2.

23   Q.  (By MR. CHAFFIN) J.W., what is this, 4-2?

24   A.  That would be K.W.'s house, the neighbor's house.

25          MR. CHAFFIN:  Can we have 4-3.

                    Sarah K. Mitchell, RPR, CRR

1  Q.  (By MR. CHAFFIN) What is that?

2  A.  That is another picture from a different angle of the

3  neighbor's house.

4  Q.  Did the house look like that all boarded up when K.W.

5  lived there?

6  A.  It wasn't boarded up like that, but it did look like that.

7  It just wasn't boarded up.  The windows were there.  It looked

8  a little more, you know, livable, not rundown.

9          MR. CHAFFIN:  Thank you.  Will you take that down.

10  Q.  (By MR. CHAFFIN) What sorts of things would you do at the

11  D 1/2 Road house?

12  A.  We would do a lot of things at the D 1/2 Road house.  We

13  got into activities like BMX racing, motocross which is a step

14  above BMX because you actually have a motor on your bike.  We

15  had paintball, airsoft.  We built forts.  We drove around the

16  property in the vehicles that we had on the property including

17  some of the heavy machinery.

18  Q.  Was that a lot of fun?

19  A.  Yeah, it was a lot of fun.

20  Q.  Who got you involved in BMX and motocross?

21  A.  Mike got me into it because my cousins already were doing

22  it.

23  Q.  And the like paintball, stuff like that, where did that

24  come from?

25  A.  It probably would just be one of us kids saying, hey,

1   let's get into this, let's try something new, because we would

2   probably get bored of the same activity over the span of a

3   year.  Get bored of BMX racing, so, okay, let's go buy some

4   airsoft guns or paintball guns or make a fort.

5   Q.  And who would go buy you those things?

6   A.  Mike would.

7   Q.  The equipment that you talked about, where did that come

8   from?

9   A.  Mike ran, like, a business with some dude that he worked

10  with, and they used to always bring over, like, backhoes or

11  skitters they'd be using for their work, but they would stay

12  on our property, so we would be able to drive them around and

13  build forts with them.

14  Q.  Would Mr. McFadden take you on trips?

15  A.  Yes.

16  Q.  Was that fun?

17  A.  Yes.

18  Q.  What sorts of trips would you go on?

19  A.  We would go on trips to different states, and me living in

20  Colorado my whole life I never really left the state, so it

21  was really fun at first when we went to different states and

22  we got to see different places.

23  Q.  How would you go on these trips?

24  A.  It would be in a semi-truck.  He would be going on these

25  trips for his work.

Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 2                    225

1           MR. CHAFFIN:  Your Honor, I move to admit

2    Government's Exhibits 2-1 through 2-9 by stipulation.

3           THE COURT:  2-1 through 2-9 are stipulated.  They are

4    admitted and you may publish.

5       (Government's Exhibits 2-1 - 2-9 received.)

6           MR. CHAFFIN:  Can we have 2-1, please.

7    Q.  (By MR. CHAFFIN) J.W., what are we looking at here?

8    A.  This is one of our semis that we had that we did trips on.

9    Q.  Were there other semi-trucks that Mr. McFadden had as

10   well?

11   A.  Yes.  There were other semi-trucks, but this is the truck

12   we mainly used.

13   Q.  So this is the main truck?

14   A.  Yes.

15   Q.  And it says something on the side.  Can you tell the jury

16   what that says?

17   A.  On the side of the truck it says Precision Construction.

18   Q.  What is that, Precision Construction?

19   A.  That was Mike's and his partner's company.

20   Q.  Do you recall what his partner's name was?

21   A.  Darren or Darrell.

22           MR. CHAFFIN:  Could we have 2-2.

23   Q.  (By MR. CHAFFIN) What is this?

24   A.  This is a picture of that semi-truck from a different

25   angle.

                    Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 2                    226

1    Q.   2-3, what is this?

2    A.   This is the other side of that semi-truck.

3    Q.   We're just kind of walking around the truck, right?

4    A.   Yeah.

5    Q.   2-4, what is this?

6    A.   This would be the backside of it if you were continuing

7    walking around.

8    Q.   Now, this -- what was the cab like in this truck?

9    A.   The cab was like a big mattress in the cab.  There were

10   two side flaps that you could flap open to get some fresh air.

11   There was also a cubby on the right side of the bed that you

12   could store stuff in, clothes, food, anything.  It was kind of

13   like a closet.  And then you walk forward.  There's a curtain

14   you could close for privacy.  You could open the curtain, and

15   then there's the two front seats of the semi-truck.

16           MR. CHAFFIN:  Can we take a look at 2-5.

17   Q.   (By MR. CHAFFIN) What are we looking at right here?

18   A.   This is, like, if you opened up the driver door of the

19   semi and you looked into the semi, you would see this.

20   Q.   And if we take a look at 2-6, what is this?

21   A.   This is a picture of a cab that I was describing earlier.

22   Q.   And I think you mentioned like a mattress?

23   A.   Yes.

24   Q.   Is that in the photo?

25   A.   Yes, it is.

                    Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 2                    227

1    Q.  When you went on trips, where would you stay?

2    A.  I would stay on that mattress.

3    Q.  Mr. McFadden, where would he stay?

4    A.  He would sleep on the mattress as well.

5    Q.  2-7, what are we looking at here?

6    A.  This is the other side of the back cab.  You're looking

7    at, like, that window flap that I also was describing and then

8    the bed.

9    Q.  And the cubby, is that in here as well?

10   A.  Yeah, that cubby is to the left.  It wasn't the cubby I

11   was referencing to earlier, but it is another cubby in the

12   semi.

13   Q.  I see.

14   A.  If you had a picture of the other side you'd see the other

15   cubby I was talking about that looked more like a closet.

16         MR. CHAFFIN:  Can we go back to 2-6, I guess.

17   Q.  (By MR. CHAFFIN) Is that the other cubby?  The other cubby

18   you talked about, is that this?

19   A.  Yes.  And right below -- if you can look at the cubby that

20   has Ramen noodles in it, right below that is a spot where you

21   can put hangers and stuff for your clothes.

22   Q.  And the curtain you mentioned, is that depicted here as

23   well?

24   A.  Yes.  You can see the curtain that had buttons so you can

25   snap them together when they're closed.

                        Sarah K. Mitchell, RPR, CRR

1    Q.   2-8, what is this?

2    A.   This is a picture of the back of the cab.

3    Q.   Is this the mattress that you talked about?

4    A.   Yes.  At the bottom of the picture you can see the

5    mattress and the pillows.

6    Q.   2-9, what are we looking at here?

7    A.   This is a picture of the front of the semi as if you were

8    sitting on the bed of the cab.

9    Q.   Thank you.  J.W., how long has been it since you've been

10   in this truck?

11   A.   It's been over ten years.

12   Q.   It's been a while?

13   A.   Yes.

14   Q.   You talked about living with Mr. McFadden.  Did you -- we

15   can take this down now.  Did you always live with Mr. McFadden

16   when you were growing up?

17   A.   I didn't always live with him when I was growing up.

18   Q.   Were there times when you would spend time away from his

19   house as well?

20   A.   When I did live with him?

21   Q.   Yes.

22   A.   Yes.  There were times I went and stayed with my mom.

23   Q.   What was -- what was life like when you were staying with

24   your mom?

25   A.   I didn't like staying with my mom.

19-cr-00243-CMA-GPG-1 Jury Trial - Day 2                              229

1   Q.   Why not?

2   A.   She had a boyfriend that was really abusive, and then she

3   had also a drug problem that her and her boyfriend were

4   having.

5   Q.   When you say that her boyfriend was abusive, what do you

6   mean?

7   A.   He used to beat my mom.  He used to break bottles over her

8   head.  He used to grab my baby sister roughly when she was an

9   infant.  He would even slam me against the walls and stuff if

10  I ever copped an attitude or something with him.

11  Q.   That was scary?

12  A.   Yeah.

13  Q.   Stuff like that, did that happen when you were staying

14  with Mr. McFadden?

15  A.   No.

16  Q.   Did you feel safe at Mr. McFadden's house?

17  A.   Yes.

18  Q.   What about at your mom's house?

19  A.   I felt safe, but it was just I knew that there was a

20  possibility I could end up seeing my mom get hurt, my siblings

21  get hurt, or even me.

22  Q.   When you were staying with your mom, did you always have

23  enough to eat?

24  A.   No.

25  Q.   What do you mean by that?

                              Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 2                          230

 1   A.  We didn't have much money growing up.  My mom and her

 2   boyfriend kind of thought because we go to school, that's

 3   where we will get our meals, so most of the food that we had

 4   they would eat.  We would have like a dinner at night, and I

 5   always remember getting dinner and it never being enough, and

 6   I always remember my sister sneaking me food.

 7   Q.  Why would your sister need to sneak you food?

 8   A.  Because I was always asking for more after dinner.  I was

 9   always hungry.

10   Q.  Those things -- did that sort of thing happen to you when

11   you stayed with Mr. McFadden?

12   A.  No.

13   Q.  You always had enough to eat?

14   A.  Yeah.

15   Q.  When you were with Mr. McFadden, who got you to school?

16   A.  Mike McFadden got me to school.

17   Q.  Who took you to the doctor?

18   A.  Mike did.

19   Q.  Who made sure that you had clean clothes to wear?

20   A.  Mike did.

21   Q.  At that time how did you feel about Mr. McFadden?

22   A.  At the time I was happy that I could have another place to

23   go to and kind of enjoy being a kid, not having to worry about

24   stuff like what I'm going to eat or if I'm going to have to go

25   to the neighbor's to call the cops because my mom and her

                    Sarah K. Mitchell, RPR, CRR

1    boyfriend got in a fight.  So it was a big change.

2    Q.  You said earlier that you thought of him as a dad.  Did

3    you use those words with him?

4    A.  Yeah.

5    Q.  Did you love him?

6    A.  Yeah.

7    Q.  J.W., I want to talk to you a little about some

8    uncomfortable things, okay?

9    A.  Okay.

10   Q.  Were there things that happened when you stayed with

11   Mr. McFadden that made you feel uncomfortable?

12   A.  Yeah.

13   Q.  When is the first time that you remember something that

14   made you feel uncomfortable?

15   A.  The first time that I felt uncomfortable with Mike was we

16   were going to a funeral.  It was one of my cousins that died.

17   We were going to a funeral.  It was located in Arizona, and it

18   was kind of like the first trip I ever took.

19   Q.  Do you remember how old you were?

20   A.  I was about eight.

21   Q.  So early on --

22   A.  Yeah.

23   Q.  Sort of similar age to Government's Exhibit 8-1?

24   A.  Yeah.

25   Q.  How do you know that you went to Arizona?

1   A.  Because -- I know we went to Arizona because I remember

2   driving there.  I remember seeing the Paradise Road signs, and

3   that amused me because here in town we have like North Ave or

4   Gunnison, but in like Arizona they have Paradise Road, and

5   there were palm trees, and it was cool to see.

6   Q.  And you said that a cousin had passed away?

7   A.  Yeah.

8   Q.  Do you know who the cousin was?

9   A.  His name was Justin.

10  Q.  How did he sort of factor into your family?

11  A.  He was my cousins D.O. and E.S. -- he was their cousin's

12  brother.  So it was Brandon, it was his brother Justin who

13  passed away, and I was related to them through my cousins.

14  Q.  Okay.  Who all went on this trip down to Arizona to this

15  funeral?

16  A.  Me, Mike, Crystal, our parents, our Uncle Monkey, a

17  majority of us went down there.

18  Q.  You mentioned an Uncle Monkey.  Who's that?

19  A.  That is my grandpa's brother.  We called him Uncle Monkey.

20  Q.  Did you mention Mr. McFadden?

21  A.  Yes.

22  Q.  Okay.  I think you said Mike, right?

23  A.  Yeah, Mike McFadden, he was there as well.

24  Q.  Okay.  I just want to make sure we're talking about the

25  same Mike because there's also your biological father that is

                    Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 2                           233

1    referred to as Mike, correct?

2    A.  Correct.

3    Q.  And your biological father is sort of out of the picture?

4    A.  Yeah, he's out of the picture.

5    Q.  Even back then?

6    A.  Yes.

7    Q.  Who did you travel with when you went down to this

8    funeral?

9    A.  I traveled with Mike.

10   Q.  Do you remember who else was in the vehicle?

11   A.  My Aunt Crystal was in the vehicle with us, and I believe

12   one of the kids with us.  Probably my cousin.

13   Q.  Where would you guys stay?

14   A.  When we were going there?

15   Q.  Yeah.

16   A.  We got there all in one trip so we didn't have to stop and

17   stay anywhere, but we did get lost on the way so it took us a

18   longer time than when the rest of our family got there,

19   because I remember us getting there at night, and we were

20   already supposed to be there like a few hours before.

21   Q.  Did you stay at somebody's house?

22   A.  No.  We stayed at a hotel when we got there.

23   Q.  Okay.  Whose room did you stay in?

24   A.  I slept in Mike's hotel room.  It was like a conjoined

25   room that they had.

                        Sarah K. Mitchell, RPR, CRR

1    Q.  Do you recall who else stayed in the room?

2    A.  It was me, Mike, and one of the boys.  It was E.S., I

3    believe.

4    Q.  What about your mom?

5    A.  My mom and the girls stayed in the other conjoined room.

6    So it was kind of like this was the boy room, and then this

7    was the girl room.  Then there was a conjoined door.

8    Q.  You said that something uncomfortable happened on this

9    trip.  What happened?

10   A.  During that night I went to bed and I woke up late in the

11   night to like a wet sensation in my rectum area.  I woke up,

12   and when I came to awareness, my pants were lowered and I had

13   that wet sensation.

14   Q.  Do you remember going to bed that night?

15   A.  Yeah.

16   Q.  What were you wearing when you went to bed?

17   A.  I was wearing, like, some pajamas.

18   Q.  And you said that when you woke up you felt this wet

19   sensation in your rectum?

20   A.  Yeah.

21   Q.  Had you ever felt something like that before?

22   A.  No.

23   Q.  That you said your pants were down?

24   A.  Uh-huh.

25   Q.  How were they down, where were they at?

1   A.  Like around the ankles.

2   Q.  What did you do when you woke up to that?

3   A.  I didn't quite know what to do, but I know because I had

4   like that wet sensation, I knew I needed to change, so I got

5   up and changed.

6   Q.  Was there anybody else up at that point?

7   A.  Yeah.  Mike was up at that point because I was already

8   rolling and tossing and turning and showing like signs of

9   struggle, so, like, he, if I remember, asked me like what was

10  wrong, and I said I needed to change.

11  Q.  Did you talk to him about this sensation that you felt?

12  A.  No, I didn't.

13  Q.  Did he say anything else?

14  A.  No.  I just kind of went back to bed.

15  Q.  Why did that make you feel uncomfortable?

16  A.  Because it was something that I knew, like, wasn't right,

17  and I knew something -- like, I didn't do that myself, but I

18  was kind of confused, so I knew it wasn't right, but I was

19  just confused.

20  Q.  Did anything else like that happen on that trip?

21  A.  No.

22  Q.  When's the next time that you recall something -- well,

23  did you tell anybody about that --

24  A.  No.

25  Q.  -- experience?

                        Sarah K. Mitchell, RPR, CRR

1    A.   No.

2    Q.   Why not?

3    A.   It was -- like I said, I was confused and you could say

4    even I was scared a little bit.  I didn't really know.

5    Q.   When's the next time that you remember something

6    uncomfortable happening?

7    A.   The next time I remember something uncomfortable happening

8    was his first house we talked about over on the Monument.

9    Q.   The house with the big backyard?

10   A.   Yeah, the backyard with, like, the Bobcat and stuff.

11   Q.   Where did this happen, this uncomfortable thing?

12   A.   We were on an air mattress in, like, the living room at

13   the house.

14   Q.   Who's we?

15   A.   We as in me and Mike stayed on the air mattress.

16   Q.   So you and Mr. McFadden were sleeping on an air mattress?

17   A.   Correct, yeah.

18   Q.   What happened?

19   A.   I remember being super sick during the time, like having a

20   bug or a fever, and I remember sweating a lot, and because I

21   was sweating through my clothes, Mike was there for me to keep

22   changing my clothes for me when I sweat through them.  And

23   during part of the night I woke up and kind of just thought

24   maybe he was changing my clothes because I sweat through them,

25   but I was soon to realize that that uncomfortable feeling in

Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 2                      237

1   my rectum area was there as well, so I was already kind of

2   putting two and two together, and I know it was uncomfortable

3   and it didn't feel good.

4   Q.   The uncomfortable feeling in your rectum, what was that?

5   A.   It was when I woke up I first thought that he was just

6   changing my clothes, so I kind of like played asleep because I

7   was sick.  I didn't feel good.  And as he was changing my

8   clothes, I felt like pressure in my rectum area and that wet

9   sensation feeling, and that's when I knew he wasn't just

10  changing my clothes because I was sick.

11  Q.   What was he doing?

12  A.   He was sticking his penis into my rectum.

13  Q.   How do you know that it was his penis?

14  A.   Because of the way it felt and because of the positioning

15  we were laying in.

16  Q.   Can you describe for the jury the position that you were

17  laying in?

18  A.   Yeah, I was laying on my side with my knees up, so kind of

19  like to where my butt is sticking out.  And I was laying on my

20  left side, and he was like kind of cuddling me in the same

21  exact position that I was in, so on our sides, left sides,

22  looking at the wall.

