1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF COLORADO

3
   Criminal Action No. 19-cr-00243-CMA-GPG-1
4

5    UNITED STATES OF AMERICA,
                                   (Pages 344 - 548)
6          Plaintiff,

7          vs.

8    MICHAEL TRACY MCFADDEN,

9          Defendant.

10   ------------------------------------------------------------

11                    REPORTER'S TRANSCRIPT
                     Jury Trial - Day 3
12
   ------------------------------------------------------------
13
   Proceedings before the HONORABLE CHRISTINE M. ARGUELLO, Senior
14    Judge, United States District Court for the District of
     Colorado, and a jury of 12 and one alternate, commencing on
15    the 9th day of November, 2022, in United States Courthouse,
                   Grand Junction, Colorado.
16
                         APPEARANCES
17
   For the Plaintiff:
18   JEREMY L. CHAFFIN, U.S. Attorney's Office, 205 North 4th St.,
   Ste. 400, Grand Junction, CO 81501
19
   ANDREA L. SURRATT, U.S. Attorney's Office, 1801 California
20   St., Ste. 1600, Denver, CO 80202

21   For the Defendant:
   SEAN M. MCDERMOTT, McDermott Stuart & Ward, LLP, 140 East 19th
22   Ave., Ste. 300, Denver, CO 80203

23   BEN LABRANCHE, Benjamin R. LaBranche PLLC, 1544 Race St.,
   Denver, CO 80206
24

25      Sarah K. Mitchell, RPR, CRR, 901 19th Street, Room A252,
               Denver, CO 80294, 303-335-2108
        Proceedings reported by mechanical stenography;
             transcription produced via computer.

19-cr-00243-CMA-GPG-1 Jury Trial - Day 3        11/09/2022   345

1                          I N D E X

2    GOVERNMENT'S WITNESSES                              PAGE

3    SUE GOEBEL
        Direct Examination By Ms. Surratt               347
4       Cross-Examination By Mr. LaBranche              367
        Redirect Examination By Ms. Surratt            386
5    K.W.
        Direct Examination By Ms. Surratt               387
6       Cross-Examination By Mr. McDermott              431
        Redirect Examination By Ms. Surratt            443
7    STACY W.
        Direct Examination By Ms. Surratt               446
8       Cross-Examination By Mr. McDermott              463
        Cross-Examination By Mr. McDermott              464
9    S.W. JR.
        Direct Examination By Ms. Surratt               473
10      Cross-Examination By Mr. McDermott              485
     JOHN STADLER
11      Direct Examination By Mr. Chaffin               489
        Cross-Examination By Mr. McDermott              496
12   EDWARD PRESCOTT
        Direct Examination By Ms. Surratt               498
13      Cross-Examination By Mr. McDermott              516
        Redirect Examination By Ms. Surratt            523

14

15
                    GOVERNMENT'S
16                  EXHIBITS                   RECEIVED

17           13-1                              388

18           13-2                              390

19           227                               415

20           228                               415

21

22

23

24

25

                 Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 3                              346

1                *        *        *        *        *

2       (The proceedings commenced at 8:27 a.m.)

3               THE COURT:  All right.  We are back on the record in

4    case number 19-cr-00243, United States of America versus

5    Michael McFadden.  Are the jurors ready to come in?

6               THE COURTROOM DEPUTY:  Yes, they are.

7               THE COURT:  You may bring them in.

8               MR. CHAFFIN:  Your Honor, would you like us to call

9    our witness and put her on the witness stand?

10              THE COURT:  Yes, that would be fine.

11              THE COURTROOM DEPUTY:  All rise for the jury.

12      (Jury entered the courtroom at 8:27 a.m.)

13              THE COURT:  Good morning and welcome back, ladies and

14   gentlemen.  The Government can call the next witness.

15              MS. SURRATT:  Your Honor, the Government calls Sue

16   Goebel.

17              THE COURTROOM DEPUTY:  Will you please stand and

18   raise your right hand.

19                              SUE GOEBEL

20   was called as a witness and, having been duly sworn, was

21   examined and testified as follows:

22              THE COURTROOM DEPUTY:  Thank you.  Please be seated,

23   and then please state your name and spell your first and last

24   name for the record.

25              THE WITNESS:  My name is Sue Goebel, G-o-e-b-e-l.

                         Sarah K. Mitchell, RPR, CRR

                              DIRECT EXAMINATION

BY MS. SURRATT:

Q.   Ms. Goebel, what do you do for a living?

A.   I'm a registered nurse who teaches at Colorado Mesa
University.  I've been a professor there for 24 years.  I work
as a nurse practitioner at Integrative Medicine Center, and I
see patients one day a week, and I'm also a Sexual Assault
Nurse Examiner.

Q.   How long have you been a nurse practitioner for?

A.   I've been a nurse practitioner since 1993.

Q.   And what are your duties and responsibilities as a nurse
practitioner?

A.   As a nurse practitioner my responsibility is to elicit a
history, provide physical examination.  To get a history from
my patients, subjective data, and then to perform examination,
focused examination.  I do physicals.  I provide holistic
care.  I provide comprehensive healthcare to my patients.

Q.   And you mentioned that you're a professor.  What kind of
classes do you teach?

A.   I currently teach a course called Health Assessment Across
Life Span, and I've got the clinical labs for that.  So I'm
teaching student nurses how to use the tools of our trade,
stethoscopes and temperatures; how to perform physical
assessment on the patient, including techniques of inspection.
So we trust our eyes and our sense of smell.  We palpate,

1   which means we touch.  We sometimes percuss things like a

2   reflex hammer, and then to be able to auscultate and hear

3   breath sounds and heart sounds, bowel sounds.  I am

4   responsible for teaching how to do a general survey, to be

5   able to look at a patient's appearance, their behavior, their

6   cognition, their thoughts and their thought processes.  So,

7   again, whole health.  I also teach a course called Senior

8   Capstone.  So I'm fortunate.  I meet student nurses in their

9   first semester and then in their last semester.  In their

10  capstone they're doing their favorite nursing in a specialized

11  area that they've chosen.  So I could have nurses in the

12  neonatal ICU.  I could have student nurses in the emergency

13  department, oncology.  So those are the two major courses I'm

14  responsible for.

15  Q.  We'll talk about this more in a moment, but very

16  generally, what is a Sexual Assault Nurse Examiner, or SANE?

17  A.  SANE, or Sexual Assault Nurse Examiner, is a designation

18  that forensic nurses, in this case registered nurses who have

19  practiced for at least two years and have completed

20  specialized training in the physical, psychology, and forensic

21  examination of patients who have made an outcry of sexual

22  assault.

23  Q.  What is your educational background?

24  A.  I have a bachelor of science in nursing, a master of

25  science with a focus on parent-child nursing, what most of us

Sarah K. Mitchell, RPR, CRR

1  would think of as family nursing.  Now I forgot the question.

2  I apologize.

3  Q.  I asked your educational background, Nurse Goebel.

4  A.  And so I've got both of those.  And then as nurses we're

5  always looking at specialty areas, and one of those for me was

6  forensic nursing, and that's why I began this career, this

7  journey in 1999 with my education in SANE.

8  Q.  Have you published anything on the topic of nursing?

9  A.  Yes.

10  Q.  What have you published?

11  A.  Most recently I'm involved in two textbooks, a fourth

12  edition of one and I think the eighth edition of the other.

13  One of those is reproductive health, and the other is

14  sexuality is a concept that is in one textbook.  The other is

15  called reproductive health and perineum.

16  Q.  Other than in the classroom as a professor, do you give

17  any lectures or talks on topics related to nursing?

18  A.  I do.  On campus I'm involved in the CMU Sexual Assault

19  Response Team, so we are always educating students and faculty

20  and staff who want to get involved with our CMU SART, Sexual

21  Assault Response Team.  Most recently in April we were able to

22  meet in person at Hilltop.  A local agency sponsors an academy

23  on domestic violence and sexual assault, so I presented there.

24  I'm also involved at the Center for Children with SANEs in

25  training.  So a SANE nurse and nurses expressing interest will

1    need to be able to do ten precepted exams, so doing a SANE

2    exam alongside a seasoned SANE so that they can become

3    proficient and be competent.  They've got to do ten.  I had to

4    do ten children's exams with a preceptor, and I needed to

5    complete six adult exams with a preceptor who could then check

6    me off and say she's proficient, she's competent, she can

7    provide this sort of care.  So I am still involved in that way

8    as a consultant.

9    Q.  Are you a member of any professional organizations or

10   associations?

11   A.  I currently maintain my professional membership in a

12   nursing -- nurse -- I know them by initials.  One is a nurse

13   practitioner academy across the United States, and the other

14   is nurse practitioners and reproductive health.

15   Q.  Do you hold any professional licenses?

16   A.  I do.

17   Q.  And what are those?

18   A.  I have a registered nursing license in the State of

19   Colorado, and an advanced practice registered nursing.

20   Q.  Are you board-certified in anything?

21   A.  I am.  I am board -- well, I passed my BSN, so I'm a

22   registered nurse.  And then I maintain my certification in my

23   nurse practitioner role.

24   Q.  You used an acronym, Nurse Goebel, BSSN.  What is that?

25   A.  It was actually one S, I might have said BSSN.  Bachelor

19-cr-00243-CMA-GPG-1 Jury Trial - Day 3                          351

1    of Science in Nursing.

2    Q.   What does it mean to be board-certified?

3    A.   It means you've demonstrated for the general public -- for

4    the general public that you are proficient.  You've

5    demonstrated a working knowledge of and you can begin to

6    practice as a registered nurse.

7    Q.   Let's turn back now to your role as a Sexual Assault Nurse

8    Examiner, or SANE.  What kind of training does someone have to

9    go through to become a SANE?

10   A.   When I started in the role of SANE training, I completed

11   24 hours of classroom.  So I revisited all that I knew about

12   adult health and adolescent health, 24 hours in the classroom

13   specifically to that.  I did 24 hours in the classroom

14   specifically to the pediatric patient.  In this case,

15   prepubertal patient.  So 48 hours of classroom.  I attended

16   24 hours in the courts, not necessarily related to sexual

17   assault, but instead to learn about the court system and what

18   it would be to testify with the use of forensics, so 24 hours

19   in the courtroom.  I did ten precepted exams with children

20   side by side with another, demonstrated proficiency.  I

21   completed six exams with adults and did that very same.

22   Q.   What is a precepted exam?

23   A.   I think people are familiar with it when you have a med

24   student in the room with you or you have a student nurse in

25   the room with you.  When I'm the preceptor, I'm overseeing a

                        Sarah K. Mitchell, RPR, CRR

1    registered nurse who is working towards that same designation.

2    So when I was being precepted, I was working alongside

3    somebody who recognized the SANE response to sexual assault.

4    Q.   Approximately how many exams have you conducted as a

5    Sexual Assault Nurse Examiner, or SANE?

6    A.   Approximately 300.

7    Q.   Approximately how many of those were on children?

8    A.   More than half.

9    Q.   In addition to examinations you've conducted yourself,

10   have you also assisted or observed others conducting SANE

11   examinations?

12   A.   Yes, I have.  I have done that because I've precepted and

13   because there are times we nurses choose to respond in two.

14   Q.   Nurse Goebel, what is your current role as a SANE

15   examiner, and in particular if it's different than it was back

16   in 2013.

17   A.   It is different, because from the year of 2000 until I

18   believe 2019 I was still taking call.  It meant that I put

19   myself on a call schedule, and if there had been a request for

20   a SANE exam, I would have been on the front line.  In the last

21   couple years that I was taking call I dedicated to children

22   because that was something I'm competent and comfortable

23   doing.  In 2019, and of course the pandemic changed response

24   to much, I took my name off the call list, but I remain a

25   resource, and I remain somebody who will phone and look.  So,

19-cr-00243-CMA-GPG-1 Jury Trial - Day 3                    353

1    for instance, last month a nurse who had taken care of a

2    patient and had taken photographs and wanted some assistance

3    with interpreting those, that's how I serve, because I have

4    that expertise.  I can be of use in that way without -- I've

5    gotten older since 2013, so taking myself off that call

6    schedule has been fruitful that way too.

7    Q.  Who pays for SANE exams?

8    A.  The SANE exam is paid for, reimbursed by the law

9    enforcement who requests the exam.

10   Q.  In very broad terms, what is the purpose of a SANE exam?

11   A.  A SANE exam, the very first thing the SANE nurse will be

12   thinking is I won't re-victimize a victim.  I'm responsible

13   for providing holistic care, being mindful of what acute and

14   long-term consequences exist when there's sexual assault.  I'm

15   responsible for doing a physical exam, assessing the

16   psychology, spiritual, mental health of my patient, and for

17   collecting forensic evidence when indicated.

18   Q.  Is a SANE exam a medical exam?

19   A.  A SANE exam would be deemed a medical exam.

20   Q.  How long might the exam portion of a SANE exam take

21   knowing that it can vary widely from patient to patient?

22   A.  It can vary very widely because it may only include a

23   history.  It might include a history and a physical exam on

24   focused areas.  It could include forensic documentation using

25   a camera, and it could include collection of forensic evidence

Sarah K. Mitchell, RPR, CRR

1    using what we call a sexual assault kit.  So I have done a

2    SANE exam that probably lasts about an hour, and I've been

3    with a patient for greater than seven hours, and it always

4    depends upon the patient.

5    Q.  Where do your SANE exams generally occur?

6    A.  Currently a SANE exam for an adult or for a child will

7    probably take place at the Center for Children here in Grand

8    Junction, but patients present all over, and they might

9    present in an ambulatory clinic, an emergency room department.

10   If the SANE response is initiated on campus, we do have a SANE

11   room, but most of them -- and, again, the pandemic impacted

12   this -- are being cared for -- most patients are being cared

13   for at the Center for Children.

14   Q.  What is the Center for Children?

15   A.  The Center for Children is a children's advocacy center

16   dedicated to the healing and the recovery of people who have

17   been exposed to violence or who have been violated themselves.

18   So the Western Slope Center for Children was its original

19   name, now we call it the Center for Children, is a place where

20   kids and families can find safe and supporting care.

21   Q.  You talked about this a little bit already, but in general

22   terms, what types of things might you do during a SANE exam?

23   A.  Well, I talk, and I elicit a history.  I may do a set of

24   vital signs.  I'll do a general head-to-toe physical, a

25   screening exam of sorts.  And then I will let my patient's

19-cr-00243-CMA-GPG-1 Jury Trial - Day 3                    355

1    story guide the assessment.  A SANE is really responsible for

2    doing culturally sensitive, developmentally appropriate

3    trauma-informed patient specific care.  So it's like a nurse

4    does in her daily nursing.  You meet a patient where they are,

5    and together you work to provide a safe space and take care of

6    a patient.

7    Q.  As part of that do you take a health history of the

8    patient?

9    A.  I do.

10   Q.  What is the purpose of taking a health history?

11   A.  It's baseline data to establish other things I might need

12   to consider.  A for instance would be if there was evidence of

13   bruising, is my patient on an anticoagulant, and could that

14   bruising be secondary to a current medication.  Does my

15   patient have intellectual disabilities?  Does my patient

16   appear stated age and are their cognitive thoughts and the

17   processing appropriate for that person?  So I'm listening.

18   I'm assessing.  I may have not answered the question.

19   Q.  That did answer the question, Nurse Goebel.  As part of

20   that health history and as part of a SANE exam, do you ask a

21   patient whether they've been sexually assaulted?

22   A.  I will ask, but I quite probably don't use those terms.

23   Q.  Okay.  But using those terms for now, is it relevant to

24   your care of a patient to learn how they might have been

25   sexually assaulted?

                         Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 3                          356

1    A.   Yes.

2    Q.   Is it relevant to your care of a patient to learn how

3    often they were sexually assaulted?

4    A.   Yes.

5    Q.   How about when they were sexually assaulted?

6    A.   Yes.

7    Q.   And is it relevant to your exam to learn from the patient

8    what they believe to be the physical consequences of a sexual

9    assault?

10   A.   Yes.

11   Q.   When you conduct exams, are you concerned with the

12   patient's physical health or psychological health or both?

13   A.   Both.

14   Q.   Let's turn to a specific SANE exam that you conducted on

15   March 25, 2013.  Did you conduct a SANE exam of an individual

16   named J.W. on that day?

17   A.   I did.

18   Q.   Do you recall how you were called to conduct that

19   particular SANE exam?

20   A.   I do not.

21   Q.   Do you remember whether there was a break from school that

22   week?

23   A.   I know that it was Monday, March 25th.  It was spring

24   break of 2013.  And I know that I agreed to meet the patient

25   at 10 o'clock on that Wednesday -- or that Monday morning, and

19-cr-00243-CMA-GPG-1 Jury Trial - Day 3                    357

 1   we were over here on Grand Avenue where the Center for

 2   Children was located originally.

 3   Q.  So did your SANE exam of J.W. occur at the Western Slope

 4   Center for Children?

 5   A.  It did.

 6   Q.  Do you recall how old J.W. was when you saw him in 2013?

 7   A.  He was a little over 12, 12 and a quarter probably.

 8   Q.  When you go into a SANE exam, how much do you typically

 9   know about the patient before you actually meet him or her?

10   A.  That will always be patient specific because of the

11   coordination of effort that goes on behind scenes before I

12   enter into it.  I intentionally work to speak with my patient

13   first.  I want to go in and hear a patient's story, and I

14   don't want to enter into it with any sort of bias or prejudice

15   or understanding of what this patient might have said to other

16   people.  So -- and I don't want to give them what I think they

17   should be saying, so I go in generally when I can control for

18   it and say, you know what?  I really just want to talk to the

19   patient first.

20   Q.  What, if anything, do you recall knowing about J.W. before

21   you met him?

22   A.  I knew that he had been -- I knew I was going to see a

23   boy.  I knew that he had reported he had been sexually

24   assaulted, and I didn't have any more detail than that in

25   terms of what he had expressed.

                        Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 3                    358

1   Q.  During your examination of J.W. was anybody else in the

2   room?

3   A.  No.

4   Q.  What does the exam room look like that you used at the

5   Western Slope Center for Children?

6   A.  The exam room is a little bit bigger than an ordinary exam

7   room, which is really nice.  Very child friendly, light

8   colors, on the second floor so light could shine in.  Really a

9   safe space.  A pediatric exam room.

10  Q.  Do you have a preference as a general matter as to whether

11  you meet with your patients alone or whether there's somebody

12  else in the room?

13  A.  I don't have a preference.  What I seek to determine is

14  what a patient's preference will be.

15  Q.  What do you recall observing when you first met J.W.?

16  A.  We generally -- in terms of techniques that would be

17  inspection, but part of inspection is doing a general survey.

18  Looking at my patient's appearance, their behavior, and,

19  again, paying attention to language, how is my patient

20  speaking, how are they thinking, and are these thought

21  processes smooth and clear.

22  Q.  And what do you remember in that respect about J.W.

23  specifically?

24  A.  Oh, J.W. was a quiet boy.  And when we very first began to

25  talk about things in general in the course of the week, he

1   talked just like you'd expect a boy to talk.  As I approached

2   the reason as to why we were meeting, why he was going to see

3   a nurse, he became quiet and still, oftentimes looking down,

4   fidgeting of hands, really closed body language in terms of

5   pulling into himself.

6   Q.  What was the very first thing you did with J.W. to begin

7   your exam?

8   A.  Oh, I'm certain it was I introduced myself and said, J.W.,

9   I'm a nurse.  I'm your nurse, and I'm here to take care of you

10  today.

11  Q.  And then do you typically begin with some sort of

12  conversation with a patient like J.W.?

13  A.  So the word typical is hard to really -- there is really

14  not a typical.  I walk into a room, and I do that appearance

15  behavior, who is this person?  How are they feeling?  Do their

16  verbal -- the words they're saying, does it match their

17  nonverbals and the mood and affect my patients have?  So I

18  believe I just asked him to sit down and told him I'd like to

19  talk to him.  I'd like to find out some things about the

20  reason he was there to see me.

21  Q.  As a Sexual Assault Nurse Examiner, do you have a form

22  that you use to guide your conversations with your patients?

23  A.  We do we have a chart form.

24  Q.  And what is the purpose of the chart form?

25  A.  It serves as medical documentation, and all medical

                    Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 3                    360

1   documentation is a legal document, so it provides the backdrop

2   for my assessment.  It guides the assessment.

3   Q.  And did you use one of those forms during your examination

4   of J.W.?

5   A.  I did.

6   Q.  Nurse Goebel, did J.W. eventually start talking to you

7   about the reason he was there for a SANE exam that day?

8   A.  I oftentimes start an exam with a child by determining

9   names for body parts so that we're speaking the same language.

10  So I have diagrams, that of an adult and that of a child, and

11  we have them for males and for females, and oftentimes by

12  using that chart it facilitates conversation, because we're

13  not talking straight to straight.  We're looking at a diagram

14  together, and I point to body parts, and I say, What would you

15  call this?  With J.W. I was able to establish this is a man

16  and this is a child.  He was so reluctant to talk, so in my

17  assessment I wasn't going to push further.  It's uncomfortable

18  saying breast or penis or -- so I moved on from that place.

19  On the chart form there's an entire page -- at least some

20  great portions of the page that are questions that you

21  specifically ask, and they are responded to with yes and no,

22  and then patients might add narrative.  I showed him that

23  page.  He glanced at it.  And I asked him would he be willing

24  to answer yes-or-no questions, and he nodded he would answer

25  yes-or-no questions.

                          Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 3                          361

1   Q.  And so, Nurse Goebel, if I'm understanding right, J.W. was

2   reluctant to simply speak about what happened to him in a

3   narrative form, but agreed to answer your yes-or-no questions?

4   A.  That's correct.

5   Q.  Let's talk a little bit about the things that you asked

6   J.W. and what he told you.  Did J.W. tell you that he had been

7   sexually assaulted?

8   A.  He didn't use those words.

9   Q.  Do you recall what words he used?

10  A.  J.W. told me he put his penis in me many times.

11  Q.  Meaning -- he meaning his assailant?

12  A.  Yes.

13  Q.  And to be clear, did you ever ask J.W. who his assailant

14  was?

15  A.  I did not.

16  Q.  Did you ask J.W. when the assailant first began putting

17  his penis in J.W.?

18  A.  I did, and he responded at age six.

19  Q.  Did J.W. tell you for how long the assailant continued

20  putting his penis in J.W.?

21  A.  I met J.W. in March of 2013.  He had told me it stopped in

22  December of 2012.

23  Q.  So from age six to December of 2012?

24  A.  Correct.

25  Q.  As part of your -- the form that you use, do you also ask

                      Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 3                           362

1   what time the assaults occurred?

2   A.  Yes.

3   Q.  Did you ask J.W. that?

4   A.  I did, and he responded with at nighttime.

5   Q.  He responded that the assaults happened at nighttime?

6   A.  Correct.

7   Q.  Did you ask J.W. any other questions during the exam?

8   A.  I did.

9   Q.  What did you ask him?

10  A.  I specifically asked yes-or-no questions about the use of

11  force.  I asked about any type of force being used, were there

12  weapons?  He said no.  Was there anything else that felt like

13  force?  No.  I asked him if he had had any troubles pooping or

14  peeing.  He indicated no.  I asked him about if anything had

15  been put in his mouth.  He said no.  I asked him if anything

16  had been put in his bottom.  He said, yes, a penis had been

17  put in his bottom.  I also asked him if there had been any

18  kissing, no.  Any licking, no.

19  Q.  Did J.W. give you any indication of whether or not the

20  assaults caused him any pain?

21  A.  It hurt.  It hurt is what he told me.  The penis hurt.

22  Q.  Did J.W. in response to your questions tell you how he was

23  feeling or thinking during the assaults?

24  A.  I asked him specifically do you remember anything more

25  about what you were thinking or feeling, and he told me I was

                    Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 3                    363

1   scared.  I was scared.

2   Q.  And did J.W. tell you anything else during the course of

3   your questioning of him during the -- that portion of your

4   examination?

5   A.  He did.  He said, I didn't know.  I didn't know.  I said,

6   J.W., what didn't you know?  He said, It wasn't only me.

7   Q.  Did you do a physical examination of J.W.?

8   A.  I did a physical examination in terms of I used my powers

9   of inspection.  I didn't do any physical assessment of him in

10  terms of looking at his genital area or his anal area.

11  Q.  And why not?

12  A.  He didn't want me to.

13  Q.  In sexual assault nurse examination parlance, what is an

14  impression?

15  A.  The impression is taking all of what the patient has told

16  me, or a guardian, a parent -- that's subjective data.  It's

17  taking what I've inspected, observed, and smelled, what I've

18  touched, did I feel any lump or bump, did I listen to breath

19  sounds -- it's taking the subjective data and then the

20  objective data, putting it together and drawing a conclusion.

21  That can be an impression.  It can be a conclusion.  It could

22  also be known as an assessment.

23  Q.  And did you make any impressions in J.W.'s case?

24  A.  In this case, I -- my impression was there was sexual

25  assault by history as evidenced by the child's statement of he

Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 3                          364

1    put his penis in me many times from the time I was six until

2    December of 2012.

3    Q.  What was your observation of J.W.'s demeanor during this

4    portion of your questioning?

5    A.  Again, closed.  It wasn't easy answering questions to a

6    stranger about things that had been done to his body, so he

7    was very still with the exception of his hands fidgeting.

8    Sometimes his head would bow.  He didn't make strong eye

9    contact.  When he uttered that it wasn't only me, he welled up

10   with tears in his eyes.

11   Q.  Let's turn now, Nurse Goebel, and discuss very generally

12   the physical effects that sodomy may have on an individual.

13   Before we begin, what is sodomy?

14   A.  Sodomy is the insertion of something in an anus.  In this

15   case I think we generally think about penises in anuses, but

16   it's the insertion of something in an anus.

17   Q.  In the course of your training and experience that you

18   outlined earlier, have you become familiar with the physical

19   effects that might be experienced by someone who has been

20   anally penetrated?

21   A.  I've had a career of that in terms of there are people who

22   engage in consensual anal penetration.  In the course of my

23   SANE training, I specifically focus on those responses to anal

24   penetration.

25   Q.  For a person who is subjected to anal penetration, what

1  can some of the physical effects be?

2  A.   Some people may experience nothing, but there are two

3  sphincters of the anus, an internal and an external sphincter.

4  Some people might have some fecal smearing.  They may have

5  some loss of stool with being aware of it or unaware of it.

6  You could have anything that could disrupt the bowel.  So a

7  person could experience constipation.  So I see changes in

8  bowel movements, hesitancy.  Some people have pain.  Others

9  have bleeding.

10 Q.   You mentioned constipation.  Can diarrhea also be an

11 effect of anal penetration?

12 A.   Yeah, and if you think about it -- yes, it can, and that's

13 what I was referring to in terms of fecal smearing.  But also

14 thinking about the impact of our emotions and our

15 psychological health on our nervous system.  So our

16 gastrointestinal system is directly connected to our central

17 nervous system.  They're derived from the very same cells in

18 utero.  If something can distress me mentally, spiritually,

19 psychologically, I can most definitely feel that impact in my

20 gastrointestinal system.  Constipation, diarrhea, some

21 combination of the two, irritable bowel, hemorrhoids.  I think

22 of fissures.  Different presentations.

23 Q.   Does everyone who's been anally penetrated experience all

24 of these symptoms?

25 A.   No.

19-cr-00243-CMA-GPG-1 Jury Trial - Day 3                    366

1    Q.  In particular, does every person who's been anally

2    penetrated present with physical injury?

3    A.  No.

4    Q.  Can some people who have been anally penetrated present

5    with no physical injury at all?

6    A.  Yes.

7         MS. SURRATT:  One moment, Your Honor.

8    Q.  (By MS. SURRATT) Nurse Goebel, why is it that some

9    individuals may not present with physical injury at all by the

10   time you see them?

11   A.  Many times it's a matter of timing.  If you care for a

12   patient in the acute period of time, generally speaking

13   72 hours, might have evidence of penetration.  Could be a

14   tear, could be a bruise, could be an abrasion, could be, if

15   you see it within 72 hours.  Most -- and in this case children

16   I'm speaking to, most children are not going to have a

17   physical finding of anal penetration unless it's observed

18   within the first 72 hours, and even in that case, there's a

19   strong likelihood that you will not have evidence of physical

20   trauma.

21   Q.  Nurse Goebel, a moment ago you explained some of the

22   symptoms someone might experience after being anally

23   penetrated.  Can those symptoms sometimes linger for a few

24   days?

25   A.  Yes.

                    Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 3                    367

1   Q.  Like, for instance, may someone experience pain for a few

2   days after being anally penetrated?

3   A.  Yes.

4   Q.  Might someone experience loose stools for a few days post

5   anal penetration?

6   A.  Yes.

7   Q.  And similarly, might someone experience constipation for a

8   few days post anal penetration?

9   A.  Yes.

10          MS. SURRATT:  No further questions, Your Honor.

11          THE COURT:  Cross-examination.

12          Mr. LaBranche, you may proceed.

13                      CROSS-EXAMINATION

14  BY MR. LABRANCHE:

15  Q.  Good morning.

16  A.  Good morning.

17  Q.  So this exam that you performed was in March of 2013,

18  correct?

19  A.  It was.

20  Q.  Okay.  Do you actually remember it or are you just going

21  off what's in your report?

22  A.  I remember J.W. specifically saying to me it wasn't only

23  me.

24  Q.  Okay.  So you remember --

25  A.  That is something that has stayed in my head for nine

                    Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 3                           368

1   years.

2   Q.  Okay.  So he told you that.  So when you met with him, he

3   told you that he originally thought he was the only one, or he

4   didn't use those exact words, but he said, I didn't know it

5   was only me -- or I'm sorry.  What did he say exactly?

6   A.  He simply said, when I asked him what didn't you know,

7   J.W., it wasn't only me.

8   Q.  Okay.  Do you remember anything else independently of your

9   report?

10  A.  I remember the commotion in the Center for Children.  I

11  remember that there were adults on that second floor with us.

12  I remember the flurry of that and being able to say I simply

13  want to meet with my patient.

14  Q.  What was the flurry?

15  A.  The response to this.  I know that his mom presented.  She

16  had with her another adult woman.  There was a man as well,

17  and all the conversation about what this investigation would

18  be, I was very aware of that energy field.  It was important

19  for me to say, J.W., let's go on into our exam room.

20  Q.  And you met with him in the exam room alone, correct?

21  A.  I did.

22  Q.  But did you leave the door open?

23  A.  I did.  In this case, I -- having made my assessment

24  working to establish trust and rapport, I felt it was in the

25  best interest of J.W. who was meeting an entire stranger to

Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 3                      369

1    leave that door open a crack so that he didn't feel as though

2    he was locked in a room with me.

