1           IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF COLORADO

3
   Criminal Action No. 19-cr-00243-CMA-GPG-1
4

5    UNITED STATES OF AMERICA,
                                          (Pages 549 - 644)
6          Plaintiff,

7          vs.

8    MICHAEL TRACY MCFADDEN,

9          Defendant.

10   ------------------------------------------------------------

11                    REPORTER'S TRANSCRIPT
                       Jury Trial - Day 4
12
   ------------------------------------------------------------
13
   Proceedings before the HONORABLE CHRISTINE M. ARGUELLO, Senior
14   Judge, United States District Court for the District of
   Colorado, and a jury of twelve and one alternate, commencing
15      on the 10th day of November, 2022, in United States
                Courthouse, Grand Junction, Colorado.
16
                           APPEARANCES
17
   For the Plaintiff:
18   JEREMY L. CHAFFIN, U.S. Attorney's Office, 205 North 4th St.,
   Ste. 400, Grand Junction, CO 81501
19
   ANDREA L. SURRATT, U.S. Attorney's Office, 1801 California
20   St., Ste. 1600, Denver, CO 80202

21   For the Defendant:
   SEAN M. MCDERMOTT, McDermott Stuart & Ward, LLP, 140 East 19th
22   Ave., Ste. 300, Denver, CO 80203

23   BEN LABRANCHE, Benjamin R. LaBranche PLLC, 1544 Race St.,
   Denver, CO 80206
24

25     Sarah K. Mitchell, RPR, CRR, 901 19th Street, Room A252,
              Denver, CO 80294, 303-335-2108
        Proceedings reported by mechanical stenography;
             transcription produced via computer.

19-cr-00243-CMA-GPG-1 Jury Trial - Day 4        11/10/2022   550

1                              I N D E X

2

GOVERNMENT'S WITNESS                                    PAGE
3
CHERYL YOUNG
4        Direct Examination By Mr. Chaffin               560
         Cross-Examination By Mr. LaBranche              584
5        Redirect Examination By Mr. Chaffin             609

6

7    CLOSING ARGUMENTS                                   PAGE

8    By Mr. Chaffin                                      619
     By Mr. McDermott                                    628
9    By Mr. Chaffin                                      640

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                    Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 4       11/10/2022    551

```
 1              *         *         *         *         *

 2       (The proceedings commenced at 7:32 a.m.)

 3            THE COURT:  We are back on the record in 19-cr-243.

 4  This is for the final charging conference on the jury

 5  instructions, and the way I do this you don't have to stand up

 6  when you address me.  We just go instruction by instruction.

 7  I ask if there are any objections.  If there are, you can make

 8  your -- or amendments, you can make your statement on the

 9  record, and then we'll move on to the next instruction.

10            So Instruction No. 1 is introduction to final

11  instructions.  That's the standard one.

12            MR. CHAFFIN:  No objection.

13            MR. LABRANCHE:  No objection, Your Honor.

14            THE COURT:  Instruction No. 2, purpose of jury and

15  duty to follow instructions.

16            MR. CHAFFIN:  No objection.

17            MR. LABRANCHE:  No objection.

18            THE COURT:  No. 3, all persons equal before the law,

19  implicit bias.

20            MR. LABRANCHE:  No objection.

21            MR. CHAFFIN:  No objection.

22            THE COURT:  Instruction No. 4, presumption of

23  innocence, burden of proof, and reasonable doubt.

24            MR. CHAFFIN:  No objection.

25            MR. LABRANCHE:  No objection.
```

Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 4     11/10/2022    552

1              THE COURT:  No. 5, evidence defined.

2              MR. CHAFFIN:  No objection.

3              MR. LABRANCHE:  No objection.

4              THE COURT:  Evidence No. 6 -- I'm sorry --

5      Instruction No. 6, evidence, direct and circumstantial

6      inferences.

7              MR. CHAFFIN:  No objection.

8              MR. LABRANCHE:  No objection, Your Honor.

9              THE COURT:  No. 7, credibility of witnesses.  On this

10     one in the second paragraph I struck the comma after witnesses

11     and all of the brackets including Mr. McFadden, bracket,

12     comma, on that second paragraph.  On the third paragraph I

13     have stricken the same, the comma from after heard through the

14     bracket and comma after Mr. McFadden.  And then I struck the

15     bracketed you should weigh the testimony and evaluate the

16     credibility of Mr. McFadden.  I struck that entire sentence.

17             Any objection?

18             MR. CHAFFIN:  No objection.

19             MR. LABRANCHE:  No objection, Your Honor.

20             THE COURT:  8, impeachment by prior conviction.

21             MR. CHAFFIN:  No objection.

22             MR. LABRANCHE:  No objection.

23             THE COURT:  9, impeachment by prior inconsistencies.

24             MR. CHAFFIN:  No objection.

25             MR. LABRANCHE:  No objection.

19-cr-00243-CMA-GPG-1 Jury Trial - Day 4     11/10/2022    553

1           THE COURT:  10, witness's use of addictive drugs.

2           MR. CHAFFIN:  No objection.

3           MR. LABRANCHE:  No objection.

4           THE COURT:  11, expert witness opinion evidence.

5           MR. CHAFFIN:  No objection.

6           MR. LABRANCHE:  No objection.

7           THE COURT:  12, similar conduct -- oh, that one needs

8  to come out, right?  No.  No, that still comes in because we

9  had the individual -- the victims testify.

10          MR. LABRANCHE:  But -- sorry.

11          MR. CHAFFIN:  It's the Court's position that the

12  prior conduct related to -- I think I understand.  The prior

13  conduct related to J.W. -- the other acts.

14          THE COURT:  The other acts of the victims, yes.  And

15  I did rule on that under Rule 414 at the hearing.

16          MR. CHAFFIN:  I understand.

17          THE COURT:  We can delete 414 evidence, paren, F.R.E.

18  414 evidence.  But I think the children testified -- the

19  victims testified about other similar conduct not charged, so

20  I think that stays.  Do you wish me to delete the F.R.E. 414

21  evidence?

22          MR. CHAFFIN:  Yes, Your Honor.  I think that would

23  confuse the jury.

24          THE COURT:  Okay.  Any objection?

25          MR. LABRANCHE:  No, Your Honor.  I think -- I think

                    Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 4     11/10/2022     554

1    deleting the 414 is appropriate.

2              THE COURT:  All right.  13, nontestifying defendant.

3              MR. CHAFFIN:  No objection.

4              MR. LABRANCHE:  No objection.

5              THE COURT:  14, statements of the defendant I deleted

6    entirely.

7              MR. CHAFFIN:  Thank you.

8              MR. LABRANCHE:  Okay.

9              MR. CHAFFIN:  No objection to that.

10             MR. LABRANCHE:  No objection.

11             THE COURT:  15 now becomes 14.  That's the only

12   change I made.

13             MR. CHAFFIN:  No objection.

14             MR. LABRANCHE:  No objection.

15             THE COURT:  16 becomes 15.  That's the only change I

16   made.

17             MR. CHAFFIN:  No objection.

18             MR. LABRANCHE:  No objection.

19             THE COURT:  17, I have changed everything to

20   singular, so during this trial you have heard a video

21   recording.  This recording was legally produced.  It is a

22   proper form of evidence and may be considered by you as you

23   would any other evidence.  And then in the last paragraph,

24   keep in mind that the transcript is not evidence.  I moved

25   that down to a separate paragraph.  I moved it up to you were

                    Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 4     11/10/2022    555

1   also given transcripts of these recordings to make that all

2   one paragraph.  It was given to you only as a guide.  The

3   recording itself is the evidence.  And then deleted plural

4   recordings and transcripts.

5         MR. CHAFFIN:  Understood.  Did the Court also change

6   this to 16?

7         THE COURT:  Yes.  And changed 17 to 16.

8         MR. CHAFFIN:  No objection.

9         MR. LABRANCHE:  No objection.

10        THE COURT:  18 I changed to 17.  No other change.

11        MR. CHAFFIN:  No objection.

12        MR. LABRANCHE:  No objection.

13        THE COURT:  19 I changed to 18, indictment is not

14  evidence.

15        MR. CHAFFIN:  No objection.

16        MR. LABRANCHE:  No objection.

17        THE COURT:  20 changed to 19.

18        MR. CHAFFIN:  No objection.

19        MR. LABRANCHE:  No objection.

20        THE COURT:  21 changed to 20, separate counts.

21        MR. CHAFFIN:  No objection.

22        MR. LABRANCHE:  No objection.

23        THE COURT:  22 changed to 21.  It's the elements of

24  Counts 1 and 3.

25        MR. CHAFFIN:  Did the Court make the change in the

Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 4      11/10/2022    556

1    unanimity instruction as to during the charged time period --

2    or identified time period?

3            THE COURT:  All right.  What paragraph is that?

4            MR. CHAFFIN:  That's the last paragraph.

5            THE COURT:  Your verdict -- the last paragraph reads,

6    Your verdict on each count must be unanimous.  You have heard

7    testimony about multiple alleged acts.  The Government does

8    not have to prove all of these different sexual acts for you

9    to return a guilty verdict on a count, but in order to return

10   a guilty verdict on a count, all 12 of you must agree on at

11   least one specific sexual act that Mr. McFadden attempted to

12   commit during the identified time period.  If the jury cannot

13   unanimously agree on at least one specific sexual act that

14   Mr. McFadden attempted to commit during this -- the identified

15   time period -- we should add that there, shouldn't we?

16           MR. CHAFFIN:  We certainly can.

17           THE COURT:  If the jury cannot unanimously agree on

18   at least one specific sexual act Mr. McFadden attempted to

19   commit, the jury must return a verdict of not guilty.  So

20   that's how it reads now.

21           MR. CHAFFIN:  No objection.

22           MR. LABRANCHE:  No objection.

23           THE COURT:  23 becomes 22.

24           MR. CHAFFIN:  No objection.

25           MR. LABRANCHE:  No objection.

                    Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 4      11/10/2022    557

 1              THE COURT:  24 becomes 23, proof of knowledge or

 2    intent.

 3              MR. CHAFFIN:  No objection.

 4              MR. LABRANCHE:  No objection.

 5              THE COURT:  25 becomes 24, knowingly declined.

 6              MR. CHAFFIN:  No objection.

 7              MR. LABRANCHE:  No objection.

 8              THE COURT:  26 becomes 25, intentionally defined.

 9              MR. CHAFFIN:  No objection.

10              MR. LABRANCHE:  No objection.

11              THE COURT:  27 becomes 26, duty to deliberate,

12    verdict form.

13              MR. CHAFFIN:  No objection.

14              MR. LABRANCHE:  No objection.

15              THE COURT:  28 becomes 27, communications with the

16    Court.

17              MR. CHAFFIN:  No objection.

18              MR. LABRANCHE:  No objection.

19              THE COURT:  And that's the end.  And then we have the

20    verdict form which was sent to you last week.  It just has

21    Count 1, guilty, not guilty; 2, 3, 4, and 5 as well, and then

22    signed by the foreperson.

23              MR. CHAFFIN:  Your Honor, I don't have an objection,

24    but I think that the defense had indicated before that they

25    would ask for a special interrogatory regarding the sexual

                       Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 4      11/10/2022      558

1   acts.  I don't know how we would phrase that other than

2   perhaps for Counts 3 and 4 where there are contact between

3   Mr. McFadden's penis and J.W.'s anus and then contact between

4   Mr. McFadden's mouth and J.W.'s anus.  That's the only

5   instance that I see where there are separate distinguishable

6   sexual acts that they might not agree on.  I don't -- I'm not

7   sure that a special interrogatory is necessary, but I'm not

8   opposed, I suppose, to adding a line for Count 3 and Count 4,

9   but I think the instruction probably satisfies that.

10          THE COURT:  I think the instruction is pretty clear

11   they have to find this -- unanimously agree on the same.  I

12   don't have an objection, but no language has been proposed to

13   me.

14          MR. LABRANCHE:  Your Honor, I think based on the

15   current instructions, we won't offer the interrogatory.

16          THE COURT:  All right.  So the verdict form is fine

17   as is.  I will change this, and we'll get copies made and be

18   ready to go.  So we only have the one witness.  How long do

19   you expect she will take?

20          MR. CHAFFIN:  Approximately an hour, hour and a half,

21   Your Honor.

22          THE COURT:  Okay.

23          MR. CHAFFIN:  Your Honor, I think that implicit in

24   our conversation, implicit in the Government and defense's

25   agreement is that Mr. McFadden is not testifying, but I would

Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 4      11/10/2022   559

1    ask that we put his decision on the record because it

2    ultimately is his decision to make.  I don't know if the Court

3    wants to do that or break after we rest.

4          THE COURT:  I don't ever do that.  Essentially I just

5    ask the defense if they are going to put on a case.  They will

6    say no, and then that's on the record he's not taking the

7    stand.  I don't do *Curtis* advisements.  That's up to the

8    lawyers.  That's a state court thing.  I don't intend to put

9    anything formally on the record other than the defense is

10   going to rest.

11         MR. CHAFFIN:  Thank you, Your Honor.

12         THE COURT:  Then we will get the jury instructions

13   done, and we will be in recess until the jury arrives.

14         THE COURTROOM DEPUTY:  All rise.  Court is in recess.

15      (Break was taken from 7:43 a.m. to 8:32 a.m.)

16         THE COURT:  Ms. Myhaver, will you please bring in the

17   jury.

18         MR. CHAFFIN:  Your Honor, can we bring in our

19   witness?

20         THE COURT:  Yes, you may go ahead and bring in your

21   witness.

22         THE COURTROOM DEPUTY:  All rise.

23      (Jury entered the courtroom at 8:33 a.m.)

24         THE COURT:  The Government may call its next witness.

25         MR. CHAFFIN:  Your Honor, the Government calls Cheryl

Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 4    11/10/2022    560

 1   Young.

 2            THE COURT:  Ms. Myhaver, will you please administer

 3   the oath.

 4            THE COURTROOM DEPUTY:  Stand and raise your right

 5   hand.

 6                         CHERYL YOUNG

 7   was called as a witness and, having been duly sworn, was

 8   examined and testified as follows:

 9            THE COURTROOM DEPUTY:  Thank you.  Please be seated,

10   and then please state your name and spell your first and last

11   name for the record.

12            THE WITNESS:  Cheryl Young, C-h-e-r-y-l Y-o-u-n-g.

13            THE COURT:  Mr. Chaffin, you may proceed.

14            MR. CHAFFIN:  Thank you, Your Honor.

15                       DIRECT EXAMINATION

16   BY MR. CHAFFIN:

17   Q.  Good morning, Ms. Young.  Can you tell the jury how you're

18   employed?

19   A.  I'm an owner and partner of Behavioral Health and Wellness

20   in Grand Junction, Colorado.  It's a private psychological

21   practice of about 22 clinicians practicing together,

22   psychologists, neuropsychologists, licensed clinical social

23   workers, marriage and family therapists, professional

24   counselors, and psychiatric nurse practitioners in a group

25   practice model.

                      Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 4      11/10/2022    561

1    Q.  And how long have you been involved with that practice?

2    A.  I've been the co-owner since 1992.

3    Q.  And in addition to being the owner, what other roles do

4    you fulfill in that practice?

