1

2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Action No. 19-CR-00243-CMA-GPG

3

UNITED STATES OF AMERICA,

4

Plaintiff,

5

vs.

6

MICHAEL TRACY McFADDEN,

7

Defendant.

8

_____

9

REPORTER'S TRANSCRIPT
Hearing on Motions

10

_____

11      Proceedings before the HONORABLE CHRISTINE M. ARGUELLO,

12  Judge, United States District Court for the District of

13  Colorado, commencing at 9:02 a.m., on the 17th day of October,

14  2022, in Courtroom A602, United States Courthouse, Denver,

15  Colorado.

16

17

18

19

20

21

22

23

24  Proceeding Recorded by Mechanical Stenography, Transcription
    Produced via Computer by Janet M. Coppock, 901 19th Street,
25      Room A257, Denver, Colorado, 80294, (303) 335-2106

 1                              APPEARANCES

 2              Jeremy Chaffin, U.S. Attorney's Office,

 3   205 North 4th Street, Suite 400, Grand Junction, CO 81501;

 4              Andrea Surratt, U.S. Attorney's Office,

 5   1801 California Street, Suite 1600, Denver, CO 80202, appearing

 6   for the plaintiff.

 7              Sean McDermott of McDermott Stuart & Ward, LLP, One

 8   Sherman Place, 140 East 19th Avenue, Suite 300,

 9   Denver, CO 80203, appearing for the defendant.

10

11                              PROCEEDINGS

12        *THE COURT:*  The Court calls Criminal Case

13   No. 19-CR-00243-CMA entitled United States of America v.

14   Michael Tracy McFadden.

15              Counsel, would you please enter your appearances.

16        *MR. CHAFFIN:*  Good morning, Your Honor.  Jeremy

17   Chaffin for the government.  To my right is Special Agent Alex

18   Zappe with the FBI.  And also in the courtroom is Detective

19   Prescott with the Grand Junction Police Department.  I will let

20   Ms. Surratt introduce herself.

21        *MS. SURRATT:*  Good morning, Your Honor.  Andrea

22   Surratt for the government.

23        *THE COURT:*  Good morning.

24        *MR. McDERMOTT:*  Good morning, Your Honor.  Sean

25   McDermott appearing on behalf of the defendant, Michael

1   McFadden.  Mr. McFadden is in custody and he is seated to the

2   right of me.

3              *THE COURT:*  Good morning.

4              All right.  We are convened today for hearing on

5   several matters pending before the Court.  The first is

6   Mr. McFadden's Motion to Dismiss Due To Pre-Indictment Delay,

7   Docket No. 62.  The second is Mr. McFadden's Motion to Suppress

8   Statements, Docket No. 63.

9              And Mr. McDermott, I understand from my courtroom

10  deputy, Ms. Roberson, that you have indicated that you wish to

11  withdraw that motion to suppress; is that correct?

12             *MR. McDERMOTT:*  Your Honor, the United States

13  represented to me that they did not intend to bring any

14  statements in in the case in chief.  And then after evaluating

15  what I believe my proffered evidence would be, the motion was

16  submitted on a voluntariness theory, and I will go ahead and

17  withdraw that motion at this time.

18             *THE COURT:*  All right.  So Document No. 63 is

19  withdrawn pursuant to the oral motion the Court grants.

20             All right.  We are also here on Mr. McFadden's

21  Objection to the Government's Notice of Intent to Admit

22  Evidence Pursuant to Federal Rule of Evidence 414, 404(b), and

23  807, which is Docket No. 59.  And really from my analysis --

24  and I will go through it -- of this, the only thing I think I

25  needed testimony on would be the 807 issues in that case.  I

1  would take offers of proof on the 414 if necessary.

2  Before turning, though, to the pending motion, I am

3  going to summarize the factual and procedural history of this

4  case to make sure we are all on the same page.  I have reviewed

5  all of the documentation in this case.  Mr. McFadden was

6  indicted by a Grand Jury on May 17, 2019 on five counts

7  involving child molestation.

8  Counts One and Two of the Indictment relate to an

9  incident in which Mr. McFadden allegedly took K.W., a minor who

10  was 11 years old, and two of his siblings on a commercial

11  trucking trip sometime between Christmas 2012 and January 3rd

12  2013.

13  Counts Three and Four relate to an incident in which

14  Mr. McFadden allegedly took J.W., a minor who was approximately

15  10 years old, on a different commercial trucking trip traveling

16  between Telluride, Colorado and Farmington, New Mexico.

17  Count Five relates to another alleged incident with

18  J.W. on a commercial trucking trip when J.W. was 12 years old

19  or younger sometime between January 1, 2007 and January 3rd,

20  2013.  J.W. recalled sleeping in the sleeper compartment of the

21  truck and described Mr. McFadden as having put his penis into

22  his butt during the night.

23  Counts One and Three charge violations of 18, United

24  States Code, Section 2241(c), aggravated sexual abuse with

25  children.  And Counts Two, Four and Five charge violations of

1    18, United States Code, Section 2423(a), transportation of

2    minor with intent to engage in criminal sexual activity.

3           Mr. McFadden was previously charged with offenses

4    related to this same conduct as well as offenses concerning

5    four other children on January 7, 2013 by District Attorney's

6    Office in Mesa County.  He was convicted on all counts after a

7    jury trial in 2015.  However, the Colorado Court of Appeals

8    reversed his conviction on June 22nd, 2017, on the grounds that

9    Mr. McFadden's statutory speedy trial rights had been violated.

10   On February 12, 2018, the district court dismissed all charges

11   against Mr. McFadden and he was released from custody.  The

12   Indictment in this case was filed 15 months later on May 17,

13   2019.

14          This case is set for a two-week trial in Grand

15   Junction starting on November 7, 2022.  That's not right.

16   Isn't it October 3rd?

17          MR. CHAFFIN:  November 7th is correct, Your Honor.

18          THE COURT:  Okay, great.  I had another trial on the

19   31st.  Okay, on November 7, 2022.  The trial preparation

20   conference is -- final trial preparation conference is

21   scheduled for Tuesday, October 25th, at 3:00 p.m.

22          As I mentioned, I have carefully reviewed all of the

23   relevant briefing, the legal standards and the records in this

24   case.  I am aware that some testimony -- well, when we were

25   going to have the motion to suppress, there would be

1    overlapping testimony.  So as I indicated, I do believe that I

2    need to have some further testimony with respect to the 807 --

3    Rule 807 video.

4         First, however, I want to make some rulings.  I want

5    to first address the Defendant's Motion to Dismiss Due to

6    Pre-Indictment Delay, Docket No. 62.  In that motion

7    Mr. McFadden moves that the Court find that the exculpatory

8    evidence was lost due to pre-indictment delay.  He alleges that

9    he cannot obtain evidence including, but not limited to,

10   business records that show the length of his travels outside of

11   the state of Colorado and that John Fox, his roommate during

12   the time of the alleged conduct who "was present in the same

13   household and who could refute much of the prosecution's case,"

14   passed away during that 15-month -- between the dismissal of

15   the charges against him and the new Indictment.

16        He asserts that Mr. Fox could have testified that

17   there would be close to 20 people in the home at a time, that

18   they were there because they trusted Mr. McFadden, that

19   Mr. McFadden assisted the adults and children who lived in the

20   home, and that Mr. Fox did not see Mr. McFadden commit crimes.

21   For these reasons Mr. McFadden contends that the government has

22   placed Mr. McFadden at a tactical disadvantage in this case and

23   that the disadvantage is great enough that dismissal is

24   warranted.

25        The standard for dismissal for pre-indictment delay

1    requires a defendant to plead and prove by a preponderance of

2    the evidence that, one, the delay caused actual and substantial

3    prejudice to the defendant; and, two, the government

4    purposefully designed the delay to gain a tactical advantage or

5    to harass the defendant. *United States v. Comosona*, 848 F.2d

6    1110 at 1114 (10th Circuit, 1988), quoting from *United States*

7    *v. Padilla*, 819 F.2d 952 at Pages 962 through 63, (10th

8    Circuit, 1987).

9         The defendant has the initial burden of making a prima

10    facie showing of both prongs. That's also from *Comosona*. The

11    burden then shifts to the government to present evidence

12    showing that the delay was not improperly motivated or

13    unjustified. The defendant bears the ultimate burden of

14    establishing the government's due process violation by a

15    preponderance of the evidence. All of that is from *Cocomsona*

16    as well.

17         I have a few questions that I need to ask to clarify

18    my understanding of the record. Mr. McDermott, if as you

19    indicate Mr. Fox could have refuted the prosecution's case, I

20    assume that he was called to testify in the state prosecution;

21    is that correct?

22         *MR. McDERMOTT:* He was not, Your Honor. And I will

23    just say I've reviewed the state case and I plan on presenting

24    my case in a completely different way. So I know that a lot of

25    the pleadings simply say, oh, Mr. McFadden's previously been

1    found guilty, and the only reason we are here is because there

2    was a mistake on his speedy trial.  I frankly see things very

3    differently.  And so respectfully, Your Honor, my position is

4    what happened in Grand Junction, the state case, is not

5    relevant to this case.  We are here and this is a fresh case

6    and he is still presumed innocent.

7         THE COURT:  All right.  And that I don't question, but

8    if he wasn't called in the state trial, that's an indication

9    that Mr. Fox would not have provided the information, at least

10   there is a presumption that if he had been able to provide that

11   testimony to exonerate Mr. McFadden, then it would have -- he

12   would have been called at that point.  If he wasn't, that's not

13   on the government.

14        All right.  The business records, you indicate they

15   would show the length of his travels outside the state of

16   Colorado.  Again, if those were relevant to the charges, were

17   they introduced at the state trial?

18        MR. McDERMOTT:  Your Honor, my understanding is they

19   were not and I don't know -- I don't know why.  I can't speak

20   for what the other attorneys chose to do and not to do.  I know

21   that Mr. McFadden had a laptop that would have a number of

22   those records, and for whatever reason the people in charge of

23   the state case did not obtain that and present the records.

24        THE COURT:  All right.  But those are, then, business

25   records that were in the possession of Mr. McFadden.

1          *MR. McDERMOTT:*  My understanding is back then, yes.

