APPEAL,GRNDGJ,TERMED

# U.S. District Court − District of Colorado
# District of Colorado (Denver)
# CRIMINAL DOCKET FOR CASE #: 1:19−cr−00243−CMA−GPG−1

Case title: USA v. McFadden

Date Filed: 05/17/2019

Date Terminated: 03/13/2023

---

Assigned to: Senior Judge Christine M. Arguello
Referred to: Magistrate Judge Gordon P. zzz_Gallagher−MJ

Appeals court case number: 23−1089 Tenth Circuit

**Defendant (1)**

**Michael Tracy McFadden**
*TERMINATED: 03/13/2023*

represented by

**Ben LaBranche**
Benjamin R. Labranche PLLC
1544 Race Street
Denver, CO 80206
225−927−5495
Fax: 225−927−5568
Email: ben@brllawyer.com
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

**Sean Michael McDermott**
McDermott Stuart & Ward LLP
One Sherman Place
140 East 19th Avenue
Suite 300
Denver, CO 80203
303−355−6789
Email: smcdermott@mswdenver.com
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

**Timothy Patrick O'Hara**
Office of the Federal Public Defender
633 Seventeenth Street
Suite 1000
Denver, CO 80202
303−294−7002
Fax: 303−294−1192
Email: timothy_ohara@fd.org
*TERMINATED: 02/09/2021*
*Designation: Public Defender or Community*

*Defender Appointment*

| **Pending Counts** | **Disposition** |
|---|---|
| 18 U.S.C. § 2241(c) Crossing state lines with intent to engage in a sexual act with a minor under 12 (1) | Defendant committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of LIFE. Supervised Release of LIFE. Special Assessment of $100.00 |
| 18 U.S.C. § 2423(a) Transportation of a minor with intent to engage in sexual activity. (2) | Defendant committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of LIFE to run concurrently to Counts 1, 3, 4, and 5. Supervised Release of LIFE to run concurrently to Counts 1, 3, 4, and 5. Special Assessment of $100.00 |
| 18 U.S.C. § 2241(c) Crossing state lines with intent to engage in a sexual act with a minor under 12 (3) | Defendant committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of LIFE to run concurrently to Counts 1, 2, 4, and 5. Supervised Release of LIFE to run concurrently to Counts 1, 2, 4, and 5. Special Assessment of $100.00 |
| 18 U.S.C. § 2423(a) Transportation of a minor with intent to engage in sexual activity. (4) | Defendant committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of LIFE to run concurrently to Counts 1, 2, 3, and 5. Supervised Release of LIFE to run concurrently to Counts 1, 2, 3, and 5. Special Assessment of $100.00 |
| 18 U.S.C. § 2423(a) Transportation of a minor with intent to engage in sexual activity. (5) | Defendant committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of LIFE to run concurrently to Counts 1, 2, 3, and 4. Supervised Release of LIFE to run concurrently to Counts 1, 2, 3, and 4. Special Assessment of $100.00 |

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
|---|---|
| None | |

**Highest Offense Level (Terminated)**

None

| **Complaints** | **Disposition** |
|---|---|
| None | |

**Plaintiff**

**USA** represented by **Jeremy Lee Chaffin**
U.S. Attorney's Office
205 North 4th Street
Suite 400
Grand Junction, CO 81501
970−257−7113
Fax: 970−248−3630
Email: jeremy.chaffin@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Federal Agency Attorney*

**Andrea Lee Surratt**
U.S. Attorney's Office
District of Colorado
1801 California Street
Suite 1600
Denver, CO 80202
303−454−0124
Email: andrea.surratt@usdoj.gov
*ATTORNEY TO BE NOTICED*
*Designation: Federal Agency Attorney*

| Date Filed | # | Docket Text |
|---|---|---|
| 05/17/2019 | 1 | INDICTMENT as to Michael Tracy McFadden (1) count(s) 1, 2, 3, 4−5. (Attachments: # 1 Criminal Information Sheet) (jgonz, ) (Entered: 05/17/2019) |
| 05/17/2019 | 2 | Arrest Warrant Issued in case as to Michael Tracy McFadden. (jgonz, ) (Entered: 05/17/2019) |
| 05/22/2019 | 5 | MINUTE ENTRY for proceedings held before Magistrate Judge Gordon P. Gallagher. Initial Appearance as to Michael Tracy McFadden held on 5/22/2019. This is a WSPP case. Detention Hearing set for 5/31/2019 02:00 PM in Room 323 (Grand Junction) before Magistrate Judge Gordon P. Gallagher. Defendant remanded. Hearing concluded. FTR: Grand Junction − AM. (tsher, ) (Entered: 05/23/2019) |
| 05/23/2019 | 4 | NOTICE OF ATTORNEY APPEARANCE: Timothy Patrick O'Hara appearing for Michael Tracy McFaddenAttorney Timothy Patrick O'Hara added to party Michael Tracy McFadden(pty:dft) (O'Hara, Timothy) (Entered: 05/23/2019) |
| 05/23/2019 | 8 | Arrest Warrant Returned Executed on 5/21/2019 in case as to Michael Tracy McFadden. (tsher, ) (Entered: 05/23/2019) |
| 05/31/2019 | 11 | MINUTE ENTRY for proceedings held before Magistrate Judge Gordon P. Gallagher: Detention Hearing as to Michael Tracy McFadden held on 5/31/2019. Jury Trial set for 7/1/2019 08:30 AM in Room 323 (Grand Junction) before Judge Marcia S. Krieger. FTR: Grand Junction−AM. (jgonz, ) (Entered: 06/04/2019) |
| 05/31/2019 | 12 | ORDER OF DETENTION as to Michael Tracy McFadden by Magistrate Judge Gordon P. Gallagher on 5/31/2019. (jgonz, ) (Entered: 06/04/2019) |

| | | |
|---|---|---|
| 05/31/2019 | 13 | Discovery Conference Memorandum and ORDER: Estimated Trial Time − 2 weeks as to Michael Tracy McFadden by Magistrate Judge Gordon P. Gallagher on 5/31/2019. (jgonz, ) Modified on 6/17/2019 to correct PDF (jgonz, ). (Entered: 06/04/2019) |
| 05/31/2019 | 14 | AMENDED MINUTE ENTRY for proceedings held before Magistrate Judge Gordon P. Gallagher: Detention Hearing as to Michael Tracy McFadden held on 5/31/2019. Deadline for Motions to Continue Trial is 6/14/2019 FTR: Grand Junction−PM. (jgonz, ) (Entered: 06/04/2019) |
| 06/05/2019 | 16 | CONSENT OF THE GOVERNMENT AND THE DEFENDANT Pursuant to D.C.COLO.LCrR 11.1(b), by Michael Tracy McFadden. (nmarb, ). (Entered: 06/13/2019) |
| 06/13/2019 | 17 | GRAND JUNCTION SPECIFIC SETTING AND TRIAL PREPARATION ORDER FOR CRIMINAL ACTIONS FALLING WITHIN THE WESTERN SLOPE PROTOCOL by Magistrate Judge Gordon P. Gallagher on 6/13/2019. (jgonz, ) (Entered: 06/13/2019) |
| 06/14/2019 | 19 | Unopposed MOTION for Order *to Vacate and Reset Trial Date* by Michael Tracy McFadden. (O'Hara, Timothy) (Entered: 06/14/2019) |
| 06/17/2019 | 21 | Unopposed MOTION for Protective Order by USA as to Michael Tracy McFadden. (Attachments: # 1 Proposed Order (PDF Only))(Chaffin, Jeremy) (Entered: 06/17/2019) |
| 06/17/2019 | 22 | PROTECTIVE ORDER by Magistrate Judge Gordon P. Gallagher on 6/17/2019. (jgonz, ) (Entered: 06/17/2019) |
| 06/28/2019 | 23 | STATEMENT *on Speedy Trial Clock* by Plaintiff USA (Surratt, Andrea) (Entered: 06/28/2019) |
| 08/22/2019 | 26 | MOTION for Order *Excluding Time* by USA as to Michael Tracy McFadden. (Attachments: # 1 Proposed Order (PDF Only))(Surratt, Andrea) (Entered: 08/22/2019) |
| 08/26/2019 | 27 | ORDER granting 26 Joint Motion to Exclude Time from the Speedy Trial Clock pursuant to 18 U.S.C. § 3161(h) through the trial date of January 6, 2020, by Magistrate Judge Gordon P. Gallagher on 8/26/2019. (jgonz, ) (Entered: 08/26/2019) |
| 11/04/2019 | 28 | Unopposed MOTION for Order *to Vacate and Reset Trial Date* by Michael Tracy McFadden. (O'Hara, Timothy) (Entered: 11/04/2019) |
| 11/15/2019 | 30 | STATEMENT *on Speedy Trial Clock* by Plaintiff USA (Surratt, Andrea) (Entered: 11/15/2019) |
| 04/06/2020 | 31 | Unopposed MOTION to Continue by Michael Tracy McFadden. (O'Hara, Timothy) (Entered: 04/06/2020) |
| 05/04/2020 | 33 | Unopposed MOTION for Protective Order by Michael Tracy McFadden. (Attachments: # 1 Proposed Order (PDF Only))(O'Hara, Timothy) (Entered: 05/04/2020) |
| 05/06/2020 | 34 | AMENDED PROTECTIVE ORDER re 33 Motion for Protective Order as to Michael Tracy McFadden (1) by Magistrate Judge Gordon P. Gallagher on 5/5/2020. (jgonz, ) (Entered: 05/06/2020) |

| | | |
|---|---|---|
| 09/08/2020 | 37 | Unopposed MOTION to Vacate by Michael Tracy McFadden. (O'Hara, Timothy) (Entered: 09/08/2020) |
| 09/09/2020 | 38 | ORDER to Exclude Time from Speedy Trial Act and Continue Trial Dates as to Michael Tracy McFadden (1). Defendant Michael Tracy McFadden's Fourth Unopposed Motion to Vacate and Reset Trial Date (Doc. # 37 ) is GRANTED and time is excluded from the date of this Order through April 6, 2021. Pretrial motions are due by February 1, 2021. Responses due by February 15, 2021. The Final Trial Preparation Conference set for October 29, 2020, is VACATED and RESET to March 23, 2021, at 3:00 PM, Courtroom A 602 of the Alfred A. Arraj United States Courthouse, 901 19th Street, Denver, CO, before Judge Christine M. Arguello. Five−day jury trial set to begin on November 2, 2020 is VACATED and RESET to April 5, 2021, at 8:30 AM, Courtroom A 602 of the Alfred A. Arraj United States Courthouse, 901 19th Street, Denver, CO, before Judge Christine M. Arguello. By Judge Christine M. Arguello on 9/9/2020. (angar, ) (Entered: 09/09/2020) |
| 12/02/2020 | 39 | Notice of Rule 404b by USA as to Michael Tracy McFadden *Intent to Introduce Evidence 414, 404(b) and 807* (Attachments: # 1 Exhibit 1)(Chaffin, Jeremy) (Entered: 12/02/2020) |
| 12/10/2020 | 40 | Unopposed MOTION for Extension of Time to File by Michael Tracy McFadden. (O'Hara, Timothy) (Entered: 12/10/2020) |
| 02/01/2021 | 42 | Unopposed MOTION to Vacate by Michael Tracy McFadden. (O'Hara, Timothy) Modifi (Entered: 02/01/2021) |
| 02/02/2021 | 43 | ORDER that Defendant Michael Tracy McFadden's Fifth Unopposed Motion to Vacate and Reset Trial Date (Doc. # 42 ) is GRANTED and time is excluded from the current trial date of April 5, 2021 to July 26, 2021. That pretrial motions are due by June 1, 2021. Responses due by June 15, 2021. That the Final Trial Preparation Conference set for March 23, 2021, is VACATED and RESET to July 8, 2021, at 3:00 PM. That five−day jury trial set to begin on April 5, 2021 is VACATED and RESET to July 26, 2021, at 8:30 AM, Courtroom A 602 of the Alfred A. Arraj United States Courthouse, 901 19th Street, Denver, CO, before Judge Christine M. Arguello, by Judge Christine M. Arguello on 2/2/2021. (evana, ) (Entered: 02/02/2021) |
| 02/07/2021 | 44 | MOTION to Withdraw as Attorney by Timothy P. O'Hara by Michael Tracy McFadden. (O'Hara, Timothy) (Entered: 02/07/2021) |
| 02/15/2021 | 46 | NOTICE OF ATTORNEY APPEARANCE: Sean Michael McDermott appearing for Michael Tracy McFaddenAttorney Sean Michael McDermott added to party Michael Tracy McFadden(pty:dft) (McDermott, Sean) (Entered: 02/15/2021) |
| 05/26/2021 | 47 | Unopposed MOTION to Vacate *AND RESET TRIAL DATE PURSUANT TO 18 U.S.C. §3161(h)(7)(A)* by Michael Tracy McFadden. (McDermott, Sean) (Entered: 05/26/2021) |
| 05/27/2021 | 48 | ORDER to Exclude Time from Speedy Trial Act Continue Trial Dates as to Michael Tracy McFadden (1). The Court hereby grants an ends of justice continuance in this case of 280 days, which shall be excluded from the current trial date of July 26, 2021, by Judge Christine M. Arguello on 5/27/2021. Motions are due by 12/6/2021. Responses are due by 12/20/2021. A Final Trial Preparation Conference is set for 4/19/2022 at 03:00 PM in Courtroom A 602 before Judge Christine M. Arguello AND a 5−Day Jury Trial is set for 5/2/2022 at 08:30 AM in Courtroom A 602 before |

| | | |
|---|---|---|
| | | Judge Christine M. Arguello.. (angar, ) (Main Document 48 replaced on 6/1/2021 to attach Correct PDF)) (evana, ). (Modified on 6/1/2021 to attach correct PDF)(evana, ). (Entered: 05/27/2021) |
| 12/15/2021 | 49 | Unopposed MOTION for Leave to File *Motions Out of Time* by Michael Tracy McFadden. (McDermott, Sean) (Entered: 12/15/2021) |
| 12/22/2021 | 51 | Supplemental MOTION for Extension of Time to File *Motions AND SEVENTH MOTION TO VACATE AND RESET TRIAL DATE PURSUANT TO 18 U.S.C. §3161(h)(7)(A)* by Michael Tracy McFadden. (McDermott, Sean) (Entered: 12/22/2021) |
| 12/23/2021 | 52 | ERRATA to 51 Supplemental MOTION for an Extension of time and Seventh Motion to Vacate and Rese Trial Date PURSUANT TO 18 U.S.C. §3161(h)(7)(A) by Michael Tracy McFadden (McDermott, Sean) (Entered: 12/23/2021) |
| 12/23/2021 | 53 | Second ERRATA to 51 Supplemental MOTION for an Extension of time and Seventh Motion to Vacate and Rese Trial Date PURSUANT TO 18 U.S.C. §3161(h)(7)(A) by Michael Tracy McFadden (McDermott, Sean) (Entered: 12/23/2021) |
| 02/01/2022 | 55 | Unopposed MOTION to Vacate *and Reset Trial Date Pursuant to 18 U.S.C. §3161(h)(7)(A)* by Michael Tracy McFadden. (McDermott, Sean) (Entered: 02/01/2022) |
| 02/03/2022 | 56 | ORDER by Judge Christine M. Arguello on 2/3/2022, re: 55 Defendant Michael Tracy McFaddens Eighth and Unopposed Motion to Vacate and Reset Trial Date and the Court hereby GRANTS an ends of justice continuance in this case. ORDERED that pretrial motions are due by **September 6, 2022**. Responses due by **October 10, 2022**. **ORDERED** that the Final Trial Preparation Conference set for April 19, 2022 is VACATED and RESET to **October 25, 2022, at 3:00 PM**, and will be held via VTC. **ORDERED** that **five−day jury trial** set to begin on May 2, 2022 is VACATED and RESET to **November 7, 2022, at 8:30 AM**, Courtroom A 602 of the Alfred A. Arraj United States Courthouse, 901 19th Street, Denver, CO, before Judge Christine M. Arguello. **ORDERED** that all time between the current trial date of May 2, 2022 and the new trial date of November 7, 2022 shall be excluded from speedy trial calculations. (sphil, ) (Entered: 02/03/2022) |
| 09/02/2022 | 57 | Unopposed MOTION for Extension of Time to File *Motions* by Michael Tracy McFadden. (McDermott, Sean) (Entered: 09/02/2022) |
| 09/13/2022 | 59 | Objection *TO GOVERNMENTS NOTICE OF INTENT TO INTRODUCE EVIDENCE PURSUANT TO FEDERAL RULES OF EVIDENCE 414, 404(b), AND 807* by Michael Tracy McFadden re 39 Notice of Rule 404b (Attachments: # 1 Exhibit Affidavit of David Thompson)(McDermott, Sean) Modified on 9/14/2022 to restrict documents at level 1 per protective order 22 and attorney phone call. (sphil, ). (Entered: 09/13/2022) |
| 09/13/2022 | 60 | STRICKEN by Doc. #80 MOTION to Compel *Production and Request for Subpoena Return Date* by Michael Tracy McFadden. (McDermott, Sean) Modified on 9/14/2022 to restrict motion at level 1 per protective order 22 and attorney phone call. (sphil, ). Modified on 9/20/2022 to add text striking document (lrobe, ). (Entered: 09/13/2022) |
| 09/13/2022 | 61 | |

| | | |
|---|---|---|
| | | MOTION for Bill of Particulars by Michael Tracy McFadden. (McDermott, Sean) (Entered: 09/13/2022) |
| 09/13/2022 | 62 | MOTION to Dismiss *DUE TO PREINDICTMENT DELAY* by Michael Tracy McFadden. (McDermott, Sean) (Entered: 09/13/2022) |
| 09/13/2022 | 63 | MOTION to Suppress *Statements* by Michael Tracy McFadden. (McDermott, Sean) (Entered: 09/13/2022) |
| 09/13/2022 | 64 | MOTION for Hearing by Michael Tracy McFadden. (McDermott, Sean) (Entered: 09/13/2022) |
| 09/14/2022 | 65 | Unopposed MOTION to Withdraw Document 59 Objection (Other), by Michael Tracy McFadden. (McDermott, Sean) (Entered: 09/14/2022) |
| 09/14/2022 | 66 | Unopposed MOTION to Withdraw Document *60* by Michael Tracy McFadden. (McDermott, Sean) (Entered: 09/14/2022) |
| 09/14/2022 | 67 | STRICKEN by Doc. # 69 −−− RESTRICTED DOCUMENT − Level 1: by Michael Tracy McFadden. (Attachments: # 1 Exhibit Affidavit of David Thompson)(McDermott, Sean) Modified on 9/14/2022 (cmasec). (Entered: 09/14/2022) |
| 09/14/2022 | 68 | STRICKEN by Doc. # 69 −− RESTRICTED DOCUMENT − Level 1: by Michael Tracy McFadden. (Attachments: # 1 Exhibit Affidavit of David Thompson)(McDermott, Sean) Modified on 9/14/2022 (cmasec). (Entered: 09/14/2022) |
| 09/14/2022 | 71 | Unopposed MOTION for Leave to Restrict by Michael Tracy McFadden. (McDermott, Sean) (Entered: 09/14/2022) |
| 09/14/2022 | 74 | Unopposed MOTION for Leave to Restrict by Michael Tracy McFadden. (McDermott, Sean) (Entered: 09/14/2022) |
| 09/14/2022 | 77 | ERRATA by Michael Tracy McFadden (McDermott, Sean) (Entered: 09/14/2022) |
| 09/19/2022 | 78 | Objection *TO GOVERNMENTS NOTICE OF INTENT TO INTRODUCE EVIDENCE PURSUANT TO FEDERAL RULES OF EVIDENCE 414, 404(b), AND 807* by Michael Tracy McFadden re 39 Notice of Rule 404b (McDermott, Sean) (Entered: 09/19/2022) |
| 09/19/2022 | 79 | STRICKEN by Doc. #80 MOTION to Compel *PRODUCTION AND REQUEST FOR SUBPOENA RETURN DATE* by Michael Tracy McFadden. (Attachments: # 1 Exhibit Affidavit of David Thompson)(McDermott, Sean) Modified on 9/20/2022 to add text striking document (lrobe). (Entered: 09/19/2022) |
| 09/26/2022 | 81 | Second MOTION to Compel *Production and Request for Subpoena Return Date* by Michael Tracy McFadden. (Attachments: # 1 Exhibit Affidavit of David Thompson, # 2 Exhibit 45 CFR 164.512, # 3 Exhibit 34 CFR 99.31)(McDermott, Sean) (Entered: 09/26/2022) |
| 10/06/2022 | 84 | RESPONSE to Motion by USA as to Michael Tracy McFadden re 61 MOTION for Bill of Particulars (Chaffin, Jeremy) (Entered: 10/06/2022) |
| 10/06/2022 | 85 | RESPONSE to Motion by USA as to Michael Tracy McFadden re 62 MOTION to Dismiss *DUE TO PREINDICTMENT DELAY* (Chaffin, Jeremy) (Entered: 10/06/2022) |

| | | |
|---|---|---|
| 10/06/2022 | 86 | RESPONSE to Motion by USA as to Michael Tracy McFadden re 81 Second MOTION to Compel *Production and Request for Subpoena Return Date* (Attachments: # 1 Exhibit 1)(Chaffin, Jeremy) (Entered: 10/06/2022) |
| 10/06/2022 | 87 | RESPONSE to Motion by USA as to Michael Tracy McFadden re 63 MOTION to Suppress *Statements* (Attachments: # 1 Exhibit 1)(Chaffin, Jeremy) (Entered: 10/06/2022) |
| 10/10/2022 | 88 | REPLY by USA as to Michael Tracy McFadden to 59 Objection (Other), (Attachments: # 1 Exhibit B, # 2 Exhibit C, # 3 Exhibit D, # 4 Exhibit E, # 5 Exhibit F)(Surratt, Andrea) (Entered: 10/10/2022) |
| 10/11/2022 | 89 | NOTICE *OF CONVENTIONAL FILING: EXHIBIT A* re 88 Reply by USA as to Michael Tracy McFadden (Surratt, Andrea) (Entered: 10/11/2022) |
| 10/11/2022 | 91 | REPLY TO RESPONSE to Motion by Michael Tracy McFadden re 81 Second MOTION to Compel *Production and Request for Subpoena Return Date* (McDermott, Sean) (Entered: 10/11/2022) |
| 10/11/2022 | 92 | REPLY TO RESPONSE to Motion by Michael Tracy McFadden re 62 MOTION to Dismiss *DUE TO PREINDICTMENT DELAY* (McDermott, Sean) (Entered: 10/11/2022) |
| 10/11/2022 | 93 | REPLY TO RESPONSE to Motion by Michael Tracy McFadden re 63 MOTION to Suppress *Statements* (McDermott, Sean) (Entered: 10/11/2022) |
| 10/11/2022 | 94 | MOTION to Continue *And Reset Trial Date Pursuant To 18 U.S.C. §3161(h)(7)(A) And To Exclude 60 Days From Speedy Trial* by Michael Tracy McFadden. (McDermott, Sean) (Entered: 10/11/2022) |
| 10/12/2022 | 98 | RESPONSE in Opposition by USA as to Michael Tracy McFadden re 94 MOTION to Continue *And Reset Trial Date Pursuant To 18 U.S.C. §3161(h)(7)(A) And To Exclude 60 Days From Speedy Trial* (Surratt, Andrea) (Entered: 10/12/2022) |
| 10/13/2022 | 100 | ORDER DENYING MOTION FOR BILL OF PARTICULARS AND MOTION TO AUTHORIZE SUBPOENA by Magistrate Judge Gordon P. Gallagher on 10/13/2022. Mr. McFadden's Motion for a Bill of Particulars (D. 61 ) and Request for Subpoena (D. 81 ) are DENIED as to Michael Tracy McFadden (1) (alave, ) (Entered: 10/13/2022) |
| 10/14/2022 | 101 | STATEMENT re 96 Order *Regarding Speedy Trial Calculation* by Plaintiff USA (Surratt, Andrea) (Entered: 10/14/2022) |
| 10/18/2022 | 103 | Unopposed MOTION for Extension of Time to File *Exhibit List* by Michael Tracy McFadden. (McDermott, Sean) (Entered: 10/18/2022) |
| 10/19/2022 | 104 | MOTION to Continue *Trial Pursuant To 18 U.S.C. §3161(h)(7)(A)* by Michael Tracy McFadden. (Attachments: # 1 Exhibit Affidavit)(McDermott, Sean) (Entered: 10/19/2022) |
| 10/19/2022 | 105 | RESTRICTED DOCUMENT − Level 3: by Michael Tracy McFadden. (McDermott, Sean) (Entered: 10/19/2022) |
| 10/19/2022 | 106 | RESPONSE in Opposition by USA as to Michael Tracy McFadden re 104 MOTION to Continue *Trial Pursuant To 18 U.S.C. §3161(h)(7)(A)* (Surratt, Andrea) (Entered: 10/19/2022) |

| | | |
|---|---|---|
| 10/19/2022 | 107 | REPLY TO RESPONSE to Motion by Michael Tracy McFadden re 104 MOTION to Continue *Trial Pursuant To 18 U.S.C. §3161(h)(7)(A)* (McDermott, Sean) (Entered: 10/19/2022) |
| 10/19/2022 | 108 | ORDER: Defendant's Motion to Continue Trial Pursuant to 18 U.S.C. § 3161(h)(7)(A) 104 is DENIED. SO ORDERED by Senior Judge Christine M. Arguello on 10/19/2022. (sphil, ) (Entered: 10/19/2022) |
| 10/21/2022 | 110 | MOTION for Leave to Restrict by USA as to Michael Tracy McFadden. (Attachments: # 1 Proposed Order (PDF Only))(Chaffin, Jeremy) (Entered: 10/21/2022) |
| 10/24/2022 | 117 | CJA MOTION by Michael Tracy McFadden. (Attachments: # 1 CJA Attachment Resume of Benjamin R. LaBranche)(McDermott, Sean) (Entered: 10/24/2022) |
| 10/24/2022 | 118 | ORDER ***granting 115 Motion as to Michael Tracy McFadden (1). SO ORDERED by Senior Judge Christine M. Arguello on 10/24/2022. (sphil, ) (sphil, ). (Entered: 10/24/2022) |
| 10/25/2022 | 122 | NOTICE OF ATTORNEY APPEARANCE: Ben LaBranche appearing for Michael Tracy McFaddenAttorney Ben LaBranche added to party Michael Tracy McFadden(pty:dft) (LaBranche, Ben) (Entered: 10/25/2022) |
| 10/25/2022 | 123 | MOTION for Leave to Restrict by Michael Tracy McFadden. (McDermott, Sean) (Entered: 10/25/2022) |
| 10/31/2022 | 126 | Unopposed MOTION for Extension of Time to File *or Submit Exhibits* by Michael Tracy McFadden. (McDermott, Sean) (Entered: 10/31/2022) |
| 10/31/2022 | 128 | RETURN OF SERVICE of Unexecuted Subpoena as to Defendant Michael Tracy McFadden. (Attachments: # 1 Return Subpoena Unexecuted, # 2 Return Subpoena Unexecuted, # 3 Return Subpoena Unexecuted, # 4 Return Subpoena Unexecuted, # 5 Return Subpoena Unexecuted)(sphil, ) (Entered: 11/01/2022) |
| 10/31/2022 | 129 | RETURN OF SERVICE of Executed Subpoena as to Defendant Michael Tracy McFadden. Subpoena executed on10/26/2022. (Attachments: # 1 Return of Service of Subpoena − Executed, # 2 Return of Service of Subpoena − Executed, # 3 Return of Service of Subpoena − Executed)(sphil, ) (Entered: 11/01/2022) |
| 11/01/2022 | 130 | ORDER granting 126 Motion for Extension of Time to File as to Michael Tracy McFadden (1) by Senior Judge Christine M. Arguello on 11/1/2022. Text Only Entry (cma) (Entered: 11/01/2022) |
| 11/02/2022 | 131 | MOTION for Leave to Restrict by Michael Tracy McFadden. (Attachments: # 1 Proposed Order (PDF Only) Restricted Document)(McDermott, Sean) (Entered: 11/02/2022) |
| 11/02/2022 | 133 | RETURN OF SERVICE of Executed Subpoena filed byDefendant Michael Tracy McFadden. Subpoena executed on10/26/2022. (Attachments: # 1 Return of Service of Subpoena − Executed, # 2 Return of Service of Subpoena − Executed)(sphil, ) (Entered: 11/03/2022) |
| 11/03/2022 | 135 | MOTION to Continue *Trial Within Speedy Trial To Secure Witnesses* by Michael Tracy McFadden. (McDermott, Sean) (Entered: 11/03/2022) |
| 11/04/2022 | 139 | Writ of Habeas Corpus ad Testificandum Issued as to a Material Witness for 11/14/2022 in case as to Michael Tracy McFadden. (sphil, ) Modified on 11/4/2022 |

| | | |
|---|---|---|
| | | to edit text. (sphil, ). (Entered: 11/04/2022) |
| 11/10/2022 | 148 | Jury Instructions as to Michael Tracy McFadden (kmyha, ) (Entered: 11/15/2022) |
| 11/10/2022 | 149 | Jury Note as to Michael Tracy McFadden (kmyha, ) (Entered: 11/15/2022) |
| 11/14/2022 | 150 | Jury Note as to Michael Tracy McFadden. (kmyha) (Entered: 11/15/2022) |
| 11/14/2022 | 152 | JURY VERDICT as to Michael Tracy McFadden. (kmyha) (Entered: 11/15/2022) |
| 12/12/2022 | 156 | SENTENCING STATEMENT by USA as to Michael Tracy McFadden (Surratt, Andrea) (Entered: 12/12/2022) |
| 02/14/2023 | 160 | OBJECTION/RESPONSE to Presentence Report by Michael Tracy McFadden (McDermott, Sean) (Entered: 02/14/2023) |
| 02/17/2023 | 161 | RESPONSE by USA as to Michael Tracy McFadden re: 160 Objection/Response to Presentence Report filed by Michael Tracy McFadden (Surratt, Andrea) (Entered: 02/17/2023) |
| 02/23/2023 | 162 | MOTION for Non−Guideline Sentence by Michael Tracy McFadden. (Attachments: # 1 Exhibit Grand Junction Daily Sentinel Article, # 2 Exhibit Report of Dr. David Thompson)(McDermott, Sean) (Entered: 02/23/2023) |
| 02/27/2023 | 165 | RESPONSE in Opposition by USA as to Michael Tracy McFadden re 162 MOTION for Non−Guideline Sentence (Surratt, Andrea) (Entered: 02/27/2023) |
| 03/07/2023 | 166 | Unopposed MOTION for Leave to File *Letter Of Support Prior To Sentencing* by Michael Tracy McFadden. (McDermott, Sean) (Entered: 03/07/2023) |
| 03/07/2023 | 168 | Unopposed MOTION for Leave to Restrict by Michael Tracy McFadden. (McDermott, Sean) (Entered: 03/07/2023) |
| 03/13/2023 | 172 | JUDGMENT as to Defendant Michael Tracy McFadden (1): Defendant committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of LIFE Imprisonment as to each of Counts 1 through 5, to run concurrently. Supervised Release of LIFE as to each of Counts 1 through 5, to run concurrently. Total Special Assessment of $500.00. SO ORDERED by Senior Judge Christine M. Arguello on 3/13/2023. (cmasec) (Entered: 03/13/2023) |
| 03/22/2023 | 174 | NOTICE OF APPEAL by Michael Tracy McFadden. (McDermott, Sean) (Entered: 03/22/2023) |
| 03/23/2023 | 175 | LETTER Transmitting Notice of Appeal to all counsel advising of the transmittal of the 174 Notice of Appeal as to Michael Tracy McFadden to the U.S. Court of Appeals. ( CJA,) (Attachments: # 1 Preliminary Record, # 2 Docket Sheet)(sphil, ) (Entered: 03/23/2023) |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Criminal Case No. 19-cr-00243-GPG

UNITED STATES OF AMERICA,

Plaintiff,

v.

MICHAEL TRACY McFADDEN,

Defendant.

FILED
UNITED STATES DISTRICT COURT
DENVER, COLORADO
*1:53 pm, May 17, 2019*
JEFFREY P. COLWELL, CLERK

---

**INDICTMENT**

---

The Grand Jury charges that:

**COUNT ONE**

Between on or about December 25, 2012, and on or about January 3, 2013, in and outside the State and District of Colorado, and elsewhere, the defendant, MICHAEL TRACY McFADDEN, did knowingly cross a state line with intent to engage in a sexual act, to wit, contact between the penis and the anus, with K.W., a person who had not attained the age of 12 years, and attempted to do so.

All in violation of Title 18, United States Code, Section 2241(c).

**COUNT TWO**

Between on or about December 25, 2012, and on or about January 3, 2013, in the State and District of Colorado, and elsewhere, the defendant, MICHAEL TRACY McFADDEN, did knowingly transport K.W., an individual who had not attained the age

of 18 years in interstate and foreign commerce, with the intent that such individual engage in sexual activity for which any person can be charged with a criminal offense.

All in violation of Title 18, United States Code, Section 2423(a).

**COUNT THREE**

Between on or about December 1, 2010, and on or about January 1, 2011, in and outside the State and District of Colorado, and elsewhere, the defendant, MICHAEL TRACY McFADDEN, did knowingly cross a state line with intent to engage in a sexual act, to wit, contact between the penis and the anus and contact between the mouth and the anus, with J.W., a person who had not attained the age of 12 years, and attempted to do so.

All in violation of Title 18, United States Code, Section 2241(c).

**COUNT FOUR**

Between on or about December 1, 2010, and on or about January 1, 2011, in the State and District of Colorado, and elsewhere, the defendant, MICHAEL TRACY McFADDEN, did knowingly transport J.W., an individual who had not attained the age of 18 years in interstate and foreign commerce, with the intent that such individual engage in sexual activity for which any person can be charged with a criminal offense.

All in violation of Title 18, United States Code, Section 2423(a).

**COUNT FIVE**

Between on or about January 1, 2007, and on or about January 3, 2013, in the State and District of Colorado, and elsewhere, the defendant, MICHAEL TRACY McFADDEN, did knowingly transport J.W., an individual who had not attained the age of 18 years in interstate and foreign commerce, with the intent that such individual engage in sexual activity for which any person can be charged with a criminal offense.

All in violation of Title 18, United States Code, Section 2423(a).

A TRUE BILL:

Ink signature on file in the clerk's office
FOREPERSON

JASON R. DUNN
United States Attorney

By: *s/ Jeremy Chaffin*
Jeremy Chaffin
Assistant U.S. Attorney
U.S. Attorney's Office
205 N. 4th St., Ste. 400
Grand Junction, CO 81501
Telephone: 970-241-3843
Fax: 970-248-3630
E-mail: jeremy.chaffin@usdoj.gov
Attorney for Government

DEFENDANT: Michael Tracy McFadden

YOB: 1971 **AGE: 47**

COMPLAINT FILED? ______ Yes __X__ No

If Yes, MAGISTRATE CASE NUMBER____________

HAS DEFENDANT BEEN ARRESTED ON COMPLAINT? ______ Yes __X__ No

If No, a new warrant is required

OFFENSE(S): **Counts 1 & 3: 18 U.S.C. § 2241(c)**
Crossing state lines with intent to engage in a sexual act with a minor under 12.

**Counts 2, 4-5: 18 U.S.C. § 2423(a)**
Transportation of a minor with intent to engage in sexual activity.

LOCATION OF OFFENSE: Mesa County, Colorado, and elsewhere

PENALTY: **Counts 1 & 3:** For first offense, NLT 30 years and NMT life; NMT $250,000 fine, or both; supervised release of NLT 5 years, NMT life; $100 Special Assessment. If defendant has previously been convicted of another Federal offense under this subsection, or of a State offense that would have been an offense under either such provision had the offense occurred in a Federal prison, unless the death penalty is imposed, NLT life; NMT $250,000 fine, or both; supervised release of NLT 5 years and NMT life; $100 Special Assessment.

**Counts 2, 4-5:** NLT 10 years imprisonment and NMT life imprisonment, NMT $250,000 fine, or both; NLT 5 years supervised release, NMT life supervised release; $100 special assessment.

AGENT: Alex Zappe, Special Agent, FBI

AUTHORIZED BY: Jeremy Chaffin
Assistant U.S. Attorney

ESTIMATED TIME OF TRIAL:

___ five days or less __X__ over five days ____ other

THE GOVERNMENT

__X__ will seek detention in this case based on 18 U.S.C. § 3142(f)(1)

______ will not seek detention

The statutory presumption of detention **is** applicable to this defendant.

AO 442 (Rev. 01/09) Arrest Warrant

# UNITED STATES DISTRICT COURT

for the

District of Colorado

United States of America
v.

Michael Tracy McFadden
*Defendant*

Case No. 19-cr-00243-GPG

## ARREST WARRANT

To: Any authorized law enforcement officer

**YOU ARE COMMANDED** to arrest and bring before a United States magistrate judge without unnecessary delay *(name of person to be arrested)* Michael Tracy McFadden, who is accused of an offense or violation based on the following document filed with the court:

☑ Indictment ☐ Superseding Indictment ☐ Information ☐ Superseding Information ☐ Complaint
☐ Probation Violation Petition ☐ Supervised Release Violation Petition ☐ Violation Notice ☐ Order of the Court

This offense is briefly described as follows:

Crossing state lines with intent to engage in a sexual act with a minor under 12, in violation of Title 18, United States Code, Section 2241(c);
Transportation of a minor with intent to engage in sexual activity, in violation of Title 18, United States Code, Section 2423 (a).

Date: 05/17/2019

s/ J. Garcia-Gonzalez, Deputy Clerk
*Issuing officer's signature*

City and state: Denver, Colorado

Jeffrey P. Colwell, Clerk
*Printed name and title*

**Return**

This warrant was received on *(date)* ______, and the person was arrested on *(date)* ______ at *(city and state)* ______.

Date: ______

______
*Arresting officer's signature*

______
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

CASE NO. 19-cr-00243-GPG

UNITED STATES OF AMERICA,

Plaintiff,

v.

MICHAEL TRACY McFADDEN,

Defendant.

---

**NOTICE OF APPEARANCE**

---

The Office of the Federal Public Defender, by and through undersigned counsel, hereby enters its appearance in the above-captioned case.

Respectfully submitted,

VIRGINIA L. GRADY
Federal Public Defender

s/ Timothy P. O'Hara
TIMOTHY P. O'HARA
Assistant Federal Public Defender
633 Seventeenth Street, Suite 1000
Denver, Colorado 80202
Telephone: (303) 294-7002
FAX: (303) 294-1192
Email: timothy_ohara@fd.org
Attorney for Defendant

## CERTIFICATE OF SERVICE

I hereby certify that on May 23, 2019, I electronically filed the foregoing **NOTICE OF APPEARANCE** with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following e-mail addresses:

Jeremy Chaffin
Assistant U.S. Attorney
Email: jeremy.chaffin@usdoj.gov

and I hereby certify that I have mailed or served the document or paper to the following non CM/ECF participants in the manner (mail, hand-delivery, etc.) indicated by the non-participant's name:

Michael T. McFadden        (U.S. Mail)

s/ Timothy P. O'Hara
TIMOTHY P. O'HARA
Assistant Federal Public Defender
633 Seventeenth Street, Suite 1000
Denver, Colorado  80202
Telephone:  (303) 294-7002
FAX:  (303) 294-1192
Email:  timothy_ohara@fd.org
Attorney for Defendant

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
U.S. MAGISTRATE JUDGE GORDON P. GALLAGHER

Criminal Case No. 19-cr-243-MSK-GPG
Date: May 22, 2019

Court Deputy: A. Barnes
Recorder: Grand Jct - FTR

UNITED STATES OF AMERICA,
Plaintiff,
v.
MICHAEL TRACY McFADDEN,
Defendant.

---

Minutes: Initial Appearance

---

9:32 a.m.

Defendant appeared in person in custody. AUSA Jeremy Chaffin appeared. CJA Panel Attorney Stephen Laiche appeared.

The Court advised Defendant of the charges brought against him and of his rights.

ORDERED: Defendant requested a court-appointed attorney. The Court reviewed and accepted Defendant's financial affidavit and ORDERED that court-appointed counsel be provided per CJA Plan. CJA Attorney Laiche advised that while he was representing Defendant today, per the CJA Plan, that AFPD Timothy O'Hara would be entering an appearance soon and ultimately be the attorney of record on this case.

The Government was requesting detention. Attorney Laiche advised the Court that AFPD O'Hara was requesting a waiver of the 3-day Detention Hearing time period so as to investigate the case and to fly over and meet with his client and be properly prepared for hearing. In fact, AFPD O'Hara requested a good cause waiver to hold the hearing on June 3. The Court denied an extension of that length of time, but allowed a good cause waiver of 8 days due to the significant charges being brought and because Defendant likewise consented to this waiver.

ORDERED: A detention hearing is set as follows: **May 31, 2019 at 2:00 p.m.** in Aspinall Federal Building in Grand Junction, Room 323, before Magistrate Judge Gallagher.

ORDERED: The Court found that this was a Western Slope Protocol Plan ("WSPP") case.

**ORDERED: This case is to be unsealed at this time.**

ORDERED: Defendant was remanded to the custody of the USMS.
Hearing concluded at: 9:43 a.m.
Hearing duration:11 minutes

AO 442 (Rev. 01/09) Arrest Warrant

# UNITED STATES DISTRICT COURT

for the

District of Colorado

United States of America
v.

Michael Tracy McFadden
*Defendant*

Case No. 19-cr-00243-GPG

## ARREST WARRANT

To: Any authorized law enforcement officer

**YOU ARE COMMANDED** to arrest and bring before a United States magistrate judge without unnecessary delay *(name of person to be arrested)* Michael Tracy McFadden, who is accused of an offense or violation based on the following document filed with the court:

☑ Indictment ☐ Superseding Indictment ☐ Information ☐ Superseding Information ☐ Complaint
☐ Probation Violation Petition ☐ Supervised Release Violation Petition ☐ Violation Notice ☐ Order of the Court

This offense is briefly described as follows:

Crossing state lines with intent to engage in a sexual act with a minor under 12, in violation of Title 18, United States Code, Section 2241(c);
Transportation of a minor with intent to engage in sexual activity, in violation of Title 18, United States Code, Section 2423 (a).

Date: 05/17/2019

s/ J. Garcia-Gonzalez, Deputy Clerk
*Issuing officer's signature*

City and state: Denver, Colorado

Jeffrey P. Colwell, Clerk
*Printed name and title*

**Return**

This warrant was received on *(date)* 5/17/2019, and the person was arrested on *(date)* 05/21/2019 at *(city and state)* Colorado Springs, CO.

Date: 05/22/2019

[signature]
*Arresting officer's signature*

Alex J. Zappe, Special Agent
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
U.S. MAGISTRATE JUDGE GORDON P. GALLAGHER

Criminal Case No. 19cr243-MSK-GPG
Date: May 31, 2019

Court Deputy: A. Barnes
Recorder: Grand Junction

UNITED STATES OF AMERICA,
Plaintiff,

v.

MICHAEL McFADDEN,
Defendant.

---

Court Minutes-Detention Hearing

---

1:36 p.m.

Defendant appeared in custody in Grand Junction. AFPD Timothy O'Hara appeared via VTC from A702 (Arraj) on his behalf. AUSA Jeremy Chaffin appeared in person. PO Jason Cohen appeared in person.

All had previously read the Pre-Trial Services Report except AFPD O'Hara who waived reading of it.

Defendant was not contesting detention at this time, but reserved the right to contest it at a later date.

ORDERED: The Court, finding grounds, will enter a Detention Order and Defendant is remanded to the custody of the USMS.

Defendant waived further Advisement and Arraignment and entered a plea of Not Guilty to all charges.

The Court accepted the plea.

**ORDERED: This is a Western Slope Protocol Practice (WSPP) case.**

ORDERED: Parties have 10 days within which to tender to the Court a WSPP consent.

ORDERED: The Court entered the following speedy trial deadlines:
30 days: 6/30/2019
70 days: 7/30/2019
90 days: 8/192019


ORDERED:  A jury trial was set to commence **July 1, 2019 at 8:30 a.m.** before Chief Judge Krieger and to occur in Room 323 of the Aspinall Federal Building at 400 Rood Avenue in Grand Junction.

ORDERED: Deadline for Motions to Continue Trial is 7/14/2019.

**ORDERED: This case may be unsealed.**

ORDERED: Parties submitted a Discovery Memo and proposed Order to the Court which it made an Order of this Court.

Hearing concluded at: 1:45 p.m.
Hearing duration: 9 minutes

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

U.S. Magistrate Judge Gordon P. Gallagher

Criminal Case No.: 19-cr-00243-MSK-GPG

UNITED STATES OF AMERICA,

Plaintiff,

v.

MICHAEL TRACY McFADDEN,

Defendant.

---

ORDER OF DETENTION

---

This matter came before the Court for a detention hearing on May 31, 2019. Assistant United States Attorney Chaffin represented the Government and Mr. O'Hara represented the Defendant. After considering:

The contents of the file;
The indictment;
The pre-trial services report;
The fact that Defendant does not currently contest detention—reserving for a later time if appropriate; and
The arguments of Counsel;

I ORDER the Defendant detained.

In order to sustain a motion for detention, the government must establish that (a) there is no condition or combination of conditions which could be imposed in connection with pretrial release that would reasonably insure the defendant's presence for court proceedings; or (b) there is no condition or combination of conditions which could be imposed in connection with pretrial release that would reasonably insure the safety of any other person or the community.

The Bail Reform Act, 18 U.S.C. § 3142(g), directs the court to consider the following factors in determining whether there are conditions of release that will reasonably assure the appearance of the defendant as required and the safety of any other person and the community:

(1) [t]he nature and circumstances of the offense charged, including whether the offense is a crime of violence or involves a narcotic drug;

(2) the weight of the evidence against the person;

(3) the history and characteristics of the person, including –

(A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and

(B) whether at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State or local law; and

(4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

The Court takes judicial notice of the Court's file and the information presented at hearing. Weighing the statutory factors set forth in the Bail Reform Act, I find the following:

In this action, Defendant is charged, by way of indictment, with knowingly crossing a state line with the intent to engage in a sexual act, to wit, contact between the penis and the anus, with K.W., a person who had not attained the age of 12 years and attempted to do so, in violation of Title 18, United States Code, Section 2241(c). Defendant is also charged, by way of indictment, with knowingly transporting K.W., an individual who had not attained the age of 18 years in interstate and foreign commerce, with the intent that such individual engage in sexual activity, in violation of Title 18, United States Code, Section 2423(a). Defendant is also charged, by way of indictment, with knowingly cross a state line with intent to engage I a sexual act, to wit, with J.W., a person who had not attained the age of 12 years, and attempted to do so, all in violation of Title 18, United States Code, Section 2241(c). Defendant is also charged, by way of indictment, with knowingly transport J.W., an individual who had not attained the age of 18 years in interstate and foreign commerce, with the intent that such individual engage in sexual activity, in violation of Title 18, United States Code, Section 2423(a). Defendant is also charged, by way of indictment, with knowingly transport J.W., an individual who had not attained the age of 18 years in interstate and foreign commerce,

with the intent that such individual engage in sexual activity, in violation of Title 18, United States Code, Section 2423(a). For counts 1 & 3, defendant is facing NLT 30 years and NMT life; NMT $250,000 fine, or both; supervised release of NLT 5 years, NMT life; $100 Special Assessment. For counts 2, 4-5, defendant is facing NLT 10 years imprisonment and NMT life imprisonment, NMT $250,000 fine, or both; NLT 5 years supervised release, NMT life supervised release; $100 special assessment. Defendant has a prior state conviction in 1990 for felony sexual assault on a child and served a prison sentence for that case.

Furthermore, there exists a rebuttable presumption that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community. The Court finds that the presumption was not overborne in this action and Defendant presented no argument nor evidence in any attempt to overbear the presumption.

As a result, after considering all of these factors, I find by a preponderance of the evidence that Defendant is a flight risk and I conclude that there is no condition or combination of conditions for release which will reasonably assure the Defendant's appearance for Court proceedings.

As a result, after considering all of these factors, I find by clear and convincing evidence that Defendant is a danger to the community and I conclude that there is no condition or combination of conditions for release that will assure the safety of any other persons and the community.

Accordingly, it is hereby

**ORDERED** that the Defendant is detained as a flight risk.

**ORDERED** that the Defendant is detained as a danger to the community.

**ORDERED** that the Defendant shall be committed to the custody of the Attorney General or his designee for confinement in a corrections facility separate, to the extent practicable, from persons awaiting or serving sentences, or being held in custody pending appeal. It is further

**ORDERED** that the Defendant shall be afforded reasonable opportunity for private consultation with counsel. It is further

**ORDERED** that upon an order of a Court of the United States, or upon request of an attorney for the Government, the person in charge of the corrections facility in which the defendant is confined shall deliver each Defendant to a United States Marshal for the purpose of an appearance in connection with any Court proceeding in this matter.

In accordance with the provisions of the Bail Reform Act, if at any time before trial the judicial officer determines that information exists which was not known at the time of the detention hearing and that has a material bearing on the issue of whether there are conditions of release that will reasonably assure the appearance of the defendant as required and the safety of the community, the detention hearing may be reopened (18 U.S.C. § 3142(f)).

Dated May 31, 2019.

BY THE COURT:

______________________________
Gordon P. Gallagher
United States Magistrate Judge

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Criminal Action No. 19-cr-00243-MSK-GPG

JUDGE ASSIGNED: Krieger

UNITED STATES OF AMERICA,

Plaintiff,

ESTIMATED TRIAL TIME: 2 week

v.

NUMBER OF DEFENDANTS: 1

1. MICHAEL TRACY McFADDEN,

Defendant.

DOCUMENT DISCLOSURE EXTENSIVE

( ) Yes (•) No

(Please select one)

---

**DISCOVERY CONFERENCE**
**MEMORANDUM AND ORDER**

---

## INTRODUCTION

Rule 16, Federal Rules of Criminal Procedure, is entitled Discovery and Inspection and provides for discovery by both defendant and the government. D.C.COLO.LCrR 17.1.1 requires a discovery hearing to be held by a magistrate judge.

A defendant may discover certain material as a matter of right without any obligation to permit discovery by the government. However, if a defendant requests certain materials by discovery, namely, documents and tangible objects, as well as reports of examinations and tests, then the defendant is obligated to permit similar discovery by the government.

In addition to discovery we will take up the matter of notice, as required by Rules 12.1 and 12.2, Fed.R.Crim.P., if the defense of alibi or mental capacity is contemplated. Further, a date will be set for the filing of all motions.

At the conclusion of this hearing the report will be signed by defendant and/or his counsel, and government counsel, as well as the magistrate judge. The discovery hearing proceedings will be recorded.

## I. DEFENDANT'S REQUEST FOR DISCOVERY AND NOTICE

(A) Request for Rule 16 Material

1. The defendant requests disclosure of the substance of any relevant oral statements made by the defendant, before or after arrest, in response to interrogation by any person the defendant knew to be a government agent if the government intends to use that statement at trial. Rule 16(a)(1)(A). The government states that it will disclose to the defendant and make available for inspection, copying, or photographing such statements in accordance with Rule 16(a)(1)(A).

2. The defendant requests disclosure of any relevant written or recorded statement made by the defendant within the government's possession, custody, or control, which the attorney for the government knows – or through due diligence could know – that the statement exists; the portion of any written record containing the substance of any relevant oral statement made before or after arrest if the defendant made the statement in response to interrogation by any person the defendant knew to be a government agent. Rule 16(a)(1)(B)(i) and (ii).

3. The defendant requests disclosure of any recorded testimony of the defendant before a grand jury which relates to the offense charged pursuant to Rule 16(a)(1)(B)(iii). The government states it will permit the defendant to inspect and copy such statements.

4. If government counsel knows of such statements he will so indicate by initialing here. ____________

5. The defendant requests, if the defendant is an organization, the government's disclosure to the defendant of any statement described in Rule 16(a)(1)(A) and (B), if the government contends that the person making the statement; (i) was legally able to bind the defendant regarding the subject of the statement because of that person's position as the defendant's director, officer, employee, or agent; or (ii) was personally involved in the alleged conduct constituting the offense and was legally able to bind the defendant regarding that conduct because of that person's position as the defendant's director, officer, employee or agent. Rule 16(a)(1)(C).

6. The defendant requests a copy of his prior criminal record. The government states it will furnish to the defendant a copy of his prior criminal record, if any, in accordance with Rule 16(a)(1)(D).

7. The defendant, understanding his burden of reciprocal discovery as set forth in Rule 16(b)(1)(A), (requests) (does not request) disclosure of books, papers, documents, data, photographs, tangible objects, buildings or places, and copies or portions thereof, which are within the possession, custody, or control of the government, and which are material to the preparation of his defense, or are intended for use by the government as evidence in chief at the trial, or were obtained from or belong to the defendant.

8. The defendant, understanding his burden of reciprocal discovery as set forth in Rule 16(b)(1)(B), (requests) (does not request) disclosure of any results or reports of physical or mental examinations, and of scientific tests or experiments, or copies thereof, which are within the possession, custody, or control of the government, the existence of which is known, or by the exercise of due diligence may become known, to the attorney for the

government, and which are material to the preparation of the defense or are intended for use by the government as evidence in chief at the trial.

9. The defendant, understanding his burden of reciprocal discovery as set forth in Rule 16(b)(1)(C), (requests) (does not request) disclosure of a written summary of testimony the government intends to use under Rule 702, 703, or 705 of the Federal Rules of Evidence, relating to expert testimony and opinions of experts, during its case in chief at trial, as set forth in Rule 16(a)(1)(G).

10. The government acknowledges its continuing duty to disclose under Rule 16(c).

(B) Request for Exculpatory Evidence

The defendant requests disclosure of evidence favorable to the defendant on the issue of guilt and/or sentencing. The government states it will disclose material evidence which is favorable to the defendant as required by Brady v. Maryland, 373 U.S. 83 (1963); Giglio v. United States, 405 U.S. 150 (1972); and United States v. Bagley, 473 U.S. 667 (1985). The government acknowledges its continuing duty to make these disclosures. This request does not foreclose the defendant from filing a more specific motion requesting exculpatory evidence.

(C) Request for Evidence of Other Crimes, Wrongs, or Acts

The defendant requests notice of other crimes, wrongs or acts under Rule 404(b) of the Federal Rules of Evidence. The government states that if it intends to introduce such evidence at trial it will provide written notice to the defendant no later than 21 days before trial unless, for good cause shown, the court permits less notice in accordance with Rule 404(b).

(D) Request for Disclosure of the Identity of Confidential Informants

1. The government states there (was) (was not) a confidential informant who was a participant in or a witness to the crime charged and that the informant (may) (will) (will not) be called as a witness at trial. The government further states it (has supplied) (will claim privilege of non-disclosure of) the identity of the confidential informant. Rovario v. United States, 353 U.S. 53 (1957).

(E) The Government States There Have Been in this Case:

(Circle those which are applicable)

1. Telephone tape recordings;
2. Electronic surveillance of the defendant or his premises;
3. Leads obtained by electronic surveillance of defendant's person or premises; and
4. Photographic surveillance.

The government (may) (will) (will not) permit discovery of the foregoing items.

## II. GOVERNMENT'S REQUEST FOR DISCLOSURE AND NOTICE

(A) Request for Rule 16 Material

1. The government requests disclosure of books, papers, documents, data, photographs, tangible objects, or copies or portions thereof, which are within the possession, custody or control of the defendant and which the defendant intends to introduce as evidence in chief at the trial. If the defendant made a similar request under Rule 16(a)(1)(E), the defendant states that upon compliance by the government with the defendant's request he will permit the government to inspect and copy or photograph such items in accordance with Rule 16(b)(1)(A).

2. The government requests disclosure of any results or reports of physical or mental examinations and of scientific tests or experiments made in connection with this case, or copies thereof, within the possession or control of the defendant as described in Rule 16(b)(1)(B). If the defendant made a similar request under Rule 16(a)(1)(F), the defendant states that upon compliance by the government with the defendant's request he will permit the government to inspect and copy or photograph such items in accordance with Rule 16(b)(1)(B).

3. The government requests disclosure of a written summary of testimony the defendant intends to use under Rules 702, 703 and 705, F.R.E. as evidence at trial. If the defendant made a similar request under Rule 16(a)(1)(G), the defendant states that upon compliance by the government with the defendant's request he will disclose such summaries in accordance with Rule 16(b)(1)(C).

4. The defendant acknowledges his continuing duty to disclose under Rule 16(c).

(B) Request for Notice of Alibi

1. The government hereby requests notice of the defendant's intent to rely on an alibi defense pursuant to Rule 12.1(a) of the Federal Rules of Criminal Procedure. The parties agree that the indictment/information and the discovery provided by the government give the defendant sufficient notice of the time, date, and place at which the alleged offense was committed and triggers the defendant's obligation under Rule 12(a) to serve upon the attorney for the government a written notice of alibi within 20 days from the date of this request, or at such different time as the court may direct. Should the defendant require additional information concerning the time, date, or place at which the alleged offense was committed, it is the defendant's obligation to file a request for additional information in the time provided for filing motions.

2. The government states that if the defendant files a notice of intent to rely upon alibi, the attorney for the government shall serve upon the defendant or the defendant's attorney a written notice stating the names and addresses of the witnesses upon whom the government intends to rely to establish the defendant's presence at the scene of the alleged offense and any other witnesses to be relied on to rebut the testimony of any of the defendant's alibi witnesses. The government's written notice shall be filed within 10 days of its receipt of the defendant's Rule 12.1(a) notice, but in no event less than 10 days before trial, unless the court otherwise directs.

3. The parties acknowledge their continuing duty to disclose under Rule 12.1(c).

(C) Request for Notice of Insanity Defense and Expert Testimony Regarding Defendant's Mental Condition

The government hereby requests notice of the defendant's intent to rely on a defense based on insanity or to introduce expert testimony relating to mental condition. If the defendant intends to rely on the defense of insanity or introduce expert testimony relating to mental disease or defect or any other mental condition bearing on the issue of guilt, he agrees to file a written notice and disclosure of the same within 20 days from the date of this request, or at such different time as the court may direct.

## III. LIKELIHOOD OF DISPOSITION OR TRIAL

(A) There is a (good) (fair) (poor) chance of a Rule 11 disposition of this case.

(B) The parties understand that the court must be given notice of any proposed disposition no less than 10 days before the scheduled trial date. Unless otherwise ordered, notice of disposition shall be filed no later than 14 days before the date set forth for trial. (D.C.COLO LCrR 11.1A)

(C) The defendant will receive a jury trial in accordance with F.R.Crim.P. 23(a). Waiver of jury can only be accomplished by filing a motion with the trial court.

## IV. SPEEDY TRIAL

(A) The speedy trial time limits of 18 U.S.C. § 3161 are as follows:

30 days 6/30/2019

70 days 7/30/19

90 days 8/19/2019

| | |
|---|---|
| Date Signed | Defendant |
| 5/31/19 Date Signed | Attorney for Defendant |
| 5/28/19 Date Signed | Assistant United States Attorney |

## V. DISCOVERY ORDER

(A) Effect of Report

The responses by the parties set forth in this Report shall have the effect of a binding discovery order. All requests for discovery will be considered continuing requests, and any discoverable information and/or material coming into the possession or knowledge of either party prior to or during the trial shall be made available to the opposing party promptly, consistent with the law and on an ongoing basis.

(B) U.S. Probation Office

Unless otherwise specified in this Discovery Order, at the time of the detention hearing or by 5/31/19 [date], the U.S. Probation Office will disclose any criminal history information compiled on the defendant to both parties.

(C) Disclosure by the Government

Unless otherwise specified in this Discovery Order, the government on or before 6/14/2019, shall disclose those materials that are on that date within the possession of the attorney for the government and are subject to disclosure under the provisions of Rule 16. If additional material subject to the disclosure obligations of Rule 16 come into the possession of the attorney for the government, the attorney for the government shall promptly disclose the material to the defendant. The attorney for the government shall exercise due diligence as expressly required by provisions of Rule 16 to fulfill his or her discovery obligations under the provisions of Rule 16.

Written summaries of any testimony that the government intends to use under Rules 702, 703, or 705, Fed. R.Crim P. 16(a)(1)(G) shall be provided on such schedule as the District Court shall determine upon motion by either party.

(D) Disclosure by the Defendant

Unless otherwise specified in this Discovery Hearing Report, the defendant shall disclose its Rule

16 discovery material to counsel for the government on or before 6/28/19.

Written summaries of any testimony that the defendant intends to use under Rules 702, 703, or 705, Fed.R.Crim P. 16(b)(1)(C) shall be provided on such schedule as the District Court shall determine upon motion by either party.

(E) Any motion alleging a failure to comply with the time limits set forth in this report and order must be filed promptly.

(F) Any pretrial motions shall be filed on or before______________________.

IT IS SO ORDERED.

BY THE COURT

________________________
U.S. Magistrate Judge

5/31/2019
________________________
Date

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
U.S. MAGISTRATE JUDGE GORDON P. GALLAGHER

Criminal Case No. 19cr243-MSK-GPG
Date: May 31, 2019

Court Deputy: A. Barnes
Recorder: Grand Junction

UNITED STATES OF AMERICA,
Plaintiff,

v.

MICHAEL McFADDEN,
Defendant.

---

*AMENDED Court Minutes-Detention Hearing
(*To Correct Date for Motions to Continue)

---

1:36 p.m.

Defendant appeared in custody in Grand Junction. AFPD Timothy O'Hara appeared via VTC from A702 (Arraj) on his behalf. AUSA Jeremy Chaffin appeared in person. PO Jason Cohen appeared in person.

All had previously read the Pre-Trial Services Report except AFPD O'Hara who waived reading of it.

Defendant was not contesting detention at this time, but reserved the right to contest it at a later date.

ORDERED: The Court, finding grounds, will enter a Detention Order and Defendant is remanded to the custody of the USMS.

Defendant waived further Advisement and Arraignment and entered a plea of Not Guilty to all charges.

The Court accepted the plea.

**ORDERED: This is a Western Slope Protocol Practice (WSPP) case.**

ORDERED: Parties have 10 days within which to tender to the Court a WSPP consent.

ORDERED: The Court entered the following speedy trial deadlines:
30 days: 6/30/2019
70 days: 7/30/2019
90 days: 8/192019


ORDERED:  A jury trial was set to commence **July 1, 2019 at 8:30 a.m.** before Chief Judge Krieger and to occur in Room 323 of the Aspinall Federal Building at 400 Rood Avenue in Grand Junction.

ORDERED: Deadline for Motions to Continue Trial is **6/14/2019 (corrected date).**

**ORDERED: This case may be unsealed.**

ORDERED: Parties submitted a Discovery Memo and proposed Order to the Court which it made an Order of this Court.

Hearing concluded at: 1:45 p.m.
Hearing duration: 9 minutes

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No.: 19cR243-MSK-GPG

UNITED STATES OF AMERICA,

Plaintiff,

vs. Michael Tracy McFadden

Defendant.

CONSENT OF THE GOVERNMENT AND THE DEFENDANT[1]
Pursuant to D.C.COLO.LCrR 11.1(b)

After consideration and, for the Defendant, full consultation with counsel, we voluntarily consent to having the Magistrate Judge:

☒ Set pretrial deadlines, determine any motion to continue/reschedule a trial, and set trial in accordance with the Speedy Trial Act.

☒ Upon Order of Reference from the assigned Article III Judge, hear and make Recommendations as to any pretrial motion.

☒ Upon Order of Reference from the assigned Article III Judge, receive Defendant's Change of Plea, give appropriate advisement in accordance with Rule 11 of the Federal Rules of Criminal Procedure, make a Recommendation as to whether Defendant's plea should be accepted and schedule a Sentencing Hearing.

☐ Upon Order of Reference from the assigned Article III Judge, hear a Petition for Revocation of Probation and/or Supervised Release and make a Recommendation as whether the revocation/modification/coninuation of Probation or Supervised Release is appropriate.

The parties separately agree that:

☐ A Sentencing Hearing may be held by video teleconferencing with the assigned Article III Judge in Denver.

Dated: 6/5/19

[signature]
Defendant's Signature

[signature]
Signature of the U.S. Attorney

[signature]
Signature of Defendant's Attorney

[1] The parties shall not file this document unless it reflects unanimous consent of the government and the defendant pursuant to D.C.COLO.LCrR 11.1(b). In a multi-defendant matter, no individual consent, other than to the sentencing hearing, will be operative unless all defendants have similarly consented and filed this form.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
United States Magistrate Judge Gordon P. Gallagher

Criminal Action No. 19-cr-243-MSK-GPG

UNITED STATES OF AMERICA,
Plaintiff,
v.

1. MICHAEL TRACY McFADDEN,
Defendant(s).

---

GRAND JUNCTION SPECIFIC SETTING AND TRIAL PREPARATION ORDER FOR CRIMINAL ACTIONS FALLING WITHIN THE WESTERN SLOPE PROTOCOL

I. ORDERS APPLICABLE TO ALL GRAND JUNCTION PROTOCOL CASES

II. ADDITIONAL ORDERS APPLICABLE TO MULTI-DEFENDANT GRAND JUNCTION PROTOCOL CASES

---

## I. ORDERS APPLICABLE TO ALL GRAND JUNCTION PROTOCOL CASES

THIS MATTER has already come before the Court for setting of trial and pretrial deadlines. The Court has addressed deadlines applicable pursuant to the Speedy Trial Act (18 U.S.C. §3161, *et. seq.*) and this Order is issued in accordance with the Speedy Trial Act and the Local Rules of the United States District Court for the District of Colorado. This Order may not be modified by agreement of the parties. Upon timely application, however, either or both parties may seek modification as may be necessary to meet a *bona fide* emergency, to avoid irreparable injury or harm, or as may otherwise be necessary to do substantial justice.

A.     TRIAL AND MOTIONS SETTING

1.     The initial trial setting in this matter is for a trial to a jury of twelve, plus alternates, in the United States District Court for the District of Colorado, Wayne Aspinall Courthouse, Room 323, in Grand Junction, Colorado.  Motions to suppress and other pretrial motions shall be filed and briefed on the schedule already set by the Court.  Absent a specific directive to the contrary, responses to all other motions in this case shall be filed within seven days of the motion's filing.  The government's response to any suppression motion shall include the estimated time needed for an evidentiary hearing on the motion.

2.     A final pretrial conference/motions hearing has been set in the Alfred Arraj Courthouse, Room 901, Denver, Colorado.   If no motions are pending at the time of the hearing, this hearing will be a final pretrial conference.   If motions are pending, the hearing will automatically be converted to a  non-evidentiary motion hearing.   At the hearing, non-evidentiary motions will be resolved or set  for further determination, evidentiary motions will be set for hearing, and trial may be set.   Please  confer prior to the hearing to determine whether issues are in dispute, then narrow the issues to be determined.

3.     A request for a *James* determination shall be made through a jointly filed motion accompanied by a completed chart in conformance with Exhibit A attached hereto.   Absent extraordinary circumstances, the determination will be made on the papers and without a hearing.   The Court will issue a  written advisory ruling, premised upon the assumption that all identified evidence as to the alleged  conspiracy is admitted at trial and a proffer of the identified statements pursuant to Fed.R.Evid.   801(d)(2)(E) is made.

B.      PLEA AGREEMENTS

Local Rule D.C.COLO.LCrR 11.1 is applicable in this matter.    Absent Court Order, a Notice of Disposition shall be filed no later than 14 days before the trial date.   At the Change of Plea Hearing, the original of the Plea Agreement and Statement in Advance should be marked as exhibits.   If an Information is to be proffered, it should be marked as well.   Oral motions to dismiss counts pursuant to the Plea Agreement can be made at the Change of Plea Hearing, and if granted, the order of dismissal will be stayed until the time of sentencing.

1.      **Setting of Change of Plea Hearings.**  Upon the filing of a Notice of Disposition, the Magistrate Judge will vacate the Trial Preparation Conference and Jury Trial and set the matter for a Change of Plea Hearing.

2.  **Setting of Sentencing Hearings**.  At the Change of Plea Hearing, the Magistrate Judge will set a Sentencing Hearing for a particular Term Week.   The parties will consult the Calendar for the specified Term Week which is posted on the court's website Calendars and select a time from available hearing dates and times during the specified Term Week.   Upon selection, but no later than 21 days before the Term Week begins, counsel shall jointly advise the chambers of the Honorable Marcia S. Krieger at Krieger_chambers@cod.uscourts.gov or **303-335-2289** of the date and time selected for the sentencing hearing.  Dates and times will be assigned upon request on a first-come first-served basis.  If the date and time selected by the parties is available when counsel contact chambers, the sentencing hearing will be set on the Term Week Calendar as requested.  If a hearing in another matter has been set at the date and time that counsel request, they shall select another.  The Term Calendar will be updated from time to time, all settings will become final 14 days before the Term Week begins.  Once final, dates and times of hearings will not be modified (except for unanticipated circumstances).

C.       TRIAL PREPARATION REQUIREMENTS

1.       **Conflicts in Scheduling**.   Continuances of the trial will be granted only in truly exceptional circumstances upon grounds satisfying the provisions of the Speedy Trial Act

2.       **Motions and Jury Instructions**.     All motions *in limine* and proposed jury instructions must be filed no later than the day before the final trial preparation conference. All instructions submitted should contain language which is gender neutral or gender correct. Instructions should contain the caption "Instruction No.____" and the supporting authority, but no other titles or numbers.     To the extent the parties stipulate to facts, those stipulations should be set forward in a standalone jury instruction.   The Court typically reads the Indictment to the *venire* as part of jury selection; to the extent that redactions to the Indictment are warranted for this purpose, the parties shall tender a redacted Indictment with their proposed jury instructions.

3.       **Witness List**.  No later than the day before the final trial preparation conference, the Government shall file the final Witness List on the form prescribed by the Court.[1]  Because this document will also be used by the Court reporter, please be sure that first and last names are spelled correctly (using initial capital letters only for proper names) and that any pseudonyms or maiden names that might be used are also noted.

4.       **Exhibit List**. Prior to the conference, counsel shall confer and agree upon the manner of labeling exhibits.   Pursuant to such agreement, no later than the day before the final trial preparation conference, the Government will file an Exhibit List on the form prescribed by the Court.   If their use is anticipated, demonstrative exhibits and documents used to refresh memory shall also be listed on the Exhibit List.

Regardless of the manner of publishing exhibits that will be used at trial, all

---

[1]      Unless otherwise noted, all forms and procedures referenced in this Order can be found on the Court's website, www.cod.uscourts.gov, by following the links for Rules and Procedures -> Judicial Practice Standards -> Hon. Marcia S. Krieger.

documentary exhibits shall also be available to the Court and to witnesses in hard copy in three-ring notebooks or folders. The notebook or folder labeled with the following information: (i) caption, (ii) charges, (iii) scheduled date and time, (iv) parties name and designation and (v) "original"or "copy," and delivered to the CRD at the final trial preparation conference.

5. ***Voir Dire* Questions**. The Court will conduct *voir dire*. Counsel may submit proposed *voir dire* questions no later than the day before the final trial preparation conference.

6. **Terminology**. At least one week before the final trial preparation conference, parties shall file a glossary of any unusual or technical terminology. The glossary should also include names of persons who will be mentioned during the course of trial but are not parties to the litigation. Proper names shall have initial capitals only.

7. **Video and Special Equipment**. If you intend to use electronic equipment advise the courtroom deputy clerk at least two weeks before trial and make an appointment for training.

8. **Trial Briefs**. Please advise the Court at the final trial preparation conference if you wish to file trial briefs. Briefs shall be filed on a date to be set by the Court. Unless otherwise specified, trial briefs shall be limited to 5 pages.

9. **Issues to be addressed at the Final Trial Preparation Conference**.

The parties shall be prepared to address the following issues:

- jury selection;
- sequestration of witnesses;
- timing of presentation of witnesses and evidence;
- anticipated evidentiary issues (need for scheduling of hearings outside the presence of the jury);
- any stipulations as to fact or law; and
- any other issue affecting the duration or course of the trial.

## II. ADDITIONAL ORDERS APPLICABLE ONLY TO MULTI-DEFENDANT CASES

It is the Court's experience that multi-Defendant criminal cases often present unusual and significant administrative challenges for both counsel and the Court. In an attempt to preemptively alleviate some of those burdens, and to expressly advise counsel of procedures that the Court will follow, the following procedures will apply to all cases with more than one Defendant.

(1) The Magistrate Judge determine speedy trial issues, set pretrial deadlines, issue recommendations with regard to pretrial motions, or give advisements under Fed.R.Crim.P. 11 in the context of a change of plea only in situations were all Defendants in the case have given consent. In the absence of complete consent, all such matters involving any Defendant (consenting or not) will be heard by Judge Krieger.

(2) All documents filed by any party in this case shall bear the complete case caption. If a document pertains only to a particular Defendant or Defendants, the name of such Defendant or Defendants shall be in **bold** print on the caption. The caption is deemed amended and the name of a Defendant may be removed from the caption upon the completion of the sentencing of that Defendant.

(3) If a Defendant files a Notice of Disposition, that Defendant and his or her counsel are excused from participating in all subsequent hearings except for hearings which pertain to that Defendant, *i.e.*, change of plea and sentencing hearings.

(4) If counsel for a Defendant is unable to attend a hearing, that Defendant may file a motion to allow substitute counsel to represent him or her at such hearing. Such motion must be accompanied by a statement that the Defendant consents to representation by substitute counsel at the particular hearing.

(5) Except as may otherwise be directed by the Court, any Defendant who has not filed a Notice of Disposition shall attend all scheduled hearings (apart from change of plea or sentencing hearings for co-Defendants who have filed Notices of Disposition) with his or her counsel. If any Defendant or defense counsel desires to waive his or her appearance at any hearing, an appropriate motion shall be filed no later than 3 business days prior to the hearing.

(6) With regard to any Defendant who is not in custody, a motion seeking leave to allow the Defendant to travel shall be filed at least 5 business days before the requested travel date. No such motion will be granted unless the pre-trial supervision office is in agreement and either (a) the Government files written assent to the travel at least 2 business days before the requested travel date or (b) the motion is stipulated.

(7) If a Defendant wishes to adopt the arguments made in a co-Defendant's motion, the Defendant shall not file a "Motion to Join" in the co-Defendant's motion. Instead, the Defendant should file a motion whose caption and body identifies the specific relief requested, and which simply incorporates by reference the arguments raised by the co-Defendant's motion (identifying the motion being incorporated by docket number wherever possible). Alternatively, where it is possible for counsel to collaborate in drafting, a single motion seeking relief on behalf of multiple Defendants is helpful in minimizing docket sheet congestion.

(8) At any hearing on motions, counsel shall be responsible for monitoring the disposition of their own motions. Please note their docket numbers. If a motion is not addressed by the Court at the hearing, and counsel do not request a ruling on the motion, the motion may be deemed denied as abandoned. Note that the initial scheduled motions hearing is non-evidentiary. Where an evidentiary presentation is necessary to resolve a particular motion, the Court will specifically set a date for an evidentiary hearing in consultation with counsel.

(9) Please be aware of the Court's specific procedures on the following points:

(a) Severance: Although the general motions deadline governs the filing of motions to sever, typically, the Court will not rule on motions seeking severance until the time of the Pretrial Conference, at which point the contours of the case to be tried have become clearer.

(b) *James* proffers: The Court does not typically conduct hearings on requests for *James* determinations of the admissibility of co-conspirator statements. When a *James* issue is raised, the Government shall make a written proffer containing:

(i) identification of the facts showing the existence, composition, scope, and object of the conspiracy; and

(ii) a specific identification of each statement that is to be offered, its dedeclarant, and an explanation as to how that statement is admissible under Fed.R.Evid. 801(d)(2).

This proffer is made on the form attached to this Order. The form also includes a place to state the nature of such objection. Upon its review of a completed proffer, the Court will usually issue a written ruling either: (i) finding the proffer to be *prima facie* adequate to permit the admission of the co-conspirator testimony under Rule 801(d)(2), subject to the Government establishing the necessary foundational facts at trial; or (ii) finding that specific statements are inadmissible under Rule 801(d)(2).

(c) Rule 702 issues: A party's disclosure of expert opinions under Fed.R.Crim.P. 16 shall sufficiently identify the foundational facts necessary to support the expert's opinion under Fed.R.Evid. 702. Challenges to the foundation of a designated expert's opinion on the grounds specified in Rule 702 must be made by a joint filing according to the procedure set forth on the Court's website.

Dated this June 13, 2019.

By the Court:

Gordon P. Gallagher
United States Magistrate Judge

*Exhibit A*
[Case Caption]

PROFFER UNDER FED. R. EVID. 801(d)(2) AND OBJECTIONS

---

SECTION 1: Government's Initial Proffer as to Conspiracy
[The Government's proffer of facts showing that (1) a conspiracy or conspiracies existed, (2) the declarant of each statement and the defendant(s) were members of the conspiracy or conspiracies, and (3) the statements were made in the course of, and in furtherance of, the conspiracy or conspiracies.]

SECTION 2: Government's Proffer as to Specific Statements

| Statement #1 | Declarant | Date | Source | Basis for Admission |
|---|---|---|---|---|
| [verbtaim recitation of statement or best possible paraphrase] | [name] | [when statement made] | [source of statement – e.g. interview with agent, intercepted phone call, etc.] | [additional explanation, if necessary, why the statement is admissible under Rule 801(d)(2)] |

| Defendant | Objections to Statement #1 |
|---|---|
| [name] | [e.g. statement made outside scope of conspiracy, statement pre-/post-dates conspiracy, etc.] |
| [name] | |

| Statement #2 | Declarant | Date | Source | Basis for Admission |
|---|---|---|---|---|
| | | | | |

| Defendant | Objections to Statement #2 |
|---|---|
| | |
| | |

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

CASE NO. 19-cr-243-MSK-GPG

UNITED STATES OF AMERICA,

Plaintiff,

v.

**MICHAEL TRACY MCFADDEN,**

Defendant.

---

**DEFENDANT MICHAEL TRACY MCFADDEN'S UNOPPOSED MOTION TO VACATE AND RESET TRIAL DATE PURSUANT TO 18 U.S.C. §3161(h)(7)(A)**

---

MR. MICHAEL TRACY MCFADDEN (hereinafter Mr. McFadden), by and through counsel, Timothy P. O'Hara, Assistant Federal Public Defender, respectfully moves this Court for an Order vacating current deadlines, including the trial date (currently set for July 1, 2019). Undersigned counsel requests that ninety days be excluded from the calculation of time under the Speedy Trial Act (18 U.S.C. §3161). In support of this Unopposed Motion, undersigned counsel states as follows:

## I. Procedural Background

1) On May 17, 2019, the government filed a five count Indictment against Mr. McFadden alleging that he has violated two sections of the United States Criminal Code, 18 U.S.C. §§ 2241(c) and 2423(a). *See* Doc. 1.

2) On May 21, 2019, Mr. McFadden was arrested in connection with the federal charges. *See* Doc. 8.

3) On May 22, 2019, Mr. McFadden appeared before the Honorable Magistrate Judge Gordon P. Gallagher for an Initial Appearance. *See* Doc. 5. At that time, the Court appointed counsel for Mr. McFadden. The Court also continued the matter until May 31, 2019, for an Arraignment, Detention Hearing, and Discovery Conference. *See id.*

4) On May 23, 2019, undersigned counsel filed a Notice of Appearance. *See* Doc. 4.

5) On May 31, 2019, the parties and Mr. McFadden appeared before Magistrate Judge Gallagher.[1] *See* Doc. 11. Mr. McFadden entered a plea of Not Guilty to the charges in the Indictment [Doc. 1]. *See id.* At that time, the government sought to detain Mr. McFadden. The defense did not contest detention, but reserved the right to contest Mr. McFadden's detention at a later time. *See id.* At that time, Magistrate Judge Gallagher set the present matter for a Jury Trial to begin on July 1, 2019. At undersigned counsel's request the Court set June 14, 2019, as the date by which a Motion to Continue the Trial should be filed. *See* Doc. 14 (Court minutes with corrected date).

6) It is undersigned counsel's position that the correct starting date for Speedy Trial purposes is the date of the Initial Appearance, May 22, 2019, as that is the latest date of all the options listed in 18 U.S.C. §3161(c)(1). Based on that starting date, the original 70-day date would be July 30, 2019. *See* Doc. 13 at p. 8.

[1] Undersigned counsel appeared by VTC from Denver.

7) As of today's date, 22 days have run on the 70-day speedy trial timeline, leaving 48 days remaining. The filing of the present Unopposed Motion would toll the speedy trial calculation until the motion has been ruled on. *See* 18 U.S.C. § 3161(h)(1)(D).

8) Since the Court appointed counsel, approximately three weeks have passed. During that time, undersigned counsel has spoken to Mr. McFadden by phone and traveled to visit him in person in the Mesa County Jail.

9) The charges against Mr. McFadden are extremely serious. Each count carries at least a 10-year or 30-year mandatory minimum sentence. *See* Doc. 1.

10) Undersigned counsel has not yet received discovery materials from the government. The government anticipated in the Discovery Conference Memorandum and Order that it would tender discovery on today's date. *See* Doc. 13 at p. 9.

11) Undersigned counsel expects that the amount of discovery in the present case will be voluminous. In 2013, the Mesa County District Attorney's Office filed similar charges against Mr. McFadden in three separate cases. *See* Mesa County, Colorado cases 2013CR27, 2013CR339, and 2013CR342. Those cases were pending for more than two years while the parties prepared for trial. In July of 2015, a 12-day jury trial was held and Mr. McFadden was convicted. Following an appeal in the Colorado Court of Appeals, the convictions were vacated and sent back to the trial court with directions to dismiss the charges in each case. Undersigned counsel expects a considerable, if not complete, overlap between the state court cases and the present case. The transcripts from a 12-day jury trial will be significant.

12) The necessary investigation will be considerable as well. Undersigned counsel expects the number of witnesses to be substantial. The government has alleged that Mr. McFadden committed crimes against two minor victims as alleged in the Indictment, but has informed undersigned counsel that it intends to introduce evidence under Federal Rule of Evidence 404(b) involving other alleged victims.

13) Without the discovery materials and the transcripts from the prior trial, undersigned counsel is not requesting that the Court set the matter for trial on a specific date in the future. Instead, undersigned counsel requests that the Court vacate the current trial date, exclude 90 days from the speedy trial calculation, and set a date for status for the parties to inform the Court on how much time will be necessary in order to prepare for trial. In other words, undersigned counsel expects to request an additional exclusion of time beyond the initial 90 day exclusion, and will be in a better position to make a specific request after approximately 90 days.

14) Undersigned counsel contacted the government about the present Motion. The Assistant United States Attorney handling the present matter has no objection.

15) Undersigned counsel advised Mr. McFadden about the requested continuance. Similarly, he has no objection.

**II. Standard for Continuances**

16) Title 18 U.S.C. §3161(h)(7)(A) provides that a Court shall exclude a period of delay from computing the time within which a trial must commence where "the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial." The factors to be considered in such an evaluation are listed at 18 U.S.C. § 3161(h)(7)(B)(i)-(iv).

17) Pertinent factors that apply to an "ends of justice" finding in the present case include:

> (i) Whether the failure to grant such a continuance in the proceeding would be likely to make a continuation of such proceeding impossible, or a result in a miscarriage of justice.
>
> . . . .
>
> (iv) Whether the failure to grant such a continuance in a case which, taken as a whole, is not so unusual or so complex as to fall within clause (ii), would deny the defendant reasonable time to obtain counsel, would unreasonably deny the defendant or the Government continuity of counsel, or would deny counsel for the defendant or the attorney for the Government the reasonable time necessary for the effective preparation, taking into account the exercise of due diligence.

*See* 18 U.S.C. §1361(h)(7)(B)(Westlaw 2016). *See also*, *United States v. Toombs*, 574 F. 3d 1262, 1268-69 (10th Cir. 2009).

18) In the similar context of addressing trial continuances, the Tenth Circuit has set forth four factors that the Court should consider. *See United States v. West*, 828 F.2d 1468, 1470 (10th Cir. 1987). According to the Tenth Circuit, the Court should consider: (1) the diligence of the party requesting the continuance, (2) the likelihood that the continuance, if granted, would accomplish the purpose underlying the request for continuance, (3) the inconvenience to the opposing party, its witnesses, and the court resulting from the continuance, and (4) the need asserted for the continuance and the harm that could be suffered as a result of the court's denial of the continuance. *See id.* No single factor is determinative. *See id.*

19) The decision to grant an "ends of justice" continuance is within the sound discretion of the Court, and is reviewed under an abuse of discretion standard. *See Toombs*, 574 F. 3d at 1262. "Adequate preparation time is a clearly permissible reason for granting a continuance and tolling the Speedy Trial Act." *United States v. Gonzales*,

137 F. 3d 1431, 1435 (10th Cir. 1998). The Supreme Court has recognized that "subsection (h)(7) expressly accounts for the possibility that a district court will need to delay a trial to give the parties adequate preparation time" to ensure that the ends of justice are met, and that "subsection (h)(7) provides 'much of the Act's flexibility.'" *Bloate v. United States*, 130 S. Ct. 1345 (2010).

**III. Argument**

20) This case meets the criteria set forth in both 18 U.S.C. § 3161(h)(7) and *West*. Accordingly, undersigned counsel requests that this Court vacate the current trial date and exclude 90 days from the speedy trial calculation.

21) At this time, undersigned counsel is not requesting a finding of complexity under subsections (h)(7)(B)(ii), but rather, is requesting a determination that the ends of justice will be served by the granting of the requested continuance because "the failure to grant such a continuance in the proceeding would . . . result in a miscarriage of justice" and "would deny counsel for the defendant . . . reasonable time necessary for effective preparation." 18 U.S.C. §3161(h)(7)(B)(iv).

22) Undersigned counsel will require 90 days to receive and review the discovery materials (including the trial transcripts), plan the necessary pre-trial investigation, and begin the process of researching the relevant legal issues, preparing pre-trial motions, consulting with Mr. McFadden about his options, and preparing for trial.

23) The failure to grant the requested continuance on behalf of Mr. McFadden

would result in a miscarriage of justice in his case and would also deny undersigned counsel the reasonable time necessary for effective preparation as discussed in 18 U.S.C. §3161(h)(7)(B)(i) and (iv).

24) Finally, a speedy trial extension of 90 days would not offend the standard set forth by the Tenth Circuit in the *West* decision.

25) Thus far, undersigned counsel has diligently pursued the defense of this case. However, the nature and facts of the case, including but not limited to the outstanding discovery, the outstanding trial transcripts, the investigation that is expected, the anticipated legal research, and the consultation with Mr. McFadden that is required are such that no amount of diligent work can insure effective assistance of counsel prior to the current trial date as contemplated by the current speedy trial time-frame.

26) Undersigned counsel believes that the extension would serve the requested purpose and allow undersigned counsel to inform the Court of a realistic trial date.

WHEREFORE, Mr. McFadden respectfully requests that this Court issue an Order vacating current deadlines and the trial date, excluding 90 days from the speedy trial calculation, and setting the present matter for a status hearing in approximately 90 days.

Respectfully submitted,

VIRGINIA L. GRADY
Federal Public Defender

s/ Timothy P. O'Hara
TIMOTHY P. O'HARA
Assistant Federal Public Defender
633 Seventeenth Street, Suite 1000
Denver, Colorado  80202
Telephone:  (303) 294-7002
FAX:  (303) 294-1192
Email:  Timothy_OHara@fd.org
Attorney for Defendant

## CERTIFICATE OF SERVICE

I hereby certify that on June 14, 2019, I electronically filed the foregoing

**DEFENDANT MICHAEL MCFADDEN'S UNOPPOSED MOTION TO VACATE AND RESET TRIAL DATE PURSUANT TO 18 U.S.C. §3161(h)(7)(A)**

with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

Jeremy Chaffin
Assistant United States Attorney
Jeremy.Chaffin@usdoj.gov

s/ Timothy P. O'Hara
TIMOTHY P. O'HARA
Assistant Federal Public Defender
633 Seventeenth Street, Suite 1000
Denver, Colorado 80202
Telephone: (303) 294-7002
FAX: (303) 294-1192
Email: Timothy_OHara@fd.org
Attorney for Defendant

Case 1:19-cr-00243-MSK-GPG Document 21 Filed 06/27/19 USDC Colorado Page 1 of 8

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Criminal Action No. 19-cr-00243-MSK-GPG

UNITED STATES OF AMERICA,

Plaintiff,

v.

1. MICHAEL TRACY McFADDEN,

Defendant.

---

**UNOPPOSED MOTION FOR A PROTECTIVE ORDER**

---

The United States of America, by and through Jeremy Chaffin, Assistant United States Attorney, hereby moves this Court for a protective order.

1. Due to the nature of the charges, the privacy protection measures set forth below and afforded under the Child Victims' and Child Witnesses' Rights Act (the "Act"), 18 U.S.C. § 3509, including § 3509(d), apply to this case.

2. The Act affords certain protections to child victims and child witnesses, including requiring the parties and other personnel to maintain the confidentiality of any documents disclosing the name of and information concerning a child victim or witness, maintain the confidentiality of any information in said documents concerning a child victim or witness, maintain the confidentiality of the child victim or witness's identity in all public filings and court proceedings, and file under seal without the necessity of a Court order any filings that disclose the identity or other personal information of the child victim or witness. Additionally, victims have a right to be treated with fairness and with respect for the victim's dignity and privacy. 18 U.S.C. § 3771(a)(8).

3.  The Government submits that due to the nature of the case and due to the underlying discovery, there is a significant possibility that without a protective order, names or other information concerning child victims or witnesses, as well as child victims or witnesses that have since become adults, could be disclosed, which would be detrimental.  18 U.S.C. § 3509(d); *see also* Fed. R. Crim. P. 16(d)(1) ("At any time the court may, for good cause, deny, restrict, or defer discovery or inspection, or grant other appropriate relief.").

4.  The Government is requesting a protective order that governs the discovery and filings in this case consistent with 18 U.S.C. § 3509(d) and as suggested in the Proposed Order attached hereto.

5.  The Government has consulted with counsel for Defendant and informs the Court that the Defendant does not object to the entry of the proposed protective order.

WHEREFORE, the Government respectfully requests the Court enter a protective order consistent with those suggested in the Proposed Order, which is attached.

Respectfully submitted,

JASON R. DUNN
United States Attorney

*s/ Jeremy Chaffin*
JEREMY CHAFFIN
Assistant U.S. Attorney
U.S. Attorney's Office
205 North 4th Street, Suite 400
Grand Junction, CO 81501
Tel: (970) 257-7113
Fax: (970) 248-3630
E-mail: jeremy.chaffin@usdoj.gov
Attorney for Government

**CERTIFICATE OF SERVICE**

I hereby certify that on this 17th day of June, 2019, I electronically filed the foregoing **UNOPPOSED MOTION FOR PROTECTIVE ORDER** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following e-mail address:

**Defense Attorney:**
Timothy P. O'Hara

**Email Address:**
Timothy_Ohara@fd.org

*s/ Cosandra Foster*
COSANDRA FOSTER
Paralegal Specialist
U.S. Attorney's Office
205 N. 4th Street, Suite 400
Grand Junction, CO 81501
Telephone (970) 241-3843
Fax (970) 248-3630
E-mail: cosandra.foster@usdoj.gov

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Criminal Action No. 19-cr-00243-MSK-GPG

UNITED STATES OF AMERICA,

Plaintiff,

v.

1. MICHAEL TRACY McFADDEN,

Defendant.

---

## PROTECTIVE ORDER

---

THIS MATTER coming before the Court upon motion of the Government to enter a protective order enters the following findings and Order:

1. Due to the nature of the charges, the privacy protection measures set forth below and afforded under the Child Victims' and Child Witnesses' Rights Act (the "Act"), 18 U.S.C. § 3509, apply in this case.

2. The Act affords certain protections to child victims and child witnesses, including requiring the parties and other personnel to maintain the confidentiality of any documents that disclose the name or any other information concerning a child, maintain the confidentiality of the child's identity in all public filings and court proceedings, and file under seal without the necessity of a Court order any filings that disclose the identity or other personal information of the child.

3. Due to the nature of the case, the Court finds that there is a significant possibility that disclosure to the public of the names or other information concerning any child

victims or witnesses in this case, as well as child victims or witnesses who have since

become adults, would be detrimental.

4.   The Defendant does not object to the entry of a protective order with the terms

and conditions outlined below.

5.   Good cause appearing, the Court hereby orders that:

(a)     All persons acting in this case in a capacity described in 18 U.S.C.

§ 3509(d)(1)(B) shall, at trial and during any and all pre-trial and post-trial

proceedings in this case, refer to any involved child victims or witnesses, including

child victims or witnesses that have since become adults, by initials or a pseudonym

for each such individual;

(b)     All documents that disclose the name or any other information concerning

a minor, as well as any child victims or witnesses that have since become adults,

shall be kept in a secure place to which no person who does not have reason to

know their contents has access, pursuant to and in compliance with 18 U.S.C. §

3509(d)(1)(A)(i);

(c)     All documents that disclose the name or any other information concerning

a minor, as well as child victims or witnesses who have since become adults, and

the information in such documents shall be disclosed only to persons who, by

reason of their participation in the proceeding, have reason to know such

information, pursuant to and in compliance with 18 U.S.C. § 3509(d)(1)(A)(ii);

(1)     The Government will provide defense counsel with a copy of

discovery in this case.  The discovery may be viewed only by defense

counsel, the Defendant, and members of the defense team, including any

defense attorneys, investigators, and staff from the Office of the Federal

Public Defender, as the Office of the Federal Public Defender determines necessary for the purpose of preparing a defense in this particular case.

(2) The discovery materials, including those that disclose the name or any other information concerning a minor and child victims or witnesses who have since become adults, as well as any depictions of such individuals, shall be provided to the Defendant under the circumstances described below. The Defendant may be allowed to view the discovery materials referenced in this paragraph, but only while in the direct presence of defense counsel or members of the defense team, including any defense attorneys, investigators, or staff from the Office of the Federal Public Defender, as the Office of the Federal Public Defender determines necessary for the purpose of preparing a defense in this particular case.

(d) All documents to be filed in Court that disclose the name or other information concerning a minor, as well as child victims or witnesses who have since become adults, shall be filed under restriction without necessity of obtaining a Court order; and

(e) Defense counsel will take reasonable measures to ensure that counsel and members of the defense team safeguard the above-referenced information.

BY THE COURT:

____________________________________

Marcia S. Krieger
United States District Court

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Criminal Action No. 19-cr-00243-MSK-GPG

UNITED STATES OF AMERICA,

      Plaintiff,

v.

1. MICHAEL TRACY McFADDEN,

      Defendant.

---

**PROTECTIVE ORDER**

---

      THIS MATTER coming before the Court upon motion of the Government to enter a protective order enters the following findings and Order:

    1.  Due to the nature of the charges, the privacy protection measures set forth below and afforded under the Child Victims' and Child Witnesses' Rights Act (the "Act"), 18 U.S.C. § 3509, apply in this case.

    2.  The Act affords certain protections to child victims and child witnesses, including requiring the parties and other personnel to maintain the confidentiality of any documents that disclose the name or any other information concerning a child, maintain the confidentiality of the child's identity in all public filings and court proceedings, and file under seal without the necessity of a Court order any filings that disclose the identity or other personal information of the child.

    3.  Due to the nature of the case, the Court finds that there is a significant possibility that disclosure to the public of the names or other information concerning any child

victims or witnesses in this case, as well as child victims or witnesses who have since

become adults, would be detrimental.

4.   The Defendant does not object to the entry of a protective order with the terms

and conditions outlined below.

5.   Good cause appearing, the Court hereby orders that:

(a)      All persons acting in this case in a capacity described in 18 U.S.C.

§ 3509(d)(1)(B) shall, at trial and during any and all pre-trial and post-trial

proceedings in this case, refer to any involved child victims or witnesses, including

child victims or witnesses that have since become adults, by initials or a pseudonym

for each such individual;

(b)      All documents that disclose the name or any other information concerning

a minor, as well as any child victims or witnesses that have since become adults,

shall be kept in a secure place to which no person who does not have reason to

know their contents has access, pursuant to and in compliance with 18 U.S.C. §

3509(d)(1)(A)(i);

(c)      All documents that disclose the name or any other information concerning

a minor, as well as child victims or witnesses who have since become adults, and

the information in such documents shall be disclosed only to persons who, by

reason of their participation in the proceeding, have reason to know such

information, pursuant to and in compliance with 18 U.S.C. § 3509(d)(1)(A)(ii);

(1)      The Government will provide defense counsel with a copy of

discovery in this case.  The discovery may be viewed only by defense

counsel, the Defendant, and members of the defense team, including any

defense attorneys, investigators, and staff from the Office of the Federal

Public Defender, as the Office of the Federal Public Defender determines necessary for the purpose of preparing a defense in this particular case.

(2) The discovery materials, including those that disclose the name or any other information concerning a minor and child victims or witnesses who have since become adults, as well as any depictions of such individuals, shall be provided to the Defendant under the circumstances described below. The Defendant may be allowed to view the discovery materials referenced in this paragraph, but only while in the direct presence of defense counsel or members of the defense team, including any defense attorneys, investigators, or staff from the Office of the Federal Public Defender, as the Office of the Federal Public Defender determines necessary for the purpose of preparing a defense in this particular case.

(d) All documents to be filed in Court that disclose the name or other information concerning a minor, as well as child victims or witnesses who have since become adults, shall be filed under restriction without necessity of obtaining a Court order; and

(e) Defense counsel will take reasonable measures to ensure that counsel and members of the defense team safeguard the above-referenced information.

BY THE COURT:

Gordon P. Gallagher
Unites States Magistrate Judge
District of Colorado

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 19-cr-00243-MSK-GPG

UNITED STATES OF AMERICA,

Plaintiff,

v.

1. MICHAEL TRACY MCFADDEN,

Defendant.

---

**PARTIES' JOINT POSITION ON THE SPEEDY TRIAL CLOCK**

---

The UNITED STATES OF AMERICA, by and through Jason R. Dunn, United States Attorney for the District of Colorado, and Andrea Surratt and Jeremy Chaffin, Assistant United States Attorneys, and Michael Tracy McFadden, by and through his attorney, Timothy O'Hara respectfully submit this speedy trial calculation in response to the Court's June 17, 2019 Order.

<u>Background</u>

The defendant was indicted on May 17, 2019, in five counts related to sexual abuse of two alleged child victims. (Dkt #1). The defendant was arrested on May 21, 2019 and made his initial appearance in this District on May 22, 2019. (Dkt #8). On May 31, 2019, the defendant was ordered detained pending trial, which was scheduled for July 1, 2019. (Dkt #31).

On June 14, 2019, the defendant moved to vacate and reset the trial date pursuant to 18 U.S.C. § 3161(h)(7)(A). (Dkt #19). Specifically, citing the seriousness of the

charges, the anticipated volume of discovery, and the substantial prior state litigation in this matter, the defendant requested a speedy trial extension of 90 days, to be followed by a status conference at which point the parties would agree upon a new trial date. (Dkt #19).

On June 16, 2019, the defendant's motion was granted in part and denied in part. (Dkt #20). The July 1, 2019 trial date was vacated and the Court set a trial date of January 6, 2020 and excluded speedy trial time through that new trial date. (Dkt #20).

Speedy Trial Calculation

As noted in the defendant's motion to continue (Dkt #19), the speedy trial clock began running on May 22, 2019, the date of the defendant's initial appearance. The original 70-day date was therefore July 20, 2019. Twenty-two days ran off the speedy trial clock by time the defendant filed his motion to continue on June 14, 2019, at which point the clock was tolled by the filing of that motion. *See* 18 U.S.C. § 3161(h)(1)(D). The Court granted the speedy trial portion of the defendant's motion on June 16, 2019, tolling the clock until January 6, 2020. Accordingly, 22 days have run, and 48 days of the speedy trial clock still remain of the original 70 days.

Dated this 28th day of June, 2019.

JASON R. DUNN
United States Attorney

By: *Andrea Surratt*
Andrea Surratt & Jeremy Chaffin
Assistant U.S. Attorneys
United States Attorney's Office
1801 California Street, #1800
Denver, Colorado 80101
(303) 454-0100
andrea.surratt@usdoj.gov

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 19-cr-00243-MSK-GPG

UNITED STATES OF AMERICA,

Plaintiff,

v.

1. MICHAEL TRACY MCFADDEN,

Defendant.

---

**JOINT MOTION FOR EXCLUSION OF TIME UNDER 18 U.S.C. § 3161(h)**

---

The UNITED STATES OF AMERICA, by and through Jason R. Dunn, United States Attorney for the District of Colorado, and Andrea Surratt and Jeremy Chaffin, Assistant United States Attorneys, and Michael Tracy McFadden, by and through his attorney, Timothy O'Hara, respectfully move to exclude time through the January 6, 2019 trial date in this matter.

Background

The defendant was indicted on May 17, 2019, in five counts related to sexual abuse of two alleged child victims. (Dkt #1). The defendant was arrested on May 21, 2019 and made his initial appearance in this District on May 22, 2019. (Dkt #8). On May 31, 2019, the defendant was ordered detained pending trial, which was scheduled for July 1, 2019. (Dkt #31).

On June 14, 2019, the defendant moved to vacate and reset the trial date pursuant to 18 U.S.C. § 3161(h)(7)(A). (Dkt #19). Specifically, citing the seriousness of the

charges, the anticipated volume of discovery, and the substantial prior state litigation in this matter, the defendant requested a speedy trial extension of 90 days, to be followed by a status conference at which point the parties would agree upon a new trial date. (Dkt #19).

On June 16, 2019, the defendant's motion was granted in part and denied in part. (Dkt #20). The July 1, 2019 trial date was vacated, but instead of setting a status conference in 90 days, the Court set a trial date of January 6, 2020 and excluded speedy trial time from July 1, 2019 through the new trial date. (Dkt #20).

Speedy Trial Calculation

As noted in the defendant's motion to continue (Dkt #19), the speedy trial clock began running on May 22, 2019, the date of the defendant's initial appearance. The original 70-day date was therefore July 20, 2019. Twenty-two days had run off the speedy trial clock at the time that the defendant filed his motion to continue on June 14, 2019, at which point the clock was tolled by the filing of the motion. *See* 18 U.S.C. § 3161(h)(1)(D). The Court granted the speedy trial portion of the defendant's motion on June 16, 2019, tolling the clock from July 1, 2019 until January 6, 2020. An additional 14 days ran off the clock between June 16, 2019 and June 30, 2019.

Accordingly, 34 days still remain of the original 70 days.[1]

Motion to Exclude Time

In the defendant's original motion, he moved to exclude only 90 days. The Court, however, excluded more than twice that. The parties believe that the defendant's original motion provided sufficient factual basis to support an exclusion of time through

[1] This calculation amends that calculation proffered by the Government on June 28, 2019, in which the Government asserted that 48 days remain on the Speedy Trial Clock. (Dkt# 23). The Government's previous calculation failed to take into account the time that ran between June 16, 2019 and June 30, 2019.

the January 6, 2020 trial date and, indeed, the parties anticipated that a trial date would ultimately be set in 2020. But, out of an abundance of caution, the parties hereby move to exclude time through the new trial date and seek a finding from the Court that such exclusion is appropriate under the law.

Pursuant to the Speedy Trial Act, a criminal defendant's trial shall commence within 70 days after he is charged or makes his initial appearance, whichever is later. *See* 18 U.S.C. § 3161(c)(1). A defendant may not waive his rights under the Speedy Trial Act. *See United States v. Williams,* 511 F.3d 1044, 1055 (10th Cir. 2007). The Speedy Trial Act permits time to be excluded from this 70-day calculation for very specific statutory reasons or where the "ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial". *See* 18 U.S.C. § 3161(h)(1)-(7). With regard to the ends-of-justice provision, the Speedy Trial Act provides:

> The following periods of delay shall be excluded . . . in computing the time within which the trial of any such offense must commence:
> . . . .
> (7)(A) Any period of delay resulting from a continuance granted by any judge on its own motion or at the request of the defendant or his counsel or at the request of the attorney for the Government, if the judge granted such continuance on the basis of his findings that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial. No such period of delay resulting from a continuance granted by the court in accordance with this paragraph shall be excludable unless the court sets forth, in the record of the case, either orally or in writing, its reasons for finding that the ends of justice served by the granting of such continuance outweigh the best interests of the public and the defendant in a speedy trial.
>
> (B) The factors, among others, which a judge shall consider in determining whether to grant a continuance… are as follows:
>
>> (i) Whether the failure to grant such a continuance in the proceeding would be likely to make a continuation of such

> proceeding impossible, or result in a miscarriage of justice.
>
> (ii) Whether the case is so unusual or so complex, due to the number of defendants, the nature of the prosecution, or the existence of novel questions of fact or law, that it is unreasonable to expect adequate preparation for pretrial proceedings or for the trial itself within the time limits established [by § 3161].
>
> ***
>
> (iv) Whether the failure to grant such a continuance in a case which, taken as a whole, is not so unusual or so complex as to fall within clause (ii) would deny the defendant reasonable time to obtain counsel, would unreasonably deny the defendant or the Government continuity of counsel, or would deny counsel for the defendant of the attorney for the Government the reasonable time necessary for effective preparation, taking into account the exercise of due diligence.

18 U.S.C. §3161(h)(7)(A) & (B).

The Tenth Circuit has set forth four factors that the Court should consider. *See United States v. West*, 828 F.2d 1468, 1470 (10th Cir. 1987). According to the Tenth Circuit, the Court should consider: (1) the diligence of the party requesting the continuance, (2) the likelihood that the continuance, if granted, would accomplish the purpose underlying the request for continuance, (3) the inconvenience to the opposing party, its witnesses, and the court resulting from the continuance, and (4) the need asserted for the continuance and the harm that could be suffered as a result of the court's denial of the continuance. No single factor is determinative. *See id.*

In *United States v. Toombs*, the Tenth Circuit addressed the degree of specificity that the district court and the parties must use in making a record to support an ends-of-justice continuance. *Toombs*, 574 F.3d 1262, 1271-72 (10th Cir. 2009). The district court or the party requesting a continuance must explain "why the mere

occurrence of the event identified by the party as necessitating the continuance results in the need for additional time." *Id.*; *see also United States v. Williams*, 511 F.3d 1044, 1058 (10th Cir. 2007). "Simply identifying an event, and adding the conclusory statement that the event requires more times for counsel to prepare, is not enough." *Id.*

Here, as noted in the defendant's June 14, 2019 motion, several factors counsel for exclusion of speedy trial time through the January 6, 2020 trial date. The Government produced voluminous discovery on June 19, 2019. Because the defendant was tried before a jury for similar conduct in Mesa County in 2013, the discovery produced in the instant case included thousands of pages of state court transcripts. These transcripts include not only the 12-day jury trial, but also numerous pretrial hearings.[2] Many of the same witnesses testified in the state proceeding that the Government anticipates calling in the instant federal case. Also produced on July 19, 2019 were numerous recordings of the alleged victims' forensic interviews, and interviews of other witnesses, many of which are many hours long. These recordings are both from near in time to the alleged conduct as well as from more recent interviews. In addition, the defendant's investigation in preparation for trial will be substantial, particularly since the alleged conduct occurred between 2008 and 2013. The Indictment charges five counts related to two separate victims, but the Government anticipates calling numerous other alleged victims as Rule 404(b) or Rule 414 evidence.

As noted in his motion of June 14, 2019, in addition to reviewing voluminous discovery and conducting pretrial investigation, the defendant's counsel also anticipates needing to research the relevant legal issues, prepare pretrial motions, consult with the defendant about his options, and begin preparing for trial.

---

[2] The defendant's state conviction was overturned on appeal for speedy trial violations.

In conclusion, the parties respectfully request that the Court make specific findings justifying the exclusion of speedy trial time through the January 6, 2020 trial date. A proposed order is included for the Court's consideration.

Dated this 22nd day of August, 2019.

JASON R. DUNN
United States Attorney

By: *<u>/s Andrea Surratt</u>*
Andrea Surratt & Jeremy Chaffin
Assistant U.S. Attorneys
United States Attorney's Office
1801 California Street, #1800
Denver, Colorado 80101
(303) 454-0100
andrea.surratt@usdoj.gov

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 19-cr-00243-MSK-GPG

UNITED STATES OF AMERICA,

Plaintiff,

v.

1. MICHAEL TRACY MCFADDEN,

Defendant.

---

**ORDER EXCLUDING TIME UNDER 18 U.S.C. § 3161(h)**

---

This motion is before the Court on the parties' joint motion to exclude time from the speedy trial clock pursuant to 18 U.S.C. § 3161(h) through the trial date of January 6, 2020. The Court has reviewed the parties' joint motion (Dkt #26) the defendant's motion of June 14, 2019 (Dkt #19), and the remainder of the docket in this case. The parties' joint motion is GRANTED for the reasons stated in those documents and for the reasons that follow:

- Discovery was recently produced to the defendant, and it consists of thousands of pages of transcripts from related state court proceedings in which the defendant was tried and convicted for very closely related conduct to the instant case, which counsel will need time to carefully review. Many of the same victims that the Government anticipates calling in the instant case testified in the state proceeding.

- Discovery also consists of many hours of video and audio recordings of interviews of numerous alleged victims and other witnesses, both from shortly after the alleged conduct occurred as well as more recently.

- The defendant anticipates that a lengthy pre-trial investigation will be necessary in this case since the Government intends to call as witnesses not just the two charged victims, but also other numerous other alleged victims

pursuant to Rule 404(b) and/or Rule 414.   Moreover, the alleged conduct occurred between 2008 and 2013, further complicating the defendant's ability to investigate the incidents that form the basis for the indictment.

- The defendant's counsel also anticipates needing time to research the relevant legal issues, prepare pretrial motions, consult with the defendant about his options, and begin preparing for trial.

For the reasons stated in the parties' joint motion and the defendant's motion of June 14, 2019, and given the complexity and age of the case, the volume and nature of discovery, and the number of victims, the Court finds that the requested exclusion is appropriate.   The Court further finds that the parties have been diligent in their preparation thus far and that the requested continuance would accomplish the purpose of the continuance—that is, to review voluminous discovery, conduct an extensive pretrial defense investigation, and prepare for trial.   The Court also finds that, absent this continuance, the defendant would be ill-served by counsel would who be unlikely to be fully prepared for trial.

Accordingly, considering the factors in 18 U.S.C. § 3161(h)(7)(B), the Court finds pursuant to 18 U.S.C. § 3161(h)(7)(A) that the ends of justice served by granting the Motion outweigh the best interests of the public and the defendant in a speedy trial.

It is therefore ORDERED that the parties' joint motion for exclusion of time pursuant to 18 U.S.C. § 3161(h) from the date of this Order through the January 6, 2020 trial date is GRANTED.

Dated this __ day of August, 2019.

______________________________

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 19-cr-00243-MSK-GPG

UNITED STATES OF AMERICA,

Plaintiff,

v.

1. MICHAEL TRACY MCFADDEN,

Defendant.

---

**ORDER EXCLUDING TIME UNDER 18 U.S.C. § 3161(h)**

---

This motion is before the Court on the parties' joint motion to exclude time from the speedy trial clock pursuant to 18 U.S.C. § 3161(h) through the trial date of January 6, 2020. The Court has reviewed the parties' joint motion (Dkt #26) the defendant's motion of June 14, 2019 (Dkt #19), and the remainder of the docket in this case. The parties' joint motion is GRANTED for the reasons stated in those documents and for the reasons that follow:

- Discovery was recently produced to the defendant, and it consists of thousands of pages of transcripts from related state court proceedings in which the defendant was tried and convicted for very closely related conduct to the instant case, which counsel will need time to carefully review. Many of the same victims that the Government anticipates calling in the instant case testified in the state proceeding.

- Discovery also consists of many hours of video and audio recordings of interviews of numerous alleged victims and other witnesses, both from shortly after the alleged conduct occurred as well as more recently.

- The defendant anticipates that a lengthy pre-trial investigation will be necessary in this case since the Government intends to call as witnesses not just the two charged victims, but also other numerous other alleged victims

pursuant to Rule 404(b) and/or Rule 414. Moreover, the alleged conduct occurred between 2008 and 2013, further complicating the defendant's ability to investigate the incidents that form the basis for the indictment.

- The defendant's counsel also anticipates needing time to research the relevant legal issues, prepare pretrial motions, consult with the defendant about his options, and begin preparing for trial.

For the reasons stated in the parties' joint motion and the defendant's motion of June 14, 2019, and given the complexity and age of the case, the volume and nature of discovery, and the number of victims, the Court finds that the requested exclusion is appropriate. The Court further finds that the parties have been diligent in their preparation thus far and that the requested continuance would accomplish the purpose of the continuance—that is, to review voluminous discovery, conduct an extensive pretrial defense investigation, and prepare for trial. The Court also finds that, absent this continuance, the defendant would be ill-served by counsel would who be unlikely to be fully prepared for trial.

This Order specifically supplements those findings previously made on June 16, 2019.

Accordingly, considering the factors in 18 U.S.C. § 3161(h)(7)(B), the Court finds pursuant to 18 U.S.C. § 3161(h)(7)(A) that the ends of justice served by granting the Motion outweigh the best interests of the public and the defendant in a speedy trial.

It is therefore ORDERED that the parties' joint motion for exclusion of time pursuant to 18 U.S.C. § 3161(h) from the date of this Order through the January 6, 2020 trial date is GRANTED.

Dated this 26 day of August, 2019.

United States Magistrate Judge
Gordon P. Gallagher
District of Colorado

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

CASE NO. 19-cr-243-MSK-GPG

UNITED STATES OF AMERICA,

Plaintiff,

v.

**MICHAEL TRACY MCFADDEN,**

**Defendant.**

---

**DEFENDANT MICHAEL TRACY MCFADDEN'S SECOND UNOPPOSED MOTION TO VACATE AND RESET TRIAL DATE PURSUANT TO 18 U.S.C. §3161(h)(7)(A)**

---

MR. MICHAEL TRACY MCFADDEN (hereinafter Mr. McFadden), by and through counsel, Timothy P. O'Hara, Assistant Federal Public Defender, respectfully moves this Court for an Order vacating current deadlines, including the motions deadline (currently set for November 4, 2019) and trial date (currently set for January 6, 2020). Undersigned counsel requests that an additional 180 days be excluded from the calculation of time under the Speedy Trial Act (18 U.S.C. §3161) and that the matter be set for trial in the July 2020 term of court with a motions deadline in early May of 2020. In support of this Unopposed Motion, undersigned counsel states as follows:

## I. Procedural Background

1-13) Undersigned counsel seeks to incorporate paragraphs 1-13 of Doc. 19 by reference.

14) On June 16, 2019, Magistrate Judge Gordon P. Gallagher granted in part and denied in part the defendant's Unopposed Motion to Vacate and Reset Trial Date Pursuant to 18 U.S.C. §3161(h)(7)(A). *See* Doc. 20. At that time, the Court excluded all time between the vacated trial date of July 1, 2019, and the date of January 6, 2020, from the speedy trial calculation. *See id.* The Court also set the deadline for the filing of pretrial motions as November 4, 2019. *See id.*

15) According to the parties, 22 days ran on the speedy trial clock and 48 days remain. *See* Doc. 23 at p. 2.

Discovery Tendered by the Government

16) On June 20, 2019, the government tendered the following information to undersigned counsel:[1]

*Written Discovery*

a) 359 pages of police reports and witness interviews from the Grand Junction Police Department;

b) 687 pages of reports from the investigation of the Federal Bureau of Investigation (FBI);

c) 4,209 pages of transcripts from the prior state court proceedings; and

d) 62 pages of reports relating to the criminal history of Mr. McFadden.

*Media Files*

e) 34 total video and audio files from the Grand Junction Police Department Investigation (witness/defendant interviews) totaling approximately **21 hours**; and

f) 24 total video and audio files from the FBI Investigation (witness/defendant interviews) totaling approximately **29 hours**.

[1] The discovery materials have been tendered subject to a Protective Order that was entered by the Court. *See* Doc. 22.

17) Following a Motion from the government [Doc. 24], on August 21, 2019, the government tendered 73 pages of transcribed testimony from the grand jury proceedings along with three video files.

18) On October 8, 2019, the government tendered an additional 2,262 pages of discovery material relating to the prior Grand Junction Police Department Investigation.

Review of Discovery Materials

19) Undersigned counsel's review of the discovery materials is ongoing. Undersigned counsel has yet to review the entirety of the transcripts from the 2015 jury trial as well as a large majority of the media files tendered in discovery.

20) After reviewing a significant amount of the written discovery provided by the government and some information provided by the Colorado Public Defenders' office in Mesa County,[2] undersigned counsel has a good idea of the government's evidence against Mr. McFadden.

21) Pursuant to the terms of the Protective Order [Doc. 22], Mr. McFadden cannot possess the discovery materials unless he is in the presence of defense counsel or members of the defense team. *See* Doc. 22 at p. 3. As a result, undersigned counsel must dedicate extra time to the review of discovery materials with Mr. McFadden to ensure that he is informed of the evidence that the government intends to present against him.

[2] An investigator from undersigned counsel's office has visited the state public defenders' office to review their file. Some information was received at the time of that visit, but a large amount of additional information has been requested and remains outstanding.

Necessary Investigation

22) The conduct alleged in the Indictment spans a wide range of time. *See* Doc. 1. The conduct alleged by the government in Count Five alone occurred between January 7, 2007, and January 3, 2013, a period of approximately six years. *See id.*

23) Additionally, the government has informed undersigned counsel that it will present evidence not only of the alleged crimes in the Indictment, but it also intends to present a significant amount of evidence of other alleged crimes pursuant to Federal Rules of Evidence (FRE) 404(b) and/or 414.

24) Undersigned counsel has identified approximately 35 potential witnesses, many of whom were minors around the time of the alleged criminal conduct. Many of these witnesses have been interviewed on multiple occasions in connection with the prior case or in connection with the present prosecution. It is expected that additional witnesses become necessary once the investigation begins.

25) The witnesses predominately reside in the Grand Junction area, however, at least one group of witnesses now lives in Utah.

26) Undersigned counsel and an investigator must travel in order to interview the witnesses. It was discovered recently that the lead investigator assigned to work on the present case will be out of the office due to health issues. A new investigator was assigned to the case. Undersigned counsel expects the investigation to begin in earnest in December of 2019.

Expert Testimony

27) At the 2015 trial, the prosecution called expert witnesses in the areas of forensic nursing and child abuse disclosure. The defense called an expert witness in the area of child forensic psychology.

28) Undersigned counsel must determine whether expert witnesses will be necessary to Mr. McFadden's defense, and if so, undersigned counsel must consult and contract with such witnesses. Relatedly, undersigned counsel must determine whether the government intends to call expert witnesses at Mr. McFadden's trial, and if so, prepare to defend such testimony, including by procuring the services of a rebuttal expert witness.

Pretrial Motions

29) Undersigned counsel must research the applicability of a number of potential pretrial motions, including, but not limited to:

a) Pre-Indictment Delay,
b) Double Jeopardy,
c) Bill of Particulars,
d) Change of Venue,
e) Response to FRE 404(b)/414, and
f) the admissibility of oral statements of Mr. McFadden.

30) Undersigned counsel contacted the government about the present Motion. The Assistant United States Attorney handling the present matter has no objection to vacating the current dates nor to the requested extension of time.

31) Undersigned counsel advised Mr. McFadden about the requested continuance. Similarly, he has no objection.

**II. Standard for Continuances**

32) Title 18 U.S.C. §3161(h)(7)(A) provides that a Court shall exclude a period of delay from computing the time within which a trial must commence where "the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial." The factors to be considered in such an evaluation are listed at 18 U.S.C. § 3161(h)(7)(B)(i)-(iv).

33) Pertinent factors that apply to an "ends of justice" finding in the present case include:

> (i) Whether the failure to grant such a continuance in the proceeding would be likely to make a continuation of such proceeding impossible, or a result in a miscarriage of justice.
>
> . . . .
>
> (iv) Whether the failure to grant such a continuance in a case which, taken as a whole, is not so unusual or so complex as to fall within clause (ii), would deny the defendant reasonable time to obtain counsel, would unreasonably deny the defendant or the Government continuity of counsel, or would deny counsel for the defendant or the attorney for the Government the reasonable time necessary for the effective preparation, taking into account the exercise of due diligence.

*See* 18 U.S.C. §1361(h)(7)(B)(Westlaw 2016). *See also*, *United States v. Toombs*, 574 F. 3d 1262, 1268-69 (10th Cir. 2009).

34) In the similar context of addressing trial continuances, the Tenth Circuit has set forth four factors that the Court should consider. *See United States v. West*, 828 F.2d 1468, 1470 (10th Cir. 1987). According to the Tenth Circuit, the Court should consider: (1) the diligence of the party requesting the continuance, (2) the likelihood that the continuance, if granted, would accomplish the purpose underlying the request for continuance, (3) the inconvenience to the opposing party, its witnesses, and the court

resulting from the continuance, and (4) the need asserted for the continuance and the harm that could be suffered as a result of the court's denial of the continuance. *See id.* No single factor is determinative. *See id.*

35) The decision to grant an "ends of justice" continuance is within the sound discretion of the Court, and is reviewed under an abuse of discretion standard. *See Toombs*, 574 F. 3d at 1262. "Adequate preparation time is a clearly permissible reason for granting a continuance and tolling the Speedy Trial Act." *United States v. Gonzales*, 137 F. 3d 1431, 1435 (10th Cir. 1998). The Supreme Court has recognized that "subsection (h)(7) expressly accounts for the possibility that a district court will need to delay a trial to give the parties adequate preparation time" to ensure that the ends of justice are met, and that "subsection (h)(7) provides 'much of the Act's flexibility.'" *Bloate v. United States*, 130 S. Ct. 1345 (2010).

**III. Argument**

36) This case meets the criteria set forth in both 18 U.S.C. § 3161(h)(7) and *West*. Accordingly, undersigned counsel requests that this Court vacate the current trial date and exclude an additional 180 days from the speedy trial calculation.

37) At this time, undersigned counsel is not requesting a finding of complexity under subsections (h)(7)(B)(ii), but rather, is requesting a determination that the ends of justice will be served by the granting of the requested continuance because "the failure to grant such a continuance in the proceeding would . . . result in a miscarriage of justice" and "would deny counsel for the defendant . . . reasonable time necessary for effective preparation." 18 U.S.C. §3161(h)(7)(B)(iv). While in the Discovery Conference Memorandum and Order [Doc. 13], the parties did not estimate that the document

disclosure would be “extensive,” the amount of information tendered by the government is substantial nonetheless, surpassing 7,500 pages of written material and 50 hours of audio/video footage.

38) Undersigned counsel will require an additional 180 days to review the discovery materials tendered by the government, plan the necessary pretrial investigation, research the relevant legal issues, prepare pretrial motions, consult with Mr. McFadden about his options, and prepare for trial.

39) The failure to grant the requested continuance on behalf of Mr. McFadden would result in a miscarriage of justice in his case and would also deny undersigned counsel the reasonable time necessary for effective preparation as discussed in 18 U.S.C. §3161(h)(7)(B)(i) and (iv).

40) Finally, a speedy trial extension of an additional 180 days would not offend the standard set forth by the Tenth Circuit in the *West* decision.

41) Thus far, undersigned counsel has diligently pursued the defense of this case, by reviewing discovery materials, forming an investigation plan, consulting with Mr. McFadden’s prior attorneys from the state prosecution, conducting legal research about the potential motions, and meeting with Mr. McFadden on multiple occasions. However, the nature and facts of the case, including but not limited to the amount of discovery (including a large quantity of audio/video footage), the lengthy trial transcripts, the breadth and location of the expected investigation, the anticipated legal research, and the consultation with Mr. McFadden that are required are such that no amount of diligent work can insure effective assistance of counsel prior to the current trial date as contemplated by the current speedy trial time-frame.

42) Undersigned counsel believes that the extension would serve the requested purpose and allow undersigned counsel to be ready to file pretrial motions and to prepare for trial.

WHEREFORE, Mr. McFadden respectfully requests that this Court issue an Order vacating current deadlines and the trial date, excluding an additional 180 days from the speedy trial calculation, and setting a motions deadline for the beginning of May 2020 and setting the matter for trial in the July term of court.

Respectfully submitted,

VIRGINIA L. GRADY
Federal Public Defender

s/ Timothy P. O'Hara
TIMOTHY P. O'HARA
Assistant Federal Public Defender
633 Seventeenth Street, Suite 1000
Denver, Colorado 80202
Telephone: (303) 294-7002
FAX: (303) 294-1192
Email: Timothy_OHara@fd.org
Attorney for Defendant

**CERTIFICATE OF SERVICE**

I hereby certify that on November 4, 2019, I electronically filed the foregoing

**DEFENDANT MICHAEL MCFADDEN'S UNOPPOSED SECOND MOTION TO VACATE AND RESET TRIAL DATE PURSUANT TO 18 U.S.C. §3161(h)(7)(A)**

with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

Jeremy Chaffin
Assistant United States Attorney
Jeremy.Chaffin@usdoj.gov

Andrea Surrat
Assistant United States Attorney
Andrea.Surrat@usdoj.gov

s/ Timothy P. O'Hara
TIMOTHY P. O'HARA
Assistant Federal Public Defender
633 Seventeenth Street, Suite 1000
Denver, Colorado 80202
Telephone: (303) 294-7002
FAX: (303) 294-1192
Email: Timothy_OHara@fd.org
Attorney for Defendant

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 19-cr-00243-MSK-GPG

UNITED STATES OF AMERICA,

Plaintiff,

v.

1. MICHAEL TRACY MCFADDEN,

Defendant.

---

**PARTIES' JOINT POSITION ON THE SPEEDY TRIAL CLOCK**

---

The UNITED STATES OF AMERICA, by and through Jason R. Dunn, United States Attorney for the District of Colorado, and Andrea Surratt and Jeremy Chaffin, Assistant United States Attorneys, and Michael Tracy McFadden, by and through his attorney, Timothy O'Hara respectfully submit this speedy trial calculation in response to the Court's November 6, 2019 Order. (Dkt #29).

The speedy trial clock began running on May 22, 2019, the date of the defendant's initial appearance. (Dkt #5). The original 70-day date was therefore July 20, 2019. Twenty-two days had run off the speedy trial clock at the time that the defendant filed his first motion to continue on June 14, 2019 (Dkt #19), at which point the clock was tolled by the filing of the motion. *See* 18 U.S.C. § 3161(h)(1)(D). On June 16, 2019, the Court granted the speedy trial portion of the defendant's motion, tolling the clock from July 1, 2019 until January 6, 2020 and resetting the trial date to January 6, 2020. (Dkt #20). An additional 14 days ran off the clock between June 16, 2019 and June 30, 2019.

On August 22, 2019, though time had already been excluded through January 6, 2020, out of an abundance of caution, the parties filed a joint motion for exclusion of time through the January 6, 2020 trial date. (Dkt #26). The motion was granted on August 26, 2019. (Dkt #27). As of August 26, 2019, 34 days remained on the speedy trial clock.

On November 4, 2019, the defendant filed an unopposed motion to vacate and reset the January 6, 2020 trial date and exclude 180 days from the speedy trial clock. (Dkt #28). That motion was granted on November 6, 2019, and trial was reset for June 1, 2020, with all time until June 1, 2020 excluded from the speedy trial clock. (Dkt #29).

Accordingly, as of the filing of this notice, 34 days still remain on the speedy trial clock.

Dated this 15th day of November, 2019.

JASON R. DUNN
United States Attorney

By: */s Andrea Surratt*
Andrea Surratt & Jeremy Chaffin
Assistant U.S. Attorneys
United States Attorney's Office
1801 California Street, #1800
Denver, Colorado 80101
Tel: (303) 454-0100
Email: andrea.surratt@usdoj.gov

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

CASE NO. 19-cr-243-MSK-GPG

UNITED STATES OF AMERICA,

Plaintiff,

v.

**MICHAEL TRACY MCFADDEN,**

**Defendant.**

---

**DEFENDANT MICHAEL TRACY MCFADDEN'S THIRD UNOPPOSED MOTION TO VACATE AND RESET TRIAL DATE PURSUANT TO 18 U.S.C. §3161(h)(7)(A)**

---

MR. MICHAEL TRACY MCFADDEN (hereinafter Mr. McFadden), by and through counsel, Timothy P. O'Hara, Assistant Federal Public Defender, respectfully moves this Court for an Order vacating current deadlines, including the motions deadline (currently set for April 6, 2020) and trial date (currently set for June 1, 2020). Undersigned counsel requests that an additional 150 days be excluded from the calculation of time under the Speedy Trial Act (18 U.S.C. §3161) and that the matter be set for trial in the November 2020 term of court with a motions deadline in early September of 2020. In support of this Unopposed Motion, undersigned counsel states as follows:

## I. Procedural Background

1-13) Undersigned counsel seeks to incorporate paragraphs 1-13 of Doc. 19 by reference.

14-15) Undersigned counsel seeks to incorporate paragraphs 14-15 of Doc.

28 by reference.

Discovery Tendered by the Government

16) On June 20, 2019, the government tendered the following information to undersigned counsel:[1]

*Written Discovery*

a) 359 pages of police reports and witness interviews from the Grand Junction Police Department;

b) 687 pages of reports from the investigation of the Federal Bureau of Investigation (FBI);

c) 4,209 pages of transcripts from the prior state court proceedings; and

d) 62 pages of reports relating to the criminal history of Mr. McFadden.

*Media Files*

e) 34 total video and audio files from the Grand Junction Police Department Investigation (witness/defendant interviews) totaling approximately **21 hours**; and

f) 24 total video and audio files from the FBI Investigation (witness/defendant interviews) totaling approximately **29 hours**.

17) Following a Motion from the government [Doc. 24], on August 21, 2019, the government tendered 73 pages of transcribed testimony from the grand jury proceedings along with three video files.

18) On October 8, 2019, the government tendered an additional 2,262 pages of discovery material relating to the prior Grand Junction Police Department Investigation.

19) On November 21, 2019, the government tendered an additional 1,125 pages of transcripts of some of the recorded interviews.

[1] The discovery materials have been tendered subject to a Protective Order that was entered by the Court. *See* Doc. 22.

20) To date, undersigned counsel has received the following discovery from the government:

a) 5,335 pages of transcripts,

b) 3,308 pages of police reports (combined between Grand Junction Police Department and Federal Bureau of Investigation), and

c) approximately 50 hours of video interview footage.

21) Undersigned counsel also has received an extensive file from the Colorado State Public Defender's Office, the office that represented Mr. McFadden in the related state matters.

Review of Discovery Materials

22) Undersigned counsel's review of the discovery materials is ongoing. Undersigned counsel has made progress on each of the three areas of discovery: transcripts, police reports, and video interview footage.

23) Review of the video interviews has been extremely time consuming. While the government has provided transcripts of some of the witness interviews, a large number of the interviews are not transcribed. Due to variations in sound quality, reviewing some videos has taken nearly twice as long as listening to the interviews straight through.

24) Pursuant to the terms of the Protective Order [Doc. 22], Mr. McFadden cannot possess the discovery materials unless he is in the presence of defense counsel or members of the defense team. *See* Doc. 22 at p. 3. As a result, undersigned counsel must dedicate extra time to the review of discovery materials with Mr. McFadden to ensure that he is informed of the evidence that the government intends to

present against him. At this time, as will be explained below, undersigned counsel and staff cannot visit Mr. McFadden at the Clear Creek County Jail. As a result, for the foreseeable future, undersigned counsel cannot provide access to discovery materials to Mr. McFadden.

Necessary Investigation

25) As described in Doc. 28, the conduct alleged in the Indictment spans a wide range of time. *See* Doc. 1. The conduct alleged by the government in Count Five alone occurred between January 7, 2007, and January 3, 2013, a period spanning approximately six years. *See id.*

26) Additionally, the government has informed undersigned counsel that it will present evidence not only of the alleged crimes in the Indictment, but it also intends to present a significant amount of evidence of other alleged crimes pursuant to Federal Rules of Evidence (FRE) 404(b) and/or 414.

27) Undersigned counsel has identified approximately 40 potential witnesses, many of whom were minors around the time of the alleged criminal conduct. Many of these witnesses have been interviewed on multiple occasions in connection with the prior case or in connection with the present prosecution. It is expected that additional witnesses will become known as the investigation progresses.

28) The witnesses predominately reside in or around the Grand Junction area, however, at least one group of witnesses now lives in Utah.

29) On January 14, 2020, undersigned counsel and an investigator traveled to Grand Junction in order to visit various locations relevant to the case and to conduct witness interviews.

30) It will be necessary for undersigned counsel and an investigator to travel at least two additional times in order to conclude the investigation.

Meetings with Mr. McFadden

31) Since the last Unopposed Motion [Doc. 28], undersigned counsel has both traveled to Clear Creek County Jail to meet with Mr. McFadden and spoken with Mr. McFadden by phone to make sure that he is informed about the status of the case and the discovery provided by the government.

Expert Testimony

32) At the 2015 trial, both the prosecution and defense called expert witnesses.

33) Undersigned counsel is considering consultation with expert witnesses in a number of areas.

34) For example, the most recent conduct alleged in the Indictment occurred in 2013, now more than seven years ago.  Since a significant period of time has passed since the alleged conduct occurred, undersigned counsel must consult with an expert to investigate how the passage of time impacts an individual's memory.

35) Undersigned counsel must continue to determine whether expert witnesses will be necessary to Mr. McFadden's defense, and if so, undersigned counsel must consult and contract with such witnesses.  Relatedly, undersigned counsel must

determine whether the government intends to call expert witnesses at Mr. McFadden's

trial, and if so, prepare to defend such testimony, including by procuring the services of

a rebuttal expert witness.

Pretrial Motions

36) Undersigned counsel has requested the assistance of a lawyer specializing

in appellate issues in the Federal Public Defender's Office to assist with general legal

research and the preparation of pretrial motions, including, but not limited to the areas

of:

a) Pre-Indictment Delay,
b) Double Jeopardy,
c) Bill of Particulars,
d) Change of Venue,
e) Response to FRE 404(b)/414,
f) Motions *in Limine*,
g) Motions to Sever Counts, and
h) The admissibility of oral statements of Mr. McFadden.

COVID-19 (Coronavirus) Pandemic

37)      On March 13, 2020, in response to the global pandemic caused by the

spread of COVID-19 (coronavirus), the Chief Judge of the United States District Court

for the District of Colorado issued an General Order that continued all trials scheduled

to commence on or before April 3, 2020, and provided notice to litigants, attorneys, and

the public that the Court's judicial officers will endeavor to reschedule hearings or

convert hearings to telephonic appearances.  *See* District Court General Order 2020-1.

The Chief Judge subsequently extended the order through May 1, 2020.  See District

Court General Order 2020-3.

38) The recent pandemic already has impacted and will continue to have a significant impact on undersigned counsel's ability to defend the present case in two main areas. First, undersigned counsel is not able to visit personally with Mr. McFadden in order to discuss case strategy and review discovery. Since the discovery is covered by a Protective Order, the materials can only be viewed by Mr. McFadden in the presence of either defense counsel or members of the defense team. As a result, for the time being, Mr. McFadden is cut off from the ability to review discovery materials. Second, due to the Colorado governor's stay-at-home order, travel and other investigation-related tasks are limited. The investigator's ability to conduct in-person interviews, the preferred method of interviewing key witnesses, is similarly limited. It is not known when travel restrictions will end and when normal human interaction will resume.

<u>Consultation</u>

39) Undersigned counsel contacted the government about the present Motion. The Assistant United States Attorney handling the present matter has no objection to vacating the current dates nor to the requested extension of time.

40) Undersigned counsel advised Mr. McFadden about the requested continuance. Similarly, he has no objection.

**II. Standard for Continuances**

41) Title 18 U.S.C. §3161(h)(7)(A) provides that a Court shall exclude a period of delay from computing the time within which a trial must commence where "the ends of justice served by taking such action outweigh the best interest of the public and the

defendant in a speedy trial."  The factors to be considered in such an evaluation are listed at 18 U.S.C. § 3161(h)(7)(B)(i)-(iv).

42)     Pertinent factors that apply to an "ends of justice" finding in the present case include:

> (i) Whether the failure to grant such a continuance in the proceeding would be likely to make a continuation of such proceeding impossible, or a result in a miscarriage of justice.
>
> . . . .
>
> (iv) Whether the failure to grant such a continuance in a case which, taken as a whole, is not so unusual or so complex as to fall within clause (ii), would deny the defendant reasonable time to obtain counsel, would unreasonably deny the defendant or the Government continuity of counsel, or would deny counsel for the defendant or the attorney for the Government the reasonable time necessary for the effective preparation, taking into account the exercise of due diligence.

*See* 18 U.S.C. §1361(h)(7)(B)(Westlaw 2016).  *See also*, *United States v. Toombs*, 574 F. 3d 1262, 1268-69 (10th Cir. 2009).

43)     In the similar context of addressing trial continuances, the Tenth Circuit has set forth four factors that the Court should consider.  *See United States v. West*, 828 F.2d 1468, 1470 (10th Cir. 1987).  According to the Tenth Circuit, the Court should consider: (1) the diligence of the party requesting the continuance, (2) the likelihood that the continuance, if granted, would accomplish the purpose underlying the request for continuance, (3) the inconvenience to the opposing party, its witnesses, and the court resulting from the continuance, and (4) the need asserted for the continuance and the harm that could be suffered as a result of the court's denial of the continuance.  *See id.* No single factor is determinative.  *See id.*

44)     The decision to grant an "ends of justice" continuance is within the sound discretion of the Court, and is reviewed under an abuse of discretion standard.  *See*

*Toombs*, 574 F. 3d at 1262. "Adequate preparation time is a clearly permissible reason for granting a continuance and tolling the Speedy Trial Act." *United States v. Gonzales*, 137 F. 3d 1431, 1435 (10th Cir. 1998). The Supreme Court has recognized that "subsection (h)(7) expressly accounts for the possibility that a district court will need to delay a trial to give the parties adequate preparation time" to ensure that the ends of justice are met, and that "subsection (h)(7) provides 'much of the Act's flexibility.'" *Bloate v. United States*, 130 S. Ct. 1345 (2010).

**III. Argument**

45) This case meets the criteria set forth in both 18 U.S.C. § 3161(h)(7) and *West*. Accordingly, undersigned counsel requests that this Court vacate the current trial date and exclude an additional 150 days from the speedy trial calculation.

46) At this time, undersigned counsel is not requesting a finding of complexity under subsections (h)(7)(B)(ii), but rather, is requesting a determination that the ends of justice will be served by the granting of the requested continuance because "the failure to grant such a continuance in the proceeding would . . . result in a miscarriage of justice" and "would deny counsel for the defendant . . . reasonable time necessary for effective preparation." 18 U.S.C. §3161(h)(7)(B)(iv). In the Discovery Conference Memorandum and Order [Doc. 13], the parties did not estimate that the document disclosure would be "extensive," however, the amount of information tendered by the government is substantial nonetheless, surpassing 8,600 pages of written material and 50 hours of audio/video footage.

47) Undersigned counsel will require an additional 150 days to review the discovery materials tendered by the government, review the materials with Mr.

McFadden in compliance with the Protective Order, conduct the necessary pretrial investigation, research the relevant legal issues, prepare pretrial motions, consult with Mr. McFadden about his options, and prepare for trial.

48) The failure to grant the requested continuance on behalf of Mr. McFadden would result in a miscarriage of justice and would also deny undersigned counsel the reasonable time necessary for effective preparation as discussed in 18 U.S.C. §3161(h)(7)(B)(i) and (iv).

49) Finally, a speedy trial extension of an additional 150 days would not offend the standard set forth by the Tenth Circuit in the *West* decision.

50) Thus far, undersigned counsel has diligently pursued the defense of Mr. McFadden's case, by reviewing discovery materials, including reading hundreds of pages of transcripts and watching/listening to hours of witness interviews, continuing to consult with Mr. McFadden's prior attorneys from the state prosecution, conducting legal research about the potential motions, and speaking with Mr. McFadden on multiple occasions. However, the nature and facts of the case, including but not limited to the amount of discovery (including a large quantity of audio/video footage), the lengthy trial transcripts, the breadth and location of the expected investigation, the anticipated legal research, and the consultation with Mr. McFadden that are required are such that no amount of diligent work can insure effective assistance of counsel prior to the current trial date as contemplated by the current speedy trial time-frame. Additionally, as described above, the impact of COVID-19 will limit undersigned counsel's ability to provide a vigorous defense for Mr. McFadden.

51) Undersigned counsel believes that the requested extension would serve the stated purpose and allow undersigned counsel to be ready to file pretrial motions and to prepare for trial.

WHEREFORE, Mr. McFadden respectfully requests that this Court issue an Order vacating current deadlines and the trial date, excluding an additional 150 days from the speedy trial calculation, and setting a motions deadline for the beginning of September 2020 and setting the matter for trial in the November term of court.

Respectfully submitted,

VIRGINIA L. GRADY
Federal Public Defender

s/ Timothy P. O'Hara
TIMOTHY P. O'HARA
Assistant Federal Public Defender
633 Seventeenth Street, Suite 1000
Denver, Colorado 80202
Telephone: (303) 294-7002
FAX: (303) 294-1192
Email: Timothy_OHara@fd.org
Attorney for Defendant

Case 1:19-cr-00243-CMA-GPG Document 131 Filed 04/06/20 Page 12 of 12

**CERTIFICATE OF SERVICE**

I hereby certify that on April 6, 2020, I electronically filed the foregoing

**DEFENDANT MICHAEL MCFADDEN'S UNOPPOSED THIRD MOTION TO VACATE AND RESET TRIAL DATE PURSUANT TO 18 U.S.C. §3161(h)(7)(A)**

with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

Jeremy Chaffin
Assistant United States Attorney
Jeremy.Chaffin@usdoj.gov

Andrea Surrat
Assistant United States Attorney
Andrea.Surrat@usdoj.gov

s/ Timothy P. O'Hara

TIMOTHY P. O'HARA
Assistant Federal Public Defender
633 Seventeenth Street, Suite 1000
Denver, Colorado 80202
Telephone: (303) 294-7002
FAX: (303) 294-1192
Email: Timothy_OHara@fd.org
Attorney for Defendant

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Criminal Action No. 19-cr-00243-MSK-GPG

UNITED STATES OF AMERICA,

Plaintiff,

v.

**MICHAEL TRACY McFADDEN,**

**Defendant.**

---

**UNOPPOSED MOTION TO AMEND THE PROTECTIVE ORDER**

---

MR. MICHAEL TRACY MCFADDEN, by and through his attorney, Timothy P. O'Hara, Assistant Federal Public Defender, hereby moves this Court to amend the terms of the Protective Order [Doc. 22] issued in the present case on June 17, 2019.

1. On June 17, 2019, the government moved for a Protective Order governing the discovery and filings in the present case. *See* Doc. 21. Specifically, the government requested that the following restrictions apply to the discovery materials tendered by the government:

> (b) All documents that disclose the name or any other information concerning a minor, as well as any child victims or witnesses that have since become adults, shall be kept in a secure place to which no person who does not have reason to know their contents has access, pursuant to and in compliance with 18 U.S.C. § 3509(d)(1)(A)(i);
>
> (c) All documents that disclose the name or any other information concerning a minor, as well as child victims or witnesses who have since become adults, and the information in such documents shall be disclosed only to persons who, by reason of their participation in the proceeding, have reason to know such information, pursuant to and in compliance with 18 U.S.C. § 3509(d)(1)(A)(ii);

> (1) The Government will provide defense counsel with a copy of discovery in this case. The discovery may be viewed only by defense counsel, the Defendant, and members of the defense team, including any defense attorneys, investigators, and staff from the Office of the Federal Public Defender, as the Office of the Federal Public Defender determines necessary for the purpose of preparing a defense in this particular case.
>
> (2) The discovery materials, including those that disclose the name or any other information concerning a minor and child victims or witnesses who have since become adults, as well as any depictions of such individuals, shall be provided to the Defendant under the circumstances described below. The Defendant may be allowed to view the discovery materials referenced in this paragraph, but only while in the direct presence of defense counsel or members of the defense team, including any defense attorneys, investigators, or staff from the Office of the Federal Public Defender, as the Office of the Federal Public Defender determines necessary for the purpose of preparing a defense in this particular case.

Undersigned counsel had no objection to the aforementioned restrictions. *See* Doc. 21 (Motion was unopposed.)

2. Also on June 17, 2019, the Honorable United States Magistrate Judge Gordon P. Gallagher granted the government's request. *See* Doc. 22.

3. To date, undersigned counsel has abided by the requirements of the Protective Order. However, due the coronavirus pandemic (COVID-19), all person-to-person visits between inmates and members of the general public have been discontinued. *See* Clear Creek County Jail website (https://www.co.clear-creek.co.us/DocumentCenter/View/10485/INMATE-VISITATION-RESTRICTIONS) (last visited April 28, 2020). As a result, undersigned counsel and members of the defense team are no longer allowed to visit with Mr. McFadden at the Clear Creek County Jail. While phone and video conferencing options are available, these options would not allow for Mr. McFadden to review the discovery materials that are in the possession of undersigned counsel as viewing documents and videos is impracticable.

4.   Therefore, undersigned counsel requests to amend the terms of the previously entered Protective Order to allow undersigned counsel to send discovery materials to the Clear Creek County Jail.  The materials will be received and stored by Clear Creek County Jail Deputies in a locked storage area.  Mr. McFadden will be allowed to access and review the discovery materials on a computer provided by the Clear Creek County Jail.  When he is finished reviewing the discovery materials, the materials will be returned to the locked storage area.  Mr. McFadden may take notes while reviewing the discovery but all notes must remain with the discovery materials.  A copy of this Order will remain with the discovery materials.

5.   Undersigned counsel has consulted with counsel for the government.  The government does not object to the entry of the amended protective order.

WHEREFORE, undersigned counsel respectfully requests the Court enter an amended protective order consistent with the Proposed Amended Order, which is attached.

Respectfully submitted,

VIRGINIA L. GRADY
Federal Public Defender

*s/ Timothy P. O'Hara*
TIMOTHY P. O'Hara
Assistant Federal Public Defender
633 17th St. – Suite 1000
Denver, CO 80202
Tel: (303) 294-7002
Fax: (303) 294-1182
E-mail: Timothy_OHara@fd.org
Attorney for the Defendant

Case 1:19-cr-00243-CMA-GPG Document 133 Filed 05/04/20 Page 4 of 4

**CERTIFICATE OF SERVICE**

I hereby certify that on this May 4, 2020, I electronically filed the foregoing **UNOPPOSED MOTION TO AMEND THE PROTECTIVE ORDER** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following e-mail address:

Jeremy Chaffin
Assistant U.S. Attorney
Email: Jeremy.Chaffin@usdoj.gov

Andrea Surratt
Assistant U.S. Attorney
Email: Andrea.Surratt@usdoj.gov

s/ Timothy P. O'Hara
TIMOTHY P. O'HARA
Assistant Federal Public Defender
633 Seventeenth Street, Suite 1000
Denver, Colorado 80202
Telephone: (303) 294-7002
FAX: (303) 294-1192
Email: Timothy_OHara@fd.org
Attorney for Defendant

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Criminal Action No. 19-cr-00243-MSK-GPG

UNITED STATES OF AMERICA,

Plaintiff,

v.

**MICHAEL TRACY McFADDEN,**

**Defendant.**

---

**PROPOSED AMENDED PROTECTIVE ORDER**

---

THIS MATTER coming before the Court upon motion of the Defendant to enter an amended protective order enters the following findings and Order:

1. Due to the nature of the charges, the privacy protection measures set forth below and afforded under the Child Victims' and Child Witnesses' Rights Act (the "Act"), 18 U.S.C. § 3509, apply in this case.

2. The Act affords certain protections to child victims and child witnesses, including requiring the parties and other personnel to maintain the confidentiality of any documents that disclose the name or any other information concerning a child, maintain the confidentiality of the child's identity in all public filings and court proceedings, and file under seal without the necessity of a Court order any filings that disclose the identity or other personal information of the child.

3. Due to the nature of the case, the Court finds that there is a significant possibility that disclosure to the public of the names or other information concerning any child

Case 1:19-cr-00243-WJM-GPG Document 33-1 Filed 05/04/20 Page 2 of 4

victims or witnesses in this case, as well as child victims or witnesses who have since become adults, would be detrimental.

4. The Defendant does not object to the entry of a protective order, as amended herein. Similarly, the government does not object to the amended protective order.

5. Good cause appearing, the Court hereby orders that:

(a) All persons acting in this case in a capacity described in 18 U.S.C. § 3509(d)(1)(B) shall, at trial and during any and all pre-trial and post-trial proceedings in this case, refer to any involved child victims or witnesses, including child victims or witnesses that have since become adults, by initials or a pseudonym for each such individual;

(b) All documents that disclose the name or any other information concerning a minor, as well as any child victims or witnesses that have since become adults, shall be kept in a secure place to which no person who does not have reason to know their contents has access, pursuant to and in compliance with 18 U.S.C. § 3509(d)(1)(A)(i);

(c) All documents that disclose the name or any other information concerning a minor, as well as child victims or witnesses who have since become adults, and the information in such documents shall be disclosed only to persons who, by reason of their participation in the proceeding, have reason to know such information, pursuant to and in compliance with 18 U.S.C. § 3509(d)(1)(A)(ii);

(1) The Government will provide defense counsel with a copy of discovery in this case. The discovery may be viewed only by defense counsel, the Defendant, and members of the defense team, including any defense attorneys, investigators, and staff from the Office of the Federal

Public Defender, as the Office of the Federal Public Defender determines necessary for the purpose of preparing a defense in this particular case.

(2) The discovery materials, including those that disclose the name or any other information concerning a minor and child victims or witnesses who have since become adults, as well as any depictions of such individuals, shall be provided to the Defendant under the circumstances described below. The Defendant may be allowed to view the discovery materials referenced in this paragraph in two ways: 1), while in the direct presence of defense counsel or members of the defense team, including any defense attorneys, investigators, or staff from the Office of the Federal Public Defender, as the Office of the Federal Public Defender determines necessary for the purpose of preparing a defense in this particular case, or 2) in a designated discovery viewing area of the Clear Creek County Jail. If Mr. McFadden views the discovery materials at the Clear Creek County Jail, after reviewing the information, the materials (including notes) must remain in the locked storage area.

(d) All documents to be filed in Court that disclose the name or other information concerning a minor, as well as child victims or witnesses who have since become adults, shall be filed under restriction without necessity of obtaining a Court order; and

(e) Defense counsel will take reasonable measures to ensure that counsel and members of the defense team safeguard the above-referenced information.

BY THE COURT:

____________________________________

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Criminal Action No. 19-cr-00243-MSK-GPG

UNITED STATES OF AMERICA,

Plaintiff,

v.

**MICHAEL TRACY McFADDEN,**

**Defendant.**

---

**AMENDED PROTECTIVE ORDER**

---

THIS MATTER coming before the Court upon motion of the Defendant to enter an amended protective order enters the following findings and Order:

1. Due to the nature of the charges, the privacy protection measures set forth below and afforded under the Child Victims' and Child Witnesses' Rights Act (the "Act"), 18 U.S.C. § 3509, apply in this case.

2. The Act affords certain protections to child victims and child witnesses, including requiring the parties and other personnel to maintain the confidentiality of any documents that disclose the name or any other information concerning a child, maintain the confidentiality of the child's identity in all public filings and court proceedings, and file under seal without the necessity of a Court order any filings that disclose the identity or other personal information of the child.

3. Due to the nature of the case, the Court finds that there is a significant possibility that disclosure to the public of the names or other information concerning any child

victims or witnesses in this case, as well as child victims or witnesses who have since become adults, would be detrimental.

4. The Defendant does not object to the entry of a protective order, as amended herein. Similarly, the government does not object to the amended protective order.

5. Good cause appearing, the Court hereby orders that:

(a) All persons acting in this case in a capacity described in 18 U.S.C. § 3509(d)(1)(B) shall, at trial and during any and all pre-trial and post-trial proceedings in this case, refer to any involved child victims or witnesses, including child victims or witnesses that have since become adults, by initials or a pseudonym for each such individual;

(b) All documents that disclose the name or any other information concerning a minor, as well as any child victims or witnesses that have since become adults, shall be kept in a secure place to which no person who does not have reason to know their contents has access, pursuant to and in compliance with 18 U.S.C. § 3509(d)(1)(A)(i);

(c) All documents that disclose the name or any other information concerning a minor, as well as child victims or witnesses who have since become adults, and the information in such documents shall be disclosed only to persons who, by reason of their participation in the proceeding, have reason to know such information, pursuant to and in compliance with 18 U.S.C. § 3509(d)(1)(A)(ii);

(1) The Government will provide defense counsel with a copy of discovery in this case. The discovery may be viewed only by defense counsel, the Defendant, and members of the defense team, including any defense attorneys, investigators, and staff from the Office of the Federal

Public Defender, as the Office of the Federal Public Defender determines necessary for the purpose of preparing a defense in this particular case.

(2) The discovery materials, including those that disclose the name or any other information concerning a minor and child victims or witnesses who have since become adults, as well as any depictions of such individuals, shall be provided to the Defendant under the circumstances described below. The Defendant may be allowed to view the discovery materials referenced in this paragraph in two ways: 1), while in the direct presence of defense counsel or members of the defense team, including any defense attorneys, investigators, or staff from the Office of the Federal Public Defender, as the Office of the Federal Public Defender determines necessary for the purpose of preparing a defense in this particular case, or 2) in a designated discovery viewing area of the Clear Creek County Jail. If Mr. McFadden views the discovery materials at the Clear Creek County Jail, after reviewing the information, the materials (including notes) must remain in the locked storage area.

(d) All documents to be filed in Court that disclose the name or other information concerning a minor, as well as child victims or witnesses who have since become adults, shall be filed under restriction without necessity of obtaining a Court order; and

Case 1:23-cr-00243-GPG Document 34 Filed 06/26/23 Page 4 of 4

(e) Defense counsel will take reasonable measures to ensure that counsel and members of the defense team safeguard the above-referenced information.

By the Court:

Gordon P. Gallagher
United States Magistrate Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

CASE NO. 19-cr-243-CMA-GPG

UNITED STATES OF AMERICA,

Plaintiff,

v.

**MICHAEL TRACY MCFADDEN,**

**Defendant.**

---

**DEFENDANT MICHAEL TRACY MCFADDEN'S FOURTH UNOPPOSED MOTION TO VACATE AND RESET TRIAL DATE PURSUANT TO 18 U.S.C. §3161(h)(7)(A)**

---

MR. MICHAEL TRACY MCFADDEN (hereinafter Mr. McFadden), by and through counsel, Timothy P. O'Hara, Assistant Federal Public Defender, respectfully moves this Court for an Order vacating current deadlines, including the motions deadline (currently set for September 8, 2020) and trial date (currently set for November 2, 2020). Undersigned counsel requests that an additional five months be excluded from the calculation of time under the Speedy Trial Act (18 U.S.C. §3161) and that the matter be set for trial in April 2021 with a motions deadline in early February of 2021. The government does not oppose the present motion.

**I. Procedural Background**

1) On May 17, 2019, the government filed a five count Indictment against Mr. McFadden alleging that he has violated two sections of the United States Criminal Code, 18 U.S.C. §§ 2241(c) and 2423(a). *See* Doc. 1.

2) On May 21, 2019, Mr. McFadden was arrested in connection with the federal charges. *See* Doc. 8.

3) On May 22, 2019, Mr. McFadden appeared before the Honorable Magistrate Judge Gordon P. Gallagher for an Initial Appearance. *See* Doc. 5. At that time, the Court appointed counsel for Mr. McFadden. The Court also continued the matter until May 31, 2019, for an Arraignment, Detention Hearing, and Discovery Conference. *See id.*

4) On May 23, 2019, undersigned counsel filed a Notice of Appearance. *See* Doc. 4.

5) On May 31, 2019, the parties and Mr. McFadden appeared before Magistrate Judge Gallagher.[1] *See* Doc. 11. At that time, Mr. McFadden entered a plea of Not Guilty to the charges in the Indictment [Doc. 1]. *See id.* Also at that hearing, the government sought to detain Mr. McFadden. The defense did not contest detention, but reserved the right to contest Mr. McFadden's detention later. *See id.* At that time, Magistrate Judge Gallagher set the present matter for a Jury Trial to begin on July 1, 2019. At undersigned counsel's request the Court set June 14, 2019, as the date by which a Motion to Continue the Trial should be filed. *See* Doc. 14 (Court minutes with corrected date).

6) On June 14, 2019, undersigned counsel filed Doc. 19, Defendant Michael Tracy McFadden's Unopposed Motion to Vacate and Reset Trial Date Pursuant to 18 U.S.C. §3161(h)(7)(A).

---

[1] Undersigned counsel appeared by VTC from Denver.

7) On June 16, 2019, Magistrate Judge Gordon P. Gallagher granted in part and denied in part the defendant's Unopposed Motion to Vacate and Reset Trial Date Pursuant to 18 U.S.C. §3161(h)(7)(A). *See* Doc. 20. At that time, the Court excluded all time between the vacated trial date of July 1, 2019, and the date of January 6, 2020, from the speedy trial calculation. *See id.* The Court also set the deadline for the filing of pretrial motions as November 4, 2019. *See id.*

Discovery Tendered by the Government

8) On June 20, 2019, the government tendered the following information to undersigned counsel:[2]

*Written Discovery*

a) 359 pages of police reports and witness interviews from the Grand Junction Police Department;

b) 687 pages of reports from the investigation of the Federal Bureau of Investigation (FBI);

c) 4,209 pages of transcripts from the prior state court proceedings; and

d) 62 pages of reports relating to the criminal history of Mr. McFadden.

*Media Files*

e) 34 total video and audio files from the Grand Junction Police Department Investigation (witness/defendant interviews) totaling approximately **21 hours**; and

f) 24 total video and audio files from the FBI Investigation (witness/defendant interviews) totaling approximately **29 hours**.

---

[2] The discovery materials were tendered subject to a Protective Order that was entered by the Court. *See* Doc. 22.

9) Following a Motion from the government [Doc. 24], on August 21, 2019, the government tendered 73 pages of transcribed testimony from the grand jury proceedings along with three video files.

10) On October 8, 2019, the government tendered an additional 2,262 pages of discovery material relating to the prior Grand Junction Police Department Investigation.

11) On November 4, 2019, undersigned counsel filed Doc. 28, Defendant Michael Tracy McFadden's Second Unopposed Motion to Vacate and Reset Trial Date Pursuant to 18 U.S.C. §3161(h)(7)(A).

12) On November 6, 2019, Magistrate Judge Gallagher granted Doc. 28, and continued the jury trial until June 1, 2020, setting a motions deadline of April 6, 2020. *See* Doc. 29.

13) On November 21, 2019, the government tendered an additional 1,125 pages of transcripts of some of the recorded interviews.

14) To date, undersigned counsel has received the following discovery from the government:

a) 5,335 pages of transcripts,

b) 3,308 pages of police reports (combined between Grand Junction Police Department and Federal Bureau of Investigation), and

c) approximately 50 hours of video interview footage.

15) Also in November of 2019, undersigned counsel received an extensive file from the Colorado State Public Defender's Office, the office that represented Mr. McFadden in the related state case.

16) On November 15, 2019, the parties filed their Joint Position on the Speedy Trial Clock. *See* Doc. 30.

17) On April 6, 2020, undersigned counsel filed Doc. 31, Defendant Michael McFadden's Third Unopposed Motion to Vacate and Reset Trial Date Pursuant to 18 U.S.C. §3161(h)(7)(A). In the unopposed motion, undersigned counsel requested an additional five months be excluded from the calculation of time under the Speedy Trial Act. *See* Doc. 31.

18) On April 7, 2020, Magistrate Judge Gallagher granted the unopposed motion, resetting the motions deadline until September 8, 2020, and the jury trial until November 2, 2020. *See* Doc. 32.

19) On May 4, 2020, undersigned counsel moved to amend the Protective Order. *See* Doc. 33. In particular, undersigned counsel sought to expand the terms of the previously issued Protective Order to allow Mr. McFadden to view the discovery materials while at the Clear Creek County Jail without undersigned counsel or a member of the defense team being present. *See id.* at p. 3. Because the Clear Creek County Jail, like most facilities, has limited attorney/client visits, this measure was necessary in order for Mr. McFadden to view the discovery-related materials. The motion was not opposed by the government. *See id.*

20) On May 6, 2020, Magistrate Judge Gallagher entered the Amended Protective Order as an order of the Court. *See* Doc. 34.

21) Since May, undersigned counsel has been holding weekly or bi-weekly phone meetings with Mr. McFadden to consult about the case and discuss the review of the discovery materials.

22) Undersigned counsel has enlisted a second lawyer to assist in the review of the discovery materials and prepare for trial.

Review of Discovery Materials

23) Undersigned counsel's review of the discovery materials is ongoing. Undersigned counsel has made progress on each of the three areas of discovery: transcripts, police reports, and video/audio interview footage.

24) Undersigned counsel has completed review of the video/audio interviews. Review of the video/audio interviews was extremely time consuming. While the government has provided transcripts of some of the witness interviews, a number of the interviews were not transcribed and thus review was more time consuming. Undersigned counsel arranged to have multiple interviews transcribed. Due to variations in sound quality, the speed of conversation, and the need to take notes during the interview, reviewing many of the videos has taken nearly twice as long as listening to the interviews straight through.[3]

25) On May 14, 2020, undersigned counsel arranged for Mr. McFadden to receive the discovery materials consistent with the Amended Protective Order. Since then, Mr. McFadden has been reviewing the materials. The amount of time that the facility allows him to review discovery has not been consistent. Most weeks he is allowed to review the materials on one or two days for two to three hours at a time. This is based on staff availability as he needs to be transported to the discovery viewing area. Some weeks, however, Mr. McFadden has not been able to review the discovery at all.

---

[3] As it is estimated that the audio/video files were approximately 50 hours in length, it is conservatively estimated that the review of the video/audio files took somewhere between 60 – 75 hours.

26) Mr. McFadden's review of the discovery materials is not complete and he would like to continue reviewing the materials and consulting with his counsel on a regular basis in advance of the motions deadline and trial.

Necessary Investigation

27) The conduct alleged in the Indictment spans a wide range of time. *See* Doc. 1. The conduct alleged by the government in Count Five alone occurred between January 7, 2007, and January 3, 2013, a period spanning approximately six years. *See id.*

28) Additionally, the government has informed undersigned counsel that it will present evidence not only of the alleged crimes in the Indictment but also of a significant amount of evidence of other alleged crimes pursuant to Federal Rules of Evidence (FRE) 404(b) and/or 414. This greatly expands the need for investigation of material outside the scope of the Indictment.

29) Undersigned counsel previously identified approximately 40 potential witnesses, many of whom were minors around the time of the alleged criminal conduct. *See* Doc. 31 at p. 40. Many of these witnesses have been interviewed on multiple occasions in connection with the prior case or in connection with the present prosecution. Additional witnesses have become known as the investigation has progressed.

30) The witnesses predominately reside in or around the Grand Junction area, however, at least one group of witnesses now lives in Utah.

31) On January 14, 2020, undersigned counsel and an investigator traveled to Grand Junction in order to visit various locations relevant to the case and to conduct witness interviews.

32) Travel since March of 2020 has been limited due to the coronavirus pandemic, as will be described more in depth below.

33) It is expected that undersigned counsel and an investigator will need to travel at least two additional times to the Grand Junction area in order to conclude the investigation.

Meetings with Mr. McFadden

34) As described above, since the filing of the Third Unopposed Motion [Doc. 31] in April of 2020, undersigned counsel has spoken regularly by phone with Mr. McFadden.  Undersigned counsel has not visited a jail since March of 2020.

Consultation with Expert Witnesses

35) At the 2015 jury trial in Mesa County, both the prosecution and defense called expert witnesses.

36) Undersigned counsel is in active consultation with more than one expert witness relating to the present case.  Continued consultation with expert witnesses is a necessary part of Mr. McFadden's defense and additional time is needed for that purpose.

37) Relatedly, undersigned counsel must determine whether the government intends to call expert witnesses at Mr. McFadden's trial, and if so, prepare to defend such testimony, including by procuring the services of a rebuttal expert witness.

Pretrial Motions

38) Undersigned counsel has requested the assistance of a lawyer specializing in appellate issues in the Federal Public Defender's Office to assist with general legal research and the preparation of pretrial motions, including, but not limited to:

a) Pre-Indictment Delay,
b) Double Jeopardy,
c) A Motion for Bill of Particulars,
d) Change of Venue,
e) Response to FRE 404(b)/414,
f) Motions *in Limine*,
g) Motions to Sever Counts, and
h) The admissibility of oral statements of Mr. McFadden.

The research associated with these legal issues is ongoing.

Coronavirus (COVID-19) Pandemic

39) On March 13, 2020, in response to the global pandemic caused by the spread of the coronavirus (COVID-19), the Chief Judge of the United States District Court for the District of Colorado issued an General Order that continued all trials scheduled to commence on or before April 3, 2020, and provided notice to litigants, attorneys, and the public that the Court's judicial officers will endeavor to reschedule hearings or convert hearings to telephonic appearances. *See* District Court General Order 2020-1. Through a series of subsequent general orders, the Chief Judge has extended the order delaying all civil and criminal trials through October 1, 2020. *See* District Court General Orders 2020-3 through District Court General Order 2020-15.

40) The recent pandemic has had a significant impact on undersigned counsel's ability to defend the present case. With slight exception, undersigned counsel has worked from home since March of 2020 and undersigned counsel's work-related efficiency has been affected because of non-work related obligations. This diminished efficiency[4] is obvious in the present case due to the long stretches of time required to make significant progress in reviewing discovery.

41) Undersigned counsel expects to improve efficiency moving forward as undersigned counsel begins the transition to working more from the office rather than from home.

Speedy Trial Calculation

42) It is undersigned counsel's position that the correct starting date for Speedy Trial purposes is the date of the Initial Appearance, May 22, 2019. *See* 18 U.S.C. §3161(c)(1). From that date, the original 70-day date was July 20, 2019. *See* Doc. 13 at p. 8.

43) According to the parties, as of June 28, 2019, 22 days ran on the speedy trial clock and 48 days remained. *See* Doc. 23 at p. 2. As of August 26, 2019, 36 days had run on the speedy trial clock, leaving 34 days remaining. *See* Doc. 30 at p. 2.

44) When the Court granted Doc. 31, the Third Unopposed Motion to Vacate, the Court excluded an additional five months from the speedy trial calculation, thus excluding time until November 2, 2020. *See* Doc. 32.

[4] Should the Court require more information in this area, undersigned counsel would be happy to provide it.

45) A further exclusion of five months would exclude time until April 2, 2021. With an additional 34 days still remaining on the speedy trial clock, the trial would have to occur prior to May 6, 2021.

Consultation

46) Undersigned counsel contacted the government about the present Motion. The Assistant United States Attorney handling the present matter has no objection to vacating the current dates nor to the requested extension of time.

47) Undersigned counsel advised Mr. McFadden about the requested continuance. Similarly, he has no objection.

## II. Standard for Continuances

48) Title 18 U.S.C. §3161(h)(7)(A) provides that a Court shall exclude a period of delay from computing the time within which a trial must commence where "the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial." The factors to be considered in such an evaluation are listed at 18 U.S.C. § 3161(h)(7)(B)(i)-(iv).

49) Pertinent factors that apply to an "ends of justice" finding in the present case include:

> (i) Whether the failure to grant such a continuance in the proceeding would be likely to make a continuation of such proceeding impossible, or a result in a miscarriage of justice.
>
> . . . .
>
> (iv) Whether the failure to grant such a continuance in a case which, taken as a whole, is not so unusual or so complex as to fall within clause (ii), would deny the defendant reasonable time to obtain counsel, would unreasonably deny the defendant or the Government continuity of counsel, or would deny counsel for the defendant or the attorney for the Government the reasonable time necessary for the effective preparation, taking into account the exercise of due diligence.

*See* 18 U.S.C. §1361(h)(7)(B)(Westlaw 2016). *See also*, *United States v. Toombs*, 574 F. 3d 1262, 1268-69 (10th Cir. 2009).

50) In the similar context of addressing trial continuances, the Tenth Circuit has set forth four factors that the Court should consider. *See United States v. West*, 828 F.2d 1468, 1470 (10th Cir. 1987). According to the Tenth Circuit, the Court should consider: (1) the diligence of the party requesting the continuance, (2) the likelihood that the continuance, if granted, would accomplish the purpose underlying the request for continuance, (3) the inconvenience to the opposing party, its witnesses, and the court resulting from the continuance, and (4) the need asserted for the continuance and the harm that could be suffered as a result of the court's denial of the continuance. *See id.* No single factor is determinative. *See id.*

51) The decision to grant an "ends of justice" continuance is within the sound discretion of the Court, and is reviewed under an abuse of discretion standard. *See Toombs*, 574 F. 3d at 1262. "Adequate preparation time is a clearly permissible reason for granting a continuance and tolling the Speedy Trial Act." *United States v. Gonzales*, 137 F. 3d 1431, 1435 (10th Cir. 1998). The Supreme Court has recognized that "subsection (h)(7) expressly accounts for the possibility that a district court will need to delay a trial to give the parties adequate preparation time" to ensure that the ends of justice are met, and that "subsection (h)(7) provides 'much of the Act's flexibility.'" *Bloate v. United States*, 130 S. Ct. 1345 (2010).

## III. Argument

52) This case meets the criteria set forth in both 18 U.S.C. § 3161(h)(7) and *West*. Accordingly, undersigned counsel requests that this Court vacate the current trial date and exclude an additional five months from the speedy trial calculation.

53) At this time, undersigned counsel is not requesting a finding of complexity under subsections (h)(7)(B)(ii), but rather, is requesting a determination that the ends of justice will be served by the granting of the requested continuance because "the failure to grant such a continuance in the proceeding would . . . result in a miscarriage of justice" and "would deny counsel for the defendant . . . reasonable time necessary for effective preparation." 18 U.S.C. §3161(h)(7)(B)(iv). In the Discovery Conference Memorandum and Order [Doc. 13], the parties did not estimate that the document disclosure would be "extensive," however, the amount of information tendered by the government is substantial nonetheless, surpassing 8,600 pages of written material and 50 hours of audio/video footage.

54) Undersigned counsel will require an additional five months to complete a review of the discovery materials tendered by the government, consult with Mr. McFadden about those materials, conduct the necessary pretrial investigation, research the relevant legal issues, prepare pretrial motions, and prepare for trial.

55) The failure to grant the requested continuance on behalf of Mr. McFadden would result in a miscarriage of justice and would also deny undersigned counsel the reasonable time necessary for effective preparation as discussed in 18 U.S.C. §3161(h)(7)(B)(i) and (iv). Preparation for trial in the present case will require an enormous expenditure of time and energy for multiple lawyers.

56) Finally, a speedy trial extension of an additional 150 days would not offend the standard set forth by the Tenth Circuit in the *West* decision. By way of comparison with the related state trial, the period between Mr. McFadden's arrest (January of 2013) and the scheduled trial date in Mesa County (April of 2015) was 27.5 months.[5] Even including the extension requested herein, the present matter would proceed to trial in less than 24 months from the date of Mr. McFadden's federal arrest (May of 2019). Considering that the amount of discovery has nearly doubled in the federal prosecution, the suggested timeline is eminently reasonable.

57) Thus far, undersigned counsel has diligently pursued the defense of Mr. McFadden's case, by reviewing discovery materials, including reading hundreds of pages of transcripts and watching/listening to hours of witness interviews, consulting with Mr. McFadden's prior attorneys from the state prosecution, conducting legal research about the potential motions, and speaking with Mr. McFadden regularly. However, the nature and facts of the case, including but not limited to the amount of discovery (including a large quantity of audio/video footage), the lengthy trial transcripts, the breadth and location of the expected investigation, the need to create transcripts for video/audio interviews, the required legal research, the necessary consultation with Mr. McFadden that are required are such that no amount of diligent work can insure effective assistance of counsel prior to the current trial date as contemplated by the current speedy trial time-frame. Additionally, as described above, the COVID-19 pandemic has delayed matters.

[5] The trial did not proceed in April of 2015 because a mistrial was declared. Instead, the matter proceeded to trial in July of 2015, more than 30 months after Mr. McFadden's arrest in January of 2013.

Case 1:19-cr-00243-CMA-GPG Document 31-7 Filed 07/08/20 Page 15 of 16

58) Undersigned counsel believes that the requested extension would serve the stated purpose and allow undersigned counsel to be ready to file pretrial motions and to prepare for trial.

WHEREFORE, Mr. McFadden respectfully requests that this Court issue an Order vacating current deadlines and the trial date, excluding an additional five months from the speedy trial calculation, and setting a motions deadline for the beginning of February 2021 and setting the matter for trial in April of 2021.

Respectfully submitted,

VIRGINIA L. GRADY
Federal Public Defender

s/ Timothy P. O'Hara
TIMOTHY P. O'HARA
Assistant Federal Public Defender
633 Seventeenth Street, Suite 1000
Denver, Colorado 80202
Telephone: (303) 294-7002
FAX: (303) 294-1192
Email: Timothy_OHara@fd.org
Attorney for Defendant

**CERTIFICATE OF SERVICE**

I hereby certify that on September 8, 2020, I electronically filed the foregoing

**DEFENDANT MICHAEL MCFADDEN'S UNOPPOSED FOURTH MOTION TO VACATE AND RESET TRIAL DATE PURSUANT TO 18 U.S.C. §3161(h)(7)(A)**

with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

Jeremy Chaffin
Assistant United States Attorney
Jeremy.Chaffin@usdoj.gov

Andrea Surrat
Assistant United States Attorney
Andrea.Surrat@usdoj.gov

s/ Timothy P. O'Hara
TIMOTHY P. O'HARA
Assistant Federal Public Defender
633 Seventeenth Street, Suite 1000
Denver, Colorado 80202
Telephone: (303) 294-7002
FAX: (303) 294-1192
Email: Timothy_OHara@fd.org
Attorney for Defendant

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge Christine M. Arguello**

Criminal Action No. 19-cr-00243-CMA-GPG

UNITED STATES OF AMERICA,

Plaintiff,

v.

MICHAEL TRACY MCFADDEN,

Defendant.

---

**ORDER TO EXCLUDE TIME FROM SPEEDY TRIAL ACT**
**AND CONTINUE TRIAL DATES**

---

This matter is before the Court on Defendant Michael Tracy McFadden's Fourth Unopposed Motion to Vacate and Reset Trial Date (Doc. #37). The Court has reviewed this motion and the case file, and the reasons set forth in the motion, specifically:

1. Defense counsel needs additional time to review discovery with the Defendant
2. Defense counsel has been in contact with the Defendant regularly by phone, however, due to COVID restrictions, has been unable to visit with the Defendant in the jail facility since March of 2020.

Upon review, the Court finds pursuant to 18 U.S.C. § 3161(h)(7)(A) that the ends of justice served by granting the motion outweigh the best interests of the public and the Defendant in a speedy trial. It is, therefore,

ORDERED that Defendant Michael Tracy McFadden's Fourth Unopposed Motion to Vacate and Reset Trial Date (Doc. #37) is GRANTED and time is excluded from the date of this Order through April 6, 2021. It is

ORDERED that pretrial motions are due by **February 1, 2021**. Responses due by **February 15, 2021**. If counsel believes that an evidentiary hearing on the pretrial motions is necessary, a separate Motion for Evidentiary Hearing shall be filed at the same time the pretrial motions are filed. No later than three days after the filing of the Motion for Evidentiary Hearing, both counsel for the Defendant and counsel for the Government shall confer and e-mail Chambers at arguello_chambers@cod.uscourts.gov to set such a hearing.

FURTHER ORDERED that the Final Trial Preparation Conference set for **October 29, 2020**, is VACATED and RESET to **March 23, 2021, at 3:00 PM, Courtroom A 602 of the Alfred A. Arraj United States Courthouse, 901 19th Street, Denver, CO, before Judge Christine M. Arguello**. It is

FURTHER ORDERED **that five-day** jury trial set to begin on **November 2, 2020** is VACATED and RESET to **April 5, 2021, at 8:30 AM**, **Courtroom A 602 of the Alfred A. Arraj United States Courthouse, 901 19th Street, Denver, CO, before Judge Christine M. Arguello**.

DATED: September 9, 2020

BY THE COURT:

CHRISTINE M. ARGUELLO
United States District Judge

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Criminal Action No. 19-cr-00243-CMA-GPG

UNITED STATES OF AMERICA,

Plaintiff,

v.

1. MICHAEL TRACY McFADDEN,

Defendant.

---

**GOVERNMENT'S NOTICE OF INTENT TO INTRODUCE EVIDENCE PURSUANT TO FEDERAL RULES OF EVIDENCE 414, 404(b), AND 807**

---

The United States of America, by and through Jeremy Chaffin and Andrea Surratt, Assistant United States Attorneys, hereby notifies the Court and the defendant of its intent to introduce evidence pursuant to Federal Rules of Evidence 414, 404(b), and 807, as well as a proffer of the evidence it will seek to introduce at trial. While some case law is provided in support of its various theories of admissibility, this is not intended as a full briefing. Instead, this is intended as notice. *See* Fed. R. 414 (requiring disclosure of 414 evidence); Fed R. 404(b)(2)(A)-(B) (requiring pretrial notice of 404(b) evidence); Fed. R. 807(b) (requiring reasonable notice); *see also* ECF # 13, p. 4 (requiring notice of 404(b) evidence at least 21 days before trial).

**BACKGROUND**

On May 17, 2019, the defendant was indicted by the Grand Jury for five counts involving acts of child molestation. ECF # 1.

Counts One and Two of the Indictment relate to an incident, occurring sometime between Christmas 2012 and January 3, 2013, in which the defendant took a minor, identified in the Indictment as K.W., and two of his siblings on a commercial truck trip. During this trip, K.W. reported that the defendant and he slept in the sleeper compartment of the truck. During the night, K.W. woke up when he felt the defendant's penis touching his butt. K.W. said that the defendant put his penis inside K.W.'s butt and that it hurt. K.W. described the defendant moving up against him and then stopping after a few minutes. Throughout this, the defendant had his hands around K.W.'s waist. K.W. explained that he did not cry out because he was scared and that neither of his siblings awoke during the assault. After the assault, K.W. said that his butt hurt "pretty bad" for a few days. K.W. was eleven years old at the time of this assault. The defendant was previously charged, as part of a pattern of abuse count, and convicted for this incident during a prior state court proceeding.[1]

Counts Three and Four relate to an incident, occurring sometime between December 1, 2010, and January 1, 2011, in which the defendant took a minor, identified in the Indictment as J.W., on a commercial truck trip. J.W. reported that the defendant took him on a multi-day trip travelling between Telluride, CO, and Farmington, NM. J.W. explained that the commercial loads were picked up from an area near the

---

[1] Although the government does not intend to introduce such facts during its presentation of evidence, the government makes note, throughout this notice, of instances in which charges were brought in prior state court proceedings and whether a conviction resulted. The government does this to assist the Court in evaluating the admissibility of the proffered evidence. Some of the convictions referenced herein were later overturned based on a speedy trial violation. Notably, however, the appellate decision overturning the conviction did not raise any question as to the validity of the jury's determination of guilt. A copy of this appellate decision can be provided to the Court if this Court so requires.

Telluride airport.  Business records establish that these trips occurred during the charged time period.

J.W. described a particular instance of child molestation that occurred during one of the nights of this trip.  J.W. explained that they had stopped at a location in New Mexico and were sleeping in the sleeper compartment of the truck.  J.W. described the defendant sodomizing him.  After the assault, J.W. explained that he urinated and defecated on himself and the defendant had to clean J.W. up with wipes the defendant kept in the front cab of the truck.  On what J.W. believed was another night during the trip, J.W. awoke to the defendant licking his anus.  J.W. explained that it did not feel like a penis and that he felt what he described as the defendant's mustache touching his bottom.  J.W. was approximately ten years old at the time of these assaults.  The defendant was previously charged in a prior state court proceeding, as part of a pattern of abuse count, related to assaults occurring on semi-truck trips and was subsequently convicted.

Count Five relates to another instance in which the defendant took J.W. on a commercial truck trip.  J.W. was unsure of the precise time frame of this assault.  As a result, the charged time period in the Indictment encompasses the approximate time period during which the defendant subjected J.W. to sexual assaults.  J.W. reported that, during this specific instance, they were transporting goods to or from Arizona.  J.W. recalled stopping at a Love's truck stop and sleeping in the sleeper compartment of the truck.  J.W. described the defendant placing his penis into J.W.'s butt during the night.  During the charged time period J.W. was 12 years-old or younger.  As referenced above, the defendant was previously charged in a prior state court proceeding, as part

of a pattern of abuse count, related to assaults occurring on semi-truck trips and was subsequently convicted for that conduct.

The charged victims, J.W. and K.W., reported multiple other acts of child molestation committed by the defendant. Additionally, during the time periods during which J.W. and K.W. were assaulted by the defendant, other victims reported acts of child molestation committed by the defendant. Finally, in 1990 the defendant was convicted of committing an act of child molestation on another victim.

The government provides notice of its intent to introduce evidence of these other acts of child molestation committed by the defendant, as detailed below. The government also provides notice of its intent to introduce additional evidence, as detailed below, pursuant to Federal Rules of Evidence 404(b) and 807.

**RULE 414 EVIDENCE**

To the extent it is not *res gestea* evidence, the government provides notice of its intent to introduce the following evidence pursuant to Federal Rule of Evidence 414.

Other acts of child molestation related to J.W.

The first act of molestation that J.W. has consistently recalled involved a trip to a funeral in AZ when J.W. was approximately eight-years-old. JW recalls the defendant giving him a drink with what J.W. described as a lump of substance inside. At the time, J.W. thought it was a clump of sugar because the defendant overheard him asking a cousin about it and told him that was what the substance was. J.W. now believes the substance was a sleep aid that the defendant placed in his drink. In a prior interview when J.W. was twelve-years-old, J.W. explained that the defendant put his penis inside J.W.'s butt while they were sleeping in a hotel. In a more recent interview, conducted approximately seven years after the prior interview, J.W. stated that he does not

specifically recall any sexual acts committed by the defendant, but does recall waking up naked in a bed next to the defendant (during this recent interview investigators did not direct J.W. to his prior statement or otherwise attempt to refresh J.W.'s recollection). In the more recent interview, J.W. explained that even though he does not now specifically recall being sexually assaulted during this incident, he believes that this was the first time he was molested by the defendant.

Following this, J.W. reports that the defendant began sexually assaulting him on a frequent basis. Indeed, J.W. explains that he was assaulted hundreds of times—far too many for him to count—and that the defendant rarely allowed three or four days to pass without molesting him. These assaults did not stop until the defendant was arrested when J.W. was twelve years old. J.W. describes these assaults as always occurring at night, typically after he had received a drink he believed had something put in it or some sort of medication to help him sleep. These assaults occurred either in the defendant's bed or in a semi-truck driven by the defendant while they slept. In a prior trial, J.W. testified that he would typically wake up to his shorts coming down. When his shorts would come down, J.W. would feel something he described as a penis. Sometimes it seemed to J.W. that the defendant was testing to see if he was awake. At times J.W. would act like he was sleeping, other times he would roll over or try to get away. J.W. explained that many times the defendant put his penis into J.W.'s butt. But occasionally, the defendant would not sodomize J.W., and would just stop trying after J.W. rolled over. J.W. stated that the assaults made him feel scared and would cause his "rear-end" to hurt.[2]

---

[2] The incident in Arizona at the hotel, the description of the ongoing assaults, and a final "normal" assault in approximately December 2012 at the defendant's home were the

Although most of these assaults blend together for J.W., and are difficult for him to describe with precise detail, several instances of child molestation stand out. Two of these instances form the basis of charges in this case. In addition, J.W. recalls a separate specific instance that occurred in a semi-truck driven by the defendant. J.W. had accompanied the defendant on a trip and they had returned the night before J.W. was supposed to attend school. They had parked the truck down the street from J.W.'s home and slept in the truck. J.W. recalls sleeping near an air vent in the truck and being assaulted in the morning before school. J.W. described this as a "normal" assault, where the defendant inserted his penis into J.W.'s butt. J.W. explains that this instance stands out for him because the assault put him in a "bad mood" and he had to go to school afterwards. J.W. also recalls needing to frequently use the restroom that day during school because he had "really bad diarrhea" which he attributed to the assault, and used different restrooms in the school because he had already used the closest restroom several times. J.W. also recalls instances in which "normal" assaults occurred during trips to Texas and Yellowstone National Park. However, J.W. is unsure in which states, or the specific time frames when, these assaults occurred.

Finally, J.W. recalls instances in which he was present when he believes other children were molested by the defendant. One of the first instances J.W. describes occurred in a home in Grand Junction in the defendant's bed. J.W. and at least one other child, K.W., were sleeping in the defendant's bed. J.W. awoke to K.W. screaming at the defendant to "get off of me." J.W. explains that both K.W. and the defendant had their clothes on, but this instance is when J.W. realized that other children were also being assaulted by the defendant.

---

basis of the charges related to J.W. in the prior state proceedings for which the defendant was convicted.

J.W. described another instance in which he believes K.W. was actually molested.  J.W. was on a semi-truck trip with K.W. and the defendant.  J.W. does not recall the specific details of the trip, but recalls waking in the night to a "painful grunting" noise he believed K.W. was making.  J.W. also recalls smelling a "fecal smell" during this instance, which led him to believe K.W. was being sexually assaulted by the defendant.

J.W. also recalls a similar instance in which he believes that his cousin D.O. was molested by the defendant.  The three were on a trip to someplace in Texas; J.W. recalls he and his cousin placing pennies on some railroad tracks and sleeping the night in the sleeper cab of the semi-truck at a truck stop.  J.W. slept on the top bunk of the sleeper compartment while the defendant and D.O. shared the bed below.  During the night, J.W. was awakened by some movement and groaning.  J.W. also smelled a "musky fart smell" that lead him to believe D.O. was being subjected to "something sexual" by the defendant.  J.W. recalled opening a nearby air vent to get fresh air because of the smell.

D.O. was later interviewed by agents.  D.O. recalled a trip in which he woke up and was told by J.W. that the defendant had been "touching his privates."  D.O. stated that he was on prescription medications that made him sleep at the time and wasn't awake when anything happened.  D.O. also recalled a trip in which he and J.W. put pennies on railroad tracks, but was not sure if it was the same trip in which J.W. told him that he had been assaulted.

Other acts of child molestation related to K.W.

In addition to the specific instance charged in this matter, K.W. reported that he was molested by the defendant "a lot."  K.W. explained  that it would typically occur at

night in the defendant's bed, after the defendant had given K.W. melatonin or something else to make K.W. sleepy. K.W. stated that he would feel the defendant put his hand inside K.W's. pants and touch K.W.'s penis. K.W. explained that this touching is what typically occurred, but there were some occasions when the defendant would rub his penis on K.W.'s butt, but did not put it inside. Based on these instances, the defendant was charged and convicted in a prior state court proceeding. All of these instances occurred when K.W. was eleven years old or younger.

K.W. also described an instance in which he observed what he believed to be the defendant touching J.W.'s penis. This occurred on a night when K.W. was staying at the defendant's home. Early in the morning, K.W. walked into the defendant's room to ask for some milk—which K.W. explained the defendant kept locked up in a fridge. As he entered, K.W. observed the defendant jerk his hand out from under a blanket from the area of J.W.'s penis. K.W. stated that J.W. was asleep when this occurred and he did not say anything about what he observed.

<u>Acts of child molestation involving I.S.</u>

In December 2012, officers from the Grand Junction Police Department received a report of a sexual assault of a minor, identified herein by the initials I.S., committed by the defendant. A detective interviewed I.S. in a forensic interview. During the interview, I.S. explained that the defendant rubbed I.S.'s "pee pee" while I.S. was sleeping at the defendant's house. I.S. stated that he "lost count" of the number of times that this had happened. I.S. described these acts as occurring in the defendant's bed, while I.S. was sleeping there. I.S. said that the defendant would put his hand inside I.S.'s underwear and rub his penis, causing I.S. to wake up. I.S. would try to stop the defendant by trying to "grab his hand and put it in his lap." I.S. said that the defendant persisted until I.S.

rolled over. I.S. reported that other boys slept in the defendant's bed as well, but I.S. was not sure if this was happening to them.

After this report, state authorities initiated an investigation in which they discovered much of the conduct described above and below. In addition, in a subsequent interview, I.S. disclosed that the defendant put his penis into I.S.'s butt on at least one occasion. I.S. stated that this occurred when he was approximately 8 years old, and that it occurred during the night in the defendant's bed. The defendant was eventually charged with the acts of child molestation reported by I.S. in a prior state court proceeding and ultimately convicted by a jury.

Acts of child molestation related to E.S.

Based on the report from I.S. described above, the detective conducted a forensic interview of another child present in the defendant's home, identified herein by the initials E.S. (but who was identified in the prior state court proceeding by the initials E.M.). During the interview, E.S. initially expressed anger at I.S. for reporting and said that the defendant told him that it was all lies. E.S. did not initially disclose any sexual contact.

A few days later, E.S.'s family contacted the detective because E.S. indicated there was something he wanted to tell the detective. In the subsequent interview, E.S. described multiple instances of molestation committed by the defendant. E.S. explained that on several occasions—which E.S. identified by which dog in the home was sleeping with him at the time—the defendant touched E.S.'s penis with the defendant's hand under E.S.'s clothing. In several of these instances, the defendant moved E.S. to the defendant's bed, lowered E.S.'s clothing, and stroked E.S.'s penis.

When asked if this occurred anywhere else, E.S. said that it also happened down by the river. E.S. then described two instances where the defendant took E.S. to an area near some roller dams on the Gunnison River, in Mesa County, Colorado. At this location, the defendant bent E.S. over and put his "pee pee" in E.S.'s "butt." In the first instance, E.S. explained that his brother was present, but sleeping in the cab of the defendant's truck. In the second instance, E.S. was alone with the defendant. E.S. described pain and difficulty defecating for several days after these instances. A Sexual Assault Nurse Examination revealed a possible healed laceration in E.S.'s anus consistent with his description of the assaults. E.S. was approximately eight years old or younger when these assaults occurred.

The defendant was eventually charged related to these instances in a prior state court proceeding. A jury found the defendant guilty of these offenses.

Acts of child molestation involving S.J.W.

The prior described investigation identified J.W. and K.W. as victims and many of the acts related to them described above. The detective then interviewed K.W.'s sibling, identified herein by the initials S.J.W., during a forensic interview. S.J.W. described one incident of child molestation that occurred while she was sleeping on a couch at the defendant's home. S.J.W. awoke to the defendant grabbing her by the waist.

S.J.W. reported that the defendant then stuck his finger in her butt. She turned over onto her back to get away from the defendant, but the defendant turned her back over onto her stomach. The defendant then put his finger in her butt again. S.J.W. said that this repeated about five times, explaining that each time the defendant put his finger in her butt and she would turn away. S.J.W. said that she knew it was the

defendant because he walked away to go wash his hand and she peeked through a slit in her eyelids and saw the defendant. S.J.W. was approximately nine years old when this occurred.

The defendant was eventually charged in a state court proceeding related to this incident. A jury found the defendant guilty of this offense.

Acts of child molestation related to D.R.

During the same investigation described above, the detective interviewed a minor, identified herein by the initials D.R., in a forensic interview. D.R. reported that the defendant touched D.R.'s penis while D.R. was sleeping in the defendant's bed. D.R. said that he slept in the defendant's bed along with the defendant, J.W., and another boy one night for a sleepover. D.R. explained that he went to bed with shorts and a pull-up on and woke up when he felt the defendant's hand down his shorts, fondling D.R.'s penis. D.R. said he pushed the defendant's hand away and went back to sleep. Later that night, D.R. woke up again to the defendant's hand down his shorts, on D.R.'s penis again. D.R. then moved off the bed and slept under the bed the remainder of the night. This occurred when D.R. was approximately eleven years old.

The defendant was eventually charged in a state court proceeding related to this incident. A jury found the defendant guilty of this offense.

Acts of child molestation related to L.W.

More recently, another child has disclosed that the defendant had molested him. L.W. is K.W. and S.J.W.'s younger brother. He reports that beginning when he was approximately 6 years old, the defendant molested him on five or six occasions. He explained that the defendant would frequently give him melatonin when he, along with friends or siblings, stayed over at the defendant's home. L.W. typically slept on the

couch, but would awake to the defendant carrying him into the defendant's bed. Once there, the defendant would pull down L.W.'s clothes and rub spit from his hand onto L.W.'s butt. The defendant would then put his penis into L.W.'s butt.

Acts of child molestation related to M.S.

Finally, prior to the present allegations, the defendant molested another child. Around Christmas 1989, the defendant was staying at a friend's home. During the night, the defendant entered the room of an eight-year-old boy, identified herein as M.S., living in the home. The defendant picked M.S. up and then took him to the basement. M.S. reported that he thought his grandmother had woken up his mother, because his mother came downstairs and saw him and the defendant in the basement. M.S. explained that the defendant told his mother that they were moving some things around and, after that, M.S.'s mother left the two alone again (a description of events later corroborated by M.S.'s mother).

Once alone, M.S. said that the defendant told him to "shut up" and covered M.S.'s mouth with the defendant's hand. The defendant then laid M.S. on a carpet on his stomach and got on top of him. At that point, M.S. stated that the defendant "stuck his private up [M.S.'s] butt" and "moved around a little." When asked how he knew it was the defendant's private, M.S explained that "it hurt and it was not soft." He also explained that one of the defendant's hands was covering his mouth and the other was visible on the floor when M.S. felt pain in his rectum. M.S. later identified a "private" as a penis.

Sometime later M.S. disclosed to his mother that the defendant had put his private in M.S.'s butt, but M.S.'s mother took no action. M.S. then disclosed to a babysitter what had occurred. The babysitter took M.S. to the hospital to be evaluated

and reported the matter to law enforcement. After an investigation, law enforcement interviewed the defendant. The defendant denied the entire incident, claiming that he was never in the basement with M.S. and did not assault him. The defendant was then arrested.

The defendant later pled guilty in this matter to sexual assault on a child and initially received a probation sentence. Ultimately, the defendant admitted to the conduct M.S. described.

**RULE 404(b) EVIDENCE**

To the extent it is not *res gestea* evidence or otherwise included in the evidence described above, the government provides notice of its intent to introduce the following evidence pursuant to Federal Rule of Evidence 404(b).

Use of Sleep Aids

As described above, all, or nearly all, of the children the defendant molested reported that he frequently provided them with sleep aids that made them drowsy. Several other children, who have not reported that the defendant molested them, also have reported that the defendant provided them with sleep aids. Some children described finding pills or clumps in drinks the defendant gave them. Others reported receiving melatonin or other medications from the defendant that caused them to become drowsy. All of the children are consistent in their reports that the defendant frequently gave all of the children in the home something to help them sleep.

Additional Grooming Behaviors

Many of the children and their families reported conditions and behaviors consistent with grooming of sexual assault victims. The defendant's home was designed to largely cater toward the interests of children, and young boys in particular.

The children reported that there were televisions and gaming consoles in nearly every room of the house. The defendant also purchased trampolines, dirt bikes, and four-wheelers that were used by the children. As a result of these items, the defendant frequently had many children at his home.

The defendant would also take the children on fun and exciting trips. He would frequently suggest that children accompany him on long-distance trucking trips to other states, taking several children to the ocean on one trip. He also took several children to an amusement park in Denver in a limousine. Simply put, the defendant's home and the defendant were fun for the children—at least when they were not being molested. Even the sexual acts the defendant inflicted upon his victims were not without their own associated grooming behaviors. Indeed, several of the children reported that the defendant would frequently buy them gifts after assaults had occurred. And that it was common place for the defendant to otherwise shower the children with gifts.

The defendant's grooming behavior was not limited to just the children, the defendant groomed the parents as well. Many of the parents of the children the defendant molested struggled with substance abuse. The defendant was aware of this and provided somewhat stable housing, and a seemingly stable environment for their children, while the parents continued to use controlled substances. The defendant would frequently "help out" these parents by providing money, equipment for repairs, or food. For most of the families involved, the defendant was a trusted friend or family member, allowing him far greater access to the children he victimized. Indeed, several of the victims in this matter considered the defendant their primary caregiver during the period of assault.

**RULE 807 EVIDENCE**

The government provides notice of its intent to introduce the following evidence pursuant to Federal Rule of Evidence 807

On January 16, 2013, K.W. was forensically interviewed by a detective at the Dolphin House Child Advocacy Center in Montrose, Colorado. The interview was audio and video recorded and is approximately 33 minutes long. A transcript of the interview is included with this filing as Exhibit 1. Should the Court wish, a copy of the recording of the interview can be provided to the Court as well.

During the interview, K.W. and the detective first spent a few minutes discussing television shows and the classes that K.W. likes at school in the 6th grade. K.W. expressed an understanding of telling the truth and telling lies. K.W. then told the detective that "Mike touched [him] in the no-no." K.W. explained that the "no-no" is the "butt." K.W. told the detective that the "other no-no" is his "penis."

K.W. then went into more detail about the assaults, and told the detective that "Mike touched [him] in the butt . . . the night before he got arrested." K.W. explained that he was "asleep" in a bed in the semi-truck in Nebraska when this assault happened. K.W. elaborated that Mike touched him "with his penis" under his pajama pants and that the defendant put "his penis up [K.W.'s] butt" and moved around up against K.W. The defendant held K.W. "in place so [he] couldn't move" even though K.W. was trying to move away. K.W. explained that this "hurt . . . badly" and that it hurt for a couple of days. K.W. said the assault lasted a "couple minutes" and made him "upset and crying at the same time."

K.W. told the detective that the defendant had assaulted him "a lot" of times before, starting when K.W. first started going to the defendant's house. The assault

began with McFadden's "hand on [K.W.'s] no-no," meaning penis. K.W. explained that when the defendant touched K.W.'s penis, the defendant held his hand still. K.W. explained that the incident in the semi-truck was the first time that the defendant had put his penis in K.W.'s anus.

K.W. told the detective that the defendant "was overdosing [him] with pills, to sleep with" and that the defendant gave K.W. pills "every time [he was] there." K.W. elaborated that the defendant would give K.W. "five to six pills of sleep medicine" every night and they caused K.W. to be "out cold" after three minutes.

K.W. also explained that he knew that the defendant assaulted other boys because he witnessed what he believed to be an assault against his friend, J.W. while J.W. was asleep. K.W. said that he saw the defendant's "hand jerked from under the blanket" and that the defendant's hand was near where J.W.'s "no-no was."

K.W. told the detective that although the defendant repeatedly assaulted him, K.W. never told anyone because he was "afraid" and "really scared." K.W. expressed that he was afraid that if he told someone, he would no longer be allowed to go "over there" and see his friend, J.W.

**ARGUMENT**

It is the government's position that any and all acts of child molestation committed upon J.W. and K.W., charged victims in this case, as well as the provision of sleep aids and other grooming behaviors regarding them is *res gestea* evidence. The Tenth Circuit has explained that res gestae evidence is "part and parcel of the proof of the offense charged in the indictment." *United States v. Kimball*, 73 F.3d 269, 272 (10th Cir. 1995) (citations omitted). The Tenth Circuit has approved using res gestae evidence "when it provides the context for the crime, is necessary to a full presentation

of the case, or is appropriate in order to complete the story of the crime on trial by proving its immediate context or the res gestae." *Id.* The conduct described above with regard to the charged victims in this case is inextricably intertwined with the substantive charges in this matter. *United States v. Green*, 175 F.3d 822, 831 (10th Cir. 1999) (direct or intrinsic evidence of the crime charged does not fall within the ambit of Rule 404(b)). Indeed, these victims cannot fully explain the specific instances of assault charged in this matter without providing the context of the ongoing and consistent sexual assaults the defendant inflicted upon them.

In any event, the government hereby provides notice of its intent to admit the evidence of the defendant's molestation of J.W., K.W., I.S., E.S., S.J.W., D.R., L.W., and M.S. during it is case-in-chief at trial. The government submits that all of this evidence is admissible pursuant to Federal Rule of Evidence 414, but also notices this evidence under Federal Rule of Evidence 404(b) in an abundance of caution. In addition, and to the extent such evidence is not considered *res gestea* evidence of the charged offenses and the acts of molestation described above, the government provides notice of its intent to introduce evidence of the defendant's provision of sleep aides to children staying in his home on a frequent basis, and the previously discussed grooming behaviors the defendant engaged in, during the government's case-in-chief at trial.

The government further provides notice of its intent to admit K.W.'s video-taped January 16, 2013, statement regarding the defendant's assaults of him, the description of the sleeping pills the defendant administered to him, and K.W.'s observation of the defendant's assault on J.W.

Case 1:19-cr-00243-CMA-GPG Document 193-3 Filed 01/27/2020 Page 18 of 27

**A. LEGAL STANDARDS**

In Counts One and Three of the Indictment, the government must prove, among other things, that the defendant crossed a state line with the intent to engage in a sexual act with the victim. 18 U.S.C. § 2241(c). In Counts Two, Four, and Five of the Indictment, the government must prove, among other things, that the defendant transported the victim with the intent that the victim engage in any sexual activity for which any person could be charged with a criminal offense. 18 U.S.C. § 2423(a).

**B. FED. R. EVID. 414**

Rule 414 provides as follows:

> In a criminal case in which the defendant is accused of an offense of child molestation, evidence of the defendant's commission of another offense or offenses of child molestation is admissible, and may be considered for its bearing on any matter to which it is relevant.

Fed. R. Evid. 414. The Tenth Circuit has held that for a prior crime of child molestation to be admissible under this rule, the trial court must determine that: 1) the defendant is accused of an offense of child molestation; 2) the evidence proffered is evidence of the commission of another offense of child molestation; and 3) the evidence is relevant. *United States v. Sturm*, 673 F.3d 1274, 1282 (10th Cir. 2012). All of these factors are met here.

Child molestation means a crime under federal or state law involving 1) any conduct prohibited by 18 U.S.C., Chapter 109A and committed with a child; 2) contact between any part of the defendant's body and a child's genitals or anus; or 3) any attempt to engage in such conduct. Fed. R. Evid. 414(d)(2)(A)-(C). A "child" means a person below the age of 14. Fed R. Evid. 414(d)(1).

The offenses charged in Counts One and Three of the Indictment involve conduct prohibited by 18 U.S.C., Chapter 109A and the victims involved were less than 14. Counts Two, Four, and Five of the Indictment are federal crimes involving alleged contact between a part of the defendant's body—namely his penis or tongue—and a child's anus, and the victims involved were less than 14. Thus, the first factor is met.

Similarly, the proffered evidence involves the commission of other offenses of child molestation. For nearly all of these offenses, the defendant was previously charged and convicted of a state criminal offense. And all of these prior offenses involves contact or attempted contact between a part of the defendant's body—namely his penis or his hand—and a child's genitals or anus. Finally, all of the offenses involve victims who were less than 14 at the time of the conduct. Thus, the second factor is also met.

The last factor is likewise met. Child molestation evidence may be considered on any matter to which it is relevant. Fed. R. Evid. 414(a). The Tenth Circuit stated that in cases involving child molestation, Rule 414 "replaces the restrictive Rule 404(b), which prevents parties from proving their cases through 'character' or 'propensity' evidence." *United States v. Castillo*, 140 F.3d 874, 879 (10th Cir. 1998). The Tenth Circuit has repeatedly held that evidence of this nature is properly admissible under Rule 414 in child molestation cases. It has held that Rule 414 allows for evidence of child molestation for any matter to which it is relevant, "including the defendant's 'propensity to commit . . . child molestation offenses, and assessment of the probability or improbability that the defendant has been falsely or mistakenly accused of such an offense.'" *Sturm*, 673 F.3d at 1285, 1287 (quoting 140 Cong. Rec. H8968–01, H8991 (daily ed. Aug. 21, 1994) (statement of Rep. Molinari)); *see also Castillo*, 140 F.3d at

881-82 (explaining that Rule 414 incorporates Congress's view that this evidence is "typically relevant and probative." *Citing* 140 Cong. Rec. S12990 (daily ed. Sept. 20, 1994) (statement of Sen. Dole)). Rule 414 favors liberal admission of propensity evidence even with the required Rule 403 balancing. *Id.*; *United States v. Enjady*, 134 F.3d 1427, 1433 (10th Cir. 1998); *United States v. LeCompte*, 131 F.3d 767, 769 (8th Cir. 1997) (noting "the strong legislative judgment that evidence of prior sexual offenses should ordinarily be admissible").

Consequently, in the context of this case, the Rule 414 evidence is highly probative. As noted, Rule 414 is allowed to prove propensity, this as well as the additional purposes discussed below, render this evidence highly relevant to the crimes charged in this case. *United States v. Meacham*, 115 F.3d 1488, 1492 (10th Cir. 1997).

**C. FED. R. EVID. 404(b)**

"Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). However, such evidence may be admissible for other relevant purposes. Fed. R. Evid. 404(b)(2). In weighing the admissibility of Rule 404(b) evidence, the Tenth Circuit considers four factors: (1) whether the evidence is offered for a proper purpose, (2) whether the evidence is relevant, (3) whether the probative value of the evidence is substantially outweighed by its prejudicial effect, and (4) whether a limiting instruction is given if the defendant requests it. *United States v. Parker*, 553 F.3d 1309, 1313-14 (10th Cir. 2009), *citing Huddleston v. United States*, 485 U.S. 681, 691 (1988). The standard of review is abuse of discretion. *Parker*, 553 F.3d at 1313. The standard for admissibility under Rule 404(b) is "permissive: '[I]f the other act evidence is relevant and tends to prove a

material fact other than the defendant's criminal disposition, it is offered for a proper purpose under Rule 404(b) and may be excluded only under Rule 403." *Id.* at 1314, *citing United States v. Tan*, 254 F.3d 1204, 1208 (10th Cir. 2001).

While the government asserts that the evidence regarding other acts of child molestation are either *res gestea* evidence or properly admissible pursuant to Federal Rule of Evidence 414, out of an abundance of caution, the government discloses the evidence involving the children discussed above under Rule 404(b). Such evidence reflects the defendant's sexual interest in minors, his intent, his knowledge, his identity, and his *modus operandi*; in addition it corroborates the descriptions of the charged victims and demonstrates that he did not engage in sexual contact with those children by mistake or accident. *United States v. Meacham*, 115 F.3d 1488, 1494 (10th Cir. 1997) (prior alleged molestations properly admitted to demonstrate intent, plan, and preparation under 404(b)); *United States v. Porter*, 881 F.2d 878, 886 (10th Cir. 1989) (corroborating the testimony of a prosecution witness is a proper purpose under Rule 404(b)).

The evidence that the defendant provided sleep aids to the children demonstrates his motive, opportunity, intent, preparation, and planning with regard to the acts of sexual molestation that he committed on these children. Such evidence will also assist the jury in understanding the difficulty some victims may have in describing the acts in precise detail. The evidence regarding the defendant's grooming behaviors, likewise, demonstrates his motive, opportunity, intent, preparation, and planning.

All of this evidence is relevant independent of any character or propensity inference. Indeed, the evidence demonstrates the defendant's motive, opportunity, intent, preparation, plan, knowledge, *modus operandi*, and lack of mistake or accident

as well as provides corroboration for the charged victims without need to resort to any inference regarding the defendant's character or propensity to commit acts of child molestation.

The evidence is highly probative in nature, and its relevance would not be substantially outweighed by the concerns articulated in Federal Rule of Evidence 403. While there is certainly some risk of "unfair" prejudice, *United States v. Isabella*, 918 F.3d 816, 837 (10th Cir. 2019) ("Unfair prejudice means an undue tendency to suggest a decision on an improper basis, commonly, though not necessarily, an emotional one."), any such concerns can be adequately addressed through the use of an appropriate limiting instruction.

**D. FED. R. EVID. 807**

Federal Rule of Evidence 807 provides:

> (a) In General. Under the following conditions, a hearsay statement is not excluded by the rule against hearsay even if the statement is not admissible under a hearsay exception in Rule 803 or 804:
>
> (1) the statement is supported by sufficient guarantees of trustworthiness—after considering the totality of circumstances under which it was made and evidence, if any, corroborating the statement; and
>
> (2) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts.[3]

Courts have held that "[t]he residual hearsay exception is to be used rarely, and only in exceptional circumstances that generally exist when a child sexual abuse victim relates the details of the abusive events to an adult." *United States v. Gallardo*, 970

[3] Rule 807 was amended in December 2019. The Committee Notes, however, explain that Rule 807 was "amended to fix a number of problems that the courts have encountered in applying it." The amendment, therefore, does not appear to invalidate the body of pre-2019 caselaw interpreting the Rule.

F.3d 1042, 1046 (8th Cir. 2020); *see also United States v. W.B.*, 452 F.3d 1002, 1005 (8th Cir. 2006) ("[E]xceptional circumstances generally exist when a child victim of sexual abuse is unable or unwilling to testify to a material issue regarding the abuse."). Indeed, the Tenth Circuit has noted that though Rule 807 "should be used only in extraordinary circumstances where the court is satisfied that the evidence offers guarantees of trustworthiness and is material, probative and necessary in the interest of justice . . . courts regularly employ the residual exception in child abuse litigation." *United States v. Harrison*, 296 F.3d 994, 1003 (10th Cir. 2002).

In determining whether hearsay statements made by a child in a sexual assault case are reliable for purposes of Rule 807, the court should consider "the spontaneity of the child's statement, the consistent repetition of the child's allegation, the mental state of the child, the use of terminology unexpected of a child of a similar age, and the lack of a motive to fabricate" as well as the length of time that had passed between the abuse and the statement. *United States v. Tome*, 61 F.3d 1446, 1452-53 (10th Cir. 1995) (discussing admissibility under prior residual hearsay exception Rule 803(24)). In order to admit a child's hearsay statement regarding sexual abuse, the court must consider whether the child "was particularly likely to be telling the truth when the statement was made." *Id.* at 1452.

K.W.'s video-recorded interview meets both requirements of Rule 807. First, K.W.'s video-recorded statements during the forensic interview are supported by sufficient guarantees of trustworthiness. Until recently, when, as described below, K.W. professed to have a lack of memory about the assaults, K.W.'s statements about the assaults have been consistent. Indeed, in the state prosecution in this matter, K.W. testified to the assault in the semi-truck and the local instances of molestation, albeit in

less detail than the forensic interview.[4] The forensic interview was conducted close in time to the assaults, which ended approximately two weeks prior to the January 16, 2013 interview. In the interview, K.W. uses terminology consistent with his age, such as "no-no" to describe both his penis and anus. K.W. also described the abuse with detail, and distinguished between the assault that occurred in the semi-truck with the pattern of abuse that occurred at home. *See Harrison*, 296 F.3d at 1005 (noting that "specificity and peculiarity" of the child's statement is relevant because "those features in themselves can suggest trustworthiness"). K.W. had no reason at all to fabricate during his forensic interview; rather, he explained that he did not want to have to stop visiting the defendant's home. And, unlike many of the cases in which courts have introduced hearsay evidence of sexual assault on a child, K.W.'s statements were recorded, so the jury will have an opportunity to observe and evaluate K.W.'s demeanor.

While no one else witnessed the assaults themselves—common in sexual assault cases—K.W.'s statements are corroborated in other ways. For instance, K.W. describes the sleeping arrangements in the semi-truck during the final assault in Nebraska. J.W.'s older brother, S.W., corroborates J.W.'s account of the sleeping arrangements and also recalls that he (S.W.) did not wake up during the night. K.W. also described the home where the defendant assaulted him repeatedly before the final semi-truck trip. Though K.W. cannot recall the address, he describes the area and the home in some detail.

K.W.'s recorded forensic interview is also more probative as to the assaults than any other available evidence. In 2018, when K.W. was 17, K.W. was interviewed by the FBI about the abuse by the defendant. During this interview, which was audio recorded,

---

[4] The forensic interview was introduced as evidence at the state trial.

K.W. claimed that he does not remember a lot because the events in question were "forever ago." K.W. explained that the defendant gave him melatonin to make him sleep and, occasionally, K.W. would wake up in the defendant's bed and he was "doing what he was doing." K.W. explained, however, that he does not "remember anything" because he "pretty much shut that thought out of [his head] and locked it away." K.W. said that the defendant "did something really bad," and explained that the defendant "was just pulling down [his] pants" and "started to do what he was doing."

In the 2018 interview, K.W. recalled that he travelled in the semi-truck with the defendant to places like South Dakota and California. K.W. recalled being on melatonin during these trips and did not remember if anything happened, though he did state that when "stuff would happen," everyone would be "on the same bed, but it wouldn't be, like, very bad stuff." K.W. stated that he convinced himself that "this will be fine" because he would get a reward in the morning. K.W. claimed that, on the last trip around Christmas, he "[doesn't] remember it at all" and "something probably did but . . . a lot of memories has been (inaudible) or forgotten."

On May 3, 2019, K.W. was interviewed again by the FBI and the U.S. Attorney's Office. In this interview, which was also recorded, K.W. recalled very little about the final truck trip with the defendant. K.W. explained that he "kind of pushed out a lot of those [trips] from [his] mind."

K.W.'s memory of the abuse—and his willingness to speak about it—was much clearer in 2013 than it is now. His 2013 forensic interview, which has all the indicia of truthfulness, is more probative than K.W.'s faded memory now. And because of the secretive nature of the defendant's assault on K.W., there is no other evidence more probative than the 2013 forensic interview. *See W.B.*, 452 F.3d at 1006 (admitting

video-taped forensic interview of child sexual assault victim under Rule 807 because child victim was "unable or unwilling to recall specific details regarding the abuse during her in-court testimony").

**CONCLUSION**

Evidence of the defendant's uncharged acts of child molestation of J.W., K.W., I.S., E.S., S.J.W., D.R., L.W., and M.S. is admissible under Federal Rule of Evidence 414. This evidence is alternatively admissible pursuant to Federal Rule of Evidence 404(b) in relation to all of the crimes with which the defendant is charged. Furthermore, evidence regarding the defendant providing sleep aides to children and his other grooming behaviors is admissible pursuant to Federal Rule of Evidence 404(b). K.W.'s video-recorded January 16, 2013 forensic interview is admissible pursuant to Federal Rule of Evidence 807.

Respectfully submitted,

JASON R. DUNN
United States Attorney

*s/ Jeremy Chaffin*
JEREMY CHAFFIN
Assistant U.S. Attorney
U.S. Attorney's Office
205 North 4th Street, Suite 400
Grand Junction, CO 81501
Tel: (970) 257-7113
Fax: (970) 248-3630
E-mail: jeremy.chaffin@usdoj.gov

*s/ Andrea Surratt*
ANDREA SURRATT
Assistant U.S. Attorney
U.S. Attorney's Office
REST OF BLOCK

Attorneys for Government

**CERTIFICATE OF SERVICE**

I hereby certify that on this 2nd day of December, 2020, I electronically filed the foregoing **GOVERNMENT'S NOTICE OF INTENT TO INTRODUCE EVIDENCE PURSUANT TO FEDERAL RULES OF EVIDENCE 414, 404(b), AND 807** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all parties of record.

s/ Cosandra Foster
COSANDRA FOSTER
Paralegal Specialist
U.S. Attorney's Office
205 N. 4th Street, Suite 400
Grand Junction, CO 81501
Telephone (970) 241-3843
Fax (970) 248-3630
E-mail: cosandra.foster@usdoj.gov

**INTERVIEW WITH K W**
**Q=Ed Prescott**
**A=K W**

A: There's a computer in the other room.

Q: Yeah, there is. I'll tell you a little bit about that okay?

A: Yeah, I wanna go play on it.

Q: That's not to play on that's a, that has a video system, okay. And see this up here, this is a camera…

A: I know.

Q: …so they can watch what we're doing.

A: I'm in sixth grade.

Q: You're in sixth grade? So that means you're pretty smart huh?

A: Yeah.

Q: All right. What I want you to do is go ahead and draw on that if you want, can you draw on that while we're talkin'?

A: Yeah.

Q: Can you do two things at once?

A: Yeah.

Q: Okay. I'll go ahead and sit down here…

A: Do you have any other crayons or colored pencils?

Q: We actually do, there's a whole cupboard full, you want big ones or small ones?

GOVERNMENT EXHIBIT 1
19-cr-00243-CMA-GPG

A: I don't care just bring (unintelligible) both of 'em.

Q: Mm, how 'bout we just bring one for now?

A: Okay.

Q: Do you remember my name?

A: No.

Q: Can you say Mr. Ed?

A: Mist- yeah.

Q: Is that a easy one to remember?

A: Yeah, because there's a show that has Eddie on it.

Q: There's a show that has Eddie on it?

A: (Unintelligible).

Q: So what show is that?

A: Mm, have you heard of Flashpoint?

Q: Huh?

A: Um, ye- do you watch Netflix?

Q: I do, actually.

A: You should watch Flashpoint, it's a - it's a Canadian SWAT team, it's a really good show?

Q: Canadian SWAT team?

A: Yeah.

Q: You know actually I have, a- and that's a series huh?

A: Yeah.

Q: Yeah, all right, yeah, I have watched that. In fact my son used to watch that.

A: How far did you get?

Q: Um, I've only watched a few of 'em um…

A: Good show?

Q: …so - huh?

A: Good show?

Q: Yeah, it's a good show. There's another one that we're watchin' - my wife and I are watchin' it's called uh, The Last Cowboy, where they have three ranches up in Montana, and it takes 'em all through their - the whole season of their ranching.

A: Yeah.

Q: Yeah.

A: Yeah, one of - we just got done watching cornered by SWAT members quit because he had a mental disorder.

Q: He had a - he had problems, he got a little too intense for him?

A: Yeah, because he kinda flipped (unintelligible).

Q: Oh, you know and that's not - not a good thing but sometimes people get under pressure and they do things that aren't - that aren't right, or they make - start makin' mistakes or somethin'. The military guys have that a lot, and they have to watch 'em real careful, so they do that. K do you know h- how to spell your name? I know you're in the sixth grade, so that might be a goofy question to ask you…

A: Yeah.

Q: …but can you spell your name…

A: Yeah.

Q: …your full name for me?

A: K

Q: I'm sorry?

A: K W

Q: W

A:

Q: What's your middle name?

A: Uh, I got two.

Q: What is it?

A:

Q: I'm sorry?

A:

Q:

A: Yes.

Q: And how do you spell ? Can you do me a favor?

A: Yeah.

Q: Because they need - I need to hear this and hear you speak clean, can you take your mouth out from under your jacket there? Okay. What's your date of birth K ?

A: Uh, it's 01.

Q: '01. And do you know your home address?

A: Yeah, Road.

Q: Road? And, we're in what city?

A: Um, Montrose, Colorado.

Q: Do you know your zip code here?

A: No.

Q: Okay. How 'bout your phone number?

A: Isn't it like 81504?

Q: You got it buddy. And what's your phone number?

A: I don't know they change it so much.

Q: Okay. Who's your teacher at school?

A: Um, Miss - I got a lot.

Q: You got a lotta teachers?

A: I'm in sixth grade, I switch class to class.

Q: I didn't know that, I thought they did that in junior high?

A: That's middle school.

Q: So, okay, are you in middle school now?

A: Yes.

Q: So it's the sixth, seventh, and eighth grade? Oh, okay. All right. See when I was in school years and years ago…

A: (Unintelligible) Miss (Barry), Mr. (Sell), Mr. (Perforest), m- Miss (Higman), Miss (Barry), uh, Mr. (Roth) and Mr. (White).

Q: So you have how many periods?

A: Seven.

Q: Seven periods? All right. Okay. And what classes do you like the best?

A: Uh, sixth and seventh.

Q: Sixth and seventh?

A: And third.

Q: What - what are those?

A: Computer, shop and then band.

Q: All right. Computer shop and math?

A: Band.

Q: And band, what in- instrument to you play?

A: Trumpet.

Q: Trumpet, I used to play the trombone.

A: Trombone?

Q: Yeah, now do you guys have a band, a marching band, or?

A: No, we just have a sit down band, we…

Q: I'm…

A: …well we do it up in the pavilion.

Q: Like a concert band? Oh, wow, how long have you been playin' the trumpet?

A: Since the beginning of the year.

Q: Since the beginning of this year?

A: Uh-huh, I already know like eight or nine notes.

Q: Oh, all right. Do you ha- you get to practice at home, do you have your own trumpet at home or do you - do you ha…

A: I have a trumpet at home.

Q: Okay. Great. And what do you do in shop?

A: Shop right now we're doing safety courses, we have to get 100% on all of 'em…

Q: Uh-huh.

A: …and drafting.

Q: And drafting? Okay, and drafting is when you draw out what you're gonna make?

A: Yeah.

Q: Okay, and do you do that on the computer or by hand?

A: By hand.

Q: By hand? And you know there's a program called AutoCAD like on the computer that will…

A: Yeah.

Q: …assist you?

A: But if you don't wanna do um, (unintelligible) call it, the buildings well if you don't like (unintelligible) well you can do that.

Q: Oh, okay. K I'm - I'm a, actually a Police Officer.

A: I know…

Q: Okay?

A: …you're a Detective.

Q: A Detective? Okay. And you probably know what a Detective does?

A: Yes.

Q: Goes out and investigates things? Okay. but my job a lotta times I work with kids, okay, and like I told you I'm from Grand Junction, so I meet in a house like this with other kids (L )…

A: Yeah.

Q: …um, I actually met at a school with (L , okay big (L ) and (I ) I met and e…

A: (E ).

Q: …(E ) I met at a house, he has a friend named (I ) do you know (I )? It's (E cousin?

A: Oh, yeah.

Q: Okay. (I ) and I met with him too okay, so I've actually talked to a buncha kids already, but my job is to help you guys.

A: I- I don't like (I ) he's annoying.

Q: Is he?

A: Yes.

Q: Okay.

A: When you get to know him and you're around him most of th- every week and he a- he will get annoying.

Q: And there are some people you don't get along with, I understand that, that - but uh, we all live in a world together don't we?

A: Uh-huh.

Q: Okay. So my job is to help you guys, all right, but in order for me to help you I need your help okay? You like puzzles?

A: Yeah.

Q: Okay. So if your little sister J took five pieces of the puzzle would you have a full puzzle?

A: Nope.

Q: No? Why, because somethin' would be missin' huh?

A: Yep.

Q: Okay. Um, so a lotta times my job as a Detective, is to put the puzzle together, but in order to do that I have to have pictures or so- I have to have pieces from everybody around that's involved in somethin' okay, and there's other times K , if w- no- well lemme ask you this, do you know what my house looks like?

A: No.

Q: I'd have to describe that to you wouldn't I? Okay. So because I don't know - you don't know what my house looks like you - you're - you're dependent on my description of that huh? Okay. So I need your help to describe things that

you saw or things that you have that happened, things that uh, you smell, you know, that type of stuff okay? Does that make sense?

A: Uh-huh.

Q: Okay. Do you know if I told you it was snowin' outside right now, what would that be truth or not a truth?

A: Uh, false.

Q: It'd be false huh? Okay. Um, can you give me an example of somethin' else that's not true?

A: Mm, it's cloudy.

Q: Okay, it's cloudy? And it's not cloudy today it's vey sunny out huh?

A: Yeah.

Q: For one - for a change. How 'bout if I told you it's 100 degrees out right now?

A: No, I wish.

Q: If I told you, and I was serious, K it's 100 degrees out, would I be tellin' you the truth or a lie?

A: No, a lie.

Q: Okay. All right. Um, do you know the difference between what's real and what's not real?

A: Yes.

Q: Okay. So if I told you that uh, the movie Flashpoint was real…

A: It is.

Q: …would I be tellin' the truth? Is it - is it somethin' that actually happened or is it just a movie?

A: It's a show but it's actually pretty cool, it's the Canadian SWAT team and they're a SWAT team…

Q: Yeah.

A: …and they actually do that s- kinda stuff.

Q: And they actually do, but Flashpoint is actually a movie huh?

A: No, it's a show.

Q: A show? That's what I meant. Okay. Get the difference there. Okay, so um, and if I said that uh, I uh, you rode a motorcycle across the country that would be making something up wouldn't it? Maybe somethin' you'd like to do…

A: Yeah.

Q: …go out and ride a motorcycle, but - so we don't wanna make things up okay, when we're talkin' can you - can we agree to do that…

A: Yeah.

Q: …if - that we tell the truth?

A: Yeah.

Q: Okay.

A: I just don't feel good.

Q: I'm sorry?

A: I don't feel good.

Q: Are yo- you feelin' okay that you can talk to me though?

A: Yeah.

Q: Okay. Um, there are some things that happen to us K that we like and some things we don't like, and some things we don't understand, and growin' up as a - as a kid some things happen that we don't understand and uh, that's why I'm here to talk to you okay? Can you - can you tell me about the incident of why I'm here, tell me - tell me why we came here today?

A: Um, like in the - (Mike ) has a wat- I don't know what it's called but it's a disease and it makes him like little children.

Q: So (Mike) has a disease that makes him like little children? Okay. And um, m- there are - there are places - there are places - or there are um, I'm sorry I'm got a loss for words there, there are ways people touch…

A: Yeah.

Q: … the wa- there are ways people touch you that you like, and ways people touch you - you don't like, okay?

A: Uh-huh.

Q: Can you tell me some ways your mom might touch you that you like?

A: (Unintelligible) she hugs me.

Q: Okay. How 'bout - how else?

A: That's it.

Q: Does she tickle your arms and back?

A: Yeah.

Q: Okay. And when y- when you're sick, does she rub your back for you?

A: Uh-huh.

Q: Okay, how 'bout your dad, does he give you good touches too?

A: Yeah, he wrestles me.

Q: He wrestled with you okay, and do you like to wrestle?

A: Uh-huh.

Q: Okay, and that's okay, huh? How 'bout ways that uh, someone would touch you that you don't like?

A: Uh, he - (Mike) touched me in the no-no.

Q: Okay, in the no-no, and can you explain to me what the no-no is for you?

A: Um, butt.

Q: In the butt? Okay. Um, and where else would be a place where - that would make you uncomfortable for someone to touch you?

A: In the other no-no.

Q: In your other no-no? And where would that other no-no be K '

A: Right well my penis.

Q: Your penis? Okay. So when we're talkin' can we use the word penis?

A: Yeah.

Q: And butt?

A: Uh-uh.

Q: Okay, you wanna, what do you wanna, I - I may have to ask you though 'cause if you say no-no for your bottom, and no-no for your penis, I won't know which one's which, okay, so I might have to ask you, okay? Can you tell me a little bit about that um, if someone's touched you there and who and when?

A: (Mike) touched me in the butt, (unintelligible)…

Q: Take your…

A: …(Mike) touched me in the (unintelligible) the night uh, he - before he got arrested.

Q: Okay, (Mike) touched you in the middle of the night - and I repeat stuff 'cause I wanna make sure I'm hearin' you right okay - (Mike) touched you in the middle of the night before he got arrested?

A: Yeah.

Q: Okay. Where were you at when that happened?

A: Asleep.

Q: Asleep? Where?

A: In the bed.

Q: In the bed, was it in a house…

A: The semi.

Q: …was it in the semi?

A: It's in the…

Q: Okay.

A: …(unintelligible).

Q: And were you here in Montrose or somewhere else?

A: Nebraska.

Q: In Nebraska? Okay. Were - you were in bed in the semi in Nebraska, um, who else was in bed?

A: Me, (S ) my little brother and that's it.

Q: Okay. And…

A: (Unintelligible) my brother was in the front of the semi.

Q: He was in the front?

A: Because just the bed's not big enough.

Q: Okay. So the bed is - they call it a sleeper I think on the back of a truck?

A: Yeah.

Q: So it wasn't big enough for all of you to be in there?

A: 'Cause it has a bunk bed but the bunk bed wasn't in there.

Q: Oh, okay. Okay. So who all was in the bed?

A: Me, my uncle and (L ).

Q: And (L ), and (L )'s your little younger brother?

A: Yeah.

Q: Okay. Okay. And what position were you in the bed, who was - who was at the back of sleeper who was in the middle and who was in the fr…

A: We were all laying together in the front.

Q: If the - if the sleeper's like this, and the fronta the truck is up here and you have a seat here and a seat here…

A: Uh-huh.

Q: …who was - who was here, who was here, and who was here?

A: (L ), (Mike), me.

Q: So (I ?

A: Yep.

Q: (Mike) and K ?

A: Yep.

Q: Okay. And K , where was - if - if this is the driver's right here…

A: Yeah.

Q: …and this is the passenger seat here…

A: Uh-huh.

Q: …where was your head, was it toward the driver's seat?

A: Uh-huh, towards the driver's seat.

Q: Okay, so K head was right here?

A: Yeah, we all had…

Q: How 'bout (Mike) where was his…

A: …all of ours was.

Q: Okay. So all of your heads are - are in fronta the truck? Towar- toward the driver's seat side? Okay. And K , were you facin' toward the back of the truck or toward the front?

A: Front. The front.

Q: Toward the front? Okay.

A: (Mike) was too and (L ) wasn't.

Q: (L ) was facin' this way?

A: Yeah, he always faces the wall (unintelligible).

Q: He likes the wall?

A: Yes.

Q: Okay. And you said (Mike) touched you while you were asleep in the truck?

A: Yeah.

Q: How did he do that?

A: With his penis.

Q: With his penis? Okay. You know, sometimes it's hard to talk about those things isn't it K ?

A: Yeah.

Q: You know what, but I need you to help me out okay? Okay, so where did he touch you in yo- with his penis?

A: In the butt.

Q: Okay. Um, did you have your pajamas on or shorts on and pants on?

A: Pajamas on.

Q: Uh, your PJs on? Okay, are they long pajamas or short pajamas?

A: Long.

Q: Long pajamas? Okay.

A: They're pants.

Q: I'm sorry?

A: They're pants.

Q: They're pants?

Q: K did (Mike) um, touch you over your clothing?

A: No.

Q: Or under your clothing?

A: Under.

Q: Under? Okay. Um, when - when someone touches you um, they either touch you on the outside or they touch you on the inside, did he touch you outside…

A: Inside.

Q: …your body or inside your body?

A: Inside.

Q: And how did - how did he do that, can you…

A: He put his penis up my butt.

Q: He put his penis up your butt? Okay. How did that feel?

A: Hurt.

Q: It hurt? How bad did that hurt?

A: Uh, badly.

Q: Um, what - how did you feel about that?

A: Bad.

Q: Uh, can you tell me a little bit more about that?

A: Mm, uh, not really, that's all I remember.

Q: Can you tell me a little bit more about how that made you feel?

A: Bad, it hurt.

Q: Okay. Does it still hurt?

A: No.

Q: How long did it hurt for?

A: A couple days.

Q: A couple days? Okay. And when he - when he did that um, was he just laying still, was he…

A: He (unintelligible)…

Q: …movin' around?

A: He was movin' around.

Q: Okay, can you tell me how?

A: Uh-uh. Not really, I was asleep, he was - all I felt was moving.

Q: Okay. Um, if I give you two dolls, can you show me what he did?

A: No.

Q: Huh?

A: No. It's just scary.

Q: I'm sorry?

A: It's - I don't like to do that stuff.

Q: Okay. Um, and you said he was moving around, was he movin' up against you?

A: Yeah.

Q: Or - or on top of you or…

A: Up against me.

Q: Up against you? Okay. Where were his hands when he was doin' that?

A: On me.

Q: Where at on you?

A: Like holding me in place so I couldn't move.

Q: So you couldn't move?

A: Yeah.

Q: Can you sh- can you show me on your - on your body where…

A: Right here.

Q: …his hands were?

A: Right here.

Q: Okay. How tight was he holdin' you?

A: Pretty tight, 'cause I was tryin' to move away.

Q: You were tryin' to move away? Okay. And you said your brother was (L ) was sleepin' here?

A: Yeah.

Q: Did he wake up durin' that time?

A: No.

Q: How 'bout (S - (S ) was in the front here somewhere?

A: He was passed out.

Q: Where was he at?

A: He was facing this way facing the window.

Q: Okay. What do you mean he was passed out?

A: He was like this, he was facing this way, there was something in the middle…

Q: Kind of a dog house or somethin'?

A: Holding him up…

Q: Yeah?

A: …and he was facing the window.

Q: Okay. And he didn't wake up?

A: Uh-uh.

Q: All right. K , how long did he do that for?

A: Couple minutes.

Q: Couple minutes? Did you go back to sleep after that?

A: No.

Q: Okay. How did that make - you know you said it hurt, but how did that make you feel in your mind?

A: Bad.

Q: Bad? Okay. Were you um, crying were you upset…

A: Yes.

Q: …were you…

A: I was upset and crying at the same time but…

Q: Okay.

A: …he couldn't hear me.

Q: Okay.

A: 'Cause I was on the other side of the bed crying in the bed.

Q: Could you - did you move away after he did that?

A: Yeah.

Q: Okay. And when you went like this, K , I'm sorry I a- I - it's - it's stuff I have to talk about, and I don't have to talk to you again about it okay, so let's do it one time.

A: Okay.

Q: You said you went like this, like he had both hands here?

A: Uh-huh.

Q: Okay. Um, is that the first time (Mike) did this?

A: No.

Q: How many times before?

A: A lot.

Q: What do you mean a lot?

A: I mean he started when I first was goin' over there.

Q: He started when you first were goin' over there?

A: Yeah.

Q: The same thing, puttin' his penis in your butt?

A: Uh-uh.

Q: What?

A: He started touching me and I moved away.

Q: Well, describe to me what do you mean by he started touching you?

A: He started touching me with his hand on my no-no-…

Q: On…

A: …on my penis.

Q: On your penis? Okay. And how often was that?

A: Not very often.

Q: Was it every weekend, every other weekend?

A: It was…

Q: Um…

A: …only once 'cause I started sleeping in the living room after that incident.

Q: Okay. You started sleepin' in the living room, now what - what living room is this, your house here in Montrose or the house up there?

A: Uh, Junction.

Q: What, do you know what that house looks like?

A: I don't remember now because it's so old uh, we - we moved.

Q: Y…

A: He moved I helped.

Q: I'm sorry?

A: He moved and I helped.

Q: Okay, he moved so…

A: Yeah.

Q: …do you know the house that he was livin' in now?

A: Uh-huh.

Q: Okay. Was it at that house?

A: Uh-uh.

Q: It was at a different house?

A: It was like a two story blue house and I don't remember the address.

Q: Two story blue house? Do you remember where you guys were livin' when that happened?

A: Uh, yeah.

Q: Where was that?

A: Yeah, we were - we were living uh, crap I don't remember we were living at a house with my - where my mom's best friend use to live before they moved because we got evicted out of our Orchard Mesa house.

Q: Okay, where your mom's best friend I - I need to ask you…

A: We were - we were living in a trailer park.

Q: Oh, okay. And was that…

A: I don't really remember…

Q: …do you know the name of the street?

A: Uh, no but it's in - it was like north do you know where north is?

Q: Uh-huh.

A: You - do you know a trailer park that where you keep on goin' past uh, the Texas Roadhouse…

Q: Okay.

A: …you know that trailer park…

Q: Okay.

A: …and it's right down right by the trashcan right there.

Q: When you pass Texas Roadhouse…

A: House, there's a trailer park you know where you go past the trailer park…

Q: Okay.

A: …right here…

Q: Uh-huh.

A: …if you turn right there and you go down there's a green trashcan.

Q: Oh, okay.

A: And then the trailer's right there.

Q: If I said there's a motorcycle shop in the area would I be tellin' the truth?

A: No. It's a Big-O it's like uh, tires it's Monkeys Grease something.

Q: Grease Monkey huh?

A: Yeah.

Q: Okay. Yeah. Do you remember there bein' a motorcycle shop next to the Grease Monkey or just right down below it - beside it?

A: I don't remember.

Q: Okay, but there's a Grease Monkey there?

A: Uh-huh.

Q: Okay. If I said Lemaster, would that help you out?

A: Uh-huh.

Q: Okay. Is that the name of the trailer park?

A: Mm, yeah I don't remember.

Q: Okay.

A: But if you keep on going down there's like Walmart, there's like Walmart…

Q: Uh-huh.

A: …right by Texas Roadhouse…

Q: Right.

A: …and if you keep on goin' down then you and there's kmart, hastings, uh…

Q: Okay.

A: …uh, I don't remember the other one it's like somethin' with a big like, co- like I can't remember…

Q: Now is the Grease Monkey next to it or across the street from it?

A: Like way down, there's like Hastings, Dollar Tree, uh, Rent-A-Center…

Q: Okay.

A: …uh, what's that called, Big - it's like a big, you know what the a- at the end of a sentence where you put it after (unintelligible) and you put a line and a circle under it?

Q: Uh-huh.

A: That's what it is.

Q: (Unintelligible)…

A: …it's big.

Q: Okay. All right, I think I can get that. Um, okay, so he started touching you, did he ever do this where he put his um…

A: Mm.

Q: …penis in your no-no?

A: No.

Q: Before, this was the first ti me?

A: Uh-huh.

Q: Okay. Um, did you tell him anything while he was doin' that?

A: No, I was passed out.

Q: Did you sa- and what do you mean you were passed out?

A: I was asleep and after he did it I woked up and I really hurt so I just switched sides and tried, couldn't fall back asleep 'cause it hurt that bad.

Q: Okay. K I need you to help me out here okay?

A: Okay.

Q: You said he put his hands here and was holding?

A: Yeah.

Q: Okay, so if he - if you knew he had his hands here would you have been asleep or awake?

A: E- asleep because it - it - 'cause his - if he was - I tried to move and he kept on pushing me back.

Q: Okay. So, did you know what he was doing when he did it?

A: Uh-uh.

Q: In other words…

A: Yeah.

Q: …and see when someone's asleep they don't know what's goin' on…

A: Yeah I…

Q: …if…

A: …I knew.

Q: …but you knew what was goin' on?

A: 'Cause I woke up after he went like that.

Q: Okay. All right. And you could feel…

A: Yeah.

Q: Okay. Um, when did you tell the first person about that?

A: (Unintelligible) first person was when I was at counseling yesterday.

Q: Okay. Um, did you ever talk to any of the other boys, kids about that?

A: No.

Q: Okay. So, do you know anyone else that he's uh, been touching before? Who's that?

A: Uh, i- my best friend, he's - his name is J W .

Q: Is what?

A: (J W ), one of - another of (D friends.

Q: How d- how do you know…

A: One of his cousin.

Q: …how do you know about that?

A: 'Cause um, I saw him.

Q: What do you mean?

A: I saw him when I walked in there his hand jerked from under the blanket.

Q: S- saw who?

A: (Mike).

Q: Doin' what?

A: Touching (J ).

Q: Okay. Touching (J ) where?

A: In the no-no in the penis with his hand.

Q: Okay, but you said that there was a blanket there?

A: Yeah, and he jerked his hand from where (J no-no was.

Q: Was (J ) awake at the time?

A: No, he was (unintelligible).

Q: I'm sorry?

A: It was way early in the morning I went in there to ask him for some milk because he locked it in his fridge so it don't go bad drink like it used to…

Q: Yeah.

A: …the first time, 'cause people just got out there and drink outta the gallon so it go way down…

Q: Yeah.

A: …real fast so he started lockin' it in his fridge.

Q: Okay. And where was - where was this though was it i- on the couch, were they on a bed?

A: On the bed in his room, because there was black fridge located in his room.

Q: Because what's in the room?

A: The bla- f- the - there's a little black fridge…

Q: Oh…

A: …like locked…

Q: …okay.

A: …(unintelligible).

Q: Okay. And it's in (J room or (Mike)'s room?

A: Uh, (J and (Mike) share a room.

Q: Oh, okay. And did you see that one time or more than once?

A: One.

Q: Okay. You know, I'm gonna back up a little bit K . When you said (Mike) touched you and he touched you a lot, um, what did he do when he touched you?

A: He just touched me in the penis.

Q: Lemme - lemme show you som- or can you show me if this - if this was your penis can you show me how he touched you?

A: He just went like this.

Q: Okay. And did he just hold it tight?

A: No, (unintelligible) it up.

Q: I'm sorry.

A: he loosened. he just holded it right there.

Q: Okay. Did he - did he hold his hand still or did he move his hand?

A: He holded it still.

Q: Okay. Um, is that the only way he did that?

A: Uh-huh.

Q: And you said he did that a lot, um, and you didn't talk to anybody about that before?

A: 'Cause I was afraid.

Q: Okay. Because you were afraid?

A: Yeah.

Q: What were you afraid of?

A: Really scared.

Q: Can you tell me why you were scared?

A: Because I like my cousin so much I did not wanna stop goin' over there.

Q: Okay, because you like your cousin so much?

A: Yeah, because there's - right where the house is located there's a big field me and him built a fort.

Q: Oh, when you say your cousin who are you talkin' about?

A: (J ).

Q: (J

A: Yeah, we built a f- build a - well we took - we - what we used - we used uh, (Mike)'s four-wheeler to bring a big old - old freezer…

Q: Yeah.

A: …and then we just you know, built it and dug down.

Q: Yeah.

A: Like it's like a mine type thing.

Q: Yeah. All right. I know when I was a kid I used to dig holes all the time we had a big field out behind our house and we'd make - we'd make a big hole and then we'd have dirt clots in there and we'd have dirt clot fights with each other.

A: Oh.

Q: But uh, just - the dirt wasn't hard like here it was soft.

A: Oh.

Q: And we'd bomb each other with dirt clots and it'd pull the grass up and have a big buncha dirt on it he - heave that and it'd go flyin' over, pretty soon somebody would say owe. So, but that was fun we used to - we'd have…

A: Yeah.

Q: …there was about…

A: We did that…

Q: …six of us.

A: …all the time.

Q: Yeah? So, but you were scared 'cause you like - you didn't wanna - you like your cousin (J )?

A: Yeah.

Q: And you like goin' over there?

A: He's not my cousin he's like one of my best friends.

Q: But you call him your cousin kinda?

A: Yeah.

Q: Okay. All right. And uh, has anybody else that you know that - that (Mike) touched?

A: hm-mm.

Q: Okay. Um, K , thank you for talkin' with me okay?

A: Uh-huh.

Q: I know it's hard, but it - it needs - we need to stop (Mike) and - and get him some help too but…

A: Yeah.

Q: …we need to get you some help okay, so this doesn't happen to other boys. But, and I already told you that I've talked to some other boys okay, and you can talk with them later about it…

A: Uh-huh.

Q: …'cause it may be a good thing too, but for right now um…

A: I just don't wanna go to school today.

Q: Okay and I don't think that - you probably shouldn't okay? But nobody at school knows about this, or should know about it okay?

A: My (unintelligible) my uh, counselor…

Q: Your counselor ta…

A: …(unintelligible) I just don't wanna go to school because I don't want to have an outburst.

Q: That's okay.

A: 'Cause if I have an outburst class e- they what they do they take grades down.

Q: Yeah, well…

A: They take the (unintelligible) points part, or whatever it's called par…

Q: Don't…

A: (Unintelligible)…

Q: …that's okay, don't let this cause your outbursts okay? This is a - this is over done and…

A: I had an outburst this morning and I don't want it to happen again.

Q: We- we'll try to do better from here okay? And, that's why I'm here - I'm here to help you all right?

A: Okay.

Q: Now, um, you talked about yourself here…

A: Yeah.

Q: …what about - what about (L )?

A: (L a hard sleeper, he don't wake up to anything.

Q: Okay. All right.

A: Um, the only way he'll wake up if you take all of his blankets and go like this, he wake up and punch you.

Q: Okay. All right. You know, remember we started at the beginning and I told you about the puzzle?

A: Yeah.

Q: And then I told you about my house that you wouldn't know…

A: Uh-huh.

Q: …what my house looked like, is there anything else K , that you can think of that I didn't ask you about, anything that you're aware of? Okay. All right. Um, well lemme ask you this, there's - there's a couple more questions, when (Mike) did that, did anything happen after he did that?

A: Uh-uh.

Q: A- what stopped it?

A: He uh, I don't know but he has pills, but I don't know what it helps him with.

Q: Okay. When - you said he did it for two minutes?

A: Uh-huh, like a couple them.

Q: What happened at the end of two minutes?

A: He got up and moved and went and did somethin' so he didn't do it again.

Q: I'm sorry?

A: He got up and went to do somethin' and then it didn't happen again it's ye…

Q: Okay, he got up and did somethin'?

A: Yeah I think he took pills.

Q: He - he took pills?

A: Yeah.

Q: Okay. All right. Well was there…

A: And he w- well one more thing, he was overdosing me with pills, to sleep with.

Q: When was that?

A: He does it every time I'm there.

Q: What do you mean he's overdosin' you?

A: He's t- he givin' me five or six - five to six pills of sleep medicine I d- gotta ask my mom what it's called 'cause…

Q: Okay.

A: …I can't name it…

Q: Okay.

A: …it's too hard.

Q: He'd give you five to six?

A: Yeah.

Q: How often did he give those to you?

A: Every night.

Q: Every night?

A: When I was over there.

Q: Did he give them to you this night?

A: No.

Q: No? Okay.

A: 'Cause he was out, or he would've.

Q: Okay. Um, and well what did those pills do to you? What do you think they did to you?

A: Well after three minutes I was out cold.

Q: You were out cold? Okay. What w- you know when you went to his house did you sleep on - in his bedroom or did you sleep on the couch, you said you slept on the couch?

A: Uh-huh, I slept on reclining chairs.

Q: Did you ever find yourself someplace else where yo- where you didn't go to sleep at?

A: Yeah, sometimes on the floor but (unintelligible).

Q: Okay. All right. All right. Um, K , do you have any questions for me?

A: Uh-uh.

Q: Okay. If you do you know how to get a hold of me?

A: Yeah.

Q: You ask your mom and she'll call me? Okay? She's got my phone number and she knows how to get a hold of me.

A: Uh-huh.

Q: Okay? And if you do have questions…

A: (Unintelligible) it's just been botherin' me…

Q: It would be kinda…

A: …she's so (unintelligible)…

Q: …kinda hard to sleep on that pillow huh?

A: Oh, (unintelligible) a long time.

Q: Okay. All right. Well, um, I'm gonna give your mom my - my card okay?

A: Okay.

Q: So that if you have questions, and it's okay, you can call me okay?

A: Okay.

Q: All right. Now let's go downstairs.

A: Is that your cat?

Q: Is that my cat? Nope, I don't have a cat, looks like it has a big fish though.

A: It does.

Q: Better fisherman than I am.

A: (Unintelligible).

Q: I don't catch fish that big.

A: Nobody catches my fish.

Q: I catch little fish.

A: (Unintelligible).

Q: Yeah. Okay.

A: (Unintelligible).

Q: Okay, be careful.

Woman: It'll take just a couple seconds to get restarted.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

CASE NO. 19-cr-00243-CMA-GPG

UNITED STATES OF AMERICA,

Plaintiff,

v.

**MICHAEL TRACY MCFADDEN,**

**Defendant.**

---

**UNOPPOSED MOTION TO EXTEND THE DEADLINE FOR FILING A RESPONSE TO THE "GOVERNMENT'S NOTICE OF INTENT TO INTRODUCE EVIDENCE PURSUANT TO FEDERAL RULES OF EVIDENCE 414, 404(b), AND 807" [DOC. 39]**

---

MICHAEL TRACY MCFADDEN, by and through counsel, Timothy P. O'Hara, Assistant Federal Public Defender, hereby requests that the Court extend the deadline for the filing of Objections to the "Government's Notice of Intent to Introduce Evidence Pursuant to Federal Rules of Evidence 414, 404(b), and 807" [Doc. 39] until the motions deadline (February 1, 2021). The government has no objection to such an extension.

1) On December 2, 2020, the government filed its Notice of Intent to Introduce Evidence Pursuant to Federal Rules of Evidence 414, 404(b), and 807 ("the Notice"). *See* Doc. 39.

2) Pursuant to this Court's Practice Standard's, "[o]bjections to Rule 404(b) Notices shall be filed no later than 7 days[1] after the Rule 404(b) Notice is filed." *See* CMA Crim. Practice Standard 12(g).

3) The government's Notice is 27 pages long and alleged significant, additional criminal conduct by Mr. McFadden, little of which was included in the Indictment. The conduct consisted of supplemental, uncharged, allegations of abuse toward both of the two alleged victims named in the Indictment, J.W. and K.W., but also included allegations of abuse by Mr. McFadden upon seven other children not named in the Indictment. The time-frame covered by the Notice is between 1989 and 2012. The Notice also alleged Mr. McFadden's use of sleep aids and grooming behaviors.

4) The government asserted several avenues of admissibility for this evidence, first suggesting that some or all of the aforementioned conduct is admissible as *res gestae* evidence and then citing several rules of evidence, including Federal Rules of Evidence 404(b), 414, and 807 (the Residual Exception).

5) While the alleged conduct does not come as a surprise considering the discovery materials disclosed by the government, undersigned counsel anticipates filing a lengthy response to the government's Notice, objecting to the admission of this alleged evidence, on grounds relating to, among other things, relevancy, reliability, and prejudice to Mr. McFadden. *See Huddleston v. United States*, 485 U.S. 681 (1988). In *Huddleston*, the Supreme Court expressed a general concern about the danger of this type of highly

[1] Undersigned counsel apologizes to the Court and government counsel for inadvertently allowing the Court's seven-day deadline to lapse. Undersigned counsel seeks the Court's leave to file the present document out of time.

prejudicial evidence and indicated that a multi-layered approach must be taken by the Court to analyze its admissibility:

> the protection against unfair prejudice [of 404(b) type evidence] emanates . . . from four other sources: first from the requirement of Rule 404(b) that the evidence be offered for a proper purpose; second, from the relevancy requirement of Rule 402 – as enforced through Rule 104(b); third from the assessment the trial court must make under Rule 403 to determine whether the probative value of the similar acts evidence is substantially outweighed by its potential for unfair prejudice, and fourth from Federal Rule of Evidence 105, which provides that the trial court shall, upon request instruct the jury that the similar acts evidence is to be considered only for the purpose for which is admitted.

*Id.* at 691-92 (citing *United States v. Ingraham*, 832 F.2d 229, 235 (1st Cir. 1987).

6) Due to the scope and complexity of the government's Notice, as well as the enormous impact that this evidence would have on the jury's consideration of the conduct alleged in the Indictment, a thorough and reasoned response, one based on extensive preparation and research, is required. Undersigned counsel has begun to prepare a response on behalf of Mr. McFadden but cannot file an appropriate one within the Court's deadline.

7) As a result, undersigned counsel requests that the deadline to file Objections to the government's Notice be extended until the motions deadline, February 1, 2021.

8) Undersigned counsel informed the government of the requested extension and the government has no objection.

WHEREFORE, undersigned counsel requests that the deadline to object to the government's Notice be extended until February 1, 2021.

Respectfully submitted,

VIRGINIA L. GRADY
Federal Public Defender

s/ Timothy P. O'Hara
TIMOTHY P. O'HARA
Assistant Federal Public Defender
633 Seventeenth Street, Suite 1000
Denver, Colorado 80202
Telephone: (303) 294-7002
FAX: (303) 294-1192
Email: timothy_ohara@fd.org
Attorney for Defendant

**CERTIFICATE OF SERVICE**

I hereby certify that on December 10, 2020, I electronically filed the foregoing

**UNOPPOSED MOTION TO EXTEND THE DEADLINE FOR FILING A RESPONSE TO THE "GOVERNMENT'S NOTICE OF INTENT TO INTRODUCE EVIDENCE PURSUANT TO FEDERAL RULES OF EVIDENCE 414, 404(b), AND 807" [DOC. 39]**

with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following e-mail addresses:

Jeremy Chaffin
Assistant U.S. Attorney
Email: jeremy.chaffin@usdoj.gov

Andrea Surratt
Assistant U.S. Attorney
Email: andrea.surratt@usdoj.gov

s/ Timothy P. O'Hara
TIMOTHY P. O'HARA
Assistant Federal Public Defender
633 Seventeenth Street, Suite 1000
Denver, Colorado 80202
Telephone: (303) 294-7002
FAX: (303) 294-1192
Email: timothy_ohara@fd.org
Attorney for Defendant

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

CASE NO. 19-cr-243-CMA-GPG

UNITED STATES OF AMERICA,

Plaintiff,

v.

**MICHAEL TRACY MCFADDEN,**

**Defendant.**

---

**DEFENDANT MICHAEL TRACY MCFADDEN'S FIFTH UNOPPOSED MOTION TO VACATE AND RESET TRIAL DATE PURSUANT TO 18 U.S.C. §3161(h)(7)(A)**

---

MR. MICHAEL TRACY MCFADDEN (hereinafter Mr. McFadden), by and through counsel, Timothy P. O'Hara, Assistant Federal Public Defender, respectfully moves this Court for an Order vacating current deadlines, including the motions deadline, the deadline to respond to the government's Notice of Intent to Introduce Evidence (Doc. 39)[1] (both currently set for February 1, 2021), the Final Trial Preparation Conference (currently set for March 23, 2021) and the trial date (currently set for April 5, 2021). Undersigned counsel requests that an additional four months (120 days) be excluded from the calculation of time under the Speedy Trial Act (18 U.S.C. §3161) and that the matter be set for trial in August 2021 with a motions deadline in early June 2021. The government does not oppose the present motion.

[1] On December 2, 2020, the government filed its Notice of Intent to Introduce Evidence Pursuant to Federal Rules of Evidence 414, 404(b), and 807. *See* Doc. 39. On December 10, undersigned counsel filed an Unopposed Motion to Extend the Deadline for Filing a Response. *See* Doc. 40. The Court granted the Unopposed Motion. *See* Doc. 41.

## I. Procedural Background

1) On May 17, 2019, the government filed a five count Indictment against Mr. McFadden alleging that he violated two different sections of the United States Criminal Code, 18 U.S.C. §§ 2241(c) and 2423(a). *See* Doc. 1. According to the Indictment, the alleged conduct occurred between 2007 and 2013. *See id.*

2) On May 21, 2019, Mr. McFadden was arrested in connection with the federal charges. *See* Doc. 8.

3) On May 22, 2019, Mr. McFadden appeared before the Honorable Magistrate Judge Gordon P. Gallagher for an Initial Appearance. *See* Doc. 5. At that time, the Court appointed counsel for Mr. McFadden. The Court also continued the matter until May 31, 2019, for an Arraignment, Detention Hearing, and Discovery Conference. *See id.*

4) On May 23, 2019, undersigned counsel filed a Notice of Appearance. *See* Doc. 4.

5) On May 31, 2019, the parties and Mr. McFadden appeared before Magistrate Judge Gallagher.[2] *See* Doc. 11. At that time, Mr. McFadden entered a plea of "Not Guilty" to the charges in the Indictment [Doc. 1]. *See id.* Also at that hearing, Mr. McFadden was detained. *See id.* Magistrate Judge Gallagher set the present matter for a Jury Trial to begin on July 1, 2019. At undersigned counsel's request the Court set

[2] Undersigned counsel appeared by VTC from Denver.

June 14, 2019, as the date by which a Motion to Continue the Trial should be filed. *See* Doc. 14 (Court minutes with corrected date).

6) On June 14, 2019, undersigned counsel filed Defendant Michael Tracy McFadden's Unopposed Motion to Vacate and Reset Trial Date Pursuant to 18 U.S.C. §3161(h)(7)(A). *See* Doc. 19.

7) On June 16, 2019, Magistrate Judge Gordon P. Gallagher granted in part and denied in part the defendant's Unopposed Motion to Vacate and Reset Trial Date Pursuant to 18 U.S.C. §3161(h)(7)(A). *See* Doc. 20. At that time, the Court excluded all time between the vacated trial date of July 1, 2019, and the date of January 6, 2020, from the speedy trial calculation. *See id.* The Court also set the deadline for the filing of pretrial motions as November 4, 2019. *See id.*

8) Since the initial Unopposed Motion to Vacate filed in June of 2019, undersigned counsel has filed successive motions to exclude time on August 22, 2019 (Doc. 26)[3], November 4, 2019 (Doc. 28), April 6, 2020 (Doc. 31), and September 8, 2020 (Doc. 37). All of the Motions were either filed jointly with the government or unopposed by the government. All of the Motions were granted without a hearing. *See* Docs. 20, 27, 29, 32, and 38.

9) In the most recent Unopposed Motion (Doc. 37) filed on September 8, 2020, undersigned counsel requested an extension of five months. The Court granted the request, excluding five months from the Speedy Trial calculation and setting new deadlines: for the filing of pretrial motions (February 1, 2021), for the Final Trial

[3] This was a Joint Motion for Exclusion of Time Under 18 U.S.C. § 3161(h). *See* Doc. 26.

Preparation Conference (March 23, 2021), and for a two-week long jury trial (to begin on April 5, 2021). *See* Doc. 38.

**II. Reasons for the Requested Extension**

Discovery Tendered by the Government

10) As described in prior Motions, the discovery in the present case is massive. Leading up to the most recent request for additional time, undersigned counsel had received the following discovery from the government:

a) 5,388 pages of transcripts,

b) 3,308 pages of police reports (combined between Grand Junction Police Department and Federal Bureau of Investigation),

c) 73 pages of Grand Jury material, and

d) about 58 video recorded interviews, totaling approximately 50 hours of video interview footage.

11) Undersigned counsel also received an extensive file from the Colorado State Public Defender's Office, the office that represented Mr. McFadden in the related state prosecution.

12) On November 19, 2020, undersigned counsel sent a letter to the government requesting 34 items of discovery. On December 2, 2020, the government responded in writing to the defendant's discovery requests.[4] In its letter, the government agreed to produce some of the requested information, agreed to investigate other information, and indicated it would not produce some information, because either it was not in the

[4] One of the defendant's requests was for a new version of a video interview that had been tendered previously with a 30-minute portion of the interview removed. Prior to its letter, the government sent a new copy of that interview, including the additional 30 minutes that had not been included in the original version.

government's possession, it did not fall under the government's discovery obligations, or the government believed that it was privileged.

13) On December 11, 2020, the parties convened by telephone to discuss the defendant's discovery requests. In a productive meeting, the parties were able to clarify their respective positions as to each discovery request.

14) On January 21, 2021, the government tendered 51 additional pages of discovery and two audio/video files, totaling approximately 35 additional minutes of footage. The government has confirmed that some of the information that was requested by the defendant no longer exists and that other information will not be obtained by the government and will need to be pursued by subpoena.

15) As a result, undersigned counsel believes that some discovery materials remains outstanding. This information must be obtained by subpoena as it is not in the control of the government at this time. Undersigned counsel is in the process of formulating those subpoenas to be able to file them with the Court in the next 30 days.

Ongoing Review of Discovery Materials & Consultation with Mr. McFadden

16) Undersigned counsel's review of the government's discovery materials is nearly complete. Undersigned counsel has reviewed the video/audio interview footage previously disclosed by the government[5] as well as all of the police reports. Undersigned counsel's review of the transcripts is ongoing.

17) The Amended Protective Order [Doc. 34] remains in place. Undersigned counsel has arranged for Mr. McFadden to receive the discovery materials consistent

[5] Undersigned counsel has not fully reviewed the audio/video footage recently disclosed by the government.

with the Amended Protective Order, and he continues to review the materials. He has not completed his review of the discovery at this time – partly due to the volume of information and partly due to the inconsistent access that he has been given to view the materials by the staff at Clear Creek County Jail.

18) Undersigned counsel plans to send Mr. McFadden the recently received discovery within the next few days.

19) Undersigned counsel and the investigator assigned to the present case continue to hold regular phone/IPad meetings with Mr. McFadden in order to make sure that he is informed about the status of the case.

Ongoing Investigation

20) As made apparent by the government's Notice of Intent to Introduce Evidence Pursuant to Federal Rules of Evidence 414, 404(b), and 807, the number of witnesses and the amount of information that the government anticipates it will present at trial are both significant. *See* Doc. 39. Therefore, the investigation of this information also must be extensive. And due to the passage of time since the alleged events are said to have occurred, locating witnesses has been a challenge. The investigation is ongoing and will require at least two more months to complete.

21) The witnesses predominately reside in or around the Grand Junction area, and, as the investigation has progressed, it has been determined that some witnesses live out-of-state.

22) Not all witnesses can be reached by telephone. As a result, in-person interviews will be required for those witnesses that cannot be contacted over the phone.

Due to the present circumstances surrounding the coronavirus pandemic, however, the investigation has been restricted to telephone interviews so additional time is required for this purpose.

23) It still is expected that undersigned counsel and an investigator will need to travel at least once to the Grand Junction area in order to conclude the investigation.

Ongoing Consultation with Expert Witnesses

24) Undersigned counsel continues to be in active consultation with more than one expert witness relating to the present case. Continued consultation with expert witnesses is a necessary part of Mr. McFadden's defense and additional time is needed for this purpose. One expert requires in-person consultation with Mr. McFadden, something that is not feasible at the present time.

Pretrial Motions

25) As indicated previously, there are numerous pretrial issues that demand attention, particularly relating to:

a) Pre-Indictment Delay,
b) Double Jeopardy,
c) A Motion for Bill of Particulars,
d) Response to FRE 404(b)/414,
e) Motions *in Limine*,
f) Motions to Sever Counts, and
g) The admissibility of oral statements of Mr. McFadden.

The research associated with these legal issues and the drafting of motions is ongoing.

Coronavirus (COVID-19) Pandemic

26) On March 13, 2020, in response to the global pandemic caused by the spread of the coronavirus (COVID-19), the Chief Judge of the United States District

Court for the District of Colorado issued an General Order that continued all trials scheduled to commence on or before April 3, 2020, and provided notice to litigants, attorneys, and the public that the Court's judicial officers will endeavor to reschedule hearings or convert hearings to telephonic appearances. *See* District Court General Order 2020-1. Through a series of subsequent general orders, the Chief Judge has extended the order delaying all civil and criminal trials through February 26, 2021. *See* District Court General Orders 2020-3 through District Court General Order 2021-2.

27) The recent pandemic has had a significant impact on undersigned counsel's ability to defend the present case. Investigation has been restricted to telephone contacts. Communication with Mr. McFadden has to be conducted by phone or by an IPad at the Clear Creek County Jail, not in-person. Access to Mr. McFadden by an expert has been limited.

28) Also, the trial will require a significant amount of time and a significant number of prospective jurors. The parties estimated in the Discovery Conference Memorandum that the trial will take at least two weeks. *See* Doc. 13. Depending on the number of witnesses that the government is allowed to call from its Notice [Doc. 39], as well as the length of time for jury selection, the parties' estimate may be insufficient.

29) Jury selection is expected to take much longer here than in the average case. Due to the subject matter alleged, many jurors will find it difficult to serve. In the prior state prosecution, many potential jurors were removed for cause due to their stated inability to be fair. The parties have discussed the use of a jury questionnaire in order to streamline this process. Undersigned counsel has begun the process of

preparing a jury questionnaire in hopes that the parties can present a joint questionnaire for the Court's approval.

Speedy Trial Calculation

30) The correct starting date for Speedy Trial purposes is the date of the Initial Appearance, May 22, 2019. *See* 18 U.S.C. §3161(c)(1). From that date, the original 70-day date was July 20, 2019. *See* Doc. 13 at p. 8.

31) According to the parties, as of June 28, 2019, 22 days ran on the speedy trial clock and 48 days remained. *See* Doc. 23 at p. 2. As of August 26, 2019, 36 days ran on the speedy trial clock, leaving 34 days remaining. *See* Doc. 30 at p. 2.

32) When the Court granted Doc. 31, the Third Unopposed Motion to Vacate, the Court excluded an additional five months from the speedy trial calculation, thus excluding time until November 2, 2020. *See* Doc. 32.

33) In granting Doc. 37, Defendant Michael Tracy McFadden's Fourth Unopposed Motion to Vacate and Reset the Trial Date Pursuant to 18 U.S.C. § 3161(h)(7)(A), the Court excluded an additional five months until April 6, 2021. *See* Doc. 38.

34) With the exclusion of an additional four months, the new Speedy Trial date would be approximately August 6, 2021.

Consultation

35) Undersigned counsel contacted the government about the present Motion. The Assistant United States Attorney handling the present matter has no objection to vacating the current dates nor to the requested extension of time.

36) Undersigned counsel advised Mr. McFadden about the requested continuance. Similarly, he has no objection.

## III. Standard for Continuances

37) Title 18 U.S.C. §3161(h)(7)(A) provides that a Court shall exclude a period of delay from computing the time within which a trial must commence where "the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial." The factors to be considered in such an evaluation are listed at 18 U.S.C. § 3161(h)(7)(B)(i)-(iv).

38) Pertinent factors that apply to an "ends of justice" finding in the present case include:

> (i) Whether the failure to grant such a continuance in the proceeding would be likely to make a continuation of such proceeding impossible, or a result in a miscarriage of justice.
>
> . . . .
>
> (iv) Whether the failure to grant such a continuance in a case which, taken as a whole, is not so unusual or so complex as to fall within clause (ii), would deny the defendant reasonable time to obtain counsel, would unreasonably deny the defendant or the Government continuity of counsel, or would deny counsel for the defendant or the attorney for the Government the reasonable time necessary for the effective preparation, taking into account the exercise of due diligence.

*See* 18 U.S.C. §1361(h)(7)(B)(Westlaw 2016). *See also*, *United States v. Toombs*, 574 F. 3d 1262, 1268-69 (10th Cir. 2009).

39) In the similar context of addressing trial continuances, the Tenth Circuit has set forth four factors that the Court should consider. *See United States v. West*, 828 F.2d 1468, 1470 (10th Cir. 1987). According to the Tenth Circuit, the Court should consider: (1) the diligence of the party requesting the continuance, (2) the likelihood that the continuance, if granted, would accomplish the purpose underlying the request for

continuance, (3) the inconvenience to the opposing party, its witnesses, and the court resulting from the continuance, and (4) the need asserted for the continuance and the harm that could be suffered as a result of the court's denial of the continuance. *See id.* No single factor is determinative. *See id.*

40) The decision to grant an "ends of justice" continuance is within the sound discretion of the Court, and is reviewed under an abuse of discretion standard. *See Toombs*, 574 F. 3d at 1262. "Adequate preparation time is a clearly permissible reason for granting a continuance and tolling the Speedy Trial Act." *United States v. Gonzales*, 137 F. 3d 1431, 1435 (10th Cir. 1998). The Supreme Court has recognized that "subsection (h)(7) expressly accounts for the possibility that a district court will need to delay a trial to give the parties adequate preparation time" to ensure that the ends of justice are met, and that "subsection (h)(7) provides 'much of the Act's flexibility.'" *Bloate v. United States*, 130 S. Ct. 1345 (2010).

## IV.   Argument

41) This case meets the criteria set forth in both 18 U.S.C. § 3161(h)(7) and *West*. Accordingly, undersigned counsel requests that this Court vacate the current trial date and exclude an additional four months from the speedy trial calculation.

42) At this time, undersigned counsel is not requesting a finding of complexity under subsections (h)(7)(B)(ii), but rather, is requesting a determination that the ends of justice will be served by the granting of the requested continuance because "the failure to grant such a continuance in the proceeding would . . . result in a miscarriage of justice" and "would deny counsel for the defendant . . . reasonable time necessary for effective preparation." 18 U.S.C. §3161(h)(7)(B)(iv). In the Discovery Conference

Memorandum and Order [Doc. 13], the parties did not estimate that the document disclosure would be "extensive," however, the amount of information tendered by the government (8,600 pages of written investigative materials and 50+ hours of audio/video interview footage) could easily qualify as extensive.

43) Undersigned counsel will require an additional four months to complete a review of the discovery materials tendered by the government, consult with Mr. McFadden about those materials and about trial, complete the necessary investigation, research the relevant legal issues, prepare a jury questionnaire and pretrial motions, and respond to the government's request to introduce evidence not directly related to the present charges, and prepare for trial.

44) The failure to grant the requested continuance on behalf of Mr. McFadden would result in a miscarriage of justice and would also deny undersigned counsel the reasonable time necessary for effective preparation as discussed in 18 U.S.C. §3161(h)(7)(B)(i) and (iv). Preparation for trial in the present case will require an enormous expenditure of time and energy for multiple lawyers.

45) Finally, a speedy trial extension of an additional 120 days would not offend the standard set forth by the Tenth Circuit in the *West* decision. By way of comparison with the related state trial, the period between Mr. McFadden's arrest (January of 2013) and the scheduled trial date in Mesa County (April of 2015) was 27.5 months.[6] Even including the extension requested herein, the present matter would proceed to trial in 27 months from the date of Mr. McFadden's federal arrest (May of 2019). Considering that

[6] The trial did not proceed in April of 2015 because a mistrial was declared. Instead, the matter proceeded to trial in July of 2015, more than 30 months after Mr. McFadden's arrest in January of 2013.

the amount of discovery has nearly doubled in the federal prosecution, the suggested timeline is eminently reasonable.

46) Thus far, undersigned counsel has diligently pursued the defense of Mr. McFadden's case, by reviewing discovery materials and requesting additional information from the government, reviewing thousands of pages of transcripts, watching/listening to hours of witness interviews, consulting with Mr. McFadden's prior attorneys from the state prosecution, conducting legal research about the potential pretrial motions, speaking with Mr. McFadden regularly, interviewing witnesses, and researching the use of subpoenas to obtain information in the present case. However, the nature and facts of the case, including but not limited to the amount of discovery (including a large quantity of audio/video footage and lengthy trial transcripts), the breadth and location of the expected investigation, the need to interview upwards of 40+ witnesses, the necessary legal research, the extensive consultation with Mr. McFadden, all of which are required and are such that no amount of diligent work can insure effective assistance of counsel prior to the current trial date as contemplated by the current speedy trial time-frame. Additionally, as described above, the COVID-19 pandemic has delayed matters.

46) Undersigned counsel believes that the requested extension would serve the stated purpose and allow undersigned counsel to be ready to file pretrial motions and to prepare for trial within the requested time frame.

WHEREFORE, Mr. McFadden respectfully requests that this Court issue an Order vacating current deadlines and the trial date, excluding an additional four months

Case 1:19-cr-00243-CMA-GPG Document 42 Filed 02/02/21 Page 14 of 15

from the speedy trial calculation, and setting a motions deadline for the beginning of June 2021 and setting the matter for trial in August of 2021.

Respectfully submitted,

VIRGINIA L. GRADY
Federal Public Defender

*s/ Timothy P. O'Hara*
TIMOTHY P. O'HARA
Assistant Federal Public Defender
633 Seventeenth Street, Suite 1000
Denver, Colorado 80202
Telephone: (303) 294-7002
FAX: (303) 294-1192
Email: Timothy_OHara@fd.org
Attorney for Defendant

Case 1:19-cr-00243-CMA-GPG Document 142 Filed 02/01/21 Page 15 of 15

**CERTIFICATE OF SERVICE**

I hereby certify that on February 1, 2021, I electronically filed the foregoing

**DEFENDANT MICHAEL TRACY MCFADDEN'S FIFTH UNOPPOSED MOTION TO VACATE AND RESET TRIAL DATE PURSUANT TO 18 U.S.C. §3161(h)(7)(A)**

with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

Jeremy Chaffin
Assistant United States Attorney
Jeremy.Chaffin@usdoj.gov

Andrea Surrat
Assistant United States Attorney
Andrea.Surrat@usdoj.gov

*s/ Timothy P. O'Hara*
TIMOTHY P. O'HARA
Assistant Federal Public Defender
633 Seventeenth Street, Suite 1000
Denver, Colorado 80202
Telephone: (303) 294-7002
FAX: (303) 294-1192
Email: Timothy_OHara@fd.org
Attorney for Defendant

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge Christine M. Arguello**

Criminal Action No. 19-cr-00243-CMA-GPG

UNITED STATES OF AMERICA,

Plaintiff,

v.

MICHAEL TRACY MCFADDEN,

Defendant.

---

**ORDER TO EXCLUDE TIME FROM SPEEDY TRIAL ACT**
**AND CONTINUE TRIAL DATES**

---

This matter is before the Court on Defendant Michael Tracy McFadden's Fifth Unopposed Motion to Vacate and Reset Trial Date (Doc. #42). The Court has reviewed this motion and the case file, and the reasons set forth in the motion, specifically:

1. Additional discovery was provided to defense counsel on January 21, 2021. Defense counsel needs additional time to review this new discovery with the Defendant.
2. Defense counsel's ability to review discovery with Defendant is limited due to COVID concerns at the facility in which the Defendant is being housed.

Upon review, the Court finds pursuant to 18 U.S.C. § 3161(h)(7)(A) that the ends of justice served by granting the motion outweigh the best interests of the public and the Defendant in a speedy trial. It is, therefore,

ORDERED that Defendant Michael Tracy McFadden's Fifth Unopposed Motion to Vacate and Reset Trial Date (Doc. #42) is GRANTED and time is excluded from the current trial date of **April 5, 2021** to **July 26, 2021**. It is

ORDERED that pretrial motions are due by **June 1, 2021**. Responses due by **June 15, 2021**. If counsel believes that an evidentiary hearing on the pretrial motions is necessary, a separate Motion for Evidentiary Hearing shall be filed at the same time the pretrial motions are filed. No later than three days after the filing of the Motion for Evidentiary Hearing, both counsel for the Defendant and counsel for the Government shall confer and e-mail Chambers at arguello_chambers@cod.uscourts.gov to set such a hearing.

FURTHER ORDERED that the Final Trial Preparation Conference set for March 23, 2021, is VACATED and RESET to **July 8, 2021, at 3:00 PM**, and will be held *via VTC.* Counsel are directed to contact my Courtroom Deputy via email (Socorro_West@cod.uscourts.gov) not later than THREE DAYS before the Hearing for instructions on how to proceed with the VTC/Telephone**.** It is

FURTHER ORDERED that **five-day jury trial** set to begin on April 5, 2021 is VACATED and RESET to **July 26, 2021, at 8:30 AM**, Courtroom A 602 of the Alfred A. Arraj United States Courthouse, 901 19th Street, Denver, CO, before Judge Christine M. Arguello.

DATED: February 2, 2021

BY THE COURT:

Christine M Arguello

CHRISTINE M. ARGUELLO
United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

CASE NO. 19-cr-243-CMA-GPG

UNITED STATES OF AMERICA,

Plaintiff,

v.

**MICHAEL TRACY MCFADDEN,**

**Defendant.**

---

**MOTION TO WITHDRAW AS COUNSEL OF RECORD AND FOR APPOINTMENT OF COUNSEL FROM THE CRIMINAL JUSTICE ACT PANEL**

---

MR. MICHAEL MCFADDEN, by and through undersigned counsel, requests an Order withdrawing the Federal Public Defender and undersigned counsel from further representation of him, and for the appointment of a member of the Criminal Justice Act Panel to represent him.

Colorado Rule of Professional Conduct (CRPC) 1.16 requires an attorney to withdraw from a client's case after representation has commenced when "the representation will result in violation of the Rules of Professional Conduct." *See* CRPC 1.16(a)(1) (2016). Undersigned counsel maintains that good cause exists for withdrawal in the present case because continued representation of Mr. McFadden would violate the Rules of Professional Conduct.

Specifically, CRPC 1.7 prevents the representation of a client if the representation involves a concurrent conflict of interest. *See* CRPC 1.7(a). Such a conflict exists if:

1) The representation of one client will be directly adverse to another client; or

> 2) There is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person . . .

*Id.*

Based on information learned within the last week, undersigned counsel believes that continued representation of Mr. McFadden would violate multiple Rules of the CRPC, particularly:

a) Rule 1.3 (Diligence),

b) Rule 1.7(a)(2) (Conflict of Interest: Current Clients), and

c) Rule 1.9 (Duties to Former Clients).

As a result, Rule 1.16(a) prohibits undersigned counsel's office from continuing to represent Mr. McFadden. Furthermore, undersigned counsel is precluded from disclosing more specific information as such information is covered by the attorney-client privilege. *See* CRPC 1.6.

Pursuant to CRPC 1.16, undersigned counsel is filing the present motion seeking withdrawal with the appointing authority. *See* Comment Two to CRPC 1.16. A copy of this motion will be mailed to Mr. McFadden. Because Mr. McFadden previously has been declared indigent, undersigned counsel respectfully requests that a member of the Criminal Justice Act Panel be appointed to represent him.

WHEREFORE, undersigned counsel respectfully requests that this Court issue an Order to withdraw the Federal Public Defender and undersigned counsel from further representation of Mr. McFadden, and to appoint a member of the Criminal Justice Act Panel to represent him.

Respectfully submitted,

VIRGINIA L. GRADY
Federal Public Defender

*s/Timothy P. O'Hara*

TIMOTHY P. O'HARA
Assistant Federal Public Defender
633 Seventeenth Street, Suite 1000
Denver, Colorado 80202
Telephone: (303) 294-7002
FAX: (303) 294-1192
Email: Timothy_OHara@fd.org
Attorney for Defendant

**CERTIFICATE OF SERVICE**

I hereby certify that on February 8, 2021, I electronically filed the foregoing

**MOTION TO WITHDRAW AS COUNSEL OF RECORD AND FOR APPOINTMENT OF COUNSEL FROM THE CRIMINAL JUSTICE ACT PANEL**

with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

Jeremy Chaffin
Assistant US Attorney
Jeremy.Chaffin@usdoj.gov

Andrea Surratt
Assistant US Attorney
Andrea.Surratt@usdoj.gov

and I hereby certify that I have mailed or served the document or paper to the following non CM/ECF participants in the manner (mail, hand-delivery, etc.) indicated by the non-participant's name:

Mr. Michael McFadden (U.S. Mail)

*s/Timothy P. O'Hara*
TIMOTHY P. O'HARA
Assistant Federal Public Defender
633 Seventeenth Street, Suite 1000
Denver, Colorado 80202
Telephone: (303) 294-7002
FAX: (303) 294-1192
Email: Timothy_OHara@fd.org
Attorney for Defendant

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 19-cr-00243-CMA-GPG

UNITED STATES OF AMERICA,

Plaintiff,

**v.**

**MICHAEL TRACY McFADDEN,**

**Defendant.**

---

**NOTICE OF ENTRY OF APPEARANCE**

---

COMES NOW, Sean M. McDermott, an attorney with the law firm of McDermott Stuart & Ward LLP, hereby enters his appearance as court appointed counsel in the above captioned matter on behalf of his client, Mr. McFadden.

Respectfully submitted,

s/Sean M. McDermott
Sean M. McDermott
McDermott Stuart & Ward LLP
140 E. 19th Avenue, Suite 300
Denver, CO 80203
(303) 832-8888
(303) 863-8888 (fax)
Email: smcdermott@mswdenver.com

**CERTIFICATE OF SERVICE**

  I hereby certify that on this 15th day of February 2021, I filed the foregoing **Notice of Entry of Appearance** with the Clerk of Court using the CM/ECF system which will send notification of such filing to all listed parties.

s/ Sean McDermott
  Sean McDermott

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 19-cr-00243-CMA-GPG

UNITED STATES OF AMERICA,

Plaintiff,

**v.**

**MICHAEL TRACY McFADDEN,**

**Defendant.**

---

**DEFENDANT MICHAEL TRACY MCFADDEN'S SIXTH UNOPPOSED MOTION TO VACATE AND RESET TRIAL DATE PURSUANT TO 18 U.S.C. §3161(h)(7)(A)**

---

COMES NOW, Mr. McFadden by and through his attorney Sean M. McDermott, and moves this Honorable Court to continue the scheduled trial date currently set for, July 26, 2021 extend the deadlines for filing Motions, and to exclude time from the Speedy Trial Act (18 U.S.C. §3161). As grounds thereof, Mr. McFadden states the following:

Procedural Summary of the Case

1. On May 17, 2019, the government filed a five count Indictment against Mr. McFadden alleging that he has violated two sections of the United States Criminal Code, 18 U.S.C. §§ 2241(c) and 2423(a). ( Document No. 1).

2. On May 21, 2019, Mr. McFadden was arrested in connection with the federal charges. (Document No. 8).

3. On May 22, 2019, Mr. McFadden appeared before the Honorable Magistrate Judge Gordon P. Gallagher for an Initial Appearance. (Docket No. 5). At that time, the Court

appointed counsel for Mr. McFadden. The Court also continued the matter until May 31, 2019, for an Arraignment, Detention Hearing, and Discovery Conference.

4.     On May 23, 2019, Mr. McFadden's previous counsel entered his appearance. (Document No. 4).

5.     On May 31, 2019, Mr. McFadden appeared before Magistrate Judge Gallagher. (Document No. 11). At that time, Mr. McFadden entered a plea of Not Guilty to the charges in the Indictment. Also at that hearing, the government sought to detain Mr. McFadden. The defense did not contest detention, but the defense did reserve the right to contest Mr. McFadden's detention later. At that time, Magistrate Judge Gallagher set the present matter for a Jury Trial to begin on July 1, 2019. At counsel's request the Court set June 14, 2019, as the date by which a Motion to Continue the Trial should be filed. (Document No. 14) (Court minutes with corrected date).

6.     On June 14, 2019, Mr. McFadden through his counsel filed Document No. 19, Defendant Michael Tracy McFadden's Unopposed Motion to Vacate and Reset Trial Date Pursuant to 18 U.S.C. §3161(h)(7)(A).

7.     On June 16, 2019, Magistrate Judge Gordon P. Gallagher granted in part and denied in part the defendant's Unopposed Motion to Vacate and Reset Trial Date Pursuant to 18 U.S.C. §3161(h)(7)(A). ( Document No. 20).  At that time, the Court excluded all time between the vacated trial date of July 1, 2019, and the date of January 6, 2020 from the speedy trial calculation. *See id.*  The Court also set the deadline for the filing of pretrial motions as November 4, 2019.

8.     On November 4, 2019, previous counsel filed Doc. 28, Defendant Michael Tracy McFadden's Second Unopposed Motion to Vacate and Reset Trial Date Pursuant to 18 U.S.C. §3161(h)(7)(A).

9.    On November 6, 2019, Magistrate Judge Gallagher granted (Document No. 28), and continued the jury trial until June 1, 2020, setting a motions deadline of April 6, 2020. (See Document No. 29).

10.    On April 6, 2020, Mr. McFadden's prior counsel filed Document No. 31, Defendant Michael McFadden's Third Unopposed Motion to Vacate and Reset Trial Date Pursuant to 18 U.S.C. §3161(h)(7)(A). In the unopposed motion, undersigned counsel requested an additional five months be excluded from the calculation of time under the Speedy TrialAct. (See Doc. 31).

11.    On April 7, 2020, Magistrate Judge Gallagher granted the unopposed motion, resetting the motions deadline until September 8, 2020, and the jury trial until November 2, 2020. (See Doc. 32).

12.    On May 4, 2020, prior counsel for Mr. McFadden moved the Court to expand the protective order. This was done so that Mr. McFadden could review the discovery in the case during times when counsel or an agent of counsel were unable to be present. (Document No. 33). This Motion was granted on May 6, 2020. (Document No. 34).

13.    On September 8, 2020 Mr. McFadden's attorney filed his Fourth Unopposed Motion to Vacate and Reset Trial Date Pursuant to 18 U.S.C. §3161(h)(7)(A) (Document No. 37).  This Motion was granted on September 9, 2020. (Document No. 38).

14.    On February 1, 2021, Mr. McFadden through his counsel filed his Fifth Unopposed Motion to Vacate and Reset Trial Date Pursuant to 18 U.S.C. §3161(h)(7)(A) (Document No. 42). This was granted on February 2, 2021. (Document No. 43)

15.    On February 7, 2021, Mr. McFadden's attorney filed a Motion to Withdraw as counsel (Document No. 44). On February 9, 2021, this Motion was granted. Document No. 45).

16.    On February 15, 2021 undersigned counsel entered his appearance. (Document No.

45).

Outside of the Court's Procedure

17. Previous counsel made a very good record regarding the amount of discovery in this case. (See Document No. 37 ¶ 14 -15; Document No. 42 ¶ 10 - 15). This record encapsulates the extensive discovery in this case. It includes 5,335 pages of transcripts, 3,308 pages of police reports, approximately 50 hours of video interview footage, and an extensive file from the office of the Colorado State Public Defender. Document 42 also addresses discovery that remains outstanding.

18. Previous counsel was having regular meetings with Mr. McFadden via phone to consult about the case. Previous counsel had been having Mr. McFadden review the discovery in the case, after the protective order was expanded. (See Document No. 37 ¶ 21; Document No. 42 ¶ 17- 19).

19. Mr. McFadden lost access to the discovery. After undersigned counsel was appointed to the case, Mr. McFadden was moved from the Clear Creek County Detention Facility to the facility in Washington County. His discovery did not accompany the trip. Related to this move was another circumstance that has slowed things down for Mr. McFadden's defense. Undersigned counsel had sent a release regarding attorney-client privilege for Mr. McFadden to sign. The reason for the release was so that Mr. McFadden could have his file released from the Public Defender to undersigned counsel. However, the release was delayed because when it arrived in Clear Creek County, Mr. McFadden was no longer there. The release was subsequently re-sent to Washington County. Once the release was received it was immediately sent to the Office of the Federal Public Defender on April 13, 2021. The Federal Public Defender processed the release and organized the materials so that the materials would be

intelligible to someone from outside of that office. The material was electronically delivered to undersigned on April 22, 2021. This file includes some of the investigation that has been done in this case. Despite best efforts by undersigned and previous counsel, undersigned counsel has had this material for just over four weeks.

20.     The previous legal team had two lawyers assigned to Mr. McFadden's case. (See Document No. 37 ¶ 22). The United States has two lawyers assigned to the case. This case has a lot of material and the potential consequences are serious. In addition to two lawyers preparing for trial, the previous legal team also had an appellate lawyer assigned to the case, to assist with pre-trial motions. (See Document No. 37 ¶38).

Speedy Trial Calculation

21.   Previous counsel calculated the speedy trial date in the Fifth Unopposed Motion to Continue (Document No. 42, ¶¶ 30 – 34)

22.     The correct starting date for Speedy Trial purposes is the date of the Initial Appearance, May 22, 2019. *See* 18 U.S.C. §3161(c)(1). From that date, the original 70-day date was July 20, 2019. (See Document No. 13 at p. 8).

23.     According to the parties, as of June 28, 2019, 22 days ran on the speedy trial clock and 48 days remained. *See* Doc. 23 at p. 2. As of August 26, 2019, 36 days ran on the speedy trial clock, leaving 34 days remaining. (See Document No. 30 at p. 2).

24.     When the Court granted Doc. 31, the Third Unopposed Motion to Vacate, the Court excluded an additional five months from the speedy trial calculation, thus excluding time until November 2, 2020. (See Document No. 32).

25.    In granting Document No. 37, Defendant Michael Tracy McFadden's Fourth Unopposed Motion to Vacate and Reset the Trial Date Pursuant to 18 U.S.C. § 3161(h)(7)(A),

the Court excluded an additional five months until April 6, 2021. (See Doc. 38).

26. On February 1, 2021, Mr. McFadden through his previous counsel filed his Fifth Unopposed Motion to Vacate and Reset the Trial Date Pursuant to 18 U.S.C. § 3161(h)(7)(A). (Doc. 42). The speedy trial calculation was done, and the proposed new speedy trial date was set to run on approximately August 6, 2021 (Document No. 42, ¶ 34).

27. To have enough time to properly investigate this case, and to minimize or obviate the need to request more continuances, and to avoid scheduling conflicts with two major trials that undersigned counsel has scheduled to commence on February 27, 2022 in Denver District Court, and March 28, 2022 in the United States District Court of Colorado, Courtroom A801; counsel for Mr. McFadden is requesting an additional 280 days be excluded from the speedy trial clock. This would put speedy trial at May 13, 2022.

Conferral

28. Undersigned counsel contacted the government about the present Motion. The Assistant United States Attorney handling the present matter has no objection to vacating the current dates nor to the requested extension of time.

Legal Standard For Continuances

29. Title 18 U.S.C. §3161(h)(7)(A) provides that a Court shall exclude a period of delay from computing the time within which a trial must commence where "the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial." The factors to be considered in such an evaluation are listed at 18 U.S.C. § 3161(h)(7)(B)(i)-(iv).

30. Pertinent factors that apply to an "ends of justice" finding in the present case include:

> (i) Whether the failure to grant such a continuance in the proceeding would be likely to make a continuation of such proceeding impossible, or a result in a miscarriage of justice.
>
> . . . .
>
> (iv) Whether the failure to grant such a continuance in a case which, taken as a whole, is not so unusual or so complex as to fall within clause (ii), would deny the defendant reasonable time to obtain counsel, would unreasonably deny the defendant or the Government continuity of counsel, or would deny counsel for the defendant or the attorney for the Government the reasonable time necessary for the effective preparation, taking into account the exercise of due diligence.

*See* 18 U.S.C. §1361(h)(7)(B). *See also*, *United States v. Toombs*, 574 F. 3d 1262, 1268-69 (10th Cir. 2009).

31. In the similar context of addressing trial continuances, the Tenth Circuit has set forth four factors that the Court should consider. *See United States v. West*, 828 F.2d 1468, 1470 (10th Cir. 1987). According to the Tenth Circuit, the Court should consider: (1) the diligence of the party requesting the continuance, (2) the likelihood that the continuance, if granted, would accomplish the purpose underlying the request for continuance, (3) the inconvenience to the opposing party, its witnesses, and the court resulting from the continuance, and (4) the need asserted for the continuance and the harm that could be suffered as a result of the court's denial of the continuance. *See id.* No single factor is determinative. *See id.*

32. The decision to grant an "ends of justice" continuance is within the sound discretion of the Court and is reviewed under an abuse of discretion standard. *See Toombs*, 574 F. 3d at 1262. "Adequate preparation time is a clearly permissible reason for granting a continuance and tolling the Speedy Trial Act." *United States v. Gonzales*, 137 F. 3d 1431, 1435 (10th Cir. 1998). The Supreme Court has recognized that "subsection (h)(7) expressly accounts for the possibility that a district court will need to delay a trial to give the parties adequate

preparation time" to ensure that the ends of justice are met, and that "subsection (h)(7) provides 'much of the Act's flexibility.'" *Bloate v. United States*, 130 S. Ct. 1345 (2010).

Argument

33. This case meets the criteria set forth in both 18 U.S.C. § 3161(h)(7) and *West*. Accordingly, undersigned counsel requests that this Court vacate the current trial date and exclude additional time from the speedy trial calculation. At this time, undersigned counsel is not requesting a finding of complexity under subsections (h)(7)(B)(ii), but rather, is requesting a determination that the ends of justice will be served by the granting of the requested continuance because "the failure to grant such a continuance in the proceeding would . . . result in a miscarriage of justice" and "would deny counsel for the defendant . . . reasonable time necessary for effective preparation." 18 U.S.C. §3161(h)(7)(B)(iv). The amount of information tendered by the government (8,600 pages of written investigative materials and 50+ hours of audio/video interview footage) is extensive. Furthermore, novel questions of law will be addressed, as the United States has filed extensive Motions regarding FRE 404(b), the timing of the indictment, subpoenas regarding possible privileged information may be necessary. Essentially, this is a complex case, except for the fact there is only one defendant. See 18 U.S.C. § 3161(h)(7)(B(ii).

34. Mr. McFadden is in Washington County which is in Eastern Colorado. The investigation to be completed in the case is on the Western Slope of Colorado.

35. The failure to grant the requested continuance on behalf of Mr. McFadden would result in a miscarriage of justice and would also deny undersigned counsel the reasonable time necessary for effective preparation as discussed in 18 U.S.C. §3161(h)(7)(B)(i) and (iv). Preparation for trial in the present case will require an enormous expenditure of time and energy.

36. Finally, a speedy trial extension of an additional 280 days would not offend the standard set forth by the Tenth Circuit in the West decision. By way of comparison with the related state trial, the period between Mr. McFadden's arrest (January of 2013) and the scheduled trial date in Mesa County (April of 2015) was 27.5 months but the case did not get tried until July 2015, about 30 months after Mr. McFadden's arrest. Undersigned counsel proposes that this case get to trial in just over a year after undersigned was appointed. As previous counsel pointed out the discovery in the Federal Case has nearly doubled. Additionally, the attorneys in the state case were geographically close to the places and witnesses that needed to be contacted.

37. Undersigned counsel is reviewing the case materials, he has conferred with previous counsel, and he has obtained a release from Mr. McFadden so that undersigned can use some of the work that prior counsel has done. This has been slowed somewhat because of the change in Mr. McFadden's location of incarceration. This is not counsel's doing. Counsel scheduled an in-person meeting with Mr. McFadden as soon as he was able and as soon as COVID restrictions began to ease.

38. Undersigned counsel believes that the requested extension would serve the stated purpose and allow undersigned counsel to be ready to file pretrial motions and to prepare for trial within the requested time frame.

WHEREFORE, Mr. McFadden respectfully requests that this Court issue an Order to vacate current deadlines and the trial date, excluding 280 days from the speedy trial calculation, and setting a motions deadline for the beginning of December 2021 and setting the matter for trial in May of 2022.

Respectfully submitted,

s/Sean M. McDermott

Case 1:19-cr-00243-CMA-GPG Document 181-1 Filed 05/26/21 Page 10 of 10

Sean M. McDermott
McDermott Stuart & Ward LLP
140 E. 19th Avenue, Suite 300
Denver, CO 80203
(303) 832-8888
(303) 863-8888 (fax)
Email: smcdermott@mswdenver.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 26th day of May 2021, I filed the foregoing **pleading** with the Clerk of Court using the CM/ECF system which will send notification of such filing to all listed parties.

s/ Sean McDermott
Sean McDermott

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge Christine M. Arguello**

Criminal Action No. 19-cr-00243-CMA-GPG

UNITED STATES OF AMERICA,

Plaintiff,

v.

MICHAEL TRACY MCFADDEN,

Defendant.

---

**ORDER TO EXCLUDE TIME FROM SPEEDY TRIAL ACT**
**AND CONTINUE TRIAL DATES**

---

This matter is before the Court on Defendant Michael Tracy McFadden's Sixth Unopposed Motion to Vacate and Reset Trial Date (Doc. #47). The Court has reviewed this motion and the case file, and the reasons set forth in the motion, specifically:

1. Counsel entered his appearance on this case on February 15, 2021.

2. After counsel was appoint to the case, Defendant was moved from the Clear Creek County Detention Facility to Washington County. Defendant's discovery did not accompany the Defendant.

3. Counsel needs additional time to review the discovery.

4. Defense counsel's ability to review discovery with Defendant is limited due to COVID concerns at the facility in which the Defendant is being housed.

Upon review, the Court finds pursuant to 18 U.S.C. § 3161(h)(7)(A) that the ends of justice served by granting the motion outweigh the best interests of the public and the Defendant in a speedy trial. It is, therefore,

ORDERED that Defendant Michael Tracy McFadden's Sixth Unopposed Motion to Vacate and Reset Trial Date (Doc. #47) is GRANTED and the Court hereby grants an ends of justice continuance in this case of **280 days**, which shall be excluded from the current trial date of **July 26, 2021**. It is

ODERED that pretrial motions are due by **December 6, 2021**. Responses due by **December 20, 2021**. If counsel believes that an evidentiary hearing on the pretrial motions is necessary, a separate Motion for Evidentiary Hearing shall be filed at the same time the pretrial motions are filed. No later than three days after the filing of the Motion for Evidentiary Hearing, both counsel for the Defendant and counsel for the Government shall confer and e-mail Chambers at arguello_chambers@cod.uscourts.gov to set such a hearing.

FURTHER ORDERED that the Final Trial Preparation Conference set for July 8, 2021 is VACATED and RESET to **April 19, 2022, at 3:00 PM**, and will be held *via VTC.* Counsel are directed to contact my Courtroom Deputy via email (Socorro_West@cod.uscourts.gov) not later than THREE DAYS before the Hearing for instructions on how to proceed with the VTC/Telephone**.** It is

FURTHER ORDERED that **five-day jury trial** set to begin on July 26, 2021 is VACATED and RESET to **May 2, 2022, at 8:30 AM**, Courtroom A 602 of the Alfred A.

Arraj United States Courthouse, 901 19th Street, Denver, CO, before Judge Christine M. Arguello.

DATED:  May 27, 2021

BY THE COURT:

CHRISTINE M. ARGUELLO
United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 19-cr-00243-CMA-GPG

UNITED STATES OF AMERICA,

Plaintiff,

**v.**

**MICHAEL TRACY McFADDEN,**

**Defendant.**

---

**UNOPPOSED MOTION FOR LEAVE TO FILE MOTIONS OUT OF TIME**

---

COMES NOW, Mr. McFadden by and through his attorney Sean M. McDermott, and moves this Honorable Court for leave to file Motions out Time. As grounds, Mr. McFadden states the following:

Conferral

1. On December 13, 2021, undersigned counsel contacted the government about the present Motion. The Assistant United States Attorney handling the present matter has no objection to the requested relief. Assistant United States Attorney Jeremy Chaffin did request that undersigned request in this Motion that the United States have through January 26, 2022, to respond to the defense motions. Undersigned Counsel appreciates the courtesy extended by opposing Counsel.

Basis For the Motion

2. After undersigned Counsel was appointed to this case, and after analyzing the breadth and seriousness of this case, on May 26, 2021, Mr. McFadden through counsel filed *Defendant Michael Tracy McFadden's Sixth Unopposed Motion to Vacate and Reset Trial Date*

*Pursuant to 18 U.S.C. §3161(h)(7)(A)*. (Doc. No. 47).

3. The Court granted this Motion and issued the Court's *Order to Exclude Time From Speedy Trial Act and Continue Trial Dates* (Doc. No. 48). In this order the Court stated "that pretrial motions are due by **December 6, 2021**. Responses due by **December 20, 2021**…" (Doc. No. 48, page 2).

4. Undersigned Counsel erroneously believed that Motions were due on December 15, 2021. On December 13, 2021, undersigned re-read the Court's order and realized his mistake. After realizing this mistake, undersigned counsel conferred via Electronic Mail with Assistant United States Attorney, Jeremy Chaffin. Due to another deadline, undersigned counsel did not file this Motion immediately after conferring with Mr. Chaffin.

5. Undersigned Counsel apologizes for any inconvenience to the Court or the United States, caused by undersigned's oversight. Being mindful of Mr. McFadden's situation and the stress that this case naturally brings him, undersigned counsel apologizes to him as well.

Legal Standard

6. The determination of whether a party's neglect of a deadline is excusable is at bottom an equitable one, taking account of all relevant circumstances surrounding the party's omission. These include the danger of prejudice to the party, the length of the delay and its potential impact on judicial proceedings, the reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith. *Pioneer Inv. Servs. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 395, 113 S. Ct. 1489, 1498 (1993).

Although the above cited case is not a criminal case, the standard should be applied. Additionally, Mr. McFadden has the Sixth Amendment right to effective assistance of counsel. Through no fault of his, if the Court does not grant this Motion, Mr. McFadden will be

prejudiced and denied his right to effective assistance of counsel. *See Buck v. Davis*, 137 S. Ct. 759, 775 (2017).

7.      In Mr. McFadden's case and as explained to the United States in a responsive conferral, undersigned counsel made a mistake. He was working heavily on an unrelated civil case that is complex and that has significant consequences to the litigants. Undersigned counsel had imminent deadlines on that case, which were not predictable at the beginning of that case, because they were dependent on when other parties filed their pleadings. Counsel believed that he had until December 15, 2021, to file Motions in this case. While the control and knowledge of that deadline was within counsel's control, counsel made a mistake. To compound matters, undersigned counsel had a problem with the digital file in this case which was corrupted. As of this writing, undersigned counsel is checking to make sure that the file has been fully restored. However, counsel is filing this Motion today, so that the proceedings in this case are not delayed. Counsel and Mr. McFadden have not acted in bad faith. If Mr. McFadden is not permitted to file Motions in his case, he will be prejudiced and denied his Sixth Amendment Right to Effective Assistance of Counsel.

WHEREFORE, Mr. McFadden respectfully requests that this Court issue an Order to permit the defense to file pretrial through Wednesday, December 22, 2021. and for the United States to have through January 26, 2021.


Respectfully submitted,

s/Sean M. McDermott
   Sean M. McDermott
   McDermott Stuart & Ward LLP
   140 E. 19th Avenue, Suite 300
   Denver, CO 80203
   (303) 832-8888
   (303) 863-8888 (fax)

Case 1:19-cv-02443-RM-GPG Document 149 Filed 12/15/21 USDC Colorado Page 4 of 4

Email: smcdermott@mswdenver.com

**CERTIFICATE OF SERVICE**

I hereby certify that on this 15th day of December 2021, I filed the foregoing **pleading** with the Clerk of Court using the CM/ECF system which will send notification of such filing to all listed parties.

s/ Sean McDermott
Sean McDermott

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 19-cr-00243-CMA-GPG

UNITED STATES OF AMERICA,

Plaintiff,

**v.**

**MICHAEL TRACY McFADDEN,**

**Defendant.**

---

**DEFENDANT MICHAEL TRACY MCFADDEN'S SUPPLEMENT TO MOTION FOR AN EXTENSION OF TIME AND SEVENTH MOTION TO VACATE AND RESET TRIAL DATE PURSUANT TO 18 U.S.C. §3161(h)(7)(A)**

---

COMES NOW, Mr. McFadden by and through his attorney Sean M. McDermott, and moves this Honorable Court to continue the scheduled trial date currently set for, May 2, 2021 and to extend the deadlines for filing Motions, and to exclude time from the Speedy Trial Act (18 U.S.C. §3161). As grounds thereof, Mr. McFadden states the following:

Procedural Summary of the Case

1. On May 17, 2019, the government filed a five count Indictment against Mr. McFadden alleging that he has violated two sections of the United States Criminal Code, 18 U.S.C. §§ 2241(c) and 2423(a). ( Document No. 1).

2. On May 21, 2019, Mr. McFadden was arrested in connection with the federal charges. (Document No. 8).

3. On May 22, 2019, Mr. McFadden appeared before the Honorable Magistrate Judge Gordon P. Gallagher for an Initial Appearance. (Docket No. 5). At that time, the Court

Case 1:19-cr-00243-CMA-GPG Document 151 Filed 06/27/21 Page 2 of 10

appointed counsel for Mr. McFadden. The Court also continued the matter until May 31, 2019, for an Arraignment, Detention Hearing, and Discovery Conference.

4. On May 23, 2019, Mr. McFadden's previous counsel entered his appearance. (Document No. 4).

5. On May 31, 2019, Mr. McFadden appeared before Magistrate Judge Gallagher. (Document No. 11). At that time, Mr. McFadden entered a plea of Not Guilty to the charges in the Indictment. Also at that hearing, the government sought to detain Mr. McFadden. The defense did not contest detention, but the defense did reserve the right to contest Mr. McFadden's detention later. At that time, Magistrate Judge Gallagher set the present matter for a Jury Trial to begin on July 1, 2019. At counsel's request the Court set June 14, 2019, as the date by which a Motion to Continue the Trial should be filed. (Document No. 14) (Court minutes with corrected date).

6. On June 14, 2019, Mr. McFadden through his counsel filed Document No. 19, Defendant Michael Tracy McFadden's Unopposed Motion to Vacate and Reset Trial Date Pursuant to 18 U.S.C. §3161(h)(7)(A).

7. On June 16, 2019, Magistrate Judge Gordon P. Gallagher granted in part and denied in part the defendant's Unopposed Motion to Vacate and Reset Trial Date Pursuant to 18 U.S.C. §3161(h)(7)(A). ( Document No. 20). At that time, the Court excluded all time between the vacated trial date of July 1, 2019, and the date of January 6, 2020 from the speedy trial calculation. *See id.* The Court also set the deadline for the filing of pretrial motions as November 4, 2019.

8. On November 4, 2019, previous counsel filed Doc. 28, Defendant Michael Tracy McFadden's Second Unopposed Motion to Vacate and Reset Trial Date Pursuant to 18 U.S.C. §3161(h)(7)(A).

9. On November 6, 2019, Magistrate Judge Gallagher granted (Document No. 28), and continued the jury trial until June 1, 2020, setting a motions deadline of April 6, 2020. (See Document No. 29).

10. On April 6, 2020, Mr. McFadden's prior counsel filed Document No. 31, Defendant Michael McFadden's Third Unopposed Motion to Vacate and Reset Trial Date Pursuant to 18 U.S.C. §3161(h)(7)(A). In the unopposed motion, undersigned counsel requested an additional five months be excluded from the calculation of time under the Speedy TrialAct. (See Doc. 31).

11. On April 7, 2020, Magistrate Judge Gallagher granted the unopposed motion, resetting the motions deadline until September 8, 2020, and the jury trial until November 2, 2020. (See Doc. 32).

12. On May 4, 2020, prior counsel for Mr. McFadden moved the Court to expand the protective order. This was done so that Mr. McFadden could review the discovery in the case during times when counsel or an agent of counsel were unable to be present. (Document No. 33). This Motion was granted on May 6, 2020. (Document No. 34).

13. On September 8, 2020 Mr. McFadden's attorney filed his Fourth Unopposed Motion to Vacate and Reset Trial Date Pursuant to 18 U.S.C. §3161(h)(7)(A) (Document No. 37). This Motion was granted on September 9, 2020. (Document No. 38).

14. On February 1, 2021, Mr. McFadden through his counsel filed his Fifth Unopposed Motion to Vacate and Reset Trial Date Pursuant to 18 U.S.C. §3161(h)(7)(A) (Document No. 42). This was granted on February 2, 2021. (Document No. 43)

15. On February 7, 2021, Mr. McFadden's attorney filed a Motion to Withdraw as counsel (Document No. 44). On February 9, 2021, this Motion was granted. Document No. 45).

16. On February 15, 2021 undersigned counsel entered his appearance. (Document No.

45).

17.    On May 26, 2021, after counsel reviewed the case, Mr. McFadden move this Court to Continue the trial and to reset the deadlines. (*See Defendant Michael Tracy McFadden's Sixth Unopposed Motion to Vacate and Reset Trial Date Pursuant to 18 U.S.C. §3161(h)(7)(A)* (Document No. 47).

18.    This Motion was granted, and the Court the Court rescheduled the trial to May 2, 2021, and the Court set a Motions Deadline of December 6, 2021. (Doc. No. 48).

19.    On December 15, 2021, Mr. McFadden's counsel filed his *Unopposed Motion For Leave to File Motions Outside of Time*. (Doc. No. 49) The Court granted this request. (Doc. No. 50).

20.    In Mr. McFadden's *Unopposed Motion For Leave to File Motions Outside of Time*. (Doc. No. 49), Mr. McFadden's counsel cited another case that has taken up tremendous resources and cited that as a reason for making the mistake of not filing Motions by December 6, 2021. That case has continued to take tremendous time and resources. The case is *Cuevas v. Public Service Company of Colorado dba Xcel Energy, et., al*. The case is in the district court of Denver Colorado. The case number is 2019CV34285. It is set for trial to commence on February 6, 2022. The case is not a routine case as the Plaintiff became paraplegic as the result of suffering a high voltage electric shock which caused him to fall from a stepladder and which resulted in a spinal cord injury. This matter is set for a discovery dispute hearing on December 22, 2021.

21.    Deadlines in that case were coming to a head, when undersigned counsel mistakenly thought the Motions deadline in this case was December 15, 2021.

22.    In late November, undersigned counsel also received a medical diagnosis which is discussed below.

Outside of the Court's Procedure

23. At the time of the diagnosis, undersigned counsel scheduled a surgery for March 11, 2022. Counsel spent early December looking into seeing if there were options for an earlier surgery. On December 16, 2021undesigned counsel had a consultation with the doctors that will perform the surgery. While the overall healing time is longer, undersigned was advised that he will not be able to be in front of a jury for eight weeks after the March 11, 2022, surgery. This conflicts with the scheduled trial date.

24. Because of the circumstances cited in this Motion and for some other reasons that are not mentioned, undersigned needs additional time to prepare Motions and Trial for Mr. McFadden.

25. Undersigned counsel's prognosis is good. Barring something that is unforeseen, undersigned counsel will be fine but needs time to heal following the March 11, 2022, surgery.

26. Mr. McFadden is aware of the circumstances mentioned in this Motion.

27. Previous counsel made a very good record regarding the amount of discovery in this case. (See Document No. 37 ¶ 14 -15; Document No. 42 ¶ 10 - 15). This record encapsulates the extensive discovery in this case. It includes 5,335 pages of transcripts, 3,308 pages of police reports, approximately 50 hours of video interview footage, and an extensive file from the office of the Colorado State Public Defender. Document 42 also addresses discovery that remains outstanding.

28. Previous counsel was having regular meetings with Mr. McFadden via phone to consult about the case. Previous counsel had been having Mr. McFadden review the discovery in the case, after the protective order was expanded. (See Document No. 37 ¶ 21; Document No. 42 ¶ 17- 19).

29. Mr. McFadden lost access to the discovery. After undersigned counsel was

appointed to the case, Mr. McFadden was moved from the Clear Creek County Detention Facility to the facility in Washington County. His discovery did not accompany the trip. Related to this move was another circumstance that has slowed things down for Mr. McFadden's defense. Undersigned counsel had sent a release regarding attorney-client privilege for Mr. McFadden to sign. The reason for the release was so that Mr. McFadden could have his file released from the Public Defender to undersigned counsel. However, the release was delayed because when it arrived in Clear Creek County, Mr. McFadden was no longer there. The release was subsequently re-sent to Washington County. Once the release was received it was immediately sent to the Office of the Federal Public Defender on April 13, 2021. The Federal Public Defender processed the release and organized the materials so that the materials would be intelligible to someone from outside of that office. The material was electronically delivered to undersigned on April 22, 2021. This file includes some of the investigation that has been done in this case. Despite best efforts by undersigned and previous counsel, undersigned counsel has had this material for just over four weeks.

30. The previous legal team had two lawyers assigned to Mr. McFadden's case. (See Document No. 37 ¶ 22). The United States has two lawyers assigned to the case. This case has a lot of material and the potential consequences are serious. In addition to two lawyers preparing for trial, the previous legal team also had an appellate lawyer assigned to the case, to assist with pre-trial motions. (See Document No. 37 ¶38).

Speedy Trial Calculation

31. Previous counsel calculated the speedy trial date in the Fifth Unopposed Motion to Continue (Document No. 42, ¶¶ 30 – 34)

32. The correct starting date for Speedy Trial purposes is the date of the Initial

Appearance, May 22, 2019. *See* 18 U.S.C. §3161(c)(1). From that date, the original 70-day date was July 20, 2019. (See Document No. 13 at p. 8).

33. According to the parties, as of June 28, 2019, 22 days ran on the speedy trial clock and 48 days remained. *See* Doc. 23 at p. 2. As of August 26, 2019, 36 days ran on the speedy trial clock, leaving 34 days remaining. (See Document No. 30 at p. 2).

34. When the Court granted Doc. 31, the Third Unopposed Motion to Vacate, the Court excluded an additional five months from the speedy trial calculation, thus excluding time until November 2, 2020. (See Document No. 32).

35. In granting Document No. 37, Defendant Michael Tracy McFadden's Fourth Unopposed Motion to Vacate and Reset the Trial Date Pursuant to 18 U.S.C. § 3161(h)(7)(A), the Court excluded an additional five months until April 6, 2021. (See Doc. 38).

36. On February 1, 2021, Mr. McFadden through his previous counsel filed his Fifth Unopposed Motion to Vacate and Reset the Trial Date Pursuant to 18 U.S.C. § 3161(h)(7)(A). (Doc. 42). The speedy trial calculation was done, and the proposed new speedy trial date was set to run on approximately August 6, 2021 (Document No. 42, ¶ 34).

37. To have enough time to properly investigate this case, and to minimize or obviate the need to request more continuances, and to avoid scheduling conflicts with two major trials that undersigned counsel has scheduled to commence on February 27, 2022 in Denver District Court, and March 28, 2022 in the United States District Court of Colorado, Courtroom A801; counsel for Mr. McFadden is requesting an additional 280 days be excluded from the speedy trial clock. This would put speedy trial at May 13, 2022.

Conferral

38. Undersigned counsel contacted the government about the present Motion. The

Assistant United States Attorney handling the present matter has no objection to vacating the current dates nor to the requested extension of time.

Legal Standard For Continuances

39. Title 18 U.S.C. §3161(h)(7)(A) provides that a Court shall exclude a period of delay from computing the time within which a trial must commence where "the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial." The factors to be considered in such an evaluation are listed at 18 U.S.C. § 3161(h)(7)(B)(i)-(iv).

40. Pertinent factors that apply to an "ends of justice" finding in the present case include:

> (i) Whether the failure to grant such a continuance in the proceeding would be likely to make a continuation of such proceeding impossible, or a result in a miscarriage of justice.
>
> . . . .
>
> (iv) Whether the failure to grant such a continuance in a case which, taken as a whole, is not so unusual or so complex as to fall within clause (ii), would deny the defendant reasonable time to obtain counsel, would unreasonably deny the defendant or the Government continuity of counsel, or would deny counsel for the defendant or the attorney for the Government the reasonable time necessary for the effective preparation, taking into account the exercise of due diligence.

*See* 18 U.S.C. §1361(h)(7)(B). *See also*, *United States v. Toombs*, 574 F. 3d 1262, 1268-69 (10th Cir. 2009).

41. In the similar context of addressing trial continuances, the Tenth Circuit has set forth four factors that the Court should consider. *See United States v. West*, 828 F.2d 1468, 1470 (10th Cir. 1987). According to the Tenth Circuit, the Court should consider: (1) the diligence of the party requesting the continuance, (2) the likelihood that the continuance, if granted, would accomplish the purpose underlying the request for continuance, (3) the inconvenience to the opposing party, its witnesses, and the court resulting from the continuance, and (4) the need

asserted for the continuance and the harm that could be suffered as a result of the court's denial of the continuance. *See id.* No single factor is determinative. *See id.*

42. The decision to grant an "ends of justice" continuance is within the sound discretion of the Court and is reviewed under an abuse of discretion standard. *See Toombs*, 574 F. 3d at 1262. "Adequate preparation time is a clearly permissible reason for granting a continuance and tolling the Speedy Trial Act." *United States v. Gonzales*, 137 F. 3d 1431, 1435 (10th Cir. 1998). The Supreme Court has recognized that "subsection (h)(7) expressly accounts for the possibility that a district court will need to delay a trial to give the parties adequate preparation time" to ensure that the ends of justice are met, and that "subsection (h)(7) provides 'much of the Act's flexibility.'" *Bloate v. United States*, 130 S. Ct. 1345 (2010).

Argument

43. This case meets the criteria set forth in both 18 U.S.C. § 3161(h)(7) and *West*. Accordingly, undersigned counsel requests that this Court vacate the current trial date and exclude additional time from the speedy trial calculation. At this time, undersigned counsel is not requesting a finding of complexity under subsections (h)(7)(B)(ii), but rather, is requesting a determination that the ends of justice will be served by the granting of the requested continuance because "the failure to grant such a continuance in the proceeding would . . . result in a miscarriage of justice" and "would deny counsel for the defendant . . . reasonable time necessary for effective preparation." 18 U.S.C. §3161(h)(7)(B)(iv). The amount of information tendered by the government (8,600 pages of written investigative materials and 50+ hours of audio/video interview footage) is extensive. Furthermore, novel questions of law will be addressed, as the United States has filed extensive Motions regarding FRE 404(b), the timing of the indictment,

subpoenas regarding possible privileged information may be necessary. Essentially, this is a complex case, except for the fact there is only one defendant. See 18 U.S.C. § 3161(h)(7)(B(ii).

44.     Mr. McFadden is in Washington County which is in Eastern Colorado. The investigation to be completed in the case is on the Western Slope of Colorado.

45.     The failure to grant the requested continuance on behalf of Mr. McFadden would result in a miscarriage of justice and would also deny undersigned counsel the reasonable time necessary for effective preparation as discussed in 18 U.S.C. §3161(h)(7)(B)(i) and (iv). Preparation for trial in the present case will require an enormous expenditure of time and energy.

46.     Finally, a speedy trial extension of an additional 280 days would not offend the standard set forth by the Tenth Circuit in the West decision. By way of comparison with the related state trial, the period between Mr. McFadden's arrest (January of 2013) and the scheduled trial date in Mesa County (April of 2015) was 27.5 months but the case did not get tried until July 2015, about 30 months after Mr. McFadden's arrest. Undersigned counsel proposes that this case get to trial in just over a year after undersigned was appointed. As previous counsel pointed out the discovery in the Federal Case has nearly doubled. Additionally, the attorneys in the state case were geographically close to the places and witnesses that needed to be contacted.

47.     Undersigned counsel is reviewing the case materials, he has conferred with previous counsel, and he has obtained a release from Mr. McFadden so that undersigned can use some of the work that prior counsel has done. This has been slowed somewhat because of the change in Mr. McFadden's location of incarceration. This is not counsel's doing. Counsel scheduled an in-person meeting with Mr. McFadden as soon as he was able and as soon as COVID restrictions began to ease.

48. Undersigned counsel believes that the requested extension would serve the stated purpose and allow undersigned counsel to be ready to file pretrial motions and to prepare for trial within the requested time frame.

WHEREFORE, Mr. McFadden respectfully requests that this Court issue an Order to vacate current deadlines and the trial date, excluding 280 days from the speedy trial calculation, and setting a motions deadline for the beginning of December 2021 and setting the matter for trial in May of 2022.

Respectfully submitted,

s/Sean M. McDermott
Sean M. McDermott
McDermott Stuart & Ward LLP
140 E. 19th Avenue, Suite 300
Denver, CO 80203
(303) 832-8888
(303) 863-8888 (fax)
Email: smcdermott@mswdenver.com

**CERTIFICATE OF SERVICE**

I hereby certify that on this 22nd day of December 2021, I filed the foregoing **pleading** with the Clerk of Court using the CM/ECF system which will send notification of such filing to all listed parties.

s/ Sean McDermott
Sean McDermott

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 19-cr-00243-CMA-GPG

UNITED STATES OF AMERICA,

Plaintiff,

**v.**

**MICHAEL TRACY McFADDEN,**

**Defendant.**

---

**ERRATA TO DEFENDANT MICHAEL TRACY MCFADDEN'S SUPPLEMENT TO MOTION FOR AN EXTENSION OF TIME AND SEVENTH MOTION TO VACATE AND RESET TRIAL DATE PURSUANT TO 18 U.S.C. §3161(h)(7)(A)**

---

COMES NOW, Mr. McFadden by and through his attorney Sean M. McDermott, and submits this Notice of Errata *to Defendant Michael Tracy McFadden's Supplement to Motion For an Extension of Time and Seventh Motion to Vacate and Reset Trial Date Pursuant to 18 U.S.C. § 3161(h)(7)(A)* (Doc. No. 51) and states the following:

**Paragraph 38** should read:

"Undersigned counsel contacted the United States about the present Motion by email communication two times. Undersigned counsel intended to place a phone call as well, but due to commitments on a separate matter, he did not do that prior to filing the Motion. Therefore, the Defendant, Michael McFadden cannot represent what the prosecution's position is" **instead of** "The Assistant United States Attorney handling the present matter has no objection to vacating the current dates nor to the requested extension of time."

Respectfully submitted,

s/Sean M. McDermott
Sean M. McDermott
McDermott Stuart & Ward LLP
140 E. 19th Avenue, Suite 300
Denver, CO 80203
(303) 832-8888
(303) 863-8888 (fax)
Email: smcdermott@mswdenver.com

**CERTIFICATE OF SERVICE**

I hereby certify that on this 23rd day of December 2021, I filed the foregoing **pleading** with the Clerk of Court using the CM/ECF system which will send notification of such filing to all listed parties.

s/ Sean McDermott
Sean McDermott

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 19-cr-00243-CMA-GPG

UNITED STATES OF AMERICA,

Plaintiff,

**v.**

**MICHAEL TRACY McFADDEN,**

**Defendant.**

---

**SECOND ERRATA TO DEFENDANT MICHAEL TRACY MCFADDEN'S SUPPLEMENT TO MOTION FOR AN EXTENSION OF TIME AND SEVENTH MOTION TO VACATE AND RESET TRIAL DATE PURSUANT TO 18 U.S.C. §3161(h)(7)(A)**

---

COMES NOW, Mr. McFadden by and through his attorney Sean M. McDermott, and submits this Notice of Errata *to Defendant Michael Tracy McFadden's Supplement to Motion For an Extension of Time and Seventh Motion to Vacate and Reset Trial Date Pursuant to 18 U.S.C. § 3161(h)(7)(A)* (Doc. No. 51) and states the following:

**Paragraph 37** should read

To have enough time to properly investigate this case, to file Motions that do not have errors, and to minimize or obviate the need and to avoid scheduling conflicts with a trial in the case that is referenced in ¶¶ 20-21 that is set to commence on February 7, 2022 in Denver District Court, and two trials in the United States District Court of Denver Colorado; *United States v. Juan Antonio-Amaya-Nunez, et.,al.,* and *Helvie v. Jenkins,* 20-cv-02521-STV, counsel for Mr. McFadden is requesting an additional 129 days be excluded from the speedy trial clock. This would put the speedy trial deadline on September 17, 2021.

**instead of**

To have enough time to properly investigate this case, and to minimize or obviate the need to request more continuances, and to avoid scheduling conflicts with two major trials that undersigned counsel has scheduled to commence on February 27, 2022 ,in Denver District Court, and March 28, 2022 in the United States District Court of Colorado, Courtroom A801; counsel for Mr. McFadden is requesting an additional 280 days be excluded from the speedy trial clock. This would put speedy trial at, May 13, 2022.

**Paragraph 38** should read:

"Undersigned counsel contacted the United States about the present Motion by email communication two times. Undersigned counsel intended to place a phone call as well, but due to commitments on a separate matter, he did not do that prior to filing the Motion. Therefore, the Defendant, Michael McFadden cannot represent what the prosecution's position is" **instead of** "The Assistant United States Attorney handling the present matter has no objection to vacating the current dates nor to the requested extension of time."

The prayer for relief should state, "Wherefore Mr. McFadden requests that this Court issue an Order to vacate current deadlines and the trial date, excluding 129 days from the speedy trial calculation, and setting a motions deadline for the beginning of March 2022 and setting the matter for trial in September of 2022."

Respectfully submitted,

s/Sean M. McDermott
  Sean M. McDermott
  McDermott Stuart & Ward LLP
  140 E. 19th Avenue, Suite 300
  Denver, CO 80203
  (303) 832-8888
  (303) 863-8888 (fax)

Email: smcdermott@mswdenver.com

**CERTIFICATE OF SERVICE**

I hereby certify that on this 23rd day of December 2021, I filed the foregoing **pleading** with the Clerk of Court using the CM/ECF system which will send notification of such filing to all listed parties.

s/ Sean McDermott
Sean McDermott

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 19-cr-00243-CMA-GPG

UNITED STATES OF AMERICA,

Plaintiff,

v.

**MICHAEL TRACY McFADDEN,**

**Defendant.**

---

**DEFENDANT MICHAEL TRACY MCFADDEN'S EIGHTH AND UNOPPOSED MOTION TO VACATE AND RESET TRIAL DATE PURSUANT TO 18 U.S.C. §3161(h)(7)(A)**

---

COMES NOW, Mr. McFadden by and through his attorney Sean M. McDermott, and moves this Honorable Court to continue the scheduled trial date currently set for, May 2, 2022, and to exclude time from the Speedy Trial Act (18 U.S.C. §3161). The primary ground for this is that undersigned counsel, is scheduled to have surgery on March 11, 2022. The recovery time is estimated at eight weeks. Undersigned Counsel regretfully but not voluntarily is medical unable to prepare for and conduct this trial. Undersigned counsel has conferred with Assistant United States Attorney Jeremy Chaffin. The United States does not oppose this request. The parties are requesting that the trial be re-set in October 2022. This is not an unduly lengthy delay, and it gives time for defense counsel to prepare following surgery, and it gives the United States time to prepare following its scheduled trial captioned *United States v. Hess, 20-cr-00098-CMA-GPG*. As further grounds thereof, Mr. McFadden states the following:

Procedural Summary of the Case

1. On May 17, 2019, the government filed a five count Indictment against Mr.

McFadden alleging that he has violated two sections of the United States Criminal Code 18 U.S.C. §§ 2241(c) and 2423(a). ( Document No. 1).

2.      On May 21, 2019, Mr. McFadden was arrested in connection with the federal charges. (Document No. 8).

3.      On May 22, 2019, Mr. McFadden appeared before the Honorable Magistrate Judge Gordon P. Gallagher for an Initial Appearance. (Docket No. 5). At that time, the Court appointed counsel for Mr. McFadden. The Court also continued the matter until May 31, 2019, for an Arraignment, Detention Hearing, and Discovery Conference.

4.      On May 23, 2019, Mr. McFadden's previous counsel entered his appearance. (Document No. 4).

5.      On May 31, 2019, Mr. McFadden appeared before Magistrate Judge Gallagher. (Document No. 11). At that time, Mr. McFadden entered a plea of Not Guilty to the charges in the Indictment. Also at that hearing, the government sought to detain Mr. McFadden. The defense did not contest detention, but the defense did reserve the right to contest Mr. McFadden's detention later. At that time, Magistrate Judge Gallagher set the present matter for a Jury Trial to begin on July 1, 2019. At counsel's request the Court set June 14, 2019, as the date by which a Motion to Continue the Trial should be filed. (Document No. 14) (Court minutes with corrected date).

6.      On June 14, 2019, Mr. McFadden through his counsel filed Document No. 19, Defendant Michael Tracy McFadden's Unopposed Motion to Vacate and Reset Trial Date Pursuant to 18 U.S.C. §3161(h)(7)(A).

7.      On June 16, 2019, Magistrate Judge Gordon P. Gallagher granted in part and denied in part the defendant's Unopposed Motion to Vacate and Reset Trial Date Pursuant to 18 U.S.C. §3161(h)(7)(A). ( Document No. 20). At that time, the Court excluded all time between

the vacated trial date of July 1, 2019, and the date of January 6, 2020 from the speedy trial calculation. *See id.* The Court also set the deadline for the filing of pretrial motions as November 4, 2019.

8.     On November 4, 2019, previous counsel filed Doc. 28, Defendant Michael Tracy McFadden's Second Unopposed Motion to Vacate and Reset Trial Date Pursuant to 18 U.S.C. §3161(h)(7)(A).

9.     On November 6, 2019, Magistrate Judge Gallagher granted (Document No. 28), and continued the jury trial until June 1, 2020, setting a motions deadline of April 6, 2020. (See Document No. 29).

10.     On April 6, 2020, Mr. McFadden's prior counsel filed Document No. 31, Defendant Michael McFadden's Third Unopposed Motion to Vacate and Reset Trial Date Pursuant to 18 U.S.C. §3161(h)(7)(A). In the unopposed motion, undersigned counsel requested an additional five months be excluded from the calculation of time under the Speedy TrialAct. (See Doc. 31).

11.     On April 7, 2020, Magistrate Judge Gallagher granted the unopposed motion, resetting the motions deadline until September 8, 2020, and the jury trial until November 2, 2020. (See Doc. 32).

12.     On May 4, 2020, prior counsel for Mr. McFadden moved the Court to expand the protective order. This was done so that Mr. McFadden could review the discovery in the case during times when counsel or an agent of counsel were unable to be present. (Document No. 33). This Motion was granted on May 6, 2020. (Document No. 34).

13.     On September 8, 2020 Mr. McFadden's attorney filed his Fourth Unopposed Motion to Vacate and Reset Trial Date Pursuant to 18 U.S.C. §3161(h)(7)(A) (Document No. 37).   This Motion was granted on September 9, 2020. (Document No. 38).

14.     On February 1, 2021, Mr. McFadden through his counsel filed his Fifth Unopposed Motion to Vacate and Reset Trial Date Pursuant to 18 U.S.C. §3161(h)(7)(A) (Document No. 42). This was granted on February 2, 2021. (Document No. 43).

15.     On February 7, 2021, Mr. McFadden's attorney filed a Motion to Withdraw as counsel (Document No. 44). On February 9, 2021, this Motion was granted. Document No. 45).

16.     On February 15, 2021 undersigned counsel entered his appearance. (Document No. 45).

17.     On May 26, 2021, after counsel reviewed the case, Mr. McFadden move this Court to Continue the trial and to reset the deadlines. (*See Defendant Michael Tracy McFadden's Sixth Unopposed Motion to Vacate and Reset Trial Date Pursuant to 18 U.S.C. §3161(h)(7)(A)* (Document No. 47).

18.     This Motion was granted, and the Court the Court rescheduled the trial to May 2, 2021, and the Court set a Motions Deadline of December 6, 2021. (Doc. No. 48).

19.     On December 15, 2021, Mr. McFadden's counsel filed his *Unopposed Motion for Leave to File Motions Outside of Time*. (Doc. No. 49) The Court granted this request. (Doc. No. 50).

20.     In Mr. McFadden's *Unopposed Motion for Leave to File Motions Outside of Time*. (Doc. No. 49), Mr. McFadden's counsel cited another case that has taken up tremendous resources and cited that as a reason for making the mistake of not filing Motions by December 6, 2021. That case has continued to take tremendous time and resources. The case is *Cuevas v. Public Service Company of Colorado dba Xcel Energy, et., al*. The case is in the district court of Denver Colorado. The case number is 2019CV34285. It was set for trial to commence on February 7, 2022. The case is not a routine case as the Plaintiff became paraplegic as the result of suffering a high voltage

electric shock which caused him to fall from a stepladder and which resulted in a spinal cord injury. This matter was set for a discovery dispute hearing on December 22, 2021. Currently, one party has settled and Motions requesting that the Court Reconsider its Rulings regarding Summary Judgment in favor of two Defendants are pending. The February 7, 2022, trial has been vacated.

21. Deadlines in that case were coming to a head, when undersigned counsel mistakenly thought the Motions deadline in this case was December 15, 2021.

22. In late November, undersigned counsel also received a medical diagnosis which is discussed below.

Outside of the Court's Procedure

23. At the time of the diagnosis, undersigned counsel scheduled a surgery for March 11, 2022. Counsel spent early December looking into seeing if there were options for an earlier surgery. On December 16, 2021undesigned counsel had a consultation with the doctors that will perform the surgery. While the overall healing time is longer, undersigned was advised that he will not be able to be in front of a jury for eight weeks after the March 11, 2022, surgery. This conflicts with the scheduled trial date as trial is scheduled for May 2, 2022. Not only does the recovery time from the surgery conflict with the trial but it is not compatible with preparation for trial.

24. The work involved in the case alluded to in ¶ 20-21 has also been greater than anticipated, so undersigned counsel can and will use any additional time that this Court gives to diligently represent Mr. McFadden and prepare for his trial.

25. Because of the circumstances cited in this Motion and for some other reasons that are not mentioned, undersigned needs additional time to prepare the Trial for Mr. McFadden.

26. Undersigned counsel's prognosis is good. Barring something that is unforeseen, undersigned counsel will be fine but needs time to heal following the March 11, 2022, surgery.

27.   Mr. McFadden is aware of the circumstances mentioned in this Motion.

28.   Previous counsel made a very good record regarding the amount of discovery in this case.  (See Document No. 37 ¶ 14 -15; Document No. 42 ¶ 10 - 15). This record encapsulates the extensive discovery in this case.  It includes 5,335 pages of transcripts, 3,308 pages of police reports, approximately 50 hours of video interview footage, and an extensive file from the office of the Colorado State Public Defender. Document 42 also addresses discovery that remains outstanding.

29.   Previous counsel was having regular meetings with Mr. McFadden via phone to consult about the case. Previous counsel had been having Mr. McFadden review the discovery in the case, after the protective order was expanded. (See Document No. 37 ¶ 21; Document No. 42 ¶ 17- 19).

30.   Mr. McFadden lost access to the discovery. After undersigned counsel was appointed to the case, Mr. McFadden was moved from the Clear Creek County Detention Facility to the facility in Washington County. His discovery did not accompany the trip. Related to this move was another circumstance that has slowed things down for Mr. McFadden's defense. Undersigned counsel had sent a release regarding attorney-client privilege for Mr. McFadden to sign. The reason for the release was so that Mr. McFadden could have his file released from the Public Defender to undersigned counsel. However, the release was delayed because when it arrived in Clear Creek County, Mr. McFadden was no longer there. The release was subsequently re-sent to Washington County. Once the release was received it was immediately sent to the Office of the Federal Public Defender on April 13, 2021. The Federal Public Defender processed the release and organized the materials so that the materials would be intelligible to someone from outside of that office. The material was electronically delivered to

undersigned on April 22, 2021. This file includes some of the investigation that has been done in this case. Despite best efforts by undersigned and previous counsel, undersigned counsel has had this material for just over four weeks.

31. The previous legal team had two lawyers assigned to Mr. McFadden's case. (See Document No. 37 ¶ 22). The United States has two lawyers assigned to the case. This case has a lot of material and the potential consequences are serious. In addition to two lawyers preparing for trial, the previous legal team also had an appellate lawyer assigned to the case, to assist with pre-trial motions. (See Document No. 37 ¶38).

32. The Washington County Jail is two hours away from undersigned counsel's office. Undersigned counsel had been utilizing confidential phone calls to prepare the trial with Mr. McFadden.

33. The Washington County Jail recently discontinued these confidential phone calls. Homewav, which is an internet virtual video method of communication is the only way for counsel to communicate with Mr. McFadden. Counsel had been advised to set up a Homewav appointment with Mr. McFadden during lockdown to ensure privacy.

34. On January 31, 2022, undersigned counsel had a scheduled visit with Mr. McFadden during lockdown. There was no confidentiality. Another inmate was mopping behind Mr. McFadden.

35. Therefore, the only way for undersigned counsel to have meaningful attorney-client communications, is to travel to Washington County for in-person visits.

36. Undersigned counsel intends to limit his caseload to accomplish this, but this does take additional time.

Speedy Trial Calculation

37. Previous counsel calculated the speedy trial date in the Fifth Unopposed Motion to Continue (Document No. 42, ¶¶ 30 – 34).

38. The correct starting date for Speedy Trial purposes is the date of the Initial Appearance, May 22, 2019. *See* 18 U.S.C. §3161(c)(1). From that date, the original 70-day date was July 20, 2019. (See Document No. 13 at p. 8).

39. According to the parties, as of June 28, 2019, 22 days ran on the speedy trial clock and 48 days remained. *See* Doc. 23 at p. 2. As of August 26, 2019, 36 days ran on the speedy trial clock, leaving 34 days remaining. (See Document No. 30 at p. 2).

40. When the Court granted Doc. 31, the Third Unopposed Motion to Vacate, the Court excluded an additional five months from the speedy trial calculation, thus excluding time until November 2, 2020. (See Document No. 32).

41. In granting Document No. 37, Defendant Michael Tracy McFadden's Fourth Unopposed Motion to Vacate and Reset the Trial Date Pursuant to 18 U.S.C. § 3161(h)(7)(A), the Court excluded an additional five months until April 6, 2021. (See Doc. 38).

42. On February 1, 2021, Mr. McFadden through his previous counsel filed his Fifth Unopposed Motion to Vacate and Reset the Trial Date Pursuant to 18 U.S.C. § 3161(h)(7)(A). (Doc. 42). The speedy trial calculation was done, and the proposed new speedy trial date was set to run on approximately August 6, 2021 (Document No. 42, ¶ 34).

43. To have enough time to properly investigate this case, and to minimize or obviate the need to request more continuances, and to avoid scheduling conflicts with two major trials that undersigned counsel had scheduled to commence on February 7, 2022, in Denver District Court, and March 28, 2022, in the United States District Court of Colorado, Courtroom A801;

present counsel for Mr. McFadden requested an additional 280 days be excluded from the speedy trial clock. (Document No. 46). On May 27, 2021, this Honorable Court excluded 280 days from the speedy trial clock, reset the trial date to May 2, 2022. Motions were ordered to be filed by December 6, 2021. (Doc. No. 48). Speedy trial expires on approximately May 13, 2022.

44. Undersigned counsel then requested to file Motions out of time. (Doc. No. 49). This request was granted. (Doc. No. 50).

45. Following this Mr. McFadden's counsel filed *Defendant Michael Tracy McFadden's Supplement to Motion For An Extension of Time and Seventh Motion to Vacate and Reset Trial Date Pursuant to 18 U.S.C. §3161(h)(7)(A*). (Doc. No. 51 Counsel filed an *Errata* (Doc. No. 52) and a second *Errata* (Doc. No. 53). The Court granted the Motion in part and denied the Motion in part. In pertinent part the Court ordered that the Motions deadline set for 1/5/2022 is VACATED and RESET to 3/21/2022. The Responses deadline set for 1/27/2022 is VACATED and RESET to 4/4/2022. The trial date was not continued and nor was the pre-trial conference.

Conferral

46. Undersigned counsel contacted the government about the present Motion. The Assistant United States Attorney handling the present matter has no objection to vacating the current dates nor to the requested extension of time. The parties discussed the reason for the requested relief and their respective schedules. The United States requested that if the trial date is rescheduled that it be rescheduled to an October setting.

Legal Standard For Continuances

47. Title 18 U.S.C. §3161(h)(7)(A) provides that a Court shall exclude a period of delay from computing the time within which a trial must commence where "the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a

speedy trial." The factors to be considered in such an evaluation are listed at 18 U.S.C. § 3161(h)(7)(B)(i)-(iv).

48. Pertinent factors that apply to an "ends of justice" finding in the present case include:

> (i) Whether the failure to grant such a continuance in the proceeding would be likely to make a continuation of such proceeding impossible, or a result in a miscarriage of justice.
>
> . . . .
>
> (iv) Whether the failure to grant such a continuance in a case which, taken as a whole, is not so unusual or so complex as to fall within clause (ii), would deny the defendant reasonable time to obtain counsel, would unreasonably deny the defendant or the Government continuity of counsel, or would deny counsel for the defendant or the attorney for the Government the reasonable time necessary for the effective preparation, taking into account the exercise of due diligence.

*See* 18 U.S.C. §1361(h)(7)(B). *See also*, *United States v. Toombs*, 574 F. 3d 1262, 1268-69 (10th Cir. 2009).

49. In the similar context of addressing trial continuances, the Tenth Circuit has set forth four factors that the Court should consider. *See United States v. West*, 828 F.2d 1468, 1470 (10th Cir. 1987). According to the Tenth Circuit, the Court should consider: (1) the diligence of the party requesting the continuance, (2) the likelihood that the continuance, if granted, would accomplish the purpose underlying the request for continuance, (3) the inconvenience to the opposing party, its witnesses, and the court resulting from the continuance, and (4) the need asserted for the continuance and the harm that could be suffered as a result of the court's denial of the continuance. *See id.* No single factor is determinative. *See id.*

50. The decision to grant an "ends of justice" continuance is within the sound discretion of the Court and is reviewed under an abuse of discretion standard. *See Toombs*, 574 F. 3d at 1262. "Adequate preparation time is a clearly permissible reason for granting a continuance and tolling the Speedy Trial Act." *United States v. Gonzales*, 137 F. 3d 1431, 1435

(10th Cir. 1998). The Supreme Court has recognized that "subsection (h)(7) expressly accounts for the possibility that a district court will need to delay a trial to give the parties adequate preparation time" to ensure that the ends of justice are met, and that "subsection (h)(7) provides 'much of the Act's flexibility.'" *Bloate v. United States*, 130 S. Ct. 1345 (2010).

Argument

51. This case meets the criteria set forth in both 18 U.S.C. § 3161(h)(7) and *West*. Accordingly, undersigned counsel requests that this Court vacate the current trial date and exclude additional time from the speedy trial calculation. At this time, undersigned counsel is not requesting a finding of complexity under subsections (h)(7)(B)(ii), but rather, is requesting a determination that the ends of justice will be served by the granting of the requested continuance because "the failure to grant such a continuance in the proceeding would . . . result in a miscarriage of justice" and "would deny counsel for the defendant . . . reasonable time necessary for effective preparation." 18 U.S.C. §3161(h)(7)(B)(iv). The amount of information tendered by the government (8,600 pages of written investigative materials and 50+ hours of audio/video interview footage) is extensive. Furthermore, novel questions of law will be addressed, as the United States has filed extensive Motions regarding FRE 404(b), the timing of the indictment, subpoenas regarding possible privileged information may be necessary. Essentially, this is a complex case, except for the fact there is only one defendant. See 18 U.S.C. § 3161(h)(7)(B(ii).

52. Mr. McFadden is in Washington County which is in Eastern Colorado. The investigation to be completed in the case is on the Western Slope of Colorado.

53. The failure to grant the requested continuance on behalf of Mr. McFadden would result in a miscarriage of justice and would also deny undersigned counsel the reasonable time

necessary for effective preparation as discussed in 18 U.S.C. §3161(h)(7)(B)(i) and (iv). Preparation for trial in the present case will require an enormous expenditure of time and energy.

54. Undersigned counsel is medically unable to conduct a trial on the scheduled date.

55. Furthermore, because of the continuing COVID-19 pandemic, it is currently uncertain whether the currently scheduled trial will be held in Grand Junction or Denver. This makes it difficult for both parties to secure and subpoena witnesses.

56. Finally, a speedy trial extension of an additional 172 days would not offend the standard set forth by the Tenth Circuit in the West decision. As previous counsel pointed out the discovery in the Federal Case has nearly doubled. Additionally, the attorneys in the state case were geographically close to the places and witnesses that needed to be contacted. The primary reason for the request of this continuance is counsel's health issue and need to recover from surgery.

57. Undersigned counsel is reviewing the case materials, he previously conferred with previous counsel, and he has obtained a release from Mr. McFadden so that undersigned can use some of the work that prior counsel has done. This was slowed somewhat because of the change in Mr. McFadden's location of incarceration. This is not counsel's doing. Counsel scheduled an in-person meeting with Mr. McFadden as soon as he was able and as soon as COVID restrictions began to ease.

58. Undersigned counsel believes that the requested extension would serve the stated purpose and allow undersigned counsel to be ready to file pretrial motions and to prepare for trial within the requested time frame. An exclusion of 172 days from the speedy trial clock would put speedy trial as expiring on November 1, 2022.

WHEREFORE, Mr. McFadden respectfully requests that this Court issue an Order to vacate current deadlines and the trial date, excluding 172 days from the speedy trial calculation, and setting the matter for trial in October of 2022.

Respectfully submitted,

s/Sean M. McDermott
Sean M. McDermott
McDermott Stuart & Ward LLP
140 E. 19th Avenue, Suite 300
Denver, CO 80203
(303) 832-8888
(303) 863-8888 (fax)
Email: smcdermott@mswdenver.com

Case 1:19-cr-00243-CMA-GPG Document 131-5 Filed 02/01/22 USDC Colorado Page 14 of 14

**CERTIFICATE OF SERVICE**

I hereby certify that on this 1st day of February 2022, I filed the foregoing **pleading** with the Clerk of Court using the CM/ECF system which will send notification of such filing to all listed parties.

s/ Sean McDermott
Sean McDermott

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Christine M. Arguello**

Criminal Action No. 19-cr-00243-CMA-GPG

UNITED STATES OF AMERICA,

Plaintiff,

v.

MICHAEL TRACY MCFADDEN,

Defendant.

---

**ORDER TO EXCLUDE TIME FROM SPEEDY TRIAL ACT
AND CONTINUE TRIAL DATES**

---

This matter is before the Court on Defendant Michael Tracy McFadden's Eighth and Unopposed Motion to Vacate and Reset Trial Date (Doc. # 55). The Court has reviewed this Motion and the case file, and the reasons set forth in the Motion, specifically:

1. Counsel needs additional time to prepare for trial.

2. Defense counsel's ability to review discovery with Defendant is limited due to COVID concerns at the facility in which the Defendant is being housed.

Upon review, the Court finds pursuant to 18 U.S.C. § 3161(h)(7)(A) that the ends of justice served by granting the Motion outweigh the best interests of the public and the Defendant in a speedy trial. It is, therefore,

ORDERED that Defendant Michael Tracy McFadden's Eighth and Unopposed Motion to Vacate and Reset Trial Date (Doc. # 55) is GRANTED and the Court hereby grants an ends of justice continuance in this case. It is

FURTHER ORDERED that all time between the current trial date of May 2, 2022 and the new trial date of November 7, 2022 shall be excluded from speedy trial calculations. It is

FURTHER ODERED that pretrial motions are due by **September 6, 2022**. Responses due by **October 10, 2022**. If counsel believes that an evidentiary hearing on the pretrial motions is necessary, a separate Motion for Evidentiary Hearing shall be filed at the same time the pretrial motions are filed. No later than three days after the filing of the Motion for Evidentiary Hearing, both counsel for the Defendant and counsel for the Government shall confer and e-mail Chambers at arguello_chambers@cod.uscourts.gov to set such a hearing. It is

FURTHER ORDERED that the Final Trial Preparation Conference set for April 19, 2022 is VACATED and RESET to **October 25, 2022, at 3:00 PM**, and will be held *via VTC.* Counsel are directed to contact Chambers, via email, not later than THREE DAYS before the Hearing for instructions on how to proceed with the VTC/Telephone. It is

FURTHER ORDERED that **five-day jury trial** set to begin on May 2, 2022 is VACATED and RESET to **November 7, 2022, at 8:30 AM**, Courtroom A 602 of the Alfred A. Arraj United States Courthouse, 901 19th Street, Denver, CO, before Judge Christine M. Arguello.

DATED: February 3, 2022

BY THE COURT:

CHRISTINE M. ARGUELLO
United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 19-cr-00243-CMA-GPG

UNITED STATES OF AMERICA,

Plaintiff,

**v.**

**MICHAEL TRACY McFADDEN,**

**Defendant.**

---

**UNOPPOSED MOTION FOR A ONE-WEEK EXTENSION TO FILE MOTIONS**

---

Mr. McFadden by and through his attorney Sean M. McDermott, moves this Honorable Court for a one-week extension of time to file Motions. As grounds thereof, Mr. McFadden states the following:

Conferral

1. The parties conferred by email. On September 1, 2022, the United States as represented by Jeremy Chaffin represented that the Government does not object to the requested one week extension, but opposes any further delay of this case. Therefore, this Motion is unopposed.

Reasons for the Requested Relief

2. On May 17, 2019, the government filed a five count Indictment against Mr. McFadden alleging that he has violated two sections of the United States Criminal Code, 18 U.S.C. §§ 2241(c) and 2423(a). ( Document No. 1).

3. Counts one and three are punishable by 30 years to life imprisonment and not less than five years to life of supervised release for a first offense. Counts 2,4-5 are punishable by ten

years to life imprisonment and five years to life of supervised release.

4. The allegations span the years 2007 through 2013. The age of the allegations presents challenges to the defense.

5. Defense counsel has limited his intake of new work, so that he can devote the time and attention to this case that Mr. McFadden deserves.

6. Nonetheless, undersigned counsel does have commitments to other clients and cases. One of these cases is *People v. Leon,* 2019CR1239, Boulder County.

7. The current posture of *People v. Leon* is that the trial is scheduled to commence September 19, 2022. It will likely go through most of that week. This trial was scheduled over Mr. Leon's objection outside of speedy trial. A fourth different prosecutor recently took the case over as the responsible attorney. The previous prosecutor was appointed to be the District Attorney in the twelfth judicial district of the state of Colorado.

8. On August 22, 2022, a late discovery disclosure was made by the People of Boulder in *People v. Leon*. Due to commitments, including commitments in the above captioned matter, counsel could not review this material until August 26, 2022. The material contains DEA reports from 2020. The discovery material points to other reports, including witness statements and officer reports that undersigned counsel does not believe have ever been disclosed to the defense. On September 1, 2022, undersigned counsel drove to Boulder to go through discovery with the prosecutor who has taken over this case. Undersigned counsel and this prosecutor intend to follow up with each other on Labor or as early as possible, the week of September 5th. A hearing in *People v. Leon* is scheduled for Friday, September 9, 2022.

9. The circumstances in *People v. Leon*, has taken time away from the time that had been allocated to finish the drafting of Motions in the above captioned matter. Undersigned

counsel could not, or at least did not foresee these circumstances.

10. Because of these unforeseen circumstances, that are not the fault of undersigned counsel or Mr. McFadden, Mr. McFadden respectfully requests an additional week, so that his counsel can finish drafting and revising motions in this case.

11. Good cause exists for this additional week.

WHEREFORE, Mr. McFadden respectfully requests that this Court give Mr. McFadden through September 13, 2022, to file Motions in this matter.


Respectfully submitted,

s/Sean M. McDermott
    Sean M. McDermott
    McDermott Stuart & Ward LLP
    140 E. 19th Avenue, Suite 300
    Denver, CO 80203
    (303) 832-8888
    (303) 863-8888 (fax)
    Email: smcdermott@mswdenver.com




**CERTIFICATE OF SERVICE**

I hereby certify that on this 2nd day of September 2022, I filed the foregoing **pleading** with the Clerk of Court using the CM/ECF system which will send notification of such filing to all listed parties.

    s/ Sean McDermott
        Sean McDermott

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 19-cr-00243-CMA-GPG

UNITED STATES OF AMERICA,

Plaintiff,

**v.**

**MICHAEL TRACY McFADDEN,**

**Defendant.**

---

**OBJECTION TO GOVERNMENT'S NOTICE OF INTENT TO INTRODUCE EVIDENCE PURSUANT TO FEDERAL RULES OF EVIDENCE 414, 404(b), AND 807**

---

Mr. McFadden by and through his attorney Sean M. McDermott, submits his response to the Government's Notice of Intent to Introduce Evidence Pursuant to Federal Rules of Evidence 414, 404(b) and 807:

Introduction

Mr. McFadden was a marked man who attempted to do right by his extended but dysfunctional family. Mr. McFadden was marked because of an illegal act of sexual assault that he pled guilty to shortly after his 18th birthday. That offense occurred on December 26, 1989. Mr. McFadden, who himself was abused as a child pled guilty to a sex offense against a minor.

Mr. McFadden was trusted with his extended family's kids and other kids. The kids' parents had serious problems and so the kids would stay with Mr. McFadden. The house was often crowded. Some of the parents would stay at the residence as well. On December 15, 2012, a disgruntled child who was upset with Mr. McFadden made up a story that Mr. McFadden had touched him. This child had previously said that nobody had ever sexually abused him.

This uncorroborated outcry broke the dam and a flood of false accusations followed. A second child who a mere three weeks earlier had denied any touching, changed his story, and alleged Mr. McFadden touched him.

An arrest warrant for Michael McFadden was applied for on January 3, 2013. The warrant alleged there was probable cause for the arrest of Mr. McFadden regarding these allegations against these two children, even though their allegations were objectively suspect.

Mr. McFadden has been unfairly accused. The prosecution takes great pains to point out that Mr. McFadden was convicted in state court. Mr. McFadden was convicted in state court because of the sheer volume of allegations. The prosecution knows that Mr. McFadden has zero chance of prevailing in this case if the Government is allowed to present the evidence that the Government wants to present in their Notice.

It is the **quantity rather than the quality of the allegations against Mr. McFadden that led to his unfair conviction in state Court**. Because the proffered evidence is **unfairly prejudicial**, Mr. McFadden requests that the proffered evidence not be admitted. Against the backdrop of the unfair allegations, that finally occurred in December 2012, by people who had previously said nothing happened, the Court should take into consideration the unfairness of the inflammatory nature of the allegations that are made without any physical corroboration.

Family Background

I.S.'s guardian was Dian Stauter. I.S. started to stay at Mr. McFadden's residence at 2980 D ½ Road, Grand Junction, CO because his mom worked out of state every other month.

Duane Ricks and Anita Ricks had a daughter named Cindy Ricks. Crystal McFadden is the daughter of Cindy Ricks and Tony McFadden, who is Michael McFadden's half-brother. Crystal McFadden has three children. These children include E.S. f/k/a E.M whose father is Mathew

(Ryan) Stauter She also had a child D.O. whose father is Ryan Olmstead. She also has a daughter, J.M. (INV_GJPD_0000025). The person who is the father is unknown. Ryan Stauter is I.S.'s Uncle.

Terry Ricks is the son of Duane and Anita Ricks. A woman named Theresa Ricks is married to Terry Ricks. Theresa is the daughter-in-law of Cindy Ricks. Theresa Ricks had Michelle Ricks who had four kids including L.W. and J.W. Thomas Wright acted as the legal father for L.W. (DOB 7/15/04) and J.W. (DOB 10/25/00). Thomas Wright and Michelle Ricks were divorced. (INV_GJPD_0000025). Michelle Ricks who is Mr. McFadden's niece and the mother of J.W. and L.W. had difficulty caring for J.W. and L.W. Therefore, the kids would come over. As their uncle, Michael McFadden would care for them

When Theresa Ricks would get upset with Mr. McFadden, she would talk about him being a registered sex offender in front of the kids. Theresa Ricks' grandparents Duane Ricks and Anita Ricks would also refer to Mr. McFadden being a registered sex offender in front of the kids.

The Wesolowski family moved next door to Mr. McFadden and others when Mr. McFadden resided at 2980 D ½ Road, Grand Junction Colorado. Prior to this, this family had reports of sexual abuse involving the children and completely independent of Mr. McFadden. These include allegations of someone perpetrating on S.J.W. and K.W. (INV_GJPD_1103), February 2007 allegations that K.W. touched S.J.W. inappropriately. (INV_GJPD_1103), investigation of other incest, *(INV_GJPD_1103)* and KW being a victim of neglect in 2010 (INV_GJPD_1104). K.W. would come to the home because Stacy Wesolowski was having difficulty with K.W. K.W. would often be put in a stabilizing unit.

Prior to moving to 2980 D ½ Road Mr McFadden resided at 476 Glen Road, Grand Junction, Colorado with Phyllis and John Hockenberry. Mr. McFadden moved in with the

Hockenberrys after his divorce from Tammie McFadden. In late 2009 they all moved to 2980 D ½ Road. The Hockenberry's reported that while at 476 Glen Road L.W., E.S., and K.W. would come to the home. They would stay the night. The Hockenberry's had a young son, S.H. who was friends with D.R. D.R. who was the young son of Leslie Rader. Therefore, D.R. would come over the house. (INV_GJPD_00000260). Mr. McFadden happened to know Leslie Rader from junior high school.

Beginning of the Investigation

After I.S. made his December 15, 2012, disclosure, law enforcement pulled Mr. McFadden's record and the reports from the 1989 case. This was done even though I.S. had previously made two false allegations against two different people. Law enforcement knew that Mr. McFadden was a registered sex offender for something he pled guilty to for something that was alleged when he was just north of 18 years old. On December 19, 2012, Detective Prescott looked up the 1990 case (INV_GJPD__48). Detective Prescott contacted Theresa Ricks and talked to her about her former son-in-law, Thomas Wright alleging that one of the boys made disturbing statements about things that Mr. McFadden had allegedly done in 2008. (INV_GJPD__49). That investigation had been closed when J.W. and his brother L.W. stated that nothing happened. (INV_GJPD_0000003 and GJPD0000007). LW was interviewed again and again said nothing happened. (INV_GJPD_29).

Detective Prescott went to visit Thomas Wright who was in jail on a parole violation, to revisit this non-disclosure from four years earlier. Although, there was a reasonable basis to pause and conduct further investigation, by January 3, 2013, Detective Prescott asked for and obtained an arrest warrant for allegations made by I.S. and then E.S. Within 17 days of his investigation Detective Prescott asked for and obtained an arrest warrant even though I.S. had made two

allegations against two other people and even though 13 days earlier E.S. had said that Mr. McFadden had not inappropriately touched him or I.S. and that I.S. was simply saying this to get Mr. McFadden in trouble. The dominoes fell from there.

**RULE 414 EVIDENCE**

**Allegation Made December 15, 2012**

**Other alleged Acts Related to I.S.**

On December 15, 2012, almost 23 years after the allegation that got Mr. McFadden branded a sex offender. I.S. made a disclosure that set off the chain of false accusations. His guardian Dian Stauter called the police. She told Officer Eric Wood, that I.S. told her son Ryan Stauter and his cousin E.M. (now E.S.) that Uncle Mike (McFadden) had touched him inappropriately.

Ms. Stauter also stated that I.S. had been acting out. She believed it was because she had to work out of state every other month from June 2012 until October 2012. What is not included in the police report is that I.S. came to stay on weekends with Mr. McFadden after I.S. falsely accused Ryan Staudard of sexually assaulting Mr. McFadden.

I.S. would stay with Uncle Mike (McFadden) at 2980 D ½ Road, Grand Junction, Colorado. At the time Ms. Staudard was interviewed I.S. was staying with Mr. McFadden on weekends while she worked. (INV_GJPD_0000007). What is not included in the report is that I.S. was upset with Mr. McFadden for enforcing Teresa's rules. I.S. then made a false allegation against Mr. McFadden.

I.S. had previously been interviewed by a caseworker. After having behavior issues and after acting out sexually he was interviewed on March 3, 2009, I.S. denied that anyone had ever touched him inappropriately. (INV_GJPD_000179). In October 2011, abuse against I.S. by another person who is not Michael McFadden was investigated. (INV_GJPD_1078).

As a result of I.S.'s report E.S. f/k/a E.M. was interviewed on December 21, 2012. E.S. was asked whether he had ever been touched inappropriately by Mr. McFadden. He answered no. E.S. said that I.S. told him that Mr. McFadden or Uncle Mike had touched him inappropriately. E.S. stated that Mike did not touch I.S. or anyone else in the privates. He stated that I.S. said this because he just wanted to get Mr. McFadden in trouble but that he didn't know why he wanted to get Mr. McFadden in trouble. (INV_GJPD_ 000331). In sum, I.S.'s allegation is unfairly prejudicial as misappropriation to Mr. McFadden or retaliation against Mr. McFadden for enforcing I.S.'s mother's rules is a real possibility.

**Other alleged Acts Related to E.S. f/k/a E.M.**

As stated above, on December 21, 2012. E.S. denied being touched by Mr. McFadden. He even went as far to say that Mr. McFadden didn't touch him or anyone inappropriately and that I.S. was just trying to get Mr. McFadden in trouble. (INV_GJPD_ 000331). On January 2, 2013, Detective Prescott was scheduled to interview E.M.'s brother D.O. By this time, pressure was mounting to have Mr. McFadden arrested.

E.S. who is D. O's brother showed up at the interview and changed his December 21, 2012, story. E.S.'s allegation against Mr. McFadden is unreliable. Its admission will unfairly prejudice Mr. McFadden. Parenthetically but relevant to the falsity of E.S.'s allegation, during Detective Prescott's interview of D.O., D.O. denied any abuse by Michael McFadden.

**Other alleged Acts Related to J.W.**

On January 21, 2009, J.W. denied that Mr. McFadden abused him. (GJ_PD_000050). On December 21, 2012, in an interview with Nicole Surad from Family Services there was another denial of abuse (GJ_PD_000147). While he denied abuse in this December 21, 2012, interview, he did make detailed disclosures related to other adults in his life. (GJ_PD_000147).

J.W. said he was not allowed in a pod outside of the house because his mom (Michelle Ricks) and Crystal McFadden "do drugs." He reported that his mom and Crystal are generally lazy and don't pick up after themselves. They smoke weed and cigarettes. However, when they smoke weed, they get energy and then they clean the whole house. His mom and Aunt Crystal live in the pod. Not being allowed in the pod, because of their drug use, he slept with his Uncle Mike. He said that Uncle Mike was like a father to him. He was asked about sexual behavior and he reported none. He went on to say that the only adult he had seen naked was his mother. (GJ_PD_000147).

On February 7, 2013, in an interview with Detective Prescott and Julie Stogsdill, there was finally an allegation of abuse. A testimonial hearing can reveal that this final interview was very suggestive and therefore unreliable. It also came after others were putting pressure to have Mr. McFadden punished. There is no physical evidence to support the allegations. On their own the allegations in the charging document are suspect.

**Other alleged Acts Related to K.W.**

K.W. and his family had a long history of interaction with Mr. McFadden. K.W. never mentioned any abuse until after Mr. McFadden was arrested on January 3, 2013, and K.W. was travelling back to Colorado with his parents. Detective Prescott contacted the Wesolowski family and informed them that an arrest warrant for Mr. McFadden had been signed. Following this arrest warrant KW, allegedly had a conversation with his mother on the way back from Nebraska. He said he hoped Mr. McFadden would be put away. His mom asked why. He said because Mr. McFadden had sex with J.W. K.W.'s mom took it upon herself to think that K.W. was talking about himself and not J.W. She took him to counselor Emily Bowman at the Montrose Center for Mental Health and then he disclosed.

No disclosure occurred until the shame of an arrest warrant followed Mr. McFadden. Mr. McFadden had been in K.W.'s life for several years, but no disclosure occurred until now. The Wesolowski family was no stranger to accusations of sexual abuse. These include allegations of someone perpetrating on S.J.W. and K.W. (INV_GJPD_1103), February 2007 allegations that K.W. touched S.J.W. inappropriately. (INV_GJPD_1103). The possibility of misappropriation is high. Especially considering that in January of 2013 K.W. was telling his mom that Mr. McFadden had done an act to someone who was not him.

**Other alleged Acts Related to S.J.W.**

All people who know Mr. McFadden in the police reports state that he favored being around boys rather than girls. However, S.J.W. S.J.W.'s allegations of Mr. McFadden putting his finger up her butt, do not fit. However, S.J.W. was familiar with the topic sexual abuse. There were allegations of her having a special relationship with her father and of K.W. abusing her. (INV_GJPD_1103). The trustworthiness of her allegation is low.

**Other alleged Acts Related to D.R.**

On March 26, 2013, law enforcement contacted D.R.'s mom Lesleigh Rader of the allegations against Mr. McFadden. Lesleigh Rader told law enforcement that she had previously asked D.R. about the allegations. He told her that Mr. McFadden had not done anything to him. (INV_GJPD_260). At the state jury trial D.R.'s statement was found inadmissible as the Court found that it did not describe sexual touching. (TRAN_1439).

**Other alleged Acts Related to L.W.**

On January 21, 2009, L.W. denied any abuse. Almost four years later, in another interview with Detective Prescott, on December 19, 2012, L.W. denied any abuse. L.W. denied any abuse

on January 16, 2013. L.W. continued to deny the abuse as recently as May 22, 2018. He finally alleged abuse on August 8, 2018.

It should be noted that L.W. is K.W. and S.J.W.'s younger brother. His is the most recent allegation. On January 21, 2009. he was interviewed at the same location as his brother who was also interviewed the same day. Like his older K.W. he denied any inappropriate touching by Mr. McFadden. He continued those denials for more than nine years. On its face his allegation is suspect to say the least.

**Acts Regarding M.S.**

M.S. involves conduct from 1989. This conduct was 20 years prior to the allegations in this case. Mr. McFadden's plea in that case, most likely led to the poisoning of the well with his family, which led to the first untrue allegation by I.S.

**RULE 404(b) EVIDENCE**

The prosecution asks for the Court to admit evidence regarding the use of sleep aids including melatonin and a "clump" in drinks to show that Mr. McFadden, used sleep aids to lull victims to sleep. This should be determined at an evidentiary hearing. At a hearing the Court can determine the likelihood of whether melatonin was misused. Additionally, the Court can weigh whether an unidentified "clump" in a drink is probative under FRE 401 or unfairly prejudicial under FRE 403. With respect to the other grooming behaviors mentioned at Doc. No. 39 p. 13-14, the Court can and should weigh the context of the evidence so that any inadmissible lay opinion can be excluded pre-trial. On the one-hand, while the prosecution may view the activities as grooming, a reasonable person can conclude that the activities and stability provided to the kids of parents with drug problems and other stability problems as something more charitable.

**RULE 807 EVIDENCE**

The prosecution intends to use a visual and audio recording of a January 16, 2013 interview at the Dolphin House Center in Montrose, Colorado of K.W. Doc. No 39. P. 15. The defense objects to the use of this recording. An evidentiary hearing will establish that the use of this recording is unreliable. K.W. never disclosed anything until he was surrounded by people who influenced his disclosure.

K.W. never mentioned any abuse until after Mr. McFadden was arrested 2013 and K.W. was travelling back to Colorado with his parents. Prior to him speaking with his parents, Detective Prescott contacted the Wesolowski family and informed them that an arrest warrant for Mr. McFadden had been signed. Following this arrest warrant KW, allegedly had a conversation with his mother on the way back from Nebraska. He said he hoped Mr. McFadden would be put away. His mom asked why. He said because Mr. McFadden had sex with J.W. K.W.'s mom took it upon herself to think that K.W. was talking about himself and not J.W. She took him to counselor Emily Bowman at the Montrose Center for Mental Health and then he eventually disclosed.

The circumstances leading up to the January 16, 2013, should be evaluated by this Honorable Court in an evidentiary hearing. At this hearing the Court should determine that the recording does not meet the reliability required by FRE 807.

**ARGUMENT**

The Government does not provide specifics with respect to the evidence it believes is part and parcel of the charged conduct in this case and therefore res gestae. The other acts with respect to K.W. and J.W. lack specificity with respect time, place, and manner, and therefore a sufficient foundation cannot be found at this time. See Doc. No. 39. P. 3-7. *United States v. Kimball,* 73 3.d 269,272 (10th Cir. 1995). Given the unreliability of the initial disclosures by K.W. and J.W. other allegations without support, will unfairly prejudice Mr. McFadden.

**1. I.S.'s Proffered Evidence is Unreliable**

As stated above the initial unreliable disclosure made by I.S. that was made when he had a motive to fabricate, and a history of fabrication started a chain reaction of falsehoods. To recap, on March 3, 2009, I.S. denied that anyone had ever touched him inappropriately. (INV_GJPD_000179).

In October 2011, abuse against I.S. by at least one other person who is not Michael McFadden was investigated. (INV_GJPD_1078). It was determined to be unfounded. He had a motive to get Mr. McFadden in trouble and he had made false allegations regarding other adults.

**2. E.S.'s Proffered Evidence is Unreliable**

E.S. had initially said that I.S. was not telling the truth and that I.S. just wanted to get Mr. McFadden in trouble. E.S. initially denied that Mr. McFadden did anything to him. A hearing should be conducted to determine the circumstances of E.S. changing his story.

**3. J.W.'s Proffered Evidence is Unreliable**

On January 21, 2009, J.W. denied that Mr. McFadden abused him. (GJ_PD_000050). On December 21, 2012, in an interview with Nicole Surad from Family Services there was another denial of abuse (GJ_PD_000147). While he denied abuse in this December 21, 2012, interview, J.W. made detailed disclosures related to other adults in his life. (GJ_PD_000147).

**4. K.W's Proffered Evidence is Unreliable**

K.W. and his family had a long history of interaction with Mr. McFadden. K.W. never mentioned any abuse until after Mr. McFadden was arrested on January 3, 2013, and K.W. was travelling back to Colorado with his parents. Detective Prescott contacted the Wesolowski family and informed them that an arrest warrant for Mr. McFadden had been signed. Following this arrest warrant KW, allegedly had a conversation with his mother on the way back from Nebraska. He

said he hoped Mr. McFadden would be put away. His mom asked why. He said because Mr. McFadden had sex with J.W. K.W. was taken to counselor Emily Bowman at the Montrose Center for Mental Health and then he eventually disclosed.

**5. <u>SJW's Proffered Evidence is Unreliable</u>**

SJW's statement was made late in time, after Mr. McFadden had publicly been castigated. Her recitation does not fit into the overall narrative that Mr. McFadden preferred to do things with boys. Unfortunately SJW was familiar with the topic of sexual abuse and she had alleged that others in her family had abused her.

**6. <u>D.R.'s Proffered Evidence is Unreliable</u>**

D.R. changed his story in March 2013. He previously told his mother that Mr. McFadden had not done anything improper to him.

A hearing should be conducted to determine the reliability or unreliability of all of the proffered FRE 414 material.

**7. <u>L.W.'s proffered Evidence is Unreliable</u>**

On January 21, 2009, L.W. denied any abuse. Almost four years later, in another interview with Detective Prescott, on December 19, 2012, L.W. denied any abuse. L.W. denied any abuse on January 16, 2013. L.W. continued to deny the abuse as recently as May 22, 2018. He finally alleged abuse on August 8, 2018.

**8. <u>Evidence Regarding MS</u>**

The conduct was alleged in 1989 and Mr. McFadden pled guilty in the case. It is this case and the subsequent registration by Mr. McFadden which led to him being treated unfairly by his community and law enforcement.

**A. LEGAL STANDARDS**

The Government wants to use the proffered evidence to prove the Mr. McFadden violated 18 U.S.C. § 2241(c) which is alleged in Counts One and Three and prove Counts Two, Four, and Five which charges a violation of 18 U.S.C. §2423(e). The Government wants to use this evidence to show that Mr. McFadden crossed a state line with the intent to engage in a sex act with a victim, Counts One and Three, and that Mr. McFadden transported a victim with the intent that the victim engage in sexual activity for which any person could be charged with a criminal offense; Counts Two, Four, and Five.

The unreliability of the proffered evidence renders its admission unfairly prejudicial and therefore inadmissible under FRE 403 and the cases that interpret FRE 414.

**B-C. Fed R. EVID 414 and FED R. EVID. 404(b)**

The unreliable nature of the proffered evidence and outcries renders the proffered evidence inadmissible. The Court should conduct a pre-trial evidentiary hearing to determine admissibility.

There are three "threshold requirements" for admitting evidence pursuant to Rule 414: "(1) the defendant is accused of a crime involving sexual assault or child molestation, (2) the evidence proffered is evidence of the defendant's commission of another offense or offenses involving sexual assault or child molestation, and (3) the evidence is relevant." United States v. Benally, 500 F.3d 1085, 1090 (10th Cir. 2007). But that is not the end of the road. (Courts) subject Rule 414 evidence to a particular breed of **Rule 403** balancing and insist that "**the district court has an obligation 'to fully evaluate the proffered . . . evidence and make a clear record of the reasoning behind its findings.'**" Id. at 1091 (omission in original) (quoting United States v. Guardia, 135 F.3d 1326, 1331 (10th Cir. 1998)). United States v. Piette, No. 20-7008, 2022 U.S. App. LEXIS 23004, at *29-30 (10th Cir. Aug. 18, 2022).

This specialized Rule 403 inquiry has two stages. First, the district court must consider the four *Enjady* factors: "(1) how clearly the prior act has been proved; (2) how probative the evidence is of the material fact it is admitted to prove; (3) how seriously disputed the material fact is; and (4) whether the government can avail itself of any less prejudicial evidence." *United States v. Perrault*, 995 F.3d 748, 765-66 (10th Cir. 2021) (footnotes omitted); *see also United States v. Enjady*, 134 F.3d 1427, 1433 (10th Cir. 1998). The district court must next weigh the *Enjady* factors against three additional factors: "(1) how likely [it is that] such evidence will contribute to an improperly-based jury verdict; (2) the extent to which such evidence will distract the jury from the central issues of the trial; and (3) how time consuming it will be to prove the prior conduct." *Perrault*, 995 F.3d at 766. *United States v. Piette*, No. 20-7008, 2022 U.S. App. LEXIS 23004, at *30 n.4 (10th Cir. Aug. 18, 2022)

In this case the four *Enjady* factors weigh in favor of the Rule 414 evidence being excluded. The sheer volume of uncharged conduct dwarfs the unreliability of the uncharged conduct. The uncharged conduct is vehemently disputed. The Court should conduct an evidentiary hearing to determine the reliability of the allegations and whether the reliability or lack of reliability balanced with inflammatory nature of the allegations passes muster under **Rule 414 and 403.**

**D. FED. R. EVID 807**

K.W.'s recorded and delayed statement, which was made after Mr. McFadden's community had turned on him should not be admitted.

> Federal Rule of Evidence 807 provides:
>
> (a) In General. Under the following conditions, a hearsay statement is not excluded by the rule against hearsay even if the statement is not admissible under a hearsay exception in Rule 803 or 804:
>
> (1) the statement is supported by sufficient guarantees

> of trustworthiness—after considering the totality of circumstances under which it was made and evidence, if any, corroborating the statement; andit is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts.

Rule 807 "should be used only in extraordinary circumstances where the court is satisfied that the evidence offers guarantees of trustworthiness and is material, probative and necessary in the interest of justice . . . courts regularly employ the residual exception in child abuse litigation." *United States v. Harrison*, 296 F.3d 994, 1003 (10th Cir. 2002). In determining whether hearsay statements made by a child in a sexual assault case are reliable for purposes of Rule 807, the court should consider "the spontaneity of the child's statement, the consistent repetition of the child's allegation, the mental state of the child, the use of terminology unexpected of a child of a similar age, and the lack of a motive to fabricate" as well as the length of time that had passed between the abuse and the statement. *United States v. Tome*, 61 F.3d 1446, 1452-53 (10th Cir.1995) (discussing admissibility under prior residual hearsay exception Rule 803(24)). In order to admit a child's hearsay statement regarding sexual abuse, the court must consider whether the child "was particularly likely to be telling the truth when the statement was made." *Id.* at 1452.

K.W. and his family had a long history of interaction with Mr. McFadden. K.W. never mentioned any abuse until after Mr. McFadden was arrested on January 3, 2013, and K.W. was travelling back to Colorado with his parents. There was a long delay in the reporting. KW allegedly had a conversation with his mother on the way back from Nebraska where he discussed Mr. McFadden harming JW, not himself. He said he hoped Mr. McFadden would be put away. His mom asked why. He said because Mr. McFadden had sex with J.W. After returning to Colorado, K.W. was taken to counselor Emily Bowman at the Montrose Center for Mental Health and then

he eventually disclosed. It is the defenses understanding that the disclosure came after multiple sessions.

## CONCLUSION

The Court must be confident that the proffered evidence is reliable enough that it will unfairly prejudice the fact finder. The Court cannot permit the jury to unfairly have its passion inflamed. The Court should conduct a pre-trial hearing to determine whether the proffered evidence is admissible under Rule 404(b), Rule 403, Rule 414, and Rule 807.

WHEREFORE, Mr. McFadden respectfully requests that this Court have an evidentiary hearing, and at a minimum deny the admission of FRE 414 and FRE 807 evidence.

Respectfully submitted,

s/Sean M. McDermott
Sean M. McDermott
McDermott Stuart & Ward LLP
140 E. 19th Avenue, Suite 300
Denver, CO 80203
(303) 832-8888
(303) 863-8888 (fax)
Email: smcdermott@mswdenver.com

Case 1:19-cr-00243-CMA-GPG Document 193-5 Filed 09/13/22 Page 17 of 17

**CERTIFICATE OF SERVICE**

I hereby certify that on this 13th day of September 2022, I filed the foregoing **pleading** with the Clerk of Court using the CM/ECF system which will send notification of such filing to all listed parties.

s/ Sean McDermott
Sean McDermott

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 19-cr-00243-CMA-GPG

UNITED STATES OF AMERICA,

Plaintiff,

**v.**

**MICHAEL TRACY McFADDEN,**

**Defendant.**

---

**AFFIDAVIT OF DAVID W. THOMPSON**

---

STATE OF WISCONSIN )
) ss
COUNTY OF RACINE )

---

DAVID W. THOMPSON, being sworn, states:

1. I am a clinical and forensic psychologist duly licensed to practice psychology in the state of Wisconsin.

2. The defendant in the above captioned matter retained me for the purpose of providing expert services in this case.

3. Through my research and experience I am aware that the memories and event reports of children and adults are highly malleable and subject to influence and distortion in a number of ways.

4. I have reviewed various documents and reports in the above captioned matter.

5. Treatment providers are taught to provide evidence-based services (services that have some empirical basis and known effectiveness) and to do so in a trauma-informed manner (i.e., with an awareness of the ways in which an individual's history of traumatic experiences may impact the person's emotions and behavior).

6. These treatment techniques, while therapeutically effective, are known to affect the accuracy of the individual's memories for the traumatic events.

7. The unintended consequences of these effective, evidence-based techniques may include irretrievably contaminating the individual's memory for the alleged traumatic event.

8. Peer reviewed published papers have cautioned therapists about the effects of such treatment efforts when clients are expected to testify in administrative or judicial procedures. Branaman, T. F., & Gottlieb, M. C. (2013). Ethical and legal considerations for treatment of alleged victims: When does it become witness tampering? *Professional Psychology: Research and Practice, 44*, 299-306.

9. Because these treatment techniques require the regular rehearsal of the events that are believed to have caused the trauma, treatment records are very likely to contain descriptions by the alleged victim of the allegations involved.

10. There are many other *ineffective* treatment techniques utilized by therapists who are uninformed or incompetent, and when used to treat persons they may further contaminate the client's memory for events.

11. Participation in counseling or psychotherapy both prior to the reporting of allegations as well as following the reports of such allegations may have a profound effect not only on the individual's initial event reports, but also on the individual's memory and event reports at the time of trial.

12. Michael McFadden is currently charged with two counts of crossing state lines with intent to engage in a sexual act with a minor under 12, and three counts of transportation of a minor with intent to engage in sexual activity. These charges involve KW (birth date 4/23/01) and JW (birth date 10/25/00).

13. Mr. McFadden was previously charged in Mesa County, Colorado cases 13CR27, 13CR339, and 13CR342 with similar charges involving both the alleged victims in the current case and alleging sexual abuse of other youth.

14. In addition to the current federal charges, the government is seeking to bring in these other allegations under FRE Rule 414.

15. There are numerous references in the investigation material to the various children's participation in psychotherapy:

    a. In the current case, alleged victim KW reportedly participated in outpatient psychotherapy during which he reported being sexually abused by the defendant. INV_GJPD_00000221.

    b. Child protective services investigation records specifically naming EM (3/22/04) and DO (8/25/01) report that the "boys [are] in counseling." INV_GJPD_00001079.

Additional documentation indicates that both DO and EM are in therapy at "the WSCC once a week." INV_GJPD_00001081. Records go on to indicate that "[DO] was in getting set up for outpatient services in their facility and during the intake process he disclosed that he was sexually abused by his uncle and physically abused by his mother."

c. Records indicate that IS had been placed in foster care and was actively receiving psychotherapy. CPS records indicate that it was recommended that the therapist would continue to work with IS "and explore this area," referring to the reports of "a long balloon in his bottom." INV_GJPD_00001095.

d. CPS reports indicate that on 8/24/11 KW was scheduled to "begin community counseling again." INV_GJPD_00001102.

e. Additional allegations were made concerning KW, SB (5/28/04), and an ex-husband of the children's mother (Kayo Bassett) alleging sexual abuse of SB and KW by Mr. Bassett. These were investigated and were unfounded or inconclusive, but the children were recommended to return to outpatient therapy. INV_GJPD_00001103.

16. There are other references in the investigation material to special needs of one of the children:

a. IS (10/21/04) was described as a child with developmental delays who was enrolled in special education school programming. INV_GJPD_00001097.

17. Based on my education and experience, it is likely that the special education records for IS, including behavior reports, formal psychological, educational, and behavioral assessments, and his Individual Educational Plan (IEP) will contain information relative to the child's early sexual behavior and sexual knowledge. This information is likely to be relevant to the reliability of the child's memory and event reports.

18. Source misattribution errors are common memory mistakes made by children and adults in a variety of situations. They involve recalling an event tbut erroneously reporting the source of that recollection. Johnson, M. K., Hashtroudi, S., & Lindsay, D. S. (1993). Source monitoring. *Psychological Bulletin, 114*, 3-28.

19. The sexual abuse allegations related to SB and KW that were screened out and referred to therapy, especially as to how the therapist addressed these issues with the children, provide an early foundation for source misattribution errors that may well be exculpatory in the current case.

20. All of the records of therapeutic involvement of the alleged victims are likely to be highly relevant to the integrity of the children's memories and the accuracy of their event reports.

Affidavit of David W. Thompson
U.S. v. McFadden, 19-cr-00243-CMA-GPG
4

21. I am able to maintain the security and confidentiality of all of the children's treatment records according to normal clinic procedures, as well as any special conditions that the court may impose.

22. It is crucial for me to review the above referenced school and treatment records in order to adequately advise Mr. McFadden's defense attorney in the preparation of this case.

David W. Thompson, PhD

The forgoing Affidavit acknowledged before me this 13th day September, 2022.

Witness my hand and official seal.

Christine Mamerow
Notary Public, State of Wisconsin
My commission expires April 2, 2025.

298

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 19-cr-00243-CMA-GPG

UNITED STATES OF AMERICA,

Plaintiff,

**v.**

**MICHAEL TRACY McFADDEN,**

**Defendant.**

---

**MOTION TO COMPEL PRODUCTION AND REQUEST FOR SUBPOENA RETURN DATE**

---

Mr. McFadden by and through his attorney Sean M. McDermott, moves this Honorable Court to provide a subpoena return date and to compel the production of certain materials. As grounds Mr. McFadden states the following:

1. Mr. McFadden is charged with two counts of crossing state lines with intent to engage in a sexual act with a minor under 12 years of age, and three counts of transportation of a person over state lines with the intent to engage in a sexual act that is a crime.

2. The alleged victims of these crimes are KW in Counts One and Two and JW in Counts Three, Four and Five.

3. Despite knowing Mr. McFadden for a long period of time, KW had never disclosed that Mr. McFadden had any sexual activity with him. After Mr. McFadden's arrest, KW allegedly told his mother that he wanted Mr. McFadden to be put away. He said he wanted Mr. McFadden put away because Mr. McFadden had sex with JW. He did not state that Mr. McFadden had done anything inappropriate to him. When he and his mother returned to

Colorado, he saw a counselor. She took him to counselor Emily Bowman at the Montrose Center for Mental Health. He eventually made a disclosure against Mr. McFadden.

4.      In addition to K.W. being referred to therapy, his sister SJW who is a FRE 414 witness was as well was referred to counseling prior to making a disclosure against Mr. McFadden. She was discussing possible sexual abuse by someone else. (Exhibit A, Affidavit of Dr. David Thompson ¶15(b)). She also made a late disclosure against Mr. McFadden.

5.      I.S. is a witness who the Government wants to use to elicit FRE 414 evidence. I.S. made a disclosure against Mr. McFadden. He made this disclosure even though he previously stated that nobody had molested him. He was in therapy, and he was working on "exploring" the possibility of a sexual assault. (INV_GJPD_00001095).

6.      E.S. f/k/a E.M. like I.S. is also a witness who the Government wants to use to elicit FRE 414 evidence. Like I.S., E.S. initially stated that Mr. McFadden had not molested him. He even went so far as to say that I.S. made up an allegation because he wanted to get Mr. McFadden in trouble. Shortly after saying this, he changed 180 degrees, and made an allegation against Mr. McFadden.

7.      K.W., I.S., and E.S. all initially made statements that Mr. McFadden did not molest them. All three of these people were enrolled in counseling. All three ended up changing their story and making allegations against Mr. McFadden.

8.      Source misattribution errors are common memory mistakes made by Children and adults in a variety of situations. They involve recalling an event but erroneously reporting the source of that recollection. (Exhibit A, Affidavit of David Thompson).

9.      The defense needs these records to properly defend Mr. McFadden.

10. A subpoena for documents may be quashed if their production would be "unreasonable or oppressive," but not otherwise.

> In order to require production prior to trial, the moving party must show: (1) that the documents are evidentiary and relevant; (2) that they are not otherwise procurable reasonably in advance of trial by exercise of due diligence; (3) that the party cannot properly prepare for trial without such production and inspection in advance of trial and that the failure to obtain such inspection may tend unreasonably to delay the trial; and (4) that the application is made in good faith and is not intended as a general "fishing expedition."

United States v. Nixon, 418 U.S. 683, 699-700, 94 S. Ct. 3090, 3103 (1974)

WHEREFORE, Mr. McFadden respectfully requests that this Court order that Mr. McFadden's defense team be permitted to obtain the therapy records of any of the witnesses who were in therapy and are alleging that Mr. McFadden sexually assaulted them.

Respectfully submitted,

s/Sean M. McDermott

Sean M. McDermott
McDermott Stuart & Ward LLP
140 E. 19th Avenue, Suite 300
Denver, CO 80203
(303) 832-8888
(303) 863-8888 (fax)
Email: smcdermott@mswdenver.com

Case 1:19-cv-02443-RM-GPG Document 160 Filed 09/13/22 Page 4 of 4

**CERTIFICATE OF SERVICE**

I hereby certify that on this 13th day of September 2022, I filed the foregoing **pleading** with the Clerk of Court using the CM/ECF system which will send notification of such filing to all listed parties.

s/ Sean McDermott
Sean McDermott

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 19-cr-00243-CMA-GPG

UNITED STATES OF AMERICA,

Plaintiff,

**v.**

**MICHAEL TRACY McFADDEN,**

**Defendant.**

---

**MOTION FOR A BILL OF PARTICULARS**

---

Mr. McFadden by and through his attorney Sean M. McDermott, moves this Honorable Court to order a bill of particulars with respect to Count 5. As grounds therof:

1. Mr. McFadden is charged with two counts of crossing state lines with intent to engage in a sexual act with a minor under 12 years of age, and three counts of transportation of a person over state lines with the intent to engage in a sexual act that is a crime.

2. Counts one and two span the dates of December 25, 2012, through January 3, 2013. Counts three and four include the dates of December 1, 2010, through January 1, 2011. Count Five includes January 1, 2007, through January 3, 2013.

3. Count Five spans a six-year period of time. Without more specificity, Mr. McFadden cannot defend this charge.

4. The scope of a motion for a bill of particulars is limited. The purpose of a bill of particulars is not to evaluate the prosecution's case, *United States v. Rogers*, 617 F. Supp. 1024 (D.Colo., 1985), but of a significantly more limited scope and purpose. It is to inform the defendant of "the charge" with sufficient precision to allow him to prepare a defense. *United*

*States v. Ivy*, 83 F.3d 1266 (10th Cir., 1996); *United States v. Levine*, 983 F.2d 165, 166-67 (10th Cir., 1992); *United States v. Radetsky*, 535 F.2d 556 (10th Cir., 1976). It has as a purpose the minimization of surprise as to the substantive facts of the charges, not the evidentiary basis of the charge. See *Wong Tai v. United States*, 273 U.S. 77, 71 L. Ed. 545, 47 S. Ct. 300 (1927); *United States v. Hopkins*, 716 F.2d 739, 745 (10th Cir., 1982); *United States v. Garrett*, 797 F.2d 656 (8th Cir., 1986). The whole of the indictment is to be considered as to the defendants' needs. *Hopkins; United States v. Crummer*, 151 F.2d 958, 962 (C.C.A. 10, 1945). The bill of particulars can be helpful to a defendant, but its essential purpose is to inform the defendant of the charge. *Ivy*, supra; *United States v. Stoner*, 98 F.3d 527, 537 (10th Cir., 1996). If an indictment sets forth the "elements" of the offense charged and apprizes the defendant of the charges sufficient to enable him to prepare for trial, the court may deny a bill of particulars. *Levine*, supra; *United States v. Higgins*, 2 F.3d 1094, 1096 (10th Cir., 1993).

    5.    The matter of a bill of particulars is within the discretion of the court, whether to grant the bill or to allow it in any part *Will v. United States*, 389 U.S. 90, 19 L. Ed. 2d 305, 88 S. Ct. 269 (1967).

    6.    In this case, the Court should use its discretion to order a bill of particulars with respect to count 5, so that the defendant can defend himself against this count.

    Wherefore, Mr. McFadden respectfully requests that this Court order a bill of particulars with respect to Count 5.

Respectfully submitted,

s/Sean M. McDermott
Sean M. McDermott
McDermott Stuart & Ward LLP
140 E. 19th Avenue, Suite 300
Denver, CO 80203
(303) 832-8888
(303) 863-8888 (fax)
Email: smcdermott@mswdenver.com

**CERTIFICATE OF SERVICE**

I hereby certify that on this 13th day of September 2022, I filed the foregoing **pleading** with the Clerk of Court using the CM/ECF system which will send notification of such filing to all listed parties.

s/ Sean McDermott
Sean McDermott

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 19-cr-00243-CMA-GPG

UNITED STATES OF AMERICA,

Plaintiff,

**v.**

**MICHAEL TRACY McFADDEN,**

**Defendant.**

---

**MOTION TO DISMISS DUE TO PREINDICTMENT DELAY**

---

Mr. McFadden by and through his attorney Sean M. McDermott, moves this Honorable Court to find that exculpatory evidence was lost due to preindictment delay and to therefore dismiss this matter:

1. Mr. McFadden is charged with two counts of crossing state lines with intent to engage in a sexual act with a minor under 12 years of age, and three counts of transportation of a person over state lines with the intent to engage in a sexual act that is a crime.

2. Counts one and two span the dates of December 25, 2012 through January 3, 2013. Counts three and four include the dates of December 1, 2010 through January 1, 2011. Count Five includes January 1, 2007, through January 3, 2013. The indictment was filed on May 17, 2019.

3. The indictment was filed after Mr. McFadden was tried in the state of Colorado for the same conduct. His conviction was reversed. The Federal Government then decided to charge Mr. McFadden with Counts One through Five.

4.     Because of the delay Mr. McFadden cannot obtain evidence including but not limited to business records that show the length of his travels outside of the state of Colorado. This information could provide a timeline surrounding the allegations and show the unlikeliness of him having the opportunity to commit the alleged acts.

5.     More importantly, during the delay, a person who was present in the same household and who could refute much of the prosecution's case, John Fox, passed away.

6.     At trial, the Court will see that the delay has placed Mr. McFadden at a disadvantage.

7.     The Due Process Clause warrants dismissal of indictments for preindictment delay only in exceptional circumstances." *United States v. Comosona*, 848 F.2d 1110, 1113 (10th Cir. 1988). Instead, "statutes of limitations, which provide predictable, legislatively enacted limits on prosecutorial delay, provide the primary guarantee against bringing overly stale criminal charges." *United States v. Lovasco*, 431 U.S. 783, 789, 97 S. Ct. 2044, 52 L. Ed. 2d 752 (1977) (citations and internal quotation marks omitted).

8.     To determine whether pre-indictment delay rises to the extraordinary level warranting dismissal with prejudice, a defendant must plead and prove by a preponderance of the evidence: (1) that the delay caused actual and substantial prejudice to the defendant; and (2) that the government delayed intentionally to gain a tactical advantage. *Lovasco*, 431 U.S. at 789; *Johnson*, 120 F.3d at 1110. With respect to the second prong, the government's delay must be purposefully designed to gain a tactical advantage or to harass the defendant. *United States v. Beitscher*, 467 F.2d 269, 272 (10th Cir. 1972). Although the Court applies a shifting burden of production, the defendant has the ultimate burden of proof. *United States v. Comosona*, 614 F.2d 695, 697 (10th Cir. 1980) (per curiam). The Tenth Circuit has held consistently that it is not its

function to second guess the timing of the filing of an indictment in the absence of proof of these elements. *United States v. Francisco*, 575 F.2d 815, 817 (10th Cir. 1978).

WHEREFORE, at the conclusion of the trial, Mr. McFadden will request that the Court find that his due process rights were violated by intentional preindictment delay.

Respectfully submitted,

s/Sean M. McDermott
Sean M. McDermott
McDermott Stuart & Ward LLP
140 E. 19th Avenue, Suite 300
Denver, CO 80203
(303) 832-8888
(303) 863-8888 (fax)
Email: smcdermott@mswdenver.com

**CERTIFICATE OF SERVICE**

I hereby certify that on this 13th day of September 2022, I filed the foregoing **pleading** with the Clerk of Court using the CM/ECF system which will send notification of such filing to all listed parties.

s/ Sean McDermott
Sean McDermott

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 19-cr-00243-CMA-GPG

UNITED STATES OF AMERICA,

Plaintiff,

**v.**

**MICHAEL TRACY McFADDEN,**

**Defendant.**

---

**MOTION TO SUPPRESS STATEMENTS**

---

Mr. McFadden by and through his attorney Sean M. McDermott, moves this Honorable Court to suppress statements that were involuntarily made

1. Mr. McFadden is charged with two counts of crossing state lines with intent to engage in a sexual act with a minor under 12 years of age, and three counts of transportation of a person over state lines with the intent to engage in a sexual act that is a crime.

2. On December 19, 2012, Mr. McFadden was contacted via phone by Detective Prescott. Mr. McFadden ended up meeting Detective Prescott and making a statement. The interaction between Detective Prescott and Mr. McFadden renders the statement involuntary and should be suppressed.

3. Mr. McFadden was implicitly if not explicitly threatened in the lead up to the interview. Mr. McFadden was given the impression that he had no choice but to submit to an interview.

4. Under the Due Process Clause of the United States and Colorado Constitutions in order for an accused's statement to be used against her or him, the statement must be voluntarily

made.  U.S. CONST. AMENDS. V, *Mincey v. Arizona*, 437 U.S. 385 (1978). a defendant in a criminal case is deprived of due process of law if his conviction is founded, in whole or in part, upon an involuntary confession, without regard for the truth or falsity of the confession.

*Jackson v. Denno*, 378 U.S. 368, 376, 84 S. Ct. 1774, 1780 (1964).

5.      While Mr. McFadden's statements are largely exculpatory. The defense can foresee a scenario where the prosecution attempts to use his statements to inculpate him.

Wherefore, Mr. McFadden respectfully requests that this Court conduct a hearing regarding the voluntariness of his statements, and then suppress the statements as involuntarily made.

Respectfully submitted,

s/Sean M. McDermott
  Sean M. McDermott
  McDermott Stuart & Ward LLP
  140 E. 19th Avenue, Suite 300
  Denver, CO 80203
  (303) 832-8888
  (303) 863-8888 (fax)
  Email: smcdermott@mswdenver.com

Case 1:19-cv-02443-GPG-GPG Document 163 Filed 09/13/22 Page 3 of 3

**CERTIFICATE OF SERVICE**

I hereby certify that on this 13th day of September 2022, I filed the foregoing **pleading** with the Clerk of Court using the CM/ECF system which will send notification of such filing to all listed parties.

s/ Sean McDermott
Sean McDermott

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 19-cr-00243-CMA-GPG

UNITED STATES OF AMERICA,

Plaintiff,

**v.**

**MICHAEL TRACY McFADDEN,**

**Defendant.**

---

**MOTION FOR AN EVIDENTIARY HEARING**

---

Mr. McFadden by and through his attorney Sean M. McDermott, moves this Honorable Court to conduct an evidentiary hearing in the above captioned matter.

1. Mr. McFadden is charged with two counts of crossing state lines with intent to engage in a sexual act with a minor under 12 years of age, and three counts of transportation of a person over state lines with the intent to engage in a sexual act that is a crime.

2. On December 19, 2012, Mr. McFadden was contacted via phone by Detective Prescott. Mr. McFadden ended up meeting Detective Prescott and making a statement. The interaction between Detective Prescott and Mr. McFadden renders the statement involuntary and should be suppressed.

3. An evidentiary hearing is necessary to resolve the Government's Notice of its Intent to Utilize Evidence Pursuant to Federal Rules of Evidence 414, 404(b) and 807.

With respect to the related Federal Rules of Evidence 414 and 404(b) issues the Court should hold an evidentiary hearing so that the Court may thoroughly consider "(1) how clearly the prior act has been proved; (2) how probative the evidence is of the material fact it is admitted

to prove; (3) how seriously disputed the material fact is; and (4) whether the government can avail itself of any less prejudicial evidence." *United States v. Perrault*, 995 F.3d 748, 765-66 (10th Cir. 2021) (footnotes omitted); *see also United States v. Enjady*, 134 F.3d 1427, 1433 (10th Cir. 1998). The district court must next weigh the *Enjady* factors against three additional factors: "(1) how likely [it is that] such evidence will contribute to an improperly-based jury verdict; (2) the extent to which such evidence will distract the jury from the central issues of the trial; and (3) how time consuming it will be to prove the prior conduct." *Perrault*, 995 F.3d at 766. *United States v. Piette*, No. 20-7008, 2022 U.S. App. LEXIS 23004, at *30 n.4 (10th Cir. Aug. 18, 2022)

With respect to the proffered Federal Rule of Evidence 807, a hearing will assist the Court to determine pretrial, “the spontaneity of the child’s statement, the consistent repetition of the child’s allegation, the mental state of the child, the use of terminology unexpected of a child of a similar age, and the lack of a motive to fabricate” as well as the length of time that had passed between the abuse and the statement. *United States v. Tome*, 61 F.3d 1446, 1452-53 (10th Cir.1995).

Finally, Mr. McFadden has filed a Motion contesting the Voluntariness of his Statements. This generally requires a pretrial hearing. See *Jackson v. Denno*, 378 U.S. 368, 376, 84 S. Ct. 1774, 1780 (1964).

Wherefore, Mr. McFadden respectfully requests that this Court conduct an evidentiary hearing to determine these issues.

Respectfully submitted,

s/Sean M. McDermott
   Sean M. McDermott
   McDermott Stuart & Ward LLP
   140 E. 19th Avenue, Suite 300
   Denver, CO 80203
   (303) 832-8888
   (303) 863-8888 (fax)
   Email: smcdermott@mswdenver.com

Case 1:22-cv-01243-GPG Document 164 Filed 09/13/22 Page 4 of 4

**CERTIFICATE OF SERVICE**

I hereby certify that on this 13th day of September 2022, I filed the foregoing **pleading** with the Clerk of Court using the CM/ECF system which will send notification of such filing to all listed parties.

s/ Sean McDermott
Sean McDermott

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 19-cr-00243-CMA-GPG

UNITED STATES OF AMERICA,

Plaintiff,

**v.**

**MICHAEL TRACY McFADDEN,**

**Defendant.**

---

**UNOPPOSED MOTION TO WITHDRAW DOCUMENT 59**

---

**COMES NOW,** Sean McDermott, by and through Sean McDermott of McDermott Stuart & Ward LLP, and respectfully moves this Honorable Court to withdraw document 59. As grounds thereof, Mr. McFadden states the following:

1. Counsel for Mr. McFadden filed this pleading. The documents within the pleading lists minors or minors who are now adults by initials.

2. However, the names of their respective families are included in this pleading and their dates of birth are as well.

3. The parties conferred and to ensure that the Protective Order (Doc. No. 22) and Fed. R. Crim. P 49.1 are complied with, undesigned counsel respectfully requests that Doc. No. 59 and 59-1 be withdrawn.

4. Mr. McFadden will file Doc. 59 and request an appropriate level one restriction, so that the parties and the Court have access, but the general public does not.

Wherefore, Mr. McFadden respectfully requests that Doc. No. 59 and 59-1 be withdrawn so that they can be re-filed with a level one restriction viewable by the Court and the parties.

Respectfully submitted,

Dated: September 14, 2022

s/Sean M. McDermott
Sean M. McDermott
McDermott Stuart & Ward LLP
140 E. 19th Avenue, Suite 300
Denver, CO 80203
(303) 832-8888
(303) 863-8888 (fax)
Email: smcdermott@mswdenver.com

**CERTIFICATE OF SERVICE**

I hereby certify that on this 14th day of September 2022, I filed the foregoing **pleading** with the Clerk of Court using the CM/ECF system which will send notification of such filing to all listed parties.

s/ Sean McDermott
Sean McDermott

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 19-cr-00243-CMA-GPG

UNITED STATES OF AMERICA,

Plaintiff,

**v.**

**MICHAEL TRACY McFADDEN,**

**Defendant.**

---

**UNOPPOSED MOTION TO WITHDRAW DOCUMENT 60**

---

**COMES NOW,** Sean McDermott, by and through Sean McDermott of McDermott Stuart & Ward LLP, and respectfully moves this Honorable Court to withdraw document 60. As grounds thereof, Mr. McFadden states the following:

1. Counsel for Mr. McFadden filed this pleading. The documents within the pleading lists minors or minors who are now adults by initials.

2. However, the affidavit mentioned in the document that is supposed to accompany this pleading lists dates of birth as well.

3. The parties conferred and to ensure that the Protective Order (Doc. No. 22) and Fed. R. Crim. P 49.1 are complied with, undesigned counsel respectfully requests that Doc. No. 60 be withdrawn.

4. Mr. McFadden will file Doc. 60 and request an appropriate level one restriction, so that the parties and the Court have access, but the general public does not.

Wherefore, Mr. McFadden respectfully requests that Doc. No. 60 be withdrawn so that the correct pleading and accompanying affidavit can be re-filed with a level one restriction viewable by the Court and the parties.

Respectfully submitted,

Dated: September 14, 2022

s/Sean M. McDermott
Sean M. McDermott
McDermott Stuart & Ward LLP
140 E. 19th Avenue, Suite 300
 Denver, CO 80203
(303) 832-8888
(303) 863-8888 (fax)
Email: smcdermott@mswdenver.com

**CERTIFICATE OF SERVICE**

I hereby certify that on this 14th day of September 2022, I filed the foregoing **pleading** with the Clerk of Court using the CM/ECF system which will send notification of such filing to all listed parties.

s/ Sean McDermott
Sean McDermott

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 19-cr-00243-CMA-GPG

UNITED STATES OF AMERICA,

Plaintiff,

**v.**

**MICHAEL TRACY McFADDEN,**

**Defendant.**

---

**OBJECTION TO GOVERNMENT'S NOTICE OF INTENT TO INTRODUCE EVIDENCE PURSUANT TO FEDERAL RULES OF EVIDENCE 414, 404(b), AND 807**

---

Mr. McFadden by and through his attorney Sean M. McDermott, submits his response to the Government's Notice of Intent to Introduce Evidence Pursuant to Federal Rules of Evidence 414, 404(b) and 807:

Introduction

Mr. McFadden was a marked man who attempted to do right by his extended but dysfunctional family. Mr. McFadden was marked because of an illegal act of sexual assault that he pled guilty to shortly after his 18th birthday. That offense occurred on December 26, 1989. Mr. McFadden, who himself was abused as a child pled guilty to a sex offense against a minor.

Mr. McFadden was trusted with his extended family's kids and other kids. The kids' parents had serious problems and so the kids would stay with Mr. McFadden. The house was often crowded. Some of the parents would stay at the residence as well. On December 15, 2012, a disgruntled child who was upset with Mr. McFadden made up a story that Mr. McFadden had touched him. This child had previously said that nobody had ever sexually abused him.

This uncorroborated outcry broke the dam and a flood of false accusations followed. A second child who a mere three weeks earlier had denied any touching, changed his story, and alleged Mr. McFadden touched him.

An arrest warrant for Michael McFadden was applied for on January 3, 2013. The warrant alleged there was probable cause for the arrest of Mr. McFadden regarding these allegations against these two children, even though their allegations were objectively suspect.

Mr. McFadden has been unfairly accused. The prosecution takes great pains to point out that Mr. McFadden was convicted in state court. Mr. McFadden was convicted in state court because of the sheer volume of allegations. The prosecution knows that Mr. McFadden has zero chance of prevailing in this case if the Government is allowed to present the evidence that the Government wants to present in their Notice.

It is the **quantity rather than the quality of the allegations against Mr. McFadden that led to his unfair conviction in state Court**. Because the proffered evidence is **unfairly prejudicial**, Mr. McFadden requests that the proffered evidence not be admitted. Against the backdrop of the unfair allegations, that finally occurred in December 2012, by people who had previously said nothing happened, the Court should take into consideration the unfairness of the inflammatory nature of the allegations that are made without any physical corroboration.

Family Background

I.S.'s guardian was Dian Stauter. I.S. started to stay at Mr. McFadden's residence at 2980 D ½ Road, Grand Junction, CO because his mom worked out of state every other month.

Duane Ricks and Anita Ricks had a daughter named Cindy Ricks. Crystal McFadden is the daughter of Cindy Ricks and Tony McFadden, who is Michael McFadden's half-brother. Crystal McFadden has three children. These children include E.S. f/k/a E.M whose father is Mathew

(Ryan) Stauter She also had a child D.O. whose father is Ryan Olmstead. She also has a daughter, J.M. (INV_GJPD_0000025). The person who is the father is unknown. Ryan Stauter is I.S.'s Uncle.

Terry Ricks is the son of Duane and Anita Ricks. A woman named Theresa Ricks is married to Terry Ricks.  Theresa is the daughter-in-law of Cindy Ricks. Theresa Ricks had Michelle Ricks who had four kids including L.W. and J.W. Thomas Wright acted as the legal father for L.W. (DOB 7/15/04) and J.W. (DOB 10/25/00). Thomas Wright and Michelle Ricks were divorced. (INV_GJPD_0000025). Michelle Ricks who is Mr. McFadden's niece and the mother of J.W. and L.W. had difficulty caring for J.W. and L.W. Therefore, the kids would come over. As their uncle, Michael McFadden would care for them

When Theresa Ricks would get upset with Mr. McFadden, she would talk about him being a registered sex offender in front of the kids. Theresa Ricks' grandparents Duane Ricks and Anita Ricks would also refer to Mr. McFadden being a registered sex offender in front of the kids.

The Wesolowski family moved next door to Mr. McFadden and others when Mr. McFadden resided at 2980 D ½ Road, Grand Junction Colorado. Prior to this, this family had reports of sexual abuse involving the children and completely independent of Mr. McFadden. These include allegations of someone perpetrating on S.J.W. and K.W. (INV_GJPD_1103), February 2007 allegations that K.W. touched S.J.W. inappropriately. (INV_GJPD_1103), investigation of other incest, *(INV_GJPD_1103)* and KW being a victim of neglect in 2010 (INV_GJPD_1104). K.W. would come to the home because Stacy Wesolowski was having difficulty with K.W. K.W. would often be put in a stabilizing unit.

Prior to moving to 2980 D ½ Road Mr McFadden resided at 476 Glen Road, Grand Junction, Colorado with Phyllis and John Hockenberry. Mr. McFadden moved in with the

Hockenberrys after his divorce from Tammie McFadden. In late 2009 they all moved to 2980 D ½ Road. The Hockenberry's reported that while at 476 Glen Road L.W., E.S., and K.W. would come to the home. They would stay the night. The Hockenberry's had a young son, S.H. who was friends with D.R. D.R. who was the young son of Leslie Rader. Therefore, D.R. would come over the house. (INV_GJPD_00000260). Mr. McFadden happened to know Leslie Rader from junior high school.

Beginning of the Investigation

After I.S. made his December 15, 2012, disclosure, law enforcement pulled Mr. McFadden's record and the reports from the 1989 case. This was done even though I.S. had previously made two false allegations against two different people. Law enforcement knew that Mr. McFadden was a registered sex offender for something he pled guilty to for something that was alleged when he was just north of 18 years old. On December 19, 2012, Detective Prescott looked up the 1990 case (INV_GJPD__48). Detective Prescott contacted Theresa Ricks and talked to her about her former son-in-law, Thomas Wright alleging that one of the boys made disturbing statements about things that Mr. McFadden had allegedly done in 2008. (INV_GJPD__49). That investigation had been closed when J.W. and his brother L.W. stated that nothing happened. (INV_GJPD_0000003 and GJPD0000007). LW was interviewed again and again said nothing happened. (INV_GJPD_29).

Detective Prescott went to visit Thomas Wright who was in jail on a parole violation, to revisit this non-disclosure from four years earlier. Although, there was a reasonable basis to pause and conduct further investigation, by January 3, 2013, Detective Prescott asked for and obtained an arrest warrant for allegations made by I.S. and then E.S. Within 17 days of his investigation Detective Prescott asked for and obtained an arrest warrant even though I.S. had made two

allegations against two other people and even though 13 days earlier E.S. had said that Mr. McFadden had not inappropriately touched him or I.S. and that I.S. was simply saying this to get Mr. McFadden in trouble. The dominoes fell from there.

**RULE 414 EVIDENCE**

**Allegation Made December 15, 2012**

**Other alleged Acts Related to I.S.**

On December 15, 2012, almost 23 years after the allegation that got Mr. McFadden branded a sex offender. I.S. made a disclosure that set off the chain of false accusations. His guardian Dian Stauter called the police. She told Officer Eric Wood, that I.S. told her son Ryan Stauter and his cousin E.M. (now E.S.) that Uncle Mike (McFadden) had touched him inappropriately.

Ms. Stauter also stated that I.S. had been acting out. She believed it was because she had to work out of state every other month from June 2012 until October 2012. What is not included in the police report is that I.S. came to stay on weekends with Mr. McFadden after I.S. falsely accused Ryan Staudard of sexually assaulting Mr. McFadden.

I.S. would stay with Uncle Mike (McFadden) at 2980 D ½ Road, Grand Junction, Colorado. At the time Ms. Staudard was interviewed I.S. was staying with Mr. McFadden on weekends while she worked. (INV_GJPD_0000007). What is not included in the report is that I.S. was upset with Mr. McFadden for enforcing Teresa's rules. I.S. then made a false allegation against Mr. McFadden.

I.S. had previously been interviewed by a caseworker. After having behavior issues and after acting out sexually he was interviewed on March 3, 2009, I.S. denied that anyone had ever touched him inappropriately. (INV_GJPD_000179). In October 2011, abuse against I.S. by another person who is not Michael McFadden was investigated. (INV_GJPD_1078).

As a result of I.S.'s report E.S. f/k/a E.M. was interviewed on December 21, 2012. E.S. was asked whether he had ever been touched inappropriately by Mr. McFadden. He answered no. E.S. said that I.S. told him that Mr. McFadden or Uncle Mike had touched him inappropriately. E.S. stated that Mike did not touch I.S. or anyone else in the privates. He stated that I.S. said this because he just wanted to get Mr. McFadden in trouble but that he didn't know why he wanted to get Mr. McFadden in trouble. (INV_GJPD_ 000331). In sum, I.S.'s allegation is unfairly prejudicial as misappropriation to Mr. McFadden or retaliation against Mr. McFadden for enforcing I.S.'s mother's rules is a real possibility.

**Other alleged Acts Related to E.S. f/k/a E.M.**

As stated above, on December 21, 2012. E.S. denied being touched by Mr. McFadden. He even went as far to say that Mr. McFadden didn't touch him or anyone inappropriately and that I.S. was just trying to get Mr. McFadden in trouble. (INV_GJPD_ 000331). On January 2, 2013, Detective Prescott was scheduled to interview E.M.'s brother D.O. By this time, pressure was mounting to have Mr. McFadden arrested.

E.S. who is D. O's brother showed up at the interview and changed his December 21, 2012, story. E.S.'s allegation against Mr. McFadden is unreliable. Its admission will unfairly prejudice Mr. McFadden. Parenthetically but relevant to the falsity of E.S.'s allegation, during Detective Prescott's interview of D.O., D.O. denied any abuse by Michael McFadden.

**Other alleged Acts Related to J.W.**

On January 21, 2009, J.W. denied that Mr. McFadden abused him. (GJ_PD_000050). On December 21, 2012, in an interview with Nicole Surad from Family Services there was another denial of abuse (GJ_PD_000147). While he denied abuse in this December 21, 2012, interview, he did make detailed disclosures related to other adults in his life. (GJ_PD_000147).

J.W. said he was not allowed in a pod outside of the house because his mom (Michelle Ricks) and Crystal McFadden "do drugs." He reported that his mom and Crystal are generally lazy and don't pick up after themselves. They smoke weed and cigarettes. However, when they smoke weed, they get energy and then they clean the whole house. His mom and Aunt Crystal live in the pod. Not being allowed in the pod, because of their drug use, he slept with his Uncle Mike. He said that Uncle Mike was like a father to him. He was asked about sexual behavior and he reported none. He went on to say that the only adult he had seen naked was his mother. (GJ_PD_000147).

On February 7, 2013, in an interview with Detective Prescott and Julie Stogsdill, there was finally an allegation of abuse. A testimonial hearing can reveal that this final interview was very suggestive and therefore unreliable. It also came after others were putting pressure to have Mr. McFadden punished. There is no physical evidence to support the allegations. On their own the allegations in the charging document are suspect.

**Other alleged Acts Related to K.W.**

K.W. and his family had a long history of interaction with Mr. McFadden. K.W. never mentioned any abuse until after Mr. McFadden was arrested on January 3, 2013, and K.W. was travelling back to Colorado with his parents. Detective Prescott contacted the Wesolowski family and informed them that an arrest warrant for Mr. McFadden had been signed. Following this arrest warrant KW, allegedly had a conversation with his mother on the way back from Nebraska. He said he hoped Mr. McFadden would be put away. His mom asked why. He said because Mr. McFadden had sex with J.W. K.W.'s mom took it upon herself to think that K.W. was talking about himself and not J.W. She took him to counselor Emily Bowman at the Montrose Center for Mental Health and then he disclosed.

No disclosure occurred until the shame of an arrest warrant followed Mr. McFadden. Mr. McFadden had been in K.W.'s life for several years, but no disclosure occurred until now. The Wesolowski family was no stranger to accusations of sexual abuse. These include allegations of someone perpetrating on S.J.W. and K.W. (INV_GJPD_1103), February 2007 allegations that K.W. touched S.J.W. inappropriately. (INV_GJPD_1103). The possibility of misappropriation is high. Especially considering that in January of 2013 K.W. was telling his mom that Mr. McFadden had done an act to someone who was not him.

**Other alleged Acts Related to S.J.W.**

All people who know Mr. McFadden in the police reports state that he favored being around boys rather than girls. However, S.J.W. S.J.W.'s allegations of Mr. McFadden putting his finger up her butt, do not fit. However, S.J.W. was familiar with the topic sexual abuse. There were allegations of her having a special relationship with her father and of K.W. abusing her. (INV_GJPD_1103). The trustworthiness of her allegation is low.

**Other alleged Acts Related to D.R.**

On March 26, 2013, law enforcement contacted D.R.'s mom Lesleigh Rader of the allegations against Mr. McFadden. Lesleigh Rader told law enforcement that she had previously asked D.R. about the allegations. He told her that Mr. McFadden had not done anything to him. (INV_GJPD_260). At the state jury trial D.R.'s statement was found inadmissible as the Court found that it did not describe sexual touching. (TRAN_1439).

**Other alleged Acts Related to L.W.**

On January 21, 2009, L.W. denied any abuse. Almost four years later, in another interview with Detective Prescott, on December 19, 2012, L.W. denied any abuse. L.W. denied any abuse

on January 16, 2013. L.W. continued to deny the abuse as recently as May 22, 2018. He finally alleged abuse on August 8, 2018.

It should be noted that L.W. is K.W. and S.J.W.'s younger brother. His is the most recent allegation. On January 21, 2009. he was interviewed at the same location as his brother who was also interviewed the same day. Like his older K.W. he denied any inappropriate touching by Mr. McFadden. He continued those denials for more than nine years. On its face his allegation is suspect to say the least.

**Acts Regarding M.S.**

M.S. involves conduct from 1989. This conduct was 20 years prior to the allegations in this case. Mr. McFadden's plea in that case, most likely led to the poisoning of the well with his family, which led to the first untrue allegation by I.S.

**RULE 404(b) EVIDENCE**

The prosecution asks for the Court to admit evidence regarding the use of sleep aids including melatonin and a "clump" in drinks to show that Mr. McFadden, used sleep aids to lull victims to sleep. This should be determined at an evidentiary hearing. At a hearing the Court can determine the likelihood of whether melatonin was misused. Additionally, the Court can weigh whether an unidentified "clump" in a drink is probative under FRE 401 or unfairly prejudicial under FRE 403. With respect to the other grooming behaviors mentioned at Doc. No. 39 p. 13-14, the Court can and should weigh the context of the evidence so that any inadmissible lay opinion can be excluded pre-trial. On the one-hand, while the prosecution may view the activities as grooming, a reasonable person can conclude that the activities and stability provided to the kids of parents with drug problems and other stability problems as something more charitable.

**RULE 807 EVIDENCE**

The prosecution intends to use a visual and audio recording of a January 16, 2013 interview at the Dolphin House Center in Montrose, Colorado of K.W. Doc. No 39. P. 15. The defense objects to the use of this recording. An evidentiary hearing will establish that the use of this recording is unreliable. K.W. never disclosed anything until he was surrounded by people who influenced his disclosure.

K.W. never mentioned any abuse until after Mr. McFadden was arrested 2013 and K.W. was travelling back to Colorado with his parents. Prior to him speaking with his parents, Detective Prescott contacted the Wesolowski family and informed them that an arrest warrant for Mr. McFadden had been signed. Following this arrest warrant KW, allegedly had a conversation with his mother on the way back from Nebraska. He said he hoped Mr. McFadden would be put away. His mom asked why. He said because Mr. McFadden had sex with J.W. K.W.'s mom took it upon herself to think that K.W. was talking about himself and not J.W. She took him to counselor Emily Bowman at the Montrose Center for Mental Health and then he eventually disclosed.

The circumstances leading up to the January 16, 2013, should be evaluated by this Honorable Court in an evidentiary hearing. At this hearing the Court should determine that the recording does not meet the reliability required by FRE 807.

**ARGUMENT**

The Government does not provide specifics with respect to the evidence it believes is part and parcel of the charged conduct in this case and therefore res gestae. The other acts with respect to K.W. and J.W. lack specificity with respect time, place, and manner, and therefore a sufficient foundation cannot be found at this time. See Doc. No. 39. P. 3-7. *United States v. Kimball,* 73 3.d 269,272 (10th Cir. 1995). Given the unreliability of the initial disclosures by K.W. and J.W. other allegations without support, will unfairly prejudice Mr. McFadden.

**1. I.S.'s Proffered Evidence is Unreliable**

As stated above the initial unreliable disclosure made by I.S. that was made when he had a motive to fabricate, and a history of fabrication started a chain reaction of falsehoods. To recap, on March 3, 2009, I.S. denied that anyone had ever touched him inappropriately. (INV_GJPD_000179).

In October 2011, abuse against I.S. by at least one other person who is not Michael McFadden was investigated. (INV_GJPD_1078). It was determined to be unfounded. He had a motive to get Mr. McFadden in trouble and he had made false allegations regarding other adults.

**2. E.S.'s Proffered Evidence is Unreliable**

E.S. had initially said that I.S. was not telling the truth and that I.S. just wanted to get Mr. McFadden in trouble. E.S. initially denied that Mr. McFadden did anything to him. A hearing should be conducted to determine the circumstances of E.S. changing his story.

**3. J.W.'s Proffered Evidence is Unreliable**

On January 21, 2009, J.W. denied that Mr. McFadden abused him. (GJ_PD_000050). On December 21, 2012, in an interview with Nicole Surad from Family Services there was another denial of abuse (GJ_PD_000147). While he denied abuse in this December 21, 2012, interview, J.W. made detailed disclosures related to other adults in his life. (GJ_PD_000147).

**4. K.W's Proffered Evidence is Unreliable**

K.W. and his family had a long history of interaction with Mr. McFadden. K.W. never mentioned any abuse until after Mr. McFadden was arrested on January 3, 2013, and K.W. was travelling back to Colorado with his parents. Detective Prescott contacted the Wesolowski family and informed them that an arrest warrant for Mr. McFadden had been signed. Following this arrest warrant KW, allegedly had a conversation with his mother on the way back from Nebraska. He

said he hoped Mr. McFadden would be put away. His mom asked why. He said because Mr. McFadden had sex with J.W. K.W. was taken to counselor Emily Bowman at the Montrose Center for Mental Health and then he eventually disclosed.

**5. <u>SJW's Proffered Evidence is Unreliable</u>**

SJW's statement was made late in time, after Mr. McFadden had publicly been castigated. Her recitation does not fit into the overall narrative that Mr. McFadden preferred to do things with boys. Unfortunately SJW was familiar with the topic of sexual abuse and she had alleged that others in her family had abused her.

**6. <u>D.R.'s Proffered Evidence is Unreliable</u>**

D.R. changed his story in March 2013. He previously told his mother that Mr. McFadden had not done anything improper to him.

A hearing should be conducted to determine the reliability or unreliability of all of the proffered FRE 414 material.

**7. <u>L.W.'s proffered Evidence is Unreliable</u>**

On January 21, 2009, L.W. denied any abuse. Almost four years later, in another interview with Detective Prescott, on December 19, 2012, L.W. denied any abuse. L.W. denied any abuse on January 16, 2013. L.W. continued to deny the abuse as recently as May 22, 2018. He finally alleged abuse on August 8, 2018.

**8. <u>Evidence Regarding MS</u>**

The conduct was alleged in 1989 and Mr. McFadden pled guilty in the case. It is this case and the subsequent registration by Mr. McFadden which led to him being treated unfairly by his community and law enforcement.

**A. LEGAL STANDARDS**

The Government wants to use the proffered evidence to prove the Mr. McFadden violated 18 U.S.C. § 2241(c) which is alleged in Counts One and Three and prove Counts Two, Four, and Five which charges a violation of 18 U.S.C. §2423(e). The Government wants to use this evidence to show that Mr. McFadden crossed a state line with the intent to engage in a sex act with a victim, Counts One and Three, and that Mr. McFadden transported a victim with the intent that the victim engage in sexual activity for which any person could be charged with a criminal offense; Counts Two, Four, and Five.

The unreliability of the proffered evidence renders its admission unfairly prejudicial and therefore inadmissible under FRE 403 and the cases that interpret FRE 414.

**B-C. Fed R. EVID 414 and FED R. EVID. 404(b)**

The unreliable nature of the proffered evidence and outcries renders the proffered evidence inadmissible. The Court should conduct a pre-trial evidentiary hearing to determine admissibility.

There are three "threshold requirements" for admitting evidence pursuant to Rule 414: "(1) the defendant is accused of a crime involving sexual assault or child molestation, (2) the evidence proffered is evidence of the defendant's commission of another offense or offenses involving sexual assault or child molestation, and (3) the evidence is relevant." United States v. Benally, 500 F.3d 1085, 1090 (10th Cir. 2007). But that is not the end of the road. (Courts) subject Rule 414 evidence to a particular breed of **Rule 403** balancing and insist that "**the district court has an obligation 'to fully evaluate the proffered . . . evidence and make a clear record of the reasoning behind its findings.'**" Id. at 1091 (omission in original) (quoting United States v. Guardia, 135 F.3d 1326, 1331 (10th Cir. 1998)). United States v. Piette, No. 20-7008, 2022 U.S. App. LEXIS 23004, at *29-30 (10th Cir. Aug. 18, 2022).

This specialized Rule 403 inquiry has two stages. First, the district court must consider the four *Enjady* factors: "(1) how clearly the prior act has been proved; (2) how probative the evidence is of the material fact it is admitted to prove; (3) how seriously disputed the material fact is; and (4) whether the government can avail itself of any less prejudicial evidence." *United States v. Perrault*, 995 F.3d 748, 765-66 (10th Cir. 2021) (footnotes omitted); *see also United States v. Enjady*, 134 F.3d 1427, 1433 (10th Cir. 1998). The district court must next weigh the *Enjady* factors against three additional factors: "(1) how likely [it is that] such evidence will contribute to an improperly-based jury verdict; (2) the extent to which such evidence will distract the jury from the central issues of the trial; and (3) how time consuming it will be to prove the prior conduct." *Perrault*, 995 F.3d at 766. *United States v. Piette*, No. 20-7008, 2022 U.S. App. LEXIS 23004, at *30 n.4 (10th Cir. Aug. 18, 2022)

In this case the four *Enjady* factors weigh in favor of the Rule 414 evidence being excluded. The sheer volume of uncharged conduct dwarfs the unreliability of the uncharged conduct. The uncharged conduct is vehemently disputed. The Court should conduct an evidentiary hearing to determine the reliability of the allegations and whether the reliability or lack of reliability balanced with inflammatory nature of the allegations passes muster under **Rule 414 and 403.**

**D. FED. R. EVID 807**

K.W.'s recorded and delayed statement, which was made after Mr. McFadden's community had turned on him should not be admitted.

> Federal Rule of Evidence 807 provides:
>
> (a) In General. Under the following conditions, a hearsay statement is not excluded by the rule against hearsay even if the statement is not admissible under a hearsay exception in Rule 803 or 804:
>
> (1) the statement is supported by sufficient guarantees

> of trustworthiness—after considering the totality of circumstances under which it was made and evidence, if any, corroborating the statement; andit is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts.

Rule 807 "should be used only in extraordinary circumstances where the court is satisfied that the evidence offers guarantees of trustworthiness and is material, probative and necessary in the interest of justice . . . courts regularly employ the residual exception in child abuse litigation." *United States v. Harrison*, 296 F.3d 994, 1003 (10th Cir. 2002). In determining whether hearsay statements made by a child in a sexual assault case are reliable for purposes of Rule 807, the court should consider "the spontaneity of the child's statement, the consistent repetition of the child's allegation, the mental state of the child, the use of terminology unexpected of a child of a similar age, and the lack of a motive to fabricate" as well as the length of time that had passed between the abuse and the statement. *United States v. Tome*, 61 F.3d 1446, 1452-53 (10th Cir.1995) (discussing admissibility under prior residual hearsay exception Rule 803(24)). In order to admit a child's hearsay statement regarding sexual abuse, the court must consider whether the child "was particularly likely to be telling the truth when the statement was made." *Id.* at 1452.

K.W. and his family had a long history of interaction with Mr. McFadden. K.W. never mentioned any abuse until after Mr. McFadden was arrested on January 3, 2013, and K.W. was travelling back to Colorado with his parents. There was a long delay in the reporting. KW allegedly had a conversation with his mother on the way back from Nebraska where he discussed Mr. McFadden harming JW, not himself. He said he hoped Mr. McFadden would be put away. His mom asked why. He said because Mr. McFadden had sex with J.W. After returning to Colorado, K.W. was taken to counselor Emily Bowman at the Montrose Center for Mental Health and then

he eventually disclosed. It is the defenses understanding that the disclosure came after multiple sessions.

## CONCLUSION

The Court must be confident that the proffered evidence is reliable enough that it will unfairly prejudice the fact finder. The Court cannot permit the jury to unfairly have its passion inflamed. The Court should conduct a pre-trial hearing to determine whether the proffered evidence is admissible under Rule 404(b), Rule 403, Rule 414, and Rule 807.

WHEREFORE, Mr. McFadden respectfully requests that this Court have an evidentiary hearing, and at a minimum deny the admission of FRE 414 and FRE 807 evidence.

Respectfully submitted,

s/Sean M. McDermott
Sean M. McDermott
McDermott Stuart & Ward LLP
140 E. 19th Avenue, Suite 300
Denver, CO 80203
(303) 832-8888
(303) 863-8888 (fax)
Email: smcdermott@mswdenver.com

Case 1:19-cr-00243-CMA-GPG Document 193-6 Filed 07/14/22 Page 17 of 17

**CERTIFICATE OF SERVICE**

I hereby certify that on this 13th day of September 2022, I filed the foregoing **pleading** with the Clerk of Court using the CM/ECF system which will send notification of such filing to all listed parties.

s/ Sean McDermott
Sean McDermott

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 19-cr-00243-CMA-GPG

UNITED STATES OF AMERICA,

Plaintiff,

**v.**

**MICHAEL TRACY McFADDEN,**

**Defendant.**

---

**AFFIDAVIT OF DAVID W. THOMPSON**

---

STATE OF WISCONSIN )
) ss
COUNTY OF RACINE )

---

DAVID W. THOMPSON, being sworn, states:

1. I am a clinical and forensic psychologist duly licensed to practice psychology in the state of Wisconsin.

2. The defendant in the above captioned matter retained me for the purpose of providing expert services in this case.

3. Through my research and experience I am aware that the memories and event reports of children and adults are highly malleable and subject to influence and distortion in a number of ways.

4. I have reviewed various documents and reports in the above captioned matter.

5. Treatment providers are taught to provide evidence-based services (services that have some empirical basis and known effectiveness) and to do so in a trauma-informed manner (i.e., with an awareness of the ways in which an individual's history of traumatic experiences may impact the person's emotions and behavior).

6. These treatment techniques, while therapeutically effective, are known to affect the accuracy of the individual's memories for the traumatic events.

7. The unintended consequences of these effective, evidence-based techniques may include irretrievably contaminating the individual's memory for the alleged traumatic event.

8. Peer reviewed published papers have cautioned therapists about the effects of such treatment efforts when clients are expected to testify in administrative or judicial procedures. Branaman, T. F., & Gottlieb, M. C. (2013). Ethical and legal considerations for treatment of alleged victims: When does it become witness tampering? *Professional Psychology: Research and Practice, 44*, 299-306.

9. Because these treatment techniques require the regular rehearsal of the events that are believed to have caused the trauma, treatment records are very likely to contain descriptions by the alleged victim of the allegations involved.

10. There are many other *ineffective* treatment techniques utilized by therapists who are uninformed or incompetent, and when used to treat persons they may further contaminate the client's memory for events.

11. Participation in counseling or psychotherapy both prior to the reporting of allegations as well as following the reports of such allegations may have a profound effect not only on the individual's initial event reports, but also on the individual's memory and event reports at the time of trial.

12. Michael McFadden is currently charged with two counts of crossing state lines with intent to engage in a sexual act with a minor under 12, and three counts of transportation of a minor with intent to engage in sexual activity. These charges involve KW (birth date 4/23/01) and JW (birth date 10/25/00).

13. Mr. McFadden was previously charged in Mesa County, Colorado cases 13CR27, 13CR339, and 13CR342 with similar charges involving both the alleged victims in the current case and alleging sexual abuse of other youth.

14. In addition to the current federal charges, the government is seeking to bring in these other allegations under FRE Rule 414.

15. There are numerous references in the investigation material to the various children's participation in psychotherapy:

    a. In the current case, alleged victim KW reportedly participated in outpatient psychotherapy during which he reported being sexually abused by the defendant. INV_GJPD_00000221.

    b. Child protective services investigation records specifically naming EM (3/22/04) and DO (8/25/01) report that the "boys [are] in counseling." INV_GJPD_00001079.

Additional documentation indicates that both DO and EM are in therapy at "the WSCC once a week." INV_GJPD_00001081. Records go on to indicate that "[DO] was in getting set up for outpatient services in their facility and during the intake process he disclosed that he was sexually abused by his uncle and physically abused by his mother."

c. Records indicate that IS had been placed in foster care and was actively receiving psychotherapy. CPS records indicate that it was recommended that the therapist would continue to work with IS "and explore this area," referring to the reports of "a long balloon in his bottom." INV_GJPD_00001095.

d. CPS reports indicate that on 8/24/11 KW was scheduled to "begin community counseling again." INV_GJPD_00001102.

e. Additional allegations were made concerning KW, SB (5/28/04), and an ex-husband of the children's mother (Kayo Bassett) alleging sexual abuse of SB and KW by Mr. Bassett. These were investigated and were unfounded or inconclusive, but the children were recommended to return to outpatient therapy. INV_GJPD_00001103.

16. There are other references in the investigation material to special needs of one of the children:

a. IS (10/21/04) was described as a child with developmental delays who was enrolled in special education school programming. INV_GJPD_00001097.

17. Based on my education and experience, it is likely that the special education records for IS, including behavior reports, formal psychological, educational, and behavioral assessments, and his Individual Educational Plan (IEP) will contain information relative to the child's early sexual behavior and sexual knowledge. This information is likely to be relevant to the reliability of the child's memory and event reports.

18. Source misattribution errors are common memory mistakes made by children and adults in a variety of situations. They involve recalling an event tbut erroneously reporting the source of that recollection. Johnson, M. K., Hashtroudi, S., & Lindsay, D. S. (1993). Source monitoring. *Psychological Bulletin, 114*, 3-28.

19. The sexual abuse allegations related to SB and KW that were screened out and referred to therapy, especially as to how the therapist addressed these issues with the children, provide an early foundation for source misattribution errors that may well be exculpatory in the current case.

20. All of the records of therapeutic involvement of the alleged victims are likely to be highly relevant to the integrity of the children's memories and the accuracy of their event reports.

Affidavit of David W. Thompson
U.S. v. McFadden, 19-cr-00243-CMA-GPG

4

21. I am able to maintain the security and confidentiality of all of the children's treatment records according to normal clinic procedures, as well as any special conditions that the court may impose.

22. It is crucial for me to review the above referenced school and treatment records in order to adequately advise Mr. McFadden's defense attorney in the preparation of this case.

David W. Thompson, PhD

The forgoing Affidavit acknowledged before me this 13th day September, 2022.

Witness my hand and official seal.

Christine Mamerow
Notary Public, State of Wisconsin
My commission expires April 2, 2025.

Exhibit A

342

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 19-cr-00243-CMA-GPG

UNITED STATES OF AMERICA,

Plaintiff,

**v.**

**MICHAEL TRACY McFADDEN,**

**Defendant.**

---

**MOTION TO COMPEL PRODUCTION AND REQUEST FOR SUBPOENA RETURN DATE**

---

Mr. McFadden by and through his attorney Sean M. McDermott, moves this Honorable Court to provide a subpoena return date and to compel the production of certain materials. As grounds Mr. McFadden states the following:

1. Mr. McFadden is charged with two counts of crossing state lines with intent to engage in a sexual act with a minor under 12 years of age, and three counts of transportation of a person over state lines with the intent to engage in a sexual act that is a crime.

2. The alleged victims of these crimes are KW in Counts One and Two and JW in Counts Three, Four and Five.

3. Despite knowing Mr. McFadden for a long period of time, KW had never disclosed that Mr. McFadden had any sexual activity with him. After Mr. McFadden's arrest, KW allegedly told his mother that he wanted Mr. McFadden to be put away. He said he wanted Mr. McFadden put away because Mr. McFadden had sex with JW. He did not state that Mr. McFadden had done anything inappropriate to him. When he and his mother returned to

Colorado, he saw a counselor. She took him to counselor Emily Bowman at the Montrose Center for Mental Health. He eventually made a disclosure against Mr. McFadden.

4.     In addition to K.W. being referred to therapy, his sister SJW who is a FRE 414 witness was as well was referred to counseling prior to making a disclosure against Mr. McFadden. She was discussing possible sexual abuse by someone else. (Exhibit A, Affidavit of Dr. David Thompson ¶15(b)). She also made a late disclosure against Mr. McFadden.

5.     I.S. is a witness who the Government wants to use to elicit FRE 414 evidence. I.S. made a disclosure against Mr. McFadden. He made this disclosure even though he previously stated that nobody had molested him. He was in therapy, and he was working on "exploring" the possibility of a sexual assault. (INV_GJPD_00001095).

6.     E.S. f/k/a E.M. like I.S. is also a witness who the Government wants to use to elicit FRE 414 evidence. Like I.S., E.S. initially stated that Mr. McFadden had not molested him. He even went so far as to say that I.S. made up an allegation because he wanted to get Mr. McFadden in trouble. Shortly after saying this, he changed 180 degrees, and made an allegation against Mr. McFadden.

7.     K.W., I.S., and E.S. all initially made statements that Mr. McFadden did not molest them. All three of these people were enrolled in counseling. All three ended up changing their story and making allegations against Mr. McFadden.

8.     Source misattribution errors are common memory mistakes made by Children and adults in a variety of situations. They involve recalling an event but erroneously reporting the source of that recollection. (Exhibit A, Affidavit of David Thompson).

9.     The defense needs these records to properly defend Mr. McFadden.

10.     A subpoena for documents may be quashed if their production would be

"unreasonable or oppressive," but not otherwise.

> In order to require production prior to trial, the moving party must show: (1) that the documents are evidentiary and relevant; (2) that they are not otherwise procurable reasonably in advance of trial by exercise of due diligence; (3) that the party cannot properly prepare for trial without such production and inspection in advance of trial and that the failure to obtain such inspection may tend unreasonably to delay the trial; and (4) that the application is made in good faith and is not intended as a general "fishing expedition."

United States v. Nixon, 418 U.S. 683, 699-700, 94 S. Ct. 3090, 3103 (1974)

WHEREFORE, Mr. McFadden respectfully requests that this Court order that Mr.

McFadden's defense team be permitted to obtain the therapy records of any of the witnesses who

were in therapy and are alleging that Mr. McFadden sexually assaulted them.


Respectfully submitted,

s/Sean M. McDermott
  Sean M. McDermott
  McDermott Stuart & Ward LLP
  140 E. 19th Avenue, Suite 300
  Denver, CO 80203
  (303) 832-8888
  (303) 863-8888 (fax)
  Email: smcdermott@mswdenver.com

Case 1:09-cv-02448-GPG-GPG Document 168 Filed 06/29/24 Page 4 of 4

**CERTIFICATE OF SERVICE**

I hereby certify that on this 13th day of September 2022, I filed the foregoing **pleading** with the Clerk of Court using the CM/ECF system which will send notification of such filing to all listed parties.

s/ Sean McDermott
Sean McDermott

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 19-cr-00243-CMA-GPG

UNITED STATES OF AMERICA,

Plaintiff,

v.

**MICHAEL TRACY McFADDEN,**

**Defendant.**

---

**AFFIDAVIT OF DAVID W. THOMPSON**

---

STATE OF WISCONSIN )
) ss
COUNTY OF RACINE )

---

DAVID W. THOMPSON, being sworn, states:

1. I am a clinical and forensic psychologist duly licensed to practice psychology in the state of Wisconsin.

2. The defendant in the above captioned matter retained me for the purpose of providing expert services in this case.

3. Through my research and experience I am aware that the memories and event reports of children and adults are highly malleable and subject to influence and distortion in a number of ways.

4. I have reviewed various documents and reports in the above captioned matter.

5. Treatment providers are taught to provide evidence-based services (services that have some empirical basis and known effectiveness) and to do so in a trauma-informed manner (i.e., with an awareness of the ways in which an individual's history of traumatic experiences may impact the person's emotions and behavior).

6. These treatment techniques, while therapeutically effective, are known to affect the accuracy of the individual's memories for the traumatic events.

7. The unintended consequences of these effective, evidence-based techniques may include irretrievably contaminating the individual's memory for the alleged traumatic event.

8. Peer reviewed published papers have cautioned therapists about the effects of such treatment efforts when clients are expected to testify in administrative or judicial procedures. Branaman, T. F., & Gottlieb, M. C. (2013). Ethical and legal considerations for treatment of alleged victims: When does it become witness tampering? *Professional Psychology: Research and Practice, 44*, 299-306.

9. Because these treatment techniques require the regular rehearsal of the events that are believed to have caused the trauma, treatment records are very likely to contain descriptions by the alleged victim of the allegations involved.

10. There are many other *ineffective* treatment techniques utilized by therapists who are uninformed or incompetent, and when used to treat persons they may further contaminate the client's memory for events.

11. Participation in counseling or psychotherapy both prior to the reporting of allegations as well as following the reports of such allegations may have a profound effect not only on the individual's initial event reports, but also on the individual's memory and event reports at the time of trial.

12. Michael McFadden is currently charged with two counts of crossing state lines with intent to engage in a sexual act with a minor under 12, and three counts of transportation of a minor with intent to engage in sexual activity. These charges involve KW (birth date 4/23/01) and JW (birth date 10/25/00).

13. Mr. McFadden was previously charged in Mesa County, Colorado cases 13CR27, 13CR339, and 13CR342 with similar charges involving both the alleged victims in the current case and alleging sexual abuse of other youth.

14. In addition to the current federal charges, the government is seeking to bring in these other allegations under FRE Rule 414.

15. There are numerous references in the investigation material to the various children's participation in psychotherapy:

    a. In the current case, alleged victim KW reportedly participated in outpatient psychotherapy during which he reported being sexually abused by the defendant. INV_GJPD_00000221.

    b. Child protective services investigation records specifically naming EM (3/22/04) and DO (8/25/01) report that the "boys [are] in counseling." INV_GJPD_00001079.

Additional documentation indicates that both DO and EM are in therapy at "the WSCC once a week." INV_GJPD_00001081. Records go on to indicate that "[DO] was in getting set up for outpatient services in their facility and during the intake process he disclosed that he was sexually abused by his uncle and physically abused by his mother."

c. Records indicate that IS had been placed in foster care and was actively receiving psychotherapy. CPS records indicate that it was recommended that the therapist would continue to work with IS "and explore this area," referring to the reports of "a long balloon in his bottom." INV_GJPD_00001095.

d. CPS reports indicate that on 8/24/11 KW was scheduled to "begin community counseling again." INV_GJPD_00001102.

e. Additional allegations were made concerning KW, SB (5/28/04), and an ex-husband of the children's mother (Kayo Bassett) alleging sexual abuse of SB and KW by Mr. Bassett. These were investigated and were unfounded or inconclusive, but the children were recommended to return to outpatient therapy. INV_GJPD_00001103.

16. There are other references in the investigation material to special needs of one of the children:

a. IS (10/21/04) was described as a child with developmental delays who was enrolled in special education school programming. INV_GJPD_00001097.

17. Based on my education and experience, it is likely that the special education records for IS, including behavior reports, formal psychological, educational, and behavioral assessments, and his Individual Educational Plan (IEP) will contain information relative to the child's early sexual behavior and sexual knowledge. This information is likely to be relevant to the reliability of the child's memory and event reports.

18. Source misattribution errors are common memory mistakes made by children and adults in a variety of situations. They involve recalling an event tbut erroneously reporting the source of that recollection. Johnson, M. K., Hashtroudi, S., & Lindsay, D. S. (1993). Source monitoring. *Psychological Bulletin, 114*, 3-28.

19. The sexual abuse allegations related to SB and KW that were screened out and referred to therapy, especially as to how the therapist addressed these issues with the children, provide an early foundation for source misattribution errors that may well be exculpatory in the current case.

20. All of the records of therapeutic involvement of the alleged victims are likely to be highly relevant to the integrity of the children's memories and the accuracy of their event reports.

Affidavit of David W. Thompson
U.S. v. McFadden, 19-cr-00243-CMA-GPG

4

21. I am able to maintain the security and confidentiality of all of the children's treatment records according to normal clinic procedures, as well as any special conditions that the court may impose.

22. It is crucial for me to review the above referenced school and treatment records in order to adequately advise Mr. McFadden's defense attorney in the preparation of this case.

David W. Thompson, PhD

The forgoing Affidavit acknowledged before me this 13th day September, 2022.

Witness my hand and official seal.

Christine Mamerow
Notary Public, State of Wisconsin
My commission expires April 2, 2025.

Exhibit A

350

Case 1:19-cr-00243-CMA-GPG Document 71 Filed 09/14/22 Page 1 of 2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 19-cr-00243-CMA-GPG

UNITED STATES OF AMERICA,

Plaintiff,

**v.**

**MICHAEL TRACY McFADDEN,**

**Defendant.**

---

**MOTION FOR LEVEL ONE RESTRICTION**

---

**NOW COMES,** Sean McDermott, by and through Sean McDermott of McDermott Stuart & Ward LLP, and respectfully moves this Honorable Court for Level 1 Restriction for document 59.

Respectfully submitted,

Dated: September 14, 2022

s/Sean M. McDermott
Sean M. McDermott
McDermott Stuart & Ward LLP
140 E. 19th Avenue, Suite 300
Denver, CO 80203
(303) 832-8888
(303) 863-8888 (fax)
Email: smcdermott@mswdenver.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 14th day of September 2022, I filed the foregoing **pleading** with the Clerk of Court using the CM/ECF system which will send notification of such filing to all listed parties.

s/ Sean McDermott
Sean McDermott

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 19-cr-00243-CMA-GPG

UNITED STATES OF AMERICA,

Plaintiff,

**v.**

**MICHAEL TRACY McFADDEN,**

**Defendant.**

---

**MOTION FOR LEVEL ONE RESTRICTION**

---

**NOW COMES,** Sean McDermott, by and through Sean McDermott of McDermott Stuart & Ward LLP, and respectfully moves this Honorable Court for Level 1 Restriction for document 60.

Respectfully submitted,

Dated: September 14, 2022

s/Sean M. McDermott
Sean M. McDermott
McDermott Stuart & Ward LLP
140 E. 19th Avenue, Suite 300
Denver, CO 80203
(303) 832-8888
(303) 863-8888 (fax)
Email: smcdermott@mswdenver.com

Case 1:09-cv-00243-GMA-GPG Document 172-17 Filed 06/27/24 Page 2 of 2

**CERTIFICATE OF SERVICE**

I hereby certify that on this 14th day of September 2022, I filed the foregoing **pleading** with the Clerk of Court using the CM/ECF system which will send notification of such filing to all listed parties.

s/ Sean McDermott
Sean McDermott

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 19-cr-00243-CMA-GPG

UNITED STATES OF AMERICA,

Plaintiff,

v.

**MICHAEL TRACY McFADDEN,**

**Defendant.**

---

**NOTICE OF ERRATA**

---

**COMES NOW,** Michael Tracy McFadden, by and through Sean McDermott of McDermott Stuart & Ward LLP, and respectfully submits, this errata to his Objection To Government's Notice of Intent to Introduce Evidence Pursuant to Federal Rules of Evidence 414, 404(b) and 807 filed at Docket No. 59; and his Motion to Compel Production and Request for a Subpoena Return Date filed at Docket No. 60.

Mr. McFadden's Motion to Compel Production and Request for a Subpoena Return Date filed at Docket No. 60 references Exhibit A which is an affidavit submitted by Dr. David Thompson in support of this Motion. This exhibit was mistakenly filed as an attachment to his Objection To Government's Notice of Intent to Introduce Evidence Pursuant to Federal Rules of Evidence 414, 404(b) and 807 filed at Docket No. 59.

Consistent with the Court's orders at Docket Nos. 75 and 76, Mr. McFadden will re-file these documents with the appropriate redactions. He will also file the Affidavit of David Thompson to accompany his Motion to Compel Production and Request for a Subpoena Return Date instead of the Objection To Government's Notice of Intent to Introduce Evidence Pursuant

to Federal Rules of Evidence 414, 404(b) and 807. Except for updating the date, no other changes will be made.

Respectfully submitted,

Dated: September 14, 2022

s/Sean M. McDermott
Sean M. McDermott
McDermott Stuart & Ward LLP
140 E. 19th Avenue, Suite 300
 Denver, CO 80203
(303) 832-8888
(303) 863-8888 (fax)
Email: smcdermott@mswdenver.com

Case 1:19-cv-02443-RM-STV Document 177 Filed 09/14/22 Page 3 of 3

**CERTIFICATE OF SERVICE**

I hereby certify that on this 14th day of September 2022, I filed the foregoing **pleading** with the Clerk of Court using the CM/ECF system which will send notification of such filing to all listed parties.

s/ Sean McDermott
Sean McDermott

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 19-cr-00243-CMA-GPG

UNITED STATES OF AMERICA,

Plaintiff,

**v.**

**MICHAEL TRACY McFADDEN,**

**Defendant.**

---

**OBJECTION TO GOVERNMENT'S NOTICE OF INTENT TO INTRODUCE EVIDENCE PURSUANT TO FEDERAL RULES OF EVIDENCE 414, 404(b), AND 807**

---

Mr. McFadden by and through his attorney Sean M. McDermott, submits his response to the Government's Notice of Intent to Introduce Evidence Pursuant to Federal Rules of Evidence 414, 404(b) and 807:

Introduction

Mr. McFadden was a marked man who attempted to do right by his extended but dysfunctional family. Mr. McFadden was marked because of an illegal act of sexual assault that he pled guilty to shortly after his 18th birthday. That offense occurred on December 26, 1989. Mr. McFadden, who himself was abused as a child pled guilty to a sex offense against a minor.

Mr. McFadden was trusted with his extended family's kids and other kids. The kids' parents had serious problems and so the kids would stay with Mr. McFadden. The house was often crowded. Some of the parents would stay at the residence as well. On December 15, 2012, a disgruntled child who was upset with Mr. McFadden made up a story that Mr. McFadden had touched him. This child had previously said that nobody had ever sexually abused him.

This uncorroborated outcry broke the dam and a flood of false accusations followed. A second child who a mere three weeks earlier had denied any touching, changed his story, and alleged Mr. McFadden touched him.

An arrest warrant for Michael McFadden was applied for on January 3, 2013. The warrant alleged there was probable cause for the arrest of Mr. McFadden regarding these allegations against these two children, even though their allegations were objectively suspect.

Mr. McFadden has been unfairly accused. The prosecution takes great pains to point out that Mr. McFadden was convicted in state court. Mr. McFadden was convicted in state court because of the sheer volume of allegations. The prosecution knows that Mr. McFadden has zero chance of prevailing in this case if the Government is allowed to present the evidence that the Government wants to present in their Notice.

It is the **quantity rather than the quality of the allegations against Mr. McFadden that led to his unfair conviction in state Court**. Because the proffered evidence is **unfairly prejudicial**, Mr. McFadden requests that the proffered evidence not be admitted. Against the backdrop of the unfair allegations, that finally occurred in December 2012, by people who had previously said nothing happened, the Court should take into consideration the unfairness of the inflammatory nature of the allegations that are made without any physical corroboration.

Family Background

I.S.'s guardian was Dian S[redacted]. I.S. started to stay at Mr. McFadden's residence at 2980 D ½ Road, Grand Junction, CO because his mom worked out of state every other month.

Duane R[redacted] and Anita R[redacted] had a daughter named Cindy R[redacted]. Crystal M[redacted] is the daughter of Cindy R[redacted] and Tony M[redacted] who is Michael M[redacted]s half-brother. Crystal M[redacted] has three children. These children include E.S. f/k/a E.M whose father is Mathew

████ S████ She also had a child D.O. whose father is Ryan O████. She also has a daughter, J.M. (INV_GJPD_0000025). The person who is the father is unknown. Ryan S████ is I.S.'s Uncle.

Terry R████ is the son of Duane and Anita R████. A woman named Theresa R████ is married to Terry R████. Theresa is the daughter-in-law of Cindy R████. Theresa R████ had Michelle R████ who had four kids including L.W. and J.W. Thomas W████ acted as the legal father for L.W. (DOB ████) and J.W. (DOB ████). Thomas W████ and Michelle R████ were divorced. (INV_GJPD_0000025). Michelle R████ who is Mr. McFadden's niece and the mother of J.W. and L.W. had difficulty caring for J.W. and L.W. Therefore, the kids would come over. As their uncle, Michael McFadden would care for them

When Theresa R████ would get upset with Mr. McFadden, she would talk about him being a registered sex offender in front of the kids. Theresa R████' grandparents Duane R████ and Anita R████ would also refer to Mr. McFadden being a registered sex offender in front of the kids.

The W████ family moved next door to Mr. McFadden and others when Mr. McFadden resided at 2980 D ½ Road, Grand Junction Colorado. Prior to this, this family had reports of sexual abuse involving the children and completely independent of Mr. McFadden. These include allegations of someone perpetrating on S.J.W. and K.W. (INV_GJPD_1103), February 2007 allegations that K.W. touched S.J.W. inappropriately. (INV_GJPD_1103), investigation of other incest, *(INV_GJPD_1103)* and KW being a victim of neglect in 2010 (INV_GJPD_1104). K.W. would come to the home because Stacy W████ was having difficulty with K.W. K.W. would often be put in a stabilizing unit.

Prior to moving to 2980 D ½ Road Mr McFadden resided at 476 Glen Road, Grand Junction, Colorado with Phyllis and John Hockenberry. Mr. McFadden moved in with the

Hockenberrys after his divorce from Tammie McFadden. In late 2009 they all moved to 2980 D ½ Road. The Hockenberry's reported that while at 476 Glen Road L.W., E.S., and K.W. would come to the home. They would stay the night. The Hockenberry's had a young son, S.H. who was friends with D.R. D.R. who was the young son of Leslie R[redacted]. Therefore, D.R. would come over the house. (INV_GJPD_00000260). Mr. McFadden happened to know Leslie Rader from junior high school.

Beginning of the Investigation

After I.S. made his December 15, 2012, disclosure, law enforcement pulled Mr. McFadden's record and the reports from the 1989 case. This was done even though I.S. had previously made two false allegations against two different people. Law enforcement knew that Mr. McFadden was a registered sex offender for something he pled guilty to for something that was alleged when he was just north of 18 years old. On December 19, 2012, Detective Prescott looked up the 1990 case (INV_GJPD__48). Detective Prescott contacted Theresa R[redacted] and talked to her about her former son-in-law, Thomas W[redacted] alleging that one of the boys made disturbing statements about things that Mr. McFadden had allegedly done in 2008. (INV_GJPD__49). That investigation had been closed when J.W. and his brother L.W. stated that nothing happened. (INV_GJPD_0000003 and GJPD0000007). LW was interviewed again and again said nothing happened. (INV_GJPD_29).

Detective Prescott went to visit Thomas W[redacted] who was in jail on a parole violation, to revisit this non-disclosure from four years earlier. Although, there was a reasonable basis to pause and conduct further investigation, by January 3, 2013, Detective Prescott asked for and obtained an arrest warrant for allegations made by I.S. and then E.S. Within 17 days of his investigation Detective Prescott asked for and obtained an arrest warrant even though I.S. had made two

allegations against two other people and even though 13 days earlier E.S. had said that Mr. McFadden had not inappropriately touched him or I.S. and that I.S. was simply saying this to get Mr. McFadden in trouble. The dominoes fell from there.

**RULE 414 EVIDENCE**

**Allegation Made December 15, 2012**

**Other alleged Acts Related to I.S.**

On December 15, 2012, almost 23 years after the allegation that got Mr. McFadden branded a sex offender. I.S. made a disclosure that set off the chain of false accusations. His guardian Dian S[redacted] called the police. She told Officer Eric Wood, that I.S. told her son Ryan S[redacted] and his cousin E.M. (now E.S.) that Uncle Mike (McFadden) had touched him inappropriately.

Ms. S[redacted] also stated that I.S. had been acting out. She believed it was because she had to work out of state every other month from June 2012 until October 2012. What is not included in the police report is that I.S. came to stay on weekends with Mr. McFadden after I.S. falsely accused Ryan S[redacted] of sexually assaulting Mr. McFadden.

I.S. would stay with Uncle Mike (McFadden) at 2980 D ½ Road, Grand Junction, Colorado. At the time Ms. Staudard was interviewed I.S. was staying with Mr. McFadden on weekends while she worked. (INV_GJPD_0000007). What is not included in the report is that I.S. was upset with Mr. McFadden for enforcing Teresa's rules. I.S. then made a false allegation against Mr. McFadden.

I.S. had previously been interviewed by a caseworker. After having behavior issues and after acting out sexually he was interviewed on March 3, 2009, I.S. denied that anyone had ever touched him inappropriately. (INV_GJPD_000179). In October 2011, abuse against I.S. by another person who is not Michael McFadden was investigated. (INV_GJPD_1078).

As a result of I.S.'s report E.S. f/k/a E.M. was interviewed on December 21, 2012. E.S. was asked whether he had ever been touched inappropriately by Mr. McFadden. He answered no. E.S. said that I.S. told him that Mr. McFadden or Uncle Mike had touched him inappropriately. E.S. stated that Mike did not touch I.S. or anyone else in the privates. He stated that I.S. said this because he just wanted to get Mr. McFadden in trouble but that he didn't know why he wanted to get Mr. McFadden in trouble. (INV_GJPD_ 000331). In sum, I.S.'s allegation is unfairly prejudicial as misappropriation to Mr. McFadden or retaliation against Mr. McFadden for enforcing I.S.'s mother's rules is a real possibility.

**<u>Other alleged Acts Related to E.S. f/k/a E.M.</u>**

As stated above, on December 21, 2012. E.S. denied being touched by Mr. McFadden. He even went as far to say that Mr. McFadden didn't touch him or anyone inappropriately and that I.S. was just trying to get Mr. McFadden in trouble. (INV_GJPD_ 000331). On January 2, 2013, Detective Prescott was scheduled to interview E.M.'s brother D.O. By this time, pressure was mounting to have Mr. McFadden arrested.

E.S. who is D. O's brother showed up at the interview and changed his December 21, 2012, story. E.S.'s allegation against Mr. McFadden is unreliable. Its admission will unfairly prejudice Mr. McFadden. Parenthetically but relevant to the falsity of E.S.'s allegation, during Detective Prescott's interview of D.O., D.O. denied any abuse by Michael McFadden.

**<u>Other alleged Acts Related to J.W.</u>**

On January 21, 2009, J.W. denied that Mr. McFadden abused him. (GJ_PD_000050). On December 21, 2012, in an interview with Nicole Surad from Family Services there was another denial of abuse (GJ_PD_000147). While he denied abuse in this December 21, 2012, interview, he did make detailed disclosures related to other adults in his life. (GJ_PD_000147).

J.W. said he was not allowed in a pod outside of the house because his mom (Michelle R[redacted]) and Crystal M[redacted] "do drugs." He reported that his mom and Crystal are generally lazy and don't pick up after themselves. They smoke weed and cigarettes. However, when they smoke weed, they get energy and then they clean the whole house. His mom and Aunt Crystal live in the pod. Not being allowed in the pod, because of their drug use, he slept with his Uncle Mike. He said that Uncle Mike was like a father to him. He was asked about sexual behavior and he reported none. He went on to say that the only adult he had seen naked was his mother. (GJ_PD_000147).

On February 7, 2013, in an interview with Detective Prescott and Julie Stogsdill, there was finally an allegation of abuse. A testimonial hearing can reveal that this final interview was very suggestive and therefore unreliable. It also came after others were putting pressure to have Mr. McFadden punished. There is no physical evidence to support the allegations. On their own the allegations in the charging document are suspect.

**<u>Other alleged Acts Related to K.W.</u>**

K.W. and his family had a long history of interaction with Mr. McFadden. K.W. never mentioned any abuse until after Mr. McFadden was arrested on January 3, 2013, and K.W. was travelling back to Colorado with his parents. Detective Prescott contacted the W[redacted] family and informed them that an arrest warrant for Mr. McFadden had been signed. Following this arrest warrant KW, allegedly had a conversation with his mother on the way back from Nebraska. He said he hoped Mr. McFadden would be put away. His mom asked why. He said because Mr. McFadden had sex with J.W. K.W.'s mom took it upon herself to think that K.W. was talking about himself and not J.W. She took him to counselor Emily Bowman at the Montrose Center for Mental Health and then he disclosed.

No disclosure occurred until the shame of an arrest warrant followed Mr. McFadden. Mr. McFadden had been in K.W.'s life for several years, but no disclosure occurred until now. The W[redacted] family was no stranger to accusations of sexual abuse. These include allegations of someone perpetrating on S.J.W. and K.W. (INV_GJPD_1103), February 2007 allegations that K.W. touched S.J.W. inappropriately. (INV_GJPD_1103). The possibility of misappropriation is high. Especially considering that in January of 2013 K.W. was telling his mom that Mr. McFadden had done an act to someone who was not him.

**Other alleged Acts Related to S.J.W.**

All people who know Mr. McFadden in the police reports state that he favored being around boys rather than girls. However, S.J.W. S.J.W.'s allegations of Mr. McFadden putting his finger up her butt, do not fit. However, S.J.W. was familiar with the topic sexual abuse. There were allegations of her having a special relationship with her father and of K.W. abusing her. (INV_GJPD_1103). The trustworthiness of her allegation is low.

**Other alleged Acts Related to D.R.**

On March 26, 2013, law enforcement contacted D.R.'s mom Lesleigh R[redacted] of the allegations against Mr. McFadden. Lesleigh R[redacted] told law enforcement that she had previously asked D.R. about the allegations. He told her that Mr. McFadden had not done anything to him. (INV_GJPD_260). At the state jury trial D.R.'s statement was found inadmissible as the Court found that it did not describe sexual touching. (TRAN_1439).

**Other alleged Acts Related to L.W.**

On January 21, 2009, L.W. denied any abuse. Almost four years later, in another interview with Detective Prescott, on December 19, 2012, L.W. denied any abuse. L.W. denied any abuse

on January 16, 2013. L.W. continued to deny the abuse as recently as May 22, 2018. He finally alleged abuse on August 8, 2018.

It should be noted that L.W. is K.W. and S.J.W.'s younger brother. His is the most recent allegation. On January 21, 2009. he was interviewed at the same location as his brother who was also interviewed the same day. Like his older K.W. he denied any inappropriate touching by Mr. McFadden. He continued those denials for more than nine years. On its face his allegation is suspect to say the least.

**Acts Regarding M.S.**

M.S. involves conduct from 1989. This conduct was 20 years prior to the allegations in this case. Mr. McFadden's plea in that case, most likely led to the poisoning of the well with his family, which led to the first untrue allegation by I.S.

## RULE 404(b) EVIDENCE

The prosecution asks for the Court to admit evidence regarding the use of sleep aids including melatonin and a "clump" in drinks to show that Mr. McFadden, used sleep aids to lull victims to sleep. This should be determined at an evidentiary hearing. At a hearing the Court can determine the likelihood of whether melatonin was misused. Additionally, the Court can weigh whether an unidentified "clump" in a drink is probative under FRE 401 or unfairly prejudicial under FRE 403. With respect to the other grooming behaviors mentioned at Doc. No. 39 p. 13-14, the Court can and should weigh the context of the evidence so that any inadmissible lay opinion can be excluded pre-trial. On the one-hand, while the prosecution may view the activities as grooming, a reasonable person can conclude that the activities and stability provided to the kids of parents with drug problems and other stability problems as something more charitable.

## RULE 807 EVIDENCE

The prosecution intends to use a visual and audio recording of a January 16, 2013 interview at the Dolphin House Center in Montrose, Colorado of K.W. Doc. No 39. P. 15. The defense objects to the use of this recording. An evidentiary hearing will establish that the use of this recording is unreliable. K.W. never disclosed anything until he was surrounded by people who influenced his disclosure.

K.W. never mentioned any abuse until after Mr. McFadden was arrested 2013 and K.W. was travelling back to Colorado with his parents. Prior to him speaking with his parents, Detective Prescott contacted the Wesolowski family and informed them that an arrest warrant for Mr. McFadden had been signed. Following this arrest warrant KW, allegedly had a conversation with his mother on the way back from Nebraska. He said he hoped Mr. McFadden would be put away. His mom asked why. He said because Mr. McFadden had sex with J.W. K.W.'s mom took it upon herself to think that K.W. was talking about himself and not J.W. She took him to counselor Emily Bowman at the Montrose Center for Mental Health and then he eventually disclosed.

The circumstances leading up to the January 16, 2013, should be evaluated by this Honorable Court in an evidentiary hearing. At this hearing the Court should determine that the recording does not meet the reliability required by FRE 807.

**ARGUMENT**

The Government does not provide specifics with respect to the evidence it believes is part and parcel of the charged conduct in this case and therefore res gestae. The other acts with respect to K.W. and J.W. lack specificity with respect time, place, and manner, and therefore a sufficient foundation cannot be found at this time. See Doc. No. 39. P. 3-7. *United States v. Kimball,* 73 3.d 269,272 (10th Cir. 1995). Given the unreliability of the initial disclosures by K.W. and J.W. other allegations without support, will unfairly prejudice Mr. McFadden.

**1. I.S.'s Proffered Evidence is Unreliable**

As stated above the initial unreliable disclosure made by I.S. that was made when he had a motive to fabricate, and a history of fabrication started a chain reaction of falsehoods. To recap, on March 3, 2009, I.S. denied that anyone had ever touched him inappropriately. (INV_GJPD_000179).

In October 2011, abuse against I.S. by at least one other person who is not Michael McFadden was investigated. (INV_GJPD_1078). It was determined to be unfounded. He had a motive to get Mr. McFadden in trouble and he had made false allegations regarding other adults.

**2. E.S.'s Proffered Evidence is Unreliable**

E.S. had initially said that I.S. was not telling the truth and that I.S. just wanted to get Mr. McFadden in trouble. E.S. initially denied that Mr. McFadden did anything to him. A hearing should be conducted to determine the circumstances of E.S. changing his story.

**3. J.W.'s Proffered Evidence is Unreliable**

On January 21, 2009, J.W. denied that Mr. McFadden abused him. (GJ_PD_000050). On December 21, 2012, in an interview with Nicole Surad from Family Services there was another denial of abuse (GJ_PD_000147). While he denied abuse in this December 21, 2012, interview, J.W. made detailed disclosures related to other adults in his life. (GJ_PD_000147).

**4. K.W's Proffered Evidence is Unreliable**

K.W. and his family had a long history of interaction with Mr. McFadden. K.W. never mentioned any abuse until after Mr. McFadden was arrested on January 3, 2013, and K.W. was travelling back to Colorado with his parents. Detective Prescott contacted the Wesolowski family and informed them that an arrest warrant for Mr. McFadden had been signed. Following this arrest warrant KW, allegedly had a conversation with his mother on the way back from Nebraska. He

said he hoped Mr. McFadden would be put away. His mom asked why. He said because Mr. McFadden had sex with J.W. K.W. was taken to counselor Emily Bowman at the Montrose Center for Mental Health and then he eventually disclosed.

**5. <u>SJW's Proffered Evidence is Unreliable</u>**

SJW's statement was made late in time, after Mr. McFadden had publicly been castigated. Her recitation does not fit into the overall narrative that Mr. McFadden preferred to do things with boys. Unfortunately SJW was familiar with the topic of sexual abuse and she had alleged that others in her family had abused her.

**6. <u>D.R.'s Proffered Evidence is Unreliable</u>**

D.R. changed his story in March 2013. He previously told his mother that Mr. McFadden had not done anything improper to him.

A hearing should be conducted to determine the reliability or unreliability of all of the proffered FRE 414 material.

**7. <u>L.W.'s proffered Evidence is Unreliable</u>**

On January 21, 2009, L.W. denied any abuse. Almost four years later, in another interview with Detective Prescott, on December 19, 2012, L.W. denied any abuse. L.W. denied any abuse on January 16, 2013. L.W. continued to deny the abuse as recently as May 22, 2018. He finally alleged abuse on August 8, 2018.

**8. <u>Evidence Regarding MS</u>**

The conduct was alleged in 1989 and Mr. McFadden pled guilty in the case. It is this case and the subsequent registration by Mr. McFadden which led to him being treated unfairly by his community and law enforcement.

**A. LEGAL STANDARDS**

The Government wants to use the proffered evidence to prove the Mr. McFadden violated 18 U.S.C. § 2241(c) which is alleged in Counts One and Three and prove Counts Two, Four, and Five which charges a violation of 18 U.S.C. §2423(e). The Government wants to use this evidence to show that Mr. McFadden crossed a state line with the intent to engage in a sex act with a victim, Counts One and Three, and that Mr. McFadden transported a victim with the intent that the victim engage in sexual activity for which any person could be charged with a criminal offense; Counts Two, Four, and Five.

The unreliability of the proffered evidence renders its admission unfairly prejudicial and therefore inadmissible under FRE 403 and the cases that interpret FRE 414.

**B-C. Fed R. EVID 414 and FED R. EVID. 404(b)**

The unreliable nature of the proffered evidence and outcries renders the proffered evidence inadmissible. The Court should conduct a pre-trial evidentiary hearing to determine admissibility.

There are three "threshold requirements" for admitting evidence pursuant to Rule 414: "(1) the defendant is accused of a crime involving sexual assault or child molestation, (2) the evidence proffered is evidence of the defendant's commission of another offense or offenses involving sexual assault or child molestation, and (3) the evidence is relevant." United States v. Benally, 500 F.3d 1085, 1090 (10th Cir. 2007). But that is not the end of the road. (Courts) subject Rule 414 evidence to a particular breed of **Rule 403** balancing and insist that "**the district court has an obligation 'to fully evaluate the proffered . . . evidence and make a clear record of the reasoning behind its findings.'**" Id. at 1091 (omission in original) (quoting United States v. Guardia, 135 F.3d 1326, 1331 (10th Cir. 1998)). United States v. Piette, No. 20-7008, 2022 U.S. App. LEXIS 23004, at *29-30 (10th Cir. Aug. 18, 2022).

This specialized Rule 403 inquiry has two stages. First, the district court must consider the four *Enjady* factors: "(1) how clearly the prior act has been proved; (2) how probative the evidence is of the material fact it is admitted to prove; (3) how seriously disputed the material fact is; and (4) whether the government can avail itself of any less prejudicial evidence." *United States v. Perrault*, 995 F.3d 748, 765-66 (10th Cir. 2021) (footnotes omitted); *see also United States v. Enjady*, 134 F.3d 1427, 1433 (10th Cir. 1998). The district court must next weigh the *Enjady* factors against three additional factors: "(1) how likely [it is that] such evidence will contribute to an improperly-based jury verdict; (2) the extent to which such evidence will distract the jury from the central issues of the trial; and (3) how time consuming it will be to prove the prior conduct." *Perrault*, 995 F.3d at 766. *United States v. Piette*, No. 20-7008, 2022 U.S. App. LEXIS 23004, at *30 n.4 (10th Cir. Aug. 18, 2022)

In this case the four *Enjady* factors weigh in favor of the Rule 414 evidence being excluded. The sheer volume of uncharged conduct dwarfs the unreliability of the uncharged conduct. The uncharged conduct is vehemently disputed. The Court should conduct an evidentiary hearing to determine the reliability of the allegations and whether the reliability or lack of reliability balanced with inflammatory nature of the allegations passes muster under **Rule 414 and 403.**

**D. FED. R. EVID 807**

K.W.'s recorded and delayed statement, which was made after Mr. McFadden's community had turned on him should not be admitted.

Federal Rule of Evidence 807 provides:

> (a) In General. Under the following conditions, a hearsay statement is not excluded by the rule against hearsay even if the statement is not admissible under a hearsay exception in Rule 803 or 804:
>
> (1) the statement is supported by sufficient guarantees

> of trustworthiness—after considering the totality of circumstances under which it was made and evidence, if any, corroborating the statement; andit is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts.

Rule 807 "should be used only in extraordinary circumstances where the court is satisfied that the evidence offers guarantees of trustworthiness and is material, probative and necessary in the interest of justice . . . courts regularly employ the residual exception in child abuse litigation." *United States v. Harrison*, 296 F.3d 994, 1003 (10th Cir. 2002). In determining whether hearsay statements made by a child in a sexual assault case are reliable for purposes of Rule 807, the court should consider "the spontaneity of the child's statement, the consistent repetition of the child's allegation, the mental state of the child, the use of terminology unexpected of a child of a similar age, and the lack of a motive to fabricate" as well as the length of time that had passed between the abuse and the statement. *United States v. Tome*, 61 F.3d 1446, 1452-53 (10th Cir.1995) (discussing admissibility under prior residual hearsay exception Rule 803(24)). In order to admit a child's hearsay statement regarding sexual abuse, the court must consider whether the child "was particularly likely to be telling the truth when the statement was made." *Id.* at 1452.

K.W. and his family had a long history of interaction with Mr. McFadden. K.W. never mentioned any abuse until after Mr. McFadden was arrested on January 3, 2013, and K.W. was travelling back to Colorado with his parents. There was a long delay in the reporting. KW allegedly had a conversation with his mother on the way back from Nebraska where he discussed Mr. McFadden harming JW, not himself. He said he hoped Mr. McFadden would be put away. His mom asked why. He said because Mr. McFadden had sex with J.W. After returning to Colorado, K.W. was taken to counselor Emily Bowman at the Montrose Center for Mental Health and then

he eventually disclosed. It is the defenses understanding that the disclosure came after multiple sessions.

**CONCLUSION**

The Court must be confident that the proffered evidence is reliable enough that it will unfairly prejudice the fact finder. The Court cannot permit the jury to unfairly have its passion inflamed. The Court should conduct a pre-trial hearing to determine whether the proffered evidence is admissible under Rule 404(b), Rule 403, Rule 414, and Rule 807.

WHEREFORE, Mr. McFadden respectfully requests that this Court have an evidentiary hearing, and at a minimum deny the admission of FRE 414 and FRE 807 evidence.

Respectfully submitted,

s/Sean M. McDermott
Sean M. McDermott
McDermott Stuart & Ward LLP
140 E. 19th Avenue, Suite 300
Denver, CO 80203
(303) 832-8888
(303) 863-8888 (fax)
Email: smcdermott@mswdenver.com

**CERTIFICATE OF SERVICE**

I hereby certify that on this 13th day of September 2022, I filed the foregoing **pleading** with the Clerk of Court using the CM/ECF system which will send notification of such filing to all listed parties.

s/ Sean McDermott
Sean McDermott

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 19-cr-00243-CMA-GPG

UNITED STATES OF AMERICA,

Plaintiff,

**v.**

**MICHAEL TRACY McFADDEN,**

**Defendant.**

---

**MOTION TO COMPEL PRODUCTION AND REQUEST FOR SUBPOENA RETURN DATE**

---

Mr. McFadden by and through his attorney Sean M. McDermott, moves this Honorable Court to provide a subpoena return date and to compel the production of certain materials. As grounds Mr. McFadden states the following:

1. Mr. McFadden is charged with two counts of crossing state lines with intent to engage in a sexual act with a minor under 12 years of age, and three counts of transportation of a person over state lines with the intent to engage in a sexual act that is a crime.

2. The alleged victims of these crimes are KW in Counts One and Two and JW in Counts Three, Four and Five.

3. Despite knowing Mr. McFadden for a long period of time, KW had never disclosed that Mr. McFadden had any sexual activity with him. After Mr. McFadden's arrest, KW allegedly told his mother that he wanted Mr. McFadden to be put away. He said he wanted Mr. McFadden put away because Mr. McFadden had sex with JW. He did not state that Mr. McFadden had done anything inappropriate to him. When he and his mother returned to

Colorado, he saw a counselor. She took him to counselor Emily Bowman at the Montrose Center

for Mental Health. He eventually made a disclosure against Mr. McFadden.

4.　　In addition to K.W. being referred to therapy, his sister SJW who is a FRE 414

witness was as well was referred to counseling prior to making a disclosure against Mr.

McFadden. She was discussing possible sexual abuse by someone else. (Exhibit A, Affidavit of

Dr. David Thompson ¶15(b)). She also made a late disclosure against Mr. McFadden.

5.　　I.S. is a witness who the Government wants to use to elicit FRE 414 evidence. I.S.

made a disclosure against Mr. McFadden. He made this disclosure even though he previously

stated that nobody had molested him. He was in therapy, and he was working on "exploring" the

possibility of a sexual assault. (INV_GJPD_00001095).

6.　　E.S. f/k/a E.M. like I.S. is also a witness who the Government wants to use to

elicit FRE 414 evidence. Like I.S., E.S. initially stated that Mr. McFadden had not molested him.

He even went so far as to say that I.S. made up an allegation because he wanted to get Mr.

McFadden in trouble. Shortly after saying this, he changed 180 degrees, and made an allegation

against Mr. McFadden.

7.　　K.W., I.S., and E.S. all initially made statements that Mr. McFadden did not

molest them. All three of these people were enrolled in counseling. All three ended up changing

their story and making allegations against Mr. McFadden.

8.　　Source misattribution errors are common memory mistakes made by Children and

adults in a variety of situations. They involve recalling an event but erroneously reporting the

source of that recollection. (Exhibit A, Affidavit of David Thompson).

9.　　The defense needs these records to properly defend Mr. McFadden.

10. A subpoena for documents may be quashed if their production would be "unreasonable or oppressive," but not otherwise.

> In order to require production prior to trial, the moving party must show: (1) that the documents are evidentiary and relevant; (2) that they are not otherwise procurable reasonably in advance of trial by exercise of due diligence; (3) that the party cannot properly prepare for trial without such production and inspection in advance of trial and that the failure to obtain such inspection may tend unreasonably to delay the trial; and (4) that the application is made in good faith and is not intended as a general "fishing expedition."

United States v. Nixon, 418 U.S. 683, 699-700, 94 S. Ct. 3090, 3103 (1974)

WHEREFORE, Mr. McFadden respectfully requests that this Court order that Mr. McFadden's defense team be permitted to obtain the therapy records of any of the witnesses who were in therapy and are alleging that Mr. McFadden sexually assaulted them.

Respectfully submitted,

s/Sean M. McDermott

Sean M. McDermott
McDermott Stuart & Ward LLP
140 E. 19th Avenue, Suite 300
Denver, CO 80203
(303) 832-8888
(303) 863-8888 (fax)
Email: smcdermott@mswdenver.com

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this 13th day of September 2022, I filed the foregoing **pleading** with the Clerk of Court using the CM/ECF system which will send notification of such filing to all listed parties.

s/ Sean McDermott
Sean McDermott

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 19-cr-00243-CMA-GPG

UNITED STATES OF AMERICA,

Plaintiff,

v.

**MICHAEL TRACY McFADDEN,**

**Defendant.**

---

**AFFIDAVIT OF DAVID W. THOMPSON**

---

STATE OF WISCONSIN )
) ss
COUNTY OF RACINE )

---

DAVID W. THOMPSON, being sworn, states:

1. I am a clinical and forensic psychologist duly licensed to practice psychology in the state of Wisconsin.

2. The defendant in the above captioned matter retained me for the purpose of providing expert services in this case.

3. Through my research and experience I am aware that the memories and event reports of children and adults are highly malleable and subject to influence and distortion in a number of ways.

4. I have reviewed various documents and reports in the above captioned matter.

5. Treatment providers are taught to provide evidence-based services (services that have some empirical basis and known effectiveness) and to do so in a trauma-informed manner (i.e., with an awareness of the ways in which an individual's history of traumatic experiences may impact the person's emotions and behavior).

6. These treatment techniques, while therapeutically effective, are known to affect the accuracy of the individual's memories for the traumatic events.

7. The unintended consequences of these effective, evidence-based techniques may include irretrievably contaminating the individual's memory for the alleged traumatic event.

8. Peer reviewed published papers have cautioned therapists about the effects of such treatment efforts when clients are expected to testify in administrative or judicial procedures. Branaman, T. F., & Gottlieb, M. C. (2013). Ethical and legal considerations for treatment of alleged victims: When does it become witness tampering? *Professional Psychology: Research and Practice, 44*, 299-306.

9. Because these treatment techniques require the regular rehearsal of the events that are believed to have caused the trauma, treatment records are very likely to contain descriptions by the alleged victim of the allegations involved.

10. There are many other *ineffective* treatment techniques utilized by therapists who are uninformed or incompetent, and when used to treat persons they may further contaminate the client's memory for events.

11. Participation in counseling or psychotherapy both prior to the reporting of allegations as well as following the reports of such allegations may have a profound effect not only on the individual's initial event reports, but also on the individual's memory and event reports at the time of trial.

12. Michael McFadden is currently charged with two counts of crossing state lines with intent to engage in a sexual act with a minor under 12, and three counts of transportation of a minor with intent to engage in sexual activity. These charges involve KW (birth date [redacted]) and JW (birth date [redacted]).

13. Mr. McFadden was previously charged in Mesa County, Colorado cases 13CR27, 13CR339, and 13CR342 with similar charges involving both the alleged victims in the current case and alleging sexual abuse of other youth.

14. In addition to the current federal charges, the government is seeking to bring in these other allegations under FRE Rule 414.

15. There are numerous references in the investigation material to the various children's participation in psychotherapy:

    a. In the current case, alleged victim KW reportedly participated in outpatient psychotherapy during which he reported being sexually abused by the defendant. INV_GJPD_00000221.

    b. Child protective services investigation records specifically naming EM [redacted] and DO ([redacted] report that the "boys [are] in counseling." INV_GJPD_00001079.

Additional documentation indicates that both DO and EM are in therapy at "the WSCC once a week." INV_GJPD_00001081. Records go on to indicate that "[DO] was in getting set up for outpatient services in their facility and during the intake process he disclosed that he was sexually abused by his uncle and physically abused by his mother."

c. Records indicate that IS had been placed in foster care and was actively receiving psychotherapy. CPS records indicate that it was recommended that the therapist would continue to work with IS "and explore this area," referring to the reports of "a long balloon in his bottom." INV_GJPD_00001095.

d. CPS reports indicate that on 8/24/11 KW was scheduled to "begin community counseling again." INV_GJPD_00001102.

e. Additional allegations were made concerning KW, SB [redacted] and an ex-husband of the children's mother (Ka[redacted] alleging sexual abuse of SB and KW by Mr. [redacted] These were investigated and were unfounded or inconclusive, but the children were recommended to return to outpatient therapy. INV_GJPD_00001103.

16. There are other references in the investigation material to special needs of one of the children:

a. IS [redacted] was described as a child with developmental delays who was enrolled in special education school programming. INV_GJPD_00001097.

17. Based on my education and experience, it is likely that the special education records for IS, including behavior reports, formal psychological, educational, and behavioral assessments, and his Individual Educational Plan (IEP) will contain information relative to the child's early sexual behavior and sexual knowledge. This information is likely to be relevant to the reliability of the child's memory and event reports.

18. Source misattribution errors are common memory mistakes made by children and adults in a variety of situations. They involve recalling an event tbut erroneously reporting the source of that recollection. Johnson, M. K., Hashtroudi, S., & Lindsay, D. S. (1993). Source monitoring. *Psychological Bulletin, 114*, 3-28.

19. The sexual abuse allegations related to SB and KW that were screened out and referred to therapy, especially as to how the therapist addressed these issues with the children, provide an early foundation for source misattribution errors that may well be exculpatory in the current case.

20. All of the records of therapeutic involvement of the alleged victims are likely to be highly relevant to the integrity of the children's memories and the accuracy of their event reports.

Affidavit of David W. Thompson
U.S. v. McFadden, 19-cr-00243-CMA-GPG

4

21. I am able to maintain the security and confidentiality of all of the children's treatment records according to normal clinic procedures, as well as any special conditions that the court may impose.

22. It is crucial for me to review the above referenced school and treatment records in order to adequately advise Mr. McFadden's defense attorney in the preparation of this case.

David W. Thompson, PhD

The forgoing Affidavit acknowledged before me this 13th day September, 2022.

Witness my hand and official seal.

Christine Mamerow
Notary Public, State of Wisconsin
My commission expires April 2, 2025.

Exhibit A

382

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 19-cr-00243-CMA-GPG

UNITED STATES OF AMERICA,

    Plaintiff,

**v.**

**MICHAEL TRACY McFADDEN,**

    **Defendant.**

---

**SECOND MOTION TO COMPEL PRODUCTION AND REQUEST FOR
SUBPOENA RETURN DATE**

---

Mr. McFadden by and through his attorney Sean M. McDermott, moves this Honorable Court to provide a subpoena return date and to compel the production of certain materials for in-camera review. As grounds Mr. McFadden states the following:

**Conferral**

1.      The defense previously filed a Motion to Compel Production and Request for Subpoena Return Date. This Motion was filed once and then the motion was refiled with a redacted exhibit. See Doc. No.'s 60 and 79 with 79-1.

2.      The Court struck these Motions found at Doc Nos. 60 and 79. The Court stated that the Motion is construed as a discovery motion and therefore requires conferral, and that perhaps an agreement can be reached between the defense and the prosecution. Doc. No. 80.

1.      Prior to the filing of Doc. No. 60, the parties had conferred via electronic mail. In these email communications, the prosecution stated that the United States could not take a position until the Motion was made. This conferral was not set forth in the pleadings, because the

prosecution did not yet have a position, and the defense believes that the true people and entities in interest are the respective privilege holders and the respective treatment providers. With respect to therapy records, see Public Law 104 – 191, the Health Insurance Portability and Accountability Act of 1996, (HIPPA), and 45 C.F.R. § 164.512(e). With respect to any education records, the privacy interest belongs to the student once the student reaches the age of 18. See The Family Educational Rights and Privacy Act (FERPA) 20 U.S.C. § 1232g and the FERPA regulations found at 34 CFR Part 99.

2. Following the Court's issuance of its order found at Doc. No. 60, defense counsel followed up with the United States. The United States believes that it does have standing to object and does object to the requested relief.

**Request for Relief**

3. Mr. McFadden is charged with two counts of crossing state lines with intent to engage in a sexual act with a minor under 12 years of age, and three counts of transportation of a person over state lines with the intent to engage in a sexual act that is a crime.

4. The alleged victims of these crimes are KW in Counts One and Two and JW in Counts Three, Four and Five.

5. Despite knowing Mr. McFadden for a long period of time, KW had never disclosed that Mr. McFadden had any sexual activity with him. After Mr. McFadden's arrest, KW allegedly told his mother that he wanted Mr. McFadden to be put away. He said he wanted Mr. McFadden to be put away because Mr. McFadden had sex with JW. KW initially stated that Mr. McFadden had not done anything inappropriate to him. When KW and his mother returned to Colorado, KW saw a counselor. KW's mother took KW to counselor Emily Bowman at the Montrose Center for Mental Health. KW eventually made a disclosure against Mr. McFadden.

6. In addition to K.W. being referred to therapy, his sister SJW who is an FRE 414 witness was referred to counseling prior to making a disclosure against Mr. McFadden. She was discussing possible sexual abuse by someone else. (Exhibit A, Affidavit of Dr. David Thompson ¶15(b)). She also made a late disclosure against Mr. McFadden.

7. I.S. is a witness who the Government wants to use to elicit FRE 414 evidence. I.S. made a disclosure against Mr. McFadden. He made this disclosure even though he had previously stated that nobody had molested him. I.S. was in therapy, and he was working on "exploring" the possibility of a sexual assault. (INV_GJPD_00001095).

8. E.S. f/k/a E.M. is also a witness who the Government wants to use to elicit FRE 414 evidence. Like I.S., E.S. initially stated that Mr. McFadden had not molested him. He even went so far as to say that I.S. made up an allegation because he wanted to get Mr. McFadden in trouble. Shortly after saying this, he changed 180 degrees, and made an allegation against Mr. McFadden.

9. K.W., I.S., and E.S. all initially made statements that Mr. McFadden did not molest them. All three of these people were enrolled in counseling. All three ended up changing their story and making allegations against Mr. McFadden.

10. Source misattribution errors are common memory mistakes made by Children and adults in a variety of situations. They involve recalling an event but erroneously reporting the source of that recollection. (Exhibit A, Affidavit of David Thompson).

11. The defense needs these records to properly defend Mr. McFadden.

12. A subpoena for documents may be quashed if their production would be "unreasonable or oppressive," but not otherwise.

> In order to require production prior to trial, the moving party must show: (1) that the documents are evidentiary and relevant; (2) that they are not otherwise

> procurable reasonably in advance of trial by exercise of due diligence; (3) that the party cannot properly prepare for trial without such production and inspection in advance of trial and that the failure to obtain such inspection may tend unreasonably to delay the trial; and (4) that the application is made in good faith and is not intended as a general "fishing expedition."

United States v. Nixon, 418 U.S. 683, 699-700, 94 S. Ct. 3090, 3103 (1974).

13. This is not a fishing expedition. Counsel does not take the privacy interest in these records lightly. Because the witnesses have said things contrary to their inculpatory statements, the requested records are necessary to ensure that Mr. McFadden's rights under the confrontation clause and the due process clause are preserved and exercised. All four prongs of the *Nixon* test are met.

14. Courts have recognized that at a minimum a Court should conduct an in-camera review of otherwise protected records, to determine whether the disclosure of these records is necessary to protect a criminal defendant from having his due process and confrontation clause rights violated. This was recently the conclusion with respect to therapist records in *United States v. Arias*, 936 F.3d 793, 800 (8th Cir. 2019). This has also been done with other protected records such as state child welfare files. *Pennsylvania v. Ritchie*, 480 U.S. 39, 58, 107 S. Ct. 989, 1002 (1987).

15. It is well established that certain circumstances may justify in camera inspection. For example, courts conduct *Brady* reviews of potentially sensitive national security information in camera pursuant to the Classified Information Procedures Act ("CIPA"). In the same vein, courts also review information in camera for potential production under *Brady* when it may be protected by an applicable legal privilege. *United States v. Sittenfeld,* No. 1:20-cr-142, 2022 U.S. Dist. LEXIS 88314, at *3 (S.D. Ohio May 17, 2022) (Internal Citations Omitted).

16. With respect to therapy records, 45 C.F.R. § 164.512(e), governs the disclosure of these records in judicial proceedings.

17. A healthcare entity may disclose protected health information in the course of any judicial proceeding under certain circumstances. These include:

(i) In response to an order of a court or administrative tribunal, provided that the covered entity discloses only the protected health information expressly authorized by such order; or

(ii) In response to a subpoena, discovery request, or other lawful process, that is not accompanied by an order of a court or administrative tribunal, if:

(A) The covered entity receives satisfactory assurance, as described in paragraph (e)(1)(iii) of this section, from the party seeking the information that reasonable efforts have been made by such party to ensure that the individual who is the subject of the protected health information that has been requested has been given notice of the request; or

(B) The covered entity receives satisfactory assurance, as described in paragraph (e)(1)(iv) of this section, from the party seeking the information that reasonable efforts have been made by such party to secure a qualified protective order that meets the requirements of paragraph (e)(1)(v) of this section.

45 C.F.R. § 164.512(e) (A copy of 45 C.F.R. § 164.512 is attached hereto as Exhibit B)

18. With respect to education records disclosure of records may occur to comply with a lawful subpoena or court order. 34 C.F.R. § 99.31(a)(9) (i-ii). (A copy of 45 C.F.R. § 99.31 is attached hereto as Exhibit C).

19. The education of records of I.S. are relevant with respect to know what his sexual knowledge was at a young age, and bear on the reliability of his allegation. (Exhibit A, ¶ 16-17).

20. The simplest way for the Court to balance Mr. McFadden's confrontation clause and due process rights is to conduct an in-camera review of the records and disclose only those records that the defense should have to confront his accusers. See *Pennsylvania v. Ritchie*, 480 U.S. 39, 58, 107 S. Ct. 989, 1002 (1987); *United States v. Arias*, 936 F.3d 793, 800 (8th Cir. 2019)

WHEREFORE, Mr. McFadden respectfully requests that this Court order that Mr. McFadden's defense team be permitted to subpoena the therapy records of the witnesses who were in therapy and are alleging that Mr. McFadden sexually assaulted them and that he be permitted to subpoena the education records of witness I.S. for an in-camera review by this Court.

Respectfully submitted,

s/Sean M. McDermott
  Sean M. McDermott
  McDermott Stuart & Ward LLP
  140 E. 19th Avenue, Suite 300
  Denver, CO 80203
  (303) 832-8888
  (303) 863-8888 (fax)
  Email: smcdermott@mswdenver.com

Case 1:09-cr-00243-GPG Document 181 Filed 09/26/22 Page 7 of 7

**CERTIFICATE OF SERVICE**

I hereby certify that on this 26th day of September 2022, I filed the foregoing **pleading** with the Clerk of Court using the CM/ECF system which will send notification of such filing to all listed parties.

s/ Sean McDermott
Sean McDermott

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 19-cr-00243-CMA-GPG

UNITED STATES OF AMERICA,

Plaintiff,

v.

**MICHAEL TRACY McFADDEN,**

**Defendant.**

---

**AFFIDAVIT OF DAVID W. THOMPSON**

---

STATE OF WISCONSIN )
) ss
COUNTY OF RACINE )

---

DAVID W. THOMPSON, being sworn, states:

1. I am a clinical and forensic psychologist duly licensed to practice psychology in the state of Wisconsin.

2. The defendant in the above captioned matter retained me for the purpose of providing expert services in this case.

3. Through my research and experience I am aware that the memories and event reports of children and adults are highly malleable and subject to influence and distortion in a number of ways.

4. I have reviewed various documents and reports in the above captioned matter.

5. Treatment providers are taught to provide evidence-based services (services that have some empirical basis and known effectiveness) and to do so in a trauma-informed manner (i.e., with an awareness of the ways in which an individual's history of traumatic experiences may impact the person's emotions and behavior).

6. These treatment techniques, while therapeutically effective, are known to affect the accuracy of the individual's memories for the traumatic events.

7. The unintended consequences of these effective, evidence-based techniques may include irretrievably contaminating the individual's memory for the alleged traumatic event.

8. Peer reviewed published papers have cautioned therapists about the effects of such treatment efforts when clients are expected to testify in administrative or judicial procedures. Branaman, T. F., & Gottlieb, M. C. (2013). Ethical and legal considerations for treatment of alleged victims: When does it become witness tampering? *Professional Psychology: Research and Practice, 44*, 299-306.

9. Because these treatment techniques require the regular rehearsal of the events that are believed to have caused the trauma, treatment records are very likely to contain descriptions by the alleged victim of the allegations involved.

10. There are many other *ineffective* treatment techniques utilized by therapists who are uninformed or incompetent, and when used to treat persons they may further contaminate the client's memory for events.

11. Participation in counseling or psychotherapy both prior to the reporting of allegations as well as following the reports of such allegations may have a profound effect not only on the individual's initial event reports, but also on the individual's memory and event reports at the time of trial.

12. Michael McFadden is currently charged with two counts of crossing state lines with intent to engage in a sexual act with a minor under 12, and three counts of transportation of a minor with intent to engage in sexual activity. These charges involve KW (birth date [redacted]) and JW (birth date [redacted]).

13. Mr. McFadden was previously charged in Mesa County, Colorado cases 13CR27, 13CR339, and 13CR342 with similar charges involving both the alleged victims in the current case and alleging sexual abuse of other youth.

14. In addition to the current federal charges, the government is seeking to bring in these other allegations under FRE Rule 414.

15. There are numerous references in the investigation material to the various children's participation in psychotherapy:

    a. In the current case, alleged victim KW reportedly participated in outpatient psychotherapy during which he reported being sexually abused by the defendant. INV_GJPD_00000221.

    b. Child protective services investigation records specifically naming EM [redacted] and DO ([redacted] report that the "boys [are] in counseling." INV_GJPD_00001079.

Additional documentation indicates that both DO and EM are in therapy at "the WSCC once a week." INV_GJPD_00001081. Records go on to indicate that "[DO] was in getting set up for outpatient services in their facility and during the intake process he disclosed that he was sexually abused by his uncle and physically abused by his mother."

c. Records indicate that IS had been placed in foster care and was actively receiving psychotherapy. CPS records indicate that it was recommended that the therapist would continue to work with IS "and explore this area," referring to the reports of "a long balloon in his bottom." INV_GJPD_00001095.

d. CPS reports indicate that on 8/24/11 KW was scheduled to "begin community counseling again." INV_GJPD_00001102.

e. Additional allegations were made concerning KW, SB and an ex-husband of the children's mother (Ka alleging sexual abuse of SB and KW by Mr. These were investigated and were unfounded or inconclusive, but the children were recommended to return to outpatient therapy. INV_GJPD_00001103.

16. There are other references in the investigation material to special needs of one of the children:

a. IS was described as a child with developmental delays who was enrolled in special education school programming. INV_GJPD_00001097.

17. Based on my education and experience, it is likely that the special education records for IS, including behavior reports, formal psychological, educational, and behavioral assessments, and his Individual Educational Plan (IEP) will contain information relative to the child's early sexual behavior and sexual knowledge. This information is likely to be relevant to the reliability of the child's memory and event reports.

18. Source misattribution errors are common memory mistakes made by children and adults in a variety of situations. They involve recalling an event tbut erroneously reporting the source of that recollection. Johnson, M. K., Hashtroudi, S., & Lindsay, D. S. (1993). Source monitoring. *Psychological Bulletin, 114*, 3-28.

19. The sexual abuse allegations related to SB and KW that were screened out and referred to therapy, especially as to how the therapist addressed these issues with the children, provide an early foundation for source misattribution errors that may well be exculpatory in the current case.

20. All of the records of therapeutic involvement of the alleged victims are likely to be highly relevant to the integrity of the children's memories and the accuracy of their event reports.

Affidavit of David W. Thompson
U.S. v. McFadden, 19-cr-00243-CMA-GPG

4

21. I am able to maintain the security and confidentiality of all of the children's treatment records according to normal clinic procedures, as well as any special conditions that the court may impose.

22. It is crucial for me to review the above referenced school and treatment records in order to adequately advise Mr. McFadden's defense attorney in the preparation of this case.

David W. Thompson, PhD

The forgoing Affidavit acknowledged before me this 13th day September, 2022.

Witness my hand and official seal.

Christine Mamerow
Notary Public, State of Wisconsin
My commission expires April 2, 2025.

Exhibit A

393

# 45 CFR 164.512

This document is current through the Sept. 13, 2022 issue of the Federal Register, with the exception of the amendments appearing at 87 FR 55241, 87 FR 55901, 87 FR 55903, 87 FR 55916, 87 FR 55918, and 87 FR 56204.

***Code of Federal Regulations > Title 45 Public Welfare > Subtitle A — Department of Health and Human Services > Subchapter C — Administrative Data Standards and Related Requirements > Part 164 — Security and Privacy > Subpart E — Privacy of Individually Identifiable Health Information***

## § 164.512 Uses and disclosures for which an authorization or opportunity to agree or object is not required.

A covered entity may use or disclose protected health information without the written authorization of the individual, as described in § 164.508, or the opportunity for the individual to agree or object as described in § 164.510, in the situations covered by this section, subject to the applicable requirements of this section. When the covered entity is required by this section to inform the individual of, or when the individual may agree to, a use or disclosure permitted by this section, the covered entity's information and the individual's agreement may be given orally.

**(a)** Standard: Uses and disclosures required by law.

**(1)** A covered entity may use or disclose protected health information to the extent that such use or disclosure is required by law and the use or disclosure complies with and is limited to the relevant requirements of such law.

**(2)** A covered entity must meet the requirements described in paragraph (c), (e), or (f) of this section for uses or disclosures required by law.

**(b)** Standard: Uses and disclosures for public health activities.

**(1)** Permitted uses and disclosures. A covered entity may use or disclose protected health information for the public health activities and purposes described in this paragraph to:

**(i)** A public health authority that is authorized by law to collect or receive such information for the purpose of preventing or controlling disease, injury, or disability, including, but not limited to, the reporting of disease, injury, vital events such as birth or death, and the conduct of public health surveillance, public health investigations, and public health interventions; or, at the direction of a public health authority, to an official of a foreign government agency that is acting in collaboration with a public health authority;

**(ii)** A public health authority or other appropriate government authority authorized by law to receive reports of child abuse or neglect;

**(iii)** A person subject to the jurisdiction of the Food and Drug Administration (FDA) with respect to an FDA-regulated product or activity for which that person has responsibility, for the purpose of activities related to the quality, safety or effectiveness of such FDA-regulated product or activity. Such purposes include:

**(A)** To collect or report adverse events (or similar activities with respect to food or dietary supplements), product defects or problems (including problems with the use or labeling of a product), or biological product deviations;

**(B)** To track FDA-regulated products;

**(C)** To enable product recalls, repairs, or replacement, or lookback (including locating and notifying individuals who have received products that have been recalled, withdrawn, or are the subject of lookback); or

**(D)** To conduct post marketing surveillance;

**(iv)** A person who may have been exposed to a communicable disease or may otherwise be at risk of contracting or spreading a disease or condition, if the covered entity or public health authority is authorized by law to notify such person as necessary in the conduct of a public health intervention or investigation; or

**(v)** An employer, about an individual who is a member of the workforce of the employer, if:

**(A)** The covered entity is a covered health care provider who provides health care to the individual at the request of the employer:

**(1)** To conduct an evaluation relating to medical surveillance of the workplace; or

**(2)** To evaluate whether the individual has a work-related illness or injury;

**(B)** The protected health information that is disclosed consists of findings concerning a work-related illness or injury or a workplace-related medical surveillance;

**(C)** The employer needs such findings in order to comply with its obligations, under 29 CFR parts 1904 through 1928, 30 CFR parts 50 through 90, or under state law having a similar purpose, to record such illness or injury or to carry out responsibilities for workplace medical surveillance; and

**(D)** The covered health care provider provides written notice to the individual that protected health information relating to the medical surveillance of the workplace and work-related illnesses and injuries is disclosed to the employer:

**(1)** By giving a copy of the notice to the individual at the time the health care is provided; or

**(2)** If the health care is provided on the work site of the employer, by posting the notice in a prominent place at the location where the health care is provided.

**(vi)** A school, about an individual who is a student or prospective student of the school, if:

**(A)** The protected health information that is disclosed is limited to proof of immunization;

**(B)** The school is required by State or other law to have such proof of immunization prior to admitting the individual; and

**(C)** The covered entity obtains and documents the agreement to the disclosure from either:

**(1)** A parent, guardian, or other person acting in loco parentis of the individual, if the individual is an unemancipated minor; or

**(2)** The individual, if the individual is an adult or emancipated minor.

**(2)** Permitted uses. If the covered entity also is a public health authority, the covered entity is permitted to use protected health information in all cases in which it is permitted to disclose such information for public health activities under paragraph (b)(1) of this section.

**(c)** Standard: Disclosures about victims of abuse, neglect or domestic violence.

**(1)** Permitted disclosures. Except for reports of child abuse or neglect permitted by paragraph (b)(1)(ii) of this section, a covered entity may disclose protected health information about an individual whom the covered entity reasonably believes to be a victim of abuse, neglect, or domestic violence to a

Case 1:19-cv-02443-RM-STV Document 191-2 Filed 06/23/22 Page 3 of 11

government authority, including a social service or protective services agency, authorized by law to receive reports of such abuse, neglect, or domestic violence:

**(i)** To the extent the disclosure is required by law and the disclosure complies with and is limited to the relevant requirements of such law;

**(ii)** If the individual agrees to the disclosure; or

**(iii)** To the extent the disclosure is expressly authorized by statute or regulation and:

**(A)** The covered entity, in the exercise of professional judgment, believes the disclosure is necessary to prevent serious harm to the individual or other potential victims; or

**(B)** If the individual is unable to agree because of incapacity, a law enforcement or other public official authorized to receive the report represents that the protected health information for which disclosure is sought is not intended to be used against the individual and that an immediate enforcement activity that depends upon the disclosure would be materially and adversely affected by waiting until the individual is able to agree to the disclosure.

**(2)** Informing the individual. A covered entity that makes a disclosure permitted by paragraph (c)(1) of this section must promptly inform the individual that such a report has been or will be made, except if:

**(i)** The covered entity, in the exercise of professional judgment, believes informing the individual would place the individual at risk of serious harm; or

**(ii)** The covered entity would be informing a personal representative, and the covered entity reasonably believes the personal representative is responsible for the abuse, neglect, or other injury, and that informing such person would not be in the best interests of the individual as determined by the covered entity, in the exercise of professional judgment.

**(d)** Standard: Uses and disclosures for health oversight activities.

**(1)** Permitted disclosures. A covered entity may disclose protected health information to a health oversight agency for oversight activities authorized by law, including audits; civil, administrative, or criminal investigations; inspections; licensure or disciplinary actions; civil, administrative, or criminal proceedings or actions; or other activities necessary for appropriate oversight of:

**(i)** The health care system;

**(ii)** Government benefit programs for which health information is relevant to beneficiary eligibility;

**(iii)** Entities subject to government regulatory programs for which health information is necessary for determining compliance with program standards; or

**(iv)** Entities subject to civil rights laws for which health information is necessary for determining compliance.

**(2)** Exception to health oversight activities. For the purpose of the disclosures permitted by paragraph (d)(1) of this section, a health oversight activity does not include an investigation or other activity in which the individual is the subject of the investigation or activity and such investigation or other activity does not arise out of and is not directly related to:

**(i)** The receipt of health care;

**(ii)** A claim for public benefits related to health; or

**(iii)** Qualification for, or receipt of, public benefits or services when a patient's health is integral to the claim for public benefits or services.

**(3)** Joint activities or investigations. [Notwithstanding] paragraph (d)(2) of this section, if a health oversight activity or investigation is conducted in conjunction with an oversight activity or investigation relating to a claim for public benefits not related to health, the joint activity or investigation is considered a health oversight activity for purposes of paragraph (d) of this section.

Exhibit B

**(4)** Permitted uses. If a covered entity also is a health oversight agency, the covered entity may use protected health information for health oversight activities as permitted by paragraph (d) of this section.

**(e)** Standard: Disclosures for judicial and administrative proceedings.

**(1)** Permitted disclosures. A covered entity may disclose protected health information in the course of any judicial or administrative proceeding:

**(i)** In response to an order of a court or administrative tribunal, provided that the covered entity discloses only the protected health information expressly authorized by such order; or

**(ii)** In response to a subpoena, discovery request, or other lawful process, that is not accompanied by an order of a court or administrative tribunal, if:

**(A)** The covered entity receives satisfactory assurance, as described in paragraph (e)(1)(iii) of this section, from the party seeking the information that reasonable efforts have been made by such party to ensure that the individual who is the subject of the protected health information that has been requested has been given notice of the request; or

**(B)** The covered entity receives satisfactory assurance, as described in paragraph (e)(1)(iv) of this section, from the party seeking the information that reasonable efforts have been made by such party to secure a qualified protective order that meets the requirements of paragraph (e)(1)(v) of this section.

**(iii)** For the purposes of paragraph (e)(1)(ii)(A) of this section, a covered entity receives satisfactory assurances from a party seeking protected health information if the covered entity receives from such party a written statement and accompanying documentation demonstrating that:

**(A)** The party requesting such information has made a good faith attempt to provide written notice to the individual (or, if the individual's location is unknown, to mail a notice to the individual's last known address);

**(B)** The notice included sufficient information about the litigation or proceeding in which the protected health information is requested to permit the individual to raise an objection to the court or administrative tribunal; and

**(C)** The time for the individual to raise objections to the court or administrative tribunal has elapsed, and:

**(1)** No objections were filed; or

**(2)** All objections filed by the individual have been resolved by the court or the administrative tribunal and the disclosures being sought are consistent with such resolution.

**(iv)** For the purposes of paragraph (e)(1)(ii)(B) of this section, a covered entity receives satisfactory assurances from a party seeking protected health information, if the covered entity receives from such party a written statement and accompanying documentation demonstrating that:

**(A)** The parties to the dispute giving rise to the request for information have agreed to a qualified protective order and have presented it to the court or administrative tribunal with jurisdiction over the dispute; or

**(B)** The party seeking the protected health information has requested a qualified protective order from such court or administrative tribunal.

**(v)** For purposes of paragraph (e)(1) of this section, a qualified protective order means, with respect to protected health information requested under paragraph (e)(1)(ii) of this section, an order of a court or of an administrative tribunal or a stipulation by the parties to the litigation or administrative proceeding that:

**(A)** Prohibits the parties from using or disclosing the protected health information for any purpose other than the litigation or proceeding for which such information was requested; and

**(B)** Requires the return to the covered entity or destruction of the protected health information (including all copies made) at the end of the litigation or proceeding.

**(vi)** Notwithstanding paragraph (e)(1)(ii) of this section, a covered entity may disclose protected health information in response to lawful process described in paragraph (e)(1)(ii) of this section without receiving satisfactory assurance under paragraph (e)(1)(ii)(A) or (B) of this section, if the covered entity makes reasonable efforts to provide notice to the individual sufficient to meet the requirements of paragraph (e)(1)(iii) of this section or to seek a qualified protective order sufficient to meet the requirements of paragraph (e)(1)(v) of this section.

**(2)** Other uses and disclosures under this section. The provisions of this paragraph do not supersede other provisions of this section that otherwise permit or restrict uses or disclosures of protected health information.

**(f)** Standard: Disclosures for law enforcement purposes. A covered entity may disclose protected health information for a law enforcement purpose to a law enforcement official if the conditions in paragraphs (f)(1) through (f)(6) of this section are met, as applicable.

**(1)** Permitted disclosures: Pursuant to process and as otherwise required by law. A covered entity may disclose protected health information:

**(i)** As required by law including laws that require the reporting of certain types of wounds or other physical injuries, except for laws subject to paragraph (b)(1)(ii) or (c)(1)(i) of this section; or

**(ii)** In compliance with and as limited by the relevant requirements of:

**(A)** A court order or court-ordered warrant, or a subpoena or summons issued by a judicial officer;

**(B)** A grand jury subpoena; or

**(C)** An administrative request, including an administrative subpoena or summons, a civil or an authorized investigative demand, or similar process authorized under law, provided that:

**(1)** The information sought is relevant and material to a legitimate law enforcement inquiry;

**(2)** The request is specific and limited in scope to the extent reasonably practicable in light of the purpose for which the information is sought; and

**(3)** De-identified information could not reasonably be used.

**(2)** Permitted disclosures: Limited information for identification and location purposes. Except for disclosures required by law as permitted by paragraph (f)(1) of this section, a covered entity may disclose protected health information in response to a law enforcement official's request for such information for the purpose of identifying or locating a suspect, fugitive, material witness, or missing person, provided that:

**(i)** The covered entity may disclose only the following information:

**(A)** Name and address;

**(B)** Date and place of birth;

**(C)** Social security number;

**(D)** ABO blood type and rh factor;

**(E)** Type of injury;

**(F)** Date and time of treatment;

**(G)** Date and time of death, if applicable; and

**(H)** A description of distinguishing physical characteristics, including height, weight, gender, race, hair and eye color, presence or absence of facial hair (beard or moustache), scars, and tattoos.

**(ii)** Except as permitted by paragraph (f)(2)(i) of this section, the covered entity may not disclose for the purposes of identification or location under paragraph (f)(2) of this section any protected health information related to the individual's DNA or DNA analysis, dental records, or typing, samples or analysis of body fluids or tissue.

**(3)** Permitted disclosure: Victims of a crime. Except for disclosures required by law as permitted by paragraph (f)(1) of this section, a covered entity may disclose protected health information in response to a law enforcement official's request for such information about an individual who is or is suspected to be a victim of a crime, other than disclosures that are subject to paragraph (b) or (c) of this section, if:

**(i)** The individual agrees to the disclosure; or

**(ii)** The covered entity is unable to obtain the individual's agreement because of incapacity or other emergency circumstance, provided that:

**(A)** The law enforcement official represents that such information is needed to determine whether a violation of law by a person other than the victim has occurred, and such information is not intended to be used against the victim;

**(B)** The law enforcement official represents that immediate law enforcement activity that depends upon the disclosure would be materially and adversely affected by waiting until the individual is able to agree to the disclosure; and

**(C)** The disclosure is in the best interests of the individual as determined by the covered entity, in the exercise of professional judgment.

**(4)** Permitted disclosure: Decedents. A covered entity may disclose protected health information about an individual who has died to a law enforcement official for the purpose of alerting law enforcement of the death of the individual if the covered entity has a suspicion that such death may have resulted from criminal conduct.

**(5)** Permitted disclosure: Crime on premises. A covered entity may disclose to a law enforcement official protected health information that the covered entity believes in good faith constitutes evidence of criminal conduct that occurred on the premises of the covered entity.

**(6)** Permitted disclosure: Reporting crime in emergencies.

**(i)** A covered health care provider providing emergency health care in response to a medical emergency, other than such emergency on the premises of the covered health care provider, may disclose protected health information to a law enforcement official if such disclosure appears necessary to alert law enforcement to:

**(A)** The commission and nature of a crime;

**(B)** The location of such crime or of the victim(s) of such crime; and

**(C)** The identity, description, and location of the perpetrator of such crime.

**(ii)** If a covered health care provider believes that the medical emergency described in paragraph (f)(6)(i) of this section is the result of abuse, neglect, or domestic violence of the individual in need of emergency health care, paragraph (f)(6)(i) of this section does not apply and any disclosure to a law enforcement official for law enforcement purposes is subject to paragraph (c) of this section.

**(g)** Standard: Uses and disclosures about decedents.

**(1)** Coroners and medical examiners. A covered entity may disclose protected health information to a coroner or medical examiner for the purpose of identifying a deceased person, determining a cause of death, or other duties as authorized by law. A covered entity that also performs the duties of a coroner

or medical examiner may use protected health information for the purposes described in this paragraph.

**(2)** Funeral directors. A covered entity may disclose protected health information to funeral directors, consistent with applicable law, as necessary to carry out their duties with respect to the decedent. If necessary for funeral directors to carry out their duties, the covered entity may disclose the protected health information prior to, and in reasonable anticipation of, the individual's death.

**(h)** Standard: Uses and disclosures for cadaveric organ, eye or tissue donation purposes. A covered entity may use or disclose protected health information to organ procurement organizations or other entities engaged in the procurement, banking, or transplantation of cadaveric organs, eyes, or tissue for the purpose of facilitating organ, eye or tissue donation and transplantation.

**(i)** Standard: Uses and disclosures for research purposes.

**(1)** Permitted uses and disclosures. A covered entity may use or disclose protected health information for research, regardless of the source of funding of the research, provided that:

**(i)** Board approval of a waiver of authorization. The covered entity obtains documentation that an alteration to or waiver, in whole or in part, of the individual authorization required by § 164.508 for use or disclosure of protected health information has been approved by either:

**(A)** An Institutional Review Board (IRB), established in accordance with 7 CFR lc.107, *10 CFR 745.107*, *14 CFR 1230.107*, *15 CFR 27.107*, *16 CFR 1028.107*, *21 CFR 56.107*, *22 CFR 225.107*, *24 CFR 60.107*, *28 CFR 46.107*, *32 CFR 219.107*, *34 CFR 97.107*, *38 CFR 16.107*, *40 CFR 26.107*, *45 CFR 46.107*, *45 CFR 690.107*, or *49 CFR 11.107*; or

**(B)** A privacy board that:

**(1)** Has members with varying backgrounds and appropriate professional competency as necessary to review the effect of the research protocol on the individual's privacy rights and related interests;

**(2)** Includes at least one member who is not affiliated with the covered entity, not affiliated with any entity conducting or sponsoring the research, and not related to any person who is affiliated with any of such entities; and

**(3)** Does not have any member participating in a review of any project in which the member has a conflict of interest.

**(ii)** Reviews preparatory to research. The covered entity obtains from the researcher representations that:

**(A)** Use or disclosure is sought solely to review protected health information as necessary to prepare a research protocol or for similar purposes preparatory to research;

**(B)** No protected health information is to be removed from the covered entity by the researcher in the course of the review; and

**(C)** The protected health information for which use or access is sought is necessary for the research purposes.

**(iii)** Research on decedent's information. The covered entity obtains from the researcher:

**(A)** Representation that the use or disclosure sought is solely for research on the protected health information of decedents;

**(B)** Documentation, at the request of the covered entity, of the death of such individuals; and

**(C)** Representation that the protected health information for which use or disclosure is sought is necessary for the research purposes.

**(2)** Documentation of waiver approval. For a use or disclosure to be permitted based on documentation of approval of an alteration or waiver, under paragraph (i)(1)(i) of this section, the documentation must include all of the following:

**(i)** Identification and date of action. A statement identifying the IRB or privacy board and the date on which the alteration or waiver of authorization was approved;

**(ii)** Waiver criteria. A statement that the IRB or privacy board has determined that the alteration or waiver, in whole or in part, of authorization satisfies the following criteria:

**(A)** The use or disclosure of protected health information involves no more than a minimal risk to the privacy of individuals, based on, at least, the presence of the following elements;

**(1)** An adequate plan to protect the identifiers from improper use and disclosure;

**(2)** An adequate plan to destroy the identifiers at the earliest opportunity consistent with conduct of the research, unless there is a health or research justification for retaining the identifiers or such retention is otherwise required by law; and

**(3)** Adequate written assurances that the protected health information will not be reused or disclosed to any other person or entity, except as required by law, for authorized oversight of the research study, or for other research for which the use or disclosure of protected health information would be permitted by this subpart;

**(B)** The research could not practicably be conducted without the waiver or alteration; and

**(C)** The research could not practicably be conducted without access to and use of the protected health information.

**(iii)** Protected health information needed. A brief description of the protected health information for which use or access has been determined to be necessary by the institutional review board or privacy board, pursuant to paragraph (i)(2)(ii)(C) of this section;

**(iv)** Review and approval procedures. A statement that the alteration or waiver of authorization has been reviewed and approved under either normal or expedited review procedures, as follows:

**(A)** An IRB must follow the requirements of the Common Rule, including the normal review procedures (*7 CFR 1c.108(b)*, *10 CFR 745.108(b)*, *14 CFR 1230.108(b)*, *15 CFR 27.108(b)*, *16 CFR 1028.108(b)*, *21 CFR 56.108(b)*, *22 CFR 225.108(b)*, *24 CFR 60.108(b)*, *28 CFR 46.108(b)*, *32 CFR 219.108(b)*, *34 CFR 97.108(b)*, *38 CFR 16.108(b)*, *40 CFR 26.108(b)*, *45 CFR 46.108(b)*, *45 CFR 690.108(b)*, or *49 CFR 11.108(b)*) or the expedited review procedures (*7 CFR 1c.110*, *10 CFR 745.110*, *14 CFR 1230.110*, *15 CFR 27.110*, *16 CFR 1028.110*, *21 CFR 56.110*, *22 CFR 225.110*, *24 CFR 60.110*, *28 CFR 46.110*, *32 CFR 219.110*, *34 CFR 97.110*, *38 CFR 16.110*, *40 CFR 26.110*, *45 CFR 46.110*, *45 CFR 690.110*, or *49 CFR 11.110*);

**(B)** A privacy board must review the proposed research at convened meetings at which a majority of the privacy board members are present, including at least one member who satisfies the criterion stated in paragraph (i)(1)(i)(B)(2) of this section, and the alteration or waiver of authorization must be approved by the majority of the privacy board members present at the meeting, unless the privacy board elects to use an expedited review procedure in accordance with paragraph (i)(2)(iv)(C) of this section;

**(C)** A privacy board may use an expedited review procedure if the research involves no more than minimal risk to the privacy of the individuals who are the subject of the protected health information for which use or disclosure is being sought. If the privacy board elects to use an expedited review procedure, the review and approval of the alteration or waiver of authorization may be carried out by the chair of the privacy board, or by one or more members of the privacy board as designated by the chair; and

**(v)** Required signature. The documentation of the alteration or waiver of authorization must be signed by the chair or other member, as designated by the chair, of the IRB or the privacy board, as applicable.

**(j)** Standard: Uses and disclosures to avert a serious threat to health or safety.

**(1)** Permitted disclosures. A covered entity may, consistent with applicable law and standards of ethical conduct, use or disclose protected health information, if the covered entity, in good faith, believes the use or disclosure:

**(i)**

**(A)** Is necessary to prevent or lessen a serious and imminent threat to the health or safety of a person or the public; and

**(B)** Is to a person or persons reasonably able to prevent or lessen the threat, including the target of the threat; or

**(ii)** Is necessary for law enforcement authorities to identify or apprehend an individual:

**(A)** Because of a statement by an individual admitting participation in a violent crime that the covered entity reasonably believes may have caused serious physical harm to the victim; or

**(B)** Where it appears from all the circumstances that the individual has escaped from a correctional institution or from lawful custody, as those terms are defined in § 164.501.

**(2)** Use or disclosure not permitted. A use or disclosure pursuant to paragraph (j)(1)(ii)(A) of this section may not be made if the information described in paragraph (j)(1)(ii)(A) of this section is learned by the covered entity:

**(i)** In the course of treatment to affect the propensity to commit the criminal conduct that is the basis for the disclosure under paragraph (j)(1)(ii)(A) of this section, or counseling or therapy; or

**(ii)** Through a request by the individual to initiate or to be referred for the treatment, counseling, or therapy described in paragraph (j)(2)(i) of this section.

**(3)** Limit on information that may be disclosed. A disclosure made pursuant to paragraph (j)(1)(ii)(A) of this section shall contain only the statement described in paragraph (j)(1)(ii)(A) of this section and the protected health information described in paragraph (f)(2)(i) of this section.

**(4)** Presumption of good faith belief. A covered entity that uses or discloses protected health information pursuant to paragraph (j)(1) of this section is presumed to have acted in good faith with regard to a belief described in paragraph (j)(1)(i) or (ii) of this section, if the belief is based upon the covered entity's actual knowledge or in reliance on a credible representation by a person with apparent knowledge or authority.

**(k)** Standard: Uses and disclosures for specialized government functions —

**(1)** Military and veterans activities —

**(i)** Armed Forces personnel. A covered entity may use and disclose the protected health information of individuals who are Armed Forces personnel for activities deemed necessary by appropriate military command authorities to assure the proper execution of the military mission, if the appropriate military authority has published by notice in the Federal Register the following information:

**(A)** Appropriate military command authorities; and

**(B)** The purposes for which the protected health information may be used or disclosed.

**(ii)** Separation or discharge from military service. A covered entity that is a component of the Departments of Defense or Homeland Security may disclose to the Department of Veterans Affairs (DVA) the protected health information of an individual who is a member of the Armed Forces upon

the separation or discharge of the individual from military service for the purpose of a determination by DVA of the individual's eligibility for or entitlement to benefits under laws administered by the Secretary of Veterans Affairs.

**(iii)** Veterans. A covered entity that is a component of the Department of Veterans Affairs may use and disclose protected health information to components of the Department that determine eligibility for or entitlement to, or that provide, benefits under the laws administered by the Secretary of Veterans Affairs.

**(iv)** Foreign military personnel. A covered entity may use and disclose the protected health information of individuals who are foreign military personnel to their appropriate foreign military authority for the same purposes for which uses and disclosures are permitted for Armed Forces personnel under the notice published in the Federal Register pursuant to paragraph (k)(1)(i) of this section.

**(2)** National security and intelligence activities. A covered entity may disclose protected health information to authorized federal officials for the conduct of lawful intelligence, counter-intelligence, and other national security activities authorized by the National Security Act (*50 U.S.C. 401*, et seq.) and implementing authority (e.g., Executive Order 12333).

**(3)** Protective services for the President and others. A covered entity may disclose protected health information to authorized Federal officials for the provision of protective services to the President or other persons authorized by *18 U.S.C. 3056* or to foreign heads of state or other persons authorized by *22 U.S.C. 2709(a)(3)*, or for the conduct of investigations authorized by *18 U.S.C. 871* and *879*.

**(4)** Medical suitability determinations. A covered entity that is a component of the Department of State may use protected health information to make medical suitability determinations and may disclose whether or not the individual was determined to be medically suitable to the officials in the Department of State who need access to such information for the following purposes:

**(i)** For the purpose of a required security clearance conducted pursuant to Executive Orders 10450 and 12968;

**(ii)** As necessary to determine worldwide availability or availability for mandatory service abroad under sections 101(a)(4) and 504 of the Foreign Service Act; or

**(iii)** For a family to accompany a Foreign Service member abroad, consistent with section 101(b)(5) and 904 of the Foreign Service Act.

**(5)** Correctional institutions and other law enforcement custodial situations.

**(i)** Permitted disclosures. A covered entity may disclose to a correctional institution or a law enforcement official having lawful custody of an inmate or other individual protected health information about such inmate or individual, if the correctional institution or such law enforcement official represents that such protected health information is necessary for:

**(A)** The provision of health care to such individuals;

**(B)** The health and safety of such individual or other inmates;

**(C)** The health and safety of the officers or employees of or others at the correctional institution;

**(D)** The health and safety of such individuals and officers or other persons responsible for the transporting of inmates or their transfer from one institution, facility, or setting to another;

**(E)** Law enforcement on the premises of the correctional institution; or

**(F)** The administration and maintenance of the safety, security, and good order of the correctional institution.

**(ii)** Permitted uses. A covered entity that is a correctional institution may use protected health information of individuals who are inmates for any purpose for which such protected health information may be disclosed.

**(iii)** No application after release. For the purposes of this provision, an individual is no longer an inmate when released on parole, probation, supervised release, or otherwise is no longer in lawful custody.

**(6)** Covered entities that are government programs providing public benefits.

**(i)** A health plan that is a government program providing public benefits may disclose protected health information relating to eligibility for or enrollment in the health plan to another agency administering a government program providing public benefits if the sharing of eligibility or enrollment information among such government agencies or the maintenance of such information in a single or combined data system accessible to all such government agencies is required or expressly authorized by statute or regulation.

**(ii)** A covered entity that is a government agency administering a government program providing public benefits may disclose protected health information relating to the program to another covered entity that is a government agency administering a government program providing public benefits if the programs serve the same or similar populations and the disclosure of protected health information is necessary to coordinate the covered functions of such programs or to improve administration and management relating to the covered functions of such programs.

**(7)** National Instant Criminal Background Check System. A covered entity may use or disclose protected health information for purposes of reporting to the National Instant Criminal Background Check System the identity of an individual who is prohibited from possessing a firearm under *18 U.S.C. 922(g)(4)*, provided the covered entity:

**(i)** Is a State agency or other entity that is, or contains an entity that is:

**(A)** An entity designated by the State to report, or which collects information for purposes of reporting, on behalf of the State, to the National Instant Criminal Background Check System; or

**(B)** A court, board, commission, or other lawful authority that makes the commitment or adjudication that causes an individual to become subject to *18 U.S.C. 922(g)(4)*; and

**(ii)** Discloses the information only to:

**(A)** The National Instant Criminal Background Check System; or

**(B)** An entity designated by the State to report, or which collects information for purposes of reporting, on behalf of the State, to the National Instant Criminal Background Check System; and

**(iii)**

**(A)** Discloses only the limited demographic and certain other information needed for purposes of reporting to the National Instant Criminal Background Check System; and

**(B)** Does not disclose diagnostic or clinical information for such purposes.

**(l)** Standard: Disclosures for workers' compensation. A covered entity may disclose protected health information as authorized by and to the extent necessary to comply with laws relating to workers' compensation or other similar programs, established by law, that provide benefits for work-related injuries or illness without regard to fault.

## Statutory Authority

*Authority Note Applicable to 45 CFR Subtit. A, Subch. C, Pt. 164*

# 34 CFR 99.31

This document is current through the Sept. 15, 2022 issue of the Federal Register, with the exception of the amendments appearing at 87 FR 55241, 87 FR 56204, 87 FR 56268, 87 FR 56559, and 87 FR 56849.

***Code of Federal Regulations > Title 34 Education > Subtitle A — Office of the Secretary, Department of Education > Part 99 — Family Educational Rights and Privacy > Subpart D — May an Educational Agency or Institution Disclose Personally Identifiable Information from Education Records?***

## § 99.31 Under what conditions is prior consent not required to disclose information?

**(a)** An educational agency or institution may disclose personally identifiable information from an education record of a student without the consent required by § 99.30 if the disclosure meets one or more of the following conditions:

**(1)**

**(i)**

**(A)** The disclosure is to other school officials, including teachers, within the agency or institution whom the agency or institution has determined to have legitimate educational interests.

**(B)** A contractor, consultant, volunteer, or other party to whom an agency or institution has outsourced institutional services or functions may be considered a school official under this paragraph provided that the outside party—

**(1)** Performs an institutional service or function for which the agency or institution would otherwise use employees;

**(2)** Is under the direct control of the agency or institution with respect to the use and maintenance of education records; and

**(3)** Is subject to the requirements of § 99.33(a) governing the use and redisclosure of personally identifiable information from education records.

**(ii)** An educational agency or institution must use reasonable methods to ensure that school officials obtain access to only those education records in which they have legitimate educational interests. An educational agency or institution that does not use physical or technological access controls must ensure that its administrative policy for controlling access to education records is effective and that it remains in compliance with the legitimate educational interest requirement in paragraph (a)(1)(i)(A) of this section.

**(2)** The disclosure is, subject to the requirements of § 99.34, to officials of another school, school system, or institution of postsecondary education where the student seeks or intends to enroll, or where the student is already enrolled so long as the disclosure is for purposes related to the student's enrollment or transfer.

Note: Section 4155(b) of the No Child Left Behind Act of 2001, 20 U.S.C. 7165(b), requires each State to assure the Secretary of Education that it has a procedure in place to facilitate the transfer of disciplinary records with respect to a suspension or expulsion of a student by a local

educational agency to any private or public elementary or secondary school in which the student is subsequently enrolled or seeks, intends, or is instructed to enroll.

**(3)** The disclosure is, subject to the requirements of § 99.35, to authorized representatives of —

**(i)** The Comptroller General of the United States;

**(ii)** The Attorney General of the United States;

**(iii)** The Secretary; or

**(iv)** State and local educational authorities.

**(4)**

**(i)** The disclosure is in connection with financial aid for which the student has applied or which the student has received, if the information is necessary for such purposes as to:

**(A)** Determine eligibility for the aid;

**(B)** Determine the amount of the aid;

**(C)** Determine the conditions for the aid; or

**(D)** Enforce the terms and conditions of the aid.

**(ii)** As used in paragraph (a)(4)(i) of this section, financial aid means a payment of funds provided to an individual (or a payment in kind of tangible or intangible property to the individual) that is conditioned on the individual's attendance at an educational agency or institution.

(Authority: *20 U.S.C. 1232g(b)(1)(D)*)

**(5)**

**(i)** The disclosure is to State and local officials or authorities to whom this information is specifically —

**(A)** Allowed to be reported or disclosed pursuant to State statute adopted before November 19, 1974, if the allowed reporting or disclosure concerns the juvenile justice system and the system's ability to effectively serve the student whose records are released; or

**(B)** Allowed to be reported or disclosed pursuant to State statute adopted after November 19, 1974, subject to the requirements of § 99.38.

**(ii)** Paragraph (a)(5)(i) of this section does not prevent a State from further limiting the number or type of State or local officials to whom disclosures may be made under that paragraph.

**(6)**

**(i)** The disclosure is to organizations conducting studies for, or on behalf of, educational agencies or institutions to:

**(A)** Develop, validate, or administer predictive tests;

**(B)** Administer student aid programs; or

**(C)** Improve instruction.

**(ii)** Nothing in the Act or this part prevents a State or local educational authority or agency headed by an official listed in paragraph (a)(3) of this section from entering into agreements with organizations conducting studies under paragraph (a)(6)(i) of this section and redisclosing personally identifiable information from education records on behalf of educational agencies and institutions that disclosed the information to the State or local

educational authority or agency headed by an official listed in paragraph (a)(3) of this section in accordance with the requirements of § 99.33(b).

**(iii)** An educational agency or institution may disclose personally identifiable information under paragraph (a)(6)(i) of this section, and a State or local educational authority or agency headed by an official listed in paragraph (a)(3) of this section may redisclose personally identifiable information under paragraph (a)(6)(i) and (a)(6)(ii) of this section, only if—

**(A)** The study is conducted in a manner that does not permit personal identification of parents and students by individuals other than representatives of the organization that have legitimate interests in the information;

**(B)** The information is destroyed when no longer needed for the purposes for which the study was conducted; and

**(C)** The educational agency or institution or the State or local educational authority or agency headed by an official listed in paragraph (a)(3) of this section enters into a written agreement with the organization that—

**(1)** Specifies the purpose, scope, and duration of the study or studies and the information to be disclosed;

**(2)** Requires the organization to use personally identifiable information from education records only to meet the purpose or purposes of the study as stated in the written agreement;

**(3)** Requires the organization to conduct the study in a manner that does not permit personal identification of parents and students, as defined in this part, by anyone other than representatives of the organization with legitimate interests; and

**(4)** Requires the organization to destroy all personally identifiable information when the information is no longer needed for the purposes for which the study was conducted and specifies the time period in which the information must be destroyed.

**(iv)** An educational agency or institution or State or local educational authority or Federal agency headed by an official listed in paragraph (a)(3) of this section is not required to initiate a study or agree with or endorse the conclusions or results of the study.

**(v)** For the purposes of paragraph (a)(6) of this section, the term organization includes, but is not limited to, Federal, State, and local agencies, and independent organizations.

**(7)** The disclosure is to accrediting organizations to carry out their accrediting functions.

**(8)** The disclosure is to parents, as defined in § 99.3, of a dependent student, as defined in *section 152 of the Internal Revenue Code of 1986*.

**(9)**

**(i)** The disclosure is to comply with a judicial order or lawfully issued subpoena.

**(ii)** The educational agency or institution may disclose information under paragraph (a)(9)(i) of this section only if the agency or institution makes a reasonable effort to notify the parent or eligible student of the order or subpoena in advance of compliance, so that the parent or eligible student may seek protective action, unless the disclosure is in compliance with —

**(A)** A Federal grand jury subpoena and the court has ordered that the existence or the contents of the subpoena or the information furnished in response to the subpoena not be disclosed;

**(B)** Any other subpoena issued for a law enforcement purpose and the court or other issuing agency has ordered that the existence or the contents of the subpoena or the information furnished in response to the subpoena not be disclosed; or

**(C)** An ex parte court order obtained by the United States Attorney General (or designee not lower than an Assistant Attorney General) concerning investigations or prosecutions of an offense listed in *18 U.S.C. 2332b(g)(5)(B)* or an act of domestic or international terrorism as defined in *18 U.S.C. 2331*.

**(iii)**

**(A)** If an educational agency or institution initiates legal action against a parent or student, the educational agency or institution may disclose to the court, without a court order or subpoena, the education records of the student that are relevant for the educational agency or institution to proceed with the legal action as plaintiff.

**(B)** If a parent or eligible student initiates legal action against an educational agency or institution, the educational agency or institution may disclose to the court, without a court order or subpoena, the student's education records that are relevant for the educational agency or institution to defend itself.

**(10)** The disclosure is in connection with a health or safety emergency, under the conditions described in § 99.36.

**(11)** The disclosure is information the educational agency or institution has designated as "directory information", under the conditions described in § 99.37.

**(12)** The disclosure is to the parent of a student who is not an eligible student or to the student.

**(13)** The disclosure, subject to the requirements in § 99.39, is to a victim of an alleged perpetrator of a crime of violence or a non-forcible sex offense. The disclosure may only include the final results of the disciplinary proceeding conducted by the institution of postsecondary education with respect to that alleged crime or offense. The institution may disclose the final results of the disciplinary proceeding, regardless of whether the institution concluded a violation was committed.

**(14)**

**(i)** The disclosure, subject to the requirements in § 99.39, is in connection with a disciplinary proceeding at an institution of postsecondary education. The institution must not disclose the final results of the disciplinary proceeding unless it determines that —

**(A)** The student is an alleged perpetrator of a crime of violence or non-forcible sex offense; and

**(B)** With respect to the allegation made against him or her, the student has committed a violation of the institution's rules or policies.

**(ii)** The institution may not disclose the name of any other student, including a victim or witness, without the prior written consent of the other student.

**(iii)** This section applies only to disciplinary proceedings in which the final results were reached on or after October 7, 1998.

**(15)**

**(i)** The disclosure is to a parent of a student at an institution of postsecondary education regarding the student's violation of any Federal, State, or local law, or of any rule or policy of the institution, governing the use or possession of alcohol or a controlled substance if —

**(A)** The institution determines that the student has committed a disciplinary violation with respect to that use or possession; and

**(B)** The student is under the age of 21 at the time of the disclosure to the parent.

**(ii)** Paragraph (a)(15) of this section does not supersede any provision of State law that prohibits an institution of postsecondary education from disclosing information.

**(16)** The disclosure concerns sex offenders and other individuals required to register under section 170101 of the Violent Crime Control and Law Enforcement Act of 1994, *42 U.S.C. 14071*, and the information was provided to the educational agency or institution under *42 U.S.C. 14071* and applicable Federal guidelines.

**(b)**

**(1)** De-identified records and information. An educational agency or institution, or a party that has received education records or information from education records under this part, may release the records or information without the consent required by § 99.30 after the removal of all personally identifiable information provided that the educational agency or institution or other party has made a reasonable determination that a student's identity is not personally identifiable, whether through single or multiple releases, and taking into account other reasonably available information.

**(2)** An educational agency or institution, or a party that has received education records or information from education records under this part, may release de-identified student level data from education records for the purpose of education research by attaching a code to each record that may allow the recipient to match information received from the same source, provided that—

**(i)** An educational agency or institution or other party that releases de-identified data under paragraph (b)(2) of this section does not disclose any information about how it generates and assigns a record code, or that would allow a recipient to identify a student based on a record code;

**(ii)** The record code is used for no purpose other than identifying a de-identified record for purposes of education research and cannot be used to ascertain personally identifiable information about a student; and

**(iii)** The record code is not based on a student's social security number or other personal information.

**(c)** An educational agency or institution must use reasonable methods to identify and authenticate the identity of parents, students, school officials, and any other parties to whom the agency or institution discloses personally identifiable information from education records.

**(d)** Paragraphs (a) and (b) of this section do not require an educational agency or institution or any other party to disclose education records or information from education records to any party, except for parties under paragraph (a)(12) of this section.

(Authority: *20 U.S.C. 1232g(a)(5)(A)*, (b), (h), (i), and (j)).

## History

[53 FR 11943, Apr. 11, 1988; *53 FR 19368*, May 27, 1988, as amended at 58 FR 3189, Jan. 7, 1993; *61 FR 59292*, 59296, Nov. 21, 1996; *65 FR 41852*, 41853, July 6, 2000; *73 FR 74806*, 74852, Dec. 9, 2008, as corrected at *74 FR 400*, 401, Jan. 6, 2009; *76 FR 75604*, 75641, Dec. 2, 2011]

Annotations

## Notes

**[EFFECTIVE DATE NOTE:**

Case 1:19-cr-00243-CMA-GPG Document 184 Filed 10/26/20 Page 1 of 7

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Criminal Action No. 19-cr-00243-CMA-GPG

UNITED STATES OF AMERICA,

Plaintiff,

v.

1. MICHAEL TRACY McFADDEN,

Defendant.

---

**GOVERNMENT'S RESPONSE TO MOTION FOR BILL OF PARTICULARS [ECF #61]**

---

The United States of America, by and through Jeremy Chaffin and Andrea Surratt, Assistant United States Attorneys, submits this response in opposition to the defendant's motion for a bill of particulars as to Count Five of the Indictment. [ECF #61]. The Government respectfully requests that the defendant's motion be denied.

**RELEVANT BACKGROUND**

On or about May 17, 2019, a grand jury in the District of Colorado returned an indictment charging the defendant in five counts. [ECF #1]. As relevant to the instant motion, Count Five of the indictment charges:

> Between on or about January 1, 2007, and on or about January 3, 2013, in the State and District of Colorado, and elsewhere, the defendant, MICHAEL TRACY McFADDEN, did knowingly transport J.W., an individual who had not attained the age of 18 years in interstate and foreign commerce, with the intent that such individual engage in sexual activity for which any person can be charged with a criminal offense.
> All in violation of Title 18, United States Code, Section 2423(a).

The defendant has been provided extensive discovery in this case, including recorded interviews of J.W. describing being assaulted by the defendant. Discovery also includes the transcript of the prior state trial in this matter where the victims, including J.W., testified about the assaults. The discovery obviously and clearly details the basis for each count, including the reason for the broadly-charged time period in Count 5, and the specific truck trip that forms the basis of that count, the trip's destination, who else was on the trip, and stops made along the way. The discovery also clearly identifies the sexual activity alleged to have taken place.

In addition, nearly two years ago, on December 2, 2020, the Government filed a Notice of Intent to Introduce Evidence Pursuant to Federal Rules of Evidence 414, 404(b), and 807 (the "Notice of Intent"). [ECF #39]. The Notice of Intent included a detailed recitation of the conduct underlying Count Five, and an explanation for the charged date range:

> Count Five relates to another instance in which the defendant took J.W. on a commercial truck trip. J.W. was unsure of the precise time frame of this assault. As a result, the charged time period in the Indictment encompasses the approximate time period during which the defendant subjected J.W. to sexual assaults. J.W. reported that, during this specific instance, they were transporting goods to or from Arizona. J.W. recalled stopping at a Love's truck stop and sleeping in the sleeper compartment of the truck. J.W. described the defendant placing his penis into J.W.'s butt during the night. During the charged time period J.W. was 12 years-old or younger.

[ECF #39, p.3].

## LEGAL FRAMEWORK

Federal Rule of Criminal Procedure 7(c) states that an indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged." An indictment is sufficient if it: (1) "contains the elements of the

charged offense and fairly informs a defendant of the charge against which he must defend;" and (2) "enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Hamling v. United States*, 418 U.S. 87, 117 (1974); *United States v. Bedonie*, 913 F.2d 782, 790 (10th Cir. 1990). Tracking the language of the statute is generally sufficient as long as the indictment sets forth the elements of the offense and provides a statement of facts and circumstances that informs the defendant of the specific offense. *See Hamling*, 418 U.S. at 117-18; *United States v. Dunn*, 841 F.2d 1026, 1029 (10th Cir. 1988). An indictment need not allege in detail the factual proof that the government will rely on to support the charges. *See Dunn*, 841 F.2d at 1029. Sufficiency of an indictment "is determined by practical rather than technical considerations." *Dunn*, 841 F.2d at 1029.

Federal Rue of Criminal Procedure 7(f) provides that "[t]he court may direct the government to file a bill of particulars. The defendant may move for a bill of particulars before or within 14 days after arraignment or at a later time if the court permits. The government may amend a bill of particulars subject to such conditions as justice requires." The purpose of a bill of particulars is to inform the defendant of the charges against him with sufficient precision so that he may prepare his defense, minimize surprise at trial, and to enable him to assert double jeopardy should he be subject to a later prosecution for the same offense. *Dunn*, 841 F.2d at 1029. The Court has broad discretion in deciding whether to grant a motion for bill of particulars. *Id*.

A bill of particulars is unnecessary where the indictment sets forth the elements of the offense charged and sufficiently apprises the defendant of the charges in order to enable him to adequately prepare for trial. *United States v. Levine*, 983 F.2d 165, 166-67 (10th Cir. 1992). "[T]he defendant is not entitled to notice of all of the evidence the

government intends to produce, but only the theory of the government's case." *United States v. Ivy*, 83 F.3d 1266, 1281 (10th Cir. 1996) (internal citations and emphasis omitted). An indictment has sufficient precision without alleging "in detail the factual proof that will be relied upon to support the charges." *Dunn*, 841 F.2d at 1029.

Further, when the Government's discovery is sufficient to allow the defendants to prepare their defense, a bill of particulars is not warranted. *Ivy*, 83 F.3d at 1282. *See also Untied States v. Kunzman*, 53 F.3d 1522, 1526 (10th Cir. 1995) (affirming denial of motion for bill of particulars when allegations in indictment and government's discovery was "sufficient to inform Kunzman of the charges against him and to enable him to prepare his defense"); *United States v. Sturmoski*, 971 F.2d 452, 460 (10th Cir. 1992) (affirming denial of motion for bill of particulars when defendant received full discovery and failed to show he was "actually surprised at trial"). Indeed, so long as the defendant has been apprised of the "theory of the government's case," it is not an abuse of discretion to denying a motion for a bill of particulars "where defendant has been served with a sufficient indictment." *United States v. Levine*, 983 F.2d 165, 167 (10th Cir. 1992).

**ANALYSIS**

The defendant contends that a bill of particulars is required here because "Count Five spans a six-year period of time" and therefore, [w]ithout more specificity, Mr. McFadden cannot defend this charge." [ECF #61, p. 1]. The defendant, however, has not demonstrated that a failure to grant his motion will deny him the ability to defend against the charges, cause him prejudice at trial, or have any double jeopardy implications. Indeed, the defendant's bland and unsupported complaint ignores the discovery, evidence, and statements already provided in this case that provide ample

notice of the conduct that underlies Count Five.

Though Count Five does allege a broad timeframe for the charged conduct, the count "sets forth the offense in the words of the statute," *Dunn*, 841 F.3d at 1029, and is therefore facially sufficient. And, as described above, the defendant has been given ample notice of the theory behind Count Five. In short, the Government alleges that the defendant repeatedly sexually abused J.W., both at the defendant's home in Grand Junction and on long-haul trucking trips from the time that J.W. was approximately seven or eight years old until the defendant's arrest in 2013, when J.W. was 12 years old. One such instance of abuse took place on a truck trip between Colorado and Arizona about which J.W. remembers important details, but cannot remember precisely when the trip took place. Given the victim's age at the time of the assault, and the frequency with which the assaults took place, it is unsurprising that J.W. cannot remember the date of this particular trip with additional specificity.

In *United States v. Ivy*, 82 F.3d 1266 (10th Cir. 1996), the Tenth Circuit upheld the district court's denial of a bill of particulars. There, as here, the defendants contended that the counts in the indictment alleged time frames that made "effective preparation an impossibility" and the government's production of discovery did not cure this deficiency because the government did not direct the defendants to specific items of discovery that would have clarified the time spans alleged. *Id*. at 1282. The court rejected this contention, holding that

> by providing complete discovery containing sufficient information to allow them to prepare their defense, the government gave [the defendants] the tools necessary to anticipate and forestall any surprise that might have resulted from the indictment. Once the government provided these tools, it was [the defendants'] responsibility to use them in preparing their defense, regardless of whether the discovery was copious and the preparation of the defense was difficult.

> Because they had these tools available to them, and because they have done nothing more than make conclusory assertions of prejudice . . . .

*Id.*

Here, of course, the Government has gone well beyond production of discovery, and has specifically pointed the defendant to the truck trip to which Count Five refers. The indictment, as supplemented by discovery and the Government's filings in this case, informs the defendant of the charges against him with "sufficient precision to allow him to prepare his defense, to minimize surprise at trial, and to enable him to plead double jeopardy," *Dunn*, 841 F.2d at 1029, and the defendant's motion should be denied.

**CONCLUSION**

The defendant's motion for a bill of particulars should be denied for the reasons stated herein.

Respectfully submitted,

COLE FINEGAN
United States Attorney

*s/ Jeremy Chaffin*
JEREMY CHAFFIN
Assistant U.S. Attorney
U.S. Attorney's Office
205 North 4th Street, Suite 400
Grand Junction, CO 81501
Tel: (970) 257-7113
E-mail: jeremy.chaffin@usdoj.gov

*s/ Andrea Surratt*
ANDREA SURRATT
Assistant U.S. Attorney
U.S. Attorney's Office
1801 California Street, Suite 1600
Denver, CO 80202
Tel: (303) 454-0124
E-mail: andrea.surratt@usdoj.gov

Attorneys for the Government

## CERTIFICATE OF SERVICE

I hereby certify that on this 6th day of October, 2022, I electronically filed the foregoing **GOVERNMENT'S RESPONSE TO MOTION FOR BILL OF PARTICULARS [ECF #61]** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following e-mail address:

**Defense Attorney:**
Sean M. McDermott

**Email Address:**
smcdermott@mswdenver.com

s/ Cosandra Foster
COSANDRA FOSTER
Paralegal Specialist
U.S. Attorney's Office
205 N. 4th Street, Suite 400
Grand Junction, CO 81501
Telephone (970) 241-3843
Fax (970) 248-3630
E-mail: cosandra.foster@usdoj.gov

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Criminal Action No. 19-cr-00243-CMA-GPG

UNITED STATES OF AMERICA,

Plaintiff,

v.

1. MICHAEL TRACY McFADDEN,

Defendant.

---

**GOVERNMENT'S RESPONSE TO MOTION TO DISMISS DUE TO PREINDICTMENT DELAY [ECF #62]**

---

The United States of America, by and through Jeremy Chaffin and Andrea Surratt, Assistant United States Attorneys, submits this response in opposition to the defendant's motion to dismiss the indictment due to preindictment delay (the "Motion"). [ECF #62]. The Government respectfully requests that the defendant's motion be denied.

## RELEVANT BACKGROUND

On or about January 7, 2013, the district attorney's office in Mesa County, Colorado, charged the defendant with 19 offenses, alleging that he had sexually abused six different children between 2008 and 2012. *People v. McFadden*, 2013CR27, 2013CR339, 2013CR342; *see also People v. McFadden*, 15CA1925 (Co. Ct. App. June 22, 2017). The charges were consolidated for trial, and the defendant was convicted on all counts after a jury trial in July 2015 and, at a later hearing, was determined to be a habitual sexual offender.

The defendant was sentenced on October 1, 2015, to an indeterminate sentence of 324 years to life in the Department of Corrections. *People v. McFadden*, 2013CR27, 2013CR339, 2013CR342, Oct. 1, 2015, Habitual/Sentencing Hearing Transcript ("Tr.") at 73-75. The sentencing judge remarked that, though she had not added up the total time of the consecutive sentences at the time of the sentencing hearing, it is "very unlikely that [the defendant] will be out during his lifetime." Tr. at 75.

The defendant appealed, alleging that his statutory speedy trial rights had been violated. The Colorado Court of Appeals agreed, noting that "[t]he crimes of which defendant was convicted are indeed heinous. But the General Assembly has enacted a statute that dictates dismissal of the charges under the circumstances of this case." *People v. McFadden*, 15CA1925, at 21.[1] On June 22, 2017, the Court of Appeals remanded the case to the trial court with instructions to dismiss all charges. *Id*. at 1. On February 12, 2018, the Colorado Supreme Court denied the subsequent petition for a writ of certiorari. *People v. McFadden*, No. 17SC573, 2018 WL 827272 (Co. Sup. Ct. Feb. 12, 2018). On February 12, 2018, the district court dismissed all of the charges against the defendant, and he was released from custody.

On May 17, 2019, a grand jury in the District of Colorado returned the instant indictment against the defendant, charging him in five counts. [ECF #1]. Counts One and Two relate to the defendant's sexual abuse of K.W. Counts Three, Four, and Five relate to the defendant's sexual abuse of J.W. Both J.W. and K.W. testified at the defendant's state trial and are expected to testify at the upcoming federal trial.

## **LEGAL FRAMEWORK**

[1] A copy of this Colorado Court of Appeals decision can be provided upon request.

The defendant correctly notes in his Motion that "[t]he Due Process Clause warrants dismissal of indictments for preindictment delay only in exceptional circumstances." *United States v. Comosona*, 848 F.2d 1110, 1113 (10th Cir. 1988). Rather, "statutes of limitations, which provide predictable, legislatively enacted limits on prosecutorial delay, provide the primary guarantee against bringing overly stale criminal charges." *United States v. Locasco*, 431 U.S. 783, 789 (1977) (internal quotation marks omitted). Nevertheless, "the statute of limitations does not fully define (defendants') rights with respect to the events occurring prior to indictment and . . . the Due Process Clause has a limited role to play in protecting against oppressive delay." *Id.* (internal quotation marks and citations omitted).

"A defendant's Due Process rights are not offended absent a showing of actual prejudice resulting from preindictment delay and that the delay was purposefully designed to gain tactical advantage or to harass." *Comosona*, 848 F.2d at 1113 (internal quotation marks omitted). More specifically, the Tenth Circuit has explained:

> Vague and conclusory allegations of prejudice resulting from the passage of time and the absence of witnesses are insufficient to constitute a showing of actual prejudice for the purposes of impermissible preindictment delay; defendant must be able to show definite and not speculative prejudice, and in what specific manner missing witnesses would have aided his defense.

*Id.* at 1113-14 (quoting *United States v. Jenkins*, 701 F.2d 850, 855 (10th Cir. 1983)). Put another way, in order to achieve dismissal of an indictment, the defendant has the burden "to demonstrate that delay in charging him with a particular crime was the product of deliberate action by law enforcement personnel designed to gain a tactical advantage resulting in actual prejudice to the accused, thereby depriving him of his right

to a fair trial." *United States v. Comosona*, 614 F.2d 695, 696 (10th Cir. 1980) (per curium). Absent this showing, it is not the court's "function to 'second-guess' the timing of the Government's indictment." *Id*. at 696.

The Tenth Circuit has explained that evaluating a defendant's claim of preindictment delay requires a balancing test:

> First, there must be demonstration of actual prejudice to the defendant resulting from the delay. Generally, such prejudice will take the form of either a loss of witnesses and/or physical evidence or the impairment of their effective use at trial. Second, the length of delay must be considered. Finally, the Government's reasons for the delay must be carefully considered.

*Id*. at 696. In terms of burden of proof, the defendant must first make a prima facie showing that the "delay in charging him has actually prejudiced his ability to defend, and that this delay was intentionally or purposely designed and pursued by the Government to gain some tactical advantage over or to harass him, the burden of going forward with the evidence shifts to the Government." *Id.* at 697. Then, "[o]nce the Government presents evidence showing that the delay was not improperly motivated or unjustified, the defendant then bears the ultimate burden of establishing the Government's due process violation by a preponderance of evidence." *Id.*

## ANALYSIS

In his Motion, the defendant makes nothing more than "vague and conclusory allegations," *Comosona*, 848 F.2d at 1113, that exculpatory evidence and testimony have been lost to time. The Motion also suggests that, at the conclusion of trial, the Court will conclude that the "delay has placed Mr. McFadden at a disadvantage." Motion at 2.

Of course, even if the defendant is able to show—contrary to the equivocal statements in his motion—that the delay has "*actually* prejudiced his ability to defend," *Comosona*, 614 F.2d 696 (emphasis added), he has not and cannot make a prima facie showing that the delay was intentional and purposeful on the part of the Government in order to gain tactical advantage or to harass.  As the narrative outlined above makes clear, the Government charged the defendant in the instant federal case 15 months after the state case was finally dismissed.  The Government acted here for no other reason than to protect the community from the defendant and to ensure justice is done for the defendant's victims, and the defendant cannot demonstrate otherwise.

## CONCLUSION

The defendant's motion to dismiss should be denied for the reasons stated herein.

Respectfully submitted,

COLE FINEGAN
United States Attorney

*s/ Jeremy Chaffin*
JEREMY CHAFFIN
Assistant U.S. Attorney
U.S. Attorney's Office
205 North 4th Street, Suite 400
Grand Junction, CO 81501
Tel: (970) 257-7113
E-mail: jeremy.chaffin@usdoj.gov

*s/ Andrea Surratt*
ANDREA SURRATT
Assistant U.S. Attorney
U.S. Attorney's Office
1801 California Street, Suite 1600
Denver, CO 80202
Tel: (303) 454-0124
E-mail: andrea.surratt@usdoj.gov

Attorneys for the Government

Case 1:19-cr-00243-CMA-GPG Document 85 Filed 10/06/22 Page 6 of 6

## CERTIFICATE OF SERVICE

I hereby certify that on this 6th day of October, 2022, I electronically filed the foregoing **GOVERNMENT'S RESPONSE TO MOTION TO DISMISS DUE TO PREINDICTMENT DELAY [ECF #62]** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following e-mail address:

**Defense Attorney:**
Sean M. McDermott

**Email Address:**
smcdermott@mswdenver.com

s/ Cosandra Foster
COSANDRA FOSTER
Paralegal Specialist
U.S. Attorney's Office
205 N. 4th Street, Suite 400
Grand Junction, CO 81501
Telephone (970) 241-3843
Fax (970) 248-3630
E-mail: cosandra.foster@usdoj.gov

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Criminal Action No. 19-cr-00243-CMA-GPG

UNITED STATES OF AMERICA,

Plaintiff,

v.

1. MICHAEL TRACY McFADDEN,

Defendant.

---

**GOVERNMENT'S RESPONSE TO DEFENDANT'S SECOND MOTION TO COMPEL PRODUCTION AND REQUEST FOR SUBPOENA RETURN DATE**

---

The United States of America, by and through Jeremy Chaffin and Andrea Surratt, Assistant United States Attorneys, hereby responds to Mr. McFadden's motion requesting this Court comp the disclosure of therapy records for victims in this matter. ECF # 81. This Court must deny the request.

BACKGROUND

In 2019, a grand jury indicted Mr. McFadden for committing multiple acts of child molestation on J.W. and K.W., victims in this case. ECF # 1. The government has also provided notice of its intent to introduce other acts of child molestation committed by Mr. McFadden on J.W., K.W., I.S., E.S. (formerly E.M.), S.J.W., and others.

Relying on brief notations found in discovery that some of the victims of his abuse have received treatment in therapy, Mr. McFadden sought an order "that Mr. McFadden's defense team be permitted to obtain the therapy records of any of the

witnesses who were in therapy and are alleging that Mr. McFadden sexually assaulted them." ECF # 60. Mr. McFadden also refiled a redacted version of this motion. ECF # 79. Construing it as a discovery motion, the Court struck Mr. McFadden's motion for failing to comply with the Court's conferral requirement. ECF # 80. Mr. McFadden then sought the government's position on his request for records.[1] The government responded that, to the extent Mr. McFadden was seeking an order compelling the government to provide therapy records, those records were not in the government's possession or control. The government also explained that it opposed Mr. McFadden's request for a subpoena to obtain the victim's therapy records because those records are privileged. Mr. McFadden has now resubmitted his demand for "therapy records of the witnesses who were in therapy and are alleging that Mr. McFadden sexually assaulted them," and has expanded his request to I.S.'s educational records as well. ECF # 81.

## DISCUSSION

Without identifying whom it would be directed to or what precisely would be requested, Mr. McFadden asks this Court to order that he be permitted to subpoena the protected educational records of one of his victims and the privileged therapy records of all of his victims. In support of his request, Mr. McFadden cites only the barest of authority and then simply demands that this Court obtain the records and conduct an in-camera review. The process is not as simple as Mr. McFadden believes.

First, a subpoena requiring the production of personal or confidential information

[1] Prior to filing any motions, the defense had informed the government of the general nature of motions Mr. McFadden intended to file and requested the government's position. The government stated it could not take a position, and would provide a position once it had seen Mr. McFadden's motions.

about a victim"—which Mr. McFadden clearly requests—may only be issued by court order.  Fed. R. Crim. P. 17(c)(3).  Before a court may enter any such order, however, the victim must be given notice so that he or she may move to quash, modify, or object to the subpoena.  *Id.*  Mr. McFadden fails to even cite this authority, much less establish that notice has been provided.[2]

Second, even if Mr. McFadden has satisfied the procedural requirement, he cannot establish that a subpoena should be issued.  After all, Rule 17(c) subpoenas do not "provide an additional means of discovery."  *Bowman Dairy Co. v. United States*, 341 U.S. 214, 220 (1951).  Instead, they are intended to expedite trial by providing a time and place before trial for the inspection of otherwise admissible evidence.  *See id.*  The Supreme Court has laid out several factors that a party must show before a court may require production of documents prior to trial:

> (1) that the documents are evidentiary and relevant; (2) that they are not otherwise procurable reasonably in advance of trial by exercise of due diligence; (3) that the party cannot properly prepare for trial without such production and inspection in advance of trial and that the failure to obtain such inspection may tend unreasonably to delay the trial; and (4) that the application is made in good faith and is not intended as a general 'fishing expedition.'

*United States v. Nixon*, 418 U.S. 683, 699–700 (1974).  In other words, the party seeking the records "must clear three hurdles: (1) relevancy; (2) admissibility; (3) specificity."  Mr. McFadden has failed on all fronts.

As noted above, Mr. McFadden's request lacks any specificity.  It is unclear to

---

[2]  Based on communications the Court and the government has received, it appears that at least some of the victims may have been notified by the defense.  However, it is unclear if all of the victims whose records Mr. McFadden seek have received notice.

whom the subpoena would be issued or which victim's therapy records he seeks to obtain. For this reason alone, Mr. McFadden's request could be denied. *United States v. Morris*, 287 F.3d 985, 991 (10th Cir. 2002) (upholding denial of Rule 17(c) subpoena where although the information sought was "highly relevant" and "arguably admissible" the subpoena lacked the requisite specificity).

Mr. McFadden has also failed to show how these records are relevant. The most cogent argument Mr. McFadden provides for relevance appears to be premised on his speculation that his victims are misattributing sexual abuse to him that was actually committed by another person. Ignoring for the moment the additional procedural hurdles such an argument implicates, *see* Fed. R. Evid. 412, Mr. McFadden only identifies one instance, pertaining to K.W. and his sister S.J.W., in support of this theory. And, yet, that instance did not involve a disclosure by K.W. at all, and what S.J.W. disclosed lacked any similarity to the act of child molestation Mr. McFadden was convicted of committing on her. *Compare* Exhibit 1 (INV_GJPD_000011103) *with* ECF # 39, pp. 10-11. It is difficult to imagine how these unrelated allegations could lead to "source misattribution errors" as Mr. McFadden seems to allege, particularly for all of the victims.

The only other arguments Mr. McFadden raises for seeking these records are his claims that they are necessary to gauge the reliability of the victims' memories. In other words, Mr. McFadden wishes to scour the victims' confidential therapy and educational records to seek out fodder for cross-examination. This is not a proper basis for a subpoena. *Nixon*, 418 U.S. at 701 ("[T]he need for evidence to impeach witnesses is

insufficient to require its production in advance of trial.").[3]

Though he claims it is so, Mr. McFadden also fails to explain why he is unable to prepare for trial without these records. After all, this will not be Mr. McFadden's first trial regarding the allegations in this case. And, Mr. McFadden proceeded with his underlying state trial without obtaining the records he now seeks. It is unclear why he would be unable to do the same here.

Finally, Mr. McFadden makes no effort to describe how the records he seeks would be admissible at trial. Although again unclear, it appears Mr. McFadden's primary focus is obtaining the victims' descriptions of the abuse they received. Such out-of-court statements would be inadmissible. *See* Fed. R. Evid. 801-802. More importantly, the victims' therapy records are privileged. *Jaffee v. Redmond*, 518 U.S. 1 (1996) ("[C]onfidential communications between a licensed psychotherapist and her patients in the course of diagnosis or treatment are protected from compelled disclosure under Rule 501 of the Federal Rules of Evidence."). And, contrary to Mr. McFadden's assertion, the Court may not "balance" his confrontation clause and due process rights against this privilege. *Id.* at 17 (expressly rejecting any balancing of the privilege against the evidentiary need for disclosure); *United States v. Glass*, 133 F.3d 1356, 1358 (10th Cir. 1998) (the psychotherapist-patient privilege is not subject to a balancing component); *see also Kinder v. White*, 609 Fed. Appx. 126, 131-132 (4th Cir. 2015) (holding that a district court's order directing production of a witness's privileged therapy

[3] Mr. McFadden's citation to the regulations regarding the disclosure of medical and educational records is a red herring. Whether healthcare and educational entities are permitted to disclose protected information when ordered to do so by a court has no bearing on whether a court should issue such an order in the first place.

records for in camera review, under Rule 17(c), and subsequent order disclosing a portion of those records to "vindicate" the defendant's constitutional rights was erroneous and in direct conflict with *Jaffee*). Simply put, the defendant's interest in confronting adverse witnesses at trial does not justify disclosure of privileged records. *United States v. LaVallee*, 439 F.3d 670, 692 (10th Cir. 2006) (rejecting claim that a district court's denial of a motion seeking a witness's privileged psychiatric records violated the defendant's confrontation right).

CONCLUSION

Mr. McFadden has not satisfied the procedural requirements to permit this Court to issue a subpoena for confidential information about the victims in this case. Even if he had, the subpoena he seeks is vague, overbroad, and seeks information that is privileged, inadmissible, and not necessary for his preparation in this case. Accordingly, this Court must deny Mr. McFadden's motion.

Respectfully submitted,

COLE FINEGAN
United States Attorney

| s/ Jeremy Chaffin<br>JEREMY CHAFFIN<br>Assistant U.S. Attorney<br>U.S. Attorney's Office<br>205 North 4th Street, Suite 400<br>Grand Junction, CO 81501<br>Tel: (970) 257-7113<br>Fax: (970) 248-3630<br>E-mail: jeremy.chaffin@usdoj.gov | s/ Andrea Surratt<br>ANDREA SURRATT<br>Assistant U.S. Attorney<br>U.S. Attorney's Office<br>1801 California Street, #1800<br>Denver, Colorado 80101<br>Tel: (303) 454-0100<br>E-mail: andrea.surratt@usdoj.gov |
|---|---|

Attorneys for the Government

**CERTIFICATE OF SERVICE**

I hereby certify that on this 6th day of October, 2022, I electronically filed the foregoing **GOVERNMENT'S RESPONSE TO DEFENDANT'S SECOND MOTION TO COMPEL PRODUCTION AND REQUEST FOR SUBPOENA RETURN DATE** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following e-mail address:

**Defense Attorney:**
Sean M. McDermott

**Email Address:**
smcdermott@mswdenver.com

s/ Cosandra Foster
COSANDRA FOSTER
Paralegal Specialist
U.S. Attorney's Office
205 N. 4th Street, Suite 400
Grand Junction, CO 81501
Telephone (970) 241-3843
Fax (970) 248-3630
E-mail: cosandra.foster@usdoj.gov

| | 04/17/2011 1:50 PM | Mesa | Mesa | 04/18/2011 | 5 Days | 12/15/2011 |
|---|---|---|---|---|---|---|

| Victim | Allegation Severity/Category/Type | Perpetrator | Finding |
|---|---|---|---|
| K W | Minor - Intra Familial Abuse - Sexual | K B | Report Unfounded |
| S B | Minor - Intra Familial Abuse - Sexual | K B | Report Inconclusive |

**Assessment Closure Summary**

A/N sexual abuse allegations regarding S J B (6, Caucasian) and K B (9, Caucasian). Sexual abuse allegations that K B (not FOC to either child, but ex husband to S was touching K in the past and must have done something recently to S after she made a disclosure. S and K interviewed at WSCC, K made no disclosure about sexual abuse and spoke only about prior physical abuse. This appears to have been previously investigated and concerns about DV between S and J S made a disclosure that K/J touched her one time with her clothes on with his finger, like a poke, around her vaginal area. S stated she was sitting on the couch playing kid games and J touched her "no no spot" she stated he said "don't" and that was all that he said and he poked her hard. S stated she was 5 1/2 when this happened. Both Kids made it clear they did not like K and have not had contact with him. Both children were set up with services at CWMH. The time line given by S doesn't line up with the time line given by S about when this could have happened, however with S's age and understanding of time this is not surprising. It appears similar allegations have been investigated in the past with recommendation that MOC follow up with services, which have happened sporadically. Allegations in 2007 that K touched S were Inconclusive as well. It seems that following up on services is paramount and was recommended to the family to continue with services until provider says they are not needed. CM unable to contact K to discuss the allegations and a time line of when he would have seen S for this reason the referral is Inconclusive. Services are recommended for both kids for a number of reasons including a possible future disclosure as children are more comfortable talking about past incidents of abuse. S has an extensive history with DHS and a new allegation was made 6/6/11 See that referral for info on new allegations. There are 15 prior referrals since 2001 that have been investigated and more that were NAFA. 10/07 lack of supervision was founded which resulted with K being placed in a foster home until the shelter hearing when he was returned home. All other investigations have been unfounded or inconclusive. Since 10/08 all referrals, 10/08, 12/08, 4/09, 10/10, and 12/10 have been Unfounded for abuse or neglect. Family has been recommended to access and follow up on community resources as that is needed for these children to have needs met and services for S is important due to her history of abuse as well. At this time Allegations for sexual abuse by K on S is INCONCLUSIVE and allegations for sexual abuse on K by K is UNFOUNDED. No services and No open case.

GOVERNMENT EXHIBIT 1
19-cr-00243-CMA-GPG

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Criminal Action No. 19-cr-00243-CMA-GPG

UNITED STATES OF AMERICA,

Plaintiff,

v.

1. MICHAEL TRACY McFADDEN,

Defendant.

---

**GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS STATEMENTS**

---

The United States of America, by and through Jeremy Chaffin and Andrea Surratt, Assistant United States Attorneys, hereby responds to Mr. McFadden's motion to suppress statements he made during a non-custodial interview with law enforcement. ECF # 63. Mr. McFadden's statements were voluntary, and his motion should be denied.

BACKGROUND

On December 19, 2012, Grand Junction Police Department ("GJPD") detective Ed Prescott, called Mr. McFadden on the telephone.[1] Detective Prescott explained that he was conducting an investigation related to some allegations made by I.S. and that he would like to ask Mr. McFadden some questions. The two engaged in brief

[1] A copy of the recording and a transcript of the call were provided in discovery and can be provided to the Court if requested.

conversation. Mr. McFadden ultimately agreed to meet with Detective Prescott at the GJPD.

Later that same day, Mr. McFadden arrived at the GJPD and met with Detective Prescott. That interview was recorded.[2] At the outset, and throughout the interview, Mr. McFadden it was clear that Mr. McFadden was not under arrest and that he could leave if he wished. During the interview, Mr. McFadden largely denied the allegations. At the conclusion, he left of his own accord.

Mr. McFadden was later charged for several state offenses involving acts of child molestation of multiple victims. During his state cases, Mr. McFadden moved to suppress any statements he made during his interview as involuntary. The district court heard evidence and concluded his statements were voluntary. Exhibit 1 (INV_TRAN_00001350-1353). Mr. McFadden was later convicted and appealed. His convictions were overturned solely on speedy trial grounds. Based on some of the same acts of child molestation Mr. McFadden had been convicted of committing on J.W. and K.W., a federal grand jury returned an indictment against Mr. McFadden in 2019. ECF # 1. Three years after his indictment, Mr. McFadden now seeks to relitigate the voluntariness of statements he made in his interview nearly a decade ago. ECF # 81.

DISCUSSION

Mr. McFadden claims that his statements, made during a non-custodial interview that he attended voluntarily and left of his own accord, were involuntary and should be

[2] A copy of the recording and a transcript of the interview were provided in discovery and can be provided to the Court if requested.

suppressed.  Mr. McFadden's motion should be denied for at least two reasons.

First, Mr. McFadden has already fully litigated this issue.  Under similar circumstances, other Courts in this circuit have found that the doctrine of collateral estoppel would prevent a defendant from reasserting identical arguments in support of a motion to suppress.  See *United States v. Yung*, 786 F.Supp 1561, 1564-65 (D. Kan. 1992); *United States v. Campbell*, 2009 WL 361155 at *3 (D. Kan. 2009).  However, the government acknowledges that the Supreme Court has expressed doubt that collateral estoppel can be applied in a criminal case.  *See Currier v. Virginia*, ___ U.S. ___, ___, 138 S.Ct. 2144, 2154-55 (2018).  Nevertheless, in prior cases Courts have, in an abundance of caution, incorporated prior orders by reference in subsequent rulings. See *Campbell*, at *3.  The Court can simply recognize that Mr. McFadden has had a full and fair opportunity to litigate this matter, adopt the transcript of those proceedings into the record, and deny his motion.  That is what the government recommends here.

Second, even if the Court is willing to entertain this matter anew, there is no basis in law or fact to suppress Mr. McFadden's statements.

A defendant's involuntary statements are not admissible.  *United States v. Lopez*, 437 F.3d 1059, 1063 (10th Cir. 2006).  The government bears the burden of proving, by a preponderance of the evidence, that a defendant's statements were voluntary.  *Id.*  In evaluating this matter, courts consider the totality of the circumstances including various factors: "(1) the age, intelligence, and education of the defendant; (2) the length of detention; (3) the length and nature of the questioning; (4) whether the defendant was advised of his constitutional rights; and (5) whether the defendant was subject to

physical punishment." *Id.* at 1064-64.  However, "coercive police activity is a necessary predicate" to finding a defendant's statements were involuntary. *Colorado v. Connelly*, 479 U.S. 157, 167 (1986).

Here, Mr. McFadden alleges he was "implicitly if not explicitly threatened in the lead up" to his interview and that he "was given the impression that he had no choice but to submit to an interview."  It is unclear how this is possibly true.  Mr. McFadden was invited to meet with Detective Prescott in a recorded phone call.  He chose to accept, coming down to the police station of his own accord.  They then met in an interview room, where it was immediately explained that it was an informal interview, and the door to the room was closed only for privacy.  Throughout the interview, Mr. McFadden was reminded that he was not under arrest and that he could leave if he wished, which he was permitted to do at the conclusion of the interview.  At no point did Detective Prescott, or the officer that later participated in the interview, engage in any coercive conduct that overbore Mr. McFadden's will.  Absent coercive police activity the inquiry simply ends.  *Connelly*, 479 U.S. at 167.

Even assuming police overreaching occurred, which the government disputes, the totality of the circumstances clearly establish that Mr. McFadden's statements were voluntary.  At the time of the interview, Mr. McFadden was 41 years old, and reasonably well-educated and intelligent.  He was never detained, nor subjected to any physical punishment.  Instead, he participated in an interview for approximately two hours that was largely conversational.  At the conclusion of that interview, he was informed that the investigation would continue and he was permitted to leave.  Nothing from this incident

suggests Mr. McFadden's will was overborne. Indeed, Mr. McFadden largely denied any criminal conduct.

CONCLUSION

Mr. McFadden has already litigated the voluntariness of his statements and a court has concluded they were voluntary. Furthermore, the totality of the circumstances surrounding Mr. McFadden's interview demonstrates that his statements were voluntary. This Court should deny his motion to suppress.

Respectfully submitted,

COLE FINEGAN
United States Attorney

| *s/ Jeremy Chaffin*<br>JEREMY CHAFFIN<br>Assistant U.S. Attorney<br>U.S. Attorney's Office<br>205 North 4th Street, Suite 400<br>Grand Junction, CO 81501<br>Tel: (970) 257-7113<br>Fax: (970) 248-3630<br>E-mail: jeremy.chaffin@usdoj.gov | *s/ Andrea Surratt*<br>ANDREA SURRATT<br>Assistant U.S. Attorney<br>U.S. Attorney's Office<br>1801 California Street, #1800<br>Denver, Colorado 80101<br>Tel: (303) 454-0100<br>E-mail: andrea.surratt@usdoj.gov |
|---|---|

Attorneys for the Government

Case 1:19-cr-00243-CMA-GPG Document 187 Filed 10/06/22 Page 6 of 6

**CERTIFICATE OF SERVICE**

I hereby certify that on this 6th day of October, 2022, I electronically filed the foregoing **GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS STATEMENTS** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following e-mail address:

**Defense Attorney:**
Sean M. McDermott

**Email Address:**
smcdermott@mswdenver.com

s/ Cosandra Foster
COSANDRA FOSTER
Paralegal Specialist
U.S. Attorney's Office
205 N. 4th Street, Suite 400
Grand Junction, CO 81501
Telephone (970) 241-3843
Fax (970) 248-3630
E-mail: cosandra.foster@usdoj.gov

DISTRICT COURT, COUNTY OF MESA, STATE OF COLORADO

CASE NOS. 2013 CR 000027, 2013 CR 000339, and
2013 CR 000342, DIV. 5

---

REPORTER'S TRANSCRIPT (Motions Hearing)

---

IN THE MATTER OF

THE PEOPLE OF THE STATE OF COLORADO,

Plaintiff,

v.

MICHAEL TRACY MCFADDEN,

Defendant.

---

The above-entitled matter came on for hearing on Monday, August 25, 2014 at 10:33 a.m. before the HONORABLE THOMAS DEISTER, District Judge.

APPEARANCES:

FOR THE PLAINTIFF: DAVID WAITE

FOR THE DEFENDANT: KARA SMITH
SCOTT BURRILL

ALSO PRESENT: MICHAEL MCFADDEN
DEB BAILEY

GOVERNMENT
EXHIBIT
1
19-cr-00243-CMA-GPG
PENGAD 800-631-6989

was then making rulings based off of that. And so concerning the motion to suppress Michael McFadden's statement, this only applies to 13CR27 because I think that was the only case in which he was interviewed.

The motion itself is denied. I can make a much more elaborate ruling in a moment, but it does need to be redacted. Any reference to the voice stress analysis needs to be eliminated, as an example. Now I know that during that process there were some statements made about factual matters leading up to the voice stress analysis. Now those would be admissible, but references to the voice stress analysis, the testing being done, the explanation that was provided, after it was done the commentary by the officer, "I think you lied," all of that is out. But factual matters concerning the questions that were asked on which Mr. McFadden was asked factually about this incident would be fair game.

However, I think in that -- correct me if I'm wrong -- but he was asked to lie about certain things, so -- do you recall that?

MS. SMITH: Uh-huh.

THE COURT: Those statements are not admissible where he was being directed to lie about certain things for purposes of establishing a baseline for lying.

MR. WAITE: Right.

THE COURT: So I think you have to be very careful about what's admitted there, but I think that there were statements about did you do this, did you do this, did you do this. Those -- as long as he wasn't instructed to lie about those I think his answers concerning those matters are part of the interview that would be admissible. Is that clear for everybody?

MS. SMITH: I think so.

MR. WAITE: Yes, I think so.

THE COURT: Now concerning this what I found was that Mr. McFadden was not in custody. He had come down voluntarily. He drove himself down, he was not arrested while he was there. He left. I think he -- I think I recall here that this was an incident where they were talking about the voice stress analysis thing, I think there was an issue about whether he could come back or not and they said no, that it couldn't be done.

So I think Mr. McFadden then went out and spoke to somebody, family members or someone that was with him. Am I right? Did that occur here? And so he spoke to them and then he came back in and then went through the voice stress analysis. Or he called somebody. I don't remember what the deal was. It seemed like there was a break somewhere in there.

MS. SMITH: I do think the Court might be getting

that confused with --

THE COURT: Duke?

MS. SMITH: Klaasen. Does the Court remember Mr. Klaasen?

THE COURT: No, I remember that. Well anyway --

MS. SMITH: But I do think there was a break of some sort.

THE COURT: And I don't know if it was smoking or what the deal was, but anyway, I found that there was no force, threat, coercion. There was -- that there certainly was no arrest, there was no handcuffing. I think the officers let him know that the door was closed for just a limited reason, for privacy sake, and he could leave at any time. All of that was provided throughout, at the early onset. Though he was not advised of Miranda, Miranda was not required.

This was conversational throughout and very chatty. In fact, Mr. McFadden actually volunteered lots of information, even without questions. Detective Prescott started the interview with the doors shut just for privacy, and confirmed that he was down there on his own. It was just entirely conversational.

Also it's generally exculpatory because the defendant talked about I didn't do this. I think he said that repeatedly, "I did not touch I. I have never touched

I.'s penis." Bottom line is, when all was said and done he wasn't arrested and he walked out, just as he'd been promised he could do.

When I talked about the tone being very conversational, there was laughter during this, talking about a variety of things. It was very, very conversational back and forth between Mr. McFadden and Mr. Prescott.

There was a little more confrontation when Mr. Ansell (ph) entered the picture, but again, during this time period Sgt. Ansell said, "Any time you want to leave just say so and you'll walk out." So I can't find that there's any basis whatsoever to exclude the statement made by Mr. McFadden. Looking at all the circumstances he was never in custody, it was entirely conversational.

Among the things that I consider is that Mr. McFadden is experienced in the legal system. He has talked about that during this interview, about the things that have happened in his past, and so he clearly was not in any way either in custody or in any way talking involuntarily. The statements are entirely voluntary and that the statement is -- the motion to suppress is denied.

I think that's all I would be prepared to rule on now. I think the other ones -- let me see what they are.

MS. SMITH: Your Honor, I have two questions, I think. I filed a motion for a bill of particulars in all

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Criminal Action No. 19-cr-00243-CMA-GPG

UNITED STATES OF AMERICA,

Plaintiff,

v.

1. MICHAEL TRACY McFADDEN,

Defendant.

---

**GOVERNMENT'S REPLY TO DEFENDANT'S OBJECTION TO GOVERNMENT'S NOTICE OF INTENT TO INTRODUCE EVIDENCE PURSUANT TO FEDERAL RULES OF EVIDENCE 414, 404(b), AND 807**

---

The United States of America, by and through Jeremy Chaffin and Andrea Surratt, Assistant United States Attorneys, hereby responds to Mr. McFadden's motion seeking to exclude evidence the government intends to introduce pursuant to Rules 414, 404(b), and 807 of the Rules of Evidence.[1] ECF # 79. Mr. McFadden's challenge should be denied.

**OTHER ACT EVIDENCE**

Mr. McFadden alleges that the evidence the government intends to introduce under Rule 414 is unfairly prejudicial and unreliable. He is mistaken.

A defendant's prior acts of child molestation may be admitted under Rule 414 of the Federal Rules of Evidence, if certain criteria are met: 1) the defendant must be accused of an offense of child molestation in the case; 2) the evidence proffered must

[1] Although the Mr. McFadden characterizes his motion as an objection or a response to the government's prior notice, it is more appropriately considered a motion to exclude the noticed evidence.

be evidence of the commission of another offense of child molestation; and 3) the evidence must be relevant. *United States v. Sturm*, 673 F.3d 1274, 1282 (10th Cir. 2012). Mr. McFadden does not appear to dispute these matters.

Because it is undisputed that the proffered evidence meets the criteria for admission under Rule 414, the Court must then look to Rule 403's balancing test to determine whether the evidence must nevertheless be excluded. Under this rule, the Court must determine whether the probative value of the evidence is "substantially outweighed by the danger of unfair prejudice." F.R.E. 403; *United States v. Perrault*, 995 F.3d 748, 765 (10th Cir. 2021). Importantly, Rule 414 evidence is not "unfairly prejudicial" simply because it shows a propensity to commit sexual assault, such prejudice is not unfair since the rule explicitly permits admission of the evidence for that purpose. *Id.* (quoting Charles Alan Wright & Arthur R. Miller 23 Fed. Prac. & Proc. Evid. § 53787 (2d ed.)). And, "the exclusion of relevant evidence under Rule 403 should be used infrequently, reflecting Congress' legislative judgment that [Rule 414] evidence 'normally' should be admitted." *United States v. Enjady*, 134 F.3d 1427, 1433 (10th Cir. 1998).

In evaluating the relative probative value and danger of unfair prejudice attributable to Rule 414 evidence, courts must consider generally proceed in two phases. First, courts consider the four "*Enjady*" factors:

> 1) how clearly the prior act has been proved; 2) how probative the evidence is of the material fact it is admitted to prove; 3) how seriously disputed the material fact is; and 4) whether the government can avail itself of any less prejudicial evidence.

*Id.* at 1433 (citation omitted). Next, courts analyze the probative dangers, considering three additional factors.

> 1) how likely is it such evidence will contribute to an improperly-based jury verdict; 2) the extent to which such evidence will distract the jury from the central issues of the trial; and 3) how time consuming it will be to prove the prior conduct.

*Id.* It is here that Mr. McFadden claims the evidence fails to pass muster. However, Mr. McFadden misapplies the law and misapprehends the facts.

**1. The 414 evidence has been clearly established.**

Mr. McFadden primarily devotes his challenge to the alleged unreliability of the proffered evidence. In other words, Mr. McFadden believes that the prior acts have not been sufficiently established to be admitted. Yet Mr. McFadden seemingly ignores the applicable standard and the history of this case.

For the proffered evidence to be admissible, the Court need only "make a preliminary finding that a jury could reasonably find by a preponderance of the evidence that the 'other act' occurred." *Id.* (citation omitted). And here, most of the proffered 414 evidence was found to have occurred beyond a reasonable doubt by a jury in Mr. McFadden's underlying state trial or was admitted by Mr. McFadden. Indeed, only L.W.'s more recent disclosures have not yet been established beyond a reasonable doubt. Given the jury's certainty that Mr. McFadden committed acts of child molestation on J.W., K.W., I.S., E.S., S.J.W., and D.R.; and Mr. McFadden's plea of guilty to a similar act of child molestation committed on M.S., this Court can easily conclude that a jury could reasonably find that the acts alleged to have been committed on L.W. also occurred.

**2. The 414 evidence is highly probative.**

Mr. McFadden also seems to suggest that the proffered evidence lacks probative value. The Tenth Circuit has set forth several factors to guide such an analysis:

(1) the similarity of the prior acts and the charged acts, (2) the time lapse between the other acts and the charged acts, (3) the frequency of the prior acts, (4) the occurrence of intervening events, and (5) the need for evidence beyond the defendant's and alleged victim's testimony.

*United States v. Benally*, 500 F.3d 1085, 1090–91 (10th Cir. 2007). Each of these factors favor admission.

First, the proffered 414 evidence is highly similar. Indeed, the bulk of the proffered 414 evidence, in terms of duration of testimony, will likely be other acts of child molestation committed by Mr. McFadden on J.W. and K.W., the charged victims in this case.[2] *See* ECF # 39, pp. 4-8. The acts of child molestation committed on the other victims are also highly similar. All of the victims describe a similar pattern of grooming behavior in which Mr. McFadden frequently showered the children with gifts, catered to their wishes, allowed them to sleep in his bed, and ultimately exposed them to increasingly sexualized behavior.[3] Generally Mr. McFadden molested the children while they were sleeping, and in several instances after they were given something that caused them to become sleepy. The children all described similar acts of child molestation, committed in a similar manner in the same locations. Even the acts committed by Mr. McFadden on S.J.W., which he alleges are dissimilar based on her gender, bear striking similarity to the testimony of the other victims.

---

[2] As the government has previously noted, the charged acts in this case occurred as part of long-standing pattern of abuse committed by Mr. McFadden on these victims. Because the charged acts occurred during and amid various other acts of child molestation committed by Mr. McFadden, the government asserts such evidence is intrinsic evidence and admissible independent of Rule 414. ECF # 39, pp. 16-17. Of course, such evidence also falls within the ambit of Rule 414.

[3] Although the government provided notice of grooming behavior and use of sleep aides under Rule 404(b), the government primarily believes that this evidence is part and parcel of Mr. McFadden's prior acts of child molestation. *See United States v. Perrault*, 995 F.3d 748, 770 (10th Cir. 2021) (concluding evidence showing a defendant's pattern of gift-giving and grooming methods was admissible under Rule 414).

Second, besides M.S., Mr. McFadden committed acts of child molestation on all of the children identified in the government's notice during the same time period. Indeed, the proffered 414 evidence was identified during a single ongoing investigation and came to light all at the same time. In addition to making this evidence highly relevant to the matters the government must establish, the closeness in time of all of the assaults also seems to be the crux of Mr. McFadden's defense, that all of these children are simply parroting each other's allegations.

Next, Mr. McFadden engaged in the alleged acts of child molestation on a frequent and regular basis. J.W. explained he was molested by Mr. McFadden hundreds of times. K.W. likewise explained that he was molested by Mr. McFadden "a lot." I.S., E.S., and L.W. similarly stated that they had molested on multiple occasions. The frequency and regularity of these acts make the 414 evidence all the more probative. After all, without such evidence it will be impossible for the jury to understand how acts of child molestation could ever be "normal" as J.W. describes them or why he has such difficulty narrowing the timeframe within which particular acts occurred.

Finally, there are no intervening events that would render this evidence inadmissible, and the evidence reduces the likelihood that the trial will devolve into a "swearing match" between the charged victims and Mr. McFadden. *See Enjady*, 134 F.2d at 1431.

Simply put, the Rule 414 evidence is highly probative of Mr. McFadden's intent to engage in sexual activity with J.W. and K.W. when he took them across state lines, his motive for doing so, his preparation and planning in grooming these children, absence of any mistake or accident, and his propensity to molest young children.

**3. The material facts are highly disputed.**

Mr. McFadden does not clearly discuss this factor. Instead, he simply asserts that the "uncharged conduct is vehemently disputed." ECF # 79, p. 14. Implicit in that assertion is that the material facts that the uncharged conduct is offered to prove are also "vehemently disputed." Yet, contrary to Mr. McFadden's implication, this supports admission. After all, "the more seriously disputed the material fact, the more heavily this factor weighs in favor of admissibility." *Sturm*, 673 F.3d at 1286.

**4. No other factor weighs against admissibility.**

Beyond the challenges discussed above, Mr. McFadden does not assert any further grounds for excluding the proffered 414 evidence. Nevertheless, the government briefly address the remaining factors.

First, there is no less prejudicial evidence available in this matter to establish the material facts that the government must establish. If that were the case, the government would pursue that evidence.

Next, the evidence is unlikely to result in an improperly-based verdict. To be sure, the proffered evidence may have an emotional impact on the jury. *See Perrault*, 995 F.3d at 770. But that is true of all Rule 414 evidence and is not a basis to exclude it. If it were, Rule 414 evidence could rarely, if ever, be admitted. *Id.* Moreover, any potential for an improperly-based verdict can be adequately addressed with a cautionary instruction. *Id.*

Finally, the evidence will neither distract the jury from the central issues of the trial—the evidence is directly related to the central issues—nor will it be time-consuming to introduce. The government simply intends to present the testimony of the Rule 414 witnesses describing the acts Mr. McFadden committed on them

After considering all of the factors, it is clear that the Rule 414 evidence proffered in the government's notice is highly probative. Although there may be some risk of unfair prejudice, that risk does not substantially outweigh the probative value of the evidence. Accordingly, this Court must reject Mr. McFadden's challenge to the evidence.

For similar reasons, the government also asserts that Mr. McFadden's cursory challenge to the admissibility of evidence under Rule 404(b) is without merit. The government otherwise relies on its prior arguments in favor of admissibility under Rule 404(b). ECF # 39, pp. 20-22.

## RULE 807 EVIDENCE

Mr. McFadden also contends that a 33-minute audio- and video-recorded interview of K.W. in which K.W. describes Mr. McFadden's assault of him during an interstate truck trip to Nebraska is not admissible pursuant to Federal Rule of Evidence 807. Mr. McFadden is incorrect.

The January 16, 2013, interview of K.W. is described in detail in the government's filing from December 2, 2020, giving notice of the government's intent to introduce the video as evidence pursuant to Rule 807 (the "Notice"). ECF #39. A transcript of the interview was filed as Exhibit 1 to the Notice. ECF #39-1. A copy of the recording will be provided as Exhibit A for the Court's review.

Federal Rule of Evidence 807 provides:

> (a) In General. Under the following conditions, a hearsay statement is not excluded by the rule against hearsay even if the statement is not admissible under a hearsay exception in Rule 803 or 804:
>
> (1) the statement is supported by sufficient guarantees of trustworthiness—after considering the totality of circumstances under which it was made and evidence, if any, corroborating the statement; and

> (2) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts. . . .[4]

Courts have held that "[t]he residual hearsay exception is to be used rarely, and only in exceptional circumstances that generally exist when a child sexual abuse victim relates the details of the abusive events to an adult." *United States v. Gallardo*, 970 F.3d 1042, 1046 (8th Cir. 2020); *see also United States v. W.B.*, 452 F.3d 1002, 1005 (8th Cir. 2006) ("[E]xceptional circumstances generally exist when a child victim of sexual abuse is unable or unwilling to testify to a material issue regarding the abuse."). Indeed, the Tenth Circuit has noted that though Rule 807 "should be used only in extraordinary circumstances where the court is satisfied that the evidence offers guarantees of trustworthiness and is material, probative and necessary in the interest of justice[,] . . . courts regularly employ the residual exception in child abuse litigation." *United States v. Harrison*, 296 F.3d 994, 1003 (10th Cir. 2002) (internal citations omitted).

In determining whether hearsay statements made by a child in a sexual assault case are reliable for purposes of Rule 807, the court should consider "the spontaneity of the child's statement, the consistent repetition of the child's allegation, the mental state of the child, the use of terminology unexpected of a child of a similar age, and the lack of a motive to fabricate" as well as the length of time that had passed between the abuse and the statement. *United States v. Tome*, 61 F.3d 1446, 1452-53 (10th Cir. 1995) (discussing admissibility under prior residual hearsay exception in Rule 803(24)). To admit a child's hearsay statement regarding sexual abuse, the court must consider

---

[4] Rule 807 was amended in December 2019. The Committee Notes, however, explain that Rule 807 was "amended to fix a number of problems that the courts have encountered in applying it." The amendment, therefore, does not appear to invalidate the body of pre-2019 case law interpreting the Rule.

whether the child "was particularly likely to be telling the truth when the statement was made." *Id.* at 1452.

In *Harrison*, a child victim of sexual assault repeated the details of assaults at the hands of her mother's partner to law enforcement officers and others. Before trial, however, the victim recanted her story entirely and ultimately testified for the defendant. *Harrison*, 296 F.3d at 998-99, 1001. At trial, the district court admitted the victim's out of court statement to law enforcement pursuant to Rule 807. In affirming the district court's decision, the Tenth Circuit found persuasive the consistency of the victim's statements, the "professionalism of the law enforcement interrogator who elicited the statement," and the level of detail of the statements. *Harrison*, 296 F.3d at 995. When balanced against the countervailing considerations, such as the declarant's "possible motive to lie" and the length of time that had elapsed between the abuse and the disclosure (more than four years), the Court determined that the child victim's statements had "adequate indicia of reliability" to be admissible pursuant to Rule 807. *Id*.

**1. K.W.'s statement is supported by sufficient guarantees of trustworthiness.**

In connection with Mr. McFadden's underlying state trial, the prosecutor gave notice of his intent to introduce prior, out-of-courts statements of J.W., K.W., I.S., E.S., S.J.W., and D.R. pursuant to C.R.S. § 13-25-129, which provides "[a]n out-of-court statement made by a child . . . describing any act or attempted act of sexual contact, intrusion, or penetration . . . performed or attempted to be performed with, by, on, or in the presence of the child declarant, not otherwise admissible by a statute or court rule which provides an exception to the objection of hearsay, is admissible in evidence in any criminal . . . proceedings in which a child is a victim of an unlawful sexual offense."

Co. Rev. Stat. § 13-25-129. The statute requires the court to find "in a hearing conducted outside the presence of the jury that the time, content, and circumstances of the statement provide sufficient safeguards of reliability" and also requires that the child victim testify at trial or be unavailable as a witness, coupled with corroboration of the act that is the subject of the statement. *Id*.

In support of the state prosecutor's motion, now-retired Grand Junction Police Department Detective Ed Prescott testified at various pretrial hearings about his investigation of the defendant, including the interviews he conducted with the victim children. Transcripts of portions of Detective Prescott's state court testimony are attached as Exhibits B and C. Detective Prescott testified about his 20 years of experience with the Grand Junction Police department, and explained his duties include the investigation of sexual assaults on children. INV_TRAN_788, Ex. B at 4. Detective Prescott has been trained in forensic interview techniques since 2010 and has undergone additional training since then. INV_TRAN_823-24, Ex. B. at 39-40. He is familiar with the protocols involved in forensic interviewing. INV_TRAN_825, Ex. B. at 41. He explained that, in Mr. McFadden's case, he conducted forensic interviews of all the victim children known to him. INV_TRAN_789, Ex. B at 5.

Detective Prescott testified at length about how he conducts forensic interviews. He explained that, at the outset, he attempts to determine whether the children can tell the difference between "the truth and a lie." INV_TRAN_831, Ex. B at 47. Detective Prescott explained that he is trained to "interview and not lead or mislead a child and draw information out from them and not introduce information to them." INV_TRAN_823, Ex. B at 39. Typically, Detective Prescott hopes to get children to discuss the events in question "in a narrative if at all possible," but if the children will not

speak in a narrative form, he may "have to prompt them with questions." INV_TRAN_823, Ex. B at 42. Two major principles of forensic interviewing are to refrain from leading the children—that is, "not give them the answers in the questions"—and to not be suggestive. INV_TRAN_828, Ex. B at 44. Though, Detective Prescott explained, sometimes it is necessary to ask multiple choice questions of children who are struggling to provide a narrative. INV_TRAN_828-29, Ex. B at 44-45. Part of the process includes attempting to "determine whether [the children] have been coached." INV_TRAN_830, Ex. B at 46. While the circumstances of Detective Prescott's interviews differed from child to child, in each Detective Prescott endeavored to follow the protocols on which he had been trained in order to get "a reliable statement" from the victims by encouraging the "child to speak freely on their own." INV_TRAN_1138, 1140; Ex. C at 7, 9. With respect to K.W. ("K.WE." in the transcript), Detective Prescott explained that the interview was at the Dolphin House in Montrose, and occurred with only K.W. in the room. INV_TRAN_803, Ex. B at 19. He testified that K.W. was "age appropriate in his communication and the ability he had to communicate . . . and talk . . . freely." INV_TRAN_837, Ex. B at 53.

Ultimately, the court ruled that the out-of-court statements made by each of the children were admissible—with the exception of D.R.'s, which the court found did not "internally include a statement of sexual contact," as required by the Colorado statute. An excerpt from this transcript is attached as Exhibit D. As it pertains to K.W.'s statements ("K." in the transcript), the court found that while K.W.'s statement was "not spontaneous," K.W. spoke in "age appropriate language," determined that Detective Prescott did not prompt K.W. with leading questions, and concluded that there was no evidence of "bias against the Defendant" or "motive for lying." INV_TRAN_1436; Ex. D

at 11.  The court noted it was unaware of "any type of intervening event from the alleged abuse to disclosure."  INV_TRAN_1436; Ex. D at 11.  Moreover, the court found that K.W. "told a fairly elaborate story with substantial detail [which] provide[d] sufficient indicia of reliability for admission under 13-25-129."  INV_TRAN_1437; Ex. D at 12.  The out-of-court statements made by J.W., K.W., I.S., E.S., and S.J.W. were subsequently admitted at the underlying state trial and played for the jury.[5]

Here, of course, the government does not seek to admit pursuant to Rule 807 all of the victims' out-of-court statements regarding the abuse they suffered.  Rather, the government seeks to admit only K.W.'s January 16, 2013, recorded interview.  To the extent the Court determines additional testimony is necessary on this matter, the government will be prepared to call Detective Prescott.  The government anticipates that, if necessary, Detective Prescott would testify consistent with his testimony in the state court proceeding and explain the methods that he uses in interviews to elicit reliable information from victims such as K.W.  As described above, Detective Prescott's interview techniques are one way in which K.W.'s recorded statement is supported by a sufficient guarantee of trustworthiness. *Tome*, 61 F.3d at 1453 (in determining trustworthiness of out-of-court statement of child victim, noting interviewer's training and

---

[5] Accordingly, Mr. McFadden has already fully litigated the issue of reliability of K.W.'s prior statement in connection with his state court case.  Under similar circumstances, other courts in this circuit have found that the doctrine of collateral estoppel would prevent a defendant from reasserting identical arguments in support of a motion to suppress.  *See United States v. Yung*, 786 F.Supp 1561, 1564-65 (D. Kan. 1992); *United States v. Campbell*, 2009 WL 361155 at *3 (D. Kan. 2009).  However, the government acknowledges that the Supreme Court has expressed doubt that collateral estoppel can be applied in a criminal case.  See *Currier v. Virginia*, ___ U.S. ___, ___, 138 S.Ct. 2144, 2154-55 (2018).  Nevertheless, in prior cases courts have, in an abundance of caution, incorporated prior orders by reference in subsequent rulings. *See Campbell*, at *3.  The Court can simply recognize that Mr. McFadden has had a full and fair opportunity to litigate this matter, adopt the transcript of those proceedings into the record, and—after concluding that the second prong of Rule 807 is satisfied, as described below—deny his motion.

experience in interviewing children who were victims of abuse).

K.W.'s statements are also supported by sufficient guarantees of trustworthiness in other ways. Until recently, when, as described below, K.W. professed a lack of memory about the assaults, K.W.'s statements about the assaults have been consistent. Indeed, in the state prosecution in this matter, K.W. testified to the assault in the semi-truck and the local instances of molestation; K.W.'s testimony is attached as Exhibit E. INV_TRAN_2733-82; Ex. E at 1-50 (K.W. is identified as "K.H.W." in this portion of the state trial transcript). The interview the government seeks to introduce was conducted close in time to the assaults, which ended approximately two weeks prior to the interview. *Harrison*, 296 F.3d at 1005 (affirming district court's decision, pursuant to Rule 807, to admit out-of-court statements made years after sexual assault on a child). In the interview, K.W. uses terminology consistent with his age, such as "no-no" to describe both his penis and anus. K.W. also described the abuse in detail and distinguished between the assault that occurred in the semi-truck with the pattern of abuse that occurred at Mr. McFadden's home. *See Harrison*, 296 F.3d at 1005 (noting that "specificity and peculiarity" of the child's statement is relevant because "those features in themselves can suggest trustworthiness"). K.W. had no reason to fabricate statements during his forensic interview; to the contrary, he explained that he did not want to have to stop visiting Mr. McFadden's home. ECF #39-1 p.28. And, unlike many of the cases in which courts have introduced hearsay evidence of sexual assault on a child, K.W.'s statements were recorded, so the jury will have an opportunity to observe and evaluate K.W.'s demeanor.

While no one else witnessed the assaults themselves—an almost universal feature of sexual assaults—K.W.'s statements are corroborated in other ways. For

instance, K.W. described the sleeping arrangements in the semi-truck during the final assault in Nebraska. K.W.'s older brother, S.W., who was on the final trip to Nebraska, corroborated K.W.'s account of the sleeping arrangements and that he did not wake up during the night—as K.W. had described—explaining that he is a heavy sleeper. INV_GJPD_206-07; INV_FBI_181 (recording). K.W. also described the home where Mr. McFadden assaulted him repeatedly before the final semi-truck trip. Though K.W. could not recall the address, he described the area and the home in detail consistent with other witnesses.

In his objection to the government's Notice, Mr. McFadden claims that the circumstances surrounding K.W.'s disclosure makes it—and the statements in the video—unreliable. Mr. McFadden relies heavily on the lack of a disclosure prior to his arrest, and that K.W. first disclosed that Mr. McFadden had sex with J.W. In Mr. McFadden's view, K.W.'s "delayed" disclosure of the abuse Mr. McFadden inflicted upon him until he was safely home and meeting with a counselor somehow renders the disclosure unreliable. ECF #59 p.10, 15-16.

Of course, none of these facts render K.W.'s recorded statements unreliable. That K.W. first—and, as it happens, truthfully—told his mother about his suspicions about J.W.'s abuse before disclosing his own abuse has no bearing whatsoever on whether K.W.'s disclosure in the January 16, 2013, interview was reliable. What Mr. McFadden characterizes as K.W.'s "delayed statement" following the arrest was, in fact, only approximately two weeks after Mr. McFadden's abuse of K.W. had concluded. Pointing to the "long history of interaction" that K.W. and his family have had with him, Mr. McFadden seems to fault K.W. for not disclosing the abuse as it was ongoing and instead waiting until after Mr. McFadden's arrest. ECF #59 p.15.

But, this suggestion is entirely contrary to typical disclosure patterns, especially in child victims of sexual assault. Cheryl Young, a marriage and family therapist at Behavior Health and Wellness in Grand Junction, testified at Mr. McFadden's underlying state trial as a blind expert and addressed issues associated with disclosure of sexual assault; a transcript of her testimony is attached as Exhibit F.[6] She explained to the jury various factors that influence when and how a child might disclose sexual abuse. In particular, male children are less likely to "outcry" than female children, especially if the offender is of the same sex as the victim. INV_TRAN_3116; Ex. F at 11. Ms. Young noted that "[a] really significant factor" in disclosure is the "closeness that the child has to the Offender" explaining that "the closer and more dependent the child is . . . [to] an Offender, the less likely [it will be] to get a very quick outcry." INV_TRAN_3116-17; Ex. F at 11-12. In fact, delayed outcry is most common if "the Offender is close to the family, a member of the family and trusted by the family." INV_TRAN_3132; Ex. F. at 27. Moreover, delayed outcry is not at all unusual. Ms. Young testified that only 32-42% of victims will outcry within a year of the "last offense" and up to 70% of victims do not outcry in childhood at all. INV_TRAN_3119; Ex. F at 14. In young victims, a failure to immediately recognize that what happened was, in fact, sexual abuse may also delay outcry. INV_TRAN_3119-20; Ex. F at 14-15. Thus, that K.W. did not disclose Mr. McFadden's abuse for a mere two weeks after the abuse stopped, and after Mr. McFadden had been arrested and could no longer pose a danger to K.W. or other children, is not surprising. Rather, based on Ms. Young's testimony, K.W.'s outcry was relatively quick when compared to most child victims of sexual abuse. In short, the timing of K.W.'s disclosure does not in any way undermine its reliability.

[6] On September 26, 2022, the government provided notice pursuant to Rule 16(a)(1)(G) to Mr. McFadden's counsel of its intent to call Ms. Young at the upcoming federal trial.

Case 1:19-cr-00243-CMA-GPG Document 83 filed 12/17/20 USDC Colorado Page 16 of 19

Given the totality of the circumstances of K.W.'s January 16, 2013, interview, the Court should conclude—as did the state court judge considering the same issue—that K.W.'s audio- and video-recorded statement is "supported by sufficient guarantees of trustworthiness" to satisfy the first prong of Rule 807.

**2. K.W.'s recorded interview is the most probative on the point for which it is offered**

K.W.'s statements in the recorded interview pertain to Counts One and Two of the Indictment, which charge conduct occurring sometime between Christmas 2012 and January 3, 2013, in which Mr. McFadden took K.W. and two of his siblings on a commercial truck trip. During this trip, K.W. reported that Mr. McFadden and he slept in the sleeper compartment of the truck. During the night, K.W. woke up when he felt Mr. McFadden's penis touching his butt. K.W. said that Mr. McFadden put his penis inside K.W.'s butt and that it hurt. K.W. recounted these events in detail in the January 16, 2013, interview.

Subsequently, however, in 2018 and 2019, law enforcement interviewed K.W. about Mr. McFadden's abuse of K.W. Each time, K.W. professed to not remember much about the abuse or declared that he did not want to talk about it.[7]

Specifically, in 2018, when K.W. was 17 years old, he told FBI special agents that he does not "remember a lot, to be honest" since "[i]t's been forever ago." He acknowledged that the abuse that he suffered is both a topic he does not remember and that he does not like to talk about anymore. K.W. told the agents that Mr. McFadden would give him melatonin to help him sleep and K.W. recalls having awoken in Mr.

[7] Recordings and transcripts of these interviews have been provided in discovery. The government has not submitted the transcripts as Exhibits to this motion because they would require extensive redactions to protect K.W.'s privacy. Instead, the government has provided pertinent statements from these interviews. The government can provide the recordings and the transcripts to the Court if necessary.

McFadden's bed, which is not where he fell asleep. K.W explained that he figured out why Mr. McFadden was giving him melatonin when he "woke up one night and he was doing what he was doing." When pressed for details, however, K.W. said that he did not "remember anything" because he "pretty much shut that thought out of my head and just locked it away." K.W. stated that he "didn't know what was going on at first until he did something really bad." K.W. elaborated and stated that Mr. McFadden was pulling down K.W.'s pants and then "started to do what he was doing."

K.W. was asked about the truck trips and stated that he does not "remember a lot." He explained that "[s]ometimes" things would happen in the truck, but he does not "remember exactly where and stuff like that, because it was during the night" and he was often on melatonin. K.W. told agents the "last time something happened" was during a trip around Christmas, but that he does not "remember it all." When asked again if anything happened on that trip, K.W. stated that he did not remember. He added that that "[s]omething probably did," but "a lot of memories has been . . . forgotten." K.W. explained that "if something did happen, I pushed it aside, expecting something good in the morning." Later in the interview, he said that he did not want to talk about the truck trip and he did not remember the details. When asked to tell agents about a time that K.W. did remember, K.W. said that he did not "want to talk about it, to be honest" because it "bothers" him, and it is "one of the main reasons [he] started getting in trouble with the law." K.W. later described what Mr. McFadden did to him as rape and "touching inappropriately," but would not give details, explaining that he does not "really feel comfortable about anything."

In 2019, K.W. was interviewed again by an AUSA and an FBI special agent. K.W. remembered a truck trip near Christmastime with Mr. McFadden and his older and

younger brother. K.W. explained that he has tried to push old memories out of his mind, and when he was interviewed by Detective Prescott, it was "way fresher." K.W. confirmed that he told Detective Prescott the truth, did not make anything up, but may have "gotten the times wrong."

The government suspects that K.W. may persist in professing a lack of memory in his testimony at trial. For this reason, the recorded January 16, 2013, interview is "more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts." Moreover, even aside from K.W.'s recently professed lack of memory, his recorded statement was much closer in time to the abuse than any other statements he has made—or could make—and is also more probative for that reason.

## CONCLUSION

The government respectfully requests that the Court deny the defendant's motion to preclude the government's proffered evidence as described herein.

Respectfully submitted,

COLE FINEGAN
United States Attorney

*s/ Jeremy Chaffin*
JEREMY CHAFFIN
Assistant U.S. Attorney
U.S. Attorney's Office
205 North 4th Street, Suite 400
Grand Junction, CO 81501
Tel: (970) 257-7113
Fax: (970) 248-3630
E-mail: jeremy.chaffin@usdoj.gov

*s/ Andrea Surratt*
ANDREA SURRATT
Assistant U.S. Attorney
U.S. Attorney's Office
1801 California Street, #1800
Denver, Colorado 80101
Tel: (303) 454-0100
Fax: (303) 454-0400
E-mail: andrea.surratt@usdoj.gov

Attorneys for the Government

## CERTIFICATE OF SERVICE

I hereby certify that on this 10th day of October, 2022, I electronically filed the foregoing **REPLY TO DEFENDANT'S OBJECTION TO GOVERNMENT'S NOTICE OF INTENT TO INTRODUCE EVIDENCE PURSUANT TO FEDERAL RULES OF EVIDENCE 414, 404(b), AND 807** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following e-mail address:

**Defense Attorney:**
Sean McDermott

**Email Address:**
smcdermott@mswdenver.com

DISTRICT COURT, COUNTY OF MESA, STATE OF COLORADO

CASE NOS. 2013 CR 000027, 2013 CR 000339, and 2013 CR 000342, DIV. 5

---

REPORTER'S TRANSCRIPT (Motions Hearing)

---

IN THE MATTER OF

THE PEOPLE OF THE STATE OF COLORADO,

Plaintiff,

v.

MICHAEL TRACY MCFADDEN,

Defendant.

---

The above-entitled matter came on for hearing on Monday, April 28, 2014 at 10:49 a.m. before the HONORABLE THOMAS DEISTER, District Judge.

APPEARANCES:

FOR THE PLAINTIFF: DAVID WAITE

FOR THE DEFENDANT: KARA SMITH<br>SCOTT BURRILL

ALSO PRESENT: MICHAEL MCFADDEN<br>ED PRESCOTT

THE COURT: These are three cases, 13CR27, 339, and 342, all captioned, People v. Michael McFadden.

Mr. McFadden is here with counsel, Ms. Smith and Mr. Burrill. Mr. Waite is here for the People. I think Detective Prescott is here as an advisory witness. Ms. Bridges is here as the legal assistant for the D.A.

We have a number of motions, and I think they're pretty identical in each case, is that right?

MS. SMITH: Yes.

MR. WAITE: Yeah, for the most part I think that's probably true, Judge.

THE COURT: I know that there is -- actually, just seeing some -- well, there are these in camera review things. I've already issued an order concerning that. Have you all received copies of all those documents?

MS. SMITH: I think so, yeah.

THE COURT: That's been accomplished in all three cases. So you have a preference as to the order in which we do these? I don't know what witnesses you have available.

MR. WAITE: Well, Judge, I have Detective Prescott here who is going to be talking about the child hearsay motions to introduce child hearsay, and also with respect to the motion to suppress that's been filed in, I believe it's 13CR27.

So I guess my preference would be to get those

items taken care of first. I think they're going to take a chunk of time I think probably to get those all the way through. I don't know that we're going to get them through -- I'd be surprised if we get through all the motions today but we might. That would be my preference.

THE COURT: Why don't we get started with -- is that all right with you all? Because I know we have -- I think we have a motion to suppress Mr. McFadden's statements too?

MS. SMITH: Uh-huh.

THE COURT: So that's -- so we're looking at the 13-25-129 motions -- or notices and the suppression motion. Is that right?

MR. WAITE: Yes.

THE COURT: Let's do that.

MR. WAITE: Okay, call Detective Prescott to the stand, please.

THE COURT: Do you swear or affirm, under penalty of law, that the testimony you give here today will be the truth, the whole truth, and nothing but the truth?

THE WITNESS: I do.

Whereupon,

ED PRESCOTT

was duly sworn.

THE COURT: Please be seated.

MR. BURRILL: Your Honor?

THE COURT: Yes, sir?

MR. BURRILL: We have a request. Could we get one handcuff removed from Mr. McFadden so he can take notes?

THE COURT: Yes, you may. That request is granted.

MR. WAITE: Are we set?

MS. SMITH: Yes.

MR. WAITE: Okay.

DIRECT EXAMINATION

BY MR. WAITE:

Q. Good morning.

A. Good morning, sir.

Q. Would you state your name, please, and spell your last name for the record?

A. My name is Ed Prescott; it's P-R-E-S-C-O-T-T.

Q. And how are you employed?

A. I'm employed as a criminal investigator with the Grand Junction Police Department.

Q. And how long have you been so employed?

A. Over 20 years.

Q. And during the course of that is one of your duties to investigate sexual assault on a child cases?

A. Yes, sir, it is.

Q. Did you get involved in investigating a sexual

assault on a child case involving multiple victims with respect to a defendant by the name of Michael McFadden?

A. Yes, sir, I did.

Q. And in fact I think you spoke with Mr. McFadden at one point, and we'll come back to that, but I think you spoke to him at one point?

A. I did.

Q. Can you identify him in the courtroom by where he's sitting and what he's wearing, please?

A. He's sitting to your left at the counsel's table. He's wearing yellow pants, orange shoes and a brown short sleeve shirt. He has somewhat of a beard, full beard and short hair, brown hair.

MR. WAITE: Your Honor, I'd ask the record to reflect he has identified the defendant, Mr. McFadden.

THE COURT: The record will so reflect.

Q. (By Mr. Waite) During the course of investigating these cases, did you have occasion to speak to a number of children about allegations that were being made against Mr. McFadden?

A. I did.

Q. And with respect to each of those, did you do forensic interviews with respect to all of those children?

A. I did.

Q. Let's start with I.S. Was I.S. one of the

children that you spoke to?
A. He is.
Q. Is he one of the alleged victims in these cases?
A. He is.
Q. And did you do I think two interviews with the I.S.?
A. I did.
Q. And were those interviews recorded?
A. They were.
Q. Where did you do those interviews?
A. Both interviews with I.S. were at Western Slope Center for Children.
Q. Okay. And for the record what is -- is Western Slope Center for Children an advocacy center?
A. It is.
Q. And is that a place that's available for law enforcement agencies to sit down with a child and do a recorded forensic interview?
A. That's one of its purposes, yes.
Q. Okay. And do they have a specific room or several rooms that you could do those interviews in?
A. Yes, they do.
Q. Okay. And as you indicated with respect to I.S. that you -- those interviews occurred there within the center?

A. They did.
Q. Who brought I.S. to the interviews?
A. It would be his grandmother, Diane.
Q. Okay. Is she his custodian?
A. She is.
Q. Okay. And when she brings -- she would bring them to the interviews, bring him to the interviews?
A. She did.
Q. And was she inside -- was she in the interview during the time you were talking with I.S.?
A. She was not.
Q. Okay. Do you have a brief discussion with her prior to going into the interviews?
A. I did.
Q. And did you indicate to her what the purpose of the interviews were?
A. I did.
Q. Was I.S. within earshot of that during the time that you talked to her about that?
A. I actually spoke with Diane over the phone and met with her in person prior to those interviews. So we set that stage prior to them arriving at Western Slope Center.
Q. Okay. And when you spoke with her prior to this, I believe she wrote out a statement for you as well as to some of the things that I.S. had been saying?

A. Actually that statement was written out for Officer Woods.

Q. Okay. But one of the officers took a statement from Ms. [redacted] [phonetic]?

A. Yes, he did.

Q. Okay. Going back to I.S.'s interviews, you indicated that they were both recorded?

A. Yes, they were.

MR. WAITE: And, Your Honor, may I approach the witness?

THE COURT: You may.

Q. (By Mr. Waite) I'd like to show you what has been marked as People's exhibits MH-1 and 2 and ask if you can identify those exhibits, please?

A. MH-1 is the first interview with I.S. I watched this interview in its entirety on 4-24-14. MH-2 is the second interview with I.S. I watched the entire interview on this particular CD or DVD on 4-24-14.

Q. Okay. When you indicate that you watched those, did you watch those in preparation for this hearing?

A. I did.

Q. To determine whether or not those were accurate recordings of those interviews?

A. That is correct.

Q. And were they in fact accurate recordings of the

interviews?

A. Yes, they were.

MR. WAITE: Your Honor, I would offer People's MH-1 and 2 into evidence at this point.

THE COURT: Any objections?

MS. SMITH: Yes, Your Honor, I am going to object to at least the introduction of one of them. The district attorney in his notice provides notice of one interview. He doesn't specify which one, but he doesn't indicate that both interviews, both sets of statements will be attempted to be introduced in his motion on paragraph nine, subsection (b), which addresses I.S.

It states that Detective Prescott, statements made to Detective Prescott, a copy of the DVD of the interview will be provided at hearings and a copy of the report summarizing that interview is attached as exhibit A indicating that there is one interview.

MR. WAITE: Well, Judge, first of all, counsel knows that there are two interview. There have been two interviews in this case forever. There's no surprise to counsel that there are two different interviews. We are putting both interviews in because both interviews were done at different times, different recordings, and there is certainly notice that those two interviews exist not only in my pleading but also just in the discovery that's been

Exhibit B

provided in this case.

So I guess I'm a little at a loss as to why we're getting this now especially in light of the fact that the defense had a chance to file a response to this and didn't file any kind of response saying anything about one versus two interviews.

THE COURT: Ms. Smith?

MS. SMITH: I have no followup.

THE COURT: the objection is overruled. I think what would happen is that the People would then -- if I denied it at this time, they could go back and file a new motion with reasons why it wasn't filed the first time, I probably would grant it.

So given the fact that defense has notice of these statements, do you have a copy of the DVD?

MS. SMITH: Yes.

THE COURT: I find that there's no prejudice. Therefore, the objection is overruled and the People may proceed on both of the interviews.

MR. WAITE: And, Judge, then are they admitted at this point?

THE COURT: They are admitted.

MR. WAITE: Thank you, Judge.

And, Judge, I apologize to the court. We're going to leave the court I think with a lot of work after today

just to watch all of these obviously, but this is necessary, so.

Q. (By Mr. Waite) Did you also speak with a young man by the name of E.M. as a part of this investigation?

A. Yes, sir, I did.

Q. And did you speak E.M. a couple of different times?

A. Yes, sir, I did.

Q. And were those interviews, were those forensic interviews as well?

A. Yes, sir.

Q. And were those interviews recorded?

A. Yes, sir.

Q. And do you recall where those interviews took place?

A. The first interview with E.M. was held at the Western Slope Center for Children. The second interview was held at Grand Junction Police Department.

Q. And so did you record both?

A. One is -- yes, both of them are recorded.

Q. Okay.

MR. WAITE: And if I can approach the witness?

THE COURT: Yes.

Q. (By Mr. Waite) I'm showing you what's been marked as People's exhibits MH-3 and MH-4 and ask you if you can

identify what those disks are, please?
A. Do you want the note on the back of this?
Q. Oh, probably not. I don't know, let's see.
A. MH-3 is my first interview with E.M. That would have been the interview that was conducted at Western Slope Center for Children. I watched the entirety of this interview on April 24th, 2014.
MH-4 is my second interview with E.M. It occurred at Grand Junction Police Department. I watched this entire interview on this DVD on April 24th, 2014.
Q. You watched both of those in preparation for this hearing?
A. I did, sir.
Q. And do both of those recordings accurately reflect the forensic interviews that were done with E.M. on --
A. They do, sir.
Q. -- those two times. Thank you.
MR. WAITE: I would offer People's MH-3 and 4.
THE COURT: Any objection?
MS. SMITH: No objection.
THE COURT: Both are admitted.
Q. (By Mr. Waite) Now was there a third interview that was done with E.M. prior to the SANE examination?
A. I met briefly with he and his mother prior to the SANE exam, yes, for clarification of some points he made in

the interview.
Q. And was he able to clarify some of those points as well?
A. Yes, he was.
Q. Okay. And was that recorded?
A. Yes, it was.
Q. I'm showing you what's been marked as People's exhibit MH-5.
MR. WAITE: Your Honor, may I approach?
THE COURT: You may.
Q. (By Mr. Waite) And the same thing with respect to that disk, can you tell us what that is, please?
A. This is a recording that was taken on the day just prior to the SANE exam that was done on E.M. His mother and he were present at Western Slope Center for Children. We were actually in a -- not the normal interview room but the downstairs room office, something that was set up for meetings.
It is a recording. I watched the entirety of this recording on April 25th, 2014.
Q. And is that recording an accurate recording of that discussion you had with E.M. at that point?
A. Yes, sir, it is.
MR. WAITE: Your Honor, I'd offer People's MH-5.
THE COURT: Any objection?

MS. SMITH: Yes, I am going to object on this one based on the -- perhaps I should voir dire but I don't believe there's any statements in that interview regarding sexual abuse. I believe that interview was just like Detective Prescott testified to, clarifications, but that there weren't any disclosures and outcries in that interview.

THE COURT: Mr. Waite?

MR. WAITE: Judge, it's still going to be offered for res gestae. It could be offered for a number of reasons, but it is still hearsay, and it's statements taken from the child to clarify some points taken out of court and subject I think to 13-25-129 as well. I don't think the 13-25-129 is limited necessarily to statements that only incorporate allegations of sexual abuse. I think that it also talks about that the events surrounding that abuse and I think that that's what this does.

THE COURT: I'm going to grant admission. I will let the defense know that if after my review, there really isn't any statements that would be admissible under the statute, then at that time I will make an appropriate ruling. But frankly I think you say there's not -- I haven't seen it. I have to see it in order to make a ruling on that regard. So I'm going to admit it for that purpose, but I'm not sure Mr. Waite is accurate in indicating that 13-

25-129 would allow a statement in that doesn't include statements of abuse. And so I'll just have to view to see.

MR. WAITE: Okay, Judge, thank you. So it's been admitted at this point?

THE COURT: It has.

MR. WAITE: Thank you.

Q. (By Mr. Waite) And as you can see, Detective Prescott, I'm kind of going with the different cases that we've got, but I will ask you about J.W. Was J.W. also one of the individuals you spoke to and did a forensic interview with?

A. Yes, sir, he was.

Q. Okay. And where did that interview take place?

A. That interview took place at his, it would be his grandmother's residence in Glade Park.

Q. Okay. And was that a recorded interview as well?

A. Audio recorded.

Q. Okay. And when you say his grandmother's, who was present during the course of that interview?

A. During the interview, it was just myself and Detective Stogsdill. We were in a separate bedroom from the family.

Q. Okay. Other people were there at the residence?

A. Yes, they were.

Q. Okay. And do you recall who all was there?

A. His mother, Michelle, and her other children. And I don't believe the grandmother had arrived during the course of the interviews. I think she came later.

Q. Okay. You indicated that that interview was recorded although it was an audio recording?

A. That is correct.

MR. WAITE: And if I can approach?

THE COURT: Yes.

Q. (By Mr. Waite) Can you tell us what MH-6 appears to be?

A. MH-6 appears to be a copy of my interview with J.W. I watched this or listened to this interview in its entirety on a April 25th, 2014.

Q. And did it appear to be an accurate rendition of that interview that you did with J.W. at that point?

A. Yes, sir, it was.

MR. WAITE: Your Honor, I would move for admission of MH-6.

THE COURT: Any objection?

MS. SMITH: No objection.

THE COURT: MH-6 is admitted.

Q. (By Mr. Waite) Going back briefly to I.S., you indicated you had done and we've already admitted DVD's of interviews with I.S. During the course of those interviews, did you use diagrams with I.S. to ask him to describe body

parts and so forth?

A. I did.

Q. And did he also make a drawing with respect to -- during the course of one of those interviews with respect to Mr. McFadden's residence and somewhat kind of a general, general drawing?

A. He did.

Q. And did you help him with both of those things in terms of if he would name something, then you would write on the diagram so that most of it -- handwriting on the diagram is yours?

A. That is correct.

Q. I'd like to show you what's been marked as People's MH-8.

MR. WAITE: Your Honor, may I approach?

THE COURT: Yes.

Q. (By Mr. Waite) Those are two pieces of paper stapled together. If you would describe each one both of which comprise MH-8, please.

A. This is the first one is a figure of a young male, school age male and indicating the different body parts: eyes or ears, nose, hands, that type of thing. It was shown to I.S. and used in my interview with him on December 18th, 2012 at Western Slope Center. The second one is somewhat of a layout as it was given to me by I.S. of the inside or the

layout of the house at 2980 D-1/2 Road.

Q. And does that appear to be an accurate copy of the diagram, those diagrams that were prepared --

A. Yes, sir.

Q. -- out of the interviews?

THE COURT: What was the address again?

THE WITNESS: 2980 D-1/2 Road.

THE COURT: Thank you.

Q. Is that 2980 D-1/2 Road is that here in Mesa County, Colorado?

A. It is.

Q. Okay.

MR. WAITE: Your Honor, I'd offer People's exhibit MH-8.

THE COURT: Any objection?

MS. SMITH: No objection.

THE COURT: MH-8 is admitted.

Q. (By Mr. Waite) As a result of the interviews that you have just described, did you determine that there were other, possibly other victims in these cases?

A. Yes, during those interviews.

Q. And as a result of that, did you speak with another couple of children, S.J.WE. and K.WE.?

A. I did.

Q. And did you record those interviews as well?

A. I did.
Q. When you spoke with K.WE. and S.J.WE., did you do so individually without the other one there?
A. That is correct.
Q. When you interviewed them, was anybody else involved in the interview besides you and the child?
A. Just myself and the child in the room.
Q. And where did those interviews take place?
A. In Montrose at their advocacy center. It's called the Dolphin House.
Q. Okay. Very similar to the Western Slope Center for Children?
A. Somewhat.
Q. Okay. And did they have the capabilities of recording?
A. Yes.
Q. And so the interviews with S.WE. and with K.WE. were recorded?
A. Yes, sir, they were.
MR. WAITE: Your Honor, may I approach the witness?
THE COURT: Yes.
Q. (By Mr. Waite) I'm going to show you what's been marked as People's exhibits MH-9 and MH-10 and ask if you can identify each of those by exhibit number and what they

are?

A. MH-9 is the interview with S.J.WE. I watched the entirety of this interview on April 27, 2014. It is a copy of the original and contains all that the original did.

On MH-10 I watched this on April 25th, 2014 with K.WE. It's a copy of the interview I conducted with him and is a copy of that interview.

Q. Okay. Do those both appear to be accurate copies of those forensic interviews?

A. Yes, they were.

Q. Okay.

MR. WAITE: Your Honor, I'd ask to admit People's exhibits MH-9 and 10.

THE COURT: Any objection?

MS. SMITH: No objection.

THE COURT: Nine and 10 are admitted.

Q. (By Mr. Waite) During the course of those interviews, Detective Prescott, did S.J.WE. identify body parts and put together a drawing as part of that?

A. She did.

THE COURT: Which child or just another child?

MR. WAITE: This is J.WE. or S.J.WE.

THE COURT: So this is S.J.W.?

THE WITNESS: Yes.

THE COURT: Okay.

MR. WAITE: And if I could approach, I would show you what's marked as People's exhibits MH-11 and 12.

MS. SMITH: Okay.

Q. (By Mr. Waite) Starting with 11, can you tell us what MH-11 is, please?

A. MH-11 is a drawing of a school age girl. It again indicates the body parts as I would ask them to her, and she would name them, giving the names that she used and then places that she marked where people shouldn't touch her, she marked with an X. It is a copy of the original.

MH-12 is a copy of a diagram that S.J.WE. drew with help of the residence, the McFadden residence at -- or the residence at 2980 D-1/2 Road.

Q. Okay. When you say "drew with help," what does that mean?

A. Well, I believe I drew the outside box and she put in the smaller boxes as to where different rooms were located. And the rooms aren't annotated on there. They're just blocks.

Q. They're just kind of blocks and there's really -- they're not to scale --

A. Yeah.

Q. -- or anything?

A. That is correct.

Q. Okay. Are those accurate copies of those

documents?

A. They are.

MR. WAITE: Your Honor, I'd ask to admit People's exhibits MH-11 and 12.

MS. SMITH: No objection.

THE COURT: People's exhibits MH-11 and 12 are admitted.

Q. And during the course of K.WE.'s interview, did K.WE. also make a kind of a drawing I guess if you will regarding some of the things that you guys were talking about?

A. He did.

MR. WAITE: I'd like to show you what's been marked as People's exhibit MH-13.

MS. SMITH: Okay.

Q. (By Mr. Waite) What is MH-13?

A. It's not a very clear copy. It's a copy of the drawing that K.W. did while we were together talking. And this is actually what it is is a copy of the layout of Michael McFadden's bedroom and the positions on the bed, I believe.

Q. Okay. And as you indicated, it's not a very good copy of this drawing?

A. No. No, it's not real clear.

Q. Is it an accurate copy though despite the fact

that it's a little unclear?

A. That's correct.

MR. WAITE: Your Honor, I would ask to admit People's MH-13.

MS. SMITH: No objection.

THE COURT: It's admitted.

Q. (By Mr. Waite) As a part of this investigation as the investigation progressed, did you also talk with another young man who was an alleged victim of Mr. McFadden by the name of D.R.?

A. I did.

Q. How did you come across D.R.'s name; do you recall?

A. Yes, I do. The Hawkenberry's, John and Phyllis Hawkenberry lived at the residence at four -- yeah -- it's on Glenn Road, on the corner of Glenn and Gunnison, the northeast corner of that intersection. They lived there with Michael McFadden. During my interviews with them, they identified D.R. as a subject that had visited the house on numerous occasions, a friend of their young son, S.H.

And I then called D.R.'s mom, Leslie [phonetic] and spoke with her. She agreed to meet with me with her son, and I did interview D.R. That's 467 Glenn Road.

Q. And so you interviewed D.R.?

A. I did.
Q. And was that interview also recorded?
A. That interview was recorded. It was conducted at the Grand Junction Police Department. It was not a forensic interview.
Q. Okay. So that interview was more of a what? Well how would you describe that interview?
A. Just one on -- well his mom was present during the interview and just a normal interview.
Q. Okay. And did Mr. D.R. or how old is D.R.?
A. He was, I think he was 15 at the time I did the interview, 15 or 16.
Q. And was he able to relate -- do you know how old he was?
A. I believe he was 15 --
Q. Okay.
A. -- at the time of the interview.
Q. Okay. And was he able to relate to you during the course of that interview some allegations and things that had happened to him at the hands of Michael McFadden?
A. He did.
Q. You said that interview was recorded?
A. Yes, sir, it was.
Q. I'm showing you what's been marked as People's exhibit MH-14. Can you tell me what that disk is?

A. This is a DVD copy of my interview with D.R. in its entirety conducted at the Grand Junction Police Department. I watched this interview through its entirety on this DVD or CD on April 25th, 2014.

Q. And is that an accurate copy of that interview that took place?

A. Yes, sir, it is.

MR. WAITE: Your Honor, I'd ask to admit People's exhibit MH-14.

MS. SMITH: No objection.

THE COURT: It's admitted.

Q. (By Mr. Waite) And during the course of his interview with you, did D.R. also make some drawings of kind of a description of the Glenn Road address there as well as a description of Mr. McFadden's bedroom?

A. He did.

MR. WAITE: And if I could approach the witness, Your Honor?

THE COURT: You may.

Q. (By Mr. Waite) That exhibit consists of two pieces of paper. If you could describe each for us, please?

A. It's marked MH-15. The top page is a layout of the room at the Glenn Road address, and the position on the bed that they would have been sleeping or laying according to D.R.

The second one is a map. I actually drew the map based on D.R.'s description on how to get to the residence. He didn't know the address, but he knew how to get there from North Avenue.

Q. And are those accurate copies of the diagrams that D.R. prepared the day you were interviewing him?

A. That both he and I prepared, yes.

Q. Yes.

MR. WAITE: I would offer to admit People's 15.

MS. SMITH: No objection.

THE COURT: It's admitted.

MR. WAITE: Judge, those are all of the DVD's and all of the child hearsay interviews that were done by Detective Prescott. What I can indicate to the court is that they are also attached to my motions, SANE reports that were prepared either by SANE nurses or in a couple of cases doctors who had examined the two WE. children. Those are attached to motions as offers of proof.

We would ask to proceed in that manner with respect to those documents. That includes statements by Diane [redacted] and then the court will see that those are attached to my motion.

With respect to I.S. the SANE report is attached. With respect to E.M. the SANE report from Cheryl Roy is attached. With respect to J.WR. the SANE interview with Sue

Goebel is attached. With respect to K.WE. a Dr. Greg Souchen [phonetic] saw him and those medical reports are attached. With respect to S.J.WE., Dr. Mary Rader saw her and those reports are attached as well, and I would ask to proceed with those as offers of proof.

And with that I don't know if the court wants me since Detective Prescott's already on the stand, we could launch into the motion to suppress or we could simply deal with these separately. I don't know how the court or counsel wants to proceed.

THE COURT: Well let me find out if the defense is willing to accept the documents attached to the motion as offers of proof concerning the statements made by the SANE examiners and Diane [redacted]

MS. SMITH: Not Diane [redacted]. [inaudible]

MR. WAITE: I'm sorry?

MS. SMITH: What about Diane [redacted] [inaudible]

MR. WAITE: No, I -- well [inaudible].

MS. SMITH: Your Honor, I do object by proceeding to -- by offer of proof.

First of all, in terms of the SANE exams, those aren't -- the interviews done as a part of the SANE is not recorded. There is no way for the court or the defense to evaluate the factors that need to be found by People versus District Court just from the offer of proof, just from the

paperwork.

Two of the reports -- what's a little bit confusing is three of the children, the children in 13-CR-27, were evaluated by SANE's who I think the court is relatively familiar with here in Grand Junction at Western Slope Center for Children.

The WE. kids were evaluated by I think essentially doctors. I don't think they're actually SANE's in Montrose and did not -- they particularly do not document in really any way their conversation what was asked, what was said in response. It's more of a medical report.

So there is no way to gather again from just the offer of proof from just those reports the factors that the court has to find to make a reliability determination pursuant to People versus District Court, the El Paso factors as they're colloquially known.

But likewise even with the SANE exams that were done here, again there's just not any information about how those were conducted, how the questions -- I think some of the nurses do put a mini-transcript in their report, but there's also a lot of information that is gleaned in those interviews that those nurses don't document how it was found out. And so we would object to the offer of proof on that.

Likewise --

THE COURT: I think if you object to the offer of

proof, we're going to have to hear the witnesses.

MS. SMITH: Oh, okay. Okay, I didn't know that.

THE COURT: And so the offer of proof has not been accepted, and so we're going to have to go through each of those witnesses to get the statements in.

MR. WAITE: Okay, well, Judge, we'll --

THE COURT: And I know that means we're going to have to reschedule.

MR. WAITE: Yeah, it does. Yeah, we've done that that way before so I plan on going that way again obviously then. So with respect to the motion to suppress, do we want to go forward with that?

THE COURT: Sure, let's go ahead and do that.

Q. (By Mr. Waite) As part of your investigation, Detective Prescott, did you also speak with Michael McFadden in this case?

A. Yes, sir, I did.

Q. And can you recall kind of the circumstances surrounding your interview with Mr. McFadden?

A. After my interview with I.S. and then I met with L.WE. briefly at his -- actually I met with L.WE. at his school.

And then I called Michael McFadden that afternoon. I requested to meet with him. We actually met I believe it was the next day, and he met me at the Grand Junction Police

Department. He came in of his own free will, and I conducted an interview with him.

During that interview, we also conducted a CVSA on him. Sergeant Ancell was in the interview with me on that.

Q. Okay. Do he came down to the Grand Junction Police Department to do the interview?

A. He did.

Q. Came down there on his own?

A. He did.

Q. When he got there, did you meet him at the door? How does he get into the facility?

A. He came to the front door. I was called down from my office. I came downstairs, escorted him up to the interview room which is upstairs at the other end of the building by my office. We conducted the interview from that point on.

Q. Okay. Was he in cuffs?

A. He was not.

Q. Was he under arrest?

A. He was not.

Q. Did you do anything to place him into custody or to restrict his movements?

A. No, sir, I did not.

Q. Okay. Was the interview recorded?

A. It was.

Q. Okay. During the course of the interview did you Mirandize Mr. McFadden?
A. He was not in custody; I did not need to Mirandize him.
Q. Okay. And was he informed of the fact that he wasn't in custody?
A. He was told that -- I believe one of the statements I made to him and not word for word, that the door wasn't locked. He was here of his own free will. And then later on I told him that I'd try to get him out of here as soon as I could. He was not detained, not in custody.
Q. Okay. I'm going to show you what's been marked as People's MH-7. Can you tell us what that is?
A. MH-7 is a copy of my interview with Michael McFadden. I watched this interview on this DVD in its entirely on April 25th, 2014.
Q. Okay. And did that appear to be an accurate recording of the interview with Mr. McFadden?
A. Yes, sir, it did.
Q. Is there any part of the interview that took place outside of what's recorded on that disk? In other words, did the whole interview get recorded?
A. Yes, it did.
Q. Okay. Did you do any interviewing or anything else with respect to escorting him from the front door up to

 the place where he was going to be interviewed?

A. No. Small talk, I believe he was driving a truck at the time. And we talked about that. He's a mechanic also working on -- some type of work on our vehicles we discussed that as we were walking up.

Q. As you were walking up. And then once the interview was done, was he free to leave; did he leave?

A. He was. During the interview, I mentioned earlier we conducted a CVSA. I asked him if he would be willing to stick around to do that. He voluntarily stuck around, agreed to stay and complete that.

Q. Okay. What is a CVSA?

A. Computerized Voice Stress Analysis. Instead of the polygraph, we conduct CVSA's at the Grand Junction Police Department.

Q. Okay. Who conducts that test?

A. In this course, Sergeant Ancell did.

Q. Okay. And you indicated that Sergeant Ancell was there during the course of the interview with Mr. McFadden with you?

A. From that point, yes. I conducted the first part of the interview alone.

Q. Okay. Was the CVSA part, is it recorded as well?

A. Yes, it is.

Q. Okay. And you indicated that was an accurate

recording?

A. It is.

MR. WAITE: Your Honor, I'd ask to admit People's MH-7.

MS. SMITH: No objection.

THE COURT: Exhibit 7's admitted.

MR. WAITE: And, Judge, at this time I don't have any other questions for Detective Prescott.

THE COURT: Ms. Smith?

MS. SMITH: Yes, thank you.

CROSS-EXAMINATION

BY MS. SMITH:

Q. Detective Prescott, as a part of your investigation in these cases, you spoke with numerous children?

A. That is correct.

Q. And some of those children you spoke to more than one time?

A. That is correct.

Q. So I just want to begin by clarifying all of the interviews that you conducted. Starting with I.S., you indicated I think that you first spoke with him December 18th of 2012?

A. That would be correct.

Q. And then again March 21st of 2013?

A. That is correct.
Q. And in terms of J.WR. he was first interviewed by Nickie Surrad [phonetic] on December 21st, 2012?
A. I believe that date's correct. I'm not positive. But Nickie Surrad was the first one that contacted him.
Q. Okay. And you reviewed her report from that interview; right?
A. I actually contacted her later. I wasn't aware that J.WR. was actually at the PD that day. And I spoke with her later to find out what J.WR. had actually told her. So in reviewing her report, I can't testify to that. I believe our phone conversation that he made no admissions at that point and no disclosures.
Q. Okay. So the information you gathered about that interview was from speaking with Ms. Surrad on phone?
A. That's correct.
Q. And then J.WR. was re-interviewed by you and Detective Stogsdill on February 7th at his grandparents' home?
A. That is correct.
Q. And then in regard to E.M., E.M. was interviewed December 21st, 2013?
A. The first time I believe that's correct.
Q. And that was by you; right?
A. That is correct.

Q. And then you interviewed him again January 2nd, 2013?
A. When he came to the PD, yes.
THE COURT: Excuse me, I think you said that E.M. was interviewed first on December 21st in 2013?
MS. SMITH: Oh, yeah that would be 2012.
THE WITNESS: 2012.
THE COURT: Oh, `12, yeah.
MS. SMITH: I'm sorry.
THE COURT: And then the second one was in January, January 2nd of `13?
MS. SMITH: Correct, yeah.
THE WITNESS: That's correct.
THE COURT: All right, thank you.
Q. (By Ms. Smith) And then again you spoke with E.M. and his mother, Crystal McFadden January 8th, 2013?
A. When he came in for the SANE, yes.
Q. Then you went on to speak to the two WE. children?
A. That is correct.
Q. And then you also spoke with D.R.?
A. That is correct.
Q. And you spoke with other children in this case that you suspected might be victims of sexual assault as well; right?
A. I did.

Q. And you -- for example, you spoke with L.WE.; right?
A. That is correct.
Q. And L.WE. is J.WR.'s brother?
A. That is correct.
Q. And you interviewed him twice; correct?
A. That is correct.
Q. And he never made any disclosures?
A. At that point no.
Q. And likewise there's a child by the name of D.O.?
A. That's correct.
Q. And he is E.M.'s half brother?
A. Correct.
Q. And he -- you interviewed him on January 2nd, 2013?
A. That is correct.
Q. And he made no disclosure; right?
A. That is correct.
Q. Then there was a young man by the name of T.M. that you spoke to?
A. I did.
Q. And you spoke to him in April of 2013?
A. That sounds correct.
Q. Oh, about a year ago?
A. Yes.

Q. And he made no disclosures as well?
A. That is correct.
Q. And you had mentioned the [redacted]s again. They have a son who is S.H.?
A. That is correct.
Q. And you talked to John [redacted] the father; right?
A. I actually talked to him and Phyllis.
Q. Okay. And they indicated that S.H. had made no disclosure to them?
A. That is correct.
Q. How come you didn't interview S.H. individually?
A. I don't know that I had the need for it at that point.
Q. Okay, because you had spoken to his parents?
A. Right.
Q. And then there's a third young WE. child; right?
A. L.WE., little L.WE.
Q. Yes. And you interviewed him at the Dolphin House on January 16th of `13 as well?
A. I don't know that I'd call it an interview, an attempt.
Q. Okay. Why was it only an attempt?
A. He's very young and very talkative but not about what I needed to discuss. So there wasn't any useful

information.

Q. Okay. And he made -- in the course of the interview for whatever reason, he made no disclosure?

A. That is correct.

Q. L.WE. and J.WR. have two sisters; right or one sister?

A. They have two, I believe. Is it [redacted] and [redacted] I think.

Q. And is [redacted] a child?

A. She's an adult now.

Q. Okay. But [redacted] is a child; right?

A. Yes.

Q. And you didn't interview [redacted]

A. I did not. And I could have the name mixed up, because I know there's two young girls.

Q. What about [redacted]?

A. Crystal's daughter, [redacted] is who I meant, not [redacted]

Q. Oh, okay, [redacted].

A. Yeah.

Q. So there's three young girls; right: [redacted], [redacted] and [redacted]?

A. Well [redacted] not a young girl. She was an older teenager --

Q. Oh, okay.

A. -- at the time.
Q. So there's J[redacted] and [redacted] right?
A. That's correct.
Q. And you knew from your investigation that they also had some contact with Mr. McFadden?
A. They lived in the same house.
Q. And you didn't interview them; right?
A. At this point, no.
Q. Okay. Now you indicated that some of the interviews were what's called forensic interviews; right?
A. Correct.
Q. And what does that mean?
A. A forensic interview is where the investigator is trained to interview and not to lead or mislead a child and draw information out from them and not introduce information to them.
Q. And you mentioned it's an interview where the interviewer is trained. Have you undergone such training?
A. Yes. I attended Corner House in I believe it was in the summer of 2010.
Q. And was that your first forensic interview training?
A. Yes, it was.
Q. Was it your last?
A. I've been through other training. As far as the

forensic interview training, we do peer reviews, so if you want to consider that part of the forensic interview training. So that was my -- the major training. That was where I went through the full interview process training.

Q. Okay.

A. But the rest of it's just educational for upkeep.

Q. Okay. And does Corner House keep you updated on evolving protocols and research?

A. They do.

Q. And was the summer 2010 training a week long?

A. It was.

Q. When was the last time you got an update from Corner House on training?

A. They come periodically. The major one I can't tell you the exact dates. I know there was one that came out recently where they revamped their training and changed their protocols. But that was after these interviews.

Q. Okay. Do you recall was there an update after your 2010 training but before the interviews in this case?

A. I couldn't tell you that.

Q. And are these updates via email?

A. They are.

Q. And does the Corner House forensic interviewing training trains on a specific protocol; right?

A. They do.

Q. And what is that protocol called?
A. It's called RATAC. It's abbreviations, or if you want for Report Building is the R. The A is for Anatomy. And the T for Touch Scenario and then the other A for the Abuse scenario and then the Closure.
Q. And so each of those letters stand for a certain stage in the protocol?
A. They do.
Q. And there's a few what are called guiding principles to the Corner House protocol. Are you familiar with those?
A. Somewhat. I couldn't tell that to you right now.
Q. Do you recall that one of them is to be person centered?
A. Okay.
Q. Okay, you don't quite recall. Would it refresh your recollection to look at their guiding principles?
A. It might.
Q. Okay.
MS. SMITH: May I approach the witness?
THE COURT: You may.
Q. (By Ms. Smith) Okay, so did you -- you just got done reviewing the guiding principles of the Corner House protocol?
A. I did.

Q. And did these seem familiar to you on what you've been trained on?

A. They were.

Q. And one of them is to afford the individual an opportunity to communicate about their experience in their own way?

A. You want them to somewhat discuss it in a narrative if at all possible.

Q. Okay.

A. That doesn't always happen. Sometimes kids won't talk in the narrative form, and you have to prompt them with questions.

Q. And then when that's necessary to prompt the child, another principle is then to revert back to the open-ended questions as soon as possible.

A. As much as possible, yes.

Q. And a lot of that has to do with where the child is at developmentally; right?

A. It does.

Q. And verbally?

A. And verbally.

Q. And cognitively?

A. Correct.

Q. And another principle is to have an unbiased perspective; right?

A. As much as possible.
Q. And what does that mean?
A. Some things are obvious; some things aren't.
Q. And so when things are obvious, then you can change your bias?
A. As a criminal investigator, when there is evidence that a person's involved in something, you want to remain unbiased in the child's perspective as far as possible, but there are sometimes that questions come out that you're attempting to get information from the child to support or that may develop evidence you've already got from other interviews.
Q. Okay. So let me make sure I understand is it that as you're investigating a case and there's more and more evidence, then you might start to have a bias or have a decision about what might have happened?
A. In my mind.
Q. Okay.
A. I'm human.
Q. And is the idea then that you not communicate that bias to the child?
A. As much as possible, yes.
Q. Okay. But again you're human; right?
A. Uh huh. That's correct.
THE COURT: It's an admission. We finally find

out it to be true.

Q. Okay. And I think you already touched on this a little bit, but definitely part of the protocol is to use as few -- to not be leading; right?

A. And that is correct. That is probably the most important, one of the most important.

Q. And what does that mean?

A. It means that the child gives you the answers. You do not give them the answers in your questions. You're eliciting the information to flow directly from them and not from your bias or from foreknowledge of events that took place.

Q. Okay. And then another big principle is to not be suggestive; right?

A. That is correct.

Q. And what does that mean?

A. Kind of the same thing in your leading. When you're asking a question, you're not trying to suggest an answer. There are -- that would lead the child to answer a question.

Q. And what are some of the techniques that you're trained on to do to conduct a non-leading, non-suggestive interview?

A. The narrative form is one where the open-ended questions, the multiple choice, sometimes you can't get them

to conduct a narrative where they free flow with information. You've got to ask in multiple answers or try to get them to choose the most correct answer.

The questions, when you close the question, you want them "tell me more" to try to get them to answer further about a particular topic or subject they might have mentioned. So you're continually trying to elicit the information from them.

Q. So when you have to give a multiple choice question -- let me start over. Sometimes if the child is -- if you're not being able to elicit a free narrative, sometimes you have to provide the child with a multiple choice question?

A. Correct.

Q. And in these interviews with these children, you did have to sometimes provide multiple choice questions?

A. I actually use that probably quite frequently.

Q. And how come that is?

A. Especially with the younger children, just a simple fact of over and under, you know, was the ball on top of the table or under the table. You've got to give them a choice for them to answer a simple question a lot of times.

Q. And with these -- when you were using the multiple choice questions in your interviews, did you do any testing to make sure that the child wasn't just going with the first

thing in the list?

A. I don't know about the testing as you're referring to it, but when I ask them a multiple choice question, a lot of times I like to know ahead of time what the answer is and know that they are going to give a correct answer. You could ask a rather young child "did it happen in the house, a hotel or a church." You know you're giving them three opportunities in what's the logical one and see if they choose the logical one.

Q. Okay, so that's the sort of test for accuracy you do is that --

A. Well the common sense answer you know I try to, depending on their age level. The older they are the less you have to do that, the more free narrative you get from the child normally.

Q. At your Corner House training, were you trained in doing any testing of alternate hypotheses or ruling out alternate
explanations for why the child is making accusations?

A. You want to determine whether they have been coached. You're watching for that during your interview to see if there is any coaching going on that the conversation that they're having with you is free flowing and not something that has been ingrained in them. That it is not something that a parent has introduced to them.

Was there anybody else involved in this case. They named a particular individual, Michael McFadden, having known him by face and by name, having been associated to him. So in these interviews it was pretty much singled out who the perpetrator was, alleged to be and actually what took place.

Q. Okay. In the RATAC protocol there's not necessarily a phase for determining whether the child can tell the difference between a truth and a lie; right?

A. There is somewhat. You want to determine that's part of my questioning in the beginning of my talk with most of the children. We discuss things that are real and things that aren't. We agree to talk about only things that are real and sometimes that comes up such as in S.J.WE.'s interview she mentioned being four years old and I talked to her later and questioned her about that, and she says I was just joking or that wasn't real rather.

We also discuss truth and a lie. I try to discuss with each one of them being honest and what the difference is between the truth and a lie so it's something that, yes, I use.

Q. And in determining if they know the difference between the truth and a lie, it seems that you use maybe what color somebody's wearing or what color the wall is, things like this; right?

A. Similar things, yes.
Q. And how in -- and then if you say if you're wearing a blue shirt and you say -- if I said I was wearing a red shirt, would that be a truth or a lie, and the child says "lie," how do you test for the element of deceit in there?
A. I'm sorry?
Q. Well what I'm saying, let me step back. Wouldn't you say that a lie has an element of deceit in it?
A. Maybe I don't understand your question. Obviously a lie has an element of deceit, but what -- I don't know what you're getting at.
Q. So then how do you test for the child knowing -- it seems like you're definitely doing a lot of testing about whether the child can perceive reality accurately; right?
A. Uh huh. That is correct.
Q. And so then how do you do the additional test to see if they really know what a lie is?
A. You mentioned the color of the shirt. I asked him if were to say to you that your mother's name is Betty when it's really not Betty, is that the truth or a lie, and they would tell me that's a lie.
In the case of the WE.'s it was minus seven when they went to work that morning, you know, and it was a sunny day. I asked them if it was snowing outside. Or if I told

them it was snowing outside right now, is that a truth or a lie, and they would tell me -- they told me that was not the truth; that was a lie, because it was in fact a bright, sunny day.

So I'm looking for I guess to answer your question is I'm looking for deception in their statements. If I feel that they were being deceptive to me, I would probably question them further about the answer to their questions.

Q. Okay. Because would you agree that if you're saying what the weather is and you're misstating what the weather is, that could just as easily that you're mistaken rather than you're actually lying?

A. Either/or.

Q. Okay. So that weather description, a misstatement of the weather doesn't necessarily test for the deceit element; would you agree?

A. It depends on how I phrased it.

Q. Okay.

A. If I told you the weather was it was storming outside and it was a sunny day and I told you it was storming outside, would I be telling you the truth. So it would depend on how you're stating it. I'm not sure where you're going besides.

Q. Okay. I'm going to my next section.

We'd already discussed this a little bit that part

of conducting a good, forensic interview is knowing where the kid is developmentally; right?

A. That is correct.

Q. What training do you have in child development?

A. Other than Corner House, I don't have any training other than the work that I've done on the street.

Q. Okay.

A. And raising my own kids.

Q. And -- oh, I know. I did skip one part I wanted to clarify. Do you describe all of the interviews with the children that have been admitted into evidence today as forensic interviews except D.R.'s?

A. I would say that they're pretty much forensically sound.

Q. Okay.

A. The interviews that I did at Western Slope the first interviews followed pretty much the protocol as close as I could. The interviews that were conducted, the followup interviews, were just basically that, followup interviews.

Q. Okay. So to be clear, the two interviews of I.S. would you describe those as forensic interviews?

A. As much as possible, yes.

Q. And would you describe the interview with you and J.WR. and Detective Stogsdill at his grandma's home to be a

forensic interview?

A. Yes. Not all forensic interviews follow the exact protocol.

Q. Okay. And why do you describe that one of J.WR.'s to be forensic?

A. Because we conducted it. We asked him the questions, determined where he was as far as his age level. He started right off telling us exactly the purpose for the interview and went right into his free narrative as to what happened. And following his free narrative we asked followup questions. So you don't have the RATAC protocol if you want to call it that. He went right into the narrative when we asked him if he knew why we were there.

Q. Okay.

A. So we were not leading J.WR. in any questions that was so forensically yes.

Q. And E.M's first interview at Western Slope Center for Children you would describe that as a forensic interview?

A. Yes.

Q. And what about the one at the police department?

A. That was also a free narrative on E.M's part initially, and then we went into an interview, so it was a followup interview with him. Again, we didn't need to go back over what we'd done in the forensic interview.

Q. Okay. And so D.R.'s interview you described -- you testified was not a forensic interview; is that correct?

A. He's 15 years old. He came in. He knew exactly why he was there and began telling me that right off the bat. After I had actually -- actually D.R. came in as a witness initially because I didn't know that he had been victimized and his mother didn't know. He had never told anybody that he'd been victimized by Mr. McFadden. And it was after that point, after during the interview process when I started asking him some personal questions that he introduced that he had been in fact victimized by Mr. McFadden.

Q. And in D.R.'s interview, how come you switched it from a witness interview to a potential victim interview?

A. He switched it for me. When I asked him a couple of personal questions, he answered those accordingly to indicate he was a victim.

Q. Okay. So in each of these interviews what did you assess I.S.'s development to be?

A. Age appropriate.

Q. Why?

A. Just his ability to speak, communicate with me, his ability to differentiate colors, his ability to describe situations. In a discussion that I had with him concerning his -- what he likes and dislikes during the introduction

phase and then his ability to identify body parts and then describe situations that took place.

Q. What about E.M.'s?

A. E.M.'s initial interview, same age appropriate.

Q. Was his second one different?

A. The second interview with E.M.?

Q. Yes.

A. He was a little more open, talkative, although the interview was a little more subdued.

Q. But in the course of those interviews, you assessed E.M. to be age appropriate; is that what you said?

A. I did.

Q. What about J.WR.?

A. The same thing with J.WR.

Q. And when you say "age appropriate" meaning that they're cognitive, verbal, emotional development is on par with their age?

A. For what I would expect it to be, yes.

Q. What about K.WE.?

A. K.WE. was also age appropriate in his communication and the ability he had to communicate with me to talk with me freely, clearly and his understanding of the questions that I gave to him.

Q. And S.J.WE?

A. S.J.WE. is the same way in her ability to describe

the residence where they lived and her staying back -- moving back and forth between the houses and her ability to understand my questions and communicate clearly.

Q. And what about D.R.?

A. And D.R. was an older young man and very capable of handling himself in communication describing situations and circumstances.

Q. And would you say D.R. even helped you put together some of the details that the younger kids couldn't?

A. Somewhat, although his was from a different time period.

Q. Right, okay. When you interviewed I.S., did you know that Mr. McFadden had a prior conviction for sex assault on a child?

A. I believe I became aware of that directly after my interview the next day. And I think it was the next day, the 17th or 18th, afternoon of the 18th, I think I found that out the next day.

Q. Okay.

A. Because I did a criminal history and found out his priors.

Q. Okay. So you knew it when you did all the rest of the subsequent interviews?

A. Everything from that point on, yes.

Q. Okay. When did you learn about the allegation

that Detective Crocker investigated in 2008?

A. I believe it was during my talk with Cindy. I'm sorry, I just went blank with her last name. She would be the grandmother. I'm sorry.

Q. Wright or Rick?

A. Ricks, Cindy Ricks. During my talk with her, one of my initial talks with her, I believe she mentioned the incident that or allegations from Arizona, and that's when I contacted the Arizona authorities and found their case or their investigation of that.

Q. Okay. So when you had one of your first contacts with Cindy Ricks, you learned about the Arizona issue?

A. It was during my early contacts with her, yes.

Q. Okay. And the Arizona allegations involve Mr. McFadden; right?

A. That is correct.

Q. And the two -- oh, boy -- E.M. and his brother?

A. No, initially they involved D. D. was the one that made the allegation in --

Q. Okay.

A. -- or disclosure to the officer when he came to the door in Arizona, and then the family acted on that, contacted the family up here in Grand Junction and Officer Crocker. They contacted law enforcement. Officer Crocker did the interviews with J.WR. and L.WE.

Q. Okay, I see. And obviously as your investigation proceeds and unfolds, you're hearing more and more allegations against more and more children; right?

A. You could put it that way, yes.

Q. When you're doing your interviews -- I'm trying to think back, but in at least some of your interviews, maybe most of your interviews, in the closing part of your interview, you encouraged the kids to report abuse and report sexual assault; right?

A. I do.

Q. And you indicated to a couple of the kids that it's not okay what Mr. McFadden did; right?

A. After they had told me what he had done to them, yes.

Q. And so at that point you're believing the little kids; right?

A. Yes.

Q. And you gave them, you brain stormed with them ideas of who they could tell if they ever had any victimization in the future?

A. I always do that, yes.

Q. Is that part of your training to do that?

A. I don't recall Corner House, but it is one of the things that you're encouraging the child to be free to talk to people if someone were to approach them or contact them

in a like manner to talk with their parents.

And sometimes if a disclosure is not made, it's whether or not if anyone that they don't feel comfortable with or comfortable around, you know tell your parents, tell your teacher, tell the police, call the police if you need to. So that's a normal part of my interviews, the closing part of the interviews.

Q. Okay. Even though it's maybe not necessarily part of the Corner House protocol?

A. I believe part of the closing with Corner House they encouraged us in my training down there that you know let the kids know that it's okay to call. It's okay to talk to their parents.

Q. In your interview with E.M., you indicated to him that it's time to make him stop meaning Mr. McFadden; right? Do you recall that?

A. That would be his second interview I believe.

Q. Okay. The one where he discloses?

A. Yeah. That was after his disclosure.

Q. And then you also indicated to E.M. that you'll make sure that Mr. McFadden stops?

A. As much as possible, yes.

Q. You never -- as a part of your investigation, you spoke to a lot of the children's parents and family members?

A. I did.

Q. Did you ever speak directly to a Ryan [redacted]

A. You know what I didn't. I was trying to think. I talked to Mike and I was thinking got the names transpired [sic] but Michael [redacted] but not Ryan [redacted] no.

Q. Okay. All right, now.

THE COURT: Would this be a good time to break? It's 12:10.

MS. SMITH: Oh. Yeah, I'm fine with that.

THE COURT: Is that okay with everybody?

MR. WAITE: That's fine, Judge.

THE COURT: Why don't we go ahead and take a lunch break now and resume at 2:00.

MS. SMITH: Okay.

MR. WAITE: Thank you.

THE COURT: We'll be in recess.

MR. WAITE: Can we just leave all of this stuff here?

THE COURT: Yes. We're the only folks here for the rest of the day.

MR. WAITE: Thank you.

(Hearing recessed 12:10 p.m. to 2:02 p.m.)

THE COURT: Please be seated. Okay, we're back on the record in these three cases: 13-CR-27, 339 and 342.

The parties are here and we're ready to resume. Detective Prescott, if you'd be kind enough to take the

stand again. You are reminded that you are under oath, and --

MR. BURRILL: And, Your Honor, could we get --

THE COURT: Yes. That right hand certainly, unless it's his left hand he needs to use to write.

And, Ms. Smith, you're up.

CROSS-EXAMINATION (RESUMED)

BY MS. SMITH:

Q. All right, I was going to, I was just about to turn to the individual interviews and talk a little bit more specifically about each interview.

Turning first to I.S.'s interview, you had mentioned to Mr. Waite that you had spoken on the phone with Diane, I.S.'s grandmother custodian prior to I.S.'s interview; is that right?

A. That's correct.

Q. And what did you discuss with her?

A. I arranged the SANE, or the not SANE but the forensic interview with her, set up a date and time. She agreed to meet me the next day, I believe it was the 18th of December, 2012 at Western Slope Center for Children.

I described the purpose of the interview and what to expect; that I would be conducting the interview solely with her grandson and that afterwards I would meet with her after the interview, but we would meet there at Western

Slope at a certain time. I don't recall the times we met for that interview.
Q. And what did you tell her the purpose was?
A. To conduct a forensic interview on I.S. and attempt to determine what had happened and to get a statement from him.
Q. And did you give Diane [REDACTED] any directives on what to discuss or not to discuss with I.S.?
A. I don't recall directly but I believe I told her not to discuss anything with him.
Q. Okay.
A. And I think that is what she had been told earlier by the officers.
Q. Okay. But this -- I.S.'s allegations were first reported to Officer Wood; right?
A. As law enforcement, yes.
Q. Yes. And did you review Officer Wood's reports?
A. I did.
Q. And so you knew from that that I.S. had discussed the allegations with both Diane and Ryan [REDACTED]
A. That's how -- yes.
Q. And what were you going to say that's how it all got to law enforcement?
A. Well I had to start somewhere.
Q. Right. In I.S.'s interview you say to -- you ask

him, I'm sorry. In I.S.'s interview you do the touch inquiry phase of the protocol; right?

A. I believe I did.

Q. And you asked him "who gives you touches you don't like?"

A. I believe I did.

Q. And doesn't that introduce to him the idea of touches he doesn't like or bad touches?

A. Normally.

Q. Would you say normally?

A. Yes, that's correct.

Q. And after he made the disclosure, you asked several followup questions; is that right?

A. That's correct.

Q. You were trying to get details about whether -- whose clothes were on and off?

A. That's my job, yes.

Q. Okay. And there was I think I.S. first indicates that he was asleep?

A. He did.

Q. And you asked a series of questions to try to figure out if he was asleep how he would actually know?

A. I did.

Q. And -- okay. And when you say it's your job to get more details, isn't it actually your job to just make

sure the child produces a free narrative?

A. That's one and the same thing I think.

Q. Okay. But in I.S.'s interview, you were having to ask a lot of questions to get those details; right?

A. That happens, yes; that's correct.

Q. And sometimes when you're having to ask very specific questions to get those details, it disrupts the free narrative wouldn't you say?

A. I would say that if the child is not making a free narrative, I have to ask those questions. Otherwise, I do not get the details.

Q. Okay. And isn't it -- what is the protocol or what does your training say about asking repetitive or repeated questions about the same topics?

A. Part of the process in the introduction and I don't recall if I did this with I.S., but if I ask the child a question a second time, it's not because they got the questions right or wrong, it's just that I'm trying to clarify.

Q. Okay.

A. And I don't recall specifically describing that to him, but I do recall on I.S.'s part talking about his being asleep or awake and how he would have felt that if he was asleep. And in trying to have him describe that in his words or that type of situation, so yes I did ask repeated

questions about that to clarify that.

Q. To try to clarify, okay. In I.S.'s first interview, you left the room; right at one point?

A. I did.

Q. And you went and talked to Joy Thompson?

A. I did.

Q. And did she provide any feedback to you about that interview?

A. You know I don't specifically recall what her comments were on I.S.'s interview.

Q. Okay. Was I.S.'s interview peer reviewed?

A. No it was not.

Q. Do you recall a part in your interview with I.S. where you asked him, I think you asked him a series of questions about why he stayed in Mr. McFadden's bed; do you remember that?

A. I did and I do.

Q. And I.S.'s response was that he didn't know; was that it? Or he wasn't giving you a response to that question at first; right?

A. I don't recall him not giving me a response to that question. I recall that he was friends with the kids and he wanted to stay near them.

Q. Okay.

A. And those are my words, not his, so I can't --

Q. Do you recall you suggesting to him that maybe it was because the bed had nice pillows?
A. I might have used that in a multiple choice answer, but I don't recall telling him that, suggesting that to him.
Q. Okay. And then you remember that I.S. agreed that it was he had nice pillows?
A. I don't recall that; I'm sorry.
Q. Okay. That's fine. And then as we've already established, you had a second interview with I.S. about three months later?
A. December, January, February, March I believe it was; so two and a half months, three months.
Q. Okay. And what prompted that second interview?
A. I was contacted by Diane and she said that I.S. had additional information he wanted -- had disclosed to her, and she requested I do a followup interview with him.
Q. And you agreed to do that?
A. Yes.
Q. And what does your training say about doing multiple interviews?
A. You don't go back over the information you've already been over. You start from the fresh point instead of reviewing the old information and go from there.
Q. But in the second interview with I.S., you did ask

him if he remembered what you guys had talked about during the first interview; right?

A. I did.

Q. And you started that second interview by indicating to him, trying to illustrate to him that sometimes you don't have all the pieces or people -- of the puzzle or that people remember more details later on; do you remember that part of your conversation?

A. I do.

Q. And so that is suggesting to him that there might be more pieces of information out there that you're looking for; right?

A. I don't know if it's suggesting to him. It's indicating to him I guess we need -- there's a reason why we're together this time. There would be no further reason to meet otherwise. So I'm trying to elicit if there is additional details of what I need to know.

Q. And you indicated that you only ask a question more than once if it's just to clarify; right?

A. Sometimes. I can't say that's in cement.

Q. Okay. But generally would you say if you're asking a question to a child repeatedly, that that is suggestive in and of itself?

A. Not necessarily if you're asking repeatedly is because you don't understand or they don't understand the

question you're trying to clarify with the child what they are saying or the type of question you're asking. Sometimes kids don't understand. You ask them a question and they don't understand what the question is so you need to clarify it with them, so.

Q. Okay. And in I.S.'s second interview is when he discloses the anal penetration; right?

A. That is correct.

Q. And he references -- he calls it rape; right?

A. He did.

Q. And you asked him what he means by rape; right?

A. I did.

Q. And you asked him that and then he told you after the first time?

A. He did.

Q. And then you asked him again?

A. There was I think some other questions in between that, but yes I did ask him again.

Q. So if he'd already clearly defined it for you, why did you ask again?

A. I think there were questions in between that that I needed to confirm that that's what he actually meant. There were -- if I recall correctly, there were questions in between the first time he described what rape was and the second time, and I did it for clarification purposes.

Q. And in the interview I.S. indicates that his therapist had told him to tell you too; right? Do you remember that part?

A. I believe I did, and he did.

Q. And his therapist is Joan?

A. Milady, yes.

Q. At one point in the second interview with I.S., you tell him that you have to ask him a bad question; do you remember that?

A. I do.

Q. And that suggests to the child that the question you're about to ask is bad; right?

A. It prepares him for something that's a little more serious than what's normal: what color is your house, what's your mom's name.

Q. And is that part of your protocol and training to preface --

A. I don't know that that's in the training or protocol.

Q. Just more your style would you say or --

A. That would be correct.

Q. And in I.S.'s interview, the second interview, do you remember asking him several times what made it stop?

A. I don't know about several times. I think I recall asking him at least more than once what made it stop,

and I don't think that he understood me, my question. I could have worded it a little better, but I don't think he understood what I meant.

Q. Right, because he indicates that it stopped when Mr. McFadden was arrested?

A. Yes.

Q. And so you followed up trying to clarify what made the specific incident stop; right?

A. The act correct.

Q. And I.S. doesn't give an answer to that really does he?

A. I don't recall him giving a solid answer to that, no.

Q. Throughout the interview, you asked him multiple times about how many times the rape occurred; do you remember that?

A. I do.

Q. And he indicates to you one time; right?

A. He did.

Q. And then you kept asking him how many times?

A. I don't believe I kept asking him. There was a part of that questioning he had mixed up the contact, sexual contact with the penile penetration, and I needed to know that he understood what I was asking, because just like he was asleep/he was awake, I needed to clarify that that's

what he meant.

Q. But there is a time in which it's clear he's saying that the rape only occurred one time, and then you asked him at least one time after that how many times it occurred?

A. I did. Right at the end I asked him that the last or I guess it would be a second time.

Q. And at that point I.S. says: "I'll go with you."

A. He did.

Q. Okay, now turning to E.M. We touched on this a little bit, but you had a traditional forensic interview at the Western Slope Center for Children on December 21; right?

A. That sounds correct.

Q. And you followed your protocol in that interview; right?

A. Pretty much.

Q. What do you mean "pretty much?"

A. As closely as practical. So it was a normal interview for me. The first time that I had met with E.M. and pretty much there's a kind of the RATAC series that we go through, and there was no disclosure. And so --

Q. Okay. So nothing stands out to you in retrospect that that was a terrible interview or you made some glaring mistakes; right?

A. I don't recall making any glaring mistakes. It

was a pretty much normal interview with no disclosure.

Q. When at the second instance when you interview E.M. at the police station, why didn't you arrange to meet with him at the Western Slope Center for Children?

A. E.M. came to the police department with his grandmother and his mother. I think he had his little sister with them. It was an interview that was set up for D. at the time to meet with D. D. was out of town earlier. When E.M. walked into the police department, he told me: "Mr. Ed, I need to talk to you. I lied to you before."

That was -- he had mentioned that to his grandmother I believe it was while they were on their way or as they left the house that he needed to talk to me. There was no prior knowledge on my part that I was even going to be seeing E.M. or interviewing him.

In the lobby when he first saw me, he ran up to me and said: "Mr. Ed, I need to talk to you. I lied." And I took him straight up with his mom and with D. and conducted the interview right there on the spot, and it was late in the afternoon I believe 5:30, something like that 5:00 o'clock, 5:30 when all of that started.

Q. When you began the interview with E.M., his mother [redacted] was in the room; right?

A. She was.

Q. And why didn't you have her excuse herself before

you began the interview?
A. I actually did shortly into the interview. Once we got to talking, I asked E.M. if it was okay if Crystal was in there, and left it up to her. I asked Crystal the same thing. She opted to leave, and she left the interview and I conducted the interview without her in there, the rest of the interview without her.
Q. But that's not normal; right? You don't give kids and parents a choice typically for a forensic interview if they want the parent there?
A. That depends. On a forensic interview, no. But with a followup interview like that, I actually had no idea what he was going to say, so.
Q. And in this interview with E.M. you tried to get from -- elicit from him a lot of details too about -- about the pain that he felt; right?
A. That's correct.
Q. And so you asked a lot of followup questions to try to get more details about that; right?
A. That's how I normally get details, yes.
Q. And so he wasn't describing the pain or giving details about the pain in a free narrative format; you had to ask questions?
A. Yes, that's correct.
Q. E.M. indicates in that interview both that he had

told his mom and not told his mom; right? Do you remember that?

A. I do. I believe initially he said he had told his mom. Then later in the interview he said I was actually the first person that he had told about the sodomy. He didn't describe it as sodomy.

Q. Right. So did you followup with his mom or his grandma on what he had actually told either of those people?

A. They were unaware of what had happened. They didn't know the details of -- in fact Crystal I told her during the SANE exam is when I met with them for the SANE exam is when I actually disclosed to her what had happened, what E.M. had disclosed rather.

Q. And who is E.M.'s grandma?

A. That is Cindy [redacted]

Q. And did you followup with her on what he had told her?

A. At a later time.

Q. And did she indicate that he had told her about the sodomy?

A. You know I need to back up a little bit. I know when I told Crystal was the first time I had told Crystal was when we met just prior to the SANE exam. When E.M. went upstairs, I told her that E.M. had been sodomized and she didn't know what that meant. I had to explain that to her,

and she had a hard time after that.

As far as Cindy [redacted] I don't recall when I specifically talked to her about that. I discussed with her what actually had happened to E.M. I'm sorry.

Q. Okay. So you're not sure what he had discussed with his grandma?

A. Other than him telling me that I was the first person he had told; no, I'm sure.

Q. Okay. All right, you asked E.M. -- do you recall asking E.M. when did he -- when did he, meaning Mr. McFadden, start touching people; do you recall asking him that?

A. Not specifically. That specific question, no, I don't.

Q. Okay. Do you recall talking to E.M. about trying to get a time frame; right?

A. Of when he touched him, yes.

Q. And then E.M. indicates to you that he doesn't know, that he can't really provide a time frame; right?

A. Other than he recalls that he was four years old when he was sodomize by Mr. McFadden. So that would be it. And then he was in Arizona for three years, so he knew that.

Q. Okay. But you don't recall asking E.M. specifically about what he knows about when Mr. McFadden started touching other people?

A. I don't recall.
Q. Okay.
A. I'm sorry.
Q. Oh, that's fine. And then in terms of the third interview with E.M. at the Western Slope Center for Children prior to the SANE examination, you remember that interview; right?
A. I do.
Q. Okay. That interview E.M. doesn't make any disclosures to you; correct?
A. Not new disclosures. We discussed the dogs and when they had the dogs and which dogs he was in -- he would been actually the time frame they would have had the dogs because he referred to the dogs at events, particularly events of sexual contact occurring when he was sleeping with this dog on the couch and then again when he was sleeping with this dog on the couch and again. So that's what I was attempting to clarify. New disclosures, no.
Q. But even -- you were trying to get a time frame based on the dogs because of what E.M. had previously disclosed; right?
A. That is correct.
Q. And so the conversation during the third interview was just about what dogs they had when?
A. That is correct. And also at the river, I asked

him if D. had ever woke up while they were at the river --
Q. Okay.
A. -- during the sodomy.
Q. So kind of just some questions for your -- to help fill in some gaps in your investigation?
A. That is correct.
Q. Okay. Now turning to J.WR. We already discussed that J.WR. prior to being interviewed by you was interviewed by Nicole Surrad of CPS; right?
A. That is correct.
Q. And you weren't present for that interview?
A. I was not. In fact I didn't know that J.WR. was even at the police department that day.
Q. And so you don't know any of the circumstances of how Ms. Surrad conducted that interview?
A. I do not and it was not recorded that I'm aware of.
Q. Okay.
A. I do know that he didn't make a disclosure to her.
Q. Okay. When you interviewed him at his house in Glade Park, did you know that he had been interviewed by Ms. Surrad?
A. I did.
Q. And why did you then interview him again?
A. Because I was told that he was -- wanted to talk;

that there was more.

Q. Who told you that?

A. I believe it was his mother, Michelle. Actually Cindy ██████ was the one actually I was communicating with, and she told me that Michelle had talked with her, and so I contacted Michelle and set that up.

Q. Okay. And this interview took place in J.WR.'s grandparents' home on Glade Park; right?

A. That is correct.

Q. And why did it occur at his home?

A. That's where they would be, where I could arrange to meet with them. And probably the short time span, we just agreed to meet up there in Glade Park with them.

Q. Okay. Like it was maybe the most convenient thing?

A. They had -- we had, I tried to set up other interviews with them and it didn't work out, and I told Michelle that I would just meet them up at the house. That would be the easiest thing, because she would be there; we could get there.

Q. And why did you bring Detective Stogsdill?

A. Just for a second set of ears, set of eyes. You know someone else to listen. She's also a forensic interviewer, and she's kind of an office partner. I kept her up to breast on what was occurring in this case, so she

knew pretty much what was going on.

Q. And when you had tried to set up other interviews that fell through, were those at the Western Slope Center for Children?

A. I believe one of them was.

Q. How many fell through?

A. I think just the one and then we attempted to set up another time and that didn't work, so we just said "we'll meet you up at the house; that would be easiest."

Q. And you indicated that you, J.WR. and Detective Stogsdill were in a separate bedroom during the interview?

A. That is correct.

Q. And was the door open or closed?

A. It was closed.

Q. But you could still hear the other family members; right?

A. You could.

Q. How far away were they?

A. In the next room.

Q. And what -- how all were you sitting in the bedroom?

A. J.WR. I think was sitting on a -- it was the master bedroom I think at the residence. Initially, Julie and I were sitting on the bed and he was sitting on a -- there's a what do you call it, a cedar chest at the end of

the bed type thing, and I moved to that and then I went and I sat on the floor because I was looking sideways at him. So I went and I sat on the floor in front of him and we did most of the interview that way.

Q. And what was his demeanor during the interview?

A. Solemn.

Q. And was he playing with anything or -- yeah, was he playing with anything?

A. He was sitting very still.

Q. Okay. Would you say that your training in the Corner House protocol encourages interviews to be video recorded?

A. They do.

Q. At the end of the interview both you and Detective Stogsdill are asking J.WR. questions; right?

A. During the interview, that's correct.

Q. Oh, throughout the whole interview, you were both asking questions?

A. She interjects I think maybe halfway through. I looked to her "Julie, do you have anything," because I needed to stop and think for a little bit, get my thoughts clear, straightened out, and then she asked a question and I followed up and continued for a while, and then she asked questions. That's part of the reason we have two people there. A lot of times it helps when someone else can step

in and maybe can fill in the spots that you miss, so.

Q. Does the protocol or your training allow for two interviewers to sort of tag team an interview like that?

A. I don't know that it allows or disallows that. I'm sorry, I can't answer your question there.

Q. Okay. Let's see so do you recall a time where Detective Stogsdill asks J.WR. to describe Mr. McFadden's penis? Do you recall that part of the interview?

A. I believe she did.

Q. And J.WR. responds that he can't. He says "no."

A. I believe that's the case and she was attempting to elicit was it hard or was it soft I believe was her questioning to him.

Q. So after J.WR. indicates "no, I can't describe it," she asks the followup question providing multiple choices?

A. I believe that's the case.

Q. And you did something similar right when you asked J.WR. to explain how Mr. McFadden did that; right? Do you remember that part?

A. Position-wise was he on his side I believe was my questioning, line of questioning at that point.

Q. And then you followed up with examples?

A. Correct. Because the question I asked you know how did that happen is kind of broad, so I tried to narrow

it down and, therefore, gave him a multiple choice type question to try to rein in the questions, focus him on them.

Q. And sometimes J.WR. answered the questions non-verbally; right?

A. That would be correct. He shook his head or "uh huh" type thing.

Q. And obviously if he's shaking or nodding his head, that's not on the audio recording?

A. That is correct.

Q. All right, now turning to K.WE. Well, yes, turning to K.WE.'s interview, you indicated to Mr. Waite that the Dolphin House is somewhat similar to the Western Slope Center for Children. What is different about it?

A. Purpose-wise it's a different building. It's an old house that they fixed up into --

Q. Oh.

A. -- the center.

Q. I see.

A. You know it's a regular business. It looks like a business when you walk in the door. So and it's amongst a neighborhood. I means there's a residential housing area all around it.

Q. So structurally or architecturally it's different?

A. Yes.

Q. But its mission is similar?

A. It serves the same purpose, yes.
Q. Okay. Now on K.WE.'s interview, although K.WE.'s isn't the only one, you provide, you start out the interview by talking to the children about putting together a puzzle. Do you know what I'm talking about?
A. I do that a lot.
Q. Okay. And that is not necessarily part of the Corner House protocol or training is it?
A. It's my way of describing what I do, my job.
Q. Okay.
A. In a way that they can understand.
Q. And this interview with K.WE. actually begins by you telling him that there are things that we don't understand and don't like; right?
A. I believe that may be the case.
Q. And that suggests to him that this interview is to talk about things he doesn't understand or doesn't like?
A. I think he was prepared for that. He had a hard time downstairs. When I first got there, just in watching him interact with the other kids and you know this wasn't something he wanted to do or you know he was not overly joyed at meeting me and being there for that purpose, put it that way.
Q. How was he exhibiting signs of having a had time downstairs?

A. He was just quiet and reserved, not active like the other two kids.
Q. But you had never met K.WE. prior; right?
A. I had not.
Q. And then you begin after you tell or telling him that there are things we don't understand or don't like, you go straightaway to asking him to tell you about the incident and why you both were there. Do you remember that?
A. I believe I asked him if he knew why we were there, and he stated he did.
Q. He did.
A. And we went into tell me why -- can you tell me about that, and he started to describe that.
Q. When you tell a child like K.WE. "tell me about the incident," that's suggesting that there is an incident to tell about; right?
A. Well I think we both knew there was an incident to talk about. Yes, it's suggesting there is.
Q. And then K.WE. responds that Mr. McFadden has a disease that makes him like little children; right?
A. I believe he did.
Q. That's not -- a disease that makes him like little children is not something that normal children know about; right?
A. That is something that probably his parents had

mentioned to him, yes; not unexpectedly so in the circumstances.

Q. You didn't do body part diagrams with K.WE. did you?

A. I did not. I don't believe I did.

Q. And I forgot to ask you this, but you didn't do the with J.WR. either; right?

A. I didn't need to with J.WR.

Q. Why didn't you need to with J.WR.?

A. He's old enough to understand this is my hands, these are my eyes, this is my nose. He's not a little kid.

Q. Okay. But isn't it important to get the names for the genitalia so that everybody's on the same page?

A. I believe he understood what that was.

Q. Okay. What about K.WE., why didn't you do diagrams with K.WE.?

A. I think with K.WE. we went straight into -- when I asked him if he knew why we were there, he went straight into that and it was understood between me and him when he was talking, he was pretty clear as to what had happened and how it happened and what body parts were used, so I don't believe that I needed it at that point.

Q. Although you did suggest the words for penis and anus to him; right?

A. I believe he used the same word for both his penis

 and anus. He used the word "no-no" for both of them, and I told him we had to differentiate between one or the other. You know I needed for him to give one a name or the other the name he named, so yes, so I would understand.

Q. And you asked K.WE. how he, how Mister -- let's see I think you asked K.WE. how -- oh, okay, I'm sorry. I think K.WE. indicates to you that Mr. McFadden or the bed was moving. Do you remember that part?

A. I do.

Q. And I think you asked K.WE. to describe it or how it was moving and he said "no, he couldn't" -- he indicated he couldn't describe it.

A. I recall I did.

Q. And so then you pressed K.WE. and asked him if you gave him two dolls if he could describe it better?

A. Not about the bed moving, but about the act that was involved.

Q. And he said no, he didn't want to?

A. That is correct.

Q. But then you kept asking if Mr. McFadden was moving up or against him or on top of him; remember that?

A. I do.

Q. So after K.WE. had said twice "I don't want to talk about the moving," you asked him a third question about it?

A. There were details I needed to understand. Instead of leaving it open, I needed to understand what he meant and what he was saying in order for me to ask further questions on that issue, so.

Q. Okay. Did you get any feedback or peer review on the interview with K.WE.?

A. No I did not.

Q. What about the interview with S.J.WE.?

A. No, I did not.

Q. You referenced earlier, I am now turning to S.J.WE.'s interview, that she first indicated to you during the rapport-building stage that she's an adult?

A. Yes.

Q. And she said that she is 40?

A. She did.

Q. And that she said that she was as old as you?

A. She did.

Q. And when you asked her "why are we here," she said "because of Mike;" right?

A. That is correct.

Q. And both -- oh never mind.

All right now, turning finally to D.R.'s interview. I can't remember if we already talked about this -- well I don't think we did.

D.R. had previously reported to his mother no

allegations; right?

A. That is correct.

Q. And so you had explained before that the first portion of your interview with D.R. was more as a witness and then it changed to questions about him being a potential victim; right?

A. That is correct.

Q. And what -- if you thought he was just a witness and he hadn't made any prior disclosures, what made you turn the interview to the personal questions?

A. There was some suspicion that he might have been. I wanted to draw that out to give him the opportunity to talk to me about it if there was.

Q. When you say there was some suspicion, you mean you had some suspicion?

A. Give me a second. When I talked with -- do you want the groundwork for that?

Q. Yes.

A. Okay. When I talked with the Hawkenberry's, both of them explained to me that D.R. was friends with their son, S.H. initially. That he and S.H. ran around together buddy-buddy, did things together. As that relationship continued, D.R. began to go with Mike. The [redacted] from their -- what I understand from them telling me that they didn't allow S.H. to participate with the issues with

Mike as much as the other boys or he wasn't asked to go, that type of thing, D.R. was moving away from S.H. towards Mike and then that increased.

The [redacted]s told me that D.R. spent time with Mike and actually slept in his bed. So I had prior knowledge that D.R. might have been victimized since most of the kids that had been in his bed had been victimized or reportedly so, and, therefore, when I interviewed him initially, it was from a witness standpoint because he had been in the same bed with L.WE. and J.WR. and Mike at one point or another. So I had prior information that D.R. was possibly victimized also. He denied it with his mom. His mom had told me that she also had asked him about it and he denied it to her.

Q. Okay.

A. So I did have prior knowledge.

Q. Okay.

A. Suspicion.

Q. Yeah. And that came from your talking to the [redacted]

A. That is correct.

Q. Okay. And the witness portion of the interview lasted for about 30 minutes; right?

A. I don't recall. That sounds about correct though.

Q. And during that portion, D.R.'s mother was

present?
A. She was.
Q. And during that part of the interview, she participated; right in the interview?
A. She did. She asked the questions that she was curious about too.
Q. And helped D.R. maybe answer some questions?
A. Maybe one or two. I don't recall. I think they were maybe dates or something like that. That's what I don't recall specifically.
Q. And you wouldn't say from D.R. given his age and development that you were necessarily seeking a free narrative from him; right?
A. I actually would have expected it a little more from him at his age, but at the same time it wouldn't be unnatural for him not to give a free narrative. It's not -- males tend to be a little more embarrassed than females as far as opening up and because of the stigma or something.
Q. But because -- but he was able to -- because of his age, he was able to provide a level of detail that some of the younger kids couldn't; right?
A. That is correct.
Q. Okay, you indicated that your forensic interview Corner House training was a week long. How many hours was it?

A. I think they classified it as 40 hours.

Q. And not every law enforcement officer is trained in forensic interviewing; right?

A. No. That's right.

Q. Is every detective?

A. Not every detective.

Q. And the protocol is based on social science research; right?

A. Yes.

Q. And the ideas about eliciting a free narrative, how not to be leading, how not to be suggestive all comes from -- it's research based; right?

A. That is correct.

Q. Okay. Now I'm going to turn to the interview with Mr. McFadden. Let's see that interview lasted over two hours; right?

A. That sounds about right.

Q. And I can't remember, Mr. McFadden was in the room the entire time?

A. We took a break and went out to the restroom.

Q. Okay.

A. And then came back.

Q. So all but a couple of minutes he was in that room?

A. That is correct.

Q. And are the dimensions?

A. About 10 by 10 probably.

Q. And the door was closed; right?

A. It was.

Q. And even when -- and he was left in there for portions by himself; right?

A. A short time, yes.

Q. And even during those times, the door was closed?

A. It was.

Q. And you had mentioned earlier that you began the interview and then Detective Ancell did the CVSA; right?

A. That is correct.

Q. And then Detective Stogsdill comes in and looks at the CVSA at one point; right?

A. It's called a blind analysis of the CVSA procedure.

Q. And then after that, both you and Detective Ancell, Sergeant Ancell interrogate Mr. McFadden?

A. We interviewed him.

Q. And during the portion where it's you and Sergeant Ancell, the confrontation gets a little heated wouldn't you say?

A. I would say probably so.

Q. And you, the two of you indicated to him that it's better to admit; right?

A. We did.
Q. That the DA would be more willing to work with him?
A. We did.
Q. And indicating that you know if he didn't talk to you, give his side of the story, he could be arrested?
A. I don't recall saying that specifically.
Q. Okay. But implying that you guys had evidence against him that you guys knew the other side of the story; right?
A. I believe we did imply that, yes.
Q. And I think at least Sergeant Ancell tells Mr. McFadden that he does think that he did it?
A. I believe he did. In fact I know he did.
Q. Okay. And basically both you and Sergeant Ancell indicate to Mr. McFadden that basically there's no cure, right, because he has the conviction in 1990, you know, and he's still doing this, that he's, you know, that he needs help; right?
A. I don't know about "no cure." We did -- I believe I did mention to him that he needs some help.
Q. Okay.
A. And we wanted to get him some help.
Q. And after -- you indicated that he voluntarily stuck around for the CVSA, but in fact he had asked if he

could arrange to do it a different day; right?

A. There's two questions?

Q. Sure.

A. He wanted to do it another day. I asked him if he'd be willing to stick around to do it today; the Sergeant was here to do the CVSA and he agreed to that.

Q. Okay, let's see.

MS. SMITH: Okay, may I have just one second?

THE COURT: Yes.

MS. SMITH: All right, I have nothing else. Thank you.

THE COURT: Mr. Waite?

MR. WAITE: Judge, I don't have any followup based on that.

THE COURT: All right, thank you. You're excused. Mr. Waite, do you have another witness?

MR. WAITE: No, Judge, I don't.

THE COURT: I guess what we're going to need to do though there is reschedule this portion of it to another date. Do you want to do that now and then we can start working on other motions?

MR. WAITE: That's fine, Judge.

MS. SMITH: And Your Honor, I think now would also be an appropriate time to let the Court know that we are going to ask for a continuance. I do apologize. I know

DISTRICT COURT, COUNTY OF MESA, STATE OF COLORADO

CASE NOS. 2013 CR 000027, 2013 CR 000339, and 2013 CR 000342, DIV. 5

---

REPORTER'S TRANSCRIPT (Motions Hearing)

---

IN THE MATTER OF

THE PEOPLE OF THE STATE OF COLORADO,

Plaintiff,

v.

MICHAEL TRACY MCFADDEN,

Defendant.

---

The above-entitled matter came on for hearing on Friday, June 6, 2014, at 8:10 a.m., before the HONORABLE THOMAS DEISTER, District Judge.

APPEARANCES:

FOR THE PLAINTIFF: DAVID WAITE

FOR THE DEFENDANT: KARA SMITH
SCOTT BURRILL

WITNESS: ED PRESCOTT

P R O C E E D I N G S

THE COURT: Please be seated. These are three cases: 13CR27, 339, and 342, all captioned People v. Michael McFadden. Mr. McFadden is here with one of two Counsel, Ms. Lewis [phonetic]. I'm sorry, Ms. Smith, and then Mr. Waite is here for the People.

And I think we're back today to, for the Defense to put on evidence, at least for the Defense to put on some evidence regarding, their desire to put on evidence under 807, Rule 807 of the Colorado Rules of Evidence. And then, whatever else we can get done. And so, Ms. Smith were you ready to do that?

MS. SMITH: Yes. And Mr. Burrill, I believe, is on his way. He had an 8:00 sentencing in a different courtroom. They must be going late. So, he will arrive shortly. And Mr. McFadden is okay with proceeding, and I think we ought to.

THE COURT: I think we discussed that on Wednesday did we not?

MS. SMITH: But, that was for a different --

MR. WAITE: Me, too.

MS. SMITH: -- Court. That was for another setting, another motions hearing setting.

THE COURT: Okay, well --

MS. SMITH: But --

THE COURT: So, do we need to wait for Mr. Burrill?

MS. SMITH: No, no not now.

THE COURT: Okay. Then, you may proceed.

MS. SMITH: Okay. The Defense calls Detective Prescott. Yeah, and can Mr. McFadden's right arm be unshackled for note-taking?

THE COURT: Yes. Do you swear, or affirm, under penalty of law, that the testimony you give here today will be the truth, the whole truth, and nothing but the truth?

DETECTIVE PRESCOTT: I do.

THE COURT: Okay. Please have a seat.

(Asides)

Whereupon,

ED PRESCOTT

Was called as a witness, and after having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. SMITH:

Q Detective Prescott, can you please state your name and spell your last name for the record?

A It's Detective Ed Prescott, P-R-E-S-C-O-T-T.

Q And are you the Investigator involved in the cases before the Court this morning?

A I am.

Q And as a part of those investigations, how many children, in total, did you interview?
A I'll have to list them off by name.
Q Sure.
A I'm sorry. I've just been counting them. I.S., E.M., D.O., L.W., J.W., Lo.W., and K.H.W. and his sister S.L.W.
Q And --
A Also D.R. and one more, I'm sorry.
Q -- was it T.M.?
A Yes.
Q And some of these children were -- were some of these children interviewed more than one time?
A Yes, they were.
Q So, if you just listed 10 children, it's fair to say that you actually conducted probably more than 10 interviews, even?
A Yes.
Q And did some of these interviews result in allegations of sexual abuse?
A They did.
Q And did some of them not result in allegations of sexual abuse?
A They did.
Q And in each of these interviews, which I know

you've already testified to several of them, extensively, did you generally follow your training in how to conduct interviews of children, Victims of sexual assault?

A For the most part, yes.

Q And does your training include following a certain protocol?

A To some extent, yes.

Q And did you follow that protocol? Is that protocol somewhat flexible or fluid?

A It is.

Q And did you follow that protocol to some extent in each of the interviews you conducted in this case?

A Some of the interviews were witness interviews. It initially started out that way. Some of the interviews were follow-up interviews. So, it wasn't exactly per protocol, as far as the RATAC at the time.

Q Uh-huh.

A CornerHouse protocol, there was follow-up interviews that occurred, when, in one instance, was spontaneous statements that I was totally unaware of came out. We conduct the interview right on the spot.

In the witness interviews, I was unaware of any circumstances of sexual abuse at the time. But I was aware that these children were affiliated with the other children, and with Mr. McFadden. So, in that instance, yes, they were

conducted per protocol, but in the flexibility that it gives you.

Q Right, okay. So, would you say that you did anything drastically different in the interviews where children made allegations, as compared to the interviews where children didn't make allegations?

A I'm not sure what you mean by "drastically different". When a child made an allegation, of course, we delved into that quite extensively.

Q Okay.

A To obtain that information. When there was no allegation, the interview, at times, was a lot shorter.

Q Sure. I guess what I'm trying to ask is if you think there was anything in the way you conducted the interview that was somehow different, and resulted in a non-allegation, as compared to the interviews that resulted in allegations?

A I'm sorry. I --

Q Do you feel like you deviated from the protocol in a way that led to the children not disclosing in the interviews where they didn't disclose?

A Disclosure or nondisclosure, that's up to the child. So, no, I'm not sure that I can answer that correctly. But, if the child's not going to disclose, I don't have any way of telling whether something happened or

didn't happen.

So, that's a choice, if something happened and they don't want to disclose. That's a choice they make. I'm there to elicit information, but not command them to tell me something. I don't know. I'm sorry. Maybe I'm not answering your question right.

Q I think you are. So, you're not there to command a disclosure, right?

A No, my whole job is to have them provide the information, without giving information to them.

Q So, likewise --

A Or leading them. I'm sorry.

Q So, similarly, you're not there to command a nondisclosure, either?

A That's correct.

Q Okay. So, I guess I'm trying to get at -- let me ask this question. In your training on how to talk to children who are making allegations of sexual abuse, the idea is to get a accurate statement from the child, right?

A As much as possible.

Q Okay. And would you agree that your training from CornerHouse and RATAC protocol is to try to get a reliable statement from the child?

A As much as possible.

Q Okay. And so, was there anything that you did, in

the interviews where the children didn't disclose, that made the process less reliable than the interviews you conducted, where the children did disclose? For example, did you make any big errors in the protocol, when you were talking to the children who didn't disclose?

A Let me answer your first question. As --

Q Okay.

A -- as far as less reliable, again, it goes back to if the child isn't going to disclose anything. That's a choice I can't change.

Q Okay.

A If I know ahead of time that there was a disclosure, of course I want to attempt to elicit information about that disclosure. But if I don't know that there was a disclosure previously, I'm in the unknown.

So, less reliable, more reliable, that's up to the child. I think the statements the child make is -- of course, I'll try to pull information from them to try to validate what they're saying. But reliable, less reliable, I think that's up to the child.

Q Okay. And then, my second question I asked was if you feel like you made any fatal, or large errors, in the interviews you conducted, where the children didn't disclose?

A I don't know about fatal errors or large errors. Just if there wasn't a disclosure, there wasn't a disclosure.

My job is not to force a disclosure, period.

Q Right.

A My job is to elicit the child to speak freely on their own.

Q Okay. And when you are interviewing children who are making allegations of sexual abuse, would you describe that interview as fairly detailed?

A At times.

Q And would you describe it as comprehensive?

A And your question, to answer that, it depends on the child. If you get a very young child, or something that happened years ago, sometimes it's not as detailed, and sometimes it is.

I know there's always more questions that, when you leave an interview, you think back. Well, I could have asked this. Or I could have asked that better.

That's every interview you do, all interviews. So, you try to pull as much as you can to get the most comprehensive account that you can. But, again, there are details that just don't get.

Q Would you describe the interview with a child who's making an allegation of sexual assault as a process?

A For them, and for me, if they're making the allegation, the process starts with when the incident happened. And they, in that process of making the

disclosure, then come in contact with me. And then, my job is to pull that information out of them as best as possible, without leading them in any way, and helping them to build the account, in their words, of what happened. So, it's a process. Yes.

Q And would you say, even leading up to the stage in the interviews where a child discloses, or not disclose, as a process, like, for example, of rapport building?

A Well, the rapport building is the initial contact with them. It goes into the interview. So, yes, you're building rapport with that child.

They met you, as a stranger. They don't know who I am, when I first meet them. And they have to overcome those fears. So, it is a process.

Q Okay. And in the process of the interview, are you trying to elicit a free narrative from the child?

A For the most part, but that depends on the child, again. A lot of children will not talk. They will answer questions.

But they will not give a free narrative. So, you always don't have that luxury of, like, an older child, a teenager. You'll ask them a question.

They will give you a narrative answer, where a younger child may answer you yes or no, or say yeah. So, you don't always have that luxury of a free narrative.

Q But that's the goal, or that's the best-case scenario?

A That's best-case scenario, in a perfect life. Yes.

Q And then, if you're not getting a free narrative, do you have to try to elicit details from the child in other ways?

A You wouldn't get any details unless you tried.

Q Okay. And you mentioned the protocol you're trained in as being the RATAC protocol. Is that right?

A CornerHouse.

Q And can you just say what that abbreviation stands for?

A Rapport building, Anatomy ID, Touch inquiry, Abuse scenario, and the Closing.

Q And those describe, with some flexibility, the different stages of the interview, right?

A That's correct.

Q You already referenced this a little bit earlier. But I want to be clear. How did you choose which children to interview?

A Initially, the case began with I.S. He was the initial disclosure that opened up this case. The report was made, initially, solely on him.

While talking with I.S., I, then, through his interview, intended to meet with E.M. I met with L.W. He

was available that day, or the next day that we did the interviews.

Q Can I stop you one second?

A Yes, you can.

Q Well, why did you decide to interview L., then?

A I don't know if I can tell you exact answer. It's just I had been advised that L.W. and J.W. both slept with Michael McFadden, in his bed, by, I believe it was Dian Stauter had provided that information to me.

Q So, --

A Go ahead.

Q -- so J.W. and L.W. had similar access, or spent similar time with Mr. McFadden, as did I.S. Is that fair to say?

A No.

Q Okay. All right, would you describe it as more or less access to Mr. McFadden?

A J.W. had spent over, I believe it was six years with Mr. McFadden, I.S. just a short time.

Q Okay. What about L.W.?

A L.W. is about the same amount as J.W., as like L.W.

Q And what about E.M.?

A E.M. had gone to Arizona for a time period, and, when he returned, had been with McFadden quite a bit.

Q Okay.

A He didn't sleep in the same bed, for the most part.

Q But, all three of these young boys spent time with Mr. McFadden?

A All four of them, yes.

Q Okay. The fourth being I.S.?

A Well, there's more.

Q Okay. All right, but is it fair to say that you directed your investigation and you talked to the children you talked to because they had access to Mr. McFadden?

A Definitely.

Q And that they spent a lot of time with Mr. McFadden?

A That is correct.

Q Okay. And is it true that -- I think you already indicated this, but is it true that some of the children actually lived with Mr. McFadden at different periods of time?

A That is correct.

Q Okay.

MS. SMITH: All right, may I approach the Witness?

THE COURT: You may.

(Asides)

MS. SMITH: Okay.

THE WITNESS: Okay.

BY MS. SMITH:

Q Okay. Now I want to turn with a little bit more specificity to the interviews you did with L.W. You conducted two interviews with L.W., correct?

A Actually, three.

Q Three. Okay. When were the three?

A I'm sorry. Let me back that up. Two, you're correct.

Q Okay. When was the first one?

A One was at the school. I believe it would be the 19th of December. I'm not positive on that date. But I believe that's correct.

Q Of which year?

A Would have been 2010, what? Or I'm getting my years mixed up, '12, I believe.

Q Okay. And what were the circumstances of this interview?

A Detective Stogsdill and myself went to the school, where L.W. was attending, and met with him in an office there. The initial part of the interview, he was a witness, per se, to I.S., and I.S.'s contact with Michael McFadden at the house.

He would have known that I.S. slept in the bed, or not, or any contact that he had seen with I.S. We discussed with L.W., during that interview, why we were there.

We went through a rapport-building with him,

anatomy ID-type setting. And asked him about any good/bad touches, touches that made him comfortable or uncomfortable, and discussed those with him. And it was our intent, if there was any type of disclosure, to stop and take him to Western Slope Center for Children. Contact his, I'm sorry, mother, and have her meet us at Western Slope Center for Children.

Q As a part of that interview, did you ask him about whether anybody had touched him inappropriately?

A I did.

Q And what did he say?

A He indicated they had not.

Q And did you record this interview?

A I did, audio.

Q And did you book this into evidence as EP-3?

A That would appear to be so. I don't have my Property Report in front of me. But that's what you have here as EP-3. So, I'm taking your word for it that that's the correct one.

Q And is it also marked as Exhibit MH-C?

A It is.

MS. SMITH: The Defense moves to admit MH-C, per a stipulation with the District Attorney.

MR. WAITE: Yeah, no objection for purposes of this hearing, Judge.

THE COURT: All right, MH-C is admitted.

(Exhibit MH-C admitted.)

BY MS. SMITH:

Q And I'm sorry. Did L.W. make any statements as to whether he had witnessed any child sexual abuse against I.S.?

A He indicated he had not.

Q And what about any other children?

A He had not.

Q Okay. In this interview with L.W. at the school, did you or Detective Stogsdill use leading questions?

A There might have been a leading question. But, for the most part, no.

Q Okay. So, you were trying to conduct a non-leading, non-suggestive interview, as you --

A We were trying. Yes.

Q Okay. To the best of your -- is it the same to best of your ability as when you're speaking with any child who you think might be a Victim of a child sexual assault?

A I would say that's correct.

Q Okay. Now, turning to the second interview of L.W., what date was that?

A I'm sorry. I can't tell you a date. I know it was in 2013. We were up on Glade Park at his grandmother's house.

Q And was this --

A And it's --
Q -- the same date and place that you interviewed his brother, J.W.?
A That is correct.
Q Okay. If I told you it was February 7th of 2013, would you have any reason to dispute that?
A I would have no reason to dispute that.
Q And what were the circumstances of this interview?
A I had not met with J.W. up until that point. I actually, in my prior investigation, had not met J.W. that I was aware of.

I found out, during my investigation, he had actually been at the Police Department the same day that I met with E.M. for my first interview with E.M., and that the Child Protective Services Worker had met with J.W.

I obtained her interview with J.W. There were issues that caused me to believe that both L.W. and J.W. had been perpetrated on, at this point in the investigation. And it was my intent to meet with both of them again, especially J.W., as a witness, and also as a possible Victim of child sexual assault.

So, I met with J.W. One of the children, it was K.H.W., had told me that, at one point, he -- and I believe during the night he was there, he woke up to some movement between

Michael McFadden and J.W. And he had seen that.

He indicated that to me. He didn't describe what it was, in detail. So, my intent was to meet with J.W. and see if there was any disclosure, on his part, at that point.

I had a sense that both he and L.W. had been victimized. And our purpose was to do an interview with J.W. We had trouble arranging for interviews at Western Slope Center with J.W. and his mother, Michelle. And so, we told them that we would just meet them at the house. Make it easy for them.

Q And what is the relationship between J.W. and L.W.?

A Brothers.

Q Okay. And so, since you were there to follow up on an -- okay. Never mind. And which child did you interview first? Do you remember?

A Would have been J.W.

Q Okay. And in J.W.'s interview, does he make an allegation against Mr. McFadden?

A He does.

Q And then, you interviewed L.W. after that, right?

A I believe that's correct. I believe that we interviewed J.W. first. I'm --

Q It's --

A I'd have to refer to my notes to be positive on that. The other reason we were there is I had not met with

Michelle. And so, we had actually three issues there that we needed to take care of.

Q Okay. Well, I guess I don't think it matters that much which child you interviewed first. But I think my question is: was your interview with J.W. and L.W. conducted in, essentially, the same fashion?

A I'm not sure what you would mean "the same fashion". We interviewed J.W. in the master bedroom at the residence, so the bedroom that's on the east side of the house, if my directions are right. And behind a closed door, the family was home in other rooms.

We could hear muffled voices in the other rooms. Of course, you've got kids. So, you have loud talking. And I believe they were watching TV at the time, too.

That was the same room we had interviewed Michelle on, who we interviewed first, while we were there. The interview with J.W. was pretty extensive.

He was pretty descriptive, as far as what had taken place, the abuse that he suffered, where he was at, locations where that happened. The interview with L.W. was very short.

We didn't go back and re-interview him over what we'd discussed previously. We just asked if there was other information that he wanted to talk to us about. I think we weren't with L.W. more than probably five minutes.

Q And when you say you didn't go back over other

information you'd already discussed, you mean information that you talked to him about at school?

A Yes.

Q And where in the house was the interview with L.W.?

A The same room, it was --

Q Okay.

A -- it was after we had interviewed J.W. I believe it was after we interviewed J.W. We had J.W. leave. And L.W. came in and talked to us.

Q Okay. So, the interview with L.W. was L.W., you, and Detective Stogsdill?

A That is correct.

Q Now, I know that the interviews were different because of what the children were saying, or not saying, to you. But was there anything different in what you and Detective Stogsdill did, at least initially? Do you think that you and Detective Stogsdill conducted the interviews in a very different way, between J.W. and L.W., at least initially?

A Yes. J.W., I hadn't met before. And I mean, it was pretty much right off the bat. He knew why we were there. And he indicated he wanted to talk to us about that. And --

Q Okay.

A -- we went with L.W. It was, L.W., is there

anything else you want to talk to us about? Is there anything you can tell us, other than what we talked about the last time?

He knew why we were there. He mentioned [indiscernible]. I believe we discussed why we're there. He remembered.

We went and talked about I.S. and about Mike last time we talked to him. And that he indicated there wasn't anything else is could tell us.

Q Okay. Do you think that there was anything about the circumstances under which you interviewed L.W. that caused him to not disclose?

A That's, again, up to the child. If they disclose or not disclose, that's not an issue I can force.

Q Okay.

A Or would want to.

Q So, in retrospect, do you think that there's anything that you or Detective Stogsdill did, in speaking with L.W., that was erroneous or problematic?

A No.

Q And did you record this interview?

A It was.

Q And is it there before you, as MH-B?

A That is correct.

Q And it also is marked -- is it also marked as

EP-16?

A That is correct.

Q Is that likely consistent with how you booked it into evidence?

A Without looking at my Property Reports, again, I'll have to go on your word.

Q Okay.

A That it is EP-16, copy. I have not listened directly to these CDs. So, --

Q Right.

MS. SMITH: The Defense would move to admit MH-B, per stipulation with the District Attorney.

MR. WAITE: No objection, Judge.

THE COURT: MH-B's admitted.

(Exhibit MH-B admitted.)

BY MS. SMITH:

Q And just to be clear, I think it is, at this point. But let me make sure. Did L.W. make any allegations of sexual abuse against Mr. McFadden toward any child?

A No, he did not.

Q At Glade Park.

A No, he did not.

Q Okay. Now, did you interview D.O.?

A I did.

Q And why did you interview D.O.?

A As part of the investigation.
Q What's the relationship between D.O. and E.M.?
A D.O. and E.M. are brothers with different fathers.
Q Okay. Same mother, then?
A Yeah.
Q And is their mother, Crystal McFadden?
A Yes.
Q And did E.M. disclose abuse by Mr. McFadden?
A E.M. did.
Q Okay. As a part of your investigation, did you learn whether E.M. and D.O. spent similar amounts of time with Mr. McFadden?
A They were around him for similar amounts of time. Yes.
Q And did they both live with Mr. McFadden?
A At one point, yes.
Q Okay. And when did you interview D.O.?
A When I initially met with E.M., D.O. had gone to Boulder, Colorado, to see his grandparents. So, he was not available for the interview.

So, when he returned, I conducted an interview with him. I believe it was some time after the first of the year. In fact, it was the same day that I interviewed E.M. on the second interview that E.M. made his disclosure.
Q Does January 2nd, 2013 --

A That is the date.

Q Okay. And where was this interview?

A Interview was conducted at Grand Junction Police Department.

Q And did you also re-interview E.M. that same day at the Grand Junction Police Department?

A That's the date that E.M. made spontaneous statements to me.

Q And after making those spontaneous statements, did you conduct a full interview with E.M. at the Police Department?

A I did.

Q Okay. And then, after speaking with E.M., did you interview D.O.?

A I did.

Q And were the circumstances between your interviews with E.M. and D.O. similar?

A No, E.M.'s was a spontaneous statement to me that he told me he had lied, and that he needed to talk to me. That was when I first walked into the lobby of the Police Department.

He told me that. I told him, okay. Let's go upstairs and we will talk. We did a follow-up interview, because I had already conducted a interview, per protocol, with him. So, the follow-up interview was to obtain direct

information from him about the abuse that he said occurred to him, from Michael McFadden.

Q I think what I mean in circumstances is more specifically, was it the same room?

A It was.

Q And did you use a similar approach to interviewing both children?

A I hadn't met D.O. So, I went through touch scenario-type thing with D.O. And there was no disclosure on that part. The issue I did have with D.O. was the incident in Arizona, where he'd made an initial disclosure to a Law Enforcement Officer down there.

Q Okay.

A That was in 2009.

Q And did D.O. deny making that disclosure in Arizona?

A I don't know if he denied it. He didn't recall --

Q Okay.

A -- making it. So, --

Q And then, did he deny any bad touches, or sexual touches, by Mr. McFadden?

A There were no further disclosures by him.

Q Okay. And would you describe that interview you had with D.O. as a forensic interview, then?

A For the most part, yes.

Q I forgot to ask you this, when we were talking about L.W.'s second interview at Glade Park. Would you describe that as a forensic interview?

A We had, for the most part, yes, follow-up interview.

Q Okay. So, again, I know that each child's different, and then you react to what the child does or doesn't do?

A That's correct.

Q But I guess my question is: in your general overall approach to both E.M. and D.O. that day, at the Police Department, was it similar in terms of trying to get a reliable, non-leading interview from both children?

A All interviews are. You're trying to be non-suggestive to the child, to elicit information from him. So, pretty much that's the same with every interview.

Q Okay. So, nothing in your approach was drastically different with D.O. that could explain why he didn't disclose?

A Again, that's up to the -- disclosure's up to the child. I can't force that issue --

Q Okay.

A -- with a child. They have to make that --

Q Okay.

A -- decision. If it didn't happen, it didn't

happen. I can't --

Q So, in retrospect, do you think that you made any major mistakes in your interview with D.O. that could possibly explain why he didn't disclose?

A Are you telling me he should have disclosed?

Q No, I'm asking you if, just in thinking back on that interview, if you think you made a major mistake in the protocol, for D.O.?

A Again, that disclosure's up to the child. There are questions I could have asked. I mean, you always can think of questions you could have asked.

But, if that child's not going to make a disclosure, they're not going to make a disclosure. I don't know whether I made a mistake or not. Again, it's up to the child.

Q Okay. All right, I think I'm just trying to get at, I mean, it's true that, I mean, you've testified numerous times that there is a protocol that you follow, correct?

A There is. But that protocol is open.

Q Right.

A And you follow that protocol to the extent possible. There are questions that you're asking that child, and especially on a re-interview.

You don't go back and start over with anatomy ID. That's already been accomplished. You don't go back on touch

scenario.

That's already been accomplished. They're already making the disclosure. So, you go from there. If you go into a interview, and the first thing the child blurts out is I lied to you, you don't go back over that.

Q Okay.

A You go straight to your questioning as to the abuse scenario. So, maybe I don't understand what you're trying to get at.

Q In your interview with D.O., did you leave out one of the major parts of the protocol?

A In my interview with D.O.

Q Or do you think, in your interview with D.O., you deviated from the protocol in a -- deviated too far from the protocol in a way that didn't make the interview a forensic interview?

A Do I think? No.

Q Okay. Now, before you, do you have MH-A?

A I do.

Q And is that also marked as EP-11?

A It is.

Q And as D.O.'s January 2nd, 2013 interview?

A It's just marked Interview with D.O. There's no date on there.

Q There's no date. Okay. I beg your pardon.

MS. SMITH: The Defense moves to admit MH-A.

MR. WAITE: For purposes of this hearing, Judge, I don't object to that.

THE COURT: It's admitted.

(Exhibit MH-A admitted.)

BY MS. SMITH:

Q And in this interview with D.O., did he make any allegations of sexual abuse against Mr. McFadden, towards himself?

A He did not.

Q Did he make any allegations of sexual abuse against Mr. McFadden, towards any other child?

A He did not.

Q Did you interview T.M.?

A I did.

Q Did you interview T.M. because you knew that his mother dated Mr. McFadden?

A I did.

Q And did you know, from talking to that woman, that Mr. McFadden spent time with T.M.?

A I did.

Q And when did you interview T.M.?

A I'm sorry. I don't have that date. I think it was in March of 2013. But I can't tell you the date.

Q Okay. How does April 3rd of 2013 --

A That --
Q -- sound?
A -- that would work, if that's what you have in your records, from my records.
Q Okay. And where did that interview take place?
A At Grand Junction Police Department.
Q And how old was T.M. at the time of the interview?
A I'm sorry. I think he was 14 or 15. I'm not positive on that.
Q Okay. But he was an older child, then?
A I believe he was.
Q So, was your interview with T.M. similar to your interview with D.O.?
A No.
Q Okay. In your interview with -- was your interview with T.M. as a -- was your approach that he could be a Victim?
A Initially as a witness, because he had been around McFadden and around the other boys. He was named by, I'm sorry, John [phonetic] and Phyllis H[redacted] [phonetic].
His mother was named as a ex-girlfriend who had a son and had been around McFadden. My job, as an Investigator, especially in this case where I have multiple disclosures by multiple kids, over a period of multiple years, was to uncover any other possible Victims. So, T.M.

was a witness, having been around these kids, as well as a possible Victim.

Q Would you say that your interview with T.M. was a forensic interview?

A It was an interview. I was not leading Mr. T.M. in the interview, as far as the same I would a young child, since he was able to talk on his own, was able to provide narrative.

Q Did you conduct the interview in a suggestive manner?

A I did not.

Q Did you, with some flexibility, given T.M.'s age, adhere to the CornerHouse protocol with T.M.?

A I can't tell you that I did. I understand that I did talk to him as a witness, initially. But we also went into -- I think I did talk to him using the touch scenario. And then asked him about any abuse, or possible abuse to him by any person, or if he witnessed any abuse to any other persons.

Q So, it sounds like you conducted a couple of the stages of the RATAC with T.M.?

A I did.

Q And did he make any disclosures of sexual abuse?

A He made no disclosures of sexual abuse, or witnessing any sexual abuse.

Q Would you describe the interview with T.M. as suggestive? Did I already ask you that?

MR. WAITE: You did.

MS. SMITH: I'm sorry.

BY MS. SMITH:

Q I know. You had explained, when you testified previously, that whether or not an interview occurs at the Police Station, or the Western Slope Center for Children, doesn't really matter. Is that correct?

A We're supposed to conduct them at Western Slope Center for Children. But there are times when -- as such as with E.M. -- a spontaneous statement, and T.M.'s an older child.

It was later in the day. And I believed, if I'm not mistaken, when I called his mother, they agreed to come down that same afternoon. I'm not positive on that. But I'm --

Q So, nothing in the interviews that occurred at the Grand Junction Police Department make them less reliable, just because they occurred at the Police Department. Would you agree with that?

A I would agree with that.

Q Now, you recorded the interview with T.M., correct?

A I did.

Q And it's before you as MH-D, correct?

A MH what?
Q D, as in dog?
A That is correct.
Q And also marked as EP-18?
A That is correct.
MS. SMITH: And the Defense moves to introduce MH-D.
MR. WAITE: No objection for this hearing, Judge.
THE COURT: It's admitted.
(Exhibit MH-D admitted.)
BY MS. SMITH:
Q Now, finally, we turn to the interview with Lo.W. Is that how you pronounce that last name?
A It's close enough.
Q Okay. Did you interview that young child, little Lo.W.?
A I will put, I attempted to interview young Lo.W.
Q Okay. And how old was Lo.W. when you interviewed him?
A I think he was four, but a very young four, if that. So, I'm not positive on that. His mental capacity's not the word for it I'm thinking of. But, he was just very young when I conducted the interview, or tried to.
Q Okay. And where did that interview occur?
A That was at the Dolphin House down in Montrose,

which is Montrose County's sister for our CornerHouse.

Q Okay.

A Or our Western Slope Center for Children.

Q And did you interview Lo.W. because he had similar contact with Mr. McFadden, as his siblings, K.H.W. and S.L.W.?

A Somewhat similar, yes.

Q And what was that contact that --

A The W., originally they lived on North Avenue in a what we'd call trailer park, not too far from the house on Glen Road where Michael McFadden was living with John and Phyllis H[redacted]

I know that K.H.W. would frequent the H[redacted] and Mr. McFadden. But I'm not sure that Lo.W. or S.L.W., I'm sorry, per the H[redacted]' statements to me.

They, then, moved to the D and a half road address, 2[redacted] D and a half road. And the W. moved into a house next door to where McFadden and the H[redacted] lived. And the W. children would frequent that residence.

So, in that respect, they had a somewhat similar interaction with Mr. McFadden. I just don't know how much interaction Lo.W. actually had, because he was quite a bit younger than the other kids.

Q Okay. But was Lo.W. also on the over-the-road tractor-trailer trip with Mr. McFadden that his two

siblings --

A He was.

Q Or his actually three siblings were. Okay. He was. Okay. So, you said you attempted to interview Lo.W. at the Dolphin House. And was this the same date and place that you interviewed his brother, K.H.W., and his sister, S.L.W.?

A It was.

Q And did you use the CornerHouse protocol when you interviewed Lo.W.?

A I tried.

Q And did Lo.W. make any disclosures of sexual abuse --

A He did not.

Q -- in the interview? And about how long was that interview?

A I can't tell you. It was pretty short.

Q Okay. Would you describe that interview as suggestive?

A No.

Q Which parts of the protocol -- which stages of the protocol did you get through with K.H.W.?

A With K.H.W. or Lo.W.?

Q I mean Lo.W., yes?

A Initial introduction, then we started talking. And it didn't go very far from there.

Q How come?
A Because he's a very young child, and very active. Moves around a lot, and it was hard to pull any information out of him, as far as -- or elicit any information out of him, as far as anything. So, --
Q Did you ask him if he had ever received bad touches?
A I think attempted to. But, I don't believe we got there.
Q Okay. Is Lo.W.'s interview before you as MH-E, there on a disk?
A It is, correct.
Q And also marked as EP-5?
A That is correct.
Q And you recorded the interview with Lo.W., right?
A I did.
Q And booked it into evidence at --
A I did.
Q Okay.
MS. SMITH: And the Defense moves to introduce MH-E.
MR. WAITE: No objection, Judge, for this motions hearing.
THE COURT: It's admitted.
(Exhibit MH-E admitted.)

BY MS. SMITH:

Q Let me just ask a couple quick questions, and then I'm going to be done. In your interviews with L.W., D.O., and T.M., and Lo.W., did the children use age-appropriate language?

A Say the four names again. I'm sorry.

Q L.W., D.O., T.M., and Lo.W.?

A Lo.W., no, the rest of them, yes.

Q Okay. And in --

A Well, I guess age-appropriate, other than he's hyper ADHD, whatever, Lo.W., age-appropriate for him, yes.

Q Okay, for his developmental age?

A Yes.

Q Okay. And then, for the two interviews with L.W. and the interview with D.O., would you describe those your interviews of those children as suggestive?

A I would not.

Q Okay.

MS. SMITH: All right, I have nothing further. Thank you.

THE COURT: Mr. Waite?

MR. WAITE: I have no questions for the Detective.

THE COURT: Okay. Thank you, sir.

MS. SMITH: Yeah, may I approach with the --

THE COURT: You may. Thank you. Argument?

Exhibit D

DISTRICT COURT, COUNTY OF MESA, STATE OF COLORADO

CASE NOS. 2013 CR 000027, 2013 CR 000339, and 2013 CR 000342, DIV. 5

---

REPORTER'S TRANSCRIPT (Motions Hearing)

---

IN THE MATTER OF

THE PEOPLE OF THE STATE OF COLORADO,

Plaintiff,

v.

MICHAEL TRACY MCFADDEN,

Defendant.

---

The above-entitled matter came on for hearing on Tuesday, October 14, 2014 at 2:48 p.m. before the HONORABLE THOMAS DEISTER, District Judge.

APPEARANCES:

FOR THE PLAINTIFF: DAVID WAITE

FOR THE DEFENDANT: KARA SMITH

ALSO PRESENT: MICHAEL MCFADDEN
CHERYL ROY

at their charts it didn't appear that the children actually made any statements.

THE COURT: Then the same rulings I made today are also made in -- was the motion only filed in 27 and --

MS. SMITH: Yeah.

THE COURT: -- 339?

MR. WAITE: Yes, just 27.

THE COURT: So my findings I guess are applicable to 13CR27 and the motion -- a similar motion but with different evaluators, examiners, was withdrawn.

So that then leaves I think the 13-25-129 rulings, and so if it's acceptable to the parties I thought I would move there and then we can handle the individual questions that each of you might have had for clarification on some of the other issues that might have been mentioned. Is that acceptable?

MR. WAITE: That's fine, Judge.

THE COURT: Let's start with -- I guess in 13CR27 there are statements that are attributed to I., E., and J.

The first statement made by I.S. was in December of 2012. The statement was not spontaneous, however I did not find him to be upset or in pain when he was being interviewed. He did speak in age appropriate language.

I find that the forensic interview that was done did not involve leading questions. There's no evidence

there was any bias or prejudice against the Defendant by I. There was nothing disclosed concerning a motive for lying. No information has been provided to me concerning any other intervening events that might have caused or been the basis for the statements that were made.

The statement was heard by more than one person, not only the law enforcement examiner, but there was another person who was listening. Also it was video taped, and so all of us can see what actually was said. The interview has been digitally recorded and therefore all of us can see what actually was said.

There was no evidence that I can recall that was introduced concerning I.'s character. In his statement I. clearly knew what was real from the unreal. He knew what a lie was. He could -- he did in fact agree to tell the truth and only talk about what's real. He had a clear ability to receive just impressions and then a clear ability to relate those facts. His statement was not a pre-narrative. He did indicate he had discussed this with his cousin.

I find based on all of those circumstances that this statement -- I believe I. is going to testify. I think the D.A. indicated that. So therefore the statement would be admissible as either a prior inconsistent or a prior consistent statement. However it also can be admitted under 13-25-129. I find that there's sufficient indicia of

reliability to allow its admission into evidence.

I. made a second statement in March of 2013. Again, this statement was not spontaneous. He was not upset or in pain.

He did speak in an age appropriate fashion. There was one statement made by Ed Prescott that -- in an effort to see if there was more information, I think Ed Prescott said something to the effect that sometimes there is more information that might be available if they talk to someone again. I don't find that that's necessarily leading but it certainly is suggestive to allow a young man to think that maybe he needs to tell more.

Again, there was no bias against the Defendant displayed. There was nothing brought up or anything that has been presented by the parties that shows a motive for lying. No information concerning intervening events.

I don't know if it was heard by another person but it was also video taped. Again, no information was provided about I.'s character.

Interestingly enough, in this statement I. did not recall what he had said before. He did indicate that he doesn't like to talk about it and gets angry about what happened to him. He did use the term in this instance that he had not used before, and that is that Mr. McFadden had raped him, and provided no details concerning what he meant

by rape. In this statement he can't recall when it occurred. Then he said something to the effect of, "I guess I'll go with you," regarding a statement that Ed had made, which is a very curious statement.

Under the circumstances here I find that these statements are not admissible under 13-25-129, especially when the child is indicating things like, "I'll just go with what you say," and that -- however this statement would be admissible as a prior consistent or a prior inconsistent statement should I. testify differently.

There was a statement made by E. on December 21st of 2012 in which he said nothing happened. And therefore this statement does not qualify under 13-25-129 because that statute requires there be a statement that is descriptive of sexual contact, and there was nothing here from E. to that effect.

E. made a second statement on -- I should say E.'s first statement was December 21st of 2012. That's out, it's not admissible under 13-25-129. Of course, statements like nothing happened would be admissible for prior inconsistent statements.

E. made a more detailed statement on January 2nd of 2013. Now this statement again was not spontaneous, however in this instance E. made lengthy narratives about what had happened in response to open ended questions.

There was not -- he did not appear to be upset or in pain. He used age appropriate language. He indicated that he had forgot to tell the investigator something before, which is curious because before he had said nothing had happened, but he's saying now I do have something to tell you.

There isn't any information that was provided concerning any bias or prejudice against Mr. McFadden, and no information concerning a motive for lying. I don't know if there was anything that occurred that might have intervened between the first and second statements, or any statements that might have been made around him that could have precipitated and caused what he divulged on January 2nd of 2013. However, no evidence was introduced about an intervening event.

I don't know if the statement was heard by more than one person, but again, it was video taped. Nothing was introduced about E.'s character generally.

Again, I indicate that there was a lengthy narrative on E.'s part while he provided a great deal of detail. He indicated that this was a result of something he remembered and had not mentioned, and his words were "forgot to tell" the investigator on a prior occasion.

He did indicate in a subsequent statement that he had lied before so he came to the Grand Junction Police Department to tell them. His statements may have been

internally inconsistent. Nonetheless, I find that given the lengthy narrative he speaks, that he acknowledges that he had lied and needed to tell something to the investigator is indicative of reliability. I find that this statement is in, but of course it could have been used anyway as a prior inconsistent or prior consistent statement, depending on what E. testifies to at trial.

E. made another statement in January of 2013. This was just prior to the SANE examination. But in this statement there was a discussion about dogs, when they had certain dogs, but there was no 13-25-129 statements, so this statement is not admissible under 13-25-129 because it lacks the necessary element of a statement concerning sexual contact. Therefore it's not admissible under 13-25-129, but can be used in the event that E. testifies either inconsistently or can be used as a prior consistent statement if his credibility is challenged, or if there's some allegations of recent fabrication, those type of things if the necessary foundation has been laid.

Next there is a first statement that's made by J. This statement was not spontaneous. It was not when he was upset or in pain. It was in age appropriate language. I find that leading questions were not used. There was no divulging of any type of bias against Mr. McFadden. There was no indication, no evidence has been provided about a

motive for lying. I can not know whether or not there was anything -- there was no evidence of any type of intervening events that might have caused the statements that were made. Nothing was presented in that regard.

I don't know if it was heard initially by more than one person, but it was video taped. No information was provided concerning J.'s character. J. did not provide a lot of detail, though there was some corroboration that was provided, and he did speak at times in a narrative, which means it wasn't just question/answer, question/answer. He was asked a question and then he would speak at some length concerning response to that, providing a fair amount of detail, but not a lot of detail.

I find that this statement certainly would be admissible as a prior inconsistent or a prior consistent statement if the necessary foundation is laid. I find though that this statement is admissible under 13-25-129 because I find that there was sufficient indicia of reliability in how the interview was conducted to warrant its admissibility.

J. provided another statement that was not video recorded. It was at his grandmother's house. More than one detective was involved. I believe it was in age appropriate language.

This was not a truly forensic interview because it

was not video recorded. It was not in what might be termed a neutral locale. It was at J.'s grandma's house and there were a lot of family members who were outside and during the audio tape you can actually hear the noise levels there.

More than one detective was involved in questioning. The standard forensic protocol was not followed, and therefore it can't be fully evaluated under the standard things of a forensic interview. Nonetheless, he had apparently divulged something to his mom and grandmother, and based on the statements that were made the family then made arrangements for detectives to speak to J. again.

The statement does not have to be conducted in a forensic manner in order to be admissible. Hearsay statements might be admissible under 13-25-129 even though the standard protocol was not utilized.

In this instance I find the detectives were careful in terms of what they did. Of course though they didn't follow completely the forensic protocol, they did not utilize leading questions that I heard. The child did speak in age appropriate language. The child did not appear to be upset or in pain when he was speaking. It was not spontaneous. This was something where J. had spoken to family members and then they had notified law enforcement that he had more to say and so law enforcement, after some

difficulty in arranging it, they end up going to the grandmother's house where J. was and then interviewed him in a bedroom away from everyone.

I find that this statement does sufficiently satisfy and provides sufficient indicia of reliability for its admission at trial under 13-25-129, and of course it can be used as a prior consistent or a prior inconsistent statement.

Turning now to the statements made in 13CR329 by S.J. and K., first concerning S.J. I found that her statements were not made spontaneously. She was not upset or in pain. The statements made were indeed in age appropriate language. Leading questions were not utilized. There was no information about bias against Mr. McFadden. There was no information provided to me about any motive for lying that S. might have.

There was no evidence -- nothing has been presented to me about any type of intervening event that could cause the substance -- or could have caused the statements that were made by S.J. on this occasion from the time of abuse until -- or the alleged abuse until the time the statement was made.

I don't know if this statement was heard by more than one person. There was no information concerning her character. She provided numerous details. She had

 previously told three people. She was really descriptive about what was said in providing her narrative responses to some questions, and so I find in this instance that this statement provides sufficient indicia of reliability for admission under 13-25-129, and therefore is admissible not only there but also would be usable concerning prior inconsistent or prior consistent statement.

Next is the statement made by her brother, K. That statement was not spontaneous. In this instance K. was not in any physical pain but he did indicate that remembering it was upsetting to him. He did speak in age appropriate language. Leading questions were not used. There was no information about bias against the Defendant was provided to me. No information about a motive for lying was provided in any evidence.

Again, I can't say if there was any type of intervening event from the alleged abuse to disclosure. Certainly no evidence was provided. I don't know if it was originally heard by more than one person, though it was video taped and we can watch him say the things that he did. A complete version of that was recorded.

No information was provided about K.'s character. He did make one curious statement about something happened while he was asleep and one would wonder how he knows that it happened when he was asleep, but interestingly here he

did indicate that he provided corroboration to the fact that he said he personally saw Mr. McFadden touch J. in a situation where they were all in the same bed.

He also told a fairly elaborate story with substantial detail, and so I find that this statement provides sufficient indicia of reliability for admission under 13-25-129, and therefore is also available as a prior inconsistent or prior consistent statement under the Rules of Evidence.

Finally, there is the out of court statement made by D. in 13CR342. I find -- oh, one other thing that I want to talk about K. is that this was an instance where the investigator talked about a puzzle metaphor and maybe suggested that more pieces might be needed, but I find that though that was discussed it was not sufficiently suggestive to warrant exclusion of the statement made by K.

Concerning D. now, it was not spontaneous. He was not in any type of pain. He spoke in age appropriate language. There was some suggestions used in questioning of him, what others had indicated I think was some of the language that was used. There was no information about bias against Mr. McFadden. No information provided to me about any motive for lying.

No information concerning any intervening event that could have led to the statements that were made. It

Exhibit D

was heard by more than one person. No information that was provided about D.'s character.

Now in this instance however the description that he provided indicated that the touch was like a dead fish. Apparently there was no movement of the hand that -- I believe that the statement was that Mr. McFadden was sleeping and his hand was resting in some way on -- or above or on J.'s -- or I mean D.'s privates.

Clearly there was a touching of an intimate area but really there was no information that was provided as to whether or not this touching could be construed as for sexual arousal, gratification, or abuse.

Because the 13-25-129 clearly indicates it has to be a statement of sexual contact, which as I understand it has a very specific legal definition which involves the touching of a person's intimate parts, either above or beneath clothing, for the purpose of sexual arousal, gratification, or abuse, given the fact that D., I believe, indicated that Mr. McFadden appeared to be asleep to him when this occurred -- my memory of the statement is that he moved the hands and Mr. McFadden did not awaken and that it was just moved.

I find that this statement at least does not internally include a statement of sexual contact given the definition of sexual contact which requires a touch for

sexual arousal, gratification, or abuse. Therefore I find that this statement is not admissible under 13-25-129, though it could be admissible for purposes of sexual arousal -- I mean for purposes of prior consistent or prior inconsistent statement.

The Defense in this instance made an argument that -- something about age limit to 13-25-129. I find that that is not persuasive at all. So anyway, that statement is not admissible under 13-25-129.

I think that covers all of those statements on all three cases. So that then, in the limited time we have left, we need to chat about the other things that might need either clarification or ruling upon.

So Mr. Waite, why don't you go through individually the matters that you wanted clarification concerning.

MR. WAITE: Well Judge, I think at this point what I would ask the Court to clarify for me is with respect to Mr. McFadden's prior conviction from 1990, I think the Court had granted the Defense motion to exclude that in part and denied it in part. If I understood the Court's previous ruling, I think the Court had indicated that the conviction -- the fact of the conviction itself couldn't come in but that the underlying circumstances could.

THE COURT: And statements of -- statements by the

Defendant admitting the act would be admissible.

MR. WAITE: Yes. So I think I'm pretty clear about that.

THE COURT: Which would include a guilty plea, though you can't use guilty plea.

MR. WAITE: Right.

THE COURT: Essentially what would happen is on the date that plea was entered you could just characterize that as that on such and such a date he admitted to the sexual contact that had been described. So I think that under -- so does that clarify it --

MR. WAITE: Yes, it does.

THE COURT: -- without any further --

MR. WAITE: Yes, I'm good, Judge, on that. Then I think the Court has really clarified everything else I needed to have clarified.

THE COURT: You had something about K.'s assault in the truck. You talked about clarification about K.'s assault --

MR. WAITE: Well --

THE COURT: -- his statement about assault in a truck.

MR. WAITE: That's true. One of the things that I had filed in my 404B/16-10-301 motion was a request to get into evidence -- and quite frankly, I'm not sure it's either

one of those things. I think it's really res gestae in large part as well, but my request was to get into evidence regarding K.'s assault by the Defendant as part of a pattern here while he was being transported in a truck and they end up -- Mr. McFadden ends up getting arrested shortly thereafter.

The reason I asked about that is because the Court had then -- with respect to the Defendant's motion for -- to exclude bad acts or character evidence regarding the Defendant had done that fairly general --

THE COURT: I don't know if this will satisfy that but that statement would be -- if that is not the basis for a charge in K.'s case it would be clearly admissible as pattern evidence, which is one of the reasons that would be admissible under 404B. And independently under the statutes relating to pattern.

MR. WAITE: And that's what I thought. That's kind of where I thought that went with the Court as well, so I'm good with that as well, Judge.

Then the last thing I would want to raise and then I'll turn things over to Counsel is I just received from Counsel s curriculum vitae from a person named (inaudible), a licensed psychologist in Lafayette, Colorado. He's not been endorsed at this point but I got the impression that the Defense wanted to endorse him as an expert in this case.

I just have received the resume, I have not seen any kind of endorsement and I've not seen any kind of a summary at this point but it's my impression from speaking with Ms. Smith earlier that the Defense intends to use him as an expert in this case.

THE COURT: Well, if they haven't endorsed him I don't know what to tell you. I do have an endorsement of Suzanne Pinto.

MR. WAITE: I don't know that I've seen --

THE COURT: From Longmont, Colorado.

MR. WAITE: I'm not sure I've seen that one.

THE COURT: It was filed on September 12th. Is there a substitution, or two experts, or --

MS. SMITH: What we would anticipate doing is withdrawing our endorsement of Dr. Pinto. So all of this is very late breaking last week. Dr. Pinto fell through. We are very much past the expert disclosure and endorsement deadline that the Court set, so I --

THE COURT: As you recall, my pre-trial order always says that late endorsements are possible, late motions are possible as long as you file a separate motion which is indicative as to why you need to file it late or endorse someone late. Then I'll hear from the opposing party and make a ruling as to whether it can occur or not.

MR. WAITE: And Judge --

THE COURT: And I'm assuming that you would then be telling us -- I'm assuming that you would be describing in that motion what happened with Dr. Pinto, who was clearly endorsed at an appropriate time, and what happened that caused her to fall through and why you are then seeking other experts. So that's what I'm talking about a motion for late endorsement or motion for late motion, that's what I'm expecting from the parties when they seek to pursue one of those things.

MS. SMITH: Sure.

MR. WAITE: So the reason I raise that, Judge, is at this point I don't have enough information to really determine whether or not I'm going to have enough time to be able to prepare for this new expert. I never did actually get the summary information I don't think from Dr. Pinto or whatever she is.

THE COURT: She's a Ph.D.

MR. WAITE: So Dr. Pinto. I don't have a summary information from that but I was told by Counsel that there's a possibility that I would see a summary or a report or something by the end of the week. So at this point I'm just mentioning this to the Court. I don't know yet whether or not I can deal with the constraints that are placed on me by the late endorsement, but I'm certainly going to make an effort at trying to --

THE COURT: Yeah, keep in mind that you're also free to file late motions as long as you file a separate motion justifying why the motion is late.

MR. WAITE: Thank you, Judge.

THE COURT: Ms. Smith, was there anything that you needed to discuss concerning rulings or something that I might have forgotten or left out in any of the -- for example the summary from July as to motions that were left for resolution?

MS. SMITH: Yes, I think I have a couple. One is just actually from today in terms of J. I think that the Court reviewed two different statements that J. made.

THE COURT: Yes.

MS. SMITH: One at Glade Park and then one prior to that.

THE COURT: Yes. I don't have the dates. I neglected to write down the dates as I did on some of the others. I'm sorry.

MS. SMITH: That's fine. The first statement of J. was ruled admissible?

THE COURT: Yes.

MS. SMITH: Was that the one that was to Mr. Rod? I think I'm confused. What were the circumstances of that statement?

THE COURT: You know, I'd have to go back and

look. Hang on a second.

MS. SMITH: Because I thought J. only made one statement that actually disclosed something, and that that was the one in Glade Park that the Court did rule was admissible.

THE COURT: I'm looking for my notes concerning all of these statements. I found them. There was a statement -- there was no video. It's MH-6. Is that the audio from the Glade Park interview? I have two statements by J. that I specifically wrote down and went through.

MS. SMITH: And both deemed to be admissible.

THE COURT: Well, hang on a second. I'm trying to find the --

MS. SMITH: MH-6 I believe is the Glade Park interview. I think that's where my confusion is. I think the Court deemed two different interviews of J. admissible, but I think --

THE COURT: Well, but you only have one statement?

MS. SMITH: Yeah, I think J. --

MR. WAITE: I agree with that, Judge.

THE COURT: Well, I don't know where I got this then.

MR. WAITE: I think that --

THE COURT: Was there an earlier statement to him?

MR. WAITE: There had been an earlier statement by

J.W. down in Arizona, Judge, to some stuff that the Court had ruled inadmissible earlier. And so there was --

THE COURT: What I will say then just for clarification is clearly the statement that was made at Glade Park is admissible if that's MH-6. The other statement I don't find any notes on, and I don't know where I listed it -- I don't know why I listed it separately and went through it and even found things that I thought were appropriate. Was there another statement made by him?

MR. WAITE: He made -- well, he also made another statement in this case but it wasn't recorded. We don't have enough information to really put that forth and at this point I don't think I've requested that be admitted.

THE COURT: Then the first one I talked about is out. The one at Glade Park where there were two detectives, that is clearly admissible under 13-25-129.

MS. SMITH: The other clarification I had was that I had filed a motion to exclude -- we completed the motion that I had filed to exclude the statements the children made to the SANEs. I had also filed a motion to exclude the SANEs under Shrek. And I already --

THE COURT: I thought I had ruled on that one.

MS. SMITH: Did you? Okay.

THE COURT: What I found is that it's a medical examination. Shrek is -- it's something of long standing,

it's clearly a medical procedure. It's utilized not only for decades but maybe centuries, and millennia in terms of talking to -- getting histories and doing examinations.

A Shrek examination is -- it's not novel scientific evidence. The examiners record and report what they see and hear, and that -- the evidence clearly showed that all of the three SANEs were well trained and had long experience at doing precisely what they were doing when they were conducting the SANEs.

So not only are the statements admissible but the observations and everything that was about the SANE is admissible. So I think I denied that motion.

MS. SMITH: I don't have any further clarification.

MR. WAITE: I think we're good at this point, Judge.

THE COURT: All right, I will see you on some future occasion. I don't want to look and see when it is.

(Hearing adjourned at 4:53 p.m.)

C E R T I F I C A T E

I, Christopher Boone, certify that the foregoing matter is a complete and accurate transcript of the proceedings based upon the recording, and that this is as accurate a transcript of what happened at that time and place as is possible, due to the conditions of the recording and/or duplicating. Indiscernible, indecipherable or inaudible statements are due to microphones not working properly, excessive noises, muffled voices or the parties not staying within close proximity of their microphones.

In witness whereof, I have affixed my signature this 12th day of February, 2016.

My commission expires August 16, 2018.

__________________________________________

/s/Christopher Boone

that the testimony you give will be the truth, the whole truth, and nothing but the truth?

MR. K.H.W. Yes.

THE COURT: Thank you. Go ahead and have a seat in that green chair.

(Asides)

Whereupon,

K.H.W.

Was called as a witness, and after having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. WAITE:

Q Good morning, K.H.W.

A Good morning.

Q K.H.W., would you state your name, please, and spell your last name?

A K.H.W. K.H.W.

Q K.H.W., how old are you?

A Fourteen.

Q And what's your birth date?

A April 23rd, '01.

Q Okay. And where do you, where do you currently live?

A Enoch, Utah.

Q Okay. Where is that in Utah? Can you tell us --

A Close --

Q -- about [indiscernible]?

A -- to Cedar City.

Q Okay. And where do you go to school over there?

A Canyon View High.

Q Okay. So, what grade will you be in, here come in the fall?

A Ninth.

Q Ninth grade? Do you have a favorite subject?

A Math.

Q Math is your favorite? You're pretty good at math?

A Yes.

Q All right. Tell me a little bit about your family. Who is your mom?

A My mom is a -- she works at Wal-Mart. And she is opening a ceramic shop. She is kind of short.

Q Okay. What's her name?

A Stacy W[redacted]

Q Okay. And is she in the courtroom today?

A Yes.

Q Okay. Is this your mom sitting right over here?

A Yes.

Q Okay. Do you have any sisters and brothers?

A Yes.

Q Can you tell me who they are?

A Lo.W., and S.L.W., and S [redacted] D [redacted] W [redacted] Jr. [phonetic]
Q Okay. Okay. Which one is the oldest?
A S [redacted] D [redacted] W [redacted] Jr.
Q And how old is he?
A Twenty-one.
Q Okay, 21? Okay. How old is Lo.W.?
A Nine.
Q Okay. And -- well, I will ask you that in a minute. And, and what's your sister's name?
A S.L.W.
Q And, and how old is she?
A She is 11.
Q Eleven? Okay. And what's your dad's name?
A Scott David W [redacted] Sr.
Q Okay. And do you live with all of those folks?
A Yes.
Q Okay. Over there in Enoch?
A Yes.
Q Okay. K.H.W., I want to take you back to a time when you were living here in Grand Junction, and then down in Montrose. Do you remember that?
A Yes.
Q And is there a time when you used to go over and spend a lot of time at a guy's house by the name of

Michael McFadden?

A Yes.

Q Do you remember about when you started going over there?

A I'm not sure.

Q Okay. Do you --

A It was --

Q -- remember where you --

A -- when my mom needed help and tried to find a job.

Q Okay. Do you remember where you guys were living about the first time you started going over there?

A Somewhere in North Avenue, the Trailer Park on North Avenue.

Q If I said the Lemaster Trailer Park, would that sound right to you?

A I'm not for sure.

Q Not for sure on that? Okay. And when you first started going over there, do you remember were there kids over there at Michael McFadden's --

A Yes.

Q -- house? Can you tell me who the kids were that were there?

A L.W., J.W., and S.C.

Q Okay. Now, L.W. -- you said, L.W. and J.W. Were, were there some of those kids that were friends of yours?

A Yes.

Q And who was that?

A All of them.

Q All of them were? Okay. Did you go over there primarily to play with them?

A Yeah.

Q Okay. And did you spend some nights over there, as well?

A Yes.

Q Okay. Now, what relationship did Michael McFadden have to your family? Was he related in some way, or --

A No.

Q -- just a friend of the family?

A Just a friend for a long time.

Q Okay. Did you spend a lot of time over there?

A Yes.

Q Were there fun things to do over at Mike's house?

A Yes.

Q What kinds of things would you do when you were over there?

A me and J.W., we used to like -- me, J.W., Lo.W., we used to like go out to this field. And we would build a fort out there.

Q Okay.

A And spend a lot of time over there.

Q Okay. Other fun things to do?
A Yes.
Q What -- like what?
A There was a PS2, and a lot of games, and a lot of fun stuff to do there.
Q Okay. Is a PS2 like a videogame --
A Yes.
Q -- thing? Okay.
A PlayStation.
Q Okay. Were there lots of TVs over there?
A Yes.
Q Dirt bikes?
A Yes.
Q Do you remember some dirt bikes?
A No.
Q No, don't remember the dirt bikes? How about trampolines, anything --
A Yes.
Q -- like that over there? Okay. And were there some pets over there as well?
A I'm not sure again. No, I don't think so -- yeah, Phyllis Hawkenberry had two, two or three dogs over there.
Q Okay. So, were there other adults at the house, as well?
A Yes.

Q Okay. Do you remember what their names were?

A John H[redacted], Phyllis H[redacted].

Q Okay. Was there -- was it their son S.C. that was over there?

A S.C., yes.

Q Okay. Now, you, you said you remembered Mike McFadden. Do you see him in the courtroom today?

A Yes.

Q And could you describe, please, kind of where he is sitting? Or if you want to just point in that direction.

A Over there.

Q Okay. And over here, there are two gentlemen. One is on my right-hand side. And one is on my left-hand side. Can you tell me which one it is?

A Left.

Q Left-hand side?

MR. WAITE: Your Honor, I would ask the record reflect, he has identified the Defendant, Mr. McFadden.

THE COURT: The record will so reflect.

(Asides)

BY MR. WAITE:

Q Now, you have talked about some fun things that happened at Mike's. Can you tell us a little bit about, were there other things that happened over there that made you uncomfortable?

A Yes.

Q Okay. Can you tell me one of the first things you remember about happening over there that made you feel uncomfortable?

A He touched in the wrong places.

Q Okay. And by touching you in the wrong places, can you, can you tell me a little bit more about that? What did he use to touch you?

A His hands.

Q His hand, okay. And where would he touch you?

A My junk.

Q Your junk, okay. And is that another word for like your penis?

A Yes.

Q Okay, in that area, okay. When he would do that, was it over your clothes or under your clothes?

A Under.

Q Under, okay. And then, did that happen more than once?

A Yes, sir.

Q Okay. Did that start happening when you first started going over there to Mike's house?

A Yes.

Q Okay. And would it typically happen during the daytime or in the --

A Night.

Q -- nighttime, or -- nighttime, okay. Do you remember when you would go over there and spend the night, K.H.W.?

A Yes.

Q When you, when you would, would there be -- would -- he would give you something to help you sleep?

A Yeah, melatonin.

Q Melatonin, okay. And you knew it was melatonin?

A [Indiscernible]

Q Okay. And did that help you sleep?

A Yeah, some, some nights.

Q Okay, all right. Now, do you remember -- you said that that happened to you, and it happened more than once. Can you give us any idea of how many times it happened while you were there?

A I'm not sure.

Q Okay. And how would it -- where would it typically happen in the house, do you remember?

A His bedroom.

Q In the bedroom? Was it in Mike's bedroom?

A Yes.

Q Okay. Was it in Mike's bed?

A Yes.

Q Okay. Would you sleep in the bed from time to

time?

A Yes.

Q Okay. Who else was sleeping in the bed when you were --

A J.W. --

Q -- sleeping? J.W. was there too? Okay. And I assume that he was asleep when this was happening, or --

A Yeah.

Q Do you remember, did anybody say anything about it? Is that a no?

A Yeah.

Q Yes, that's a no?

A [Indiscernible].

Q Okay. Now, do you remember talking to Ed Prescott about something had happened just before the end of all of this?

A Truck driving, yes.

Q A truck driving incident? Okay. Do you remember what happened during that truck driving incident?

A Yeah.

Q Okay. Who, who all was on that trip?

A Lo.W., L.W., and J.W.

Q Okay. Were -- and you were there?

A Yeah. And so, was S[redacted] D[redacted] W[redacted] Jr.

Q Okay. So, S[redacted] Jr. was there also?

A Yeah.

Q Okay. And were you --

A No --

Q -- guys --

A -- not L.W. and J.W. [indiscernible] were there. But, I remember one time when they went with us.

Q Okay. So, there were --

A It was just, it was just my family.

Q Okay. So, let me, let me confirm that, make sure we are clear. Were there a couple of truck trips?

A Yes.

Q Okay. On the, on the very last one, you were there. Who else was there?

A L.W. -- or Lo.W., and S[redacted] D[redacted] Wa[redacted] Jr.

Q Okay. So, your brothers were there as well?

A [Indiscernible].

Q And where did you guys start out from?

A Grand Junction. We went somewhere. Then, we -- I'm not sure where. I think it was Telluride. Then, we went to New Mexico to drop off rocks.

Q And then, didn't you end up somewhere like in Nebraska?

A Yeah. I'm not sure. I can't remember exactly.

Q Not sure where you were? Okay. Did something happen on that trip to you?

A Yes.
Q Can you tell us what it was?
A He touched me.
Q Okay. How did he touch you on that trip?
A With his junk.
Q And when you mean, his junk, I, I assume you mean his penis?
A [Indiscernible].
Q What did he do with his penis?
A He stuck it on my butt.
Q Okay. He stuck on your butt, or in your butt?
A In.
Q Okay. Did this happen at night?
A Yes, sir.
Q Was it inside or outside the truck?
A Inside, because there was snow on the ground.
Q Okay. Was there kind of a -- is there kind of a sleeping compartment in the truck?
A Yes.
Q And was it in that sleeping compartment?
A Yes.
Q Okay. How did, how did that make you feel when he did that to you?
A Extremely uncomfortable.
Q Okay. Did it hurt, as well?

A Yes.
Q Okay. Did you try to tell him no?
A I was sleeping.
Q Okay. So, you were kind of sleeping, and woke up to that?
A Yeah.
Q Okay. And that was the last time you remember anything like that --
A Yeah.
Q -- happening?
A That was the last thing I have ever had.
Q Okay. You haven't had any contact with him since then, right?
A [Indiscernible].
Q Okay. Now, when you guys were staying -- let me, let me go back just a little. When you guys were staying at the, at the hotel there on North Avenue, and you would go over and visit him, do you remember the address --
A No --
Q -- of the --
A -- it was a, it was a house. It was like a two-story old house that they burnt down. Because -- we got kicked out of it because it was a condemned. We could go through the floor any second.
Q Okay.

A It was --
Q So --
A -- like over 100 years old, at --
Q Okay.
A -- the most. It wasn't taken care of --
Q Okay.
A -- before when we moved in.
Q Okay. Before that, before you moved in there, you were living at -- on North Avenue?
A Yes.
Q And, and when you were living on North Avenue, when you went over to Mike McFadden's house, do you remember where he was living at the time?
A It was like a two-story house somewhere close by.
Q Somewhere --
A I'm not --
Q -- fairly --
A -- exactly --
Q -- close?
A -- sure.
Q Okay. And then, did he -- and is that when you first started going over there, when --
A Yes.
Q -- he was living at that house?
A And then, I helped him over at [indiscernible].

Q Okay. So, you helped him move over to another house, this [indiscernible] Road sound right?
A Yeah.
Q About then? And then, you guys moved into --
A It was --
Q -- a house --
A -- a 22-acre lot. So --
Q Pretty big lot? Okay. And then, you guys moved into the house right next door?
A Yes.
Q And is that the one you were talking about [indiscernible]?
A Yeah, that, that, that 100-year old house one --
Q Okay.
A -- that they burnt down.
Q Okay. So, it was kind of a yucky house?
A Yeah.
Q Okay.
A It --
Q How --
A -- was a, it was a pretty house, but it was just too old. It wasn't taken care of properly.
Q Okay. And you guys lived next then -- next -- right next door to Mike McFadden?
A Yeah, we could just walk like right across the

field.

Q Okay. And did you see him a lot during that period --

A Yes.

Q -- of time also?

A During the summer, mainly.

Q Okay.

A Summer, and like weekends.

Q Okay. And did you continue to go over there and visit, and spend time --

A Yeah.

Q -- with the kids and everything, then, too? Okay. Just a second. K.H.W., when, when was the first time that you ever told anybody about this?

A The Detective that is sitting right there with the, the official visitor badge.

Q Okay. So, this guy right over here to my right?

A Yes.

Q Okay. You remember talking to him? Was that the first time you ever really described what had happened to you?

A Yes.

Q Okay. Thank you, K.H.W. I don't have anything else. But, the Defense may have some questions for you.

A Okay.

THE COURT: Mr. Burrill?

MR. BURRILL: Thank you, Your Honor.

(Asides)

CROSS EXAMINATION

BY MR. BURRILL:

Q Hello, K.H.W.

A Hello.

Q My name is Scott Burrill. How are you doing?

A Good.

Q First thing I would like to ask is, did you review anything prior to coming in and testifying here today?

A No.

Q If I can have just one second, K.H.W.? Now, today, you're here testifying about Michael McFadden --

A Yes.

Q -- right? [Indiscernible]? And this is a criminal case, right?

A Yes, sir.

Q You know this is a criminal case, correct?

A [Indiscernible]

Q And K.H.W., one of the things that sometimes Judge Robison tells people to, is if you have an answer, you, you have to speak it out loud in here, because everything is recorded, okay?

A Okay.

Q Is that okay?
A [Indiscernible].
Q Okay. So, this is a criminal case, right?
A Yes.
Q And, and there's somebody that's prosecuting this case, correct?
A Yes.
Q And you have met this -- with this Prosecutor beforehand, right?
A Yes.
Q His name is David Waite, right?
A Yes, sir.
Q And how many times have you spoken with him before?
A Three or four times, at the most.
Q Okay. And did he come and he show you around the courtroom at all before you testified?
A No, sir.
Q Okay. Now, you have your own criminal case going on right now in Utah, correct?
A Yes, sir.
Q Okay. And that case involves a charge of burglary, right?
A Yes, burglary and theft.
Q Burglary and theft. So, essentially, you have been charged with an offense that involves going into someone's

house, right?

A Yes, sir.

Q And --

A And taking their cell phone, taking their son's cell phone.

Q And you would agree that that cell phone did not belong to you, correct?

A Yes, sir.

Q Okay. But, you did -- you took it anyway, right?

A Yes.

THE COURT: And could you all approach, please?

(Proceedings at the bench)

THE COURT: Is, is this an ongoing prosecution? Do I need to talk to him about his Fifth Amendment rights? Is this something that's resolved? I'm, I'm a little concerned based on --

MR. WAITE: [Indiscernible].

THE COURT: -- the questioning. I don't know.

MR. WAITE: At this point, Judge, I mean, I think that they have gone into everything they can go into with --

MR. BURRILL: [Indiscernible] --

MR. WAITE: -- to that.

MR. BURRILL: -- ask anymore questions about that [indiscernible]. It is -- I mean, we are certainly allowed to ask the questions that we have under Davis [phonetic] v.

Alaska. But --

THE COURT: Then, I also need to advise the Witness about his Fifth Amendment rights before that goes on. So, I'm a little concerned.

MR. WAITE: I didn't realize [indiscernible] --

THE COURT: [Indiscernible].

MR. WAITE: -- fact. But, I think [indiscernible] gone in --

MR. BURRILL: [Indiscernible] --

MR. WAITE: -- assuming we [indiscernible].

MR. BURRILL: -- [indiscernible] questions [indiscernible] asked.

MR. WAITE: Okay.

THE COURT: I need to talk about whether I need to advise K.H.W. --

MR. WAITE: I don't think [indiscernible] --

THE COURT: -- on that.

MR. WAITE: -- Judge. I honestly think that it's a case that's been disposed of. He has, he has -- I think he has been sentenced. And I think he is currently just doing whatever he is doing on a sentence. I'm not even sure what that is. But --

MR. BURRILL: [Indiscernible] never -- I guess, I have, I have asked people about pending criminal matters before, and I have never done it where I notify anyone I'm

going to do it beforehand. So, I apologize of that.

THE COURT: If it's pending in sentence, I don't have a problem. There is no issue. If it's pending and -- not resolved, that's when I got to make the advisement for him. But, it sounds like it's resolved already.

MR. WAITE: It sounds like it.

(Asides)

THE COURT: Thank you.

(Proceedings return to open court)

THE COURT: Thank you. Mr. Burrill?

MR. BURRILL: Thank you, Your Honor. Okay.

BY MR. BURRILL:

Q K.H.W., one of the things I wanted to talk about was your relationship with your family.

A Yes.

Q Now, you mentioned when you were talking to Mr. Waite, that you live with all your family --

A Yes.

Q -- in Utah, right? So, you live with your dad, Scott --

A Stepdad.

Q -- or stepdad, stepdad, Scott Sr.?

A Yes.

Q You live with your mom, Stacy Wasolowski?

A Yes

Q You live with your brother, S[redacted] W[redacted] Jr.?
A Yes.
Q You live with your brother, Lo.W.?
A Yes.
Q And you live with your sister, S.L.W., right?
A Yes.
Q And you know, you love your mom, right?
A Yes.
Q You get along with her?
A Sometimes.
Q Sometimes. As much as you can, right? Is that, is that correct?
A Yes.
Q And you love your brothers and sisters, right?
A Yes.
Q You, you love your dad, your --
A Yes.
Q -- stepdad, Scott Sr., right?
A Yes.
Q And you are able to talk with them about problems that you're having, right?
A Yes.
Q You talk about the problems that you're having, if you have any problems at school, or anything like that, right?

A Not a lot, but sometimes.
Q Okay. You talk to them about what's going on in your life --
A Yes.
Q -- right? Now, back in 2012 and 2013, you, you loved your family back, then, too --
A Yes.
Q -- right?
A I love my family since the beginning.
Q Your whole life, you have loved them, right?
A [Indiscernible].
Q And that goes for everybody that's in your family, right?
A [Indiscernible].
Q And I'm sorry. Could you say yes or no out loud?
A Yes.
Q Okay. I'm sorry, K.H.W. I got to keep asking you that. I apologize. Now, you never, ever mentioned that Mike touched you in any way, until, as you testify today, you told Ed Prescott, correct?
A Yes.
Q Okay. And I know that this was a long time ago. But, was it also possible that the day before you talked to Ed Prescott, you told your Therapist? Do you remember anything with that?

A No.

Q Okay. So, you don't remember ever talking to your Therapist before talking to Ed Prescott?

A No.

Q Okay.

A I don't really get along with Therapists. So --

Q And what, what did you say again, K.H.W.?

A -- I don't really get along with Therapists. So --

Q Okay. So, you have never been in therapy?

A -- I have been in therapy. Yes.

Q Okay. But, you don't recall being in therapy about the time that you spoke with Ed Prescott, back in 2013?

A Yes -- no.

Q Okay. So, you don't remember being in --

A Yeah.

Q Okay. Sorry, it was a weird way I phrased that question, K.H.W. Now, let's talk a little bit about this Nebraska thing. One of the things that you mentioned is that you took a trip to Nebraska, or at least a trucking trip with Michael McFadden --

A Yes.

Q -- correct? You don't remember exactly all the places you went, right?

A No.

Q And I --

A All I know is the halfway point was Telluride.

Q Okay. So, you went to Telluride at one point on that --

A Yeah.

Q -- trip? Okay.

A Like a lot of the time, I'm not sure.

Q And while you were on that trip, that's when, essentially, your parents came and got you, correct?

A Yes.

Q Okay.

A My -- Stacy W[redacted], Mike, Mike John [phonetic] [Indiscernible], and another truck driver [indiscernible].

Q Okay. They all came to get you, correct?

A Yes.

Q And they picked you up in Nebraska. You remember that, right?

A Yes.

Q And you remember that it was a long drive, correct?

A Yes.

Q And you know it was a long drive, because you rode in the car all the way back, right?

A Yes.

Q And you rode back with your mom, Stacy W[redacted]?

A It was actually a faster drive --

Q Okay.
A -- back.
Q It was faster, because you were in a car rather than a truck?
A Yeah.
Q Okay. But, again, it was still a long drive, right?
A Yeah.
Q It was about 10-hour drive, right?
A Yes.
Q And you drove back with your mom, Stacy?
A Yes.
Q And on the way back from that trip, your mom told you about what people were saying Mike did, right?
A Yes.
Q She told you what the allegations were in this case, correct?
A Yes.
Q And she started asking you questions about it, right?
A Yes.
Q And she started asking questions about whether or not Mike ever did anything to you, right?
A Yeah.
Q And she asked you a bunch of questions about that?

A Yes.

Q And in fact, you told her that Mike had not done anything to you, correct?

A Yes.

Q You never told her that Mike ever stuck anything in your butt, correct?

A Yes.

Q You never told her that he ever touched you before, correct?

A Yes.

Q Now, you mentioned that you don't remember being in counseling about the time that you talked to Detective Ed Prescott. But, you do recall that you have had Therapists in the past, right?

A Yes.

Q And when you went to those Therapists, it was some family counseling, right? Or was it --

A Sometimes, yes, and sometimes, just me.

Q Okay. So, sometimes, you were meeting with some of your siblings at the same time --

A Yes.

Q -- right? So, for example, sometimes, it was you and S.L.W. meeting at the same time?

MR. WAITE: Judge, I'm going to object. I don't see the relevance to this at all.

MR. BURRILL: And Your Honor, I think that the relevance is -- actually, may we approach really briefly?

THE COURT: Yes.

(Proceedings at the bench)

MR. BURRILL: And Your Honor, the relevance is, he has testified that he doesn't recall being in counseling prior to essentially making his disclosure to Ed Prescott. But, we have evidence that he was actually in counseling the day beforehand.

And that's when the first disclosure occurred. The nature of that disclosure was in a group setting. It was not him one on one on with his Therapist. And then, the nature of that disclosure, also, we contend, influenced S.L.W.'s disclosure after that, because he was actually meeting, we believe, with his sister at the time that that occurred.

That's why I'm asking these questions. These are questions that go towards, you know, whether or not this disclosure was made on a one on one setting, whether or not he was influencing other disclosure, whether or not someone was influencing him in making the disclosure. So, that's the reason and relevance for the question.

THE COURT: Has privilege been waived?

MR. WAITE: No. Privilege has never been waived.

MR. BURRILL: I, I -- has privilege been waived? The way that this has occurred, is after the counseling

appointment, Stacy W[redacted] contacted Law Enforcement, and disclosed that there had been a disclosure during this counseling appointment.

Ed Prescott questioned K.H.W. about the, the counseling appointment. He told Detective Ed Prescott that he disclosed during the counseling appointment.

So, in my opinion, it has clearly been waived by the fact that he has disclosed exactly what was said during the counseling appointment. So, I don't even know how that argument could be made that he has not waived that privilege.

MR. WAITE: Well, I'm, I'm less worried about that, Judge. I'm more worried about the fact the questions actually have been more general than that, about all the counseling he has had beforehand, about when he was counseling, about who he was counseling with.

I think that, I think that if they keep just directly to the counseling that happened shortly before his disclosure to Ed. I understand that.

But, he has already said he doesn't remember doing that. And so, I think that these questions are, are designed to get into more of his counseling, more of those issues.

And, and I -- you know, I'm -- I don't think he has waived with respect to that. I think he has waived with respect to the disclosure he made in this particular case.

MR. BURRILL: I'm not asking him specifics about

what he has talked to his Therapist on in the past. I'm asking whether or not other people were present when he has met with his Counselor in the past, which I think again, goes towards again, the quality of the nature of the disclosures in this case, and you know, whether or not they were tainted or contaminated with, with other people present for both himself and his sister.

So, I'm, I'm not going to ask any questions that involve like in past therapy appointments, whether or not any specifics about what he mentioned. I'm just asking whether or not in the past, other people have been present when he has met with his Therapist.

THE COURT: I, I think that you can ask about the specific incident that you're talking about. It sounds like not only has he discussed it, but also, his mother has discussed it, who would probably be the privilege holder, since he is a minor.

So, both, she has, she has waived it to the extent that she indicated that a disclosure had occurred. And then, K.H.W. has, as well.

So, I don't find that there's a privilege issue for that particular appointment in the disclosure that is stated to have been made based on the record made by Counsel. With respect to the objection on relevance, the objection is overruled. I certainly find that it is relevant. Anything

else?

(Proceedings return to open court)

THE COURT: The objection is overruled. Mr. Burrill?

BY MR. BURRILL:

Q So -- and K.H.W., my memory is not exactly right. But, I, I think that the last question I had asked you, is that in some of your therapy appointments, other people were present and met with you and your Therapist?

A Yeah, my mom and my little sister.

Q Okay. Thank you. Another thing that I wanted to ask you is again, you remember talking to Detective Ed Prescott back in 2013, correct?

A Yes, sir. [Indiscernible].

Q Isn't it true that you told Detective Prescott that you first disclosed the day beforehand in your Therapist appointment? Do you remember that?

A No, sir.

Q Okay. You don't recall making that statement?

A No.

Q Okay. Now, when you got home from, when you got home from Nebraska, there was a little bit of time before you talked to Detective Ed Prescott, correct? Is, is that correct?

A Yes, sir.

Q Okay. And when -- would you estimate it was about two weeks? Is that what you would say it was before you talked to Detective Ed Prescott?
A I think about two weeks or a month, one of the two.
Q Somewhere in that vicinity, right? Is that correct?
A Yes, sir.
Q And while that was going on, people were talking about Michael McFadden's case, correct?
A Yes.
Q People were talking about the allegations from I.S., right?
A Yes.
Q And you remember that, correct?
A Yes.
Q Your mom was talking about it?
A I don't think she was talking about it. She was just really upset.
Q Really upset. And you could tell she was really upset, right?
A Yes.
Q That was something that you knew, just from looking at it, correct?
A Yeah.
Q And maybe some things she mentioned, as well?

A Especially when she gets overstressed, and she goes out.
Q Okay. And that was going on before you talked to Ed Prescott, correct?
A Yes.
Q Okay. Now, during your testimony today, you didn't mention anything about seeing anything else that Mr. McFadden did, correct?
A Yes.
Q You, you didn't mention anything about Mr. McFadden touching any other children, correct?
A Yes.
Q In some past times, you have discussed this case, you had talked about that though, correct?
A Yes.
Q In fact, when you talked to -- when you first talked to your mom, you said that you had seen Michael McFadden have sex with J.W., correct?
A Yes.
Q But, that's not what you told Detective Prescott, was it?
A No, sir.
Q In fact, with Detective Prescott, you told him that you didn't see anything directly, correct?
A Yes, sir.

Q You told him that you had seen essentially, Mr. McFadden's hand move from outside -- from under a blanket, correct?
A Yes, sir.
Q You never told Detective Prescott that you saw Mr. McFadden have sex with J.W., correct?
A Yes, sir.
Q And again, there was a period of time that separated your conversation with your mom and Detective Ed Prescott, correct?
A Yes, sir.
Q Now, let's talk a little bit about this Nebraska trip, or this trucking trip, I think we could probably call it. You would agree that J.W. was not on that trip with you --
A Yes --
Q -- correct?
A -- sir. He was -- he came up for Christmas, because they went somewhere.
Q Okay. But, he didn't go with you on the trucking trip, right?
A No, sir. They weren't even [indiscernible].
Q Again, you mentioned that it was you, S[redacted] W[redacted] Jr., right?
A Yes.

Q And then, there was Lo.W., right?
A Yes.
Q And then, Mr. McFadden?
A Yes.
Q So, there was four total people on this trip, right?
A Yes, sir.
Q And you knew, again, that, you know, J.W. wouldn't be going with you, right?
A Yeah.
Q But, you still wanted to go on the trip, correct?
A Yeah.
Q And you wanted to go with Michael McFadden, correct?
A Yeah, because I like trucking [indiscernible].
Q Okay. You like trucking. But, you did that, even though he supposedly touched you in the past, correct?
A Yes, sir.
Q You never told your mom that you didn't want to go, correct? Is that correct?
A Yes, sir.
Q And you never told your mom about anything that has happened in the past with Mr. McFadden?
A Yes, sir.
Q And you never mentioned any concerns to her before

you went on that trip?

A Yes, sir.

Q You don't think your mom would have forced you to go --

A No --

Q -- would --

A -- sir.

Q -- she? And you also mentioned that this -- I guess there was an incident inside the truck, itself, right?

A Yes, sir.

Q And I think that you said it happened at night, right?

A Yes, sir.

Q And I think that you mentioned that you were asleep at the time?

A Yes, sir.

Q Okay. So, when we talk about the sleep situation, there were four of you sleeping in this truck --

A Yes --

Q -- right?

A -- sir.

Q And there is a sleeper compartment in this [indiscernible]?

A Yes, sir.

Q Okay. And the sleeper compartment has a bed in it,

Exhibit E

right?

A Yes, sir.

Q Okay. And the sleeper compartment is attached to the rest of the truck, right?

A Yes, sir.

Q In fact, the way that you get into the sleeper compartment is through the front seats, right?

A Yes, sir.

Q There's open pathway through there?

A Yes, sir.

Q Okay. So, you're sleeping in the truck. And there are three people on the bed of the truck, correct?

A No.

Q No?

A [Indiscernible].

Q How many people were in the back?

A There was two. There was -- no, two, two -- My little brother, Lo.W., he was on the other end --

Q Okay.

A -- [indiscernible]. My older brother, he was in the front seat, like spread out on the two seats. And then, I was in the bed.

Q Okay. And then, Mr. McFadden was in the bed, too, right?

A Yes, sir.

Q Okay. So, the way that the sleeping arrangements work too, is Lo.W., your brother, was at the back of the cab --
A Yes.
Q -- correct? Then, it was Mr. McFadden, correct?
A Yes.
Q And then, it was you closes to the front of the cab --
A Yes, sir.
Q -- correct? And you were sleeping with your head facing the front of the cab?
A Yes.
Q Okay. And your brother, S[redacted] W[redacted] Jr. is --
A Yes.
Q -- in the front of the cab --
A Yeah --
Q -- sleeping?
A -- he was out cold, snoring.
Q Out cold, snoring, okay. S[redacted] W[redacted] Jr. was 19 years old at the time you took this trip, correct?
A Yes, sir.
Q So, he was an adult, right?
A Yes, sir.
Q Okay. And again, you mentioned that you have a good relationship with your brother --

A Yes --
Q -- right?
A -- I do.
Q And he is -- I guess he is -- he is a tough guy, right?
A Oh, yeah, he is.
Q He is a very tough guy, right? Okay.
A He is a big boy.
Q Okay. So, you're in there. And you say that Michael McFadden essentially puts his, his junk or his, his penis in your butt?
A Yes, sir.
Q Okay. And you mentioned that you are asleep at the time that that, that that happened --
A Yes --
Q -- right?
A -- sir.
Q You also mentioned, this is the only time he ever allegedly did anything like this to you, right?
A No, sir.
Q Well, this is the first time he has ever stuck anything --
A Yes.
Q -- in your butt, correct? Okay. So, you're asleep when this happens -- or when it starts to happen, correct?

Is that, is that accurate?

A Yes.

Q Okay. And your clothes are on when you go to sleep, correct?

A Yes, sir.

Q Okay. And your clothes are on throughout the incident, or off?

A They are like half-off.

Q Okay. So, they are, they are like half-off. So, you're asleep, and you wake up when he stars pulling your --

A No.

Q -- clothes off, or, or --

A I sleep like a rock. So, I don't really wake up to a lot of things.

Q Okay. So, you sleep through that. His hands are where?

A Behind him.

Q His hands are behind him?

A Yes.

Q Okay. So, his hands aren't touching you at all?

A [Indiscernible].

Q Okay. So, your testimony is the hands were not touching you while this was going on?

A Yes.

Q Okay. So, there's none of that. And you wake up.

And were his hands, I guess around your butt area at all, or no?

A Yes, and no.

Q Okay, yes and no, they were there. But, you didn't wake up when he was touching that area?

A No.

Q Okay. So, you wake up. And where -- I'm sorry to be asking these questions. I know these are tough. When, when you wake up, is there something already in your butt? Or what was -- how did that happen?

A I woke up. And then, he like jumped and moved.

Q Okay. He jumped and moved. So, you don't actually know whether or not something was in your butt?

A No.

Q Okay. So, you admit. You don't actually know whether or not he did put anything in your butt?

A No.

Q Okay. And again, you're right by your brother, S[redacted] W[redacted] Jr., right?

A He is in the front, out cold snoring, like I said before.

Q Okay. So, he is -- would you estimate that he is was maybe 3 feet away from you, or how close would you say?

A I think 4 --

Q Within --

A -- 5 --
Q -- 4 --
A -- feet.
Q -- within 4 feet, right?
A Yes.
Q Okay. And you don't, you don't say anything to him, do you?
A No.
Q Okay. And you don't --
A It's hard to talk to even him about it. And our relationships is like really good.
Q Okay. So, you have a good relationship with him?
A Yes.
Q Okay. But, you did not mention anything to him, correct?
A Yes.
Q And then, the next morning, when you guys got up, you didn't mention anything to him, right?
A Yes.
Q Now, you guys had access to a cellular telephone when you were there, correct?
A Yes.
Q Okay. And you never called your mom, did you?
A She called -- she like called us every once in a while. But -- yeah, I talked to her on the trip.

Q Okay. So, you actually specifically spoke to your mom during this trip, right?
A Yes.
Q And you didn't mention anything to her about concerns over anything that was going on with --
A No --
Q -- Mr. McFadden?
A -- sir.
Q Is -- I'm sorry, is that right?
A Yes.
Q You never mentioned that.
A Okay. I'm sorry, K.H.W.
MR. BURRILL: If I can have just one second?
BY MR. BURRILL:
Q All right, thank you, K.H.W. Thank you for your time.
THE COURT: Anything else, Mr. Waite?

REDIRECT EXAMINATION

BY MR. WAITE:
Q All right, K.H.W., just a couple of things here.
A Yeah.
Q Mr. Burrill asked a number of questions that -- about whether or not you had told anybody. And up to that point you hadn't told anybody.
A No, sir.

Q How come?
A I don't like to talk about this stuff.
Q Okay. Not something you're comfortable talking about?
A No.
Q Okay. Even to the folks that were the closest to you?
A Yes.
Q Okay. Now, he also asked questions about that -- he said, people were talking about what Mr. McFadden had done to some of the other kids. When he says, people, who was talking about that?
A My mom, just -- that's it.
Q Okay. Just your mom?
A My mom and, my mom and dad, that's just about it.
Q Okay.
A And Detective.
Q Okay. And were they talking specifics, or just talking about the fact that this had happened to other kids?
A They, they were wondering if it did or not.
Q Okay. So, they weren't, they weren't talking about something as if it had happened. They were talking about something, wondering about whether it had happened?
A Yeah.
Q Okay. Now, one -- yeah, one of the things I didn't

ask you earlier was, had you seen anything happen to anyone else. During the course of staying with Mike, it sounds like you saw something happen --

A Yeah, it was like his hand like jerked out from underneath the blanket. I just left it alone.

Q Okay.

A I thought --

Q That was --

A -- he was just like moving his hand or something.

Q That was with J.W.?

A Yes, sir.

Q Okay. So, you hadn't actually seen him have sex with J.W.?

A No.

Q And, and did you ever tell anybody that?

A No.

Q Okay. You just saw him kind of move his hand out from --

A Yeah.

Q -- under the blanket? Okay. And because it had happened to you, did you kind of make the assumption that maybe it was happening to J.W. too?

MR. BURRILL: Objection, leading, and calls for speculation.

MR. WAITE: I will, I will withdraw, and rephrase

that.

THE WITNESS: All right.

BY MR. WAITE:

Q Why did you think something was happening at that point?

A Because it's -- I'm not -- I can't explain it exactly.

Q But, you had a suspicion?

A Yes, I had a suspicion.

Q Okay. Now, Mr. Burrill just asked you a bunch of questions about being in the truck. And it made it sound maybe like you don't know for sure exactly what happened in --

A Yeah.

Q -- in the truck? Do you, do you remember what happened in the truck?

A No, but the next day it was kind of hard to sit down.

Q Okay. But, you said earlier, that he put his junk in your butt.

A Yeah.

Q Did that happen?

A I can't explain it, but it kind of felt like it.

Q Okay. Kind of felt like it, in what fashion?

A I can't explain it exactly.

Q Okay. But, do you remember it hurting?

A Yes, sir.

Q Okay. You remember your clothes being halfway off?

A Yes, sir.

Q Do you remember kind of waking up, and him kind of moving away from you at that --

A Yes --

Q -- point?

A -- sir.

Q Okay. You weren't sure exactly where his hands were?

A No, sir.

Q Okay. And you didn't say anything to anybody about that incident?

A No, sir.

Q Okay. Up to that point, he had never done that to you before?

A No, sir.

Q Right? Up to that -- and you, you testified earlier that he had touched you a number of times with his --

A Yes.

Q -- hand, on your, on your penis. But, that this is the first time that that had ever happened?

A No, he just kind of like rubbed it on me. But, that's like it.

Q Okay. So, there were times when he would rub it on you, but not necessarily put it in?

A Um-hmm.

Q Okay. Is that right? Say yes or no.

A Yes, sir.

Q Okay. Thank you. And about -- when, when it did hurt after this incident in the truck, do you remember about how long it hurt?

A About two, three days.

Q So, it hurt for a while?

A Yeah.

Q Okay. Was there anything else that he done to your butt that would have made it hurt --

A No.

Q -- it hurt?

MR. WAITE: Okay. I don't have anything else.

THE COURT: Mr. Burrill?

MR. BURRILL: Thank you.

RE-CROSS EXAMINATION

BY MR. BURRILL:

Q And so, K.H.W., you mentioned that after this happened, your butt hurt, correct?

A Yes.

Q And you mentioned that it hurt for about two or three days after?

A Yes, sir.

Q Okay. You, in fact -- you got a medical examination done after your conversation with Detective Ed Prescott, correct?

A Yes.

Q And that was close in time to the time that you talked to Detective Prescott --

A Yes.

Q -- correct? And they checked out that area, correct?

A Yes.

Q Okay. You mentioned too, that you said that he, Michael McFadden, kind of rubbed it on you in the past?

A Yes.

Q But, did not necessarily put it on you before --

A Yes.

Q -- correct? Okay. And you never told Detective Ed Prescott that, did you, when you talked to him?

A No, sir.

Q Okay. So, that's new information that we are just learning today, correct?

A Okay.

Q Okay.

MR. BURRILL: No further questions.

THE COURT: Anything else, Mr. Waite?

MR. WAITE: No, Judge.

THE COURT: Any questions from the jury? No. Thank you, K.H.W. You're finished.

THE WITNESS: Okay.

MR. WAITE: Judge, I would call Ed Prescott to the stand.

THE COURT: Um-hmm. And could you all approach, please?

(Proceedings at the bench)

THE COURT: Really, I had you approach, because I see K.H.W. sitting down in the audience. I wanted to make sure that that was -- he is not going to be recalled as a witness.

MR. BURRILL: We are not going to recall. But, [indiscernible].

MR. WAITE: I'm not going to recall him either. But, I'm not going to ask him to stay, either. So, I will make sure that he leaves here in just a moment.

THE COURT: [Indiscernible] that's fine, either way.

MR. BURRILL: I think Stacy would have to leave, at this point.

MR. WAITE: Yeah.

MR. BURRILL: Yeah, [indiscernible].

THE COURT: All right.

EXHIBIT F

DISTRICT COURT, COUNTY OF MESA, STATE OF COLORADO

CASE NOS. 2013 CR 000027, 2013 CR 000339, and 2013 CR 000342, DIV. 5

---

REPORTER'S TRANSCRIPT (Jury Trial)

---

IN THE MATTER OF

THE PEOPLE OF THE STATE OF COLORADO,

Plaintiff,

v.

MICHAEL TRACY MCFADDEN,

Defendant.

---

The above-entitled matter came on for jury trial on Wednesday, July 15, 2015, at 9:39 a.m., before the HONORABLE VALERIE ROBISON, District Judge.

APPEARANCES:

FOR THE PLAINTIFF: DAVID WAITE

FOR THE DEFENDANT: KARA SMITH
SCOTT BURRILL

WITNESSES: DEBRA BAILEY
CHERYL YOUNG

CHERYL YOUNG

Was called as a witness, and after having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY DAVID WAITE:

Q Good morning.

A Good morning.

Q Would you state your name and spell it for the record please?

A Cheryl Young, C-H-E-R-Y-L Y-O-U-N-G.

Q And, and how are you employed?

A I'm an owner and partner of Behavioral Health and Wellness in Grand Junction, Colorado.

Q And, and what is Behavioral Health and Wellness?

A It's a private psychological counseling practice. There's approximately 18 Clinicians, Neuropsychologists, Psychologists, Licensed Clinical Social Workers, Licensed Professional Counselors, and licensed marriage and family Therapists.

Q How long have you done that work?

A I've done, you know, behavioral health counseling since I completed my Graduate degree in '84. But, I've been with Behavioral Health and Wellness since 1992, 1992.

Q Would you describe your job for us please?

A So, I'm a licensed marriage and family Therapist.

My practice has changed over the last year. Approximately maybe 60 percent of my clinical time, three days a week is spent embedded into a family practice clinic or a pediatric clinic where I do consultations and brief treatment within the, the primary care practice.

Two days a week my practice is pretty traditional. I see children and families. I would say the larger percentage of my practice is probably related to trauma and the larger percent of my -- both -- actually I would say both the family practice pediatric hours, as well as my regular outpatient hours, trauma adjustment, divorce adjustment, child maltreatment.

And a very small part of my practice these days is perhaps more forensic in nature, evaluations, court-appointed evaluations, court testimony, those types of things.

Q Well, just describe for us please your training and the education that you've been to get to this point?

A I have a Bachelor's degree in Social Work with an emphasis in child welfare and child development from Colorado State University. I have a Master's degree in marriage and family therapy from United States International University in San Diego, California. And I am licensed in the State of Colorado as a marriage and family Therapist.

Q Does some of your education and some of your

experience deal with -- and I think you said child maltreatment over -- earlier, but deal with Victims of sexual assault?

A Yes.

Q And, and can you describe for us please what training you've had in that area and, and, and what type of experience you've had with Victims of child sexual assault?

A Well, my Bachelor's degree in Social Work was on what was then called the child welfare track. I think they call it now the child and family track where the focus is on, you know, family systems, healthy family systems, family systems with pathology, child development, and child maltreatment, child protection, abuse, neglect, sexual abuse, educational neglect, medical neglect, coursework in those types of areas.

My Master's degree was more specific to a clinical psychology and marriage and family therapy. So, I had traditional psych classes in abnormal psychology, developmental psychology and then my specialization in marriage and family therapy.

And that, again, included pathological family dynamics, child mental treatment, families with different cultural backgrounds and that's what prepared me for the licensure exam in marriage and family therapy.

Q What professional boards or professional

organizations do you belong to?

A Currently, I'm a Clinical Fellow of the American Association of Marriage and Family Therapists. I belong to the -- locally, I'm a member of the Mesa County Child Fatality Review Team with the Coroner and Pathologist, District Attorney's Office, Department of Human Services, Law Enforcement.

I'm their mental health representative. I'm also a member of the Mesa County Child Sexual Assault Review Team which includes many of those same agencies. I'm on the Advisory Council of the Western Slope Center for Children.

I am a member of the Advancing Care Together Project out of the University of Colorado Health Sciences and the Colorado Health Foundation which has been a three-year study I've been working on with primary care partners.

Those are the ones -- oh, and I'm also a member of the Association of Family and Conciliatory Courts which is more divorce, custody, child abuse, forensic side of working with families and children.

Q Ms. Young, do you train, educate or supervise others in your field as well?

A I do.

Q What types of things do you do in that area?

A I provide supervision to Clinicians who are

unlicensed and who are working towards licensure that could be in our practice typically. I also do trainings for a variety of different agencies, usually more around developmental concerns in terms of forensic interviewing or interviewing children in high conflict custody or interviewing children where there are allegations of abuse or neglect or maltreatment.

So, I've done trainings for different Law Enforcement Agencies, different Department of Human Service agencies in western Colorado and some in eastern Colorado, as well.

Q You indicated earlier that you have counseled with children that are sex assault Victims. Is that right?

A Yes.

Q Can you, can you give us a rough idea of how many over the course of the last number of years?

A Since 1984. I mean I've talked with hundreds of children who have victimization including sexual assault. You know, when you practice full time for as many years as I've practiced and you specialized in child trauma, that's going to be a large percentage. So, I, I, I have no idea the number of -- about I would say hundreds.

Q Hundreds? Okay. How many cases of sexual assault have you reviewed?

A So, I mean if we talk in terms of more

EXHIBIT F

comprehensive reviews where I might see the entire case file, as well as videotaped interviews, I'd say I've probably conducted probably 35 to 40 of those.

More cursory, less intense reviews or consultations on cases, I would say any given year I've probably done I don't know, 15 to 20 of those with both Prosecution as well as Defense Counsel and that would be not just Mesa County but in counties all over western Colorado and some also in eastern Colorado in the front range.

Q Have you ever been qualified as an Expert in child sexual assault trials?

A I have.

Q How many times have you testified as an Expert would you say?

A In child sexual abuse trials, just over 90 since 1996.

Q Can you tell us roughly the jurisdictions? I mean is that mainly here in Mesa County?

A No, but I'm very bad with the jurisdictions --

Q Okay.

A -- by number but I can tell you sort of by county. So, I've testified in Mesa County, Delta County, Montrose County, Montezuma County, La Plata County, I can't remember what Minturn is in or Leadville. I've testified in Rio Blanco, Garfield, Moffat, Routt, Aurora, and that's all I can

think of off the top of my head.

Q You indicated earlier that you've done that -- you've consulted with the Prosecution. You've also -- have you ever testified for Defense Counsel?

A I have much less frequently. I've only testified for Defense approximately three times, once in Mesa County, once in Delta County and once in Meeker, Rio Blanco County, or Moffat County.

My policy is that I will consult with either District Attorney's or Prosecution or Respondent's Attorney in D and N cases or the County Attorney. That I try to keep a very open door policy.

MR. WAITE: Your Honor, at this time I'm going to move -- I would tender Ms. Young as an Expert in the areas of dynamics of child sexual abuse --

THE COURT: Okay, go slow. Hang on.

MR. WAITE: Disclosure patterns, disclosure dynamics, Victim/Offender relations, memory and factors that might impact child sexual assault Victims.

THE COURT: Mr. Burrill?

MR. BURRILL: And Your Honor, we continue to object to Ms. Young's testimony, as again, we think it really amounts to credibility avouchment on her part. So, we'd renew our objection. Some of this has been [indiscernible] and we renew our objection to [indiscernible] today.

THE COURT: That specific objection is overruled based on earlier records that have been made, as well as the record that has been made here today. And at this time, based on the only objection that has been propounded, I do accept you as an Expert in the area of the dynamics of child sexual assault Victims, disclosure patterns, disclosure dynamics, Victim/Offender relationships, memory factors that might impact child sex assault Victims and you'll be allowed to express Expert opinions in those areas.

BY MR. WAITE:

Q As we start into this, I want to, I want to make this clear for the jury. Have you done any work to prepare for this case? In other words have you been given any of the facts of this case?

A No.

Q Okay. You haven't talked to the Victim in this case?

A No.

Q Haven't interviewed the Victim?

A No.

Q Okay, so you're here kind of as a blind expert, if you will?

A Yes.

Q Okay. All right. I want to talk to you about disclosure dynamics. Let's talk first about what is an

outcry statement?

A So, when we think of an outcry statement, we think of it as the first process or step in a disclosure. So, an outcry is either made by a child to a parent, more typical the mother than anybody else.

Also it can be to other people, older children, teenagers are also pretty likely to disclose to friends, friends of families, sometimes school personnel, youth ministers, that sort of thing.

So, the first stage of disclosure is outcry. The goal of an outcry being different than a formal disclosure to Law Enforcement.

Q So, what is a disclosure then and what are the differences between those two?

A So, an outcry typically by a child is, is you know, prompted for different reasons. But, it's -- the goal by in large is to get some sort of emotional support to relieve some sort of emotional distress.

A formal disclosure or interview to Law Enforcement has different goals, not child directed necessarily but directed by the agencies conducting an interview, which is more of a forensic fact-finding. Were any laws broke? Are there specific needs to protect a child?

And so the process often starts with the outcry to someone the child trusts. And then if it gets reported to

agencies, it then culminates in a formal disclosure.

Q What factors affect how a child discloses?

A There are a variety of factors. Age certainly is one we would have to consider. Younger children, if we're talking preschool are more likely to make an excited utterance or to have certain behaviors that draw attention of an adult, sexually acting out, inappropriate knowledge for a child that's three or four, sexualized behaviors.

Elementary school children it could be prompted by a variety of factors. It's a little bit more of a planned but not -- I should say intentional outcry but necessarily well planned.

They can still somewhat blurt something out under some -- certain factors of distress and I can go into a few more of those. Adolescents tend to be more intentional and a little bit more planned.

So, in terms of one of the factors, development is one. Another factor is gender. Female children are more likely to outcry as compared to male children, particularly if the Offender is of the same sex because of concerns about being labeled as homosexual or having people look down at them.

A really significant factor is the closeness that the child has to the Offender. If the Offender is somebody within the family who the child is in a dependent

relationship, it, it's harder for that child to disclose.

If the Offender is a, a stranger it's actually much, much more likely that it'll be an immediate and rapid outcry. But, the closer and more dependent the child is and/or the mother is on an Offender, the less likely to get a very quick outcry.

Another factor can be to prompt an outcry, or I guess we're talking more about delaying an outcry is if the child has experienced any sense of threat or perceived threat if they make an outcry. That can obviously be another factor that will delay it.

Q So, are there -- there are delays in disclosure?

A Yes.

Q Are there, and, and, and those occur because of some of the things you just talked about?

A Those are some of the things that we just know that statistically it's very quite likely --

MR. BURRILL: Your Honor, I'm going to object to any sort of statistics that are introduced to explain, you know, behaviors. Again, I think that that goes into the area of vouching on credibility.

MR. WAITE: And Judge --

MR. BURRILL: I also, I also -- and I'm sorry, Mr. Waite, I just wanted to clarify this one point. I'd add that that would be shifting the burden of proof under both

United States and Colorado Constitutions, thank you.

MR. WAITE: Judge, I don't think her answer in terms of the statistics was talking about -- it was talking mainly about delay and disclosure. It has really nothing to do with a credibility issue.

THE COURT: The objections are overruled.

THE WITNESS: By the way I think social scientists try to learn about human behavior are retroactive studies, meaning that we go back and we attempt to interview in, in terms of child sexual assault, you know, conduct research on people who are committing these offenses or Victims who have experienced these types of things.

And so the secrecy or the outcry piece is a complicated, complicated set of dynamics. And so what we have learned in some of the social sciences research, and it's kind of a summary of about 11 or 12 different studies is that about 32, maybe to 40 --

MR. BURRILL: Your Honor, I'm, I'm going to object again. If we're citing specific statistics about how often something was disclosed, I think this is inappropriate Expert testimony. I think it vouches for the credibility of the alleged Victims in this can and I, I believe it's shifting the burden of proof.

THE COURT: I understand the objection. The objection is overruled. Go ahead.

BY MR. WAITE:

Q Go ahead.

A Thirty-two to 42 percent will outcry sometime within a year of the last offense. We will go 42 to maybe 52 percent sometime in childhood.

So, sometime before the age of 18. And so what that tells us is that anywhere between you know, 52 to maybe sometimes as high as 70 percent don't outcry in childhood. And some don't outcry at all, ever.

Maybe researching these, being part of a research study was the first time that they have made this disclosure outcry about their childhood history. So, when we, when we know that and when we see that you know, anecdotally as, as Clinicians or, or individuals who work with child Victims, we recognize that the outcry to disclosure process is slow.

And we are trying to identify those, those events that help us understand it more. Why is it that it's so hard to make that outcry? And those are the things we've know is all these fears, you know, the fear of being labeled in terms of our male Victims, the fear of the court process, the fear of being rejected by family members who won't perhaps believe or who perhaps are aligned with the Offender.

The fear of being taken, removed from the home or, or losing the regular contact of a loved one. The other one that is kind of an interesting one for children is a reason

for delay is something we call racket emotional awareness.

That sometimes it takes until late in middle school to early high school to recognize that what happened when you were younger was sexual in nature. When you're six you might think it's kind of icky and it's kind of funny and it's kind of weird.

But, the fact that it was sexual and what it may represent at 13, 14 or 15 is going to be different than what it represented at four, five, and six. And so what we see with child Victims is that the events often are more distressing as they're older, even if the events have stopped because of what they now understand that type of experience means; that it was a sexual violation.

Q What are victor Offender, Victim/Offender relations? What is that?

A So, that's the other thing we've tried to understand is, is what are the circumstances that allows these types of relationships to start in, in a Victim or an Offender, the actual uniqueness of that relationship. And some of the things that happen are pretty normal things that should happen between adults and children.

And one is attention and affection. You know, we, we laugh about children being resource seekers and they are seeking resources, usually from adults. And one of those fundamentally important ones is attention, the seeking the

attention and affection.

So, it doesn't look inappropriate until retrospectively if you're talking about sexual offense. So, attention and affection.

Another one that we see that's very common is a very slow, subtle exposure to the concept of sexual behavior, tickling, back rubs, wedgies, patting, rubbing, it, it's very slow. And it moves to certain parts of the body that the child may not quite understand, if it's a younger child, what that intention is.

There can be another thing we call misrepresentation of moral values. So when an Offender is in a relationship with a child and maybe would say things like this is okay because I love you. Or this is okay because God wanted that -- this for us so that there's a misrepresentation to the child that somehow what is being done is acceptable.

There's mislabeling the activity which you can do with younger children as part of that dynamic. So, telling the child you need to check their breasts for tumors or check their bottoms for sores or cleanliness or you know, those sites -- sort of things.

Another one is threats, which can be explicit or implicit. You know, the, the more common ones are that if you tell, you know I could have to go away from the family

forever. I could go to jail.

The less common, but they do happen are ones where the child is personally threatened that something bad will happen to them or their family or their pets if they tell. And then there's also a common one of just rewards and bribes which are you know, for younger children could be candy or activities.

For adolescents it can be drugs or alcohol or cigarettes or money. So, that's another one of those dynamics.

Q What type of relationships affect discloser and whether or not it's delayed?

A In terms of the type of Victim Offender relationship that the way that it, again, that the more access, the longer the Victimization is gone through and, and actually whether and how much the child feels that they've been a participant.

So, the more that children participate in not just having sexual acts performed on them, but also performing sexual acts then makes it even harder for them to make the outcry because of their own guilt and shame and confusion about now participating.

So, that would be one of them. And certainly the isolation that a child might experience if it's a type of family abuse where they're more isolated.

Perhaps things like living more rural, not having very many friends or family that ever come to the homes, home-schooling as the intention to socially isolate children, those things also can slow down an outcry or inhibit one.

Q Is it common to have delays in disclosure when it's either a family member or a, a friend of the family?

A It's the most common to have delays if the Offender is close to the family, a member of the family and trusted by the family.

Q Okay. Thank you. Let's move to a different area at this point. I want to talk about memory and specific, specifically children's member. What is memory?

A So, memory is a, a pretty complicated process. It's a neurological process. It, it actually involves some structural parts of the brain.

But, it involves like really what the mind does with information. There's lots of memory domains. There's the, the fact domain, like we know the world is round and we know two times two is four and we don't have to relearn those things.

And we have skill memory. If you operate a table saw, you don't have to re-teach yourself every time. Every time you get in the car to drive, it's a skill memory. You just know how.

There's face recognition memory. There's all sorts

of memory domains and then the -- the type of memory I believe you're talking about here is what we call events memory or autobiographical memory.

Q So, what are the parts of memory?

A So, a, a autobiographical or event memory, those are things specifically that we've experienced. We have three stages of memory and the first stage is encoding. The second stage is storage and the third stage of memory is retrieval.

Q And so how does memory work? As we go through those three things, how, how does memory work?

A So, the, the way that our minds encode an, an experience is based on our five senses. What we see, smell, hear, taste and touch, tactile experiences are being encoded or encoding the event while the event is happening.

So, we're hearing something, we're seeing something. Sometimes we're smelling something while an event is happening.

Any kind of event. And once that event is over the brain has to be able to pay attention to the next thing. And it's kind of like on a computer, you know, on a desktop.

You can minimize your desktop on your PC and then you can look at the next thing. So, that's what we have to do kind of for our brains as well, is we have to move on.

And so then that we do is we begin this process of

storage; very complicated process. We start with kind of the fluid consciousness while an event is happening. It then goes to short term memory.

And then actually in our deepest stage of sleep it moves parts of it or, or most of it or some of it moves into long term storage in our, in our brain. And different parts of our brain, the hippocampus is particularly involved in memory.

And then the, the last stage is the, the having to retrieve it. And so what we call the retrieval part of memory is a reconstructive memory. We don't think of it as reproductive. We think of it as reconstructive.

Q Why do we think of it in that, in those terms?

A Well, we think of the concept of reproductive might think of like a videotape. You know, you just play something back and that's not how memory works.

Plus, videotape doesn't include smell. It doesn't include tactile experience. So, when we talk about the reconstructive aspects of memory, that when we retrieve an actual memory of something we've experienced, it doesn't happen in exactly the same way every time.

It can be -- we're -- as we reconstruct it, you think of a puzzle. Every time you put a puzzle together, you don't put it together in exactly the same order and exactly the same pieces.

You put it together a piece fits here, a piece fits there. And that's probably my best example of how we reconstruct memory. So, the sequencing could be a little bit different.

The amount and the richness of details can change with time but what we should see in any actual experienced event is what we call the salient details. The salient details should be present consistently across time.

Q And what are salient details?

A So, what we think of in terms of memory of events, salient details are who was there during the event, what were the basic transactions and interactions between the, the Parties during this memory and where physically like geographically, what were the surroundings during that event, that you know, visually a person encoded.

So, who was present, what are the transactions and where physically. When isn't something our memory store unless it's truly anchored in some way like it was our birthday, like it was a holiday or it happened, you know, the day after you know, a surgery, something like that.

Our brains will anchor the when. But, other than that we don't store when something happened with our memories. We have to infer it.

Q So, what is an episode specific memory?

A So, the brain has to be pretty effici9ent too when

you think about all the material it's exposed to day in and day out. And so how the mind manages that is that some things are so unique and stand out, that they end up with their own episode specific memory.

So, I guess in -- if we make it like an example is like it's in its own file. It stands alone. And then we also have what's called script memory and those are memories that for the sake of efficiency and management, our minds will script together or put in the same file things that are highly similar and repeated.

And so the best example I've heard, it wasn't one I came up with. It was at a training was you know, when somebody asks any of us where were you when you learned or saw the Twin Tower bombing?

And the vast majority of people can -- they'll react that's an event episode specific memory that they knew where they were at when they saw or heard that event. Now if you ask any of us, what were you doing on September 4th of that same year or September 14th?

You know, then we would have to probably go into a script memory and we would say something like well, if it was a workday I probably got up around 6:00. I let the dogs out. I made some coffee. I went in and turned the shower on to get the water hot.

And so we then have scripted that memory. And so

when children are in interview and you, and you listen to them, you can hear them move between script and episode specific in certain cases.

And script memory will typically have words like most of the time it would happen whatever they might say. Usually when it happened we would be. Whereas an episode specific is going to have unique details to that one episode.

Q So, what do you expect to be -- as we, as we retrieve these memories, what, what do you expect to be inconsistent in memory?

A I guess I would say that inconsistencies that are not unusual would be the sequencing, like what order it gets said in. Across time what you'll see is maybe the richness of the details changes.

So, if it's a memory from a month ago, you know, you might have a child be able to say that they were in their pajamas and it was their Hello Kitty pajamas. Okay.

But, if it's something that was a year ago or two years ago, or three years ago, they might say, well, I was in my pajamas. But, they wouldn't necessarily recall that superfluous detail of it was my Hello Kitty.

So, you're just seeing the less, less richness. And in some cases where you talk about multiple, multiple episodes, sometimes you have situations where a child has not recalled or doesn't remember recalling one particular event.

And then later it comes up in another interview but they haven't previously disclosed it so it's an inconsistency in that it's not previously disclosed. But, if there are multiple, multiple incidents then that wouldn't necessarily be something that I would be surprised at.

Q So, do children disclose sex assault all at once?

A They can. It's more likely if it is -- it goes back to that, that degree of connection to an Offender. If an Offender is very close or a member of the family, or the child's in a dependent relationship with them, you will often see a little bit more of the tip of the iceberg because they're not sure if their world is going to fall apart by making the outcry and certainly the formal disclosure.

It's not unusual to see kids not readily discuss the events they participated in, the sexual acts that they performed. It's a little bit easier for them to outcry initially about the things that were done to them. It's harder to discuss the things that perhaps they've done.

Q But it's, but it's not unusual for a child, for instance to, as you indicated, tell a little bit about an event and then perhaps tell more about what happened to them over time?

MR. BURRILL: Objection; leading.

THE COURT: The objection is overruled. She can answer yes or no.

THE WITNESS: That is not unusual. That's -- and I should have been more specific when I said the tip of the iceberg is I'm going to just see how safe I'm feeling.

And if anything more horrible is happening to my family as a result of talking about this, then you will see that begin to increase in terms of their -- plus, keeping in mind sometimes children are referred into therapy and they are now talking about these experiences now. And that too increases their retrieval of, of events that they may not have previously discussed.

MR. WAITE: If I could have just a moment, Judge.

THE COURT: Yes.

BY MR. WAITE:

Q I, I guess, you know, in, in kind of response to that then, are, are memories ever reconstructed perfect, perfectly? Is that something that's reconstructed perfectly during the course of retrieval?

A I'm not sure if I would understand the word "perfectly". I guess if I am interpreting that to mean exactly --

Q Um-hmm.

A -- yes. We, any of us talk about events and it doesn't have to be a traumatic event. But, there are actual events we might have experienced, maybe it was hunting or fishing or a vacation. And you know, each time we might

discuss it with somebody, it may not be in exactly the same order.

We might include a detail that might be just unique to that friendship of who we're talking about our vacation to for example. So, the, the fact of it being inconsistent in terms of the Order things come out isn't unusual.

The reconstructive process should be pretty unconstructured [phonetic] anyway because that's normally how we talk about things in this unstructured kind of casual manner we might jump around and say, oh, but wait, I got to tell you this part first.

You know, so that's just how the human retrieval part of memory works. And so it's, it's a little bit -- it's efficient but it's not exact or perfect that, that it -- something was actually experienced.

A detail might be left out, might be forgotten. Maybe it's not salient or relevant whether it was the morning or the afternoon. Those kinds of things, if it wasn't relevant or salient, it often does not come back up in the retrieval process. Perhaps it didn't actually store.

Q And so there may be details, certainly in the script memories that you talked about, there may be details that kind of get lost? Is that a fair statement?

A Definitely when kids are in that scripted memory that, that a rich, specific detail that was unique to that

one event would put it into an episode specific. But, if everything else is so highly similar then that less unique detail just kind of falls out and it just becomes more scripted.

Q Thank you, Ms. Young.

MR. WAITE: I don't think I have anything else at this time.

THE COURT: Mr. Burrill.

MR. BURRILL: Your Honor, can we just approach [indiscernible]?

THE COURT: Sure.

(Proceedings at the bench)

MR. BURRILL: Do you want me to do -- well it's going to be a lot longer than 15 minutes to, to start. And then do you want me to just, when I [indiscernible] raise my hand/or should we stop and do lunch now? What do you want -- I can do whatever.

THE COURT: I presume that we're going to be done with the Prosecution's case today after Ms. Young is over. I really don't care either way. So, probably --

MR. WAITE: I'll, I'll leave it up to you.

MR. BURRILL: I'll start and I'll get close to noon and then if I see a convenient place I'll just stop.

(Proceedings return to open court)

THE COURT: Mr. Burrill.

MR. BURRILL: Thank, Your Honor.

CROSS EXAMINATION

BY MR. BURRILL:

Q Hello, Ms. Young.

A Hello.

Q How you doing?

A Fine, thank you.

Q I wanted to first touch on a couple of the things that Mr. Waite talked to you about, just so I don't forget to touch on any of these things. One thing that you did is you described something called script memory, correct?

A Yes.

Q One of the examples that you used was to describe kind of the difference between your memory of the World Trade Center issue and then, you know, maybe, you know, what you had for lunch around that time. Right?

A I, I think my example was what would you have been doing at that same time of the morning, like let's say September 4th or September 14th. I gave that example I think.

Q Okay.

A What you'd been doing at the same time in the morning.

Q Okay. So, okay. Just, you know, what you might've been doing same time but not on that specific date, same time

though that you found out about the World Trade Center, right?

A Yes.

Q And you'd agree that actually you just don't remember at all really what you were doing that morning, right?

A Which morning?

Q The morning that was not the World Trade Center morning.

A Oh, the morning that wasn't? No, I would probably be scripting it. I mean I, I don't know exactly of September 4th was a workday or, or not specifically.

Q Okay, but that's not really script memory, it's a guess, right?

A It's an, it's a -- well, I would say it would be scripted in the example I'm trying to use and maybe that wasn't the best example, using something that's not sexual abuse specific.

Q Okay.

A But, you know, if, if in the month of September, I went to work all but about eight days, because I'll take the weekends out, then I would be able to go back and say that that would be scripted.

Now, if I would have happened to have had a baby on September 9th of that same year, then my scripting would be

different as a result. I would have said those mornings were very different because I had just had a baby, etc, etc. So, that's how I intended to explain script memory.

Q But, but yeah, under your example for what we're talking about right now, that would be a guess. You'd be asking someone to guess as to what they were doing that same time of day, but just not on the World Trade Center day. Right?

A I'm asking to use memory --

Q Okay.

A -- to tell me what they would likely have been doing any other morning besides September 11th.

Q Which would be a guess, correct?

A I mean I -- you can use that word. I would -- I mean that's not how I'm intending it but that's okay if you use that word.

Q Okay. Another thing that you talked about was some factors related to how likely someone is to disclose with Mr. Waite. Do you recall that?

A I recall some of that, yes.

Q Okay. And one of the things that you mentioned was that children are less likely to discuss acts that they participated in, correct?

A That those may come, often come later --

Q Okay.

EXHIBIT F

A -- than the acts that were committed by them. If we're talking about multiple acts and a close relationship.

Q Right, but again you told Mr. Waite that children would be less likely to disclose acts that they had participated in, right?

A Right.

Q Okay. And so what you mean by that is sort of, rather than being I guess not acting at all, that person was maybe -- I guess doing something more than just laying there or something, right?

A Right, is that, the delaying disclosure as the result of their guilt and shame --

Q Right.

A -- is stronger if there are acts that they have actually initiated or participated in, in terms of conducting this, performing a sexual act on somebody as compared to having it performed on them.

Q Okay. I just want to make sure that distinction is clear. You mentioned too that people don't store when, correct?

A Yeah. When is typically inferred --

Q Okay.

A -- unless it's anchored and I think I gave a couple of examples.

Q And by inferred, you mean you can logically figure

out when, correct?

A Right. And the older we are, we're better at it except in maybe the later years but generally the older we are as adults, we're better at inferring as compared to a six year old or a ten year old.

And that's because we manage our time and we have a cognitive ability to manage our schedule and our time and to be more aware of time. And six and 10 year olds for example or three to 12 year olds aren't as responsible for time.

Q Right, but the question was human beings can logically put together when, when is, correct?

A Again, I want to be specific too that younger children are not as competent as adolescents and adults are in that area --

Q Okay.

A -- but typically we can kind of go through and infer some of that.

Q Okay.

A Deduce it maybe is the better word.

Q Children are still people. Right?

A Yes, they are.

Q Okay.

A But, they have different cognitive -- they're on a different cognitive developmental pace than adults and even adolescents.

Q Okay. Another thing that you talked about a little bit that can influence disclosure is social isolation, correct?
A Yeah, it can be one of the things that delays disclosure.
Q And by social isolation you sort of mean when -- I guess like a family doesn't have kind of people outside the family over and things like that?
A Yes.
Q Okay. You also mentioned like when they could be maybe in a more rural setting or something like that. Was that something that you mentioned?
A Right. Home-schooling, and I'm talking more about incest cases you know, where that use -- social isolation is used as a mechanism to inhibit disclosure and outcry.
Q Okay. One of the things that Mr. Waite touched on with you at the very beginning was just that, you know, you don't know any of the case details in this particular case, right?
A That's true. I don't.
Q I mean you're here to be sort of an Expert in jury education. Right?
A That's my understanding, yes.
Q Okay. And that's something that you routinely do with this Prosecution's office, right?

A I do it with other District Attorney Offices as well.

Q Okay. But, you also do it with this District Attorney's Office, right?

A Yes, this one as well.

Q And in fact, I saw you talking to Mr. Waite out in the hallway before your testimony, right?

A Yes.

Q And was that the first time you'd even talked to him about this particular case?

A I think so.

Q Okay.

A I mean I don't -- I, I, I have to tell you, usually I do know something like how, because I don't want to waste anybody's time, how old the alleged Victim is, what's the relationship between the alleged Victim and the accused. And, and this is a case where I, I actually don't know anything.

I'm, I'm -- so I may be talking about preschoolers and shouldn't be. I just don't know anything about this case.

Q All right, so literally five minutes before you testified, that was your first time even talking to the district Attorney?

A No --

Q On this case.
A -- the first time I've ever talked him --
Q Right, right, right.
A The first time on this case that I recall talking to him, yes.
Q Okay. So, you'd agree that generally the District Attorney has a pretty good idea of what you're going to say. Right?
A Oh, I think they do, yes.
Q Okay. Now, kind of building on that, again, you didn't get any sort of detail or social detail about the families at issue in this case, right?
A I did not.
Q So, no details about Mr. McFadden over here, right?
A No, none.
Q So, no detail about the W[redacted] family, right?
A No.
Q Or the R[redacted] family?
A No.
Q The W[redacted] family?
A No.
Q The R[redacted] family?
A No.
Q Okay. We were touching just a little bit just upon your interaction with this DA's office. It would be fair to

say that generally you come and testify for this District Attorney's Office about once a month. Would that be fair?

A That's the more typical, yes.

Q Okay. And I notice that you meant more typical and I was going to ask of [indiscernible] on that. Lately you've had a lot of trials that you've been testifying in, right?

A I think I've had four in -- since February.

Q Okay. And I think at least one of those was with me, correct?

A Yes.

Q And I think there was actually two in March that you did, right?

A Or maybe it was March, not February.

Q Right. So, I think there was two in March that you did, right?

A Yes.

Q There was Mr. Short and Mr. Pfifer.

A I don't usually know the Accused names.

Q Okay, okay, but you remember that there was at least one that you did with me, right?

A I do. I, I'll go with that.

Q Okay. And then recently you've been in a lot of trials as well, right?

A I think I've only been in one last week and this week. There might have been -- I don't -- I, I would have to

look at my schedule but I don't think I was here in April or May, or June. I could have been, I just don't recall.

Q Okay. Do you recall a trial that would have been with Mr. Jeremy Savage and John Burkey as the Defense Attorney? Do you recall that at all?

A I think that they've had more than just that one -- more than one trial. I, I, I don't recall any specifics about their trial.

Q Okay. All right, so at least like this year what you're saying is you've testified about four times or so, is that correct? Since February?

A That's my recollection. I would have to look at my schedule in my billing -- my office's billing records to know for sure.

Q Okay. And you're paid for your time. You discussed this Mr. Waite, but you're paid for your time for testifying on these cases, right?

A Yeah. The clinic bills and there is a state capitated rate and they -- I'm assuming the District Attorney's Office pays their bills but they reimburse the clinic I work for, Behavioral Health and Wellness.

Q Okay. And that's at $100 an hour, correct?

A Actually I think it is. I think that those rates went up from like 80 something to $100 recently or sometime in the last year or two, last year.

Q Okay. And you can also -- you get paid for your wait time as well, correct?

A Yeah, but I think that's at like $50.

Q Yes, correct, it's a lower rate, $50 an hour, right?

A Yes.

Q Okay. Now, one thing that you touched on with Mr. Waite is that you are on a couple different review teams, correct?

A Yes.

Q You're on the Mesa County Sexual Assault Review Team?

A I am.

Q Okay. And you're also on -- I think it was -- I didn't remember the exact term that you used, but it was child --

A Fatality Review Team.

Q Fatal -- okay, child fatality one. Okay. And both of those review teams work with a couple different agencies, correct?

A Actually there are a variety of agencies that are on both of those teams.

Q Right. There's Department of Human Services. That's one of them.

A Yes.

EXHIBIT F

Q Okay. The District Attorney's Office, that's another one.

A Yes.

Q And then there's a variety of Law Enforcement agencies, right?

A Yeah, Fruita, Palisade, Junction, Mesa, yeah.

Q So, those are the people on that team, correct?

A And SANE Nurses.

Q Okay. And you'd agree that those are all investigative bodies, correct?

A Yes.

Q Okay. And in fact, a lot of those cases involve criminal prosecutions, correct?

A Yes.

Q Okay. And again, you're on that team that coordinates that.

A I don't, I don't think I'm on a team that coordinates it. I don't know what that means. Like, my, like, my involvement on that team is really just to sort of track cases and make sure that cases don't fall in the cracks and are not heard of, that kids get referred appropriately. But, decisions about prosecution and what to investigate, I don't have any say in any of that.

Q Okay. But, you again, you make sure that these cases don't fall through the cracks, correct?

A The team does, not me personally.
Q Okay. But, you as a member of that team have a say in that right?
A Yeah, I guess we would.
Q Okay. One of the things that you also mentioned is that you're on -- I don't remember your exact term for this but it was, it wasn't Board of Western Slope Center for Children but what was it?
A Oh there's an Advisory Council.
Q Advisory Council, okay. Advisory Council, so you're obviously, you're aware of the memorandum of understanding with Western Slope Center for Children, right?
A I'm familiar that the Western Slope Center for Children has memorandums of understanding with different agencies. I don't know the specifics of those.
Q Okay. So, you don't know anything about the memorandum of understanding with Law Enforcement on the part of Western Slope Center for Children?
A No. I, I just know that there are some types of agreements in all counties that have advocacy or some center similar to the Western Slope Center for Children where there is an agreement about what types of services are provided.
Like, what type of setting that they provide for the forensic interviews. I don't know the specifics but I know that that's a standard for all of these types of

advocacy centers.

Q But, there's actually an agreement or a memorandum of understanding about how they investigate some of these types of cases, correct?

A Oh, I don't know about that, that's an agreement about investigation.

Q Okay. But, where the forensic interview is going to take place, right?

A Yes.

Q Who's going to pay for the SANE examination, right?

A I think they have some of that in those.

Q Yeah, okay.

MR. BURRILL: Now, Your Honor I think actually it's a convenient place to stop right now.

THE COURT: Okay. Ladies and gentlemen, we're going to go ahead and break for the noon hour. We will be back together at 1:30. Please remember the admonishments that I've given you before and have a nice lunch. I'll see you back here at 1:30. Please rise for the jury.

(Asides)

THE COURT: You may be seated. We are now outside the presence of the jury. Anything before we break, Mr. Waite?

MR. WAITE: No, Your Honor, thank you.

THE COURT: Ms. Smith, Mr. Burrill?

MR. BURRILL: I think I'm good.

MS. SMITH: We have nothing [indiscernible].

THE COURT: Okay, see you at 1:30.

(Off the record at 11:58 a.m.)

(Off the record at 1:37 p.m.)

THE COURT: Please be seated. Good afternoon. We are once again back on the record in 13CR27, 13CR339 and 13CR342. All Parties and Attorneys are present. Anything before we bring the jury in, Mr. Waite?

MR. WAITE: No, Your Honor.

THE COURT: Ms. Smith, Mr. Burrill?

MS. SMITH: No.

MR. BURRILL: No, Your Honor.

THE COURT: Okay. Ms. Young, if you'll come back up on the witness stand and we will go ahead and call the jury in.

(Asides)

THE COURT: Please rise. Please be seated. Once again, welcome back ladies and gentlemen. Mr. Burrill.

MR. BURRILL: Thank you, Your Honor.

BY MR. BURRILL:

Q Hello again, Ms. Young.

A Hello.

Q Okay. So, I think we were kind of switching gears when we left off but I wanted to touch on the salient detail

issue with you again. You mentioned that salient details should always be present, correct?

A Yes.

Q Okay. And by salient details we mean who, you know, who was involved, right?

A Yes.

Q What, which are kind of the basic transactions, right?

A Yes.

Q And that would involve where on the body someone was touched and things like that?

A I, I would agree with that.

Q Okay. And then where geographically, so like in a bedroom or at a certain location?

A Yeah, the, the, the physical surroundings.

Q Okay. Now in fact, in cases that involve inconsistencies across salient details, there's greater concern, right?

A Yes.

Q Okay. You'd also agree that, you know, allegations that lack free narrative should include investigating whether or not there's motive for a child to fabricate abuse or look for coaching?

A I would say that a standard of forensic interviewing is that regardless of whether there's a

substantial of free narrative or not, you should always still investigate whether there is a motive for a false report --

Q Okay, yeah.

A -- not just based on whether there's free narrative.

Q Okay. So, something that you should always be looking for, right?

A Right.

Q And especially if there's free narrative though, maybe it's a reason to even look at that even more. Right?

A I guess I wouldn't disagree with that. I think that the, the free narrative kind of concern a question would also depend if you were talking like a four-year-old. There would be certainly much less free narrative and would involve lots of cuing and prompting with questions as compared to a 13-year-old.

Q Okay, or even like an eight-year-old, right?

A By age, yeah would --

Q Yeah.

A -- graduate with greater free narrative as children age.

Q Okay. One thing that I know that you have a lot of experience is in forensic interviewing, right?

A Yes.

MR. WAITE: Judge, can we approach?

THE COURT: Yes.

MR. BURRILL: Yeah.

(Proceedings at the bench)

MR. WAITE: I did not ask to have her an Expert in forensic interviewing, stayed very specifically away from any questions involving the forensic interviewing. This is not only beyond the scope of direct but beyond the scope of her expertise as she's been tendered to the Court.

THE COURT: Mr. Burrill.

MR. BURRILL: Yeah, Your Honor, I disagree. In fact the whole disclosure process actually culminates in a report to Law Enforcement that typically involves a, a forensic interview. And in fact, Cheryl Young did testify about the fact that you know, a report to Law Enforcement is part of the disclosure process. So, first of all I think it was absolutely touched upon during the direct examination.

Second of all, I'd point out the fact that you know, we have the right to confront and cross examine the witnesses against Mr. McFadden here in this case and that is relatively expansive right, that can only be curtailed under certain specific circumstances.

We want to get into issues related to forensic interviewing and the suggestibility of children, which I think is something that's absolutely proper based on her testimony about disclosure rates and other things that she

brought up during her direct testimony.

THE COURT: Anything else?

MR. WAITE: Well, Judge, I think she can talk about forensic interviewing being a part of the disclosure process. I don't think she's been tendered as an Expert though in the area of what is a proper forensic interview as opposed to what is not a proper forensic interview.

And, and, and so I don't -- I, I don't think she can testify in that area. It's, it's, it's certainly beyond the scope of my direct. She is, she is my Expert Witness.

MR. BURRILL: Can I go grab something really quick? I think the Court wrote down the exact things that she was tendered in. I have down that it would be -- sorry --

THE COURT: I'll tell you what she was tendered -- well I don't know why she was tendered, but she was qualified in the area of dynamics of child sex assault, disclosure patterns, disclosure dynamics, Victim/Offender relations, memory factors that might impact child sex assault Victims. Those are the areas.

MR. BURRILL: So, first of all issues related to forensic interviewing implicate memory, child suggestibility implicates memory. That's something that she's been endorsed in.

The generic factors that might impact child sexual assault Victims is clearly forensic interviewing. And the

disclosure that's made to Law Enforcement, the manner in which questions are asked, the manner in which that occurs, that's all a factor that might impact a child sexual assault Victim or you know, whether or not that person is a child sexual assault Victim.

So, all those things, and including the disclosure issues I've already raised are implicated by my question and that's why I think it's appropriate under both the United States and Colorado Constitutions, the right to confront and cross examine the witnesses against my Client, Mr. McFadden. Thank you.

THE COURT: The objection is sustained. She's not been qualified as an Expert in the area of forensic interviewing.

The only information and testimony that was presented on direct examination was that forensic interviewing is part of the disclosure process or talking to them. She didn't go into any details as far as what a forensic interview is or any details regarding that.

You can certainly get into areas that may be that, but not anything specific to a forensic interview itself. So, again, the objection is sustained.

(Proceedings return to open court)

THE COURT: Mr. Burrill.

MR. BURRILL: If I could just have one second,

Your Honor.

THE COURT: Certainly.

MR. BURRILL: Okay.

BY MR. BURRILL:

Q Ms. Young, during your direct examination you testified that disclosure is a process, correct?

A Yes.

Q And in fact it can start out with an outcry statement, right?

A Yes.

Q And then it moves -- well it doesn't have to, but it can move towards a formal report to Law Enforcement, right?

A It doesn't always.

Q Okay, but it can, right?

A It can.

Q And you know, once it rises to that level, there's often somebody who speaks to the child, right?

A Yes.

Q And that person is well, can be a forensic interviewer, right?

A Law enforcement officer, Department of Human Services Caseworker and some agencies actually employ forensic interviewers.

Q And you'd agree that the purpose of the interview

when it gets to that point, is to get factual information, right?

A It's always been my opinion that it's sort of twofold. One is, of course, it's fact finding around whether there were laws broken. And the other is that it is intended to help make decisions about the protective needs of a child.

Q Okay. But, you, you make those decisions based on the factual information you receive from the child, right?

A That's what the professionals that do the assessments, yes.

Q So, it's important to get as much accuracy as possible out of that interview?

A Yes.

Q And you would agree that those type of interviewers should try to obtain those facts in an unbiased way, right?

A Yes.

Q You're familiar with the term confirmation bias?

A Yes.

Q Okay. And confirmation bias is the tendency to search for, interpret or recall information in a way that confirms one's own beliefs, right?

A Yes.

Q Now you'd agree that confirmation bias can be present in these type of interviews, right?

A I would say that they were -- was a significant

EXHIBIT F

concern, particularly in the '80s which developed the protocols --

Q Right.

MR. WAITE: Judge, again I'm going to object. Again we're going into the area I just asked the Court to rule on. With respect to forensic interviewing, that's exactly where this is going.

THE COURT: Anything else?

MR. BURRILL: Your Honor, I'm talking about I guess confirmation bias in the context of the disclosure patterns and the process of disclosure which was elicited on direct examination from the District Attorney.

THE COURT: The objection is overruled.

MR. BURRILL: Okay.

BY MR. BURRILL:

Q I don't remember the exactly question I asked. I think it was something about how confirmation bias can be present within those interviews and then you were talking about some of the things back in the '80s.

A The, the greater concern in the '80s was that the lack of protocols and good training, there were concerns that confirmation bias in people who were, the whole field was untrained in the '80s. And so out of those circumstances, the McMartin preschool case, some of those high profile cases throughout the late '80s, '90s and for -- since then has been

the development of protocols that are based on you know, forensic interviewing, investigative interviewing techniques.

Q Right. And you'd agree that in some of those interviews that were conducted, you could see confirmation bias in the way that they asked questions, right?

A I -- I've not actually seen any --

Q Okay.

A -- of the interviews but I, I do know that that was the concern.

Q Right. And sometimes like you know, there are both I guess, verbal and nonverbal cues that can be given in interviews with children. Right?

A I, I, I guess I, -- you -- I wouldn't disagree with that. I think that, that the difficulty that happens in these sorts of cases is that you know, the development of building rapport is an important part of forensic interview that you develop some kind of rapport with the child.

And so I've seen cases where you know, one side believes that the process of developing rapport and being you know, kind and respectful to a child is a confirmation bias. They're overly friendly. So, I, I, I have to know specifics but --

Q Okay.

A -- you know, we have to differentiate building rapport from confirmation bias.

Q Right, right. There, there should be a difference right --

A There is, yes.

Q -- that you should be able to see. Okay. And sometimes you can see confirmation bias in the way that certain questions are not asked in an interview, right?

A Oh, in a forensic interview if certain questions don't get asked that, that on retrospect should be? And I -- and forensic interviews are pretty dynamic and fluid.

And so sometimes that's why you see a follow-up interview is to clear up some confusion. And sometimes it's not the question that's asked that's the problem, it's the child's interpretation of the question.

Younger children have a more difficultly, like this is an example I've seen a few times in interviews where an interviewer ask a child where did that happen. And the interviewer intends to mean where was the geographic location.

And the child interprets it as where on their body. So, you know, they'll -- the, the nature of younger children also can create some misunderstandings in interviews.

Q Okay. Now, you would agree that as compared with adults, children are more suggestible than adults.

A They are in, in terms of there's indication that younger, preschool children, if there is coercive

questioning, do have a higher incidence of suggestibility than older children and/or coercive interviewing.

The, the key piece is, is the interviewer highly coercive and suggestive and saying questions and asking questions in such a way that prompts the child to be led into making statements that weren't part of actual researched events.

Q Okay. And there's, there's really no dispute the younger the child, the more suggestible, right?

A The -- again, the younger the child with coercive questioning, the greater the degree of suggestibility.

Q Okay. And you keep saying coercive questioning. What do you mean by coercive questioning?

A So, how it's been used in, in terms of child sexual abuse us an open-ended question would be something like I understood you came in to talk to me about some things happening in your life. It's a very broad, open-ended, non leading question.

A leading question would be, is an example, I understand you're here to talk to me about the things that have happened with your stepfather or your uncle or whatever it might be. And a coercive question is your stepfather touched you on your private parts didn't he?

Didn't your stepfather touch you on your private parts? He did, didn't he? That's the coercive questioning

that we have talked about in the research that we saw then that preschool children have a greater percentage of folding into and not standing their ground on.

And it wasn't those kinds of questions. It was questions about doctor visits and did the doctor kiss you? And those kinds of things where they researched that kind of questioning.

Q Okay, and you keep using this term coercive questioning. Are you getting that from social science research? Is that what you're going at?

A That would be the term that were used by the researchers, yes.

Q Okay, and --

A Coercive, highly coercive, highly suggestive questioning.

Q Highly coercive and highly suggestive is your testimony, okay. So, you'd agree that there acts -- absolutely has been research into these issues before, right?

A I think the research has been ongoing, and particularly since the '90s and early 2000 but I think it's a field of research for a variety of reasons, not funded as well as it should be but --

Q Okay.

A -- yes.

Q And you know, there are some pretty famous

researches on these topics that we're talking about, right?

A There are a variety of people that have published more frequently, yes.

Q Okay. And for example, some of those people are Stephen Ceci and Maggie Brock, right?

A Out of Cornell, yes.

Q Yep. And they're some of the foremost researchers on child suggestibility, right?

A Memory and suggestibility, yes.

Q And disclosure, which we've talked about as well, right?

A Yes.

Q Okay. And there's somebody that you actually cite in your Expert opinion letter that you send out in these type of cases, right?

A I'm sure there's more than one.

Q Okay. At least to your knowledge, the Expert opinion letter that you send out includes citations to Stephen Ceci and --

A Oh yes. I'm sorry.

Q -- Maggie Brock.

A I didn't understand your question.

Q Okay.

A Yes, he would be one of them.

Q Okay. In fact, in the Expert opinion letter that

we got in this case, you cite them four separate times in your reference section, correct?

A I don't disagree with that.

Q Okay. I, I think you mentioned they're out of Cornell, right?

A I don't think Maggie Brock's at Cornell anymore. Stephen Ceci I believe still is.

Q Yeah, I think Maggie is at McGill University, right?

A Yes.

Q Okay. So, you'd agree that they provide some reliable authority that we're talking about relating to the suggestibility of children, right?

A Yes.

MR. BURRILL: Okay. If I may approach, Your Honor?

THE COURT: Yes.

BY MR. BURRILL:

Q And Ms. Young, I'm handing you an article by doctors Ceci and Brock on the suggestibility of children's memory. It looks like that article was published in the Annual Review of Psychology, right?

A Yes, in '99.

Q Okay. And the Annual Review of Psychology is a publication that's been in existence since about 1950, right?

A I wouldn't disagree with that.

THE COURT: Mr. Burrill, I'm sorry, could you tell me the exhibit --

MR. BURRILL: Oh, it's --

THE COURT: -- number or letter?

MR. BURRILL: -- it's labeled as Exhibit C.

THE COURT: C, thank you. I'm sorry, go ahead.

MR. BURRILL: Is it -- yeah it was C. Sorry, I'm just trying to make sure because mine doesn't have the marking on it. Okay.

BY MR. BURRILL:

Q And the American -- or the Annual Review of Psychology covers significant developments in psychology, right?

A Yes.

Q And they're rely -- it's a reliable publication that Psychologists and Therapists in your field rely upon for research, right?

A Yes.

Q And you'd agree that this article is a reliable authority by Dr. Brock and Dr. Ceci into the area of child suggestibility, right?

A I wouldn't -- I have not read it in years but I wouldn't disagree with that.

Q Okay. But, again, still, they're a reliable authority regarding child suggestibility right?

A Yes.

Q Okay. So, let's talk a little bit just about some of these principles. One of the, the first things, and we've kind of already been talking about this, but one of the first things that Dr. Ceci and Brock mentioned as important regarding suggestibility is interviewer bias. Right?

A Yes.

Q So, they sort of agree with some of the things we've been talking about, right?

A I, I think that the, the training for forensic interviewers is to, to try to protect and that is that you need to start with as many hypothesis as possible. And that your forensic interview, your goal is to rule out as many of those possibilities that could, could exist in any given case.

Q Right. And they talk about how you know, interviewer bias, one of those hallmarks is gathering only confirmatory evidence and avoiding all avenues that may produce disconfirmatory evidence, correct?

A They would say that, yes.

Q Okay. And Your Honor, also I'd actually move at this point to admit Defense Exhibit C.

THE COURT: Mr. Waite?

MR. WAITE: And I, I object, Judge. Can we approach?

THE COURT: Yes.

(Proceedings at the bench)

MR. WAITE: Defense Exhibit C includes an awful lot of information here that's not been talked about by this, this Witness, that's not been confronted with her. I mean to go through this and confront her with line by line; we're going to be here another two, two weeks.

Judge, this is, you don't, you don't get to admit these. You get to ask her questions about them. To admit this would be to talk about all of the stuff that's in here, specific versus open-ended questions, interviewer bias, all of which I've already objected to with respect to this.

We've already got into the forensic interviewing process further than this Court said they -- the Defense was allowed to get into. At this point we're not -- we're no longer talking about disclosures.

We are talking about the interviews themselves and the bias that the interviewers have. And again, we're way beyond the scope of direct, way beyond her, her tendered expertise and, so, for all of those reasons I object to this.

In addition to that, this has a lot of information here that has nothing to do with what her testimony just was. So, I just, I mean we can, we can start admitting studies, but we're going to, we're going to have this jury looking at studies.

Because I can -- I can come up with 100 studies. And I -- quite frankly I think it's irrelevant and inappropriate to admit these studies.

He can question her about them to the extent, I guess, that the Court's allowed him to do so. But, I don't think you get to admit this Exhibit. It is not evidence.

MR. BURRILL: Your Honor, I guess in response, first of all it's irrelevant how long this is going to take. Mr. McFadden has the right to confront and cross examine the witnesses against him, a Witness that we deem very, very critical in this case.

We've been talking about child suggestibility. We've been talking about, as part of the disclosure, you know, reports that are made to DHS, to Law Enforcement, and this goes into the influence that those people can have on disclosure.

So it's 100 percent relevant to what was both discussed on direct and earlier during cross examination. She's now testified that the only reason that these children are suggestible is because of these really, really coercive questions and things like that, which is 100 percent false.

This is something that she testified to as reliable authority in her field, the field regarding both child suggestibility, regarding disclosure. I am drawing her attention to it and essentially asking her questions about

it.

You know, she can say what she will regarding the research that's here, but we can contend that this is 100 percent vital to our case, pursuant to C.R.E. 803.18. This is a learned treatise.

I think I've laid an adequate foundation for that showing that this is the type of research that's relied upon in this area, that this is reliable authority and she's admitted that it is so.

So, I think it's appropriate that both its, both can be admitted and that I can ask questions about it at this point. And I certainly -- that is what I intend to do. Again, this all goes down towards the disclosure of these, these allegations of child sexual abuse and the influence that things can have on that disclosure.

THE COURT: If the article in question is the suggestibility of children's memory, it has a whole host of sections that are contained in here. Some of which have been discussed during the course of the trial, some of which have not.

Some of those that have not include the anatomically detailed dolls, multiple suggestive techniques. As I go through this it also talks about the effective suggestive interviews on children's credibility, etc.

The exhibit is not going to be admitted. You can

continue your questioning, but I'm not exhibit -- admitting Exhibit C at this time.

MR. BURRILL: So, I can still ask questions concerning it as long as --

THE COURT: [Indiscernible] considering the objection that you could ask.

(Proceedings return to open court)

THE COURT: The objection is sustained. Exhibit C will not be admitted.

MR. BURRILL: Okay.

BY MR. BURRILL:

Q Well, Ms. Young, I still wanted to ask you some questions about that. So, I think where we had left off was we were talking about interviewer bias and how Dr. Ceci and Dr. Brock were essentially talking about that.

Right? And you mentioned it's always important to explore alternative hypothesis for the allegation of abuse, right?

A Yes.

Q And some of the things that they mention that should be pursued as questions like did your mommy tell you to say this or did you see it with your own eyes? Right?

A That would be an example of one -- if, if there was a, a reason to ask that type of a question. But, that specific question but to try to explore the possible reasons

for the allegations that could be one of the questions.

Q Okay. And let me give some other examples too. Like, who besides your teacher touched your private parts? Did your brother touch them too? Those are other types of questions that show a lack of interviewer bias, right?

A Well, who besides your teacher touched you is pretty suggestive.

Q Okay.

A I, I wouldn't recommend that one. I would recommend something at -- if you're talking about an interview where a child's made some allegations, it would be also appropriate to say is there any other time in your life when anybody else has done something that made your body uncomfortable or made your feelings uncomfortable. I would ask it broader than who else, because who else implies somebody else has touched you.

Q Okay. So, I guess you would disagree then with Dr. Ceci and Brock regarding that?

A I'm not sure that they would still use that question now. That was maybe 1999.

Q Okay. Okay, so you think --

A But, the example of exploring other possible offenders or perpetrators is a, a good practice.

Q Okay. And they mentioned too like another good thing to ask would be something like did this really happen.

Right? That's something that you should certainly ask, right?

A There, questions around is this something that you remember happening or is this something that somebody talked with you about? Those kind of questions can be appropriate.

Q Okay. You would agree too, that another thing they note that shows interviewer bias is a tendency to ignore inconsistent or bizarre evidence that comes from the child making an allegation of abuse, right?

A The, I -- I'm not sure if you mean like fantastic statements or --

Q Yeah. Yeah. Yeah, like fantastic statements or things that just don't seem to add up.

A Right. Those, those should be explored. Not always --

Q Right.

A -- necessarily with the child but with somebody that has access to the child. Or sometimes it's appropriate to not explore it right at that moment in that interview, if you hear something very fantastic or unusual, or unbelievable, but to then follow-up with additional interviews with people who know the child.

Maybe the person that the out cried to, and then come back. So, sometimes it doesn't happen in the same interview.

Q Okay. Another thing that I know that we've talked about beforehand, not in this trial but another one is that another alternative hypothesis to explore is whether or not the child has serious psychiatric issues, right?

A Yes.

Q Okay. According to some of the research, interviewer bias can influence the entire structure of an interview with a child, right?

A Right, which is why the protocols have been developed over the last 20 to 25 years is in an effort to set the train to go from broad to more narrow, to formulate -- start with your hypothesis, formulate your interview and then go beyond to more specific questions to clarify at the end of the interview and not at the start. So, the protocols were designed, in part, to help control for that.

Q Okay. One of the things that you touched on a little bit beforehand was this coercive, repeated questioning, right?

A Yes.

Q Now, according to some of the research that's been done, they don't, they don't use that terminology, do they?

A That word is used in this article you gave me.

Q Okay. Well, what page are you looking at?

A Might take me a minute to find it.

Q Yeah, it's okay. Don't worry.

A I'm sorry. I saw it when I was scanning.

Q It's --

A It's, it's in here somewhere.

Q Yeah, I'm, I'm sure. I'm, -- I have no reason to doubt that either. But, but let me go -- what -- if you could go to page 425, I wanted to ask you some questions about this.

One of the concerns that Dr. Ceci and Dr. Brock talk about is concerns about using specific questions versus open-ended questions, right?

A Right, the goal being to start with as -- open-ended questions as possible. Keeping in mind that much younger children may need a little bit more of a narrowed question in order to understand more about what the goal of the conversation is about.

Q But, they know, in some of the studies that they've conducted on children or that have been conducted on children, that just asking specific questions themselves can create some problems with accuracy, right?

A Oh, you mean just like yes, no questions?

Q Correct.

A Yes. And, and you can have interviews where children you know, have what we call LVA which is Low Verbal Ability and those children are the ones that struggle the most with free narrative.

Q Right.
A It's sort of a cognitive limitation they have.
Q Right. And when they talk about specific questions, you know, Dr. Ceci and Dr. Brock too, they -- they're talking just about, they don't, they don't label them as leading, they call them things like forced choice questions, right?
A Yeah, forced choice --
Q Um-hmm.
A -- direct questions, the, the, the -- I think the most important thing is not necessarily if a multiple choice question is used but the context of the -- when it's used. So, if a child is giving you a pretty good description of an alleged event and you know, the one thing that they didn't mention is whether that happened in the daytime or nighttime, because there's not a lot of other choices for time besides day and night.

That could be qualified as a forced choice question, a multiple choice question. But, I wouldn't have as many concerns about that kind of a question after a, a pretty good disclosure.
Q Okay.
A So, there's a lot of nuances and I, I don't want to waste your time. I don't know if that's helpful or not.
Q Well, let me ask you this. You'd agree that

Dr. Ceci and Brock caution against using things like forced choice questions, right?

A Certainly using them earlier in the interview, absolutely, to avoid them if you can with younger children. Practically, unfortunately, sometimes they're necessary but it shouldn't be to substantiate an act.

Q Um-hmm.

A It should be to clarify daytime or nighttime, something like that. But not to confirm an act.

Q Right, but for example, you keep saying the -- shouldn't use it earlier in the interview. That's not what Dr. Ceci and Dr. Brock note in this study, do they?

A I, I don't know which study you're referring to.

Q The one on page 425. Where it discusses specific versus open-ended questions.

A Which particular section?

Q Well, I think --

A I mean, I'm reading that paragraph. I didn't remember that part of your question. I apologize.

Q Okay, it was just that they don't limit cautioning against specific questions to the beginning of the interview, do they?

A Right, it, it indicates here that a biased interviewer does not ask a child open-ended questions such as can you tell me what happened. But, instead, resort to a

barrage of specific questions, many which are repeated and leading. And that's a problematic strategy.

Q Right. And the study that they cite, they actually talk about how children were first asked open questions, tell me what happened, and then asked more specific questions, right?

A I didn't read all that. I apologize.

Q Well, go ahead --

A I've not read the whole article -- that whole section.

Q Keep going down.

A Do you want me to read it now?

Q Yeah, go ahead.

A Oh, okay. So, I read the part on specific versus open-ended.

Q Right. And they talk about how errors increase, even with starting with those open-ended then moving to specific, right?

A Right, that, that if you can do an interview where you never ask one, with a child of high verbal abilities.

Q Um-hmm.

A But, if you ask them, know why you're asking them and, and be able to assess whether or not asking that question was harmful or created more bias or any confirmation bias.

Q Okay. And let me ask you this too, just because I didn't know this before I started doing cases like this, but what is a forced choice question? Go ahead.

A Well, I think that the example, the -- that they gave there, which is was it black or was it White? I think they gave that example.

I don't know what they were referring to in this. A forced choice question, was it black or was it white, that's because there's also a lot of other colors besides black and white --

Q Right.

A -- that it would be a forced choice. And the third option, or the third thing that they're referring to is if you're going to say was it black or was it white or you might also want to say, or do you not remember or do you not know. I mean so giving one of your choices is that you don't know and you don't remember is an okay answer, as well.

Q And that's because children are reluctant to say that type of answer right, that they don't know.

A Yes.

Q Okay.

A They can be.

Q All right. Another thing that Dr. Ceci and Brock talk about is being of concern is when someone repeats specific questions to children, right?

A It can be a concern. I think that it's important to explain why and sometimes what you have to say is I'm still really confused and so I'm going to ask you this question again. And you often, you know, have already set some parameters or rules.

It's okay to disagree with me. It's okay to say you don't remember. But, I'm still really confused about that time you talked about in the camper bus, whatever.

Q Okay. So, I think what you're saying though generally is that you agree social science research is concerned with asking children repeated, repeated specific questions, right?

A Right. So, you want to clarify it as your problem, it's not their -- there's not a problem with their answer, there's a problem with you understanding it.

Q And the reason why is because children feel like if you keep asking the same question, they're giving the wrong answer, right?

A They can, yes.

Q Right. So, that's why you definitely want to avoid those issues, correct?

A Yes.

Q You don't want the child to guess or anything like that.

A Yes.

Q Okay. You would agree too that interviewers can have subtle cues in an interview with a child as part of the disclosure process?

A Like, you mean nonverbal?

Q Yeah, it could even be nonverbal, right?

A Yeah. I don't -- I'm not sure I quite understand what you're talking about but -- that do -- can interviewers convey a message with non-verbals? Yes.

Q Right. But, even just an emotional tone of an interview can influence how a child discloses, right?

A Yes. You want to be professional and you do want to be somewhat neutral about the subjects that are being discussed.

You don't want to be effusive and excited based on an answer of theirs but you also don't want to suggest to a child that you're disinterested or you think they're talking about something that makes you uncomfortable. So, it's a complicated balance.

Q Okay. Yeah, it's difficult but something to look for when you're looking at an interview, right?

A Yes.

Q Okay. Stereotype induction can be part of a suggestive interview, right?

A It can be.

Q And that's when like you know, if a child's told

that somebody's a bad person or some -- or does bad things, they might incorporate that belief into their report. Right?

A They can.

Q Okay. Sometimes, I guess, suggestibility can be kind of subtle, right?

A It can be.

Q Are you familiar at all with a Mr. Science study that was conducted?

A I need to know more about it. That one doesn't ring a bell.

Q Okay. If you want, you can look at page 429 on this article. They talk about it about halfway down the page. And maybe if you read that, it might refresh your recollection about that specific study.

A You say 429?

Q Yes.

A Oh, that's the wiping the mouth study, yes.

Q Okay. Yeah. So, in that study, essentially what happened was some children went and they played with a guy named Mr. Science, right?

A Yes.

Q And some things happened and some things -- well, I'll phrase it this way. So, a story book was prepared about the child's experience with Mr. Science, right?

A Yeah. If I recall, they watched him complete some

experiments but they didn't watch -- some of the kids didn't see all of the experiment. They only saw two of the four or something like that.

Q Exactly, exactly. And so they gave the storybook to the parents of the child, right?

A To read to the children --

Q Okay.

A -- four months later.

Q Right. And the parents read that story to their children three times, right?

A I don't disagree with that. I don't remember that part.

Q Okay. And later on, the children actually told the experiments, -- the -- or yeah, told the experimenters that they had participated in demonstrations that they had actually not participated in; they don't even mention in the story, right?

A Right. They didn't actually participate in those but the story that was --that their parents read to them about their time there, talked as if they had participated in those experiments.

Q And that's another thing that Dr. Ceci and Brock talk about is that children can actually come to believe that they've experienced false events sometimes, right?

A They can if a trusted sources suggests and leads

them into believing something that the examples that they're using in here --

Q Okay.

A That somebody wiped their mouth with something yucky.

Q And that's -- I guess that has led to some problems with professionals evaluating reports. Right?

A What has?

Q I guess the fact that children can sometimes come to believe that something happened to them when it did not. Right?

A I, I think that that's -- the question then goes to one of the hypothesis is there evidence or indication in cases like this that somebody is coaching a child into making a false allegation. So, that would be one of the hypothesis that forensic interviewers should always start with.

Q Okay. Now you're also familiar with some of the research that Dr. Ceci and Brock have talked about, about the fact that professionals cannot tell what stories from children are fabricated and which are, which are accurate. Correct?

A I would have to know what specific you're talking about.

Q I think that would be if you wanted to check it out, it would be page 432 they really talk about this. Maybe

just go ahead and read that first full paragraph and say whether or not you agree or disagree with some of those propositions.

A And is -- if I recall this, that this -- these were children that were interviewed that had previously experienced repeated suggestive interviewing that included false reports.

If I'm reading that correctly, that they were, first of all suggestively, coercively interviewed about events that didn't happen to them. And that, that repeatedly happened and then they were interviewed by some, I don't know who they said did the interviews, some type of mental health professionals.

Not, so -- that then the children appeared pretty credible after these things were repeatedly suggested to them that these things had happened to them. Later when they were interviewed by a mental health professional with child development expertise that they could not discriminate between which reports were accurate from those that were inaccurate. And I think the key piece is that there was repeated, suggestive interviewing of the child --

Q Okay.

A -- or conversations with the child to try to convince the child that an event had happened.

Q But, you'd also agree that part of the problem is

source misattribution for children, right?

A Source monitoring and source misattribution, yes.

Q And by source misattribution is that the child can't remember if the event was actually experienced or came from the suggestion. Right?

A That's a concern with preschool children that -- and part of the concern is the questions from interviewers. So, source monitoring is, there was the child know how it is they know something.

You can ask a three year old how do you know that? And they might say I just always knowed [phonetic] it. Because they don't know where it is they learned it from.

It could be some skill they have or some new thing that they've learned that they could do. So, children who are preschool age cannot monitor the source of where it is or how it is they know something like older children and certainly adults can.

Q Okay.

MR. BURRILL: If I can have just one second.

THE COURT: Yes.

MR. BURRILL: And Dr. Young, I just wanted to thank you for your time.

THE WITNESS: Thank you.

THE COURT: Mr. Waite.

REDIRECT EXAMINATION

BY MR. WAITE:

Q So, Dr. Young, that -- there's something you just testified about --

A Yes.

Q All came out of the 1990's correct?

A Yes, but I want to clarify I'm not -- I don't have a PhD. So, thank you for giving me one but I really don't have one. Go ahead.

Q But, all, all of these studies were done in the 1990's.

A Yes, they were.

Q And all of these were done pre forensic interview protocols.

A Right. This is part of what galvanized the country and the field of mental health and social sciences to develop protocols so that we dramatically decrease the risk of, of, of false allegation or a coaching or a suggestive interview.

Q So, when we talked today about forensic interviewers that are trained in forensic interviewing, that's a result, those protocols and that training is a result of these studies.

A Right, these and many other studies but in partially the ones from Cornell.

Q Okay. But, these were yet -- so these studies were instrumental in making those changes.

A Yes.

Q Okay. And some of the, some of the concerns as you noted were things like repetitive, suggestive questions.

A Yes.

Q And, and, and they -- and there were a number of studies that said, you know, that yes, if you repeat these suggestive questions over and over again, eventually the child will adopt those as their own.

A Yeah, younger children can acquiesce to those, certainly ahead of older children and adults.

Q Okay. And in fact, and I'll kind of go through what Mr. Burrill just did. But specific versus open-ended questions, they said that really you should ask open-ended questions such as what happened instead of resorting to a barrage of specific questions, many of which are repeated and many of which are leading. And that's problematic.

A That's problematic, yes.

Q And we would agree with that.

A Right, I think we would all agree with that.

Q Okay, all right. And so when we talk about forced choice questions, forced kind of talks about what you were talking about earlier, about coercive questioning.

A Yeah. It, it binds the child into having to choose one of your options and ignores the fact that either A, there's also other options or B, the child really may not

remember.

So, if you don't remember you should always be either part of the conversation with the child in the -- early on or it should be an option in your question if you have to ask a multiple choice question like that.

Q And the children in these studies, most of these studies were performed on young children.

A A lot of them were -- there were some that were performed on a little bit more elementary school children but preschool children have, you know, anywhere that three to six, three to five year range has always been the greater concern.

Q And that's where a lot of the studies come from are -- is that age range.

A Yes.

Q Okay.

A But, that -- and there are some studies though, children that age range and then compared to elementary school age compared to older. But, yeah, I would say certainly a lot of these were referencing the preschooler or the younger children.

Q Okay. I'd draw your attention to page 429. You were looking for the word coercive and so I'm going to help you with that.

A Oh, guess you found it.

Q Under subtle suggestive influences it, it reads: many of the techniques that have been described seem quite explicit and when used repeatedly can appear to be coercive.

A Yes.

Q Is, and, and, and so coercive is used in this, in this --

A In the social sciences research, yes.

Q Okay. And that was the Mr. Science study where the, the kids went in and they experienced things. And then reports were sent to their parents and the parents read those same things to them over and over and over again.

A Three times.

Q Three times. And they're -- so they sent it to their parents. You know, would you agree that parents are kind of an important part of a child's life?

A Typically, usually, hopefully a trusted source.

Q Okay, especially at that age, especially at that three to five year range.

A Yes.

Q And so a trusted source read these things three times over to these kids and then they did another test and the kids has adopted some of those things that were said, right?

A Yeah. They had adopted that they had participated in some of the experiments or observed some that they hadn't.

And then the more suggestive statement was that their mouth -- Mr. Science wiped their mouth with something really yucky and it tasted really yucky.

And that was the question where that didn't actually happen in any of the children's actual experience but it was suggested to them repeatedly that their mouth had been wiped with something yucky.

Q So, when we talk about coaching, that's kind of what we're talking about is a trusted source that tries to convince them to tell a false story.

A It could, it could be in that range, yes.

Q Okay. And turning to 432, Mr. Burrill asked you then about suggestive interviews and children's credibility. There was a study that was quoted there and it says wherein children were repeatedly and suggestively interviewed about true and false events, the children's narratives would become more embellished in detail. So, that by the third interview, it was impossible to differentiate between them.

A Yes.

Q Okay. So, repeatedly and suggestively interview once again.

A Yes.

Q Yeah, we, we hear that a lot throughout these, throughout these.

A Yes.

Q Okay. And that's where we started talking, started talking about source misattribution and things like that.

A Yes.

Q Okay. So, would you agree that we've come a long way since the 1990's?

A Since the McMartin preschool case and those things, yes. We've came a long way.

Q Okay. And that the reason we have is because we now have training and protocols in place that help us with those.

A Yes.

Q Thank you.

MR. WAITE: I don't think I have anything else.

MR. BURRILL: Your Honor, could we have one second? I'm sorry.

THE COURT: Yes.

RE-CROSS EXAMINATION

BY MR. BURRILL:

Q So, Ms. Young, one thing that you talked about is sort of age ranges for some of these studies, right?

A That -- some of the studies on suggestibility highlighted kind of the preschool ages, but not only. But, that was kind of a key area of study.

Q You'd agree that not every child is developmentally where they are age-wise, right?

A Right. We have --
Q Okay, and so --
A -- we call typical development and we have children who are ahead in some areas, behind in some areas and within normal limit.
Q And/or who might be delayed, right?
A Yes.
Q Right. And that's something that you should be looking for as an interviewer with children because it's important, right?
A Yes.
Q Okay. One of the other things that -- I, I just want to go back to the Mr. Science story. It actually -- there was no trusted source trying to convince the children that that is what occurred, correct? Wasn't the whole purpose of that study to be the subtle suggestive influences?
A The -- if I'm interpreting Mr. Waite's questions correctly that the, the, the parents being the trusted source that are reading this information or misinformation to the children --
Q Um-hmm.
A -- was what he was referring to.
Q Right, but the parents didn't actually know what happened with Mr. Science, right?
A Yeah, they -- I don't think --

Q Right.
A -- they were informed of what experiments the kids saw or any of that.
Q Right. That was the whole point of the study, right?
A Right.
Q It was just --
A It was still misinformation but I don't --
Q Right.
A -- believe the parents knew it was misinformation.
Q Correct, so there was no attempt on their part to suggest the children anything.
A No, I think that was designed by the researchers who wrote the story.
Q Okay. Okay, no further questions. Thank you doctor -- or [indiscernible] sorry.
A That's fine.
Q It's been a long day for me already.
A That's okay.
Q Ms. Young, I'm sorry.
A That's fine.
THE COURT: Mr. Waite, anything else?
MR. WAITE: Nothing based on that, Judge.
THE COURT: Okay. And I know we have at least one question from jury, couple of questions from the jury. Thank

you.

(Proceedings at the bench)

THE COURT: Oh --

MR. BURRILL: [Indiscernible].

THE COURT: Well, hang on just a second. Let me -- I'm going to go to each of the questions. Okay.

MR. BURRILL: No objection to 12. Said no objection to 12. Yeah.

THE COURT: Okay, number 13. Mr. Waite, I'm going to go to you first since it's --

MR. WAITE: I mean I'm not sure I answer -- I understand the question so I -- I'm not sure I object to it but I don't think that -- I mean if, if, if she knows. I mean I'm not sure if she knows but if she knows.

THE COURT: Mr. Burrill?

MR. BURRILL: I would object on grounds that I don't think that we talked about any sort of studies where children were coached nor am I aware of Norris, I guess.

There've been testimony from Ms. Young that she knows about studies where children were coached. And quite frankly, I'd be objecting because based on her answer, it'd be certainly something that I'd want to cross her on and that's some sort of prior disclosure on.

I'd look through her, you know, like curriculum [indiscernible] you know, studies that she knows and I'm not

familiar of any specifically where children were coached to say anything.

So, the problem is if she says something, I'm in the position where then I don't -- I'm not able to cross-examine her on it.

So, I'd be objecting to the question. It's outside the scope of her Expert disclosures and outside the scope of my questions and Mr. Waite's questions.

THE COURT: Did you have anything else?

MR. WAITE: I'll just leave it up to the Court.

THE COURT: I'm not going to ask 13 but I will ask 12.

(Proceedings return to open court)

THE COURT: Can children also be convinced that something did not happen to them when in fact it did happen to them?

THE WITNESS: I mean, so, can children also be convinced that something didn't happen when it did? It's -- I would say that probably the more accurate answer to that is children can be shot down in the sense of talking about something.

So, if a child is making an outcry about something and a parent is -- or a caregiver is trying to convince the child that something didn't happen, my experience with, with kids who've been in that situation is that it shuts down the

outcry or them talking about it.

I have not necessarily seen that it is something that is forgotten or never remembered. I think it's just no longer talked about.

That's the best answer. That I haven't seen a situation where something happened to a child and they -- it was completely extinguished from their memory because somebody convinced them it didn't happen. Not, not a significant thing in their life anyway.

THE COURT: Anything from that, Mr. Waite?

MR. WAITE: No, nothing from that, Judge.

THE COURT: Mr. Burrill?

MR. BURRILL: No, nothing, Your Honor.

THE COURT: You may step down.

THE WITNESS: Thank you.

MR. BURRILL: And Your Honor, may --

THE COURT: Yes. Thank you. Mr. Waite?

MR. WAITE: Judge, at this time the People would rest.

THE COURT: All right. Ladies and gentlemen, we're going to go ahead and take our mid-afternoon break at this time. We are going to take until five until so 2:55-ish.

So, just to give -- maybe a little bit longer than that, but we will try to make it not any more longer than that. So, see you back here at 2:55. Please rise for the

Case 1:19-cr-00243-CMA-GPG Document 89 Filed 10/13/20 Page 1 of 3

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Criminal Action No. 19-cr-00243-CMA-GPG

UNITED STATES OF AMERICA,

Plaintiff,

v.

1. MICHAEL TRACY McFADDEN,

Defendant.

---

**NOTICE OF CONVENTIONAL FILING:**
**EXHIBIT A TO GOVERNMENT'S REPLY TO DEFENDANT'S OBJECTION TO GOVERNMENT'S NOTICE OF INTENT TO INTRODUCE EVIDENCE PURSUANT TO FEDERAL RULES OF EVIDENCE 414, 404(b), AND 807 [ECF #88]**

---

The United States of America, by and through Andrea Surratt and Jeremy Chaffin, Assistant United States Attorneys for the District of Colorado, hereby provides a copy of Exhibit A to the Government's Reply to Defendant's Objection to Government's Notice of Intent to Introduce Evidence Pursuant to Federal Rule of Evidence 414, 404(b), and 807 [ECF #88], for delivery to chambers for review. The Exhibit is contained on a USB drive and consists of a video recording of a January 16, 2013, interview of K.W.

In order to protect K.W.'s privacy, the Government respectfully requests that Exhibit A be filed under **Level 2 restriction** such that it is available only to the Government, the defendant, and the court.

Case 1:19-cv-02443-GPG Document 189 Filed 10/11/22 Page 2 of 3

Dated: October 11, 2022.

Respectfully submitted,

COLE FINEGAN
United States Attorney

*s/ Jeremy Chaffin*
JEREMY CHAFFIN
Assistant U.S. Attorney
U.S. Attorney's Office
205 North 4th Street, Suite 400
Grand Junction, CO 81501
Tel: (970) 257-7113
Fax: (970) 248-3630
E-mail: jeremy.chaffin@usdoj.gov

*s/ Andrea Surratt*
ANDREA SURRATT
Assistant U.S. Attorney
U.S. Attorney's Office
1801 California Street, #1800
Denver, Colorado 80101
Tel: (303) 454-0100
Fax: (303) 454-0400
E-mail: andrea.surratt@usdoj.gov

Attorneys for the Government

**CERTIFICATE OF SERVICE**

I hereby certify that on this 11th day of October, 2022, I electronically filed the foregoing **NOTICE OF CONVENTIONAL FILING: EXHIBIT A TO GOVERNMENT'S REPLY TO DEFENDANT'S OBJECTION TO GOVERNMENT'S NOTICE OF INTENT TO INTRODUCE EVIDENCE PURSUANT TO FEDERAL RULES OF EVIDENCE 414, 404(b), AND 807 [ECF #88]** with the Clerk of the Court using the CM/ECF systemwhich will send notification of such filing to all parties of record.

*s/Portia Peter*
Legal Assistant
United States Attorney's Office 1801 California Street, Suite 1600
Denver, CO 80202
Telephone: 303-454-0100 Email: Portia.peter@usdoj.gov

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 19-cr-00243-CMA-GPG

UNITED STATES OF AMERICA,

Plaintiff,

**v.**

**MICHAEL TRACY McFADDEN,**

**Defendant.**

---

**REPLY SECOND MOTION TO COMPEL PRODUCTION AND REQUEST FOR SUBPOENA RETURN DATE**

---

Mr. McFadden by and through his attorney Sean M. McDermott, submits to this Honorable Court his reply to his Second Motion to Compel Production and Request For Subpoena Return Date:

1. The request for these records are specific. The records exist. Based on the discovery and investigation, the records are believed to be at Western Colorado Counseling, which is located at 2829 North Ave unit 207, Grand Junction, CO, 81501.

2. The defense is asking for permission to subpoena these records, because absent a Court order, Western Colorado Counseling likely cannot produce the records.

3. The records are governed by Public Law 104 – 191, the Health Insurance Portability and Accountability Act of 1996. (HIPPA).

4. The U.S. Department of Health and Human Services ("HHS") issued what is known as the "Privacy Rule" to implement the privacy requirement of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"). Pub. L. 104-191. The Privacy Rule

standards address the use and disclosure of individuals' health information which is called "protected health information" by organizations subject to the Privacy Rule as well as standards for individuals' privacy rights to understand and control how their health information is used.

5. With respect to Court orders and Court subpoenas, 45 C.F.R. § 164.512(e) controls. For an entity to disclose records, the request must be by way of a Court order. Alternatively records can be produced in response to a subpoena, discovery request, or other lawful process, that is not accompanied by an order of a court or administrative tribunal, if the covered entity receives satisfactory assurance, from the party seeking the information that reasonable efforts have been made by such party to ensure that the individual who is the subject of the protected health information that has been requested has been given notice of the request; or from the party seeking the information that reasonable efforts have been made by such party to secure a qualified protective order that meets certain requirements. See 45 C.F.R. § 164.512(e) (Exhibit B at Doc. No. 81-2).

6. With respect to the therapy records the defense has specifically identified persons who made outcries during therapy. These people are KW, EM, DO, IS, KW, and IS.

7. The defense needs these records to properly defend Mr. McFadden. They are discoverable under Federal and Colorado law.

**Federal Law**

8. A subpoena for documents may be quashed if their production would be "unreasonable or oppressive," but not otherwise.

> In order to require production prior to trial, the moving party must show: (1) that the documents are evidentiary and relevant; (2) that they are not otherwise procurable reasonably in advance of trial by exercise of due diligence; (3) that the party cannot properly prepare for trial without such production and inspection in advance of trial and that the failure to obtain such inspection may tend

> unreasonably to delay the trial; and (4) that the application is made in good faith and is not intended as a general "fishing expedition."

United States v. Nixon, 418 U.S. 683, 699-700, 94 S. Ct. 3090, 3103 (1974).

9. Federal Rule of Evidence 501 does not create a privilege. The United States cannot cite a common law privilege between a child and a therapist. However, as stated in Paragraphs 12 and 13, a disclosure that is made pursuant to Colorado's mandatory reporting law, is not a privileged disclosure and is subject to disclosure. Therefore the cases cited in the United States response **(Doc. No. 86 p. 5)** which include, *Jaffee v. Redmond,* 518 Us. (1996); *United States v. Glass*, 133 F.3d 1356, 1358 (10th Cir. 1998), and *Kinder v. White,* 609 Fed. Appx. 126, 131-132 (4th Cir. 2015) do not apply to the materials that Mr. McFadden requests.

10. To protect from over disclosure of records, courts have recognized that at a minimum a Court should conduct an in-camera review of otherwise protected records, to determine whether the disclosure of these records is necessary to protect a criminal defendant from having his due process and confrontation clause rights violated. This was recently the conclusion with respect to therapist records in *United States v. Arias*, 936 F.3d 793, 800 (8th Cir. 2019). This has also been done with other protected records such as state child welfare files. *Pennsylvania v. Ritchie*, 480 U.S. 39, 58, 107 S. Ct. 989, 1002 (1987).

11. With respect to education records disclosure of records may occur to comply with a lawful subpoena or court order. 34 C.F.R. § 99.31(a)(9) (i-ii). (A copy of 45 C.F.R. § 99.31 was attached as Exhibit C, found at Doc. No. 81-3).

**Applicable Colorado Law**

12. A therapist or mental health professional is required to report suspected abuse or cause a report to be made of such fact to the county department, the local law enforcement agency, or through the child abuse reporting hotline system. C.R.S. § 19-3-304. The incident of

privileged communication between patient and a professional which is the basis for a report pursuant to section 19-3-304, shall not be a ground for excluding evidence in any judicial proceeding resulting from a report pursuant to this part 3.  C.R.S. § 19-3-311(1). Therefore, these communications are not privileged and can be obtained by the defense.

13.      The C.R.S. § 19-3-311 statutory exception is well recognized under Colorado case law.  In *Dill v. People*, 927 P.2d 1315 (Colo. 1996), the court applied C.R.S. 19-3-311 to a case involving sexual assault on a child by one in a position of trust.  In *Dill*, a psychologist prepared a written report based on a child's report of sexual abuse after conducting two separate interviews.  The psychologist first met with the child on January 18, 1992, and then followed up with the child again on January 24, 1992.  On February 24, 1992, the psychologist wrote and submitted a report to local police.  "The psychologist relied upon both the January 18 and January 24 interviews in preparing [the] written psychological report, which was provided to law enforcement authorities." Id at 1319.   Where it was clear that the psychologist's written report and testimony were based on her two initial meetings with the child, the court "[concluded] that any psychologist-client privilege that may otherwise have been applicable with respect to the communications between the child and the psychologist during the January 18 and January 24 meetings was abrogated under section 19-3-311." *Dill v. People*, 927 P.2d 1315, 1319 (Colo. 1996).

WHEREFORE, Mr. McFadden respectfully requests that this Court order that Mr. McFadden's defense team be permitted to subpoena the therapy records of the witnesses who were in therapy and are alleging that Mr. McFadden sexually assaulted them and that he be permitted to subpoena the education records of witness I.S. for an in-camera review by this Court.

Respectfully submitted,

s/Sean M. McDermott

Sean M. McDermott
McDermott Stuart & Ward LLP
140 E. 19th Avenue, Suite 300
Denver, CO 80203
(303) 832-8888
(303) 863-8888 (fax)
Email: smcdermott@mswdenver.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 11th day of October 2022, I filed the foregoing **pleading** with the Clerk of Court using the CM/ECF system which will send notification of such filing to all listed parties.

s/ Sean McDermott
    Sean McDermott

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 19-cr-00243-CMA-GPG

UNITED STATES OF AMERICA,

Plaintiff,

**v.**

**MICHAEL TRACY McFADDEN,**

**Defendant.**

---

**REPLY MOTION TO DISMISS DUE TO PREINDICTMENT DELAY**

---

Mr. McFadden by and through his attorney Sean M. McDermott, moves this Honorable Court to find that exculpatory evidence was lost due to preindictment delay and to therefore dismiss this matter:

1. Counts one and two span the dates of December 25, 2012, through January 3, 2013. Counts three and four include the dates of December 1, 2010, through January 1, 2011. Count Five includes January 1, 2007, through January 3, 2013. The indictment was filed on May 17, 2019.

2. The indictment was filed after Mr. McFadden was tried in the state of Colorado for the same conduct. His conviction was reversed. The Federal Government then decided to charge Mr. McFadden with Counts One through Five.

3. There was no reason the United States could not have charged Mr. McFadden at the time that the state of Colorado charged him.

4. John Fox, who was Mr. McFadden's roommate has passed away. Mr. Fox was present in the house that Mr. McFadden lived in during the time frame of the allegations. Mr.

Fox could testify there would be close to 20 people in the home at a time. The people were there, because they trusted Mr. McFadden, and that Mr. McFadden assisted the adults and the kids who lived in the home. Mr. Fox could testify that he did not see Mr. McFadden commit crimes.

5.      The Due Process Clause warrants dismissal of indictments for preindictment delay only in exceptional circumstances." *United States v. Comosona*, 848 F.2d 1110, 1113 (10th Cir. 1988). Instead, "statutes of limitations, which provide predictable, legislatively enacted limits on prosecutorial delay, provide the primary guarantee against bringing overly stale criminal charges." *United States v. Lovasco*, 431 U.S. 783, 789, 97 S. Ct. 2044, 52 L. Ed. 2d 752 (1977) (citations and internal quotation marks omitted).

6.      To determine whether pre-indictment delay rises to the extraordinary level warranting dismissal with prejudice, a defendant must plead and prove by a preponderance of the evidence: (1) that the delay caused actual and substantial prejudice to the defendant; and (2) that the government delayed intentionally to gain a tactical advantage. *Lovasco*, 431 U.S. at 789; *Johnson*, 120 F.3d at 1110. With respect to the second prong, the government's delay must be purposefully designed to gain a tactical advantage or to harass the defendant. *United States v. Beitscher*, 467 F.2d 269, 272 (10th Cir. 1972).

7.      Whether it was done at the time the state charges were filed or done after the fact, the Government has placed Mr. McFadden at a tactical disadvantage in this case. The disadvantage is great enough, that Mr. McFadden's due process rights have been violated.

WHEREFORE, at the conclusion of the trial, Mr. McFadden will request that the Court find that his due process rights were violated by intentional preindictment delay.

Respectfully submitted,

s/Sean M. McDermott
Sean M. McDermott
McDermott Stuart & Ward LLP
140 E. 19th Avenue, Suite 300
Denver, CO 80203
(303) 832-8888
(303) 863-8888 (fax)
Email: smcdermott@mswdenver.com

Case 1:19-cv-02443-GPG Document 192-1 Filed 10/11/22 Page 4 of 4

**CERTIFICATE OF SERVICE**

I hereby certify that on this 11th day of October 2022, I filed the foregoing **pleading** with the Clerk of Court using the CM/ECF system which will send notification of such filing to all listed parties.

s/ Sean McDermott
Sean McDermott

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 19-cr-00243-CMA-GPG

UNITED STATES OF AMERICA,

Plaintiff,

**v.**

**MICHAEL TRACY McFADDEN,**

**Defendant.**

---

**REPLY MOTION TO SUPPRESS STATEMENTS**

---

Mr. McFadden by and through his attorney Sean M. McDermott, submits the herein reply to his Motion to Suppress Statements.

1. Mr. McFadden is charged with two counts of crossing state lines with intent to engage in a sexual act with a minor under 12 years of age, and three counts of transportation of a person over state lines with the intent to engage in a sexual act that is a crime.

2. Mr. McFadden pled sufficient facts to have a contested hearing regarding the admission or suppression of his statements.

3. A statement must be voluntarily made. U.S. CONST. AMENDS. V, *Mincey v. Arizona*, 437 U.S. 385 (1978). a defendant in a criminal case is deprived of due process of law if his conviction is founded, in whole or in part, upon an involuntary confession, without regard for the truth or falsity of the confession. *Jackson v. Denno*, 378 U.S. 368, 376, 84 S. Ct. 1774, 1780 (1964).

4. The United States correctly cites that they bear the burden of proving by a preponderance of the evidence that Mr. McFadden's statements were voluntary. *United States v. Lopez,* 437 F. 3d 1059, 1063 (10th Cir. 2006)

Wherefore, Mr. McFadden respectfully requests that this Court conduct a hearing regarding the voluntariness of his statements, and then suppress the statements as involuntarily made.

Respectfully submitted,

s/Sean M. McDermott
Sean M. McDermott
McDermott Stuart & Ward LLP
140 E. 19th Avenue, Suite 300
Denver, CO 80203
(303) 832-8888
(303) 863-8888 (fax)
Email: smcdermott@mswdenver.com

**CERTIFICATE OF SERVICE**

I hereby certify that on this 13th day of September 2022, I filed the foregoing **pleading** with the Clerk of Court using the CM/ECF system which will send notification of such filing to all listed parties.

s/ Sean McDermott
Sean McDermott

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 19-cr-00243-CMA-GPG

UNITED STATES OF AMERICA,

Plaintiff,

**v.**

**MICHAEL TRACY McFADDEN,**

**Defendant.**

---

**DEFENDANT MICHAEL TRACY MCFADDEN'S MOTION TO CONTINUE AND RESET TRIAL DATE PURSUANT TO 18 U.S.C. §3161(h)(7)(A) AND TO EXCLUDE 60 DAYS FROM SPEEDY TRIAL**

---

COMES NOW, Mr. McFadden by and through his attorney Sean M. McDermott, and moves this Honorable Court to continue the scheduled trial date currently set for, November 7, 2022, and to exclude time from the Speedy Trial Act (18 U.S.C. §3161). **As a prefatory matter, counsel for Mr. McFadden is not asking for a lengthy continuance. He is asking for enough time to effectively prepare for trial following the Motions Hearing that is scheduled for October 18, 2022.** Without knowing what the Court's availability is, the defense is asking for **60 days** to be excluded from the speedy trial clock. As further grounds thereof, Mr. McFadden states the following:

Conferral

1. On October 10, 2022, the parties conferred by electronic mail. Undersigned counsel stated that after reviewing the court's orders and some email correspondence, that undersigned would be moving to continue the trial that is scheduled for November 7, 2022. This conferral occurred, in the context of discussing an email thread that discussed the location of the

trial. Undersigned counsel pointed out that with the procedural posture of the case, trying this case (within three weeks of the Motions Hearing) would be a challenge, irrespective of where the trial was held. Undersigned was asked via electronic mail whether he could get the case tried if the trial location were in Denver. Undersigned counsel asked to confer by phone regarding trial logistics. Assistant United States Attorney Jeremy Chaffin stated that he had work commitments but would attempt to call the next day, today October 11, 2022. As of this writing the parties have not connected. Based on the October 10, 2022, email correspondence, undersigned counsel believes that the relief requested is opposed by the United States.

Procedural Summary of the Case

**2.** For conciseness, Mr. McFadden incorporates by reference the procedural summary of the case previously filed. This history has been previously briefed. Mr. McFadden incorporates by reference the procedural history of this case as set forth in the previously filed Unopposed Motions to Continue the Trial Date and Ends of Justice Continuances**, Doc. No. 19 ¶¶,1-15; Doc. No. 28, ¶¶ 1-31; Doc. No. 31, ¶¶ 1-40; Doc. No. 37, ¶¶ 1-47; Doc. No. 42, ¶¶ 1-36; Doc. No. 47, ¶¶ 1-27; Doc. No. 51,¶¶ 1-37; Doc. No. 55, ¶¶ 1-45.**

3. Counsel for Mr. McFadden filed an Errata to Doc. No. 51 at Docs. Nos. 52 and 53. Following the filing of **Doc. Nos. 51 – 53**, The Court moved the Motions deadline, but the previously scheduled jury trial remained scheduled for May 2, 2022. **Doc. No. 54.**

4. On February 1, 2022, undersigned counsel filed his *Defendant Michael Tracy McFadden's Eighth and Unopposed Motion to Vacate and Reset Trial Date Pursuant to 18 U.S.C. § 3161(h)(7)(A)*. **Doc. No. 55.**

5. A major reason that Doc. No. 55 was filed was because Mr. McFadden's counsel had a medical diagnosis that required surgery and recovery time. Counsel was unable to physically

conduct the May 2, 2022, trial. **Doc. No. 55 ¶ 22.**

6. In The Motion to Vacate and Reset that was filed at Doc. No. 55, undersigned counsel pointed to fact that his diagnosis occurred in late November, efforts were made to get immediate treatment in December, but that immediate treatment was unavailable, and that other unforeseen difficulties had occurred. **Doc. No. 55 ¶ ¶ 22-27.**

7. On February 3. 2022, this Honorable Court in response to Doc. No. 55, ordered the trial to be continued and time to be excluded from the speedy trial clock.

8. In the Court's Order at Doc. No. 56, the Court ordered that trial was going to be a five-day jury trial set to begin On November 7, 2022, at the Arraj Courthouse in Denver, Colorado. **Doc. No. 56 p. 3**.

9. Counsel has recovered well, this past medical condition will likely not recur, and counsel has limited his workload to focus on this case, and to prevent any delays due to future circumstances whether they are foreseen or unforeseen.

10. Mr. McFadden was represented by the Public Defender from May 23, 2019 **(Doc. No. 4)** until February 9, 2021.

11. Undersigned Counsel entered his appearance as CJA counsel on February 15, 2021. **Doc. No. 47.** As discussed below, shortly after this and at about the time that counsel received discovery, Mr. McFadden was moved from the detention center in Clear Creek County to the detention center in Washington County.

12. The defense has consulted with an expert witness. The expert witness has assisted in getting counsel to analyze the facts underlying what the defense believes to be the false outcries and allegations surrounding this case.

13. Based on the belief that trial is to be held in Denver, defense counsel obtained an

investigator who has another case in Grand Junction. Since this investigator has another case in Grand Junction, it made sense to have this investigator assist with subpoenas and witness interviews leading up to trial. However, this investigator is not based in Grand Junction.

14. Prior to receiving an order stating that the trial would be held in Denver (**Doc. No. 56)**, the defense had contacted a Grand Junction based investigator. However, since the trial was scheduled to be in Denver, authorization for a Grand Junction investigator was not sought or obtained.

15. In an email exchange initiated by the United States, the parties were recently informed that although the Court ordered the case to be tried in Denver **(Doc. No. 56),** the case will now be tried in Grand Junction. The parties were informed that if the defense wishes to have the trial in Denver, the defense needs to file a Motion to have the trial in Denver.

Outside of the Court's Procedure and Control

16. In February 2021, when counsel accepted appointment in this matter, Mr. McFadden was being detained at the Clear Creek County Jail. This facility is 45 miles from counsel's office. It generally takes 52 minutes to drive there from undersigned's office.

17. In March 2021, Mr. McFadden was moved from the Clear Creek County Jail to the jail in Washington County. This facility is 115 miles from undersigned's office. It generally takes approximately two hours to get to this facility from counsel's office.

18. COVID also made visitation more of a challenge than usual. In the interest of time and safety, virtual visits were attempted via a service called Homewav. However, the Homewav service lacked privacy. The last time Homewav was used another inmate was sweeping next to Mr. McFadden when Mr. McFadden was consulting with counsel.

19. The sheer volume of discovery has been well documented in previous pleadings.

This case is a challenge to properly prepare for, under ideal circumstances. Ideal circumstances have not been present during the pendency of this case.

Legal Standard For Continuances

20. Title 18 U.S.C. §3161(h)(7)(A) provides that a Court shall exclude a period of delay from computing the time within which a trial must commence where "the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial." The factors to be considered in such an evaluation are listed at 18 U.S.C. § 3161(h)(7)(B)(i)-(iv).

21. Pertinent factors that apply to an "ends of justice" finding in the present case include:

> (i) Whether the failure to grant such a continuance in the proceeding would be likely to make a continuation of such proceeding impossible, or a result in a miscarriage of justice.
>
> . . . .
>
> (iv) Whether the failure to grant such a continuance in a case which, taken as a whole, is not so unusual or so complex as to fall within clause (ii), would deny the defendant reasonable time to obtain counsel, would unreasonably deny the defendant or the Government continuity of counsel, or would deny counsel for the defendant or the attorney for the Government the reasonable time necessary for the effective preparation, taking into account the exercise of due diligence.

*See* 18 U.S.C. §1361(h)(7)(B). *See also*, *United States v. Toombs*, 574 F. 3d 1262, 1268-69 (10th Cir. 2009).

22. In the similar context of addressing trial continuances, the Tenth Circuit has set forth four factors that the Court should consider. *See United States v. West*, 828 F.2d 1468, 1470 (10th Cir. 1987). According to the Tenth Circuit, the Court should consider: (1) the diligence of the party requesting the continuance, (2) the likelihood that the continuance, if granted, would accomplish the purpose underlying the request for continuance, (3) the inconvenience to the opposing party, its witnesses, and the court resulting from the continuance, and (4) the need

asserted for the continuance and the harm that could be suffered as a result of the court's denial of the continuance. *See id.* No single factor is determinative. *See id. 50.*

23. The decision to grant an "ends of justice" continuance is within the sound discretion of the Court and is reviewed under an abuse of discretion standard. *See Toombs*, 574 F. 3d at 1262. "Adequate preparation time is a clearly permissible reason for granting a continuance and tolling the Speedy Trial Act." *United States v. Gonzales*, 137 F. 3d 1431, 1435 (10th Cir. 1998). The Supreme Court has recognized that "subsection (h)(7) expressly accounts for the possibility that a district court will need to delay a trial to give the parties adequate preparation time" to ensure that the ends of justice are met, and that "subsection (h)(7) provides 'much of the Act's flexibility.'" *Bloate v. United States*, 130 S. Ct. 1345 (2010).

Argument

24. This case meets the criteria set forth in both 18 U.S.C. § 3161(h)(7) and *West*. Accordingly, undersigned counsel requests that this Court vacate the current trial date and exclude additional time from the speedy trial calculation. At this time, undersigned counsel is not requesting a finding of complexity under subsections (h)(7)(B)(ii), but rather, is requesting a determination that the ends of justice will be served by the granting of the requested continuance because "the failure to grant such a continuance in the proceeding would . . . result in a miscarriage of justice" and "would deny counsel for the defendant . . . reasonable time necessary for effective preparation." 18 U.S.C. §3161(h)(7)(B)(iv). The amount of information tendered by the government (8,600 pages of written investigative materials and 50+ hours of audio/video interview footage) is extensive. Furthermore, novel questions of law will be addressed, as the United States has filed extensive Motions regarding FRE 404(b), the timing of the indictment, a

request for subpoenas regarding possible privileged information have been filed. This is a complex case, except for the fact there is only one defendant. See 18 U.S.C. § 3161(h)(7)(B(ii).

25. The Motions Hearing that is scheduled for October 18, 2022, is more significant than most. The outcome of this hearing will dictate what evidence and witnesses will be permitted to testify. This involves FRE 414 evidence which if admitted will be extremely difficult and prejudicial. **See Doc. Nos. 37, 40, 41, 77, 78, 89, and 90.** This will also determine what witnesses will need to be impeached, and whether additional impeachment witnesses need to be secured for trial.

26. Additionally, the Court ordered that the trial be conducted in Denver. **Doc. No. 56**. However, in an off the record discussion, it appears that the trial may now be conducted in Grand Junction.

27. The defense did not file a Motion for a Change of Venue, because the defense relied on the Court's order which states that the trial will be held in Denver.

28. On information and belief, the state criminal prosecution has received a lot of local media attention in Grand Junction that included an effort to not retain the trial judge. This issue should be fairly determined.

29. The failure to grant the requested continuance on behalf of Mr. McFadden would result in a miscarriage of justice and would also deny undersigned counsel the reasonable time necessary for effective preparation as discussed in 18 U.S.C. §3161(h)(7)(B)(i) and (iv).

30. Finally, a speedy trial extension of an additional 60 days would not offend the standard set forth by the Tenth Circuit in the *West* decision. This is the case for the following reasons as it relates to the *West* factors:

(1) <u>The diligence of the party making the request</u> - the defense has reviewed the materials and has traveled extensively to meet with Mr. McFadden. The

subject matter spans large geographical area, and the evidence that the prosecution wants to tender covers several years. In part, because of less-than-ideal situations which pertain to the location of Mr. McFadden during the COVID pandemic, Mr. McFadden has communicated with both sets of counsel by reviewing the discovery and sending detailed written communications by mail. Mr. McFadden and his counsel have made good faith efforts to prepare for trial under less-than-ideal circumstances. Mr. McFadden has been extremely diligent in assisting his lawyers. He should not punished for circumstances that have been outside his control.

(2) the likelihood that the continuance, if granted, would accomplish the purpose underlying the request for continuance. The case has made progress. As this case has posed challenges, defense counsel has foregone other work, so that this case can be the primary focus. A relatively short continuance will ensure that this is the focus of the parties, and Mr. McFadden will receive a fair trial. A fair trial will occur if, Mr. McFadden is given an additional 60 days to prepare for trial.

(3) the inconvenience to the opposing party, its witnesses, and the court resulting from the continuance. The prosecution will not be inconvenienced by a short continuance. The confusion over where the trial date will occur, began in emails dated September 23 and 26. On September 26, the defense stated that it relied on the court's order regarding the location of the trial. The prosecution can easily subpoena witnesses for another trial date. They can do this as easily if not easier than the November 7th trial date. The real inconvenience is borne by the defense. Given the posture of this case, the defense cannot effectively try this case on November 7, 2022. The defense cannot uproot everything, walk away from commitments for a lengthy period of time on short notice, have Mr. McFadden move to another location, without time for additional support to be put in place.

(4) the need asserted for the continuance and the harm that could be suffered as a result of the court's denial of the continuance. Mr. McFadden is facing mandatory minimum sentence of 30 years for counts one and three and not less than ten years for counts two, four, and five. All counts face a sentence of up to life imprisonment. If Mr. McFadden is not given the additional 60 days following the Motions Hearing to properly confer with counsel, secure witnesses, and prepare in a predictable manner, with counsel who has adequate time to make arrangements to try the case either in Denver or another location, the result will be catastrophic.

31. Under the *West* standard the Court should grant an additional 60 days to ensure that the trial is a fair trial.

WHEREFORE, Mr. McFadden respectfully requests that this Court issue an Order to

vacate the trial date, excluding 60 days from the speedy trial calculation, and re-setting the trial

Respectfully submitted,

s/Sean M. McDermott
   Sean M. McDermott
   McDermott Stuart & Ward LLP
   140 E. 19th Avenue, Suite 300
   Denver, CO 80203
   (303) 832-8888
   (303) 863-8888 (fax)
   Email: smcdermott@mswdenver.com

Case 1:19-cr-00243-CMA-GPG Document 193-9 Filed 06/27/23 Page 10 of 10

**CERTIFICATE OF SERVICE**

I hereby certify that on this 11th day of October 2022, I filed the foregoing **pleading** with the Clerk of Court using the CM/ECF system which will send notification of such filing to all listed parties.

s/ Sean McDermott
Sean McDermott

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Criminal Action No. 19-cr-00243-CMA-GPG

UNITED STATES OF AMERICA,

Plaintiff,

v.

1. MICHAEL TRACY McFADDEN,

Defendant.

---

**GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO CONTINUE AND RESET TRIAL DATE PURSUANT TO 18 U.S.C. § 3161(h)(7)(A) AND TO EXCLUDE 60 DAYS FROM THE SPEEDY TRIAL CLOCK [ECF #94]**

---

The United States of America, by and through Jeremy Chaffin and Andrea Surratt, Assistant United States Attorneys, submits this response in opposition to the defendant's motion to continue, reset the trial date, and exclude 60 days from the speedy trial clock. [ECF #94].

Background

Trial in the above-captioned matter was originally set for July 1, 2019. [ECF #11]. Since then, the Government has consented to numerous requests for continuances, first from the Federal Public Defenders, and then from Mr. McDermott. This case is complex, the alleged conduct is ten years old and, accordingly, those continuances were entirely warranted under the applicable law. However, the current trial date in the above-captioned matter—November 7, 2022—has been set since February 3, 2022, following the defendant's eighth request for a continuance. [ECF #56]. Due to COVID-19 protocols, the November 7, 2022, trial was set in Denver. [ECF

#56].

On February 4, 2022, after the November trial date was set, the Government contacted the Court via email, copying Mr. McDermott, and asked if the trial would occur in Denver or Grand Junction.  The Court informed the parties that, although trials were still being set in Denver because of COVID-19, it was the Court's hope that trials could start occurring in Grand Junction.  As of February 4, 2022, therefore, Mr. McDermott was on notice that the upcoming trial would be set in Grand Junction if the COVID-19 situation allowed it.

On September 26, 2022, in response to inquiry from the Government, the Court informed the parties that since the COVID-19 situation now allows use of the Grand Junction courthouse, the expectation is that all Grand Junction jury trials will be held in Grand Junction.[1]  The Government informed the Court that it is the Government's position that this case should be heard in Grand Junction.  Mr. McDermott expressed a preference for the trial to be in Denver, and the Court invited him to file a motion to address the matter.

On October 10, 2022, Mr. McDermott informed the Government that he is considering filing a motion to continue the trial and, additionally, for reasons that he cannot get into, he cannot go to Grand Junction in November.  The Government told Mr. McDermott it opposes a further continuance and inquired whether he would be able to do the trial if it is in Denver instead of Grand Junction.  He replied that it would present "challenges" for him even if it was in Denver.

On October 11, 2022, Mr. McDermott filed a motion to continue, reset the trial

---

[1] This has been the case since at least April 11, 2022.  *See* http://www.cod.uscourts.gov/Portals/0/Documents/Orders/GO_2022-4_Court_Operations.pdf.

date, and exclude time from the speedy trial clock. [ECF #94]. In it, he explained—once again—that, in essence, this is a complex case that required extensive investigation on his part. He also explained that he did not file a motion for change of venue because he thought the trial was set for Denver.

Argument

The offense conduct in this case is 10 years old. The Government's indictment against the defendant has been pending for 3½ years. Nothing in the defendant's motion explains why, three weeks before a trial that has been set for nine months, a continuance is required. He does not explain what he has remaining to accomplish, or how an additional 60 days will benefit the defendant's defense. More importantly, the victims and their families have now been subject to eight continuances of this trial. On the instant occasion, as with prior trial settings, the Government has begun preparing those witnesses for the upcoming trial, repeatedly causing them incredible stress and trauma. Witnesses have delayed trips and rearranged their lives over and over again because of defense requests for continuances in this case. It should go without saying that the victims in this case, who were small children at the time of the alleged abuse and who are now teenagers and young adults, deserve closure. Further delay also presents hardship and inconvenience to the Government. The offense conduct in this case is already 10 years old, and as time passes, memories fade and witnesses become more difficult to locate.

Although the defendant's motion is not a motion for change of venue, in it he does complain that trial in Grand Junction would be difficult for him. Although the Government believes that this Grand Junction-indicted case should be held in Grand Junction where most of the Government's witnesses, the case agent, and one of the

prosecutors are located, the Government will not object to trying the case in Denver if the Court determines Mr. McDermott cannot travel to Grand Junction, and if it means the trial can go forward on November 7, 2022.[2]

Conclusion

It is the Government's position that this trial should occur as scheduled on November 7, 2022, in Grand Junction and opposes any further continuance. However, if the Court determines that Mr. McDermott has a legitimate reason he cannot travel to Grand Junction in November, the Government does not object to trial occurring in Denver, so long as it can go as scheduled on November 7, 2022.

Respectfully submitted,

COLE FINEGAN
United States Attorney

*s/ Jeremy Chaffin*
JEREMY CHAFFIN
Assistant U.S. Attorney
U.S. Attorney's Office
205 North 4th Street, Suite 400
Grand Junction, CO 81501
Tel: (970) 257-7113
E-mail: jeremy.chaffin@usdoj.gov

*s/ Andrea Surratt*
ANDREA SURRATT
Assistant U.S. Attorney
U.S. Attorney's Office
1801 California Street, Suite 1600
Denver, CO 80202
Tel: (303) 454-0124
E-mail: andrea.surratt@usdoj.gov

Attorneys for the Government

[2] One of the Government's witnesses—a blind expert—may need to testify via VTC as she will be recovering from surgery during the time of trial, making travel to Denver impossible. Presumably, the defense will not object to an accommodation that is necessary because of its request to try the case in Denver.

Case 1:19-cv-02443-GPG Document 198 filed 10/12/22 Page 5 of 5

**CERTIFICATE OF SERVICE**

I hereby certify that on this 12th day of October, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following e-mail address:

**Defense Attorney:**
Sean M. McDermott

**Email Address:**
smcdermott@mswdenver.com

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Magistrate Judge Gordon P. Gallagher**

**Criminal Action No. 19-cr-00243-CMA-GPG**

**UNITED STATES OF AMERICA,**

**Plaintiff,**

**v.**

**MICHAEL TRACY MCFADDEN,**

**Defendant.**

---

**ORDER DENYING MOTION FOR BILL OF PARTICULARS AND MOTION TO AUTHORIZE SUBPOENA**

---

This matter is before this Court for determination of Mr. McFadden's Motion for Bill of Particulars (D. 61),[1] and Request for Subpoena *Duces Tecum* (D. 81). Those motions are referred to this Court for determination pursuant to the June 13, 2019 Order of Reference (D. 18).

Mr. McFadden is charged in a five-count Indictment of May 17, 2019 (D. 1). Counts One and Two charge him with crossing state lines for the purpose of engaging in sexual acts with a minor, K.W., in violation of 18 U.S.C. § 2241(c) (Count One), and 18 U.S.C. § 2423(a) (Count Two). Counts Three through Five allege the same crimes with a different victim, J.W.

**A. Motion for Bill of Particulars**

Mr. McFadden moves (D. 61) for a Bill of Particulars relating to Count Five. As pled in the Indictment, that count alleges:

---

[1] References to (D. __) are to the cited docket number.

> Between on or about January 1, 2007, and on or about January 3, 2013, in the State and District of Colorado, and elsewhere, the defendant, MICHAEL TRACY McFADDEN, did knowingly transport J.W., an individual who had not attained the age of 18 years in interstate and foreign commerce, with the intent that such individual engage in sexual activity for which any person can be charged with a criminal offense.

Mr. McFadden argues that this Count 'spans a six-year period of time" and that "without more specificity, [he] cannot defend this charge." He does not specifically identify the types of information that he contends should be included in a Bill of Particulars, but a fair reading of his reference to concerns about the time span of the count suggest he is seeking a more specific indication of the date(s) on which the conduct at issue occurred.

An Indictment is sufficient where in "quotes the language of a statute and includes the date, place, and nature of illegal activity" and it "need not go further and allege in detail the factual proof that will be relied upon to support the charges." *U.S. v. Doe*, 572 F.3d 1162, 1173 (10th Cir. 2009). The Indictment need only provide the defendant with the theory of the Government's case, not an articulation of the evidence the Government intends to produce. *U.S. v. Ivy*, 83 F.3d 1266, 1281 (10th Cir. 1996); *see also U.S. v. Dunn*, 841 F.3d 1026, 1029 (10th Cir. 1988) ("a Bill of Particulars is not a discovery device"). Nevertheless, in situations where a facially-sufficient Indictment nevertheless fails to adequately advise the defendant of the charge against him with sufficient precision to allow him to prepare a defense, a Bill of Particulars might be appropriate. *Id.*

Here, Mr. McFadden has not demonstrated that the Indictment's failure to identify the specific dates on which he alleged transported J.W. to engage in sexual activity precludes him from presenting a defense. Mr. McFadden is adequately advised of the Government's theory of the offense and the general time frame in which the crime occurred. Although a six-year period

is a fairly wide temporal window, the Government explains that it has not provided a more specific date because it does not have one. With regard to the assault charged in Count Five, the Government has previously stated that "J.W. was unsure of the precise time frame of this assault. As a result, the charged time period in the Indictment encompasses the approximate time period during which the defendant subjected J.W. to sexual assaults. . . During the charged time period J.W. was 12 years-old or younger." (D. 39 at 3). The Government has adequately advised Mr. McFadden of the specific conduct it alleges in Count Five, namely that "during this specific instance, they were transporting goods to or from Arizona. J.W. recalled stopping at a Love's truck stop and sleeping in the sleeper compartment of the truck. J.W. described the defendant placing his penis into J.W.'s butt during the night." *Id.* Thus, the Court finds that Mr. McFadden has been provided with information sufficient to permit him to marshal a defense to Count Five.

Moreover, the Court notes that Mr. McFadden has recently moved to continue the trial in this case, citing to "extensive" discovery produced by the Government, consisting of "8,600 pages of written investigative materials and 50+ hours of audio/video interview footage." (D. 94 at 6). Presumably, that footage includes any statements by J.W. detailing as much information about the incidents as he can recall.[2] In these circumstances, Mr. McFadden has adequate information to prepare a defense to Count Five and no Bill of Particulars is required.

Accordingly, the motion is denied.

**B. Motion for Subpoena**

---

[2] Although it does not necessarily rely upon this fact in reaching its ruling, the Court is compelled to observe that Mr. McFadden was previously tried in state court on the same allegations by J.W. (D. 39 at 4). Thus, it would appear that Mr. McFadden is certainly familiar with J.W.'s allegations and the degree of specificity that he can offer about them.

Mr. McFadden moves (D. 81) for the Court to authorize his to submit subpoenas *duces tecum* to obtain "the therapy records of the witnesses" – identified as victim K.W. and witnesses E.S. and I.S. – "who were in therapy and are alleging that Mr. McFadden sexually assaulted them."[3]  Mr. McFadden points to several instances in which discovery has revealed that the identified minor victims in this case or other Rule 404(b) witnesses either: (i) failed to make allegations against Mr. McFadden for long periods of time, despite knowing him; (ii) expressly stated on certain occasions that Mr. McFadden had not engaged in sexual contact with them, and (iii) accused persons other than Mr. McFadden of engaging in sexual contact with them.  He tenders an affidavit from his expert who states that therapeutic treatments received by child victims of sexual abuse are "known to affect the accuracy of the individual's memories" and that "source misattribution errors are common memory mistakes made by children," including "recalling an event but erroneously reporting the source of that recollection." Thus, Mr. McFadden seeks to obtain the therapy records of each victim and Rule 404(b) witness in order to address their statements "contrary to their inculpatory statements" and thereby "ensure that Mr. McFadden's rights under the confrontation clause and the due process clause are preserved and exercised." He does not identify the particular individuals to whom the subpoenas would be directed,[4] nor has he specifically described the particular records he intends to obtain.

The Government raises several arguments in opposition to Mr. McFadden's motion: (i) that Fed. R. Crim. P. 17(c)(3) requires that motions seeking to subpoena the confidential

---

[3]     Mr. McFadden also seeks to subpoena special education records relating to witness I.S., as such information may include "information relative to the child's early sexual behavior and sexual knowledge."

[4]     In his reply brief, Mr. McFadden clarifies that the subpoena would be sent to "Western Colorado Counseling" in Grand Junction, Colorado.

information about a victim be served on the victim, allowing him or her the opportunity to object, and that Mr. McFadden has not served his motion on victim K.W.; (ii) Mr. McFadden's motion is insufficiently specific in identifying which persons' records are sought and from whom; (iii) Mr. McFadden's itemization of the instances fails to adequately identify a basis for believing that "misattribution errors" have occurred in the witness' testimony; (iv) that Mr. McFadden simply seeks the records to "scour [them for] fodder for cross-examination," an impermissible purpose; and (v) Mr. McFadden cannot demonstrate how the records, even if he obtained them, could possibly be used at trial over the hearsay rule and doctor-patient privileges.

Fed. R. Crim. P. 17(c)(1) provides that parties may issue subpoenas ordering witnesses to produce books, papers, and other information, either at trial or prior to trial. In *U.S. v. Nixon*, 418 U.S. 683, 698-700 (1974), the Supreme Court explained that the subpoena process is not a device for obtaining discovery; it is a mechanism to secure the production of admissible evidence that the party intends to offer at trial. *Id.* at 698-99, *citing Bowman Dairy Co. v. U.S.*, 341 U.S. 214, 219-20 (1951). *Nixon* requires the movant to show: (i) that the documents sought are evidentiary and relevant; (ii) that they are not otherwise procurable; (iii) that the party cannot prepare for trial without obtaining the material in advance of trial; and (iv) that the application is not a "general fishing expedition." *Id.* at 699-700.

The Court finds that Mr. McFadden has not carried his burden. It appears to the Court that Mr. McFadden is engaged in the sort of "fishing expedition" mentioned in *Nixon*. He does not assert any facts that suggest a knowledge or belief that the therapy records he seeks to subpoena do show that a therapist has induced the child witnesses to misattribute instances of sexual abuse to Mr. McFadden. Rather, it appears that Mr. McFadden wishes to review the therapy records to see if the therapists did so. Thus, Mr. McFadden's request for the records is in

the nature of discovery, not an attempt to secure evidence that Mr. McFadden necessarily intends to offer at trial. As *Nixon* and *Bowman Dairy* explain, this is not a proper use of a Rule 17 subpoena.

Moreover, it appears that Mr. McFadden already has all of the information he needs to prepare his defense, without needing the subpoenaed therapy records. Mr. McFadden already has evidence reflecting situations in which the child witnesses "initially made statements that Mr. McFadden did not molest them." (D. 81, ¶ 9.) He has ample information reflecting that the witnesses then began therapy (D. 81-1, ¶ 15), and then records reflecting that thereafter, they "ended up changing their story and making allegations against Mr. McFadden" (D. 81, ¶ 9). Coupled with his expert's affidavit that explains that therapeutic treatments "are known to affect the accuracy of the individual's memories for the traumatic events," Mr. McFadden has all the pieces necessary to prepare a defense that the witnesses' accusations were induced via the therapy process. The crux of the defense is the timing of the child witness changing their story – that the change occurred after therapy began – and that information is already in Mr. McFadden's possession.

The Court is also persuaded by the Government's argument that Mr. McFadden faces several hurdles to demonstrate that the therapy records could be presented as admissible evidence. The Government highlights that statements made by the child witnesses to therapists are likely privileged and are also hearsay for which no apparent exception would apply. Mr. McFadden's reply brief does not address this argument, leaving the distinct possibility that the records would not be admissible in evidence regardless of what they contain. This factor, too, marshals against granting Mr. McFadden's motion.

Finally, the Court also agrees with the Government's arguments concerning the lack of specificity in Mr. McFadden's motion and his failure to comply with Rule 17(c)(3). As to the former, the Government correctly noted that Mr. McFadden's motion did not identify the particular therapists(s) he sought to subpoena. In his reply brief, Mr. McFadden indicated only that a subpoena would be sent to Western Colorado Counseling. The Court is compelled to note that Mr. McFadden's motion identifies K.W.'s counselor as Emily Bowman of the Montrose Center for Mental Health. It is not clear to what extent the two entities are related or why K.W.'s counseling records with Ms. Bowman would be found at Western Colorado Counseling. The imprecision in Mr. McFadden's showing as to how many subpoenas would be issued and to whom is another factor warranting denial of the motion.

In addition, Rule 17(c)(3) provides that before "a subpoena requiring the production of personal or confidential information about a victim may be served on a third party . . . the court must require giving notice to the victim so that the victim can move to quash or modify the subpoena or otherwise object." One of the targets of Mr. McFadden's contemplated subpoena is K.W., who is named in the Indictment as the victim in Counts One and Two. Under Rule 17(c)(3), then, the Court could not grant Mr. McFadden's motion with regard to K.W.'s record without a showing that K.W. has been given notice of Mr. McFadden's request and been given an opportunity to respond. Mr. McFadden has not given any indication that he provided K.W. with that notice. This, too, warrants denial of the motion.

Accordingly, Mr. McFadden's request for authorization of a subpoena *duces tecum* is denied.

**C. Conclusion**

For the foregoing reasons, Mr. McFadden's Motion for a Bill of Particulars (D. 61) and Request for Subpoena (D. 81) are **DENIED**.[5]

Dated at Grand Junction, Colorado this October 13, 2022.

Gordon P. Gallagher
United States Magistrate Judge

---

[5] Pursuant to 28 U.S.C. §636(b), any party objecting to the disposition of these motions must file objections within 14 days of service of a copy of this Order.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Criminal Action No. 19-cr-00243-CMA-GPG

UNITED STATES OF AMERICA,

Plaintiff,

v.

1. MICHAEL TRACY McFADDEN,

Defendant.

---

**GOVERNMENT'S STATEMENT ADDRESSING SPEEDY TRIAL CALCULATION**

---

The United States of America, by and through Jeremy Chaffin and Andrea Surratt, Assistant United States Attorneys, hereby submits the following speedy trial calculation.[1]

| Date | Event | Days run in speedy trial calculation | Notes/citation |
|---|---|---|---|
| 5/22/19 | Initial appearance on indictment [ECF # 5] | n/a | 70-day clock starts on initial appearance in District; 18 U.S.C. § 3161(c)(1). |
| 5/22/19-6/13/19 | | 22 days | It is the Government's position that the time from 5/22/19-5/31/19 is excludable since the Government moved for detention on 5/22/19 [ECF #5] and the motion was granted after a hearing on 5/31/19. [ECF #12]. 18 U.S.C. § 3161(h)(1)(D). Out |

[1] The Government has consulted with Mr. McDermott, who stated that he is still working through the speedy trial calculation and will be prepared to address it with the Court on Monday.

| | | | |
|---|---|---|---|
| | | | of an abundance of caution, after consulting with counsel for the defendant, and to maintain consistency with other speedy trial calculations in this case, the parties here do not exclude this time. |
| 6/14/19-6/16/19 | First defense EOJ motion pending [ECF #19] | n/a | Motion stops clock; 18 U.S.C. § 3161(h)(1)(D). |
| 6/16/19 | First EOJ motion granted, excluding time from 7/1/19 through 1/6/20 [ECF #20] | n/a | |
| 6/17/19-7/1/19 | | 15 days | |
| 11/4/19-11/6/19 | Second defense EOJ motion pending [ECF #28] | n/a | |
| 11/6/19 | Second defense EOJ motion granted, excluding time from 11/6/19 through 6/1/20 [ECF #29] | n/a | |
| 4/6/20-4/7/20 | Third defense EOJ motion pending [ECF #31] | n/a | |
| 4/7/20 | Third defense EOJ motion granted, excluding time between 4/7/20 and 11/2/20 [ECF #32] | n/a | |
| 9/8/20-9/9/20 | Fourth defense EOJ motion pending [ECF #37] | n/a | |
| 9/9/20 | Fourth defense EOJ motion granted, excluding time from 9/9/20 through 4/6/21 [ECF #38] | n/a | |
| 2/1/21-2/2/21 | Fifth defense EOJ motion pending [ECF #42] | n/a | |
| 2/2/21 | Fifth defense EOJ motion granted, excluding time from 4/5/21 through 7/26/21 [ECF #43] | n/a | |
| 5/26/21-5/27/21 | Sixth defense EOJ motion pending [ECF #47] | n/a | |

| | | | |
|---|---|---|---|
| 5/27/21 | Sixth defense EOJ motion granted, excluding 280 days from the speedy trial clock, starting from 7/26/21 [ECF #48] | n/a | Time excluded from 7/26/21 through 5/2/2022 |
| 12/22/21-12/30/21 | Seventh defense EOJ motion pending [ECF #51] | n/a | |
| 12/30/21 | Seventh defense EOJ motion granted in part and denied in part; no additional time excluded [ECF #54] | n/a | |
| 2/1/22-2/3/22 | Eighth defense EOJ motion pending [ECF #55] | n/a | |
| 2/3/22 | Eighth defense EOJ motion granted, excluding time from 5/2/22 through 11/7/22 [ECF #56] | n/a | |
| **Total days included in calculation** | | **37** | |
| **Total days remaining on 70-day clock** | | **33** | |

As calculated in the above chart, 37 days have run from the speedy trial clock, leaving 33 days remaining. Time has already been excluded through November 7, 2022. [ECF #56]. The 70-day clock therefore expires on December 10, 2022.

Respectfully submitted,

COLE FINEGAN
United States Attorney

*s/ Jeremy Chaffin*
JEREMY CHAFFIN
Assistant U.S. Attorney
U.S. Attorney's Office
205 North 4th Street, Suite 400
Grand Junction, CO 81501
Tel: (970) 257-7113
E-mail: jeremy.chaffin@usdoj.gov

*s/ Andrea Surratt*
ANDREA SURRATT
Assistant U.S. Attorney
U.S. Attorney's Office
1801 California Street, Suite 1600
Denver, CO 80202
Tel: (303) 454-0124
E-mail: andrea.surratt@usdoj.gov

Attorneys for the Government

**CERTIFICATE OF SERVICE**

I hereby certify that on this 14th day of October, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following e-mail address:

**Defense Attorney:**
Sean M. McDermott

**Email Address:**
smcdermott@mswdenver.com

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 19-cr-00243-CMA-GPG

UNITED STATES OF AMERICA,

Plaintiff,

**v.**

**MICHAEL TRACY McFADDEN,**

**Defendant.**

---

**UNOPPOSED MOTION FOR AN EXTENSION OF TIME TO FILE EXHIBIT LIST**

---

Mr. McFadden by and through his attorney Sean M. McDermott, moves this Honorable Court for a six-day extension of time to file his exhibit list. As grounds thereof, Mr. McFadden states the following:

Conferral

1. The parties have conferred by email. The United States does not object to the requested relief.

Reasons for the Requested Relief

2. The defense has been working to compile exhibits that are both included and not included in discovery and other preparations for this case.

3. The exhibits and other preparation are not complete.

4. The defense is currently asking that it be given until the day prior to the presently scheduled pre-trial conference to submit its Exhibit List. This means that the defense is asking to have through October 24, 2022, to submit its exhibit list.

5. This extension will not prejudice the prosecution or inconvenience the Court.

WHEREFORE, Mr. McFadden respectfully requests that this Court give Mr. McFadden through October 24, 2022, to submit his Exhibit List.

Respectfully submitted,

s/Sean M. McDermott
Sean M. McDermott
McDermott Stuart & Ward LLP
140 E. 19th Avenue, Suite 300
Denver, CO 80203
(303) 832-8888
(303) 863-8888 (fax)
Email: smcdermott@mswdenver.com

**CERTIFICATE OF SERVICE**

     I hereby certify that on this 18th day of October 2022, I filed the foregoing **pleading** with the Clerk of Court using the CM/ECF system which will send notification of such filing to all listed parties.

     s/ Sean McDermott
       Sean McDermott

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 19-cr-00243-CMA-GPG

UNITED STATES OF AMERICA,

Plaintiff,

**v.**

**MICHAEL TRACY McFADDEN,**

**Defendant.**

---

**DEFENDANT MICHAEL TRACY MCFADDEN'S MOTION TO CONTINUE TRIAL PURSUANT TO 18 U.S.C. §3161(h)(7)(A)**

---

COMES NOW, Mr. McFadden by and through his attorney Sean M. McDermott, and moves this Honorable Court to continue the scheduled trial date currently set for, November 7, 2022, and to exclude time from the Speedy Trial Act (18 U.S.C. §3161Without knowing what the Court's availability is, the defense is asking for 60 days to be excluded from the speedy trial clock. As further grounds thereof, Mr. McFadden states the following:

Conferral

1. The parties have conferred. The Government opposes the requested relief.

Speedy Trial Calculation

2. Defense counsel calculates that there are 34 days remaining on the Speedy Trial Clock. See Doc. No. 42 ¶ 31. No additional days have run since this calculation.

Factual Reasons For the Continuance

3. The sheer volume of material in this case has been well documented. Mr. McFadden incorporates by reference his previous Motions to Continue which document the volume of discovery and reviewable material.

4. Undersigned counsel would need to file a Motion to Continue irrespective of the location of the trial. (See Restricted Document, Exhibit B that is being filed separately). That document is being filed without objection.

5. Counsel did believe that the trial was going to be conducted in Denver. (Exhibit A, Affidavit).

6. Undersigned counsel has documented items that need to be done and that have not yet been done, so that Mr. McFadden can have a fair trial. See Restricted Affidavit submitted in support of this Motion.

7. This includes, securing necessary witnesses to the proper venue, completing exhibits, and preparing examinations.

8. Mr. McFadden has not filed a Motion for Change of Venue. A Google search of Mr. McFadden's name shows that Grand Junction Media portrayed Mr. McFadden as a guilty person who got off on a technicality. Undersigned, has not properly investigated whether prejudice to Mr. McFadden will occur if the trial is held in Grand Junction.

9. In addition to the items in Paragraph 7, counsel needs additional time to prepare Mr. McFadden for trial. Basic things, such as obtaining clothes for Court need to be done. This is an example of something seemingly minor that needs to be done. But when counsel already does not have sufficient time remaining to prepare for trial, the minor things became major.

10. There are other reasons, that counsel has documented for not being able to conduct the trial on November 7, 2022, in Grand Junction, Colorado. (Exhibit B. Restricted Document).

11. Moving forward, undersigned counsel will do his part to make sure that CMA Crim. Practice Standard 1.2 is followed when scheduling matters, whether he initiates the scheduling communication or whether another party does so. Undersigned, also will implement an email review process to make sure that no communication between the parties and/or the Court are missed. (See Exhibit A).

12. If the Court grants this continuance, counsel will use the time allocated for the trial so that he can accomplish the items that he needs to accomplish to effectively represent Mr. McFadden.

13. Counsel needs this additional time. As documented in his restricted affidavit, a lot of things have coalesced during the representation of Mr. McFadden, that necessitates additional time, so that Mr. McFadden is properly represented.

14. Counsel is asking the court to exclude 60 days from the speedy trial clock so that he can conclude the things that need to be done, and so that Mr. McFadden receives a fair trial.

Legal Standard For Continuances

15. Title 18 U.S.C. §3161(h)(7)(A) provides that a Court shall exclude a period of delay from computing the time within which a trial must commence where "the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial." The factors to be considered in such an evaluation are listed at 18 U.S.C. § 3161(h)(7)(B)(i)-(iv).

16. Pertinent factors that apply to an "ends of justice" finding in the present case include:

(i) Whether the failure to grant such a continuance in the proceeding would be likely to make a continuation of such proceeding impossible, or a result in a miscarriage of justice.

. . . .

(iv) Whether the failure to grant such a continuance in a case which, taken as a whole, is not so unusual or so complex as to fall within clause (ii), would deny the defendant reasonable time to obtain counsel, would unreasonably deny the defendant or the Government continuity of counsel, or would deny counsel for the defendant or the attorney for the Government the reasonable time necessary for the effective preparation, taking into account the exercise of due diligence.

*See* 18 U.S.C. §1361(h)(7)(B). *See also*, *United States v. Toombs*, 574 F. 3d 1262, 1268-69 (10th Cir. 2009).

17. In the similar context of addressing trial continuances, the Tenth Circuit has set forth four factors that the Court should consider. *See United States v. West*, 828 F.2d 1468, 1470 (10th Cir. 1987). According to the Tenth Circuit, the Court should consider: (1) the diligence of the party requesting the continuance, (2) the likelihood that the continuance, if granted, would accomplish the purpose underlying the request for continuance, (3) the inconvenience to the opposing party, its witnesses, and the court resulting from the continuance, and (4) the need asserted for the continuance and the harm that could be suffered as a result of the court's denial of the continuance. *See id.* No single factor is determinative. *See id.*

18. The decision to grant an "ends of justice" continuance is within the sound discretion of the Court and is reviewed under an abuse of discretion standard. *See Toombs*, 574 F. 3d at 1262. "Adequate preparation time is a clearly permissible reason for granting a continuance and tolling the Speedy Trial Act." *United States v. Gonzales*, 137 F. 3d 1431, 1435 (10th Cir. 1998). The Supreme Court has recognized that "subsection (h)(7) expressly accounts for the possibility that a district court will need to delay a trial to give the parties adequate

preparation time" to ensure that the ends of justice are met, and that "subsection (h)(7) provides 'much of the Act's flexibility.'" *Bloate v. United States*, 130 S. Ct. 1345 (2010).

Argument

19. This case meets the criteria set forth in both 18 U.S.C. § 3161(h)(7) and *West*. Accordingly, undersigned counsel requests that this Court vacate the current trial date and exclude additional time from the speedy trial calculation. At this time, undersigned counsel is not requesting a finding of complexity under subsections (h)(7)(B)(ii), but rather, is requesting a determination that the ends of justice will be served by the granting of the requested continuance because "the failure to grant such a continuance in the proceeding would . . . result in a miscarriage of justice" and "would deny counsel for the defendant . . . reasonable time necessary for effective preparation." 18 U.S.C. §3161(h)(7)(B)(iv). The amount of information tendered by the government (8,600 pages of written investigative materials and 50+ hours of audio/video interview footage) is extensive. Furthermore, novel questions of law will be addressed, as the United States has filed extensive Motions regarding FRE 404(b), the timing of the indictment, subpoenas regarding possible privileged information may be necessary. Essentially, this is a complex case, except for the fact there is only one defendant. See 18 U.S.C. § 3161(h)(7)(B(ii).

20. Mr. McFadden has diligently assisted his counsel. This request is through no fault of his. He has assisted with exhibits, when communication has been difficult as a result of COVID and the lack of privacy afforded at the facility in Washington County he written counsel and assisted in his defense as best he can. Mr. McFadden through no fault of his, had his counsel changed. Like everyone involved in this case, this matter has been difficult for him.

21. This case involves FRE 414 evidence which if admitted will be extremely difficult and prejudicial. Preparing for the contingency of this evidence is time consuming and difficult.

22. The defense did not file a Motion for a Change of Venue. As the Court pointed out at the October 17, 2022, this should have been done.

23. The state criminal prosecution has received a lot of local media attention in Grand Junction that included an effort to not retain the trial judge. This issue should be fairly determined.

24. An additional amount of time will result in counsel being properly prepared for trial. Undersigned counsel has limited his work so that the time and attention is devoted to this case, irrespective of other things that may occur. This case is the focus of counsel's time.

25. The failure to grant the requested continuance on behalf of Mr. McFadden would result in a miscarriage of justice and would also deny undersigned counsel the reasonable time necessary for effective preparation as discussed in 18 U.S.C. §3161(h)(7)(B)(i) and (iv).

26. Finally, a speedy trial extension of an additional 60 days would not offend the standard set forth by the Tenth Circuit in the *West* decision.

27. To the contrary, given the fact that this case has been previously continued to ensure a fair trial to the parties, it would offend the *West* standard to not grant an additional 60 days to ensure that the trial is a fair trial.

WHEREFORE, Mr. McFadden respectfully requests that this Court issue an Order to vacate the trial date, excluding 60 days from the speedy trial calculation, and re-setting the trial

Respectfully submitted,

s/Sean M. McDermott
Sean M. McDermott
McDermott Stuart & Ward LLP
140 E. 19th Avenue, Suite 300
Denver, CO 80203
(303) 832-8888
(303) 863-8888 (fax)
Email: smcdermott@mswdenver.com

**CERTIFICATE OF SERVICE**

I hereby certify that on this 19th day of October 2022, I filed the foregoing **pleading** with the Clerk of Court using the CM/ECF system which will send notification of such filing to all listed parties.

s/ Sean McDermott
Sean McDermott

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 19-cr-00243-CMA-GPG

UNITED STATES OF AMERICA,

Plaintiff,

v.

**MICHAEL TRACY McFADDEN,**

**Defendant.**

---

**AFFIDAVIT OF SEAN McDERMOTT**

---

Sean McDermott, being sworn states:

1. I am the attorney for Michael McFadden.

2. On February 3, 2022, the Court issued an order found at Doc. No. 56. This order set trial in this matter, for November 7, 2022, at 8:30 a.m. The order indicates that the trial will be held at Courtroom A 602 of the Alfred A. Arraj United States Courthouse, 901 19th Street, Denver, CO, before Judge Christine M. Arguello.

3. While preparing this affidavit, undersigned has reviewed past email correspondence, pleadings in other cases, and his calendar.. The following facts are based on this review and on undersigned's memory.

4. According to undersigned's review of emails, on Friday February 4, 2022, an email exchange occurred regarding the Court's Order found at Doc. No. 56. The subject of the email thread is the length of the trial and the location. The first email was initiated by Assistant United States Attorney Jeremy Chaffin at 1:09 p.m. The Honorable Court's chambers responded to Mr. Chaffin's email, at night this same calendar day. In a polite email, Mr. Chaffin, responded to chambers on Saturday, February 5, 2022, at 9:13 a.m. Counsel did not respond to this email exchange. As a matter of fact, undersigned counsel did not see this email exchange or thread until a much later date.

5. Undersigned Counsel does not know why he did not see these emails. Counsel knows that an out-of-office meeting was cancelled on February 4,

2022, and that he attended a birthday dinner that evening. Over the weekend there were family commitments.

6. Undersigned counsel did not see the February 4, 2022, email thread that concluded on February 5, 2022, until after the Court issued the Court's order denying Mr. McFadden's Motion to Continue. Doc. No. 56. This was on October 13, 2022. The Court's order caught undersigned's attention. As a result undersigned, searched his computer for the referenced email.

7. Counsel read the Prosecution's Response to Mr. McFadden's Motion to Continue the trial, which was filed on October 12, 2022, after the Court denied Mr. McFadden's Motion to Continue. This pleading filed by the United States, mentions the February 4, 2022, email by the Court's chambers. See Doc. No. 94.

8. On September 23, 2022, at 2:50 p.m. Assistant United States Attorney Jeremy Chaffin sent an email to the Court's Chambers regarding the location of upcoming hearings and the trial. Undersigned was copied on the email and so was Assistant United States Attorney Andrea Surrat.

9. On Monday, September 26, 2022, the Court's chambers responded to this email at 10:20 a.m.

10. In response to that email undersigned sent an email at 10:33 a.m. Undersigned wrote in relevant part:

> Thank you for the clarification. I took the Court's order to mean that the trial was being heard in Denver. For a lot of reasons that is Mr. McFadden's and my preference. I am happy to address this in more detail or in a pleading. In the interest of a prompt response, I want to let you know our position as quickly as possible, so I am sending this email.

11. At 11:46 a.m., the Court's Chambers sent another email. The Court's Chambers responded in relevant part:

Yes, if you would let me know as soon as possible that you all plan on having the trial in Denver I will make a note on the Calendar that it is being held in Denver and then we don't need to make any changes down the line. That would be a great help.

12. Undersigned counsel did not immediately see the email sent by Chambers at 11:46 a.m., on September 26, 2022, or the emails that followed it. Undersigned, had a meeting with a Spanish interpreter at the Federal Detention Center to see a client at 1:00 p.m. Undersigned

believes that he did not immediately see the above referenced emails, because he left his desk to eat lunch at the Great Harvest Bread Company, on his way to the Federal Detention Center. Undersigned did not return to this email thread on September 26, 2022.

13. On October 10, 2022, as part of the case preparation, undersigned reviewed the Court's Orders in this case and all emails sent between the parties and the Court's Chambers. When undersigned did this, undersigned saw the September 26th emails between the Court's Chambers and the parties. Undersigned had not previously read these emails. These emails discuss the location of the trial. A September 26, 11:57 a.m. email sent by Mr. Chaffin states that the United States believes that the trial should be held in Grand Junction. At 3:48 p.m. on September 26, the Court's Chambers sent an email letting counsel know that if undersigned wanted to have the trial in Denver, undersigned should file a Motion so that this could be addressed at the (October 17th) hearing.

14. On October 10, 2022, after reading these September 26th emails, undersigned conferred with the United States by stating the following:

> I went back and reviewed the orders and the email thread from Judge Arguello's clerk. Irrespective of where the trial is held, with the timing of the Motions Hearing and the trial, the logistics of this November date is difficult, and I was considering filing a Motion to Continue the Trial.
> Additionally, I relied on the Court's order stating the trial would be in Denver. For reasons that I cannot get into, I cannot go to Grand Junction in November, but I can go after November. I am going to file a Motion to Continue based primarily on these facts. I don't know what the schedule is in Grand Junction, but I was considering asking for 60 to 90 days to be excluded, so that we can get our respective witnesses in place and under subpoena. Can you please give me your position?

15. The United States gave their position. In an email exchange, after undersigned registered his displeasure with the trial location seemingly being changed via email, Mr. Chaffin stated that we knew that the case could get moved back to Grand Junction. Since undersigned had not read the email chain from February 4 through 5, this was out of context, and this did not register with undersigned.

16. Due to a hearing that Mr. Chaffin had, the parties could not confer further on October 10, 2022. The parties conferred further on October 11, 2022, and then undersigned filed a Motion to Continue. Docket No. 94.

17. Part of the October 10 preparation that undersigned was doing, was determining trial subpoenas and pre-trial interviews.

18. When initiating scheduling matters with the Court, it is undersigned's practice to contact opposing counsel, and to let opposing counsel know that he wants to address a scheduling matter. Undersigned prefers to then have the parties contact the Court or write a Motion. Undersigned follows this practice as a courtesy, to improve communication, and because he knows that he can get off track with email interruptions.

19. As a result of the experience of not seeing the above-referenced emails in a timely manner, undersigned is now adopting a practice of reviewing emails at the end of the week, to make sure that he has not missed anything.

The affiant swears that the above is true.

Sean McDermott

STATE OF Colorado)

) ss.

COUNTY OF Denver)

The forgoing Affidavit acknowledged before me this 18th day October 2022

My commission Expires: August 8, 2023

Witness my hand and official seal.

KINDRA RODRIGUEZ
NOTARY PUBLIC - STATE OF COLORADO
NOTARY ID 20194030263
MY COMMISSION EXPIRES AUG 8, 2023

Notary Public

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 19-cr-00243-CMA-GPG

UNITED STATES OF AMERICA,

Plaintiff,

v.

**MICHAEL TRACY McFADDEN,**

**Defendant.**

---

**AFFIDAVIT OF SEAN McDERMOTT**

---

Sean McDermott, being sworn states:

1. I am the attorney for Michael McFadden.

2. I am setting forth the following facts because, they have affected my representation of Mr. McFadden.

3. While preparing this affidavit, undersigned has reviewed past email correspondence, pleadings in other cases, and his calendar. I have also reviewed legal documents, court records and HIPPA protected records. The following facts are based on this review and on undersigned's memory.

4. Undersigned entered his appearance in this matter on February 15, 2021.

5. Prior to taking Mr. McFadden's case, undersigned considered the difficulty of a case like this and the time that it would take. Undersigned knew that Mr. McFadden would need to spend a lot of time with his lawyer. The reason for this is that Mr. McFadden is the one person who can be a historian in this case. This case literally spans the time from when he was 18 years-old through the time he was 41 years old. If the case goes to sentencing, it will be longer than that, because according to case documents, Mr. McFadden was abused as a child.

6. Prior to taking this case, undersigned spoke to Mr. McFadden's previous counsel Tim O'Hara. Mr. O'Hara gave undersigned a lot of information based on his investigation. Mr. O'Hara gave undersigned a lot of information to build

upon. Undersigned believes that if this case is done correctly, there will be adequate facts to lead a person to conclude that Mr. McFadden has been unfairly targeted because he pled guilty to a sex offense when he was 18 years old.

7. Undersigned, believes that evidence will be developed that shows that Mr. McFadden's past plea to a sex offense is in the past and he became a reliable citizen who assisted Grand Junction families who had a lot of problems. This included assisting their kids. Counsel did not get his entire theory of defense out at the Motions Hearing on October 17, 2022, but he intends to do so in pleadings that are not ex parte. The prosecution has indicated that they do not object to the defense sharing portions of their defense with the court, but undersigned does not feel that it is appropriate to use an ex parte communication to advance his case.

8. One thing that undersigned considered when taking this case, is the amount of time it would take to get through all information, and fact checking the discovery with Mr. McFadden. Mr. O'Hara made the importance of this very clear in his communication with undersigned and his pleadings with the Court.

9. Undersigned knew that this case would be time intensive and psychologically taxing. A major factor that undersigned counsel considered when he decided to take this case, was that Mr. McFadden was being detained in the Clear Creek County Detention Center. This detention center is easy to get to by counsel. Counsel believed that he could manage his current caseload and effectively represent Mr. McFadden under those circumstances.

10. As discussed fully below Mr. McFadden's detention location unexpectedly changed and so did undersigned's situation.

11. In February 2021 undersigned decided to take this case even though undersigned was attempting to continue to decrease his workload. Undersigned states that he was attempting to decrease his caseload, because in March 2020, as the stay-at-home orders were put in place, undersigned realized, that he often took on more than he should.

12. Undersigned wanted to better manage his work and home responsibilities. Undersigned's goals were to be a more thorough and attentive lawyer, and a more attentive father and husband.

13. On April 22, 2020, undersigned became the respondent in a dissolution of marriage proceeding. This process was still going on in February 2021. It

ultimately concluded on August 19, 2021. The marriage had begun on August 4, 2001, and legally ended on August 19, 2021.

14. Undersigned has a son who was born July 27, 2007. He will be referred to as LM. Undersigned has joint custody of LM.

15. LM has been on an IEP since early grade school. Issues related to the IEP were apparent before grade school. His parents had sought out and received professional help from an early age.

16. During the stress of the pandemic which included schooling from home for all kids, and the dissolution of his parents' marriage which coincided with this, LM had additional problems.

17. In mid-2021, undersigned sought out a neuropsychological examination for LM. Testing occurred in September and October of 2021. LM's parents met with the professional in charge of the testing in December 2022 and a report with recommendations was made. A more complete diagnosis was obtained.

18. Undersigned has been attempting to implement some of the recommendations made. Undersigned has done things that he did not plan on when he took Mr. McFadden's case. One example, is attending virtual social skills classes with LM.

19. There are not enough hours in the day, to implement all recommendations suggested in the above-referenced report. Undersigned has been learning to balance the responsibility of being a single parent and being a lawyer.

20. Additionally, there are a shortage of professionals who have the training to assist LM and his parents with these challenges. Undersigned has been unable to obtain some of the professional help that he would like. Nonetheless, he has spent time attempting to get this assistance.

21. To compound the shortage of professionals, LM's professional who assisted LM since pre-school retired earlier than anticipated, after being diagnosed with cancer.

22. Undersigned has sought out and obtained other professionals to assist LM. The first appointment with someone to help take the place of the long-time professional is tonight, October 18, 2022, at 6:00 p.m.

23. There are things that have occurred, that will not be put in this document related to these problems that unexpectedly took time away from case

responsibilities. These are in addition to the things that one would expect such as undersigned cancelling a trip to see Mr. McFadden in Washington County because LM was sick.

24. With planning, undersigned can do a two-week trial and maintain his parental responsibilities, but he does need to plan.

25. Other things that undersigned did not foresee in February 2021, when he took Mr. McFadden's case, occurred with respect to undersigned that have impacted his time for this case.

26. In late November 2021, undersigned was diagnosed with a cancer on this face. The cancer cells had apparently grown for years and were deep through his nose. Photos were shown to undersigned depicting what he would like. These photos were frankly horrific. To avoid looking disfigured, and to avoid being away from work longer than expected, undersigned sought out and luckily obtained an alternative. This alternative resulted in more procedures than expected. This included two surgeries, and other maintenance. This medical care took time away from work.

27. Unforeseeable work complications occurred as well. In a previous Motion to Continue, undersigned referenced one case. This case is identified as *Cuevas v. Public Service, et.,al.* 19CV34285, Denver District Court.

28. In summary, due to COVID delays in 2020 and COVID complications that occurred in 2020, this case dominated undersigned's time in 2021. By way of example, one party, initiated experts that were not in the Case Management Order, discovery disputes occurred, the case cost more than six five times the amount that undersigned estimated to the client and this was the case even after sharing expert costs and fees with another party. Judicial intervention was sparse and could not be obtained contemporaneous to the dispute, because of the backlog from COVID. The current posture of the case is that two parties have been resolved and the two remaining parties are in the Court of Appeals. The respondent will file their Answer Brief soon. Undersigned, has contracted with an appellate specialist to handle the appeal. That specialist will handle the Reply and Oral Argument. In sum, the earliest that undersigned could have to expend significant time on that case, is many months down the road.

29. Undersigned, reluctantly admits that the stressors above and others that are not mentioned, impacted his ability to focus his casework in this matter. This is not Mr. McFadden's or the Court's fault.

30. With that said, undersigned has learned from this experience. For the last year and a half, counsel has limited his case load, while attempting to devote the time and attention necessary to discharge his professional responsibilities.

31. Currently, Counsel has endeavored to limit cases. Mr. McFadden's case is the only case that undersigned currently has set for trial. This is the opposite of undersigned's practice prior to March 2020.

32. Counsel has intentionally done this in large part, so that if this Court grants Mr. McFadden's Motion to Continue, the time and attention necessary will be given to this case to ensure that every detail is prepared properly and that all witnesses are subpoenaed to the correct venue, whatever venue that Court may be.

33. As of this writing, undersigned counsel needs this additional time so that he can properly represent Mr. McFadden.

34. Undersigned has relied on a lot of the summaries of the evidence that previous counsel has done. Undersigned is extremely thankful for that previous work. Undersigned needs to finish the substantive review of a lot of the work that has been done, so that it will be presented in a cogent and organized manner.

35. Undersigned counsel currently does not have the witnesses under subpoena that he needs to subpoena.

36. Undersigned has taken steps to ensure that if the Court grants the continuance, nothing will get in the way of being ready for trial. These steps include, declining work and getting supervision for LM in place. If this Court grants the continuance the time that was calendared for this trial will mostly be allocated to Untied States v. McFadden.

37. Undersigned knows that he needs additional time to properly prepare for trial. If given this additional time, the time will be used for this purpose.

Case 1:19-cr-00243-CMA-GPG Document 193 (Ex Filed 10/19/22 Page 6 of 6

The affiant swears that the above is true.

Sean McDermott

STATE OF Colorado)

) ss.

COUNTY OF Denver)

The forgoing Affidavit acknowledged before me this 18th day October 2022

My commission Expires: August 8, 2023

Witness my hand and official seal.

Notary Public

KINDRA RODRIGUEZ
NOTARY PUBLIC - STATE OF COLORADO
NOTARY ID 20194030263
MY COMMISSION EXPIRES AUG 8, 2023

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Criminal Action No. 19-cr-00243-CMA-GPG

UNITED STATES OF AMERICA,

Plaintiff,

v.

1. MICHAEL TRACY McFADDEN,

Defendant.

---

**GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO CONTINUE TRIAL PURSUANT TO 18 U.S.C. § 3161(h)(7)(A) [ECF #104]**

---

The United States of America, by and through Jeremy Chaffin and Andrea Surratt, Assistant United States Attorneys, submits this response in opposition to the defendant's motion to continue, reset the trial date, and exclude 60 days from the speedy trial clock. ECF #104.

Continuance

The Government strenuously opposes any additional continuances of this matter and believes that trial should proceed as long-scheduled—that is, in Grand Junction, on November 7, 2022. Though Mr. McDermott vaguely claims that he is, as of this date, unprepared for a trial in Grand Junction, true hardship will come to the Government and its witnesses from additional delay. As the Court knows, Government counsel who charged this case and who has the most familiarity with this case may be leaving the U.S. Attorney's Office this fall. A continuance of this trial may unreasonably deprive the Government of continuity of counsel. 18 U.S.C. § 3161(h)(7)(b)(iv).

More importantly, however, the child victims in this case deserve closure. They have been subject to 3½ years of delay in this case. In that time, the Government has contacted the victims and their families multiple times in order to begin preparing for trial, only to have to explain that trial will be delayed again. This time, the victims and other witnesses have already been subpoenaed to appear in Grand Junction and are beginning to make travel arrangements. Many of them have already arranged to take time off work, in many cases despite the worry of the financial hardship occasioned by giving up shifts in their hourly-wage jobs.

In short, for the sake of victims, the witnesses, the public, and Government counsel, this trial needs to happen as scheduled in Grand Junction. Nothing in the defendant's publicly-filed motion convinces the Government otherwise. There are currently nearly three weeks left before trial—and at the time the defendant became definitively and unequivocally aware that trial was scheduled to proceed in Grand Junction, there was more than a month left before trial. *See* ECF #104-1 ¶ 10 (referencing email dated September 26, 2022). Surely this is enough time to complete the tasks that remain to prepare to try a case that has already been tried once in the state court system and has been pending in federal court for 3½ years.

Moreover, it seems to Government counsel—themselves experienced attorneys familiar with the demands of trial—that the specific tasks that the defendant claims he has left to complete can be adequately accomplished in the time remaining before November 7. Defense counsel claims that he needs to secure witnesses, complete exhibits, and prepare examinations. To date, the Government has heard of one defense witness—John Foxx—who is deceased and presumably will not be appearing at trial. As for other witnesses, the Government has already spoken with the FBI, who

will be happy to assist counsel in tracking down any witnesses that counsel believes necessary to his defense. And for preparing exhibits and examinations—the Government has these tasks remaining as well, so it cannot be said that the defendant is at a disadvantage in that regard. To the extent someone at Mr. McDermott's law firm cannot assist him in securing clothing for the defendant, the Government is willing to speak with counsel to see if the Government can assist with that too.

Counsel in this case has filed numerous motions and ably litigated them at the October 17, 2022, motions hearing in this matter. He made arguments and conducted a cross-examination of the Government's witness that demonstrated a mastery of the record in this case. To the extent counsel is feeling the pinch of an important trial bearing down, he is not alone in that regard. Government counsel, too, has a lot of work left to do. Nothing in the defendant's motion suggest that the defendant will be denied competent counsel, and his motion should be denied.

Change of Venue

The defendant has still not filed a motion for change of venue. Perhaps this is because if he did, it would be easily denied. It is true that this matter received some publicity in Grand Junction in prior years. The last Google hit for "Michael McFadden grand junction," however, is from May 2019, when the federal charges against the defendant were brought. This is not a case where "extraordinary local prejudice will prevent a fair trial" because the "trial atmosphere [will be] utterly corrupted by press coverage." *Skilling v. United States*, 561 U.S. 358, 378, 380 (2010). In any event, any prejudice on the part of individual Grand Junction-based jurors can be dealt with at jury selection. *See id.* at 381 (noting that "[p]rominence does not necessarily produce prejudice, and juror impartiality. . . does not require ignorance").

To the extent Mr. McDermott seeks a change of venue to Denver for personal reasons, the Government is sympathetic, but is having a difficult time understanding why Mr. McDermott cannot make arrangements for childcare—or whatever other personal issues need his attention—given that he has known for sure this trial would be in Grand Junction since September 26, 2022. *See* ECF #104-1 ¶ 10. It seems unfair to inconvenience the Government's many witnesses—most of whom have work and childcare concerns of their own on the Western Slope—because of the personal difficulties of one attorney.

Conclusion

The Court should deny the instant motion—the second such motion in as many weeks—to exclude time and continue this trial. If the Court is inclined to grant the requested continuance, the Government believes it may be prudent for the Court to consider appointing counsel to assist Mr. McDermott in this matter.

Respectfully submitted,

COLE FINEGAN
United States Attorney

*s/ Jeremy Chaffin*
JEREMY CHAFFIN
Assistant U.S. Attorney
U.S. Attorney's Office
205 North 4th Street, Suite 400
Grand Junction, CO 81501
Tel: (970) 257-7113
E-mail: jeremy.chaffin@usdoj.gov

*s/ Andrea Surratt*
ANDREA SURRATT
Assistant U.S. Attorney
U.S. Attorney's Office
1801 California Street, Suite 1600
Denver, CO 80202
Tel: (303) 454-0124
E-mail: andrea.surratt@usdoj.gov

Attorneys for the Government

**CERTIFICATE OF SERVICE**

I hereby certify that on this 12th day of October, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following e-mail address:

**Defense Attorney:**
Sean M. McDermott

**Email Address:**
smcdermott@mswdenver.com

*s/ Andrea Surratt*
ANDREA SURRATT
Assistant U.S. Attorney
U.S. Attorney's Office
1801 California Street, Suite 1600
Denver, CO 80202
Tel: (303) 454-0124
E-mail: andrea.surratt@usdoj.gov

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 19-cr-00243-CMA-GPG

UNITED STATES OF AMERICA,

Plaintiff,

**v.**

**MICHAEL TRACY McFADDEN,**

**Defendant.**

---

**REPLY TO RESPONSE OF DEFENDANT MICHAEL TRACY MCFADDEN'S MOTION TO CONTINUE TRIAL PURSUANT TO 18 U.S.C. §3161(h)(7)(A)**

---

COMES NOW, Mr. McFadden by and through his attorney Sean M. McDermott, and moves this Honorable Court to continue the scheduled trial date currently set for, November 7, 2022, and to exclude time from the Speedy Trial Act (18 U.S.C. §3161Without knowing what the Court's availability is, the defense is asking for 60 days to be excluded from the speedy trial clock. As further grounds thereof, Mr. McFadden states the following:

1. The Government points to counsel's failure to file a Change of Venue Motion in its Response to the Motion to Continue. Respectfully, on Friday February 4, 2022, and the other emails initiated by the United States did not CMA Crim. Practice Standard 1.2 and confer with counsel prior to contacting chambers.

2. While undersigned counsel has taken responsibility for his portion of the miscommunication and other things that are contained in his Exhibit A and B, counsel should not have to scour emails to guess where any trial is supposed to be held,

especially one of this magnitude. Counsel is not attempting to assign blame to anyone. Counsel will endeavor to make sure a miscommunication does not occur in the future, but Mr. McFadden should not have his Constitutional rights violated, because in part, lawyers didn't follow this court's protocol regarding scheduling. It will be tragic, if Mr. McFadden does not receive a fair trial because in part of missed emails.

3.      Furthermore, counsel has not received updated criminal histories of the witnesses. He knows that at least one of the witnesses that the Government may call is in custody on what appear to be three felony cases.

4.      The bottom line is that this case has been pending during an unprecedented time, that being the COVID-19 pandemic. Courtrooms were inoperable, visitation with clients were suspended, and the location of this case was less than clear.

5.      Counsel just wants this case to be tried correctly. Counsel has requested a modest extension of 60 days. Counsel is mindful that may be unsettling, given the lengthy history of the case, but under the circumstances, it is a better alternative than risking a retrial.

6.      Counsel has entertained the idea of asking for less than 60 days to be excluded, but out of an abundance of caution, 60 days is being requested.

WHEREFORE, Mr. McFadden respectfully requests that this Court issue an Order to continue the trial date, exclude 60 days from the speedy trial calculation, and re-setting the trial.

Respectfully submitted,

s/Sean M. McDermott
Sean M. McDermott
McDermott Stuart & Ward LLP
140 E. 19th Avenue, Suite 300
Denver, CO 80203
(303) 832-8888
(303) 863-8888 (fax)
Email: smcdermott@mswdenver.com

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this 23rd day of October 2022, I filed the foregoing **pleading** with the Clerk of Court using the CM/ECF system which will send notification of such filing to all listed parties.

s/ Sean McDermott
Sean McDermott

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Senior Judge Christine M. Arguello**

Criminal Action No. 19-cr-00243-CMA-GPG

UNITED STATES OF AMERICA,

Plaintiff,

v.

MICHAEL TRACY MCFADDEN,

Defendant.

---

**ORDER DENYING DEFENDANT'S MOTION TO CONTINUE TRIAL PURSUANT TO 18 U.S.C. § 3161(h)(7)(A)**

---

This matter is before the Court on Defendant Michael Tracy McFadden's Motion to Continue Trial Pursuant to 18 U.S.C. § 3161(h)(7)(A). (Doc. # 104.) This case is currently set for trial to begin in two and a half weeks, on November 7, 2022. Mr. McFadden requests to exclude 60 days from the speedy trial clock on the basis that his counsel needs more time to be adequately prepared for trial. The Government opposes the Motion. (Doc. # 106.)

The Speedy Trial Act requires that a federal criminal trial commence within seventy days of the later of the filing of the information or indictment or the defendant's initial appearance. 18 U.S.C. § 3161(c)(1); *United States v. Toombs*, 574 F.3d 1262, 1268 (10th Cir. 2009). "The Speedy Trial Act is designed to protect a criminal defendant's constitutional right to a speedy trial and serve the public interest in bringing

prompt criminal proceedings." *United States v. Thompson*, 524 F.3d 1126, 11131 (10th Cir. 2008). The Act excludes from the seventy-day period "[a]ny period of delay resulting from a continuance . . . if the judge granted such continuance on the basis of his findings that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial." 18 U.S.C. § 3161(h)(7)(A). In order to exclude time pursuant to the ends-of-justice provision, a district court must set forth its findings and reasoning either orally or in writing. *Id.* The Court must consider:

> (i) Whether the failure to grant such a continuance in the proceeding would be likely to make a continuation of such proceeding impossible, or result in a miscarriage of justice.
>
> (ii) Whether the case is so unusual or so complex, due to the number of defendants, the nature of the prosecution, or the existence of novel questions of fact or law, that it is unreasonable to expect adequate preparation for pretrial proceedings or for the trial itself within the time limits established by this section.
>
> (iii) Whether, in a case in which arrest precedes indictment, delay in filing of the indictment is caused because the arrest occurs at a time such that it is unreasonable to expect return and filing of the indictment within the period specified in section 3161(b), or because the facts upon which the grand jury must base its determination are unusual or complex.
>
> (iv) Whether the failure to grant such a continuance in a case which, taken as a whole, is not so unusual or so complex as to fall within clause (ii), would deny the defendant reasonable time to obtain counsel, would unreasonably deny the defendant or the Government continuity of counsel, or would deny counsel for the defendant or the attorney for the Government the reasonable time necessary for effective preparation, taking into account the exercise of due diligence.

18 U.S.C. § 3161(h)(7)(B)(i)–(iv).

The ends-of-justice exclusion is "meant to be a rarely used tool for those cases demanding more flexible treatment." *Toombs*, 574 F.3d at 1269 (quoting *United States v. Doran*, 882 F.2d 1511, 1515 (10th Cir. 1989)). The record must clearly establish that the district court considered the proper factors at the time such a continuance was granted, however, "the district court need not articulate facts which are obvious and set forth in the motion for the continuance itself." *United States v. Occhipinti*, 998 F.2d 791, 797 (10th Cir. 1993).

The Court has reviewed Defendant's Motion (Doc. # 104), the ex parte Affidavit of counsel Sean McDermott (Doc. # 105), the Government's Response in opposition (Doc. # 106), and Defendant's Reply (Doc. # 107). The Court is also apprised of the record in this case and has carefully considered applicable legal authority and the above factors. Pursuant to this analysis, the Court makes the following findings.

This Court has granted eight (8) prior ends-of-justice continuances requested by Defendant in this case. On October 13, 2022, the Court denied Defendant's ninth motion to continue and reset trial date because Defendant failed to provide the Court with any meaningful justification for delaying this trial further. (Doc. # 99.) In the instant Motion, filed six days later, Defendant requests a continuance on the basis that his counsel needs more time to be prepared for trial.

Defendant states that "undersigned counsel is not requesting a finding of complexity under subsections (h)(7)(B)(ii), but rather, is requesting a determination that the ends of justice will be served by the granting of the requested continuance because "the failure to grant such a continuance in the proceeding would . . . result in a

miscarriage of justice" and "would deny counsel for the defendant . . . reasonable time necessary for effective preparation." 18 U.S.C. § 3161(h)(7)(B)(iv). Although the Court has acknowledged that some of the issues in this case (particularly the timeline, the potential number of witnesses, and evidentiary issues under Rule 414 and Rule 807) render the case more complicated, the Court agrees that a finding of complexity under 18 U.S.C. § 3161(h)(7)(B)(ii) is not appropriate in this case. The Court therefore narrows its analysis to factors (i) and (iv).

First, the Court finds that Defendant has failed to show that proceeding to trial in two and a half weeks would "result in a miscarriage of justice" under 18 U.S.C. § 3161(h)(7)(B)(i). In his Motion, Defendant states that his counsel needs more time for "securing necessary witnesses to the proper venue, completing exhibits, and preparing examinations." (Doc. # 104 at ¶ 2.) However, he does not identify what witnesses he deems necessary to secure. Defense counsel claims that he needs to secure witnesses, complete exhibits, and prepare examinations. In his Motion to Dismiss for Pre-Indictment Delay, the Defendant identified only one defense witness—John Foxx—his former roommate, who is deceased. Counsel also indicates that he needs additional time to obtain clothes for Court for Mr. McFadden, secure witnesses, and review discovery.[1] The Court finds that these statements lacking detail are insufficient to demonstrate that counsel will be so unprepared as to result in a miscarriage of justice

[1] The Government states that it has spoken with the FBI, "who will be happy to assist counsel in tracking down any witnesses that counsel believes necessary to his defense." (Doc. # 106 at 3.) The Government also states that it is willing to assist in securing clothing for Mr. McFadden for trial.

should trial proceed in two weeks. *See Toombs*, 574 F.3d at 1271–2 ("Simply identifying an event, and adding the conclusory statement that the event requires more time for counsel to prepare, is not enough."). Defendant does not explain why his counsel cannot complete these tasks in the two and a half weeks remaining before trial, nor does he provide any detail or explanation as to the amount of time counsel needs to complete these tasks or in what way these tasks are so complicated—beyond the typical burden of preparing for trial—as to require additional time. Moreover, defense counsel has had nine months to prepare for this trial since the last continuance was granted. The Court also notes that at the motions hearing held on October 17, 2022, two days before the instant Motion was filed, defense counsel displayed a thorough understanding of this case. He litigated several motions, conducted cross-examination of the Government's witness, and made arguments that demonstrated strong familiarity with the record. Based on this performance, and without any further detail provided in the instant Motion as to what counsel needs to do to be effectively prepared for trial, the Court finds that Defendant has not demonstrated that a miscarriage of justice will occur should this case proceed to trial on November 7, 2022.

The Court also finds that Defendant's argument regarding needing time to prepare for trial is unavailing under 18 U.S.C. § 3161(h)(7)(B)(iv). Factor (iv) allows a continuance in the event that refusing to grant additional time "would deny counsel for the defendant or the attorney for the Government the reasonable time necessary for effective preparation, **taking into account the exercise of due diligence**." *Id.* (emphasis added). Counsel's arguments in his affidavit (Doc. # 105) and the instant

Motion (Doc. # 104) effectively amount to an admission that was distracted by personal matters and may not have appropriately managed his time or diligently prepared for trial, as is required by the statute.

Further, although counsel cites to some unforeseeable work complications, the Court notes that those complications occurred in 2021, prior to the last continuance granted in this case, and that this case is the only case counsel currently has set for trial. With respect to childcare concerns, counsel shares custody of his child with the child's mother. This is not a situation where there is no one to care for his child. Although the Court is sympathetic to counsel's other personal matters, including previous medical procedures, the Court again notes that these procedures occurred before the last continuance granted in this case. Counsel has not provided sufficient justification for his apparent lack of preparation for this trial in the last nine months.

The Court agrees with the Government that the child victims in this case deserve closure. They have been subject to 3½ years of delay in this case. The Government states that it has contacted the victims and their famalies multiple times in order to begin preparing for trial, only to have to explain that trial will be delayed again. The Government has already subpoenaed the witnesses to appear in Grand Junction and many of them have already arranged to take time off work, despite the worry of the financial hardship occasioned by giving up shifts in their hourly-wage jobs.[2]

---

[2] The Court is also aware that there is a possibility that Government counsel who charged this case and who has the most familiarity with this case may be leaving the U.S. Attorney's Office this fall. Thus, a continuance of this case would unreasonably deprive the Government of continuity of counsel pursuant to 18 U.S.C. § 3161(h)(7)(b)(iv), and could result in even longer delays for a case that has already been pending for three and a half years.

In sum, the Court finds that none of the four factors are met for granting a ninth continuance in this case and further delaying trial. Defendant has not demonstrated with specificity that his counsel is unable to be prepared for trial in two and a half weeks, and the Court finds that the ends of justice served by the granting of such continuance do not outweigh the best interests of the public and the defendant in a speedy trial. 18 U.S.C. § 3161(h)(7)(A); *see Toombs*, 574 F.3d at 1273 (observing that it is the responsibility of the district court to protect the best interests of the public by ensuring adherence to the requirements of the Speedy Trial Act).

The Court has also considered the factors from *United States v. Rivera*, 900 F.2d 1462, 1475 (10th Cir. 1990): (1) The diligence of the party requesting the continuance; (2) the likelihood that the continuance, if granted, would accomplish the purpose underlying the party's expressed need for the continuance; (3) the inconvenience to the opposing party, its witnesses, and the court resulting from the continuance; and (4) the need asserted for the continuance and the harm that [defendant] might suffer as a result of the district court's denial of the continuance. The Court finds that Defendant has not satisfied the first factor because he has had nine months to prepare for trial since the last continuance was granted, but he did not seek a continuance until three weeks before trial. Defendant has also not satisfied the second factor because he has not demonstrated specifically how additional time, beyond the two and a half weeks remaining before trial, will help Defendant with the tasks he has listed in his Motion, including securing witnesses, preparing exhibits and examinations, and procuring clothes for Mr. McFadden for trial. The Court notes that this to do list of remaining tasks

is typical of all trials and does not include any particular complication, such as newly disclosed evidence, that would plainly require extra time.

With respect to the third factor, for reasons listed above and in the Government's Response, the Court finds that there would be significant inconvenience to the Government and its witnesses if trial were to be delayed yet again. Finally, the Court finds that Defendant has not satisfied the fourth and most important factor because the purported need for the continuance—counsel needing more time to prepare for trial—is vague and insufficiently specific. Defendant has not shown what specific harm will occur if his counsel is not given additional time, beyond the remaining two-and-a-half weeks, to complete the typical tasks he asserts need to be done before trial. For these reasons, the Court finds that *Rivera* factors do not weigh in favor of granting a continuance.

For the foregoing reasons, Defendant's Motion to Continue Trial Pursuant to 18 U.S.C. § 3161(h)(7)(A) is DENIED.

DATED: October 19, 2022

BY THE COURT:

CHRISTINE M. ARGUELLO
Senior United States District Judge

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Criminal Case Number 19-cr-00243-CMA-GPG

UNITED STATES OF AMERICA,

Plaintiff,

v.

MICHAEL TRACY McFADDEN,

Defendant.

---

**GOVERNMENT'S MOTION TO RESTRICT DOCUMENT NO. 111**

---

The United States of America, by and through United States Attorney Cole Finegan, and the undersigned Assistant United States Attorney, respectfully moves to restrict document, any order revealing the contents of that document. The basis for this request is that the Motion for Writ contains a victim's name and other personally identifying information. The United States requests a "Level 2" Restriction which would make the document and attachment, any order revealing the contents of that document, "Viewable by Selected Parties & Court" only.

//

//

//

//

Respectfully submitted this 21st day of October 2022.

RESPECTFULLY SUBMITTED,

COLE FINEGAN
UNITED STATES ATTORNEY

By: *s/ Jeremy Chaffin*
JEREMY CHAFFIN
Assistant U.S. Attorney
United States Attorney's Office
205 N. 4th Street, Suite 400
Grand Junction, Colorado 81501
Telephone: (970) 257-7113
FAX: (970) 248-3630
E-mail: jeremy.chaffin@usdoj.gov
Attorney for the Government

Case 1:19-cr-00243-CMA-GPG Document 111 Filed 10/21/22 Page 3 of 3

**CERTIFICATE OF SERVICE**

I hereby certify that on this 21st day of October 2022, I electronically filed the foregoing **GOVERNMENT'S MOTION TO RESTRICT DOCUMENT NO. 111** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record in this case.

*s/ Cosandra Foster*
Cosandra Foster
Paralegal Specialist
U.S. Attorney's Office

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 19-cr-00243-CMA-GPG

UNITED STATES OF AMERICA,

Plaintiff,

v.

MICHAEL TRACY McFADDEN,

Defendant.

---

**ORDER TO RESTRICT DOCUMENT NO. 111**

---

This matter is before the Court on the Government's Motion to Restrict Document. Upon consideration and for good cause shown,

IT IS ORDERED that said Document, as well as any order revealing the contents of that document, are hereby restricted until further order by the Court.

IT IS ORDERED that said Document, as well as any order revealing the contents of that document, are hereby at a "Level 2 Restriction" and will be "Viewable by Selected Parties & Court" only.

IT IS SO ORDERED on this _______ day of October 2022.

BY THE COURT:

______________________________
THE HON. CHRISTINE M. ARGUELLO
UNITED STATES DISTRICT COURT JUDGE
DISTRICT OF COLORADO

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 19-cr-00243-CMA-GPG

UNITED STATES OF AMERICA,

     Plaintiff,

**v.**

**MICHAEL TRACY McFADDEN,**

     **Defendant.**

---

**EX PARTE MOTION REQUESTING A SECOND CJA ATTORNEY**

---

     Mr. McFadden by and through his attorney Sean M. McDermott, moves this Court for an order permitting a second CJA attorney to be appointed to assist with trial in this matter. As grounds, Mr. McFadden states the following:

    1.    This trial is scheduled for two weeks. Th Mr. McFadden faces five charges with two alleged victims.

    2.    There are five witnesses that may testify with respect to Federal Rule of Evidence 414 allegations.

    3.    Counsel is attempting to subpoena numerous witnesses to impeach potential Federal Rule of Evidence 414 allegations.

    4.    In addition to this, the discovery in this case is voluminous, the legal issues, are unique to a case with these allegations, and there is complex subject matter such as medical witnesses, and forensic interviews.

    5.    Should the Court grant this request, efforts will not be duplicated with a second attorney.

6.      Counsel was attempting to locate a local Grand Junction attorney with availability to handle this case.

7.      Counsel has found an attorney who is available and who is willing to travel to Grand Junction and assist with this case.

8.      That attorney is Criminal Justice Act Attorney Ben LaBranche.

9.      Mr. LaBranche's curricula vitae is attached hereto as an appendix.

Wherefore, Mr. McFadden respectfully requests that a second CJA attorney be appointed to his case to assist with the trial.

Date: October 24, 2022

Respectfully submitted,

s/Sean M. McDermott
   Sean M. McDermott
   McDermott Stuart & Ward LLP
   140 E. 19th Avenue, Suite 300
   Denver, CO 80203
   (303) 832-8888
   (303) 863-8888 (fax)
    Email: smcdermott@mswdenver.com

**CERTIFICATE OF SERVICE**

I hereby certify that on this 24th day of October 2022, I filed the foregoing **pleading** with the Clerk of Court using the CM/ECF system which will send notification of such filing to all listed parties.

s/ Sean McDermott
Sean McDermott

**Benjamin R. LaBranche**
**4509 Vallejo St**
**Denver, CO 80211**
**(225) 921-4543**
**Email: ben@brllawyer.com**

## WORK EXPERIENCE

April 2022-Present
***Benjamin R. LaBranche, P.l.l.c***
1544 Race St
Denver, CO 80206

March 2021-April 2022
***Adams County Public Defender's Office***
4710 E. Bromley Ln
Brighton, CO 80601

July 2005-December 2020
***Benjamin R. LaBranche, LLC Attorney at Law***
10636 Linkwood Ct.
Baton Rouge, LA 70810

May 2007-January 2012
***Felony Assistant Public Defender, East Baton Rouge Parish***
300 Louisiana Avenue
Baton Rouge, LA 70802

November 2004 – July 2005
***Attorney: Insurance Defense and Subrogation for American National Property and Casualty***
Funderburk & Andrews, APLC
329 Saint Ferdinand St.
Baton Rouge, LA 70802

## EDUCATION

*Southern University Law Center, Baton Rouge, LA*
***Juris Doctor, May 2004***

*Louisiana State University, Baton Rouge, LA*
***Bachelor of Science, Business Management, May 2001***

## SPECIAL SKILLS

Conversational Spanish

**PROFESSIONAL ORGANIZATIONS**

Colorado Criminal Defense Bar (2022-present)
- Board Member (2022-Present)

National Association of Criminal Defense Lawyers
- Life Member (Board Member from 2012-2018)
- Public Defense Committee (2011-present)- Past Committee Chair
- Fourth Amendment Committee Member (2012-present)
- Diversity Committee Co-Chair (2018-2020)
- Nominating Committee (2018-2021)

Louisiana Association of Criminal Defense Lawyers
- Life Member (Board Member 2013-2020)
- CLE Committee (2013-2020)
- LACDL President's Award - 2011
- Publications Committee - 2020

Baton Rouge Bar of Criminal Justice (President 2010-2020)

National Criminal Defense College (June 2008)

DUI Defense Lawyers Association (Founding Member)

Louisiana State Bar Association

Texas State Bar Association

Colorado State Bar Association

CJA Panel Attorney for Middle District Court of Louisiana (2012-2020)

**LICENSES and CERTIFICATIONS**

Louisiana State Bar (10/14/04)

Texas State Bar (3/7/19)

Colorado State Bar (5/7/20)

U.S. District Court, Middle District of Louisiana (10/15/04)

U.S. District Court, Eastern District of Louisiana (11/9/15)

U.S. District Court, Western District of Louisiana (10/21/2015)

U.S. Court of Appeals, 5th Circuit (7/30/2019)

U.S. District Court, Colorado (Pending Application Filed 1/29/22)

N.H.T.S.A. Certification in Standardized Filed Sobriety Testing

**PRESENTATIONS and CLE's**

Chair of LACDL's Law and All that Jazz CLE (2011-2020)

LACDL Nuts and Bolts CLE, *DWI Basics and Some Advanced Strategies, 10/25/19,* Baton Rouge, LA

Past Chair of LACDL's DWI Seminar

National Business Institute Gun Law in Louisiana CLE. *Ethical Consideration When Representing Gun Owners and Dealers, 12/10/2016, Baton Rouge, LA*

Louisiana Public Defender Board/NACDL LA Trial Skills Re-Boot Camp Program Instructor, Baton Rouge (11/3/16)

Panel Member for Records Relief Expungement Seminar, 3/28/14, 19th JDC, Baton Rouge, LA

Program Instructor for Innocence Project Joint Training Program for Public Defenders and Prosecutors, Criminal Practice Ethics Training.

Louisiana Attorney Disciplinary Board Annual Free CLE, Ethics Panel, 5/2/2012, Baton Rouge, LA

Dean Henry George McMahon Inns of Court, *Civility Matters*, 10/27/2011, Baton Rouge, LA

Guest Speaker: Southern University Law Center on Criminal Procedure and 4th Amendment, Baton Rouge, LA

Guest Speaker: LSU Law Center, Public Interest Law Society, *What Happens from Arrest to Trial*, Baton Rouge, LA

Organize Presentations for Baton Rouge Bar of Criminal Justice Happy Hours (not for CLE credit)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Criminal Action No. 19-cr-00243-CMA-GPG

UNITED STATES OF AMERICA,

Plaintiff,

v.

MICHAEL TRACY MCFADDEN

Defendant.

---

**ORDER FOR SERVICE OF SUBPOENAS IN FORMA PAUPERIS**

---

This matter coming to the attention of the court on the motion of the defendant for an order that subpoenas be issued in Forma Pauperis, it is, therefore,

ORDERED that the motion be granted and that the clerk of court issue subpoenas, for the time of trial, November 7, 2022, at 8:30 a.m. for the appearance of the witnesses named as follows:

1. Cindy Lou Ricks, 2704 B ¼ Road, Grand Junction, CO 81503.
2. Thomas Lee Right, 1143 Chipeta Avenue, Grand Junction, CO 81501.
3. Dian Lou Stauter, 833 ½ White Avenue, Grand Junction, CO 81501.

IT IS FURTHER ORDERED that the U.S. Marshal make service of said subpoenas on witnesses without the prepayment of the fees and that the witness fees, mileage and subsistence of said witnesses be paid by the U.S. Marshal and taxed as costs in favor of the United States.

DATED: October 24, 2022

BY THE COURT:

Christine M. Arguello

CHRISTINE M. ARGUELLO
Senior United States District Judge

Case 1:19-cr-00243-CMA-GPG Document 121 Filed 10/25/22 Page 1 of 2

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Criminal Case No. 19-cr-00243-CMA-GPG

UNITED STATES OF AMERICA,

Plaintiff

v.

**MICHAEL TRACY MCFADDEN,**

**Defendant.**

---

**NOTICE OF APPEARANCE OF COUNSEL**

---

Benjamin R. LaBranche hereby enters his appearance as court appointed CJA co-counsel for the defendant, Michael Tracy McFadden, in the above-captioned case.

Dated: October 25, 2022

Respectfully Submitted:

*/s/Benjamin R. LaBranche*
Benjamin R. LaBranche
1544 Race St.
Denver, CO 80206
Phone: 225-927-5495
ben@brllawyer.com

*Attorney for Michael Tracy McFadden.*

**Certificate of Service**

I certify that on October 25, 2022, I electronically filed the foregoing Notice of Appearance of Counsel with the Clerk of Court using the CM/ECF system which will send notification of such filing to all parties of record.

*/s/Benjamin R. LaBranche*
Benjamin R. LaBranche

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 19-cr-00243-CMA-GPG

UNITED STATES OF AMERICA,

Plaintiff,

v.

**MICHAEL TRACY McFADDEN,**

**Defendant.**

---

**MOTION IN SUPPORT OF LEVEL THREE RESTRICTION FOR DOC. NO. 105**

---

Mr. McFadden by and through his attorney Sean M. McDermott, moves this Court for a level three restriction of Doc. No. 105.

1. Doc. No. 105 is an affidavit filed in Support of a Motion to Continue that was filed in Doc. 104.

2. The affidavit contains information that touches on private matter including HIPPA protected or medical information.

3. The Motion discusses the medical condition of someone under the age of 18 years old. The person is identifiable by the reader and should not be identified to other parties or the public.

4. Undersigned Counsel respectfully requests that this document receive a level three restriction, so that it is only viewable by the filing party and the Court.

Wherefore, Mr. McFadden's counsel respectfully requests that Doc. No. 105 receive a level three restriction so that it is only viewable by the filing party and the Court.

Date: October 25, 2022

Respectfully submitted,

s/Sean M. McDermott
Sean M. McDermott
McDermott Stuart & Ward LLP
140 E. 19th Avenue, Suite 300
Denver, CO 80203
(303) 832-8888
(303) 863-8888 (fax)
Email: smcdermott@mswdenver.com

**CERTIFICATE OF SERVICE**

I hereby certify that on this 25th day of October 2022, I filed the foregoing **pleading** with the Clerk of Court using the CM/ECF system which will send notification of such filing to all listed parties.

s/ Sean McDermott
Sean McDermott

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 19-cr-00243-CMA-GPG

UNITED STATES OF AMERICA,

Plaintiff,

**v.**

**MICHAEL TRACY McFADDEN,**

**Defendant.**

---

**UNOPPOSED MOTION FOR A TWO-DAY EXTENSION OF TIME TO SUBMIT EXHIBITS**

---

Mr. McFadden by and through his attorney Sean M. McDermott, moves this Honorable Court for a two-day extension of time to submit his exhibits. As grounds, Mr. McFadden states:

Conferral

1. The parties conferred by email. The United States does not oppose the requested relief.

Reasons for the Requested Relief

2. The paralegal for Mr. McFadden and for his attorney's other cases was ill and unable to perform work the entire week of October 24, 2022.

3. She is the person who has been working the exhibits that the defense will tender.

4. This has impacted the ability for counsel to meet the deadline that the Court set for the submission of exhibits.

5. At the time of the pre-trial conference, counsel did not know that the staff person would

be ill for the entire week of October 24, 2022. Otherwise, he would have asked for more time.

      6.    Good cause exists for this two-day extension of time.

      WHEREFORE, Mr. McFadden respectfully requests that this Court give Mr. McFadden

through November 2, 2022, to tender exhibits in this matter.

      Respectfully submitted,

      s/Sean M. McDermott
        Sean M. McDermott
        McDermott Stuart & Ward LLP
        140 E. 19th Avenue, Suite 300
        Denver, CO 80203
        (303) 832-8888
        (303) 863-8888 (fax)
        Email: smcdermott@mswdenver.com

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this 31st day of October 2022, I filed the foregoing **pleading** with the Clerk of Court using the CM/ECF system which will send notification of such filing to all listed parties.

s/ Sean McDermott
Sean McDermott

AO 89 (Rev 08/09) Subpoena to Testify at a Hearing or Trial in a Criminal Case (Page 2)

Case No. 19-cr-00243-CMA-GPG

**PROOF OF SERVICE**

This subpoena for *(name of individual and title, if any)* Kayo Bassett
was received by me on *(date)* 10/26/22

☐ I served the subpoena by delivering a copy to the named person as follows: ______________________

______________________ on *(date)* ______________ ; or

☑ I returned the subpoena unexecuted because: Bad address. New resident residing at listed address. Current tenant is Eric Houston

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness fees for one day's attendance, and the mileage allowed by law, in the amount of

$ ______________ .

My fees are $ ______________ for travel and $ ______________ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: 10/27/22

[signature]
*Server's signature*

Johnathan Brown DUSM
*Printed name and title*

400 Rood Ave 3rd Floor
Grand Junction, CO 81501
*Server's address*

Additional information regarding attempted service, etc:

AO 89 (Rev 08/09) Subpoena to Testify at a Hearing or Trial in a Criminal Case

# UNITED STATES DISTRICT COURT
for the
District of Colorado

2022 OCT 25 P 5:04

United States of America
v.
Michael Tracy McFadden
*Defendant*

Case No. 19-cr-00243-CMA-GPG

## SUBPOENA TO TESTIFY AT A HEARING OR TRIAL IN A CRIMINAL CASE

To: Kayo Bassett
834 E. Harrison Avenue
Fruita, CO 81521

**YOU ARE COMMANDED** to appear in the United States district court at the time, date, and place shown below to testify in this criminal case. When you arrive, you must remain at the court until the judge or a court officer allows you to leave.

| Place of Appearance: Wayne Aspinall Courthouse 400 Rood Avenue Grand Junction, CO 81501 | Courtroom No.: 323 |
|---|---|
| | Date and Time: 11/07/2022 8:30 am |

You must also bring with you the following documents, electronically stored information, or objects *(blank if not applicable)*:

*(SEAL)*

Date: 10/25/2022

*CLERK OF COURT*

*Signature of Clerk or Deputy Clerk*

The name, address, e-mail, and telephone number of the attorney representing *(name of party)* ____________________ , who requests this subpoena, are:

FILED
U.S. DISTRICT COURT
DISTRICT OF COLORADO
2022 OCT 31 AM 11:12
JEFFREY P. COLWELL
CLERK

AO 89 (Rev. 08/09) Subpoena to Testify at a Hearing or Trial in a Criminal Case (Page 2)

Case No. 19-cr-00243-CMA-GPG

## PROOF OF SERVICE

This subpoena for *(name of individual and title, if any)* Kaitlyn Wright

was received by me on *(date)* 26 OCT 22.

☐ I served the subpoena by delivering a copy to the named person as follows:

on *(date)* ; or

☒ I returned the subpoena unexecuted because: subject does not live at 3211 ½ Bunting Avenue, Clifton CO 81520.

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness fees for one day's attendance, and the mileage allowed by law, in the amount of

$ 0.

My fees are $ 0 for travel and $ 0 for services, for a total of $ 0.00.

I declare under penalty of perjury that this information is true.

Date: 26OCT22

*Server's signature*

Judson Eastes DUSM

*Printed name and title*

400 Rood Ave Grand Junction CO 81501

*Server's address*

Additional information regarding attempted service, etc:

FILED
U.S. DISTRICT COURT
DISTRICT OF COLORADO

AO 89 (Rev 08/09) Subpoena to Testify at a Hearing or Trial in a Criminal Case

2022 OCT 31 AM 11:13

# UNITED STATES DISTRICT COURT

for the

District of Colorado

CLERK

DEP. CLK

2022 OCT 25 P 5:03

United States of America
v.
Michael Tracy McFadden
*Defendant*

Case No. 19-cr-00243-CMA-GPG

**SUBPOENA TO TESTIFY AT A HEARING OR TRIAL IN A CRIMINAL CASE**

To: Kaitlyn Wright
3211 1/2 Bunting Avenue
Clifton, CO 81520

- doesn't live here

**YOU ARE COMMANDED** to appear in the United States district court at the time, date, and place shown below to testify in this criminal case. When you arrive, you must remain at the court until the judge or a court officer allows you to leave.

| Place of Appearance: | Wayne Aspinall Courthouse 400 Rood Avenue Grand Junction, CO 81501 | Courtroom No.: | 323 |
|---|---|---|---|
| | | Date and Time: | 11/07/2022 8:30 am |

You must also bring with you the following documents, electronically stored information, or objects *(blank if not applicable)*:

*(SEAL)*

Date: 10/25/2022

*CLERK OF COURT*

*Signature of Clerk or Deputy Clerk*

The name, address, e-mail, and telephone number of the attorney representing *(name of party)* ________________ , who requests this subpoena, are:

AO 89 (Rev. 08/09) Subpoena to Testify at a Hearing or Trial in a Criminal Case (Page 2)

Case No. 19-cr-00243-CMA-GPG

**PROOF OF SERVICE**

This subpoena for *(name of individual and title, if any)* Scott Wesolowski
was received by me on *(date)* 26OCT22 .

☐ I served the subpoena by delivering a copy to the named person as follows: ____________________
____________________ on *(date)* ____________ ; or

☒ I returned the subpoena unexecuted because: Subject doesnot live at 570½ 32½ Rd Clifton CO.

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness fees for one day's attendance, and the mileage allowed by law, in the amount of

$ 0 .

My fees are $ 0 for travel and $ 0 for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: 26OCT22

[signature]
*Server's signature*

Judson Eakes DUSM
*Printed name and title*

400 Rood Ave Grand Junction CO 81501
*Server's address*

Additional information regarding attempted service, etc:

possible cell phone 435-238-3787

FILED
U.S. DISTRICT COURT
DISTRICT OF COLORADO
2022 OCT 31 AM 11: 13
JEFFREY P. COLWELL
CLERK
BY______DEP. CLK

AO 89 (Rev 08/09) Subpoena to Testify at a Hearing or Trial in a Criminal Case

# UNITED STATES DISTRICT COURT

for the

District of Colorado

2022 OCT 25 P 5: 04

United States of America
v.
Michael Tracy McFadden
*Defendant*

Case No. 19-cr-00243-CMA-GPG

## SUBPOENA TO TESTIFY AT A HEARING OR TRIAL IN A CRIMINAL CASE

To: Scott Wesolowski
530 1/2 32 1/2 Road
Clifton, CO 81520

**YOU ARE COMMANDED** to appear in the United States district court at the time, date, and place shown below to testify in this criminal case. When you arrive, you must remain at the court until the judge or a court officer allows you to leave.

| Place of Appearance: | Wayne Aspinall Courthouse 400 Rood Avenue Grand Junction, CO 81501 | Courtroom No.: | 323 |
|---|---|---|---|
| | | Date and Time: | 11/07/2022 8:30 am |

You must also bring with you the following documents, electronically stored information, or objects *(blank if not applicable)*:

*(SEAL)*

Date: 10/25/2022

*CLERK OF COURT*

*Signature of Clerk or Deputy Clerk*

The name, address, e-mail, and telephone number of the attorney representing *(name of party)* ______, who requests this subpoena, are:

AO 89 (Rev. 08/09) Subpoena to Testify at a Hearing or Trial in a Criminal Case (Page 2)

Case No. 19-cr-00243-CMA-GPG

## PROOF OF SERVICE

This subpoena for *(name of individual and title, if any)* Stacy Wesobwski was received by me on *(date)* 26 OCT 22.

☐ I served the subpoena by delivering a copy to the named person as follows: ______ on *(date)* ______ ; or

☒ I returned the subpoena unexecuted because: Address 2713 Onehalf Road, Apt 20 Grand Junction CO 81503 does not exist.

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness fees for one day's attendance, and the mileage allowed by law, in the amount of

$ 0 .

My fees are $ 0 for travel and $ 0 for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: 26 OCT 22

[signature]
*Server's signature*

Judson Easter, DUSM
*Printed name and title*

400 Rood Ave Grand Junction CO 81501
*Server's address*

Additional information regarding attempted service, etc:

FILED
U.S. DISTRICT COURT
DISTRICT OF COLORADO
2022 OCT 31 AM 11:13
JEFFREY P. COLWELL
CLERK

AO 89 (Rev. 08/09) Subpoena to Testify at a Hearing or Trial in a Criminal Case

# UNITED STATES DISTRICT COURT

for the

District of Colorado

2022 OCT 25 PM 5:03

United States of America
v.
Michael Tracy McFadden
*Defendant*

Case No. 19-cr-00243-CMA-GPG

## SUBPOENA TO TESTIFY AT A HEARING OR TRIAL IN A CRIMINAL CASE

To: Stacy Wesolowski
2713 Onehalf Road, Apt. 20
Grand Junction CO 81503 } - no address / bad address

**YOU ARE COMMANDED** to appear in the United States district court at the time, date, and place shown below to testify in this criminal case. When you arrive, you must remain at the court until the judge or a court officer allows you to leave.

| Place of Appearance: Wayne Aspinall Courthouse 400 Rood Avenue Grand Junction, CO 81501 | Courtroom No.: 323 |
|---|---|
| | Date and Time: 11/07/2022 8:30 am |

You must also bring with you the following documents, electronically stored information, or objects *(blank if not applicable)*:

*(SEAL)*

Date: 10/25/2022

CLERK OF COURT

[signature]
*Signature of Clerk or Deputy Clerk*

The name, address, e-mail, and telephone number of the attorney representing *(name of party)* ________________ , who requests this subpoena, are:

AO 89 (Rev 08/09) Subpoena to Testify at a Hearing or Trial in a Criminal Case (Page 2)

Case No. 19-cr-00243-CMA-GPG

## PROOF OF SERVICE

This subpoena for *(name of individual and title, if any)* Eric Wood was received by me on *(date)* 26OCT22.

☐ I served the subpoena by delivering a copy to the named person as follows: ______ on *(date)* ______ ; or

☒ I returned the subpoena unexecuted because: Eric Wood no longer works at address indicated on subpoena or for GJPD.

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents. I have also tendered to the witness fees for one day's attendance, and the mileage allowed by law, in the amount of $ 0.

My fees are $ 0 for travel and $ 0 for services, for a total of $ 0.00.

I declare under penalty of perjury that this information is true.

Date: 26OCT22

[signature]
*Server's signature*

Judson Eastes DUSM
*Printed name and title*

400 Rood Ave Grand Junction Co 81501
*Server's address*

Additional information regarding attempted service, etc:

FILED
U.S. DISTRICT COURT
DISTRICT OF COLORADO
2022 OCT 31 AM 11:13
JEFFREY P. COLWELL
CLERK
BY

AO 89 (Rev. 08/09) Subpoena to Testify at a Hearing or Trial in a Criminal Case

# UNITED STATES DISTRICT COURT

for the

District of Colorado

2022 OCT 25 P 5:03

United States of America
v.
Michael Tracy McFadden
*Defendant*

Case No. 19-cr-00243-CMA-GPG

## SUBPOENA TO TESTIFY AT A HEARING OR TRIAL IN A CRIMINAL CASE

To: Officer Eric Wood
Grand Junction Police Dept.
555 Ute Avenue
Grand Junction CO 81501

**YOU ARE COMMANDED** to appear in the United States district court at the time, date, and place shown below to testify in this criminal case. When you arrive, you must remain at the court until the judge or a court officer allows you to leave.

| Place of Appearance: | Wayne Aspinall Courthouse 400 Rood Avenue Grand Junction, CO 81501 | Courtroom No.: | 323 |
|---|---|---|---|
| | | Date and Time: | 11/07/2022 8:30 am |

You must also bring with you the following documents, electronically stored information, or objects *(blank if not applicable)*:

*(SEAL)*

Date: 10/25/2022

*CLERK OF COURT*

*Signature of Clerk or Deputy Clerk*

The name, address, e-mail, and telephone number of the attorney representing *(name of party)* ________________ , who requests this subpoena, are:

AO 89 (Rev 08/09) Subpoena to Testify at a Hearing or Trial in a Criminal Case (Page 2)

Case No. 19-cr-00243-CMA-GPG

## PROOF OF SERVICE

This subpoena for *(name of individual and title, if any)* Lesleigh Rader

was received by me on *(date)* 26OCT22 .

☐ I served the subpoena by delivering a copy to the named person as follows:

on *(date)* ; or

☒ I returned the subpoena unexecuted because: Subject does not live at 3211 ½ Bunting Ave, Clifton CO 81520 .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness fees for one day's attendance, and the mileage allowed by law, in the amount of

$ 0 .

My fees are $ 0 for travel and $ 0 for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: 26OCT22

[signature]
*Server's signature*

Judson Easter DUSM
*Printed name and title*

400 Rood Ave Grand Junction CO 81501
*Server's address*

Additional information regarding attempted service, etc:

FILED
U.S. DISTRICT COURT
DISTRICT OF COLORADO
2022 OCT 31 AM 11:13
JEFFREY P. COLWELL
CLERK
BY
2022 OCT 25 P 5:03

AO 89 (Rev 08/09) Subpoena to Testify at a Hearing or Trial in a Criminal Case

# UNITED STATES DISTRICT COURT

for the

District of Colorado

United States of America
v.
Michael Tracy McFadden
*Defendant*

Case No. 19-cr-00243-CMA-GPG

## SUBPOENA TO TESTIFY AT A HEARING OR TRIAL IN A CRIMINAL CASE

To: Lesleigh Rader
3211 1/2 Bunting Avenue
Clifton, CO 81520

do not try her

**YOU ARE COMMANDED** to appear in the United States district court at the time, date, and place shown below to testify in this criminal case. When you arrive, you must remain at the court until the judge or a court officer allows you to leave.

| Place of Appearance: | Wayne Aspinall Courthouse 400 Rood Avenue Grand Junction, CO 81501 | Courtroom No.: | 323 |
|---|---|---|---|
| | | Date and Time: | 11/07/2022 8:30 am |

You must also bring with you the following documents, electronically stored information, or objects *(blank if not applicable)*:

*(SEAL)*

Date: 10/25/2022

CLERK OF COURT

*Signature of Clerk or Deputy Clerk*

The name, address, e-mail, and telephone number of the attorney representing *(name of party)* ________, who requests this subpoena, are:

AO 89 (Rev. 08/09) Subpoena to Testify at a Hearing or Trial in a Criminal Case (Page 2)

Case No. 19-cr-00243-CMA-GPG

## PROOF OF SERVICE

This subpoena for *(name of individual and title, if any)* JOHN HOCHENBERRY was received by me on *(date)* 10/26/2022.

☑ I served the subpoena by delivering a copy to the named person as follows: JOHN HOCHENBERRY on *(date)* 10/26/2022 ; or

☐ I returned the subpoena unexecuted because:

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness fees for one day's attendance, and the mileage allowed by law, in the amount of $ ______.

My fees are $ ______ for travel and $ ______ for services, for a total of $ 0.00.

I declare under penalty of perjury that this information is true.

Date: 10/26/2022

[signature]
*Server's signature*

KEVIN BONILLA USMS-TFO
*Printed name and title*

805 S. TEDDY ROOSEVELT RD, GOLDEN VALLEY, AZ 86413
*Server's address*

Additional information regarding attempted service, etc:

Case No. 1:19-cr-00243-CMA-GPG Document 128 (Ex parte) filed 10/31/22 USDC Colorado pg 2 of 2

AO 89 (Rev. 08/09) Subpoena to Testify at a Hearing or Trial in a Criminal Case

# UNITED STATES DISTRICT COURT

for the

District of Colorado

2022 OCT 25 P 5:03

| | | |
|---|---|---|
| United States of America<br>v.<br>Michael Tracy McFadden<br>*Defendant* | ) ) ) ) ) | Case No. 19-cr-00243-CMA-GPG |

FILED
U.S. DISTRICT COURT
DISTRICT OF COLORADO
2022 OCT 31 AM 11:12
JEFFREY P. COLWELL
CLERK
BY ______ DEP. CLK

## SUBPOENA TO TESTIFY AT A HEARING OR TRIAL IN A CRIMINAL CASE

To: John Hochenberry
805 South Teddy Roosevelt Road
Golden Valley, AZ 86413

**YOU ARE COMMANDED** to appear in the United States district court at the time, date, and place shown below to testify in this criminal case. When you arrive, you must remain at the court until the judge or a court officer allows you to leave.

| Place of Appearance: | | |
|---|---|---|
| Wayne Aspinall Courthouse<br>400 Rood Avenue Grand Junction, CO 81501 | Courtroom No.: | 323 |
| | Date and Time: | 11/07/2022 8:30 am |

You must also bring with you the following documents, electronically stored information, or objects *(blank if not applicable)*:

*(SEAL)*

Date: 10/25/2022

*CLERK OF COURT*

*Signature of Clerk or Deputy Clerk*

The name, address, e-mail, and telephone number of the attorney representing *(name of party)* ______, who requests this subpoena, are:

AO 89 (Rev 08/09) Subpoena to Testify at a Hearing or Trial in a Criminal Case (Page 2)

Case No. 19-cr-00243-CMA-GPG

## PROOF OF SERVICE

This subpoena for *(name of individual and title, if any)* Sean Crocker
was received by me on *(date)* 26 OCT 22.

☒ I served the subpoena by delivering a copy to the named person as follows: Lorie Sanchez PST @ GJPD
on *(date)* 26 OCT 22 ; or

☐ I returned the subpoena unexecuted because:

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness fees for one day's attendance, and the mileage allowed by law, in the amount of
$ 0 .

My fees are $ 0 for travel and $ 0 for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: 26 OCT 22

[signature]
*Server's signature*

Judson Eastes DUSM
*Printed name and title*

400 Rood Ave Grand Junction CO 81501
*Server's address*

Additional information regarding attempted service, etc:

FILED
U.S. DISTRICT COURT
DISTRICT OF COLORADO
2022 OCT 31 AM 11: 13
JEFFREY P. COLWELL
CLERK
BY ___ 2022 OCT 25 P 5: 03

AO 89 (Rev 08/09) Subpoena to Testify at a Hearing or Trial in a Criminal Case

# UNITED STATES DISTRICT COURT
for the
District of Colorado

United States of America
v.
Michael Tracy McFadden
*Defendant*

Case No. 19-cr-00243-CMA-GPG

## SUBPOENA TO TESTIFY AT A HEARING OR TRIAL IN A CRIMINAL CASE

To: Officer Sean Crocker
Grand Junction Police Department
555 Ute Avenue
Grand Junction, CO 81501

**YOU ARE COMMANDED** to appear in the United States district court at the time, date, and place shown below to testify in this criminal case. When you arrive, you must remain at the court until the judge or a court officer allows you to leave.

| Place of Appearance: | Wayne Aspinall Courthouse 400 Rood Avenue Grand Junction, CO 81501 | Courtroom No.: 323 |
|---|---|---|
| | | Date and Time: 11/07/2022 8:30 am |

You must also bring with you the following documents, electronically stored information, or objects *(blank if not applicable)*:

*(SEAL)*

Date: 10/25/2022

CLERK OF COURT

*Signature of Clerk or Deputy Clerk*

The name, address, e-mail, and telephone number of the attorney representing *(name of party)* ________________, who requests this subpoena, are:

AO 89 (Rev. 08/09) Subpoena to Testify at a Hearing or Trial in a Criminal Case (Page 2)

Case No. 19-cr-00243-CMA-GPG

## PROOF OF SERVICE

This subpoena for *(name of individual and title, if any)* Debra Bailey was received by me on *(date)* 10/26/22.

☑ I served the subpoena by delivering a copy to the named person as follows: served at the listed residence. on *(date)* ______ ; or

☐ I returned the subpoena unexecuted because: ______

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness fees for one day's attendance, and the mileage allowed by law, in the amount of

$ ______ .

My fees are $ ______ for travel and $ ______ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: 10/26/22

[signature]
*Server's signature*

Johnathan Brown DUSM
*Printed name and title*

400 Rood Ave 3rd
Grand Junction, CO 81501
*Server's address*

Additional information regarding attempted service, etc:

FILED
U.S. DISTRICT COURT
DISTRICT OF COLORADO
2022 OCT 31 AM 11: 14
JEFFREY P. COLWELL
CLERK
2022 OCT 25 P 5: 04
BY_______ DEP. CLK

AO 89 (Rev. 08/09) Subpoena to Testify at a Hearing or Trial in a Criminal Case

# UNITED STATES DISTRICT COURT

for the

District of Colorado

United States of America
v.
Michael Tracy McFadden
*Defendant*

Case No. 19-cr-00243-CMA-GPG

## SUBPOENA TO TESTIFY AT A HEARING OR TRIAL IN A CRIMINAL CASE

To: Debra Bailey
2241 Cortina Court
Grand Junction, CO 81506

**YOU ARE COMMANDED** to appear in the United States district court at the time, date, and place shown below to testify in this criminal case. When you arrive, you must remain at the court until the judge or a court officer allows you to leave.

| Place of Appearance: | Wayne Aspinall Courthouse 400 Rood Avenue Grand Junction, CO 81501 | Courtroom No.: | 323 |
|---|---|---|---|
| | | Date and Time: | 11/07/2022 8:30 am |

You must also bring with you the following documents, electronically stored information, or objects *(blank if not applicable)*:

*(SEAL)*

Date: 10/25/2022

*CLERK OF COURT*

*Signature of Clerk or Deputy Clerk*

The name, address, e-mail, and telephone number of the attorney representing *(name of party)* ______________________ , who requests this subpoena, are:

AO 89 (Rev. 08/09) Subpoena to Testify at a Hearing or Trial in a Criminal Case (Page 2)

Case No. 19-cr-00243-CMA-GPG

**PROOF OF SERVICE**

This subpoena for *(name of individual and title, if any)* Nicole Surad

was received by me on *(date)* 10/24/22 .

☑ I served the subpoena by delivering a copy to the named person as follows: Served at the listed residence.

on *(date)* ; or

☐ I returned the subpoena unexecuted because:

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness fees for one day's attendance, and the mileage allowed by law, in the amount of

$ .

My fees are $ for travel and $ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: 10/24/22

*Server's signature*

Johnathan Brown DUSM

*Printed name and title*

400 Rood Ave 3rd

Grand Junction, CO 81501

*Server's address*

Additional information regarding attempted service, etc:

FILED
U.S. DISTRICT COURT
DISTRICT OF COLORADO

2022 OCT 31 AM 11:14

AO 89 (Rev. 08/09) Subpoena to Testify at a Hearing or Trial in a Criminal Case

# UNITED STATES DISTRICT COURT

for the

District of Colorado

JEFFREY P. COLWELL
CLERK

BY__________DEP. CLK

2022 OCT 25 P 5:04

United States of America
v.
Michael Tracy McFadden
*Defendant*

Case No. 19-cr-00243-CMA-GPG

## SUBPOENA TO TESTIFY AT A HEARING OR TRIAL IN A CRIMINAL CASE

To: Nicole Surad
626 Glacier Drive
Grand Junction, CO 81507

**YOU ARE COMMANDED** to appear in the United States district court at the time, date, and place shown below to testify in this criminal case. When you arrive, you must remain at the court until the judge or a court officer allows you to leave.

| Place of Appearance: | Wayne Aspinall Courthouse 400 Rood Avenue Grand Junction, CO 81501 | Courtroom No.: | 323 |
|---|---|---|---|
| | | Date and Time: | 11/07/2022 8:30 am |

You must also bring with you the following documents, electronically stored information, or objects *(blank if not applicable)*:

*(SEAL)*

Date: 10/25/2022

*CLERK OF COURT*

*Signature of Clerk or Deputy Clerk*

The name, address, e-mail, and telephone number of the attorney representing *(name of party)* __________ __________, who requests this subpoena, are:

MIME−Version:1.0
From:COD_ENotice@cod.uscourts.gov
To:COD_ENotice@cod.uscourts.gov
Bcc:
−−Case Participants: Sean Michael McDermott (krodriguez@mswdenver.com, smcdermott@mswdenver.com, xgarzon@mswdenver.com), Ben LaBranche (ben@brllawyer.com), Jeremy Lee Chaffin (caseview.ecf@usdoj.gov, cosandra.foster@usdoj.gov, jeremy.chaffin@usdoj.gov, usaco.ecfcriminal@usdoj.gov), Andrea Lee Surratt (andrea.surratt@usdoj.gov, caseview.ecf@usdoj.gov, danielle.storinsky@usdoj.gov, portia.peter@usdoj.gov, usaco.ecfcriminal@usdoj.gov), Magistrate Judge Gordon P. Gallagher (gallagher_chambers@cod.uscourts.gov, gordon_p_gallagher@cod.uscourts.gov), Senior Judge Christine M. Arguello (arguello_chambers@cod.uscourts.gov)
−−Non Case Participants: Probation−General (cod_efiling@cod.uscourts.gov)
−−No Notice Sent:

Message−Id:8873472@cod.uscourts.gov
Subject:Activity in Case 1:19−cr−00243−CMA−GPG USA v. McFadden Order on Motion for Extension of Time to File
Content−Type: text/html

**U.S. District Court − District of Colorado**

**District of Colorado**

## Notice of Electronic Filing

The following transaction was entered on 11/1/2022 at 1:35 PM MDT and filed on 11/1/2022

| | |
|---|---|
| **Case Name:** | USA v. McFadden |
| **Case Number:** | 1:19−cr−00243−CMA−GPG |
| **Filer:** | |
| **Document Number:** | 130(No document attached) |

**Docket Text:**
**ORDER granting [126] Motion for Extension of Time to File as to Michael Tracy McFadden (1) by Senior Judge Christine M. Arguello on 11/1/2022. Text Only Entry (cma)**

**1:19−cr−00243−CMA−GPG−1 Notice has been electronically mailed to:**

Sean Michael McDermott smcdermott@mswdenver.com, krodriguez@mswdenver.com, xgarzon@mswdenver.com

Jeremy Lee Chaffin jeremy.chaffin@usdoj.gov, CaseView.ECF@usdoj.gov, Cosandra.Foster@usdoj.gov, usaco.ecfcriminal@usdoj.gov

Andrea Lee Surratt andrea.surratt@usdoj.gov, CaseView.ECF@usdoj.gov, USACO.ECFCriminal@usdoj.gov, danielle.storinsky@usdoj.gov, portia.peter@usdoj.gov

Ben LaBranche ben@brllawyer.com

**1:19−cr−00243−CMA−GPG−1 Notice has been mailed by the filer to:**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 19-cr-00243-CMA-GPG

UNITED STATES OF AMERICA,

Plaintiff,

v.

**MICHAEL TRACY McFADDEN,**

**Defendant.**

---

**MOTION IN SUPPORT OF LEVEL THREE RESTRICTION FOR DOC. NO. 132**

---

Mr. McFadden by and through his attorney Sean M. McDermott, moves this Court for a level three restriction of Doc. No. 132.

1. Doc. No. 132 is an ex parte witness list.

2. At the trial preparation conference on October 25, 2022, the Court gave the Defendant through November 2, 2022, to file an ex parte witness list.

3. Doc. 132 is the ex parte witness list.

4. In addition to the ex parte nature of the pleading, the pleading contains identifying information that is subject to the Protective order in this case found at Docket Number 22.

5. Undersigned Counsel respectfully requests that this document receive a level three restriction, so that it is only viewable by the filing party and the Court.

Wherefore, Mr. McFadden's counsel respectfully requests that Doc. No. 132 receive a level three restriction so that it is only viewable by the filing party and the Court.

Date: November 2, 2022

Respectfully submitted,

s/Sean M. McDermott
   Sean M. McDermott
   McDermott Stuart & Ward LLP
   140 E. 19th Avenue, Suite 300
   Denver, CO 80203
   (303) 832-8888
   (303) 863-8888 (fax)
    Email: smcdermott@mswdenver.com

**CERTIFICATE OF SERVICE**

I hereby certify that on this 2nd day of November 2022, I filed the foregoing **pleading** with the Clerk of Court using the CM/ECF system which will send notification of such filing to all listed parties.

s/ Sean McDermott
Sean McDermott

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 19-cr-00243-CMA-GPG

UNITED STATES OF AMERICA,

Plaintiff,

v.

MICHAEL TRACY McFADDEN,

Defendant.

---

**ORDER TO RESTRICT DOCUMENT NO. 132**

---

This matter is before the Court on the Defendant's Motion to Restrict Document. Upon consideration and for good cause shown,

IT IS ORDERED that said Document, as well as any order revealing the contents of that document, are hereby restricted until further order by the Court.

IT IS ORDERED that said Document, as well as any order revealing the contents of that document, are hereby at a "Level 3 Restriction" and will be "Viewable by the filing Party & Court" only.

IT IS SO ORDERED on this _______ day of October 2022.

BY THE COURT:

______________________________
THE HON. CHRISTINE M. ARGUELLO
UNITED STATES DISTRICT COURT JUDGE
DISTRICT OF COLORADO

AO 89 (Rev. 08/09) Subpoena to Testify at a Hearing or Trial in a Criminal Case (Page 2)

Case No. 19-cr-00243-CMA-GPG

FILED
U.S. DISTRICT COURT
DISTRICT OF COLORADO
2022 NOV -2 AM 10:07
JEFFREY P. COLWELL
CLERK
BY________ DEP. CLK

**PROOF OF SERVICE**

This subpoena for *(name of individual and title, if any)* Crystal McFadden was received by me on *(date)* 10/26/2022.

☒ I served the subpoena by delivering a copy to the named person as follows: Crystal McFadden at 1406 Troy Ave, Pueblo, CO 81001 on *(date)* 10/27/2022 ; or

☐ I returned the subpoena unexecuted because:

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness fees for one day's attendance, and the mileage allowed by law, in the amount of

$ ________ .

My fees are $ 129.95 for travel and $ 65.00 for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: 10/27/22

[signature] DUSM
*Server's signature*

A. Gallagher; Deputy U.S. Marshal
*Printed name and title*

901 19th Street-Ste 300, Denver, CO 80294
*Server's address*

Additional information regarding attempted service, etc:

AO 89 (Rev. 08/09) Subpoena to Testify at a Hearing or Trial in a Criminal Case (Page 2)

Case No. 19-cr-00243-CMA-GPG

FILED
U.S. DISTRICT COURT
DISTRICT OF COLORADO
2022 NOV -2 AM 10: 07
JEFFREY P. COLWELL
CLERK
BY_________DEP. CLK

**PROOF OF SERVICE**

This subpoena for *(name of individual and title, if any)* Logan Wright was received by me on *(date)* 10/26/2022.

☒ I served the subpoena by delivering a copy to the named person as follows: Logan Wright on *(date)* 10/30/2022 ; or

☐ I returned the subpoena unexecuted because:

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness fees for one day's attendance, and the mileage allowed by law, in the amount of

$ __________ .

My fees are $ 7.13 for travel and $ 65.00 for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: 10/30/2022

*Server's signature*

A. Gallagher, Deputy U.S. Marshal
*Printed name and title*

901 19th Street - Ste 300, Denver, CO 80294
*Server's address*

Additional information regarding attempted service, etc:

Ed Wright 719-675-0174

AO 89 (Rev. 08/09) Subpoena to Testify at a Hearing or Trial in a Criminal Case (Page 2)

FILED
U.S. DISTRICT COURT
DISTRICT OF COLORADO
2022 NOV -2 AM 10:07
JEFFREY P. COLWELL
CLERK
BY________DEP. CLK

Case No. 19-cr-00243-CMA-GPG

**PROOF OF SERVICE**

This subpoena for *(name of individual and title, if any)* Mathew Stauter

was received by me on *(date)* 10-26-22.

☒ I served the subpoena by delivering a copy to the named person as follows: hand delivered Mr Stauter's subpoena to him at Sterling Correctional Facility on *(date)* 10-27-22 ; or

☐ I returned the subpoena unexecuted because: ________

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness fees for one day's attendance, and the mileage allowed by law, in the amount of

$ N/A .

My fees are $ 156.24 for travel and $ 195.00 for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: 10-27-22

[signature]
*Server's signature*

Paul Otto DUSM
*Printed name and title*

901 19th St, Denver Co 80294
*Server's address*

Additional information regarding attempted service, etc:

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 19-cr-00243-CMA-GPG

UNITED STATES OF AMERICA,

Plaintiff,

**v.**

**MICHAEL TRACY McFADDEN,**

**Defendant.**

---

**DEFENDANT MICHAEL TRACY MCFADDEN'S MOTION TO RESET TRIAL DATE WITHIN SPEEDY TRIAL TO SECURE WITNESSES**

---

COMES NOW, Mr. McFadden by and through his attorney Sean M. McDermott, and moves this Honorable Court to reschedule the trial date currently set for, November 7, 2022. As grounds, Mr. McFadden states the following:

1. At the October 17, 2022. Motions Hearing the Court affirmed that the trial in this matter will be held in Grand Junction. (Docket No. 102).

2. This affirmation came after counsel filed a Motion to Continue, Docket Number 94 in which the location of the trial was questioned. This Honorable Court denied that Motion to Continue (Docket No. 99). Following a discussion at the October 17, 2022, hearing Mr. McFadden's counsel filed another Motion to Continue, Docket Number 104, which was also denied on October 19, 2022 (Docket No. 108).

3. Mr. McFadden has attempted to secure witnesses for this matter. He has secured some witnesses, but some have not yet been secured. Currently, Mr. McFadden is attempting to subpoena witnesses for the second week of trial.

4.      Returns of service for executed and unexecuted subpoenas were received on October 31, 2022. (Doc. Nos. 128 and 129).

5.      There are a lot of impeachment witnesses and eye and ear witnesses that have not yet been secured for trial. Many of these witnesses will be necessary to rebut any Federal Rule of Evidence 414 evidence that may be admitted.

6.      Mr. McFadden is not asking for an ends of justice continuance. He is asking that he be given more time so that he can secure the witnesses necessary for his defense.

7.      Related to this, accommodations for witnesses are limited since downtown hotels are sold out because of the Colorado Government Finance Officers Association convention, which begins November 15, 2022 and runs through November 18, 2022.

8.       The United States has currently calculated the Speedy Trial Deadline as December 10, 2022, and the defense has stated that it is December 11, 2022.

9.      Good cause exists for a short continuance within speedy trial.

10.     Mr. McFadden submits this, so that his counsel may apprise the court of his trial status before or contemporaneous to the scheduled November 3, 2022, hearing scheduled for 10:00 a.m.

WHEREFORE, Mr. McFadden respectfully requests that this Court issue an Order to re-set the trial, so that he can get the witnesses that he need to court.

Respectfully submitted,

s/Sean M. McDermott
Sean M. McDermott
McDermott Stuart & Ward LLP
140 E. 19th Avenue, Suite 300
Denver, CO 80203
(303) 832-8888
(303) 863-8888 (fax)
Email: smcdermott@mswdenver.com

Benjamin R. LaBranche
1544 Race St.
Denver, CO 80206
Phone: 225-927-5495
ben@brllawyer.com

*Attorneys for Michael Tracy McFadden*

Case 1:19-cr-00243-CMA-GPG Document 135 Filed 06/27/23 Page 4 of 4

**CERTIFICATE OF SERVICE**

I hereby certify that on this 3rd day of November 2022, I filed the foregoing **pleading** with the Clerk of Court using the CM/ECF system which will send notification of such filing to all listed parties.

s/ Sean McDermott
Sean McDermott

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Action No. 19-cr-00243-CMA-GPG

UNITED STATES OF AMERICA,

Plaintiff,

v.

MICHAEL TRACY McFADDEN,

Defendant.

---

**WRIT OF HABEAS CORPUS AD TESTIFICANDUM**

---

**TO THE UNITED STATES MARSHAL FOR THE DISTRICT OF COLORADO, OR TO ANY OTHER UNITED STATES MARSHAL, OR TO ANY OTHER FEDERAL LAW ENFORCEMENT OFFICER** AND TO ANY AUTHORIZED OFFICER IN WHOSE CUSTODY THE DEFENDANT MAY BE HELD:

This Writ is issued upon Order of the United States District Court for the District of Colorado. I hereby command that you bring the material witness, Mathew R. Stauter who is 37 years old, and has Colorado Department of Corrections Number or DOC Number 136023, now confined in the Colorado Department of Corrections at the facility located at the Sterling Correctional Facility whose address is 12101 CO 61, Sterling, CO. on November 14, 2022, and from day to day thereafter, to testify to the truth, according to his knowledge, in a cause to be heard before a United States District Judge, to appear therein as a material witness, and immediately after return the witness to the institution where he was confined, under safe and secure conduct.

You are further commanded to serve a certified copy of the writ on said Warden, Superintendent, or Custodian of Limon Correction Facility, in the Colorado Department of Corrections, located at 12101 CO 61, Sterling, CO or the Warden, Superintendent, or Custodian of any other institution where Mathew R. STAUTER is confined.

DATED at Denver, Colorado, this 4th day of November 2022.

BY THE COURT:

*s/S. Phillips, Deputy Clerk*

CLERK, UNITED STATES DISTRICT COURT

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge Christine M. Arguello**

Criminal Action No. 19-cr-00243-CMA-GPG

ORIGINAL INSTRUCTIONS CMA

UNITED STATES OF AMERICA,

Plaintiff,

v.

MICHAEL TRACY MCFADDEN,

Defendant.

---

## FINAL JURY INSTRUCTIONS

---

**INSTRUCTION NO. 1**
**INTRODUCTION TO FINAL INSTRUCTIONS**

Members of the Jury:

In any jury trial there are, in effect, two judges. I am one of the judges, you are the other. I am the judge of the law. You, as jurors, are the judges of the facts. I presided over the trial and decided what evidence was proper for your consideration. It is also my duty at the end of the trial to explain to you the rules of law that you must follow and apply in arriving at your verdict.

In explaining the rules of law that you must follow, first, I will give you some general instructions that apply in every criminal case – for example, instructions about burden of proof and insights that may help you to judge the believability of witnesses. Then I will give you some specific rules of law that apply to this particular case and, finally, I will explain the procedures you should follow in your deliberations, and the possible verdicts you may return. You will be allowed to take these instructions with you to the jury deliberation room, so you need not take notes as I read them to you.

**INSTRUCTION NO. 2**
**PURPOSE OF JURY AND DUTY TO FOLLOW INSTRUCTIONS**

You are here to decide whether the Government has proved beyond a reasonable doubt that Mr. McFadden is guilty of the crimes charged. Mr. McFadden is not on trial for any act, conduct, or crime not charged in the indictment.

It is not up to you to decide whether anyone who is not on trial in this case should be prosecuted for the crimes charged. The fact that another person also may be guilty is no defense to a criminal charge.

The question of the possible guilt of others should not enter your thinking as you decide whether Mr. McFadden has been proved guilty of the crimes charged.

You, as jurors, are the judges of the facts. But in determining what actually happened – that is, in reaching your decision as to the facts – it is your sworn duty to follow all of the rules of law as I explain them to you.

You have no right to disregard or give special attention to any one instruction, or to question the wisdom or correctness of any rule I may state to you. You must not substitute or follow your own notion or opinion as to what the law is or ought to be. It is your duty to apply the law as I explain it to you, regardless of the consequences. However, you should not read into these instructions, or anything else I may have said or done, any suggestion as to what your verdict should be. That is entirely up to you.

It is also your duty to base your verdict solely upon the evidence, without prejudice or sympathy. That was the promise you made and the oath you took.

**INSTRUCTION NO. 3**
**ALL PERSONS EQUAL BEFORE THE LAW – IMPLICIT BIAS**

You should consider and decide this case as a dispute between persons of equal standing in the community, of equal worth, and holding the same or similar stations in life. Corporations and governmental agencies are entitled to the same fair trial as a private individual. All persons, including corporations, governmental agencies, and other organizations stand equal before the law, and are to be treated as equals. You should not be influenced by who the parties are, or who the witnesses are, i.e., whether they are rich or poor, young or old, well-educated or not.

You also should be aware of the natural human tendency to look at others, and to filter what they have to say, through the lens of our own personal experience and background. Because we all do this, we often see life – and evaluate evidence – in a way that tends to favor people who are like ourselves or who have had life experiences like our own. In deciding this case, I urge you to be aware of this natural human tendency to stereotype other people and to make assumptions about them based on the stereotypes, and I urge you to avoid such stereotyping.

**INSTRUCTION NO. 4**
**PRESUMPTION OF INNOCENCE, BURDEN OF PROOF, AND REASONABLE DOUBT**

The Court instructs you that you must presume Mr. McFadden to be innocent of the crimes charged. Thus, Mr. McFadden, although accused of crimes in the indictment, begins the trial with a “clean slate” – with no evidence against him. The law permits the jury to consider only legal evidence presented in court. The indictment or formal charge against Mr. McFadden is not evidence of guilt. In fact, it is not evidence of any kind.

The Government has the burden of proving Mr. McFadden guilty beyond a reasonable doubt. Unless the Government proves, beyond a reasonable doubt, that Mr. McFadden has committed each and every element of the offenses charged in the indictment, you must find him not guilty of those offenses not proven. This burden never shifts to Mr. McFadden because the law never imposes upon a defendant in a criminal case the burden or duty of calling any witnesses, producing any evidence, or even cross-examining the Government’s witnesses.

Although the Government’s burden of proof is a strict and heavy burden, proof beyond a reasonable doubt does not mean proof beyond all possible doubt. There are very few things in this world that we know with absolute certainty. The test is one of reasonable doubt. A “reasonable doubt” is a doubt based upon reason and common sense after careful and impartial consideration of all the evidence in the case. Reasonable doubt may arise from the evidence, the lack of evidence, or the nature of the evidence. It is the kind of doubt that would make a reasonable person hesitate to act. Proof beyond a reasonable doubt must, therefore, be proof which is so convincing that a reasonable person would not hesitate to rely and act upon it in making the most important decisions in his or her own life.

**INSTRUCTION NO. 5**
**EVIDENCE – DEFINED**

You must make your decision based only on the evidence that you saw and heard here in court. Do not let rumors, suspicions, or anything else that you may have seen or heard outside of court influence your decision in any way.

The evidence in this case includes only what the witnesses said while they were testifying under oath, the exhibits that I allowed into evidence, and the stipulations that the lawyers or parties agreed to.

Nothing else is evidence. The lawyers' statements and arguments are not evidence. Their questions and objections are not evidence. My legal rulings are not evidence. My comments and questions are not evidence.

During the trial, I may have not let you hear the answers to some of the questions that the lawyers asked. I may have also ruled that you could not see some of the exhibits that the lawyers wanted you to see. And, I may have ordered you to disregard things that you saw or heard, or struck things from the record. You must completely ignore all of these things. Do not even think about them. Do not speculate about what a witness might have said or what an exhibit might have shown. These things are not evidence, and you are bound by your oath not to let them influence your decision in any way.

**INSTRUCTION NO. 6**
**EVIDENCE – DIRECT AND CIRCUMSTANTIAL – INFERENCES**

There are, generally speaking, two types of evidence from which a jury may properly determine the facts of a case. One is direct evidence, such as the testimony of an eyewitness. The other is indirect or circumstantial evidence, that is, the proof of a chain of facts which point to the existence or non-existence of certain other facts.

As a general rule, the law makes no distinction between direct and circumstantial evidence. The law simply requires that you find the facts in accord with all the evidence in the case, both direct and circumstantial.

Although you must consider only the evidence in this case, you are permitted to draw reasonable inferences from the testimony and exhibits; inferences you feel are justified in the light of common experience. Inferences are conclusions that reason and common sense lead you to draw from the facts established by the evidence in the case.

## INSTRUCTION NO. 7
## CREDIBILITY OF WITNESSES

I remind you that it is your job to decide whether the Government has proved the guilt of Mr. McFadden beyond a reasonable doubt. In doing so, you must consider all of the evidence. This does not mean, however, that you must accept all of the evidence as true or accurate.

You are the sole judges of the credibility or "believability" of each witness and the weight to be given to the witness's testimony. An important part of your job will be making judgments about the testimony of the witnesses who testified in this case.

You should think about the testimony of each witness you have heard and decide whether you believe all or any part of what each witness had to say, and how important that testimony was. In making that decision, I suggest that you ask yourself a few questions:

Did the witness impress you as honest?
Did the witness have any particular reason not to tell the truth?
Did the witness have a personal interest in the outcome in this case?
Did the witness have any relationship with either the Government or the defense?
Did the witness seem to have a good memory?
Did the witness clearly see or hear the things about which he or she testified?
Did the witness have the opportunity and ability to understand the questions clearly and answer them directly?
Did the witness's testimony differ from the testimony of other witnesses?

When weighing the conflicting testimony, you should consider whether the discrepancy has to do with a material fact or with an unimportant detail. You should keep in mind that innocent misrecollection – like failure of recollection – is not uncommon.

In reaching a conclusion on a particular point, or ultimately in reaching a verdict in this case, do not make any decisions simply because there were more witnesses on one side than on the other.

**INSTRUCTION NO. 8**
**IMPEACHMENT BY PRIOR CONVICTION**

The testimony of a witness may be discredited or impeached by showing that the witness previously has been convicted of a felony, that is, of a crime punishable by imprisonment for a term of years, or of a crime of dishonesty or false statements. A prior conviction does not mean that a witness is not qualified to testify, but is merely one circumstance that you may consider in determining the credibility of the witness. You may decide how much weight to give any prior conviction that was used to impeach a witness.

Case 1:19-cr-00243-CMA-GPG Document 148 Filed 06/17/22 USDC Colorado Page 10 of 32

**INSTRUCTION NO. 9**
**IMPEACHMENT BY PRIOR INCONSISTENCIES**

The testimony of a witness may also be discredited or impeached by showing that, before trial, the witness made a statement that may have been different from his or her testimony here in court.

Unless instructed otherwise, you can only use such earlier statements as one way of evaluating the witness's testimony here in court. You cannot use it as proof of anything else.

**INSTRUCTION NO. 10**
**WITNESS'S USE OF ADDICTIVE DRUGS**

You heard from some witnesses who may be considered to be abusers of drugs. The testimony of a drug abuser must be examined and weighed by the jury with greater caution than the testimony of a witness who does not abuse drugs.

You must determine whether the testimony of those witnesses has been affected by the use of drugs or the need for drugs.

**INSTRUCTION NO. 11**
**EXPERT WITNESS OPINION EVIDENCE**

The rules of evidence ordinarily do not permit witnesses to testify as to their own opinions or their own conclusions about important questions in a trial. An exception to this rule exists as to those persons who are described as "expert witnesses." An "expert witness" is someone who, by education or by experience, may have become knowledgeable in some technical, scientific, or very specialized area. If such knowledge or experience may be of assistance to you in understanding some of the evidence or in determining a fact, an "expert witness" in that area may state an opinion as to a matter in which he or she claims to be an expert.

You should consider each expert opinion received in evidence in this case and give it such weight, if any, as you may think it deserves. You should consider the testimony of expert witnesses just as you consider other evidence in this case. If you should decide that the opinion of an expert witness is not based upon sufficient education or experience, or if you should conclude that the reasons given in support of the opinion are not sound, or if you should conclude that the opinion is outweighed by other evidence, you may disregard the opinion in part or in its entirety.

As I have told you several times, you – the jury – are the sole judges of the facts of this case.

**INSTRUCTION NO. 12**
**SIMILAR CONDUCT**

There has been evidence received during the trial that Mr. McFadden engaged in other conduct which was similar in nature to the acts charged in the indictment. In a criminal case in which a defendant is accused of an offense of sexual assault or child molestation, evidence of the defendant's commission of another offense or offenses of sexual assault or child molestation is admissible and may be considered for its bearing on any matter to which it is relevant. You may use such evidence in your determination of whether Mr. McFadden committed the offenses for which he is charged in the indictment.

However, evidence of another offense on its own is not sufficient to prove Mr. McFadden guilty of the crimes charged in the indictment. As you consider this evidence, bear in mind at all times that the Government has the burden of proving that Mr. McFadden committed each of the elements of the offense in the indictment as I will explain them to you. I remind you that Mr. McFadden is not on trial for any act, conduct, or offense not charged in the indictment. The fact that Mr. McFadden may have committed an act similar to the ones charged in this case does not mean that Mr. McFadden necessarily committed the acts charged in this case.

**INSTRUCTION NO. 13**
**NON-TESTIFYING DEFENDANT**

Mr. McFadden did not testify and I remind you that you cannot consider his decision not to testify as evidence of guilt. You must understand that the Constitution of the United States grants to a defendant the right to remain silent. That means the right not to testify. That is a constitutional right in this country, it is very carefully guarded, and you must not presume or infer guilt from the fact that a defendant does not take the witness stand and testify or call any witnesses.

**INSTRUCTION NO. 14**
**JURY'S RECOLLECTION CONTROLS**

If any reference by the Court or by counsel to matters of testimony or exhibits does not coincide with your own recollection of that evidence, it is your recollection which should control during your deliberations and not the statements of the Court or of counsel.

You are the sole judges of the evidence received in this case.

**INSTRUCTION NO. 15**
**SPECIAL INVESTIGATIVE TECHNIQUES NOT REQUIRED**

During the trial, you may have heard testimony of witnesses and argument by counsel that the Government did not utilize specific investigative techniques. You may consider these facts in deciding whether the Government has met its burden of proof, because as I told you, you should look to all of the evidence or lack of evidence in deciding whether a defendant is guilty. However, you also are instructed that there is no legal requirement that the Government use any specific investigative techniques to prove its case. There is no requirement to conduct interviews using a particular technique, to conduct examinations of victims, or to collect particular evidence. Law enforcement techniques are not your concern.

I am sure that at least one of you has seen the popular TV shows, CSI, or Law & Order. The TV standards, and the capabilities of law enforcement as portrayed on TV and in the movies, do not apply here to this trial. Witness testimony is sufficient to establish the charges in this case. Specific investigative techniques, such as DNA and fingerprints, are not required to be presented in order for you to find Mr. McFadden guilty of the charges in this case. Please dismiss from your deliberations in consideration of the appropriate verdict in this case, any investigative techniques which you may have seen on TV or in the movies, as well as anything else about which there was no evidence.

Your concern, as I have said, is to determine whether or not, on the evidence or lack of evidence, Mr. McFadden's guilt has been proved beyond a reasonable doubt.

**INSTRUCTION NO. 16**
**TRANSCRIPTS OF RECORDINGS**

During this trial, you have heard a video recording. This recording was legally produced, it is a proper form of evidence, and may be considered by you as you would any other evidence.

You were also given transcripts of ~~those~~ that CMA recordings. Keep in mind that the transcript is not evidence. It was given to you only as a guide to help you follow what was being said. The recording itself is the evidence. If you noticed any differences between what you heard on the recording and what you read in the transcript, you must rely on what you heard, not what you read. If you could not hear or understand certain parts of the recording, you must ignore the transcript as far as those parts are concerned.

**INSTRUCTION NO. 17**
**CAUTION – PUNISHMENT**

If you find Mr. McFadden guilty, it will be my duty to decide what the punishment will be. You should not discuss or consider the possible punishment in any way while deciding your verdict.

**INSTRUCTION NO. 18**
**THE INDICTMENT IS NOT EVIDENCE**

An indictment is only a formal method used by the Government to accuse a defendant of a crime. It is not evidence of any kind against Mr. McFadden. Mr. McFadden is presumed to be innocent of the crimes charged. Even though an indictment has been returned against Mr. McFadden, he begins this trial with absolutely no evidence against him.

Mr. McFadden has pleaded "Not Guilty" to the indictment and, therefore, denies that he is guilty of the charges.

**INSTRUCTION NO. 19**
**"ON OR ABOUT"**

The indictment charges that crimes were committed "on or about" certain dates. The Government must prove beyond a reasonable doubt that Mr. McFadden committed each crime reasonably near these dates.

**INSTRUCTION NO. 20**
**SEPARATE COUNTS**

Mr. McFadden is charged with five counts related to trips in which he is alleged to have engaged in sexual activity with a minor. Counts 1 and 2 both relate to a trip in which Mr. McFadden is alleged to have subjected K.W. to sexual activity, but involve separate additional factual determinations that you must make. Similarly, Counts 3 and 4 both relate to a trip in which Mr. McFadden is alleged to have subjected J.W. to sexual activity, but also involve separate additional factual determinations that you must make. Finally Count 5 relates to a separate trip in which Mr. McFadden is alleged to have subjected J.W. to sexual activity. It will be your function as the jury to determine if the Government has established Mr. McFadden's guilt beyond a reasonable doubt of any one or all of the counts.

Each crime or offense as charged and the evidence applicable thereto should be considered separately as to each count. The fact that you may find Mr. McFadden guilty or not guilty of one crime or offense should not control your verdict with reference to any of the other crimes or offenses charged. As I have stated, Counts 1 and 2 relate to one alleged trip, Counts 3 and 4 relate to another alleged trip, and Count 5 relates to another separate alleged trip.

**INSTRUCTION NO. 21**
**COUNTS 1 & 3: Crossing State Lines with the Intent to Engage in a Sexual Act with a Minor Under 12 Years Old.**

Count 1 of the Indictment charges that between on or about December 25, 2012, and on or about January 3, 2013, in and outside the State and District of Colorado and elsewhere, the defendant, MICHAEL TRACY McFADDEN, did knowingly cross a state line with intent to engage in a sexual act, to wit, contact between the penis and the anus, with K.W., a person who had not attained the age of 12 years, and attempted to do so. All in violation of Title 18, United States Code, Section 2241(c).

Count 3 of the Indictment charges that between on or about December 1, 2010, and on or about January 1, 2011, in and outside the State and District of Colorado, and elsewhere, the defendant, MICHAEL TRACY McFADDEN, did knowingly cross a state line with intent to engage in a sexual act, to wit, contact between the penis and the anus and contact between the mouth and the anus, with J.W., a person who had not attained the age of 12 years, and attempted to do so. All in violation of Title 18, United States Code, Section 2241(c).

Section 2241(c) of Title 18 of the United States Code provides, in part, that "[w]hoever crosses a State line with intent to engage in a sexual act with a person who has not attained the age of 12 years, . . . or attempts to do so, shall be fined under this title and imprisoned . . . ."

This law makes it a crime for anyone to cross a state line with the intent to engage in a sexual act with a minor under the age of 12. To find Mr. McFadden guilty of this crime you must be convinced that the Government has proved each of the following beyond a reasonable doubt:

*First:* Mr. McFadden travelled across a state line;

*Second:* When Mr. McFadden travelled, he intended to engage in a sexual act with a minor under twelve (12) years old; and

*Third:* Mr. McFadden engaged in or attempted to engage in such act.

The term "State" means a State of the United States, the District of Columbia, and any commonwealth, possession, or territory of the United States.

The term "sexual act" means contact between the penis and the vulva or the penis and the anus, involving penetration however slight; or contact between the mouth and the penis, the mouth and the vulva, or the mouth and the anus; or the penetration, however slight, of another person's anal or genital opening by a hand, finger, or any object, with an intent to abuse, humiliate, harass, degrade a person, or to arouse or

gratify the sexual desire of any person; or the intentional touching, not through the clothing, of the genitalia of another person, with an intent to abuse, humiliate, harass, degrade a person, or to arouse or gratify the sexual desire of any person.

The Government need not prove that Mr. McFadden travelled across a state line for the sole and exclusive purpose of engaging in a sexual act with a person under 12 years old, nor need this be the most important of Mr. McFadden's reasons for travel. A person may have different purposes or motives for travel and each may prompt in varying degrees the act of making a journey. For the purposes of these counts, the Government must prove beyond a reasonable doubt that a dominant, significant, or motivating purpose of Mr. McFadden's travel across a state line was to engage in a sexual act with a person under 12 years. In other words, the Government must prove the sexual act was not merely incidental to the travel.

Your verdict on each count must be unanimous. You have heard testimony about multiple alleged sexual acts. The Government does not have to prove all of these different sexual acts for you to return a guilty verdict on a count. But, in order to return a guilty verdict on a count, all twelve of you must agree on at least one specific sexual act that Mr. McFadden attempted to commit during the identified time period. If the jury cannot unanimously agree on at least one specific sexual act that Mr. McFadden attempted to commit, the jury must return a verdict of not guilty.

**INSTRUCTION NO. 22**
**COUNTS 2, 4, & 5: Transportation of a Minor with Intent to Engage in Sexual Activity**

Count 2 of the Indictment charges that between on or about December 25, 2012, and on or about January 3, 2013, in the State and District of Colorado, and elsewhere, the defendant, MICHAEL TRACY McFADDEN, did knowingly transport K.W., an individual who had not attained the age of 18 years in interstate and foreign commerce, with the intent that such individual engage in sexual activity for which any person can be charged with a criminal offense. All in violation of Title 18, United States Code, Section 2423(a).

Count 4 of the Indictment charges that between on or about December 1, 2010, and on or about January 1, 2011, in the State and District of Colorado, and elsewhere, the defendant, MICHAEL TRACY McFADDEN, did knowingly transport J.W., an individual who had not attained the age of 18 years in interstate and foreign commerce, with the intent that such individual engage in sexual activity for which any person can be charged with a criminal offense. All in violation of Title 18, United States Code, Section 2423(a).

Count 5 of the Indictment charges that between on or about January 1, 2007, and on or about January 3, 2013, in the State and District of Colorado, and elsewhere, the defendant, MICHAEL TRACY McFADDEN, did knowingly transport J.W., an individual who had not attained the age of 18 years in interstate and foreign commerce, with the intent that such individual engage in sexual activity for which any person can be charged with a criminal offense. All in violation of Title 18, United States Code, Section 2423(a).

Section 2423(a) of Title 18 of the United States Code states that "[a] person who knowingly transports an individual who has not attained the age of 18 years in interstate or foreign commerce, or in any commonwealth, territory or possession of the United States, with intent that the individual engage in . . . any sexual activity for which any person can be charged with a criminal offense, shall be fined under this title and imprisoned . . . ."

This law makes it a crime to transport a minor for sexual activity. To find Mr. McFadden guilty of this crime you must be convinced that the Government has proved each of the following beyond a reasonable doubt:

*First:* Mr. McFadden knowingly transported the individual identified by initials in the indictment in interstate or foreign commerce;

*Second:* At the time of the transportation, the individual identified by initials in the indictment was less than eighteen (18) years of age; and

*Third:* At the time of the transportation, Mr. McFadden intended that the individual identified by initials in the indictment would engage in sexual activity for which someone could be charged with a crime.

Interstate commerce means commerce or travel between one state, territory or possession of the United States and another state, territory or possession of the United States, including the District of Columbia. Commerce includes travel, trade, transportation and communication.

Foreign commerce means commerce between any part of the United States (including its territorial waters), and any other country (including its territorial waters).

The Government need not prove that Mr. McFadden transported a minor in interstate or foreign commerce for the sole and exclusive purpose of engaging in sexual activity, nor need this be the most important of Mr. McFadden's reasons for travel. For the purposes of these counts, the Government must prove beyond a reasonable doubt that a dominant, significant, or motivating purpose of transporting a minor in interstate or foreign commerce was to have the minor engage in sexual activity. In other words, the Government must prove the sexual activity was not merely incidental to the travel.

The Government must prove that any sexual activity could have been charged as a criminal offense. In other words, the Government must prove the intended sexual activity would have been illegal under the laws of the state in which they were committed. It is not necessary that the Government prove Mr. McFadden intended to violate the laws of those states, only that he intended to engage in sexual activity with K.W. or J.W., and that the sexual activity could have formed the basis for a criminal charge against Mr. McFadden in the state in which it occurred.

In Count 2, the alleged sexual activity involves contact between Mr. McFadden's penis and K.W.'s anus. You are instructed that such activity could form the basis of a criminal charge in each of the following states: Colorado, Utah, Idaho, Wyoming, or Nebraska.

In Count 4, the alleged sexual activity involves contact between Mr. McFadden's penis or mouth, and J.W.'s anus. You are instructed that such activity could form the basis of a criminal charge in each of the following states: Colorado, Arizona, or New Mexico.

In Count 5, the alleged sexual activity involves contact between Mr. McFadden's penis and J.W.'s anus. You are instructed that such activity could form the basis of a criminal charge in each of the following states: Colorado, Arizona, or New Mexico.

Your verdict on each count must be unanimous. You have heard testimony about multiple alleged sexual activities. The Government does not have to prove all of these different sexual activities for you to return a guilty verdict on a count. But, in order to return a guilty verdict on a count, all twelve of you must agree on at least one specific sexual activity that Mr. McFadden intended to engage in with the individual identified in the count during the identified time period. If the jury cannot unanimously agree on at least one specific sexual activity that Mr. McFadden intended to engage in with the individual identified in the count, the jury must return a verdict of not guilty.

**INSTRUCTION NO. 23**
**PROOF OF KNOWLEDGE OR INTENT**

The intent of a person or the knowledge that a person possesses at any given time may not ordinarily be proved directly because there is no way of directly scrutinizing the workings of the human mind. In determining the issue of what a person knew or what a person intended at a particular time, you may consider any statements made or acts done by that person and all other facts and circumstances received in evidence which may aid in your determination of that person's knowledge or intent.

You may infer, but you certainly are not required to infer, that a person intends the natural and probable consequences of acts knowingly done or knowingly omitted. It is entirely up to you, however, to decide what facts to find from the evidence received during this trial.

**INSTRUCTION NO. 24**
**"KNOWINGLY" DEFINED**

The term "knowingly," as used in these instructions to describe the alleged state of mind of Mr. McFadden, means that he was conscious and aware of his action, realized what he was doing or what was happening around him, and did not act because of ignorance, mistake, or accident.

**INSTRUCTION NO. 25**
**"INTENTIONALLY" DEFINED**

The term intentionally, where I have used it in these instructions, means, "deliberately and purposely." That is, Mr. McFadden's acts must have been the product of his conscious objective, rather than the product of mistake or accident.

**INSTRUCTION NO. 26**
**DUTY TO DELIBERATE – VERDICT FORM**

After the closing arguments, the court security officer will escort you to the jury room and will give you the original jury instructions and the original verdict form. Any exhibits admitted into evidence will also be placed in the jury room for your review. You will be allowed to take your notes and your copy of the jury instructions that I have just read with you. The original of the jury instructions and the exhibits are a part of the Court record. Do not place any marks or notes on them. Your copy of the instructions may be marked or used in any way you see fit.

When you go to the jury room, you should first select a foreperson, who will help to guide your deliberations and will speak for you here in the courtroom. The second thing you should do is review the instructions. Not only will your deliberations be more productive if you understand the legal principles upon which your verdict must be based, but for your verdict to be valid, you must follow the instructions throughout your deliberations. Remember, you are the judges of the facts, but you are bound by your oath to follow the law stated in the instructions.

A Verdict Form has been prepared to help guide you through your deliberations. To reach a verdict, whether it is guilty or not guilty, all of you must agree. Your verdict must be unanimous on each count of the indictment. Your deliberations will be secret. You will never have to explain your verdict to anyone. Your foreperson will write the unanimous answer of the jury in the space provided for each count of the indictment, either guilty or not guilty. This is the only verdict form that you will receive, so please do not write on the original verdict form or indicate your answer to any questions on the original verdict form until you have all agreed on the answer.

During your deliberations, you must not communicate with or provide any information to anyone by any means about this case. You may not use any electronic device or media, such as a telephone, cell phone, smart phone, iPhone, Blackberry or computer; the internet, any internet service, or any text or instant messaging service; or any internet chat room, blog, or website such as Facebook, My Space, LinkedIn, YouTube or Twitter, to communicate to anyone any information about this case or to conduct any research about this case until I accept your verdict.

This is an important case. If you should fail to agree upon a verdict, the case is left open and must be tried again. Obviously, another trial would require the parties to make another large investment of time and effort, and there is no reason to believe that the case can be tried again by either side better or more exhaustively than it has been tried before you.

You are reminded that Mr. McFadden is presumed innocent, and that the Government, not Mr. McFadden, has the burden of proof and it must prove Mr.

McFadden guilty beyond a reasonable doubt. As judges of the facts, you must decide whether the Government has proved Mr. McFadden's guilt beyond a reasonable doubt.

It is your duty, as jurors, to consult with one another and deliberate with a view toward reaching an agreement, if you can do so without violence to individual judgment. Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors. Those of you who believe that the Government has proved Mr. McFadden guilty beyond a reasonable doubt should stop and ask yourselves if the evidence is really convincing enough. Those of you who believe that the Government has not proved Mr. McFadden guilty beyond a reasonable doubt should stop and ask yourselves if the doubt you have is a reasonable one. In the course of your deliberations do not hesitate to reexamine your own views and change your opinion if you are convinced it is erroneous. But do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict.

After you reach a verdict, your foreperson should ensure that the original verdict form is complete and then he or she must sign and date the original verdict form. The foreperson should then advise the court security officer that you have reached a verdict, but do not tell the court security officer what your verdict is. The court security officer will then inform me that you have reached a verdict. The foreperson should remain in possession of the original verdict form until you return to the courtroom and I request that it be given to me.

**INSTRUCTION NO. 27**
**COMMUNICATIONS WITH THE COURT**

If it becomes necessary during your deliberations to communicate with me, you may send a folded note through the court security officer. Do not disclose the content of your note to the court security officer. No member of the jury should hereafter attempt to communicate with me except in writing and I will communicate with any member of the jury on anything concerning the case only in writing, or orally here in open court. You are not to tell anyone – including me – how the jury stands, numerically or otherwise, until you have reached a unanimous verdict and I have discharged you.

If you send a note to me containing a question or request for further direction, please bear in mind that responses take considerable time and effort. Before giving an answer or direction I must first notify the attorneys and bring them back to the court. I must confer with them, listen to arguments, research the legal authorities, if necessary, and reduce the answer or direction to writing.

There may be some question that, under the law, I am not permitted to answer. If it is improper for me to answer the question, I will tell you that. Please do not speculate about what the answer to your question might be or why I am not able to answer a particular question.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 19-cr-00243-CMA

Date: 11-10-22

Time: 4:20 pm

NOTE TO COURT

_____ We the jury have a verdict.

X We the jury have a question.

Does Count 5 relate solely to an Arizona trip?

ANSWER FROM THE COURT

Yes.

PLEASE KEEP AS PART OF THE RECORD

Court Exhibit 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No.19-cr-00243-CMA

Date: 11/14/2022

Time: ~~10:05 AM~~ 9:05AM JR

NOTE TO COURT

✓ We the jury have a verdict.

_____ We the jury have a question.

ANSWER FROM THE COURT

PLEASE KEEP AS PART OF THE RECORD

Court Exhibit 2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge Christine M. Arguello**

Criminal Action No. 19-cr-00243-CMA-GPG

UNITED STATES OF AMERICA,

Plaintiff,

v.

MICHAEL TRACY MCFADDEN,

Defendant.

---

**VERDICT FORM**

---

**COUNT 1**

We, the jury, upon our oaths, unanimously find Mr. McFadden, in Count 1 of the Indictment, charging Mr. McFadden with **Crossing State Lines with the Intent to Engage in a Sexual Act with a Minor Under 12 Years Old**, related to K.W.:

____ Not Guilty ✓ Guilty

**COUNT 2**

We, the jury, upon our oaths, unanimously find Mr. McFadden, in Count 2 of the Indictment, charging Mr. McFadden with **Transportation of a Minor with Intent to Engage in Sexual Activity**, related to K.W.:

____ Not Guilty ✓ Guilty

**COUNT 3**

We, the jury, upon our oaths, unanimously find Mr. McFadden, in Count 3 of the Indictment, charging Mr. McFadden with **Crossing State Lines with the Intent to Engage in a Sexual Act with a Minor Under 12 Years Old**, related to J.W.:

____ Not Guilty ✓ Guilty

**COUNT 4**

We, the jury, upon our oaths, unanimously find Mr. McFadden, in Count 4 of the Indictment, charging Mr. McFadden with **Transportation of a Minor with Intent to Engage in Sexual Activity**, related to J.W.:

____ Not Guilty ✓ Guilty

**COUNT 5**

We, the jury, upon our oaths, unanimously find Mr. McFadden, in Count 5 of the Indictment, charging Mr. McFadden with **Transportation of a Minor with Intent to Engage in Sexual Activity**, related to J.W.:

____ Not Guilty ✓ Guilty

11/14/2022
DATE

[redacted]
FOREPERSON

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Criminal Action No. 19-cr-00243-CMA-GPG

UNITED STATES OF AMERICA,

Plaintiff,

v.

1. MICHAEL TRACY McFADDEN,

Defendant.

---

**GOVERNMENT'S SENTENCING STATEMENT**

---

The United States of America, by and through Andrea Surratt, Assistant United States Attorney, respectfully submits this Sentencing Statement as required by District of Colorado Local Rule 32.1(a). As discussed below, after consideration of the factors set forth in 18 U.S.C. § 3553(a), the Government believes that a sentence of life imprisonment is the only appropriate sentence in this case. The Government may submit additional materials and argument in support of the appropriate sentence in this case after reviewing the Probation Office's Presentence Investigation Report.

## I. PROCEDURAL HISTORY

In January 2013, Michael McFadden was charged by the 21st Judicial District Attorney's Office in Mesa County in 19 counts, alleging that he sexually abused six children: J.W., K.W., I.S., E.S., S.J.W., and D.R. *People v. McFadden*, 2013CR27, 2013CR339, 2013CR342; *see also People v. McFadden*, 15CA1925 (Co. Ct. App. June 22, 2017). The charges were consolidated for trial, and the defendant was convicted on all counts after a jury trial in July 2015 and, at a later hearing, was determined to be a

habitual sexual offender. Each of these six children testified at trial.

The defendant was sentenced in state court on October 1, 2015, to an indeterminate sentence of 324 years to life in the Department of Corrections. *People v. McFadden*, 2013CR27, 2013CR339, 2013CR342, Oct. 1, 2015, Habitual/Sentencing Hearing Transcript ("Tr.") at 73-75. The sentencing judge remarked that, though she had not added up the total time of the consecutive sentences at the time of the sentencing hearing, it is "very unlikely that [the defendant] will be out during his lifetime." Tr. at 75.

The defendant appealed, alleging that his statutory speedy trial rights had been violated. The Colorado Court of Appeals agreed, noting that "[t]he crimes of which defendant was convicted are indeed heinous. But the General Assembly has enacted a statute that dictates dismissal of the charges under the circumstances of this case." *People v. McFadden*, 15CA1925, at 21. On June 22, 2017, the Court of Appeals remanded the case to the trial court with instructions to dismiss all charges. *Id.* at 1. On February 12, 2018, the Colorado Supreme Court denied the subsequent petition for a writ of certiorari. *People v. McFadden*, No. 17SC573, 2018 WL 827272 (Co. Sup. Ct. Feb. 12, 2018). On February 12, 2018, the Mesa County district court dismissed all charges against the defendant, and he was released from custody.

On or about May 17, 2019, a grand jury in the District of Colorado returned an indictment charging the defendant in five counts. ECF #1. Counts One and Two of the indictment related to the defendant's sexual abuse of K.W. and Counts Three, Four, and Five related to his sexual abuse of J.W. After extensive pretrial litigation, a jury trial commenced in this matter on November 7, 2022. ECF #143. On November 14, 2022, the jury returned a guilty verdict on all five counts of the indictment. ECF #147.

Sentencing is scheduled for March 7, 2023, at 3:00 p.m. in Grand Junction. ECF #147.

## II. OFFENSE CONDUCT

The Government proved at trial that the defendant sexually abused two boys—J.W. and K.W.—while on long-haul truck trips that crossed state lines. He also abused J.W. and K.W. for years at the defendant's various homes in Grand Junction. In addition, the Government has shown by a preponderance of the evidence that, during the same timeframe he was abusing J.W. and K.W., the defendant also sexually abused I.S., E.S., S.J.W., D.R., and L.W. Finally, it is also relevant for sentencing that the defendant sexually abused eight-year-old M.S. in 1990—an offense to which the defendant pled guilty.

Although the Court presided over the trial, the Government provides a detailed recitation of facts below, in part, for the benefit of the Probation Office.

### A. Offense Conduct Proved at Trial

#### *i. Background*

Michael McFadden, who lived in Grand Junction during all of the relevant conduct in this matter, was a truck driver who hauled loads within Colorado and out of state. While in Grand Junction and on truck trips, the defendant sexually abused two boys by anally raping them. The defendant drove trucks owned by another individual, but the defendant was responsible for deciding what loads to accept and when to accept them. There was never any business-related purpose for bringing children on truck trips.

#### *ii. J.W.*

One of the defendant's victims was a boy named J.W. J.W. was first abused by

the defendant on a family trip to Arizona to attend a funeral. J.W. stayed in a hotel room with the defendant and slept in the same bed as the defendant. J.W. woke up one night with his pants lowered to his ankles and a wet sensation in his butt. J.W. got out of bed and changed his clothes. When J.W. got up, he saw that the defendant was also up and out of bed. J.W. did not realize it at the time—he put the pieces together only later—but this was the first time that the defendant inserted his penis into J.W.'s anus.

Around this same time, J.W. was abused by the defendant at a house near the Colorado National Monument. J.W. and his cousins, D.O. and E.S., would regularly visit the defendant at that house. While at the defendant's house, J.W. and his cousins enjoyed playing in the large backyard and riding a small electric motorcycle.

J.W. spent nights at the Monument house and slept on an air mattress with the defendant. One night, while J.W. was sick with a fever, the defendant had to change J.W.'s clothes. J.W. realized that the defendant was not simply changing his clothes, however, when J.W. felt pressure and a wet sensation in his butt. J.W. realized that, while he was laying on his side and the defendant was spooning him, the defendant put his penis in J.W.'s anus. J.W. was around eight years old at the time of this abuse. Subsequent to this abuse, J.W. attempted to position himself at night in a way that would make it difficult for the defendant to access his butt and, consequently, this was the only time the defendant abused J.W. at the Monument house.

J.W. was next abused by the defendant when the defendant lived at a house on Glen Road. The defendant lived at the Glen Road house with Phyllis and John H. and their son S.H., who had his own bedroom. J.W., however, stayed in the defendant's bedroom with the defendant. J.W. recalled that D.O, E.S., and some friends would come over to the Glen Road house, and the boys would play on a motorcycle, go in the

hot tub, and make dirt jumps for their bicycles.

J.W. was around nine years old when he was sexually abused by the defendant at the Glen Road house. J.W. slept in a bed in a bedroom that he shared with the defendant. The defendant repeatedly anally raped J.W. On these occasions, J.W. would feel painful pressure as the defendant inserted his penis into J.W's anus. Shortly thereafter, J.W. would feel same the wet sensation, which J.W. described as fluid coming from his own butt—specifically, a "poop fluid" that had a distinct smell. Sometimes, J.W. would toss and turn in an attempt to keep the defendant from abusing him, but other times J.W. would simply let it happen and allow the defendant to "finish." This type of abuse happened two to three times a week at the Glen Road house.

The defendant next moved to a house on D ½ Road, and he sexually abused J.W. there for many years, until the defendant was arrested. Phyllis and John H. moved to D ½ Road with the defendant and, throughout the years, other children and adults lived there as well. John Foxx—"Papa John"—stayed in the living room, and helped out with cooking and cleaning. J.W.'s mother, M.R., and J.W.'s aunt, C.M., lived in trailers outside of the D ½ Road house, sometimes with boyfriends. Once Phyllis and John moved out, the defendant moved into the master bedroom, and J.W. moved into the bedroom with the defendant shortly thereafter. Other boys also slept in the bed with the defendant, including D.R. (a friend), E.S., I.S. (a cousin), and K.W. (a friend and neighbor).

Like his other homes, the defendant made D ½ Road a fun place for boys. The boys engaged in BMX racing, motocross, paintball, and airsoft. They built forts and used the vehicles and machinery that were on the property. The defendant also took the boys on trips to places like Elich Gardens and local amusement parks. The

defendant paid for all of these activities—activities many of the boys' families never would have been able to afford otherwise.

The sexual abuse at the D ½ Road house was similar to the abuse that J.W. had already been enduring. The abuse first occurred at D ½ Road in a utility room that the defendant used as a bedroom, and then transitioned into the master bedroom that J.W. shared with McFadden. During the years of abuse at the D ½ Road house, the defendant was drugging J.W. and other boys with melatonin to make them sleepy. One time, J.W. found a partially dissolved pill in a soda that McFadden had given to J.W.

The defendant also took J.W. and other boys on trips in his semi-truck. When J.W. went on trips with the defendant, he slept with the defendant on the mattress in the truck's sleeper compartment. When J.W. was around nine years old, McFadden took J.W. on a trip to Arizona. One night during the trip, they stopped at a truck stop that J.W. remembers specifically because it was a particularly nice truck stop with interesting toys. That night, J.W. awoke to a wet sensation and pressure on his butt, caused by the defendant putting his penis into J.W.'s anus. J.W. tossed and turned until the defendant stopped.[1]

In late 2010, when J.W. was around 10 years old, the defendant took J.W. on trips in the semi-truck between Telluride, CO and Farmington, NM. One night, J.W. went to bed in the sleeper compartment of the semi and awoke to the defendant pulling down his pants. J.W. pretended to be asleep and did not fight when the defendant anally raped him. This instance of abuse, unlike some other instances, caused a mess of J.W.'s "poop juice" that had to be cleaned up. The defendant had to use wet wipes from the truck to clean J.W. and help J.W. with a change of clothes. J.W. did not let the

[1] This sexual abuse endured by J.W. on this semi-truck trip to Arizona forms the basis for Count Five of the Indictment.

Case 1:19-cr-00243-CMA-GPG Document 156 Filed 12/12/22 Page 7 of 26

defendant know he had been fake-sleeping during this incident because he was afraid that the defendant would find out that J.W. sometimes pretended to sleep through the abuse.[2]

On one of the same trips between Telluride and Farmington, the defendant parked the semi-truck down the street from J.W.'s house. It was early in the morning, so rather than dropping J.W. off at home, the defendant allowed J.W. to finish sleeping on the mattress in the cab of the truck. The defendant woke J.W. up by putting his tongue on J.W.'s butt. J.W. remembers this incident specifically because it was not a "normal assault" where the defendant put his penis into J.W.'s anus.

The defendant's anal assaults of J.W. were painful and made him feel sick and nauseated. They also resulted in difficulties using the restroom. One day, J.W. went to school after such an assault, and wiped blood from his butt in the bathroom. J.W. described having trouble pooping and recalled that pooping "hurt really bad." When J.W. was in third or fourth grade, he went to school after being assaulted by the defendant and had "really bad diarrhea," requiring him to change his clothes at school. He went to the restroom so many times that day that his teacher asked if he was ok.

J.W. believed that K.W. was also being sexually assaulted by the defendant. Specifically, J.W. remembers being in bed with the defendant and K.W. and feeling the bed moving around and smelling a "musty smell" that reminded J.W. of his own "poop juice" smell.

Despite the years of abuse—which lasted from the time J.W. was around six years old until he was twelve years old—J.W. chose to stay with the defendant rather than live with his mom, M.R. J.W.'s biological dad was never in his life. M.R. had an

---

[2] The sexual abuse endured by J.W. on these trips to Farmington forms the basis of Counts Three and Four of the Indictment.

abusive boyfriend who would beat M.R. and break bottles over her head. The boyfriend was rough with J.W.'s baby sister and would slam J.W. against walls. M.R. abused drugs such as methamphetamine and alcohol. While she was high and drunk, M.R. was often unaware of what her children were doing or where they were; to this day, she does not know what trips J.W. went on with the defendant. There was not always enough to eat at M.R.'s house. The family did not have much money, and because J.W. and his siblings got fed at school, M.R. and her boyfriend would eat the food at home. J.W.'s sister sometimes snuck him food, but he often went to bed hungry.

By contrast, J.W. always had enough to eat at the defendant's house. The defendant took J.W. to school and took him to the doctor. McFadden bought J.W. clothes and made sure he had prescription eyeglasses that he needed. For J.W., it was a relief to not have to worry about whether he would have to call the police because M.R. and her boyfriend got into a fight. J.W. loved the defendant and called him "dad."

Consequently, J.W. never told anyone about the abuse while it was ongoing. In addition, he was afraid of what the defendant might do to him if he told, in part because he saw the defendant react very negatively to K.W. when K.W. attempted to resist being abused.

*iii. K.W.*

Before he began abusing K.W., K.W.'s family had known the defendant for many years. K.W.'s mom, S.W., knew the defendant through her ex-husband, but then reconnected with the defendant when K.W. was in elementary school. One day when S.W. was dropping K.W. off at school, she ran into the defendant also dropping off a child at school (presumably J.W.). At the time, S.W. was separated from her current husband, S.W. Sr., and when the defendant offered to help bring K.W. to school, S.W.

was grateful and relieved. Like the families of many of the other children that the defendant abused, the W. family did not have much money. S.W. and her family trusted the defendant and considered him a friend.

At the time the defendant came back into the W. family's lives, he was living at the house on Glen Road. And it was at the Glen Road house that K.W. began spending time with the defendant, when K.W. was around 10 years old. The Glen Road house was fun for K.W. He played with his friend J.W. and rode electric motorcycles around the neighborhood. K.W. went to the Glen Road house nearly every weekend and spent the night.

The defendant's sexual abuse of K.W. started at the Glen Road house. At trial, however, K.W. struggled to describe what happened to him at the Glen Road house because he has "tried to push a lot of these memories away."

While the defendant lived on Glen Road, K.W. and his family lived in a trailer park on North Avenue in Grand Junction. But, after the defendant moved to D ½ Road, K.W. and his family moved in next door, into a house across a field, also on D ½ Road. Like the defendant's house on Glen Road, the house on D ½ Road was also extremely fun for K.W. and his friends and siblings. The defendant had airsoft guns, paintball guns, trampolines, videogames, and side-by-sides, all of which K.W. was free to use.

Although K.W. lived right next door, he often spent the night at the defendant's house. K.W. slept in various places, including on a futon in the living room or with the defendant in the defendant's bed. Like he did with J.W., the defendant also gave K.W. melatonin. The defendant gave K.W. high doses of the sleep aid—five or six pills or gummies at a time. The melatonin would cause K.W. to fall asleep quickly. Sometimes, after being dosed with melatonin, K.W. would fall asleep in one place and wake up in

the defendant's bed, with the defendant.

The defendant's sexual abuse of K.W. continued at the D ½ Road house. One night, K.W. woke up and the defendant was top of K.W. rubbing his erect penis on K.W. The defendant also frequently molested K.W. by touching K.W.'s penis, something that always occurred at night. This abuse was ongoing until the defendant was finally arrested in January 2013. K.W. described that the abuse made him feel "small" and "hate [himself] for a long time."

K.W. accompanied the defendant on semi-truck trips. On these trips, the defendant molested K.W. by touching and groping K.W. In late 2012, the defendant invited K.W. and his brothers, L.W. and S.W. Jr., on a truck trip that would eventually take them through Utah and Idaho and end in Nebraska with the defendant's arrest. Although the W. family lived in Montrose at the time, prior to this trip, the defendant spent Thanksgiving and Christmas with the W. family. On this final trip, the defendant tried to force his penis into K.W.'s butt. Specifically, the defendant pulled K.W.'s pants down and anally raped K.W., which caused K.W. pain. K.W. was 11 years old at the time of this trip.[3]

*iv. The Defendant's Arrest*

By the time K.W. and his brothers left Colorado on their final semi-truck trip with the defendant, the Grand Junction Police Department was already investigating the defendant for abusing other children in Grand Junction. On January 3, 2013, Detective Ed Prescott obtained a warrant for the defendant's arrest based on disclosures of abuse made by I.S. and E.S.

Detective Prescott learned that the defendant was with K.W. and his siblings and,

[3] The abuse that K.W. endured on this trip that ended in Nebraska formed the basis for Counts One and Two of the Indictment.

with S.W. Jr.'s help, located the defendant at a truck stop in North Platte, Nebraska. Detective Prescott alerted the North Platte police department, who took the defendant into custody on the warrant on January 3, 2013.

B. Other Relevant Conduct

In addition to J.W. and K.W, each of I.S., E.S., and S.J.W testified at the state trial in this matter about the sexual abuse to which the defendant subjected them as well. As to each child, the jury believed their testimony beyond a reasonable doubt and convicted the defendant of sexually abusing each child. Accordingly, the Court can and should easily find by a preponderance of the evidence that the defendant abused these children.

L.W.—the younger sibling of K.W. and S.W. Jr.—disclosed the defendant's abuse subsequent to the state trial. He was quite young at the time of the offense conduct, and as Cheryl Young explained to the jury, it is not uncommon for very young children to disclose later on, as they get older and realize more fully what had happened to them. L.W. spent time around the defendant like the rest of the children, and the abuse he describes fits the defendant's sexual *modus operandi*. Finally, L.W., who is now 16 years old, was prepared to testify at the federal trial as a victim pursuant to Federal Rule of Evidence 414, has no motivation to lie. Accordingly, the Court should also find that the defendant's abuse of L.W. is relevant to sentencing in this matter.

Finally, the Court can and should easily find that the defendant's 1989 abuse of eight-year-old M.S. is relevant to sentencing. McFadden admitted to this offense conduct in 1990.

*i. I.S., E.S., S.J.W., and L.W.*

In late 2012, I.S. was the first boy to disclose the defendant's abuse. During his

forensic interview, I.S. explained that the defendant rubbed I.S.'s "pee pee" while I.S. was sleeping at the defendant's house in the defendant's bed. I.S. "lost count" of the number of times this happened. I.S. described the defendant putting his hands in I.S.'s underwear and rubbing I.S.'s penis while I.S. was sleeping, which would cause I.S. to wake up. I.S. tried to stop the defendant by trying to "grab his hand and put it in his lap," but the defendant persisted until I.S. rolled over. In a subsequent interview, I.S. disclosed that the defendant anally raped I.S. on at least one occasion when I.S. was approximately eight years old.

Because of I.S.'s disclosure, Detective Prescott next interviewed I.S.'s cousin E.S., who at first did not disclose any sexual abuse, and said that the defendant told him that I.S. was lying. A few days later, E.S. disclosed and described multiple instances of molestation committed by the defendant. E.S. explained that the defendant touched E.S.'s penis under E.S.'s clothing. In several of these instances, the defendant moved E.S. to the defendant's bed, lowed E.S.'s pants, and stroked E.S.'s penis. E.S. also described two instances where the defendant took E.S. to an area near the roller dam on the Gunnison River in Mesa County. At this location, the defendant bent E.S. over and put his "pee pee" in E.S.'s anus, causing E.S. pain and difficulty defecating.

S.J.W., K.W.'s sister, was interviewed as part of the Grand Junction Police Department's investigation. S.J.W. described an incident that occurred while she was sleeping on a couch at the defendant's house at D ½ Road. S.J.W. awoke one night to the defendant grabbing her by the waist. The defendant then stuck his finger in S.J.W.'s anus. S.J.W. turned away, but the defendant flipped her back over and put his finger in her anus again. This occurred around five times in a row before the defendant stopped. S.J.W. was approximately nine years old at the time.

Detective Prescott also interviewed D.R. as part of his investigation. D.R. reported that the defendant touched D.R.'s penis while D.R. was sleeping in the defendant's bed. D.R. said that he slept in the defendant's bed along with the defendant, J.W., and another boy one night. D.R. went to bed with shorts and a pull-up on and woke up when he felt the defendant's hand down his shorts fondling D.R.'s penis. D.R. pushed the defendant's hand away and went back to sleep. Later that same night, D.R. woke again to the defendant's hand down his shorts on D.R's penis. D.R. moved off the bed and slept under the bed the rest of the night. D.R. was approximately 11 years old at the time.

More recently, and subsequent to the defendant's state trial, L.W.—K.W. and S.J.W.'s younger brother—disclosed that the defendant molested him. L.W. told law enforcement that beginning when he was approximately six years old,[4] the defendant molested him on five or six occasions. L.W. explained that the defendant frequently gave him melatonin when he, along with friends or siblings, stayed at the defendant's house. L.W. typically slept on the couch, but would awaken to the defendant carrying him to the defendant's bed. Once there, the defendant pulled down L.W.'s clothes and rubbed spit from his hand onto L.W.'s butt. The defendant would then anally rape L.W.

*ii. 1990 Victim: M.S.*

Prior to the more recent abuse, the defendant molested another child. On around January 25, 1990, the defendant was staying at a friend's home. During the night, the defendant entered the room of an eight-year-old boy, M.S., living in the home. the defendant picked M.S. up and then took him to the basement. M.S.'s mother came downstairs and saw him and the defendant in the basement. M.S. explained that the

[4] Since L.W. is 16 years old now, and the defendant was arrested ten years ago, it is likely that L.W. was younger than six when he was abused by the defendant.

defendant told his mother that they were moving some things around and, after that, M.S.'s mother left the two alone again (a description of events later corroborated by M.S.'s mother).

Once alone, M.S. said that the defendant told him to "shut up" and covered M.S.'s mouth with the defendant's hand. The defendant then laid M.S. on a carpet on his stomach and got on top of him. At that point, M.S. stated that the defendant "stuck his private up [M.S.'s] butt" and "moved around a little." When asked how he knew it was the defendant's private, M.S explained that "it hurt and it was not soft." He also explained that one of McFadden's hands was covering his mouth and the other was visible on the floor when M.S. felt pain in his rectum. M.S. later identified a "private" as a penis.

Sometime later, M.S. disclosed the anal rape to his mother, but M.S.'s mother took no action. M.S. then disclosed to a babysitter. The babysitter took M.S. to the hospital to be evaluated and reported the matter to law enforcement. After an investigation, law enforcement interviewed the defendant. The defendant denied the entire incident, claiming that he was never in the basement with M.S. and did not assault him. The defendant was arrested.

Ultimately, on March 27, 1990, the defendant pled guilty and admitted to the conduct M.S. described. He was originally sentenced to 60 days of incarceration, sex offense counseling, and required to get his probation officer's approval before having any contact with children under 18. He was also required to register as a sex offender.

## III. GUIDELINES CALCULATION AND STATUTORY PENALTIES

### A. Statutory Penalties

Counts One and Three of the indictment, each charging a violation of 18 U.S.C. §

2241(c) (crossing state lines with intent to engage in a sexual act with a minor under 12), carry potential sentences of not less than 30 years imprisonment and not more than life; not more than a $250,000 fine; a term of supervised release of not less than five years and not more than life; and a $100 special assessment.

Counts Two, Four, and Five of the indictment, each charging a violation of 18 U.S.C. § 2423(a) (transportation of a minor with intent to engage in sexual activity), carry a potential sentences of not less than 10 years imprisonment and not more than life; not more than a $250,000 fine; a term of supervised release of not less than five years and not more than life; and a $100 special assessment.

B. Guidelines Calculation

The Government believes that the correct Guidelines calculation is as follows.

*Counts One and Two (K.W.)*

- Count One
  - Pursuant to U.S.S.G. § 2A3.1(a)(1), the base offense level for Count One is 38.
  - Pursuant to U.S.S.G. § 2A3.1(b)(3)(A), because the victim was in the custody, care, or supervisory control of the defendant, two levels are added.[5]
  - The adjusted offense level for Count One is therefore 40.

---

[5] Application Note 3 to U.S.S.G. § 2A3.1(b)(3)(A) states:

> Subsection (b)(3) is to be construed broadly and includes offenses involving a victim less than 18 years of age entrusted to the defendant, whether temporarily or permanently. For example, teachers, day care providers, baby-sitters, or other temporary caretakers are among those who would be subject to this enhancement. In determining whether to apply this enhancement, the court should look to the actual relationship that existed between the defendant and the minor and not simply to the legal status of the defendant-minor relationship.

Both K.W. and J.W. were in the defendant's custody, care, and control to varying degrees. Both, of course, spent nights with the defendant regularly. For times during the ongoing abuse, J.W.'s primary residence was with the defendant, who he called "dad" and relied on for his basic needs. Both boys went on multi-day truck trips with the defendant where the defendant was the only adult.

- Count Two

  - Pursuant to U.S.S.G. § 2G1.3(a)(3), the base offense level is 28.

  - Pursuant to U.S.S.G. § 2G1.3(b)(1)(B), because the minor was in the custody, care, or supervisory control of the defendant, two levels are added.

  - Pursuant to U.S.S.G. § 2G1.3(b)(2)(B), because the defendant unduly influenced a minor to engage in prohibited sexual conduct, two levels are added.

  - Pursuant to U.S.S.G. § 2G1.3(b)(4)(A), because the offense involved the commission of a sex act or sexual conduct, two levels are added.

  - Pursuant to U.S.S.G. § 2G1.3(b)(5), because the offense involved a minor who had not attained the age of 12 years, eight levels are added.

  - The adjusted offense level for Count Two is therefore 42.

- Pursuant to U.S.S.G. § 3D1.2(a), Counts One and Two group. Pursuant to U.S.S.G. § 3D1.3(a), the offense level for the group is the offense level for the most serious of the counts comprising the group. Accordingly, the offense level for the Group is 42.

*Counts Three, Four, and Five (J.W.)*

- Count Three

  - Pursuant to U.S.S.G. § 2A3.1(a)(1), the base offense level for Count One is 38.

  - Pursuant to U.S.S.G. § 2A3.1(b)(3)(A), because the victim was in the custody, care, or supervisory control of the defendant, two levels are added.

  - The adjusted offense level for Count Three is therefore 40.

- Counts Four and Five

  - Pursuant to U.S.S.G. § 2G1.3(a)(3), the base offense level is 28.

  - Pursuant to U.S.S.G. § 2G1.3(b)(1)(B), because the minor was in the custody, care, or supervisory control of the defendant, two levels are added.

  - Pursuant to U.S.S.G. § 2G1.3(b)(2)(B), because the defendant

unduly influenced a minor to engage in prohibited sexual conduct, two levels are added.

- Pursuant to U.S.S.G. § 2G1.3(b)(4)(A), because the offense involved the commission of a sex act or sexual conduct, two levels are added.

- Pursuant to U.S.S.G. § 2G1.3(b)(5), because the offense involved a minor who had not attained the age of 12 years, eight levels are added.

- The adjusted offense level for Counts Four and Five is therefore 42.

- Pursuant to U.S.S.G. § 3D1.2(a), Counts Three, Four, and Five group. Pursuant to U.S.S.G. § 3D1.3(a), the offense level for the group is the offense level for the most serious of the counts comprising the group. Accordingly, the offense level for the Group is 42.

*Total Offense Level and Guidelines Calculation*

- Pursuant to U.S.S.G. § 3D1.4, one Group listed above is assigned one Unit. The other Group is assigned an additional Unit, for a total of two units. Accordingly, two levels are added to offense level 42 for a total offense level of 44.

- Regardless of his criminal history category, the defendant's Guidelines range is 360-life.

## IV. 18 U.S.C. § 3553 Factors and Sentencing Recommendation

Considering the 18 U.S.C. § 3553(a) factors, the only just sentence in this case is a sentence of life imprisonment, and the Government respectfully requests that the Court impose such a sentence.

### A. Nature and Circumstances of the Offense

The sickening and heinous nature of the offense conduct in this case cannot be overstated. To be sure, the defendant stole childhood away from each of his victims, but it is not an exaggeration to say that the defendant also destroyed lives. His selfish and deliberate action inflicted a horror on his victims and their families that can never be truly remediated.

Case 1:19-cr-00243-CMA-MRG Document 193-15 Filed 06/27/22 Page 18 of 23

As the Court knows from trial, and is described above, the defendant laid the groundwork for his sexual abuse of J.W., K.W., and at least five other children for many years. In each place that the defendant lived in Grand Junction, he made his home a haven for little boys. Strikingly, there is no evidence at all that the defendant partook in the activities and toys that he kept around his house. Rather, all evidence suggests that he deliberately turned his homes into a place where elementary school-aged boys would want to be. Not surprisingly, therefore, numerous witnesses reported that the defendant always had boys around him.

In addition to grooming his victims by providing a fun place for them to play, the defendant also groomed his victims' families. With rare exception, the defendant targeted children with difficult home lives, particularly children who did not have a biological father in the home. J.W. is a good—and tragic—example. J.W.'s biological father has never been part of his life, and even when Michael W. did come around, he largely ignored J.W. J.W.'s mother was addicted to drugs and alcohol. Before her abusive boyfriend died of an overdose, he was violent toward M.R. and the children. J.W.'s family did not have much money, and J.W. and his siblings often did not have enough to eat. Even before the defendant began abusing J.W., J.W.'s life was heartbreaking.

Then the defendant stepped in. He became a father figure for J.W. and provided the material things that M.R. could not. But he also provided love, affection, and a feeling of safety that J.W. did not have anywhere else. When the abuse first started, J.W. was so young, perhaps around six years old, he did not understand what was happening. As he got slightly older, he put the pieces together and realized the painful and wet sensations he had been having at night was the defendant anally raping him.

The abuse continued for six years. For those six years, not more than two or three nights would lapse before the defendant found J.W. at night and anally raped him. But J.W. trusted and loved the defendant, and he did not tell anyone what was happening.

Perhaps the most heartbreaking thing of all is that for all of those six years, every single time the defendant raped him, J.W. made the choice to stay quiet and live with the pain of the defendant's abuse, rather than return to his mom's house and deal with the violence, drugs, and hunger. For J.W., this must have felt like torture.

The defendant also groomed K.W. and his family. Unlike J.W., K.W. lived with his parents and multiple siblings in a separate house. But the W. family was not well-off financially, and the defendant provided the children things S.W. and S.W. Sr. could not. When S.W. and S.W. Sr. were separated, and the defendant offered to take K.W. to school, S.W. was appreciative—and did not for a moment think that the defendant had an ulterior motivation. So, while J.W. went on truck trips without his mom's knowledge, the defendant integrated himself so well into the W. family that S.W. and S.W. Sr. encouraged their kids to go on road trips with the defendant. In fact, this is a hallmark of the defendant's personality—everyone who knew the defendant liked him, trusted him, and considered him a friend. This is one reason that the defendant's abuse was able to continue for so long undetected.

While J.W. was largely—and bravely—matter-of-fact on the witness stand, K.W. barely made it through his testimony. K.W. has dealt with his pain and trauma by doing his best to forget. He was able to tell the jury, however, how the defendant's constant abuse made him feel small and worthless, feelings that have persisted to this day. Although many of the defendant's victims are extremely reluctant to re-live their trauma by talking about it now, K.W.'s pain was on full display for the jury. As the Court recalls,

it was apparent that the horror that the defendant inflicted upon K.W. for years is still with K.W., despite his best efforts to suppress his memories and feelings.

All of the defendant's victims are now teenagers and young adults. Admirably, some of them have dealt with the trauma and are doing relatively well, holding down jobs and maintaining healthy relationships. Others, like K.W. and E.S., began acting out in childhood, found themselves in a variety of legal trouble, and have had difficulty establishing a stable adult life.

Ultimately, because the defendant targeted vulnerable children, and sufficiently and thoroughly groomed those children and their families, he was able to continue sexually abusing seven children for years. For some, most of their childhood was marred with active, ongoing, and physically painful abuse. It is difficult to imagine offense conduct more deserving of a life sentence.

B. History and Characteristics of the Defendant

The defendant is a man with few redeeming characteristics. While he outwardly appeared to be a caring man who provided a safe and loving home for children who had no other place to go, this was all a smokescreen. Instead, the defendant used his personality and resources to lure kids and their families into his fold, giving him the unfettered access to little boys that he craved. He kept up the façade for years, likely abusing a child nearly every night, until 10 years ago when he was finally exposed.

The defendant's tactics also became more sophisticated with time. In 1990, when the defendant was 18 years old, he sexually abused M.S. in M.S.'s mother's home. In that case, however, the defendant physically carried M.S. to the basement and restrained M.S. so that the defendant could anally rape M.S. without M.S. escaping or crying out. As far as we know, the defendant's abuse of M.S. occurred only once.

By contrast, before sexually abusing J.W., K.W., I.S., E.S., S.J.W., and D.R., he took time to groom them and their families—which Cheryl Young reported is almost universally a hallmark of a successful long-term abuser. The victims at issue in the instant case do not report being physically restrained by the defendant. Rather, his abuse was quiet and gentle enough that it could occur without waking other boys who were asleep in the same bed, thus enabling him to keep his abuse a secret for years.

C. Reflect the Seriousness of the Offense and Provide Just Punishment

Only a sentence of life imprisonment will adequately reflect the seriousness of the defendant's crimes and provide just punishment. Of course, no punishment will make the victims and their families whole or give them back what the defendant stole from them. But a sentence that ensures the defendant will never be free in any community ever again will at least send the right message—that perpetrators of this kind of horrendous, unforgivable crime will die in prison.

D. Provide Adequate Deterrence and Protect the Public

It is not clear that this defendant can be deterred. Indeed, being convicted of felony sexual abuse of a child in 1990, followed by decades of sex offender registration, did nothing to deter the defendant from adopting a lifestyle that revolved around grooming and abusing children in Grand Junction. So, it is the Government's position that deterrence is far outweighed as a Section 3553(a) factor when compared to the need for the sentence imposed to protect the public. The defendant is a habitual, life-long sexual abuser of children who victimized nearly every child in his immediate orbit for years until his arrest in January 2013. There is no question that the defendant needs to be incarcerated for the rest of his life in order to protect children in his community from his abuse.

To be sure, a sentence of life imprisonment will protect the community from this defendant. In addition, however, it will serve to deter others. A sentence of life imprisonment—even more than a sentence of a finite number of years—will send a message to others that sexual abuse of children is never tolerated, and individuals commit these atrocious acts upon the most vulnerable among us will live out their lives in a jail cell.

## V. RESTITUTION

The Court must order restitution to victims for the harm caused by the conduct in Counts One and Three pursuant to 18 U.S.C. § 2248. The Court must order restitution to victims for the harm caused by the conduct in Counts Two, Four, and Five pursuant to 18 U.S.C. § 2429.

The Government anticipates seeking restitution for victims in this case and will compile additional information for the Court prior to sentencing.

## VI. CONCLUSION

Taking into account all of the Section 3553(a) factors, a life sentence is the only sentence that is sufficient, but not greater than necessary, to satisfy the statutory purposes of sentencing.

Respectfully submitted,

COLE FINEGAN
United States Attorney

*_/s Andrea Surratt_*
Andrea Surratt
Assistant U.S. Attorney
U.S. Attorney's Office
1801 California Street, Suite 1600
Denver, CO 80202
Tel: (303) 454-0124
E-mail: andrea.surratt@usdoj.gov
Attorney for the Government

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 19-cr-00243-CMA-GPG

UNITED STATES OF AMERICA,

Plaintiff,

**v.**

**MICHAEL TRACY McFADDEN,**

**Defendant.**

---

**DEFENDANT MICHAEL TRACY MCFADDEN'S OBJECTIONS, ADDITIONS, AND CORRECTIONS TO THE PRESENTENCE REPORT**

---

Mr. McFadden by and through his attorneys Sean M. McDermott and Benjamin LaBranche, submits his Objections and Corrections to the Presentence Report (Doc. No 157). Mr. McFadden states the following:

**Corrections and Additions**

1. **Page One and Two -** Since the presentence report was filed, the sentencing date has been moved from March 7, 2023, at 3:00 p.m. to March 9, 2023, at 9:00 a.m. See Docket Nos. 158 and 159. Therefore, at the time of sentencing, Mr. McFadden will have had 3,270 days of presentence confinement credit instead of 3,268.

2. **Paragraph Three -** Paragraph three states in part that, "The defendant is currently housed at the Clear Creek County Jail in Georgetown, Colorado. According to jail staff, the defendant arrived at the facility on April 26, 2022." In addition to what is stated in the presentence report, Mr. McFadden was in the Clear Creek County Jail prior to March 8, 2021. On March 8, 2021, Mr. McFadden was transferred to the Washington

County Detention Facility. He stayed there until April 6, 2022. Mr. McFadden was then transferred to the Federal Detention Center in Englewood, Colorado. On April 26, 2022, Mr. McFadden was then moved back to the Clear Creek County Jail. Mr. McFadden was moved to the Mesa County Detention Center prior to trial before returning to the Clear Creek County Jail on November 18, 2022. He has remained in the Clear Creek County Jail through the present time.

3. **Paragraph 107 –** It has been documented that Mr. McFadden has previously spoken about prior abuse to him when he was a child. It is documented that this was discussed in therapy. Mr. McFadden acknowledged that flashbacks of abuse came to his attention in therapy. If this was not communicated clearly, it is being clarified now.

**Objections**

4. **Paragraphs 45-59, <u>Other Relevant Conduct</u> –** Mr. McFadden objects to the court considering the other relevant conduct that the Prosecution wants the Court to consider. This alleged conduct is contained paragraphs 45 through 59 of the presentence report. No testimony regarding this conduct was elicited at trial or at any pretrial hearing. The defense's position is that this alleged conduct was not clearly established and did not meet the Tenth Circuit's standard for admission at trial. *See United States v. Perrault*, 995 F.3d 748, 766 (10th Cir. 2021) applying the *Enjady* factors found at United States v. Enjady, 134 F.3d 1427, 1433 (10th Cir. 1998). The prosecution also stated on the record, that it did not intend to elicit evidence regarding M.S. Under the circumstances, none of the alleged conduct should be considered at sentencing.

**5. Paragraphs 69 and Paragraphs 78–** These paragraphs relate to USSG § 2G1.3(b)(2)(B)

The two-level enhancement under U.S.S.G. § 2G1.3(b)(2)(B), should not apply because the defendant did not unduly influence J.W. or K.W. to engage in prohibited sexual conduct.

Application Note 3(B) to U.S.S.G. §2G1.3 states:

> In determining whether subsection (b)(2)(B) applies, the court should closely consider the facts of the case to determine whether a participant's influence over the minor compromised the voluntariness of the minor's behavior. The voluntariness of the minor's behavior may be compromised without prohibited sexual conduct occurring.
>
> However, subsection (b)(2)(B) does not apply in a case in which the only "minor" (as defined in Application Note 1) involved in the offense is an undercover law enforcement officer.
>
> In a case in which a participant is at least 10 years older than the minor, there shall be a rebuttable presumption that subsection (b)(2)(B) applies. In such a case, some degree of undue influence can be presumed because of the substantial difference in age between the participant and the minor.

Since the defendant is more than 10 years older than J.W. and K.W., there is a presumption that the undue influence enhancement should apply. However, it is a rebuttable presumption, and an analysis of the specific facts of this case show that it should not apply. According to the Application Note, the issue is "whether a participant's influence over the minor compromised the voluntariness of the minor's behavior".

The Presentence Report **(PSR)** describes the offense conduct as consisting of sexual acts with J.W. and K.W. while they were asleep. While the defendant was an adult who at times did help care for and provide for J.W. and K.W., the allegations proven at trial did not show he used his status as an adult or caretaker to compromise

the voluntariness of their behavior to engage in sexual acts. While it was alleged at trial that the defendant "groomed" J.W. and K.W. by buying them gifts, being nice to them, and allowing them to play games at his house, it was never alleged that he used such acts of kindness to get them to voluntarily engage in sexual acts.

The government did not offer evidence at trial that J.W. and K.W. engaged in any sexual activity with the defendant because of the defendant's status. Most acts occurred while they were asleep, and in most cases, they did not realize there was sexual activity until the contact was over. Therefore, there was no undue influence to get them to engage in this activity.

The **(PSR)** outlines the offense conduct related to both J.W. and K.W. The **PSR** outlines how every sexual act, except one, occurred while J.W. and K.W. were asleep**.** **PSR ¶ 20** describes the other act committed upon J.W. while he was sick with a fever. J.W. did not engage in the act because he was not really aware of what was happening due to his fever. Therefore, there was no undue influence for that act either.

U.S.S.G. § 2G1.3(b)(2)(B) requires that a defendant unduly influence the victim **to engage** [emphasis added] in prohibited sex acts. The finding of undue influence is a fact-based inquiry *United States v. Hornbuckle*, 784 F.3d 549, 557 (9th Cir. 2015), and the facts of this case are different than any other. While the defendant did treat J.W. and K.W. like family and helped care for them, there are no facts to support that his status as an adult or caretaker was actually used to get J.W. and K.W. to consent to sexual conduct.

WHEREFORE, Mr. McFadden respectfully submits the herein objections, additions, and corrections to the presentence report.

Respectfully submitted,

Dated: February 14, 2023

s/Sean M. McDermott
  Sean M. McDermott
  McDermott Stuart & Ward LLP
  140 E. 19th Avenue, Suite 300
  Denver, CO 80203
  Phone: (303) 832-8888
  Fax:    (303) 863-8888
  Email: smcdermott@mswdenver.com

s/Benjamin R. LaBranche
  Benjamin R. LaBranche
  1544 Race Street
  Denver, CO 80206
  Phone: (225) 927-5495
  Fax:    (225) 927-5568
  Email:  ben@brllawyer.com

**CERTIFICATE OF SERVICE**

I hereby certify that on this 14th day of February 2023, the foregoing **pleading** was filed with the Clerk of Court using the CM/ECF system which will send notification of such filing to all listed parties.

s/ Sean McDermott
Sean McDermott

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Criminal Action No. 19-cr-00243-CMA-GPG

UNITED STATES OF AMERICA,

Plaintiff,

v.

1. MICHAEL TRACY McFADDEN,

Defendant.

---

**RESPONSE TO DEFENDANT'S OBJECTIONS TO THE PSR**

---

The United States of America, by and through Andrea Surratt, Assistant United States Attorney, respectfully submits this response to the defendant's objections to the Presentence Investigation Report ("PSR") [ECF # 160].

Paragraphs 45-59. The defendant objects to the court considering as relevant conduct the defendant's molestation of I.S., E.S., S.J.W., L.W., and M.S.

As this court is aware, "a sentencing court ha[s] broad discretion to consider information concerning the defendant's life and characteristics, including conduct on which he had not been convicted." *United States v. Magallanez*, 408 F.3d 672, 684 (10th Cir. 2005). Courts may find facts relevant to sentencing "by a preponderance of the evidence." *United States v. Hall*, 473 F.3d 1295, 1312 (10th Cir. 2007).

As described in the PSR, I.S., E.S., and S.J.W. all testified at the defendant's state trial. As to each of these victims, the jury found their testimony credible and the defendant was convicted of molesting each of them. L.W. disclosed the defendant's abuse of him after the state trial, but as the court is aware from pretrial litigation in this

matter, L.W.—who was very young at the time the defendant abused him—describes abuse that was similar to the abuse suffered by his siblings K.W. and S.J.W., and was prepared to testify at the instant federal trial pursuant to Federal Rule of Evidence 414. The court should easily find that the defendant molested each of I.S., E.S., S.J.W., and L.W. by a preponderance of the evidence and consider that conduct at sentencing.

The defendant also argues that the Government "stated on the record" that it did not intend to elicit evidence concerning the defendant's molestation of M.S. As the court no doubt recalls, in 1990, the defendant molested M.S., a-then eight-year-old boy, by putting his penis in M.S.'s butt. This conduct, to which the defendant pled guilty, forms the basis of his 1990 conviction for sex assault on a child. PSR ¶ 93. The court was prepared to allow the Government to introduce evidence of the defendant's molestation of M.S. at trial pursuant to Rule 414, but the Government acknowledged that, despite its best efforts, it would be unable to produce a witness at trial to testify as to this instance of molestation. The Government, of course, never conceded that it would not be relevant at sentencing, should the defendant be convicted. Given the defendant's admission to this conduct, and the similarity of the 1990 conduct to the conduct that formed the basis of the defendant's instant federal conviction, the court should find that the defendant molested M.S. by a preponderance of the evidence and consider this as relevant conduct when fashioning a sentence.

Paragraphs 69 and 78. The defendant objects to the application of U.S.S.G. § 2G1.3(b)(2)(B), which provides for a two-level enhancement when the defendant "unduly influenced a minor to engage in a prohibited sexual conduct."

The Government agrees with the PSR's application of the enhancement. As the PSR notes, Application Note 3 explains:

> In determining whether subsection (b)(2)(B) applies, the court should closely consider the facts of the case to determine whether a participant's influence over the minor compromised the voluntariness of the minor's behavior. The voluntariness of the minor's behavior may be compromised without prohibited sexual conduct occurring.
>
> * * *
>
> In a case in which a participant is at least 10 years older than the minor, there shall be a rebuttable presumption that subsection (b)(2)(B) applies. In such a case, some degree of undue influence can be presumed because of the substantial difference in age between the participant and the minor.

U.S.S.G. § 2G1.3 n.3(B). The Tenth Circuit has explained that while "undue influence" is not defined in the Guidelines, "the sentencing enhancement was added to the Guidelines in 2000 to capture those cases where coercion, enticement, or other forms of undue influence by the defendant . . . compromised the voluntariness of the victim's behavior and, accordingly, increased the defendant's culpability for the crime." *United States v. Castellon*, 213 F. App'x 732, 736 (10th Cir. 2007) (internal quotation marks omitted). The ultimate burden to prove this enhancement, like all sentencing enhancements, is on the Government. *Id*. at 737.

As an initial matter, the rebuttable presumption applies as to both K.W. and J.W. since each of them was at least 10 years younger than the defendant at the time of the molestation. Indeed, the defendant's sexual assault of J.W. began when J.W. was approximately eight years old, at the house near the Monument. The defendant's assaults of K.W. began when K.W. around 10 years old and the defendant was living at the house on Glen Road. The defendant is 29 years older than J.W. and K.W. and so was in his late 30s when the assaults began. He was easily old enough to be either of their father. *See id.* at 737 (noting the defendant was 26 years older than his victim, an age gap that made the defendant old enough to be the victim's father).

Next, there should be no question that the defendant's influence over J.W. compromised the voluntariness of J.W.'s behavior. J.W. testified at trial that, for the many years he was sexually abused by the defendant, he made the choice to stay with the defendant because his life at home was so awful. His mother's abusive boyfriend was rough with all members of the family, including J.W. and his younger sister. J.W.'s mother was a methamphetamine and alcohol addict and was frequently high and drunk. She testified at trial that she was often unaware of what her children were doing, and to this day cannot recall what truck trips J.W. went on with the defendant. J.W. did not have enough food at his mother's house—but there was always enough to eat at the defendant's. The defendant also cared for J.W. in other ways, such as by taking him to school and to the doctor. J.W. loved the defendant and called him "dad."

As a young child, therefore, J.W. had to make the heartbreaking choice every single day to stay with the defendant and get raped or go back to his mother and suffer abuse, hunger, and neglect. Given how close he was with J.W.'s family—he was "Uncle Mike" to many members of the family, literally as to some of them—the defendant clearly knew about J.W's awful home life. By positioning himself as a father figure when J.W. had none, the defendant's "influence over [J.W.] compromised the voluntariness of [J.W.'s] behavior" and the U.S.S.G. § 2G1.3(b)(2)(B) enhancement is applicable to Counts Four and Five.

The defendant also exercised undue influence over K.W. that compromised the voluntariness of K.W.'s behavior. As a close family friend for many years, K.W. and his family trusted the defendant. When the defendant re-entered their lives, K.W.'s mom was separated from his dad, so when the defendant offered to bring K.W. to school, K.W.'s mom gratefully accepted the help. So, as with J.W., the defendant positioned

himself in K.W.'s life as a trusted parent-like figure. As with other kids, the defendant invited K.W. into his house and provided K.W. with food, toys, and trips—things that K.W.'s family could not easily afford. He also plied K.W. with doses of melatonin before some of the instances of abuse, making him more susceptible and less able to resist. Accordingly, the U.S.S.G. § 2G1.3(b)(2)(B) is also applicable to Count Two.

The defendant argues that this enhancement is not appropriate because, in substance, the defendant did not engage in an explicit *quid pro quo* to get the boys to "consent" to engage in sex acts. But, of course, the U.S.S.G. § 2G1.3(b)(2)(B) enhancement requires nothing of the sort. Rather, it is sufficient that the defendant used his trusted role as an adult in the lives of both K.W. and J.W. to invite them into his home, provide for various of their basic needs, bring them into his bed at night, and shower them with gifts and trips during the day. In short, the defendant made his home an attractive, safe space for his victims and used that as implicit leverage to influence K.W. and J.W. to submit to the defendant's molestation over and over again, without disclosing the abuse for years. Although the defendant's influence over J.W. was arguably greater than it was over K.W., this is not a competition between victims. As to K.W. and J.W., the rebuttable presumption cannot be overcome and the enhancement is applicable to both.[1]

The Government therefore agrees with the Guidelines calculation in the PSR. The defendant's total offense level is 44 (which is treated as offense level 43 pursuant to Chapter 5, Part A, note 2). At criminal history category II, his Guidelines range is

---

[1] The Government also agrees with the PSR's application of U.S.S.G. § 4B1.5 which, in this case, does not change the offense level.

life.[2]

Respectfully submitted,

COLE FINEGAN
United States Attorney

*/s Andrea Surratt*

Andrea Surratt
Assistant U.S. Attorney
U.S. Attorney's Office
1801 California Street, Suite 1600
Denver, CO 80202
Tel: (303) 454-0124
E-mail: andrea.surratt@usdoj.gov
Attorney for the Government

[2] In its sentencing statement [ECF #156], the Government correctly computed the total offense level as 44, but erroneously stated that this translates to a Guidelines range of 360-life when, in fact, the Guidelines range is life. The Government will argue at the sentencing hearing that a downward variance from this Guidelines range is entirely inappropriate and that the only appropriate sentence here is life imprisonment.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 19-cr-00243-CMA-GPG

UNITED STATES OF AMERICA,

Plaintiff,

**v.**

**MICHAEL TRACY McFADDEN,**

**Defendant.**

---

**MOTION FOR NON-GUIDELINE SENTENCE**

---

Pursuant to D.C.COLO.LCrR 32.1(c) , Mr. McFadden by and through his attorneys, Sean M. McDermott and Benjamin LaBranche, submits his Motion For Non-Guideline Sentence. The basis of this Motion is that Mr. McFadden's character and circumstances must be included pursuant to 18 U.S.C. 3553(a). Mr. McFadden states the following:

## I. Introduction

### A. Procedural History of the Case

On or about May 17, 2019, a grand jury in the District of Colorado returned an indictment charging the defendant in five counts. ( Doc. No. 1) The People filed a Motion to Introduce Other Acts Evidence in the Government's Notice Of Intent To Introduce Evidence Pursuant To Federal Rules Of Evidence 414, 404(b), and 807. (Doc. No. 32). Mr. McFadden filed his Objection to the Government's Notice Of Intent To Introduce Evidence Pursuant To Federal Rules Of Evidence 414, 404(b), and 807 (Doc. No. 59). As the trial date approached Mr. McFadden filed Motions to Continue to the Jury Trial

with supporting Documents. These are found at (Doc. Nos. 94, 104-1, and 105). These Motions were denied. (Doc. Nos. 99 and 108).

The Court held a hearing on October 17, 2022. The Court deferred ruling with respect to the proposed FRE 414 and FRE 807 material the United States Proposed. The FRE 404(b) evidence as it related to J.W. and K.W. was deemed admissible at trial

At the October 17, 2022 hearing, the Court affirmed that the trial would be held in Grand Junction rather than Denver. Following this hearing the defense filed another Motion to Continue the Trial (Doc. No.104). This Motion was denied. (Doc. No. 108). On November 3, 2022, the Defense filed another Motion to Continue (Doc. No. 135) which was also denied. (Doc. No. 140).

Trial commenced on November 7, 2022 (Doc. No. 143). The Jury began deliberations on the early afternoon of November 10 (Doc. No. 146). The jury resumed deliberations on November 11, 2022. One question was asked (Doc. No. 150) and then the jury came back with a verdict of guilty on all counts. (Doc. No. 152) Parenthetically the day before the trial commenced, the Grand Junction Sentinel ran an article regarding the trial. The article reported that Mr. McFadden was previously convicted but the conviction was overturned because of a speedy trial violation. (Exhibit 1). The fact that Mr. McFadden had previously been convicted in state court has been a consistent prosecution theme throughout pretrial litigation in this case.

## II. <u>Legal Standard</u>

### A. Sentencing Under 18 U.S.C. § 3553(a)

The Court's sentencing decision in Mr. McFaden's case is guided and governed by 18 U.S.C. § 3553(a), which directs that the Court should impose a sentence

that is sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph 2 of that subsection. In making its determination, the court is specifically directed to consider both the nature and circumstances of the offense and the history and characteristics of the defendant, among other factors.

The sentencing guidelines promulgated by the United States Sentencing Commission are advisory. Rather than focusing solely on the calculated guideline range, courts must "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party." *Gall v. United States*, 128 S.Ct. 586, 596 (2007). The sentencing court should consider arguments that the guidelines should not apply on general policy grounds, case specific grounds, or any other factor that might render a particular sentence "reasonable". *Gall*, 128 S.Ct. at 596-97. In short, the court must "consider every convicted person as an individual and every case as a unique study in human failings that sometimes mitigate, sometimes magnify, the crime and punishment to ensue." *Gall*, 128 S.Ct. at 598.

**III. The Facts as Applied to the Law Favor a Non-Guideline Sentence**

A. Nature and Circumstances of the Offense

At the October 17, 2022 hearing, and in his Objection to the proffered evidence (Doc. No. 59), the defendant laid out his theory of defense, which was based on the facts as known to the defense and based on the way that the Federal Rules of Evidence would likely be interpreted. The theory did not take into account that the prosecution witnesses who gave the initiating story to law enforcement would be unavailable to testify. It is uncontroverted, that I.S. and his guardian as a juvenile, D.S., dodged or avoided service

of process after D.S. was contacted by Mr. McFadden's legal team who requested a waiver of I.S.'s therapy history by way of a letter.

The theory of defense that was laid out, was that Mr. McFadden had become an easy target for troubled kids that he cared for. Mr. McFadden was a registered sex offender, for a crime that he pled guilty to when he was just over 18 years old. On December 15, 2012, almost 23 years after the allegation that got Mr. McFadden branded a sex offender. I.S. made a disclosure that set off the chain of what the defense planned to assert were false accusations that were likely the result of misattribution caused by repeated interviews by adults of children who previously had either not disclosed or specifically denied abuse by Mr. McFadden.

In December of 2012, I.S.'s guardian, who is referred to as D.S., for purposes of this motion called the police. She told Officer Eric Wood, that I.S. told her son R S., and his cousin E.M. (now E.S.) that Uncle Mike (McFadden) had touched him inappropriately.

When I.S. made the initial disclosure, his cousin E.S. f/k/a E.M stated that I.S. was lying and that I.S. was simply attempting to get Mr. McFadden in trouble. I.S. had previously made two allegations against two different people. These allegations were never substantiated.

After I.S. made his December 15, 2012, disclosure, law enforcement pulled Mr. McFadden's record and the reports from the 1990 case for which Mr. McFadden was convicted. This case is Mesa County Combined Court, 1990CR80. (Doc. No. 157, p. 15, ¶93).

On December 19, 2012, Detective Prescott looked up this 1990 prosecution. Detective Prescott contacted Theresa Ricks and talked to her about the previously closed

investigation. That investigation had been closed when J.W. and his brother L.W. stated that nothing happened. LW was interviewed again, and again said nothing happened.

By January 3, 2013, a mere 17 days after his investigation began, Detective Prescott asked for and obtained an arrest warrant for allegations made by I.S. and then E.S. This was done even though I.S. had made two allegations against two other people that were unsubstantiated; and even though 13 days earlier E.S. had said that Mr. McFadden had not inappropriately touched him or I.S., and that I.S. was simply saying this to get Mr. McFadden in trouble.

Up to this point, none of the disclosures, that the jury heard at this trial had ever been uttered. To the contrary J.W. had repeatedly said that nothing occurred. Once the warrant was obtained on January 3, 2013, the proverbial dominoes fell from there.

Prior to this, on January 21, 2009, J.W. denied that Mr. McFadden abused him. On December 21, 2012, in an interview with Nicole Surad from Family Services there was another denial of abuse by J.W. In this interview, J.W. said he was not allowed in a pod outside of the house because his mom and another woman who resided there C.M. “do drugs.” Not being allowed in the pod, because of their drug use, he slept with his Uncle Mike. He said that Uncle Mike was like a father to him. He was asked about sexual behavior, and he reported none. He went on to say that the only adult he had seen naked was his mother.

After repeated interviews, on February 7, 2013, in an interview with Detective Prescott and Julie Stogsdill, there was **finally** an allegation of abuse. The allegations grew larger and more serious. Despite the seriousness and the horrific details provided in subsequent interviews and at trial, there is no physical evidence to support the

allegations. The defense's major concern that the horrific recitation of the allegations would overshadow any objective review of the evidence, became true. Mr. McFadden was convicted of the Counts that pertain to J.W.

With respect to K.W., K.W. and his family had a long history of interaction with Mr. McFadden. K.W. never mentioned any abuse until after Mr. McFadden was arrested on January 3, 2013. When speaking with his mother, K.W. initially attributed sexual conduct by Mr. McFadden against J.W. and not himself.

Prior to this arrest, Detective Prescott contacted K.W.'s family and informed them that an arrest warrant for Mr. McFadden had been signed. Following this arrest, K.W.'s mom took it upon herself to think that K.W. was talking about himself and not J.W. According to police reports K.W.'s mom took him to counselor Emily Bowman at the Montrose Center for Mental Health and then he disclosed. At trial, K.W. did not recall seeing a therapist.

No disclosure by K.W. occurred until the shame of an arrest warrant followed Mr. McFadden. K.W. also was surrounded by family that discussed what Detective Prescott shared with the family. Prior to this, Mr. McFadden had been in K.W.'s life for several years, but no disclosure occurred until now. The family of K.W. was not a stranger to accusations of sexual abuse. These include allegations of someone perpetrating on S.J.W. and K.W. There were February 2007 allegations of sexual misconduct within the family. These did not include Mr. McFadden.

The purpose of the above recitation is not to attack the witnesses who were prepared to testify in this case or the ones who testified in this case. By the time, the witnesses testified, they likely believe what they said. However, source misattribution is

real. (Exhibit 2, Report of Dr. David Thompson, p. 4 - 13). At trial, the Defense cross-examined the witnesses including the prosecution's expert witness, with this source misattribution in mind. The Jury deliberated and returned its verdict. However, this Court is not bound to believe every detail that it heard at trial, when it considers the verdict to impose.

The Court can have a lingering or residual doubt that Mr. McFadden violently committed rapes in the presence of other people. The fact that no independent witness in Mr. McFadden's crowded D ½ Road house ever witnessed anything; the fact that the Counts pertaining to K.W. allegedly occurred in a small truck cabin with two other people present including a young adult with nobody seeing or witnessing the conduct; and the fact that no physical evidence was ever seen by anyone--**should not be lost on the Court when the Court takes into account the nature and circumstances of the offense**. The Jury could have reached its verdict, without believing that the conduct was as horrific as the testimony that it heard from J.W. and K.W.

B. <u>History and Characteristics of the Defendant</u>

Mr. McFadden is a 51-year-old man who stands before the Court. He will turn 52 in August. (Doc. No. 157 p. 3). He has a Criminal History of II. He has the Criminal History of II based on the plea of guilty that Mr. McFadden entered in 1990. (Doc. No. 157 p. 15-16). At the time of that plea, Mr. McFadden was a mere 18 years old. He received a probationary sentence for that case. When Mr. McFadden was in therapy following his state case, he reported flashbacks of physical and sexual abuse at the hands of someone who was in a position of trust. This is touched on in the presentence report (Doc. No. 157 p. 18, ¶ 107).

Case 1:19-cr-00243-CMA-GPG Document 162 Filed 02/21/23 Page 8 of 11

Mr. McFadden was released in the state prosecution of this case on February 27, 2018. He was rearrested on May 21, 2019 (Doc. No. 157 p. 2) for the federal charges in this case for which he had been freed from by the state of Colorado. In that year-and-a half, Mr. McFadden worked and did not have any criminal offenses, which shows he is not a danger to the community. When not in custody, Mr. McFadden has always maintained steady employment. (Doc. No. 157 p. 21, §§ 128-132).

At the age of 51, Mr. McFadden has high cholesterol and high blood pressure. (Doc. No. 157 p. 20, ¶ 117).

Testimony at trial demonstrated that Mr. McFadden has a side to him that shows that he cares for other people. He brought JW and other kids to medical appointments. He provided food and clothing. Other adults were at his home. These adults were often troubled. This conduct was not just a veiled plot to gain access to children and prey upon them. John Hockenberry lived with Mr. McFadden and so did his minor son. They are complimentary of Mr. McFadden and the defense anticipates that will communicate this to the Court.

C. Reflect the Seriousness of the Offense and Provide Just Punishment

1. Statutory Penalties

Counts One and Three of the indictment, each charged a violation of 18 U.S.C. §2241(c) (crossing state lines with intent to engage in a sexual act with a minor under 12), carry potential sentences of not less than 30 years imprisonment and not more than life; not more than a $250,000 fine; a term of supervised release of not less than five years and not more than life; and a $100 special assessment.

Counts Two, Four, and Five of the indictment, each charging a violation of 18

U.S.C. § 2423(a) (transportation of a minor with intent to engage in sexual activity), carry a potential sentences of not less than 10 years imprisonment and not more than life; not more than a $250,000 fine; a term of supervised release of not less than five years and not more than life; and a $100 special assessment.

Mr. McFadden is 51 years old. He has already spent years incarcerated related to this case. Any legal sentence that this Court can give will reflect the seriousness of the conviction and provide punishment.

D. Provide Adequate Deterrence and Protect the Public

At Mr. McFadden's age any sentence will provide adequate deterrence and protect the public. A 30-year sentence is likely a life sentence.

**CONCLUSION**

Mr. McFadden is a 51-year-old man who has worked when he has not been in custody. He suffered abuse as a minor. A governing sentence of 30 years on Counts One or Three with concurrent sentences 20 years on Counts Two, Four, and Five is sufficient but not greater than necessary to achieve the goals of 18 U.S.C. § 3553.

Case 1:19-cv-02443-RM-GPG Document 193-16 Filed 02/23/23 Page 10 of 11

Respectfully submitted,

Dated: February 23, 2023

s/Sean M. McDermott
Sean M. McDermott
McDermott Stuart & Ward LLP
140 E. 19th Avenue, Suite 300
Denver, CO 80203
(303) 832-8888
(303) 863-8888 (fax)
Email: smcdermott@mswdenver.com

s/Benjamin R. LaBranche
Benjamin R. LaBranche (54678)
1544 Race Street
Denver, CO 80206
Phone: (225) 927-5495
Fax: (225) 927-5568
Email: ben@brllawyer.com

**CERTIFICATE OF SERVICE**

I hereby certify that on this 23rd day of February 2023, I filed the foregoing **pleading** with the Clerk of Court using the CM/ECF system which will send notification of such filing to all listed parties.

s/ Sean McDermott
Sean McDermott

https://www.gjsentinel.com/news/western_colorado/trial-for-accused-child-molester-to-start-monday/article_44ebf0b2-5bb9-11ed-a28d-bb5e9687b472.html

# Trial for accused child molester to start Monday

By SAM KLOMHAUS Sam.Klomhaus@gjsentinel.com
Nov 7, 2022

Michael McFadden

A former Grand Junction man whose 324-year sentence for child sex crimes was overturned by the Colorado Supreme Court on a technicality is set to begin an eight-day trial Monday in Grand Junction.

A federal grand jury indicted Michael McFadden in May 2019, on charges of crossing state lines with intent to engage in a sexual act with a minor under 12, and transportation of a minor with intent to engage in sexual activity.

Privacy - Terms

McFadden was convicted in Mesa County of child sex assault, but was freed in 2018 after the Colorado Supreme Court ruled his right to a speedy trial had been violated, and his 2015 conviction was vacated.

At the time of the indictment, 21st Judicial District Attorney Dan Rubinstein called the Colorado Supreme Court's decision "appalling."

The indictment alleges McFadden crossed state lines with the intention of having sex with a child, and also transported a minor across state lines, between December 2012 and January 2013, and also between December 2010 and January 2011.

A fifth count relates to transportation of a minor between January 2007 and January 2013.

The maximum sentence for each count is life in prison, according to the indictment.

According to court documents, the speedy trial deadline for McFadden's case is either Dec. 10 or Dec. 11.

Sam Klomhaus



**Clinical Psychology Associates, LLC**

clinicpsych.com • P: 262-763-9191 • F: 262-763-7767
197 W. Chestnut St., Burlington, WI 53105

February 16, 2023

Sean McDermott
McDermott Stuart & Ward LLP
One Sherman Place
140 E. 19th Avenue, Suite 300
Denver, CO 80203

Re: United States of America v. Michael Tracy McFadden
Case No. 19-cr-00243-CMA-GPG (District of Colorado)

Dear Attorney McDermott:

At the time of my review, Michael McFadden was charged in the United States District Court for the District of Colorado with two counts of Crossing State Lines with Intent to Engage in a Sexual Act with a Minor Under 12 Years of Age, and three counts of Transportation of a Person Over State Lines with the Intent to Engage in a Sexual Act that is a Crime. The alleged victim in counts one and two is KW, and in counts three, four, and five the alleged victim is JW.

You requested that I review file documents in the above-referenced matter for the purpose of identifying factors related to memory that may affect the alleged victim's testimony at trial. I did not personally interview or evaluate any of the parties in this matter, including the alleged victim. To do so would not have added significantly to the information available to me in this case, and might potentially have increased the distress of the children and affected the reliability of their subsequent reports or testimony.

During the course of my evaluation I reviewed the following material:

Doc. 34 - Amended Protective Order
Affidavit in Support of Arrest Warrant Case No. 13CR27 (Mesa County, Colorado)
Affidavit in Support of Arrest Warrant Case No. 13CR339 (Mesa County, Colorado)
Affidavit in Support of Arrest Warrant Case No. 13CR342 (Mesa County, Colorado)
Indictment Case No. 19-cr-00243-GPG (Federal District of Colorado)
Video recorded 12/20/2012 interview of Cindy Ricks INV_GJPD352 (52:50)

Transcript of 12/20/2012 video recorded interview of Cindy Ricks
Colorado Department of Human Services records INV_GJPD_1045-1113
Handwritten statement of Dian Stauter 12/15/2012
Report regarding Dian Stauter INV_GJPD_17-18
Written summary of 12/21/2012 interview of JW INV_GJPD_147
Recorded 12/21/2012 interview of Crystal McFadden INV_GJPD_306 (33:14)
Transcript of video recorded interview 12/21/2012 INV_GJPD 1430-1450
Video recorded 12/21/2012 interview of EM INV_GJPD_307 (28:10)
Transcript of 12/21/2012 interview of EM
Video recorded 1/3/2013 interview of EM INV_GJPD_315 (49:36)
Transcript of 1/3/2013 interview of EM
Video recorded 1/16/2013 interview of KW (INV_GJPD_317 (32:40)
Transcript of 1/16/2013 interview of KW
Judge in GJ statement regarding March 2013 interview INV_TRAN_1429-1430
Transcript of 3/21/2013 interview of IS
Video recorded 12/18/2012 interview of IS INV_GJPD_357 (31:36) & 304 (2:55)
Transcript of 12/18/2012 video recorded interview of IS 12/18/12
E-mail from Nicole Surad to Ed Prescott dated 1/2/2013 GG APD 0147
Recorded 2/7/2013 interview of Michelle Ricks INV_GJPD_313 (26:45)
Transcript of 2/7/2013 interview of Michelle Ricks
Recorded 2/7/2013 interview of JW INV_GJPD_310 (38:08)
Transcript of 2/7/2013 interview of JW
Recorded 3/21/2013 interview of IS INV_GJPD_305 (22:15)
Transcript of 3/21/2013 interview of IS
Pinal County Sheriff's Office report No. 081215153 INV_GJPD_86-88
Grand Junction Police Department case report No. 2008-077914
Grand Junction Police Department case report No. 2012-00060954
Stacy Wesolowski telephone call with Det. Prescott 1/15/2013 INV_GJPD_316 (23:58)
Transcript of 1/15/2013 telephone call with Investigator Prescott and Stacy Wesolowski
Transcript of 5/22/2018 interview of KW
Transcript of 8/8/2018 interview of JW
Doc. 39 - Other Acts Motion filed 12/2/2020
Doc. 81 - Second Motion to Compel Production filed 9/26/2022

**Synopsis**

In December 2012, the Grand Junction Police Department opened an investigation into allegations that Mr. McFadden had engaged in sexual behavior with several young boys. IS reported during a recorded forensic interview that Mr. McFadden gave him touches he didn't like. Other children were interviewed but did not report sexual contact. A number of charges were issued in the state case, which eventually resulted in a jury trial, convictions, and reversal at the appellate level due to speedy trial violations.

The current indictment stems from allegations that in December 2012 and January 2013, Mr. McFadden transported KW across a state line on two occasions with the intent to engage in sexual activity with the child. The indictment also alleges that between December 1, 2010 and

January 1, 2011, on two occasions, Mr. McFadden knowingly crossed the state line with the intent to engage in a sexual act with JW, and that between January 1, 2007 and January 3, 2013. Mr. McFadden knowingly transported JW in interstate commerce with the intent to engage in sexual activity with the child.

The purpose of my report is to describe a variety of factors present in this case that extensive research has shown affect an individual's memory. As the determination of the credibility of either child's statements is a matter for the trier of fact, I cannot and will not offer an opinion on the ultimate question regarding whether their statements are true.

In order to place the information below in proper context, it is important to understand some basic processes regarding how human memory works. Research on human memory has been conducted for over 100 years, and I will not review that body of literature in this report. For a readable review of memory research, please see Loftus (1988). Memory is reconstructive in nature, and generally consists of three different stages: acquisition, storage, and retrieval. Memories are acquired through sensory input such as touch, hearing, or sight, as well as through imagination. Memory is stored in traces, called gists. When we recall (retrieve) a memory, we retrieve the stored traces and we combine them with post-event information (things that we have learned or experienced after the original memory experience) and reconstruct the event in question. This new memory (new because it has been reconstructed using post-event information) is then returned to our memory storage different than when it was retrieved.

Research has identified a number of factors that can affect an individual's memory. In the following sections I will briefly review research in specific areas that may impact the accuracy of memory, and I will apply that research to the facts of this individual case.

Repeated Conversations.[1] Research studies have shown that when children are repeatedly questioned about non-events (e.g., Ceci, Crotteau-Huffman, Smith, & Loftus, 1994), they report such events at a relatively high rate and vigorously hold to those memories despite evidence to the contrary (that these memories are inaccurate). Similar effects have been demonstrated with older children and adults (e.g., Loftus, Coan, & Pickrell, 1996; Pezdek & Hodge, 1999). Research has also shown, though, that under some circumstances, the repeated questioning of children can be a useful tool and can result in additional accurate information from the child (e.g., Orbach, Lamb, La Rooy, & Pipe, 2012). It is extremely important to point out, however, that this assertion is only accurate when unbiased interviewers using appropriate interviewing techniques have conducted all of the interviews (LaRooy, Katz, Malloy, & Lamb, 2010). Under such circumstances, multiple interviews can be useful in retrieving additional information, particularly given the reconstructive nature of memory. This same advantage has not been demonstrated in situations where one or more of the repeated interviews, including informal

[1] Both this evaluator and the authors of published research papers define interviews as including conversations the child has with formal interviewers, such as those conducted at child advocacy centers, as well as less structured or informal conversations in which the child is questioned by or otherwise talks with other persons such as siblings, relatives, parents, teachers, therapists and counselors, law enforcement investigators, police officers, social workers, physicians, nurses, district attorneys, and victim witness coordinators, to name a few. See, e.g., Lamb, Brown, Hershkowitz, Orbach, & Esplin (2018).

conversations with others, utilized either a biased interviewer or questioning techniques that are contrary to best practice.

The following table describes events that relate to repeated conversations with JW:

| Date | Event | Details |
|---|---|---|
| 12/16/08 | Mom | JW was questioned by his mother about being touched by McFadden. No disclosure was made during this discussion. |
| 1/21/09 | Police | Det. Crocker interviewed JW at Western Slope CAC. No disclosure was made during this interview. |
| "Years ago" | Cousin | JW told reportedly cousin DOS that Mr. McFadden touched his pee pee. |
| 12/21/12 | CPS | DHS caseworker Surad interviewed JW alone at GJPD. No allegations made. |
| Before 2/7/13 | "The Cops" | JW reported to detectives that "the cops" had talked to him previously about the allegations. |
| 2/7/13 | Police | Dets. Prescott and Stogsdill interviewed JW at his home. |

The following table describes events that relate to repeated conversations with KW:

| Date | Event | Details |
|---|---|---|
| 1/3/13 | Mom | Enroute home from a truck stop in NE after Mr. McFadden's arrest, KW told mom about "sexual issues" between "[McFadden] and someone." |
| Before 1/15/13 | Brother | KW's brother said that Mr. McFadden "humped" him. |
| 1/15/13 | Counselor | KW saw a counselor and reported abuse allegations by Mr. McFadden. |
| January 2013 | Sister | KW and sister SJW discussed "sexual issues which concerned [McFadden]." |
| 1/16/13 | Police | Det. Prescott interviewed KW. |
| 1/18/13 | Parents | Parents awakened KW, who reported nightmares of sexual assault (audio-recorded by parents). |
| 1/18/13 | Physician | Physical examination performed yielding no signs of anal sexual abuse. |

<u>External influences can affect a child's reports.</u> Research with children and adults tells us that factors external to the child can have a significant impact on the accuracy of the child's memory (Poole & Lindsay, 1995). For example, research on negative stereotype induction (e.g., Leichtman & Ceci, 1995; Lepore & Sesco, 1994) tells us that simply over-hearing other people talk in a negative manner about an individual can lead to the child making reports consistent with the negative characteristics attributed to the person in question. In a similar vein, family discussions (Poole & Lindsay, 2001) or family pressure can influence the child's memory or event reports in a variety of ways. Pressure to minimize or not report observations can occur in situations where doing so may cause disruption or financial hardship for the family, and pressure

to make negative statements about an individual can occur in situations where the family is angry with or hostile toward the person in question. Even older children have been shown to make implausible event reports in the presence of false prevalence information (Otgaar, Candel, Merckelbach, & Wade, 2009).

In the current case, there are a number of factors that raise concerns about external influences on the reliability of the children's memories and event reports. Very broadly, the extensive investigations conducted by Mesa County authorities and the Colorado Department of Human Services resulted in many discussions between both adults and the alleged victims as well as other youth and the alleged victims, any one of which are sufficient to serve as the foundation for injecting unreliability into the investigation. More specifically, however, the following occurred:

- The Colorado DHS investigator Surad told Michelle Ricks to tell the children that "other kids are saying stuff happened." This tactic is known to produce inaccurate information from children (Ceci & Bruck, 1995).
- Twice during the 1/16/2013 interview of KW, Det. Prescott told KW that he had already talked with other kids that KW knew. Again, this tactic is known to produce inaccurate information from children (Ceci & Bruck, 1995).

The potential for negative stereotype induction in this matter is significant.

- During Cindy Rick's interview with DHS, she reported that she was "always worried" that Mr. McFadden was hurting the kids. DHS records, INV_GJPD_1062.
- KW's mother "had [a] feeling" that KW had been the victim of sexual assault. DHS records, INV_GJPD_1106.

To the extent that these feelings were communicated to the alleged victims or their peer contacts prior to the allegations in this case the children's reports are likely to have been influenced by such information. There was evidence that the youth viewed Mr. McFadden in such negative terms, as evidenced by JW's comment during a forensic interview that Mr. McFadden was "a bad person." DHS records, INV_GJPD_1068.

Forensic Interviews: Because of the extensive published research in the area of child forensic interviewing and the ease with which such interviews can be improperly conducted and thereby taint the information obtained, a variety of authors (some affiliated with specific organizations and others with research programs or governmental bodies) have developed specific guidelines or protocols for conducting child forensic interviews. These approaches seek to inform the interviewer on the relevant research and guide the interviewer in the conduct of the evaluation so as to most effectively and reliably elicit and preserve accurate information. These guidelines, for the most part, contain the same basic instructions for interviews although the specific timing of various interview components may differ among the approaches (see Poole, 2016, for a more comprehensive discussion of this area). Research has demonstrated that when these techniques are properly applied in child forensic interviews, even very young children are able to provide reliable and relevant information (Walker, Kenniston, & Inada, 2013). When interview guidelines are ignored or improperly applied, however, the resulting information obtained during the interview (and often subsequent to the interview) is of questionable reliability. Research has

shown that despite proper training, child forensic interviewers often deviate from proper interviewing procedures. For these reasons it is important to carefully examine the interviewer's interaction with the child interviewee on a case-by-case basis.

I reviewed the 8/8/2018 video recorded interview of JW and rated each utterance by Stephanie Knapp as a non-query (a simple restating of what the child said to verify accuracy or utterances referred to as "facilitators," such as "Yes," "Go on," or "Uh-huh"), an invitation, a directive, an option-posing query, or a suggestive statement. I used the following guide to classify Ms. Knapp's utterances:

Invitations. Questions, statements, or imperatives, prompting free-recall responses from the child. Such utterances do not delimit the child's focus except in a general way (for example, "Tell me everything that happened"), or use details disclosed by the child as cues (for example, "You mentioned that he touched you. Tell me everything about the touching").

Directives. Directive inquiries refocus the child's attention on details or aspects of the alleged incident that the child has already mentioned, providing a category for requesting additional information using "Wh-" questions (cued recall). For example, "When did it happen?" (when the child disclosed that something happened), or "What color was his t-shirt?" (when the child said he was wearing a t-shirt).

Option-posing utterances. These focus the child's attention on details or aspects of the alleged incident that the child has not previously mentioned, asking the child to affirm, negate, or select options provided by the investigator using recognition memory processes, but do not necessarily imply that a particular response is expected. For example, "Did he say anything to you?" or "Did he touch you over or under your clothes?" (when the child mentioned that he touched him/her).

Suggestive utterances. These are stated in such a way that the interviewer strongly communicates what response is expected (e.g., "He forced you to do that, didn't he?") or they assume details that have not been revealed by the child (for example: Child: "We laid on the sofa." Interviewer: "He laid on you or you laid on him?"). Suggestive utterances, which communicate to the child what response is expected, are strongly discouraged. The contaminating effects of option-posing and suggestive utterances are aggravated when they are repeated.

I used the same coding guidelines to review and analyze the 2/7/2013 interview of JW conducted by Detectives Prescott and Stogsdill, the 1/16/2013 interview of KW conducted by Detective Prescott, and the 5/22/2018 interview of KW conducted by A. Howard & A. Zappe. The results of these analyses are provided below.

Best Practices for Forensic Interviewers: Researchers have addressed the concept of best practices in child forensic interviewing (see, e.g., Brubacher, Peterson, La Rooy, Dickinson, & Poole, 2019; Lamb, Brown, Hershkowitz, Orbach, & Esplin, 2018; Newlin et al., 2015; Saywitz, Lyon & Goodman, 2018). A child forensic interview seeks to gather factual information from a child in a sensitive and legally sound manner while also preserving the integrity of the child's

memories of the alleged events. A methodologically sound coding system[2] has been developed for the purpose of identifying and measuring the content of investigative interviews. Hershkowitz et al. (2017) reported the rates of question types used by well-trained child forensic investigators: Five sixths of all questions focused on the recall memory of the child (invitations and directives), one sixth of questions were follow-up for details not mentioned (option-posing questions), and there were almost no suggestive questions. Well-trained, unbiased interviewers who work hard to obtain details from children's recall memory rather than from recognition memory use almost entirely invitation and directive questions. The following figure, based on the Hershkowitz et al. (2017) data, demonstrates the rates of question types in an example of best practice child forensic interviewing:

The research in child forensic interviewing (e.g., Ceci & Bruck, 1995; Thompson, Clarke-Stewart, & Lepore, 1997; Poole & Lamb, 1998) also consistently identifies a number of inappropriate interviewing techniques that result in inaccurate reports. The use of leading and Yes/No questions, social reinforcement for specific statements, or disapproval for specific statements all can have a significant impact on the accuracy of a child's reports. Research studies have shown that younger youth are disproportionately more vulnerable than older children to suggestive post-event questioning (Ceci & Bruck, 1993).

I reviewed the video recorded interviews and transcripts several times to carefully characterize each statement by the interviewers on each date as either a non-query (restatement or facilitator) or a query (invitation, directive, option choosing, or suggestion).

<u>2013 Interview of JW</u>

In all there were 160 queries by Detectives Prescott and Stogsdill. Only six (four percent) of these queries were invitations for JW to report what happened to him. Thirty-eight (about 24 percent) of the queries were requests for details from JW. One hundred nine (68 percent) of the

[2] NICHD's Quality of Interview Analyses

queries from the detectives were option-posing queries, asking JW to confirm or disconfirm choices presented to him by the interviewers. A total of seven (four percent) of the queries met the strict definition for suggestive questioning. The following graph compares the two detectives' rate of queries to a sample of best practice.[3]

2018 Interview of JW

JW was interviewed a second time on 8/8/2018 by Stephanie Knapp for a total of 97 substantive queries. Thirteen (13 percent) of these queries were invitations for JW to report what happened to him. Forty-five (about 46 percent) of the queries were requests for details from the child. Thirty-six (37 percent) of the queries from the detectives were option-posing queries, asking JW to confirm or disconfirm choices presented to him by Ms. Knapp. A total of three (three percent) of the queries met the strict definition for suggestive questioning. The following graph compares Ms. Knapp's rate of queries to a sample of best practices:

[3] The summed percentages on this and other graphs in this report may reflect minor rounding error.

## 2013 Interview of KW

Detective Prescott interviewed KW on January 16, 2013. Out of a total of 127 substantive queries, only one (one percent) was an invitation for the child to report what happened to him. Forty-nine (38 percent) of the queries were requests for details, while fully 72 constituted option-posing questions. A total of five queries met the strict definition for suggestive questioning. The following graph compares Detective Prescott's rate of queries to a sample of best practice:

## 2018 Interview of KW

KW was interviewed a second time on 5/22/2018, this time by interviewers A. Howard and A. Zappe. Out of a total of 204 substantive queries, 34 (17 percent) were invitations for KW to

report what happened to him. Eighty-seven (about 42 percent) of the queries were requests for details from KW. Eighty-one (39 percent) of the queries from the interviewers were option-posing queries, asking KW to confirm or disconfirm choices presented to him by them. Three (one percent) of the queries met the strict definition for suggestive questioning. The following graph compares the two interviewers' rate of queries to a sample of best practice.

It is important to note that these data should not be considered in isolation from other information obtained during my review of the investigation material. The presence or absence of misinformation provided to the children is crucial to an understanding of the likely impact of the various questioners' interviewing styles.

The recorded forensic interviews in this matter were uniformly poor. Two of the four interviews featured two interviewers simultaneously meeting with a child, which is outside of proper interviewing protocol and is not recommended. The questioning styles in all four interviews consistently reflected the interviewers' marked departure from best practice techniques.

<u>Bias</u>: Interviewers at times engage in what is called "confirmatory bias" (Faust & Faust, 2012; Festinger, 1957). This type of bias occurs when an interviewer approaches an interview with a preconceived notion of what may have occurred. The interviewer then tends to pay attention to or assign greater weight to information or statements that confirm the interviewer's preconceived ideas, while simultaneously paying less attention to or giving less weight to statements that refute the interviewer's preconceived notion. This bias has been shown in research studies to be quite insidious and to greatly affect the outcome of the interview. The presence of interviewer bias can be inferred from interviews where the interviewer misses opportunities to test alternative hypotheses (other explanations) for the statements made by the child being interviewed.

Interviewer bias can be assessed in several ways. First, it can be inferred by a lack of alternative

hypothesis testing on the part of the forensic interviewer. In at least some of the above recorded interviews the interviewer appeared to consider alternative hypotheses, although minimally so.

The second way that interviewer bias can be assessed is by watching the nonverbal interaction between an interviewer and interviewee. Research has demonstrated that subtle nonverbal communication can have a powerful effect on the reports of the individual interviewee. The camera placement in the above interviews was generally poor, such that I was unable to observe the presence or absence of nonverbal communications.

Therapy Effects: Many appropriate psychotherapeutic techniques that are used to treat children that have experienced trauma, including various forms of abuse, can affect the child's recollections and reports (e.g., Branaman & Gottlieb, 2013). For example, trauma-focused cognitive behavioral therapy (TF-CBT) is an evidence-based treatment approach (Cohen, Mannarino, & Deblinger, 2006; Cohen, Mannarino, Deblinger, & Steer, 2004) for use with children and adolescents who have experienced traumatic events. It also includes a parent component. In general, the treatment approach involves a desensitization process that is characterized by the construction of what is called a trauma narrative, which is a written story composed by the child with the assistance of the therapist. This story helps the child review and process the traumatic events and to cope effectively with communication problems, misunderstanding and misinformation, and other potential complicating factors. It is important to note that TF-CBT involves the regular revisiting of and discussion about the alleged traumatic events. It is this regular discussion, involving both the child and the therapist (and eventually other persons) that allows the child to become desensitized to the reported trauma. Eye Movement Desensitization and Reprocessing (EMDR) therapy (Shapiro, 2007) is another example of such an evidence-based treatment approach that involves regular revisiting of the identified traumatic event.

The records that I reviewed very clearly indicated that the children were involved in various types of psychotherapy. The details were not provided. See my affidavit, executed 13 September 2022, for additional details and discussion. I have not been provided with records related to the children's therapy, but in the event that I receive those records I will be prepared to provide an addendum to this report.

When I review therapy records I am looking for several things. First, I am interested in the number of sessions in which the therapist and child discussed the abuse allegations. This is important due to the effects of repeated conversations (as discussed above), particularly when the therapist is using those discussions to desensitize the child to the alleged traumatic experiences (this is accomplished by helping the child think differently and react differently to his or her recollections). Second, I am looking for the application of treatment techniques that are known to affect a child's memory, such as TF-CBT and EMDR, described above. Finally, I am looking for indicators of the application of treatment methods or techniques that are known to be ineffective or even harmful. There are a number of such techniques that are unfortunately still utilized by uninformed or incompetent providers. See Koocher et al. (2014) for a more in-depth discussion and listing of these techniques. I am able to secure treatment records according to professional standards, and am likewise able to closely adhere to any Orders of Protection for those records that may apply.

Source Misattribution Errors: Source misattribution errors (also referred to as source monitoring errors) are situations in which an individual (adult or child) identifies the incorrect source of a memory. The memory can be true or it can be false. Many different factors influence the ways in which people make source misattribution errors, and they can be compounded by the use of inappropriate interviewing techniques across situations. Indeed, the details provided by the child in such situations can be rich and varied, and the individual in error is completely convinced that he or she is accurately recounting a true experience. Source misattribution errors occur when persons have been influenced by other individuals (such as overhearing rumors or experiencing negative stereotype induction), have been subjected to leading questions or other inappropriate or suggestive interviewing techniques, and in situations in which a person actually had the experience being reported but under different conditions (for example, being sure that they placed their car keys on the kitchen counter when in reality they placed their keys on their nightstand). Research has shown that these source misattribution errors are not confined to "peripheral details," but can include erroneous reports of bodily touching, including reports of genital touching when children are interviewed with the use of anatomical dolls (Ceci et al., 1994).

The research on source misattribution errors demonstrates that children who experience this phenomenon are fully convinced that their memory is accurate, and some such children will not change their reports even when provided with information to the contrary. Furthermore, the more times the child repeats the story, the more it will be cemented in his or her memory as a memory the child believes is true.

An individual's ability to accurately recall the source of specific memories is affected by a number of factors, including the frequency with which he or she has discussed events with others, the impact of peer and family influence, the presence of negative stereotype induction, the passage of time, and the presence of various mental health factors. The inappropriate interviewing techniques utilized with the alleged victims in this case, as well as the likely presence of negative stereotyping, are in my opinion sufficient to form the foundation for source misattribution errors.

It is also important to point out that there is not a profile of an abused child that might be used to substantiate a history of or the presence of physical or sexual abuse. Children evidence a number of behaviors for many different reasons. Research (e.g., Kendall-Tackett, Williams, & Finkelhor, 1993) has concluded that there is no specific syndrome for children who have been sexually abused.

Finally, much of the information presented above concerning memory and the subtle yet powerful effects on recollection and reports of the vulnerabilities described above are beyond the understanding of the average juror. Research (e.g., Quas, Thompson, & Clarke-Stewart, 2005; Warren & Woodall, 1999) suggests that while some jurors may be aware of some of the concerns described in this report, significant gaps exist in the knowledge base of both individual jurors and collective juries, particularly as it relates to the extent and accuracy of their information. The provision of expert testimony may serve to reduce this variability and correct the misperceptions of a majority (or a large minority) of jurors. The researchers conclude that the knowledge

provided by experts might reduce both unwarranted skepticism and naïve trust in children's claims of sexual abuse.

**Opinion**

It is substantially likely that the factors described above negatively impacted the reliability of the alleged victims' memories and event reports. This impact is likely to extend to the reliability of the children's future testimony at trial.

**Evidence that Does Not Support My Opinion**

An individual's memory for an event is generally the most accurate closer to the date of the event, in the absence of intervening misinformation. Although in the current matter it appears that the various children involved in the investigation had contact with each other, there is little clear documentation that they discussed the allegations among themselves or that they directly or indirectly were exposed to the information by adults.

Therapy records for the alleged victims were requested but were not available to me. Although it is very likely that the therapists providing services to the children were trained to be sensitive to potential traumatic events in the lives of their clients and to use evidence-based treatment techniques to address such experiences, I am unable to be certain of their skills and training in the absence of the therapy records.

I am available to testify in this case as needed. Please contact me if you have questions concerning the above.

Sincerely,

David W. Thompson, Ph.D., ABPP
Diplomate in Forensic Psychology
American Board of Professional Psychology
Clinical and Forensic Psychologist

References

Branaman, TF & Gottlieb, MC (2013). Ethical and Legal Considerations for Treatment of Alleged Victims: When Does It Become Witness Tampering? *Professional Psychology: Research and Practice, 44*, 299–306

Brubacher, SP, Peterson, C, La Rooy, D, Dickinson, JJ, & Poole, DA (2019). How children talk about events: Implications for eliciting and analyzing eyewitness reports. *Developmental Review 51*, 70-89.

Ceci, SJ & Bruck, M (1993). Child Witnesses: Translating research into policy. SCRD Social Policy Reports, 7, No. 3.

Ceci, SJ & Bruck, M (1995). Jeopardy in the Courtroom: A Scientific Analysis of Children's Testimony. American Psychological Association, Washington, DC.

Ceci, SJ, Crotteau-Huffman, ML, Smith, E, & Loftus, E (1994). Repeatedly thinking about a nonevent: Source misattributions among preschoolers. *Consciousness and Cognition, 3*, 388-407.

Cohen, JA, Berliner, L, & Mannarino, A (2010). Trauma focused CBT for children with co-occurring trauma and behavior problems. *Child Abuse & Neglect, 34*, 215-224.

Cohen, JA, Mannarino, AP, Deblinger, E, & Steer, RA (2004). A multisite randomized controlled trial for children with sexual abuse-related PTSD symptoms. *Journal of the American Academy of Child and Adolescent Psychiatry, 43*, 393-402.

Faust, D., & Faust, K. A. (2012). Clinical judgment and prediction. In D. Faust (Ed.), Coping with psychiatric and psychological testimony (6th ed., pp. 147–208). New York, NY: Oxford University Press.

Festinger, L. (1957). A theory of cognitive dissonance. Stanford, CA: Stanford University Press.

Hershkowitz, I., Ahern, E. C., Lamb, M. E., Blasbalg, U., Karni-Visel, & Breitman, M. (2017). Changes in interviewer's use of supportive techniques during the Revised Protocol Training. *Applied Cognitive Psychology, 31*, 340-350.

Kendall-Tackett, KA, Williams,, LM & Finkelhor, D (1993). Impact of Sexual Abuse on Children: A Review and Synthesis of Recent Empirical Studies. *Psychological Bulletin, 113*, 164-180.

Koocher, G.P., McMann, M.R., Stout, A.O., & Norcross, J.C. (2014): Discredited Assessment and Treatment Methods Used with Children. *Journal of Child and Adolescent Psychology, 44*, 722-729.

Lamb, M.E, Brown, D.A., Hershkowitz, I., Orbach, Y., & Esplin, P.W. (2018). Tell Me What Happened: Questioning Children About Abuse (Second Edition). John Wiley & Sons, Ltd. Hoboken, NJ.

La Rooy, D., Katz, C., Malloy, L.C., and Lamb, M.E. (2010). Do we need to rethink guidance on repeated interviews? *Psychology, Public Policy, and Law, 16*, 373-392.

Leichtman, MD & Ceci, SJ (1995). The effects of stereotypes and suggestions on preschoolers' reports. *Developmental Psychology, 31*, 568-578.

Lepore, SJ & Sesco, B (1994). Distorting children's reports and interpretation of events through suggestion. *Applied Psychology, 79*, 108-120.

Loftus, EF (1988). Memory. Ardsley House, New York.

Loftus, E., Coan, J., & Pickrell, J. (1996). Manufacturing false memories using bits of reality. In L.M. Reder (Ed.) Implicit Memory and Metacognition, New York: Psychology Press.

Loftus, EF & Pickrell, BA (1995). The formation of false memories. *Psychiatric Annals, 25(12),* 720-725.

Newlin, C., Steele, L.C., Chamberlin, A., Anderson, A., Kenniston, J., Russell, A., Stewart, H., and Vaughan-Eden, V. (2015). Child Forensic Interviewing: Best Practices. Office of Juvenile Justice and Delinquency Prevention Juvenile Justice Bulletin. http://www.ojjdp.gov/pubs/248749.pdf

Orbach, Y, Lamb, ME, La Rooy, D, & Pipe, ME (2012). A case study of witness consistency and memory recovery across multiple investigative interviews. *Applied Cognitive Psychology, 26,* 118–129

Otgaar, H, Candel, I, Merckelbach, H, & Wade, K (2009). Abducted by a UFO: Prevalence information affects young children's false memories for an implausible event. *Applied Cognitive Psychology, 23,* 115–125.

Pezdek, K. & Hodge, D. (1999). Planting false childhood memories in children: The role of event plausibility. *Child Development, 70,* 887-895.

Poole, D. A. (2016). Interviewing children: The science of conversation in forensic contexts. Washington, D.C.: American Psychological Association.

Poole, DA & Lamb, ME (1998). Investigative Interviews of Children. American Psychological Association, Washington, DC.

Poole, DA & Lindsay, DS (2001). Children's eyewitness reports after exposure to misinformation from parents. *Journal of Experimental Psychology: Applied, 7,* 27-50.

Poole, DA & Lindsay, DS (1995). Interviewing preschoolers: Effects of nonsuggestive techniques, parental coaching, and leading questions on reports of nonexperienced events. *Journal of Experimental Child Psychology, 60,* 129-154.

Quas, JA, Thompson, WC,and Clarke-Stewart, KA (2005). Do jurors "know" what isn't so about child witnesses? *Law and Human Behavior, 29(4),* 425-456.

Saywitz, K. J., Lyon, T. D., & Goodman, G. S. (2018). When interviewing children: A review and update. In B. Klika, & J. Conte (Eds.). APSAC handbook on child maltreatment (pp. 310–329). (4). CA: Sage: Newbury Park.

Shapiro, F. (2007). EMDR, adaptive information processing, and case conceptualization. *Journal of EMDR Practice and Research*, *1*, 68–87.

Thompson, W, Clarke-Stewart, A, & Lepore, S (1997). What did the janitor do? Suggestive interviewing and the accuracy of children's accounts. *Law and Human Behavior, 21*, 405-426.

Walker, AG, Kenniston, J, & Inada, S (2013). Handbook on Questioning Children: A Linguistic Perspective (3rd Edition). American Bar Association, Washington, DC.

Warren, A. R., & Woodall, C. E. (1999). The reliability of hearsay: How well do interviewers recall their interviews with children? *Psychology, Public Policy, and Law, 5*, 456-472.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Criminal Action No. 19-cr-00243-CMA-GPG

UNITED STATES OF AMERICA,

Plaintiff,

v.

1. MICHAEL TRACY McFADDEN,

Defendant.

---

**OPPOSITION TO DEFENDANT'S MOTION FOR NON-GUIDELINES SENTENCE**

---

The United States of America, by and through Andrea Surratt, Assistant United States Attorney, respectfully submits this response in opposition to the defendant's motion for a non-Guidelines sentence of 30 years, his mandatory minimum. [ECF # 162 (the "Motion")]. The only appropriate sentence in this case is a within-Guidelines sentence of life imprisonment. There is nothing in the defendant's Motion that should come close to convincing the court otherwise.

Unbelievably, after conviction at two different trials, in two different jurisdictions, by two different juries, the defendant still refuses to accept responsibility for his abhorrent conduct in this matter. In his Motion, he rehashes some of the same themes that were prevalent throughout pretrial litigation and at trial. Essentially, the defendant still argues, I.S. lied about being abused, so a bunch of other kids did too—inexplicably, even kids who were not entwined in the immediate social or familial group, such as D.R. Then, the defendant argues, he was unable to present this theory to the jury because I.S. did not testify.

Detective Ed Prescott, however, *did* testify, and was well-aware of (and prepared to testify about) the sequence of disclosures in this case. The Government, of course, did not elicit from Detective Prescott hearsay testimony about what he learned about non-testifying witnesses' sexual abuse by the defendant. The defendant also made the very reasonable strategic decision to avoid the same. Indeed, the defendant's counsel in the state trial pursued this "social contagion" theory and the jury did not believe it and convicted him on all counts. Ultimately, there is no evidence that I.S.—or any of the other children who testified at the state trial—told anything but the truth about the abuse inflicted by the defendant.

The defendant also still relies on the delayed disclosures in this case more broadly to proclaim his innocence. This argument—which was also a theme of cross-examination of J.W. and K.W.—only illustrates why the testimony of expert witnesses such as Cheryl Young is so critical in child sex abuse cases. As the court recalls, Ms. Young explained to the jury why young children, especially boys, often fail to disclose sexual abuse as it is ongoing. As the jury learned, and believed, there was nothing unusual about the way in which the defendant's victims disclosed the abuse in this case. Further, the jury heard from J.W. and K.W. themselves why each of them did not disclose the abuse as it happened.

Finally, the defendant rehashes in his Motion another theory rejected by the jury—that because none of the adults at the D½ Road house were aware of the abuse, then it must not have happened. The defendant seems to maintain that if he had "violently rap[ed]" [ECF #162, p.7] all of these kids in the bedroom at D½ Road, surely someone else would have heard it or seen it. But, as the court knows, the Government has never argued that these were "violent" rapes in the sense that the defendant

means. There was no evidence that the defendant violently restrained or attacked his victims. Rather, he did what many other child rapists do—he groomed the children into submission over a period of time. And, often, he plied them with sleep aids to make them more compliant. The rapes themselves, then, were almost gentle. The defendant brought the children into his bed at night, saddled up behind them, and carefully put his penis in their butts. And, of course, this was done in a bedroom full of young children, when no other adults were around. It is easy to believe (as the jury did) that none of the adults—many of whom were impaired on substances or otherwise preoccupied with their own issues—noticed the abuse.

Ultimately, the defendant was convicted of raping J.W. and K.W. And, as the court knows, he raped at least five other young children around the same time. His continued insistence that one theory or another exculpates him from this horrific conduct should tell the court only that this defendant will always pose a danger to his community. Absent a speedy trial violation in state court, the defendant would already be spending the rest of his life in prison, and that remains the only sentence that will serve all of the purposes of sentencing.

Dated: February 27, 2023.

Respectfully submitted,

COLE FINEGAN
United States Attorney

*<u>/s Andrea Surratt</u>*
Andrea Surratt
Assistant U.S. Attorney
U.S. Attorney's Office
1801 California Street, Suite 1600
Denver, CO 80202
Tel: (303) 454-0124
E-mail: andrea.surratt@usdoj.gov
Attorney for the Government

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 19-cr-00243-CMA-GPG

UNITED STATES OF AMERICA,

Plaintiff,

**v.**

**MICHAEL TRACY McFADDEN,**

**Defendant.**

---

**UNOPPOSED MOTION FOR LEAVE TO FILE LETTER OF SUPPORT PRIOR TO SENTENCING**

---

Mr. McFadden by and through his attorneys Sean M. McDermott and Benjamin LaBranche, moves this Honorable Court to submit a letter prior to his sentencing hearing. As grounds, Mr. McFadden states:

Conferral

1. The parties conferred by email. The United States does not oppose the requested relief. Counsel for Mr. McFadden also discussed this matter via email with the Probation Department on March 6, 2023. The Probation Department expects this pleading instead of the Probation Department filing an addendum.

Reasons for the Requested Relief

2. Undersigned counsel received the letter that is attached as Exhibit 1 on, Tuesday February 28, 2023. This was within ten days of the scheduled sentencing hearing of Mr. McFadden.

3. On March 1, 2023, Mr. McFadden's counsel contacted the probation department

regarding the filing of an addendum to the presentence report, and defense counsel noted that this was within ten days of the scheduled hearing.

4. The probation officer overseeing this case, was unavailable until March 6, 2023. This was through no fault of the probation officer. The email was shared with the probation within 10 days of the scheduled sentencing hearing.

5. An addendum by the probation office was initially offered, but after further communication, undersigned counsel agreed to submit the letter via Motion.

6. Mr. McFadden's counsel requests that this document be filed and accepted. It is being filed as a separate ECF filing as Exhibit 1 to this Motion. It is also requested that the exhibit be filed restricted to the court and the parties. This is a document that would usually be included in an addendum to a presentence report and therefore not viewable by the public.

WHEREFORE, Mr. McFadden respectfully requests that this Court permit him to file the letter, Exhibit 1 prior to sentencing.

Respectfully submitted,

Dated: March 7, 2023

s/Sean M. McDermott
Sean M. McDermott
McDermott Stuart & Ward LLP
140 E. 19th Avenue, Suite 300
Denver, CO 80203
(303) 832-8888
(303) 863-8888 (fax)
Email: smcdermott@mswdenver.com

s/Benjamin R. LaBranche
Benjamin R. LaBranche (54678)
1544 Race Street
Denver, CO 80206
Phone: (225) 927-5495
Fax: (225) 927-5568
Email: ben@brllawyer.com

Case 1:19-cr-00243-CMA-GPG Document 193-1 Filed 03/07/23 Page 3 of 3

CERTIFICATE OF SERVICE

I hereby certify that on this 7th day of March 2023, I filed the foregoing **pleading** with the Clerk of Court using the CM/ECF system which will send notification of such filing to all listed parties.

s/ Sean McDermott
Sean McDermott

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 19-cr-00243-CMA-GPG

UNITED STATES OF AMERICA

Plaintiff,

**v.**

**MICHAEL TRACY McFADDEN**

**Defendant.**

---

**MOTION IN SUPPORT OF MOTION FOR LEVEL ONE RESTRICTION FOR DOCUMENT NO. 167 WHICH IS AN EXHIBIT TO DOC. NO. 166**

---

**COMES NOW,** Sean McDermott, by and through Sean McDermott of McDermott Stuart & Ward LLP, and respectfully states the following in support of his Motion for Level two Restriction of Document No 167 which is an exhibit to Doc. No. 166. This document is a letter of support for Mr. McFadden's sentencing hearing.

1. Counsel for Mr. McFadden filed this document.

2. This is a document that would under ordinary circumstances be filed as an addendum to a presentence report.

3. The author of the document sent this to undersigned counsel on February 28, 2023. The writer of the document informed counsel that due to work commitments it was difficult to write and submit the document to counsel by that date.

4. The probation officer who authored the presentence report was unavailable to respond to counsel's email correspondence regarding the timing of the document until March 6, 2023. This was through no fault of the probation officer, as the document was shared less than 10 days prior to the sentencing hearing.

5. Following correspondence on March 6, 2023, undersigned counsel agreed to file this document.

6. On March 1, 2023, the United States represented that it would not oppose the filing of this document prior to the sentencing hearing, even though it was known that it would likely be filed within seven days of the sentencing hearing.

7. The United States does not oppose this document being restricted.

8. A level one restriction will help ensure that the Protective Order (Doc. No. 22) and Fed. R. Crim. P 49.1 are complied with.

9. Undesigned counsel respectfully requests that the Document No. 167 be given a level two restriction, so that it is viewable by selected parties and the Court.

Wherefore, Mr. McFadden respectfully requests that Doc. No. 167 be given level one restriction that is only accessible by selected parties and the Court.

Respectfully submitted,

Dated: March 7, 2023

s/Sean M. McDermott
Sean M. McDermott
McDermott Stuart & Ward LLP
140 E. 19th Avenue, Suite 300
Denver, CO 80203
(303) 832-8888
(303) 863-8888 (fax)
Email: smcdermott@mswdenver.com

Benjamin R. LaBranche (54678)
1544 Race Street
Denver, CO 80206
Phone: (225) 927-5495
Fax: (225) 927-5568
Email: ben@brllawyer.com

**CERTIFICATE OF SERVICE**

I hereby certify that on this 7th day of March 2023, I filed the foregoing **pleading** with the Clerk of Court using the CM/ECF system which will send notification of such filing to all listed parties.

s/ Sean McDermott
Sean McDermott

# UNITED STATES DISTRICT COURT

District of Colorado

UNITED STATES OF AMERICA
v.
MICHAEL TRACY MCFADDEN

**JUDGMENT IN A CRIMINAL CASE**

Case Number: 1:19-cr-00243-CMA-GPG-1

USM Number: 45307-013

Sean Michael McDermott and Ben LaBranche
Defendant's Attorney

**THE DEFENDANT:**

☐ pleaded guilty to count(s) ________

☐ pleaded nolo contendere to count(s) ________ which was accepted by the court.

☒ was found guilty on count(s) 1 through 5 of the Indictment after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. § 2241(c) | Crossing State lines with Intent to Engage in a Sexual Act with a Minor Under the Age of 12 | 01/03/2013 | 1 |
| 18 U.S.C. § 2423(a) | Transportation of a Minor with Intent to Engage in Sexual Activity | 01/03/2013 | 2 |
| 18 U.S.C. § 2241(c) | Crossing State Lines with Intent to Engage in a Sexual Act with a Minor Under the Age of 12 | 01/01/2011 | 3 |
| 18 U.S.C. § 2423(a) | Transportation of a Minor with Intent to Engage in Sexual Activity | 01/01/2011 | 4 |
| 18 U.S.C. § 2423(a) | Transportation of a Minor with Intent to Engage in Sexual Activity | 01/03/2013 | 5 |

The defendant is sentenced as provided in pages 2 through 7 of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s) ________

☐ Count(s) ________ ☐ is ☐ are dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

March 9, 2023
Date of Imposition of Judgment

Christine M Arguello
Signature of Judge

Christine M. Arguello, Senior United States District Judge
Name and Title of Judge

3/13/2023
Date

DEFENDANT: MICHAEL TRACY MCFADDEN
CASE NUMBER: 1:19-cr-00243-CMA-GPG

# IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of: **Life Imprisonment, as to each of Counts 1 through 5, to run concurrently.**

☐ The court makes the following recommendations to the Bureau of Prisons:

☒ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

- ☐ at ______________ ☐ a.m. ☐ p.m. on ______________ .
- ☐ as notified by the United States Marshal.

☐ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

- ☐ before 2 p.m. on ______________ .
- ☐ as notified by the United States Marshal.
- ☐ as notified by the Probation or Pretrial Services Office.

# RETURN

I have executed this judgment as follows:

Defendant delivered on ______________ to ______________

at ______________ , with a certified copy of this judgment.

______________
UNITED STATES MARSHAL

By ______________
DEPUTY UNITED STATES MARSHAL

DEFENDANT: MICHAEL TRACY MCFADDEN
CASE NUMBER: 1:19-cr-00243-CMA-GPG-1

## SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of: **Life, as to each of Counts 1 through 5, to run concurrently.**

## MANDATORY CONDITIONS

1. You must not commit another federal, state or local crime.
2. You must not unlawfully possess a controlled substance.
3. You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and a maximum of 20 tests per year of supervision thereafter.
   ☐ The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. *(check if applicable)*
4. ☒ You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check if applicable)*
5. ☒ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
6. ☒ You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, *et seq*.) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
7. ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

DEFENDANT: MICHAEL TRACY MCFADDEN
CASE NUMBER: 1:19-cr-00243-CMA-GPG

## STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1. You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2. After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3. You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4. You must answer truthfully the questions asked by your probation officer.
5. You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6. You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7. You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8. You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9. If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12. If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may, after obtaining Court approval, notify the person about the risk or require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.
13. You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's Signature ______________________________ Date ________________

DEFENDANT: MICHAEL TRACY MCFADDEN
CASE NUMBER: 1:19-cr-00243-CMA-GPG-1

# SPECIAL CONDITIONS OF SUPERVISION

1. You must participate in a sex-offense specific evaluation and/or treatment program approved by the probation officer. This may include polygraph and visual response testing as part of the required participation. The probation officer, in consultation with the treatment provider, will supervise your participation in and compliance with the treatment program. You must comply with all rules and regulations of the treatment program that are specified by the treatment agency and the probation officer. You must pay for the cost of treatment based on your ability to pay.

2. You must submit your person, and any property, house, residence, vehicle, papers, computer, Internet capable device, other electronic communications or data storage devices or media, and effects to search at any time, with or without a warrant, by any law enforcement or probation officer with reasonable suspicion concerning a violation of a condition of supervised release or unlawful conduct and by any probation officer in the lawful discharge of the officer's supervision functions.

3. Except for your biological children, you must not associate with any child or children under the age of 18 except in the presence and supervision of an adult specifically designated in writing by the probation officer. The probation officer will notify the designated adult of risks occasioned by your criminal record or personal history or characteristics. You must permit the probation officer to make such notifications. If you have incidental contact with children, you will be civil and courteous to the children and immediately remove yourself from the situation. All such incidental contacts must be immediately reported to the probation officer.

4. You must not have contact with any victim including correspondence, telephone contact, or communication through a third party except under circumstances approved in advance and in writing by the probation officer. If you have incidental contact with the victim, you will immediately remove yourself from the situation. All such incidental contacts must be immediately reported to the probation officer.

DEFENDANT: MICHAEL TRACY MCFADDEN
CASE NUMBER: 1:19-cr-00243-CMA-GPG

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on the following page.

| | Assessment | Restitution | Fine | AVAA Assessment* | JVTA Assessment** |
|---|---|---|---|---|---|
| **TOTALS** | $ 500.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 |

☐ The determination of restitution is deferred until ________ . An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss*** | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| **TOTALS** | $ ________ | $ ________ | |

☐ Restitution amount ordered pursuant to plea agreement $ ________

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on the following page may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

☐ the interest requirement is waived for the ☐ fine ☐ restitution.

☐ the interest requirement for the ☐ fine ☐ restitution is modified as follows:

* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Publ. L. No. 115-299.
** Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
*** Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

DEFENDANT: MICHAEL TRACY MCFADDEN
CASE NUMBER: 1:19-cr-00243-CMA-GPG-1

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

A ☐ Lump sum payment of $ ______________ due immediately, balance due

☐ not later than ____________________ , or
☐ in accordance with ☐ C, ☐ D, ☐ E, or ☐ F below; or

B ☒ Payment to begin immediately (may be combined with ☐ C, ☐ D, or ☐ F below); or

C ☐ Payment in equal __________ *(e.g., weekly, monthly, quarterly)* installments of $ ____________ over a period of __________ *(e.g., months or years)*, to commence __________ *(e.g., 30 or 60 days)* after the date of this judgment; or

D ☐ Payment in equal __________ *(e.g., weekly, monthly, quarterly)* installments of $ ____________ over a period of __________ *(e.g., months or years)*, to commence __________ *(e.g., 30 or 60 days)* after release from imprisonment to a term of supervision; or

E ☐ Payment during the term of supervised release will commence within __________ *(e.g., 30 or 60 days)* after release from imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

F ☐ Special instructions regarding the payment of criminal monetary penalties:

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐ Joint and Several

| Case Number<br>Defendant and Co-Defendant Names<br>*(including defendant number)* | Total Amount | Joint and Several Amount | Corresponding Payee, if appropriate |
|---|---|---|---|

☐ The defendant shall pay the cost of prosecution.

☐ The defendant shall pay the following court cost(s):

☐ The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Criminal Action No. 19-cr-0000243-CMA-GPG

UNITED STATES OF AMERICA,

Plaintiff,

v.

**MICHAEL TRACY McFADDEN**,

Defendant.

---

**NOTICE OF APPEAL**

---

Comes now, the Defendant, Michael Tracy McFadden, by and through undersigned court appointed (CJA) counsel Sean McDermott and Benjamin R. LaBranche and Pursuant to Fed. R. App. P. 3 and Fed. R. App. P. 4(b), notice is hereby given that he appeals to the United States Court of Appeals for the Tenth Circuit from the judgment of conviction and sentence in the above captioned matter (Doc. 172); filed and entered on March 13, 2023; and the related, Order on Motion for Non-Guideline Sentence (Doc. No. 170), filed and entered on Thursday, March 9, 2023.

Dated: Wednesday, March 22, 2023

Respectfully Submitted,

s/Sean M. McDermott
Sean M. McDermott
McDermott Stuart & Ward LLP
140 E. 19th Avenue, Suite 300
Denver, CO 80203
Tel: 303.832.8888
Fax: 303.863.8888
Email: smcdermott@mswdenver.com

Case 1:19-cv-02443-CMA-GPG Document ... Filed 06/27/23 Page 2 of 3

Benjamin R. LaBranche (54678)
1544 Race Street
Denver, CO 80206
Phone: (225) 927-5495
Fax: (225) 927-5568
Email: ben@brllawyer.com

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on Wednesday, March 22, 2023, I electronically filed the foregoing **NOTICE OF APPEAL** with the Clerk of Court using the CM/ECF system, which will automatically send notification of such filing to all opposing counsel of record.

s/Kindra Rodriguez
Kindra Rodriguez



**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**OFFICE OF THE CLERK**

Alfred A. Arraj
United States Courthouse
901 19th Street
Denver, Colorado 80294
www.cod.uscourts.gov

Jeffrey P. Colwell
*Clerk*

Phone: (303) 844-3433

Date: 3/23/2023

☐ Pro Se ☐ Retained ☒ CJA ☐ FPD ☐ USA or other Federal Agency (Appeal Fee Exempt)

Case No: 19-cr-243-CMA-GPG

Date Filed: 3/22/2023

Appellant: Michael Tracy McFadden

☐ Amended Notice of Appeal
☐ Other pending appeals
☐ Transferred Successive §2254 or §2255
☐ Supplemental Record

Pro Se Appellant:
☐ IFP forms mailed/given ☐ Motion IFP pending ☐ Appeal fee paid
☐ IFP denied ☐ Appeal fee not paid

Retained Counsel:
☐ Appeal fee paid ☐ Appeal fee not paid ☐ Motion IFP filed

The Preliminary Record on Appeal is hereby transmitted to the Tenth Circuit Court of Appeals. Please refer to the forms, procedures, and requirements for ordering transcripts, preparing docketing statements and briefs, and designations of the record that are found on the Tenth Circuit's website, www.ca10.uscourts.gov.

If not already completed, either an appeal fee payment for filing this case or filing of a motion to proceed *in forma pauperis* will be made to this District Court.

The transcript order form must be filed in the District Court as well as the Court of Appeals within 14 days after the notice of appeal was filed with the District Court.

If you have questions, please contact this office.

Sincerely,

JEFFREY P. COLWELL, CLERK

by: s/ S. Phillips
Deputy Clerk

cc: Clerk of the Court, Tenth Circuit Court of Appeals

Rev. 8/17/2017

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Criminal Action No. 19-cr-0000243-CMA-GPG

UNITED STATES OF AMERICA,

Plaintiff,

v.

**MICHAEL TRACY McFADDEN**,

Defendant.

---

## NOTICE OF APPEAL

---

Comes now, the Defendant, Michael Tracy McFadden, by and through undersigned court appointed (CJA) counsel Sean McDermott and Benjamin R. LaBranche and Pursuant to Fed. R. App. P. 3 and Fed. R. App. P. 4(b), notice is hereby given that he appeals to the United States Court of Appeals for the Tenth Circuit from the judgment of conviction and sentence in the above captioned matter (Doc. 172); filed and entered on March 13, 2023; and the related, Order on Motion for Non-Guideline Sentence (Doc. No. 170), filed and entered on Thursday, March 9, 2023.

Dated: Wednesday, March 22, 2023

Respectfully Submitted,

s/Sean M. McDermott

Sean M. McDermott
McDermott Stuart & Ward LLP
140 E. 19th Avenue, Suite 300
Denver, CO 80203
Tel: 303.832.8888
Fax: 303.863.8888
Email: smcdermott@mswdenver.com

Benjamin R. LaBranche (54678)
1544 Race Street
Denver, CO 80206
Phone: (225) 927-5495
Fax: (225) 927-5568
Email: ben@brllawyer.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on Wednesday, March 22, 2023, I electronically filed the foregoing **NOTICE OF APPEAL** with the Clerk of Court using the CM/ECF system, which will automatically send notification of such filing to all opposing counsel of record.

s/Kindra Rodriguez
Kindra Rodriguez

# UNITED STATES DISTRICT COURT

District of Colorado

UNITED STATES OF AMERICA
v.
MICHAEL TRACY MCFADDEN

**JUDGMENT IN A CRIMINAL CASE**

Case Number: 1:19-cr-00243-CMA-GPG-1

USM Number: 45307-013

Sean Michael McDermott and Ben LaBranche
Defendant's Attorney

**THE DEFENDANT:**

☐ pleaded guilty to count(s) ______

☐ pleaded nolo contendere to count(s) ______ which was accepted by the court.

☒ was found guilty on count(s) 1 through 5 of the Indictment after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| **Title & Section** | **Nature of Offense** | **Offense Ended** | **Count** |
|---|---|---|---|
| 18 U.S.C. § 2241(c) | Crossing State lines with Intent to Engage in a Sexual Act with a Minor Under the Age of 12 | 01/03/2013 | 1 |
| 18 U.S.C. § 2423(a) | Transportation of a Minor with Intent to Engage in Sexual Activity | 01/03/2013 | 2 |
| 18 U.S.C. § 2241(c) | Crossing State Lines with Intent to Engage in a Sexual Act with a Minor Under the Age of 12 | 01/01/2011 | 3 |
| 18 U.S.C. § 2423(a) | Transportation of a Minor with Intent to Engage in Sexual Activity | 01/01/2011 | 4 |
| 18 U.S.C. § 2423(a) | Transportation of a Minor with Intent to Engage in Sexual Activity | 01/03/2013 | 5 |

The defendant is sentenced as provided in pages 2 through 7 of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s) ______

☐ Count(s) ______ ☐ is ☐ are dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

March 9, 2023
Date of Imposition of Judgment

Christine M Arguello
Signature of Judge

Christine M. Arguello, Senior United States District Judge
Name and Title of Judge

3/13/2023
Date

DEFENDANT: MICHAEL TRACY MCFADDEN
CASE NUMBER: 1:19-cr-00243-CMA-GPG-1

## IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of: **Life Imprisonment, as to each of Counts 1 through 5, to run concurrently.**

☐ The court makes the following recommendations to the Bureau of Prisons:

☒ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

- ☐ at ______________ ☐ a.m. ☐ p.m. on ______________ .
- ☐ as notified by the United States Marshal.

☐ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

- ☐ before 2 p.m. on ______________ .
- ☐ as notified by the United States Marshal.
- ☐ as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on ______________ to ______________

at ______________ , with a certified copy of this judgment.

______________
UNITED STATES MARSHAL

By ______________
DEPUTY UNITED STATES MARSHAL

DEFENDANT: MICHAEL TRACY MCFADDEN
CASE NUMBER: 1:19-cr-00243-CMA-GPG-1

## SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of: **Life, as to each of Counts 1 through 5, to run concurrently.**

## MANDATORY CONDITIONS

1. You must not commit another federal, state or local crime.
2. You must not unlawfully possess a controlled substance.
3. You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and a maximum of 20 tests per year of supervision thereafter.
   ☐ The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. *(check if applicable)*
4. ☒ You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check if applicable)*
5. ☒ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
6. ☒ You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
7. ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

DEFENDANT: MICHAEL TRACY MCFADDEN
CASE NUMBER: 1:19-cr-00243-CMA-GPG-1

# STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1. You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2. After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3. You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4. You must answer truthfully the questions asked by your probation officer.
5. You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6. You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7. You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8. You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9. If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12. If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may, after obtaining Court approval, notify the person about the risk or require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.
13. You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's Signature ______________________________ Date ______________

DEFENDANT: MICHAEL TRACY MCFADDEN
CASE NUMBER: 1:19-cr-00243-CMA-GPG

## SPECIAL CONDITIONS OF SUPERVISION

1. You must participate in a sex-offense specific evaluation and/or treatment program approved by the probation officer. This may include polygraph and visual response testing as part of the required participation. The probation officer, in consultation with the treatment provider, will supervise your participation in and compliance with the treatment program. You must comply with all rules and regulations of the treatment program that are specified by the treatment agency and the probation officer. You must pay for the cost of treatment based on your ability to pay.

2. You must submit your person, and any property, house, residence, vehicle, papers, computer, Internet capable device, other electronic communications or data storage devices or media, and effects to search at any time, with or without a warrant, by any law enforcement or probation officer with reasonable suspicion concerning a violation of a condition of supervised release or unlawful conduct and by any probation officer in the lawful discharge of the officer's supervision functions.

3. Except for your biological children, you must not associate with any child or children under the age of 18 except in the presence and supervision of an adult specifically designated in writing by the probation officer. The probation officer will notify the designated adult of risks occasioned by your criminal record or personal history or characteristics. You must permit the probation officer to make such notifications. If you have incidental contact with children, you will be civil and courteous to the children and immediately remove yourself from the situation. All such incidental contacts must be immediately reported to the probation officer.

4. You must not have contact with any victim including correspondence, telephone contact, or communication through a third party except under circumstances approved in advance and in writing by the probation officer. If you have incidental contact with the victim, you will immediately remove yourself from the situation. All such incidental contacts must be immediately reported to the probation officer.

DEFENDANT: MICHAEL TRACY MCFADDEN
CASE NUMBER: 1:19-cr-00243-CMA-GPG-1

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on the following page.

| | Assessment | Restitution | Fine | AVAA Assessment* | JVTA Assessment** |
|---|---|---|---|---|---|
| **TOTALS** | $ 500.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 |

☐ The determination of restitution is deferred until ________ . An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss*** | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| **TOTALS** | $ ________ | $ ________ | |

☐ Restitution amount ordered pursuant to plea agreement $ ________

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on the following page may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

☐ the interest requirement is waived for the ☐ fine ☐ restitution.

☐ the interest requirement for the ☐ fine ☐ restitution is modified as follows:

* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Publ. L. No. 115-299.
** Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
*** Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

DEFENDANT: MICHAEL TRACY MCFADDEN
CASE NUMBER: 1:19-cr-00243-CMA-GPG

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

A ☐ Lump sum payment of $ ______________ due immediately, balance due

☐ not later than ____________________ , or
☐ in accordance with ☐ C, ☐ D, ☐ E, or ☐ F below; or

B ☒ Payment to begin immediately (may be combined with ☐ C, ☐ D, or ☐ F below); or

C ☐ Payment in equal __________ *(e.g., weekly, monthly, quarterly)* installments of $ ______________ over a period of __________ *(e.g., months or years)*, to commence __________ *(e.g., 30 or 60 days)* after the date of this judgment; or

D ☐ Payment in equal __________ *(e.g., weekly, monthly, quarterly)* installments of $ ______________ over a period of __________ *(e.g., months or years)*, to commence __________ *(e.g., 30 or 60 days)* after release from imprisonment to a term of supervision; or

E ☐ Payment during the term of supervised release will commence within __________ *(e.g., 30 or 60 days)* after release from imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

F ☐ Special instructions regarding the payment of criminal monetary penalties:

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐ Joint and Several

| Case Number Defendant and Co-Defendant Names *(including defendant number)* | Total Amount | Joint and Several Amount | Corresponding Payee, if appropriate |
|---|---|---|---|

☐ The defendant shall pay the cost of prosecution.

☐ The defendant shall pay the following court cost(s):

☐ The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.

APPEAL,GRNDGJ,TERMED

**U.S. District Court - District of Colorado**
**District of Colorado (Denver)**
**CRIMINAL DOCKET FOR CASE #: 1:19-cr-00243-CMA-GPG-1**

Case title: USA v. McFadden

Date Filed: 05/17/2019

Date Terminated: 03/13/2023

---

Assigned to: Senior Judge Christine M. Arguello
Referred to: Magistrate Judge Gordon P. Gallagher

**Defendant (1)**

**Michael Tracy McFadden**
*TERMINATED: 03/13/2023*

represented by

**Ben LaBranche**
Benjamin R. Labranche PLLC
1544 Race Street
Denver, CO 80206
225-927-5495
Fax: 225-927-5568
Email: ben@brllawyer.com
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

**Sean Michael McDermott**
McDermott Stuart & Ward LLP
One Sherman Place
140 East 19th Avenue
Suite 300
Denver, CO 80203
303-355-6789
Email: smcdermott@mswdenver.com
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

**Timothy Patrick O'Hara**
Office of the Federal Public Defender
633 Seventeenth Street
Suite 1000
Denver, CO 80202
303-294-7002
Fax: 303-294-1192
Email: timothy_ohara@fd.org
*TERMINATED: 02/09/2021*
*Designation: Public Defender or Community Defender Appointment*

| Pending Counts | Disposition |
| --- | --- |
| 18 U.S.C. § 2241(c) Crossing state lines with intent to engage in a sexual act with a minor under 12<br>(1) | Defendant committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of LIFE. Supervised Release of LIFE. Special Assessment of $100.00 |
| 18 U.S.C. § 2423(a) Transportation of a minor with intent to engage in sexual activity.<br>(2) | Defendant committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of LIFE to run concurrently to Counts 1, 3, 4, and 5. Supervised Release of LIFE to run concurrently to Counts 1, 3, 4, and 5. Special Assessment of $100.00 |
| 18 U.S.C. § 2241(c) Crossing state lines with intent to engage in a sexual act with a minor under 12<br>(3) | Defendant committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of LIFE to run concurrently to Counts 1, 2, 4, and 5. Supervised Release of LIFE to run concurrently to Counts 1, 2, 4, and 5. Special Assessment of $100.00 |
| 18 U.S.C. § 2423(a) Transportation of a minor with intent to engage in sexual activity.<br>(4) | Defendant committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of LIFE to run concurrently to Counts 1, 2, 3, and 5. Supervised Release of LIFE to run concurrently to Counts 1, 2, 3, and 5. Special Assessment of $100.00 |
| 18 U.S.C. § 2423(a) Transportation of a minor with intent to engage in sexual activity. | Defendant committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of LIFE to run |

(5) concurrently to Counts 1, 2, 3, and 4. Supervised Release of LIFE to run concurrently to Counts 1, 2, 3, and 4. Special Assessment of $100.00

**Highest Offense Level (Opening)**

Felony

**Terminated Counts** | **Disposition**

None

**Highest Offense Level (Terminated)**

None

**Complaints** | **Disposition**

None

---

**Plaintiff**

**USA** represented by **Jeremy Lee Chaffin**
U.S. Attorney's Office
205 North 4th Street
Suite 400
Grand Junction, CO 81501
970-257-7113
Fax: 970-248-3630
Email: jeremy.chaffin@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Federal Agency Attorney*

**Andrea Lee Surratt**
U.S. Attorney's Office
District of Colorado
1801 California Street
Suite 1600
Denver, CO 80202
303-454-0124
Email: andrea.surratt@usdoj.gov
*ATTORNEY TO BE NOTICED*
*Designation: Federal Agency Attorney*

| Date Filed | # | Docket Text |
|---|---|---|
| 05/17/2019 | 1 | INDICTMENT as to Michael Tracy McFadden (1) count(s) 1, 2, 3, 4-5. (Attachments: # 1 Criminal Information Sheet) (jgonz, ) (Entered: 05/17/2019) |
| 05/17/2019 | 2 | Arrest Warrant Issued in case as to Michael Tracy McFadden. (jgonz, ) (Entered: 05/17/2019) |
| 05/20/2019 | 3 | RESTRICTED DOCUMENT - Level 4 by Michael Tracy McFadden. (tsher, ) (Entered: 05/22/2019) |
| 05/22/2019 | 5 | MINUTE ENTRY for proceedings held before Magistrate Judge Gordon P. Gallagher. Initial Appearance as to Michael Tracy McFadden held on 5/22/2019. This is a WSPP case. Detention Hearing set for 5/31/2019 02:00 PM in Room 323 (Grand Junction) before Magistrate Judge Gordon P. Gallagher. Defendant remanded. Hearing concluded. FTR: Grand Junction - AM. (tsher, ) (Entered: 05/23/2019) |
| 05/22/2019 | 6 | CASE REASSIGNED as to Michael Tracy McFadden pursuant to Grand Junction Protocol. This case is directly reassigned to Judge Marcia S. Krieger in the presiding role and Magistrate Judge Gordon P. Gallagher in the referral role. All future pleadings should be designated as 19-cr-00243-MSK-GPG. (Text Only Entry) (tsher, ) (Entered: 05/23/2019) |
| 05/22/2019 | 7 | CJA 23 Financial Affidavit by Michael Tracy McFadden. (tsher, ) (Entered: 05/23/2019) |
| 05/23/2019 | 4 | NOTICE OF ATTORNEY APPEARANCE: Timothy Patrick O'Hara appearing for Michael Tracy McFaddenAttorney Timothy Patrick O'Hara added to party Michael Tracy McFadden(pty:dft) (O'Hara, Timothy) (Entered: 05/23/2019) |
| 05/23/2019 | 8 | Arrest Warrant Returned Executed on 5/21/2019 in case as to Michael Tracy McFadden. (tsher, ) (Entered: 05/23/2019) |
| 05/24/2019 | 9 | ORDER as to Michael Tracy McFadden: Detention Hearing re-set for 5/31/2019 01:30 PM (new time) in Room 323 (Grand Junction) before Magistrate Judge Gordon P. Gallagher. By Magistrate Judge Gordon P. Gallagher on May 24, 2019. Text Only Entry (gpgsec ) (Entered: 05/24/2019) |
| 05/31/2019 | 11 | MINUTE ENTRY for proceedings held before Magistrate Judge Gordon P. Gallagher: Detention Hearing as to Michael Tracy McFadden held on 5/31/2019. Jury Trial set for 7/1/2019 08:30 AM in Room 323 (Grand Junction) before Judge Marcia S. Krieger. FTR: Grand Junction-AM. (jgonz, ) (Entered: 06/04/2019) |

| | | |
|---|---|---|
| 05/31/2019 | 12 | ORDER OF DETENTION as to Michael Tracy McFadden by Magistrate Judge Gordon P. Gallagher on 5/31/2019. (jgonz, ) (Entered: 06/04/2019) |
| 05/31/2019 | 13 | Discovery Conference Memorandum and ORDER: Estimated Trial Time - 2 weeks as to Michael Tracy McFadden by Magistrate Judge Gordon P. Gallagher on 5/31/2019. (jgonz, ) Modified on 6/17/2019 to correct PDF (jgonz, ). (Entered: 06/04/2019) |
| 05/31/2019 | 14 | AMENDED MINUTE ENTRY for proceedings held before Magistrate Judge Gordon P. Gallagher: Detention Hearing as to Michael Tracy McFadden held on 5/31/2019. Deadline for Motions to Continue Trial is 6/14/2019 FTR: Grand Junction-PM. (jgonz, ) (Entered: 06/04/2019) |
| 06/05/2019 | 16 | CONSENT OF THE GOVERNMENT AND THE DEFENDANT Pursuant to D.C.COLO.LCrR 11.1(b), by Michael Tracy McFadden. (nmarb, ). (Entered: 06/13/2019) |
| 06/07/2019 | 15 | NOTICE OF ATTORNEY APPEARANCE Andrea Lee Surratt appearing for USA. Attorney Andrea Lee Surratt added to party USA(pty:pla) (Surratt, Andrea) (Entered: 06/07/2019) |
| 06/13/2019 | 17 | GRAND JUNCTION SPECIFIC SETTING AND TRIAL PREPARATION ORDER FOR CRIMINAL ACTIONS FALLING WITHIN THE WESTERN SLOPE PROTOCOL by Magistrate Judge Gordon P. Gallagher on 6/13/2019. (jgonz, ) (Entered: 06/13/2019) |
| 06/13/2019 | 18 | ORDER REFERRING CASE to Magistrate Judge Gordon P. Gallagher as to Michael Tracy McFadden: In view of the filing of the Defendant's Consent 16 , and pursuant to District Court General Order 2015-1, this matter is referred to Magistrate Judge Gordon P. Gallagher for final determination as authorized by statute and rule, and recommendations for those matters that the magistrate judge cannot finally determine. By Judge Marcia S. Krieger on 6/13/19. Text Only Entry (msklc2, ) (Entered: 06/13/2019) |
| 06/14/2019 | 19 | Unopposed MOTION for Order *to Vacate and Reset Trial Date* by Michael Tracy McFadden. (O'Hara, Timothy) (Entered: 06/14/2019) |
| 06/16/2019 | 20 | ORDER granting in part and denying in part 19 Motion for Order as to Michael Tracy McFadden (1): The Court grants the motion to vacate the present trial but denies the motion to set the matter for a status conference without setting a new trial date. However, the parties may request a status conference at any point it they feel such a conference would be beneficial to the process. Defendant entered a not guilty plea to each count of the indictment. This action is set for trial on July 1, 2019. Defendant and the Government unanimously consented to the jurisdiction of the Magistrate Judge to determine speedy trial related matters and to address a motion to continue. Defendant moves to continue the trial on the basis that there is not enough time to be properly prepared for trial on July 1, 2019. The reasons for the continuance include: This is a complex matter which carries a potential 30-year minimum sentence, were Defendant to be convicted. The Government has just or will soon be providing initial discoverywhich will likely be voluminous. There are two (2) alleged victims and a related trial occurred in Mesa County District Court, spanning some twelve (12) days. There will likely be extensive investigation, the need for transcripts and other records, and other matters justifying a continuance of the trial in this action. The Court has considered and includes the reasons set forth in the Defendants motion. The Court, examining the factors set forth in U.S. v. Toombs, 574 F.3d 1262 (10th Cir. 2009) and 18 USC § 3161, determines that the ends of justice would be served by continuing the trial in this matter and that the factors in favor of granting such a continuance outweigh the best interests of the public and the Defendant in a speedy trial. The Court finds that failure to grant such a continuance would make it impossible for the Defense to proceed, would provide inadequate preparation time taking into account the fact that the parties have all exercised due diligence. The Government did not object, in any fashion, to the motion to continue. All time between the vacated trial date of July 1, 2019 and the new date of January 6, 2020 shall be excluded from the speedy trial calculation. The parties are to file a joint memo, within 14 days, providing a current speedy trial calculation. Motions due by 11/4/2019. Responses due by 12/2/2019 Jury Trial set for 1/6/2020 08:30 AM in Room 323 (Grand Junction) before Judge Marcia S. Krieger. Pretrial Conference set for 1/2/2020 03:30 PM in Courtroom A 901 before Judge Marcia S. Krieger. by Magistrate Judge Gordon P. Gallagher on 6/16/2019. Text Only Entry (GPG) (Entered: 06/16/2019) |
| 06/17/2019 | 21 | Unopposed MOTION for Protective Order by USA as to Michael Tracy McFadden. (Attachments: # 1 Proposed Order (PDF Only))(Chaffin, Jeremy) (Entered: 06/17/2019) |
| 06/17/2019 | 22 | PROTECTIVE ORDER by Magistrate Judge Gordon P. Gallagher on 6/17/2019. (jgonz, ) (Entered: 06/17/2019) |
| 06/28/2019 | 23 | STATEMENT *on Speedy Trial Clock* by Plaintiff USA (Surratt, Andrea) (Entered: 06/28/2019) |
| 08/07/2019 | 24 | MOTION to Disclose Grand Jury Material to Defendant by USA as to Michael Tracy McFadden. (Attachments: # 1 Proposed Document)(Chaffin, Jeremy) (Entered: 08/07/2019) |
| 08/07/2019 | 25 | ORDER Permitting Disclosure of Grand Jury Material by Magistrate Judge Gordon P. Gallagher on 8/7/2019. (jgonz, ) (Entered: 08/09/2019) |
| 08/22/2019 | 26 | MOTION for Order *Excluding Time* by USA as to Michael Tracy McFadden. (Attachments: # 1 Proposed Order (PDF Only))(Surratt, Andrea) (Entered: 08/22/2019) |
| 08/26/2019 | 27 | ORDER granting 26 Joint Motion to Exclude Time from the Speedy Trial Clock pursuant to 18 U.S.C. § 3161(h) through the trial date of January 6, 2020, by Magistrate Judge Gordon P. Gallagher on 8/26/2019. (jgonz, ) (Entered: 08/26/2019) |
| 11/04/2019 | 28 | Unopposed MOTION for Order *to Vacate and Reset Trial Date* by Michael Tracy McFadden. (O'Hara, Timothy) (Entered: 11/04/2019) |
| 11/06/2019 | 29 | ORDER granting 28 Motion for Order as to Michael Tracy McFadden (1) Motions due by 4/6/2020. Responses due by 5/4/2020 Jury Trial set for 6/1/2020 08:30 AM in Room 323 (Grand Junction) before Judge Marcia S. Krieger. Pretrial Conference set for 5/28/2020 03:30 PM in Courtroom A 901 before Judge Marcia S. Krieger. Defendant entered a not guilty plea to each count of the indictment. This action is set for trial on January 6, 2020--with one prior continuance. Defendant and the Government unanimously consented to the jurisdiction of the Magistrate Judge to determine speedy trial related matters and to address a motion to continue. Defendant moves to continue the trial and exclude 180 days from the speedy trial calculation on the basis that there is not enough time to be properly prepared for trial on January 6, 2020. The reasons for the continuance are set forth in |

| | | |
|---|---|---|
| | | Defendants detailed motion on the topic and include: the Defense has received 359 pages of police reports and witness interviews from the Grand Junction Police Department; 687 pages of reports from the investigation of the Federal Bureau of Investigation (FBI); 4,209 pages of transcripts from the prior state court proceedings; 62 pages of reports relating to the criminal history of Mr. McFadden; 34 total video and audio files from the Grand Junction Police Department Investigation (witness/defendant interviews) totaling approximately 21 hours; 24 total video and audio files from the FBI Investigation (witness/defendant interviews) totaling approximately 29 hours; 73 pages of transcribed testimony from the grand jury proceedings along with three video files; and an additional 2,262 pages of discovery material relating to the prior Grand Junction Police Department Investigation. The Defense still needs to: review the entirety of the transcripts from the 2015 jury trial as well as a large majority of the media files tendered in discovery; address issues of potentially significant amounts of 404(b) evidence; interview numerous witnesses in more than one state; address expert witness issues in multiple fields; and draft numerous pre-trial motions.The Court has considered and includes the reasons set forth in the Defendant's motion. The Court, examining the factors set forth in U.S. v. Toombs, 574 F.3d 1262 (10th Cir. 2009) and 18 USC § 3161, determines that the ends of justice would be served by continuing the trial in this matter and that the factors in favor of granting such a continuance outweigh the best interests of the public and the Defendant in a speedy trial. The Court finds that failure to grant such a continuance would make it impossible for the Defense to proceed and would provide inadequate preparation time taking into account the fact that the parties have all exercised due diligence. The Government did not object, in any fashion, to the motion to continue. Additionally, Defense Counsel has specifically discussed this motion with Defendant and represents that the Defendant does not object to the motion. All time between now and the new date of June 1, 2020 shall be excluded from the speedy trial calculation. The parties are to file a joint memo, within 14 days, providing a current speedy trial calculation. by Magistrate Judge Gordon P. Gallagher on 11/6/2019. Text Only Entry (GPG) (Entered: 11/06/2019) |
| 11/15/2019 | 30 | STATEMENT *on Speedy Trial Clock* by Plaintiff USA (Surratt, Andrea) (Entered: 11/15/2019) |
| 04/06/2020 | 31 | Unopposed MOTION to Continue by Michael Tracy McFadden. (O'Hara, Timothy) (Entered: 04/06/2020) |
| 04/07/2020 | 32 | ORDER granting 31 Motion to Continue as to Michael Tracy McFadden (1) Motions due by 9/8/2020. Responses due by 10/5/2020 Jury Trial set for 11/2/2020 10:00 AM in Room 323 (Grand Junction) before Judge Marcia S. Krieger. Pretrial Conference set for 10/29/2020 03:30 PM in Courtroom A 901 before Judge Marcia S. Krieger. Defendant entered a not guilty plea to each count of the indictment. This action is set for trial on June 1, 2020. Defendant and the Government unanimously consented to the jurisdiction of the Magistrate Judge to determine speedy trial related matters and to address a motion to continue. Defendant moves to continue the trial until November 2020 on the basis that there is not enough time to be properly prepared for trial on June 1, 2020. The reasons for the continuanceset forth in detail in the motion and incorporated hereininclude that Counsel cannot currently meet with Defendant due to the National Emergency and that all in-person prison visits have been cancelled. Also, due to a travel moratorium, Counsel cannot travel to the Western Slope to investigate, interview witnesses, or view evidence. This matter involves thousands of pages of reports, numerous witnesses, and 50 plus hours of video footage. The Defendant, who is currently cut-off from in-person visits with Counsel due to the Covid-19 pandemic, cannot currently view the videos. Similarly, the Defense cannot undertake the in-person investigation necessary to properly defend this matter. The Court has considered and includes the reasons set forth in the Defendants motion. The Court, examining the factors set forth in U.S. v. Toombs, 574 F.3d 1262 (10th Cir. 2009) and 18 USC § 3161, determines that the ends of justice would be served by continuing the trial in this matter and that the factors in favor of granting such a continuance outweigh the best interests of the public and the Defendant in a speedy trial. The Court finds that failure to grant such a continuance would make it impossible for the Defense to proceed and would provide inadequate preparation time taking into account the fact that the parties have all exercised due diligence. The Government did not object, in any fashion, to the motion to continue. All time between now and the new date of November 2, 2020 shall be excluded from the speedy trial calculation. The parties SHALL file a joint memo, within 14 days, providing a current speedy trial calculation. by Magistrate Judge Gordon P. Gallagher on 4/7/20. Text Only Entry (GPG) (Entered: 04/07/2020) |
| 05/04/2020 | 33 | Unopposed MOTION for Protective Order by Michael Tracy McFadden. (Attachments: # 1 Proposed Order (PDF Only)) (O'Hara, Timothy) (Entered: 05/04/2020) |
| 05/06/2020 | 34 | AMENDED PROTECTIVE ORDER re 33 Motion for Protective Order as to Michael Tracy McFadden (1) by Magistrate Judge Gordon P. Gallagher on 5/5/2020. (jgonz, ) (Entered: 05/06/2020) |
| 08/24/2020 | 35 | ORDER as to Michael Tracy McFadden: Pursuant to D.C. Colo. L. Crim. R. 50.1, and with the prior permission of the Chief Judge, this case is transferred to Judge Arguello consistent with her assumption of supervision of the Grand Junction criminal docket. The Clerk of the Court shall reassign this case to Judge Arguello as the presiding Article III judge, terminate the assignment to the undersigned, and adjust the draw of future criminal cases to reflect this reassignment. By Judge Marcia S. Krieger on 8/24/20. Text Only Entry (msklc2, ) (Entered: 08/24/2020) |
| 08/24/2020 | 36 | CASE REASSIGNED pursuant to [#35] Order as to Michael Tracy McFadden. This case is directly reassigned to Judge Christine M. Arguello. All future pleadings should be designated as **19-cr-0243-CMA-GPG**. (Text Only Entry). (sphil, ) (Entered: 08/25/2020) |
| 09/08/2020 | 37 | Unopposed MOTION to Vacate by Michael Tracy McFadden. (O'Hara, Timothy) (Entered: 09/08/2020) |
| 09/09/2020 | 38 | ORDER to Exclude Time from Speedy Trial Act and Continue Trial Dates as to Michael Tracy McFadden (1). Defendant Michael Tracy McFadden's Fourth Unopposed Motion to Vacate and Reset Trial Date (Doc. # 37 ) is GRANTED and time is excluded from the date of this Order through April 6, 2021. Pretrial motions are due by February 1, 2021. Responses due by February 15, 2021. The Final Trial Preparation Conference set for October 29, 2020, is VACATED and RESET to March 23, 2021, at 3:00 PM, Courtroom A 602 of the Alfred A. Arraj United States Courthouse, 901 19th Street, Denver, CO, before Judge Christine M. Arguello. Five-day jury trial set to begin on November 2, 2020 is VACATED and RESET to April 5, 2021, at 8:30 AM, Courtroom A 602 of the Alfred A. Arraj United States Courthouse, 901 19th Street, Denver, CO, before Judge Christine M. Arguello. By Judge Christine M. Arguello on 9/9/2020. (angar, ) (Entered: 09/09/2020) |
| 12/02/2020 | 39 | Notice of Rule 404b by USA as to Michael Tracy McFadden *Intent to Introduce Evidence 414, 404(b) and 807* (Attachments: # 1 Exhibit 1)(Chaffin, Jeremy) (Entered: 12/02/2020) |
| 12/10/2020 | 40 | Unopposed MOTION for Extension of Time to File by Michael Tracy McFadden. (O'Hara, Timothy) (Entered: 12/10/2020) |

| | | |
|---|---|---|
| 12/14/2020 | 41 | ORDER Granting 40 Motion for Extension of Time. Defendant shall have up to and including 2/1/2021 within which to file his objection to 39 Government's Notice of Intent to Introduce Evidence Pursuant to Federal Rules of Evidence 414, 404(b), and 807. SO ORDERED by Judge Christine M. Arguello on 12/14/2020. Text Only Entry (cmasec) (Entered: 12/14/2020) |
| 02/01/2021 | 42 | Unopposed MOTION to Vacate by Michael Tracy McFadden. (O'Hara, Timothy) Modifi (Entered: 02/01/2021) |
| 02/02/2021 | 43 | ORDER that Defendant Michael Tracy McFadden's Fifth Unopposed Motion to Vacate and Reset Trial Date (Doc. # 42 ) is GRANTED and time is excluded from the current trial date of April 5, 2021 to July 26, 2021. That pretrial motions are due by June 1, 2021. Responses due by June 15, 2021. That the Final Trial Preparation Conference set for March 23, 2021, is VACATED and RESET to July 8, 2021, at 3:00 PM. That five-day jury trial set to begin on April 5, 2021 is VACATED and RESET to July 26, 2021, at 8:30 AM, Courtroom A 602 of the Alfred A. Arraj United States Courthouse, 901 19th Street, Denver, CO, before Judge Christine M. Arguello, by Judge Christine M. Arguello on 2/2/2021. (evana, ) (Entered: 02/02/2021) |
| 02/07/2021 | 44 | MOTION to Withdraw as Attorney by Timothy P. O'Hara by Michael Tracy McFadden. (O'Hara, Timothy) (Entered: 02/07/2021) |
| 02/09/2021 | 45 | ORDER: Granting 44 Motion to Withdraw as Attorney. Mr. O'Hara is permitted to withdraw as counsel for Defendant due to a conflict of interest existing between Defendant and the Federal Public Defender's Office. The Clerk of the Court is DIRECTED to delete Mr. O'Hara's email address from future ECF filings and electronic notifications in this case. It is FURTHER ORDERED that conflict-free counsel from the Criminal Justice Act Panel shall be appointed for this Defendant. SO ORDERED by Judge Christine M. Arguello on 2/9/2021. Text Only Entry (cmasec) (Entered: 02/09/2021) |
| 02/15/2021 | 46 | NOTICE OF ATTORNEY APPEARANCE: Sean Michael McDermott appearing for Michael Tracy McFaddenAttorney Sean Michael McDermott added to party Michael Tracy McFadden(pty:dft) (McDermott, Sean) (Entered: 02/15/2021) |
| 05/26/2021 | 47 | Unopposed MOTION to Vacate *AND RESET TRIAL DATE PURSUANT TO 18 U.S.C. §3161(h)(7)(A)* by Michael Tracy McFadden. (McDermott, Sean) (Entered: 05/26/2021) |
| 05/27/2021 | 48 | ORDER to Exclude Time from Speedy Trial Act Continue Trial Dates as to Michael Tracy McFadden (1). The Court hereby grants an ends of justice continuance in this case of 280 days, which shall be excluded from the current trial date of July 26, 2021, by Judge Christine M. Arguello on 5/27/2021. Motions are due by 12/6/2021. Responses are due by 12/20/2021. A Final Trial Preparation Conference is set for 4/19/2022 at 03:00 PM in Courtroom A 602 before Judge Christine M. Arguello AND a 5-Day Jury Trial is set for 5/2/2022 at 08:30 AM in Courtroom A 602 before Judge Christine M. Arguello.. (angar, ) (Main Document 48 replaced on 6/1/2021 to attach Correct PDF)) (evana, ). (Modified on 6/1/2021 to attach correct PDF)(evana, ). (Entered: 05/27/2021) |
| 12/15/2021 | 49 | Unopposed MOTION for Leave to File *Motions Out of Time* by Michael Tracy McFadden. (McDermott, Sean) (Entered: 12/15/2021) |
| 12/15/2021 | 50 | ORDER: Granting 49 Unopposed Motion for Leave to File Motion Out of Time. Motions due by 1/5/2022. Responses due by 1/26/2022. SO ORDERED by Judge Christine M. Arguello on 12/15/2021. Text Only Entry (cmasec) (Entered: 12/15/2021) |
| 12/22/2021 | 51 | Supplemental MOTION for Extension of Time to File *Motions AND SEVENTH MOTION TO VACATE AND RESET TRIAL DATE PURSUANT TO 18 U.S.C. §3161(h)(7)(A)* by Michael Tracy McFadden. (McDermott, Sean) (Entered: 12/22/2021) |
| 12/23/2021 | 52 | ERRATA to 51 Supplemental MOTION for an Extension of time and Seventh Motion to Vacate and Rese Trial Date PURSUANT TO 18 U.S.C. §3161(h)(7)(A) by Michael Tracy McFadden (McDermott, Sean) (Entered: 12/23/2021) |
| 12/23/2021 | 53 | Second ERRATA to 51 Supplemental MOTION for an Extension of time and Seventh Motion to Vacate and Rese Trial Date PURSUANT TO 18 U.S.C. §3161(h)(7)(A) by Michael Tracy McFadden (McDermott, Sean) (Entered: 12/23/2021) |
| 12/30/2021 | 54 | ORDER: Granting in part and denying in part 51 Defendant Michael Tracy McFadden's Supplement to Motion for an Extension of Time and Seventh Motion to Vacate and Reset Trial Date. The Court notes that a VTC Final Trial Preparation Conference is set for 4/19/2022, at 3:00 PM and a five-day Jury Trial is set for 5/2/2022, at 8:30 AM. FURTHER ORDERED that the Motions deadline set for 1/5/2022 is VACATED and RESET to 3/21/2022. The Responses deadline set for 1/27/2022 is VACATED and RESET to 4/4/2022. SO ORDERED by Judge Christine M. Arguello on 12/30/2021. Text Only Entry (cmasec) (Entered: 12/30/2021) |
| 02/01/2022 | 55 | Unopposed MOTION to Vacate *and Reset Trial Date Pursuant to 18 U.S.C. §3161(h)(7)(A)* by Michael Tracy McFadden. (McDermott, Sean) (Entered: 02/01/2022) |
| 02/03/2022 | 56 | ORDER by Judge Christine M. Arguello on 2/3/2022, re: 55 Defendant Michael Tracy McFaddens Eighth and Unopposed Motion to Vacate and Reset Trial Date and the Court hereby GRANTS an ends of justice continuance in this case. ORDERED that pretrial motions are due by **September 6, 2022**. Responses due by **October 10, 2022**. **ORDERED** that the Final Trial Preparation Conference set for April 19, 2022 is VACATED and RESET to **October 25, 2022, at 3:00 PM**, and will be held via VTC. **ORDERED** that **five-day jury trial** set to begin on May 2, 2022 is VACATED and RESET to **November 7, 2022, at 8:30 AM**, Courtroom A 602 of the Alfred A. Arraj United States Courthouse, 901 19th Street, Denver, CO, before Judge Christine M. Arguello. **ORDERED** that all time between the current trial date of May 2, 2022 and the new trial date of November 7, 2022 shall be excluded from speedy trial calculations. (sphil, ) (Entered: 02/03/2022) |
| 09/02/2022 | 57 | Unopposed MOTION for Extension of Time to File *Motions* by Michael Tracy McFadden. (McDermott, Sean) (Entered: 09/02/2022) |
| 09/05/2022 | 58 | ORDER granting 57 Motion for Extension of Time to File as to Michael Tracy McFadden (1). Motions to be filed by 9/13/22. by Magistrate Judge Gordon P. Gallagher on 9/5/22. Text Only Entry (GPG) (Entered: 09/05/2022) |
| 09/13/2022 | 59 | Objection *TO GOVERNMENTS NOTICE OF INTENT TO INTRODUCE EVIDENCE PURSUANT TO FEDERAL RULES OF EVIDENCE 414, 404(b), AND 807* by Michael Tracy McFadden re 39 Notice of Rule 404b (Attachments: # 1 Exhibit Affidavit of David Thompson)(McDermott, Sean) Modified on 9/14/2022 to restrict documents at level 1 per protective order 22 and attorney phone call. (sphil, ). (Entered: 09/13/2022) |

| | | |
|---|---|---|
| 09/13/2022 | 60 | STRICKEN by Doc. #80 MOTION to Compel *Production and Request for Subpoena Return Date* by Michael Tracy McFadden. (McDermott, Sean) Modified on 9/14/2022 to restrict motion at level 1 per protective order 22 and attorney phone call. (sphil, ). Modified on 9/20/2022 to add text striking document (lrobe, ). (Entered: 09/13/2022) |
| 09/13/2022 | 61 | MOTION for Bill of Particulars by Michael Tracy McFadden. (McDermott, Sean) (Entered: 09/13/2022) |
| 09/13/2022 | 62 | MOTION to Dismiss *DUE TO PREINDICTMENT DELAY* by Michael Tracy McFadden. (McDermott, Sean) (Entered: 09/13/2022) |
| 09/13/2022 | 63 | MOTION to Suppress *Statements* by Michael Tracy McFadden. (McDermott, Sean) (Entered: 09/13/2022) |
| 09/13/2022 | 64 | MOTION for Hearing by Michael Tracy McFadden. (McDermott, Sean) (Entered: 09/13/2022) |
| 09/14/2022 | 65 | Unopposed MOTION to Withdraw Document 59 Objection (Other), by Michael Tracy McFadden. (McDermott, Sean) (Entered: 09/14/2022) |
| 09/14/2022 | 66 | Unopposed MOTION to Withdraw Document *60* by Michael Tracy McFadden. (McDermott, Sean) (Entered: 09/14/2022) |
| 09/14/2022 | 67 | STRICKEN by Doc. # 69 --- RESTRICTED DOCUMENT - Level 1: by Michael Tracy McFadden. (Attachments: # 1 Exhibit Affidavit of David Thompson)(McDermott, Sean) Modified on 9/14/2022 (cmasec). (Entered: 09/14/2022) |
| 09/14/2022 | 68 | STRICKEN by Doc. # 69 -- RESTRICTED DOCUMENT - Level 1: by Michael Tracy McFadden. (Attachments: # 1 Exhibit Affidavit of David Thompson)(McDermott, Sean) Modified on 9/14/2022 (cmasec). (Entered: 09/14/2022) |
| 09/14/2022 | 69 | ORDER: Denying 65 and 66 Motions to Withdraw Documents. Counsel shall file proper motions to restrict pursuant to D.C.COLO.LCrR 47.1(c) as to Docs. ## 59 and 60. FURTHER ORDERED Docs. ## 67 and 68 are STRICKEN as duplicate filings. SO ORDERED by Senior Judge Christine M. Arguello on 9/14/2022. Text Only Entry (cmasec) (Entered: 09/14/2022) |
| 09/14/2022 | 70 | ORDER: Granting 64 Motion for an Evidentiary Hearing. A half-day Suppression/Motion Hearing re 62 Motion to Dismiss and 63 Motion to Suppress Statements is set for 10/17/2022, at 09:00 AM in Courtroom A 602 before Senior Judge Christine M. Arguello. Any Replies are due on or before 10/11/2022. SO ORDERED by Senior Judge Christine M. Arguello on 9/14/2022. Text Only Entry (cmasec) (Entered: 09/14/2022) |
| 09/14/2022 | 71 | Unopposed MOTION for Leave to Restrict by Michael Tracy McFadden. (McDermott, Sean) (Entered: 09/14/2022) |
| 09/14/2022 | 72 | RESTRICTED DOCUMENT - Level 1: by Michael Tracy McFadden. (McDermott, Sean) (Entered: 09/14/2022) |
| 09/14/2022 | 73 | RESTRICTED DOCUMENT - Level 1: by Michael Tracy McFadden. (McDermott, Sean) (Entered: 09/14/2022) |
| 09/14/2022 | 74 | Unopposed MOTION for Leave to Restrict by Michael Tracy McFadden. (McDermott, Sean) (Entered: 09/14/2022) |
| 09/14/2022 | 75 | ORDER granting 71 Motion for Leave to Restrict 71 Unopposed MOTION for Leave to Restrict as to Michael Tracy McFadden (1). The current filings SHALL be maintained at their current levels of restriction. However, keeping in mind the limited information in the filings necessitating the restriction, the Court finds these filings amenable to redaction. This appropriately balances the public's right to know what is occurring in the Court system. Therefore, the filing party SHALL file a redacted version of the filing, unrestricted, within seven (7) days, redacting that information which is sensitive. So Ordered. by Magistrate Judge Gordon P. Gallagher on 9/14/22. Text Only Entry (GPG) (Entered: 09/14/2022) |
| 09/14/2022 | 76 | ORDER granting 74 Motion for Leave to Restrict 74 Unopposed MOTION for Leave to Restrict as to Michael Tracy McFadden (1). The current filings SHALL be maintained at their current levels of restriction. However, keeping in mind the limited information in the filings necessitating the restriction, the Court finds these filings amenable to redaction. This appropriately balances the public's right to know what is occurring in the Court system. Therefore, the filing party SHALL file a redacted version of the filing, unrestricted, within seven (7) days, redacting that information which is sensitive. So Ordered. by Magistrate Judge Gordon P. Gallagher on 9/14/22. Text Only Entry (GPG) (Entered: 09/14/2022) |
| 09/14/2022 | 77 | ERRATA by Michael Tracy McFadden (McDermott, Sean) (Entered: 09/14/2022) |
| 09/19/2022 | 78 | Objection *TO GOVERNMENTS NOTICE OF INTENT TO INTRODUCE EVIDENCE PURSUANT TO FEDERAL RULES OF EVIDENCE 414, 404(b), AND 807* by Michael Tracy McFadden re 39 Notice of Rule 404b (McDermott, Sean) (Entered: 09/19/2022) |
| 09/19/2022 | 79 | STRICKEN by Doc. #80 MOTION to Compel *PRODUCTION AND REQUEST FOR SUBPOENA RETURN DATE* by Michael Tracy McFadden. (Attachments: # 1 Exhibit Affidavit of David Thompson)(McDermott, Sean) Modified on 9/20/2022 to add text striking document (lrobe). (Entered: 09/19/2022) |
| 09/19/2022 | 80 | ORDER as to Michael Tracy McFadden: The Court STRIKES both 60 and 79 for failing to confer as required by CMA Crim. Practice Standard 12(e). In many respects, the two filings, both requesting that the Court compel production of therapy records and a return date for such, are discovery motions falling under the above cited CMA Practice Standard and are thus amenable to conferral. Conferral may be beneficial in that, should the Government not oppose, perhaps some agreement may be reached on the topic thus avoiding litigation. By Magistrate Judge Gordon P. Gallagher on September 19, 2022. Text Only Entry (gpgsec) Modified on 9/19/2022 to add hyperlinks (lrobe). (Entered: 09/19/2022) |
| 09/26/2022 | 81 | Second MOTION to Compel *Production and Request for Subpoena Return Date* by Michael Tracy McFadden. (Attachments: # 1 Exhibit Affidavit of David Thompson, # 2 Exhibit 45 CFR 164.512, # 3 Exhibit 34 CFR 99.31)(McDermott, Sean) (Entered: 09/26/2022) |
| 09/27/2022 | 82 | ORDER taking under advisement 81 Motion to Compel as to Michael Tracy McFadden (1). The Government SHALL file any desired response within ten (10) days. by Magistrate Judge Gordon P. Gallagher on 9/27/22. Text Only Entry (GPG) (Entered: 09/27/2022) |
| 10/04/2022 | 83 | MINUTE ENTRY as to Michael Tracy McFadden: On this date, Arguello Chambers and Gallagher Chambers received a voice message from a person, D.S., who stated he/she was related to the case and requested a call back. The Court called D.S. and without discussing the case and without discussing the substance of the voice message, stated to D.S. that communications with |

| | | |
|---|---|---|
| | | the Court needed to be in writing with a copy to each side. D.S. stated she understood. The Court also transmitted the voice-mail to both the Government and Defense Counsel on this date; and the Court advised D.S. of the identity of the Assistant U.S. Attorneys assigned to handle this case. By Magistrate Judge Gordon P. Gallagher on October 4, 2022. Text Only Entry (gpgsec, ) (Entered: 10/04/2022) |
| 10/06/2022 | 84 | RESPONSE to Motion by USA as to Michael Tracy McFadden re 61 MOTION for Bill of Particulars (Chaffin, Jeremy) (Entered: 10/06/2022) |
| 10/06/2022 | 85 | RESPONSE to Motion by USA as to Michael Tracy McFadden re 62 MOTION to Dismiss *DUE TO PREINDICTMENT DELAY* (Chaffin, Jeremy) (Entered: 10/06/2022) |
| 10/06/2022 | 86 | RESPONSE to Motion by USA as to Michael Tracy McFadden re 81 Second MOTION to Compel *Production and Request for Subpoena Return Date* (Attachments: # 1 Exhibit 1)(Chaffin, Jeremy) (Entered: 10/06/2022) |
| 10/06/2022 | 87 | RESPONSE to Motion by USA as to Michael Tracy McFadden re 63 MOTION to Suppress *Statements* (Attachments: # 1 Exhibit 1)(Chaffin, Jeremy) (Entered: 10/06/2022) |
| 10/10/2022 | 88 | REPLY by USA as to Michael Tracy McFadden to 59 Objection (Other), (Attachments: # 1 Exhibit B, # 2 Exhibit C, # 3 Exhibit D, # 4 Exhibit E, # 5 Exhibit F)(Surratt, Andrea) (Entered: 10/10/2022) |
| 10/11/2022 | 89 | NOTICE *OF CONVENTIONAL FILING: EXHIBIT A* re 88 Reply by USA as to Michael Tracy McFadden (Surratt, Andrea) (Entered: 10/11/2022) |
| 10/11/2022 | 90 | ORDER: Counsel shall be prepared to address 59 Defendant's Objection to Defendant's Notice of Intent to Introduce Evidence at the 10/17/2022, 9:00 AM half-day Suppression/Motion Hearing. SO ORDERED by Senior Judge Christine M. Arguello on 10/11/2022. Text Only Entry (cmasec) (Entered: 10/11/2022) |
| 10/11/2022 | 91 | REPLY TO RESPONSE to Motion by Michael Tracy McFadden re 81 Second MOTION to Compel *Production and Request for Subpoena Return Date* (McDermott, Sean) (Entered: 10/11/2022) |
| 10/11/2022 | 92 | REPLY TO RESPONSE to Motion by Michael Tracy McFadden re 62 MOTION to Dismiss *DUE TO PREINDICTMENT DELAY* (McDermott, Sean) (Entered: 10/11/2022) |
| 10/11/2022 | 93 | REPLY TO RESPONSE to Motion by Michael Tracy McFadden re 63 MOTION to Suppress *Statements* (McDermott, Sean) (Entered: 10/11/2022) |
| 10/11/2022 | 94 | MOTION to Continue *And Reset Trial Date Pursuant To 18 U.S.C. §3161(h)(7)(A) And To Exclude 60 Days From Speedy Trial* by Michael Tracy McFadden. (McDermott, Sean) (Entered: 10/11/2022) |
| 10/11/2022 | 95 | Conventionally Submitted Material : 1 Flash Drive to 88 Reply by Plaintiff USA. Location: 1st Floor Area, Box D-5-8. Text Only Entry. (sphil, ) (Entered: 10/12/2022) |
| 10/12/2022 | 96 | ORDER: The parties SHALL file a joint memo, on or before 10/14/2022, providing a current speedy trial calculation. SO ORDERED by Senior Judge Christine M. Arguello on 10/12/2022. Text Only Entry (cmasec) (Entered: 10/12/2022) |
| 10/12/2022 | 97 | ORDER: The Government shall file its Response to 94 Defendant's Motion to Continue and Rest Trial Date on or before 10/14/2022. SO ORDERED by Senior Judge Christine M. Arguello on 10/12/2022. Text Only Entry (cmasec) (Entered: 10/12/2022) |
| 10/12/2022 | 98 | RESPONSE in Opposition by USA as to Michael Tracy McFadden re 94 MOTION to Continue *And Reset Trial Date Pursuant To 18 U.S.C. §3161(h)(7)(A) And To Exclude 60 Days From Speedy Trial* (Surratt, Andrea) (Entered: 10/12/2022) |
| 10/13/2022 | 99 | ORDERED: Denying 94 Motion to Continue and Reset Trial Date. Although the Court acknowledges that this case is complex, the Defendant has previously been granted eight (8) ends of justice continuances. The current trial date in this case11/7/2022has been set since 2/3/2022, following the Defendant's eighth request for a continuance. Regardless of the outcome of the Motions Hearing set for 11/18/2022, the parties have had more than 9 months to prepare for trial. Defendant has failed to provide the Court with any meaningful justification for delaying this trial further. He has not demonstrated with any specificity how a lack of continuance would deny his counsel reasonable time necessary for effective preparation. The Defendant's surprise that the trial will be held in Grand Junction appears to this Court to be a weak and feigned expression of surprise. Both counsel were informed on 2/4/2022, that the only reason the place of trial in its 2/3/2022 Order (Doc. # 56) was Denver, rather than Grand Junction, was because of COVID-19 limitations on the ability to hold jury trials at the Courthouse in Grand Junction. However, the parties were informed at that time that once COVID-19 restrictions were lifted, the court would begin holding its trials on Grand Junction cases in Grand Junction pursuant to the Western Slope Protocol. Thus, Defendant has been on notice since 2/4/2022 that the trial of this matter would most likely be held in Grand Junction. SO ORDERED by Senior Judge Christine M. Arguello on 10/13/2022. Text Only Entry (cmasec) (Entered: 10/13/2022) |
| 10/13/2022 | 100 | ORDER DENYING MOTION FOR BILL OF PARTICULARS AND MOTION TO AUTHORIZE SUBPOENA by Magistrate Judge Gordon P. Gallagher on 10/13/2022. Mr. McFadden's Motion for a Bill of Particulars (D. 61 ) and Request for Subpoena (D. 81 ) are DENIED as to Michael Tracy McFadden (1) (alave, ) (Entered: 10/13/2022) |
| 10/14/2022 | 101 | STATEMENT re 96 Order *Regarding Speedy Trial Calculation* by Plaintiff USA (Surratt, Andrea) (Entered: 10/14/2022) |
| 10/17/2022 | 102 | AMENDED MINUTE ENTRY for proceedings held before Judge Christine M. Arguello: Motion Hearing as to Michael Tracy McFadden held on 10/17/2022. ORDERED: Granting defendant's oral motion to withdraw 63 Motion to Suppress Statements. Witness sworn and testified: Edward Prescott. Exhibits received: Governments Exhibits 1, 2, 3,1a, 2a, 3a. FURTHER ORDERED: Denying 62 Motion to Dismiss due to Pre-Indictment Delay. FURTHER ORDERED: Overruling Defendant's objections as to JW and KW testifying about the acts of molestation they allege happened. FURTHER ORDERED: Reserving ruling until trial on whether the video of KW can be admitted under FRE 807 and whether the children who are not victims in Counts 1-5 can testify to acts of molestation they suffered. FURTHER ORDERED: The transcript shall be redacted to identify the alleged victims and their parents by their initials only. Government counsel shall email the court reporter a key with the names used during the hearing and their corresponding initials. FURTHER ORDERED: Counsel for the parties shall retain |

| | | |
|---|---|---|
| | | custody of their respective exhibits until such time as all need for the exhibits has terminated and the time to appeal has expired or all appellate proceedings have been terminated plus sixty days. TRIAL: The Court affirms that the two-week trial scheduled to commence on 11/7/2022 will be held in Grand Junction, Colorado. The Government states that the speedy trial deadline is 12/10/2022; Defendant states that the speedy trial deadline is 12/11/2022. Defendant present in custody; Defendant remanded. (Total time: 1 Hour 48 Minutes, Hearing time: 9:01 a.m. 10:49 a.m.)<br><br>**APPEARANCES:** Jeremy Chaffin and Andrea Surratt on behalf of the Government; Sean McDermott on behalf of the Defendant. Court Reporter: Janet Coppock. (lrobe) Text Only Entry. Amended on 10/18/2022 to correctly reflect the Court's rulings. (lrobe). (Entered: 10/17/2022) |
| 10/18/2022 | 103 | Unopposed MOTION for Extension of Time to File *Exhibit List* by Michael Tracy McFadden. (McDermott, Sean) (Entered: 10/18/2022) |
| 10/19/2022 | 104 | MOTION to Continue *Trial Pursuant To 18 U.S.C. §3161(h)(7)(A)* by Michael Tracy McFadden. (Attachments: # 1 Exhibit Affidavit)(McDermott, Sean) (Entered: 10/19/2022) |
| 10/19/2022 | 105 | RESTRICTED DOCUMENT - Level 3: by Michael Tracy McFadden. (McDermott, Sean) (Entered: 10/19/2022) |
| 10/19/2022 | 106 | RESPONSE in Opposition by USA as to Michael Tracy McFadden re 104 MOTION to Continue *Trial Pursuant To 18 U.S.C. §3161(h)(7)(A)* (Surratt, Andrea) (Entered: 10/19/2022) |
| 10/19/2022 | 107 | REPLY TO RESPONSE to Motion by Michael Tracy McFadden re 104 MOTION to Continue *Trial Pursuant To 18 U.S.C. §3161(h)(7)(A)* (McDermott, Sean) (Entered: 10/19/2022) |
| 10/19/2022 | 108 | ORDER: Defendant's Motion to Continue Trial Pursuant to 18 U.S.C. § 3161(h)(7)(A) 104 is DENIED. SO ORDERED by Senior Judge Christine M. Arguello on 10/19/2022. (sphil, ) (Entered: 10/19/2022) |
| 10/19/2022 | 109 | ORDER: Granting 103 Unopposed Motion for an Extension of Time to File Exhibit List. Defendant's Exhibit List due on or before 10/24/2022. SO ORDERED by Senior Judge Christine M. Arguello on 10/19/2022. Text Only Entry (cmasec) (Entered: 10/19/2022) |
| 10/21/2022 | 110 | MOTION for Leave to Restrict by USA as to Michael Tracy McFadden. (Attachments: # 1 Proposed Order (PDF Only))(Chaffin, Jeremy) (Entered: 10/21/2022) |
| 10/21/2022 | 111 | RESTRICTED DOCUMENT - Level 2: as to Michael Tracy McFadden. (Attachments: # 1 Proposed Order (PDF Only), # 2 Proposed Document)(Chaffin, Jeremy) (Entered: 10/21/2022) |
| 10/21/2022 | 112 | RESTRICTED DOCUMENT - Level 2: as to Michael Tracy McFadden. (Chaffin, Jeremy) (Entered: 10/21/2022) |
| 10/21/2022 | 113 | RESTRICTED DOCUMENT - Level 2: as to Michael Tracy McFadden. (sdunb, ) (Entered: 10/21/2022) |
| 10/21/2022 | 114 | RESTRICTED DOCUMENT - Level 2: as to Michael Tracy McFadden. (sdunb, ) (Entered: 10/21/2022) |
| 10/21/2022 | 115 | RESTRICTED DOCUMENT - Level 3: by Michael Tracy McFadden. (Attachments: # 1 Appendix Appendix, # 2 Proposed Order (PDF Only) Proposed Order)(McDermott, Sean) (Entered: 10/21/2022) |
| 10/24/2022 | 116 | RESTRICTED DOCUMENT - Level 3: by Michael Tracy McFadden. (Attachments: # 1 Appendix, # 2 Proposed Order (PDF Only))(McDermott, Sean) (Entered: 10/24/2022) |
| 10/24/2022 | 117 | CJA MOTION by Michael Tracy McFadden. (Attachments: # 1 CJA Attachment Resume of Benjamin R. LaBranche) (McDermott, Sean) (Entered: 10/24/2022) |
| 10/24/2022 | 118 | ORDER ***granting 115 Motion as to Michael Tracy McFadden (1). SO ORDERED by Senior Judge Christine M. Arguello on 10/24/2022. (sphil, ) (sphil, ). (Entered: 10/24/2022) |
| 10/24/2022 | 119 | ORDER APPOINTING COUNSEL: Benjamin R. LaBranche shall be appoint from the CJA Panel as co-counsel in this case. SO ORDERED by Senior Judge Christine M. Arguello on 10/24/2022. Text Only Entry (cmasec) (Entered: 10/24/2022) |
| 10/25/2022 | 120 | RESTRICTED DOCUMENT - Level 3: as to Michael Tracy McFadden. (sphil, ) (Entered: 10/25/2022) |
| 10/25/2022 | 121 | ORDER: Granting 110 Motion for Leave to Restrict. Docs. ## 111 and 112 , all exhibits attached thereto, and any orders that may reveal the contents of these documents shall have a Level 2 Restriction. SO ORDERED by Senior Judge Christine M. Arguello on 10/25/2022. Text Only Entry (cmasec) (Entered: 10/25/2022) |
| 10/25/2022 | 122 | NOTICE OF ATTORNEY APPEARANCE: Ben LaBranche appearing for Michael Tracy McFaddenAttorney Ben LaBranche added to party Michael Tracy McFadden(pty:dft) (LaBranche, Ben) (Entered: 10/25/2022) |
| 10/25/2022 | 123 | MOTION for Leave to Restrict by Michael Tracy McFadden. (McDermott, Sean) (Entered: 10/25/2022) |
| 10/25/2022 | 124 | COURTROOM MINUTES for Trial Preparation Conference by VTC as to Michael Tracy McFadden held on 10/25/2022 before Senior Judge Christine M. Arguello. B>TRIAL: The Court affirms an 8-day jury trial scheduled to begin 11/7/20222 at 8:30 a.m. in Grand Junction, Colorado. Each subsequent day of trial will begin at 8:00 a.m. Masks will be required during jury selection. Once the jury is selected, vaccinated jurors may decide if they wish to continue wearing masks for the duration of the trial. Unvaccinated jurors will be required to wear masks for the duration of the trial. Jury Selection will begin at 8:30 a.m. on 11/7/2022. Parties allowed 15 minutes per side for voir dire. Case shall be tried to a jury of 13. Jurors will be allowed to take notes. Parties waive the reporting of Jury Instructions. Parties agree to the sequestration of witnesses. Victims, if testifying, will be subject to the sequestration order. **DEADLINES:** The parties shall submit a thumb drive of exhibits to Arguello Chambers by 10/31/2022. The parties shall submit an exhibit list, indicating which exhibits are stipulated, to Arguello Chambers, via email, by 11/4/2022, 5:00 PM. Defendant shall submit an ex parte witness list to Arguello Chambers, via email, by 11/2/2022. Defendant shall submit proposed jury instructions by 10/31/2022. The parties shall submit a glossary of medical terms or unusually spelled words or names to Nicholas_Richards@cod.uscourts.gov by 11/3/2022, 4:00 p.m. Defendant present in custody by VTC. Defendant remanded. (Total time: 00:35, Hearing time: 3:15 p.m. 3:50 p.m.) |

| | | |
|---|---|---|
| | | **APPEARANCES**: Andrea Surratt, Jeremy Chaffin (by VTC) on behalf of the Government, Sean McDermott (by VTC) on behalf of the defendant. Court Reporter: Kevin Carlin. (sgrim) Text Only Entry (Entered: 10/26/2022) |
| 10/31/2022 | 125 | ORDER: Pursuant to communications between counsel and Chambers' staff, a VTC Status Conference is set for 11/3/2022, 10:00 AM before Senior Judge Christine M. Arguello. Counsel are directed to contact Nicholas Richards, via email at Nicholas_Richards@cod.uscourts.gov, to set up VTC. The Defendant's presence is not required for this Hearing. SO ORDERED by Senior Judge Christine M. Arguello on 10/31/2022. Text Only Entry (cmasec) (Entered: 10/31/2022) |
| 10/31/2022 | 126 | Unopposed MOTION for Extension of Time to File *or Submit Exhibits* by Michael Tracy McFadden. (McDermott, Sean) (Entered: 10/31/2022) |
| 10/31/2022 | 127 | Conventionally Submitted Material : 1 Flash Drive re 124 Trial Preparation Conference, by Plaintiff USA. Location: 1st Floor Area, Box D-5-8. Text Only Entry. (sphil, ) (Entered: 11/01/2022) |
| 10/31/2022 | 128 | RETURN OF SERVICE of Unexecuted Subpoena as to Defendant Michael Tracy McFadden. (Attachments: # 1 Return Subpoena Unexecuted, # 2 Return Subpoena Unexecuted, # 3 Return Subpoena Unexecuted, # 4 Return Subpoena Unexecuted, # 5 Return Subpoena Unexecuted)(sphil, ) (Entered: 11/01/2022) |
| 10/31/2022 | 129 | RETURN OF SERVICE of Executed Subpoena as to Defendant Michael Tracy McFadden. Subpoena executed on10/26/2022. (Attachments: # 1 Return of Service of Subpoena - Executed, # 2 Return of Service of Subpoena - Executed, # 3 Return of Service of Subpoena - Executed)(sphil, ) (Entered: 11/01/2022) |
| 11/01/2022 | 130 | ORDER granting 126 Motion for Extension of Time to File as to Michael Tracy McFadden (1) by Senior Judge Christine M. Arguello on 11/1/2022. Text Only Entry (cma) (Entered: 11/01/2022) |
| 11/02/2022 | 131 | MOTION for Leave to Restrict by Michael Tracy McFadden. (Attachments: # 1 Proposed Order (PDF Only) Restricted Document)(McDermott, Sean) (Entered: 11/02/2022) |
| 11/02/2022 | 132 | RESTRICTED DOCUMENT - Level 3: by Michael Tracy McFadden. (McDermott, Sean) (Entered: 11/02/2022) |
| 11/02/2022 | 133 | RETURN OF SERVICE of Executed Subpoena filed byDefendant Michael Tracy McFadden. Subpoena executed on10/26/2022. (Attachments: # 1 Return of Service of Subpoena - Executed, # 2 Return of Service of Subpoena - Executed)(sphil, ) (Entered: 11/03/2022) |
| 11/03/2022 | 134 | RESTRICTED DOCUMENT - Level 3: by Michael Tracy McFadden. (Attachments: # 1 Appendix Subpoena, # 2 Proposed Order (PDF Only) Subpoena, # 3 Proposed Document Subpoena, # 4 Proposed Document Subpoena, # 5 Proposed Document Subpoena, # 6 Proposed Document Subpoena, # 7 Proposed Document Subpoena, # 8 Proposed Document Subpoena, # 9 Proposed Document Subpoena, # 10 Proposed Document Subpoena, # 11 Proposed Document Subpoena, # 12 Proposed Document Subpoena, # 13 Proposed Document Subpoena, # 14 Proposed Document Subpoena, # 15 Proposed Document)(McDermott, Sean) (Entered: 11/03/2022) |
| 11/03/2022 | 135 | MOTION to Continue *Trial Within Speedy Trial To Secure Witnesses* by Michael Tracy McFadden. (McDermott, Sean) (Entered: 11/03/2022) |
| 11/03/2022 | 136 | RESTRICTED DOCUMENT - Level 3: as to Michael Tracy McFadden. (Attachments: # 1 Subpoenas issued)(sphil, ) (Entered: 11/03/2022) |
| 11/03/2022 | 137 | RESTRICTED DOCUMENT - Level 2: as to Michael Tracy McFadden. (Attachments: # 1 Proposed Order (PDF Only), # 2 Proposed Document)(McDermott, Sean) (Entered: 11/03/2022) |
| 11/03/2022 | 140 | MINUTE ENTRY for proceedings held before Judge Christine M. Arguello: Status Conference held on 11/3/2022. Parties shall notify chambers by close of business 11/3/2022 if copies of jury instructions should be provided to the jury. ORDERED: Denying 135 Defendants Motion to Continue Trial Within Speedy Trial to Secure Witnesses; Granting Governments oral motion to permit witness in custody to wear court attire. FURTHER ORDERED: Minors names shall be redacted in the transcript. (Total Time: 43 minutes, Hearing time: 10:00 a.m. 10:43 a.m.)APPEARANCES: Andrea Surratt and Jeremy Chaffin on behalf of the Government, Sean McDermott on behalf of the Defendant. All parties appear by VTC. Court reporter: Sarah Mitchell. (kmyha, ) Text Only Entry (Entered: 11/04/2022) |
| 11/04/2022 | 138 | RESTRICTED DOCUMENT - Level 2: as to Michael Tracy McFadden, re: 137 Motion. (sphil, ) (Entered: 11/04/2022) |
| 11/04/2022 | 139 | Writ of Habeas Corpus ad Testificandum Issued as to a Material Witness for 11/14/2022 in case as to Michael Tracy McFadden. (sphil, ) Modified on 11/4/2022 to edit text. (sphil, ). (Entered: 11/04/2022) |
| 11/06/2022 | 141 | ORDER: Granting 131 Motion for Leave to Restrict. Doc. # 132 , all exhibits attached thereto, and any orders that may reveal the contents of these documents shall have a Level 3 Restriction. SO ORDERED by Senior Judge Christine M. Arguello on 11/6/2022. Text Only Entry (cmasec) (Entered: 11/06/2022) |
| 11/06/2022 | 142 | ORDER: Granting 123 Motion for Leave to Restrict. Doc.# 105 , all exhibits attached thereto, and any orders that may reveal the contents of these documents shall have a Level 3 Restriction. SO ORDERED by Senior Judge Christine M. Arguello on 11/6/2022. Text Only Entry (cmasec) (Entered: 11/06/2022) |
| 11/07/2022 | 143 | Minute Entry for Proceedings held before Judge Christine M. Arguello: Jury Trial Day One held on 11/7/2022 as to Michael Tracy McFadden. Jury of 13 impaneled and sworn. Jury excused for the day. Trial continued to 11/8/2022. Defendant present in custody; Defendant remanded. (Total time: 4 hours, 55 minutes; Hearing time 9:36 a.m. - 12:31 p.m.; 12:52 p.m.- 2:52 p.m.)APPEARANCES: Jeremy Chaffin, and Andrea Surratt on behalf of the Government; Sean McDermott and Ben LaBranche on behalf of the Defendant. ALSO PRESENT: Government representative, Alex Zappe. Court Reporter: Sarah Mitchell. (kmyha) Text Only Entry (Entered: 11/08/2022) |
| 11/08/2022 | 144 | Minute Entry for Proceedings held before Judge Christine M. Arguello: Jury Trial Day Two held on 11/8/2022 as to Michael Tracy McFadden. Opening statements. WITNESSES SWORN AND TESTIFIED: J.W., Michelle Ricks, Darren Davidson, and Paul W. Dunham, Jr. EXHIBITS RECEIVED: 1, 8-1, 8-2, 8-3, 3-1, 3-2, 3-3, 3-4, 3-5, 4-1, 4-2, 4-3, 4-4, 2-1, 2-2, 2-3, 2-4, 2-5, 2-6, 2-7, 2-8, 2-9, 11-1, 15-1, 15-2, 15-3, 15-4, 15-5, 15-6. ORDERED: Juror 13 is discharged from further service. Jury excused |

Case 1:19-cr-00243-CMA-GPG Document 175-1 filed 03/23/23 USDC Colorado

| | | |
|---|---|---|
| | | for the day. Trial continued to 11/9/2022. Defendant present in custody; Defendant remanded. (Total time: 4 Hours, 15 Minutes, Hearing time: 8:40 a.m.- 10:44 a.m.; 11:01 a.m.- 12:04 p.m.; 12:34 p.m.- 1:43 p.m.)APPEARANCES: Jeremy Chaffin, and Andrea Surratt on behalf of the Government; Sean McDermott and Ben LaBranche on behalf of the Defendant. ALSO PRESENT: Government representative, Alex Zappe. Court Reporter: Sarah Mitchell. (kmyha) Text Only Entry (Entered: 11/09/2022) |
| 11/09/2022 | 145 | Minute Entry for Proceedings held before Judge Christine M. Arguello: Jury Trial Day Three held on 11/9/2022 as to Michael Tracy McFadden. WITNESSES SWORN AND TESTIFIED: Sue Goebel, K.W., Stacy Wesolowski, Scott Wesolowski, John Stadler, and Detective Edward Prescott. EXHIBITS RECEIVED: 13-1, 13-2, 227, 228. EXHIBITS 6 and 6-1 are admitted provisionally. ORDERED: Granting in part and denying in part Defendants objection to testimony of 414 witnesses. Only E.S. and D.R. will be permitted to testify. Jury excused for the day. Trial continued to 11/10/2022. Defendant present in custody; Defendant remanded. (Total time: 5 hours, 25 minutes, Hearing time: 8:27 a.m.- 10:18 a.m.; 10:32 a.m.- 11:59 a.m.; 12:52 p.m.- 2:59 p.m.)APPEARANCES: Jeremy Chaffin and Andrea Surratt on behalf of the Government; Sean McDermott and Ben LaBranche on behalf of the Defendant. ALSO PRESENT: Government representative Alex Zappe. Court Reporter: Sarah Mitchell. (kmyha) Text Only Entry (Entered: 11/10/2022) |
| 11/10/2022 | 146 | Minute Entry for Proceedings held before Judge Christine M. Arguello: Jury Trial Day Four held on 11/10/2022 as to Michael Tracy McFadden. Charging Conference. WITNESSES SWORN AND TESTIFIED: Cheryl Young. Plaintiff rests. Defendant rests. ORDERED: DENYING Defendants Oral Motion for Judgment of Acquittal under Rule 29(a). Jury instructed. Closing arguments. Deliberations began at 12:18 p.m. ORDERED: Lunch will be provided to the jury during their deliberations. Trial continued to 11/14/2022. Defendant present in custody; Defendant remanded. (Total time: 3 Hours, 45 Minutes, Hearing time: 7:32 a.m.- 7:43 a.m.; 8:32 a.m.- 10:17 a.m.; 10:30 a.m.- 12:20 p.m.; 4:28 p.m. -4:28 p.m.)APPEARANCES: Jeremy Chaffin and Andrea Surratt on behalf of the Government; Sean McDermott and Ben LaBranche on behalf of the Defendant. ALSO PRESENT: Government representative Alex Zappe. Court Reporter: Sarah Mitchell. (kmyha) Text Only Entry (Entered: 11/14/2022) |
| 11/10/2022 | 148 | Jury Instructions as to Michael Tracy McFadden (kmyha, ) (Entered: 11/15/2022) |
| 11/10/2022 | 149 | Jury Note as to Michael Tracy McFadden (kmyha, ) (Entered: 11/15/2022) |
| 11/14/2022 | 147 | Minute Entry for Proceedings held before Judge Christine M. Arguello: Jury Trial Day Five held on 11/14/2022 as to Michael Tracy McFadden. Deliberations continued at 8:30 a.m. JURY VERDICT: Guilty on Counts 1-5. Verdict accepted by Judge Gordon P. Gallagher. Jury excused with the thanks of the Court. A two-hour Sentencing Hearing is set for 3/7/2023 at 3:00 p.m., at Aspinall Federal Building in Grand Junction, Room 323 before Judge Christine M. Arguello.The US Probation Office shall prepare a Presentence Report. In accordance with Federal Rules of Criminal Procedure 32(F)(1); counsel shall file their sentencing positions and all motions at least 14 days before the sentencing date; responses or objections no later than 7 days before the sentencing date; or advise the Court that they do not intend to file any papers. Failure to file position papers by that date may result in a continuance of the sentencing date. ORDERED: counsel for the parties shall retain custody of their respective exhibits and depositions until such time as all need for the exhibits and depositions has terminated and the time to appeal has expired or all appellate proceedings have been terminated plus sixty days. Trial concluded. Defendant present in custody; Defendant remanded. (Total time: 14 Minutes, Hearing time: 9:21 a.m. 9:35 a.m.)APPEARANCES: Jeremy Chaffin, and Andrea Surratt on behalf of the Government; Sean McDermott and Ben LaBranche on behalf of the Defendant. ALSO PRESENT: Government representative, Alex Zappe. Court Reporter: Sarah Mitchell. (kmyha) Text Only Entry (Entered: 11/15/2022) |
| 11/14/2022 | 150 | Jury Note as to Michael Tracy McFadden. (kmyha) (Entered: 11/15/2022) |
| 11/14/2022 | 151 | Jury Note - Unredacted - Restricted Doc. - Level 4 (kmyha, ) (Entered: 11/15/2022) |
| 11/14/2022 | 152 | JURY VERDICT as to Michael Tracy McFadden. (kmyha) (Entered: 11/15/2022) |
| 11/14/2022 | 153 | Jury Verdict Un-Redacted - Level 4 - Viewable by Court Only (kmyha) (Entered: 11/15/2022) |
| 11/29/2022 | 154 | Partial TRANSCRIPT of Trial Testimony of J.W. as to Michael Tracy McFadden held on November 8, 2022 before Judge Arguello. Pages: 1-92.<br><br>**NOTICE - REDACTION OF TRANSCRIPTS: Within seven calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal identifiers from the electronic transcript of the court proceeding. If a Notice of Intent to Redact is not filed within the allotted time, this transcript will be made electronically available after 90 days. Please see the Notice of Electronic Availability of Transcripts document at www.cod.uscourts.gov.**<br><br>Transcript may only be viewed at the court public terminal or purchased through the Court Reporter/Transcriber prior to the 90 day deadline for electronic posting on PACER. (smitc, ) (Entered: 11/29/2022) |
| 11/29/2022 | 155 | Partial TRANSCRIPT of Trial Testimony of K.W. as to Michael Tracy McFadden held on November 9, 2022 before Judge Arguello. Pages: 1-61.<br><br>**NOTICE - REDACTION OF TRANSCRIPTS: Within seven calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal identifiers from the electronic transcript of the court proceeding. If a Notice of Intent to Redact is not filed within the allotted time, this transcript will be made electronically available after 90 days. Please see the Notice of Electronic Availability of Transcripts document at www.cod.uscourts.gov.**<br><br>Transcript may only be viewed at the court public terminal or purchased through the Court Reporter/Transcriber prior to the 90 day deadline for electronic posting on PACER. (smitc, ) (Entered: 11/29/2022) |
| 12/12/2022 | 156 | SENTENCING STATEMENT by USA as to Michael Tracy McFadden (Surratt, Andrea) (Entered: 12/12/2022) |

| | | |
|---|---|---|
| 01/31/2023 | 157 | RESTRICTED PRESENTENCE REPORT first disclosure for attorney review as to Michael Tracy McFadden (Attachments: # 1 Exhibit A)(tfont) (Entered: 01/31/2023) |
| 02/13/2023 | 158 | ORDER: The Court has been advised that Defendant Michael Tracy McFadden is being housed in the Metro area. Therefore, the two-hour Sentencing Hearing set for 3/7/2023 in Room 323, Grand Junction is VACATED and reset to **3/9/2023 at 3:00 PM before Judge Christine M. Arguello, in Courtroom A602, Alfred A. Arraj Courthouse**. This hearing will be held in-person. Counsel whose offices are outside the Denver metropolitan area or cannot reasonably make a personal appearance may appear via VTC. For VTC appearances, counsel are directed to contact Nicholas Richards, via email, at Nicholas_richards@cod.uscourts.gov at least THREE DAYS before the scheduled hearings for instructions on how to proceed by VTC. SO ORDERED by Senior Judge Christine M. Arguello on 2/13/2023. Text Only Entry (cmasec) (Entered: 02/13/2023) |
| 02/13/2023 | 159 | ORDER: Pursuant to email correspondence between counsel and Chambers' staff the two-hour Sentencing Hearing set for 3/9/2023 is RESET IN TIME ONLY to 09:00 AM in Courtroom A 602 before Senior Judge Christine M. Arguello. SO ORDERED by Senior Judge Christine M. Arguello on 2/13/2023. Text Only Entry (cmasec) (Entered: 02/13/2023) |
| 02/14/2023 | 160 | OBJECTION/RESPONSE to Presentence Report by Michael Tracy McFadden (McDermott, Sean) (Entered: 02/14/2023) |
| 02/17/2023 | 161 | RESPONSE by USA as to Michael Tracy McFadden re: 160 Objection/Response to Presentence Report filed by Michael Tracy McFadden (Surratt, Andrea) (Entered: 02/17/2023) |
| 02/23/2023 | 162 | MOTION for Non-Guideline Sentence by Michael Tracy McFadden. (Attachments: # 1 Exhibit Grand Junction Daily Sentinel Article, # 2 Exhibit Report of Dr. David Thompson)(McDermott, Sean) (Entered: 02/23/2023) |
| 02/24/2023 | 163 | RESTRICTED PRESENTENCE REPORT as to Michael Tracy McFadden (Attachments: # 1 Exhibit A)(dbarri) (Attachment 1 corrected on 2/27/2023) (sphil, ). Modified on 2/27/2023 (sphil, ). (Entered: 02/24/2023) |
| 02/24/2023 | 164 | RESTRICTED ADDENDUM to Presentence Report 163 as to Michael Tracy McFadden (dbarri) (Entered: 02/24/2023) |
| 02/27/2023 | 165 | RESPONSE in Opposition by USA as to Michael Tracy McFadden re 162 MOTION for Non-Guideline Sentence (Surratt, Andrea) (Entered: 02/27/2023) |
| 03/07/2023 | 166 | Unopposed MOTION for Leave to File *Letter Of Support Prior To Sentencing* by Michael Tracy McFadden. (McDermott, Sean) (Entered: 03/07/2023) |
| 03/07/2023 | 167 | STRICKEN by Doc. # 169 -- RESTRICTED DOCUMENT - Level 2: as to Michael Tracy McFadden. (McDermott, Sean) Modified on 3/7/2023 (cmasec). (Entered: 03/07/2023) |
| 03/07/2023 | 168 | Unopposed MOTION for Leave to Restrict by Michael Tracy McFadden. (McDermott, Sean) (Entered: 03/07/2023) |
| 03/07/2023 | 169 | ORDER: Denying 166 Unopposed Motion for Leave to File Letter of Support Prior to Sentencing. Defendant is allowed to file his letter pursuant to D.C.COLO.LCrR11.1(e). FURTHER ORDERED Doc. #167 is STRICKEN. SO ORDERED by Senior Judge Christine M. Arguello on 3/7/2023. Text Only Entry (cmasec) (Entered: 03/07/2023) |
| 03/09/2023 | 170 | MINUTE ENTRY for proceedings held before Judge Christine M. Arguello: Sentencing held on 3/9/2023 as to Defendant Michael Tracy McFadden. ORDERED: Denying 162 Defendant's Motion for Non-Guideline Sentence. Defendant sentenced as reflected on the record. Defendant present in custody; Defendant remanded. (Total time: 51 Minutes, Hearing time: 9:03 a.m. - 9:54 a.m.)APPEARANCES: Andrea Surratt on behalf of the Government; Sean McDermott and Ben LaBranche on behalf of the Defendant. ALSO PRESENT: Government representative Alex Zappe. Ryan Kinsella on behalf of probation. Court Reporter: Kevin Carlin. (kmyha) Text Only Entry (Entered: 03/09/2023) |
| 03/13/2023 | 171 | ORDER: Granting 168 Motion for Leave to Restrict. Doc. # 167 , all exhibits attached thereto, and any orders that may reveal the contents of these documents shall have a Level 1 Restriction. SO ORDERED by Senior Judge Christine M. Arguello on 3/13/2023. Text Only Entry (cmasec) (Entered: 03/13/2023) |
| 03/13/2023 | 172 | JUDGMENT as to Defendant Michael Tracy McFadden (1): Defendant committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of LIFE Imprisonment as to each of Counts 1 through 5, to run concurrently. Supervised Release of LIFE as to each of Counts 1 through 5, to run concurrently. Total Special Assessment of $500.00. SO ORDERED by Senior Judge Christine M. Arguello on 3/13/2023. (cmasec) (Entered: 03/13/2023) |
| 03/13/2023 | 173 | STATEMENT OF REASONS as to Michael Tracy McFadden. (cmasec) (Entered: 03/13/2023) |
| 03/22/2023 | 174 | NOTICE OF APPEAL by Michael Tracy McFadden. (McDermott, Sean) (Entered: 03/22/2023) |