23  Q.   How -- you talked about staying at that house quite

24  frequently.  Do you recall something like that happening again

25  at the --

                    Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 2                          238

1  A.  No, because when something like that started to happen

2  after that incident at that house on the air mattress I kind

3  of positioned myself differently on the bed.

4  Q.  How so?

5  A.  Before I even went to sleep I kind of didn't turn my back

6  anymore.  And then, again, if I woke up to one of those

7  sensations or something, I would roll and turn and try to not

8  keep my backside exposed.  So the rest of the period where we

9  went over to that Monument house, I can't remember an incident

10 that happened after that incident because I was always tossing

11 and turning and preventing it.

12 Q.  Okay.  What about the Glen Road house, would uncomfortable

13 things happen there?

14 A.  Yes.

15 Q.  What sorts of things?

16 A.  Sort of the same incidents.  We were -- instead of on an

17 air mattress we were actually on a mattress this time, and it

18 was in my room.  So instead of it being, like, a living room,

19 it was actually my room.

20 Q.  When you say your room, what do you mean?

21 A.  Because me and Mike lived in that room.  I had my own

22 dresser.  I had my own stuff.  I had my own clothes.  I had my

23 own TV, so I considered that my room.

24 Q.  So it's the room that you shared with Mr. McFadden?

25 A.  Correct.

Sarah K. Mitchell, RPR, CRR

1    Q.  Would you do that tossing and turning that you talked

2    about before at the Glen Road house?

3    A.  Yeah, it wouldn't always work, though.

4    Q.  What does that mean, it wouldn't always work?

5    A.  Like sometimes I would toss and turn, and it might stop

6    the touching and weird sensation for a little bit, but I would

7    always wake up to it again.  Even if I did toss and kept my

8    front side to him, I'd always wake up and I'd be back on that

9    side.

10   Q.  And when you would wake up, what would be happening?

11   A.  It would be the same instance I said before.  I'd feel

12   like a pressure in my rectum area, and I'd also feel like a

13   wetness there, and it was a lot of pressure, and it didn't

14   feel very good.  It was hurting to a point.

15   Q.  Would you -- would there be times when you would be awake

16   -- it sounds like you're talking about you would wake up in

17   the middle of something happening; is that fair to say?

18   A.  Yeah.  What I said on the two incidents so far, yes.

19   Q.  Are there times when you would wake up -- or would be

20   awake before things started happening?

21   A.  Yeah, there were times that I didn't have to wake up

22   because I faked going to sleep kind of.  I pretended I was

23   sleeping, you could say.

24   Q.  Why would you pretend that you were sleeping?

25   A.  After the first few incidences, I knew something wasn't

19-cr-00243-CMA-GPG-1 Jury Trial - Day 2                          240

1   right, and I knew it wasn't myself doing it.  So at that Glen

2   Road house I used to fake going to sleep to kind of see what

3   it was for sure.  I had a thought of what it was, but when I

4   started doing my fake sleep, that's when I figured out really

5   what it was.

6   Q.  What did you figure out?

7   A.  I figured out that it was Mike doing it the whole time.

8   Q.  What would happen on one of those instances when you faked

9   sleep?

10  A.  One of those instances when I was fake sleeping I used to

11  always remember peeking at my alarm clock and waiting for

12  something to happen, and one of the nights something did

13  happen when I was not asleep yet, and I had that wet sensation

14  and that pressure feeling, and I knew it was Mike, and I

15  didn't want to show that I was awake, so at that time I didn't

16  try my rollover technique or anything.  I kind of just fake

17  sleeped and beared through it.

18  Q.  You said that you felt that wet sensation.  Where did that

19  come from?

20  A.  It was like fluids that were coming from my rectum, and it

21  was like poop fluid.

22  Q.  And you said that you bore through it.  What does that

23  mean?

24  A.  I -- like other times when I had that feeling or when I

25  was thinking he was starting to touch me or -- I would roll

                        Sarah K. Mitchell, RPR, CRR

 1   over and go back to sleep, but this time I didn't roll over.

 2   I stayed in my position I was in and let him finish what he

 3   was doing so that I could see what the full thing was going

 4   on.

 5   Q.  And what did he do at that point?

 6   A.  So he -- as I was fake sleeping he lowered my pants, kind

 7   of propped my butt into a better position kind of sticking

 8   out, and that's when I felt that pressure and that pain.

 9   After around five minutes or so I would start having fluids

10   coming out, and it had a smell to it.  That's how I knew it

11   would be poop fluids, and he would be done at that point, and

12   he would clean me up and put my clothes back on, and that

13   whole time I just stayed sleeping.

14   Q.  When you felt that pressure, was that -- where did you

15   feel the pressure?

16   A.  I felt the pressure on my rectum.  It was like something

17   being inserted into me.

18   Q.  What was being inserted into you?

19   A.  Because of the way we were laying I know it was his penis

20   being inserted to me because I felt his arms around me and the

21   only thing in that area was his waist.

22   Q.  How frequently did stuff like that happen at the Glen Road

23   house?

24   A.  It happened a lot.

25   Q.  How much is a lot?

                        Sarah K. Mitchell, RPR, CRR

1   A.  Like two or three times a week, I would say.

2   Q.  And you said earlier that you lived there about a year?

3   A.  Yeah, a little over a year.

4   Q.  Was that sort of off and on throughout that year?

5   A.  Yeah.

6   Q.  Did stuff like that continue at the D 1/2 Road house?

7   A.  Yes, it did.

8   Q.  Where would that take place?

9   A.  At first it would take place in the utility room that we

10  said that he turned into a bedroom and a laundry room.  So at

11  first -- the first instance in that new house, it happened in

12  that room.

13  Q.  Same sorts of things?

14  A.  Yes.

15  Q.  Would you be awake or would you be asleep or what?

16  A.  Some of the times I would wake up during.  Some of the

17  times I would be fake sleeping.  And then some of the times I

18  would have like a hard time remembering.

19  Q.  How come?

20  A.  At first I didn't really know why.  I didn't know if I

21  just didn't get enough sleep or what.  But soon I realized

22  that -- I found a little pill in my soda, and I put two and

23  two together.  Because I was already given medication for

24  sleeping because I had trouble sleeping, and so I was given

25  hand-to-hand medication that I would take, but that was the

1   first time that I found something, like, in my drink that I

2   didn't know I was taking.

3   Q.  Let's unpack that a little bit.  You said that you were

4   taking medication for sleeping.

5   A.  Yes.  Not necessarily like a prescription medication, but

6   because I had trouble sleeping, my parents and even Mike would

7   give me a melatonin gummy or a melatonin pill to help me

8   sleep.  So I was already used to taking, like, melatonin

9   before I went to bed.

10  Q.  What -- how often would you take melatonin before you went

11  to bed?

12  A.  It would usually be if I was having trouble sleeping.  It

13  wouldn't be, like, every night you get a melatonin, but I did

14  have trouble sleeping a lot.

15  Q.  Who would give you the melatonin?

16  A.  Mike would give me the melatonin.

17  Q.  Explain to us this stuff that you found in your drink.

18  When was that?

19  A.  It was at the D Road house.  We were limited sodas, so we

20  couldn't just open the fridge and open a soda.  We could only

21  get one for dinner, and it would already be there opened at

22  our dinner table ready for us to drink.

23  Q.  Who would give you the soda?

24  A.  Mike would give us the soda for dinner.

25  Q.  And the can would already be open?

Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 2                          244

1    A.   Yeah.

2    Q.   Okay.  And it sounds like you said earlier you found

3    something in your drink?

4    A.   Yeah.  I drank all of it, and I had this weird residue in

5    my mouth, and then I shook my can, and I could tell there was

6    something in my can, so I tilted it and seen that it was like

7    a mushy white substance.

8    Q.   Did you ask anybody about that?

9    A.   Yeah, I asked Mike about it.

10   Q.   What did Mr. McFadden tell you?

11   A.   He told me that it was probably sugar or something that

12   didn't get dissolved in the soda when they made it.

13   Q.   How long ago was that?

14   A.   About 9, 10 years ago.

15   Q.   In the 9, 10 years since then I imagine you've drank soda?

16   A.   Yeah, I drink soda every day.

17   Q.   Ever find sugar, undissolved sugar in your soda?

18   A.   No.

19   Q.   So there would be times when you would be asleep and

20   things would happen.  There would be times when you were sort

21   of groggy it sounds like?

22   A.   Yeah.

23   Q.   And there would be times when you fake slept.  Who was

24   there during all of these uncomfortable times?

25   A.   Mike was there.

                          Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 2                          245

1   Q.  Were there times when there were other people nearby?

2   A.  There were times when other people were nearby.

3   Q.  Did they wake up?

4   A.  Did the other people wake up?  I'm not sure.

5   Q.  Did other -- did anybody else in the house get melatonin

6   for sleep?

7   A.  Yeah.

8   Q.  Who all to your knowledge received melatonin?

9   A.  Mainly the kids.  None of the adults received melatonin.

10  It was mainly us kids, because we were rambunctious and rowdy

11  and would watch a WWE event and try to wrestle each other all

12  night, and were, like, hyper all night, so us kids were the

13  ones who were getting melatonin.

14  Q.  Do you recall the names of the kids who --

15  A.  Yeah, my cousins, even some of the neighborhood friends or

16  friends of S.H.

17  Q.  So I think you talked about D.O. and E.S.?

18  A.  Yeah, my cousins.

19  Q.  Would they get melatonin?

20  A.  Yeah.

21  Q.  You talked about K.W.?

22  A.  Yeah.

23  Q.  He would get melatonin?

24  A.  Yeah.

25  Q.  J.W., I want to talk to you about some truck trips, okay?

                    Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 2                          246

1    A.   Okay.

2    Q.   Did -- are you doing okay?

3    A.   Yeah.

4    Q.   Did anything uncomfortable happen on a truck trip?

5    A.   Yeah.

6    Q.   What's the first trip that you recall something

7    uncomfortable happening?

8    A.   The first trip I remember something uncomfortable

9    happening was that funeral trip.

10   Q.   Okay.  Was that with the semi-truck?

11   A.   No, it wasn't a semi-truck.  So that was a trip without a

12   semi.

13   Q.   Okay.  What's the first semi-truck trip that you recall

14   something uncomfortable happening?

15   A.   The first time I recall taking, like, a semi trip we

16   didn't leave state, but we did take a haul from town to one of

17   the neighboring cities, like, I believe it was Durango because

18   I remember going past the Durango pass and it being scary.

19   Q.   Okay.  What happened on that trip?

20   A.   It's like the same incidence I described before where I

21   had, like, a wet sensation, and during that trip was after I

22   had already stayed awake and already kind of did my experiment

23   to see what it was.  So during that time I knew what was going

24   on, and I just played asleep and continued on with the trip.

25   Q.   In times before when we spoke you referred to those as

                        Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 2                    247

1    sort of a normal incident?

2    A.  Yeah, a normal incident as in, like, I woke up with

3    pressure or a wet sensation on my rear.

4    Q.  Why would you call it normal?

5    A.  Because of how frequently and how many times I had to just

6    sit there and fake sleep through it and...

7    Q.  Okay.  Do you remember trips where you went out of state?

8    A.  Yeah.

9    Q.  Do you recall a trip between Telluride and Farmington?

10   A.  Yeah.

11   Q.  How old were you when you went on trips between Telluride

12   and Farmington?

13   A.  I was probably like 10.

14   Q.  Okay.  So would have been sometime in 2010?

15   A.  Yes.

16   Q.  It's easy for you to kind of figure out the year based on

17   your age, right?

18   A.  Yeah.  Because I was born in 2000, so whatever year I am

19   will be that year.  And that's kind of why I got confused

20   earlier when I said my wrong age because it's about to be

21   2023, so usually whatever year it is, that's what age I am.

22   Q.  Do you remember what sort of loads you were taking between

23   Telluride and Farmington?

24   A.  It was like some pipe, I want to say.

25   Q.  Okay.  Where would you go to pick up the loads?

                        Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 2                          248

1   A.  We were going to Telluride to pick up the loads.

2   Q.  Do you remember where in Telluride you went?

3   A.  I don't remember where in Telluride I went, but I do

4   remember it being really close to an airport.

5   Q.  Okay.

6   A.  Like right next to an airport because I remember seeing

7   the planes land right across the fence that we were parked at.

8   So it was right next to the airport.

9   Q.  And where were you at when you saw these planes coming in?

10  A.  I was in the semi-truck.

11  Q.  Was it that green truck that we talked about before?

12  A.  Yes.

13  Q.  The one that's in Government's Exhibit 2?

14  A.  Yes.

15  Q.  So you would go someplace near the airport.  Sounds like

16  that's where you would pick up loads?

17  A.  Yeah, that's where we picked it up at.  And there was

18  multiple loads, because we went there and picked up a load,

19  and we would go to New Mexico and drop it off in Farmington,

20  and then we'd have to come back to Telluride, pick up another

21  load, back to New Mexico.  So it was multiple loads during the

22  one trip.

23  Q.  How do you know that it was in Farmington?

24  A.  I remember Farmington not only because of the name of

25  Farmington and because I never really left my state a lot, but

1    I remember seeing a really big high-speed chase, and we don't

2    really -- I'd never seen anything like that in my town.  It

3    was like a 15-police-car chase on the interstate of

4    Farmington.

5    Q.  So you saw this big police chase?

6    A.  The police chase.  That's how I know it was in Farmington.

7    Q.  Did you guys ever stay anywhere on these trips?

8    A.  Yeah, we stayed in the semi, but we wouldn't just, like,

9    park.  We would go to a truck stop.

10   Q.  Okay.  Do you recall something happening on one of these

11   trips between Telluride and Farmington?

12   A.  Yeah.

13   Q.  Where would you guys park for the night?

14   A.  We would park at a truck stop in Farmington and sleep

15   before we went and picked up the next load in Telluride the

16   next morning.

17   Q.  Where would you sleep?

18   A.  I'd sleep in the back cab of the semi.

19   Q.  On that mattress?

20   A.  On that mattress, yes.

21   Q.  How about Mr. McFadden, where did he sleep?

22   A.  He'd sleep next to me on that mattress.

23   Q.  Can you tell the jury what happened during that incident?

24   A.  Yeah.  After like that high-speed chase and everything

25   went down, I remember getting a message from my mom.  My mom

1    didn't want me to go on that trip for some reason, and I just

2    told her that it was okay.  I had seen a high-speed chase, it

3    was cool, and I'd be home soon.  Then I remember going to bed

4    in the back of the bed, and it was dark out because I remember

5    when the high-speed chase happened it was dark, I could see

6    all the lights clearly.  So I went to bed in the back of the

7    cab of the semi and woke up to Mr. McFadden pulling my pants

8    down, and this was one of those incidents I called a normal

9    incident because I just played asleep and let him do his thing

10   and just kind of suffered through it.  And once it was done

11   and over with, I just stayed remaining like I was sleeping and

12   just went on with the trip.

13   Q.  Did something happen to you after this incident?

14   A.  As in like?

15   Q.  Was there a mess that had to be cleaned up?

16   A.  Yeah.  So after the incident -- like I was stating earlier

17   when I would have some of like -- I call it poop juice or some

18   type of fluid, during this specific incident it was worse than

19   incidents I mentioned before.  It was so worse that he had to

20   grab a thing of wipies and actually clean up and give me a

21   change of clothes.

22   Q.  And this normal incident, what did that involve?

23   A.  It involved him pulling my pants down, feeling that

24   pressure in my rectum which was him sticking his penis into

25   me.

19-cr-00243-CMA-GPG-1 Jury Trial - Day 2                          251

1   Q.  Into your butt?

2   A.  Into my rectum.  Yeah, into my butt.

3   Q.  Did you talk to him at all --

4   A.  No.

5   Q.  -- during this incident?

6   A.  No.

7   Q.  Did he say anything to you?

8   A.  No.  Even after when he -- when I made a mess and he had

9   to get me a change of clothes I still acted like I was

10  sleeping and I was just out of it, and when I -- at that time

11  I was not out of it.  I was just acting like I was out it.  I

12  remember him cleaning me up and giving me a change of clothes.

13  Q.  Why did you act like you were out of it?

14  A.  Because I was afraid.  I didn't want him to know I was

15  fake sleeping.  I didn't want him to know that I was doing

16  that.

17  Q.  What were you afraid of?

18  A.  I was afraid that if I -- because usually I would just

19  toss and turn so I didn't have to say anything physically to

20  him like stop or -- so I would toss and turn, and usually that

21  would get -- be done with it.  I was really afraid to say

22  something after an incident because I just felt my day-to-day

23  life would change, and I would have to go through what I am

24  going through now if I said something, or he would do

25  something that I never saw before, so I was, like, afraid of

 1    that.

 2    Q.   During these trips, did anything else happen, these trips

 3    between Telluride and Farmington?

 4    A.   So the night of the police chase, that was the first trip

 5    that we did, and then when we went back to Telluride and then

 6    picked up another load and went back to Farmington.  That

 7    second night there was another instance what I would call as

 8    just a same incident, just a normal incident happened.

 9    Q.   Was there ever -- during these trips was there ever

10    something unusual that happened?  Different than the normal?

11    A.   Yeah.  So I would say those are normal just because it was

12    just the pressure feeling that I had of him inserting and then

13    me playing it off.  But a time that was what I would consider

14    a not normal incident was one time when I woke up -- I wasn't

15    playing sleeping, but I actually woke up to a wet sensation in

16    my rectum, but it wasn't a wet sensation like the wet

17    sensations I felt before.  It was like a tongue feeling.