3    Q.  Because you were a stranger?

4    A.  I was a stranger.  I'm a nurse, an adult woman he's

5    meeting for the first time, and has probably been told -- but

6    I hadn't asked him -- that she's going to want to look at you.

7    That's what I was thinking when I met J.W.

8    Q.  And who were the -- who were the adults that were outside

9    the door when you were performing the exam?

10   A.  The three that I know were adults that had accompanied him

11   there.  I'm not sure who was staffed that day at the Center

12   for Children.  It could have been Tammy or Megan.

13   Q.  But he was brought there by his mother?

14   A.  I believe he arrived with his mother and two other adults.

15   Q.  Two other adults.

16   A.  Uh-huh.

17   Q.  Okay.  One female, one male, you said?

18   A.  Yes.

19   Q.  Okay.  Any idea what his relationship was like with his

20   mother?

21   A.  No.

22   Q.  Okay.  But you left the door open because you felt like he

23   would feel more comfortable with his mom to be nearby?

24   A.  I wasn't considering who those adults were.  I wasn't

25   thinking, oh, J.W.'s going to feel more comfortable with his

                        Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 3                    370

1    mom.  If that had been the case, I quite probably would have

2    ask J.W. do you want your mom in here, but I didn't.  Instead

3    I kept it open to assure my patient this is your exam, stop,

4    start, slow down, we're done at any time, and I'm going to

5    leave the door open a little bit so that you know if you want

6    to leave you can.

7    Q.  Okay.  So you have no idea what their relationship was

8    like?

9    A.  I do not.

10   Q.  Do you know if he lived with her?

11   A.  I do not.

12   Q.  So you never provided him with medical treatment before?

13   A.  No.

14   Q.  You never -- did you -- you didn't review his medical

15   history?

16   A.  I did because he's a child.  I asked his mom is there any

17   medical history that I need to be aware of, anything of

18   significance, any current medications.  His mom replied to me

19   he was as healthy as a horse.

20   Q.  But you didn't review any medical records?

21   A.  I did not.

22   Q.  You said medical history.  You just asked his mom what it

23   was?

24   A.  And I asked J.W. as I went down that list of, J.W., do you

25   have any troubles breathing?  J.W., do you have any troubles

                        Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 3                    371

1   with your muscles?  J.W., do you -- I asked him those

2   questions about his body systems.  But in the backdrop I

3   always ask a parent, because this child is diabetic, if they

4   have seizures, if there's a preexisting condition, I need to

5   be aware of that as I enter into his care.

6   Q.  Okay.  He said that he had been basically sodomized for

7   six years, correct?

8   A.  He indicated to me that a penis had been put in his

9   bottom.

10  Q.  That's sodomy, right?

11  A.  It is.

12  Q.  So he said he was sodomized for six years, but you don't

13  know if anything in his medical records would indicate or

14  confirm that?

15  A.  I never saw any other record of J.W.

16  Q.  Okay.  Did you ask about his living conditions at home?

17  A.  I didn't.

18  Q.  Okay.  And your area of expertise is medical, correct?

19  A.  Nursing specifically.

20  Q.  Nursing specifically.  Your -- you can't interview someone

21  and basically -- you're not trained to determine if someone's

22  telling the truth or not.  That's beyond your area of

23  expertise.

24  A.  I am -- I'm taking care of my patients, and I elicit

25  history, and mine isn't the forensic interview.  I am not

1  acquiring information for prosecution or for detail.  I'm

2  doing a health history to guide the diagnosis and treatment of

3  my nursing care for my patient.

4  Q.  Okay.  And do you have any idea who J.W. first reported a

5  sex assault to?

6  A.  I do not.  That would be the role of a forensic

7  interviewer.

8  Q.  Okay.  Do you have any -- but he obviously did before he

9  got to you?

10  A.  Clearly, or I wouldn't have been called in to provide

11  care.

12  Q.  Do you have any idea if he ever denied it to anyone before

13  seeing you?

14  A.  No.

15  Q.  Okay.  You know Mr. McFadden is the defendant here.  Have

16  you ever met him?

17  A.  No, I have not met Mr. McFadden.

18  Q.  You didn't ask for any information on him during your

19  exam?

20  A.  I didn't.

21  Q.  Okay.  Now, I think, you know -- would you agree that

22  based on your prior testimony -- I just want to ask you this

23  -- would you agree that the closer to the alleged sex assault,

24  the more accurate your examination is going to be?

25  A.  No.

19-cr-00243-CMA-GPG-1 Jury Trial - Day 3                          373

1    Q.  No.  Okay.  Well, I mean, is it better to examine someone

2    within 24 hours after a sex assault?

3    A.  If you are going to collect forensic evidence, if you are

4    going to get swabs, to collect DNA, yes, you've got about a

5    72-hour window to do that, and there are times a SANE nurse

6    will push that out beyond.  So timeliness in terms of forensic

7    collection is important.  When you think about injury, which

8    could be a tear, an abrasion, that type of thing, it's ideal

9    to see that because the possibility is greater in those first

10   72 hours.  Healing happens rapidly.  Healing is a lot -- of

11   the genital area or the anal area a lot like the mouth, so you

12   can bite the inside of your mouth, and then all day long bite

13   that same darn spot a couple more times, it might even stick

14   out a little, and in 24 hours try to find that spot inside

15   that mouth.  It's a mucous membrane.  It will heal readily.

16   So, yes, ideally within 72 hours.  And in this case it was

17   three months later.

18   Q.  So it's better to do it within 72 hours because you can

19   collect -- you have a better chance of actually obtaining

20   physical evidence, right?

21   A.  Physical evidence.

22   Q.  Yes.  To corroborate any statements that somebody makes,

23   correct?

24   A.  Correct.

25   Q.  Okay.  So -- and the types of physical evidence that you

                        Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 3                    374

1   look for are, you know, it could be DNA?

2   A.   Yes.

3   Q.   Semen?

4   A.   Yes.

5   Q.   Blood?

6   A.   Yes.

7   Q.   Okay.  Because where's the blood usually come from in a

8   sex assault where sodomy is alleged?

9   A.   Could you please repeat your question?  Thank you.

10  Q.   If someone reports sodomy within 72 hours, you look for

11  blood, right?

12  A.   Well, I look at an anus.

13  Q.   Okay.  And so blood would come from the anus?

14  A.   Generally -- I'm not going to state a typical, but if

15  there were to be frank red bleeding, red bleeding, I would

16  inspect, and I would see where the source of it is, and I

17  would anticipate that maybe there were anal tears or fissures

18  that, again, like the mouth are going to heal readily.

19  Q.   Okay.  So -- but in some cases they don't always heal,

20  correct?

21  A.   In the vast majority of cases we will have no physical

22  finding of anal penetration of the child or the adult.

23  Q.   So -- but there's tears -- and you said there could be

24  tears, and what is the other word, fissures?

25  A.   A fissure is a deeper tear.  It could be like an abrasion

                    Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 3                    375

1    like when we skin the knee.  It could be redness and swelling,

2    but those are indeterminate findings.  We can almost always

3    have a bit of redness around our anuses.  There could be

4    swelling.  That's really what I'm looking at.  Tears,

5    erythema, which is redness, are there any abrasions, any

6    swelling.

7    Q.  And when they heal, they can also scar, correct?

8    A.  They can.  In the vast majority of cases there will be no

9    evidence of scarring.

10   Q.  Okay.  But -- but, you know, ideally you can -- you can

11   tell within 72 hours?

12   A.  I've cared for people within 72 hours where there's

13   actually been -- the accused has reported I anally penetrated

14   this person, it's true, and I have no physical finding of anal

15   penetration.

16   Q.  So J.W. told you this happened when he was six years old,

17   began when he was six years old?

18   A.  Yes.

19   Q.  And continued until he was 12?

20   A.  Yes.

21   Q.  Okay.  And your testimony is had you been able to examine

22   his rectal area, you wouldn't have found any signs that he was

23   sexually active?

24   A.  In the vast majority of cases normal is normal.  Even in

25   those cases where we know and the research indicates it -- and

Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 3                    376

1    2018 was the most recent report in the literature -- in cases

2    where the accused reported I anally penetrated with penis,

3    with finger, and care was provided beyond that 72 hours, the

4    vast majority have no physical finding of scarring, of any

5    sort of injury.

6    Q.  So the vast majority may -- vast majority don't have any,

7    but then some do?

8    A.  Some do.  Normal is normal is really what a SANE nurse or

9    a forensic medical examiner is --

10   Q.  Would it matter -- would the amount -- well, would the

11   frequency of sex make a difference?  The more times the person

12   was assaulted, would that make a difference in being able to

13   find something beyond the 72-hour time?

14   A.  I don't know.

15   Q.  You don't know.  So you think -- if somebody is sexually

16   assaulted once or 100 times, it could be the same?

17   A.  I suspect that with repeated penetration of the human anus

18   there would be lack of tone, and therefore I might suspect

19   there would be things happening over time.  I've cared for

20   fourth degree perianal lacerations with follow-up and not had

21   any evidence, so -- and no one asks.  That's why the research

22   isn't done.

23   Q.  And then also, you know, the -- let's say the age

24   difference, the younger the person, the more physical trauma

25   they would have?

Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 3                          377

1    A.  Possibly.

2    Q.  Possibly?  So a younger child who's small is going to have

3    the same amount of trauma as an adult?

4    A.  I've cared for small children who were sedated, and with

5    that sedation comes the laxity of the anus and dilatation, and

6    with adequate lubrication and width, I have -- I have

7    witnessed that type of exploitation on video and seen that

8    there was no anal injury following those things.  So, again,

9    for me it's very patient specific, and I would only be

10   guessing that one time is less than five times, but I've seen

11   the severest injuries on the first report.

12   Q.  And you would also be guessing in this case that J.W. had

13   -- wouldn't have anything visible?

14   A.  I'm not guessing at anything.  I was not allowed to

15   inspect his anal area or genital area.

16   Q.  So you can't say for sure there was not any scarring?

17   A.  That I cannot say, but I had evidence, subjective evidence

18   based on his report.

19   Q.  Okay.  Did he ever tell you how many times he was sexually

20   assaulted?

21   A.  The word he used was many times.

22   Q.  That's it?

23   A.  Uh-huh.

24   Q.  What do you interpret many times to mean?

25   A.  I didn't attempt to interpret.  I didn't say by many do

19-cr-00243-CMA-GPG-1 Jury Trial - Day 3                    378

1    you mean one or three or five or seven?  I had a 12-year-old

2    boy who was scared and reluctant to speak, and whether he

3    reported it happened one time or 25 times, that wasn't going

4    to change the course of my care.  So when he trusted me with

5    it was many times, that's what I documented.

6    Q.  And he told you it happened in bed?

7    A.  In bed.

8    Q.  Did he tell you whose bed?

9    A.  No.

10   Q.  Did he tell you it happened anywhere else?

11   A.  No.

12   Q.  He didn't mention a car or truck or motel or anything like

13   that?

14   A.  No.  I didn't ask anything beyond when he said in bed.

15   Q.  But you asked where it happened, and the only thing he

16   told you was it happened in bed?

17   A.  He told me in bed.

18   Q.  Okay.  And then did you ask him about if, you know, did he

19   ever see or feel any -- was there ejaculation?  I think that's

20   something you ask?

21   A.  I do ask.

22   Q.  What exactly do you ask in relation to that?

23   A.  I said, Do you remember anything you felt?  Did you feel

24   anything after a penis would come out?  And he told me, I

25   don't know.

                        Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 3                    379

1  Q.  Did you ask him specifically if he felt anything wet?

2  A.  Wet, I probably said wet or warm or did you feel anything?

   It hurt.  And he did not report anything other than that.

4  Q.  Okay.  And he reported that it hurt?

5  A.  It hurt.

6  Q.  For how long -- did you say he said it hurt for a couple

7  days after?

8  A.  No, he told me it hurt.

9  Q.  Oh, it just hurt.  Okay.  Did you say something that it

10 could hurt for a couple of days after?  Did you say anything

11 about the time period?

12 A.  I was asked specifically could somebody hurt for a few

13 days after anal penetration, and, yes, patients report they

14 hurt several days afterwards.

15 Q.  Okay.

16 A.  Or persistently.

17 Q.  Okay.  And that would be common in somebody that age who's

18 assaulted, correct?  To have experienced pain for a couple of

19 days after?

20 A.  Again, words like normal and typical and common are not

21 words I usually use because each patient is unique and the

22 circumstance is unique.  So I would not ever be surprised if

23 somebody told me, yeah, I hurt for a lot of days after that,

24 and I wouldn't be surprised if somebody said, no, it hurt when

25 it was happening and then it didn't.  I've heard both

                    Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 3                    380

1    responses.

2    Q.   Then you also ask about change in bowel movements?

3    A.   I do.

4    Q.   But, I mean, with children you're not using those type of

5    words.  So what kind of questions are you asking related to

6    bowel movements to a child?

7    A.   I asked him about pooping and peeing.

8    Q.   Like what specifically?

9    A.   Did anything change when you were pooping?  How about when

10   you were peeing?

11   Q.   And one of the questions is did you experience any

12   bleeding while pooping; is that correct?

13   A.   Or just any bleeding.  Like, afterwards did you notice any

14   bleeding in your underwear when you wiped?

15   Q.   And his response was no?

16   A.   No.

17   Q.   That he did not experience bleeding?

18   A.   He told me no.

19   Q.   Okay.  So you knew that this was three months after,

20   right?

21   A.   I did.

22   Q.   Okay.  But you still wanted to examine his rectum, right?

23   A.   I did.

24   Q.   Even though it's way beyond the 72 hours, right?

25   A.   I did.

19-cr-00243-CMA-GPG-1 Jury Trial - Day 3                    381

1   Q.  Okay.  So even though it was way beyond the 72 hours, why

2   did you want to look at it?  Why did you want to examine him?

3   A.  I believe that the SANE exam, the response to an outcry of

4   sexual assault can be part of healing.  I can't change what

5   was.  I am not going to be able to say what will be, but I can

6   be a part of someone's healing at that point in time.  And

7   whether they're an adult or child, many times people need to

8   hear I'm okay.  Did you see anything?  Am I normal?  And so

9   part of a SANE exam is attending to a patient.  That's how I

10  think of people.  You're my patient.  And I might be at a

11  place where I can reassure you and teach you about your body

12  really feeling strongly that this can be part of someone's

13  healing and movement forward.

14  Q.  So you weren't looking for tears, scars, or evidence that

15  he has been sexually active for six years.  You just wanted to

16  tell him he was normal?

17  A.  I don't think that's what I said.  I incorporate the

18  physical exam as a piece of it, and I incorporate it as part

19  of the healing process, not to minimize, but to normalize.

20  Q.  Okay.

21  A.  When I am doing the SANE exam, I'm not specifically

22  looking for evidence of a sexual assault.  I may just as well

23  be looking at it and saying there is a tear and there is an

24  abrasion, and is there anything else that could have

25  contributed to this.  What else and what else?

                        Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 3                      382

1    Q.  You also asked him if there was any kissing?

2    A.  I did.

3    Q.  He denied?

4    A.  He said no.

5    Q.  You asked him if there was any licking?

6    A.  I did.

7    Q.  Now, when you're asking licking, are you asking if he was

8    licked or if he was licking his assailant?

9    A.  I just am asking was there any licking?  And if any

10   patient indicates, yeah, I was licked, and if we are in that

11   72-hour period of time, I'll say where were you licked, and

12   that will be a place that I moisten swabs, I roll the swabs

13   over that area, I air dry them, I package and seal them, and I

14   identify where they were obtained, because if there were

15   licking, there's a possibility saliva was there and DNA can be

16   identified.

17   Q.  So he never indicated that he was licked?

18   A.  I just asked him was there any licking.  He said no.

19   Q.  But, I mean, it's three months later.  You wouldn't be

20   able to swab that for DNA anyway?

21   A.  Correct.

22   Q.  And he also -- so you also asked about oral sex?

23   A.  I do.

24   Q.  But with a child, you're not -- you don't use those terms.

25   What kind of questions do you ask when you're trying to find

                         Sarah K. Mitchell, RPR, CRR

1   out if there was any oral sex involved in an allegation?

2   A.   I would be saying did you put your mouth anywhere on him

3   or her?  Did that person put their mouth anywhere on you?

4   Q.   Anywhere by -- what do you mean anywhere?

5   A.   Genital area, on your -- and at that point if I knew the

6   patient's name for it -- but I'll say the genital area.  Where

7   were you touched with someone's mouth?

8   Q.   Okay.  So any privates in general, like the genitals as

9   well as the anus?

10  A.   Genitals, anus, sometimes it's breasts.

11  Q.   Okay.  And he denied any oral sex?

12  A.   He said no.

13  Q.   Okay.  I mean, you asked questions to make sure that

14  includes, you know, oral sex performed on him or oral sex

15  performed by him?

16  A.   Yeah, J.W. had agreed to answer yes-or-no questions, and I

17  walked down that form and specifically asked -- and you're

18  correct, I would not use the word oral sex.  I would say mouth

19  and genitals, mouth and bottom.

20  Q.   And so his mother -- you said his mother reported to you

21  that he was healthy as a horse?

22  A.   Yeah.  That's -- and that's about the most she and I had

23  talked.

24  Q.   Is there anything in your examination to lead you to

25  believe that she was wrong or -- I mean, did you agree with

1    that assessment physically?  Like, his physical health?

2    A.  Yeah.  I was meeting with a 12-year-old boy who appeared

3    as stated age.  He was dressed appropriate for his age, the

4    weather, the circumstance.  He looked like a typical

5    12-year-old engaged in conversation until it got very

6    specific.  I hadn't any reason to believe he had an illness of

7    any sort.

8    Q.  And so I think you said earlier you're not trained to do

9    forensic interviews?

10   A.  I'm not a forensic interviewer.

11   Q.  Okay.  But basically -- I mean, do you know what a

12   forensic interviewer does?

13   A.  I know that we have forensic interviewers who are

14   specifically trained in that.  They may become certified, and

15   they are part of the investigative process.  I'm just a spoke

16   on this.  I'm the medical response to an outcry of sexual

17   assault, so I don't chase statements from patients.  When he

18   said it wasn't only me, I didn't say, well, how do you know

19   that and who else would have been involved?  Because had I

20   asked him those questions, his responses weren't going to

21   change the course of my care.  So my questions are really

22   directed at providing healthcare to a patient.

23   Q.  Okay.  By just -- and in this case it was all yes-or-no

24   questions?

25   A.  And then our conversation in between where he let me know

Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 3                              385

1   he had felt scared.  He let me know how many times.

2   Q.  But most of them were just yes-or-no questions, correct?

3   A.  The very specific directed towards were you hurt, sexual

4   assault questions were yes or no.

5   Q.  And so you weren't able to collect any evidence in this

6   case?

7   A.  I did not collect any physical evidence.

8   Q.  Okay.  And so your impression was based solely on his

9   statements?

10  A.  Yes.  It's subjective data, and that is evidence.

11  Q.  And you were not able to corroborate it with any physical

12  evidence?

13  A.  I didn't do a physical assessment.

14  Q.  So you weren't able to corroborate those statements with

15  anything else?

16  A.  I didn't do any physical assessment, and therefore there

17  were no findings that I documented about a physical

18  assessment.  And in that, recalling that the vast majority

19  wouldn't have a physical finding, corroboration may or may not

20  have been -- to me, to a nurse, subjective information, that

21  data is evidence.

22  Q.  But in this case, we don't know if there would be any

23  physical evidence, because in some cases there are, right?

24          MS. SURRATT:  Objection, Your Honor.  Asked and

25  answered.

                    Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 3                              386

1              THE COURT:  Sustained.

2              MR. LABRANCHE:  Thank you.

3              THE COURT:  Any redirect?

4              MS. SURRATT:  Briefly, Your Honor.

5                         REDIRECT EXAMINATION

6    BY MS. SURRATT:

7    Q.  Nurse Goebel, you were asked a number of questions about

8    the 72-hour window.  Do you commonly see children within

9    72 hours of when they relate they were assaulted?

10   A.  Here in Mesa County that would be an exception to the

11   rule.  It is far more common to care for a child beyond the

12   72-hour period of time.  Far more common.

13   Q.  Nurse Goebel, when you're asking questions of children

14   about their assault, are your questions designed to elicit

15   every single instance of assault they may have experienced?

16   A.  No.

17   Q.  Would you ever pressure a reluctant or scared child to

18   talk to you more than they're comfortable?

19   A.  No.

20             MS. SURRATT:  No further questions.

21             THE COURT:  All right.  Thank you.  May this witness

22   be excused?

23             MS. SURRATT:  Yes, Your Honor.

24             THE COURT:  Thank you very much, Ms. Goebel.  You are

25   excused.

                    Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 3                    387

1          THE WITNESS:  Thank you.

2          THE COURT:  The Government may call its next witness.

3          MS. SURRATT:  Your Honor, the Government calls K.W.

4          THE COURTROOM DEPUTY:  Can you please stand and raise

5    your right hand.

6                              K.W.

7    was called as a witness and, having been duly sworn, was

8    examined and testified as follows:

9          THE COURTROOM DEPUTY:  Thank you.  Please be seated,

10   and then please state your name and spell your first and last

11   name for the record.

12         THE WITNESS:  My name is K////////, K-////////////, last

13   name W////////////, W-//////////////////////.

14                     DIRECT EXAMINATION

15   BY MS. SURRATT:

16   Q.  Good morning.  Can I call you K.W.?

17   A.  Yes.

18   Q.  K.W., how old are you now?

19   A.  I am 21 years of age.

20   Q.  What is your date of birth?

21   A.  April 23rd, 2001.

22   Q.  April 23rd, 2001?

23   A.  Yes.

24   Q.  So in January of 2013, were you 11 years old?

25   A.  I was, indeed.  No, 2013 of January I would have been --

                    Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1                                              388

1   yes, I would have been 11.

2   Q.  Not quite 12 yet?

3   A.  Not quite 12 yet.

4   Q.  K.W., there's a binder in front of you.  Can you look in

5   the binder and find what's marked as Exhibit 13-1.

6   A.  I have it.

7   Q.  What is that?

8   A.  That's going to be my -- me and my two little siblings.

9   Q.  Is that a photograph?

10  A.  It is, indeed.

11  Q.  And you said you recognize the people in that photograph?

12  A.  I do, indeed.

13  Q.  And you said it's you and your siblings?

14  A.  Yes.

15  Q.  Is that a photograph that fairly and accurately represents

16  what you and your siblings looked like around that time?

17  A.  Yes, it does.

18          MS. SURRATT:  The Government offers 13-1.

19          THE COURT:  Any objection?

20          MR. MCDERMOTT:  No objection, Your Honor.

21          THE COURT:  13-1 is admitted.  You may publish.

22      (Government's Exhibit 13-1 received.)

23  Q.  (By MS. SURRATT) K.W., who is the tallest boy on the far

24  left?

25  A.  That would have been me at the time.

                    Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1                                              389

1   Q.   Do you know approximately how old you are in this photo?

2   A.   I would have been around 11 years old.

3   Q.   Who is the girl in the middle?

4   A.   That would be my little sister.

5   Q.   And what's your sister's name?

6   A.   S.J.W.

7   Q.   About how old was S.J.W. in this photograph?

8   A.   8, 8 years old at the time.  7 or 8 around that time.  I

9   think she would have been 7 at the time because her birthday

10  is in May.

11  Q.   And who is the little boy in the darker blue shirt on the

12  right side of the photograph?

13  A.   That would be my little brother L.We.

14  Q.   And do you know approximately how old L.We. would have

15  been in this photograph?

16  A.   He would have been 3 or 4 years old.

17  Q.   K.W., do you know where this photo was taken?

18  A.   That was taken at the D 1/2 Road house.

19  Q.   Okay.  And we'll talk about the places that you lived in

20  Grand Junction in a moment.

21  A.   Okay.

22  Q.   Could you turn to the next exhibit, which is Government's

23  Exhibit 13-2 in the binder.

24  A.   14-2?

25  Q.   13.  Sorry, K.W.  13-2, the very next exhibit.

                          Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1                                              390

1   A.  Got it.

2   Q.  Do you recognize that?

3   A.  I do, indeed.

4   Q.  What is it?

5   A.  That is me -- that is also me.

6   Q.  Is it a photograph of you?

7   A.  It is a photograph of me, yes.

8   Q.  And is that a photograph that fairly and accurately

9   represents what you looked like around the time it was taken?

10  A.  Yes.

11          MS. SURRATT:  The Government offers Government's

12  Exhibit 13-2.

13          THE COURT:  Any objection?

14          MR. MCDERMOTT:  No objection, Your Honor.

15          THE COURT:  13-2 is admitted.  You may publish.

16      (Government's Exhibit 13-2 received.)

17  Q.  (By MS. SURRATT) About how old were you in this photo,

18  K.W.?

19  A.  So at D 1/2 Road house I was 11, 11 to 12 about the entire

20  time.  So this one I would have been 11.

21  Q.  And where was this photo taken?

22  A.  This was taken inside the home at D 1/2.

23  Q.  You've mentioned two of your siblings.  Do you have any

24  other siblings?

25  A.  Yes.  I do have one step-brother.  He's older than me.

                        Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1                                              391

```
 1   His name is S.W. Jr.

 2   Q.   Your older step-brother is S.W. Jr.?

 3   A.   Yeah.

 4   Q.   About how old is he?

 5   A.   He's almost 30 now.  He's 29.

 6   Q.   Where do you currently live?  Just the city and state.

 7   A.   Cedar City, Utah.

 8   Q.   About how long have you lived in Cedar City, Utah?

 9   A.   I moved to Cedar City, Utah, when I was 14 years old.  So

10   from 14 to now, which is roughly eight years.

11   Q.   Who do you live with in Cedar City?

12   A.   I live on my parents' property.

13   Q.   And do you live with anyone on your parents' property?

14   A.   I live with my fiancée and my little daughter.

15   Q.   How old is your daughter?

16   A.   My daughter is a year and two months.

17   Q.   What do you do for work?

18   A.   I am assistant manager at Zaxby's.

19   Q.   What is Zaxby's?

20   A.   Zaxby's is just a chicken place.  It's very similar to

21   Chick-fil-A.

22   Q.   And you said you're an assistant manager there?

23   A.   I am, indeed.

24   Q.   About how long have you worked at Zaxby's?

25   A.   I will be there two years in May.
```

                        Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1                                          392

1   Q.   K.W., do you have any felony adjudications in your past?

2   A.   I do, indeed.

3   Q.   Just very broadly, what are they for?

4   A.   I have a few for gun theft.  I have a few burglaries.

5   Q.   And were these all juvenile adjudications?

6   A.   They were all juvenile adjudications, yes.  In Cedar City,

7   Utah, Iron County.

8   Q.   And at this point have all of your juvenile adjudications

9   been resolved?

10  A.   They have been, yes.  I was successfully terminated from

11  juvenile parole.

12  Q.   You were successfully terminated from juvenile parole?

13  A.   Yes.

14  Q.   Do you have any pending cases?

15  A.   I have two.

16  Q.   And are those misdemeanors?

17  A.   They are, indeed.  They're Class 3s.

18  Q.   Do those pending misdemeanors have anything to do with

19  your testimony here today?

20  A.   They do not, no.

21  Q.   And are you expecting any benefit in your misdemeanor case

22  from me or any another representative of the Government here

23  today?

24  A.   I do not, no.  Those are my mistakes.  Those are for me to

25  deal with.

1   Q.  What places did you live before you lived in Cedar City,

2   Utah?

3   A.  I've only -- so my entire life I've only lived in Grand

4   Junction, Colorado; Montrose, Colorado; and Cedar City, Utah.

5   Q.  So Grand Junction; Montrose, Colorado; and Cedar City,

6   Utah?

7   A.  And Enoch, Utah, but they're very closely -- like a mile

8   apart.

9   Q.  And Enoch, Utah, as well?

10  A.  Yes.

11  Q.  K.W., did you know someone named Michael McFadden?

12  A.  I do, indeed.

13  Q.  What did you call him when you knew him?

14  A.  Mike.

15  Q.  Do you see Mr. McFadden in the courtroom here today?

16  A.  I do, indeed.

17  Q.  Can you identify him by an article of clothing he's

18  wearing?

19  A.  Gray suit jacket.

20  Q.  What color shirt is he wearing?

21  A.  Blue.

22        MS. SURRATT:  Your Honor, may the record please

23  reflect that the witness has identified the defendant?

24        THE COURT:  It will so reflect.

25  Q.  (By MS. SURRATT) K.W., how did you first meet

                    Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1                                      394

1   Mr. McFadden?

2   A.   My mom ran into him at the North Avenue Walmart, I

3   believe.   As I'm here in Junction, I'm kind of remembering

4   locations.

5   Q.   And you said she ran him into at the North Avenue --

6   A.   Walmart.

7   Q.   -- Walmart?

8   A.   Yeah.

9   Q.   And when did you first start spending time around

10  Mr. McFadden?

11  A.   About a couple weeks after that point.

12  Q.   So shortly after your mom ran into him?

13  A.   Yes.

14  Q.   Are you aware of where Mr. McFadden lived when you first

15  met him?

16  A.   I don't know the exact street name, but I do remember

17  mostly the picture of the house.

18       MS. SURRATT:   Your Honor, may we please publish

19  Government's Exhibit 3-1?

20       THE COURT:   You may.

21  Q.   (By MS. SURRATT) K.W., do you recognize this house?

22  A.   I do, indeed.

23  Q.   What is it?

24  A.   It's the house that I first went to.   Mike used to live

25  with two other adults.   One was -- their names were John and

Sarah K. Mitchell, RPR, CRR

1    Phyllis.  They lived with their son named S.H.

2    Q.  And you said that Mr. McFadden lived with John and

3    Phyllis.  Do you know --

4    A.  So kind of how it worked, they were kind of like

5    downstairs.  Mike was upstairs.  It was a split duplex kind

6    of.

7    Q.  So John and Phyllis lived downstairs.  Do you remember

8    John and Phyllis's last name?

9    A.  Not by heart.

10   Q.  Okay.  And you said they had a son; is that right?

11   A.  Yeah, his name is S.H.

12   Q.  Do you know approximately how old S.H. was at the time?

13   A.  I don't remember.  I lost contact with S.H.  I've

14   forgotten how old he is, so forth and so on.

15   Q.  Was he about your age or older or younger?

16   A.  I believe he's a little bit older than me.  I'm not

17   100 percent sure or certain.