5    A.  So I'm the clinical director of the practice.  My primary

6    responsibilities include seeing my own patient load.  I'm

7    primarily integrated into a family medicine clinic, but I

8    supervise clinicians in seeing pediatric patients, family

9    therapy, couples therapy.  I co-supervise the forensic team of

10   other practitioners, and I'm responsible for the clinical

11   fellowships, so individuals who have graduated and are

12   pursuing licensure in a fellowship model are also under my

13   supervision.

14   Q.  You said you deal directly with patients, correct?

15   A.  Yes.

16   Q.  In your practice do you deal with patients who have been

17   victims of child sexual abuse?

18   A.  Yes.

19   Q.  Do you have an approximate percentage of your practice

20   that deals with that?

21   A.  So I would say in the first 30 -- 34 years of practice my

22   primary patient load would have been preschool, elementary,

23   middle, and high school age children.  Probably it would be

24   easy to say that 60 to 65 percent of those patients would have

25   been patients who had identified symptoms of trauma or

Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 4      11/10/2022    562

1   traumatic stress.  In the last four to five years I have

2   broadened to not just pediatric and adolescent patients, I see

3   pretty much across the age span of patients as an integrated

4   care clinician, and I would say at this point it's usually

5   between 30 and 40, 45 percent of those patients have a history

6   of trauma, often frequently a history of sexual abuse, both

7   males and females.

8   Q.  I want to just back up a little.  Could you describe for

9   the jury your educational background.

10  A.  I have a bachelor's degree in social work with an emphasis

11  in child development from Colorado State University, which I

12  completed in '81.  I have a master's degree in marriage and

13  family therapy from the United States International University

14  in San Diego, which I completed in 1984.  I did my two-year

15  fellowship postgraduate training in Washington D.C. and South

16  Carolina while my husband was active duty.  I obtained my

17  first license in South Carolina as a licensed marriage and

18  family therapist, and when I returned to Western Colorado I

19  was licensed in Colorado by endorsement from South Carolina.

20  Q.  And when were you licensed in the State of Colorado?

21  A.  In 1992.

22  Q.  And have you maintained that license this entire time?

23  A.  I have.

24  Q.  Are you a member of any professional boards or

25  organizations?

                      Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 4      11/10/2022    563

1    A.  I'm a member of the Association of Marriage and Family

2    Therapists.  I'm a member of the Association of Family and

3    Conciliation Courts.  And then locally I'm a member of the

4    Mesa County Child Fatality Review Team, so we review all

5    unattended deaths of individuals under the age of 21.  And I

6    am a member of the Colorado Mesa University graduate nursing

7    school advisory council.  And then some local net -- I guess I

8    would say networks or groups working in integrating care of

9    family medicine or primary care with integrating behavioral

10   healthcare into those types of clinics.

11   Q.  And I think you described what sounds like several decades

12   of experience treating patients.  Is that fair to say?

13   A.  Yes.

14   Q.  Approximately how many hours would you say that you have

15   spent meeting with patients over the course of your career?

16   A.  Oh, my gosh.  I have worked consistently full-time with

17   some short six-month breaks when I had my own children.  So

18   since '92 I would see an average of 34 to 38 patients a week.

19   I have thousands and thousands of hours of direct clinical

20   care in 38 years.

21   Q.  Have you ever been qualified to testify as an expert in

22   cases related to child sexual assault?

23   A.  I have.

24   Q.  Where have -- where has that occurred?

25   A.  So mostly that occurred in Colorado.  There was some

19-cr-00243-CMA-GPG-1 Jury Trial - Day 4    11/10/2022    564

1   family court testimony when I was in South Carolina, but in

2   Colorado I've been qualified as an expert, and I'm terrible at

3   the numbers, judicial district numbers, so I've been qualified

4   in Mesa County, Montrose, Delta County, certainly Meeker,

5   Craig, Steamboat, Aurora, Leadville, Minturn, and La Plata and

6   Montezuma Counties.

7   Q.   Sounds like you span most of Colorado?

8   A.   I think there's probably a few where I haven't, but the

9   majority I have testified in.

10  Q.   Approximately how many times have you testified in that

11  capacity as an expert?

12  A.   In terms of district court testimony in cases involving

13  allegations of child sexual abuse I have testified well over

14  85 times in district court.   In family what I would say civil

15  matters, child custody, parenting time matters, and Department

16  of Human Services child abuse dependency and neglect cases

17  I've testified over 55 to 60 times in different counties,

18  primarily Mesa County.

19  Q.   Thank you.   Now, Ms. Young, I want to turn to your

20  familiarity with this case.   Have you met with this gentleman

21  here, Mr. McFadden?

22  A.   I have not.

23  Q.   Have you ever met any of the victims in this case?

24  A.   I have not.

25  Q.   We've met or at least talked on the phone?

                        Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 4      11/10/2022      565

1   A.  We've talked on the phone, yes.

2   Q.  Have you reviewed any evidence about this case?

3   A.  I have not.

4   Q.  What is your role today?

5   A.  My understanding of my role is to provide the jury

6   education or information related to cases that involve

7   allegations or specific experiences, psychological reactions,

8   common patterns associated with child sexual abuse that I

9   would have seen or that I know is part of my history of

10  practice and keeping abreast of the information regarding

11  allegations of child sexual abuse.

12  Q.  I imagine you're paid for your services; is that accurate?

13  A.  I know that my practice bills for my services.  I'm not

14  involved or aware of how exactly that works or what those

15  negotiations are.

16  Q.  Ms. Young, can we start by discussing disclosure dynamics?

17  Is that a good place to start?

18  A.  Sure.  So I think the best way to understand disclosure is

19  in recognizing that it's a process and not really an event.

20  Disclosure typically starts with what we in the field refer to

21  as an outcry.  An outcry can be verbal or nonverbal.  It can

22  be certainly different based on the age of the child.  The

23  goal of an outcry is typically when we talk about children who

24  are, say, over the age of 5, 6, 7, an outcry is intended to

25  seek emotional support.  There's not an intention for there to

Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 4     11/10/2022    566

1   be contacts with law enforcement or protection agencies.  The

2   process then can lead to -- does not always -- but can lead to

3   a formal type of interview or formal disclosure by an agency.

4   That goal is not to provide support.  It's to be fact-finding

5   in nature.  The additional ongoing process of disclosure can

6   be part of what happens in therapy in terms of the process of

7   sorting through memories, experiences, perceptions, beliefs

8   towards trying to help that particular child heal and begin to

9   move forward in their life.

10  Q.  So it sounds like you make a distinction between outcry

11  and disclosure.  Who does an outcry typically -- well, I

12  guess, let's orient ourselves.  We're talking about child

13  sexual abuse when we talk about outcry and disclosure,

14  correct?

15  A.  Yes.

16  Q.  Who does an outcry -- who is an outcry typically made to?

17  A.  So for preschool children it can be that a behavior draws

18  the attention of a parent or caregiver.  When the outcry is,

19  you know, more verbal or intentional, it's typically made with

20  elementary school children to a parent or a caregiver that the

21  child has a sense of security with.  When we get up to teens

22  we can see that broaden from a parent to it could be another

23  trusted parent figure, friend.  It could be a youth minister.

24  It could be often just a friend who then might seek the

25  support or help from an adult.  But typically elementary

Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 4       11/10/2022    567

1   school and young middle school will typically see the outcry

2   to a parent and usually the mother.

3   Q.  Might an outcry be made to a counselor if a child is in

4   counseling?

5   A.  Yes.  If the -- so an interesting thing about an outcry is

6   it sometimes has a lot to do with whether or not questions are

7   asked, right?  So one of the things that's changed for most of

8   us who go to primary care physicians is that there are now

9   questions about being feeling safe in your home or were you

10  ever a victim of any kind of childhood abuse.  So we have

11  moved to asking a lot more questions that might help explain

12  somebody's psychological or medical health.  That's also

13  obviously happening in therapy.  It's not unusual for a

14  therapist and part of the standard of practice to ask about

15  their sense of safety and whether or not anybody has done

16  anything in their history that made them feel uncomfortable.

17  Q.  Sounds like as opposed to an outcry, you talked about a

18  disclosure, something more formal typically to law

19  enforcement; is that fair?

20  A.  So we think of a formal disclosure, we think of this as

21  the disclosure process, but the formal disclosure that is a

22  law enforcement or child protection interview is what we think

23  of as that formal disclosure.  It's often used that way in

24  different legal terms.  It's still part of the whole process

25  of disclosure.

Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 4          11/10/2022    568

1    Q.  And can a disclosure occur without an outcry, an

2    investigation-prompted disclosure?

3    A.  Well, sometimes they happen to be at the same time.  I

4    mean, there are situations where a child has not made an

5    outcry to a parent or to a trusted person, but somehow some

6    professional entity, it could be a law enforcement entity,

7    that then has identified other children as possible victims of

8    abuse by an individual that's under, you know, investigation.

9    We have seen cases where -- I certainly have seen cases where

10   an individual in sex offender treatment, part of their

11   treatment is to pass polygraphs, and part of that polygraph is

12   to identify any other victims that have not disclosed to their

13   knowledge but the offender is aware of.  When those children

14   have not made the outcry, then often law enforcement is the

15   initial contact, so that outcry comes as part of a formal

16   interview.  So that does happen, but it's kind of then

17   combined into one experience, not initiated by the child

18   necessarily, but the child has responded.

19   Q.  Is it unusual for an outcry or disclosure to be delayed?

20   A.  So it's fairly common.  There's a couple of exceptions

21   where it's not common, and that's usually when the offender is

22   unknown, it's a stranger assault, or in rare cases -- I've

23   seen only a few where the offender had failed to groom a child

24   adequately to help maintain the secret.  But most outcries,

25   the most typical child sexual abuse we see are delayed, and

                    Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 4      11/10/2022    569

1    they're delayed for a variety of reasons.  But they can be

2    delayed for months, years, through all of childhood, and even

3    through most of adulthood, if not all of adulthood.

4    Q.   You talked about some reasons -- what are some of the

5    reasons why an outcry or a disclosure might be delayed?

6    A.   So the typical reasons have to do with the child

7    experiences a sense of embarrassment.  There's a sense of

8    shame.  They have a fear of being blamed.  They -- for the

9    events.  They have a fear of being rejected by their family.

10   They have a fear of getting the accused or the offender into

11   trouble.  They can have a fear based on threats that have been

12   made, and not necessarily directly towards them.  Sometimes

13   the threats are if anybody finds out about this, I would have

14   to end my life.  Sometimes the threats are to the child or the

15   child's pets, or, if you tell, you'll have to go to foster

16   care.  There can be a variety of threats.

17           There certainly can be a fear of court process for

18   children who are old enough to understand that being a

19   potential outcome.  And there's another thing with younger

20   children we refer to as a lack of emotional awareness.  So

21   preschool and younger elementary school children might

22   experience sexual abuse as weird or funny or icky, but they

23   don't necessarily have a sense of it being sexual or abusive.

24   But as they age and get a little bit older into later

25   elementary, middle school certainly, in high school, there's

Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 4      11/10/2022    570

1   that greater sense of, oh, that was a sexual thing.  That

2   feels a lot worse then.

3          And then, of course, the most complicated one for

4   children is a sense of participation where that blame piece

5   comes from.  That when children have been involved in longer

6   term sexual abuse, there's a lot of participation in their

7   mind, meaning that they may have done sexual acts on the

8   person or they've had physiology arousal to the things that

9   happened to them, and that complicates greatly their sense of

10  being bad or blamed or responsible.

11  Q.  Might a fear of how outcry or disclosure might affect

12  their family delay disclosure?

13  A.  So that's the part where I said the fear of losing a

14  family or being blamed, being rejected by the family, having

15  people angry at them, as well as a fear of something bad

16  happening to them, the accused.  I have seen kids who have

17  held on to the secret out of a fear of losing a horse because

18  they would only have the horse because they live on the

19  offender's property with their mother.  Children have their

20  own sort of sense of commerce and economy and what's important

21  to them even if it's not what we think would be important, and

22  those kinds of perceptions can delay their outcome and outcry.

23  Q.  Are there gender dynamics that affect outcry?

24  A.  If we're talking about the children who are the same sex

25  as the accused, that's the fear of being labeled.  We tend to

19-cr-00243-CMA-GPG-1 Jury Trial - Day 4      11/10/2022    571

1   see it more with male children if the offender is male, that

2   they have a lot of belief or worry or concern that this might

3   mean they're gay, and they believe in this distortion that

4   they are supposed to fight and these things aren't supposed to

5   happen to them.  So out of those distortions that happen with

6   our male victims, elementary school, middle school, and even

7   high school, even adulthood that that fear of being labeled

8   can help delay a disclosure.

9   Q.  Now, I want to turn to a term you used earlier, grooming.

10  Can you explain to the jury what that means?

11  A.  So that's more of a kind of common nomenclature for what

12  we think of as victim-offender relationship dynamics.  So what

13  are those unique dynamics and processes that happen between an

14  offender and a child victim, and they are very complicated for

15  children.  The first being what we call attention and

16  affection.  So children -- all humans need attention and

17  affection, and most grooming starts in a way that looks very

18  normal and healthy and a child is very open and receptive to.

19  So attention and affection typically then slides to a pattern

20  of what we call a slow and subtle exposure to the concept of

21  touching.  So that could be tickling.  That could be wedgies.

22  That could be physical touch that looks more like play, but

23  starts to then get more -- and it can even look accidental.

24  Like children have said they thought that first time something

25  happened they were touched accidentally.  And so that process

                    Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 4       11/10/2022     572

 1    continues for a while.

 2              There certainly can be with younger children and even

 3    elementary school children what we refer to as mislabeling the

 4    activity.  So common ones would be I need to check your

 5    breasts for tumors.  I need to check to make sure you're not

 6    letting anybody touch you or mess with you.  Or I need to show

 7    you this so you'll know what to do when a boy is interested in

 8    you.  Things like that are mislabeling the activity.  There

 9    can certainly be rewards and bribes, and those are usually

10    developmentally appropriate.  So for younger children, candy

11    and toys.  Middle school, older children, it can be alcohol,

12    drugs, rides, transportation, money, things of that nature.

13              There can also be a sense of -- it's kind of an odd

14    one -- a sense of continuing to go along with something in

15    order to protect others.  So sometimes you'll see an older

16    sibling allow events to continue in their mind in order to

17    protect others, so there can be those types of victim-offender

18    relationship dynamics.

19    Q.  Can grooming take the effect of providing care for a

20    child?

21    A.  Yes.  So that's in that affection and attention, but it

22    also can be to the point where there is an increased sense of

23    dependency, whether it's rides to school, clothing, food,

24    time.  Attention comes in all types of sort of events.  It can

25    be in terms of paying for things that are important for the

                          Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 4      11/10/2022     573

1   child, activities.  Not just gifts or things that they would

2   want, but helping them pay for things that are important, like

3   maybe it's a club or maybe it's a sport.

4   Q.  Can this sort of victim-offender dynamics, can that also

5   be applied to a family member of victims?  Can grooming apply

6   to them?