2          *THE COURT:*  So those are records that he could have

3     preserved himself.

4          *MR. McDERMOTT:*  He has been -- he has been in custody.

5     I think he was somewhat limited as to what he was able to

6     control and not control.

7          *THE COURT:*  Well, he was out of custody after the

8     state case, was he not?  I was under the impression that when

9     the Court of Appeals reversed his conviction he was released.

10    So he was out for 15 months until he was indicted; isn't that

11    correct?

12         *MR. McDERMOTT:*  I mean, we -- well --

13         *THE COURT:*  They were records he could have preserved

14    himself.

15         *MR. McDERMOTT:*  My position is, Your Honor, I think

16    his attorneys and investigators had a duty to collect those and

17    preserve them.  My understanding is that the evidence was gone

18    by then.  May I have just a moment, Your Honor?

19         *THE COURT:*  You may.

20         *MR. McDERMOTT:*  So yeah, Your Honor, Mr. McFadden just

21    reinforced what my understanding is.  Mr. McFadden resided at

22    this home where most of the witnesses also resided, and that at

23    some point when the state got involved, the laptop was gone.

24    And I don't have a better answer other than had this been

25    charged federally to begin with, then it would have been

1   federal attorneys' responsibility to go and promptly get those

2   records.  We're here many years after the fact and the records

3   are gone, and my position is that it's not attributable to

4   Mr. McFadden.

5        THE COURT:  Although they were his records.

6        MR. McDERMOTT:  Yes.

7        THE COURT:  All right.  In the motion the defendant

8   does not identify any intentional or purposeful action by the

9   government to delay in order to gain a tactical advantage or to

10   harass him.  What evidence do you have to show that the

11   government purposefully designed this delay to gain a tactical

12   advantage?

13        MR. McDERMOTT:  Your Honor, I would simply say this

14   could have been referred to the Federal Government to begin

15   with.  I think there is an obvious inference here that what

16   happened is they didn't like the Colorado Court of Appeals'

17   opinion and so they found a way to recharge Mr. McFadden.  I

18   think that's a reasonable inference.  And frankly, as I drafted

19   the motion, I am asking for essentially an extension of

20   existing case law.  Under these circumstances, Mr. McFadden's

21   due process rights are violated.

22        THE COURT:  All right.  "The due process clause

23   warrants dismissal of indictments for pre-indictment delay only

24   in exceptional circumstances," *United States v. Comosona*,

25   848 F.2d 110 -- I am sorry, 1110 at Page 1113, (10th Circuit,

1    1988).

2            To determine whether pre-indictment delay rises to the

3    extraordinary level warranting dismissal with prejudice, a

4    defendant must plead and prove by a preponderance of the

5    evidence, one, that the delay caused actual and substantial

6    prejudice to the defendant; and, two, that the government

7    delayed intentionally to gain a tactical advantage, *United*

8    *States v. Lovasco*, 413 U.S. at 789, and *United States v.*

9    *Johnson*, 120 -- actually, I should give the full cite for

10   *Lovasco.  United States v. Lovasco*, 431 U.S. 783 at Page 789,

11   also *United States v. Johnson*, 120 F.3d 1107 at 1110,

12   (10th Circuit, 1997).

13           Regarding the first prong, the 10th Circuit has said

14   that "generally prejudice will take the form of either a loss

15   of witnesses and/or physical evidence or the impairment of

16   their effective use at trial."  That's also from *Comosona* at

17   Page 697.

18           The length of the delay must also be considered.

19   However, "they in conclusory allegations of prejudice resulting

20   from the passage of time and the absence of witnesses are

21   insufficient to constitute a showing of actual prejudice,"

22   *United States v. Trammell*, 133 F.3d 1343 at Page 1351,

23   (10th Circuit, 1998.)

24           With respect to the second prong, the government's

25   delay must be "purposefully designed to gain tactical advantage

1   or to harass the defendant," *United States v. Beitscher*, 467

2   F.2d 269 at Page 272, (10th Circuit, 1972).

3          To meet his burden of making a prima facie showing of

4   a claim for pre-indictment delay, Mr. McFadden must show both

5   prejudice and improper motive.  The Court finds that

6   Mr. McFadden has failed to meet his burden of showing either

7   prejudice or improper motive.  If the evidence defendant

8   asserts has been lost were as relevant to his defense as he

9   asserts, defendant would have introduced it during the state

10  court prosecution.  The fact that it was not introduced at that

11  time leads to the inference that such evidence was not as

12  relevant or not as favorable as the defendant now asserts.

13  Moreover, the business records were in his possession and could

14  have been preserved by him.

15         The Court may not second-guess the timing of the

16  government's Indictment in the absence of proof by an accused

17  of both actual prejudice to his case and an ulterior motive by

18  the prosecution for that delay, *United States v. Francisco*,

19  575 F.2d 815 at Page 817, (10th Circuit, 1978).

20         However, in this case there is nothing to

21  second-guess.  The government indicted the defendant on this

22  case only 15 months after the state charges were dismissed.

23  Fifteen months is not an inordinate delay.  Defendant has not

24  brought forward any definitive evidence from which the Court

25  can infer intentional delay for the purpose of gaining a

1       tactical advantage.  *United States v. Wood*, 207 F.3d 1222,

2       (10th Circuit, 2000); also *United States v. Johnson*, 120 F.3d

3       1107, (10th Circuit, 1997); and *United States v. Jenkins*, 701

4       F.2d 850, (10th Circuit, 1983).  The Court therefore denies

5       Mr. McFadden's motion to dismiss for pre-indictment delay.

6              Moving next to the sexual assault on a child

7       conviction when Mr. McFadden was 18 years old, my understanding

8       is that that conduct took place back in 1989 when Mr. McFadden

9       was staying at a friend's home.  During the night he entered

10      the room of an eight-year-old boy, M.S., and brought him down

11      to the basement.  He then laid M.S. on the carpet on his

12      stomach and got on top of him.  M.S. stated that Mr. McFadden

13      "stuck his private up M.S.'s butt," and "moved around a

14      little."  M.S. disclosed the incident to his mother who took no

15      action.  He also disclosed it, however, to a baby-sitter who

16      took M.S. to the hospital and reported the matter to law

17      enforcement.

18             Defendant pled guilty to this crime.  Thus, it is an

19      admission on his part.  And Rule 413 of the Federal Rules of

20      Evidence which relates to evidence of similar crimes in sexual

21      assault cases indicates that a prior act of sexual assault can

22      be used to prove the defendant's bad character.  And 413

23      essentially does not have the 404(b).  Although it is more than

24      30 years requirement -- although it is more than 30 years old,

25      the Court finds that the nature of that crime and the

1    similarity to the crimes defendant is charged with in this case

2    make that conviction more probative than prejudicial under Rule

3    403's balancing test.  Thus, the Court will allow introduction

4    of that conviction.

5            My question to the government is how does the

6    government intend to prove that conviction?

7            *MR. CHAFFIN:*  Your Honor, I don't think that we will

8    actually seek to introduce that in our case in chief.  We had

9    intended to have the victim testify, but we have been unable to

10   locate the victim.  I think the only way to introduce that with

11   a witness -- I am not aware of another way to introduce

12   evidence of that from a witness who has personal knowledge of

13   the circumstances, and so unless the Court -- I don't think

14   that there is a basis.

15           *THE COURT:*  A certified copy of the conviction record?

16           *MR. CHAFFIN:*  We certainly could do that.

17           *THE COURT:*  You just wouldn't get the facts in.

18           *MR. CHAFFIN:*  The facts are not there, and I think the

19   facts are what is important, so I think that we will likely

20   forego that unless we can locate the victim in the case.

21           *THE COURT:*  All right.  Next we move on to the

22   objection of notice of intent to introduce evidence pursuant to

23   Rules 414, 404(b) and 807.  The government filed this notice of

24   intent on December 2nd, 2020.  I am sorry, no, I must have the

25   wrong date here.  Well, anyway, it refers to the government's

1   notice.  On September 13, 2022, Mr. McFadden filed his

2   objection to the government's notice of intent.  Mr. McFadden

3   challenges the admissibility of all of the government's noticed

4   evidence.

5          The Court is going to break this out into two

6   separate -- well, actually three separate packages because I

7   think they need to be analyzed under three different scenarios.

8   First, I am going to address the conduct that relates to the

9   other acts of child molestation of J.W., who was the victim in

10  Counts Three, Four and Five, and K.W., who was the victim in

11  Counts One and Two.  I am not going to go through the acts in

12  detail here.  I don't think it's necessary.  It is in the

13  record as to what J.W. described in terms of the molestation of

14  Mr. McFadden while he was on the trip in Arizona and the fact

15  that he describes that Mr. McFadden sexually assaulted him

16  hundreds of times after that and that he rarely allowed three

17  or four days to pass without molesting him.

18         He describes the assaults as always occurring at

19  night, typically after he had been given a drink that he

20  believed had something put in it to help him sleep.  They

21  occurred either in Mr. McFadden's bed or in the sleeper bed of

22  the semi truck driven by Mr. McFadden.  And each time he was

23  sodomized by Mr. McFadden.

24         K.W. reports that he also was molested by Mr. McFadden

25  a lot.  He describes it also as typically happening at night

1    after he had been given melatonin or something else to make him

2    sleepy.  He stated that Mr. McFadden would put his hands inside

3    his pants, touch his penis, and occasionally would rub his

4    penis on K.W.'s butt.  He also describes an instance in which

5    he observed what he believed to be Mr. McFadden touching J.W.'s

6    penis at night when K.W. was staying at Mr. McFadden's house.

7         Federal Rule of Evidence 414 provides, "In a criminal

8    case in which the defendant is accused of child molestation,

9    the Court may admit evidence that the defendant committed any

10   other child molestation.  The evidence may be considered on any

11   matter to which it is relevant."

12        Rule 414 of the Federal Rules of Evidence, in other

13   words, permits the government to introduce evidence that a

14   defendant has committed other child molestation not charged in

15   the Indictment.  The government has outlined this evidence in

16   detail that it seeks to introduce pursuant to Rule 414.

17   Mr. McFadden objects on the basis that the evidence is

18   unreliable and that the quantity of the evidence is more

19   prejudicial than probative.