18    Q.   Where were you at when this happened?

19    A.   I was at the back of the cab of the semi.

20    Q.   Do you recall where the semi was parked?

21    A.   Yeah, it was parked down from my house.

22    Q.   Why were you in the semi parked down from your house?

23    A.   It was one of those incidences where my mom didn't want me

24    to go, and so my mom just said whenever you're done for the

25    trip, just come back to the house.  And like I said earlier, I

1   didn't mind going and staying with my mom, but my mom always

2   insisted that I would prefer to stay over at Mike's house, but

3   she wanted me back that day.  So after our trip, instead of

4   him just taking me back to the house and dropping me off, it

5   was early in the morning, none of my parents were even up in

6   the house yet, so he parked down the road from my house and

7   let me finish sleeping and then was going to take me to my

8   house.

9   Q.  And you said you woke up?

10  A.  Yeah, I woke up, and the side of the flap was open, and I

11  could look out, and that's how I could tell I was in my

12  neighborhood of my house.  And so I kind of peeked out the

13  little slide flap and seen I was in my neighborhood, but I was

14  quick to realize that it was a different feeling than I ever

15  felt before.

16  Q.  You said it felt like a tongue?

17  A.  Yeah, it was, like, a tongue, and the reason I would say

18  it was a tongue is because I felt his mustache, and it was

19  poking me.  And then on the normal incidents I knew it was his

20  penis because his arms would be around me and his waist would

21  be there, but during this incident he wasn't laying next to

22  me.

23  Q.  Where did you feel his tongue?

24  A.  On my rectum.

25  Q.  J.W., I'd like to talk to you about a different trip now.

19-cr-00243-CMA-GPG-1 Jury Trial - Day 2                              254

1          THE COURT:  Mr. Chaffin, we've been sitting for a few

2    hours, so is it okay if we take a break?

3          MR. CHAFFIN:  I think this is probably a perfect

4    point to take a break.

5          THE COURT:  Great.  So, ladies and gentlemen,

6    remember you do not discuss this case among yourselves or with

7    anyone else.  Do not conduct any research.  We will take a

8    15-minute break.  We'll reconvene at approximately 11 o'clock.

9          THE COURTROOM DEPUTY:  All rise for the jury.

10         (Jury left the courtroom at 10:44 a.m.)

11         (Break was taken from 10:45 a.m. to 11:01 a.m.)

12         THE COURT:  You may be seated.  It's been brought to

13   my attention by Ms. Myhaver that one of the jurors' husbands

14   texted to indicate that his mother was going into hospice now

15   and she has 48 hours to live.  So I don't know that she will

16   be able to concentrate, to even hear anything, and I wish I

17   picked two alternates, but I didn't.  I didn't think we would

18   lose somebody this quickly, but my suggestion is that we

19   excuse her from jury duty.

20         MR. CHAFFIN:  No objection.

21         MR. MCDERMOTT:  Of course.

22         THE COURT:  All right.  So, Ms. Myhaver, would you

23   tell them that she's excused from jury duty and she can go be

24   with her family.

25         THE COURTROOM DEPUTY:  I will do that, yes, and then

                    Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 2                          255

 1   I'll bring them in.

 2            All rise for the jury.

 3        (Jury entered the courtroom at 11:03 a.m.)

 4            THE COURT:  Mr. Chaffin, you may proceed.

 5   Q.  (By MR. CHAFFIN) J.W., I want to talk to you about another

 6   trip that you took to Arizona.  Do you recall that trip?

 7   A.  Yeah, the one after the funeral.

 8   Q.  In the semi-truck?

 9   A.  Yes, in the semi-truck.

10   Q.  About -- well, do you recall how old you were on that

11   trip?

12   A.  I was like nine, I'd say.  I'd say it was before the trip

13   to New Mexico.

14   Q.  Where were you going in Arizona?

15   A.  I can't remember where we were going in Arizona, but I do

16   remember it was going to Arizona.

17   Q.  How do you know that it was to Arizona?

18   A.  Because when we got past the border and into Arizona we

19   stopped at a truck stop.

20   Q.  What do you recall about this truck stop?

21   A.  It was a big truck stop, bigger than the ones we normally

22   stay at, and they had all kinds of cool trucking knickknacks

23   in that truck stop.

24   Q.  What sorts of stuff do you recall in the truck stop?

25   A.  There was, like, toy semi-trucks, and the thing that,

19-cr-00243-CMA-GPG-1 Jury Trial - Day 2                               256

1    like, standed out mainly to me there was a big, huge, probably

2    like this big remote control semi that had a truck and a

3    trailer.

4    Q.   And you're holding your hands about three feet apart?

5    A.   Yeah.

6    Q.   A big remote --

7    A.   Big remote control semi you could drive with a trailer

8    connected to it.

9    Q.   And that was cool to you?

10   A.   Yeah, that was real cool to me.

11   Q.   Did you guys spend the night there at that truck stop?

12   A.   Yeah.

13   Q.   Same truck that we've been talking about?

14   A.   Yes.

15   Q.   That green truck in Exhibit 2, right?

16   A.   Yes.  The green semi with Precision Construction on the

17   side.

18   Q.   Did you and Mr. McFadden -- was it you and Mr. McFadden?

19   A.   Yes.

20   Q.   Anybody else?

21   A.   No.

22   Q.   Did you guys sleep in the same places?

23   A.   Yes.  In the cab of the semi on the mattress.

24   Q.   What, if anything, happened that night?

25   A.   That night after looking at that toy semi and all that I

1    remember watching a movie in the cab and going back into the

2    truck stop for a few different times like maybe to use the

3    restroom or to grab another snack or soda and watched a movie

4    and went to sleep that night, and it wasn't until later that

5    night until I woke up to like an incident.

6    Q.   What did you wake up to?

7    A.   I woke up to a wet sensation, kind of one of my normal

8    experiences, but prior to that it was like a wet sensation and

9    pressure.

10   Q.   What was the pressure from?

11   A.   It was Mike McFadden sticking his penis into me.

12   Q.   Into your butt?

13   A.   Yes, into my rectum.

14   Q.   What made that incident stop, do you recall?

15   A.   Me tossing and turning made that incident stop earlier

16   than it would have.

17   Q.   Did you ever talk to Mr. McFadden during that incident?

18   A.   No.

19   Q.   Were there other times that stood out for you?  Let me ask

20   it this way.  Were there times when something happened that

21   stood out for you thinking back?

22   A.   Like, incidences during the night that stand out?

23   Q.   Yeah, or things that happened afterwards.

24   A.   That tongue incident was one that really stands out, and

25   one time another incident that stood out was instead of like a

19-cr-00243-CMA-GPG-1 Jury Trial - Day 2                                    258

1    pressure feeling that I was normally feeling, during one of

2    the incidences I kind of felt maybe a finger instead of a

3    tongue or a penis.  That might have been a strange incident.

4    Q.  Do you recall where that took place?

5    A.  I believe it took place at the Glen Road house.

6    Q.  How would you feel after these incidents?  How would your

7    body feel?

8    A.  I'd, like, feel sick kind of, like almost nauseating.  And

9    I had real troubles using the bathroom.  For instance, I

10   remember one time being at school and going and using the

11   bathroom and wiping, and it was all red, all blood.  And then

12   I knew it was from that, and I just didn't tell nobody.  And

13   certain instances afterwards that would happen and on the

14   worser instances.  So that's the incidences I remember.

15   Q.  When you say you had trouble going to the bathroom...

16   A.  I had trouble pooping.  It hurt really bad.

17   Q.  Would you get diarrhea?

18   A.  Yeah.

19   Q.  Do you recall talking to us about a time at school where

20   you had diarrhea?

21   A.  Uh-huh.

22        MR. MCDERMOTT:  Objection, leading.

23        THE COURT:  He's transitioning.  Overruled.

24        MR. CHAFFIN:  Thank you, Your Honor.

25   Q.  (By MR. CHAFFIN) About how old was that incident?

                        Sarah K. Mitchell, RPR, CRR

1  A.  I was around like 9.  9, 10.

2  Q.  Do you remember what grade you were in?

3  A.  I think I was in like 3rd or 4th grade.

4  Q.  Okay.  What school?

5  A.  Dos Rios.

6  Q.  Okay.  That's here in Grand Junction?

7  A.  Yes.

8  Q.  What happened at school at that -- did you have trouble

9  going to the bathroom?

10  A.  Yes.  I was having trouble going to the bathroom, and I

11  was having really bad diarrhea, and in this instance I

12  couldn't really make it to the bathroom, and so I needed a

13  change of clothes at school.

14  Q.  Okay.  Did you -- how many times did you have to go to the

15  bathroom that time?

16  A.  I'd say, like, three times I had to go, like, back to back

17  to back almost, and because I had to ask so many times, my

18  teacher was like, Are you okay?  And I told her I was having

19  trouble going to the bathroom.

20        MR. CHAFFIN:  Could I have just one moment, Your

21  Honor?

22        THE COURT:  You may.

23  Q.  (By MR. CHAFFIN) J.W., did you ever tell your teachers

24  about what was going on?

25  A.  No.

19-cr-00243-CMA-GPG-1 Jury Trial - Day 2                                    260

1   Q.  Did you ever tell your mom?

2   A.  No.

3   Q.  What about your cousins?

4   A.  No.

5   Q.  Your aunts?

6   A.  No.

7   Q.  Your grandma is in the picture, right?

8   A.  Yeah.

9   Q.  Did you tell her?

10  A.  No.

11  Q.  Do you remember telling -- do you recall a time -- well,

12  do you recall a time meeting with police officers when you

13  were about seven?

14  A.  Yeah.

15  Q.  And they asked you questions, right?

16  A.  Yeah.

17  Q.  Did you ever tell them about what was going on during that

18  incident?

19  A.  No.

20  Q.  Why not?

21  A.  I was scared, and I didn't want to be the first person to

22  say something.

23  Q.  Were there times -- was there a time when you felt like

24  something was happening to another boy?

25  A.  Yeah.

                    Sarah K. Mitchell, RPR, CRR

1    Q.  K.W., right?

2    A.  Yeah.

3    Q.  Can you tell the jury about what happened that made you

4    feel like something was happening to him?

5    A.  I was at the 2980 D 1/2 Road house, and it was before John

6    and Phyllis moved out.  So we were staying in the utility room

7    next to the laundry room, and it was me, Mike and K.W. who

8    were sleeping in the bed.  And Mike was in the middle of the

9    bed, and K.W. was on the right side, and I was on the left

10   side, and I woke up to K.W. saying, Stop, and K.W. saying, Ew,

11   that's gross.  And because of previous instances with Mike I

12   already knew what was going on, but I continued to play asleep

13   on my side, continued hearing K.W. say, Stop, that's nasty,

14   that's gross, and Mike saying, Quit it, knock it off, you

15   little shit, go to bed.  And I just remained acting like I was

16   asleep.

17   Q.  And you said because of prior instances you knew what was

18   going on.  Are you talking what about was happening with you?

19   A.  With me.  And in this instance when he said that's gross

20   and stop, I put two and two together from my previous

21   instances on myself, yes.

22   Q.  During that incident with K.W. did you feel anything that

23   was going on?

24   A.  I felt like a motion in the bed.  After he was saying

25   stop, he was trying to almost get out of the bed and rolling

1  around in the bed, so I did feel a commotion in the bed.

2  Q.  And did you smell anything?

3  A.  Like a musty smell.

4  Q.  What did that smell remind you of?

5  A.  It reminded me of the previous instances where I would

6  have, like, juices come out of my butt.  It would kind of

7  smell like that.  It was a like musty fart smell.

8  Q.  Did it remind you of the times that Mr. McFadden put his

9  penis in your butt?

10  A.  Yes, it did.

11  Q.  Did you ever say anything to K.W.?

12  A.  No.

13  Q.  Why not?

14  A.  Again, I was scared to say anything to anyone, and let

15  alone I really didn't want to be the first person to say

16  something.

17  Q.  And when you heard Mr. McFadden speaking to K.W. and

18  saying you're being a shit, how did that make you feel?

19  A.  Well, at first I kind of felt kind of good because K.W.

20  was sticking up for himself.  And then when I seen how Mike

21  reacted to him was kind of my thoughts of why I never really

22  wanted to say something myself, because when K.W. said

23  something, he got angry, and he said, stop, you little shit,

24  and was throwing him back in bed, and that's one of the

25  reasons why I never wanted to say anything during the

19-cr-00243-CMA-GPG-1 Jury Trial - Day 2                          263

1    incidents because I was afraid something like that would

2    happen.

3              MR. CHAFFIN:  Nothing further, Your Honor.

4              THE COURT:  All right.  Cross-examination.

5                          CROSS-EXAMINATION

6    BY MR. MCDERMOTT:

7    Q.  So, J.W., I actually am going to begin where you just left

8    off.  You've spoken with law enforcement a number of times

9    about this case and the allegations against Mr. McFadden; is

10   that right?

11   A.  How many times?

12   Q.  You've spoken with them quite a few times; is that

13   correct?

14   A.  I would say that's not correct.  I'd say I spoke to them a

15   few times.

16   Q.  A few times.  Okay.  Well, I'm going to focus on the last

17   time that you spoke with the prosecutor and Agent Zappe

18   getting ready for trial on October 27th of this year; is that

19   right?

20   A.  Yes.

21   Q.  Okay.  And with respect to what you just testified to with

22   respect to K.W. sticking up for himself, as you put it, that

23   was the first time you ever said you witnessed something with

24   K.W.; is that correct?

25   A.  Yes.

                    Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 2                    264

1   Q.  Now, I'm going to now back up, and I want to talk about in

2   more specificity some of the things you previously have said,

3   okay?

4   A.  Yeah.

5   Q.  All right.  You were interviewed in -- on January 21st of

6   2009, correct?

7   A.  Possibly.

8   Q.  Possibly.  It's hard to remember, right?

9   A.  Yeah.

10  Q.  Yeah.  You were, what, nine years old?

11  A.  It was in 2009?

12  Q.  Yeah.

13  A.  Yes, I would be nine.

14  Q.  Okay.  And back when you were nine years old, you were

15  asked whether anyone had ever touched you sexually, correct?

16  A.  Yes.

17  Q.  And you answered no, right?

18  A.  Correct.

19  Q.  And you were also asked if anyone ever touched you what

20  would you do, and you answered that, correct?

21  A.  Yes.

22  Q.  And you told them that you would tell your mother?

23  A.  Yeah.

24  Q.  And I know that your mom has had difficulty, but you got

25  along with your mother when you were nine years old; is that

19-cr-00243-CMA-GPG-1 Jury Trial - Day 2                              265

1   fair to say?

2   A.  Yeah.

3   Q.  You loved your mom?

4   A.  Yeah.

5   Q.  She loved you?

6   A.  Yeah.

7   Q.  She was the kind of person who told you if there was

8   something going on you could tell her?

9   A.  No.

10  Q.  No.  Okay.  Now, I want to move on to when you were -- I

11  guess you had just turned 13 because it was December 21, 2012.

12  You spoke --

13  A.  So I just turned 12.

14  Q.  Yes.  Yeah.  You spoke with a woman named Ms. Surad; is

15  that correct?

16  A.  I'm not sure.

17  Q.  You're not sure.  I believe she was with Detective

18  Prescott back then.  Do you remember the conversation?

19  A.  Not much.

20  Q.  Okay.  Well, my understanding is that you told Ms. Surad

21  that you lived with your sister B.W., lived with L.Wr., Cindy,

22  your mom, your uncle Mike, your cousin D.O., your cousin E.S.,

23  your aunt Crystal, and some dogs.  Is all that accurate and

24  correct?

25  A.  Yes.

                         Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 2                          266

1    Q.  And in that interview you were asked whether anyone had

2    ever touched you inappropriately; is that correct?

3    A.  Yes.

4    Q.  And you told them no?

5    A.  Correct.

6    Q.  And this is back at the end of 2012.  It's a little bit

7    before the time Mr. McFadden was arrested; is that right?

8    A.  Yes.

9    Q.  And you were living at D 1/2 Road at the time; is that

10   right?

11   A.  Correct.

12   Q.  And you went through it a bit, but I want to talk about D

13   1/2 Road for just a bit, okay?

14   A.  Yeah.

15   Q.  All right.  Now, in 2012, there were a lot of people

16   living on D 1/2 Road; is that right?

17   A.  Yeah.

18   Q.  And each person was kind of assigned -- I don't want to

19   say assigned, but people had areas where they generally slept;

20   is that fair to say?

21   A.  Yes.

22   Q.  Now, in one bedroom Cindy R. lived in there with D.O.,

23   E.S., and Jade McFadden; is that correct?

24   A.  Yes.

25   Q.  And in another -- actually in the living room, there were

                        Sarah K. Mitchell, RPR, CRR

1    four people living in the living room; is that correct?

2    A.  I can't remember if it was four, but I know there was a

3    lot of people staying.

4    Q.  Well, let me name the names, and tell me if this sounds

5    right or not.  Donna Foxx, Tyson Cross, Hailey Cross, and John

6    Foxx?

7    A.  I only remember John, which was our Papa John, staying in

8    the living room.

9    Q.  So you remember John staying in the living room?

10   A.  Yeah.

11   Q.  All right.  Could the others have lived there, or do you

12   just not remember?

13   A.  No, they didn't live there.

14   Q.  Okay.  In the other bedroom, K.Wr., B.W., and K.Wr. had a

15   boyfriend who was living there, right?