18   Q.  Did you ever go to this house where Mike lived in

19   Government's Exhibit 3-1?

20   A.  I did, indeed.

21   Q.  About how old were you when you started going over there?

22   A.  I think I was around 10 years old at this time.

23   Q.  And how would you get there?

24   A.  Mike would pick me up or my mom would drop me off.

25   Q.  What kinds of things would you do over at this home?

                        Sarah K. Mitchell, RPR, CRR

1   A.  Things we would do is just kind of like play around.  At

2   this time -- I don't know how it looks like now, but at the

3   time there was a field across the street.  Me and J.W. would

4   always go over there and play, like, just have some fun.  They

5   would have, like, these little electric crotch rockets that

6   were in the garage.  We would ride around the neighborhood and

7   just stuff like that.

8   Q.  A couple questions.  What is a crotch rocket?

9   A.  A crotch rocket is just like a motorcycle.

10  Q.  And you mentioned someone named J.W.  Who is J.W.?

11  A.  J.W., his name is J.W.  Me and him used to be very close.

12  Q.  Was he a friend of yours?

13  A.  Yeah, he was.

14  Q.  And how old was J.W.?  Was he older than you, about the

15  same age, or younger?

16  A.  He's a year older than I am.

17  Q.  So you occasionally went to this house.  Sometimes J.W.

18  was there.  Was anyone else there when you went over?

19  A.  Yes.  It would be myself, J.W., his brothers, sometimes

20  his little sister, and then S.H.  That's all I can remember.

21  Q.  Do you remember who J.W.'s brother and sister were?

22  A.  I know -- yeah.  L.Wr. and B.W.

23  Q.  L.Wr. and B.W.?

24  A.  Yeah.

25  Q.  Do you remember any other kids going over to this house?

1   A.  Not necessarily.

2   Q.  About how often would you go over to this house?

3   A.  Almost every weekend.

4   Q.  When you were there almost every weekend, did you

5   sometimes spend the night at this house?

6   A.  Yes.  I would stay there during the weekend.

7   Q.  So you'd stay during the weekend and spend the night?

8   A.  Uh-huh.

9   Q.  When you spent the night, where did you sleep?

10  A.  At first I would sleep on like -- kind of like a sleeping

11  bag right next to Mike's bed, and then over time it just

12  turned into me sleeping on the bed with Mike.

13  Q.  And did Mike have a bedroom?

14  A.  He did.

15  Q.  And so when you were sleeping on the sleeping bag next to

16  the bed, was that in Mike's bedroom?

17  A.  Yes, it was.

18  Q.  And then you said eventually you just started sleeping in

19  the bed with him?

20  A.  Uh-huh.

21  Q.  Did anyone else spend the night?

22  A.  Yes.  J.W. lived there, as well as L.Wr. lived there.  So

23  they would kind of stay in the same room.

24  Q.  And where would they sleep?

25  A.  J.W. would sleep on the bed.  Don't remember where L.Wr.

 1   would sleep.

 2   Q.  At some point do you remember if Mr. McFadden moved to a

 3   different house?

 4   A.  He did.  At that time, after this house I think we went a

 5   little bit without contact, and then just kind of met back up

 6   with him after.  I don't remember much after this house until

 7   about right around Clifton time and D 1/2.

 8   Q.  Do you remember where Mr. McFadden moved after this house?

 9   A.  No.

10   Q.  Do you remember him moving to a house on D 1/2?

11   A.  That would be it, yes.

12         MS. SURRATT:  Your Honor, may I please publish

13   Government's Exhibit 4-1?

14         THE COURT:  You may.

15   Q.  (By MS. SURRATT) K.W., do you recognize this house?

16   A.  I do, indeed.

17   Q.  What is this?

18   A.  That was the house he lived at on D 1/2.  It's a big old

19   22-acre plot of land at the time.

20   Q.  This is the house where Mr. McFadden lived?

21   A.  Yes.

22   Q.  And at some point did your family also move to a house on

23   D 1/2 Road?

24   A.  Yes.  We moved to the two-story right across the field.

25   Q.  You moved to a two-story house across the field?

19-cr-00243-CMA-GPG-1                                         399

1   A.  Yeah, it was like an old brown two-story home right across

2   the field on D 1/2.

3   Q.  And just so we're clear, these are both in Grand Junction,

4   right?

5   A.  Yes.

6          THE COURT:  Ms. Surratt, I'm going to ask you to slow

7   down just a little bit.

8          MS. SURRATT:  Yes, Your Honor.

9          Your Honor, may I please publish what's marked as

10  Government's Exhibit 4-4?

11         THE COURT:  You may.

12  Q.  (By MS. SURRATT) K.W., do you recognize this aerial view?

13  A.  Yes, I do.

14  Q.  Could you indicate on this where Mr. McFadden lived when

15  he was on D 1/2 Road?

16  A.  On D 1/2 he would be, like, where all these kind of cars

17  and storage containers and trailers were at the time.  And

18  then the house that we moved into is like this little one

19  right down here in the corner.

20  Q.  Let me see if I can verbalize where I believe you were

21  just pointing.  When you described Mr. McFadden's property

22  with cars and other items around it, were you pointing to that

23  cluster of structures in the very middle of the photograph?

24  A.  In the middle of the screen, yeah.

25  Q.  And when you were describing your two-story home, were you

                    Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1                                          400

1   pointing at that small structure in the very lower right-hand

2   corner of the screen?

3   A.  Yes.

4        MS. SURRATT:  Your Honor, may I please publish what's

5   marked as Government's Exhibit 4-2?

6        THE COURT:  You may.

7   Q.  (By MS. SURRATT) What is this, K.W.?

8   A.  That would have been our house at the time.

9   Q.  Where you lived with your family?

10  A.  Yes.

11  Q.  Who lived there with you at the time you lived at this

12  house on D 1/2 Road?

13  A.  Everyone that lived at this home in particular would have

14  been, off the top of my head that I can remember, would be me

15  myself, S.J.W., L.We., my mom, my dad, S.W. Jr., and then one

16  of Ray Fluke's -- I think Ray used to live there.  We've had

17  people come and go from this house, but the main people that

18  lived there was the immediate family.

19  Q.  You mentioned a name Ray Fluke.  Who is that?

20  A.  That's like an adopted uncle of ours.  We just -- he lives

21  in Cedar with us now.  He's been close to our family ever

22  since we met him.

23  Q.  What is your mom's name?

24  A.  My mom's name is Stacy W.

25  Q.  And what is your dad's name?

                        Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1                                              401

1    A.  Scott W. Sr.

2           MS. SURRATT:  Your Honor, may I please publish

3    Government's Exhibit 4-3?

4           THE COURT:  You may.

5    Q.  (By MS. SURRATT) Is this another view of the same house?

6    A.  It is, indeed.

7    Q.  K.W., could you describe for the jury what this house was

8    like when you lived there?

9    A.  At the time of us moving in I was just a little kid, so it

10   was a big house, kind of excited about it.  The more we lived

11   on, like, the more things I noticed such as like holes in the

12   laundry room area, like, through the floor.  The stairs were

13   kind of creaky and loud at times.  And it's just at the time

14   my dad -- because of upstairs, my mom didn't like going up and

15   down the stairs, my dad built -- kind of sectioned off the

16   living room and cut it in half and kind of built a room right

17   there off the living room on the back of the house.  It was

18   ran down when we moved in, and kind of like what you see here,

19   just take off the wood on the windows, that's what we lived

20   in.  Everything else was pretty much the same.

21   Q.  So to be clear, when you lived there the house had

22   windows, not plywood?

23   A.  Yeah, not plywood.

24          MS. SURRATT:  Mr. Graber, you can take that down,

25   please.

                        Sarah K. Mitchell, RPR, CRR

1   Q.   (By MS. SURRATT) Turning back to Mr. McFadden's house on D

2   1/2 Road, do you remember who lived there with him?

3   A.   Yeah.  It would have been John and Phyllis, Mike himself,

4   L.Wr. and J.W.

5   Q.   Do you remember anybody else living there?

6   A.   I believe S.H. lived there as well, but I think that's

7   about -- oh, and someone by the name John Foxx.

8   Q.   Did you ever go to Mr. McFadden's house on D 1/2 Road?

9   A.   I did.  As soon as he moved into D 1/2, I was there almost

10  every day and stayed on the weekend nights.

11  Q.   About how old were you when you started going over to

12  Mr. McFadden's house on D 1/2?

13  A.   About 11 years old.

14  Q.   What kind of things would you do over at that house?

15  A.   He had a lot of stuff to do, so just whatever I could get

16  my hands on at the time.

17  Q.   What kinds of things?

18  A.   He would have, like, airsoft guns, paintball guns.  He

19  would have, like, side-by-side quads, trampolines, video game

20  systems.  He had a lot of stuff to do at that house.

21  Q.   When you went over there, were there other kids to play

22  with?

23  A.   Yeah.  So there was always -- L.Wr. and J.W. were always

24  there.  We would have a couple other kids come over as well.

25  Off the top of my head, one kid was named D.R.  Like, another

19-cr-00243-CMA-GPG-1                                            403

1    kid I keep forgetting the name of, but he would always come

2    over too.  B.W. would come over.  My little brother would come

3    over too, L.We. would come over.  So kind of how we distinct

4    the two would be big L.Wr. and little L.We.  It was just easy

5    how it was because they have the same name, just different

6    spellings.

7    Q.  Let me back up a second.  You mentioned a big --

8    A.  So L.Wr. --

9    Q.  K.W., I apologize.  I know you want to answer my

10   questions.  Can you try to wait for me to finish my questions?

11   A.  Sorry.

12   Q.  Mostly for the -- so the court reporter can take down what

13   each of us are saying, which is also why I need to slow down.

14   A.  Sorry.

15   Q.  You mentioned a big L.Wr. and a little L.We.

16   A.  Yeah.

17   Q.  Who is big L.Wr.?

18   A.  Big L.Wr. would be L.Wr.

19   Q.  And you said earlier that's J.W.'s brother?

20   A.  J.W.'s brother.

21   Q.  Who is little L.We.?

22   A.  My little brother L.We.

23   Q.  And why were they called big L.Wr. and little L.We.?

24   A.  Because big L.Wr. was a few years older.  He was taller.

25   My brother was shorter, a lot shorter because he was a lot

                    Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1                                                404

 1   younger at the time.  I think my little brother was 3 or 4 at

 2   the time.  L.Wr. was 6 or 7, right around those age periods.

 3   So we would just distinctly call them that so we could easily

 4   just say who we want, because calling L.Wr., they would both

 5   just run over.

 6   Q.  Okay.  You mentioned a moment ago having lots of fun

 7   things to do at Mr. McFadden's, toys and video games and such.

 8   Were those all things that you liked to do?

 9   A.  Yes.  Still to this day I am a heavy gamer.

10   Q.  Did you enjoy going to Mr. McFadden's house?

11   A.  At the time, yes.

12   Q.  Who owned all this fun stuff?

13   A.  It was a mix between John and Mike.  They just owned

14   different things together.

15   Q.  Did Mr. McFadden ever buy you anything?

16   A.  Not necessarily bought me personally anything that I could

17   remember, but things he bought I was free to use.

18   Q.  Things he bought you were free to use?

19   A.  Things he bought I was just free to use.

20   Q.  Okay.  You said a moment ago that you -- once you were

21   living next door, you were often over at Mr. McFadden's house,

22   right?

23   A.  Yes.

24   Q.  Did you ever spend the night at the house on D 1/2 Road?

25   A.  I did quite frequently.

                         Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1                                                405

1   Q.   Do you know about how frequently?

2   A.   Almost every weekend.

3   Q.   Where did you sleep when you spent the night at D 1/2

4   Road?

5   A.   At D 1/2 Road I would either sleep on the futon couch they

6   had in the living room or on Mike's bed.

7   Q.   Did you sometimes fall asleep in one place and wake up

8   somewhere else?

9   A.   Yes.

10  Q.   Could you tell the jury about that?

11  A.   So over a course of time Mike starting giving me melatonin

12  in lots of amounts.  At some points when I'd take melatonin

13  I'd fall asleep playing Black Ops II at the time which was the

14  new Call of Duty on PS3.  And then I'd wake up in the bed next

15  to Mike.  It freaked me out every time.  I just ignored it.

16  Q.   You said you would fall asleep somewhere else and then

17  wake up in the bed next to Mike; is that right?

18  A.   I'd fall asleep mainly on the futon, and then I'd end up

19  waking up on the bed.

20  Q.   Okay.  You said some letters and a number.  PS3, what is

21  that?

22  A.   PS3 is the PlayStation 3.  At the time it was like the new

23  PlayStation game they had out.

24  Q.   You mentioned a game you played.  What was that?

25  A.   Call of Duty Black Ops II.  Still one of my favorite Call

                        Sarah K. Mitchell, RPR, CRR

1   of Duties of all time.

2   Q.  Whose PlayStation was that?

3   A.  That would have -- I don't remember -- actually, I don't

4   remember exactly whose PS3 that was.

5   Q.  When you spent the night at Mr. McFadden's, were there

6   other people also spending the night?

7   A.  Yeah.  Quite frequently kids would stay at the house.

8   It'd be, like, the same group of kids, but it would be

9   frequent.

10  Q.  Where would the other kids sleep?

11  A.  J.W., myself, and L.Wr. -- L.Wr. would normally sleep on

12  the bed.  Other kids would just -- there was two other rooms

13  the other kids would sleep in.

14  Q.  And when you said you would sleep on the bed, whose bed

15  was that?

16  A.  Mike's.

17  Q.  And you said that there were also other rooms.  Who would

18  sleep in these other rooms?

19  A.  I know B.W. had her own room, and then John and Phyllis

20  had their own room.

21  Q.  Is this the same John and Phyllis that lived with

22  Mr. McFadden in the first house that we talked about?

23  A.  Yes.

24  Q.  You mentioned a moment ago, K.W., that Mr. McFadden gave

25  you melatonin.

19-cr-00243-CMA-GPG-1                                                407

1    A.  Yes.

2    Q.  Can you tell the jury a little bit more about that?

3    A.  Melatonin is a natural sleep aid that you can take.  It

4    just helps you fall asleep if you can't.  That's pretty much

5    all I can explain about it.  It's just a sleep aid.

6    Q.  Can you describe the circumstances when Mr. McFadden gave

7    you melatonin?

8    A.  It would be in heavy amounts.  It would be five or six

9    capsules at a time.

10   Q.  Were they pills or some other form?

11   A.  Sometimes they'd be pills.  Sometimes they'd be gummies.

12   Like, melatonin comes in all forms really.  Comes in like --

13   well, nowadays they come in drinks.  But at the time it was

14   just pills and gummies.

15   Q.  What time of day generally would Mr. McFadden give you the

16   melatonin pills or gummies?

17   A.  7:30, 8 o'clock at night.

18   Q.  After Mr. McFadden gave you the melatonin, what effect did

19   it have on you?

20   A.  At that time I was kind of little, so it would put -- it

21   would make me fall asleep fairly quickly.  And I don't

22   remember much about that, because when I sleep -- because

23   nowadays -- like, I have insomnia nowadays.  I have to take a

24   medication called Trazodone, which is a heavy sleep aid.  I

25   don't -- when I fall asleep under, like, medications I sleep

19-cr-00243-CMA-GPG-1                                                    408

1    hard, so I don't remember much when I'm asleep.

2    Q.  Did you ever see Mr. McFadden give any of the other kids

3    anything to help them sleep?

4    A.  Yes.

5    Q.  What did you see?

6    A.  Same bottle of melatonin or pills.  He would just give it

7    to almost everyone at that house.

8    Q.  K.W., I want to talk to you now about something that's a

9    little bit uncomfortable, if that's okay?

10   A.  Yeah.

11   Q.  Was there ever a time when Mr. McFadden did anything to

12   you that made you uncomfortable?

13   A.  Yes.

14   Q.  What did he do?

15   A.  It started out kind of like in the D 1/2 Road house.

16   Every so often I'd wake up, and I would just feel him on top

17   of me.  His -- he would be hard.  Like, down low he would be

18   hard.  He would just rub against me, and then -- I was little.

19   I didn't want to deal with it, so I would just fall back

20   asleep.

21   Q.  K.W., when you said he would be hard, are you talking

22   about his penis?

23   A.  Yes.

24   Q.  When is the first time that you remember something like

25   this happening?

                        Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1                                                409

1   A.  The first time I remember something happening was the

2   first house you showed on the screen.

3   Q.  The house that we looked at, the white house?

4   A.  Yes.

5   Q.  What do you remember happening at that house?

6   A.  The first -- the only thing I remember from that house

7   happening was when I slept on the floor.  Other than that,

8   like, that memory is kind of faded as I've tried to push a lot

9   of these memories away, so a lot of my memories kind of -- a

10  lot faded, but I do remember a lot.  I don't remember much

11  about that house specifically.

12  Q.  Why have you tried to push some of these memories out?

13  A.  I just want to move on with my life.  This shit's been

14  going on too long.  Sorry for my language.

15  Q.  How does it make you feel to talk about this today, K.W.?

16  A.  Same way I talked to you in Cedar.  Just I don't want to

17  -- I don't want to.

18  Q.  After you moved to the D 1/2 Road house, and Mr. McFadden

19  was also living on D 1/2, did anything like this happen there?

20  A.  Yes.  That's the -- that's the story about me waking up on

21  the bed was at the D 1/2 Road house.

22  Q.  Did Mr. McFadden ever touch you at the D 1/2 Road house?

23  A.  Yes, he did.

24  Q.  Where did you he touch you?

25  A.  He would grope me in my joint areas and stuff like that.

Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1                                                410

1    Again, I don't like talking about this.

2    Q.  Did he touch your penis?

3    A.  Yes.

4    Q.  Did it happen during the daytime or the nighttime?

5    A.  It always happened at night.

6    Q.  It always happened at night?

7    A.  Uh-huh.

8    Q.  Do you remember about how many times it happened?

9    A.  No.  It happened frequently -- it didn't happen a lot, but

10   it happened often to where I could remember it.

11   Q.  When did it stop?

12   A.  It stopped after he was picked up in North Platte,

13   Nebraska, from the police there.

14   Q.  So it occurred basically until he was arrested?

15   A.  Yes.

16   Q.  How did it make you feel when Mr. McFadden touched you

17   like that?

18   A.  It made me feel small.  I don't know.  I started to hate

19   myself for a long time.  When I moved to Utah, I kind of

20   didn't know how to handle myself, so that's when I started

21   doing things I did in Utah because I didn't know how to handle

22   it.  After that I started seeking therapy.  Certain types of

23   therapy helped me deal with the trauma.  My -- because at the

24   time when I was younger, no one knew that I was autistic.  I'm

25   on the spectrum.  And in Utah I was sent to pretty much

                         Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1                                      411

1    juvenile prison, so the JJYS custody Secure Care systems, so

2    pretty much I was in a cell most of the day.  And then at that

3    time they hired a psychiatrist for me, and that's when they

4    found out I'm like a one and a half on the autism spectrum, so

5    I'm extremely high functioning, but I have slight motor

6    dysfunctions.

7    Q.  K.W., in addition to doing things that made you feel

8    uncomfortable at his house, did Mr. McFadden ever take you

9    anywhere in his semi-truck?

10   A.  Yes.  He would take a lot of -- like, he would take me,

11   J.W., and big L.Wr. a lot on trips.

12   Q.  Did he ever do anything on a semi-truck trip that made you

13   feel uncomfortable?

14   A.  Yes.

15   Q.  What happened?

16   A.  I remember one time very specific -- not specifically, but

17   he would start touching me, groping me and stuff like that.

18   That's mostly what happened on the semis is just a lot of

19   touching, but that's about it.  He still made me feel

20   uncomfortable.

21   Q.  K.W., was there a semi-truck trip that ended in Nebraska

22   in 2013?

23   A.  Yes.

24   Q.  Did Mr. McFadden do anything on that trip specifically

25   that made you uncomfortable?

Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1                                                    412

1    A.  Yes.

2    Q.  What did he do?

3    A.  He tried to stick his thing in me.

4    Q.  By stick his thing in you, did Mr. McFadden put his penis

5    in your butt?

6    A.  He tried to, yes.

7    Q.  What do you mean he tried to?

8    A.  It just wouldn't go in necessarily, so he just tried to,

9    and then after a while he just gave up.

10   Q.  Where were your pants at the time?

11   A.  He pulled my pants down, so they just fell on the floor.

12   And then after a while I just got up and picked it back up and

13   put them back on.

14   Q.  When you say he tried to put his penis in you, did he put

15   his penis into your butt?

16   A.  Yes.

17   Q.  How did that feel?

18   A.  It hurt, because I was little at the time.  It hurt a lot.

19   Again, I don't remember a lot.  Again, I've tried to suppress

20   most of these memories, just try to fade them out.

21   Q.  Did you feel pressure against your anus?

22   A.  Yes.

23   Q.  Is that what hurt?

24   A.  Yes.

25   Q.  Where did you leave from to go on that truck trip?

Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1                                         413

1   A.  Montrose, Colorado, where I was living at the time.

2   Q.  You left from Montrose, Colorado?

3   A.  So not like -- so he picked us up in Montrose, Colorado.

4   We went to get his truck in Junction.  That's where we left.

5   Q.  When you say he picked you up, do you mean Mr. McFadden?

6   A.  Mr. McFadden picked me up in Montrose.  He picked me

7   myself up, S.W. Jr. and L.We.  At that time he came up for

8   Christmas because he told my mom that he had no one to spend

9   Christmas with, so he came up there.  And then he asked my

10  parents and myself and S.W. Jr. if we wanted to go on a truck

11  trip.

12  Q.  And so he picked up you and your older brother S.W. Jr.?

13  A.  And then my younger brother.

14  Q.  And your younger brother L.We.; is that right?

15  A.  Yes.

16         MS. SURRATT:  And, Your Honor, may we please publish

17  Government's Exhibit 2-1?

18         THE COURT:  You may.

19  Q.  (By MS. SURRATT) K.W., do you recognize this truck?

20  A.  I do, indeed.

21  Q.  And what is it?

22  A.  That is a Kenworth semi.

23  Q.  And whose truck is that?

24  A.  That would have been Mike's at the time.

25  Q.  Is that the truck in which you went on that final trip

                    Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1                                           414

1   that you're talking about?

2   A.   Yes.

3   Q.   About how old were you on that final trip?

4   A.   13, 12 or 13 at the time.

5   Q.   Do you remember when the trip was, K.W.?

6   A.   It was in December, Montrose, Colorado.  It was two years

7   before we moved to Utah, so I think I was, yeah, 11 or 12, not

8   12 or 13.

9   Q.   And where was your family living at the time?

10   A.   It was a small little trailer in the middle of Montrose,

11   Colorado.  I believe the address was 5636 Eider Road, I

12   believe.  I don't remember the exact house name, but it was on

13   Eider Road in Montrose, Colorado.

14   Q.   Do you recall how you got invited to go on this trip with

15   Mr. McFadden?

16   A.   He asked me if I wanted to go after I believe he asked my

17   parents.

18   Q.   You believe Mr. McFadden asked your parents?

19   A.   Yes, I believe he did.  I don't remember.  I was just a

20   little excited little kid to go on a truck trip.

21   Q.   Did you like going on truck trips as a little kid?

22   A.   I did.  Oh, I loved -- I still to this day love seeing the

23   country, and I was excited to go.  I believe it was from Idaho

24   to Florida, so I was excited to take that trip.

25   Q.   You mentioned -- you just mentioned that the trip was

                          Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1                                                    415

 1    supposed to be from Idaho to Florida.  Do you remember where

 2    you went when you left Colorado?

 3    A.  After looking at maps a little bit more I do.  We went --

 4    so we left, I believe, Junction, right around the Junction

 5    area.  We went through Salt Lake to get to Idaho.  That's

 6    where we loaded up -- we went through Utah to get to Idaho.

 7    That's where we loaded up on potatoes, the company that loaded

 8    potatoes.  Then from there we started to go towards the Coast,

 9    and we stopped finally in Nebraska at a Love's truck stop.

10              MS. SURRATT:  Your Honor, the Government offers

11    Government's Exhibits 227 and 228 by stipulation.

12              THE COURT:  227 and 228 are stipulated.  They are

13    admitted.  You may publish.

14         (Government's Exhibits 227 and 228 received.)

15              MS. SURRATT:  Mr. Graber, can you publish 228 only.

16    Q.  (By MS. SURRATT) So, K.W., if I understood you correctly,

17    you left from western Colorado, correct?

18    A.  Yes.

19    Q.  And you said you went up through Utah and Salt Lake City?

20    A.  Yeah, we took I-70 -- so we took I-70, and then right at

21    that, like, kind of like where it makes a Y in the crossroad

22    in Utah from I-70 to I-15, that road from Provo to St. George,

23    that's I-15.  We took that exit and went up into Idaho.

24    Q.  So you went up into Idaho, and you said you picked up a

25    load of potatoes; is that right?

                        Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1                                           416

1    A.  Yes.  After talking, I think, with you guys yesterday, it

2    kind of like brought -- sparked more knowledge of what the

3    trip was about.

4    Q.  And then you made your way east from Idaho eventually

5    ending up in Nebraska; is that right?

6    A.  Yes.

7    Q.  Do you remember precisely where you stopped for the nights

8    on this trip?

9    A.  I do not.

10   Q.  Did you stop for the nights?

11   A.  We stopped -- I think we stopped one night in Idaho and

12   then stopped again in Nebraska.

13   Q.  When you stopped in the night, where did you sleep?

14   A.  I slept right next to Mike.

15   Q.  And was this in the truck?

16   A.  This was in the sleeper of the truck, yes.

17          MS. SURRATT:  Your Honor, may we please publish

18   Government's Exhibit 2-6?

19          THE COURT:  You may.

20   Q.  (By MS. SURRATT) What is this?

21   A.  That is the back of the semi.

22   Q.  And is this the area in which -- in which you slept when

23   you spent the night in the semi?

24   A.  Yes.

25          MS. SURRATT:  Your Honor, may we also publish 2-7?

                          Sarah K. Mitchell, RPR, CRR

1            THE COURT:  You may.

2    Q.  (By MS. SURRATT) Is this another view of the sleeper

3    compartment?

4    A.  It is.

5    Q.  And you said that you slept in the sleeper compartment,

6    correct?

7    A.  Yeah, on that bed right there.

8    Q.  On that bed?

9    A.  Yeah.

10   Q.  Who slept in that bed with you?

11   A.  So on this trip specifically it was myself, my little

12   brother L.We., and Mike.  And then up front laid across the

13   seats was my older brother S.W. Jr.

14   Q.  Let me unpack that a little bit.  So in that bed was you

15   and Mr. McFadden and your little brother L.We., correct?

16   A.  Yes.

17   Q.  And then did you also say your older brother S.W. Jr.

18   would sleep across the front seats?

19   A.  Like, he would kind of like lay his head on the passenger

20   -- like his head on the passenger window and have his legs

21   across the seat.

22   Q.  Can you explain the sleeping arrangements between you,

23   your little brother L.We., and Mr. McFadden on that mattress?

24   A.  So Mike would sleep against the wall on that back

25   cushioned wall.  I would sleep right in front by the seats,

19-cr-00243-CMA-GPG-1                                            418

1   and L.We. would lay sideways at the very back by our feet.

2   Q.  So you would sleep right next to Mr. McFadden on that

3   mattress?

4   A.  Yes.

5           MS. SURRATT:  May we please publish, Your Honor,

6   Government's Exhibit 2-9?

7           THE COURT:  You may.

8   Q.  (By MS. SURRATT) Are these the front seats you described

9   that your older brother sort of laid himself across?

10  A.  Yes.

11          MS. SURRATT:  You may take that down, Mr. Graber.

12  Q.  (By MS. SURRATT) K.W., was it on that mattress where

13  Mr. McFadden put his penis right up to your anus as you

14  described earlier?

15  A.  Yes.

16  Q.  K.W., did you ever see Mr. McFadden do anything to anyone

17  else that made you uncomfortable?

18  A.  I did not, no.

19  Q.  What do you remember from the night that Mr. McFadden was

20  arrested in Nebraska?

21  A.  All I remember that night was not a lot necessarily.  I

22  just remember police knocking on the door, him being put into

23  handcuffs, and if it wasn't for my older brother S.W. Jr., we

24  would have been taken somewhere -- me and my little brother

25  would have been taken somewhere because there wouldn't have

                    Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1                                              419

 1    been an adult.  Because S.W. Jr. was there, we were allowed to

 2    stay with S.W. Jr. in the truck.

 3    Q.  How old was S.W. Jr. during that trip?

 4    A.  18 years old.

 5    Q.  And so because S.W. Jr. was 18, you were allowed to stay

 6    in the truck?

 7    A.  With S.W. Jr., yeah.

 8    Q.  Even after Mr. McFadden was arrested?

 9    A.  Uh-huh.

10    Q.  How did you get home to Colorado from Nebraska?

11    A.  So how everything happened, the load of potatoes still

12    needed to be, like, shipped out to Idaho -- or to Florida, not

13    Idaho.  So my mom, Ray Fluke, which finished the drive -- I

14    believe at the time he was driving as well, and I don't

15    remember if it was Ray or someone else, but someone along that

16    lines.  But then someone who used to live with us by the name

17    of Mike Eggers.

18    Q.  So let me unpack that a little bit, K.W.  So somebody, you

19    think maybe Ray Fluke, had --

20    A.  I believe Ray finished the drive.  I believe that's the

21    case.  Don't quote me on that part, but I believe that's who

22    finished the trip, the truck order.  Someone picked up the

23    semi from North Platte.

24    Q.  Someone had to take the semi where it was going with the

25    load of potatoes?

                         Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1                                          420

1   A.  Someone picked it up.  I don't remember who exactly it

2   was.  I believe it was Ray.  I don't remember exactly.

3   Q.  Okay.

4   A.  And then Mike Eggers and Stacy W., my mom, and then

5   someone I looked up to as my grandpa came and got me and L.We.

6   and S.W. Jr.

7   Q.  So your mom and a man named Mike Eggers came and got you

8   and your brothers and brought you home to Colorado?

9   A.  Yes.

10  Q.  K.W., when that police officer came to arrest Mr. McFadden

11  in Nebraska, did you tell him what Mr. McFadden had been doing

12  to you?

13  A.  I don't remember.

14  Q.  As far as you do remember, what was the first time you

15  told anyone about what Mr. McFadden had been doing to you?

16  A.  It was a detective at the Dolphin House, I believe.

17  Q.  Why didn't you tell your mom or dad?

18  A.  I don't know.  I honestly don't.

19  Q.  Why didn't you tell anybody for all those years while it

20  was happening?