7   A.   In terms of when we're talking about an offender that is

8   not a member of the family, could be like a family friend,

9   somebody in the neighborhood, somebody in the church

10  community, somebody in a connection, coworker, where what

11  they're doing is helping a mom often, a single mom by stepping

12  in and providing babysitting and childcare and daycare, and so

13  that increased sense of dependency and support often

14  inadvertently includes a parent who believes that this

15  individual has a genuine affection and concern for the welfare

16  of that child.  So that kind of babysitting or childcare or

17  help is a part of grooming that spreads to beyond just the

18  child.

19  Q.  Does grooming also include working to have isolated access

20  to a child or a victim?

21  A.  So that's most often seen in things that have to do with

22  childcare, babysitting, tutoring, driving the child places,

23  being almost in that kind of sense of big brother, big sister

24  programs because there may be another parent who's unavailable

25  or not part of the child's life.

                          Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 4      11/10/2022    574

1   Q.  I'd like to talk to you a little bit about sort of victim

2   behaviors.  Is it unusual for a victim to freeze when they're

3   subjected to sexual abuse?

4   A.  No, that would be common, at least in the very early

5   stages of the abuse.

6   Q.  Is it unusual for young children to not understand what is

7   going on at least initially?

8   A.  Yes.  And that falls to that lack of emotional awareness

9   where children don't understand that the events that are

10  happening are more malicious or egregious or inappropriate

11  than they realized because they were young enough that they

12  might have believed it was just something funny or weird or

13  icky or silly.

14  Q.  Do victims usually confront their -- the offender during

15  assaults?

16  A.  No.  We do see some resistance and confronting either

17  directly or indirectly as children age, but it's not common or

18  typical, but it can happen in terms of that average age being

19  about 14 when you might see an individual who's a long-term

20  victim of abuse by someone who has a lot of access, perhaps

21  lives with the family, where they start to resist or threaten

22  to tell as a way to get some control or end the abuse, but you

23  don't typically see it in younger children.  It's more of an

24  active individuation or independence like what you see

25  teenagers naturally do.

                        Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 4      11/10/2022    575

1   Q.   In your practice have you seen victims return to

2   offender's homes?

3   A.   Yes.

4   Q.   Is that unusual or surprising?

5   A.   It's not unusual or surprising, and it goes back to those

6   victim-offender relationship dynamics.  Is that -- I think the

7   best way for all of us to understand that pattern because it

8   seems so illogical is that we see this in a lot of what we

9   think of as abusive patterns of behavior.  The parent or

10  family member who struggles with becoming violent or

11  aggressive under the influence of alcohol or drugs, yet that

12  person is brought back into the family home.  The pattern of

13  domestic violence where there is an act of violence, and yet

14  that spouse who is the violent actor in that marriage or

15  relationship is brought back into the home, or that person

16  seeks out their involvement.

17       One of the things I've learned from child victims,

18  adolescent, and adult victims is that sometimes that time with

19  the offender, although the sexual abuse was an unwanted and

20  difficult part, there was also things that they felt they

21  valued or needed, and those things can be very practical;

22  money, housing, access to illegal substances.  And so that

23  exchange in their minds is that I know this is not okay, but I

24  need this, and so there can be those practical behaviors.

25  There can be returning to an accused out of a sense of guilt

Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 4      11/10/2022      576

 1   and wanting to make sure the accused is okay or doesn't hate

 2   them or those kinds of patterns.

 3   Q.  I want to turn to memory, if we can.

 4   A.  Okay.

 5   Q.  Are there different types of memory?

 6   A.  Yes.  So there are a variety of memory domains, some being

 7   what we think of as nondeclarative and some being what we

 8   think of as declarative memory.  Memory is one of those more

 9   complicated things.  When we're talking about the kind of

10   memory that has to do with experiences we've had, we think of

11   that as autobiographical memory or event memory, and so those

12   are things we've actually experienced in life compared to fact

13   memory, right?  Two plus two is four.  I know I'm married.  I

14   don't have to think back as to whether or not I went through a

15   wedding.  I just know certain facts about myself in the world.

16   But autobiographical memory is unique to the specific

17   experience we've had in life that's unique to us and that we

18   actually witnessed and were a part of.

19   Q.  Are there different aspects of autobiographical memory?

20   A.  I think the best way to understand it is it also is a

21   process, and the process starts with what we call encoding.

22   Encoding is using all of our senses while something is

23   happening, what we're seeing, what we're hearing, what we're

24   smelling, what we tactile experience in terms of feeling, what

25   we're tasting.  Another one called proprioception, which is

                        Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 4      11/10/2022    577

1   like where is our body in space when this event is occurring.

2   So the brain is taking its primary energy when an event is

3   happening and encoding what it can of the event, and then it

4   goes into storage, and then it goes into retrieval, and there

5   are some specifics about each of those.

6   Q.  Can you -- well, the encoding stage, is that a conscious

7   process or is that something that we do?

8   A.   Well, it's conscious in that we are alert and we're not in

9   an altered state generally.  It's not necessarily intentional.

10  It sometimes can be, but just being awake, alert and aware and

11  encoding an event is more of just a natural process, and, yes,

12  we're conscious.  But like everything else, when the event is

13  over, we have to go on to the next thing, and so the second

14  stage of encoding is what we call storage or consolidation.

15  So we have to consolidate all of that stuff, and then it has

16  to drop into storage, and it goes in through a few stages.

17  Like short-term working memory, while it's happening, going

18  into long-term memory, getting further consolidated,

19  interestingly enough, in certain stages of sleep.  And then

20  that experience is then stored, and then it has to be

21  retrieved.  The problem is that storage is not and

22  consolidation is not like a video camera, so it's not

23  reproductive.  It's reconstructive, so we have to reconstruct

24  a memory every time we pull it up.

25  Q.  And is that recall or that reconstruction, is that a

                    Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 4      11/10/2022      578

1    process as well?

2    A.   It is.  So when we think about reconstructing a memory,

3    it's more like an analogy of like putting together a puzzle,

4    right?  And every time we do that with a memory, good

5    memories, bad memories, it's very common to leave out certain

6    pieces or to re-discuss it sometimes in a different order or

7    different sequences.  But when you are looking at retrieval of

8    a memory, you should have the salient details consistent.  Not

9    the less salient, irrelevant, extraneous details.  But the

10   salient details should be consistent across time.

11   Q.   And can you give examples of what salient details might

12   be?

13   A.   So salient details are who was present when the event was

14   happening?  What were the basic transactions?  This happened,

15   that happened, I did, they did, that transactional present.

16   And where physically did the event happen.  What room?  What

17   place?  Inside, outside, those kinds of basic -- a sense of

18   like that room or that location.  It's a little bit trickier

19   for preschool children or younger elementary school children.

20   They won't necessarily say to you, oh, that was at 462 house.

21   They wouldn't know that.  But they could describe enough of

22   that where physically did that happen for adults to deduce

23   that.  When is not stored.  It's inferred.  None of us store

24   when unless it's directly attached to something like our

25   anniversary.  Even then it might be I don't remember if that

                    Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 4     11/10/2022     579

1   was 2015 or 2016 we did that.  Like, that's still a process of

2   inference.  So who was there, what were the basic

3   transactions, where physically was the location.

4   Q.  And if I understand correctly, our memory doesn't -- we

5   don't store the date for our memories?

6   A.  When is -- the only exceptions would be most of us in a

7   memory of a wedding, and even then sometimes we get that

8   wrong.  What is our anniversary date?  But those are very

9   unique things.  But when we're talking about children, you

10  know, they're not responsible for keeping track of when their

11  dentist appointment is or what's their back-to-school night.

12  Certainly high schoolers we expect a little bit more

13  responsibility, but they're not responsible for time, and so

14  they don't -- they don't even infer it as easily.  Elementary

15  school kids and middle school often need help of a parent to

16  help infer when something was.

17  Q.  Can experiencing similar things over a period of time, can

18  that affect memory?  Can that affect how memory is stored?

19  A.  Yes.  So there are -- the brain is and the mind is

20  efficient, so what it does is it separates episode specific

21  memories from scripted memories, and we all do it all the time

22  in our -- we don't realize our mind is doing this.  But the

23  best example I was given was for event-specific memory.  For

24  most of us we can remember what we were doing when we learned

25  of the Twin Tower bombing.  Most people can say, wow, I was at

Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 4      11/10/2022    580

1    a coffee shop.  For me, I was literally getting ready for work

2    when I saw in the mirror watching the TV the first plane hit

3    the first tower.  Like, I have a vivid memory of that, and I

4    know, because we all know, that was 9/11, right, because that

5    is used in terms of referencing the event.

6            If somebody was to ask me what were you doing on that

7    same day the week before, I would go in scripted memory,

8    right?  I would have to say, Well, if it was a workday, I

9    probably got up, let the dog out, started the coffee, turned

10   on the shower, so I am scripting what I would normally do on a

11   typical workday.  As unusual as it sounds, we will script

12   memories even though they are abusive or distressing.  And

13   children, when the act of an assault or a sexual abuse

14   encounter happens in a highly similar way in the same physical

15   place, that can become scripted.

16           So the way you usually can tell a child is in

17   scripted memory is they will say most of the time or usually,

18   and then our goal is to try to get sometimes information that

19   is more episode specific.  So a lot of times you'll have

20   questions like can you remember the first time it happened

21   there?  Or can you remember a time it happened there and

22   something different happened or something unusual?  Because

23   when something unusual happens, then it becomes more episode

24   specific and not scripted.  So scripting is efficient, all of

25   us do it, and it even happens on things that are abusive or

                    Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 4      11/10/2022      581

1   difficult.

2            MR. CHAFFIN:  Could I have just one moment, Your

3   Honor?

4            THE COURT:  You may.

5   Q.   (By MR. CHAFFIN) Ms. Young, I just have one final topic

6   that I want to talk to you about.  In your experience as a

7   counselor, what sorts of long-term effects have you seen in

8   patients who have experienced child sexual abuse?

9   A.   So those are a combination of things, and they're very

10  much tied to what ended up happening in their experience of

11  sexual abuse, right?  So one of the things that is important

12  is what were the age when it happened.  If there was an outcry

13  or even a disclosure, were their parent or parents supportive,

14  so how much support and validation did they get in terms of

15  not being blamed, all those things I've already talked about

16  to kind of break down some of that shame and embarrassment.

17  So looking at the health of the family and the support,

18  whether there was ever an outcry, whether or not abuse

19  happened a few times or across a longer period of time.

20           So there are several developmental stages within

21  childhood, and I think of them as stairsteps, right, all the

22  way through life, but definitely in childhood.  Trauma creates

23  fractures in those steps, and so when trauma happens across

24  more developmental stages, then what we see on the clinical

25  side we then call complex trauma.  Complex trauma is more

                    Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 4       11/10/2022       582

1    difficult for the patient certainly, but also in terms of the

2    treatment.  When trauma happens to us as an adult, our brain

3    is already fully developed in the sense that all those

4    neurons, that wiring is completed.  So adults, trauma impacts

5    us psychologically.  Trauma for children, teens, and very,

6    very early 20s, but especially elementaries through teens,

7    trauma actually changes the way the brain wires up in terms of

8    what template synaptic connections between neurons, what

9    neural pathways are created.

10          These children that have ongoing trauma are more

11   vigilant.  They are more reactive.  They often are at much

12   greater risk to develop substance abuse problems in teen years

13   and adult years to mitigate, a type of self-medication.  They

14   struggle with a sense of confusion about sexual contact and

15   sexual intimacy.  They often struggle with just very low

16   self-value.  And the other thing that adds to that is beyond

17   the sexual abuse, what other adverse childhood experiences did

18   they have.  So we call that the ACE research, adverse

19   childhood experiences.  Most ACEs -- there's ten of them --

20   happen within the family home.  Abuse, neglect, physical

21   abuse, physical neglect, psychological abuse, emotional abuse.

22   That's within the home by a caregiver.  Sexual abuse by anyone

23   defined as unwanted sexual contact under the age of 18, that's

24   one of the ACEs.  The other five ACEs are substance abuse in a

25   parent or caregiver, mental illness in a parent or caregiver,

                    Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 4      11/10/2022      583

1   incarcerated household member, witnessing their mother treated

2   violently, and the last one being separation or divorce within

3   the family.

4          So if we have the sexual abuse as one of our ACEs, we

5   also then have several others, then it even becomes more

6   complex to recover from that type of complex ongoing trauma.

7   So much of that is tied to all of the other possible

8   adversities.  It impacts the likelihood of unmasking a chronic

9   illness, diabetes, use of drugs or alcohol.  Autoimmune

10  disorders can unmask as a result of repeated or complex

11  trauma, so then you get health factors involved, and then you

12  have that on top of the post-traumatic or complex trauma.  It

13  is a very difficult pattern, unfortunately, for a lot of our

14  childhood victims of sexual abuse.

15  Q.  Thank you.  And I said I have only one topic, but I

16  remembered a question I forgot to ask.  So can -- does the

17  passage of time affect recall or reconstruction?

18  A.  Yes.

19  Q.  Can a 20-year-old recall accurately what may have happened

20  to them as a 10-year-old?

21  A.  They can accurately recall it, but you will find that

22  across time, like almost all memories, those memories are

23  diminished is probably the best word.  So the richness of

24  those memories across time have decayed, which is, again, a

25  pretty natural process.  So when you think about that

                    Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 4     11/10/2022     584

```
 1    retrieval part of memory and that putting together the puzzle
 2    of what's happened, then what you'll find is more of those
 3    extraneous details are harder then to also access, because
 4    there's been a length of time.  We notice that if there's been
 5    ongoing therapeutic intermittently across time, because when
 6    children are traumatized, they can only understand it like the
 7    7-year-old they were.  Well, they're going to be in a very
 8    different cognitive level in middle school, into high school
 9    and then adulthood.  So if children don't get an opportunity
10    to go back through and now understand it as a high schooler or
11    a person who's a young adult, then that opportunity to kind of
12    reprocess those memories which then makes that reconstruction
13    a little bit richer with more detail, but when that gets
14    shoved away, then you'll see less of that rich detail and even
15    some of what we would call forgetting, like I don't remember
16    that part.
17                MR. CHAFFIN:  Nothing further, Your Honor.  Thank
18    you.
19                THE COURT:  Thank you.
20                Cross-examination, Mr. LaBranche.
21                          CROSS-EXAMINATION
22    BY MR. LABRANCHE:
23    Q.  Good morning.
24    A.  Good morning.
25    Q.  So you and I have never met, correct?
```

                          Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 4     11/10/2022    585

1    A.  No, I don't think so.

2    Q.  Have you ever met Mr. McDermott here?  I'm sorry, the

3    gentleman in the black jacket?

4    A.  No, I have not.

5    Q.  Okay.  And the defendant, Mr. McFadden?

6    A.  No.

7    Q.  Okay.  So we never -- you've never spoken to the defense

8    in this case?

9    A.  Unless it was way back, I don't have any memory of

10   speaking to any of you.

11   Q.  Okay.  But you did talk to the prosecution in preparation

12   for your testimony, correct?

13   A.  Yes.

14   Q.  How many times?

15   A.  Only once.  It was within the last couple of weeks, and it

16   was maybe a 20-minute, maybe a 30-minute phone call.

17   Q.  But you also drafted a report for them in this case,

18   correct?

19   A.  I don't recall drafting a report for them.

20   Q.  Okay.  But they told you what you -- they wanted you to

21   testify about, correct?