20        Rules 413, 414 and 415 all create an exception to Rule

21   404(b) exclusions with regard to evidence that would merely

22   point to propensity to commit the act.  They create this

23   exception in sexual assault cases and in particular child

24   molestation cases.  In a case involving child molestation, the

25   10th Circuit has stated that Rule 414, quote, replaces the

1    restrictive Rule 404(b) which prevents parties from proving

2    their case through "character" or "propensity" evidence.

3    That's from *United States v. Castillo*, 140 F.3d 874 at

4    Page 879, (10th Circuit, 1998).

5          In other words, Rules 413 and 414 constitutes

6    exceptions to the general exclusionary portions of Federal Rule

7    of Evidence 404 which prohibit admission of evidence to show a

8    defendant's propensity to commit bad acts.  That's from *United*

9    *States v. Perault*, 995 F.3d 748, (10th Circuit, 2021).

10   "Congress enacted these rules in part to address a frequent

11   problem in sexual assault cases.  Trials represent" -- sorry,

12   "Trials presenting he said/she said stalemates what Congress

13   described as 'unresolvable swearing matches.'" That's also from

14   *United States v. Perault*, quoting from *United States v. Enjady*,

15   134 F.3d 1427 at Page 1431, (10th Circuit, 1998).

16         The government must overcome several hurdles before it

17   may admit Rule 414 evidence.  First, the evidence must meet

18   Rule 414's three threshold requirements:  First, that the

19   defendant is accused of an offense of child molestation in this

20   case; second, that the evidence proffered is evidence of the

21   defendant's commission of another offense of child molestation;

22   and third, that the evidence is relevant.  It's from *United*

23   *States v. Perault*, 995 F.3d 748 at 765, (10th Circuit, 2021).

24         Now, Mr. McDermott, it does not appear to me that

25   Mr. McFadden disputes any of the three threshold requirements;

1    is that correct?

2         *MR. McDERMOTT:*  Your Honor, I do believe that those

3    are threshold requirements.  However, the way I interpret the

4    cases is that there is still 403 --

5         *THE COURT:*  That's absolutely right, but my question

6    is, does he dispute the threshold requirements?

7         *MR. McDERMOTT:*  No.

8         *THE COURT:*  So you are entirely correct.  The Court

9    does find that the Rule 414's threshold requirements are met in

10   this case with respect to the prior acts of child molestation

11   committed upon J.W. and K.W.  Therefore, the Court finds that

12   the evidence relating to prior molestation of K.W. and J.W. is

13   admissible under Rule 414.  However, the inquiry does not end

14   there.  The Court also needs to conduct a Rule 403 inquiry.

15        Mr. McFadden argues that the evidence is more

16   prejudicial than probative because of the quantity of the prior

17   acts of child molestation evidence.  The Court construes that

18   to mean that Mr. McFadden argues that the evidence will

19   contribute to an improperly based jury verdict or to distract

20   the jury from the central issues in this case.

21        J.W. and K.W. each describe a pattern of similar

22   assaults occurring at night in Mr. McFadden's bed or the

23   sleeper bed of his semi truck often with the use of sleep aids.

24   They describe these assaults occurring so often that they are

25   unable to state precisely the number of times the assaults

1    happened during the several year period that the conduct

2    occurred nor can they testify as to the exact dates and

3    locations.  The similarity of the prior acts and the charged

4    acts, the frequency of the prior acts and the lack of

5    intervening events between the prior acts and the charged acts

6    all weigh in favor of the probative value of the evidence

7    tending to show that Mr. McFadden committed the charged acts in

8    this case.

9         Although the Court acknowledges that K.W.'s and J.W.'s

10   testimony about prior acts will almost certainly have an

11   emotional impact on the jury, that alone is not sufficient to

12   justify excluding the evidence*, United States v. Mercer,* 653 F.

13   Appx. 622, (10th Circuit, 2016).  The evidence of prior acts of

14   child molestation involving J.W. and K.W. is intrinsic evidence

15   that is "directly connected to the factual circumstances of the

16   crime and provides contextual or background information to the

17   jury," *United States v. Murry*, 31 F.4th 1274, (10th Circuit,

18   2022).

19        J.W. reported that Mr. McFadden assaulted him hundreds

20   of times and he described a "normal" assault as one where

21   Mr. McFadden sodomized him.  Because J.W. does not recall the

22   precise time frame of the incident relating to Count Five, this

23   context is important to understand what constituted a "normal"

24   assault for J.W. and why J.W. does not remember the exact time.

25        Similarly, K.W. reported that he was molested by

1    Mr. McFadden "a lot."  The Court finds that evidence of these

2    prior acts committed on the children who are the subjects of

3    Counts One through Five is more probative than prejudicial

4    under Federal Rule of Evidence 403.  Therefore, that testimony

5    will be admitted.

6         This brings the Court, however, to the other acts of

7    child molestation involving the other five children who were

8    not victims of the crimes charged in this Indictment but four

9    of whom were victims of the crimes indicted in the state court

10   who also report being molested by Mr. McFadden during this same

11   time period under similar circumstances.  And these are the

12   other acts of child molestation involving I.S., E.S., S.J.W.

13   and D.R. and L.W.  L.W. was the one that was not charged in the

14   state case because that is just a recent disclosure.

15        The Court acknowledges that the facts of those --

16   well, the facts of all of the allegations are seriously

17   disputed because Mr. McFadden denies any acts of child

18   molestation and contends that he has been unfairly accused.  At

19   this preliminary stage it appears to the Court that the

20   proffered Rule 414 evidence relating to I.S., E.S., S.J.W.,

21   D.R. and L.W. is corroborative of K.W.'s and J.W.'s testimony.

22   They are probative because the acts involve similar conduct

23   including the use of sleep aids and that the assaults occurred

24   under similar circumstances at night in Mr. McFadden's bed, in

25   his house, or in the sleeper compartment of his semi truck.

1    Further, the acts occurred frequently and appeared to be part

2    of a larger pattern of abuse involving children who spend time

3    at Mr. McFadden's house and accompanying him on trucking trips.

4         Although a jury may express doubt about the lack of

5    physical evidence relating to these prior acts, the Court notes

6    that a jury previously found that several of these incidents

7    occurred and found Mr. McFadden guilty of the offense relating

8    to these acts.  So in short, this evidence could bolster the

9    credibility of K.W. and J.W.  Nonetheless, the Court is going

10   to reserve ruling on these prior acts -- on whether these prior

11   acts should be admissible under Rule 403 until trial.

12        The Court needs first to hear the testimony of the

13   children who were victims of Counts One through Five, hear the

14   cross-examination of them by the defendant before it makes a

15   decision as to whether there is truly a need for the jury to

16   hear this evidence.  To the extent that the defendant may

17   suggest that the victims are fabricating these accusations and

18   that there are no eyewitnesses to these assaults, this evidence

19   may become very relevant to bolster the victims' credibility.

20        Waiting until trial is the only way this Court can

21   properly conduct a 403 balancing analysis regarding how

22   relevant and probative the evidence is to prove Counts One

23   through Five, how likely it is that such evidence will

24   contribute to an improperly based jury verdict, the extent to

25   which such evidence will distract the jury from the central

1    issues of the trial, and how time consuming it will be to prove

2    the prior conduct.  So the Court is going to reserve ruling on

3    the admission of those statements by the other witnesses until

4    trial.  So the government can raise that issue and the defense

5    can object to that at the time it becomes -- at the time --

6    after the time that the two victims in this case have

7    testified.

8         All right.  With respect to the other 404(b) evidence,

9    Mr. Chaffin, from whom do you intend to elicit testimony about

10   sleep aids and grooming behaviors?

11        *MR. CHAFFIN:*  Your Honor, as far as sleep aids, I

12   think that the victims' parents may discuss some of that as

13   well as some of the grooming behavior, so the gifts that were

14   given, the details of the home, but I primarily intend to

15   introduce that through the victims themselves.

16        *THE COURT:*  All right.  If it comes in through the

17   children's testimony, then I believe it's admissible.  404(b)

18   would not even apply in that case.  To the extent that you

19   would attempt to introduce it through the parents, it's going

20   to depend on what they testify, if they can lay the foundation

21   for knowing whether those aids were given to their children,

22   but it would -- it appears to me that it would be *res gestae*

23   type of evidence.

24        *MR. CHAFFIN:*  Your Honor, one thing that the

25   government intended to elicit is not only the grooming of the

1    children, but also the grooming of the parents.  And so J.W.'s

2    mother and K.W.'s mother would testify about the behaviors that

3    Mr. McFadden did to make them comfortable, right, the provision

4    of stable housing, the fact that they were using drugs and

5    Mr. McFadden knew that they were using drugs.

6          THE COURT:  That to me does not appear to be 404(b)

7    evidence at all.

8          MR. CHAFFIN:  I just wanted to make sure that the

9    Court was aware of all of the details that we intend to elicit.

10         THE COURT:  Right.  Well, that is testimony of the

11   facts.  That does not appear to be -- to me to be evidence that

12   would be excluded by 404(b).

13         MR. CHAFFIN:  I agree, Your Honor.  I just want to be

14   transparent.

15         THE COURT:  Airing on the side of caution, okay.

16         MR. CHAFFIN:  Yes.  Your Honor, I understand the

17   Court's ruling.  I think Ms. Surratt and I will have a

18   discussion, but we will have to tread carefully with all of the

19   witnesses in light of the Court's ruling because this all came

20   up during a single investigation.  And so I think it's very

21   likely that you may hear that J.W. or K.W. were aware of other

22   allegations from children.  I think that's part of the crux of

23   the defense's cross-examination.  And so my concern is that the

24   jury is going to become aware of sort of the intermixed

25   investigation.  We'll do everything we can to caution witnesses

1    against discussing that, but --

2          THE COURT:  Well, I want to hear -- I actually just

3    need to hear more about what J.W. and K.W. are going to testify

4    to and how they are going to be cross-examined by the defense

5    before I can make a decision as to whether the statements by

6    the other children are going to be relevant to corroborate or

7    otherwise bolster the testimony which if it's -- if that's

8    questioned or addressed on cross-examination, that would open

9    the door to make it relevant.