16   A.  Correct.

17   Q.  Okay.  And in another bedroom there was you, Mr. McFadden,

18   and your brother L.Wr.?

19   A.  Correct.

20   Q.  Okay.  And was D.R. living in the house at the time?

21   A.  I wouldn't say living, but he spent the majority of nights

22   over at our house.

23   Q.  The majority of the time over there, but he wasn't there

24   every night?

25   A.  Right.

1    Q.   Okay.  And there were two trailers in the back of the

2    house; is that correct?

3    A.   Correct.

4    Q.   And your mom lived in one; is that right?

5    A.   Yeah.

6    Q.   And she lived there with Trevor, Zach, and a person named

7    Chris Vigil?

8    A.   I wouldn't say lived with her, but they were always

9    around, yes.  My mom was the one that stayed in the trailer,

10   but they did not live there, no.

11   Q.   And in another trailer there was Crystal M.  She was in

12   another trailer, correct?

13   A.   Correct.

14   Q.   Sean Crohn?

15   A.   Correct.

16   Q.   Someone named Brandon?

17   A.   I can't remember.

18   Q.   Someone named Sean Elm?

19   A.   Yeah.

20   Q.   This house had one bathroom, correct?

21   A.   Correct.

22   Q.   Now, Mr. McFadden was arrested in January of 2013.  Up to

23   that point you had never told anyone that he did anything

24   sexually inappropriate with you, correct?

25   A.   Correct.

                    Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 2                          269

1   Q.  And to your knowledge, nobody in this house ever saw

2   Mr. McFadden do anything sexually inappropriate to you?

3   A.  Can you rephrase that?

4   Q.  Yes.  Nobody ever came and told you that they saw

5   Mr. McFadden do anything sexually inappropriate to you,

6   correct?

7   A.  Correct.

8   Q.  And the first time you said that Mr. McFadden did anything

9   sexually inappropriate to you was in February of 2013; is that

10  correct?

11  A.  Is that the incident where they came up to my house on

12  Glade Park?

13  Q.  Yes.

14  A.  Then yes.

15  Q.  And that was Julie Stogsdill and Detective Prescott,

16  correct?

17  A.  Detective Prescott?

18  Q.  Yes.

19  A.  I don't recall that.

20  Q.  Okay.  Who do you recall, Ms. Stogsdill?

21  A.  Yeah, and Ed.

22  Q.  Ed Prescott?

23  A.  Is that his last name?  I know him by Ed.

24  Q.  Okay.  During the interview they asked you if you knew why

25  you were here, and you answered them, and you told them that

                        Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 2                    270

1   they were there because Mike is a bad person; is that correct?

2   A.  Yeah.

3   Q.  You told them that Mike is a bad person because he touches

4   people?

5   A.  Is that all I said?

6   Q.  Yes.

7   A.  I don't think that was all I said.

8   Q.  Okay.  You told them they were there because he was a bad

9   person.  We're in agreement with that?

10  A.  Yeah.

11  Q.  Okay.  And during that interview -- and just to be clear,

12  as you said, this is the first time you're telling anybody

13  about --

14  A.  Anything, yes.  First time I ever spoke out and said Mike

15  is a bad person, yes.

16  Q.  And you initially told them that it happened once in a

17  great while; is that correct?

18  A.  I can't remember.

19  Q.  Okay.  There is a notebook down there.

20          MR. MCDERMOTT:  Your Honor, permission to refresh?

21          THE COURT:  You may.

22  Q.  (By MR. MCDERMOTT) Okay.  I can get it for you if that

23  makes it easier.

24  A.  No.  Which one?

25  Q.  Defendant's exhibits, and it begins with the letter A.

                        Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 2                         271

 1  It's a larger notebook that should be down there.

 2  A.  There's two of them here.

 3  Q.  Okay.  If you go to the tab that is labeled B-1, okay, and

 4  then can you -- let me grab my book as well.  Okay.  If you

 5  look at the bottom, and if you go to page 1177.

 6  A.  1177?

 7  Q.  Yes.  Okay.  And then if you can just review -- you see

 8  where the lines are on the left side?

 9  A.  Yeah.

10          THE COURT:  Are we on D-1?

11          MR. MCDERMOTT:  B-1.

12          THE COURT:  D?

13          MR. MCDERMOTT:  B, as in boy, Your Honor.  Sorry.

14          THE COURT:  I'm sorry.  Go ahead.

15  Q.  (By MR. MCDERMOTT) If you can just review the top of the

16  page through line number 868.

17  A.  You want me to read that?

18  Q.  Just read it to yourself.  And does that refresh your

19  memory as to the question that was asked?

20  A.  Yeah.

21  Q.  Okay.  And do you recall now that they did ask you how

22  many times this had happened?

23  A.  Yeah.

24  Q.  Okay.  And your answer was, Once in a great while,

25  correct?

                    Sarah K. Mitchell, RPR, CRR

1   A.  Yeah.

2   Q.  Now in March of 2013, you went and saw a nurse; is that

3   correct?

4   A.  Yeah.

5   Q.  She asked you questions about this?

6   A.  Yeah.

7   Q.  And you were 13 years old, correct?

8   A.  Correct.

9   Q.  And when you spoke with her, you told her that it happened

10  since you were six, and it happened until December of 2012,

11  correct?

12  A.  Yeah, that's correct.

13  Q.  And we're approximately three months removed from when you

14  initially said that anybody had ever touched you?

15  A.  Three months from that point?

16  Q.  Yes.

17  A.  I can't remember.  This instance where I'm talking with Ed

18  is three months after?

19  Q.  No.  Let me back up.  I confused you.  I apologize.  In

20  December of 2012, you reported that nobody had touched you

21  inappropriately, correct?

22  A.  Who did I report that to?

23  Q.  Ms. Surad and Mr. Prescott.

24  A.  I believe that is incorrect.  Especially after seeing this

25  and re-jogging my memory, I didn't tell them that nothing

19-cr-00243-CMA-GPG-1 Jury Trial - Day 2                            273

 1   happened.  I just said it wasn't a lot, frequently.  That it

 2   only happened once in a while is what I said here.

 3   Q.  Okay.  Well, and my question is I'm going back to the

 4   December 2012 interview that you had with --

 5   A.  With Ed and --

 6   Q.  Ms. Surad is who I'm talking about.

 7   A.  Up at Glade Park?

 8   Q.  When they came and asked you in December --

 9   A.  Where was this?

10   Q.  We've already gone through it.

11   A.  I'm just confused.

12   Q.  Okay.  I'm backing up to the time before Mr. McFadden was

13   arrested.

14   A.  Okay.  So you're going back to 2009 is when I was

15   interviewed.

16   Q.  Well, you were interviewed when you were nine.

17   A.  Yeah.

18   Q.  That was the first time you said that nobody touched you.

19   A.  Uh-huh.

20   Q.  In that interview you said if someone did, you would tell

21   your mom.

22   A.  Then we went to --

23   Q.  Now I'm going --

24   A.  Forward.

25   Q.  -- to December 2012.

                        Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 2                    274

1   A.  When Ed and the female officer came and did an interview

2   with me up at my house?

3   Q.  No.  That is the January one when you finally say that,

4   yes, someone has touched you.

5   A.  So you're talking at the police station before that?

6   Q.  Yes.

7   A.  Okay.  Thank you.  Now I can remember.

8   Q.  Okay.  And just so we're clear with each other, so

9   December 2012, you said no one touched you.  And then in

10  January of 2013, you changed your story, and you said

11  Mr. McFadden had touched you, correct?

12  A.  Correct.

13  Q.  And then in March of 2013, you went and you spoke with

14  this nurse, correct?

15  A.  Correct.

16  Q.  Okay.  Now, I want to go ahead and talk about a few things

17  that were discussed in this January interview that we're

18  talking about that's in front of you in the notebook, okay?

19  A.  Can you give the dates when you say the interviews?  It

20  helps me to remember.

21  Q.  But it's the one -- yes.  It's the one that's right in

22  front of you.

23  A.  The one at my house in Glade Park?

24  Q.  Yes.  Okay.

25  A.  Yes.

                    Sarah K. Mitchell, RPR, CRR

1    Q.  Now, you indicated to them that sometimes you would sleep

2    in your mom's room and sometimes you would sleep in

3    Mr. McFadden's room, correct?

4    A.  What location?

5    Q.  Mr. McFadden's bedroom.

6    A.  And then my mom's bedroom?  Because my mom didn't have a

7    bedroom.  She had a trailer.

8    Q.  Okay.

9    A.  And I don't recall saying that I stayed in the trailer

10   with my mom.

11   Q.  Okay.  Well, you can turn to -- so your belief is that you

12   never stayed with your mom in her trailer, if I understand

13   correctly?

14   A.  Yeah.  I never stayed in the trailer with my mom.

15   Q.  Okay.  All right.  Well, to give you a date, you were

16   interviewed by a woman named Stephanie Knapp on August 8,

17   2018; is that correct?

18   A.  Yeah.

19   Q.  Okay.  And can you please -- I'll move on to another

20   topic.  J.W., the interview you had on October 26, 2022, you

21   spoke about the Arizona trip that you took with Mr. McFadden;

22   is that correct?

23   A.  Yes.

24   Q.  Okay.  And you told Agent Zappe and Mr. Chaffin that

25   Mr. McFadden did not put anything white in your drink on that

19-cr-00243-CMA-GPG-1 Jury Trial - Day 2                                276

1  trip; is that correct?

2  A.  On the Arizona trip with the semi remote-control trip?

3  Q.  Yes.

4  A.  No.  He didn't put anything into my drink.

5  Q.  Okay.  And in this interview, this is the first time you

6  said anything about Mr. McFadden putting his tongue on your

7  anus; is that correct?

8  A.  In the interview in 2018?

9  Q.  No.  The October 26, 2022, interview.

10 A.  Was the first time I said that he touched my anus with his

11 tongue?

12 Q.  Yes.

13 A.  Of 2022?

14 Q.  Yes.

15 A.  That's incorrect.

16 Q.  That's incorrect.

17 A.  Yeah.

18 Q.  Okay.  You told them that this happened after you returned

19 from a semi trip, and it happened in the truck while you were

20 parked in the street, correct?

21 A.  Correct.

22 Q.  And if I heard on direct correctly, you told -- or you

23 just testified that was right before Mr. McFadden brought you

24 to your house?

25 A.  Correct.

Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 2                          277

1    Q.  And it's your belief that you have told that version to

2    law enforcement before October 26, 2022?

3    A.  Yes.  I recall telling someone when asked about any

4    different instances that happened I do recall saying something

5    about me feeling a tongue on my anus to somebody.

6    Q.  And you think you said that to someone before October 26,

7    2022?

8    A.  I think so.

9    Q.  And the thing about K.W. making painful grunting noises,

10   the first time you said anything about that was October 26,

11   2022, correct?

12   A.  Correct.

13   Q.  And you said that that is the reason you never reported

14   abuse before, correct?

15   A.  That's because I had an incident where I watched another

16   boy say something?

17   Q.  Yes.

18   A.  Correct.

19   Q.  And this was the first time you said anything about seeing

20   Mr. McFadden abuse someone else?

21   A.  The first time I said that I heard another boy say verbal

22   words that led me to believe something was going on, yes.

23   Q.  Okay.  And so my question to you is the first time you

24   said that was October 26, 2022, correct?

25   A.  Yeah.

                        Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 2                    278

1    Q.  I want to talk about the Arizona trip, okay?

2    A.  Okay.

3    Q.  You have -- you initially indicated that the first time

4    anything happened was at that funeral in Arizona; is that

5    correct?

6    A.  That is correct.

7    Q.  And you initially said that in an August 8th interview

8    with a woman named Stephanie Knapp; is that correct?

9    A.  That's correct.

10   Q.  And you said --

11   A.  My watch.  Sorry.

12   Q.  That's fine.

13   A.  I accidentally pushed Siri.

14           THE COURT:  What year on the August date?

15           MR. MCDERMOTT:  I'm sorry, Your Honor?

16           THE COURT:  You said an August date, but no year.

17   Can we have the year?

18           MR. MCDERMOTT:  Yes, Your Honor.  I said August 8th,

19   2018.

20           THE COURT:  Okay.

21   Q.  (By MR. MCDERMOTT) Now, there were other people who were

22   on that trip, correct?

23   A.  On which trip?

24   Q.  On the --

25   A.  That funeral trip?

                        Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 2                          279

1   Q.  Yes.

2   A.  Correct.

3   Q.  That was for a family funeral?

4   A.  Correct.

5   Q.  And in your interview with Ms. Knapp you weren't clear as

6   to who all went on that trip, correct?

7   A.  Correct.

8   Q.  I believe your words were it was kind of like a haze?

9   A.  Kind of like a haze?

10  Q.  Yes.

11  A.  I probably listed the people I could remember, but I

12  couldn't remember everybody, correct.

13  Q.  Okay.  And when you had this interview with Ms. Knapp, you

14  indicated that actually Mr. McFadden had put drugs in your

15  drink?

16  A.  On that trip?

17  Q.  Yes.

18  A.  I don't recall that.

19  Q.  You don't recall that.

20       MR. MCDERMOTT:  Your Honor, I apologize.  I misplaced

21  my source on that.  May we take our break?

22       THE COURT:  No.

23  Q.  (By MR. MCDERMOTT) With respect to that trip --

24  A.  Which trip?

25  Q.  The Arizona trip for the funeral.

                    Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 2                              280

 1   A.   Okay.

 2   Q.   People were in adjoining rooms.   There was a boys' room

 3   and a girls' room, correct?

 4   A.   Correct.

 5   Q.   And you were in the boys' room; is that correct?

 6   A.   Yeah.

 7   Q.   And there were -- there was a door that connected the two

 8   rooms?

 9   A.   Correct.

10   Q.   And that door was open for most of the trip, correct?

11   A.   Incorrect.

12   Q.   Incorrect?

13   A.   Incorrect.

14   Q.   Okay.   There were other boys who were in the room and in

15   the bed with you, correct?

16   A.   Correct.

17   Q.   And do you recall which boys were there with you?

18   A.   E.S. and D.O., my cousins.

19   Q.   And they slept in the same bed as you, correct?

20   A.   Correct.

21   Q.   And you didn't report Mr. McFadden doing anything to you

22   to them, correct?

23   A.   To my cousins?

24   Q.   Right.

25   A.   Correct.

1   Q.  J.W., with respect to the smell that you described in your

2   direct testimony, the first time you reported that was in your

3   October 28th interview getting ready for trial; is that

4   correct?

5   A.  Correct.

6   Q.  With respect to the trips that you went to New Mexico, you

7   were not the only person on those trips; is that correct?

8   A.  On the New Mexico trip?

9   Q.  Yes.

10  A.  I was the only person.

11  Q.  You believe you were the only person?

12  A.  Yes.

13  Q.  Okay.  And how many of those trips do you recall going on?

14  A.  A lot.

15  Q.  A lot?

16  A.  Yeah.

17  Q.  J.W., how long were you at the D 1/2 address?

18  A.  For the majority of the incidents that we talked about.

19  I'd say about five years, six years.

20  Q.  Five to six years?

21  A.  Maybe even more.

22  Q.  And the entire time at D 1/2 you never told anybody that

23  Mr. McFadden was doing anything to you?

24  A.  At the D 1/2 house?

25  Q.  Right.

                        Sarah K. Mitchell, RPR, CRR

1    A.  Correct.  I never told nobody.

2    Q.  And on October 28th, 20 -- excuse me -- on October 28th

3    getting ready for this trial you mentioned an incident that

4    happened at Mr. McFadden's home prior to the Glen Road

5    address, correct?

6    A.  Correct.

7    Q.  And getting ready for trial, that was the first time you

8    mentioned that allegation, correct?

9    A.  Yeah.

10            MR. MCDERMOTT:  Those are my questions, Your Honor.

11            THE COURT:  All right.  Any redirect?

12            MR. CHAFFIN:  Yes, please.

13                        REDIRECT EXAMINATION

14   BY MR. CHAFFIN:

15   Q.  J.W., I just want to -- I'm a little confused about the

16   order of interviews, so I want to clarify.

17   A.  Okay.

18   Q.  So there was an interview in 2007.

19   A.  Yeah.

20   Q.  Who was that with, do you remember?

21   A.  I believe it was in Arizona when we went to go visit my

22   cousins D.O. and E.S. who lived in Arizona.  I believe the

23   instance happened when police received a phone call.

24   Q.  Okay.  Was there a time here in Grand Junction when you

25   talked to police?

19-cr-00243-CMA-GPG-1 Jury Trial - Day 2                     283

1   A.   Yes.

2   Q.   Okay.  When was that?

3   A.   Right after we were told -- or before, I guess, we were

4   told to go grab a couple things of clothes from the 2980 Road

5   house we were brought to the police station.

6   Q.   Okay.  Do you remember speaking with a Detective Sean

7   Crocker?

8   A.   I'm not good with names.

9   Q.   But you remember talking to a police officer in 2007,

10  2008?