21  A.  I didn't know how to -- I was young.  At the time every

22  doctor I went to just -- therapist I went to at the time just

23  diagnosed me with everything, so I wasn't a fully, like,

24  functional child.  I wasn't perfect.  So I don't remember -- I

25  honestly don't know why I didn't say anything.

                        Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1                                          421

 1   Q.  Even back then how did talking about this make you feel?

 2   A.  It still makes me feel the same way.  It just makes me

 3   feel small.

 4        MS. SURRATT:  One moment, please, Your Honor.

 5   Q.  (By MS. SURRATT) So a few clarifying questions, K.W.  You

 6   mentioned someone named John Foxx.  Who is that?

 7   A.  Used to be a really good family friend.  My dad still

 8   talks to him to this day a little bit here and there.  I don't

 9   remember much about him.  I don't remember much about -- oh,

10   John Foxx.  Sorry.  I was thinking of someone else.  John

11   Foxx, he was my -- everyone called him Papa John.

12   Q.  Okay.

13   A.  He was a great, great family friend.  I was thinking -- I

14   forget his name -- S.H.'s dad, I thought you were talking

15   about him.  John Foxx.  So he was a great family friend.  He

16   actually passed away in our home in Cedar.  Everyone loved

17   him.  He was a great guy.  Just he was a great all-around

18   person.

19   Q.  Where did he live during the events we've been talking

20   about?

21   A.  He lived at D 1/2, I believe.

22   Q.  With Mr. McFadden?

23   A.  Yes.

24   Q.  Where did he sleep at the home on D 1/2 Road?

25   A.  I don't remember.

                          Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1                                                          422

1          MS. SURRATT:  Your Honor, I have no further

2     questions, but at this time I would move to admit Government's

3     Exhibit 6 pursuant to Federal Rule of Evidence 807.

4          THE COURT:  Put on the earphones, please.

5        (Bench conference on the record and out of the

6        hearing of the jury:)

7          THE COURT:  Can you hear me?

8          MS. SURRATT:  I can hear you, Your Honor.

9          THE COURT:  Can you hear me?  All right.  In light of

10    the fact that the witness testified that he did remember the

11    truck assault, what is the purpose of the video?

12         MS. SURRATT:  Your Honor, the video, nevertheless,

13    remains the most probative evidence on that point.  As the

14    Court saw, K.W., while he did discuss the events in question,

15    did so reluctantly and often after my prompting and after I

16    used the words that he seemingly cannot.  And so I think the

17    video that was taken shortly after his disclosure of the

18    events in question is both relevant because it is closer in

19    time to the events in question, it's probative as to this

20    exact point, and it is the most probative given his extreme

21    reluctance to discuss the events today in court.

22         THE COURT:  All right.  Mr. LaBranche, what's your

23    response?  I'm sorry.  Mr. McDermott.

24         MR. MCDERMOTT:  Your Honor, the witness has testified

25    he was able to recall the events.  I don't see the purpose of

                        Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1                                           423

1   admitting the video.

2          THE COURT:  All right.  Are you going to attempt to

3   impeach him with statements from that video?

4          MR. MCDERMOTT:  Not that video.  I will be impeaching

5   with other statements that he made.

6          THE COURT:  Let me have a moment.

7          MS. SURRATT:  Your Honor, I have one more thing to

8   add, if I may.

9          THE COURT:  All right.

10         MS. SURRATT:  Your Honor, I would also like to add

11  that as the Court noted today on the witness stand, K.W. was

12  pretty equivocal about penetration.  In the video,

13  Government's Exhibit 6, he was not equivocal about the

14  penetration that occurred.  It's clear that today on the stand

15  that was the particular assault that gave him the most

16  difficulties in terms of describing to the jury.  Although on

17  the video he is also clearly uncomfortable, he was unequivocal

18  about what happened to him.

19         THE COURT:  All right.  Federal Rule of Evidence 807

20  provides that a statement that would otherwise be prohibited

21  as hearsay may nevertheless be admitted if, one, the statement

22  is supported by sufficient guarantees of trustworthiness,

23  after considering the totality of the circumstances under

24  which it was made and evidence, if any, corroborating the

25  statement; and, second, it is more probative on the point for

19-cr-00243-CMA-GPG-1                                              424

1    which it is offered than any other evidence that the proponent

2    can obtain through reasonable efforts.

3           In this case, the defendant -- I'm sorry -- the

4    victim did respond, but he was reluctant.  It was apparent

5    that he only answered with prompting and he was equivocal

6    about the penetration, which he was not in the video.

7    Therefore, the Court finds that the video evidence is more

8    probative on the point for which it is offered than any other

9    evidence that the Government can obtain through reasonable

10   efforts.

11          At the hearing the Court previously heard -- at the

12   previous hearing the Court heard testimony from Detective

13   Prescott regarding the circumstances of the forensic interview

14   with the witness at the Dolphin House on January 16, 2013.

15   Detective Prescott went through his experience, his training

16   on forensic interview techniques.  It is from the video he

17   attempted to determine that the witness did know the

18   difference between a truth and a lie.  The Court finds that

19   his previous testimony weighs in favor of a finding of

20   trustworthiness.

21          The Court has also carefully reviewed the video in

22   light of relevant facts made under the -- and the statement

23   under Rule 807 and *Idaho vs. Wright*, 497 U.S. 805, a 1990

24   case.  The Court finds that K.W.'s statement is supported by

25   sufficient indicia of reliability such as to be admissible

19-cr-00243-CMA-GPG-1                                          425

1    with respect to the first prong of the Rule 807 inquiry.

2    Regarding the second prong of the 807 inquiry, the Court finds

3    that the statement is more probative on the point for which it

4    is offered than the evidence that the Government was able to

5    elicit from the witness live on the stand which they attempted

6    to do so with reasonable effort.

7           For these reasons the Court finds that this case

8    presents extraordinary circumstances and the Court is

9    satisfied that the evidence offers guarantees of

10   trustworthiness and is material, probative, and necessary in

11   the interest of justice pursuant to *United States vs. Tome*,

12   T-o-m-e, 61 F.3d 1446, a Tenth Circuit 1995 case.  Therefore,

13   the Court will admit the video.

14          Does the defense wish to make any statements for

15   purposes of appeal?

16          MR. MCDERMOTT:  Yes, Your Honor.  I believe I gave

17   the reasons for my objection.  I am now saying we do object.

18   I would note that the witness is available.  He was able to

19   testify to the events.  The fact that some time has gone by

20   and he may not testify with as much clarity as what occurred

21   with the video I don't think is sufficient for admission.  I

22   would also note that at the hearing there was some testimony

23   elicited about statements that I believe Detective Prescott

24   had made to the parents that I think do impact the reliability

25   of the statement that he testified to today and the video

                    Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1                                        426

 1  itself.

 2          THE COURT:  Does the Government wish to put anything

 3  on the record?

 4          MS. SURRATT:  Yes, Your Honor.  Obviously K.W.'s on

 5  the stand and can be cross-examined about all these issues.

 6  Stacy W., his mother, is expected to testify next and can also

 7  be cross-examined as to these issues.  The Government expects

 8  that both of them would be cross-examined as to those and

 9  other topics whether or not Government's Exhibit 6 is played

10  at this trial.

11          THE COURT:  All right.  I'm going to allow the video.

12  Does the defense have an explanatory instruction to the jury?

13  Or the Government, do you have one that you wish me to give at

14  this time?

15          MS. SURRATT:  Your Honor, although we haven't crafted

16  a particular instruction, given that the proposed Instruction

17  No. 9 that the jury will hear at the conclusion of this trial

18  instructs them that prior statements of witnesses will

19  otherwise be introduced for impeachment purposes and they

20  can't consider them for the truth, I would ask that they be

21  instructed that they can, in fact, consider this video for the

22  truth of the matter.

23          And, Your Honor, one more thing.  We are going to ask

24  that Government's Exhibit 6 -1 be passed out to the jury as an

25  aid.  There are portions of the video that are somewhat

                        Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1                                           427

1    difficult to hear.  6-1 is a transcript to which authenticity

2    has been stipulated.  We do not intend to introduce it as an

3    exhibit, only as an aid to the jury as they're watching the

4    video.

5              THE COURT:  All right.  And how long is this?  I

6    think we should take a break at this point.

7              MS. SURRATT:  Your Honor, it's 33 minutes long.

8              THE COURT:  All right.  I think we're going to go

9    ahead and take a break.  I'll give you time to craft the

10   instruction you want me to give and clear it with the

11   defendant, and then we will reconvene at about 10:30.

12       (The following proceedings were held in open

13       court:)

14             THE COURT:  Ladies and gentlemen, we're going to take

15   a mid-morning break at this time.  We will be in recess until

16   approximately 10:30.  Remember, you're not to discuss the case

17   among yourselves or with anyone else.  You're not to conduct

18   any research.  Court will be in recess until approximately

19   10:30.

20             THE COURTROOM DEPUTY:  All rise.

21       (Jury left the courtroom at 10:18 a.m.)

22       (Break was taken from 10:18 a.m. to 10:32 a.m.)

23

24

25

                         Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1                                              428

1          THE COURT:  Counsel, would you please put on the

2     headsets.

3          (Bench conference on the record and out of the

4          hearing of the jury:)

5          THE COURT:  Counsel, I have an instruction, but I

6     understand it has not been stipulated; is that correct?

7          MR. MCDERMOTT:  It's not stipulated, Your Honor.

8     That's correct.

9          THE COURT:  Mr. McDermott, do you wish to make your

10    record or objection to this?

11         MR. MCDERMOTT:  Yes, Your Honor.  Just we continue

12    our objection about the admission of this under 807, and we're

13    not going to offer our own instruction.

14         THE COURT:  All right.  And you don't -- you're just

15    blanket objecting?

16         MR. MCDERMOTT:  Blanket objection.

17         THE COURT:  Not necessarily to the instruction, but

18    to admission of the recording under 807.

19         MR. MCDERMOTT:  Correct, Your Honor.

20         THE COURT:  Very good.  I think that the instruction

21    as tendered is appropriate.  However, I do not believe that

22    the video itself should be admitted into evidence.  I think it

23    should be treated the same way that you treat a deposition.

24    So they will hear it.  They will see the transcript, but it

25    will not go back as an exhibit.

                         Sarah K. Mitchell, RPR, CRR

1          MS. SURRATT:  Yes, Your Honor.

2          THE COURT:  All right.  Then are we ready to bring

3    the jury back?

4          MS. SURRATT:  Yes, Your Honor.

5       (The following proceedings were held in open

6       court:)

7          MR. LABRANCHE:  Your Honor, also for clarification,

8    is the transcript going to be allowed to be admitted in

9    evidence?

10         THE COURT:  No.  Neither of them will be admitted

11   into evidence.

12         MS. SURRATT:  So, Your Honor, I believe the last

13   question I asked before we broke was -- I offered Government's

14   Exhibit 6.

15         THE COURT:  Okay.  So I will -- essentially on that

16   offer I am admitting Exhibit 6 for purposes of showing it to

17   the jury.  It will not, however, come into evidence to go back

18   to the jury.  6-1 will be allowed, which is the transcript,

19   but it also will be more demonstrative, so it will not be

20   allowed to go back with the jury.

21         MS. SURRATT:  I'd like to put on the record, Your

22   Honor, prior to trial in this matter we asked defense counsel

23   if they wanted any redactions to the video, and they told us

24   the video was fine as is.  We agree.  But I just wanted that

25   to be on the record.

                        Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1                                         430

1            THE COURT:  All right.

2            MR. MCDERMOTT:  Your Honor, just to clarify

3    Ms. Surratt's final record, I believe based on the Court's 404

4    ruling at our hearing, that based on that there's nothing

5    objectionable in the video.  I'll just leave it at that.

6            THE COURT:  All right.

7            MR. MCDERMOTT:  Okay.

8            THE COURT:  Ms. Myhaver, please bring in the jury.

9            THE COURTROOM DEPUTY:  All rise.

10        (Jury entered the courtroom at 10:35 a.m.)

11           THE COURT:  You may be seated.  Ladies and gentlemen,

12   you are going to see a video of K.W. when he was interviewed

13   on January 16, 2013.  You may consider this video and the

14   statements made by K.W. for any relevant purpose.  It is for

15   you to decide what weight, if any, to give to these

16   statements.  You are also given a transcript of this

17   recording.  Keep in mind that the transcript is not evidence.

18   It is given to you only as a guide to help you follow what is

19   being said.  The recording itself is the evidence.  If you

20   notice any differences between what you heard on the recording

21   and what you read in the transcript, you must rely on what you

22   heard, not what you read.  If you cannot hear or understand

23   certain parts of the recording, then you must ignore the

24   transcript as far as those parts are concerned.

25           All right.  The Government may show Exhibit 6.

                        Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1                                             431

1            MS. SURRATT:  Thank you, Your Honor.

2            Mr. Graber, can you please play Government's

3    Exhibit 6.

4        (Video played.)

5            THE COURT:  Ms. Myhaver, will you please collect the

6    transcripts.  If you can all pass them down.

7            Ms. Surratt.

8            MS. SURRATT:  Your Honor, may I ask the witness if he

9    needs a short break?

10           THE WITNESS:  I'm all right.

11           THE COURT:  Do you have anything further,

12   Ms. Surratt?

13           MS. SURRATT:  No, Your Honor.

14           THE COURT:  Cross-examination.

15                        CROSS-EXAMINATION

16   BY MR. MCDERMOTT:

17   Q.  Good morning, K.W.

18   A.  Morning, sir.

19   Q.  The video we just watched, that was taken approximately

20   three weeks after you returned from Nebraska, right?

21   A.  I honestly don't remember, sir.

22   Q.  Okay.  Well, you were picked up in Nebraska on

23   January 2nd, 2013; is that right?

24   A.  Sounds -- I'm not going to answer.  I don't know.  I don't

25   know exactly when we were picked up.  I know it was somewhere

                        Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1                                          432

1    around that time period.

2    Q.   Somewhere around that time, okay.  And it was your mother

3    who picked you up; is that correct?

4    A.   My mom and Mike Eggers, yes.

5    Q.   Okay.  And you had a relatively long drive back to

6    Colorado; is that right?  Eight hours or so?

7    A.   About, yeah.

8    Q.   Okay.  And you talked to your mom on the way back from

9    Colorado, right?

10   A.   I don't remember.

11   Q.   Okay.  Your mom on the ride back asked you if Mr. McFadden

12   had touched you or done anything sexually inappropriate; is

13   that right?

14   A.   She might have asked something like that, yeah.

15   Q.   K.W., when you say she might have asked you something like

16   that, are you telling me that you don't remember whether she

17   asked that?

18   A.   I don't necessarily remember that car trip home.  I had

19   little to no sleep that night.  I stayed up pretty much all

20   that entire ride, and I fell asleep almost as soon as I laid

21   in my bed at home.

22   Q.   Well, you have testified about that car road trip before;

23   is that right?

24   A.   Yes.

25   Q.   Okay.  And that was back on -- it's been a while, but that

                         Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1                                             433

1   was on January 13, 2015; is that right?

2   A.  I believe so.

3   Q.  Okay.  And you should have a notebook up there that says

4   defendant's exhibits.

5           MR. MCDERMOTT:  Can we please get the one that has

6   Defendant's Exhibit E?

7   Q.  (By MR. MCDERMOTT) And, K.W., can you please open that

8   notebook, and can you open what is Exhibit E.  And could you

9   please turn to page 35 of that exhibit, and can you look at

10  lines 1 through 10.  And you were asked if Mike -- you were

11  asked whether your mother asked you whether Mike did anything

12  to you, and you told her that Mike had not done anything to

13  you; is that correct?

14  A.  Not necessarily -- that's not necessarily true.  At the

15  time of 14 years old, I was -- I just got out of a detention

16  facility in Utah.  I wasn't in the right mindset, because if

17  you look at all the other questions, I said yes to those as

18  well.  This one might have actually been a typo because I do

19  remember saying no to this.

20  Q.  Okay.  K.W. --

21  A.  Yes, sir.

22  Q.  -- I understand that back in 2015 you were a juvenile.

23  A.  Yeah, I was a juvenile, yes.

24  Q.  Yes.  But you were in court when you said these -- when

25  you testified, correct?

                        Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1                                         434

1    A.  Yes.

2    Q.  And you took an oath just like you took an oath today?

3    A.  Yes, sir.

4    Q.  And you swore to tell the truth?

5    A.  Yeah, I'm telling the truth now.  I don't remember this

6    question actually.

7    Q.  Okay.  Well, I'm doing to ask you then can you please turn

8    to page 34, the page before, and you were asked -- and I'm

9    going to begin on line 11 -- you were asked, And you drove

10   back with your mom Stacy --

11           MS. SURRATT:  Your Honor, objection.

12           THE COURT:  What's the objection?

13           MS. SURRATT:  To the extent he's trying to impeach

14   with prior inconsistent statements, it's not clear to me what

15   the statement now is that would be inconsistent with what's in

16   this exhibit.

17           THE COURT:  Overruled.  You may proceed.

18   Q.  (By MR. MCDERMOTT) And beginning on line 11 the question

19   is, And you drove back with your mom Stacy?  And your answer

20   on that day was, Yes.  Correct?

21   A.  Yes, sir.

22   Q.  And the next question is, On the way back from the trip,

23   your mom told you about what people were saying Mike did,

24   right?  And you said, Yes.  Correct?

25   A.  Yes, sir.

                      Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1                                        435

1    Q.  And it says, She told you what the allegations were in

2    this case, correct?  And you answered, Yes.

3    A.  Yes.

4    Q.  And it says, And she started asking you questions about

5    it, right?  And you said, Yes.  Is that correct?

6    A.  Yes, sir.

7    Q.  And she started asking questions about whether or not Mike

8    ever did anything to you, right?

9    A.  Yes, sir.

10   Q.  And your answer was, Yes, or yeah.

11   A.  Yes, sir.

12   Q.  And then he asked you, And she asked you a bunch of

13   questions about that?  And your answer was, Yes.  Correct?

14   A.  Yes, sir.

15   Q.  And then the question was, And, in fact, you told her that

16   Mike had not done anything to you, correct?  And your answer

17   was, Yes.  Correct?

18   A.  I may have said yes.

19   Q.  Then the next question is, You never told her that Mike

20   ever stuck anything in your butt, correct?

21   A.  Yeah.

22   Q.  Your answer was, Yes.  And the next question is, And you

23   never told her that he ever touched you before, correct?  And

24   your answer was, Yes.

25   A.  Yes, sir.

                        Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1                                                    436

1   Q.  Now, K.W., my understanding is that you have said and you

2   testified on this day that the first time you ever said that

3   Mike touched you was on January 16th in that interview that we

4   just watched; is that correct?

5   A.  Yes, sir.

6   Q.  Your mom has indicated to Detective Prescott that you --

7           MS. SURRATT:  Objection.

8           THE COURT:  Sustained.

9   Q.  (By MR. MCDERMOTT) Let me ask this.  Did you say anything

10  to a therapist the day before you spoke with Detective

11  Prescott?

12  A.  I don't remember.

13  Q.  You don't remember.

14  A.  I do not remember.

15  Q.  Okay.  K.W., in addition to that interview, you gave a --

16  still been a few years, but a more recent interview, and you

17  spoke with Investigator Zappe and an FBI agent named Amy

18  Howard on May 22nd, 2018; is that right?

19  A.  I believe so, yes, sir.

20  Q.  Okay.  And in that interview you were asked about this

21  incident with Mike in the truck?

22  A.  Yes, sir.

23  Q.  And at that time you told them that you did not remember

24  the incident, to be honest?

25  A.  I did say that, but the reason why I said that is I don't

19-cr-00243-CMA-GPG-1                                              437

1   like talking about this, and I'll find every loophole I can

2   possibly find not to talk about things like this.

3   Q.  You told them that it was a combination of it being a long

4   time ago and that it was something you didn't want to talk

5   about; is that right?

6   A.  Correct.  Correct, sorry.

7   Q.  Now, in that particular interview, you did remember things

8   about this trip; is that correct?

9   A.  Yes, sir.

10  Q.  You remember details such as Mike going to Grand Junction

11  to pick up his truck?

12  A.  Yes, sir.

13  Q.  You remembered going to Idaho to pick up potatoes?

14  A.  Yes, sir.

15  Q.  You remembered going to -- going to the Love's stop where

16  he was arrested?

17  A.  Yes, sir.

18  Q.  You remembered going to a weigh station because Mike's

19  truck was overweight; is that right?

20  A.  No.  He was trying to avoid it because he was overweight.

21  Q.  So you believe you remember him avoiding the weigh station

22  because he was overweight?

23  A.  Yes.  We never stopped at a weigh station.

24  Q.  You remember your mom calling your brother S.W. Jr., and

25  he was one of the people who was with you, right?

                            Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1                                            438

1    A.  Yes, sir.

2    Q.  And you remember S.W. Jr. getting off the phone and, in

3    your words, looking pissed off?

4    A.  Yes, sir.

5    Q.  You remember that his face had gone from looking happy to

6    being pissed off?

7    A.  Yes, sir.

8    Q.  Now, as of this May 22nd, 2018, interview, you were still

9    friends with J.W.; is that right?

10   A.  I had stopped talking to J.W. after this incident.  I

11   haven't had contact with J.W. for a while.

12   Q.  Well, as of May 22nd, 2018, were you still friends with

13   J.W.?

14   A.  We contacted each other via Facebook every so often, so

15   more of acquaintances at the time.

16   Q.  Well, on May 22nd, 2018, you were asked when the last time

17   you talked to him was, and your answer was, Before I came in

18   here.  Is that right?

19   A.  I don't remember that.

20   Q.  I want to talk about some of the other trips that you say

21   you went on with Mr. McFadden, okay?

22   A.  Yes, sir.

23   Q.  J.W. would go on the trips with you; is that right?

24   A.  He went on a couple.  J.W. went more often than most.

25   Q.  L.Wr. would go, wouldn't he?

                        Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1                                              439

1   A.  Yes, sir.

2   Q.  D.R. would go?

3   A.  Yes, sir.

4   Q.  S.H. would go?

5   A.  Don't remember, sir.

6   Q.  Pardon me?

7   A.  I don't remember.

8   Q.  In this interview with Ms. Howard on May 22nd, 2018, did

9   you tell her that S.H. would go?

10  A.  I may have.

11  Q.  Your older brother would go, correct?

12  A.  S.W. Jr. went once.  That was the Idaho one.

13  Q.  Just this one that we're here in court about today?

14  A.  Yes, sir.

15  Q.  And you told Ms. Howard that when you went on the trips

16  you would make sure that J.W. went; is that right?

17  A.  Every so often I would see if he could go, yeah.

18  Q.  And you told her you didn't want to go on the trips unless

19  J.W. went because you would be bored out of your mind if it

20  was just you and Mike because Mike didn't talk much; is that

21  right?

22  A.  Yes, sir.  I would always like the extra company of

23  another kid.  I was a kid.  I liked the company of other kids.

24          MR. MCDERMOTT:  May we please display United States

25  Exhibit 206?

                        Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1                                                440

1          THE COURT:  206 is a recording.  It's not been

2    admitted.

3          MR. MCDERMOTT:  I apologize, Your Honor.

4          THE COURT:  You mean 2-6?

5          MR. MCDERMOTT:  Yeah, that's what I meant.

6          THE COURT:  Yes, you may.

7    Q.  (By MR. MCDERMOTT) K.W., this is the cab of the truck from

8    this trip, correct?

9    A.  Yes, sir.

10   Q.  And in the video that we just watched, you said that your

11   head was close to the cab, correct?

12   A.  Close to the driver, yes, sir.

13   Q.  And your brother S.W. Jr. was seated in the front --

14   A.  Yes, sir.

15   Q.  -- correct?  And your brother S.W. Jr. at the time was 19?

16   A.  18, sir.

17   Q.  18 at the time?

18   A.  Yes, sir.

19   Q.  Okay.  And this is the same S.W. Jr. that when he got off

20   the phone with your mom he looked, in your words, pissed off,

21   right?

22   A.  Yes, sir.

23   Q.  And S.W. Jr. is within approximately three to five feet of

24   where you were sleeping, correct?

25   A.  Yes, sir.

                    Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1                                        441

1          MR. MCDERMOTT:  Your Honor, at this time I don't have

2     any more questions, but I would move for the admission of

3     Defendant's Exhibit F, which is the recording of the interview

4     that we just talked about.

5          THE COURT:  Let's put on the headphones, please.

6        (Bench conference on the record and out of the

7          hearing of the jury:)

8          THE COURT:  Mr. McDermott, what is the purpose of the

9     recording?  Can you hear me?  Can you hear me?

10         MR. MCDERMOTT:  I can now, Your Honor.

11         THE COURT:  All right.  What is the purpose of the

12    recording?

13         MR. MCDERMOTT:  Your Honor, the -- can you hear me?

14         THE COURT:  Yeah.

15         MR. MCDERMOTT:  Okay.  The 807 motion was filed

16    because in that recording he says he couldn't remember the

17    events of this trip that had to do with Mr. McFadden touching

18    him.  That video has been admitted.  In fairness, I believe

19    that the recording that gave rise to the video should be

20    admitted.

21         THE COURT:  Response?

22         MS. SURRATT:  Your Honor, to respond to what

23    Mr. McDermott just said, the recording is not the reason that

24    Government's Exhibit 6 was admitted.  We articulated on the

25    record the reasons we asked for the recording to be admitted,

                     Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1                                               442

 1   and we did not rely on the recording in the defense exhibit.

 2   In addition, fairness is not a rule of evidence.  To the

 3   extent Mr. McDermott is relying on Rule 807, there's a reason

 4   we litigated that ahead of time.  It requires notice, and it

 5   also requires that the statement is supported by sufficient

 6   guarantees of trustworthiness and is probative on point.  What

 7   it appears that Mr. McFadden (sic) wants to do is impeach the

 8   witness based on that transcript, which he has already done

 9   and can continue to do if he feels he hasn't done it

10   adequately, but there's no basis to introduce into evidence

11   this recording.

12         THE COURT:  All right.  Mr. McDermott, if you had

13   wanted to have this in evidence, you needed to give prior

14   notice.  You have used it to impeach, and I see no basis for

15   it to come in under 807.  Therefore, I'm going to deny your

16   request.

17         MR. MCDERMOTT:  My position is that the witness was

18   unable to remember.  The witness therefore was unavailable.  I

19   did not plan on asking for the admission of this.  When I read

20   the trial prep materials, I, frankly, assumed that the video

21   was not going to be admitted into evidence since the witness

22   was going to be able to testify.  That is the reason that

23   there was no other pretrial mention of it.  And although I

24   wouldn't usually ask for the admission of something like this,

25   I believe under the circumstances it's proper.

                        Sarah K. Mitchell, RPR, CRR

1           THE COURT:  But you did not follow the steps that

2    needed to be followed in order to have an 807.  I would need

3    to have more of a background on the circumstances that this

4    statement was given, that there were sufficient guarantees of

5    trustworthiness, and that you gave the appropriate notice.

6    You made your record.  I'm not going to enter it.

7        (The following proceedings were held in open

8        court:)

9           THE COURT:  The request is denied.

10          Ms. Surratt, do you have any further cross?  I mean

11   redirect?

12          MS. SURRATT:  Very brief, Your Honor.

13          THE COURT:  You may proceed.

14                     REDIRECT EXAMINATION

15   BY MS. SURRATT:

16   Q.  K.W., I'd just like to clear up a few things you were

17   asked on cross-examination.  I'd like to talk first about the

18   trip home from Nebraska when your mom and Mike Eggers came out

19   to get you and your brothers, if that's okay.

20   A.  Yeah, that's fine.

21   Q.  You were asked on cross-examination what you remember

22   telling your mom on that trip home.  Do you remember telling

23   your mom anything about what Mr. McFadden had done to you?

24   A.  I -- as he -- as the defense lawyer brought it up, I do

25   remember my mom asking questions, but at the time I didn't

19-cr-00243-CMA-GPG-1                                            444

1   want to talk about anything.  I didn't want to talk about it,

2   so I just told her no to pretty much her questions at the

3   time.

4   Q.  Okay.  And in response to one of my questions you recalled

5   that the first time that you told anyone was when you talked

6   to Detective Ed Prescott on the video we just watched.  Do you

7   remember that?

8   A.  Yes.

9   Q.  Is that still what you remember?

10  A.  That is still what I remember, yes.  I don't remember my

11  middle school therapist that I said I talked to in the video.

12  That actually caught me off guard.

13  Q.  So just sitting here today, you don't remember talking to

14  a counselor?

15  A.  I do not, no.

16  Q.  K.W., you were also asked some questions about an

17  interview that you gave in 2018 to Special Agent Zappe and

18  another woman named Amy Howard.  Do you remember that?

19  A.  I remember Zappe.  I don't remember the other girl.

20  Q.  Where were you for that interview in 2018?

21  A.  I believe I was in Secure at the time.

22  Q.  And what is that?

23  A.  That was the juvenile Secure system I was at.

24  Q.  So that's when you were serving time for your juvenile

25  adjudications; is that right?

                        Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1                                              445

1    A.  Yes.

2    Q.  Was in custody at a juvenile detention facility a good

3    place for you to talk about being sexually assaulted?

4    A.  No, it was not.

5    Q.  K.W., while we played the video just now, I noticed you

6    had your head down on the table for the most part.  How did

7    hearing and seeing this video feel for you today?

8    A.  I didn't want to see it personally.  I don't want to hear

9    it.  So I just try to drown my head out, so just started

10   thinking about other things.

11          MS. SURRATT:  No further questions, Your Honor.

12          THE COURT:  All right.  Thank you very much, sir.

13   You may step down.

14          THE WITNESS:  Thank you.

15          THE COURT:  The Government may call its next witness.

16          MS. SURRATT:  Your Honor, the Government calls Stacy

17   Wesolowski.

18          THE COURTROOM DEPUTY:  Can you please stand and raise

19   your right hand.

20                           STACY W.

21   was called as a witness and, having been duly sworn, was

22   examined and testified as follows:

23          THE COURTROOM DEPUTY:  Thank you.  Please be seated,

24   and then please state your name and spell your first and last

25   name for the record.

                        Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1                                                    446

1          THE WITNESS:  It is Stacy W.  It's S-t-a-c-y and then

2   W-///////////////////////.

3          THE COURT:  You may proceed.

4                      DIRECT EXAMINATION

5   BY MS. SURRATT:

6   Q.  Ms. W///////////, where do you currently live, just the city

7   and state.

8   A.  Cedar City, Utah.

9   Q.  Who do you currently live with in Cedar City, Utah?

10  A.  My husband and four children.

11  Q.  Who are the four children in your house these days?

12  A.  There's S.J.W., L.We. spelled with an //, Alice and John,

13  and then when we get home K.W. and Aspen and my granddaughter

14  will be moving back in with us.