22   A.  Oh, they did.  They reviewed, like, what are areas I've

23   been previously qualified as an expert in, and they indicated

24   like four or five areas that they wanted to ask me questions

25   in.

                     Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 4     11/10/2022    586

 1  Q.  Okay.  So they -- so you didn't review anything in this

 2  case, but they told you in general terms what they wanted you

 3  to testify about?

 4  A.  Yeah.  In those areas of qualification I remember they

 5  asked about me testifying to disclosure dynamics,

 6  victim-offender relationship dynamics, and I think human

 7  memory are the three that I can recall they asked me to

 8  testify to.

 9  Q.  And then, you know, you are -- sounds like you've been an

10  expert for a pretty long time, correct?

11  A.  I think since the time that I started tracking cases at

12  the request or a recommendation as just part of licensing

13  ethics was probably 2004.

14  Q.  Okay.  And then I think -- I didn't really catch this, but

15  I think you said something about 2016 there might have been

16  some developments in your area of expertise -- new

17  developments.  Am I correct about that?

18  A.  I think what I said is that in 2016 I took over managing

19  or starting a fellowship inside a family medicine clinic, and

20  that sort of altered me instead of only working with children

21  and families, I then also included working with more adults.

22  Q.  Okay.  And then in your area of expertise have there been

23  any recent developments in the past ten years?

24  A.  You mean in terms of my background and experience?

25  Q.  In the subject matter, not necessarily yours, but in the

                    Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 4      11/10/2022    587

1  subject matter for which you're an expert.

2  A.   I would say that there is always some evolution in what we

3  learn and understand.  The information on the adverse

4  childhood experiences kind of being one of those things in the

5  last ten years that's been more of -- included more in terms

6  of understanding trauma.

7  Q.   Okay.  And so there -- you know, can you explain a little

8  bit more about the ACE score, this adverse childhood -- what

9  is it, adverse childhood experience?

10 A.   Yes.

11 Q.   And isn't it true -- that's a pretty simple exam, isn't

12 it?

13 A.   In terms of checking the -- yeah, it's fairly simple, yes.

14 Q.   I believe it's, what, like, ten questions?

15 A.   Yes.

16 Q.   And you're -- I don't know if you remember them off the

17 top of your head, but it's things like if the child has been

18 sexually abused, correct?

19 A.   Right.  The unique part of the ACE score is that all of

20 the ACE questions, nine of them have to do with treatment and

21 experiences in their home by a parent or a caregiver.  The

22 only exception is the question about sexual contact or sexual

23 abuse.  That's the only one where it can be anyone, not

24 somebody within your home, but anyone.  The rest are specific

25 to the home environment of caregiving.

                    Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 4      11/10/2022    588

 1  Q.  Are there nine or ten total questions?

 2  A.  Ten.

 3  Q.  Okay.  So nine deal with family, though?

 4  A.  Yeah.  Nine are that those experiences occurred in the

 5  family home and were the responsibility of parents or

 6  caregiver.

 7  Q.  And some other questions are, you know, if they'd been --

 8  if they've lived in a household where their parent is abused

 9  by -- like mother is abused in a domestic violence way?

10  A.  Yes.

11  Q.  If they witnessed domestic violence.  That's a topic,

12  correct?

13  A.  Yes.

14  Q.  If the child is actually sexually abused, correct?

15  A.  Yes.

16  Q.  Okay.  Exposed to drugs and alcohol, correct?

17  A.  Yes.

18  Q.  If a parent goes to jail?

19  A.  Yes.

20  Q.  Okay.

21  A.  Or a family member in the household.

22  Q.  So can you think of anything -- I didn't know you were

23  going to speak about this, and I don't -- I'm not trying to

24  quiz you on it, but do you remember any other possible

25  questions that are on the ACE exam?

                     Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 4      11/10/2022   589

1    A.  Well, I know all ten.

2    Q.  Go ahead.

3    A.  Oh, okay.

4    Q.  Go ahead.  Tell us some other ones.

5    A.  So the ten questions are, you know, did you experience

6    physical neglect as a child?  Unclean home, unclean clothes,

7    lack of supervision, those things.  Were you -- did you

8    experience psychological abuse?  Being called names, being

9    cursed at.  Did you experience physical abuse?  Slapped, hit,

10   punched, kicked, those types of things.  Did you experience

11   emotional neglect?  Parents or caregivers who just did not

12   have the ability or time, there was a lack of interest

13   emotionally in noticing how you're doing and how you're

14   feeling and talking with you, paying attention to you.  And

15   then the sexual abuse, did you experience unwanted sexual

16   contact under the age of 18 by anyone, including anyone inside

17   or outside of the family?  So those are the five that are

18   specific to abuse and neglect.

19   Q.  So the test is scored 0 to 10, correct?

20   A.  Right.  And the next five have to do with what you had

21   mentioned.

22   Q.  Okay.  And so -- and then also the purpose of the test --

23   well, there have been studies that the higher the ACE score,

24   the more likely the child is going to have various types of

25   physical problems, correct?  Physical and medical problems,

Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 4     11/10/2022     590

1   correct?

2   A.   Yes.

3   Q.   And also psychological?

4   A.   I'm sorry?

5   Q.   And also psychological?

6   A.   And also psychological, yes.

7   Q.   But you didn't perform an ACE test on any subjects in this

8   case?

9   A.   No.

10  Q.   Okay.  So you don't know if they have any physical issues

11  that the ACE -- the high ACE score would contribute to?

12  A.   I don't have any idea.

13  Q.   What are those -- what are the physical medical issues

14  that a high ACE score will contribute to?

15  A.   We have to think of it more of as a pattern.  So the

16  higher the ACE score, the greater risk you have for early

17  pregnancy, substance abuse, self-medication, drugs and

18  alcohol, lifestyle issues that then also between a history of

19  trauma and the history of substance use, being a victim of

20  domestic violence, those sorts of things, leads to in the 30s,

21  40s, and 50s the unmasking of chronic health conditions;

22  autoimmune, cardiac issues, cancer, a lot of things that would

23  indicate what we've always believed that chronic high stress

24  immunocompromises, lowers our ability of our body to resist

25  illness, and those genetic vulnerabilities for certain

19-cr-00243-CMA-GPG-1 Jury Trial - Day 4      11/10/2022      591

1    illnesses can unmask leading to greater difficulty in terms of

2    morbidity and mortality.  If you have an ACE score of two or

3    under, we think of you as medically uninteresting.  We're not

4    going to see you much in terms of chronic health conditions.

5    We also believe and the research from the CDC and all the ACE

6    research suggests it's very likely you'll still be alive and

7    healthy into your 70s and 80s.  But, unfortunately, high ACE

8    scores are correlated with early morbidity and mortality, and

9    that's the tragedy of complex trauma.  I think that was the

10   question I was answering.

11   Q.  So the more trauma, the more medical health issues

12   someone's going to have?

13   A.  Increases the likelihood of that, with -- and, again, this

14   relates to when there is not the necessary interventions to

15   target that trauma, the greater risk of them falling into that

16   pattern in 30s, 40s, and 50s.  The ACE research indicates the

17   more intervention treatment and redirection we can provide

18   healthwise psychologically and physically, the less likely

19   that those chronic illnesses will unmask.

20   Q.  You said for once -- one instance you said is they're more

21   likely to use drugs and alcohol, correct?

22   A.  Yes.

23   Q.  But that doesn't necessarily mean -- someone who uses

24   drugs or alcohol, doesn't necessarily mean they were abused?

25   A.  Does not necessarily mean that, yes.

                         Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 4      11/10/2022    592

1   Q.  Now, let's get back to disclosure dynamics.  You said

2   disclosures can happen in many different ways?

3   A.  Yes.

4   Q.  Typically there's an outcry?

5   A.  Yes.

6   Q.  An outcry is usually made to family members, could be a

7   counselor, usually someone that the child is close to,

8   correct?

9   A.  Or the child trusts, or the person that the child trusts

10  who also happens to ask the question.

11  Q.  Okay.  But not every outcry -- 100 percent of child

12  outcries are -- they're not always accurate, correct?

13  A.  That's correct.  There can be a misunderstanding,

14  particularly with preschool children, and there can be some

15  outcries that are either false or a product of a

16  misunderstanding.

17  Q.  Okay.  So false outcries do exist?

18  A.  Yes.

19  Q.  Okay.  Delayed disclosure.  Now, you know, delayed

20  disclosure, I think you said that those can also be -- there's

21  many different reasons for a delayed disclosure, correct?

22  A.  Right.  There are several of what we see is the more

23  common patterns of delayed disclosure, but I think I listed

24  probably five, six, seven of those common ones.

25  Q.  Embarrassment, rejected, threats, those are things that

Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 4      11/10/2022    593

1    could delay a disclosure?

2    A.   The shame, the sense of participation, lack of emotional

3    awareness about what the events were, and then fear of being

4    labeled and certainly fear of the court process, fear of

5    getting the accused into trouble, fear of being in trouble

6    themselves.

7    Q.   And also if the child participates, what do you mean by

8    participate?

9    A.   So in longer term sexual abuse where there is -- the

10   grooming has been effective, the participation is that often

11   the children will then perform the sexual acts on the accused

12   as compared to having the sexual acts performed on them, those

13   are the harder ones for children to disclose and discuss.  One

14   of the complicated things in treating children is their

15   confusion about having normal physiology arousal even to

16   contact that was unwanted or they think was wrong.  There's a

17   lot of shame in having sexual arousal as part of that, so part

18   of the treatment with kids in therapy is helping them

19   understand the body responds the way it does in certain normal

20   patterns.

21   Q.   But if the child is participating in sex acts, meaning the

22   child is touching the abuser or performing sex acts on the

23   abuser, that's something that causes delay in the outcries?

24   A.   Yeah, and a sense of participation causes more likelihood

25   of delay.

Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 4      11/10/2022    594

1   Q.   Okay.  Also you mentioned things about -- well, and also

2   let's -- just because a disclosure or an outcry is delayed

3   doesn't mean it's true either, correct?

4   A.   No.

5   Q.   Okay.  Let's talk about grooming.  You know, not every --

6   I mean, acts of grooming themselves are not -- giving a child

7   a toy is not wrong, correct?

8   A.   It's not wrong.

9   Q.   Allowing a child to play in the yard is not wrong,

10  correct?

11  A.   It's not wrong.

12  Q.   Giving the child attention or affection, you know, it's

13  not wrong, correct?

14  A.   Let me sort of clarify that.  It is not wrong in terms of

15  how we all might visually see that.  Now, the intention of an

16  offender about why they're doing that can certainly be wrong.

17  Like, what is the ultimate goal of doing that?  But when we

18  look from the outside in, that action does not look wrong.

19  Q.   But part of the grooming process I think also -- did you

20  mention attention, affection?

21  A.   Uh-huh.

22  Q.   So that is -- normal affection is okay, hugging a child --

23  A.   Yes.

24  Q.   -- you know, is okay?

25  A.   Yes.

                    Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 4     11/10/2022     595

1    Q.  Okay.  But attention, affection -- correct me if I'm wrong

2    -- it's kind of, you know, where they're escalating the

3    affection from normal affection to some sort of sexual acts,

4    correct?

5    A.  Yes.

6    Q.  Like you said a lot of times grooming will involve

7    tickling, wedgies, physical play, you know, maybe -- and then

8    mislabeling activities as well, correct?

9    A.  Yes, with younger children mislabeling.  I think I used

10   the term slow, subtle exposure to the concept of touching and

11   sexual touching.  There's this period that is gray and

12   confusing for children about whether something was wrong or

13   whether it was just teasing or maybe it was an accident that

14   they tickled me there in that place.  That's where it happens

15   and children are confused, and then it slides into -- the more

16   that goes on, sliding into more direct sexual contact.

17   Q.  And the mislabeling activity, you know, giving the child a

18   bath and then touching them in a sexual way and using the bath

19   as kind of a cover, that would be something like a mislabeling

20   activity?

21   A.  Yes.

22   Q.  Okay.  And so those are more alarming grooming -- those

23   are the more alarming grooming factors than, you know, letting

24   the child play or giving the child a toy?

25   A.  Yes.

                    Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 4    11/10/2022    596

1  Q.  Or letting the child -- you know, taking the child to the

2  park or taking the child on a trip?

3  A.  Yes.  And I think, again, it's the progression from what

4  looks very normal and feels very appropriate into where it

5  gets more confusing for children.

6  Q.  Okay.  Also helping out family members can also be

7  considered an act of grooming?

8  A.  Right.  So if the intention of the offender is to be able

9  to isolate the children, then that's where it would be

10 considered to be an act of grooming.  Somebody that volunteers

11 to babysit out of just concern, enjoyment of taking care of

12 somebody's children and just babysits is a totally normal

13 appropriate behavior.

14 Q.  But, you know, helping out a child's family is not

15 necessarily an act of grooming.  It can also be normal?

16 A.  It can be.

17 Q.  The act of caring can be genuine?

18 A.  Yes.  It's that pattern of what is happening the more time

19 alone that an offender has with children.

20 Q.  Is the purpose of grooming family members also sometimes

21 for the family members to look the other way or not ask

22 questions or --

23 A.  No, I think that's a somewhat complicated question.

24 Certainly what I've heard from moms whose children have gone

25 through this type of sexual abuse is the hindsight.  As the

Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 4       11/10/2022     597

1   abuse is disclosed and they become aware of it, you know,

2   looking back I should have questioned A or B more, whatever

3   they think was odd.  Walking in and there is a -- you know,

4   everybody's in the bedroom and the door is closed, and things

5   where I've seen moms question that they missed things and then

6   begin to sort out therapeutically is that denial?  Was it

7   exhaustion?  Was it tied to if they have their own history of

8   maltreatment?  Having moms begin to sort that out is their

9   therapeutic challenge and goals.  But in terms of how that --

10  like, I think you said denial or looking the other way, it's

11  more typical that what I've seen is missing cues, not an

12  intentional looking the other way, but it can be.

13  Q.  Okay.  But then you talked about isolated access, and that

14  would be trying to separate the child from the parents?

15  A.  Yes.  Although sometimes I've certainly seen sexual abuse

16  even when everybody's in the same home, but it's happening in

17  a different part of the house, it's happening at night when

18  people are sleeping.  It's still a form of isolation, but it

19  does not necessarily mean you're home alone with the child.

20  Q.  But just because someone's alone with the child doesn't

21  mean there's abuse?

22  A.  That's true.

23  Q.  I think you also said something about if a child gets

24  older, they're more likely to resist or confront the abuser?

25  A.  So when you have -- and I'm talking about when an abuser

                    Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 4      11/10/2022    598

1    typically lives in the home and has quite a bit of access or

2    control over a victim.  Although there can be a lot of

3    complacency and maintaining the secret, it's not unusual to

4    begin to see at around age 14 greater resistance.  That's the

5    -- when sexual abuse is happening within a home, that tends to

6    be the common age where you will see outcries or

7    confrontations or in some heated argument, you know, a 14-,

8    13-year-old says something that causes alarm to a parent that

9    drops the hint.  That tends to be the average age where we see

10   that when the offender is in the home or very frequently in

11   the home with a lot of access.

12   Q.  But 14 is just the average.  It's not the exact age where

13   confrontation or resisting occurs.  It's average.