10          MR. CHAFFIN:  I just want to make the Court aware,

11   we'll avoid reference of any other victims in our opening

12   statement.  I will caution the witnesses against referencing

13   that.  But this investigation all arose at the same time and

14   there was discussions, there was awareness from the charged

15   victims of the other victims and vice versa.

16          THE COURT:  Well, it may be that after I hear the

17   opening statements, it will become clear to me what is going to

18   be at issue in this case.

19          MR. CHAFFIN:  Yes, Your Honor.  Thank you.

20          THE COURT:  All right.

21          MR. McDERMOTT:  Your Honor, may I interject?

22          THE COURT:  You may.

23          MR. McDERMOTT:  I, frankly, I was hoping that we were

24   going to get testimony on this issue from Detective Prescott.

25   And I frankly --

1          *THE COURT:*  On what issue?

2          *MR. McDERMOTT:*  Well, on the 403 analysis.  I mean, I

3    believe that as witnesses come forward and as they are

4    cross-examined, the Court and/or the fact finder will see why

5    the defense contends that these -- this evidence is unreliable

6    and also why it's unfairly prejudicial.  So since we are not

7    going to have testimony today, would --

8          *THE COURT:*  I can't make -- are you saying with

9    respect to the victims in this case?

10         *MR. McDERMOTT:*  Yes.  I am trying to make this as easy

11   for the Court as possible before we go into a trial.  So what I

12   am getting at is --

13         *THE COURT:*  But I have to know the whole context.  I

14   can't just hear the testimony of one detective, and that's why

15   I am deferring -- I think that evidence as to the two victims

16   in this case is admissible under 414 because I have done the

17   analysis under 403.  With respect to the other children, that's

18   different because those are not charged crimes and that's a

19   trickier 403 analysis.  But I won't know until I hear what your

20   theory of the defense is, what the witnesses testify, how you

21   cross-examine them, whether that other evidence becomes

22   admissible.

23         *MR. McDERMOTT:*  And I understand.  I understand where

24   you are coming from, Your Honor.  So my question to you is, is

25   it helpful if I do present a motion *in limine* prior to trial to

1    at least let you know what I believe the context will be and

2    why we believe --

3              THE COURT:  Sure.  That would be very helpful.

4              MR. McDERMOTT:  All right.  I will go ahead and do

5    that, then.

6              THE COURT:  All right.  So the Court is deferring its

7    ruling to the extent that the evidence of sleep aids or

8    grooming comes through the testimony of other children or other

9    witnesses or relates to other uncharged prior acts in this

10   case.

11             All right.  That now brings us to the video.  The

12   government provided notice of its intent to admit a 33-minute

13   audio and video recorded forensic interview of K.W. by

14   Detective Prescott which took place at Dolphin House Child

15   Advocacy Center in Montrose, Colorado, on January 16, 2013.  I

16   believe K.W. was only 11 at the time, maybe 12.  I have

17   reviewed that video in full.  The government seeks to admit

18   K.W.'s statements during this video pursuant to the residual

19   hearsay exception.  Mr. McFadden objects to this evidence on

20   the basis that the statement is not reliable.

21             The Court believes that it does need testimony on the

22   issues raised by the motion to suppress -- I am sorry, raised

23   by this objection to the use of this video under Rule 807 with

24   respect to its reliability.  I don't need to see the video.  As

25   I said, I have already reviewed it in full.

1          Federal Rule of Evidence 807 provides that a hearsay

2     statement is not excluded by the rules against hearsay even if

3     it is not admissible under an exception if it is supported by

4     sufficient guarantees of trustworthiness, and you need to

5     consider the totality of the circumstances under which it was

6     made and evidence, if any, corroborating the statement; and

7     (2), it is more probative on the point for which it is offered

8     than any other evidence that the proponent can obtain through

9     reasonable efforts.

10          The 10th Circuit has cautioned that the rule "should

11     be used only in extraordinary circumstances where the Court is

12     satisfied that the evidence offers guarantees of

13     trustworthiness and is material, probative and necessary in the

14     interests of justice, *United States v. Harrison*, 296 F.3d 994

15     at Page 1004, (10th Circuit, 2002).

16          However, that case also indicated that courts

17     regularly employ the residual exception in child abuse

18     litigation.  In order to determine whether hearsay statements

19     made by a child in a sexual assault case are reliable for

20     purposes of Rule 807, the Court should consider the spontaneity

21     of the child's statement, the consistent repetition of the

22     child's allegation, the mental state of the child, the use of

23     terminology unexpected of a child of similar age, and the lack

24     of motive to fabricate, *United States v. Tome*, 61 F.3d 1446,

25     (10th Circuit, 1995).  To find the statement admissible the

1    Court must find that K.W. "was particularly likely to be

2    telling the truth when the statement was made," *Idaho v. Wright*

3    497 U.S. 805, a 1990 case.

4         So I guess my first question would be, Mr. McDermott,

5    in what ways do you believe K.W.'s statements in the video lack

6    indicia of reliability and trustworthiness?

7         *MR. McDERMOTT:*  Well, here, Your Honor, I will give

8    the Court a time line, and this is why I referenced the

9    possible motion *in limine*.  Mr. McFadden became the subject of

10   an investigation in late 2012.  I will indicate to the Court

11   that everybody in this case interacts with each other and

12   that's essentially what the defense believed happened here.

13   Mr. McFadden was an easy target because when he was

14   approximately 18 years old, he entered a guilty plea to the

15   case that the Court referenced earlier today.  Despite the fact

16   that he had to register and despite the fact that he entered

17   that guilty plea, all the families in this case trusted

18   Mr. McFadden.  They left their children with him.

19        At trial the Court will see that they left their

20   children with Mr. McFadden because he was the one person that

21   was stable throughout this whole thing.  He was the one person

22   who paid the rent.  He is the one person who worked regularly.

23   Irrespective of what some of the other witnesses have to say,

24   Mr. McFadden was the one person who wasn't drinking and

25   drugging all the time.

1          And nobody came forward with any sort of allegation

2     until I.S. did, and that happened in December of 2012.  And at

3     trial I anticipate that we will show that I.S. said something

4     that wasn't true because he didn't get his way.  And he didn't

5     get his way when Mr. McFadden enforced the rule of his

6     guardian, Dian S., who the Court heard from a couple weeks ago

7     on a phone call.

8          This investigation began.  They went, they pulled

9     Mr. McFadden's old record.  They then asked questions about an

10    incident in 2008.  They interviewed J.W. and L.W., and those

11    kids said that nothing had happened.  It continues.  And as a

12    matter of fact, when I.S. initially made that disclosure, he

13    did that and he -- another kid named E.W. was involved as well

14    and they had spoken with the adults.  And E.W. said what I.S.

15    said was untrue, that he had been there to see.  He had been in

16    the house with them and that I.S. was not telling the truth.

17         I.S. was being parented and supervised by a woman

18    named Cindy R.  And Ms. R. has a strong bias against

19    Mr. McFadden.  And law enforcement spoke with Ms. R. and

20    basically told Ms. R. that Mr. McFadden had done this before

21    and that he was a bad guy and that we need to be able to -- I

22    am paraphrasing here -- but essentially get Mr. McFadden so

23    that this doesn't happen again.

24         E.W. was interviewed in late December and E.W.

25    reinforced that, no, nothing had happened.  And then

1    approximately a week later after he had a week to be with

2    Ms. R., he came back in and said, oh, I forgot to tell you

3    something.  And on January 3rd he went from, oh, nothing

4    happened to, oh, Mr. McFadden came to the living room, took me

5    into his room, pulled his pants down and, oh, by the way at a

6    different location he raped me, I believe on the first day he

7    said two times, and then a couple days later he follows up with

8    the same nurse and then it was a rape of three times.

9            So on January 3rd even though this kid had said a week

10   earlier that nothing happened, a warrant is obtained and

11   Mr. McFadden is in jail.  And after he's in jail and after he

12   is -- I don't even think I could overstate it, but he is a

13   complete pariah at this point, then that is when other

14   allegations finally start to occur.  And Mr. McFadden gets

15   arrested up in Nebraska.  K.W. is with his family.  My

16   inference is that the family and all these families were

17   talking about Mr. McFadden.  A lot of the witnesses would talk

18   about Mr. McFadden and what he did when he was 18 years old,

19   and even though they had trusted him, now that he is 41 years

20   old this is happening to him.

21           And so against that backdrop after years upon years of

22   not saying something, then K.W. is finally interviewed and

23   that's what's on the tape.  So while the tape itself may appear

24   just fine and credible, against that backdrop it's unreliable

25   and it should not be admitted.  We should get the testimony

31

1    straight from the witness himself and not rely on a video.

2         THE COURT:  All right.  Mr. Chaffin, Ms. Surratt, who

3    wishes to respond?

4         MS. SURRATT:  I will, Your Honor.

5         Your Honor, as the government stated in its

6    submission, we are prepared today to call Detective Ed Prescott

7    to testify to some of these issues including the reliability of

8    the proposed 807 evidence.  I will note at the outset, however,

9    that it seems like what Mr. McDermott's defense in this case is

10   going to be is some sort of social contagion among witnesses

11   where one after another lie and it sort of fell like dominos.

12   In essence, Your Honor, he made a pretty strong argument for

13   introduction of all the 414 evidence that the government has

14   given notice to introduce.  So to the extent this is the

15   defense we hear at trial, we will certainly renew that motion.

16        THE COURT:  All right.

17        MS. SURRATT:  But, Your Honor, the government is

18   prepared to call Detective Ed Prescott.  Before we do, I think

19   in our lengthy exhibit list the only exhibits relevant --

20        THE COURT:  I don't have an exhibit list.

21        MS. SURRATT:  We have an extra copy, Your Honor.

22        THE COURT:  Thank you.  I don't have a witness list

23   either, but --

24        COURT DEPUTY CLERK:  I can provide that to you.  I

25   apologize.

1          MS. SURRATT:  Your Honor, we dropped off with the

2     Clerk of the Court on Friday a thumb drive containing all of

3     these exhibits.

4          THE COURT:  Okay.

5          MS. SURRATT:  The only exhibits, Your Honor, that I

6     believe at this juncture are relevant are 1 through 3 and also

7     1A through 3A.  The Exhibit 1 is the recording of the interview

8     that's at issue that the Court has stated that the Court

9     already reviewed.  1A is a transcript that's provided just to

10    be helpful.