11  A.   Yeah.

12  Q.   Do you remember going to the Western Slope Center For

13  Children?

14  A.   Yes.

15  Q.   You remember that interview?

16  A.   Yes.

17  Q.   And you didn't disclose during that interview?

18  A.   Correct.

19  Q.   Okay.  We talked about why?

20  A.   Yeah.

21  Q.   Do you remember meeting with someone at the Grand Junction

22  Police Department from Child Protective Services?

23  A.   Around when?

24  Q.   Around December of 2012.

25  A.   Yes.

                    Sarah K. Mitchell, RPR, CRR

1   Q.  Her name was Niki Surad.  Do you remember her name at all?

2   A.  No.

3   Q.  Do you remember speaking with a woman?

4   A.  Yeah.

5   Q.  Had you met Detective Ed Prescott then?

6   A.  I don't know if I met him, but I know I was told about Ed.

7   Q.  When you met with that woman from Child Protective

8   Services, did you tell her about what was going on?

9   A.  No.

10  Q.  Is that for the same reasons that we've talked about

11  already?

12  A.  Yeah.  I was like kind of like -- because I know something

13  had already been said because that's why everyone is asking,

14  but I was kind of just, like, seeing if it was going to be one

15  of those, like, questions that were asked to me in 2007, if it

16  was just going to blow over when I said no and everyone said

17  no, or if it was going to be bigger than it was.

18  Q.  Okay.  Had you dealt with Child Protective Services during

19  your life at that point?

20  A.  Yeah.

21  Q.  What had happened when you've had to deal with them in the

22  past?

23  A.  I used to have them coming to my school and asking me

24  questions because I was -- like, example, I was always hungry,

25  or I remember one time kids saying I smelled, and so child

19-cr-00243-CMA-GPG-1 Jury Trial - Day 2                    285

1   services got called.

2   Q.  Did they ever take you out of your home?

3   A.  No.

4   Q.  Were you worried that might happen?

5   A.  Yeah.

6   Q.  Were you worried they might take you away from Mike's

7   house?

8   A.  Yeah.

9   Q.  And then you meet with Detective Prescott and a female

10  detective at your house?

11  A.  Yes.

12  Q.  And this is after things had happened?

13  A.  Yes.

14  Q.  Is that after you had been told you can only go into the

15  house and get some clothes?

16  A.  Yes, that was after.

17  Q.  So you had been taken out of Mr. McFadden's house?

18  A.  Yes.

19  Q.  You lost all those things --

20  A.  All those things.

21  Q.  -- that you talked about?

22  A.  Yeah.  I went into my house and grabbed a few articles of

23  clothing that I needed and a toothbrush and just to see if it

24  was going to die over and I could come back and play my Xbox.

25  When it didn't die over, we went to go grab the things I

19-cr-00243-CMA-GPG-1 Jury Trial - Day 2                          286

1   wanted from the house like my airsoft guns, my Xbox, and

2   everything was ransacked.

3   Q.  And when you met with Detective Prescott, is that the

4   first time that you told anybody a little bit of what had been

5   going on?

6   A.  Yeah.  At that moment I realized it wasn't blowing over,

7   and that I wasn't going to be the only one having to do this,

8   and it reassured me a little bit.

9   Q.  Did you tell Detective Prescott everything that had

10  happened to you?

11  A.  Not even close.  I still to this day haven't told

12  everybody every single instance because it would take forever.

13  Like I said, it happened two to three times a week for seven

14  years, so that would be a hard thing to describe every

15  incident that happened.

16  Q.  Can you even remember every single incident that happened?

17  A.  I remember a majority of it.  There's instances of

18  blocking.

19  Q.  Do they sometimes sort of blend together?

20  A.  Yeah.

21  Q.  But the ones that we talked about on direct, you remember

22  those?

23  A.  Yeah.

24  Q.  Mr. McDermott asked you about talking about the time when

25  you felt licking or a tongue.

Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 2                    287

1    A.   Uh-huh.

2    Q.   He suggested you had just said that recently.

3    A.   Yeah.  Uh-huh.

4    Q.   But I think you said that was incorrect, right?

5    A.   Yeah, because I think I told in the 2018 interview to the

6    center when I finally was saying things and more things were

7    coming to my mind, I believe when the lady asked me if there

8    was anything strange or out of the picture that you could

9    remember, and I believe I remember saying that.

10   Q.   Could you -- could you look at that defense exhibit

11   binder?  Do you have that in front of you?

12   A.   Is it the first one we were using?

13   Q.   It's the ones that go A and B and C.

14   A.   Yeah, I have it in front of me.

15   Q.   Can you turn to Defense Exhibit C-1.

16   A.   Okay.

17   Q.   What does it say that is?

18   A.   It says it's an audio transcript interview of J.W. by

19   Stephanie Knapp on the August 8th of 2018.

20   Q.   And it's pretty thick, right?

21   A.   Yeah.

22   Q.   Could you turn to page 88.

23   A.   Page 88.

24   Q.   Could you just read lines 10 through 16, please.

25              THE COURT:  To himself or out loud?

                          Sarah K. Mitchell, RPR, CRR

1          MR. CHAFFIN:  Sorry, Your Honor?

2          THE COURT:  To himself or out loud?

3          MR. CHAFFIN:  I would ask that he read them out loud

4   to the jury, Your Honor.

5          THE COURT:  All right.  Well, I think that would be

6   inappropriate.  I think he needs to read it to himself.  Then

7   you can ask him about it.  So read it to yourself, J.W.

8   A.   What lines again?

9   Q.   (By MR. CHAFFIN) 10 through 16.

10  A.   10 through 16?

11  Q.   Yes.  Have you had a chance to read those?

12  A.   Yeah, on page 86.

13  Q.   88.  Sorry.

14  A.   Page 88, sections 10 through 16?

15  Q.   Lines 10 through 16.  Did you get a chance to read those?

16  A.   Yes, I did.

17  Q.   What are you talking about in those lines?

18  A.   In those lines I'm telling Stephanie that I felt a

19  different type of sensation, not something inserting me, but a

20  licking sensation and a mustache sensation.

21  Q.   Okay.  So you talked with Stephanie Knapp about the

22  licking?

23  A.   Yeah.

24  Q.   Way back in 2018?

25  A.   In 2018, yes.  So I knew I had said it before.

1    Q.  Mr. McDermott also asked you about talking about a smell

2    and suggested that you had just recently said that --

3    A.  Yeah.

4    Q.  -- in October.

5    A.  Yeah.

6    Q.  And I think you said that was correct?

7    A.  Yeah.

8    Q.  Would it refresh your recollection to take a look at what

9    you had talked about with Ms. Knapp about whether or not that

10   actually was correct?

11   A.  Yes.  Now that I see especially that I talked to her about

12   the mustache and licking sensation, I might have mentioned a

13   smell somewhere in this interview.

14   Q.  Sure.  Could you turn to page 145, and can you just take a

15   look at line 15.  Does that refresh your recollection about

16   when you talked about a smell?

17   A.  Yeah.

18   Q.  You used the words fecal smell?

19   A.  Yeah.

20   Q.  J.W., have you felt like you've ever had a chance to talk

21   about all of the things that have happened to you?

22   A.  No.

23   Q.  And even after all of those things that were going on, did

24   you prefer staying at Mike's house to your mom's house?

25   A.  Yeah.

 1          MR. CHAFFIN:  Nothing further, Your Honor.

 2          THE COURT:  Thank you very much.  J.W., you may step

 3   down.  It is 12:03, so I suggest we take our lunch break until

 4   we start with the next witness.  Remember, ladies and

 5   gentlemen, do not discuss this case among yourselves or with

 6   anyone else and do not do any research.  We will take a lunch

 7   break from now until 12:35 or so.  Court will be in recess.

 8          THE COURTROOM DEPUTY:  All rise for the jury.

 9      (Jury left the courtroom at 12:04 p.m.)

10      (Break was taken from 12:04 p.m. to 12:34 p.m.)

11          THE COURT:  Ms. Myhaver, would you please bring in

12   the jury.

13          MR. CHAFFIN:  Your Honor, would you like me to grab

14   our next witness?

15          THE COURT:  Yes, please.

16          THE COURTROOM DEPUTY:  All rise for the jury.

17      (Jury entered the courtroom at 12:35 p.m.)

18          THE COURT:  Mr. Chaffin, the Government may call its

19   next witness.

20          MR. CHAFFIN:  Thank you.  The Government calls

21   Michelle R.

22          THE COURT:  Ms. Myhaver, would you please administer

23   the oath.

24          THE COURTROOM DEPUTY:  Will you please stand and

25   raise your right hand.

                        Sarah K. Mitchell, RPR, CRR

 1                        MICHELLE R.

 2   was called as a witness and, having been duly sworn, was

 3   examined and testified as follows:

 4           THE COURT:  You can be seated.  Please state your

 5   name and spell your first and last name for the record.

 6           THE WITNESS:  Michelle R., M-i-c-h-e-l-l-e R-//////.

 7           THE COURT:  Mr. Chaffin, you may proceed.

 8           MR. CHAFFIN:  Thank you, Your Honor.

 9                     DIRECT EXAMINATION

10   BY MR. CHAFFIN:

11   Q.   Good afternoon, Ms. R//////.  Where do you live?

12   A.   175 Wimberly Drive.

13   Q.   What city?

14   A.   Grand Junction, Colorado.

15   Q.   How long have you lived in Colorado?

16   A.   Almost all my life except for four years maybe.

17   Q.   How old are you?

18   A.   I am 43.

19   Q.   Do you have any children?

20   A.   I do.  I have four.

21   Q.   What are their names?

22   A.   K.Wr., J.W., L.Wr., and B.W.

23   Q.   What are their last names?

24   A.   W//////.

25   Q.   Now, your last name is R//////.  Did you always go by R//////?

                    Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 2                           292

1    A.  Yes.  I was never married.

2    Q.  J.W., how old is he?

3    A.  He is 22.

4    Q.  What's his birthday?

5    A.  10/25 of 2000.

6    Q.  Have you ever been convicted of a felony?

7    A.  Yes, I have.

8    Q.  When was that?

9    A.  2014, I think.

10   Q.  2014?

11   A.  Yeah.

12   Q.  What was the nature of the felony?

13   A.  It was a drug distribution charge.

14   Q.  Okay.  Have you completed your sentence?

15   A.  Yes.

16   Q.  Do you have any pending cases currently?

17   A.  I have a DUI case right now.

18   Q.  Am I or Ms. Surratt or the FBI agent involved in that

19   case?

20   A.  No.

21   Q.  Do you expect any benefit in your pending case because

22   you're testifying here?

23   A.  No.

24   Q.  Do you know a person named Mike McFadden?

25   A.  Yes, I do.

                        Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 2                              293

 1   Q.  Do you see him here in the courtroom?

 2   A.  I do.

 3   Q.  Could you point him out and describe an article of

 4   clothing he's wearing?

 5   A.  He's wearing a gray jacket, blue shirt.

 6            MR. CHAFFIN:  Your Honor, I ask that the record

 7   reflect that the witness has identified the defendant.

 8            THE COURT:  It so reflects.

 9   Q.  (By MR. CHAFFIN) Ms. R/////, how do you know Mr. McFadden?

10   A.  I grew up with him.  He is my cousin's uncle.

11   Q.  Who's your cousin?

12   A.  Crystal M.

13   Q.  How is he your cousin's uncle?

14   A.  My cousin's dad is Tony, and they were brothers.

15   Q.  Does Crystal have any children?

16   A.  She has three.

17   Q.  Do you know what their names are?

18   A.  D.O., Jade, and E.M.

19   Q.  You should have a binder in front of you somewhere that

20   says government's exhibits original and then Volume I of II.

21   I want you to take a look at Government's Exhibit 8-1.

22   A.  Okay.

23            MR. CHAFFIN:  Have we admitted that one?  Permission

24   to publish, Your Honor?

25            THE COURT:  Yes, you may publish.


                        Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 2                                      294

1    Q.   (By MR. CHAFFIN) Who's that?

2    A.   That is my son J.W.

3    Q.   About how old is J.W. in this photo?

4    A.   I want to say maybe 11.

5    Q.   Okay.  Do you recognize the clothing that he's wearing?

6    A.   Yeah, I do.

7    Q.   Where did the clothes come from?

8    A.   I'm not sure.

9    Q.   How about the glasses?

10   A.   Uncle Mike.

11   Q.   And who's Uncle Mike?

12   A.   Mike McFadden.  That's what we called him.

13   Q.   So you referred to Mr. McFadden as Uncle Mike?

14   A.   Yes.

15   Q.   Tell the jury a little bit about how Uncle Mike,

16   Mr. McFadden, came to get these glasses.

17   A.   He made the appointment and took J.W. to get them because

18   J.W.'s eyes were bad.

19   Q.   Okay.  Was J.W. staying with Mr. McFadden during that time

20   period?

21   A.   No.

22   Q.   He was staying with you?

23   A.   Yes.

24   Q.   Can we have 8-2.  Do you recognize this person?

25   A.   Yes.

                        Sarah K. Mitchell, RPR, CRR

1   Q.  Who is that?

2   A.  That is J.W.

3   Q.  Was that his birthday?

4   A.  Yes.

5   Q.  How about 8-3, who's that?

6   A.  That's J.W.

7   Q.  About how old is J.W. there?

8   A.  I'd say 12 maybe.  13.

9   Q.  12, 13?

10  A.  I'm not sure.  It's been a while.

11  Q.  Are you familiar --

12          MR. CHAFFIN:  We can take that down.  Thank you.

13  Q.  (By MR. CHAFFIN) Are you familiar with the places where

14  Mr. McFadden lived?

15  A.  Yes, a few of them.

16  Q.  Do you recall a place by the Monument?

17  A.  Yes.

18  Q.  Do you recall the address of that house?

19  A.  No.

20  Q.  What did that house look like, do you remember?

21  A.  It kind of looked like -- would be like one of those built

22  modulars maybe or something.  I don't know.  It wasn't a real

23  big house, but it was in a nice location right at the bottom

24  of the Monument.

25  Q.  How big was the backyard?

19-cr-00243-CMA-GPG-1 Jury Trial - Day 2                     296

1   A.  I don't remember how big the backyard was, but it had a

2   huge field because it was the Monument.  It was desert back

3   behind it.

4   Q.  Okay.  After that house near the Monument, do you remember

5   the next place that Mr. McFadden lived at?

6   A.  Yeah, Glenwood or Glen something.

7   Q.  Sorry?

8   A.  It's Glen something Drive.

9   Q.  Okay.

10          MR. CHAFFIN:  Could we put up 3-1.

11  A.  Yeah.

12          MR. CHAFFIN:  I don't see it.

13          THE COURT:  You may publish.  I'm sorry.

14  Q.  (By MR. CHAFFIN) Is that the house that you're talking

15  about?

16  A.  Yes.

17  Q.  Who all lived at this place?

18  A.  John Hockenberry and his wife Phyllis.

19  Q.  John Hockenberry and his wife Phyllis?

20  A.  Yes.

21  Q.  How did they get connected with Mr. McFadden?

22  A.  I have no idea.  I don't know if they grew up together,

23  him and John, or they were friends from before.

24  Q.  But they were living there with Mr. McFadden?

25  A.  Yeah.

                    Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 2                          297

1   Q.   Anybody else in the house?

2   A.   I feel like he had a kid too maybe.

3   Q.   Who had a kid?

4   A.   John Hockenberry.

5   Q.   Do you remember his kid's name?

6   A.   No, I do not.

7   Q.   Would you spend a lot of time at this house?

8   A.   No.

9   Q.   What about J.W., would he go over to this house?

10  A.   J.W. did, yeah, a few times.

11  Q.   Did he ever spend the night?

12  A.   Yes.

13  Q.   Would J.W. kind of live -- stay there for long periods of

14  time?

15  A.   He would stay there, not for long periods, but he would

16  stay there.

17  Q.   During this timeframe when Mr. McFadden is living at this

18  house, where were you -- what was going on in your life?

19  A.   I lived up on Orchard Mesa with my ex Trevor Simowski.

20  Q.   Okay.  How was your relationship with Trevor?

21  A.   Oh, it was horrible.

22  Q.   It was horrible?

23  A.   Yeah, we were -- abuse and alcohol and drugs, and it was a

24  bad relationship.

25  Q.   Were you using drugs at that time?

                        Sarah K. Mitchell, RPR, CRR

1    A.  Yes.

2    Q.  What sorts of drugs were you using?

3    A.  I was on meth and marijuana and alcohol.

4    Q.  How frequently would you use?

5    A.  Probably every day.

6    Q.  Okay.  Was that true for a long period of time?

7    A.  For a few years, yeah, actually.

8    Q.  What was home life like for the kids?

9    A.  A mess.  Fighting, watching us fight all the time or not

10   be coherent.  It was a mess.

11   Q.  Did anybody help you out with the kids during that

12   timeframe?

13   A.  Yes, he did -- Uncle Mike did a lot of help with the kids.

14   I had my parents too that would help.  I had an older

15   daughter, K.Wr., that would help.

16   Q.  After that Glen Road house, do you know the next house

17   that Mr. McFadden lived at?

18   A.  Yeah, around D 1/2 Road.

19   Q.  Do you remember the address?

20   A.  3680 -- I don't know exactly.

21            MR. CHAFFIN:  Your Honor, can we put up 4-1?

22            THE COURT:  You may.

23   A.  Yeah.

24   Q.  (By MR. CHAFFIN) Is that the house where Mr. McFadden

25   resided?

                    Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 2                          299

1   A.  Yes.

2   Q.  On D 1/2?

3   A.  Yeah.

4   Q.  Who all lived at this house?

5   A.  Me, my cousin Crystal M., my aunt Cindy, Crystal's three

6   kids, my kids, Papa John.  We had a Papa John that lived

7   there.