15  Q.  Who are S.J.W. and L.We. with an //?

16  A.  They are my children biologically.

17  Q.  And how old are each of them now?

18  A.  S.J.W. is 18 and L.We. is 16.

19  Q.  And you mentioned two other children who live with you.

20  A.  Yes.

21  Q.  Who are those children?

22  A.  I received guardianship of them two years ago when both

23  their parents passed away.

24  Q.  And how old are those two other children?

25  A.  17 and 16.

                        Sarah K. Mitchell, RPR, CRR

1   Q.   And then you mentioned someone named Aspen.  Who is that?

2   A.   That is my future daughter-in-law.

3   Q.   And you said that was K.W.'s fiancé?

4   A.   Yes.

5   Q.   What is K.W.'s date of birth?

6   A.   April 24th of 2001.

7   Q.   What is S.J.W.'s date of birth?

8   A.   5/28/04.

9   Q.   And how about your son L.We.'s date of birth?

10  A.   12/7/05.

11  Q.   And do you also have an older son named S.W. Jr.?

12  A.   Yes.  He is my stepson.

13  Q.   What is your stepson S.W. Jr.'s date of birth?

14  A.   9/16/93.

15        MS. SURRATT:  Your Honor, may I please publish

16  Government Exhibit 13-1?

17        THE COURT:  Yes, you may.

18  Q.   (By MS. SURRATT) Ms. W//////////, who are these children?

19  A.   The one in the light blue is K.W.  The one in the little

20  white and pink dress, that's S.J.W.  And the one in the dark

21  blue, that's L.We.

22  Q.   Ms. W//////////, why are you getting emotional?

23  A.   They're just so little.

24  Q.   Why does that make you sad?

25  A.   Because they were hurt.

                    Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1                                                    448

1    Q.  About how old is K.W. in this picture?

2    A.  I want to say seven or eight, if not a little younger.

3    Q.  And how old is S.J.W. in this picture?

4    A.  She's about five.

5    Q.  And little L.We., about how old is he in this picture?

6    A.  He's about four.

7    Q.  Where was this photo taken?

8    A.  It was taken off D 1/2 Road here in Grand Junction.

9    Q.  And that's a house that you lived in off D 1/2 Road?

10   A.  Yes.

11        MS. SURRATT:  Can we please publish, Your Honor,

12   Government Exhibit 13-2?

13        THE COURT:  You may.

14   Q.  (By MS. SURRATT) Who is this, Ms. W////////?

15   A.  That's K.W.

16   Q.  About how old is K.W. in this photo?

17   A.  About the same age.

18   Q.  Where was this photo taken?

19   A.  This is at D 1/2 Road on the inside.  This is the inside

20   of our home.

21   Q.  Do you remember was there some occasion on which this

22   photo was taken?

23   A.  I believe these -- it was his first day of school picture

24   for the second or third grade.

25   Q.  Ms. W////////, we talked about where you live now in

                      Sarah K. Mitchell, RPR, CRR

1    Cedar City, Utah.  Where are you originally from?

2    A.  Kodiak Island, Alaska.

3    Q.  Did you eventually end up in Grand Junction, Colorado?

4    A.  Yes, I did.

5    Q.  When did you first move to Grand Junction?

6    A.  I moved to Grand Junction December of 19 -- I'm thinking

7    -- I do believe it was '97.

8    Q.  And for about how long did you live in Grand Junction?

9    A.  I lived in Grand Junction until 2012.

10   Q.  Do you recall approximately how many different places you

11   lived in in Grand Junction?

12   A.  At least four.

13   Q.  What do you currently do for work, Ms. W////////?

14   A.  I'm a dog groomer, and I dog train on the side.

15   Q.  Now, you said you've lived in approximately four places in

16   Grand Junction.  What was the first of those?

17   A.  It was up on Orchard Mesa.

18   Q.  And what type of place was that?

19   A.  It was in a trailer park.

20   Q.  And where did you live after Orchard Mesa?

21   A.  We moved down to North Avenue.

22   Q.  And what type of place was that on North Avenue?

23   A.  That was also a trailer park.

24   Q.  Who lived in that trailer park on North Avenue with you?

25   A.  It was me, my husband, S.W. Jr., K.W., S.J.W., and L.We.

19-cr-00243-CMA-GPG-1                                                    450

 1   I'm sorry, S.J.W.  I call her S.J.W.

 2   Q.  And what is your husband's name?

 3   A.  Scott.

 4   Q.  Do people call him Scott Sr. to differentiate --

 5   A.  No.  We differentiate from Scott and S.W. Jr.

 6   Q.  So S.W. Jr. is S.W. Jr.?

 7   A.  Yes.

 8   Q.  After the trailer park on North Avenue, where did you

 9   move?

10   A.  My friend told us about her uncle's place, and they were

11   moving out of her uncle's place, but he had another one.  So

12   while we were cleaning up the one we were going to move into,

13   we moved into her uncle's -- the one they had just moved out

14   of while we were cleaning the other one.

15   Q.  And where was the house that you moved into?

16   A.  It was close to D 1/2 Road.  I don't remember exactly

17   where it was.

18   Q.  What did the house look like?

19   A.  The only thing I really can remember about it is it is a

20   three bedroom, and it had green carpeting.

21   Q.  Who lived in that house with you?

22   A.  Again, it was me, Scott, S.W. Jr., K.W., S.J.W., and L.We.

23   Q.  What type of condition was that house in?

24   A.  So the one we were going to move into that we were

25   cleaning, it was in a very poor condition.  So we were staying

19-cr-00243-CMA-GPG-1                                             451

 1   in her uncle's other rental while we were cleaning up the one

 2   that was in poor condition.

 3   Q.  Did it matter to you how much it cost to rent the places

 4   that you lived in?

 5   A.  No.

 6   Q.  I mean was money a factor?

 7   A.  Money was a factor, yes.

 8   Q.  And why is that?

 9   A.  Because I'm the main breadwinner in the family, and so

10   basically I was the only one working, so I had to budget for

11   six people.

12   Q.  What did you do for work back then?

13   A.  I do believe at that time I might have been still at

14   Carl's Jr.  I don't really remember.

15   Q.  What is Carl's Jr.?

16   A.  Carl's Jr. is a restaurant, and I was the shift lead.

17   Q.  After D 1/2 Road, the house that you were just discussing,

18   where did you go?

19   A.  We went to the brown house on D 1/2 Road.

20   Q.  Okay.

21   A.  The other one was close to where the brown house was.

22        MS. SURRATT:  Your Honor, may we please publish what

23   is marked as Government Exhibit 4-2?

24        THE COURT:  You may.

25   Q.  (By MS. SURRATT) Do you recognize this, Ms. W//////////?

                         Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1                                              452

1    A.  That's the brown house on D 1/2 Road.

2          MS. SURRATT:  You can take the exhibit down,

3    Mr. Graber.

4    Q.  (By MS. SURRATT) When you lived at that brown house on

5    D 1/2 Road, how would you describe your financial situation?

6    A.  We were living from paycheck to paycheck.

7    Q.  Did you have a lot of extra money to buy luxuries?

8    A.  No, not at all.

9    Q.  When did you leave Grand Junction?

10   A.  I left Grand Junction in 2012.

11   Q.  Where did you go when you left Grand Junction?

12   A.  We went to Montrose, Colorado.

13   Q.  And when you say we, who moved with you?

14   A.  Me, Scott, S.W. Jr., K.W., S.J.W., and L.We.

15   Q.  And after Montrose, Colorado, where did you go?

16   A.  We went to Cedar City, Utah.

17   Q.  Ms. W///////////, do you know somebody named Mike McFadden?

18   A.  Yes, ma'am, I do.

19   Q.  Do you see him in the courtroom here today?

20   A.  Yes, ma'am, I do.

21   Q.  Can you identify him by an article of clothing he's

22   wearing?

23   A.  He's wearing a gray jacket.

24         MS. SURRATT:  Your Honor, may the record please

25   reflect that the witness has identified the defendant.

                      Sarah K. Mitchell, RPR, CRR

1             THE COURT:  It will so reflect.

2    Q.  (By MS. SURRATT) How did you first meet Mr. McFadden?

3    A.  I actually met Mr. McFadden through my ex-husband.

4    Q.  And how did that come about?

5    A.  He -- my ex-husband was friends with another couple, and

6    Mike was friends with the same couple, so we met through

7    mutual friends.

8    Q.  Do you recall approximately how old your son K.W. was when

9    you first met Mr. McFadden?

10   A.  He was probably -- he was little.  He was probably about

11   three or four.

12   Q.  Did you start spending time with Mr. McFadden immediately?

13   A.  No.  I was not allowed to spend time with anybody if I

14   wasn't given permission.

15   Q.  And why is that?

16   A.  I was a classic domestic violence survivor.

17   Q.  Did there come a time later when you did start spending

18   time with Mr. McFadden?

19   A.  Yes, there was.

20   Q.  And when was that?

21   A.  I think K.W. was in the first or second grade, and he was

22   going to Dos Rios Elementary School.

23   Q.  And was there something that happened that caused you to

24   reconnect with Mr. McFadden?

25   A.  Yes.  We ran back into each other, and we started talking

19-cr-00243-CMA-GPG-1                                                    454

1    at the school.

2    Q.  And what happened after that?

3    A.  So we reconnected.  Me and my husband were having some

4    marital issues, so I was just, you know, confiding in him

5    about that kind of thing.  And I was -- you know, I needed --

6    we had moved down to North Avenue, but I still wanted the kids

7    to go to Dos Rios, and Mike said he would be more than happy

8    to help me out during that time.

9    Q.  So you had moved to North Avenue, but K.W. was still going

10   to Dos Rios Elementary School?

11   A.  Yes.

12   Q.  And Mr. McFadden offered to drive your children to school?

13   A.  Yes.

14   Q.  Did you accept that offer?

15   A.  Yes, I did.

16   Q.  How come?

17   A.  Because I -- he was, you know, sincere, and we had ran

18   into each other, and I'd known him from previous, and I really

19   appreciated the help that he offered.

20   Q.  At the time was that really helpful?

21   A.  It was very helpful.

22   Q.  Around that same time, are you aware of where Mr. McFadden

23   was living?

24   A.  Yeah, he was actually living a few blocks away from the

25   trailer park up and around the corner.

                           Sarah K. Mitchell, RPR, CRR

1          MS. SURRATT:  Your Honor, can we please publish

2    what's marked as Government Exhibit 3-1?

3          THE COURT:  You may.

4    Q.  (By MS. SURRATT) Do you recognize this house?

5    A.  That's the house he was living in.

6    Q.  While you were living at the trailer park on North Avenue?

7    A.  Yes, ma'am.

8    Q.  Did you ever go to this house of Mr. McFadden's that's in

9    Government Exhibit 3-1?

10   A.  Yes.

11   Q.  Do you know who he lived there with?

12   A.  Yes.

13   Q.  Who was that?

14   A.  It was John and Phyllis Hockenberry.

15   Q.  Anybody else?

16   A.  Their son S.H., and I do believe J.W., L.Wr., and I

17   believe B.W. too.

18   Q.  So let's back up just a second.  You said John and Phyllis

19   Hockenberry?

20   A.  Yes.

21   Q.  How old was their son S.H. at that time?

22   A.  At that time he was probably 10 or 11.

23   Q.  Was he about the same age as K.W. or older or younger?

24   A.  I believe they're around the same age.  I don't really

25   remember.  I haven't seen them in a very long time.

19-cr-00243-CMA-GPG-1                                              456

1    Q.   And you also mentioned J.W. and L.Wr., and B.W.?

2    A.   Yes.

3    Q.   Who are those people?

4    A.   They are Mike's nephew and niece.

5    Q.   And is that J.W. and his siblings?

6    A.   Yes.

7    Q.   Did any of your kids ever go over to this house?

8    A.   K.W. mainly.

9    Q.   Did K.W. ever spend the night there?

10   A.   A lot.

11   Q.   At some point do you remember whether Mr. McFadden moved

12   to another house in Grand Junction?

13   A.   Yes.

14   Q.   What do you remember about that?

15   A.   It was a modular home across the field from the brown

16   house on D 1/2 Road.

17   Q.   So Mr. McFadden and your family eventually lived near one

18   another on D 1/2; is that right?

19   A.   Yes.

20        MS. SURRATT:  Your Honor, may we please publish what

21   is marked as Government Exhibit 4-1?

22        THE COURT:  You may.

23   Q.   (By MS. SURRATT) What is this?

24   A.   That's Mike's house.

25        MS. SURRATT:  You can take that down, Mr. Graber.

                        Sarah K. Mitchell, RPR, CRR

1   Thank you.

2   Q.   (By MS. SURRATT) About how often did you see Mr. McFadden

3   when your family lived next door to him on D 1/2 Road?

4   A.   We saw each other a lot.  We were friends.

5   Q.   In what context would you see each other?

6   A.   We would have, like, barbecues together.  We'd hang out

7   together.  We were just back and forth between the two houses.

8   Q.   Did your kids ever go over to Mr. McFadden's house on

9   D 1/2 Road?

10  A.   All the time.

11  Q.   Who lived with Mr. McFadden at that house?

12  A.   If I remember correctly, it was J.W. and his siblings, and

13  then I believe Papa John moved in over there as well.  He had

14  a girlfriend at one time that lived with him as well and her

15  daughters.  I just don't remember her name.

16  Q.   Who is Papa John?

17  A.   Papa John is John Foxx, and he was basically the grandpa

18  to all the kids.

19  Q.   Did you have an independent friendship with Papa John?

20  A.   Yes.  I knew him from the trailer park up on North Avenue.

21  Q.   So you'd known him for quite some time?

22  A.   Yes.

23  Q.   What kinds of things did Mr. McFadden have over at his

24  house?

25  A.   He had trampolines and quads, and he had the hot tub, and

19-cr-00243-CMA-GPG-1                                                        458

1    he had the swing set and all the semis.

2    Q.   Did your son K.W. ever sleep over at Mr. McFadden's house?

3    A.   Yes.

4    Q.   Why?

5    A.   Because he was friends with J.W. and it was just a boys

6    sleepover.

7    Q.   Do you know where K.W. slept when he spent the night at

8    Mr. McFadden's?

9    A.   To my understanding, it was either in the living room or

10   in the back bedroom with the boys on the bunk beds.

11   Q.   Were you ever there when they spent the night?

12   A.   No.

13   Q.   So, in other words, you didn't sleep over at

14   Mr. McFadden's?

15   A.   No.  I did not sleep over at Mr. McFadden's.

16   Q.   As far as you're aware, did Mr. McFadden ever take the

17   kids anywhere?

18   A.   Yes.

19   Q.   Where did he take them?

20   A.   He would take them to like -- he would take them in the

21   semi.  He would go on semi rides with the kids.  He would take

22   them down to Elitch Gardens.  He would take them, you know,

23   just on adventures.

24   Q.   Did your kids ever go places with Mr. McFadden?

25   A.   K.W. mainly.

                        Sarah K. Mitchell, RPR, CRR

1    Q.  Did your kids ever go on truck trips with Mr. McFadden?

2    A.  Yes.

3    Q.  Was there a truck trip in particular that ended in

4    Nebraska in early 2013?

5    A.  Yes.

6    Q.  Ms. W////////////, are you aware -- did you ever give your

7    kids sleep aids such as melatonin when they were at home with

8    you?

9    A.  I never did, no.

10   Q.  Did you ever give Mr. McFadden to give sleep aids to K.W.?

11   A.  I said he could, but I didn't know he was abusing him.

12   Q.  Let's turn to this trip to Nebraska, if that's okay.  Who

13   went on that trip?

14   A.  It was S.W. Jr., L.We., and K.W.

15   Q.  If you recall, about how old were they at that time?

16   A.  So in 2012 K.W. was probably about 11, so that made L.We.

17   about 7-, 8-ish.  So he probably just turned 8 that year.

18   Q.  And about how old was S.W. Jr.?

19   A.  He was 18.

20   Q.  Where were you and your family living at the time?

21   A.  We were in Montrose, Colorado, in the -- we were in the

22   first pod.  So it was a modular home, and I don't remember the

23   street.

24   Q.  But you had left Grand Junction by that time?

25   A.  Yes, we had left Junction by that time.

19-cr-00243-CMA-GPG-1                                          460

1  Q.  How did you learn about this particular truck trip?

2  A.  Well, you know, we were still in contact with Mike.  Mike,

3  you know, still brought stuff for the kids.  So he came over

4  for Thanksgiving that year, and he came over for Christmas

5  that year, and he told us about the trip, and the kids were

6  excited to go on the trip with him, because he was taking

7  another load, and they were on Christmas break, so I didn't

8  see a problem with it.

9  Q.  How did the kids link up with Mr. McFadden to actually

10 embark on the trip?

11 A.  I don't quite remember, but I think I drove them

12 somewhere.  I'm not sure.

13 Q.  Okay.  Did you learn at some point while the kids were on

14 the trip with Mr. McFadden that the police were looking for

15 Mr. McFadden?

16 A.  Yes.

17 Q.  And do you recall a Detective Ed Prescott calling you and

18 telling you that he was looking for Mr. McFadden?

19 A.  Yes.

20 Q.  What did you do when you learned the police were looking

21 for him?

22 A.  At first I flipped out because nobody had told me that the

23 police --

24 Q.  And just what you did, Ms. W//////////.

25 A.  So I flipped out, and I was at the supermarket, so I got

Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1                                          461

1    in the truck, and I went to the house, and I was kind of like

2    emotional.  I mean, my emotional state was all over the place,

3    and I talked to my husband, and my husband called the kids,

4    and I had calmed down, and I talked to Ed Prescott, and I was

5    talking to the kids, and we were finding out where they

6    exactly were.

7    Q.  And were you and your husband ultimately able to locate

8    your boys?

9    A.  Yes, we were.

10   Q.  And were they in Nebraska?

11   A.  They were in North Platte, Nebraska, yes.

12   Q.  And at some point after that did you learn that

13   Mr. McFadden had been arrested?

14   A.  Yes.

15   Q.  At some point after that did you start driving to Nebraska

16   so you could retrieve your boys?

17   A.  I starting driving right away.  I think I was still on the

18   phone driving to North Platte, Nebraska, to get my children.

19   Q.  Did anyone go with you?

20   A.  Mike Eggers and Ray Fluke.

21   Q.  So you, Mike Eggers, and Ray Fluke began driving to North

22   Platte, Nebraska?

23   A.  Yes, ma'am.

24   Q.  About how long did it take to get there?

25   A.  I don't know.  My emotional state was -- I couldn't think.

Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1                                                      462

1    I couldn't --

2    Q.  What happened when you got there?

3    A.  The kids were in the semi, and the gas station had filled

4    up the semi for the kids, and Subway had allowed my children

5    -- my mom to call in her credit card over the phone, so they

6    were still in the semi when we pulled up.

7    Q.  And so did they eat Subway sandwiches for dinner?

8    A.  Yeah, and we joke about it because S.W. Jr. got a $22

9    sandwich off my mom.

10   Q.  What happened after you found your kids at the truck stop?

11   A.  We started driving back.

12   Q.  Who was in the car for the drive back?

13   A.  So I believe it was still me, Mike Eggers, Ray Fluke.

14   Then it was L.We., S.W. Jr., and K.W.

15   Q.  During the trip home, do you recall if you talked about

16   anything having to do with why Mr. McFadden had been arrested?

17   A.  I don't recall.

18   Q.  During the trip home did you talk about Mr. McFadden at

19   all as far as you remember?

20   A.  A little bit, but I can't remember the conversations.

21           MS. SURRATT:  One moment, please, Your Honor.

22           THE COURT:  You may.

23           MS. SURRATT:  Your Honor, no further questions.

24           THE COURT:  All right.  Cross-examination.

25


                        Sarah K. Mitchell, RPR, CRR

CROSS-EXAMINATION

1
2  BY MR. MCDERMOTT:

3  Q.  Good morning, Ms. W//////////.

4  A.  Good morning.

5  Q.  So it's my understanding from your answer to Ms. Surratt's

6  questions that as we sit here today you don't remember what

7  you and your son talked about on the way back from Nebraska;

8  is that right?

9  A.  I'm so anxious right now.  I think I need --

10  Q.  I understand, ma'am.  If you need a moment, please don't

11  hesitate to ask.

12        THE COURT:  Ma'am, would you like to take a break?

13  Why don't we go ahead and recess for lunch at this time, and

14  we'll reconvene.  So, ladies and gentlemen, we're going to

15  take our lunch break early.  I do need to advise you there's

16  another hearing taking place over the lunch hour, so clear

17  your tables a little bit.  We'll take our lunch break at this

18  time.  Remember, do not discuss this case among yourselves.

19  Do not conduct any research.  The Court will be in recess

20  until approximately 12:30.

21        THE COURTROOM DEPUTY:  All rise.

22     (Jury left the courtroom at 11:58 a.m.)

23     (Break was taken from 11:59 a.m. to 12:52 p.m.)

24        THE COURT:  Are we ready to go?

25        MS. SURRATT:  Yes, Your Honor.

Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1                                              464

 1              THE COURT:  Ms. Myhaver, please bring the jury in.

 2              THE COURTROOM DEPUTY:  All rise for the jury.

 3         (Jury entered the courtroom at 12:52 p.m.)

 4              THE COURT:  Mr. McDermott, you may proceed.

 5              Ladies and gentlemen, I apologize.  We had another

 6    hearing that took a little longer than we thought.

 7                          CROSS-EXAMINATION

 8    BY MR. MCDERMOTT:

 9    Q.  Good afternoon, Ms. W///////////.

10    A.  Good afternoon.

11    Q.  Okay.  If you need a break at any time or need a moment,

12    just please let me know, okay?

13    A.  Okay.

14    Q.  Okay.  So before the break I was asking you about the trip

15    back from Nebraska to Colorado.

16    A.  Okay.

17    Q.  And I believe you told Ms. Surratt that you didn't

18    remember what you and K.W. talked about.  And I understand

19    that this is very emotional and very difficult, and after the

20    break I'm going to ask the question again, and just tell me

21    whether you do have a recollection about what you and your son

22    spoke with -- spoke about on the way back from Nebraska.

23    A.  Okay.

24    Q.  Okay.  Do you recall what the two of you spoke about?

25    A.  I only recall one conversation.

                         Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1                                                    465

1   Q.  Okay.

2   A.  And that was the sleeping arrangement that they had in the

3   semi-truck.

4   Q.  Okay.  All right.  I'm just going to go through -- I'm

5   just going to go through, and I'm going to ask a few questions

6   about the trip back, and if you don't remember, that's fine.

7   A.  Okay.

8   Q.  Do you recall on the way back K.W. telling you that he

9   would do anything in his power to put Mr. McFadden away?

10  A.  We had so many conversations, but I believe he did say

11  that, yes.

12  Q.  Okay.  Now, my understanding from the case and from what

13  you said earlier is when you -- when you called your son S.W.

14  Jr. you were extremely upset?

15  A.  Yeah.

16  Q.  And my understanding is you were so upset your then

17  husband even had to take the phone and finish the call with

18  S.W. Jr.; is that right?

19  A.  Kind of.  Like, I calmed -- he did take over the phone

20  call for a little bit, but then I had to take back S.W. Jr.,

21  and I had the other detective on the other line, and I was

22  coordinating between the two of them.

23  Q.  Okay.  So you're coordinating two phone calls, and you're

24  obviously very upset?

25  A.  I had calmed down.

 1   Q.   Okay.

 2   A.   I mean, when I first found out, of course, you're going to

 3   be emotional.

 4   Q.   Right.

 5   A.   But I had pulled myself back together, and I was

 6   coordinating to get my children to safety.

 7   Q.   Okay.  So you're coordinating to get your children to

 8   safety.  You finish the phone call, and then you drive to

 9   Nebraska; is that right?

10   A.   Yes, sir, we did.

11   Q.   Okay.  And it's probably about a nine-and-a-half-hour

12   drive, does that sound right?

13   A.   Probably, but like it felt like it took decades.

14   Q.   Felt like it took decades?

15   A.   It took forever to get to my kids, yes.

16   Q.   Okay.  And this might seem trivial under the

17   circumstances.  Do you remember telling Detective Prescott in

18   an interview on January 15th of 2013 that your drive took nine

19   and a half hours one way and nine and a half hours back?

20   A.   Seems about right, yes.

21   Q.   Okay.  Now, on the way back did K.W. talk to you about a

22   sexual incident at all?

23   A.   Not that I recall.

24   Q.   Okay.  If you -- if you told Detective Prescott in your

25   interview about the conversation you had with K.W. on the way

19-cr-00243-CMA-GPG-1                                              467

1  back from Colorado, do you have any reason to believe what he

2  reported is inaccurate?

3  A.   Detective Prescott would accurately write anything down.

4  Q.   Do you recall K.W. saying something to the effect of he

5  wanted to put Mr. McFadden away because he believed that

6  Mr. McFadden and L.We. had sex?

7  A.   Which L.We. are you referring to?

8  Q.   J.W.  I'm sorry.  I misspoke.  J.W.  I apologize.  I

9  misspoke.

10  A.   Yeah, I do believe he said that to me.

11  Q.   Okay.  And during this ride, K.W. never reported to you

12  that Mr. McFadden and him had had any sexual contact on this

13  trip; is that correct?

14  A.   Not that I recall.  I can't remember that far back.  He

15  might have.

16  Q.   And up to this point K.W. had never told you that

17  Mr. McFadden had done anything sexually inappropriate with

18  him; is that right?

19  A.   Not up to this point, no.

20  Q.   And I see the way you react.  That's obviously something

21  that would have gotten your attention.

22  A.   You think?

23  Q.   Yeah.  Ms. W////////////, I'm not going to be too much

24  longer.

25  A.   It's fine.

Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1                                            468

1  Q.  When you returned to Colorado, did you take your son to a

2  counselor?

3  A.  We took him to the Dolphin House, so I'm not sure what you

4  would consider that.

5  Q.  Okay.  Well, prior to the Dolphin House did you take him

6  to a counselor named Emily Bowman?

7  A.  It's possible.  I don't remember the counselor's name.

8  That was years ago.

9  Q.  Okay.  Did you tell Detective Prescott that K.W. had said

10  something the day before you talked to him, Detective

11  Prescott, with Emily Bowman?

12  A.  I don't recall.

13  Q.  Okay.

14  A.  I can't remember that far back.

15  Q.  Okay.  You had known Mr. McFadden for about how long

16  before January 2013?

17  A.  A few years.  We got reconnected when K.W. was going to

18  Dos Rios, so he had to have been in, like, second grade.  So

19  that would -- he would have had to have been in second grade.

20  So maybe 2007, 2006.

21  Q.  Okay.  And Mr. McFadden had Christmas with you and your

22  family in 2012?

23  A.  He had Thanksgiving and Christmas at my house.

24  Q.  Okay.  Thanksgiving and Christmas.  And do you recall how

25  this trip came about?

19-cr-00243-CMA-GPG-1                                                    469

 1  A.  He asked my kids if they wanted to go.

 2  Q.  Did he have any discussion with your then husband about

 3  the trip?

 4  A.  He said he was going to bring us some potatoes.

 5  Q.  Okay.

 6  A.  And we had sent them with him before so we didn't think

 7  anything different.

 8  Q.  How many times had your kids gone on trips with

 9  Mr. McFadden?

10  A.  K.W., several.

11  Q.  Several.

12  A.  L.We., a few.

13  Q.  Okay.

14  A.  S.J.W., never, I don't recall.

15  Q.  How about S.W. Jr.?

16  A.  Once.

17  Q.  Once before or --

18  A.  Nope.

19  Q.  -- once including --

20  A.  This trip.

21  Q.  This is the only one he went on?

22  A.  This is the only one he went on, and he almost didn't go,

23  but me and my husband convinced him to go.

24  Q.  Okay.  Now, with respect to melatonin, it's my

25  understanding that you said it was okay if Mr. McFadden gave

19-cr-00243-CMA-GPG-1                                                470

1   your son one melatonin; is that correct?

2   A.  Yeah, one melatonin.  Not an overdose of melatonin.

3   Q.  I understand.  I understand.  When did you hear that your

4   son was receiving more than one melatonin?

5   A.  At the Dolphin House.

6   Q.  The Dolphin House?

7   A.  Yes, sir.

8   Q.  Okay.  And prior to that you had not heard that before?

9   A.  Nope.

10  Q.  Okay.  And I apologize if I get too personal, but --

11  A.  No worries.

12  Q.  Your son, K.W., he had ADD?

13  A.  He has ADHD, and he's been since diagnosed with autism.

14  Q.  Okay.

15  A.  And obsessive-compulsive anxiety disorder.

16  Q.  And, Ms. W//////////, you knew some of the same people that

17  Mr. McFadden did, some of the other people that were at the

18  house such as John Foxx?

19  A.  Yes, sir.  He passed away in my home.

20  Q.  Mr. Foxx did?

21  A.  Yes, sir, he did.

22  Q.  Did Mr. Foxx take care of some of the household duties

23  such as cooking, cleaning, laundry, things like that?

24  A.  He did it all.

25  Q.  He did it all?

                    Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1                                          471

1   A.  Yes, sir, he did.

2   Q.  Okay.  And we're talking about at Mr. McFadden's house --

3   A.  Yes.

4   Q.  -- right?

5   A.  Well, he did it anywhere he went, so...

6   Q.  Okay.  And you knew at least one of Mr. McFadden's

7   girlfriends; is that right?

8   A.  Yes, but I don't recall her name.

9   Q.  Okay.

10  A.  I knew she was on the taller and heavier-set side, and

11  that's all I remember.  And she had two or three girls.  I

12  can't remember exactly.

13  Q.  Okay.  And do you recall if he was seeing her when he was

14  at the D 1/2 address?

15  A.  Yes, she was living with him.

16  Q.  At the D 1/2 address?

17  A.  Yes.

18  Q.  Okay.  Do you recall for how long?

19  A.  A few months.

20  Q.  And your son went over to the house during the time that

21  Mr. McFadden was seeing her; is that right?

22  A.  He went over there all the time.

23  Q.  Okay.

24  A.  Before her, after her, during her.

25  Q.  And were you -- were there times where Mr. McFadden was on

19-cr-00243-CMA-GPG-1                                             472

1  truck driving trips by himself that you knew of?

2  A.  I don't know if he ever went alone, honestly.  I think

3  there was always a boy with him or one of his nephews, K.W.  I

4  mean, I don't remember if he ever went by himself, honestly.