14   A.  It's an average age, and then we look at like kind of when

15   is it most likely that's happening, right?  So 14 being like

16   on a bell curve, that average age, there are always outliers.

17   Then we look at sort of developmentally, huh, why does it tend

18   to be about that time?  That's also about the time that

19   children, teens begin to resist all sorts of adult

20   expectations and control, and so it would fit that that would

21   be one of those same areas.  More control over their body,

22   more control over their privacy, more control over who they

23   let touch their body, those sorts of things.  So that's normal

24   in all types of -- children who are not being sexually abused,

25   that's a normal time for independence, individuation, and

Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 4     11/10/2022     599

1   greater resistance to adults controlling them.

2   Q.  But children who are 12 can resist?

3   A.  Children who are 12 can.

4   Q.  Children who are 11 can resist?

5   A.  It begins to drop.  It's less frequent, and it has to go

6   back to how much access.

7   Q.  But they do.  There are cases where 11-year-olds resist?

8   A.  I think one of the first things I testified to --

9   Q.  Can you just answer the question?

10  A.  Yeah.

11  Q.  11-year-olds -- there are cases where 11-year-olds resist?

12  A.  Yes, there are.

13  Q.  There are cases where 10-year-olds resist?

14  A.  Less frequent as you go down.

15  Q.  There are cases where 9-year-olds resist?

16  A.  I'm trying to think if I know personally in my years of

17  seeing in that fourth grade, third grade realm, when I have it

18  goes those two areas that I testified to that the offender was

19  unknown or that the child was not adequately groomed.  That's

20  when, you know, I will see that in those two categories.

21  Q.  But you're just basing your answer on cases you've seen?

22  A.  Yeah, so the cases that I've seen, you know, in terms of

23  what we know from sort of the research on child sexual abuse,

24  trying to identify what are those factors that increase

25  outcry.  And, again, those two that increase the likelihood of

Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 4      11/10/2022    600

 1   outcry right away is a stranger assault or a victim who was

 2   not adequately groomed.  Something that even though the

 3   offender was known, came out of the blue.  You can even see

 4   children younger than 9 in those cases make such statements.

 5   Q.  But your answer is based on only the cases you have

 6   reviewed?  You're not looking at -- you're not looking at a

 7   case study to see?

 8   A.  Off the top of my head, no.  I'm not thinking about a case

 9   study.  I'm thinking about the research that also identifies

10   kind of the likelihood of outcry at different ages.

11   Q.  Okay.  And so you testified about various ways memory

12   works and different types of memory.  Is there also -- are you

13   familiar with false memories?

14   A.  Yes.

15   Q.  Okay.  What is a false memory?

16   A.  So false memories are memories where a pattern of what we

17   think of as coercive and repeated suggestive -- I wouldn't say

18   counseling, but I would say suggestive techniques with a child

19   where a child is then led to believe an event had occurred

20   that didn't occur.

21   Q.  Okay.  So is that why, you know -- is that -- is that why

22   individuals who question children about sexual abuse are

23   trained, forensic experts -- forensic experts; is that

24   correct?

25   A.  Correct.  The historical concern about false memories back

                    Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 4     11/10/2022     601

1   in the '80s brought forth highly structured protocols for

2   forensic interviewing, especially in this particular area of

3   allegations of child sexual abuse that didn't really exist

4   before the '80s.

5   Q.  So you don't want someone questioning a child -- you know,

6   if there's a sex assault investigation related to a child, you

7   don't want someone questioning that child with suggestive

8   questioning, correct?

9   A.  Well, I think we have to define questioning, because it's

10  very common since the outcry comes through a parent, a mom,

11  perhaps somebody within a school setting, et cetera -- it's

12  not uncommon for there to be some questions about that.  Part

13  of it is to just understand what the child is trying to tell

14  you.  Perhaps for a school counselor it is do I have what I

15  need in order to make a report?  Do I understand what the

16  child is saying?  So it's not unusual during an outcry for --

17  in fact, it's probably highly typical in an outcry for there

18  to be some questions.  That's not what was tied to false

19  memory, but there -- it's not that there's no questions.  And

20  then there is the formal -- if it gets reported to law

21  enforcement, the formal forensic interview of the trained

22  professionals using a protocol.

23  Q.  But if there are too many suggestive questions during an

24  outcry, that can create false memories, can't it?

25  A.   Well, it's -- I know it sounds like it would be highly

Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 4     11/10/2022    602

1   common, but the --

2   Q.  Excuse me.  I just asked a yes-or-no question.  I didn't

3   ask if it's very common.

4         MR. CHAFFIN:  Your Honor, I object.  I think the

5   witness needs to be allowed to explain her answer.

6         THE COURT:  Well, you can redirect.

7         MR. CHAFFIN:  I don't think it's an easy yes-or-no

8   question.

9         THE COURT:  He asked a yes-or-no question.  Answer

10  yes or no.  Mr. Chaffin can follow up.

11  Q.  (By MR. LABRANCHE) So the question is a yes-or-no

12  question.  The more suggestive questions that are asked during

13  an outcry, that would also increase -- wouldn't it also

14  increase the likelihood of there being false memories created?

15  A.  Are you talking about a particular age of child, because

16  there are some differences.

17  Q.  In children in general.

18  A.  In children in general, no.  In children, if you're

19  talking about preschool, yes.

20  Q.  But isn't it true that false memories are not limited to

21  children.  They can be -- adults can have false memories?

22  A.  They can.

23  Q.  Yes.  They can be created in adults?

24  A.  There was concerns about that particularly in the '80s,

25  yes.

                    Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 4    11/10/2022    603

1   Q.  Were there concerns or is it -- or can false memories be

2   created in adults, yes or no?

3   A.  They can, but the concern came forward in the '80s, yes.

4   Q.  And they can also be created in children?

5   A.  Particularly preschool children, yes.

6   Q.  Okay.  And they are created through -- they can be created

7   through suggestive questioning?

8   A.  So what the research shows is they can be created --

9   Q.  Ma'am, is it yes or no?

10  A.  Well, I'm going to say I can't answer that with that

11  suggestive questioning as the only term you're using,

12  unfortunately.

13  Q.  So what is suggestibility?

14  A.  So suggestibility is that when you're asking a question,

15  you are asking it in such a way that you are suggesting you

16  know the answer or that the child needs to agree with you.

17  Q.  So a question like tell me where he touched you, that's

18  suggestive, right?

19  A.  Well, it depends on where that comes in in an interview.

20  If the child has talked about being touched in a certain area

21  and you ask -- I mean, the question should be can you help me

22  understand where about where he touched you in that part of

23  your body or on that part, so it depends on where a question

24  falls to some extent.

25  Q.  Well, obviously if the child had already disclosed, and

Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 4       11/10/2022     604

1   it's a follow-up question, it's not suggestive because the

2   child already disclosed, correct?

3   A.   Generally, yes.  That's what I was confused about in your

4   question.  I'm sorry.

5   Q.   Okay.  But if the first question is where did he touch

6   you, that's definitely suggestive, right?

7   A.   It's definitely leading and suggestive.

8   Q.   Because it implies that someone was touched before they

9   make a disclosure, correct?

10  A.   It's suggesting -- say that part again.

11  Q.   If it's the first question, it implies -- it implies that

12  any -- it's implanting -- tell us why it's suggestive.  Why

13  don't you tell us, if it's the first question asked.

14  A.   If it's the first question asked, I still have to go back

15  to what has the child said, right?  And I've seen that

16  particular question where did he touch you be very confusing,

17  because sometimes when it's asked, the person asking means

18  where were you at when this happened, right, not where did he

19  touch you on your body.  Where were you at?  So there's always

20  some question about what that question means.  I certainly

21  reviewed interviews where that was asked, meaning where

22  physically were you at, and the child, you know, points to

23  their genitals, and that was not the question that the law

24  enforcement officer was asking.  So it can be a confusing

25  question to start to, but where were you touched and there's

19-cr-00243-CMA-GPG-1 Jury Trial - Day 4     11/10/2022     605

1    not been an outcry or an outcry maybe is I don't like

2    so-and-so, that's a leading and suggestive question.

3    Q.   Okay.  And so also the -- you know, forensic interviewers

4    don't use suggestive questioning, do they?

5    A.   By and large there's no suggestive questions until you get

6    down and they're not suggestive as much as they are

7    clarifying.  Sometimes they can get labeled as suggestive, but

8    they're intended to be at the very end of a -- as much of a

9    rich narrative as you can get, but they can still be labeled

10   as suggestive.  For example, did that happen in the nighttime

11   or the daytime sometimes can get labeled as suggestive because

12   it's a multiple choice to a 7-year-old child.  If the child is

13   given a rich description of touching and that question

14   happens, we don't think of it as suggestive.  If it happens

15   like you had explained earlier, that that's like the first

16   question or second question and the child hasn't even made

17   much of an outcry, it would be classified as more suggestive

18   and leading.

19   Q.   Do you know what forced questions are?

20   A.   Generally I think in terms of like that the child has to

21   give a yes or no or answer a multiple choice.

22   Q.   So basically -- yes.  There's only a couple of options

23   given for an answer, like yes or no or multiple choice,

24   correct?

25   A.   Yes.

                        Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 4    11/10/2022    606

1  Q.  Okay.  And those are things that -- forced questions are

2  also questions that can contribute to their -- to a false

3  memory, correct?

4  A.  I'm going to have to say again I'd have to determine where

5  that type of question comes in terms of what the child is

6  provided.  Forced question --

7  Q.  But it can?

8  A.  It can.

9  Q.  That's why you avoid them in forensic interviews, right?

10  A.  Yes.

11  Q.  Okay.

12  A.  Well, I've got to correct that.  You avoid them early in

13  forensic interviews.  You don't avoid them if they're to

14  clarify something about what a child has already given a

15  disclosure about.

16  Q.  And so you wouldn't want a parent asking their child about

17  a sex assault.  You don't want them asking -- if you had the

18  opportunity to tell a parent, to advise a parent before

19  questioning a child, you would not advise them to ask leading

20  questions, would you?

21  A.  Well, in a perfect world a 6-year-old would pick up the

22  phone and call 911, and that doesn't happen.

23  Q.  Okay.

24  A.  So there is always going to be a parent or caregiver who

25  asks them questions.  It's important to know what did that

Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 4      11/10/2022    607

1  parent or question ask -- parent ask?  What were those

2  questions that they asked?  It's really important to know.

3  Q.  I'm sorry.

4  A.  Go ahead.

5  Q.  I just want to be specific about the question.  I agree

6  with what you're saying, but you would not advise a parent --

7  in a perfect world, like you said, if you had the opportunity,

8  you would not tell a parent, Ask him leading questions, would

9  you?

10 A.  In a perfect world, no, I would not ask anybody to ask

11 leading questions.  If there was -- if there -- needs to be a

12 forensic interview, right?  I don't -- that does not mean that

13 every forensic interview therefore is tainted and can't help

14 identify what has occurred, but is it easier if there has been

15 none or few of those, yes.

16 Q.  Okay.  But we can agree now that leading questions and

17 forced questions, which are -- forced questions are the

18 yes-or-no, multiple choice kind of questions, that those can

19 create false memories.  We can agree now, right?  They can.

20 They don't always, but they can, yes or no?

21 A.  So you said we can agree that forced questions, multiple

22 choice questions, and what was the other thing you said?

23 Q.  Leading questions.

24 A.  Can create false memories?

25 Q.  That they can.  I'm not saying they do in every case.

Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 4     11/10/2022    608

1    A.  I can probably agree in rare circumstances they can.

2    Q.  Okay.  If it's so rare, why do we train people to be

3    forensic interviewers?

4    A.  Because it's a very serious set of allegations.

5    Q.  Okay.  But they try to avoid leading, forced, and coercive

6    questioning -- they try to avoid them in the beginning of

7    those interviews, correct?

8    A.  In early parts of the interview, yes.  It doesn't mean

9    they're not appropriate in later parts of an interview.

10   Q.  After the child has disclosed what had occurred?

11   A.  Right.  When they're used to clarify.

12   Q.  So you hadn't reviewed any evidence in this case to see if

13   a forensic interviewer asked leading or forced questions?

14   A.  I have no idea.

15   Q.  You have no idea if anyone who interviewed children in

16   this case, family members, police officers, or anyone asked

17   leading or forced questions?

18   A.  I don't know about any questions.

19   Q.  Okay.  Also, in your experience, is it better to

20   corroborate children's outcries and statements from forensic

21   interviews, is it better to try to corroborate that with

22   physical evidence?

23            MR. CHAFFIN:  Objection, speculation.

24            THE COURT:  It's overly broad.  You would need to

25   narrow it.  Sustained.

                    Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 4    11/10/2022    609

1              MR. LABRANCHE:  No further questions.

2              THE COURT:  Redirect?

3              MR. CHAFFIN:  Briefly, Your Honor.

4                        REDIRECT EXAMINATION

5  BY MR. CHAFFIN:

6  Q.  Ms. Young, did the defense attorneys ever ask to talk to

7  you?

8  A.  Not to my knowledge.

9  Q.  Would you have if they had?

10 A.  Well, of course, yes.

11 Q.  Does every offender groom victims in exactly the same way?

12 A.  No.  They don't groom children in exactly the same way,

13 but a lot of those patterns of victim-offender relationship

14 dynamics are common across different victims even though it

15 may not all be exactly the same.  Some of that depends on age.

16 Q.  Does every victim respond to grooming in exactly the same

17 way?

18 A.  No.  There are some children who are just more vulnerable

19 for sexual abuse, and there are some children who for a

20 variety of reasons have a radar that kind of alerts them and

21 they are more difficult to groom.  So some of that is sort of

22 the unique temperament of children, but generally those

23 patterns of victim-offender relationship dynamics are the more

24 typical of what we saw, not that everyone has done it with

25 each victim.

                    Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 4     11/10/2022     610

1    Q.   And if leading questions or multiple-choice questions

2    occurred, does that automatically mean a false memory will

3    occur?

4    A.   No.   In fact, it would really indicate rarely -- what I

5    think is important about understanding suggestibility is

6    knowing there are certain ages where there is some greater

7    vulnerability and that what the research has teased out about

8    suggesting something to a child is that the thing that creates

9    the greatest vulnerability for suggestibility is repeated

10   coercive pressuring questions.   That tends to be what creates

11   the greatest vulnerability in preschool children, yet the

12   majority will still resist and try to correct the interviewer.

13   Now, keeping in mind the research is not necessarily about

14   sexual abuse.   It's not like we're going to go out and have

15   children sexually abused to evaluate the degree of

16   suggestibility.

17          But what we have done is a variety of research where

18   children are repeatedly interviewed, and some of those

19   interview questions might be -- one of them, for example,

20   going into an exam room, the doctor examines the child, the

21   exam is over, and then interviewers come in and repeatedly

22   suggest to children that the doctor kissed their elbow,

23   something kind of silly, or gave them a shot.   Those kinds of

24   research to try to identify the vulnerabilities of

25   suggestibility teased out.   Preschool children have a little

                        Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 4     11/10/2022   611

 1    bit of greater vulnerability, but the majority still resisted

 2    that that had happened.  But the more repeated and coercive

 3    the interviews, the greater the vulnerability.  So it's what

 4    led to high quality protocols of forensic interviewing so that

 5    we decrease the risk of that suggestive coercive interviewing

 6    that's repeated.