11         THE COURT:  I think that was in the document you filed

12    too.

13         MS. SURRATT:  It was in the original notice filed on

14    December 2nd, 2020.  And then the exhibit filed along with our

15    response to Mr. McDermott's objection to that notice included a

16    conventionally filed exhibit.  We have included it again on the

17    disk prepared in advance of this hearing.

18         THE COURT:  Okay.

19         MS. SURRATT:  Exhibits 2 and 3 and their transcripts

20    are more recent interviews of K.W.  We don't intend to

21    introduce these at trial.  They are simply provided because

22    they go to prong two of the 807 analysis.  That is whether the

23    2013 interview is the most probative on the points at issue.

24         Your Honor, we have spoken with Mr. McDermott in

25    advance of this hearing.  It is our understanding that he does

1   not object to the authenticity of any of these, so we do move

2   to admit 1 through 3 and 1A through 3A for this hearing.

3           *THE COURT:*  Any objection to that, Mr. McDermott?

4           *MR. McDERMOTT:*  With respect to authenticity, no

5   objection, Your Honor.

6           *THE COURT:*  All right.

7           *MS. SURRATT:*  Your Honor, as we said in our

8   submission, the reason we are going through this exercise is

9   because in the two more recent interviews of K.W. in 2018 and

10  2019, K.W. professed either a lack of memory of the incident or

11  and concurrently a desire, a very strong desire to not talk

12  about the incident that he spoke about and testified about at

13  the underlying state trial.  And so we certainly wouldn't

14  object, Your Honor, to the Court also reserving ruling on our

15  807 motion because we do expect to have K.W. present at trial.

16  It's just we are out of an abundance of caution assuming that

17  he is going to maintain the posture he did in 2018 and 2019 and

18  again profess to either not remember or have a very strong

19  desire to not speak about the incident.

20          *THE COURT:*  All right.  I would like to hear the

21  testimony, though, of Detective Prescott.

22          *MS. SURRATT:*  Yes, Your Honor.  So the government

23  calls Detective Prescott to the stand.

24      (**Edward Prescott** was sworn.)

25          *THE WITNESS:*  I do.

Edward Prescott - Direct

1          *COURT DEPUTY CLERK:*  Please state your first and last

2     names and spell them for the record.

3          *THE WITNESS:*  My name is Edward Prescott,

4     P-R-E-S-C-O-T-T.

5                    **DIRECT EXAMINATION**

6     *BY MS. SURRATT:*

7     *Q.*  Mr. Prescott, where do you currently work?

8     *A.*  Grand Junction Police Department, City of Grand Junction.

9     *Q.*  What is your current position at the Grand Junction Police

10    Department?

11    *A.*  I am a civilian investigator.  I investigate -- I handle

12    the sex offender registrations for the police department,

13    runaways and missing persons.

14    *Q.*  What did you do for work in 2012?

15    *A.*  I was a criminal investigator for persons crimes for the

16    police department.

17    *Q.*  Was your title detective at the Grand Junction Police

18    Department?

19    *A.*  That's correct.

20    *Q.*  For how long were you a detective at the Grand Junction

21    Police Department?

22    *A.*  A little over 20 years.

23    *Q.*  And over what period did that span?

24    *A.*  2001 through 2020.

25    *Q.*  And was it in approximately 2020 that you stepped into your

Edward Prescott - Direct

1    current role as a civilian with the Grand Junction Police

2    Department?

3    A.   That's correct.

4    Q.   And what did you do before you were a detective at the

5    Grand Junction Police Department?

6    A.   I worked in patrol.  I initially started in California.  I

7    worked six and a half years in patrol in California for the

8    city of Ontario, California, and then about six years at Grand

9    Junction Police Department on patrol.

10   Q.   What were your duties and responsibilities as a detective

11   at the Grand Junction Police Department?

12   A.   To handle any of the crimes that were assigned to me,

13   complete the investigations as much as possible, interview

14   witnesses, suspects in those incidents, persons involved in

15   that, develop cases for that for the Court and the DA's office

16   and testify in court.

17   Q.   While you were a detective, did you investigate a case

18   involving a defendant named Michael McFadden?

19   A.   Yes, ma'am, I did.

20   Q.   Approximately when was this?

21   A.   December of 2012.

22   Q.   In brief, what caused you to initiate your investigation

23   into Mr. McFadden?

24   A.   One of the patrol officers with the Grand Junction Police

25   Department, Eric Woods, was the initial officer that received

36

Edward Prescott - Direct

1    the report, took the initial report.  That occurred on a

2    Friday.  I was off on Fridays.  Monday morning when I came in

3    on the 15th, I believe it was, I was assigned the case by my

4    sergeant, William Baker, and started the investigation at that

5    point.

6    Q.  What in particular was the event that caused this case to

7    be opened in the Grand Junction Police Department?

8    A.  There was a report of a young man, I.S.  His mother, Dian

9    S., reported that he had disclosed to persons at that

10   residence, 2980 D-1/2 Road, that he was sexually molested.

11   Q.  And who did he report that he was sexually molested by?

12   A.  Michael McFadden.

13   Q.  You said that you recall it was on the 15th.  Was this in

14   late 2012?

15   A.  That's correct.

16   Q.  And in particular if you recall was it in December of 2012?

17   A.  That is correct.

18   Q.  After you learned about this outcry from I.S., very broadly

19   what investigative steps did you take in the case?

20   A.  I contacted Dian S. first initially and she was at work.  I

21   went and met with her and discussed meeting with I.S. and how

22   the disclosure had come to her after reviewing the case.  She

23   agreed to meet with me, but it wouldn't be that day.  We met

24   the next day at Western Slope Center for Children and I

25   conducted a forensic interview with I.S.

Edward Prescott - Direct

1    Q.  I would like to focus today on those forensic interviews.

2    As a general matter, you used the term forensic interview.  Is

3    that the type of interview that you strive to conduct with

4    children who you believe to be victims of sexual assault?

5    A.  That and other types of assault or witnesses to major

6    crimes.

7    Q.  What is a forensic interview?

8    A.  It's an interview where you are not -- you are not

9    providing information to the child.  You are drawing

10   information from the child.  You're not asking leading

11   questions.  You're attempting to use open-end questions to have

12   them provide the narrative, a free narrative of an incident

13   they were a witness to or a victim of.

14   Q.  Can forensic interviews be somewhat fluid depending on the

15   situation?

16   A.  That's correct.

17   Q.  Have you been trained on forensic interviewing techniques?

18   A.  Yes.  I attended what they call Corner House training in

19   what would be April of 2010.  It's a three-day course down in

20   Delta, Colorado, and subsequently attended advanced training in

21   that.

22   Q.  And what types of things were covered in the various

23   trainings you have attended?

24   A.  How children remember, how they react to abuse, how they

25   recall issues of abuse, types of questioning that you would use

Edward Prescott - Direct

1   during a forensic interview, types of questioning you wouldn't

2   use during a forensic interview, those sorts of things, how

3   children may disclose or may not disclose.

4   Q.   What is a peer review in the context of a forensic

5   interview?

6   A.   Peer review is when we as over on the West Slope would get

7   together as forensic investigators and interviewers in a

8   meeting.  We would play a video of an interview that one of us

9   has done, and you review that interview and then make

10   recommendations or tell them maybe places they did really good

11   or they could have improved.

12   Q.   Were you ever involved in assisting with peer reviews of

13   others?

14   A.   Yeah, multiple times.

15   Q.   What's the purpose of conducting a forensic interview with

16   a child?

17   A.   To get a un -- to get an interview with a statement from a

18   child that is not leading and not coerced, that's not been

19   tampered with by other persons.

20   Q.   In sum, is it fair to say the purpose is to get to the

21   truth?

22   A.   This is true.

23   Q.   Approximately how many forensic interviews of children have

24   you done over the course of your career?

25   A.   I have documented 180.

Edward Prescott - Direct

1    *Q.* And in addition to those 180 interviews that you did, were

2    you also involved in others?

3    *A.* Correct.  Like we did the peer reviews, but also I reviewed

4    fellow investigators' interviews and watched their interviews.

5    *Q.* Let's talk specifically about one of the alleged victims in

6    this case who I will refer to as K.W.  Did you ultimately

7    interview K.W. in this case?

8    *A.* I did.

9    *Q.* What were the circumstances that led you to want to speak

10   with K.W. in this matter?

11   *A.* Leading up to that, the initial outcry of disclosure made

12   by I.S.  I had done -- completed his interview.  I also met

13   with -- can I use first names?

14   *Q.* I think that's fine.

15        *MS. SURRATT:*  We may, Your Honor, have to ask to

16   redact portions of this transcript.

17        *THE COURT:*  That will be fine.

18   *A.* Okay.  After interviewing I.S. and speaking with an adult,

19   Cindy R., who lived at the residence, I met with E.S.  E.S. had

20   been the one I.S. first disclosed anything to.  E.S. was eight,

21   I believe, at the time, and conducted an interview with E.S.

22   There was no disclosure made by E.S. in that initial interview.

23        I had set up after that an interview with E.S.'s

24   brother D.O. who had also been at the residence around

25   Mr. McFadden and also with their mother Crystal.  I had set up

Edward Prescott - Direct

1    that interview to meet with them.  When they showed up at the

2    police department, E.S. walked up to me and said,

3    "Mr. Prescott, I lied.  I need to talk to you."  And I told him

4    we would go upstairs.

5            I took him upstairs to the police department along

6    with his mother Crystal and D.O. and completed an interview

7    with E.S.  During that interview there was a lot of disclosures

8    that were made by him including sodomy and multiple instances

9    of touching of his penis by Mr. McFadden.

10           And at that point I had enough to write a firm warrant

11   for Mr. McFadden.  I wrote that warrant.  Actually, before the

12   warrant when we went downstairs back to the lobby of the police

13   department with the children, D.O., E.S. and with their mother

14   Crystal, I was given a note by Cindy R. and told you need to

15   contact these people.  The note was Stacy and Scott W., and I

16   didn't have any idea of their relationship to this other than

17   what I had been told, that they were around the boys.  And I

18   looked them up, was able to contact them, and --

19   BY MS. SURRATT:

20   Q.  Let me pause you there, Detective.  Let me clarify a couple

21   of things you just said.  You referred a number of times to the

22   residence.  Are you referring to Mr. McFadden's residence at

23   the time?