8   Q.  Let's break that down a little bit, okay?

9   A.  Yeah.

10  Q.  You talked about your aunt Cindy.  How does she factor

11  into the family?

12  A.  She's Crystal's mom, Crystal M.'s mom.

13  Q.  And what's Cindy's last name?

14  A.  Cindy R////.

15  Q.  So your -- is that your -- like your parents' sibling?

16  A.  My dad's sister.

17  Q.  And Crystal is her daughter?

18  A.  Yes.

19  Q.  So Cindy is in the house?

20  A.  Uh-huh.

21  Q.  Where is she staying in the house?

22  A.  She sleeps in the back bedroom.

23  Q.  Anybody share her bedroom?

24  A.  E.S. and D.O. and Jade.

25  Q.  E.S., D.O. and Jade?

                        Sarah K. Mitchell, RPR, CRR

 1    A.   Yeah.

 2    Q.   Those are Crystal's kids?

 3    A.   Uh-huh.

 4    Q.   What about you, where are you living?

 5    A.   There was construction pods, like construction buildings

 6    or offices or whatever that he had bought that were in the

 7    back.  I stayed in one of them.

 8    Q.   Okay.  I'm not sure I understand what a construction pod

 9    is.

10    A.   It's like if you go to a construction site or like on a

11    rig site or whatever, they have those little trailers it looks

12    like or whatever that they use for offices.

13    Q.   Okay.  And you were -- so it wasn't like a -- it wasn't

14    set up to live in necessarily?

15    A.   Well, I kind of set it up to be.  It had a bedroom and a

16    living room.

17    Q.   Did it have a bathroom?

18    A.   Yeah, one of them did.

19    Q.   One of the trailer -- sounds like there were more than

20    one?

21    A.   There was two.

22    Q.   So you were living in one?

23    A.   Uh-huh.

24    Q.   And who was living in the other one?

25    A.   Crystal M. was living in the other one.

19-cr-00243-CMA-GPG-1 Jury Trial - Day 2                          301

1    Q.  Would people come and stay with you?

2    A.  Yes.

3    Q.  A boyfriend?

4    A.  Yes.

5    Q.  What about Crystal, would people come and stay with her?

6    A.  Uh-huh.

7    Q.  Did the kids ever stay in the trailers with you?

8    A.  No.  They stayed inside, because we had like little

9    heaters and stuff, so the kids were inside.

10   Q.  Still same sort of drug use that you talked about during

11   that timeframe?

12   A.  Yes.

13   Q.  Using methamphetamine every day?

14   A.  Yeah.

15   Q.  Kind of would be out of it?

16   A.  Yeah.

17   Q.  Where -- you said J.W. and L.Wr. and your kids, B.W. I

18   think and K.Wr., where were they staying?

19   A.  So K.Wr. And B.W. and Jade would have -- at one point they

20   had a bedroom, their own bedroom.  I think I stayed in there

21   for a little bit, but -- and then the two boys J.W. and L.Wr.

22   were in the room with Mike, in the bedroom with Mike.

23   Q.  Okay.  Where would they sleep?

24   A.  In the bed.

25   Q.  In the bed?

Sarah K. Mitchell, RPR, CRR

1  A.  Yeah, or there was a cot -- sometimes there was cots made

2  on the side of the bed.

3  Q.  You mentioned a Papa John?

4  A.  Yeah.

5  Q.  Who's that?

6  A.  He was like kind of a nanny that lived in the house.  He

7  would just make dinner and clean, because Uncle Mike would be

8  out on the road working doing his truck driving, so he would

9  just kind of run the house.

10  Q.  Where did Papa John stay?

11  A.  He would fall asleep on the couch.

12  Q.  Okay.  During that timeframe when you're kind of staying

13  in trailers and the kids were in the house, who would you say

14  took the lead in taking care of J.W.?

15  A.  Uncle Mike did.

16  Q.  Uncle Mike?

17  A.  Mike McFadden.

18  Q.  What sorts of things would he take care of?

19  A.  He would take him to school.  I didn't have a vehicle at

20  the time.  He would take them to school, appointments, school

21  functions, like, if he had concerts or...

22  Q.  Can you -- in that binder in front of you --

23  A.  Uh-huh.

24  Q.  -- can you turn to Government's Exhibit 11.

25          MR. CHAFFIN:  And, Your Honor, I think that this is a

19-cr-00243-CMA-GPG-1 Jury Trial - Day 2                    303

1    stipulated exhibit.  I'd move to admit Exhibit 11-1.

2            THE COURT:  11-1 is stipulated.  It is admitted.  You

3    may publish.

4        (Government's Exhibit 11-1 received.)

5    Q.  (By MR. CHAFFIN) Could we -- well, just generally what is

6    11-1 here?  What are these?

7    A.  These are school records for J.W.

8    Q.  Okay.  Could you turn to page 9.  What is this form right

9    here?

10   A.  That is his school registration form.

11   Q.  What school is it for?

12   A.  That is for Pear Park.

13   Q.  It says that at the top, right?

14   A.  Yeah.

15   Q.  And there's a section, Emergency Information.  Do you see

16   that part?

17   A.  Yeah.

18   Q.  Who's listed there?

19   A.  Mike McFadden.

20   Q.  And what is the purpose of that section?  Why are people

21   listed there?

22   A.  So if I needed somebody to go -- or whoever needed to go

23   pick him up or if he was sick or...

24   Q.  So is -- do you recognize the handwriting from this form?

25   A.  Yeah.

                    Sarah K. Mitchell, RPR, CRR

1  Q.  Who do you recognize that handwriting --

2  A.  That is all Mike McFadden's writing.

3  Q.  That's Mr. McFadden's writing?

4  A.  Yes.

5  Q.  Do you see the signature at the bottom?

6  A.  Yes.

7  Q.  Do you recognize that signature?

8  A.  No.

9  Q.  Sorry?

10 A.  That is not my signature, so that's not -- I don't

11 recognize it.

12 Q.  Okay.  You don't recognize who signed that?

13 A.  Nuh-huh.

14 Q.  Somebody filled that in and listed Mr. McFadden as

15 emergency contact?

16 A.  Yeah.

17 Q.  Is that consistent with your recollection of who was sort

18 of taking care of your kids at that time?

19 A.  Yes.

20 Q.  Could you look at page 11?

21        MR. CHAFFIN:  And can we -- do you have a way to zoom

22 in on Section 3?

23 Q.  (By MR. CHAFFIN) Could you take a look at Section 3 there.

24 A.  Yeah.

25 Q.  Again, who's listed as emergency contact?

                    Sarah K. Mitchell, RPR, CRR

1    A.  My mom and Mike McFadden.

2    Q.  Do you recognize the signature on this form?

3    A.  Yeah.

4    Q.  Who signed that?

5    A.  That is mine.

6    Q.  Okay.  So it sounds like at least some of these maybe

7    somebody else signed them.  Some of them you signed.  So you

8    knew that Mike McFadden was an emergency contact for your

9    kids, right?

10   A.  Yeah.

11   Q.  How about the next page, page 12, same person listed?

12   A.  Yeah.

13   Q.  This is for what school?

14   A.  Dos Rios.

15   Q.  What timeframe?  What date is on this form?

16   A.  8/13 of '10, 2010.

17   Q.  How about if we go to page 22.  This is a -- are you

18   there?

19   A.  Yeah.

20   Q.  Is it a different kind of form, right?

21   A.  Yeah.

22   Q.  What kind of form is this?

23   A.  Custody statement.

24   Q.  What's the purpose of this?

25   A.  I don't know.

19-cr-00243-CMA-GPG-1 Jury Trial - Day 2                        306

1   Q.  There's a Section 3 that says is anyone else allowed to

2   pick up your child?

3   A.  Oh, yeah.

4   Q.  Whose name is listed in there?

5   A.  Mike McFadden and Theresa R////.

6   Q.  And then there's a Section 4 where it says -- it asks if

7   attendance or grades can be released to people?

8   A.  Uh-huh.

9   Q.  And who's listed there?

10  A.  Mike McFadden and Papa John and Cindy, my aunt.

11  Q.  Okay.  You said Papa John.  It doesn't say Papa John in

12  there, though, right?

13  A.  John Foxx.

14  Q.  So John Foxx is Papa John?

15  A.  Yes.

16  Q.  Fair to say, like, throughout a lot of J.W.'s elementary

17  school period Mike McFadden is in the picture?

18  A.  Yes.

19  Q.  Mr. McFadden is taking on the primary role of taking care

20  of J.W.?

21  A.  Yes.

22  Q.  We can take that down.  At the houses where Mr. McFadden

23  lived, were there things that the kids liked to do?

24  A.  Yeah.  They went four-wheeling, motorcycling,

25  snowmobiling, boating, swimming, all kinds of stuff.

                         Sarah K. Mitchell, RPR, CRR

1   Q.  And you touched on this a little bit, but what did

2   Mr. McFadden do for work?

3   A.  He -- he helped a guy with property management.

4   Q.  Okay.

5   A.  Davidson Homes.  And then he did truck driving also.

6   Semi-trucks, he drove semi-trucks.

7   Q.  Do you remember what his --

8   A.  Dispatching.

9   Q.  Sorry.

10  A.  Sorry.  That's all right.

11  Q.  Do you remember what his trucks looked like?

12  A.  He had a green one.  I remember that one.

13         MR. CHAFFIN:  Your Honor, could we put up

14  Government's Exhibit 2-1?

15         THE COURT:  You may.

16  A.  Yeah.

17  Q.  (By MR. CHAFFIN) Do you recognize that truck?

18  A.  Uh-huh.

19  Q.  Is that the semi-truck that you were talking about?

20  A.  Yeah.

21         MR. CHAFFIN:  Okay.  We can take that down.  Thank

22  you.

23  Q.  (By MR. CHAFFIN) Would Mr. McFadden ever take J.W. on

24  semi-truck trips?

25  A.  Yes.

                    Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 2                          308

1   Q.  Was that a frequent occurrence?

2   A.  Yes.

3   Q.  What sorts of places would they go, do you know?

4   A.  I'm not sure.  Most of it was just around Colorado.  I

5   remember one time he went to Texas.

6   Q.  Okay.  Ms. R////, I want to ask you about a funeral for a

7   family member in Arizona.  Do you recall that funeral?

8   A.  Yes.

9   Q.  About when did that funeral happen?

10  A.  I don't recall.  I don't remember the year.

11  Q.  Okay.  Quite a while ago?

12  A.  Yeah.  Had to have been 2010, maybe, I'm thinking -ish.

13  Q.  Okay.

14  A.  Nine, 2009 maybe.

15  Q.  Whose funeral was it?

16  A.  It was my cousin Justin R////.

17  Q.  And did J.W. go on the trip to that funeral?

18  A.  Yes.

19  Q.  Do you remember where J.W. stayed?

20  A.  We all stayed in a hotel.  I think we had two rooms, and

21  he stayed with Uncle Mike.

22  Q.  Who else stayed with J.W. and Uncle Mike, do you remember?

23  A.  I don't remember who else was.  I think my aunt was.  I

24  don't remember exactly who all was with us.

25  Q.  Were you in the same room as J.W. and --

Sarah K. Mitchell, RPR, CRR

1   A.   No.

2   Q.   -- Mr. McFadden?

3   A.   No.

4   Q.   How were the rooms situated, the two rooms that you had?

5   A.   I don't remember.  I don't remember a lot of that night,

6   because I had tooth pain or whatever, and I was crying and

7   going up and down the halls I remember.  So I don't remember

8   too much of that might.  It was a bad night.

9   Q.   Were you using drugs?

10  A.   Not on that trip I wasn't.

11  Q.   Not on that trip?

12  A.   No.  But at the time I was, yeah.

13  Q.   So during that timeframe you were using drugs, but not on

14  the trip?

15  A.   Yeah.

16  Q.   Okay.

17          MR. CHAFFIN:  Could I have just one moment, Your

18  Honor?

19          THE COURT:  You may.

20  Q.   (By MR. CHAFFIN) Ms. R////, we talked about those trips

21  that J.W. went on.  Did you give permission for him to go on

22  those trips?

23  A.   Yeah.  Sometimes I didn't even realize that he was gone

24  because of being on the drugs.  I didn't pay attention or

25  whatever, so I'm sure he went on more trips than what I

Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 2                          310

1    remember.

2    Q.  Did J.W. ever tell you what was happening to him?

3    A.  No.

4    Q.  Did he ever come to you and disclose to you that he was

5    being abused?

6    A.  No.

7    Q.  During that timeframe when you lived with Mr. McFadden, do

8    you think that you were the most available?

9    A.  No.

10          MR. CHAFFIN:  Nothing further, Your Honor.

11          THE COURT:  Cross-examination.

12                        CROSS-EXAMINATION

13   BY MR. MCDERMOTT:

14   Q.  Good afternoon, Ms. R⬚⬚⬚⬚.

15   A.  Hello.

16   Q.  My name is Sean McDermott.  I'm representing Mr. McFadden,

17   and I just have a few questions for you, okay?

18   A.  Okay.

19          MR. MCDERMOTT:  All right.  If we could pull up

20   Exhibit D-1, please.  I'm sorry.  Government D-1.  I'm sorry.

21   4-1, please.

22          THE COURT:  And you wish to publish?  You may.

23   Q.  (By MR. MCDERMOTT) And, Ms. R⬚⬚⬚⬚, that's the D 1/2

24   address, correct?

25   A.  Yes.

                        Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 2                          311

1   Q.  Okay.  And can you tell us how long you lived there,

2   please?

3   A.  Maybe a year, two maybe.

4   Q.  Okay.  And I don't want to belabor it too long, but I do

5   want to get a good idea of what the living arrangement was.

6   A.  Uh-huh.

7   Q.  You mentioned Papa John.  That's John Foxx, correct?

8   A.  Yes.

9   Q.  And he lived in the living room; is that right?

10  A.  Yes.

11  Q.  And there were times that other people lived in the living

12  room; is that correct?

13  A.  Yes.

14  Q.  Did his wife Donna live in the living room?

15  A.  No.  Oh, she did -- yeah, she was there for a small time

16  because she was homeless.

17  Q.  And my understanding is some of the people that are

18  mentioned, they would kind of come and go?

19  A.  Yeah.

20  Q.  Not everybody lived there permanently, right?

21  A.  Yeah, Donna Foxx was not permanently living there.

22  Q.  And can you tell us how you ended up living at the D 1/2

23  address?

24  A.  We lost our house on Orchard Mesa the first time I went to

25  Uncle Mike's.  The second time was my husband died in my house

                    Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 2                          312

1    so I moved in with my uncle.

2    Q.  And when you say we, you moved in with the remainder of

3    your family, right?

4    A.  Yeah.

5    Q.  And just so we're clear, who all does that include?

6    A.  So when I moved out, it was me -- the boys always stayed

7    there.  So me and K.Wr. and B.W. moved into another house, and

8    then when the husband died, I moved back with Uncle Mike.  All

9    of -- me, B.W., and K.Wr. came back.

10   Q.  And my understanding is that the boys lived there before

11   you came because of the unfortunate difficulties --

12   A.  Yeah.

13   Q.  -- you were having?

14   A.  They were still staying there, yeah.

15   Q.  Okay.  All right.  And as the prosecution pointed out,

16   Mr. McFadden was helping out with school duties and with an

17   emergency contact?

18   A.  Yes.

19   Q.  And you mentioned that he took your son to an optometrist

20   appointment?

21   A.  Yeah, doctors' appointments.

22   Q.  And he would take the kids to other doctor appointments as

23   well; is that right?

24   A.  Yes.

25   Q.  Including their medical doctors who would examine them?

Sarah K. Mitchell, RPR, CRR

1    A.  Yes.

2    Q.  Now, I want to get just --

3           MR. MCDERMOTT:  And actually, can we move up to 4-2,

4    please.  Just a different view.  I'm sorry.  Go back to 4-1.

5    Okay.  We'll just stay there for a moment.

6    Q.  (By MR. MCDERMOTT) Now, it's obviously just a one-story

7    house, correct?

8    A.  Yes.

9    Q.  And there's one bathroom in this one-story house; is that

10   right?

11   A.  Yes.

12   Q.  And then you lived in the back and you called it a pod,

13   right?

14   A.  Yeah.

15   Q.  And who did you live with in the pod?

16   A.  Just myself.

17   Q.  Okay.  There were two pods, right?

18   A.  Yeah.

19   Q.  And was Crystal M. in the other pod?

20   A.  Yes.

21   Q.  Okay.  And where were Crystal's kids?

22   A.  Inside too.

23   Q.  Okay.  And so I -- my understanding is in one bedroom

24   there were four people who lived there including Cindy R////?

25   A.  Yeah.

19-cr-00243-CMA-GPG-1 Jury Trial - Day 2                                      314

1    Q.  And Cindy is related to you how?

2    A.  She's my aunt.

3    Q.  Okay.  And Cindy's name has popped up a couple times in

4    this case.  Are you aware of whether she spoke with Detective

5    Prescott when he was investigating this case?

6    A.  I'm not aware.

7    Q.  You're not aware.  Okay.  And then we talked about who was

8    living in the living room.  And then your daughter B.W. lived

9    in one of the bedrooms as well, correct?

10   A.  Yeah, and K.Wr.

11   Q.  And she was also there with K.Wr.?

12   A.  Uh-huh.

13   Q.  And K.Wr.'s boyfriend lived there too?

14   A.  Uh-huh, J.J., yeah.

15   Q.  And in Mr. McFadden's room your sons J.W. and L.Wr. were

16   there?