5  Q.  There were -- Mr. Foxx lived there.  Did you know

6  Mr. Hockenberry?

7  A.  Yes.

8  Q.  Do you recall how long Mr. Hockenberry lived in the house?

9  A.  A few months before they got their own place.  I don't

10 remember exactly how long.

11 Q.  And did you -- did you know Mr. Hockenberry's son, S.H.?

12 A.  Yes.

13 Q.  And he spent some time with your son K.W.; is that right?

14 A.  Yes.

15 Q.  Friends --

16 A.  Yeah, all the boys were friends.  I mean, it didn't matter

17 the age.  They were all friends.

18 Q.  Yeah.

19      MR. MCDERMOTT:  I don't have anything else.  Thank

20 you very much.

21      THE COURT:  Any redirect?

22      MS. SURRATT:  No further questions, Your Honor.

23      THE COURT:  Thank you very much.  You are excused.

24      The Government can call its next witness.

25      MS. SURRATT:  The Government calls S.W. Jr.

                    Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1                                              473

1          THE COURTROOM DEPUTY:  Before you sit, please stand

2     and raise your right hand.

3                              S.W. JR.

4     was called as a witness and, having been duly sworn, was

5     examined and testified as follows:

6          THE COURTROOM DEPUTY:  Thank you.  Please be seated.

7     Then please state your name and spell your first and last name

8     for the record.

9          THE WITNESS:  S.W. Jr. S-////////, W-///////////////////.

10                        DIRECT EXAMINATION

11    BY MS. SURRATT:

12    Q.  Mr. W///////////, where do you live, just city and state.

13    A.  Cedar City, Utah.

14    Q.  About how long have you lived in Cedar City, Utah?

15    A.  Four or five years, give or take.

16    Q.  And who do you live with in Cedar City?

17    A.  I actually have my own house.  But my aunt and uncle,

18    grandma and cousins.

19    Q.  And, Mr. W///////////, you can pull that whole screen down,

20    just push it down so it's not right in your face.  There,

21    that's better.  What do you do for work?

22    A.  Assistant manager at Zaxby's.

23    Q.  And does your brother K.W. also work at that same Zaxby's?

24    A.  Yeah, I'm the one that actually got him the job.

25    Q.  And is Zaxby's the chicken place?

                         Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1                                              474

 1   A.   Yes.

 2   Q.   How old are you?

 3   A.   I'm 29.

 4   Q.   What is your date of birth?

 5   A.   9/16/93.

 6   Q.   Before you lived in Cedar City where did you live?

 7   A.   Grand Junction, Colorado.

 8   Q.   Did you live anywhere else in Colorado other than Grand

 9   Junction?

10   A.   Montrose.

11   Q.   Where are the different places you remember living in

12   Grand Junction?

13   A.   The D 1/2 House Road and then the Clifton house and then

14   the Orchard Mesa trailer park and the North Avenue trailer

15   park.

16   Q.   So you said a Clifton house.  Is that in Grand Junction or

17   is that --

18   A.   Yes.

19   Q.   -- in Clifton?

20   A.   I said Clifton.  I just figured Junction is --

21   Q.   Sort of an area?

22   A.   Yeah.

23   Q.   Okay.  Are you familiar with an individual named Michael

24   McFadden?

25   A.   Yes, I am.

19-cr-00243-CMA-GPG-1                                          475

1   Q.  In brief, how did you first meet Mr. McFadden?

2   A.  Through just going over to the trailer park and meeting

3   him there.

4   Q.  What trailer park?

5   A.  The North Avenue trailer park.

6   Q.  And do you recall meeting Mr. McFadden while he was

7   visiting the trailer park?

8   A.  Yes.

9   Q.  Who was he visiting?

10  A.  He was visiting my parents, and then I believe K.W. and --

11  yeah.

12  Q.  You mentioned K.W.  Who's K.W.?

13  A.  K.W.

14  Q.  K.W., who's K.W.?

15  A.  My brother.

16  Q.  Is he your younger brother?

17  A.  Yes, younger brother.

18  Q.  And do you have any other siblings?

19  A.  Yes.  I have S.J.W. then L.We.

20  Q.  You said S.J.W. and L.We.

21  A.  Are younger.

22  Q.  Are those W//////////////?

23  A.  Yes.

24  Q.  Do you know where Mr. McFadden was living when you recall

25  first meeting him when you lived in the North Avenue trailer

Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1                                                    476

1   park?

2   A.  No.  I do not recall where he was living at the moment --

3   at that time.

4   Q.  Who did you live with when you lived at the North Avenue

5   trailer park?

6   A.  My parents, K.W., S.J.W., L.We.

7   Q.  So your parents and your siblings?

8   A.  Yes, my parents and my siblings.

9   Q.  And then you mentioned a house on D 1/2 Road.  Is that

10  where you lived after the North Avenue trailer park?

11  A.  Yes.

12  Q.  When you lived on D 1/2 Road, do you recall where

13  Mr. McFadden lived?

14  A.  Off the top of my head, no, but then I do believe he did

15  move in like next door.

16  Q.  So at some point when you were in the D 1/2 Road

17  Mr. McFadden also lived next door?

18  A.  Yes.

19  Q.  How often did you see Mr. McFadden when you lived on D 1/2

20  Road and so did he?

21  A.  About every weekend, give or take.

22         MS. SURRATT:  Can we please publish, Your Honor,

23  Government Exhibit 4-1?

24         THE COURT:  You may.

25  Q.  (By MS. SURRATT) Do you recognize this photo?

                    Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1                                                  477

1    A.  Yes, I do.

2    Q.  What is that?

3    A.  That is -- that would be Mike's house on D 1/2 Road next

4    door to ours.

5            MS. SURRATT:  And could you please publish 4-2.

6    Q.  (By MS. SURRATT) What is this?

7    A.  That is our house on D 1/2 Road.

8    Q.  You said you went over to Mr. McFadden's house

9    approximately every weekend.  What kind of stuff did you do

10   over there?

11   A.  I would go over there and just hang out, play video games,

12   watch movies, just spend time with K.W. and L.We., whoever was

13   over there.

14   Q.  What age were you in relation to the other kids that spent

15   time at Mr. McFadden's house?

16   A.  Definitely on the older side.  I was probably 16, 17.

17   Q.  And at that time how old was your brother K.W.?

18   A.  Oh, God.  I suck with ages.  Off the top of my head, I

19   couldn't remember exactly.

20   Q.  But he's your younger brother?

21   A.  Yes, he's my younger brother.

22   Q.  Do you recall who the other kids were that you would see

23   at the D 1/2 Road house?

24   A.  Yes.  Yes.  There was J.W., L.Wr., D.R. I believe would be

25   there, K.W., L.We.

                     Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1                                                478

1  Q.  So you mentioned two different L//////.

2  A.  Yes.

3  Q.  One is your brother.  Who's the other L/////?

4  A.  L.Wr.

5  Q.  Is that J.W.'s younger brother?

6  A.  Right, yeah.  J.W.'s younger brother.

7  Q.  Do you recall whether anyone spent the night over at

8  Mr. McFadden's?

9  A.  Yes.

10  Q.  Who do you recall spending the night over there?

11  A.  J.W., L.Wr., K.W., L.We., myself sometimes, D.R.

12  Q.  So did you occasionally spend the night at Mr. McFadden's?

13  A.  Occasionally.  Not as much as the others, but on occasion

14  I would.

15  Q.  Where did you sleep when you spent the night over there?

16  A.  Either in the living room or in one of the boys' bedrooms.

17  Q.  Did you ever sleep in Mr. McFadden's bed?

18  A.  No.

19  Q.  While you were at Mr. McFadden's house did you ever see

20  him give anyone any medication?

21  A.  He might have -- I might have.  Yes, I believe I did, but

22  never knew exactly what it was.

23  Q.  What did you see?

24  A.  I just saw him give them medication, and I just assumed

25  that they needed it, so...

                         Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1                                                479

1   Q.  Do you recall whether Mr. McFadden took some of these kids

2   places?

3   A.  Yeah, he would take them places.  I remember him taking

4   them to like Bananas, movies, or other places.

5   Q.  What is Bananas?

6   A.  It's a fun park here in Junction.

7   Q.  Did you sometimes go on these fun trips?

8   A.  No.  I never went on those.

9   Q.  How come?

10  A.  I just never went.  Either just didn't want to go or

11  wasn't at the house when they were going.

12  Q.  Do you recall whether Mr. McFadden took some of the kids

13  on semi-truck trips with him?

14  A.  I do recall them talking about them, but I myself never

15  went on those.

16  Q.  Well, did you go often on any semi-truck trips?

17  A.  Yes, I went on one.

18  Q.  Which semi-truck trip did you go on?

19  A.  I went on the last one, the last one.

20  Q.  Let's talk about that trip.  About how old were you during

21  that trip?

22  A.  About 17, 18.

23  Q.  Do you recall where you were living at the time?

24  A.  I believe we were in Montrose.  Yeah, we were in Montrose.

25  Q.  And when you say we, were you living with your --

19-cr-00243-CMA-GPG-1                                         480

1   A.  My parents, K.W., S.J.W., L.We. were in Montrose.

2   Q.  How did you find out about this final semi-truck trip?

3   A.  My parents asked me about if I wanted to go.  That's how I

4   found out.  They just asked me if I wanted to go.

5   Q.  And what was your initial response?

6   A.  Initially I said no.  I said that I didn't find that it

7   would be fun.

8   Q.  And ultimately did you decide that you did want to go on

9   the trip?

10  A.  Yes.

11  Q.  Who else went on the trip?

12  A.  It was me, L.We., and K.W.

13  Q.  And Mr. McFadden?

14  A.  Yeah.

15  Q.  Do you recall how you linked up with Mr. McFadden to begin

16  the trip?

17  A.  I believe, if I recall, we met halfway I believe in Delta

18  in front of City Market -- or McDonald's.

19  Q.  When you say halfway, what do you mean?

20  A.  We were in Montrose, and I believe he was in Junction, so

21  we met half -- halfway for each individual.

22  Q.  Did he come and pick you up in the semi-truck?

23  A.  Yes.

24  Q.  After you linked up with Mr. McFadden, do you recall where

25  you went?

19-cr-00243-CMA-GPG-1                                               481

1    A.  I believe we were headed towards Idaho, so we passed

2    through Utah.

3    Q.  And is there something in particular that makes you

4    remember that you were headed to Idaho?

5    A.  Yes.  I made a joke about Idaho potatoes.

6    Q.  Do you recall where you went after picking up Idaho

7    potatoes?

8    A.  I want to say Kansas.  I don't remember where it ended,

9    but yes.

10   Q.  So you -- do you recall -- sitting here today, do you

11   recall where you went on that trip after Idaho?

12   A.  Yes, I recall where.  I just didn't remember exactly the

13   state off the top of my head.

14   Q.  So you remember going somewhere after Idaho, but you don't

15   remember what state you went to?

16   A.  Nebraska.  I remembered.

17   Q.  You remember it was Nebraska?

18   A.  Yeah, Nebraska.  Took a bit.  Sorry.

19        MS. SURRATT:  May we please publish Government

20   Exhibit 227?

21        THE COURT:  Yes, you may.

22   Q.  (By MS. SURRATT) And so, Mr. W/////////, you stated a

23   moment ago that you believe you left from Colorado and went

24   into Utah; is that right?

25   A.  Yes, around the Salt Lake-ish area.

                         Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1                                              482

1    Q.  And then from Salt Lake City you headed up into Idaho to

2    pick up potatoes?

3    A.  Yes.

4    Q.  And then you made your way back towards the east and ended

5    up in Nebraska?

6    A.  Yes.

7    Q.  Sitting here today, do you remember the exact route that

8    you took?

9    A.  No.  I just remember passing through Salt Lake, or passing

10   by Salt Lake.

11   Q.  Did you spend any nights on that trip?

12   A.  Yes.

13   Q.  Where did you sleep during the night?

14   A.  I slept between the -- on the seats.  So basically my feet

15   were on the driver seat, and my head was on the passenger seat

16   of the semi.

17          MS. SURRATT:  Can we please publish what's in

18   evidence as Government Exhibit 2-9?

19          THE COURT:  You may.

20   Q.  (By MS. SURRATT) Are these the seats that you were just

21   describing?

22   A.  Yes.

23   Q.  Are you a light sleeper or a deep sleeper?

24   A.  I am a deep sleeper once I fall asleep, but then when the

25   light starts to shine, then I wake up to almost anything.

                        Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1                                              483

1   Q.  Where did the rest of the individuals who were on that

2   trip, that is Mr. McFadden and your brothers K.W. and L.We.,

3   sleep that night?

4   A.  In the sleeper -- in the sleeper part of the semi on the

5   bed.

6           MS. SURRATT:  May we please display what's in

7   evidence as Government Exhibit 2-7?

8           THE COURT:  You may.

9   Q.  (By MS. SURRATT) Is this the sleeper compartment?

10  A.  Yes.

11  Q.  During that night do you recall if you woke up at all?

12  A.  No, I did not.

13  Q.  When did you learn that something was wrong?

14  A.  When we were in Nebraska and I was handed the phone by

15  Mr. McFadden that my stepmom wanted to talk to me.

16  Q.  Who's your stepmom?

17  A.  Stacy W//////////.

18  Q.  And what did Stacy -- did Stacy tell you that a police

19  officer was looking for Mr. McFadden?

20  A.  Yes.  I was informed that a police officer was looking for

21  either the semi or myself or Mr. McFadden, and yes.

22  Q.  What were you asked to do to assist?

23  A.  To get the license plate of the semi, and then once I got

24  it, the next time I would contact my parents I would relay the

25  information to them.

                    Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1                                                          484

1   Q.   And did you, in fact, do that?

2   A.   I went to retrieve the license plate, but I didn't get to

3   it because I saw the officer driving through the truck stop

4   before I could get it.

5   Q.   And when you saw the police officer, what did you do?

6   A.   I walked -- I approached the officer, and he asked me if

7   my name was S.W. Jr.  I said yes.  And then he asked me what

8   semi it was, and I told him the green one running, and then I

9   walked back to the semi.

10  Q.   What happened after that?

11  A.   Shortly after that the police officer pulled up in front

12  of the semi and then arrested Mike.

13  Q.   Arrested Mr. McFadden?

14  A.   Yes.

15  Q.   Where did you and your brothers stay that night after

16  Mr. McFadden was arrested?

17  A.   At the truck stop.

18  Q.   And what did you do for dinner that night?

19  A.   Subway.

20  Q.   How did you get Subway sandwiches?

21  A.   My grandma called in and paid for it over the phone with

22  her credit card.

23  Q.   After you learned what was going on, did you tell either

24  of your brothers as far as --

25  A.   No, I did not.  I did not tell them anything.

Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1                                                485

 1   Q.  How did you ultimately get home from Nebraska?

 2   A.  We were picked up by Stacy, Mike Eggers, who was a family

 3   friend, and I believe Ray Fluke came with.

 4   Q.  And how did you get home, by car?

 5   A.  Yeah, by car.

 6   Q.  Do you remember what anyone talked about in the car on the

 7   way home?

 8   A.  To be honest, no, I do not remember any of those

 9   conversations.

10        MS. SURRATT:  One moment, please, Your Honor.

11   Q.  (By MS. SURRATT) One final question, Mr. W////////////.  Did

12   you have any idea that your brother K.W. was being abused?

13   A.  No, I had none.

14   Q.  Did he ever talk to you about it?

15   A.  No.

16        MS. SURRATT:  No further questions.

17        THE COURT:  Cross-examination.

18                    CROSS-EXAMINATION

19   BY MR. MCDERMOTT:

20   Q.  Good afternoon, Mr. W////////////.

21   A.  Good afternoon.

22   Q.  So after the police came you stayed with your brothers; is

23   that right?

24   A.  Correct.

25   Q.  And you went and you had Subway for dinner?

                        Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1                                              486

1   A.  Yes.

2   Q.  And you also, to pass the time, hung out in the truck and

3   played video games or games, right?

4   A.  Yes.

5   Q.  And did you watch movies in the truck?

6   A.  Probably, yes.

7   Q.  Okay.  And were you talking with your brothers L.We. and

8   K.W.?

9   A.  Yeah.  We were talking and just having fun watching

10  movies, playing video games.

11  Q.  What were you talking about?

12  A.  To be honest, off the top of my head I can't remember, but

13  probably about video games or probably about the movies.

14  Q.  Video games and movies.  What kind of video games?

15  A.  I believe it was probably Gears of War.  Sounds like that

16  was what was with the Xbox at the time.

17  Q.  How about the movies?

18  A.  I --

19  Q.  Don't recall?

20  A.  No.  I don't recall.

21  Q.  It's been a long time?

22  A.  Yes, it has.

23  Q.  Okay.  So when did you next see your stepmom Stacy?

24  A.  That would be the next morning.

25  Q.  The next morning?

19-cr-00243-CMA-GPG-1                                                487

1   A.  It was -- yes.

2   Q.  Okay.

3   A.  I distinctly remember the morning because we had to -- we

4   went to Denny's in the morning, yes.

5   Q.  Okay.  Did you drive back with everyone to Colorado?

6   A.  Yes.

7   Q.  Do you recall what was discussed on the way back?

8   A.  I do not.  I believe I actually might have slept.

9   Q.  Might have slept then?

10  A.  Yeah.

11  Q.  Okay.

12          MR. MCDERMOTT:  Can we please display 2-8.

13          THE COURT:  You may.

14  Q.  (By MR. MCDERMOTT) Okay.  And, Mr. W////////////, this is the

15  cab, and just so I'm clear, is this -- if you had turned

16  around in the truck, is this the vantage point you would have?

17  A.  Yes.

18  Q.  Okay.

19          MR. MCDERMOTT:  And can we please see 2-6.

20          THE COURT:  You may.

21  Q.  (By MR. MCDERMOTT) And, Mr. W////////////, just so we can get

22  a complete picture of where you were that evening, how were

23  you situated with those two seats?

24  A.  So the lighter seat would have been the passenger seat,

25  and my head was on that seat, and my feet would be on the

                    Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1                                                    488

1    darker seat.

2    Q.   Okay.

3    A.   Laid across.

4    Q.   Okay.

5    A.   Very uncomfortably.

6    Q.   Okay.  That doesn't sound very comfortable.  How were you

7    able to sleep like that?

8    A.   I guess I was just tired.

9    Q.   Okay.  And the other people who were in the truck, they

10   slept there right behind you?

11   A.   Yes.

12   Q.   Okay.  And you didn't hear anything that night?

13   A.   No, I heard nothing.

14   Q.   Okay.  Thank you.

15          THE COURT:  Any redirect?

16          MS. SURRATT:  No, Your Honor.

17          THE COURT:  Thank you very much, sir.  You may step

18   down.

19          The Government may call its next witness.

20          MR. CHAFFIN:  Thank you, Your Honor.  The Government

21   calls John Stadler.

22          THE COURTROOM DEPUTY:  Please raise your right hand.

23                        JOHN STADLER

24   was called as a witness and, having been duly sworn, was

25   examined and testified as follows:

                        Sarah K. Mitchell, RPR, CRR

1          THE COURTROOM DEPUTY:  Thank you.  Please be seated,

2  and please state your name and spell your first and last name

3  for the record.

4          THE WITNESS:  John Stadler, J-o-h-n S-t-a-d-l-e-r.

5          THE COURT:  You may proceed.

6          MR. CHAFFIN:  Thank you, Your Honor.

7                        DIRECT EXAMINATION

8  BY MR. CHAFFIN:

9  Q.  Good afternoon, sir.  Could you explain to the jury where

10  you work?

11  A.  I currently work for the Lincoln County Sheriff's Office

12  in North Platte, Nebraska.

13  Q.  How long have you worked for the Lincoln County Sheriff's

14  Office?

15  A.  For just over two years, but prior to that I was with the

16  North Platte Police Department in North Platte, Nebraska.

17  Q.  How long have you been in law enforcement?

18  A.  Since December of 2002.

19  Q.  So just about 20 years?

20  A.  Yes.

21  Q.  What agency were you working for in 2013?

22  A.  I was working for the North Platte Police Department in

23  North Platte, Nebraska.

24  Q.  I want to turn your attention to January 3rd of 2013.

25  Were you working that day?

19-cr-00243-CMA-GPG-1                                                490

1    A.  I was.

2    Q.  At about 8:00 p.m. did you receive a call for service

3    related to a person named Michael McFadden?

4    A.  I did.

5    Q.  Do you see that person in the courtroom today?

6    A.  Yes.  He's in a gray suit at the defense table.

7            MR. CHAFFIN:  Your Honor, I'd ask that the record

8    reflect that the witness has identified the defendant.

9            THE COURT:  It will so reflect.

10   Q.  (By MR. CHAFFIN) The call that you received, was that in

11   relation to an arrest warrant for Mr. McFadden?

12   A.  It was, yes.

13   Q.  Were you provided a location where you might be able to

14   find him?

15   A.  I was told that a detective with the Grand Junction Police

16   Department had called advising that he had an arrest warrant

17   for a gentleman who was currently at the Love's Travel Center

18   in North Platte, Nebraska, and so I proceeded to go to Love's,

19   and while I was en route to Love's I called and spoke to a

20   detective with the Grand Junction Police Department.

21   Q.  And did you learn what you were looking for during that

22   call?

23   A.  Yes.  I was told that he would be in the Love's parking

24   lot and in the tractor portion would be a green Kenworth with

25   I believe it was Precision Construction on the side.

                        Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1                                        491

1    Q.  And when you arrived at the Love's travel stop, what did

2    you discover there?

3    A.  Well, I began driving through the parking lot looking for

4    the Kenworth, and I checked one road, didn't see it, and as I

5    was driving through I was flagged down by a young man.  I

6    believe his name was Scott.  And he came up to my patrol

7    vehicle and asked if I was looking for his uncle, Michael

8    McFadden, and asked if it was true that there was an arrest

9    warrant for him.  And evidently he had been also in contact

10   with the detective from Grand Junction, as well as his father.

11   Q.  So this young man Scott -- is that what you said?

12   A.  I believe it was.  I believe his name was Scott.

13   Q.  Approximately how old was Scott?

14   A.  He was 19.

15   Q.  So this young man flags you down?

16   A.  Yes.

17   Q.  Asks if you're looking for his uncle Mike?

18   A.  Yes.

19   Q.  What did you tell him?

20   A.  I told him I was, and I asked him if he would show me

21   where the semi tractor was parked because I needed to take his

22   uncle into custody on the warrant.

23   Q.  And did Scott direct you to where the truck was at?

24   A.  He did.  He -- not directly.  He asked me -- he didn't

25   want his uncle to know that he had showed me where the truck

Sarah K. Mitchell, RPR, CRR

1  was, so he asked if I would hang back, and he would walk to

2  the truck, and I would see where the truck is at that way.

3  And that way his uncle wouldn't know that he led him -- or

4  that he led me to the truck.

5  Q.  I see.  Eventually were you able to locate the truck?

6  A.  Yes.

7        MR. CHAFFIN:  Your Honor, can we publish Government's

8  Exhibit 2-1.

9        THE COURT:  You may.

10  Q.  (By MR. CHAFFIN) Sir, do you recognize that?

11  A.  I believe that's the truck.  It's been ten years, but I

12  believe that's the truck that was parked in the Love's Travel

13  Center.

14  Q.  And you mentioned earlier that it was a green Ken --

15  A.  Kenworth.

16  Q.  Kenworth with Precision Construction on the side?

17  A.  Yes.

18  Q.  Do you see that on this truck?

19  A.  I do.

20        MR. CHAFFIN:  We can take that down.

21  Q.  (By MR. CHAFFIN) When you approached this truck, who did

22  you see in the area?

23  A.  As I was approaching the truck, I saw Mr. McFadden also

24  walking to the truck, I assume from the truck stop, but I'm

25  not sure where he was coming from.  But he was also walking to

 1   the truck.  At the same time he was talking on a cell phone.

 2   And I asked him if his name was Michael, and he said that it

 3   was, and I advised him that there was a warrant for his arrest

 4   out of Grand Junction, Colorado, and that I needed to take him

 5   into custody.

 6   Q.  Who was with Mr. McFadden when you took him into custody?

 7   A.  He was in the truck traveling with -- and, like I say, all

 8   -- all three -- I assumed that they were siblings is what I

 9   was told.  It was Scott, who I believe at the time was 19.  I

10   believe one of the kids' names was L.We., and I can't remember

11   the third kid's name.  I know that one was 11 and one was

12   seven.

13   Q.  Did you write a report regarding this interaction?

14   A.  I did.

15   Q.  Did you document the name of the children in your report?

16   A.  I did.

17        MR. CHAFFIN:  If I could have just one moment, Your

18   Honor?

19        THE COURT:  You may.

20   Q.  (By MR. CHAFFIN) Would it refresh your recollection to

21   take a look at your report?

22   A.  Yes, it would.

23   Q.  Could you take a look at Government's Exhibits Volume II

24   of II.  There should be a binder I think on the chair next to

25   you.

1   A.   II of II, you said?

2   Q.   II of II.

3   A.   Okay.

4   Q.   Could you take a look at Exhibit 102.

5   A.   Yes.

6   Q.   Is that your report?

7   A.   It is.

8   Q.   Would you just review that, refresh your recollection, and

9   go ahead and close that up once your recollection is

10  refreshed.

11  A.   Sure.  The names that I collected from my report that

12  night were --

13  Q.   Go ahead and just read through it and remind yourself, and

14  then we'll talk.

15  A.   Sure.  Okay.

16  Q.   So you mentioned a Scott and a L.We.  What was the name of

17  the third child?

18  A.   K.W.

19  Q.   Do you recall the ages of the --

20  A.   K.W. was 11, and L.We. was seven.

21  Q.   Did you -- it sounds like you took Mr. McFadden into

22  custody?

23  A.   I did.

24  Q.   Did you transport him to a jail?

25  A.   Yes.  Before we left for the jail he asked if he could

19-cr-00243-CMA-GPG-1                                                495

1    make a few phone calls because he needed to make arrangements

2    for somebody to care for the truck, and so he ended up leaving

3    his cell phone with Scott.  He took out his wallet, took all

4    the paper money out of the wallet.  I don't know how much it

5    was.  Gave that to Scott in case the kids needed anything, and

6    then he left directions with Scott for what to tell the driver

7    that was coming to take care of his truck.  And then my

8    understanding was the kids were going to stay with the truck

9    and their father was going to be en route from Grand Junction

10   to pick the kids up.  So once he provided the kids with

11   everything they needed, then I placed him in handcuffs and

12   whatnot, and then I transported him to the Lincoln County

13   Detention Center.

14   Q.  The kids, where did they -- they remained at the truck?

15   A.  Yes.  Since Scott was 19 years old and an adult, I felt

16   comfortable knowing that he had been in contact with Detective

17   Prescott, as well as his father, and that they would be fine

18   for a few hours while family came to pick them up.

19   Q.  Did you periodically check on the kids throughout your

20   shift?

21   A.  Yes.  It was -- I work the nightshift, so it was night, so

22   I didn't actually go up and knock on the door and wake them

23   up, but I drove by several times throughout my shift to make

24   sure that everything seemed okay and nothing was -- they

25   weren't having any issues.

                        Sarah K. Mitchell, RPR, CRR

1    Q.  Did you attempt to interview the kids at all?

2    A.  No.  No, I never spoke to any of the kids other than what

     I spoke to Scott when he took me to the truck.

4    Q.  Did they tell you anything about what may or may not have

5    happened to them?

6    A.  No.

7    Q.  How did you get here today?

8    A.  I drove.

9    Q.  You drove from North Platte, Nebraska?

10   A.  I did.

11   Q.  About how long did it take you?

12   A.  I stopped.  I'm a big guy, so any time I drive by a big

13   and tall store I got to grab a couple shirts, so I stopped in

14   Denver and got a couple shirts and stopped for fuel, and

15   including that stop it took me nine hours to get here from

16   North Platte.

17          MR. CHAFFIN:  If I could have just one moment, Your

18   Honor.

19          THE COURT:  You may.

20          MR. CHAFFIN:  Nothing further.

21          THE COURT:  All right.  Cross-examination.

22                      CROSS-EXAMINATION

23   BY MR. MCDERMOTT:

24   Q.  Good afternoon, Officer.

25   A.  Good afternoon.

1   Q.  So my understanding is you went back periodically and just

2   checked on the three --

3   A.  Yes.

4   Q.  -- I want to say kids, but one of them was a young adult.

5   A.  Yes.  Like I say, I didn't speak to them or anything.  I

6   just drove by, and I told them if they needed anything to call

7   the police department or call 911 and I would go out and check

8   on them, but I didn't actually go up and knock on the door,

9   but I drove by the truck to make sure everything looked good

10  and there weren't any issues.

11  Q.  You were aware they had electronic games and things like

12  that?

13  A.  Yes.  Mr. McFadden left his cell phone, and they had that.

14  And I can't remember what they had, whether it was a tablet or

15  something, but they basically had something to entertain them

16  for a few hours while they were waiting for their dad.

17  Q.  And I know it was a long time ago.  Approximately how many

18  times do you think you went and just checked on them to make

19  sure they were okay?

20  A.  You know, I'm not sure.  Probably three or four times.  I

21  would just drive by and make sure everything was okay.  I

22  worked 6:00 a.m. -- or 6:00 p.m. to 6:00 a.m. at the time, so

23  it'd just depend on how busy we were.

24  Q.  Okay.  And did you -- were you able to visually see them

25  each time you went by?

Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1                                               498

 1   A.  No.  I just saw the truck.

 2   Q.  Okay.  All right.  Thank you.

 3   A.  You're welcome.

 4          THE COURT:  Any redirect?

 5          MR. CHAFFIN:  No, Your Honor.

 6          THE COURT:  Thank you very much, sir.  You may step

 7   down.

 8          THE WITNESS:  Thank you.

 9          THE COURT:  The Government may call its next witness.

10          MS. SURRATT:  The Government calls Ed Prescott.

11          THE COURTROOM DEPUTY:  Mr. Prescott, please raise

12   your right hand.

13                        EDWARD PRESCOTT

14   was called as a witness and, having been duly sworn, was

15   examined and testified as follows:

16          THE COURTROOM DEPUTY:  Thank you.  Please be seated.

17   And then please state your name and spell your first and last

18   name for the record.

19          THE WITNESS:  My name is Edward Prescott.  It's

20   E-d-w-a-r-d, last is Prescott, P-r-e-s-c-o-t-t.

21                      DIRECT EXAMINATION

22   BY MS. SURRATT:

23   Q.  Sir, could you tell the jury where you're currently

24   employed?