 7           MR. CHAFFIN:  Nothing further, Your Honor.

 8           THE COURT:  All right.  Thank you very much, ma'am.

 9    You may step down.

10           THE WITNESS:  Thank you.

11           THE COURT:  The Government may call its next witness.

12           MR. CHAFFIN:  Your Honor, the Government rests.

13           THE COURT:  All right.  Is the defense ready to

14    proceed?

15           MR. MCDERMOTT:  We are, Your Honor.

16           THE COURT:  All right.

17           MR. MCDERMOTT:  Your Honor, the defense has elected

18    to not call witnesses.

19           THE COURT:  All right.  So the defense rests?

20           MR. MCDERMOTT:  Yes, Your Honor.

21           THE COURT:  All right.  Any motions?

22           MR. MCDERMOTT:  We will have a motion, Your Honor.

23           THE COURT:  All right.  Ladies and gentlemen, we are

24    going to take a recess at this time, but both parties have

25    rested, so the next step after I deal with the legal issues

                    Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 4      11/10/2022    612

1   will be the reading of the jury instructions to you and then

2   the closing arguments, and then this case will be given to you

3   for deliberation.  So, remember, do not discuss this case yet

4   with one another or anyone else.  Do not conduct any research,

5   but we'll take a brief recess at this time.  The jury is

6   excused.

7            THE COURTROOM DEPUTY:  All rise.

8        (Jury left the courtroom at 10:02 a.m.)

9            THE COURT:  You may be seated.

10           All right.  Mr. LaBranche, you may proceed.

11           MR. LABRANCHE:  Yes, Your Honor.  So, Your Honor, I

12  think the only motion that the defense is going to offer at

13  this time is we just move for an oral Rule 29 motion for

14  judgment of acquittal.  Counts 1 and 3 of this case -- there's

15  five counts, two different charges alleged.  They're very

16  similar.  My Rule 29's kind of going to be focusing on the

17  intent that is required.  It's similar in both cases.

18  Counts 1 and 3 require that when Mr. McFadden traveled he

19  intended to engage in sexual acts.  Counts 2, 4, and 5 also

20  require that at the time of transportation Mr. McFadden

21  intended the individuals identified in the indictment, that he

22  intended to engage in sexual activity with them.

23           The Government must prove beyond a reasonable doubt

24  that a dominant, significant, or motivating purpose of the

25  transporting or travel with the minor or interstate commerce

                     Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 4      11/10/2022   613

1    was to have the minor engage in sexual activity or for him to

2    attempt to engage in sexual activity.  The Government must

3    prove that it's not merely incidental to the travel.

4              In this case the evidence was that Mr. McFadden

5    traveled to Arizona for a funeral.  In the light most

6    favorable to the Government, we have to credit the witness's

7    testimony.  Obviously it's something that the defense does not

8    agree with, but for purposes of Rule 29 the Court has to find

9    that what he describes -- what the witness described -- or the

10   victim described in the travel to Arizona is credible.

11   However, there was no evidence presented that the travel was

12   intended for sexual -- there was sexual intent related to the

13   travel.  The travel was related to a funeral.

14             As well with the trips involving J.W. and K.W., they

15   were all related -- the truck trips were all related to

16   Mr. McFadden's employment as a truck driver.  They offered

17   evidence that he was a truck driver, that he owned the truck

18   with his business partner, and they introduced evidence that

19   the trips from Telluride to Farmington, New Mexico, were to

20   transport loads across state lines.  And they also testified

21   the final trip where Mr. McFadden was arrested in Nebraska,

22   that that trip involved a transport of potatoes.  The fact

23   that they presented evidence from these witnesses that sexual

24   acts occurred does not alone prove that he had intent to

25   perform those acts during travel.

                        Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 4      11/10/2022    614

1              I think most of the recent cases that have looked at

2    intent have additional facts to support the intent such as

3    communications with people across state lines or engaging in

4    prostitution across state lines, going to visit a prostitute

5    that's underage or when human trafficking someone across state

6    lines.   In this case, there's nothing.   The evidence was

7    silent as to what the intent was.   There was always the

8    purpose of travel for the funeral or business for

9    Mr. McFadden.

10             Also, the Government can correct me if I'm wrong, but

11   Counts 1 and 2 we believe deal with the Nebraska truck trip

12   with K.W. because the dates alleged in Counts 1 and 2 are

13   December 25, 2012, to January 3rd, 2022.   Counts 3 and 4

14   allege sexual acts or contact with J.W. between December 1st,

15   2010, and January 1st, 2011.   We believe that these counts

16   relate to the truck driving trips with Mr. McFadden and J.W.

17   There's no sufficient evidence offered that the truck trips

18   alleging sexual activity and those counts occurred during that

19   time period alleged in the indictment, the time period of

20   December 1st, 2010, to January 1st, 2011.

21             They introduced some records that Mr. McFadden did go

22   on truck driving trips during that period, but I don't believe

23   that there was sufficient evidence that the acts alleged by

24   J.W. in Counts 3 and 4 occurred during the time period alleged

25   in Counts 3 and 4 in the indictment.   Count 5 we believe

                        Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 4      11/10/2022   615

1   relates to the Arizona funeral trip with J.W., and we believe

2   that because the funeral was in 2008 and the indictment

3   alleges that there was contact between January 1st, 2007, and

4   January 3rd, 2013.  As I stated previously, we believe that

5   there's no evidence presented or -- and not sufficient

6   evidence presented that if the Government proved sexual act or

7   sexual acts, that it wasn't just incidental to the travel.

8          THE COURT:  All right.  Mr. Chaffin.

9          MR. CHAFFIN:  Thank you, Your Honor.  Counts 1 and 2

10  relate to that Nebraska trip with K.W. where they traveled to

11  Idaho and then ultimately to Nebraska where Mr. McFadden was

12  arrested.  Counts 2 and -- or, excuse me -- 3 and 4 relate to

13  those trips between Telluride and Farmington where J.W.

14  explained that he was abused, once at a stop in New Mexico and

15  another time returning from one of those trips down the road

16  from his house.  And he talked about defecating and urinating

17  on himself and being sodomized by Mr. McFadden at the stop in

18  New Mexico, and Mr. McFadden licking his anus at the stop down

19  the street from his house.  Those occurred during those trips

20  between Telluride and New Mexico.  He described seeing the

21  airplane come in when they picked up the loads, and the

22  business records that you received show that all of those

23  trips occurred in December of 2010.  You saw the load tickets

24  that Mr. Dunham explained there were more in Exhibit 15.

25          Count 3 does not relate to the funeral -- or, excuse

                      Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 4       11/10/2022    616

 1   me -- Count 5 relates to the trip to Arizona that J.W.

 2   described where they stopped at a truck stop that was

 3   particularly nice that had the remote control trucks and that

 4   night in the cab of Mr. McFadden's truck Mr. McFadden put his

 5   penis in J.W.'s butt.  That's what Count 5 relates to.  That's

 6   what Count 5 has always related to.  That's what the

 7   Government has explained in various responses and motions

 8   Count 5 related to.

 9        J.W. explained that that occurred when he was nine

10   years old, so probably somewhere in 2009, but given what

11   Ms. Young testified about how time is not encoded in memory,

12   and given the breadth of time and given the lack of records

13   which only Mr. McFadden had, we charged a broad timeframe.

14   Now, clearly most of the elements are largely undisputed.  The

15   ages of the children are undisputed.  The transport in

16   interstate commerce is undisputed.  It sounds like really only

17   the aspect that is in dispute is whether this was incidental

18   to travel or whether it was Mr. McFadden's intent -- and you

19   can -- you and the jury can determine based on all of the

20   times that he abused these kids that he intended precisely

21   what he did.

22        Mr. McFadden controlled when he went on trips, where

23   he went, who he took, and there is absolutely no reason to

24   bring these boys other than to isolate them and abuse them.

25   Every single time Mr. McFadden crossed the state line he

Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 4      11/10/2022    617

1    intended to molest these two boys during the trips he took

2    them on, and he intended that they be subjected to sexual

3    abuse by him when he transported them.  I ask that you deny

4    the motion and provide the case to the jury.  Thank you, Your

5    Honor.

6            THE COURT:  All right.  In order to withstand a

7    motion for judgment of acquittal under Rule 29 of the Federal

8    Rules of Criminal Procedure the Government must present

9    sufficient evidence to sustain a conviction.  That means that

10   the evidence necessary to support a verdict need not

11   conclusively exclude any other reasonable hypothesis and need

12   not negate all possibilities except guilt.  Instead, the

13   evidence only has to reasonably support the jury's finding of

14   guilty beyond a reasonable doubt, *U.S. vs. Pulido-Jacobo*,

15   P-u-l-i-d-o-J-a-c-o-b-o, 377 F.3d 1124, Tenth Circuit, 2004.

16           In a Rule 29 the Court views the evidence in the

17   light most favorable to the Government and then determines

18   whether there's substantial evidence from which a jury might

19   properly find the accused guilty beyond a reasonable doubt.

20   In this case, as the parties noted, the defendant is charged

21   with five counts.  Counts 1 and 3 relate to K.W. and -- I'm

22   sorry -- Counts 1 and 3 -- Count 1 relates to K.W.'s Nebraska

23   trip, the one up through Idaho and then to Nebraska.  Count 3

24   relates to the Farmington trip by J.W.  Count 2 also ties into

25   K.W.'s Nebraska trip.  And Count 4 is the J.W. Farmington

                        Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 4      11/10/2022   618

1   trip.  And Count 9 is -- I'm sorry -- Count 5 is the Arizona

2   truck stop trip that J.W. testified to.

3           Intent can be determined from the facts and

4   circumstances of the case, as the Court has indicated.  It's

5   hard to prove intent because you can't get into the head of

6   the defendant, so the jury needs to look at the facts and

7   circumstances of the case.  In this case, as the Government

8   has indicated, the jury could infer that there was no reason

9   for this defendant to take these boys with him except for the

10  purpose of intending to engage in sexual activity with them.

11  The Court, therefore, after listening to the defendant's

12  motion and the grounds in support thereof, and the

13  Government's response and reviewing the evidence in the light

14  most favorable to the Government, finds that the evidence

15  presented by the Government is sufficient to sustain a

16  conviction on all five counts.  There is substantial evidence

17  from which a jury might properly find the accused guilty

18  beyond a reasonable doubt.  For these reasons defendant's

19  motion for judgment of acquittal is denied.

20          All right.  We will go ahead and take a minimal break

21  for you to go to the bathroom, but I want to get started as

22  soon as possible, so let's say 10:30 we will be back.

23          MR. CHAFFIN:  Thank you, Your Honor.

24          THE COURTROOM DEPUTY:  All rise.  Court is in recess.

25      (Break was taken from 10:17 a.m. to 10:30 a.m.)

                        Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 4     11/10/2022    619

 1              THE COURT:  Ms. Myhaver, do we have copies of the

 2   instructions for the jurors?

 3              THE COURTROOM DEPUTY:  Yes.

 4              THE COURT:  Do you want to hand them as they come in?

 5              THE COURTROOM DEPUTY:  I can hand them as they come

 6   in.

 7              THE COURT:  Please bring in the jury.

 8              THE COURTROOM DEPUTY:  All rise.

 9        (Jury entered the courtroom at 10:30 a.m.)

10              THE COURT:  Ladies and gentlemen, you have received a

11   copy of the law now, the jury instructions that go with this

12   case.  I'm required to read them to you, but I am more of a

13   visual learner than I am an auditory learner, so I retain

14   better what I see, so I provide you with your own copies.  So

15   you can listen to me as I read them or you can follow along on

16   the written copy as I read them.

17        (Judge reads the instructions to the jury.)

18              THE COURT:  So that concludes the reading of the jury

19   instructions.

20              Mr. Chaffin, is the Government ready to proceed with

21   closings?

22              MR. CHAFFIN:  Yes, Your Honor.

23              THE COURT:  You may.

24              MR. CHAFFIN:  I thought I was, Your Honor.

25              I want to start by thanking you again.  It's hard to

                        Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 4      11/10/2022    620

1    believe that just a few days ago we were starting.  I don't

2    know about you, but it felt like a long week even though we

3    broke early each day, and I appreciate the time and attention

4    that each of you have given, and I hope that you will give it

5    just a little more time and a little more attention.

6            There are five charges I'm asking you to consider,

7    and they're related.  Counts 1 and 2 talk about the same trip,

8    that trip that K.W. told you about, that S.W. Jr. told you

9    about, the trip from Colorado to Idaho, ended up in Nebraska

10   where Mr. McFadden was ultimately arrested.  That's the trip

11   we're talking about in Counts 1 and 2.  We'll talk about the

12   elements of those offenses in just a second, but keep in mind

13   when you're talking about Counts 1 and Count 2, we're talking

14   about that trip.

15           Counts 3 and 4 are also related.  For that trip we're

16   talking about the time that J.W. told you about on the stand

17   when they picked up a load in Telluride right there next to

18   the airport with the planes coming in, and they went to

19   Farmington, and they stopped for the night, and he told you

20   what happened.  And they returned, parked down the street from

21   his house where his mom lived, and he was abused in the truck.

22   That's Counts 3 and 4, same trip.

23           Count 5 we're talking about another trip with J.W.,

24   that trip that he told you about where they go to Arizona,

25   they stop at that truck stop, that really nice truck stop, the

                     Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 4     11/10/2022    621

1   one with the remote control trucks that he remembers, and how

2   he was sleeping in that cab of that semi-truck with

3   Mr. McFadden and was subject to a normal assault.

4           So let's talk about the elements, because they're a

5   little different, right?  So Counts 1 and 3 are focused on

6   what Mr. McFadden intended for himself, what he intended to

7   do, right?  Count 1, Count 3 asks you to consider whether

8   Mr. McFadden crossed a state line, and when he crossed that

9   state line with J.W., when he crossed that state line with

10  K.W., whether he intended to engage in a sexual act with those

11  two boys under the age of 12.

12          And you'll notice there's that age requirement,

13  right, for Counts 1 and 3, and I think you'll see when you

14  look at the date ranges that's why there's not a Count 6 in

15  this case.  Because Count 5 charges a broad timeframe from

16  2007 all the way up to the day that Mr. McFadden gets

17  arrested, because that's the time period approximately when

18  J.W. tells you that he was abused over and over and over

19  again, and you heard from Cheryl Young that we don't store

20  time in our memory.  So even though on the stand J.W. told you

21  that trip, Count 5, happened when he was about nine, we gave

22  Mr. McFadden the benefit of the doubt because there's a little

23  piece of that time between October 25, 2011, and January 3rd

24  -- excuse me -- October 25, 2012, and January 3, 2013, where

25  J.W. is actually 12 years old.  Count 5 charges a little bit

19-cr-00243-CMA-GPG-1 Jury Trial - Day 4     11/10/2022    622

1    of that time period where this offense doesn't fit.  You don't

2    have to decide exactly during that time period when these

3    things happened, just that they happened in the period that we

4    charged.

5              Count 3 asks you to decide one more thing, whether

6    Mr. McFadden either tried or did subject these kids to a

7    sexual act.  Counts 2, 4, and 5 are a little bit different.