24   A.  That is correct.

25   Q.  All right.  And then you referred to a number of children

                                                                                    41

Edward Prescott - Direct

 1   by their first names, I.S.  Is that I.S.?

 2   A.  That is correct.

 3   Q.  And E.S., at the time E.M.?

 4   A.  That's correct.

 5   Q.  And D.O., was that D.O.?

 6   A.  That's correct.

 7   Q.  And is it your understanding, Detective, that E.M. is now

 8   E.S.?

 9   A.  That's correct.

10   Q.  So in your narrative, Detective, I interrupted you.  You

11   said you were told you should reach out to The W. Family.  Did

12   you indeed do that?

13   A.  I did.  I contacted Stacy and Scott, advised them of my

14   investigation.  And they became over the phone I could tell

15   very concerned.  Their three boys were with Mr. McFadden on a

16   semi-truck run out of state.  And they didn't know at that

17   point where they were.  I had a warrant already written for

18   him.  I told them to immediately get in touch with their son

19   whom they said had a phone.  That would be S.W., Jr., had a

20   phone with him.  They called him and were advised they were at

21   North Platte, Nebraska.

22   Q.  And Detective, you said the three W. Family boys.  Who were

23   the three W. Family boys?

24   A.  I'm sorry, the oldest being S.W., the middle age would be

25   K.W., and their younger brother, L.W.

Edward Prescott - Direct

1  *Q.*  So again in your narrative, Detective, The W. Family said

2  they would try to reach out to Scott who had a cellphone.  Is

3  it your understanding they, in fact, did that?

4  *A.*  That is correct.  I received a phone call from them just a

5  few moments later that they had spoken to S.W., confirmed his

6  location in Nebraska at a Love's Truck Stop.  I then contacted

7  the North Platte law enforcement agency and advised them of the

8  warrant that I had entered into the system, at that point was

9  signed by the courts and had been entered in the system.

10         And Officer Sadler from that agency went to the truck

11  stop after he called me and gained the information of the truck

12  that they would be in and was armed with the warrant.  And he

13  called me back a short time later and said that he had

14  Mr. McFadden in custody and the children were safe.

15  *Q.*  And what happened after that?

16  *A.*  After that I had spoke again with Scott and Stacy W. and

17  requested that if any information came forward from their

18  children, to let me know immediately, that they -- Stacy had

19  gone to North Platte to pick the children up.  And I was called

20  the next day, the following day, by S.W., Sr. and advised that

21  both S.J.W. and her brother K.W. had made some concerning

22  statements that -- sexually oriented statements that they were

23  concerned about.

24  *Q.*  And just to be clear, Detective, the three boys on the trip

25  were L.W., K.W. and S.W. Jr.  Who was S.J.W.?

Edward Prescott - Direct

1   A.   S.J.W., I am sorry, is their younger sister.

2   Q.   After you learned this news from Mrs. W., what did you do

3   next?

4   A.   I tried to set up an appointment to interview the children.

5   That got delayed a short time.  On the 15th I was called by --

6   actually, I believe it was the 16th of January, 2013, I was

7   called by Stacy concerning a disclosure that K.W. had made to a

8   counselor that she had taken the children to down in Montrose,

9   Colorado where they lived.

10        I set up the interviews at The Dolphin House, which is

11   a center for children for where we conduct our interviews there

12   in Montrose, Colorado, and set it up for that day.  I met them

13   later that day in Montrose and conducted the interviews with

14   them.

15   Q.   So I will get to the interview itself in a moment.  You

16   said a moment ago that Mrs. W. told you that she took K.W. to

17   counseling and he made a disclosure.  Did K.W. also talk to his

18   parents on the way home from Nebraska about something he

19   believed happened to somebody else?

20   A.   I believe that is correct, and I believe it was J.W. that I

21   documented that he claimed it had happened, something had

22   happened to J.W. and not himself.

23   Q.   In other words, K.W. told his mom at least as relayed to

24   you that K.W. believed that J.W. had been molested.

25   A.   That's correct.

Edward Prescott - Direct

1   *Q.*  Now let's turn to your interview that occurred on

2   January 16, 2013, the interview of K.W.

3           What is The Dolphin House?

4   *A.*  It's -- every jurisdiction has a place for children

5   interviews to conduct forensic interviews.  They also supply

6   counselors and they have advocates for the children that we

7   meet there that are interviewed.  Those facilities have rooms,

8   set aside interview rooms that are set up with cameras.  They

9   are video recorded.  They are set up in a manner that the

10  children would feel comfortable instead of a cold interview

11  room such as we would have at the police department.

12  *Q.*  Was your January 16, 2013 interview of K.W. a forensic

13  interview?

14  *A.*  Yes, ma'am, it was.

15  *Q.*  In what way?

16  *A.*  The interview I conducted with him, it was recorded.  I did

17  not lead him as to what I wanted him to say.  I did not ask

18  questions that were inappropriate for him.  The conversation

19  with him was -- the initial conversation with him was to get to

20  know him to set him at ease.  We did ask the questions such as

21  typical at the beginning of an interview.  You want to know

22  that they know the difference between a truth and a lie.  You

23  want to know that they have the cognitive ability to discuss

24  rationally what you're talking to them about, that they can

25  understand the questions, that they know the difference between

Edward Prescott - Direct

 1    what's real and what's not real.  And you get them to agree to

 2    discuss only things that are real, only things that are

 3    truthful.

 4            You move into the -- at that point if they know their

 5    body parts.  Some kids don't.  They use names for body parts

 6    that aren't what you would typically use as an adult, so you

 7    want to make sure you are talking about the right body parts,

 8    that they can identify them properly.  They would make a

 9    comment about a disclosure possibly.  That's what you would

10    like to see.  If they do, then you would go into probing

11    further into that, asking them questions, open-ended questions

12    to get them to discuss that further.  And in this case K.W. was

13    very open to discuss that, very intelligent young kid and easy

14    to talk to.

15  Q.  In this case you said at the outset you like to make

16    certain the child knows the difference between truth and a lie.

17    Is your assessment that K.W. did understand the difference

18    between truth and a lie?

19  A.  Yes, ma'am.

20  Q.  You also said you make an effort to assess the child's

21    cognitive ability.  What was your assessment of K.W.'s

22    cognitive ability as an 11-year-old?

23  A.  At 11 years of age, he communication-wise was what I would

24    expect from an 11-year-old.  His intelligence level as far as

25    discussing movies he watched and sequences in those movies,

Edward Prescott - Direct

1   that type of thing, I found him to be at age level.

2   Q.  Did he use age appropriate language for the body parts that

3   you were discussing?

4   A.  He initially did not and we agreed to use penis and butt.

5   His were no-no and no-no for front and back, so we had to make

6   a difference there, differentiation.

7   Q.  In terms of describing in detail what had happened to him,

8   do you assess that K.W. did, in fact, describe in detail what

9   he alleged had happened to him?

10  A.  I did.

11  Q.  As an interviewer, what details do you look for to

12  determine whether a child is telling the truth versus making up

13  a story?

14  A.  One of the things is their ability to provide details or

15  just exact details of -- and a sequence of events that would be

16  normal as I would expect it to come out.  He was very explicit

17  in his conversation and his describing of details.  The details

18  that I focused on matched his emotion, which in a situation

19  where in an interview where a child -- you question their

20  honesty, their emotions don't fit what they're saying.  The

21  story line they are giving does not fit their emotions.

22  Q.  And in this case your assessment is that K.W.'s emotions

23  did fit the words he was saying?

24  A.  Very much so.

25  Q.  After the conclusion of your forensic interview with K.W.,

Edward Prescott - Direct

1   what was your assessment about whether he was telling the truth

2   or not?

3   A.  He absolutely was telling the truth.

4   Q.  Are you aware of any motive that K.W. had to lie in 2012,

5   2013?

6   A.  No, I was not; in fact, just the opposite.

7   Q.  And what do you mean by that?

8   A.  And it was expressed by multiple kids.  K.W. didn't want to

9   come forward previously with abuse that he had suffered because

10  he liked being at that house.  His friends -- by that house, I

11  meant 2980 D-1/2 Road, Michael McFadden's house.  He liked

12  being there with his cousins and his friends and he didn't want

13  that interrupted.

14  Q.  Are you aware of any bias that K.W. had towards

15  Mr. McFadden?

16  A.  At that point prior to this, no.

17  Q.  Are you aware of any bad blood that occurred between The W.

18  Family and Mr. McFadden?

19  A.  No.  In fact, Mr. McFadden spent Thanksgiving and Christmas

20  with them that year according to Stacy W. of 2012.

21  Q.  Detective, you mentioned at the outset that you interviewed

22  a number of other people in the course of your investigation;

23  is that right?

24  A.  That is correct.

25  Q.  Did you interview S.W. Jr., the eldest of The W. Family

Edward Prescott - Direct

1    boys?

2    A.   I did.

3    Q.   And what can you tell the Court about any corroboration

4    that S.W. Jr. provided in terms of what K.W. told you during

5    his interview?

6    A.   During -- I have to start with K.W. first.  During K.W.'s

7    interview, he explained in the truck that they were in has a

8    sleeper unit.  The sleeper has a pretty wide compartment with a

9    bunk-bed-type fixture on it.  In this instance, K.W. said the

10   bunk bed was up or was not there, that K.W. slept in the

11   position closest to the driver's and passenger's seat in the

12   sleeper.  Mr. McFadden slept in the middle.  And his younger

13   brother, L.W., slept against the back wall of the sleeper

14   facing the back wall.  He described his brother, S.W. Jr.,

15   sleeping across the driver/passenger seat in the front of the

16   semi.  When I contacted S.W. Jr., he described their sleeping

17   arrangements in exactly the same way.

18   Q.   Does it surprise you, Detective, that apparently nobody

19   witnessed the assault itself?

20   A.   It doesn't surprise me a bit because normally there are no

21   witnesses in these cases, type cases.