17   A.  Yeah.

18   Q.  And my understanding is they did have their -- another

19   room that they slept in for a period of time as well; is that

20   right?

21   A.  No.

22   Q.  Okay.  You believed that they were just there with

23   Mr. McFadden the whole time?

24   A.  Yeah.

25   Q.  Okay.  And how about D.R., do you recall him being there?

                         Sarah K. Mitchell, RPR, CRR

1    A.   Yeah.

2    Q.   Was he there permanently or was he just there some of the

3    time?

4    A.   Some of the time.

5    Q.   And in your pod, did Trevor ever stay there?

6    A.   So the second time -- or the first time, yeah, he stayed

7    there with me.

8    Q.   And were there other people who would stay in the pod from

9    time to time?

10   A.   I'd have friends over when I was partying at night.

11   Q.   Okay.  And is it fair to say that the partying would take

12   place more in the pods, and then the house was more of a --

13   A.   Yeah, it was.

14   Q.   -- for lack of a better term, a kind of, I don't know,

15   family-type home environment?

16   A.   Uh-huh.

17   Q.   And so by my count there were sometimes close to 20 people

18   staying on the property; is that right?

19   A.   No.  Maybe 15, 12.

20   Q.   15 or so?

21   A.   Yeah.

22   Q.   Okay.  All right.  Mr. Chaffin asked you about the places

23   that Mr. McFadden had lived, and prior to him living at the

24   476 Glen Road address he lived on Monument Road; is that

25   correct?

Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 2                          316

1   A.  Yes.

2   Q.  And my understanding is your kids did not ever go to the

3   Monument Road address?

4   A.  No.

5   Q.  They never went there, right?

6   A.  No.

7   Q.  And on direct I understand you said that your kids went on

8   a number of trips with Mr. McFadden, right?

9   A.  Yes.

10  Q.  And you said that there might be some that you were

11  unaware of; is that right?

12  A.  Yeah, I think so.

13  Q.  Okay.  My understanding is that to your knowledge he did

14  not take the kids on trucking trips to Arizona?

15  A.  No, I don't think -- not that I remember.

16  Q.  You don't remember him ever take them on trucking trips to

17  Arizona?

18  A.  I don't remember that.

19  Q.  Okay.  You do -- I mean -- and the trip -- the 2008 trip

20  to the funeral, that's different.  That was not a trucking

21  trip.  That was a --

22  A.  That was a family -- yeah, we all went out there, yeah.

23  Q.  Okay.  And who -- who all went on that 2008 funeral trip?

24  A.  I don't remember who all went that time.

25  Q.  Okay.  Did you ride with Mr. McFadden?

Sarah K. Mitchell, RPR, CRR

 1  A.  Yeah, uh-huh.

 2  Q.  Do you recall who else rode with him?

 3  A.  No.

 4  Q.  Okay.

 5  A.  I don't.

 6  Q.  Do you recall the town that you stayed in?

 7  A.  Either Mesa or Apache Junction.  No, I don't remember

 8  exactly, because I think we stayed by the -- I don't remember.

 9  I'm not going to say because I don't remember.

10  Q.  You did stay in either a hotel or a motel?

11  A.  We were in a motel out there, yeah.

12  Q.  And you had adjoining rooms; is that right?

13  A.  No, I don't think they joined.  I don't know.  I don't

14  remember.

15  Q.  You don't remember that?

16  A.  Nuh-huh.  I don't know why that night is a blur.

17  Q.  Okay.

18          MR. MCDERMOTT:  I don't have any other questions.

19  Thank you.

20          THE COURT:  Any redirect?

21          MR. CHAFFIN:  Briefly, Your Honor.

22                          REDIRECT EXAMINATION

23  BY MR. CHAFFIN:

24  Q.  Ms. R/////, I'm sorry I didn't ask this earlier.  Who's

25  J.W.'s father?

                          Sarah K. Mitchell, RPR, CRR

1   A.   His name is Thomas W////////.

2   Q.   And you and Thomas W////// were never married?

3   A.   No.

4   Q.   Where was he through all of this?

5   A.   I don't know.  He's been out of the kids' lives for a

6   while now.

7   Q.   He was sort of out of the picture?

8   A.   Yeah, he was out.  He'd been out of the picture since B.W.

9   was six months old.

10  Q.   And you mentioned a husband that had passed away.

11  A.   Well, yeah, I didn't get married to him, but he was pretty

12  much common law my husband.

13  Q.   Who was that?

14  A.   Trevor Simowski.

15  Q.   How did he pass away?

16  A.   He had a heart attack in bed with me.

17  Q.   Was that part of the reason you moved back in with

18  Mr. McFadden?

19  A.   Yes.

20  Q.   Okay.

21          MR. CHAFFIN:  One moment, Your Honor.

22          THE COURT:  All right.

23          MR. CHAFFIN:  Nothing further.

24          THE COURT:  All right.  Thank you very much.  You may

25  step down.

                    Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 2                          319

1              Government, call your next witness.

2              MS. SURRATT:  Your Honor, the Government calls Darren

3     Davidson.

4              THE COURTROOM DEPUTY:  Can you please stand and raise

5     your right hand.

6                          DARREN DAVIDSON

7     was called as a witness and, having been duly sworn, was

8     examined and testified as follows:

9              THE COURTROOM DEPUTY:  Thank you.  Please be seated,

10    and then please state your name and spell your first and last

11    name for the record.

12             THE WITNESS:  Darren Davidson, D-a-r-r-e-n

13    D-a-v-i-d-s-o-n.

14                         DIRECT EXAMINATION

15    BY MS. SURRATT:

16    Q.  Mr. Davidson, where do you live, just the city and state.

17    A.  Grand Junction, Colorado.

18    Q.  For about how long have you lived in Grand Junction?

19    A.  30 years.

20    Q.  What do you do for work?

21    A.  Construction.

22    Q.  And more specifically, do you own a construction company?

23    A.  Yes.  So we have several construction companies.  We have

24    Davidson Homes and Precision Paving and Construction and

25    Navajo Properties.

                          Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 2                         320

1   Q.  What was that last one?

2   A.  Navajo Properties.

3   Q.  What did you do for work in around 2012?

4   A.  I think we were still in the paving business, starting

5   that building, starting construction.

6   Q.  And so was that still Precision Paving and Construction?

7   A.  Yes.

8   Q.  Are you familiar with somebody named Michael McFadden?

9   A.  Yes.

10  Q.  And do you see him here in the courtroom today?

11  A.  Yes.

12  Q.  And could you please identify him by an article of

13  clothing that he's wearing?

14  A.  A gray jacket, gray sports jacket --

15  Q.  And what color of shirt?

16  A.  -- glasses.

17          MS. SURRATT:  Your Honor, can the record please

18  reflect that the witness has identified the defendant?

19          THE COURT:  It will so reflect.

20  Q.  (By MS. SURRATT) How did you know Mr. McFadden?

21  A.  He worked for me.

22  Q.  In what capacity did he work for you?

23  A.  He ran a -- I think general construction.  He would run

24  our semi and run equipment around if we had it, and he kind of

25  ran the trucking business.

                    Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 2                    321

1   Q.  Approximately when was this?

2   A.  I'd say 2008 or '9, somewhere in there, to 2012 or '13,

3   whatever day he quit running that.

4   Q.  So is this when you owned Precision Construction?

5   A.  Correct, yes.

6   Q.  What was the arrangement that you had with Mr. McFadden in

7   the trucking business?

8   A.  I don't remember if there was an actual arrangement.  He

9   just did that.  He would get money when he needed it.  And I

10  think we had thought we would maybe build up, and then as we

11  did we would buy a few more trucks and then actually start

12  making money.  I don't think we made hardly any money to

13  start, so there wasn't a real like pay arrangement.

14  Q.  Who handled -- sorry.

15  A.  He would rent -- or he would not rent, but he would stay

16  at the house that we owned, so that was kind of compensation

17  for that.  And then we would give him money for utilities, pay

18  the utilities, food, whatever he needed money for while we

19  were starting out this business.

20  Q.  All right.  I'll get back to the house that you owned in a

21  moment, but still focusing on the trucking business, who

22  handled the day-to-day operations of the business?

23  A.  Mike would.

24  Q.  So who made arrangements to pick up loads, for instance?

25  A.  That was Mike.

                    Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 2                    322

1    Q.   Who handled the paperwork for the loads?

2    A.   Mike did all that.

3    Q.   And how about invoices for the loads?

4    A.   I think Mike took care of all that.  We did -- he had a

5    roommate or a guy that was living with him, John, and I think

6    he might have helped with some of that paperwork.

7    Q.   And who decided where to take the trucks?

8    A.   That was Mike.

9    Q.   Did Mr. McFadden take your trucks in state or out of state

10   or both?

11   A.   Both.

12   Q.   As far as you know, would there be a business-related

13   purpose for bringing elementary-school-aged boys on truck

14   trips?

15   A.   No.  Not for business, no.

16   Q.   Did you ever observe whether Mr. McFadden had boys around

17   him generally?

18   A.   Yeah, he normally did.

19   Q.   Approximately what age were the kids?

20   A.   I would guess like 4 or 5 to 12 or 13.  Again, I didn't

21   know the boys much, but there were three or four that were

22   normally around him.

23   Q.   Do you recall the final trip that Mr. McFadden took in

24   your truck?

25   A.   I don't other than I think we had to go get the truck.  I

19-cr-00243-CMA-GPG-1 Jury Trial - Day 2                    323

 1   don't remember what -- where it was exactly, but we had to

 2   send someone over to go pick up the truck when he got arrested

 3   or whatever.

 4   Q.  So the truck was somewhere else and somebody had to go

 5   pick it up?

 6   A.  Correct.  It was out of state, but I don't remember the

 7   exact location.  I just remember it wasn't here.  It wasn't in

 8   state.

 9   Q.  Did you go pick up the truck or did somebody else, if you

10   remember?

11   A.  I can't remember.  I might have -- I couldn't -- I don't

12   drive the truck.  I don't have a license for it, so I could

13   have taken someone over there to pick up the truck and they

14   drove it back.

15   Q.  But necessarily somebody else would have driven it back?

16   A.  Yes.

17        MS. SURRATT:  Your Honor, may I please publish what's

18   in evidence as Government Exhibit 2-1?

19        THE COURT:  You may.

20   Q.  (By MS. SURRATT) Do you recognize this, Mr. Davidson?

21   A.  Yes.

22   Q.  What is it?

23   A.  It's our Kenworth semi that we would run in the trucking

24   business.

25   Q.  Is this one of the trucks Mr. McFadden would drive?

                        Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 2                          324

1   A.  Yes.

2   Q.  What does it say on the door?

3   A.  Precision Construction.

4   Q.  Is that the name of your business?

5   A.  It's Precision Paving and Construction.  We didn't have

6   room, so we just put Precision Construction on there.

7   Q.  Could you maybe lean forward into the microphone a little

8   bit.

9   A.  Yes.

10  Q.  Thank you.

11          MS. SURRATT:  And, Your Honor, may we please publish

12  what's in evidence as Government Exhibit 2-2?

13          THE COURT:  You may.

14  Q.  (By MS. SURRATT) Is that another view of the same truck?

15  A.  Yes.

16          MS. SURRATT:  And may we please publish Government

17  Exhibit 2-4?

18          THE COURT:  You may.

19  Q.  (By MS. SURRATT) Same truck, Mr. Davidson?

20  A.  Yes.

21          MS. SURRATT:  And, Mr. Graber, if you could please

22  flip to Government Exhibit 2-5.

23  Q.  (By MS. SURRATT) What is this, Mr. Davidson?

24  A.  That would be the inside of the truck.

25          MS. SURRATT:  And, Mr. Graber, can you please publish

Sarah K. Mitchell, RPR, CRR

1    2-6.

2    Q.   (By MS. SURRATT) What does this depict, Mr. Davidson?

3    A.   This looks like the back sleeping cab of the truck.

4    Q.   And a moment ago, Mr. Davidson, you mentioned an

5    arrangement that you had with Mr. McFadden as it pertained to

6    some property that you owned; is that right?

7    A.   Correct.

8    Q.   Where was that property?

9    A.   2980 D 1/2 Road.

10   Q.   Is that in Grand Junction?

11   A.   Yes.

12   Q.   And what was the arrangement that you had with

13   Mr. McFadden as to that property on D 1/2 Road?

14   A.   He was just living there and not paying rent.  I think he

15   was living there -- I think he had a trailer behind it or

16   there was a trailer behind it, and I think his daughter -- or

17   niece was living in there, Crystal.  But I wasn't collecting

18   any rent on it.

19   Q.   And you mentioned a moment ago that in lieu of collecting

20   rent Mr. McFadden was working for you.  Is that part of the

21   arrangement that you were describing?

22   A.   Correct.

23        MS. SURRATT:  May we please publish what's in

24   evidence as Government Exhibit 4-1, please?

25        THE COURT:  You may.

                    Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 2                         326

1    Q.   (By MS. SURRATT) What is this, Mr. Davidson?

2    A.   That's the house that Mike was living in.

3    Q.   The house on D 1/2 Road?

4    A.   Correct.

5    Q.   And you alluded a second ago to others living at the

6    house.  Do you remember who else lived at that house with

7    Mr. McFadden?

8    A.   I think there was John, and, again, I don't remember -- I

9    think John helped him with some paperwork.  I didn't know

10   John.  I just know he was around there when I'd go by.  And,

11   again, I wasn't there often, but there were always kids

12   around.  I think Mike took care of kids or whatever.  I don't

13   know if it was just his niece or other people, I'm not sure.

14   And then I think the trailer you can kind of see there out

15   back is where I think his niece Crystal lived.

16   Q.   Did you visit Mr. McFadden at this property?

17   A.   Not regularly, but I was by there a few times.

18   Q.   And so when you're remembering who was at the property,

19   are you remembering that from what you saw on the occasions

20   you went over there?

21   A.   Yes.

22   Q.   Do you remember approximately when Mr. McFadden lived at

23   your house on D 1/2 Road?

24   A.   I want to say maybe 2009 or '10.  I can't remember the

25   exact date.  And then until he went to jail.  And then after,

                         Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 2                          327

1   that's one of the main times I went over there too was after

2   to pick up our stuff out of the yard and that.

3   Q.  And by your stuff, do you mean stuff associated with your

4   business?

5   A.  Correct.

6   Q.  Did you also own a parcel next door to the house that

7   Mr. McFadden lived in?

8   A.  Yes.

9   Q.  Do you remember the address of that parcel?

10  A.  I think it was 2990.

11  Q.  D 1/2 Road?

12  A.  Correct.

13          MS. SURRATT:  Can we please publish what's in

14  evidence as Government Exhibit 4-4?

15          THE COURT:  You may.

16  Q.  (By MS. SURRATT) Do you recognize this aerial view,

17  Mr. Davidson?

18  A.  Yes.

19  Q.  And what is on the screen?

20  A.  So there's the house that Mike lived in to the left of the

21  screen -- in the middle of the screen with all of our

22  equipment parked around the outside, semi-trucks and trailers

23  and stuff.  And then to the right -- you can see a parcel

24  line.  To the right was a two story-house that we also owned

25  on that parcel, and then behind that was a garage.

                        Sarah K. Mitchell, RPR, CRR

1   Q.  And so if I'm understanding you correctly, Mr. Davidson,

2   sort of in the very middle of that image is a cluster of

3   buildings, and that's the property where Mr. McFadden lived;

4   is that right?

5   A.  Yes.

6   Q.  And the very right-hand side of the image is what you

7   described as a two-story house; is that right?

8   A.  Correct.

9   Q.  Do you recall who lived in that two-story house around the

10  time Mr. McFadden lived at 2980 D 1/2?

11  A.  I think it was -- I forget their names -- Scott, Stacy, I

12  don't -- again, I don't remember.  I wasn't the one that --

13  Q.  But what you're remembering today is that it was someone

14  named Scott and Stacy?

15  A.  Correct.

16  Q.  Do you remember if they had kids?

17  A.  Yes.

18  Q.  Do you remember anything about those children?

19  A.  I don't remember how many.  After Mike got arrested I

20  remember something about them calling me up.  I think it was

21  Scott that called me up and said --

22  Q.  That's fine, Mr. Davidson.

23          MS. SURRATT:  One moment, please, Your Honor.

24  Q.  (By MS. SURRATT) When that green truck wasn't being used,

25  do you know where it was parked?

1  A.  It could have been on that lot there more than likely.  We

2  do have a couple other vacant pieces of land around town, but

3  if Mike was working on it or somewhere there, it might be

4  right at that lot.

5  Q.  And you mentioned a moment ago having to go retrieve other

6  items associated with your business.  Do you remember what

7  kind of items would have been located at 2980 D 1/2?

8  A.  I think it was like welders or small tools that he might

9  have been working on equipment with.  And then paperwork.  I

10  went there to get some paperwork, because I had nothing about

11  the trucking company, so I didn't know what we were owed or

12  what we had or whatever, so I had to go there and try to find

13  paperwork.

14  Q.  Is that because Mr. McFadden kept the paperwork himself?

15  A.  Correct.

16  Q.  Back before Mr. McFadden got arrested, did you consider

17  him a friend?

18  A.  Yeah.  Employee, friend.  Most of them are all friends, I

19  guess.