25   A.  I'm currently employed with the Grand Junction Police

                   Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1                                        499

1   Department.

2   Q.  What do you currently do at the Grand Junction Police

3   Department?

4   A.  I'm a civilian investigator.  I handle the registration of

5   the sex offenders and all the data entry for that.  I also

6   handle the runaways and missing persons for the police

7   department.

8   Q.  For how long have you been a civilian investigator at the

9   Grand Junction Police Department?

10  A.  Two years.

11  Q.  Were you employed at the Grand Junction Police Department

12  before that?

13  A.  I was.

14  Q.  What did you do?

15  A.  I was initially as a patrol officer when I first was hired

16  on in 1994, and in 2001 I transferred over to investigations

17  and was an investigator.  I started out in property crimes

18  until 2010, and then I moved to persons crimes after that.

19  Q.  And you said starting in 2010 you were moved to persons

20  crimes.  What is that?

21  A.  We investigate any crimes against persons involved;

22  robbery, assaults, homicide, sex assault, rape, that type of

23  thing.  Assaults on children.

24  Q.  What was your title when you were in the crimes against

25  persons unit?

Sarah K. Mitchell, RPR, CRR

1   A.   Investigator.

2   Q.   Were you also a detective?

3   A.   Yes.

4   Q.   Other than your roles in the Grand Junction Police

5   Department, have you held any other law enforcement positions?

6   A.   Prior to the Grand Junction Police Department I worked six

7   and a half years for the city of Ontario, California, as a

8   patrol officer.

9   Q.   What are your duties and responsibility as an investigator

10  or a detective?

11  A.   We are assigned crimes by our sergeant.  We're responsible

12  to investigate those crimes, compile witnesses, evidence, take

13  statements, and look for who was responsible for that, and

14  eventually establish a case to present to the district

15  attorney's office so they can prosecute the case.

16  Q.   Do you have any training specifically in the area of

17  investigating sexual assault crimes?

18  A.   I do.

19  Q.   What kind of training?

20  A.   In investigations normally the first part of

21  investigations -- I went to schools for general homicide

22  investigation school, which included different types of

23  assault, rape, that type of thing.  In 2010 I attended classes

24  -- a class for specifically investigating sex assault and

25  abuse on child interviews.  I also attended classes on child

 1   homicide, so there's a whole gamut.

 2   Q.   You mentioned interviews.  Are there any particular types

 3   of interviews on which you've received specific training?

 4   A.   When you are interviewing children, there's a training

 5   specifically for that.  It's called a forensic interview.

 6   Normal officers working in the street do not conduct

 7   interviews with children, anywhere from 3 to 18, or 17

 8   actually.  They would leave it to us investigators to conduct

 9   those interviews.

10   Q.   What is a forensic interview?

11   A.   When you're interviewing a child, you do not want to

12   introduce any information to them.  You want to pull

13   information from them.  You don't lead them in an interview.

14   You allow them to either complete a narrative of the incident

15   they witnessed or were a victim of, and if they can't complete

16   a detailed narrative, then you would ask questions to elicit

17   information from them without leading or directing them.

18   There's a range of different type of questions you would ask.

19   You're trying to ask a free recall question where they would

20   -- you would ask the question in a manner that would elicit

21   them to give you clear information about what happened.  Maybe

22   a multiple-choice question where you would give them more than

23   one option.  Most of the time it would be three options to

24   choose from knowing that one of those options was likely the

25   correct answer.  Yes-or-no question.  But in all of that you

19-cr-00243-CMA-GPG-1                                              502

 1    don't want to lead the child.  An example, You saw this person

 2    do that, didn't you?  In other words, I'm giving them

 3    information in my question, and you don't want to do that.

 4    Q.  And why conduct a forensic interview as opposed to some

 5    other type of interview when dealing with children?

 6    A.  It's important for this, court purposes, to have a clear

 7    and honest answer from the children, an honest account from

 8    them that is the truth.  You establish early on in the first

 9    meeting with the child their abilities, their ability to

10    communicate, their recognition of the truth versus a lie,

11    what's not the truth, reality versus what's not real.  There's

12    some ground rules that you want to introduce to them.  You

13    want them to be able to correct you if you make a mistake.  As

14    a child they have -- sometimes kids are told don't correct an

15    adult.  Well, they need to be free to correct you.  They need

16    to know that if you ask them a question twice it's not because

17    you got a -- they gave you a wrong answer or anything.  It's

18    just you're clarifying what they're telling you.

19    Q.  Approximately how many forensic interviews did you conduct

20    in your career?

21    A.  I have documented 180.

22    Q.  Of those 180 approximately, how many were interviews of

23    children?

24    A.  All of those are interviews of children.

25    Q.  When you do forensic interviews of children, do you

1    endeavor to record those interviews?

2    A.   They are.  They are either video recorded or audio.  We

3    try to video record all of the interviews, but there are

4    instances where that's not possible or where the choice of

5    location, it's an audio recording.

6    Q.   When you were a detective in the Grand Junction Police

7    Department, were you the lead investigator in a case involving

8    someone named Michael McFadden?

9    A.   I was.

10   Q.   Approximately when was this?

11   A.   2012.  Actually, December 15th the case started in 2012.

12   Q.   What does it mean to be a lead investigator?

13   A.   The case is on your shoulders.  The process of the

14   investigation is your responsibility.  You may direct other

15   officers who are helping you in some cases, such as a homicide

16   case, you may have the whole investigative unit working on it

17   at first, but then when it funnels down it will eventually

18   come just to you.  You are responsible for making sure all the

19   evidence is collected.  You're responsible for the witnesses

20   and making sure that all the witnesses are contacted, the

21   victims are contacted and interviewed correctly, that you have

22   the statements, that you prepare the case for the DA's office,

23   and that you're ready to take the stand when it comes to trial

24   to stand behind what you've done.

25   Q.   Do you see Mr. McFadden in the courtroom here today?

 1   A.  I do.

 2   Q.  Can you identify him by an article of clothing that he's

 3   wearing?

 4   A.  He's seated to my left.  He's wearing a gray jacket with

 5   kind of a lighter gray shirt.

 6          MS. SURRATT:  Your Honor, may the record please

 7   reflect that the witness has identified the defendant.

 8          THE COURT:  It will so reflect.

 9   Q.  (By MS. SURRATT) After you were assigned the investigation

10   involving Mr. McFadden, did you conduct some interviews?

11   A.  I did.

12   Q.  Did you interview some children?

13   A.  I did.

14   Q.  Did you also interview some adults?

15   A.  I did.

16   Q.  On or about January 3rd, 2013, based on your investigation

17   to date, did you get an arrest warrant for Mr. McFadden?

18   A.  Yes, I did.

19   Q.  After you had the arrest warrant, what did you do?

20   A.  Armed with the arrest warrant I had information that a

21   family named W////////// may have information on him.  I

22   called them.  They advised that their kids were with him on a

23   semi trip and were currently in North Platte, Nebraska.  I

24   called the North Platte Police Department.  I talked with

25   them, advised there was an active warrant for him, and

1    requested they pick him up at the truck stop where the

2    W/////////// kids said they were currently at.

3    Q.  And what happened after that?

4    A.  I was called a short time later by Officer Stadler from

5    North Platte, and he said that he had him in custody, that the

6    kids were going to stay with the truck, and that the parents

7    were going to retrieve the kids.

8    Q.  Did you have an opportunity to take photographs of the

9    truck in which Mr. McFadden was arrested in 2013?

10   A.  I did.

11   Q.  And do you recall what date it was that Mr. McFadden was

12   arrested?

13   A.  January 3rd, 2013.

14   Q.  January 3rd, 2013?

15   A.  Yes.

16         MS. SURRATT:  Can we please display what is in

17   evidence as Government's Exhibit 2-1?

18         THE COURT:  You may.

19   Q.  (By MS. SURRATT) Detective Prescott, what is that?

20   A.  This is a green semi-truck that I took a picture of.  It's

21   a Kenworth with a sleeper attached.  It says Precision

22   Construction on the door.

23   Q.  Do you remember approximately when you took these

24   photographs?

25   A.  I believe it was in March of that same year.  I'm not

1   positive on that.

2   Q.  Of 2013?

3   A.  Yes.

4   Q.  How did you get access to the truck?

5   A.  Darren Davidson is a name that I knew, I was familiar with

6   in the process of this investigation.  I knew that that was

7   the truck.  I called him, and he gave me permission -- he told

8   me where the truck was, who the driver was with the truck, and

9   gave me permission to go take pictures of it.  Meet the driver

10  at the place where the truck was and take pictures of it.

11          MS. SURRATT:  And can we please flip to Government

12  Exhibit 2-2 also in evidence.

13          THE COURT:  You may.

14  Q.  (By MS. SURRATT) Did you take this picture as well?

15  A.  I did.

16          MS. SURRATT:  And can we flip to 2-3.

17  Q.  (By MS. SURRATT) Did you take this photo?

18  A.  I did.

19  Q.  2-4, take this photo?

20  A.  I did.

21  Q.  2-5, take this photo?

22  A.  I did.

23          MS. SURRATT:  And, Mr. Graber, could you zoom in on

24  that little calendar in front of the steering wheel.

25  Q.  (By MS. SURRATT) Can you see what month is flipped to on

19-cr-00243-CMA-GPG-1                                          507

1    that calendar?

2    A.   April 2013.

3    Q.   Does that refresh your recollection as to when you may

4    have taken these photos?

5    A.   I don't know the exact date, but it probably was in April.

6    Q.   In spring of 2013?

7    A.   Yes.

8          MS. SURRATT:   Mr. Graber, can you please flip to the

9    next one, which I think is now 2-6.

10   Q.   (By MS. SURRATT) Is this the inside of that same truck?

11   A.   It is.

12   Q.   And 2-7, please.   Is that another view of the inside of

13   the truck?

14   A.   It is.

15   Q.   And 2-8.   And finally 2-9.   Detective, did you climb into

16   the truck to take these pictures?

17   A.   I did.

18   Q.   After Mr. McFadden's arrest in Nebraska, did your

19   investigation continue?

20   A.   It did.

21          MS. SURRATT:   And, Mr. Graber, you can take that

22   photo down.

23   Q.   (By MS. SURRATT) As part of your investigation, did you

24   interview a child named K.W.?

25   A.   I did.

                        Sarah K. Mitchell, RPR, CRR

1 Q. Why did you interview K.W.?

2 A. He had made statements to his parents that there was -- he

3 was sexually or had been contacted sexually by Michael

4 McFadden.

5 Q. Where did you interview K.W.?

6 A. The Dolphin House in -- I'm sorry, in Montrose.

7 Q. What is the Dolphin House?

8 A. Each county has what we call a children's center where

9 children can go -- we can go take the children to be

10 interviewed.  They have a support staff that will support the

11 kids through the court process.  They also have counselors

12 that work with them.  Our center here in Grand Junction has a

13 room where a SANE nurse can do examinations, a sexual assault

14 nurse can do examinations on the kids.  So that's the Dolphin

15 House, and in Montrose it's actually a house that's fixed up

16 for this type of a center.

17 Q. Was your interview with K.W. a forensic interview like you

18 described earlier?

19 A. It was.

20 Q. Was it recorded?

21 A. It was video recorded.

22 Q. Was that on January 16, 2013?

23 A. That is correct.

24 Q. During that interview did K.W. disclose to you that he had

25 been sexually abused by Mr. McFadden?

19-cr-00243-CMA-GPG-1                                                    509

1    A.  He did.

2    Q.  As part of your investigation did you also speak with a

3    boy named J.W.?

4    A.  I did.

5    Q.  Before you interviewed J.W., were you aware that he had

6    already been interviewed by others?

7    A.  I was.

8    Q.  Did one of those interviews happen in 2008?

9    A.  It did.

10   Q.  What is your understanding of whether or not J.W. made any

11   disclosures in 2008?

12   A.  He did not make a disclosure.

13   Q.  Was J.W. also interviewed by someone named Nicole Surad

14   before you interviewed him?

15   A.  He was.

16   Q.  And do you have an understanding of whether J.W. made any

17   disclosures to Ms. Surad?

18   A.  He did not make a disclosure to Ms. Surad.

19   Q.  And then did you interview J.W. on December 21, 2012?

20   A.  No.  That's when Ms. Surad --

21   Q.  Oh, Ms. Surad.  I apologize, Detective.  Thank you.  Did

22   you interview J.W. on approximately February 7, 2013?

23   A.  I did.

24   Q.  How did that interview come to be?

25   A.  We attempted to contact -- or I actually contacted

Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1                                          510

1   Michelle, his mother, on a couple different occasions.  We set

2   up interviews.  She was not able to make those interviews, so

3   I ended up arranging to meet them up in Glade Park at her

4   parents' house.  Her parents -- Theresa is her mom.  And that

5   worked out for her, worked out for us, so myself and a fellow

6   investigator met her, Michelle, and J.W. at the residence

7   there and conducted an audio-recorded interview.

8   Q.  During your interview with J.W. did he disclose to you

9   that Mr. McFadden had sexually abused him?

10  A.  He did.

11  Q.  Backing up one step, Detective, who is Nicole Surad?

12  A.  Nicole worked for Department of Human Services for child

13  protective services.  At that time she worked for child

14  protective services.

15  Q.  During your investigation did you become familiar with the

16  various places that Mr. McFadden lived in Grand Junction?

17  A.  I did.

18  Q.  What is the first house that you know of Mr. McFadden

19  living in in approximately 2008?

20  A.  In 2008 he lived at 2332 Monument Road here in Grand

21  Junction.

22  Q.  And is that a house near the base of the Colorado National

23  Monument?

24  A.  It is.

25  Q.  From your investigation are you aware of where

                    Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1                                         511

1   Mr. McFadden moved next?

2   A.  I'm not sure if it was next, but I know he moved shortly

3   thereafter to 476 Glen Road here in Grand Junction.

4           MS. SURRATT:  Your Honor, may we please publish

5   what's in evidence as Government Exhibit 3-1?

6           THE COURT:  You may.

7   Q.  (By MS. SURRATT) Detective, do you recognize this house?

8   A.  I do.

9   Q.  What is that?

10  A.  It's the residence on the corner of Glen Road and Gunnison

11  here in the city of Grand Junction.

12  Q.  And is this the house that you just described that you

13  became aware from your investigation where Mr. McFadden lived?

14  A.  Correct.

15  Q.  Did you take this photo?

16  A.  I did.

17  Q.  Do you remember approximately when?

18  A.  I actually can't tell you that.  I know it was in 2013, I

19  believe, but I can't tell you the date of the photo.

20  Q.  Sometime in 2013?

21  A.  Right.  I'd have to refer to my notes on that.

22  Q.  That's -- 2013 is I think close enough.

23  A.  Okay.

24          MS. SURRATT:  Your Honor, may we please publish

25  what's in evidence as Government Exhibit 3-5.

                        Sarah K. Mitchell, RPR, CRR

 1              THE COURT:  You may.

 2    Q.  (By MS. SURRATT) Do you recognize this, Detective?

 3    A.  I do.

 4    Q.  What is this?

 5    A.  This is taken off our Grand Junction city maps page.  You

 6    can go to maps and focus on a certain area within the city,

 7    and it's the corner of Glen Road and Gunnison, 28 Road, 28 1/2

 8    Road splits in the middle there.

 9    Q.  Is that your handwriting on the top of the page?

10    A.  It is.

11    Q.  Stating 476 Glen Road?

12    A.  That is correct.

13    Q.  And which of these homes is 476 Glen Road?

14    A.  It would be on the southwest -- I'm sorry -- yeah,

15    southwest corner -- or actually it would be the northeast

16    corner of that intersection.  If I could point it out?

17    Q.  Yes, please.

18    A.  It's right here.

19    Q.  And, for the record, Detective, were you pointing to the

20    lower left structure in the group of four structures in the

21    very middle of that page?

22    A.  That's correct.

23    Q.  And is that the house where you understood Mr. McFadden to

24    have lived?

25    A.  It is.

19-cr-00243-CMA-GPG-1                                                    513

1   Q.  Approximately when did Mr. McFadden live at that house?

2   A.  2008 to about 2011, I believe it was.  Hold on just a

3   minute.  2008, 2009 area.

4   Q.  Are you aware of another house where Mr. McFadden lived

5   next?

6   A.  I am.

7   Q.  And what house is that?

8   A.  On 2980 D 1/2 Road here in Grand Junction.

9   Q.  At approximately when did Mr. McFadden live at 2980 D 1/2

10  Road?

11  A.  Sometime after -- he moved from there -- from the Glen

12  Road address to that residence 2009 to 2012.

13          MS. SURRATT:  Your Honor, may we please publish

14  what's in evidence as Government Exhibit 4-1?

15          THE COURT:  You may.

16  A.  I will correct myself on that.  It's 2008 -- during 2008

17  he actually had moved to that residence.  I had documentation

18  to that effect.

19  Q.  (By MS. SURRATT) Looking, Detective, at Government

20  Exhibit 4-1, do you recognize this photo?

21  A.  I do.

22  Q.  Did you print this?

23  A.  I did.

24  Q.  And what is this?

25  A.  It's a photo of that residence at 2980 D 1/2 Road.  It's

1   looking from the south from D 1/2 looking north.

2   Q.  And is this as far as you understand approximately what

3   the house on D 1/2 Road looked like when Mr. McFadden lived

4   there?

5   A.  Mostly still does, yes.

6   Q.  To this day still does?

7   A.  Yes.

8        MS. SURRATT:  Your Honor, may we please publish

9   what's in evidence as Government Exhibit 4-4.

10        THE COURT:  You may.

11  Q.  (By MS. SURRATT) Do you recognize this, Detective?

12  A.  I do.

13  Q.  What is this?

14  A.  This is an overview of that same residence, an aerial

15  shot, again, from city maps looking down.  That 2980 is the

16  house that's actually in the center, the long structure in the

17  center of the picture there.

18  Q.  And whose handwriting appears on this exhibit?

19  A.  That is my handwriting.

20  Q.  You've pointed out 2980 D 1/2 Road.  Is there another

21  address indicated on this exhibit?

22  A.  There is.  I don't know the address -- specific address to

23  the house that would be on the left of that, but there is two

24  structures to the right of that.  The structure to the

25  furthest right was 2990 D 1/2 Road.

                        Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1                                          515

1    Q.  From your investigation are you familiar with who lived at

2    2990 D 1/2 Road around the timeframe that we've been talking

3    about?

4    A.  I am.

5    Q.  And who is that?

6    A.  The W//////////////.

7    Q.  The W///////////// family?

8    A.  Yes.

9    Q.  Who were the husband and wife in the W///////////// family?

10   A.  Stacy and Scott Sr. W/////////////.

11   Q.  And are you aware of whether they had any children?

12   A.  They did.

13   Q.  And who are the W/////////////'s children?

14   A.  S.W. Jr. was their oldest son.  He was 18 at the time I

15   started this investigation.  K.W. was their next son down.  He

16   was 11.  Then L.We., they call him L.We. Jr.  He was I believe

17   8 -- 8 or 9 when I started this investigation.  And then they

18   had S.J.W.

19          MS. SURRATT:  And, Your Honor, may we please publish

20   what's in evidence as Government Exhibit 4-2?

21          THE COURT:  You may.

22   Q.  (By MS. SURRATT) Detective, do you recognize this?

23   A.  I do.

24   Q.  What is it?

25   A.  That is a picture of that structure at 2990 D 1/2 Road.

                    Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1                                              516

1   Q.  Is that the house in which you just described the

2   W///////// family residing?

3   A.  It is.

4          MS. SURRATT:  And, finally, can we please display

5   Government Exhibit 4-3?

6          THE COURT:  You may.

7   Q.  (By MS. SURRATT) Is that another view of the same

8   structure, Detective?

9   A.  It is.

10         MS. SURRATT:  No further questions, Your Honor.

11         THE COURT:  All right.  Cross-examination.

12                        CROSS-EXAMINATION

13  BY MR. MCDERMOTT:

14  Q.  Detective, you talked about forensic interviews and some

15  of the things that go into that.  Can you just review that for

16  us, please, what a forensic interview is and proper ways of

17  obtaining information.

18  A.  Okay.  Normally a forensic interview is conducted at the

19  centers for children, children's advocacy centers.  They're

20  video recorded, as I said before.  Part of the questioning

21  process, the initial process you do a rapport building time

22  with the kids.  It starts out you meet the kids somewhere

23  somehow.  Most times it's at the center.  You spend some time

24  getting to know them.  They're complete strangers to you,

25  you're a complete stranger to them, so to expect them to right

19-cr-00243-CMA-GPG-1                                              517

1    off the bat to talk openly to you is not very fair to them.

2           After spending some time building a rapport with them

3    of some sort -- in that actually you would just let them talk

4    about things that interest them, maybe movies, characters in

5    movies, toys they play with, what they do at school, that type

6    of thing.  Then you can go -- at that time per my training you

7    go into an anatomy ID where you want to make sure they know

8    what body parts are what.  Name the hand, the nose, the feet,

9    chest, breast, whatever names they would call their private

10   parts so that you know what you're talking about.

11          Then you'd want to go into what they call touch

12   scenario and try to have them describe what happened to them

13   and where it happened, how it happened, as much as possibly

14   they can through a narrative interview.  Granted you get some

15   kids that are very young.  A 3- to 5-year-old may not be able

16   to provide a narrative to you depending on their ability to

17   communicate.  So then you would go into asking the various

18   type of questions.  Again, not leading them at all.  Trying to

19   get information from them as best as you possibly can and

20   allow them to give you the account as best they can.

21          Once they give you an account, you go back into some

22   focused questioning on specific issues that you have and you

23   want them to expand on that they may totally skip over or just

24   give you a one-word description of something where you need to

25   build and expand on that, so you would go into focused

                         Sarah K. Mitchell, RPR, CRR

1  questioning on that.  And then close it out, just talk to them

2  about some other issue that they may be involved in or their

3  family is involved in just to bring them back down, and then

4  end -- I'm sorry -- end the interview at that point.

5  Q.  And you indicated that you don't want to lead them in an

6  interview.  How come you don't want to lead a child in an

7  interview?

8  A.  Because you introduce assumptions that you may have.  You

9  also introduce information to the child that they may not

10  know.  You want to be very careful not to interject your idea

11  into what they are thinking but have them express their

12  thoughts to you.

13  Q.  Is there a concern to avoid what's called suggestibility

14  in a child interview?

15  A.  Correct.

16  Q.  And why is it important to avoid suggestibility in a child

17  interview?

18  A.  Again, if you're describing to them what happened or a

19  person or a certain place or something, that's not their

20  information, that's your information.  You want them to

21  describe what's happened so that you have a true, honest

22  picture of what happened from them, not from you.

23  Q.  And the reason you want it from them and not from you is

24  you don't want to influence what they say; is that correct?

25  A.  That is very correct.

Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1                                                    519

1   Q.  And part of the concern about influencing what a child

2   says is they might pick up on that and give incorrect or false

3   information?

4   A.  That is true.

5   Q.  And obviously as a law enforcement officer and somebody

6   who wants to get to the truth, you want to avoid that at all

7   costs, right?

8   A.  At all costs, yes.

9   Q.  Okay.  You interviewed L.We., and the date of that

10  interview was January 16th; is that right?

11  A.  Could you --

12  Q.  L.We., the first forensic interview you had with him was

13  January 16th of 2013?

14          THE COURT:  I think you have the wrong name.

15          MR. MCDERMOTT:  Did I misspeak again?

16          THE COURT:  Yes.

17  Q.  (By MR. MCDERMOTT) I completely apologize.  I'm sorry.

18  K.W. is who I'm referring to.  January 16th of 2013.  That was

19  your first interview of him, correct?

20  A.  That is correct.

21  Q.  Okay.  And you had talked to his mom I believe it was on

22  January 3rd about Mr. McFadden and his pending arrest in

23  Nebraska; is that right?

24  A.  That is correct.

25  Q.  Okay.  And we watched a video earlier today, and you asked

Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1                                        520

1   -- and I believe your words were can you tell me about the

2   incident of why I'm here, tell me -- tell me why we came here

3   today, and K.W.'s answer was I don't know what it's called,

4   but it's a disease, and it makes him like little children.

5   Was that your question to him and his answer?

6   A.  I believe that's true.

7   Q.  Did you ever contact his parents and ask whether they had

8   discussed any of this prior to your interview with him?

9   A.  This being -- you're referring to the disease statement?

10  Q.  Yeah.  Well, let me -- yes, sure.

11  A.  No, I actually did not.

12  Q.  Okay.  Are you -- do you know whether K.W. spoke with his

13  parents prior to your interview?

14  A.  I would assume that he did.  He had the trip on the way

15  home from North Platte.  He had, what, 12 days in between that

16  day and the interview, so I would assume that he did.  Well,

17  and, in fact, I know he talked to his parents because he's a

18  kid.  Let's just leave it at that.

19  Q.  So you do know that he did talk about whether Mr. McFadden

20  had touched him on the trip to Nebraska or not?

21  A.   I know that Stacy had described to me in a phone call on

22  the 15th of January that K.W. had said some things -- had

23  disclosed some things to them.

24  Q.  He had said something sexual in nature, but he said to his

25  mother that he believed that was between J.W. and

Sarah K. Mitchell, RPR, CRR

1  Mr. McFadden; is that correct?

2  A.  I believe that is correct, as far as she stated, yes.

3  Q.  Okay.

4  A.  That was -- that was during the initial disclosure, if you

5  like, from him, but on the 15th she had described to me that

6  they had said some things, and she described them going to

7  counseling.  I had requested actually to meet them the week

8  before that and was waiting for their call, so it was actually

9  two weeks out before they actually called me and said let's --

10  we need to get together.

11  Q.  Right.  So your first opportunity after they called you

12  back was I believe January 15th of 2013, and that's when you

13  interviewed Ms. W////////// over the phone; is that right?

14  A.  That's when she called, yes, and said we need to do the

15  interview.  I then after speaking with her said I want to get

16  together as soon as possible and arranged for it the next day.

17  Q.  And I believe she told you that he had made a disclosure

18  the previous day with a therapist, correct?

19  A.  That I was told, yes.

20  Q.  So between the time that they had left Nebraska and the

21  time that you did your forensic interview, obviously the

22  matter had been discussed, correct?

23  A.  I would assume so.  That would be a fair assumption.

24  Q.  And then your first forensic interview with J.W. -- or let

25  me -- let me rephrase that.  After this interview with K.W.

                    Sarah K. Mitchell, RPR, CRR

1   you did interview J.W., and that was on February 7, 2013,

2   correct?

3   A.   That's correct, sir.

4   Q.   Do you know whether K.W. and J.W. or their parents had had

5   any discussion with each other between those two dates?

6   A.   I do not.

7   Q.   With respect to forensic interviews, you, yourself, you

8   had to get training before you were permitted to do that,

9   right?

10  A.   That is correct.

11  Q.   And as a matter of fact, you even had to get

12  peer-reviewed, correct?

13  A.   That is correct.

14  Q.   And can you explain for the jury what a peer review is?

15  A.   Actually, we participate in a peer review.  At the Western

16  Slope Center for Children myself and all the investigators

17  from the valley, as many as can show up, we meet once a month

18  for a meeting, and then after the meeting once a quarter we do

19  what we call a peer review.  In other words, one of us will

20  supply them an interview that we've conducted or that has been

21  conducted by their staff, and we will watch the interview, and

22  then we will make suggestions or make recommendations or

23  places that they did very well or places that they could

24  improve and just to build each other up that way, and it just

25  gives you checks and balances for yourself when you're doing

19-cr-00243-CMA-GPG-1                                               523

1    an interview.

2    Q.  And let me just back up one moment, Detective.  Were you

3    in consistent contact with Ms. W//////////// when she got back

4    from Nebraska, or do you remember?

5    A.  I was not.  I actually didn't hear from her until the

6    15th.

7    Q.  Okay.

8    A.  I --

9    Q.  You had made attempts, but she hadn't got back to you?

10   A.  No, actually I did talk to her one time that I wanted to

11   meet with the kids when they got back, and it was only on the

12   15th she called me that I spoke to her.

13   Q.  Okay.  And when K.W. was interviewed, was a SANE exam done

14   at that time?

15   A.  It was done by a doctor who was not a SANE nurse in

16   Montrose at a medical facility there.

17   Q.  Okay.  Thank you.

18   A.  Thank you.

19          THE COURT:  Any redirect?

20          MS. SURRATT:  Very briefly, Your Honor.

21                    REDIRECT EXAMINATION

22   BY MS. SURRATT:

23   Q.  Detective, in your career have you had cases where kids at

24   first don't disclose sexual abuse but then disclose sometimes

25   later?

                    Sarah K. Mitchell, RPR, CRR

1   A.  Multiple times.

2   Q.  Have you had cases where kids disclose part of what

3   happened to them at first and then disclose more later?

4   A.  I have.

5   Q.  Have you had cases where kids don't disclose at all?

6   A.  Many.

7   Q.  In a forensic interview do you do your best to elicit the

8   truth regardless of whether or not the child has been

9   interviewed or talked to before you have a chance to talk to

10  them?

11  A.  I do.

12          MR. MCDERMOTT:  Objection, relevance, Your Honor.

13          THE COURT:  Overruled.

14          MS. SURRATT:  No further questions.

15          THE COURT:  All right.  Thanks very much, sir.  You

16  may step down.

17          MR. CHAFFIN:  Your Honor, may we have a bench

18  conference?

19          THE COURT:  You may.

20      (Bench conference on the record and out of the

21      hearing of the jury:)

22          THE COURT:  Can you hear me?  Can the defense hear

23  me?  Mr. McDermott, can you hear me?  Can you hear me?  All

24  right.  Mr. Chaffin.

25          MR. CHAFFIN:  Your Honor, we're in a similar spot to

Sarah K. Mitchell, RPR, CRR

1    where we were yesterday.

2            THE COURT:  I can't hear you.

3            MR. CHAFFIN:  Can you hear me now?

4            MS. SURRATT:  Your Honor, can you hear me?

5            THE COURT:  I can't hear him at all.

6            MR. CHAFFIN:  Can you hear me?

7            THE COURT:  Talk again.

8            MR. CHAFFIN:  Can you hear me?

9            MR. MCDERMOTT:  Your Honor, we can hear.

10           THE COURT:  Go ahead.  Talk.

11           MR. CHAFFIN:  Your Honor, can you hear me now?

12           THE COURT:  I can't hear you.  Now talk because it's

13   coming through now.

14           MR. CHAFFIN:  Can you hear me now?

15           THE COURT:  No.

16           MS. SURRATT:  Your Honor, can you hear me?

17           THE COURT:  I can't hear Ms. Surratt either.

18           MR. CHAFFIN:  Your Honor, we're in a similar position

19   to what we were in yesterday.  We've moved very quickly.