8    Counts 2, 4, and 5 ask you to consider what Mr. McFadden

9    intended not necessarily for himself, for the kids.  What did

10   he intend they be subjected to?  So the questions are going to

11   be whether Mr. McFadden knowingly transported K.W. or J.W. --

12             THE JUROR:  Sorry.

13             THE COURT:  That's probably an AMBER Alert going on.

14             MR. CHAFFIN:  In the instructions you saw it says --

15   it uses a little different terminology, right?  It says the

16   individual identified by initials in the indictment.  I hope

17   you will forgive my shorthand when I make clear that those

18   people we're talking about are K.W. and J.W., and so for

19   Count 2 we're talking about K.W.  For Counts 4 and 5 we're

20   talking about J.W., and whether at the time of the

21   transportation those two -- those boys were under the age of

22   18, and whether at the time Mr. McFadden transported them he

23   intended that they would engage in sexual activity that could

24   be the basis of a crime.

25             And there's a lot of things, a lot of parts of that

Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 4      11/10/2022    623

 1   that aren't in dispute.  A lot of parts of that that are easy

 2   for you to determine.  Nobody is disputing that J.W.'s

 3   birthday is October 25, 2000.  Nobody is disputing that K.W.'s

 4   birthday is April 23, 2001.  Nobody is disputing how old they

 5   were during the alleged incidents.  No one is disputing that

 6   the conduct that we're talking about could form the basis of a

 7   crime.  In fact, Judge Arguello told you any state that they

 8   would have went through, if that conduct occurred, it formed

 9   the basis of a crime in any one of those states.

10          Nobody is going to stand up here and say J.W. and

11   K.W. were not transported in interstate commerce.  Nobody's

12   going to say they didn't go on these truck trips.  Nobody's

13   going to say that Mr. McFadden didn't cross a state line,

14   because we can just look at a map.  You can't get from Grand

15   Junction to North Platte, Nebraska, without crossing a line,

16   travel between states.  You can't get from Telluride to

17   Farmington or Arizona without crossing a state line.

18          The dates aren't really in dispute, right?  We heard

19   very clearly that Mr. McFadden spent Christmas with the

20   W////////////, and then was arrested on January 3, 2013.  That's

21   the timeframe for Count 1 and Count 2, sometime between when

22   he spent Christmas at their house and gets arrested in North

23   Platte, Nebraska, what K.W. told you happened took place.  The

24   dates for Counts 2 and 4 aren't really in dispute.  You have

25   these records, right, that show you in December of 2010, Mike

                         Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 4      11/10/2022    624

1    McFadden is picking up these loads just as J.W. described in

2    Telluride, taking them to Farmington.  I showed you some of

3    them, showed you these ones, right?  December 6th and

4    December 7th where Paul Dunham explained to you how long it

5    would take, how you would necessarily have to stop for the

6    night, to pick up two loads on one day, and then pick up two

7    more loads the next day, just as J.W. described.

8          And you can look through all of the records that were

9    admitted into evidence.  You can look through Exhibit 15 and

10   see that there are more of these in December 2010.  There are

11   more loads that Mr. McFadden picked up and delivered, but,

12   again, you don't have to decide that it happened on

13   December 6th.  You don't have to decide that it happened on

14   December 7th.  You just have to decide that it happened in

15   December 2010, because that's the time when Mr. McFadden was

16   taking these loads between Telluride and Farmington.

17         So when you look at these elements, you'll see that

18   there are parts that you can decide pretty quickly.  And when

19   it comes down to it for Counts 1 and 3, the question you'll

20   have to focus on, the question that you'll really have to

21   decide is what did Mr. McFadden intend when he crossed those

22   state lines and what did he do.  And for Counts 2 and 4 you

23   get to knock the first two exhibits -- or the first two

24   elements out right away and focus on a portion of the third

25   element, what did he intend when he was transporting these two

Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 4      11/10/2022     625

 1    boys.  And you heard from Judge Arguello that you can't look

 2    inside somebody's mind.  You're not mind readers, and we don't

 3    expect you to be.  What you do is you look at what someone did

 4    and what they said to figure out what they intended to do, and

 5    what that means is you get to consider what happened here over

 6    and over and over, and what continued here for years in his

 7    bed to decide what he intended here in this bed.

 8            Ultimately this case is going to come down to who you

 9    believe, because if you believe those two little boys, if you

10    believe that what they told you happened actually occurred,

11    then Mr. McFadden is guilty.  And you heard instructions from

12    Judge Arguello that some things that you should consider, some

13    questions, did the witness have a particular reason not to

14    tell the truth?  I want you to think about that.  Think about

15    what motive J.W. would have to lie.  Think about the life he

16    had.  A dad out of the picture.  A mom constantly doing drugs,

17    can't even be bothered to make sure he has enough food to eat.

18    She tells him, You get to eat at school.  Do you need to eat

19    at home?  And his sister has to sneak him food.  A slew of

20    abusive boyfriends.  A home life that was terrible.  And even

21    though he was subjected to hundreds, maybe thousands of

22    instances of abuse by this man, he loved him.  He thought of

23    him as dad.  That's the person who took care of him.  That's

24    the person that he chose to be with despite all of this,

25    because it was better than going home.

                         Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 4      11/10/2022    626

1           What motive does K.W. have to lie about what

2    happened?  Mr. McFadden spent Christmas with them right before

3    he was abused.  These kids don't have a reason to make up a

4    story.  They have no dog in this fight.  Why would they come

5    back and talk a decade after these things came to light if it

6    wasn't true?  What relationship do they have with the

7    Government?  If there's any relationship that would motivate

8    them to be untruthful, it's the relationship that they have

9    with Mr. McFadden to not get him in trouble.  They have every

10   reason in the world to say it didn't happen, and for a while

11   they did.  They said I don't want to deal with it.  I don't

12   want to be the first one.  I don't want to lose my house.  I

13   don't want to lose my friends.  And that happened for J.W.

14   Couldn't go back home.  He had to go grab a change of clothes,

15   and he lost everything.

16           Think about whether these witnesses clearly saw or

17   heard or, I submit, felt and smelled the things that they told

18   you about, because kids are not going to make up details like

19   you heard on the stand.  A little boy is not going to think I

20   need to tell people about the fecal smell or the poop juice,

21   the fecal smearing that you heard Sue Goebel describe.  A

22   little boy isn't going to think of that.  The only way they'll

23   be able to tell you about those things is if they happened.

24   And think about the way the testimony you heard fits together,

25   and the way in some places it doesn't, because it's not a

Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 4       11/10/2022     627

1  perfect fit like it would be if they were making up a story,

2  like it would be if they got together to try to railroad

3  somebody.  There are differences, because that's how it works.

4  That's how memory works.  You heard that from Ms. Young.  You

5  heard that when you recall things, it's like putting together

6  a puzzle.  You don't put it together in the same order every

7  single time.

8          Ultimately I want you to think about what these

9  little boys described, because when it happened, it wasn't the

10 young men that you saw on the stand.  It was little K.W.

11 sleeping on the floor next to his bed that progressed into

12 sleeping in his bed and being touched and groped again and

13 again.  It was little K.W. laying in that bed on that trip to

14 Idaho and to Nebraska when Mr. McFadden put his penis inside

15 of him.  It was little K.W. that you heard in that video

16 describing in detail something that no little boy should ever

17 experience, and you saw firsthand what effect that had on him

18 ten years later.

19          Think about what J.W. told you about.  The years of

20 abuse starting with that funeral when he didn't even know what

21 was going on and describing for you the fluid that had come

22 out of his bottom that caused this wet feeling at night every

23 time with Mr. McFadden there, and how it continued in the

24 house up by the Monument with the backyard that he loved, and

25 it continued at the house on Glen Road where he bore through

                    Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 4     11/10/2022   628

1  hundreds of instances of abuse where sometimes he would roll

2  over to try to make it stop, but he couldn't always make it

3  stop and sometimes he just had to lay there until this man was

4  finished.

5          Ladies and gentlemen, I want you to think about all

6  of the evidence that you heard.  I want you to think about the

7  things that those young men told you.  I want you to read

8  through and think about the law that Judge Arguello told you,

9  and when you do that, when you consider everything, I want you

10 to make a decision, the only decision that the law and the

11 facts permit, and I want you to find Mr. McFadden guilty.

12 Thank you.

13         THE COURT:  Thank you, Mr. Chaffin.

14         Mr. McDermott.

15         MR. MCDERMOTT:  Yes, Your Honor.  Your Honor, may we

16 have just a moment to load the exhibits, please?

17         THE COURT:  Yes.

18         MR. MCDERMOTT:  Thank you.

19         I want to talk about how you all got here to begin

20 with and how Mr. McFadden ended up in that seat today.  And

21 you've heard testimony and you've heard us talk about

22 suggestibility and the importance of being careful of taking

23 great care when we're interviewing children and when we're

24 investigating cases, and I want to talk about how we ended up

25 here in the first place.

                        Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 4      11/10/2022    629

1              THE JUROR:  Can we shut that blind?  Sorry.  I can't

2     see him.  Sorry.

3              MR. MCDERMOTT:  That's fine.  It gives me no

4     satisfaction, no pleasure, no enjoyment to come into court and

5     say that someone's not telling the truth or that someone's

6     lying, and that's why I want to talk about how we got here.

7     Mr. McFadden had been investigated and investigated and

8     investigated, and in January of 2009 J.W. was talked to, and

9     he was interviewed, and he was asked if he had been abused,

10    and he said no.  And in December of 2012, J.W. was then asked

11    again, and there was nothing wrong with the interview, but he

12    was asked had he been abused, and J.W. truthfully said no.

13             So what happened?  We go forward approximately three

14    weeks.  Mr. McFadden goes on a trip, some trip with K.W. and

15    K.W.'s two brothers.  One of those brothers is a young adult.

16    And K.W.'s mother gets a call, and K.W.'s mother gets a call

17    that alarms her, that scares her, and you saw her reaction up

18    there.  You heard her say, yes, I received a call.  I was

19    upset.  I called to get in touch with my kids to make sure

20    that everything was okay.  I had to give the phone to my then

21    husband.  I then did take it back, and then I went up to

22    Nebraska to see if my kids were okay and to make sure they

23    were okay.

24             Meanwhile, her son S.W. Jr. was called, and his

25    mission was to make sure and ensure that everything was okay.

                         Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 4     11/10/2022   630

1    And then the police came, they arrested Mr. McFadden.

2    Mr. McFadden left with S.W. Jr. some money and incidentals

3    that they would be okay and everything was okay.  The kids

4    were okay because nothing happened, and we know that because

5    S.W. Jr. spent the rest of the day -- they played -- they

6    watched movies, and they played games in the truck until

7    someone would come and get the truck.  And the officer drove

8    by to make sure that everything was okay, and everything was

9    okay.

10           On the ride home, his mother, S.W. Jr., and K.W.,

11   they all say that they don't remember what was said on the way

12   home.  Respectfully, I think that's something that would stick

13   out in a parent's mind or an older brother's mind or all three

14   of their minds, but none of them remember.  But we have a clue

15   as to what was discussed on the way home, because Detective

16   Prescott had talked to Stacy, talked to her on the 15th of

17   January, and on the 3rd of January, and Stacy had told him

18   that she was speaking with her son, and her son did not

19   disclose anything sexual happening between him and

20   Mr. McFadden, and he didn't disclose anything between he and

21   Mr. McFadden because nothing happened between he and

22   Mr. McFadden.

23           And that's why we're asking you to use your common

24   sense.  We're asking you to please try to take a step back

25   from these horrific and heart-wrenching allegations and do

Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 4      11/10/2022   631

1    your best to look at them objectively and apply your reason

2    and common sense when you look at the evidence and the lack of

3    the evidence.  And I'm not simply asking you to take my word

4    for it.  I'm asking you to look at everything around the

5    allegations.

6              May we please publish Exhibit 2-5?

7              THE COURT:  You may.

8              MR. MCDERMOTT:  This is a picture of the cab.  That's

9    where S.W. Jr. indicated that he was.  And would you please

10   publish 2-6?

11             THE COURT:  You may.

12             MR. MCDERMOTT:  And that's the view of where S.W. Jr.

13   says at least his feet were, his head was on the other seat,

14   and his two brothers were within five feet of him.  And after

15   the police came, the two boys and their young adult brother

16   went to Subway, and they continued to play video games and

17   watch movies, because they were fine and they were safe.  And

18   on the trip home, the one other thing that we know is that

19   K.W., although he said nothing had happened to him, he said he

20   wanted to put Mr. McFadden away.  A reasonable inference from

21   that is that during that conversation he was told something.

22   He was told something about Mr. McFadden.

23             They drive back to Colorado, and they say that it

24   took about eight and a half -- about an eight-and-a-half-hour

25   drive back to Colorado.  They return to Colorado.  K.W. has

                    Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 4      11/10/2022   632

1   still not said that Mr. McFadden has done anything.  And on

2   January 15th, in the phone conversation Stacy says that K.W.

3   has said something to a therapist, and then they go and they

4   have the interview, and what do we know about the interview?

5   K.W. is asked, Do you know why you're here?  And K.W.'s

6   response is, I'm here because Mike has a disease.  Mike likes

7   to touch children.  K.W. got that from somewhere.  It may have

8   been on the trip home.  It may have been on the trip home and

9   afterward.  We don't know.  We weren't there.  But that

10  11-year-old boy got that from an adult.

11        And we can also look objectively to the unlikelihood

12  of anything happening on that trip, not only is this cab

13  small, nobody's being isolated or any of the other things that

14  we've heard testimony about.  There are -- it's a full cab.

15  It's a full cab with everybody close.

16        And may we please see exhibit 227?

17        THE COURT:  You may.

18        MR. MCDERMOTT:  That's a map, and that shows Grand

19  Junction to Nebraska.  S.W. Jr. testified that they met out on

20  the mesa, and then they went up to Idaho to get potatoes.

21  They had to load the potatoes, and then they drove to

22  Nebraska, and S.W. Jr. indicated they were gone one night.

23  This is January.  There's testimony that there was snow on the

24  ground I believe at least when the police came in Nebraska.

25  This is a truck.  It's not a usual car ride.  You can use your

19-cr-00243-CMA-GPG-1 Jury Trial - Day 4      11/10/2022    633

1    common sense to determine how long it would take to get to

2    Wyoming, to any of those cities in Wyoming that would have

3    potatoes.  You can surmise that you would likely have to go

4    down through Wyoming, drive across Wyoming, and then they

5    arrive in Nebraska on that afternoon when Mr. McFadden is

6    arrested.  The likelihood of anything happening during this

7    timeframe in that small compartment with nobody noticing

8    anything and then everybody just being okay playing video

9    games and watching movies is more than unlikely.  It's more

10   than a reasonable doubt.

11        And so that's how we've gotten to this point.  And

12   the stories then grow.  The stories continue to grow.  And the

13   investigation keeps going.  And J.W. is now interviewed

14   approximately a month after this, and J.W. who has previously

15   and unequivocally said that nobody has touched him sexually,

16   that nobody has touched him inappropriately now says that

17   Mr. McFadden has.  And J.W., his story of events grows, and it

18   grows, and it grows.  And a reasonable inference from that is

19   that it didn't grow because he was afraid of Mr. McFadden and

20   didn't want to say anything about Mr. McFadden.  And it's not

21   because he was afraid to have to go to his mom's.  It's

22   because the first things that he said were actually the truth.