22   Q.   Just a few more questions, Detective.  In your narrative,

23   you describe K.W. as making a disclosure after Mr. McFadden was

24   arrested in Nebraska; is that right?

25   A.   Can I back up one question?

Edward Prescott - Direct

1   *Q.*  Please do.

2   *A.*  When I said there are no witnesses, there are no witnesses

3   to the actual event of molestation.

4   *Q.*  Yes, and thank you for clarifying.  That was, in fact, my

5   question, so thank you for clarifying.

6   *A.*  Can you rephrase or repeat that second question?

7   *Q.*  I think we got the record clear now, Detective.  Thank you

8   for clarifying.

9        My next question is you stated at the outset that K.W.

10  first made disclosures after Mr. McFadden was arrested in

11  Nebraska; is that right?

12  *A.*  That would be correct.

13  *Q.*  In your experience doing these cases, is it unusual to you

14  that a disclosure would occur after the arrest of the alleged

15  perpetrator?

16  *A.*  It is not unusual when you have persons outside of the

17  initial arrest, arrested person, who are affected or other

18  victims because they would feel comfortable.  That person is no

19  longer a threat to them.  They are not going to be in their

20  presence or feel they are not going to be in their presence

21  anymore, so that threat is taken out of the picture.

22       *MS. SURRATT:*  One moment, Your Honor.

23       Your Honor, no further questions.

24       *THE COURT:*  All right.  Thank you.

25       Mr. McDermott?

Edward Prescott - Cross

1                        **CROSS-EXAMINATION**

2    *BY MR. McDERMOTT:*

3    *Q.*  Detective, I am going to start with the disclosures from

4    K.W.  My understanding is that you spoke with -- it was Stacy

5    W. on January 15 of 2013; am I correct?

6    *A.*  That is correct.

7    *Q.*  Did you call her or did she call you?

8    *A.*  No, she called me.

9    *Q.*  Okay.  And my understanding is she informed you that K.W.

10   had said that nothing -- let me rephrase that -- that something

11   had happened between Mr. McFadden and J.W.; is that correct?

12   *A.*  In the -- no.  Okay, make sure I have got this straight.

13   In their trip back from Nebraska, there was comments made.  In

14   our conversation on the 15th, he had been to a counselor and

15   disclosed sodomy to the counselor, so she advised me of that on

16   the 15th.

17   *Q.*  So let's get the time line correct.  What was the date that

18   you spoke to The W. Family when they were coming back from

19   Nebraska?

20   *A.*  That would have been probably the 4th or 5th of January.

21   *Q.*  The 4th or 5th of January.

22   *A.*  Correct.

23   *Q.*  And at that time Stacy W. had indicated that Mr. McFadden

24   had not touched K.W., correct?

25   *A.*  That was our initial phone call, and that would have

Edward Prescott - Cross

1   happened on the 2nd or -- I am sorry, would have been on the

2   3rd of January when I first contacted them.

3   Q.  All right.  So on the 3rd of January your information was

4   that K.W. had said that Mr. McFadden had not touched K.W.?

5   A.  On the 3rd of January, they didn't have the information

6   from K.W.  The only information they had is the information I

7   gave them concerning the other children and they hadn't

8   questioned K.W.  So at that point, no, there was no information

9   about a disclosure.

10  Q.  Okay.  So on January 3rd you and The W. Family are talking

11  about your interviews and what you've learned about the other

12  kids, right?

13  A.  It was very brief conversation.  I basically told them that

14  I had disclosures from multiple kids, at that point two.  And

15  they told me their kids were with him.  And I said, "You need

16  to find out where they are at immediately."  So their

17  conversation was probably less than probably three, four

18  minutes.

19  Q.  Was that particular conversation recorded?

20  A.  I don't have a recording of it, no, sir.  I believe that

21  was on my cellphone.  I called them.

22  Q.  And my understanding from your statement a moment ago is

23  that you told them a number of kids had been victims of

24  Mr. McFadden, correct?

25  A.  Correct.

Edward Prescott - Cross

1    *Q.* Were you specific with the number of victims?

2    *A.* You know, I don't recall that I told them because at that

3    point I had -- and they are familiar with I.S. and with E.S.,

4    very familiar with them, so I might have given them their

5    names, but I honestly, sir, I don't remember.

6    *Q.* Okay. And at that point you had received a disclosure from

7    I.S. and E.S., correct?

8    *A.* Up to that point, yes.

9    *Q.* And approximately a week before January 3rd, E.S. had told

10   you that Mr. McFadden had not touched him.

11   *A.* That is correct.

12   *Q.* And as a matter of fact, he told you that I.S. was lying.

13   *A.* That is correct.

14   *Q.* And he told you that I.S. had been acting out.

15   *A.* That is correct.

16   *Q.* He told you that I.S. had been threatening and was being

17   physically violent toward E.S. and his brother.

18   *A.* In previous issues, he and his brother, yeah.

19   *Q.* In your conversation with Dian S., Ms. S. had told you that

20   I.S. had been acting out; is that correct?

21   *A.* That is correct.

22   *Q.* Did you discuss with Dian any of the -- well, did you

23   discuss with Dian when and why I.S. was visiting Mr. McFadden?

24        *MS. SURRATT:* Objection, Your Honor. We are straying

25   pretty far afield for the purpose of this hearing.

Edward Prescott - Cross

1                *THE COURT:*  What's the relevance?

2                *MR. McDERMOTT:*  I will go ahead and move on, Your

3     Honor.

4                *THE COURT:*  All right.

5     *BY MR. McDERMOTT:*

6     *Q.*  So back to January.  After The W. Family returned from

7     Nebraska, they saw a therapist; is that correct?

8     *A.*  That is correct.

9     *Q.*  Had K.W. been in therapy prior to that?

10    *A.*  Honestly, I can't answer that.  I'm not sure.

11    *Q.*  And the date of you learning that K.W. was in therapy was

12    January 15th; is that right?

13    *A.*  That's correct.

14    *Q.*  Was there any contact between you and The W. Family between

15    the time of that phone call when they are coming back from

16    Nebraska and January 15th?

17    *A.*  Yes.  I was trying to think when I talked with S.W., Jr.

18    Scott W. Sr. sent me an audio, and I am sorry, I don't know the

19    exact date of that, but I know it was in between there where he

20    recorded K.W. having a nightmare, and he sent me that audio.

21    So I believe that's the only call that I had with them.

22    *Q.*  So there is almost a two-week gap from the initial call

23    with The W. Family and this January 15th call, correct?

24    *A.*  That is correct.

25    *Q.*  And the date of the forensic interview was?

Edward Prescott - Cross

1   *A.*  Of the forensic interview with them was the 16th, I

2   believe, of January 2013.

3   *Q.*  Prior to that interview, did you ask either Scott, Sr. or

4   Stacy whether they had talked further about this with K.W.?

5   *A.*  I believe I documented that -- I told them that if they did

6   talk about it, don't question them further.

7   *Q.*  And my question is prior to this interview on the 16th, did

8   you ask them, "Hey, have you talked further with K.W. about

9   this since we last talked"?

10  *A.*  If I did, it was at The Dolphin House because I am

11  always -- typically always very careful to tell the parents do

12  not question them about this.  If they talk, let them talk, but

13  don't question them about that because the interview needs to

14  be clean, not their input, not the parents' input into it.  So

15  I can't tell you that I made that statement to her.  Typically

16  that's what I do so that the parents don't interject

17  information into the children.  And I believe I did, but I

18  can't tell you positively.

19  *Q.*  Why is it important for the parents not to interject

20  information into the children?

21  *A.*  Because you don't get a clean interview.  You get -- maybe

22  the parents introduced information that the child didn't have

23  or introduced false information.

24  *Q.*  So the introduction of false information is a concern, and

25  you want to make sure that the forensic interview is clean

Edward Prescott - Cross                                              55

1   going into that interview.  Do I understand correctly?

2   A.  Absolutely, yes, sir.

3   Q.  Are you aware of any other disclosures between the time

4   that K.W. returned from Nebraska and that interview at The

5   Dolphin House?

6   A.  Disclosures from K.W.?

7   Q.  Yes.

8   A.  No, I'm not, sir.

9        MR. McDERMOTT:  One second, please.

10  BY MR. McDERMOTT:

11  Q.  There are other adults who have had disclosures reported --

12  let me rephrase that.  There have been reports of other adults

13  sexually abusing K.W.; is that correct?

14       MS. SURRATT:  Objection.

15       THE COURT:  What's the relevance to this hearing?

16       MR. McDERMOTT:  It goes to the reliability of the

17  statement, Your Honor.

18       THE COURT:  Well, we are actually talking about the

19  reliability of the recording, not the statement itself.

20       MR. McDERMOTT:  I understand.  My position is what has

21  gone on outside of the interview is relevant and that question

22  is very relevant to misattribution.

23       THE COURT:  I am going to sustain the objection.  I

24  think it goes beyond the purpose of this hearing which is, is

25  the recording itself reliable.

Edward Prescott - Cross

1  *BY MR. McDERMOTT:*

2  *Q.*  Detective Prescott, when you spoke with The W. Family, you

3  were essentially warning them that it was unsafe for their kid

4  to be close to Mr. McFadden, correct?

5  *A.*  Absolutely.

6  *Q.*  When you were telling them about the information you had

7  collected, did you tell them that E.W. had initially said that

8  he had not been touched by Mr. McFadden?

9  *A.*  I don't believe I did.

10  *Q.*  Did you tell them that E.W. had initially said that I.S.

11  was lying about what he said happened with Mr. McFadden?

12  *A.*  I did not discuss that with him.

13  *Q.*  Prior to that phone call, you had also investigated a

14  2008 -- let me back up.  As a result of the I.S. disclosure on

15  December 15th of 2012, you also spoke with an adult named

16  Thomas W. to see if Mr. McFadden had previously touched his two

17  kids; is that right?

18          *MS. SURRATT:*  Objection, relevance.

19          *THE COURT:*  What is the relevance?

20          *MR. McDERMOTT:*  It goes to the -- it goes to what I

21  addressed earlier, Your Honor, and it essentially goes to the

22  integrity of the interview at The Dolphin House in January.

23          *THE COURT:*  How does it go to the integrity of the

24  interview itself as opposed to the statements that were made?