20          MS. SURRATT:  No further questions, Your Honor.

21          THE COURT:  Cross-examination.

22                    CROSS-EXAMINATION

23  BY MR. MCDERMOTT:

24  Q.  Good afternoon, Mr. Davidson.

25  A.  Afternoon.

                    Sarah K. Mitchell, RPR, CRR

1    Q.  I just have a few quick questions for you.  In January of

2    2013 you sent an employee up to Nebraska to get the truck

3    after Mr. McFadden was arrested; is that correct?

4    A.  I don't know -- I can't remember 100 percent for sure if

5    it was Nebraska, but we sent him somewhere, I'm sure, yes.

6    Q.  So you had an employee go and pick up the truck, and

7    wherever that was you don't recall?

8    A.  Correct.  I know it was out of town is all I remember.

9    Q.  Okay.  And the police didn't inspect that truck

10   immediately; is that correct?

11   A.  I wouldn't have any idea.

12   Q.  Well, did the police ask you to inspect the truck?

13   A.  You're talking police in Grand Junction?

14   Q.  Grand Junction, Nebraska, just police generically.

15   A.  Okay.  No.  I think someone once we got the truck back

16   here -- again, I don't think we've used -- we still own the

17   truck, and I don't think we've used it from that day.  But I

18   think it was sometime after they came by and looked at it.  I

19   don't remember how long.

20   Q.  You don't recall how long after it was?

21   A.  Correct.  No, I can't remember.

22   Q.  Okay.  All right.  And you believe that to this day that

23   truck still has not been reused ?

24   A.  I don't think it has been.

25   Q.  Okay.

                        Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 2                          331

 1            MR. MCDERMOTT:  That's all I have.  Thank you,

 2   Mr. Davidson.

 3            THE COURT:  Any redirect?

 4            MS. SURRATT:  One moment, Your Honor.  No further

 5   questions, Your Honor.

 6            THE COURT:  Thank you very much, sir.  You may step

 7   down.

 8            The Government may call its next witness.

 9            MR. CHAFFIN:  Thank you, Your Honor.  The Government

10   calls Paul Dunham.

11            THE COURTROOM DEPUTY:  Mr. Dunham, please raise your

12   right hand.

13                          PAUL DUNHAM

14   was called as a witness and, having been duly sworn, was

15   examined and testified as follows:

16            THE COURTROOM DEPUTY:  Thank you.  Please be seated,

17   and then please state your name and spell your first and last

18   name for the record.

19            THE WITNESS:  Paul W. Dunham Jr., P-a-u-l

20   D-u-n-h-a-m, Jr., J-r.

21            THE COURT:  You may proceed.

22            MR. CHAFFIN:  Thank you, Your Honor.

23                      DIRECT EXAMINATION

24   BY MR. CHAFFIN:

25   Q.  Good afternoon, Mr. Dunham.  Could you explain to the jury

                        Sarah K. Mitchell, RPR, CRR

1   what city and state you reside in?

2   A.   Grand Junction, Colorado.

3   Q.   And how long have you lived in Colorado?

4   A.   42 years.

5   Q.   How old are you?

6   A.   42.

7   Q.   What do you do for work?

8   A.   We have a trucking company, brokerage third-party

9   logistics.

10   Q.   What's the name of your trucking company?

11   A.   Dunham Trucking LLC.

12   Q.   And you said that you had a brokerage?

13   A.   Yeah, it's third-party logistics.

14   Q.   That's the name of the company is third-party logistics?

15   A.   No, it's Dunham Freight Solutions.

16   Q.   That's the type of company it is?

17   A.   Yes.

18   Q.   Could you just explain to the jury what third-party

19   logistics is?

20   A.   So I can -- I'm licensed to contract out to a third-party

21   carrier.  So I have my own trucks that transport, and if I

22   cannot keep up, then I can contract that, hire other trucks to

23   do the same work that my trucks are doing.

24   Q.   So if you have a particularly big job, you might contract

25   with other trucking companies, is that what you're saying?

1    A.  Yes.

2    Q.  And then other trucking companies might take some of the

3    loads for that job?

4    A.  Yes.

5    Q.  Do you know a person named Michael McFadden?

6    A.  Yes.

7    Q.  Do you see him here in the courtroom today?

8    A.  Yes.

9    Q.  Could you point him out and describe an article of

10   clothing that he's wearing?

11   A.  Gray suit jacket.

12   Q.  Is he seated to my right?

13   A.  Yes.

14           MR. CHAFFIN:  Your Honor, I'd ask that the record

15   reflect the witness has identified the defendant.

16           THE COURT:  It will so reflect.

17   Q.  (By MR. CHAFFIN) How did you first meet Mr. McFadden?

18   A.  I had hired out Precision Construction, which was then

19   Davidson, and he had worked for him.

20   Q.  So Mr. McFadden worked for a person you knew as Darren

21   Davidson?

22   A.  Yes.

23   Q.  And he worked for a company called Precision Construction?

24   A.  Yes.

25   Q.  And had you contracted with Precision as part of your

19-cr-00243-CMA-GPG-1 Jury Trial - Day 2                          334

1    third-party logistics?

2    A.  Yes.

3    Q.  Do you recall the jobs that you contracted with Precision

4    for?

5    A.  I had the 29 Route job, basically the overpass on 29,

6    Roads 6 and 50.  And then there was a job in Farmington, New

7    Mexico, for I believe it was BLM or the Forest Service.  I'd

8    have to look at the paperwork, but...

9    Q.  And before we get into the paperwork -- we'll talk about

10   the paperwork in just a second, but do you recall what sort of

11   truck Mr. McFadden drove?

12   A.  There was a green Kenworth T600 with an end dump trailer,

13   which is a trailer that just end dumps for like dirt,

14   boulders.

15        MR. CHAFFIN:  Your Honor, could we publish

16   Government's Exhibit 2-1?

17        THE COURT:  You may.

18   Q.  (By MR. CHAFFIN) Do you recognize that truck?

19   A.  Yes.

20   Q.  How do you recognize it?

21   A.  That's the truck that the defendant drove.

22   Q.  That's the truck Mr. McFadden drove?

23   A.  Yes.

24   Q.  The Kenworth that you talked about just a moment ago?

25   A.  Yes.

                    Sarah K. Mitchell, RPR, CRR

1        MR. CHAFFIN:  Thank you.  You can take that down.

2        Your Honor, at this point I'd move to admit by

3   stipulation Government's Exhibit 15 -- the entirety of

4   Government's Exhibit 15, 15-1 through 15-6.

5        THE COURT:  All right.  They are not stipulated to.

6   Is there any objection?

7        MR. MCDERMOTT:  No objection.

8        THE COURT:  All right.  15-1 through 15-6 are

9   admitted.  You may publish.

10      (Government's Exhibits 15-1 - 15-6 received.)

11       MR. CHAFFIN:  Could we have just 15-1, page 1.

12   Q.  (By MR. CHAFFIN) Mr. Dunham, what -- help the jury

13   understand what we're looking at here.

14   A.  A paystub.  So you got a ticket number, so that's the load

15   number that was hauled, the date of which the check was

16   written, and the amount for the loads that were transported.

17   Q.  And so this is a paystub from your company?

18   A.  Yes.

19   Q.  To who?

20   A.  To Darren.

21   Q.  To Precision Construction?

22   A.  Yes.

23       MR. CHAFFIN:  Can we take a look at page 2.

24   Q.  (By MR. CHAFFIN) What are these examples of?

25   A.  So the one to the left is a load ticket.  It explains, you

19-cr-00243-CMA-GPG-1 Jury Trial - Day 2                     336

 1   know, the customer, what job it was going to, the date, the

 2   contractor that was on the job, the driver, start time, end

 3   time, total time, and then it will list what loads were on it.

 4   The one to the right is a scale ticket from the quarry in

 5   Telluride.  It's got obviously the date and timestamp when the

 6   truck went in, when the truck left.

 7   Q.   And those scale tickets, are they usually signed by the

 8   driver?

 9   A.   Yes.

10   Q.   And do you recognize the signature on that --

11   A.   Yes.

12   Q.   -- ticket?

13   A.   Mike McFadden.

14   Q.   You recognize that as Mr. McFadden's signature?

15   A.   Yes.

16   Q.   Fair to say that these documents sort of detail the

17   history of your company's involvement with Precision

18   Construction?

19   A.   Yes.

20   Q.   I just want to point out a couple of pages.

21           MR. CHAFFIN:  Could we turn to page 14.

22   Q.   (By MR. CHAFFIN) What are these?

23   A.   Those are scale tickets from the quarry in Telluride.

24   Q.   Do they have dates on them?

25   A.   They do.

                        Sarah K. Mitchell, RPR, CRR

1    Q.   What are the dates?

2    A.   December 6, 2010, on both of them.

3    Q.   And these have two different numbers on the tops of them,

4    it looks like.  What does that indicate to you?

5    A.   It was two different loads.

6    Q.   Okay.  Do you see a signature on there that you recognize?

7    A.   I do.  Michael McFadden.

8    Q.   What would that indicate to you?

9    A.   That he signed -- he scaled out, he signed for the load.

10   Q.   Okay.

11   A.   He was at the quarry at that time.

12   Q.   That Mr. McFadden was the one picking up loads at this

13   quarry?

14   A.   Yes.

15          MR. CHAFFIN:  Could we go to page 22.

16   Q.   (By MR. CHAFFIN) What are we looking at here?

17   A.   Same thing, load tickets.

18   Q.   What are the dates on those load tickets?

19   A.   12/7/2010.

20   Q.   So this is the very next day from those previous load

21   tickets?

22   A.   Yes.

23   Q.   Again, there's two tickets with two different numbers.

24   Does that indicate the same thing, two different loads?

25   A.   Two different loads.

                    Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 2                          338

1    Q.  And, again, do you recognize signatures on there?

2    A.  I do, Michael McFadden.

3    Q.  So those would indicate Mr. McFadden picked up those two

4    loads?

5    A.  Yes, sir.

6    Q.  So that's four loads over two days, right?

7    A.  Yes.

8            MR. CHAFFIN:  We can take that -- the exhibit down.

9    Q.  (By MR. CHAFFIN) Have you personally driven loads from

10   that --

11   A.  Telluride Stone.

12   Q.  From Telluride Stone?

13   A.  Yes.

14   Q.  What does the area look like where you pick up loads?

15   A.  It's -- top of the hill you -- you go up to -- I don't

16   know what you call it -- Aldasoro Ranch Road, go up above

17   town.  Just before you get to the airport, you take a left,

18   follow it back in.  You go alongside the runway probably 100

19   yards back into the pit.  Load, go back out.

20   Q.  When you're waiting for loads, does it take a period of

21   time?

22   A.  Oh, yeah.

23   Q.  And could you -- if a plane flew over, would you be able

24   to see it from where you're loading?

25   A.  Yes, sir.

                    Sarah K. Mitchell, RPR, CRR

1  Q.  That sort of -- have you ever driven that trip between

2  Telluride and Farmington?

3  A.  Yes, sir.

4  Q.  About how long does it take?

5  A.  Oh, two and a half, three hours for one way.

6  Q.  So two and a half, three hours one way?

7  A.  Yes.

8  Q.  So round trip about five hours?

9  A.  Six.

10  Q.  Six hours.  So -- well, let -- let me ask you this.  Back

11  then or -- yeah, back in 2010, were there rules about how long

12  you could operate a truck?

13  A.  Yeah, there's log rules.  Ten hours driving a day.

14  Q.  Okay.

15  A.  It's changed since then, but from what I recall within a

16  ten-hour period you had to have an eight-hour break.

17  Q.  So you could drive for ten hours and then take an

18  eight-hour break and then start driving again?

19  A.  Yes, sir.

20  Q.  So two loads between Telluride and Farmington was pretty

21  much --

22  A.  Your day.

23  Q.  Your day.  Fair to say?

24  A.  Yes.

25  Q.  So if you were going to do days back to back, you'd

19-cr-00243-CMA-GPG-1 Jury Trial - Day 2                    340

1    probably stay someplace?

2    A.   Yes.

3    Q.   And that Kenworth that you saw, did it have a sleeper cab?

4    A.   Yes, sir.

5    Q.   Had you ever been inside that vehicle?

6    A.   No, sir.

7    Q.   Are you familiar with trucks like that?

8    A.   Yes, sir.

9    Q.   You can fit more than one person in a cab like that?

10   A.   Yes.  That one may have had two beds, but yes.

11         MR. CHAFFIN:  If I could have just a moment, Your

12   Honor.

13         THE COURT:  You may.

14         MR. CHAFFIN:  I have nothing further, Your Honor.

15   Thank you.

16         THE COURT:  Cross-examination.

17         MR. MCDERMOTT:  Briefly, Your Honor.

18                    CROSS-EXAMINATION

19   BY MR. MCDERMOTT:

20   Q.   Good afternoon.

21   A.   Yes, sir.

22   Q.   Do you know a man named Ray Fluke?

23   A.   Who?

24   Q.   Ray Fluke?

25   A.   Ray Fluke, no, sir.

                    Sarah K. Mitchell, RPR, CRR

1   Q.  Okay.  You don't remember contracting with Ray Fluke back

2   in 2010 or whether he worked with Mr. McFadden?

3   A.  No, sir.

4   Q.  Okay.  All right.  With respect to the Telluride to

5   Farmington trip -- or trips, rather -- did you ever personally

6   supervise Mr. McFadden with respect to those?

7   A.  I've been to the job down there, yes.

8   Q.  Okay.  And did you know who he was traveling with from

9   Telluride to Farmington?

10  A.  No, sir.

11  Q.  Okay.  And similarly, did you know whether he was

12  traveling with someone on the way back to Telluride from

13  Farmington?

14  A.  I can't see inside the sleeper, sir, no.

15          MR. MCDERMOTT:  That's all I have.  Thank you.

16          THE COURT:  All right.  May this witness be excused?

17          MR. CHAFFIN:  Yes, Your Honor.  Can we approach?

18          THE COURT:  You may put on the earphones.  Put on the

19  white noise, please.

20      (Bench conference on the record and out of the

21      hearing of the jury:)

22          THE COURT:  All right.  Can you hear me?

23          All right, Mr. Chaffin.

24          MR. CHAFFIN:  Thank you, Your Honor.  The good news

25  is we are moving far more quickly than I anticipated.  The bad

1   news is we cannot get ahold of our witness that we told to be

2   here at 3:30, and we're trying to get ahold of her, but right

3   now we don't have another witness.  So I don't know if the

4   Court wants to take a break for 15 minutes and we can try and

5   get another witness, or if the Court wants to recess for the

6   day.

7            THE COURT:  Who's the next witness you were

8   expecting?

9            MR. CHAFFIN:  Sue Goebel.  I think that she's

10  probably teaching a class right now at CMU.  She teaches a

11  class until 3 o'clock.

12           THE COURT:  I'm not going to make the jury wait an

13  hour and a half.  We are moving very rapidly, so at this pace

14  we might be done by the end of this week.

15           MR. CHAFFIN:  So my other concern is we have two 414

16  witnesses that are in school, and we had booked flights for

17  them to come in over the weekend, and so I think -- I think

18  we're moving way more quickly than we -- I don't know if we

19  can move those flights around.  We're going to try to work

20  them out tonight, but I wanted to --

21           THE COURT:  So I'm just telling you right now that I

22  think Mr. McDermott was careful in his examination, and I

23  don't think he's opening the door to 414.  I'm just going to

24  send the jury home for the day.  That way -- because the

25  witnesses aren't available.

                         Sarah K. Mitchell, RPR, CRR

 1        (The following proceedings were held in open

 2     court:)

 3           THE COURT:  Ladies and gentlemen, I have good news in

 4    the sense that we are moving much more rapidly than anyone

 5    expected we would.  The bad news is we don't have any

 6    witnesses available for another hour or so.  I'm not going to

 7    make you wait.  I'm going to let you go home for the day,

 8    because we are moving at, like, twice the speed that I thought

 9    we would.  Remember, do not discuss this case with anyone.  Do

10    not conduct any individual research on it.  Go home, enjoy

11    yourself, don't talk about the case, and we'll see you at 8:30

12    tomorrow.  The jury is excused.

13           THE COURTROOM DEPUTY:  All rise.

14      (Jury left the courtroom at 1:42 p.m.)

15           THE COURT:  You may be seated.  Is there anything

16    else that needs to be brought to my attention before we recess

17    for the day?

18           MR. CHAFFIN:  No, Your Honor.

19           THE COURT:  From defense?

20           MR. MCDERMOTT:  No.  Thank you, Your Honor.

21           THE COURT:  Then we will see you all bright and early

22    tomorrow morning and pick up the case.  Court will be in

23    recess.

24           THE COURTROOM DEPUTY:  All rise.  Court is in recess.

25      (The proceedings were concluded at 1:43 p.m.)

                        Sarah K. Mitchell, RPR, CRR

1                          REPORTER'S CERTIFICATE

2

3              I, SARAH K. MITCHELL, Official Court Reporter for the

4    United States District Court for the District of Colorado, a

5    Registered Professional Reporter and Certified Realtime

6    Reporter, do hereby certify that I reported by machine

7    shorthand the proceedings contained herein at the time and

8    place aforementioned and that the foregoing pages constitute a

9    full, true and correct transcript.

10             Dated this 23rd day of May, 2023.

11

12

13

14             _____/s/ Sarah K. Mitchell_____

15                    SARAH K. MITCHELL
                      Official Court Reporter
16             Registered Professional Reporter
                 Certified Realtime Reporter
17

18

19

20

21

22

23

24

25

                    Sarah K. Mitchell, RPR, CRR