20   Unless 414 witnesses are coming in, we have only one other

21   witness to call, Cheryl Young.  She sees patients today, and

22   so we assured her we would call her first thing on Thursday.

23           THE COURT:  All right.  And are your witnesses going

24   to be ready for tomorrow, if they rest?

25           MR. MCDERMOTT:  I don't have -- I don't have them

19-cr-00243-CMA-GPG-1                                          526

 1   until Saturday, Your Honor, because they're out of state, and

 2   I thought the United States was scheduled to go through the

 3   week.

 4        THE COURT:  Okay.  All right.  Then I think what

 5   we'll do is we'll recess for the day and we'll handle the 414.

 6   You can make a motion and offer of proofs, and I'll make a

 7   ruling on that, and then we can move forward tomorrow and

 8   recess early tomorrow.

 9        MR. LABRANCHE:  Actually, Your Honor, based on the

10   testimony we got from this witness I want to lodge an

11   objection to the witness tomorrow because it's duplicative

12   cumulative evidence.  She's going to testify about myths and

13   facts related to sexual assaults, a lot of the same thing --

14   and forensic interviewing and memory of witnesses.  I think

15   it's a lot of the things that this witness just testified to.

16        She also didn't personally interview any of the

17   witnesses or view any evidence in this case.  So I think that

18   her opinion is not necessarily helpful for this jury, and, in

19   fact, could be prejudicial because it could be used to bolster

20   the credibility of witnesses she has no contact with and

21   hasn't viewed any evidence.  I don't think we lodged that

22   originally, but we are now based on this officer's testimony

23   because of what he testified to about forensic interviewing,

24   delayed reporting, and inconsistencies.

25        THE COURT:  So the witness that you're talking about,

                    Sarah K. Mitchell, RPR, CRR

1   she's an expert in general?

2           MS. SURRATT:  Blind expert, Your Honor.

3           MR. LABRANCHE:  Your Honor, I think we have problems

4   hearing you because your mic is not moved up.

5           THE COURT:  But I can't hear anything.

6           MR. CHAFFIN:  Your Honor, can we address this after

7   we excuse the jury?

8           THE COURT:  I think so.  We'll address that after we

9   excuse the jury.

10      (The following proceedings were held in open

11      court:)

12          THE COURT:  Ladies and gentlemen, again, we're moving

13  very rapidly through this case, and I have some legal matters

14  I need to discuss with the lawyers, so I'm going to send you

15  home a bit early today.  I believe that the Government will

16  end up resting tomorrow, but we will be needing to come back

17  on Monday.  Friday is the holiday.  But at this point I'm

18  going to allow you to go home.  Do not research or talk to

19  anyone about this case, and get some good rest and come back

20  tomorrow.  The jury is excused.

21          Counsel, you will remain.

22          THE COURTROOM DEPUTY:  All rise.

23          THE COURT:  I'm sorry.  Did I say -- we will come

24  back tomorrow.  Tomorrow is Thursday.  If I misspoke -- after

25  they rest -- we will not be in session on Friday, because it's

19-cr-00243-CMA-GPG-1                                          528

 1   Veterans Day.  We will come back then on next Monday.  Yes, I

 2   need you here tomorrow.

 3        (Jury left the courtroom at 2:23 p.m.)

 4            THE COURT:  You may be seated.  There are a couple of

 5   issues that have been raised.  The first is let's just address

 6   that one with respect to the Government's expert witness that

 7   would be called first thing tomorrow morning.  I'll let

 8   Mr. LaBranche, do you want to take the lead on that?

 9            MR. LABRANCHE:  Sure.  So, Your Honor, you know, a

10   lot of what the Government wants to use this witness for was

11   exactly what Detective Prescott testified to.  She's being

12   offered for myths and facts regarding sexual abuse, patterns,

13   disclosures regarding sexual abuse, factors that may influence

14   disclosure, issues that may arise during the process, for

15   family dynamics, victim-offender relationship, forensic

16   interviewing processes and considerations, memory functions

17   and processes.

18            He -- I think he testified to a lot of that stuff.

19   He said it's common for them not to disclose initially.

20   That's things that are coming directly from Ms. Young's report

21   as well.  That's the same thing she's going to end up

22   testifying to.  I don't think this was raised pretrial because

23   we didn't know he was going to testify to all those things,

24   and I think that to have Ms. Young testify about forensic

25   interviewing, delayed reporting, inconsistencies, you know, is

                        Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1                                                529

 1   going to be cumulative because the jury has already heard

 2   this.

 3          Also, she's being offered as an expert under 702, and

 4   so I don't necessarily think her opinion is going to be

 5   helpful to the trier of fact, this jury.  She hasn't viewed

 6   any of the evidence.  She didn't participate in any of the

 7   interviews.  She hasn't met with any witnesses.  Part of 702

 8   also requires that her testimony be based on sufficient facts

 9   or data.  She doesn't have any facts related to this case.

10   Your Honor, I also think to allow such cumulative evidence

11   would also be prejudicial because it would invade on the

12   province of the jury.  I think that it also is bolstering the

13   credibility of the victims improperly by allowing her to

14   testify to these things, to give excuses for why the reporting

15   was delayed or why there's inconsistencies, and also I think

16   it is used to bolster the credibility of people that

17   participated as interviewers or investigators related to these

18   victims.

19          THE COURT:  All right.  Thank you.

20          Mr. Chaffin.

21          MR. CHAFFIN:  Thank you, Your Honor.  If I understand

22   correctly, the objection is a 403 objection, that it is

23   cumulative and therefore --

24          THE COURT:  It's kind of 403 with a mix of 702.

25          MR. CHAFFIN:  To the extent it is a 702 objection,

19-cr-00243-CMA-GPG-1                                          530

1    the Court has very clear directions on what is required.  The

2    Government provided notice well in advance of trial of its

3    intent.  To the extent Mr. LaBranche is arguing that this

4    witness lacks sufficient experience because she hasn't

5    reviewed the facts of this case, that was intentional.  This

6    witness is an educational expert to explain to the jury what

7    she has seen in her decades of experience treating victims of

8    child sexual abuse.

9         She will explain to the jury patterns that she has

10   observed, what things can affect delayed disclosure, what

11   things can discourage children from disclosing.  She will

12   explain the concept of grooming and what that looks like in

13   her experience.  She will explain how memory works and how

14   there are what she refers to as episodic memories and script

15   memories.  All of these things are things the jury has not

16   heard.  All of these things are things that will help them

17   understand the testimony that they heard from J.W., the

18   testimony that they heard from K.W., and help them understand

19   what I anticipate are going to be central issues in evaluating

20   their testimony.

21        THE COURT:  All right.  I find that the -- there's no

22   basis to exclude the expert witness on the bases of 702.

23   She's a blind expert witness, and I don't think that 403 --

24   the prejudice to the defendant would outweigh the benefit to

25   the jury to have some of these concepts explained by someone

1   who's an expert in the area.  So the objection is overruled.

2   The witness will be allowed to testify.

3           Which leads us then to the Rule 414 testimony that

4   the Government has proffered and whether those 414 witnesses

5   should be permitted to testify.  At the motions hearing held

6   on October 17, 2022, this Court found that the Government's

7   proffered evidence did meet the threshold requirements of 414

8   which are essentially that the defendant is accused of an

9   offense of child molestation; second, that the evidence

10  proffered is evidence of the defendant's commission or another

11  offense of child molestation; and, third, that the evidence is

12  relevant pursuant to *United States vs. Perrault*,

13  P-e-r-r-a-u-l-t, 995 F.3d 748, Tenth Circuit, 2021.  And at

14  that time Mr. McDermott did not dispute that the threshold

15  requirements were met.  The Court, however, did reserve ruling

16  on whether the evidence should be excluded pursuant to

17  Rule 403 and the balancing test that is set forth therein

18  until after the testimony of the charged victims in this case

19  and the parties' examinations, in particular the

20  cross-examinations.

21          However, at this time what I would like to hear from

22  the parties, I'll permit the Government to make an offer of

23  proof with respect to the first *Enjady* factor, and that's from

24  the *United States vs. Enjady*, E-n-j-a-d-y, 134 F.3d 1427,

25  Tenth Circuit, 1998.  And that first factor is how clearly the

19-cr-00243-CMA-GPG-1                                              532

1    prior act has been proved.  With respect to that prong the

2    Court must find that a reasonable jury could find that the

3    prior act has been proved by a preponderance of the evidence

4    pursuant to *United States vs. Benally*, B-e-n-a-l-l-y, 500 F.3d

5    1085, Tenth Circuit, 2007.

6            So at this point, I will hear from the Government as

7    to which of the 414 witnesses they seek to have testify, and

8    then I'll hear from the defendant in terms of their arguments

9    as to the 403 balancing test.

10           MR. CHAFFIN:  Thank you, Your Honor.  At this point

11   the Government would seek to introduce testimony from E.S. who

12   was previously referred to as E.M.  Mr. S///////, testified in

13   Mr. McFadden's prior trial as a charged victim, and

14   Mr. S///////, described a pattern of abuse that he was subjected

15   to in which Mr. McFadden both touched his penis and then took

16   him to a -- some roller dams near the Gunnison River and

17   sodomized him.  Those were substantive counts in

18   Mr. McFadden's prior trial, and he was found guilty by a jury

19   beyond a reasonable doubt as to those counts.

20           After that the Government would seek to have D.R.

21   testify.  Mr. R//////, was a friend of S.H., Mr. and Mrs.

22   Hockenberry's son, and began spending time at Mr. McFadden's

23   home.  Mr. R//////, will testify that on one occasion he slept in

24   Mr. McFadden's bed and he woke to Mr. McFadden putting his

25   hand inside of his pants and touching his penis.  Mr. R//////,

                    Sarah K. Mitchell, RPR, CRR

1    moved Mr. McFadden's hand away, and Mr. McFadden repeated that

2    conduct, and then Mr. R///// as a young boy rolled off the bed

3    and actually slept underneath the bed for the remainder of the

4    night.  Again, Mr. R///// testified in Mr. McFadden's prior

5    trial as a charged victim.  The jury found Mr. McFadden guilty

6    beyond a reasonable doubt with regard to that conduct.

7            We have two additional 414 witnesses that I'm not

8    sure we would be able to procure for tomorrow.  They are out

9    of state, and we had intended to fly them in over the weekend

10   because they're in school.  I have not made efforts to change

11   their flight in light of the Court's statements previously in

12   court, but we would ask to allow S.J.W. to testify.  Again,

13   Ms. W///////// testified in Mr. McFadden's prior trial.  She

14   described an instance where she was asleep on a couch in

15   Mr. McFadden's home.  She woke up to Mr. McFadden putting his

16   finger in her butt.  She rolled over onto her back to try to

17   make it stop, and Mr. McFadden rolled her back over several

18   times.  And she described that she knew it was Mr. McFadden

19   because she saw him go to the bathroom -- or to the sink and

20   wash his hands after that incident.  She testified as a

21   charged victim in Mr. McFadden's prior trial.  The jury

22   listened to her testimony and found him guilty with regard to

23   that specific count beyond a reasonable doubt.

24           The final 414 witness that we would ask to introduce

25   is L.We.  L.We. is the youngest brother of K.W. and S.J.W. and

19-cr-00243-CMA-GPG-1                                        534

 1    was on the trip to Nebraska.  He was interviewed more

 2    recently.  He did not disclose prior to Mr. McFadden's

 3    previous trial, but more recently he was interviewed by

 4    Detective Prescott.  He described for Mr. -- to Detective

 5    Prescott that he would sleep in the defendant's bed at his

 6    home on D 1/2 Road, that on multiple occasions he woke to a

 7    feeling of Mr. McFadden putting wet fingers between his butt

 8    cheeks, and then Mr. McFadden putting his penis into L.We.'s

 9    butt.  He said that happened on several occasions.

10          While we prepared for trial, he disclosed to us

11    during trial preparation that a similar incident happened to

12    him one of the nights in the truck on the way to Idaho and

13    then to Nebraska.  That was not something that he had

14    previously disclosed.  As I recall, he said that that was just

15    something that no one asked him about and that was the reason

16    why he had not previously disclosed that.  Given the

17    similarity between L.We.'s description of events and what

18    occurred to his siblings and to J.W., I think that the Court

19    can easily determine by a preponderance standard that that was

20    -- that a jury could conclude that that was likely to have

21    occurred.

22          If the Court has further questions, I'm happy to

23    address those.

24          THE COURT:  I do not.

25          MR. CHAFFIN:  Thank you, Your Honor.

                        Sarah K. Mitchell, RPR, CRR

1            THE COURT:  Thank you.

2            Mr. McDermott.

3            MR. MCDERMOTT:  Yes, Your Honor.  I'll begin by

4    saying that yesterday the Court indicated that since I was

5    cautious on cross-examination it looked like the 414 was not

6    going to come in.  I've continued to be cautious with my

7    cross-examination with that in mind, and under a 403 analysis

8    at this time, at this point I would be tremendously

9    handicapped in giving Mr. McFadden a proper defense.  Part of

10   the reason that I took the effort that I did to try and get

11   Dian S. under subpoena is for this very reason.  My belief and

12   theory was that I.S., who is avoiding service, got upset with

13   Mr. McFadden because Mr. McFadden was enforcing a rule that

14   was actually imposed by his guardian, and when I.S. got

15   disciplined, he then said that Mr. McFadden touched him and

16   the initial complaint was a touching.

17           He was with E.M., and E.M. is one of the kids who

18   went to the adults, and E.M. told I.S., That's not true,

19   you're just mad at Mr. McFadden, and that's why you're saying

20   it.  Now, I intentionally didn't cross-examine Detective

21   Prescott on a few points that I would had the 414 been coming

22   in at the front end of the case, and namely he had gone to

23   Dian S. and had indicated that he knew Mr. McFadden had done

24   certain things, that he had done things in Arizona to J.W.,

25   that -- and that Mr. McFadden essentially was guilty of child

19-cr-00243-CMA-GPG-1                                          536

1    molestation.

2           And I wanted Dian S. because I've heard Dian S.  I've

3    heard her loud and clear, and I believe that a jury could

4    conclude that after Dian S. received this information she did

5    the exact thing that an adult is not supposed to do, and she

6    passed that information on to the kids.  And then on I believe

7    it was January 2nd or 3rd, E.M. and I.S. then go in and talk

8    to Detective Prescott again, and after they've had Dian S. and

9    I believe it was -- no, it was Dian S. -- I'll just -- it was

10   Dian S., after they had interaction with her for three weeks,

11   they then come and tell Detective Prescott, E.M. says, Oh, I

12   forgot to tell you something, and then he initially discloses

13   a touching, and then in subsequent interviews his story also

14   gets bigger, and he talks about being sodomized as well.

15          And my whole theory and belief if all that evidence

16   had come in is that what happened is based on those two very

17   questionable disclosures by first I.S. and then E.M. after --

18   and the other point I want to make is E.M. initially said

19   nothing had happened to him, and he said the first person who

20   disclosed, I.S., was not telling the truth and he was just mad

21   at Mr. McFadden.  So my belief and my theory would be that

22   based on those two very suspect outcries, Detective Prescott

23   then went and got a warrant.  He gets a warrant in Nebraska.

24          We have another then child who testified today who

25   initially said no, nothing happened, no, nothing happened, and

19-cr-00243-CMA-GPG-1                                                        537

1   then he's left with another adult -- and my heart goes out to

2   his mother, and it's terrible -- I understand -- I try to

3   understand the emotion she's going through, but I'm sorry.

4   When someone's in that state, that will have an impact on

5   their kid, and this kid who initially said nothing happened,

6   then comes forward at a later date and says, Oh, yes,

7   something did happen.  And then after that, we have his sister

8   S.J.W., his younger brother L.We., who for years had said that

9   nothing happened, now has yet another disclosure.

10          And there comes a point where I either need to be

11  able to meet it head on, or we just need to stop, because

12  we're just going to continue to get into this mini trial on

13  each particular thing, and it just keeps growing and growing.

14  Respectfully, for all of those reasons, I believe that it does

15  fit the 403 prong and is unfairly prejudicial.

16          THE COURT:  All right.  Thank you.  As I mentioned,

17  we had previously found -- the Court had previously found that

18  the threshold requirements for Rule 414 were met, and that was

19  not disputed by the defendant.  The Tenth Circuit has

20  developed a Rule 403 balancing test for evidence of prior acts

21  of sexual assault, and that balancing test proceeds in two

22  phases.  First, the Court must consider four *Enjady* factors.

23  One, how clearly the prior act has been proved; two, how

24  probative the evidence is of the material fact it is admitted

25  to prove; three, how seriously disputed the material fact is;

Sarah K. Mitchell, RPR, CRR

1    and, four, whether the Government can avail itself of any less

2    prejudicial evidence.

3            No single factor is dispositive.  The Court considers

4    them as a whole.  Then the Court must weigh the *Enjady* factors

5    against the probative dangers by assessing three additional

6    factors.  One, how likely is such evidence -- how likely it is

7    that such evidence will contribute to an improperly based jury

8    verdict; second, the extent to which such evidence will

9    distract the jury from the central issues of the trial; and,

10   three, how time consuming it will be to prove their prior

11   conduct.

12           After considering carefully the evidence that was

13   presented in this case, the examination by counsel, and the

14   parties' arguments, the Court finds that it is appropriate to

15   admit some of the Rule 414 evidence offered by the Government

16   in this case.  Although Mr. McDermott has been careful to not

17   open the door to create the need for 414 evidence, there has,

18   nevertheless, been an emphasis in the examinations today and

19   in the opening statement on the emphasis of the lack of

20   physical evidence and corroborating eyewitnesses for the

21   allegations in this case.

22           It is often true that in cases like this one

23   involving allegations of sexual assault or molestation of

24   children there are no eyewitnesses, no physical or medical

25   evidence, or any other corroborating evidence.  The

19-cr-00243-CMA-GPG-1                                                    539

1    disclosures also can happen long after the assault or abuse

2    has taken place, and the very purpose of Rule 414 is to

3    address this, quote, frequent problem in sexual assault cases,

4    trials presenting he said/she said stalemates, what Congress

5    described as, internal quote, unresolvable swearing matches,

6    end quote -- internal quote, end quote, and that's from *Enjady*

7    at page 1431.

8           So applying the Rule 403 balancing test the Court may

9    allow evidence of prior acts of child molestation relating to

10   E.S. and D.R.  Regarding the first *Enjady* factor, this Court

11   finds that a jury could reasonably find that the other acts

12   relating to these two 414 witnesses occurred by a

13   preponderance of the evidence.  The Court has considered the

14   offer of proof provided by the Government regarding the

15   anticipated testimony of the witnesses.  Although a jury may

16   express doubt about the lack of physical evidence related to

17   these prior acts, the Court notes that a jury previously found

18   that these incidents did occur and found Mr. McFadden guilty

19   of an offense relating to these acts.

20          As to the second *Enjady* factor, probative value, the

21   Court has considered the similarity of the prior acts and the

22   charged acts, the time lapse between other acts and the

23   charged acts, the frequency of the prior acts, the occurrence

24   of intervening events, and the need for evidence beyond the

25   defendant's and alleged victims' testimony.  That's from

19-cr-00243-CMA-GPG-1                                                540

1    *United States vs. Perrault*, 995 F.3d 748, Tenth Circuit, 2021.

2    The Court finds that the prior acts involving E.S. and D.R.

3    are probative because of their similarity to the charged

4    crimes in this case, the frequency of these prior acts, the

5    lack of occurrence of intervening events, given that all of

6    the prior acts occurred in the same general time period, and

7    the ability of the prior acts to corroborate the testimony of

8    the victims in this case.

9            With respect to the prior acts relating to E.S. and

10   D.R., the Court notes that the acts do involve similar conduct

11   including that the assaults occurred under similar

12   circumstances, at night in Mr. McFadden's bed in his house or

13   after being taken somewhere in his truck.  Specifically, E.S.

14   described waking up in Mr. McFadden's bed to Mr. McFadden

15   touching his penis under his clothes.  E.S. also described an

16   incident where Mr. McFadden took him to a place by the

17   Gunnison River and inserted his penis into E.S.'s butt while

18   his brother was asleep in the cab of the truck.  D.R. also

19   described instances of being asleep in Mr. McFadden's bed and

20   waking up to Mr. McFadden touching his penis under his shorts.

21   Further, the acts occurred frequently and appeared to be part

22   of a larger pattern of abuse involving several children who

23   spent time at Mr. McFadden's house.

24           As to the need for the testimony, the Court finds the

25   testimony is necessary to buttress the credibility of J.W. and

1  K.W. and their allegations concerning their corroborating

2  eyewitnesses in this case.  In the defense's opening statement

3  the defense advised the jury there would be no physical

4  evidence and no corroborating eyewitnesses in this case.  On

5  cross-examination of SANE examiner Nurse Goebel the defense

6  repeatedly inquired into the lack of physical evidence

7  supporting J.W.'s allegation.  Defense counsel questioned the

8  lack of DNA evidence or any other physical evidence such as

9  semen, saliva, blood, tearing, redness, swelling, or any

10  injury or scarring.

11        Specifically, defense counsel asked Nurse Goebel,

12  quote, You weren't able to corroborate J.W.'s statements with

13  anything else, end quote.  Nurse Goebel responded that she did

14  no physical examination and had no findings related to a

15  physical assessment.  J.W. and K.W. do not recall precisely

16  when certain acts took place, and given the length of time

17  that has passed since the alleged events, their accounts have

18  sometimes differed regarding the details and the specifics of

19  the assaults.

20        Under these circumstances the Court finds that,

21  quote, the Government may need multiple Rule 414 witnesses to

22  effectively bolster the credibility of the victims tied to the

23  indictment, end quote.  That's from *Perrault*, 995 F.3d at 769.

24  The testimony from E.S. and D.R. will buttress these

25  weaknesses by providing corroborative accounts of assaults

1    occurred during the same time period under very similar

2    circumstances.

3           The third *Enjady* factor requires the Court to

4    analyze, quote, how seriously disputed the material fact is,

5    end quote, that the prior act evidence is intended to prove.

6    The Court finds that the facts are seriously disputed because

7    Mr. McFadden denies any acts of child molestation and contends

8    that he has been unfairly accused.

9           The fourth *Enjady* factor -- with respect to the

10   fourth *Enjady* factor, the Court finds that the Government has

11   demonstrated that it has no less prejudicial evidence

12   available.  Other than the children involved in this case

13   there appear to be no corroborating witnesses who observed any

14   prior acts of molestation.  There also does not appear to be

15   any independent medical or physical evidence of the charged

16   acts.

17          Therefore the Court must move -- must weigh the

18   *Enjady* factors against the probative dangers by assessing

19   three additional factors.  One, how likely it is that such

20   evidence will contribute to an improperly based jury verdict;

21   second, the extent to which such evidence will distract the

22   jury from central issues of the trial; and, third, how time

23   consuming it will be to prove the prior conduct.  That's from

24   *Enjady* at 1433.

25          The Court finds that the testimony from E.S. and D.R.

1    is unlikely to contribute to an improperly based jury verdict,

2    nor will the evidence distract the jury from the central

3    issues at trial.  Although the Court acknowledges that their

4    testimony will certainly have an emotional impact on the jury,

5    that alone is not sufficient to justify excluding their

6    testimony pursuant to *United States vs. Mercer*, 653 F. App'x

7    622, Tenth Circuit, 2016, in which the Court said Rule 414

8    evidence almost always have a profound impact on a jury and

9    cause them to feel disgust for the defendant, end quote.

10          Moreover, the Court will mitigate any potential juror

11   bias from Rule 414 witnesses by giving the jury limiting

12   instructions regarding permissible and impermissible uses of

13   the evidence.  Finally, the Court finds that the Rule 414

14   evidence will not be unnecessarily time consuming because the

15   strong similarities between the alleged acts may be presented

16   efficiently and through a narrowly tailored line of

17   questioning, which the Government has done in this case.

18          For these reasons the Court finds that the evidence

19   of prior acts of child molestation relating to E.S. and D.R.

20   is admissible and should not be excluded under the Rule 403

21   balancing test.  However, with respect to the proffered

22   evidence regarding the prior acts relating to S.J.W., the

23   Court finds that that evidence should be excluded pursuant to

24   the Rule 403 balancing test.  The Court finds that evidence of

25   prior acts relating to S.J.W. is less probative under the

1    second *Enjady* factor.

2         The incident described by S.J.W. is different in

3    several respects from the charged conduct in this case.

4    Unlike the charged victims and other 414 witnesses in this

5    case, S.J.W. is a girl.  She describes an incident where she

6    woke up to the defendant inserting his fingers into her butt

7    while she was asleep on the couch in the defendant's home.

8    This is distinguishable from the allegations of the charged

9    victims in this case and the other 414 witnesses who were boys

10   and described sleeping in Mr. McFadden's bed, use of sleep

11   aids, and waking to the defendant putting his penis into their

12   butt or touching their penis under their clothing.

13        Particularly given the testimony of the other two 414

14   witnesses and the charged victims in this case the Court finds

15   that S J.W.'s testimony would have diminishing probative value

16   and is dissimilar such that it may distract the jury from the

17   central issues in this case.  In sum, the Court finds that

18   S.J.W.'s testimony is not necessary and would likely be more

19   prejudicial than probative.

20        Finally, the Court finds that evidence of prior acts

21   relating to L.W. should also be excluded pursuant to the

22   Rule 403 balancing test.  The conduct involving L.W. is

23   similar to the conduct charged in this case.  L.W. reports

24   that he was molested on five or six occasions.  He said he

25   would fall asleep on the couch and wake up in Mr. McFadden's

1   bed or being carried by Mr. McFadden to his bed.  L.W. also

2   described being given melatonin by Mr. McFadden.  He described

3   Mr. McFadden spitting into his hand and then putting his penis

4   into L.W.'s butt.

5         However, the Court notes that L.W.'s allegations were

6   made much more recently in 2018, and the conduct relating to

7   L.W. was not the subject of charges in Mr. McFadden's state

8   criminal trial.  The Court has concerns about the reliability

9   of L.W.'s allegations, particularly given the extensive length

10  of time between the alleged conduct and L.W.'s disclosure and

11  the intervening criminal trial that occurred regarding

12  incidents involving L.W.'s older siblings, K.W. and S.J.W.

13  The Court is also unconvinced as to the need for the testimony

14  beyond the testimony of E.S. and D.R., the other two Rule 414

15  witnesses that this Court is allowing, and is mindful of the

16  diminishing probative value of successive 414 witnesses.  For

17  these reasons the Court finds that L.W.'s testimony should be

18  excluded.

19        All right.  So are we going to have the 414 witnesses

20  here tomorrow?

21      MR. CHAFFIN:  Yes, Your Honor.  I will make

22  arrangements with the marshals to bring Mr. S////////, from

23  custody, and Mr. R////// will be here tomorrow.  I think the

24  Government's intent is to call Cheryl Young and then to put on

25  the 414 witnesses and then rest.  I do -- I would like to ask

1   a clarification, if I may.

2          THE COURT:  You may.

3          MR. CHAFFIN:  At the prior hearing the Court ruled

4   that Mr. McFadden's 1990 conviction could be admitted.  The

5   struggle was just a witness with personal knowledge.  If

6   Mr. McFadden chooses to testify in this case, would the

7   Government be permitted to cross-examine him on the facts of

8   that conviction?

9          THE COURT:  Yes.  I think last time I found that was

10  retroactive, and the case law indicates it's admissible.

11         MR. CHAFFIN:  Thank you, Your Honor.

12         THE COURT:  Now, Mr. McDermott, I will allow you to

13  recall Mr. Prescott if you wish to do so in your case because

14  you did not delve into that, and I understand the reasons you

15  did not delve into it, but I do think the door was opened

16  based on the cross-examinations today.  All right.  Is there

17  anything further?

18         MR. MCDERMOTT:  With respect -- is a limiting

19  instruction going to be prepared?

20         THE COURT:  Yes.  Thank you for reminding me.  I need

21  you to give me -- you all need to get together, see if you can

22  come up with a limiting instruction that I'm to give the jury

23  regarding the 414 witnesses.

24         MR. CHAFFIN:  I would recommend that we give

25  Instruction No. 12.

1          THE COURT:  Hold on.  Let me take a look.

2          MR. LABRANCHE:  I think it may have to be modified a

3     bit because it just says you heard this evidence.

4          THE COURT:  So why don't you modify it to say you are

5     going to hear the testimony of these two witnesses.  Just

6     modify it, run it past the defense counsel, and then submit

7     that to me tomorrow morning.

8          MR. CHAFFIN:  Yes, Your Honor.

9          THE COURT:  That would be great.

10         MR. MCDERMOTT:  And, Your Honor, I just want to

11    clarify one point on the record, because I believe at the

12    motions hearing I was answering the Court's question, and I

13    just want to clear the record in case I misspoke or anything.

14    My intent at the motions hearing was to acknowledge that there

15    was at least a prima facie showing of the four factors and why

16    they could be relevant.  I would not and do not -- I did not

17    intend to stipulate that any of the acts had clearly been

18    proven or gave deference to them by a preponderance of the

19    evidence.

20         THE COURT:  No, and that's not what I intended to

21    say, but what I -- no dispute to the threshold requirements

22    are, one, that he is accused of an offense of child

23    molestation; two, that the evidence proffered is evidence of

24    the defendant's commission of another offense of child

25    molestation; and, three, that the evidence is relevant.  Those

19-cr-00243-CMA-GPG-1                                              548

1    were the three factors that were not really in dispute at the

2    last hearing.

3              MR. MCDERMOTT:  Okay.

4              THE COURT:  All right.  Very good.  Court will be in

5    recess.

6              THE COURTROOM DEPUTY:  All rise.  Court is in recess.

7         (The proceedings were concluded at 2:59 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                    Sarah K. Mitchell, RPR, CRR

1                           REPORTER'S CERTIFICATE

2

3           I, SARAH K. MITCHELL, Official Court Reporter for the

4    United States District Court for the District of Colorado, a

5    Registered Professional Reporter and Certified Realtime

6    Reporter, do hereby certify that I reported by machine

7    shorthand the proceedings contained herein at the time and

8    place aforementioned and that the foregoing pages constitute a

9    full, true and correct transcript.

10          Dated this 23rd day of May, 2023.

11

12

13

14                  _____/s/ Sarah K. Mitchell_____

15                      SARAH K. MITCHELL
                        Official Court Reporter
16               Registered Professional Reporter
                     Certified Realtime Reporter
17

18

19

20

21

22

23

24

25

                        Sarah K. Mitchell, RPR, CRR