23        And what did we learn about suggestibility?  You're

24   not supposed to be suggestive.  You're not supposed to impart

25   your version of events with someone.  It's dangerous.  You're

Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 4        11/10/2022     634

1   not -- an adult is not supposed to ask or tell things to a kid

2   to make them believe that they have to agree with this version

3   of events.  And that's what initially happened to K.W., and

4   we're not there to see the complete play-by-play, but J.W.,

5   who previously and unequivocally has said that Mr. McFadden

6   never did anything inappropriately to him, now changes his

7   mind, and he says he did it because he didn't want to be the

8   first to come forward and K.W. came forward.  But he also said

9   that he had not talked about it with K.W.  J.W. is hearing

10  things and is getting information from the adults in his life.

11  The adults -- we don't know who precisely he was with when he

12  was, as Mr. Chaffin said, taken from the home of Mr. McFadden,

13  but reason and common sense tells you that he was told about

14  the allegations, and his story changes and continues to grow.

15          And respectfully, the testimony I heard from the SANE

16  nurse is different than what Mr. Chaffin indicated.  The SANE

17  nurse reported that there were no reports of oral sex.  There

18  was not mention of fecal or anything like that.  And within

19  about three months, J.W., who previously and unequivocally

20  said nothing had happened, is now not just talking about

21  touching or anything like that.  He is -- his story evolves so

22  much that he talks about being sodomized by Mr. McFadden two

23  to three times per week for six years.  That is in the

24  neighborhood of 600 to 900 times.  That puts him at six years

25  old when it begins, and it's unlike -- it sounds unlikely

                    Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 4      11/10/2022   635

1   because it didn't happen.  And I'm not just asking you to take

2   my word for it.  I am asking you to look at all of the

3   evidence that surrounds everything.

4          J.W. lived in the house where people were not

5   isolated.  J.W. was surrounded by many, many people.  His

6   mother gave you an idea of how many people were around, and

7   I'm just going to name the names of the people who were

8   confirmed to live there in 2012.  Cindy Ricks, D.O., E.M.,

9   Jade McFadden, Donna Foxx, John Foxx, K.Wr., K.Wr.'s

10  boyfriend, B.W., J.W., L.Wr., Michelle R., Trevor, Crystal M.,

11  Sean Crohn, I mentioned Sean Elm and she confirmed that, and

12  then there were a couple of others who came in and out.

13         This is a small one-story house with people around.

14  Ms. W/////////// confirmed that there were other adults around.

15  There was a gentleman named John Foxx who passed away between

16  the time of these allegations and this trial.  He was there.

17  He would do things such as laundry, care for the house.

18  Nobody saw anything.  Nobody who was doing laundry ever

19  reported any bleeding, anything on the beds.  We're talking

20  about brutal alleged rapes.  Brutal alleged rapes in this

21  small, one-story house, and it's alleged to have occurred --

22  occurred hundreds of times.

23         There's not physical evidence, and there's not

24  physical evidence because it didn't occur.  And I'm asking you

25  to look at that, because I don't feel like getting up here and

Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 4    11/10/2022   636

1    calling kids liars, because somewhere along the line these

2    kids were attempting to tell the truth, and for whatever

3    reason, and back then when they were 11 and 12 years old it

4    probably wasn't their fault, but the truth got away from them.

5            I do also want to address a couple of other things

6    with respect to J.W. in particular.

7            May we please have Exhibit 15, the first page of

8    that?

9            THE COURT:  You may.

10           MR. MCDERMOTT:  These are the Dunham Trucking

11   records, and that first one comes from January of 2011.

12           May we please turn to page 7 of this exhibit?

13           Okay.  Here's one page in the exhibit, and the name

14   on that one is Ray Fluke.  On page 9 you will also have the

15   name Ray Fluke.

16           And then may we please turn to page 14?

17           Page 14 is Mr. McFadden's name.  The exhibits show

18   that Ray Fluke and Mike McFadden were truck drivers who drove

19   trucks from Telluride down to Farmington, Nebraska (sic).

20   They tell you nothing more than that.  They don't tell you who

21   else, if anyone, was in that truck, and they don't tell you

22   whether anything illegal happened in that truck.  And the

23   United States can attempt to put together a puzzle and try and

24   say that something happened on that date based on a trucking

25   record, but it's nothing but a trucking record.  There's

                    Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 4      11/10/2022    637

 1   nothing else to corroborate anything.  And that's why as hard

 2   as it is for us to talk about the allegations that were made

 3   after these two boys were tainted with stories about

 4   Mr. McFadden, that just didn't happen.  That's why I'm asking

 5   you to look at the other acts that occur or are alleged to

 6   have occurred in the locations where we know that there were

 7   people, because there's nothing to corroborate any of those,

 8   and there's nothing to corroborate any of those because it

 9   didn't happen.

10        And, frankly, as I'm up here speaking with you, I

11   get, frankly, scared.  It is hard, if not impossible, for a

12   person to defend against something like this to begin with.

13   Even in the most perfect of circumstances it is so hard for

14   someone to simply say I didn't do this.  That child has it

15   wrong.  It's especially difficult, if not impossible, when

16   you're attempting to do it this far out.  And I'm going to go

17   over just a few more details, because they're small details,

18   but they're significant, and they should be paid attention to

19   under the circumstances.

20        J.W.'s mother when she testified, she was talking

21   about trips that she was aware that her son took.  My

22   recollection of her testimony, she did not recall trips to New

23   Mexico, but she was more specific about Arizona trips, and she

24   said that she does not recall or believe that her son went on

25   a trip to Arizona except for the 2008 funeral.  And in

                    Sarah K. Mitchell, RPR, CRR

1    Count 5, that count spans several years, and that's also why

2    we had expert testimony about memory, because the Government

3    wants you to be able to hopefully find something within that

4    timeframe with which you can convict Mr. McFadden of, and

5    similarly, Counts 3 and 4, there's a narrow timeframe there,

6    and they try and fit it into the records.

7            And so I'm asking to go ahead and let's do look at

8    the one Arizona trip that we can -- I don't want to say

9    pinpoint, but at least place other people at, and that's the

10   trip to the funeral where Michelle and other people were, and

11   on that particular trip, J.W.'s story changed.  In one

12   interview he said that Mr. McFadden was putting sleeping aids

13   in his drink, and then he said -- you probably missed it, and

14   that's my fault -- I didn't ask things as cleanly as I would

15   have liked to when I spoke with J.W. on Tuesday, and that's on

16   me.  But J.W. said, No, Mike didn't use -- put something in my

17   drink on that trip.  That came later.

18           Those aren't inconsistencies because of the passage

19   of time or because of trauma from sex assault.  Those are

20   inconsistencies because they're premised on something that

21   isn't true, that didn't happen.  On that trip there was a

22   boys' room.  There was a girls' room.  There were other boys

23   in that room.  J.W.'s story grew about that trip to the point

24   where he did testify and said that was another time where

25   there was anal sex, fart smell, fluids.  There were other

19-cr-00243-CMA-GPG-1 Jury Trial - Day 4      11/10/2022    639

1   people in that room.  Nobody noticed.  Nobody noticed because

2   it didn't happen.

3        Now, the other things that do make me nervous about

4   sitting down in just a moment -- because I have to sit down

5   and the United States gets another chance and they will get

6   the last word -- what concerns me is we have jury

7   instructions, and they instruct you that it's -- we're not

8   obligated to put on evidence.  And there are other people who

9   were in this house, they haven't been called in to testify,

10  but they would say what you --

11       MR. CHAFFIN:  Objection, Your Honor.  That's not in

12  evidence.

13       MR. MCDERMOTT:  I'm sorry.  Let me rephrase that.  I

14  apologize.  You already know from the other -- from what you

15  heard from J.W.'s mom who lived in that house and even

16  Ms. W///////// who would go to the house that it was an open

17  house where a lot of these families who had problems would

18  come and that there were lots and lots of people in this

19  house.  And I also get nervous because Mr. McFadden hasn't

20  testified.  He has pled not guilty, and how does any person

21  say I didn't do this, I didn't do this, I didn't do this?

22  He's done that with his not guilty plea.

23       You have not just one reasonable doubt, but lots of

24  reasonable doubts.  And you have probably noticed things that

25  I haven't brought up that have been overlooked, and I am

                    Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 4      11/10/2022    640

1   asking you to follow the instructions, and I'm going to talk

2   about the reasonable doubt instruction which tells us proof

3   beyond a reasonable doubt must therefore be proof which is so

4   convincing that a reasonable person could not hesitate --

5   would not hesitate to rely and act upon it in making the most

6   important decision in his or her own life.  And this is one of

7   those decisions.  I thank you for your time.  I thank you for

8   your attention.  It's time for everyone to get closure in this

9   case.  I'm respectfully asking you to find Mr. McFadden not

10  guilty.

11          THE COURT:  Thank you, Mr. McDermott.

12          Mr. Chaffin, rebuttal.

13          MR. CHAFFIN:  Thank you, Your Honor.

14          Ladies and gentlemen, I will be brief, I promise, but

15  I do want to stand up and speak with you one last time.  And I

16  want to talk to you about reasonable doubt too, and I want you

17  to look at that instruction.  I want you to look at what Judge

18  Arguello told you is reasonable doubt.  It's based on reason

19  and common sense.  It's not based on speculation.  It's not

20  guessing what somebody might have said.  It's not guessing

21  that somebody told these kids something, something that you

22  did not hear in this room.  No one on that stand told you that

23  they told J.W. or told K.W. what to say in those interviews.

24  You did not hear that.  But the defense wants you to use your

25  imagination, and the instruction doesn't tell you that

Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 4      11/10/2022    641

1    reasonable doubt is based on your imagination.  Reasonable

2    doubt, if any, is based on reason and common sense.

3           I want you to use that common sense.  Some of you are

4    parents.  Think about how difficult it would be to convince a

5    child to make up a story like this and to keep it straight for

6    a decade.  Use your reason.  Use your common sense.  The young

7    men that you saw on that stand did not look, did not act, did

8    not say things that are made up.  They came in here, and they

9    bore their soul to you, and they told you what happened to

10   them.  And based on what happened, Mr. McFadden is guilty.

11   That's your verdict.  Thank you.

12          THE COURT:  Thank you.  All right.  Ladies and

13   gentlemen, you have heard the evidence.  You have been

14   instructed as to the applicable law, and now you've heard the

15   parties' closing arguments.  Now, I remind you the arguments

16   are not evidence in the case, and you should not consider them

17   to be evidence.  In a moment I'm going to submit this case to

18   you.  First, I want to tell you that the Court provides lunch

19   during deliberations, so lunch has been ordered for you, and

20   it may have already arrived.  It was supposed to arrive around

21   noon.

22          As I mentioned, the first thing you should do is

23   probably go back and get yourself organized, look at the

24   instructions, and get a foreperson elected to help guide you

25   through your deliberations.  Now, you can stay and deliberate

                     Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 4      11/10/2022    642

 1    until about 5 o'clock today, but the courthouse closes at

 2    about five.  If you do not conclude your deliberations today,

 3    what you need to do is give the court security officer who

 4    will be sitting outside of the jury deliberation room a note

 5    indicating that you are going home and what time you will

 6    return on Monday, because tomorrow we're closed for Veterans

 7    holiday.  So you're now going to be escorted to the jury

 8    deliberation room, and you will begin your deliberations.  You

 9    can now finally discuss this case among yourselves, and that's

10    what you're supposed to do.  But you cannot discuss it unless

11    all of you are present.  So if somebody has to go to the

12    bathroom or gets up and leaves, you have to stop your

13    deliberations so that everybody is on the same page.

14          Would the Court security officer please come forward.

15          Ms. Myhaver, would you please administer the oath to

16    the court security officer.

17       (Court security officer sworn.)

18          THE COURT:  All right.  Would you please give these

19    original instructions and the verdict form to the jury, and

20    would you escort them back and make sure that anybody who

21    substitutes for you has taken the same oath.

22          Ladies and gentlemen, please follow the court

23    security officer.

24       (Jury left the courtroom at 12:18 p.m.)

25          THE COURT:  You may be seated.  I assume that the

                     Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 4      11/10/2022    643

1   laptop with the exhibits is back there or do we still need to

2   get that together?

3            THE COURTROOM DEPUTY:  I need to take it back to

4   them.

5            THE COURT:  So we will get the exhibits.  I

6   understand, Counsel, you have conferred.  You've agreed on the

7   exhibits that were admitted, and you've provided the Court

8   with the thumb drive for the laptop for the jurors; is that

9   correct?

10           MR. CHAFFIN:  Your Honor, I don't know if we have

11  conferred actually.  We prepared the thumb drive based on what

12  we had conferred yesterday were the exhibits, but I don't know

13  if defense counsel wishes to review what has actually been put

14  on the thumb drive.

15           THE COURT:  Well, I will expect you to do that

16  immediately after we recess.  I also need you to give

17  Ms. Myhaver phone numbers where you can be reached in the

18  event the jury comes back with a question or returns a

19  verdict, and you need to be within ten minutes of the

20  courthouse in the event that happens.  As you can tell from my

21  directions to them, if they do not reach a verdict today, I do

22  not call them back into the courtroom.  I let them just go

23  home.  They will give us the note, and we'll contact you and

24  let you know that we will need to be back here on Monday if

25  they don't reach a verdict today.

                        Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1 Jury Trial - Day 4     11/10/2022    644

1          Very well-done job.  I really appreciate the

2   professionalism that you showed to one another in this case.

3   I think both sides were represented very well, so just want to

4   let you know that we'll see what happens.

5          MR. LABRANCHE:  Thank you.

6          THE COURT:  Court will be in recess.

7          THE COURTROOM DEPUTY:  All rise.  Court is in recess.

8      (Break was taken from 12:20 p.m. to 4:28 p.m.)

9          THE COURT:  So we got this question.  Does Count 5

10  relate solely to an Arizona trip?  The answer would be yes?

11         MR. CHAFFIN:  Yes.

12         MS. SURRATT:  Yes.

13         THE COURT:  I figured that, but I figured I'd better

14  check with you.  And that's all I'm going to put is yes.  All

15  right?

16         MR. CHAFFIN:  Yes.

17         THE COURT:  All right.  Court's in recess.

18     (The proceedings concluded at 4:28 p.m.)

19

20

21

22

23

24

25

                    Sarah K. Mitchell, RPR, CRR

1                       REPORTER'S CERTIFICATE

2

3          I, SARAH K. MITCHELL, Official Court Reporter for the

4    United States District Court for the District of Colorado, a

5    Registered Professional Reporter and Certified Realtime

6    Reporter, do hereby certify that I reported by machine

7    shorthand the proceedings contained herein at the time and

8    place aforementioned and that the foregoing pages constitute a

9    full, true and correct transcript.

10         Dated this 24th day of May, 2023.

11

12

13

14              _____/s/ Sarah K. Mitchell_____

15                 SARAH K. MITCHELL
                   Official Court Reporter
16            Registered Professional Reporter
                Certified Realtime Reporter
17

18

19

20

21

22

23

24

25


                     Sarah K. Mitchell, RPR, CRR