25          *MR. McDERMOTT:*  For purposes of that hearing, I will

                                   57
                      Edward Prescott - Cross

1    go ahead and move on, Your Honor.

2            THE COURT:  All right.

3    BY MR. McDERMOTT:

4    Q.  Detective, what is your understanding of how The W. Family

5    knew Mr. McFadden?

6            THE COURT:  Again, I will ask what is the relevance of

7    that to this hearing?

8            MR. McDERMOTT:  Same response, Your Honor.

9            THE COURT:  I think it goes beyond what I need to hear

10   for purposes of determining whether the recording of the

11   statement is reliable or not, so I am going to ask you to move

12   on.

13           MR. McDERMOTT:  Okay.

14   BY MR. McDERMOTT:

15   Q.  Detective, do you know whether The W. Family parents spoke

16   with K.W. about this between the time that they were returning

17   from Nebraska and The Dolphin House interview?

18   A.  Nothing other than what's already been stated, that K.W. --

19   or K.W. had made some -- K.W. had made some comments,

20   concerning comments on the way back to Montrose from Nebraska,

21   and then the phone call from Stacy.  Actually, a phone call

22   from Scott came, I believe, between then when he recorded

23   K.W.'s nightmare and then the phone call from Stacy on the

24   15th, that he had disclosed sodomy by Mr. McFadden on the 15th.

25   So that's the extent of the conversations I knew about.

1    *Q.*  What, if anything, were you told about the nightmare?

2    *A.*  They said that he had been having trouble sleeping.  Scott

3    W., Sr. said that K.W. had been having trouble sleeping, that

4    he had had repeated nightmares, and he recorded one and sent it

5    to me.  And that was -- that was pretty much the extent of

6    that.

7    *Q.*  Did he discuss the content of the nightmare with you?

8    *A.*  He just sent it to me and said, "You need to hear this."

9    *Q.*  Okay.  So that's it?  Whatever he sent you, that was the

10   extent of it?

11   *A.*  Yes.

12         *MR. McDERMOTT:*  Okay.  For purposes of this topic,

13   Your Honor, I don't have any other questions.

14         *THE COURT:*  Thank you.

15         Ms. Surratt, any redirect?

16         *MS. SURRATT:*  No further questions, Your Honor.

17         *THE COURT:*  All right.  Thank you very much, sir.  You

18   may step down.

19         *THE WITNESS:*  Thank you, Your Honor.

20         *THE COURT:*  The Court is going to reserve ruling on

21   this issue until trial.  In this hearing the witness referenced

22   the children by their names.  I direct the court reporter,

23   Ms. Coppock in her transcription of this testimony to

24   substitute initials for the names of the children and their

25   parents.  And to accomplish this, I need the parties to submit

```
 1     the names of all the children and adults who were referenced

 2     during this hearing to Ms. Coppock, the court reporter,

 3     together with a key of the initials she should use when she

 4     redacts the names from the report.

 5             I also -- she needs to have the spelling of the names

 6     and all that because some of them are a little difficult.  You

 7     might also provide for her the name of the place where the

 8     interview was taken, I think it was Dolphin House; is that

 9     correct?

10             MS. SURRATT:  Dolphin, yes, Your Honor.

11             THE COURT:  D-O-L-P-H-I-N?

12             MS. SURRATT:  Yes, like the fish.

13             THE COURT:  There are a couple of other issues I do

14     need to bring up.

15             MR. CHAFFIN:  Your Honor, do you want that list filed

16     or just e-mailed?

17             THE COURT:  No, just e-mailed to -- yeah, we don't

18     want it filed because I don't want it public record.

19             MR. CHAFFIN:  I would file it under restriction.

20             THE COURT:  No, just e-mail that so when she

21     transcribes this, because I assume this is going to be

22     requested to be transcribed, she knows.  I don't want to just

23     redact it because that will make no sense.  I want the initials

24     placed in there.

25             All right.  There was another matter I needed to
```

1    discuss and now it just flew out of my head.  So we are set for

2    trial.

3            Mr. McDermott, my judicial assistant indicates that

4    you were going to be filing something.

5            MR. McDERMOTT:  Yes, Your Honor.  After the Court

6    rejected or denied my motion to continue the trial, I informed

7    on an e-mail chain that I would be filing another motion.  Your

8    staff told me I could address it here today.  I am happy to

9    file another motion.

10           THE COURT:  What is the issue?

11           MR. McDERMOTT:  Well, Your Honor, I will let the Court

12   know I -- I relied on the Court's order believing that trial

13   was going to be here.  After I received --

14           THE COURT:  But there were e-mails that went out right

15   after that indicating the only reason it was scheduled here was

16   because COVID was in effect and we could not hold a trial in

17   Grand Junction with COVID restrictions.  But you also knew that

18   the protocol for the Western Slope is that Western Slope cases

19   will be heard on the Western Slope.

20           So I am not understanding what the big deal is whether

21   this case gets tried in Denver or Grand Junction.  If you have

22   a motion to change venue because you think there is prejudice,

23   that should have been filed months ago regardless of where we

24   have indicated the trial would be held because you were on

25   notice of the fact that it could be moved back to Grand

1    Junction in the event COVID restrictions were lifted, which

2    they have been.

3            MR. McDERMOTT:  Your Honor, I will let the Court know

4    when I say relied on the Court's order, I sincerely mean that.

5    After I saw the Court's order saying that we received an e-mail

6    on February 4th, I went back and I looked, and it was an unread

7    e-mail by me and I did not see that.  I will -- I mean, I am

8    just telling you that that's the case.  I am not -- I can

9    happily put this in a motion.  And I am not asking for a lot of

10   time, but I need to be able to secure witnesses.  And I will

11   say part of the reason I didn't file a motion for change of

12   venue and part of the reason I have been trying to get

13   everything together as quickly as possible is because I thought

14   we were -- that we were scheduled for Denver.

15           With that said, and I am just going to ask because I

16   have discussed this with the prosecution.  I understand what

17   their concerns are and I am not -- I am not dismissive of any

18   of that.  I just want a good clean trial.  I am happy to file

19   the motion.  I just want to bring it to the Court's attention

20   now rather than wait until the trial prep conference.  And I

21   can try to get all my witnesses to Grand Junction, but those

22   are my two issues and that's how it happened.

23           THE COURT:  All right.  So I am not understanding why

24   it makes such a big difference to your preparation whether this

25   case is held in Denver or in Grand Junction.  The matter took

1    place in Grand Junction.  The people in Grand Junction have a

2    great interest in this case.  Most of the witnesses and them

3    are from Grand Junction.  So what you're going to have to tell

4    me in your motion is why it is going to make such a huge

5    difference to you whether this matter is tried in Denver or in

6    Grand Junction and how you overcome the presumption that it

7    should be held in Grand Junction, okay?

8         *MR. McDERMOTT:*  Okay.

9         *THE COURT:*  And get that filed as soon as possible

10   because I've already made my reservations for Grand Junction.

11   And you probably need to go ahead and make your reservations

12   for Grand Junction.

13        *MR. McDERMOTT:*  I haven't.  And I have a kid that was

14   recently diagnosed with autism and I have to make arrangements.

15   And I frankly just want to have enough time to just get our

16   preparation and witnesses together without running around and

17   possibly making a mistake that shouldn't happen.

18        *THE COURT:*  All right.  My JA informs me that you did

19   read the e-mail because you responded to it.

20        *MR. McDERMOTT:*  On the 4th?

21        *THE COURT:*  Back when I sent it in January.  I don't

22   know.  I haven't seen it.

23        *MR. McDERMOTT:*  I went and looked.  I know

24   February 4th, that's my dad's birthday so that date sticks out

25   in my mind.  I know I just looked at that February 4th e-mail,

 1    and I apologize to counsel that I had missed the e-mail.

 2            THE COURT:  Well, my JA indicates that you did respond

 3    to it.

 4            MR. McDERMOTT:  Okay.  I can go back and take another

 5    look.

 6            THE COURT:  All right.  So right now we are scheduled

 7    for trial on I believe it was the 7th, correct, in Grand

 8    Junction.

 9            Is there something further that I was supposed to

10    follow up on?  I believe that's it.

11            MS. MYERS:  Speedy trial.

12            THE COURT:  Speedy trial doesn't matter.  We are going

13    to trial.  I did get the government's speedy trial calculation.

14            Mr. McDermott, you had indicated that you needed more

15    time to calculate.  Do you disagree with what the government

16    has filed?

17            MR. McDERMOTT:  Yes, I actually -- I went back.  The

18    reason it took me a while was the record, I wanted to make sure

19    it was correct and clear.  As you know, I wasn't the initial

20    counsel on the case.  I saw Mr. O'Hara would ask for certain

21    days of exclusion and sometimes the orders would come down with

22    a different amount of days.  I told the prosecution that I

23    reviewed everything and I -- my calculation has one more date

24    left on speedy than what the government submitted, and I could

25    submit that in writing as well.

 1              THE COURT:  Just one more day.  So they say it expires

 2   on December 10.  You believe it expires on December 11?

 3              MR. McDERMOTT:  Yes.

 4              THE COURT:  I don't need anything filed from you.  We

 5   are within speedy trial, and I just wanted to make sure you

 6   both agreed on that.

 7              All right.  Is there anything further from the

 8   parties?

 9              MS. SURRATT:  Not from the government, Your Honor.

10   Thank you.

11              MR. McDERMOTT:  Not orally, Your Honor.  Thank you.

12              THE COURT:  Thank you.  The defendant is remanded.

13              Thank you, United States Marshals, for your assistance

14   here.

15              The Court will be in recess.

16         (Recess at 10:49 a.m.)

17

18

19

20

21

22

23

24

25

INDEX

WITNESSES

    Edward Prescott

        Direct Examination By Ms. Surratt                34

        Cross-examination By Mr. McDermott               50

EXHIBITS

Exhibit        Offered  Received  Refused  Reserved  Withdrawn

1-3                      33

1A-3A                    33


REPORTER'S CERTIFICATE

    I certify that the foregoing is a correct transcript from

the record of proceedings in the above-entitled matter.  Dated

at Denver, Colorado, this 11th day of June, 2023.


                            S/Janet M. Coppock