APPEAL,GRNDGJ,TERMED

# U.S. District Court – District of Colorado
## District of Colorado (Denver)
## CRIMINAL DOCKET FOR CASE #: <u>1:19−cr−00243−CMA−GPG</u>−1

Case title: USA v. McFadden

Date Filed: 05/17/2019

Date Terminated: 03/13/2023

---

Assigned to: Senior Judge
Christine M. Arguello
Referred to: Magistrate Judge
Gordon P. zzz_Gallagher−MJ

Appeals court case number:
23−1089 Tenth Circuit

**<u>Defendant (1)</u>**

| | | |
|---|---|---|
| **Michael Tracy McFadden**<br>*TERMINATED: 03/13/2023* | represented by | **Ben LaBranche**<br>Benjamin R. Labranche PLLC<br>1544 Race Street<br>Denver, CO 80206<br>225−927−5495<br>Fax: 225−927−5568<br>Email: ben@brllawyer.com<br>*ATTORNEY TO BE NOTICED*<br>*Designation: CJA Appointment*<br><br>**Sean Michael McDermott**<br>McDermott Stuart & Ward LLP<br>One Sherman Place<br>140 East 19th Avenue<br>Suite 300<br>Denver, CO 80203<br>303−355−6789<br>Email: smcdermott@mswdenver.com<br>*ATTORNEY TO BE NOTICED*<br>*Designation: CJA Appointment*<br><br>**Timothy Patrick O'Hara**<br>Office of the Federal Public Defender<br>633 Seventeenth Street<br>Suite 1000<br>Denver, CO 80202<br>303−294−7002<br>Fax: 303−294−1192<br>Email: timothy_ohara@fd.org<br>*TERMINATED: 02/09/2021*<br>*Designation: Public Defender or Community* |

1

*Defender Appointment*

| **Pending Counts** | **Disposition** |
|---|---|
| 18 U.S.C. § 2241(c) Crossing state lines with intent to engage in a sexual act with a minor under 12 (1) | Defendant committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of LIFE. Supervised Release of LIFE. Special Assessment of $100.00 |
| 18 U.S.C. § 2423(a) Transportation of a minor with intent to engage in sexual activity. (2) | Defendant committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of LIFE to run concurrently to Counts 1, 3, 4, and 5. Supervised Release of LIFE to run concurrently to Counts 1, 3, 4, and 5. Special Assessment of $100.00 |
| 18 U.S.C. § 2241(c) Crossing state lines with intent to engage in a sexual act with a minor under 12 (3) | Defendant committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of LIFE to run concurrently to Counts 1, 2, 4, and 5. Supervised Release of LIFE to run concurrently to Counts 1, 2, 4, and 5. Special Assessment of $100.00 |
| 18 U.S.C. § 2423(a) Transportation of a minor with intent to engage in sexual activity. (4) | Defendant committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of LIFE to run concurrently to Counts 1, 2, 3, and 5. Supervised Release of LIFE to run concurrently to Counts 1, 2, 3, and 5. Special Assessment of $100.00 |
| 18 U.S.C. § 2423(a) Transportation of a minor with intent to engage in sexual activity. (5) | Defendant committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of LIFE to run concurrently to Counts 1, 2, 3, and 4. Supervised Release of LIFE to run concurrently to Counts 1, 2, 3, and 4. Special Assessment of $100.00 |

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
|---|---|
| None | |

**Highest Offense Level (Terminated)**

None

| **Complaints** | **Disposition** |
|---|---|
| None | |

**Plaintiff**

**USA**                                          represented by   **Jeremy Lee Chaffin**
U.S. Attorney's Office
205 North 4th Street
Suite 400
Grand Junction, CO 81501
970–257–7113
Fax: 970–248–3630
Email: jeremy.chaffin@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Federal Agency Attorney*

**Andrea Lee Surratt**
U.S. Attorney's Office
District of Colorado
1801 California Street
Suite 1600
Denver, CO 80202
303–454–0124
Email: andrea.surratt@usdoj.gov
*ATTORNEY TO BE NOTICED*
*Designation: Federal Agency Attorney*

| Date Filed | # | Docket Text |
|---|---|---|
| 11/29/2022 | 154 | Partial TRANSCRIPT of Trial Testimony of J.W. as to Michael Tracy McFadden held on November 8, 2022 before Judge Arguello. Pages: 1–92.<br><br>**NOTICE – REDACTION OF TRANSCRIPTS: Within seven calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal identifiers from the electronic transcript of the court proceeding. If a Notice of Intent to Redact is not filed within the allotted time, this transcript will be made electronically available after 90 days. Please see the Notice of Electronic Availability of Transcripts document at www.cod.uscourts.gov.**<br><br>Transcript may only be viewed at the court public terminal or purchased through the Court Reporter/Transcriber prior to the 90 day deadline for electronic posting on PACER. (smitc, ) (Entered: 11/29/2022) |
| 11/29/2022 | 155 | Partial TRANSCRIPT of Trial Testimony of K.W. as to Michael Tracy McFadden held on November 9, 2022 before Judge Arguello. Pages: 1–61.<br><br>**NOTICE – REDACTION OF TRANSCRIPTS: Within seven calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal identifiers from the electronic transcript of the court proceeding. If a Notice of Intent to Redact is not filed within the allotted time, this transcript will be made electronically available after 90 days. Please see the Notice of Electronic Availability of Transcripts document at www.cod.uscourts.gov.** |

| | | |
|---|---|---|
| | | Transcript may only be viewed at the court public terminal or purchased through the Court Reporter/Transcriber prior to the 90 day deadline for electronic posting on PACER. (smitc, ) (Entered: 11/29/2022) |

```
 1                IN THE UNITED STATES DISTRICT COURT

 2                  FOR THE DISTRICT OF COLORADO

 3   Criminal Action No. 19-cr-00243-CMA-GPG-1

 4

 5    UNITED STATES OF AMERICA,

 6            Plaintiff,

 7            vs.

 8    MICHAEL TRACY MCFADDEN,

 9            Defendant.

10   -----------------------------------------------------------

11                 PARTIAL REPORTER'S TRANSCRIPT
                    Jury Trial - Testimony of J.W.
12
     -----------------------------------------------------------
13
              Proceedings before the HONORABLE CHRISTINE M.
14   ARGUELLO, Senior Judge, United States District Court for the
     District of Colorado, commencing on the 8th day of
15   November, 2022, in United States Courthouse, Grand Junction,
     Colorado.
16
                              APPEARANCES
17
     For the Plaintiff:
18   JEREMY L. CHAFFIN, U.S. Attorney's Office, 205 North 4th St.,
     Ste. 400, Grand Junction, CO 81501
19
     ANDREA L. SURRATT, U.S. Attorney's Office, 1801 California
20   St., Ste. 1600, Denver, CO 80202

21   For the Defendant:
     SEAN M. MCDERMOTT, McDermott Stuart & Ward, LLP, 140 East 19th
22   Ave., Ste. 300, Denver, CO 80203

23   BEN LABRANCHE, Benjamin R. LaBranche PLLC, 1544 Race St.,
     Denver, CO 80206
24

25      Sarah K. Mitchell, RPR, CRR, 901 19th Street, Room A252,
              Denver, CO 80294, 303-335-2108
          Proceedings reported by mechanical stenography;
               transcription produced via computer.
```

Case No. 1:19-cr-00243-CMA-GPG Document 154 filed 06/27/22 USDC Colorado pg 6 of 159

1                          I N D E X

2

    GOVERNMENT'S WITNESS                                    PAGE
3

    J.W.
4      Direct Examination By Mr. Chaffin                      3
       Cross-Examination By Mr. McDermott                    65
5      Redirect Examination By Mr. Chaffin                   85

6

7
                     GOVERNMENT'S
8                    EXHIBITS                    RECEIVED

9             1                                      7

10            2-1 - 2-9                            27

11            3-1 - 3-5                            15

12            4-1 - 4-4                            19

13            8-1                                   9

14            8-2                                  10

15            8-3                                  12

16

17

18

19

20

21

22

23

24

25

                    Sarah K. Mitchell, RPR, CRR

Case No. 1:19-cr-00243-CMA-GPG Document 154 filed 06/27/2022 USDC Colorado pg 7 of 159

 1              *        *        *        *        *

 2           (This portion of proceedings commenced at 9:32 a.m.)

 3           THE COURT:  All right.  The Government may call its

 4   first witness.

 5           MR. CHAFFIN:  Thank you, Your Honor.  The Government

 6   calls J.W. to the stand, if we can have just a moment to set

 7   up.

 8           THE COURT:  Ms. Myhaver, will you please administer

 9   the oath.

10           THE COURTROOM DEPUTY:  Please stand and raise your

11   right hand.

12                             J.W.

13   was called as a witness and, having been duly sworn, was

14   examined and testified as follows:

15           THE COURTROOM DEPUTY:  Please be seated.  And then

16   please state your name and spell your first and last name for

17   the record.

18           THE WITNESS:  J.W., and J////////////, W////////////.

19           THE COURT:  Mr. Chaffin, you may proceed.

20           MR. CHAFFIN:  Thank you, Your Honor.

21                       DIRECT EXAMINATION

22   BY MR. CHAFFIN:

23   Q.  Good morning, J.W.  Can you tell the jury how old you are?

24   A.  I am 23 years old.

25   Q.  When is your birthday?

                     Sarah K. Mitchell, RPR, CRR

Case No. 1:19-cr-00243-CMA-GPG Document 154 filed 06/27/2022 USDC Colorado pg 8 of 159

| | |
|---|---|
| 1 | A.  Or 22, sorry.  I just turned 22. |
| 2 | Q.  When is your birthday? |
| 3 | A.  October 25th. |
| 4 | Q.  What year? |
| 5 | A.  Can I lower this? |
| 6 | Q.  Sure. |
| 7 | A.  Now I can see you. |
| 8 | Q.  Is that a little better? |
| 9 | A.  Yeah. |
| 10 | Q.  What year were you born? |
| 11 | A.  2000. |
| 12 | Q.  Where do you live? |
| 13 | A.  In Grand Junction. |
| 14 | Q.  How long have you lived in Colorado? |
| 15 | A.  Basically my whole life. |
| 16 | Q.  What do you do for work? |
| 17 | A.  I'm an Uber driver right now. |
| 18 | Q.  Can you tell the jury your mom's name? |
| 19 | A.  My mom's name is Michelle. |
| 20 | Q.  What's her last name? |
| 21 | A.  R////. |
| 22 | Q.  How about your dad? |
| 23 | A.  My dad is Thomas W////.  He goes by Mike. |
| 24 | Q.  Has your dad been in your life a significant portion of |
| 25 | growing up? |

Sarah K. Mitchell, RPR, CRR

Case No. 1:19-cr-00243-CMA-GPG Document 154 filed 06/27/2022 USDC Colorado   pg 9
of 159

1   A.  No, he was not.

2   Q.  Why was that?

3   A.  He was always either in jail or not around, going around

4   to other of his friends' houses.  Even though he has kids, he

5   wouldn't really stop by or visit us much.  So he was either

6   always in jail or somewhere not to be known.

7   Q.  Did that upset you if he wasn't around?

8   A.  Kind of.

9   Q.  How about brothers and sisters, do you have any brothers

10  or sisters?

11  A.  Yes, I do.

12  Q.  What are their names?

13  A.  I have a brother.  His name is L.W.  And I have two

14  sisters named K.Wr. and B.W., and I also have some half

15  siblings on my dad's side.

16  Q.  How about L.Wr., how old is L.Wr.?

17  A.  L.Wr. right now is 18.

18  Q.  And you said B.W., how old is she?

19  A.  B.W. is 16 now.

20  Q.  K.Wr.?

21  A.  I think K.Wr. is 26.

22  Q.  And their mom, same mom as you?

23  A.  Yes.

24  Q.  Okay.  Do you know a person named Michael McFadden?

25  A.  Yes, I do.

                    Sarah K. Mitchell, RPR, CRR

Case No. 1:19-cr-00243-CMA-GPG Document 203-5 filed 06/27/22 USDC Colorado pg 10 of 159

 1  Q.  Do you see him here in the courtroom today?

 2  A.  Yeah.

 3  Q.  Would you point him out and describe an article of

 4  clothing he's wearing?

 5  A.  Yeah, he's wearing like a tuxedo suit with a blue

 6  undershirt.

 7  Q.  Hair, no hair?

 8  A.  He's balding.

 9  Q.  But he has hair?

10  A.  A little bit, yeah.

11        MR. CHAFFIN:  Your Honor, I ask that the record

12  reflect the witness has identified the defendant.

13        THE COURT:  It will so reflect.

14  Q.  (By MR. CHAFFIN) J.W., there should be a binder in front

15  of you there.

16  A.  Yes.

17  Q.  Can you take a look at Government's Exhibit Number 1 for

18  me.

19  A.  Exhibit 1?

20  Q.  Yeah.

21  A.  Not 21?

22        MR. CHAFFIN:  Can I approach, Your Honor?

23  Q.  (By MR. CHAFFIN) It's on the chair right next to you, J.W.

24  Sorry about that.

25  A.  I see Exhibit 1 now.

                    Sarah K. Mitchell, RPR, CRR

Case No. 1:19-cr-00243-CMA-GPG Document 198-5 filed 06/27/22 USDC Colorado pg 11 of 159

1   Q.  What is that?

2   A.  This is a picture of Mike.

3   Q.  Is that Mr. McFadden?

4   A.  Yes, Michael McFadden.

5   Q.  Does that picture depict Mr. McFadden as you remember him

6   kind of growing up?

7   A.  Yes.

8   Q.  Does that fairly and accurately depict him during the time

9   that you spent time with him?

10  A.  Yes.

11        MR. CHAFFIN:  Your Honor, I move to admit

12  Government's Exhibit 1.

13        THE COURT:  Any objection?

14        MR. MCDERMOTT:  No objection, Your Honor.

15        THE COURT:  Exhibit 1 will be admitted.  You may

16  publish.

17     (Government's Exhibit 1 received.)

18  Q.  (By MR. CHAFFIN) J.W., when we talked before -- do you see

19  the earring in Mr. McFadden's ear?

20  A.  In the picture?

21  Q.  Yes.

22  A.  Yes.

23  Q.  When we talked before you mentioned that you also had an

24  earring; is that right?

25  A.  Yeah, the exact same spike earring on my left ear.

                    Sarah K. Mitchell, RPR, CRR

Case No. 1:19-cr-00243-CMA-GPG Document 103-5 filed 06/27/23 USDC Colorado  pg 12
of 159

1   Q.  Why did you get an earring like that?

2   A.  It was to look like him more.

3   Q.  Was that you -- was that your decision or somebody else's?

4   A.  Yeah, that was my decision.

5   Q.  What was your --

6          MR. CHAFFIN:  We can take Government's Exhibit 1

7   down.  Thank you.

8   Q.  (By MR. CHAFFIN) What was your relationship with

9   Mr. McFadden?

10  A.  He was like a -- almost like a dad to me.  He took care of

11  me and watched over me.

12  Q.  Was he related to you?

13  A.  He was my cousin's mom's uncle, so like my great uncle,

14  you could say.  So yes.

15  Q.  Okay.  J.W., can you take a look at Government's

16  Exhibit 8, and there's a few of them, so let's start with 8-1.

17  Have you taken a look at that?

18  A.  Yes.

19  Q.  What is that?

20  A.  This is a picture of me.

21  Q.  And how old are you in that photo?

22  A.  About like eight years old.

23  Q.  Is that around the time that you started spending time

24  with Mr. McFadden?

25  A.  Yes.

Case No. 1:19-cr-00243-CMA-GPG-1 Document 453-54 Filed 06/27/22 USDC Colorado pg 13 of 159

 1   Q.  Does that fairly and accurately depict you as an

 2   8-year-old?

 3   A.  Yes.

 4          MR. CHAFFIN:  Your Honor, I move to admit

 5   Government's Exhibit 8-1.

 6          THE COURT:  Any objection?

 7          MR. MCDERMOTT:  No objection to 8-1, Your Honor.

 8          THE COURT:  8-1 is admitted.  You may publish.

 9      (Government's Exhibit 8-1 received.)

10   Q.  (By MR. CHAFFIN) Can you just explain to the jury what

11   you're wearing in this photo?

12   A.  I'm wearing a flower collared shirt, short shorts that go

13   above my knees, and some sunglasses, prescription that shade

14   when you're in the sun.

15   Q.  Where did those clothes come from?

16   A.  Those clothes came from Mike.

17   Q.  Did he buy them for you?

18   A.  I can't remember if he bought them for me, but I know they

19   came from him because those are the type of clothes and

20   glasses he would like to wear.

21   Q.  Did you want to wear clothes like that when you were

22   eight?

23   A.  Yeah.

24   Q.  What about the glasses?  How did you get those?

25   A.  So they were prescription glasses.  I went and did an eye

                     Sarah K. Mitchell, RPR, CRR

Case No. 1:19-cr-00243-CMA-GPG Document 193-54 filed 06/27/2022 USDC Colorado   pg 14
of 159

 1  test.  I needed some glasses, and I picked those especially

 2  because Mike had the same exact glasses.  And I really when I

 3  was young I kind of just copied him instead of finding my own

 4  style, you could say.

 5  Q.  Who took you to go get those glasses?

 6  A.  Mike did.

 7  Q.  We can take that exhibit down.  Can you take a look at

 8  Government's Exhibit 8-2.  What are we looking at there?

 9  A.  Looks like a picture of me at a birthday.

10  Q.  And do you know which birthday that was?

11  A.  I think, like, my 10th or 11th birthday.

12  Q.  Does that fairly and accurately depict you at your

13  birthday?

14  A.  Yes.

15          MR. CHAFFIN:  Your Honor, I move to admit

16  Government's Exhibit 8-2.

17          THE COURT:  Any objection?

18          MR. MCDERMOTT:  No objection, Your Honor.

19          THE COURT:  8-2 is admitted.  You may publish.

20      (Government's Exhibit 8-2 received.)

21  Q.  (By MR. CHAFFIN) J.W., can you just count for the jury the

22  number of candles that are on your birthday cake?

23  A.  Looks like there's 10 candles -- or 11 candles.  One more

24  was glowing.

25  Q.  So would that mean --

Case No. 19-cr-00243-CMA-GPG   Document 193-154   filed 06/27/2022   USDC Colorado   pg 15
of 159

1   A.  That would be my 11th birthday, yes.

2   Q.  When would that picture have been taken then?

3   A.  2011.

4   Q.  And around October 25th?

5   A.  Yeah.

6   Q.  Do you remember this birthday?

7   A.  Somewhat, yes.

8   Q.  Was Mr. McFadden there?

9   A.  I believe not.

10  Q.  Was this during this timeframe when you are spending time

11  with Mr. McFadden?

12  A.  Yes.

13  Q.  So we had 8-1 when you were about 8, 8-2 when you're about

14  11.  Can you take a look at 8-3?  What is that?

15  A.  That is a picture of me.

16  Q.  And approximately how old are you in that photo?

17  A.  Looks like I'm about 12 here.

18  Q.  Do you remember when that photo was taken?

19  A.  I do not.

20  Q.  When we spoke before you mentioned that the clothes that

21  you were wearing in that photo in particular helped you

22  understand sort of when it was taken; is that right?

23  A.  Yeah, this is -- as I'm wearing these type of clothes,

24  this is where I started finding my own style instead of

25  copying.

Case No. 1:19-cr-00243-CMA-GPG Document 193-54 filed 06/27/2022 USDC Colorado pg 16 of 159

1   Q.  What -- in those clothes in particular, where did you get

2   them or how did you get them?

3   A.  They are probably hand-me-downs from a cousin.

4   Q.  Did you grab them at some point in relation to something

5   that happened with Mr. McFadden?

6   A.  They were clothes that I had to go grab from the house

7   when I was told to only grab a couple things.

8   Q.  So when you were leaving Mr. McFadden's home?

9   A.  Yes.

10  Q.  Does this photograph fairly and accurately depict you

11  towards the end of when you spent time with Mr. McFadden?

12  A.  Yes, you could say that.

13          MR. CHAFFIN:  I move to admit Government's

14  Exhibit 8-3.

15          THE COURT:  Any objection?

16          MR. MCDERMOTT:  No objection.

17          THE COURT:  8-3 is admitted.  You may publish.

18      (Government's Exhibit 8-3 received.)

19  Q.  (By MR. CHAFFIN) So this -- we had 8-1 sort of at the

20  beginning of your relationship with Mr. McFadden, 8-2 sort of

21  at the middle, and 8-3 towards the end; is that fair to say?

22  A.  Yes, that's correct.

23          MR. CHAFFIN:  Thank you.  We can take 8-3 down.

24  Q.  (By MR. CHAFFIN) J.W., do you remember some of the houses

25  where Mr. McFadden lived?

                    Sarah K. Mitchell, RPR, CRR

Case No. 19-cr-00243-CMA-GPG Document 193-154 filed 06/27/2022 USDC Colorado pg 17 of 159

 1  A.  Yes, I do.

 2  Q.  What's the first house that you remember?

 3  A.  The first house I remember was his house over at the

 4  bottom of the Monument.

 5  Q.  What do you remember about that house?  What did it look

 6  like?

 7  A.  It was like a duplex where there was, like, two units and

 8  he was on the left side.  He had the left unit.  There was

 9  also, like, a shed out front of the unit.

10  Q.  Do you recall who all lived there?

11  A.  I know Mike lived there, and us kids would go over there

12  and visit.

13  Q.  Who's "us kids"?

14  A.  Me and my cousins.

15  Q.  What are your cousin's names?

16  A.  D.O. and E.S.

17  Q.  D.O. and E.S.  Let's talk about them for a second.  How do

18  they fit in -- how are they your cousins?

19  A.  They were Crystal's kids, which is my aunt.

20  Q.  So Crystal is your aunt?

21  A.  Yes.

22  Q.  Do you know what Crystal's last name is?

23  A.  M////////.

24  Q.  And she -- is she related to Mr. McFadden?

25  A.  Yes.

                    Sarah K. Mitchell, RPR, CRR

1   Q.   D.O. and E.S. are her sons?

2   A.   Correct.

3   Q.   Do D.O. and E.S. have other siblings?

4   A.   They have a sister named Jade.

5   Q.   How old is D.O.?

6   A.   About my age, probably a year younger.

7   Q.   E.S., how old is he?

8   A.   He's more around L.Wr.'s age.  He's 17 or 18 now.

9   Q.   And Jade?

10  A.   She's like my younger sister's age.  She's probably around

11  15 to 16 now.

12  Q.   Would you see other people at that house in Monument?

13  A.   Just the people that we've named.  Like my Aunt Crystal

14  I'd see over there.  I'd see Mike over there.  I'd see my

15  cousins over there.

16  Q.   Would you spend time there?

17  A.   Would I spend time over there?

18  Q.   Yeah.

19  A.   Yes.

20  Q.   What sorts of things would you do when you would spend

21  time at Mr. McFadden's house?

22  A.   It was at the bottom of the Monument, so we liked going

23  into the backyard, and it was huge.  You could go as far as

24  you could, and we would even hear bobcats growl sometimes, so

25  we always had fun in the backyard.  And my cousin D.O. had a

Sarah K. Mitchell, RPR, CRR

1   little electronic chopper motorcycle, and we used to play on

2   that a lot.

3   Q.  Would you spend nights there?

4   A.  Yes.

5   Q.  What's the next house that you remember Mr. McFadden

6   living in?

7   A.  It would be the Glen Road house.

8   Q.  Could you take a look at Government's Exhibit --

9           MR. CHAFFIN:  3 was by stipulation; is that correct?

10          MR. MCDERMOTT:  Yes.

11          MR. CHAFFIN:  Your Honor, I'd just move to admit

12  Government's Exhibits -- all of Government's Exhibits --

13          THE COURT:  1 through 5?

14          MR. CHAFFIN:  3-1 through 3-4.

15          THE COURT:  Not 5?

16          MR. CHAFFIN:  Yes, 5.

17          THE COURT:  3-1 through 3-5 are all stipulated.

18  Therefore they are all admitted.  You may publish.

19      (Government's Exhibits 3-1 - 3-5 received.)

20          MR. CHAFFIN:  Can we have 3-1 up, please.

21  Q.  (By MR. CHAFFIN) J.W., what are we looking at here?

22  A.  We are looking at that Glen Road house that I just

23  described.

24  Q.  It's a two-story house, right?

25  A.  Yes.

                    Sarah K. Mitchell, RPR, CRR

Case No. 1:19-cr-00243-CMA-GPG Document 154 filed 06/27/2022 USDC Colorado pg 20 of 159

```
 1   Q.  How many rooms, do you recall?
 2   A.  I'm not sure how many rooms, but I do know it was two
 3   stories aboveground, and it also had, like, a basement.
 4           MR. CHAFFIN:  Can we just quickly put up 3-2.
 5   Q.  (By MR. CHAFFIN) What is this?
 6   A.  This is a picture of the same house, but from a different
 7   angle.
 8           MR. CHAFFIN:  3-3, please.
 9   Q.  (By MR. CHAFFIN) What is this?
10   A.  This is a picture of the side of the house, and you can
11   see the backyard and back porch -- well, the back fence.
12           MR. CHAFFIN:  Can we have 3-4, please.
13   Q.  (By MR. CHAFFIN) What are we looking at here?
14   A.  This looks like it's the house behind the house, the Glen
15   house.
16   Q.  And you can see sort of the backyard.  The Glen house is
17   to the left?
18   A.  Yeah, you can see the Glen house's porch back door.  You
19   can see the swamp cooler on the roof and some snow on the
20   roof.
21           MR. CHAFFIN:  Can we have 3-5.
22   Q.  (By MR. CHAFFIN) What are we looking at here?
23   A.  This looks like a satellite image of the house.
24   Q.  Can you point out for the jury which house is the Glen
25   Road house?  Feel free to stand up.
```

                          Sarah K. Mitchell, RPR, CRR

Case No. 1:19-cr-00243-CMA-GPG Document 193-154 filed 06/27/2022 USDC Colorado pg 21 of 159

1   A.  It would be this house.

2   Q.  So you're pointing at -- in the center of the photograph

3   there's like four houses, and you pointed to the bottom left?

4   A.  Yeah, bottom left house.  The one that's on the corner of

5   Glen and Gunnison.

6   Q.  Who all lived at the Glen Road house?

7   A.  Me and Mike lived in one of the bedrooms, and then Phyllis

8   and John Hockenberry were Mike's roommates.  And then their

9   son S.H. lived there as well.

10  Q.  Do you know how Phyllis and John Hockenberry became

11  Mr. McFadden's roommates?

12  A.  I think Mike McFadden somehow worked with John.

13  Q.  And you mentioned a S.H.?

14  A.  Yes.  S.H. was their son.

15  Q.  About how old was S.H.?

16  A.  He was about my age.

17  Q.  Did S.H. have his own room?

18  A.  Yes.

19  Q.  You mentioned that you lived there?

20  A.  Yes.

21  Q.  Did you have your own room?

22  A.  No, I did not.

23  Q.  Where did you stay?

24  A.  I stayed in Mike's bedroom.

25  Q.  Anybody else that would come to the house, the Glen Road

Sarah K. Mitchell, RPR, CRR

Case No.19-cr-00243-CMA-GPG Document 193-54 filed 06/27/2022 USA Pge 18 of 48  pg 22
of 159

```
 1    house?
 2    A.  Cousins would come over.  We would watch WWE events at the
 3    house, but it was mainly just us.
 4    Q.  Which cousins would come over?
 5    A.  My cousins would come over, D.O., E.S., even some friends
 6    that we made in the neighborhood would come over.  We used to
 7    have like a crotch rocket.  S.H. had some friends as well, and
 8    I think S.H. had a brother that used to come over.
 9    Q.  Do you remember any of the friends' names that would come
10    over?
11    A.  No, I do not.
12    Q.  You mentioned a crotch rocket.  What is that?
13    A.  A crotch rocket is like a mini motorcycle that goes really
14    fast.
15    Q.  How did you guys end up having a crotch rocket?
16    A.  I think one of the neighbor kids was like getting rid of
17    it or selling it, and we -- I don't think it ran at first, but
18    John or Mike or one of us got it to run for the kids.
19    Q.  Was that fun to use?
20    A.  Yeah, it was fun.
21    Q.  What other fun things would you do at the Glen Road house?
22    A.  We had a hot tub in the backyard that was always fun.  We
23    also had the hiddens we called it.  It was just a field across
24    from the house, and that's where we used to ride that crotch
25    rocket or just bicycles and make like dirt jumps.
```

Sarah K. Mitchell, RPR, CRR

Case No. 1:19-cr-00243-CMA-GPG Document 193-54 filed 06/27/2022 USDC Colorado pg 23 of 159

1   Q.  Sounds like you would spend a lot of time at that house?

2   A.  Yes.

3   Q.  About how long were you at the Glen Road house, would you

4   say?

5   A.  I'd say over a year.

6   Q.  Okay.  About how old are you?

7   A.  I'm probably around nine years old.

8   Q.  Okay.  Do you remember the next house that Mr. McFadden

9   lived in?

10  A.  Yes.

11  Q.  What house was that?

12  A.  It was the D 1/2 Road house.

13      MR. CHAFFIN:  Your Honor, I would similarly move to

14  admit Government's Exhibits 4-1 through I think 4-4.

15      THE COURT:  4-1 through 4-4 are stipulated.  They are

16  all admitted.  You may publish.

17    (Government's Exhibits 4-1 - 4-4 received.)

18      MR. CHAFFIN:  Can we have 4-1, please.

19  Q.  (By MR. CHAFFIN) J.W., what are we looking at here?

20  A.  This is that D 1/2 Road house.

21      MR. CHAFFIN:  Can we have 4-4.

22  Q.  (By MR. CHAFFIN) What are we looking at here?

23  A.  This is a satellite image of that D 1/2 Road house.

24  Q.  Which house is the D 1/2 Road house that Mr. McFadden

25  lived in?

Sarah K. Mitchell, RPR, CRR

Case No. 1:19-cr-00243-CMA-GPG Document 154 filed 06/27/2022 USDC Colorado pg 24 of 159

 1    A.  Would you like me to point?

 2    Q.  If you would, please.

 3    A.  It's going to be this house right here with all the junk

 4    around it.

 5    Q.  Just for the record, you pointed at the house in the

 6    center of the image, correct?

 7    A.  Yes.

 8    Q.  Okay.  Who all lived at this house, at D 1/2 Road?

 9    A.  At first John and Phyllis Hockenberry, Mike's roommates,

10    moved over with us to that house.

11    Q.  And do you know the address of that house?

12    A.  Yeah, it's 2980 D 1/2 Road.

13    Q.  So John and Phyllis Hockenberry lived there, Mr. McFadden

14    lived there.

15    A.  Correct.

16    Q.  Did you live there?

17    A.  Yes.

18    Q.  What about your siblings, were they there?

19    A.  Not at first.

20    Q.  You mentioned S.H. before.  Was John and Phyllis's son

21    S.H., was he --

22    A.  Yes, he moved over there with us.

23    Q.  About how long did John, Phyllis, and S.H. live at that

24    house?

25    A.  I'd say they lived there for about a year, a little over a

                    Sarah K. Mitchell, RPR, CRR

Case No. 1:19-cr-00243-CMA-GPG Document 193-4 filed 06/27/2022 USDC Colorado pg 25 of 159

 1   year before they ended up moving out.

 2   Q.  Okay.  And when they moved out, did Mr. McFadden stay or

 3   did he leave as well?

 4   A.  He stayed.

 5   Q.  What about you?

 6   A.  I stayed as well.

 7   Q.  At some point do other people move into the D 1/2 Road

 8   house?

 9   A.  Yes.

10   Q.  Who all moved in?

11   A.  John, we called him Papa John, he moved into the house.

12   Q.  Tell the jury, who's Papa John?

13   A.  Papa John was our neighborhood's mom -- or dad, sorry.

14   Q.  Okay.  And how did he come to live at the D 1/2 Road

15   house?

16   A.  I remember our neighbor's mom, her name was Stacy, talking

17   with the folks over at our house, and I don't think they had

18   room over there at the neighbor's house for him, but we were

19   so close as neighbors Mike opened and offered his couch for

20   Papa John to stay at.

21   Q.  So when Papa John lived at the house on D 1/2 Road, where

22   would he stay?

23   A.  He would stay in the living room.

24   Q.  Always in the living room?

25   A.  Yeah.

                        Sarah K. Mitchell, RPR, CRR

Case No. 1:19-cr-00243-CMA-GPG Document 193-4 filed 06/27/2022 USDC Colorado pg 26 of 159

 1  Q.  What about you, where would you stay in this D 1/2 Road
 2  house?
 3  A.  At first when we first moved to the D 1/2 Road house I
 4  would stay in a -- it was like a utility room at first, but
 5  Mike added a wall to the utility room to make it two rooms.
 6  And then one of the rooms was the laundry room, and then one
 7  of the rooms turned into our bedroom.
 8  Q.  Who all stayed in the bedroom near the laundry room?
 9  A.  Me and Mike.
10  Q.  You and Mr. McFadden?
11  A.  Correct.
12  Q.  How long would you say that you stayed in that room kind
13  of off the laundry room?
14  A.  I'd say for about two years we stayed in that laundry
15  room.
16  Q.  Okay.
17  A.  Room off the laundry room anyways.
18  Q.  At some point did that change?
19  A.  Yes.
20  Q.  Was that in relation to when John and Phyllis kind of
21  moved out?
22  A.  Correct.
23  Q.  What room -- well, did you change rooms at that point?
24  A.  At that point when John and Phyllis moved out, the room
25  they were staying in, which was the master bedroom, Mike moved

                    Sarah K. Mitchell, RPR, CRR

Case No. 1:19-cr-00243-CMA-GPG Document 93-154 filed 06/27/2022 USDC Colorado pg 27 of 159

1  his stuff to the master bedroom and then turned the room we

2  were staying in into like a kid's room.  There were two

3  separate beds.  At one time we even had a bunkbed in there.

4  So it turned into a kids room, and he moved over to the master

5  bedroom.

6  Q.  What about you?

7  A.  At first I stayed in the utility room with the kids, but

8  it didn't take very long for me to go over to the master

9  bedroom with Mike.

10  Q.  Who all at that point was staying in the kids room?

11  A.  The kids room would be for my brother or my cousins, even

12  some of the neighborhood kids that would come and spend the

13  night.  That would be the room they would stay in.

14  Q.  And you said you moved into Mike's room.  Where would you

15  sleep?

16  A.  I'd sleep in his bed.

17  Q.  Would other kids sleep in Mr. McFadden's bed as well?

18  A.  Yes.

19  Q.  Who all do you recall staying in Mr. McFadden's bed?

20  A.  I remember my brother staying.  He would sometimes have to

21  stay on the floor, though, because he had a bed wetting

22  problem, so he would have to make up a cot on the side of the

23  bed.  But he would stay in the room with us.  D.R. would stay

24  in the bed with us.  E.S. would stay in the bed with us.  I.S.

25  would stay in the bed with us.  K.W. would stay in the bed

Case No. 1:19-cr-00243-CMA-GPG Document 153-4 filed 06/27/2022 USDC Colorado pg 28 of 159

 1  with us.  All the boys would jump up in the bed, watch a

 2  movie, play some video games.

 3  Q.  Talk about some of these boys, because I don't think we

 4  talked about them yet.  So E.S., is that the same E.S. that

 5  you said was a cousin?

 6  A.  Yes.

 7  Q.  Okay.  That's Crystal's son?

 8  A.  Correct.

 9  Q.  You mentioned a D.R.  Who's D.R.?

10  A.  D.R. was like a friend that came over.

11  Q.  Whose friend?

12  A.  He was a friend of S.H.'s at first, but once S.H. moved,

13  he already came around and knew us long enough so where we

14  became friends, so even after S.H. moved out he still came

15  over a lot.

16  Q.  And then you mentioned an I.S.?

17  A.  Yes.

18  Q.  Who's I.S.?

19  A.  I.S. I believe is E.S.'s either cousin or step-cousin or

20  step-brother.  I know he's related to my cousin E.S.

21  Q.  So does that make him your cousin as well?

22  A.  It would be like a second cousin, yes.  I didn't know I.S.

23  growing up, so...

24  Q.  Okay.  And then you mentioned a K.W.

25  A.  Yes.  K.W. was the neighbor.

                    Sarah K. Mitchell, RPR, CRR

Case No.19-cr-00243-CMA-GPG Document 3154 filed 06/27/2022 USDC Colorado pg 29 of 159

 1  Q.  You know K.W.'s last name?

 2  A.  W////////////.

 3  Q.  You said that K.W. was a neighbor.  Where did K.W. live?

 4  A.  He lived to the right of the house next door.

 5  Q.  Is that on Government's Exhibit 4-4?

 6  A.  Yes, it is.

 7  Q.  Could you point out for the jury where K.W.'s house was

 8  at?

 9  A.  K.W.'s house was this house all the way on the bottom

10  right corner.

11          MR. CHAFFIN:  Could we put up 4-2.

12  Q.  (By MR. CHAFFIN) J.W., what is this, 4-2?

13  A.  That would be K.W.'s house, the neighbor's house.

14          MR. CHAFFIN:  Can we have 4-3.

15  Q.  (By MR. CHAFFIN) What is that?

16  A.  That is another picture from a different angle of the

17  neighbor's house.

18  Q.  Did the house look like that all boarded up when K.W.

19  lived there?

20  A.  It wasn't boarded up like that, but it did look like that.

21  It just wasn't boarded up.  The windows were there.  It looked

22  a little more, you know, livable, not rundown.

23          MR. CHAFFIN:  Thank you.  Will you take that down.

24  Q.  (By MR. CHAFFIN) What sorts of things would you do at the

25  D 1/2 Road house?

                    Sarah K. Mitchell, RPR, CRR

Case No. 19-cr-00243-CMA-GPG Document 193-4 filed 06/27/2022 USDC Colorado   pg 30
of 159

 1   A.  We would do a lot of things at the D 1/2 Road house.  We

 2   got into activities like BMX racing, motocross which is a step

 3   above BMX because you actually have a motor on your bike.  We

 4   had paintball, airsoft.  We built forts.  We drove around the

 5   property in the vehicles that we had on the property including

 6   some of the heavy machinery.

 7   Q.  Was that a lot of fun?

 8   A.  Yeah, it was a lot of fun.

 9   Q.  Who got you involved in BMX and motocross?

10   A.  Mike got me into it because my cousins already were doing

11   it.

12   Q.  And the like paintball, stuff like that, where did that

13   come from?

14   A.   It probably would just be one of us kids saying, hey,

15   let's get into this, let's try something new, because we would

16   probably get bored of the same activity over the span of a

17   year.  Get bored of BMX racing, so, okay, let's go buy some

18   airsoft guns or paintball guns or make a fort.

19   Q.  And who would go buy you those things?

20   A.  Mike would.

21   Q.  The equipment that you talked about, where did that come

22   from?

23   A.  Mike ran, like, a business with some dude that he worked

24   with, and they used to always bring over, like, backhoes or

25   skitters they'd be using for their work, but they would stay

                    Sarah K. Mitchell, RPR, CRR

Case No. 1:19-cr-00243-CMA-GPG Document 193-154 filed 06/27/2022 USDC Colorado pg 31 of 159

 1   on our property, so we would be able to drive them around and

 2   build forts with them.

 3   Q.  Would Mr. McFadden take you on trips?

 4   A.  Yes.

 5   Q.  Was that fun?

 6   A.  Yes.

 7   Q.  What sorts of trips would you go on?

 8   A.  We would go on trips to different states, and me living in

 9   Colorado my whole life I never really left the state, so it

10   was really fun at first when we went to different states and

11   we got to see different places.

12   Q.  How would you go on these trips?

13   A.  It would be in a semi-truck.  He would be going on these

14   trips for his work.

15        MR. CHAFFIN:  Your Honor, I move to admit

16   Government's Exhibits 2-1 through 2-9 by stipulation.

17        THE COURT:  2-1 through 2-9 are stipulated.  They are

18   admitted and you may publish.

19      (Government's Exhibits 2-1 - 2-9 received.)

20        MR. CHAFFIN:  Can we have 2-1, please.

21   Q.  (By MR. CHAFFIN) J.W., what are we looking at here?

22   A.  This is one of our semis that we had that we did trips on.

23   Q.  Were there other semi-trucks that Mr. McFadden had as

24   well?

25   A.  Yes.  There were other semi-trucks, but this is the truck

Case No. 19-cr-00243-CMA-GPG Document 193-54 filed 06/27/2022 USDC Colorado pg 32 of 159

 1   we mainly used.

 2   Q.  So this is the main truck?

 3   A.  Yes.

 4   Q.  And it says something on the side.  Can you tell the jury

 5   what that says?

 6   A.  On the side of the truck it says Precision Construction.

 7   Q.  What is that, Precision Construction?

 8   A.  That was Mike's and his partner's company.

 9   Q.  Do you recall what his partner's name was?

10   A.  Darren or Darrell.

11       MR. CHAFFIN:  Could we have 2-2.

12   Q.  (By MR. CHAFFIN) What is this?

13   A.  This is a picture of that semi-truck from a different

14   angle.

15   Q.  2-3, what is this?

16   A.  This is the other side of that semi-truck.

17   Q.  We're just kind of walking around the truck, right?

18   A.  Yeah.

19   Q.  2-4, what is this?

20   A.  This would be the backside of it if you were continuing

21   walking around.

22   Q.  Now, this -- what was the cab like in this truck?

23   A.  The cab was like a big mattress in the cab.  There were

24   two side flaps that you could flap open to get some fresh air.

25   There was also a cubby on the right side of the bed that you

                    Sarah K. Mitchell, RPR, CRR

Case No. 1:19-cr-00243-CMA-GPG Document 193-54 filed 06/27/2022 USDC Colorado pg 33 of 159

```
 1    could store stuff in, clothes, food, anything.  It was kind of

 2    like a closet.  And then you walk forward.  There's a curtain

 3    you could close for privacy.  You could open the curtain, and

 4    then there's the two front seats of the semi-truck.

 5             MR. CHAFFIN:  Can we take a look at 2-5.

 6    Q.  (By MR. CHAFFIN) What are we looking at right here?

 7    A.  This is, like, if you opened up the driver door of the

 8    semi and you looked into the semi, you would see this.

 9    Q.  And if we take a look at 2-6, what is this?

10    A.  This is a picture of a cab that I was describing earlier.

11    Q.  And I think you mentioned like a mattress?

12    A.  Yes.

13    Q.  Is that in the photo?

14    A.  Yes, it is.

15    Q.  When you went on trips, where would you stay?

16    A.  I would stay on that mattress.

17    Q.  Mr. McFadden, where would he stay?

18    A.  He would sleep on the mattress as well.

19    Q.  2-7, what are we looking at here?

20    A.  This is the other side of the back cab.  You're looking

21    at, like, that window flap that I also was describing and then

22    the bed.

23    Q.  And the cubby, is that in here as well?

24    A.  Yeah, that cubby is to the left.  It wasn't the cubby I

25    was referencing to earlier, but it is another cubby in the
```

Case No. 19-cr-00243-CMA-GPG Document 154 filed 06/27/2022 USDC Colorado  pg 34 of 159

1   semi.

2   Q.  I see.

3   A.  If you had a picture of the other side you'd see the other

4   cubby I was talking about that looked more like a closet.

5           MR. CHAFFIN:  Can we go back to 2-6, I guess.

6   Q.  (By MR. CHAFFIN) Is that the other cubby?  The other cubby

7   you talked about, is that this?

8   A.  Yes.  And right below -- if you can look at the cubby that

9   has Ramen noodles in it, right below that is a spot where you

10  can put hangers and stuff for your clothes.

11  Q.  And the curtain you mentioned, is that depicted here as

12  well?

13  A.  Yes.  You can see the curtain that had buttons so you can

14  snap them together when they're closed.

15  Q.  2-8, what is this?

16  A.  This is a picture of the back of the cab.

17  Q.  Is this the mattress that you talked about?

18  A.  Yes.  At the bottom of the picture you can see the

19  mattress and the pillows.

20  Q.  2-9, what are we looking at here?

21  A.  This is a picture of the front of the semi as if you were

22  sitting on the bed of the cab.

23  Q.  Thank you.  J.W., how long has been it since you've been

24  in this truck?

25  A.  It's been over ten years.

                    Sarah K. Mitchell, RPR, CRR

Case No. 1:19-cr-00243-CMA-GPG Document 193-154 filed 06/27/2022 USDC Colorado   pg 35
of 159

 1  Q.  It's been a while?

 2  A.  Yes.

 3  Q.  You talked about living with Mr. McFadden.  Did you -- we

 4  can take this down now.  Did you always live with Mr. McFadden

 5  when you were growing up?

 6  A.  I didn't always live with him when I was growing up.

 7  Q.  Were there times when you would spend time away from his

 8  house as well?

 9  A.  When I did live with him?

10  Q.  Yes.

11  A.  Yes.  There were times I went and stayed with my mom.

12  Q.  What was -- what was life like when you were staying with

13  your mom?

14  A.  I didn't like staying with my mom.

15  Q.  Why not?

16  A.  She had a boyfriend that was really abusive, and then she

17  had also a drug problem that her and her boyfriend were

18  having.

19  Q.  When you say that her boyfriend was abusive, what do you

20  mean?

21  A.  He used to beat my mom.  He used to break bottles over her

22  head.  He used to grab my baby sister roughly when she was an

23  infant.  He would even slam me against the walls and stuff if

24  I ever copped an attitude or something with him.

25  Q.  That was scary?

                    Sarah K. Mitchell, RPR, CRR

Case No. 1:19-cr-00243-CMA-GPG Document 154 filed 06/27/2022 USA page 32 of 159   pg 36 of 159

1  A.  Yeah.

2  Q.  Stuff like that, did that happen when you were staying

3  with Mr. McFadden?

4  A.  No.

5  Q.  Did you feel safe at Mr. McFadden's house?

6  A.  Yes.

7  Q.  What about at your mom's house?

8  A.  I felt safe, but it was just I knew that there was a

9  possibility I could end up seeing my mom get hurt, my siblings

10 get hurt, or even me.

11 Q.  When you were staying with your mom, did you always have

12 enough to eat?

13 A.  No.

14 Q.  What do you mean by that?

15 A.  We didn't have much money growing up.  My mom and her

16 boyfriend kind of thought because we go to school, that's

17 where we will get our meals, so most of the food that we had

18 they would eat.  We would have like a dinner at night, and I

19 always remember getting dinner and it never being enough, and

20 I always remember my sister sneaking me food.

21 Q.  Why would your sister need to sneak you food?

22 A.  Because I was always asking for more after dinner.  I was

23 always hungry.

24 Q.  Those things -- did that sort of thing happen to you when

25 you stayed with Mr. McFadden?

                    Sarah K. Mitchell, RPR, CRR

Case No. 19-cr-00243-CMA-GPG Document 193-54 filed 06/27/2022 USDC Colorado pg 37 of 159

```
 1   A.   No.

 2   Q.   You always had enough to eat?

 3   A.   Yeah.

 4   Q.   When you were with Mr. McFadden, who got you to school?

 5   A.   Mike McFadden got me to school.

 6   Q.   Who took you to the doctor?

 7   A.   Mike did.

 8   Q.   Who made sure that you had clean clothes to wear?

 9   A.   Mike did.

10   Q.   At that time how did you feel about Mr. McFadden?

11   A.   At the time I was happy that I could have another place to

12   go to and kind of enjoy being a kid, not having to worry about

13   stuff like what I'm going to eat or if I'm going to have to go

14   to the neighbor's to call the cops because my mom and her

15   boyfriend got in a fight.  So it was a big change.

16   Q.   You said earlier that you thought of him as a dad.  Did

17   you use those words with him?

18   A.   Yeah.

19   Q.   Did you love him?

20   A.   Yeah.

21   Q.   J.W., I want to talk to you a little about some

22   uncomfortable things, okay?

23   A.   Okay.

24   Q.   Were there things that happened when you stayed with

25   Mr. McFadden that made you feel uncomfortable?
```

Case No. 1:19-cv-00243-CMA-GPG Document 93-54 filed 06/27/2022 USDC Colorado pg 38 of 159

 1   A.  Yeah.

 2   Q.  When is the first time that you remember something that

 3   made you feel uncomfortable?

 4   A.  The first time that I felt uncomfortable with Mike was we

 5   were going to a funeral.  It was one of my cousins that died.

 6   We were going to a funeral.  It was located in Arizona, and it

 7   was kind of like the first trip I ever took.

 8   Q.  Do you remember how old you were?

 9   A.  I was about eight.

10   Q.  So early on --

11   A.  Yeah.

12   Q.  Sort of similar age to Government's Exhibit 8-1?

13   A.  Yeah.

14   Q.  How do you know that you went to Arizona?

15   A.  Because -- I know we went to Arizona because I remember

16   driving there.  I remember seeing the Paradise Road signs, and

17   that amused me because here in town we have like North Ave or

18   Gunnison, but in like Arizona they have Paradise Road, and

19   there were palm trees, and it was cool to see.

20   Q.  And you said that a cousin had passed away?

21   A.  Yeah.

22   Q.  Do you know who the cousin was?

23   A.  His name was Justin.

24   Q.  How did he sort of factor into your family?

25   A.  He was my cousins D.O. and E.S. -- he was their cousin's

                    Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1  Testimony of J.W.        11/08/2022    35

 1  brother.  So it was Brandon, it was his brother Justin who

 2  passed away, and I was related to them through my cousins.

 3  Q.  Okay.  Who all went on this trip down to Arizona to this

 4  funeral?

 5  A.  Me, Mike, Crystal, our parents, our Uncle Monkey, a

 6  majority of us went down there.

 7  Q.  You mentioned an Uncle Monkey.  Who's that?

 8  A.  That is my grandpa's brother.  We called him Uncle Monkey.

 9  Q.  Did you mention Mr. McFadden?

10  A.  Yes.

11  Q.  Okay.  I think you said Mike, right?

12  A.  Yeah, Mike McFadden, he was there as well.

13  Q.  Okay.  I just want to make sure we're talking about the

14  same Mike because there's also your biological father that is

15  referred to as Mike, correct?

16  A.  Correct.

17  Q.  And your biological father is sort of out of the picture?

18  A.  Yeah, he's out of the picture.

19  Q.  Even back then?

20  A.  Yes.

21  Q.  Who did you travel with when you went down to this

22  funeral?

23  A.  I traveled with Mike.

24  Q.  Do you remember who else was in the vehicle?

25  A.  My Aunt Crystal was in the vehicle with us, and I believe

                    Sarah K. Mitchell, RPR, CRR

Case No. 19-cr-00243-CMA-GPG Document 193-54 filed 06/27/2022 USA Page 36 of 88   pg 40 of 159

1   one of the kids with us.  Probably my cousin.

2   Q.  Where would you guys stay?

3   A.  When we were going there?

4   Q.  Yeah.

5   A.  We got there all in one trip so we didn't have to stop and

6   stay anywhere, but we did get lost on the way so it took us a

7   longer time than when the rest of our family got there,

8   because I remember us getting there at night, and we were

9   already supposed to be there like a few hours before.

10  Q.  Did you stay at somebody's house?

11  A.  No.  We stayed at a hotel when we got there.

12  Q.  Okay.  Whose room did you stay in?

13  A.  I slept in Mike's hotel room.  It was like a conjoined

14  room that they had.

15  Q.  Do you recall who else stayed in the room?

16  A.  It was me, Mike, and one of the boys.  It was E.S., I

17  believe.

18  Q.  What about your mom?

19  A.  My mom and the girls stayed in the other conjoined room.

20  So it was kind of like this was the boy room, and then this

21  was the girl room.  Then there was a conjoined door.

22  Q.  You said that something uncomfortable happened on this

23  trip.  What happened?

24  A.  During that night I went to bed and I woke up late in the

25  night to like a wet sensation in my rectum area.  I woke up,

Case No. 1:19-cr-00243-CMA-GPG Document 193-4 filed 06/27/2022 USDC Colorado pg 41 of 159

 1   and when I came to awareness, my pants were lowered and I had

 2   that wet sensation.

 3   Q.  Do you remember going to bed that night?

 4   A.  Yeah.

 5   Q.  What were you wearing when you went to bed?

 6   A.  I was wearing, like, some pajamas.

 7   Q.  And you said that when you woke up you felt this wet

 8   sensation in your rectum?

 9   A.  Yeah.

10   Q.  Had you ever felt something like that before?

11   A.  No.

12   Q.  That you said your pants were down?

13   A.  Uh-huh.

14   Q.  How were they down, where were they at?

15   A.  Like around the ankles.

16   Q.  What did you do when you woke up to that?

17   A.  I didn't quite know what to do, but I know because I had

18   like that wet sensation, I knew I needed to change, so I got

19   up and changed.

20   Q.  Was there anybody else up at that point?

21   A.  Yeah.  Mike was up at that point because I was already

22   rolling and tossing and turning and showing like signs of

23   struggle, so, like, he, if I remember, asked me like what was

24   wrong, and I said I needed to change.

25   Q.  Did you talk to him about this sensation that you felt?

Case No.19-cr-00243-CMA-GPG Document 93-4 filed 06/27/2022 USDC Colorado pg 42 of 159

1   A.  No, I didn't.

2   Q.  Did he say anything else?

3   A.  No.  I just kind of went back to bed.

4   Q.  Why did that make you feel uncomfortable?

5   A.  Because it was something that I knew, like, wasn't right,

6   and I knew something -- like, I didn't do that myself, but I

7   was kind of confused, so I knew it wasn't right, but I was

8   just confused.

9   Q.  Did anything else like that happen on that trip?

10  A.  No.

11  Q.  When's the next time that you recall something -- well,

12  did you tell anybody about that --

13  A.  No.

14  Q.  -- experience?

15  A.  No.

16  Q.  Why not?

17  A.  It was -- like I said, I was confused and you could say

18  even I was scared a little bit.  I didn't really know.

19  Q.  When's the next time that you remember something

20  uncomfortable happening?

21  A.  The next time I remember something uncomfortable happening

22  was his first house we talked about over on the Monument.

23  Q.  The house with the big backyard?

24  A.  Yeah, the backyard with, like, the Bobcat and stuff.

25  Q.  Where did this happen, this uncomfortable thing?

Sarah K. Mitchell, RPR, CRR

Case No. 1:19-cr-00243-CMA-GPG Document 193-54 Filed 06/27/2022 USDC Colorado pg 43 of 159

1   A.  We were on an air mattress in, like, the living room at

2   the house.

3   Q.  Who's we?

4   A.  We as in me and Mike stayed on the air mattress.

5   Q.  So you and Mr. McFadden were sleeping on an air mattress?

6   A.  Correct, yeah.

7   Q.  What happened?

8   A.  I remember being super sick during the time, like having a

9   bug or a fever, and I remember sweating a lot, and because I

10  was sweating through my clothes, Mike was there for me to keep

11  changing my clothes for me when I sweat through them.  And

12  during part of the night I woke up and kind of just thought

13  maybe he was changing my clothes because I sweat through them,

14  but I was soon to realize that that uncomfortable feeling in

15  my rectum area was there as well, so I was already kind of

16  putting two and two together, and I know it was uncomfortable

17  and it didn't feel good.

18  Q.  The uncomfortable feeling in your rectum, what was that?

19  A.  It was when I woke up I first thought that he was just

20  changing my clothes, so I kind of like played asleep because I

21  was sick.  I didn't feel good.  And as he was changing my

22  clothes, I felt like pressure in my rectum area and that wet

23  sensation feeling, and that's when I knew he wasn't just

24  changing my clothes because I was sick.

25  Q.  What was he doing?

Sarah K. Mitchell, RPR, CRR

Case No. 1:19-cr-00243-CMA-GPG Document 135-4 filed 06/27/2022 USDC Colorado pg 44
of 159

  1   A.  He was sticking his penis into my rectum.

  2   Q.  How do you know that it was his penis?

  3   A.  Because of the way it felt and because of the positioning

  4   we were laying in.

  5   Q.  Can you describe for the jury the position that you were

  6   laying in?

  7   A.  Yeah, I was laying on my side with my knees up, so kind of

  8   like to where my butt is sticking out.  And I was laying on my

  9   left side, and he was like kind of cuddling me in the same

 10   exact position that I was in, so on our sides, left sides,

 11   looking at the wall.

 12   Q.  How -- you talked about staying at that house quite

 13   frequently.  Do you recall something like that happening again

 14   at the --

 15   A.  No, because when something like that started to happen

 16   after that incident at that house on the air mattress I kind

 17   of positioned myself differently on the bed.

 18   Q.  How so?

 19   A.  Before I even went to sleep I kind of didn't turn my back

 20   anymore.  And then, again, if I woke up to one of those

 21   sensations or something, I would roll and turn and try to not

 22   keep my backside exposed.  So the rest of the period where we

 23   went over to that Monument house, I can't remember an incident

 24   that happened after that incident because I was always tossing

 25   and turning and preventing it.

                    Sarah K. Mitchell, RPR, CRR

Case No. 1:19-cr-00243-CMA-GPG Document 193-4 filed 06/27/2022 USDC Colorado  pg 45
of 159

1   Q.  Okay.  What about the Glen Road house, would uncomfortable

2   things happen there?

3   A.  Yes.

4   Q.  What sorts of things?

5   A.  Sort of the same incidents.  We were -- instead of on an

6   air mattress we were actually on a mattress this time, and it

7   was in my room.  So instead of it being, like, a living room,

8   it was actually my room.

9   Q.  When you say your room, what do you mean?

10  A.  Because me and Mike lived in that room.  I had my own

11  dresser.  I had my own stuff.  I had my own clothes.  I had my

12  own TV, so I considered that my room.

13  Q.  So it's the room that you shared with Mr. McFadden?

14  A.  Correct.

15  Q.  Would you do that tossing and turning that you talked

16  about before at the Glen Road house?

17  A.  Yeah, it wouldn't always work, though.

18  Q.  What does that mean, it wouldn't always work?

19  A.  Like sometimes I would toss and turn, and it might stop

20  the touching and weird sensation for a little bit, but I would

21  always wake up to it again.  Even if I did toss and kept my

22  front side to him, I'd always wake up and I'd be back on that

23  side.

24  Q.  And when you would wake up, what would be happening?

25  A.  It would be the same instance I said before.  I'd feel

                    Sarah K. Mitchell, RPR, CRR

Case No. 1:19-cr-00243-CMA-GPG Document 93-54 filed 06/27/2022 USDC Colorado pg 46 of 159

 1   like a pressure in my rectum area, and I'd also feel like a

 2   wetness there, and it was a lot of pressure, and it didn't

 3   feel very good.  It was hurting to a point.

 4   Q.  Would you -- would there be times when you would be awake

 5   -- it sounds like you're talking about you would wake up in

 6   the middle of something happening; is that fair to say?

 7   A.  Yeah.  What I said on the two incidents so far, yes.

 8   Q.  Are there times when you would wake up -- or would be

 9   awake before things started happening?

10   A.  Yeah, there were times that I didn't have to wake up

11   because I faked going to sleep kind of.  I pretended I was

12   sleeping, you could say.

13   Q.  Why would you pretend that you were sleeping?

14   A.  After the first few incidences, I knew something wasn't

15   right, and I knew it wasn't myself doing it.  So at that Glen

16   Road house I used to fake going to sleep to kind of see what

17   it was for sure.  I had a thought of what it was, but when I

18   started doing my fake sleep, that's when I figured out really

19   what it was.

20   Q.  What did you figure out?

21   A.  I figured out that it was Mike doing it the whole time.

22   Q.  What would happen on one of those instances when you faked

23   sleep?

24   A.  One of those instances when I was fake sleeping I used to

25   always remember peeking at my alarm clock and waiting for

Case No. 1:19-cr-00243-CMA-GPG-1 Document 43-154 filed 06/27/2022 USDC Colorado pg 47 of 159

1   something to happen, and one of the nights something did

2   happen when I was not asleep yet, and I had that wet sensation

3   and that pressure feeling, and I knew it was Mike, and I

4   didn't want to show that I was awake, so at that time I didn't

5   try my rollover technique or anything.  I kind of just fake

6   sleeped and beared through it.

7   Q.  You said that you felt that wet sensation.  Where did that

8   come from?

9   A.  It was like fluids that were coming from my rectum, and it

10  was like poop fluid.

11  Q.  And you said that you bore through it.  What does that

12  mean?

13  A.  I -- like other times when I had that feeling or when I

14  was thinking he was starting to touch me or -- I would roll

15  over and go back to sleep, but this time I didn't roll over.

16  I stayed in my position I was in and let him finish what he

17  was doing so that I could see what the full thing was going

18  on.

19  Q.  And what did he do at that point?

20  A.  So he -- as I was fake sleeping he lowered my pants, kind

21  of propped my butt into a better position kind of sticking

22  out, and that's when I felt that pressure and that pain.

23  After around five minutes or so I would start having fluids

24  coming out, and it had a smell to it.  That's how I knew it

25  would be poop fluids, and he would be done at that point, and

Case No. 1:19-cr-00243-CMA-GPG Document 154 Filed 06/27/2022 USDC Colorado  pg 48
of 159

 1   he would clean me up and put my clothes back on, and that

 2   whole time I just stayed sleeping.

 3   Q.  When you felt that pressure, was that -- where did you

 4   feel the pressure?

 5   A.  I felt the pressure on my rectum.  It was like something

 6   being inserted into me.

 7   Q.  What was being inserted into you?

 8   A.  Because of the way we were laying I know it was his penis

 9   being inserted to me because I felt his arms around me and the

10   only thing in that area was his waist.

11   Q.  How frequently did stuff like that happen at the Glen Road

12   house?

13   A.  It happened a lot.

14   Q.  How much is a lot?

15   A.  Like two or three times a week, I would say.

16   Q.  And you said earlier that you lived there about a year?

17   A.  Yeah, a little over a year.

18   Q.  Was that sort of off and on throughout that year?

19   A.  Yeah.

20   Q.  Did stuff like that continue at the D 1/2 Road house?

21   A.  Yes, it did.

22   Q.  Where would that take place?

23   A.  At first it would take place in the utility room that we

24   said that he turned into a bedroom and a laundry room.  So at

25   first -- the first instance in that new house, it happened in

Case No. 1:19-cr-00243-CMA-GPG  Document 154  filed 06/27/2022  USDC Colorado  pg 49 of 159

1   that room.

2   Q.  Same sorts of things?

3   A.  Yes.

4   Q.  Would you be awake or would you be asleep or what?

5   A.  Some of the times I would wake up during.  Some of the

6   times I would be fake sleeping.  And then some of the times I

7   would have like a hard time remembering.

8   Q.  How come?

9   A.  At first I didn't really know why.  I didn't know if I

10  just didn't get enough sleep or what.  But soon I realized

11  that -- I found a little pill in my soda, and I put two and

12  two together.  Because I was already given medication for

13  sleeping because I had trouble sleeping, and so I was given

14  hand-to-hand medication that I would take, but that was the

15  first time that I found something, like, in my drink that I

16  didn't know I was taking.

17  Q.  Let's unpack that a little bit.  You said that you were

18  taking medication for sleeping.

19  A.  Yes.  Not necessarily like a prescription medication, but

20  because I had trouble sleeping, my parents and even Mike would

21  give me a melatonin gummy or a melatonin pill to help me

22  sleep.  So I was already used to taking, like, melatonin

23  before I went to bed.

24  Q.  What -- how often would you take melatonin before you went

25  to bed?

Case No. 19-cr-00243-CMA-GPG Document 154 filed 06/27/2022 USDC Colorado pg 50 of 159

 1   A.  It would usually be if I was having trouble sleeping.  It

 2   wouldn't be, like, every night you get a melatonin, but I did

 3   have trouble sleeping a lot.

 4   Q.  Who would give you the melatonin?

 5   A.  Mike would give me the melatonin.

 6   Q.  Explain to us this stuff that you found in your drink.

 7   When was that?

 8   A.  It was at the D Road house.  We were limited sodas, so we

 9   couldn't just open the fridge and open a soda.  We could only

10   get one for dinner, and it would already be there opened at

11   our dinner table ready for us to drink.

12   Q.  Who would give you the soda?

13   A.  Mike would give us the soda for dinner.

14   Q.  And the can would already be open?

15   A.  Yeah.

16   Q.  Okay.  And it sounds like you said earlier you found

17   something in your drink?

18   A.  Yeah.  I drank all of it, and I had this weird residue in

19   my mouth, and then I shook my can, and I could tell there was

20   something in my can, so I tilted it and seen that it was like

21   a mushy white substance.

22   Q.  Did you ask anybody about that?

23   A.  Yeah, I asked Mike about it.

24   Q.  What did Mr. McFadden tell you?

25   A.  He told me that it was probably sugar or something that

                    Sarah K. Mitchell, RPR, CRR

Case No. 1:19-cr-00243-CMA-GPG Document 193-54 filed 06/27/2022 USDC Colorado pg 51 of 159

 1  didn't get dissolved in the soda when they made it.

 2  Q.  How long ago was that?

 3  A.  About 9, 10 years ago.

 4  Q.  In the 9, 10 years since then I imagine you've drank soda?

 5  A.  Yeah, I drink soda every day.

 6  Q.  Ever find sugar, undissolved sugar in your soda?

 7  A.  No.

 8  Q.  So there would be times when you would be asleep and

 9  things would happen.  There would be times when you were sort

10  of groggy it sounds like?

11  A.  Yeah.

12  Q.  And there would be times when you fake slept.  Who was

13  there during all of these uncomfortable times?

14  A.  Mike was there.

15  Q.  Were there times when there were other people nearby?

16  A.  There were times when other people were nearby.

17  Q.  Did they wake up?

18  A.  Did the other people wake up?  I'm not sure.

19  Q.  Did other -- did anybody else in the house get melatonin

20  for sleep?

21  A.  Yeah.

22  Q.  Who all to your knowledge received melatonin?

23  A.  Mainly the kids.  None of the adults received melatonin.

24  It was mainly us kids, because we were rambunctious and rowdy

25  and would watch a WWE event and try to wrestle each other all

Case No. 1:19-cr-00243-CMA-GPG Document 1154 filed 06/27/2022 USDC Colorado pg 52 of 159

 1   night, and were, like, hyper all night, so us kids were the

 2   ones who were getting melatonin.

 3   Q.  Do you recall the names of the kids who --

 4   A.  Yeah, my cousins, even some of the neighborhood friends or

 5   friends of S.H.

 6   Q.  So I think you talked about D.O. and E.S.?

 7   A.  Yeah, my cousins.

 8   Q.  Would they get melatonin?

 9   A.  Yeah.

10   Q.  You talked about K.W.?

11   A.  Yeah.

12   Q.  He would get melatonin?

13   A.  Yeah.

14   Q.  J.W., I want to talk to you about some truck trips, okay?

15   A.  Okay.

16   Q.  Did -- are you doing okay?

17   A.  Yeah.

18   Q.  Did anything uncomfortable happen on a truck trip?

19   A.  Yeah.

20   Q.  What's the first trip that you recall something

21   uncomfortable happening?

22   A.  The first trip I remember something uncomfortable

23   happening was that funeral trip.

24   Q.  Okay.  Was that with the semi-truck?

25   A.  No, it wasn't a semi-truck.  So that was a trip without a

```
 1   semi.
 2   Q.   Okay.  What's the first semi-truck trip that you recall
 3   something uncomfortable happening?
 4   A.   The first time I recall taking, like, a semi trip we
 5   didn't leave state, but we did take a haul from town to one of
 6   the neighboring cities, like, I believe it was Durango because
 7   I remember going past the Durango pass and it being scary.
 8   Q.   Okay.  What happened on that trip?
 9   A.   It's like the same incidence I described before where I
10   had, like, a wet sensation, and during that trip was after I
11   had already stayed awake and already kind of did my experiment
12   to see what it was.  So during that time I knew what was going
13   on, and I just played asleep and continued on with the trip.
14   Q.   In times before when we spoke you referred to those as
15   sort of a normal incident?
16   A.   Yeah, a normal incident as in, like, I woke up with
17   pressure or a wet sensation on my rear.
18   Q.   Why would you call it normal?
19   A.   Because of how frequently and how many times I had to just
20   sit there and fake sleep through it and...
21   Q.   Okay.  Do you remember trips where you went out of state?
22   A.   Yeah.
23   Q.   Do you recall a trip between Telluride and Farmington?
24   A.   Yeah.
25   Q.   How old were you when you went on trips between Telluride
```

                        Sarah K. Mitchell, RPR, CRR

Case No. 1:19-cr-00243-CMA-GPG Document 1954 filed 06/27/2022 USDC Colorado pg 54 of 159

 1  and Farmington?

 2  A.  I was probably like 10.

 3  Q.  Okay.  So would have been sometime in 2010?

 4  A.  Yes.

 5  Q.  It's easy for you to kind of figure out the year based on

 6  your age, right?

 7  A.  Yeah.  Because I was born in 2000, so whatever year I am

 8  will be that year.  And that's kind of why I got confused

 9  earlier when I said my wrong age because it's about to be

10  2023, so usually whatever year it is, that's what age I am.

11  Q.  Do you remember what sort of loads you were taking between

12  Telluride and Farmington?

13  A.  It was like some pipe, I want to say.

14  Q.  Okay.  Where would you go to pick up the loads?

15  A.  We were going to Telluride to pick up the loads.

16  Q.  Do you remember where in Telluride you went?

17  A.  I don't remember where in Telluride I went, but I do

18  remember it being really close to an airport.

19  Q.  Okay.

20  A.  Like right next to an airport because I remember seeing

21  the planes land right across the fence that we were parked at.

22  So it was right next to the airport.

23  Q.  And where were you at when you saw these planes coming in?

24  A.  I was in the semi-truck.

25  Q.  Was it that green truck that we talked about before?

                        Sarah K. Mitchell, RPR, CRR

Case No. 1:19-cr-00243-CMA-GPG Document 193-54 filed 06/27/2022 USDC Colorado pg 55 of 159

1   A.  Yes.

2   Q.  The one that's in Government's Exhibit 2?

3   A.  Yes.

4   Q.  So you would go someplace near the airport.  Sounds like

5   that's where you would pick up loads?

6   A.  Yeah, that's where we picked it up at.  And there was

7   multiple loads, because we went there and picked up a load,

8   and we would go to New Mexico and drop it off in Farmington,

9   and then we'd have to come back to Telluride, pick up another

10  load, back to New Mexico.  So it was multiple loads during the

11  one trip.

12  Q.  How do you know that it was in Farmington?

13  A.  I remember Farmington not only because of the name of

14  Farmington and because I never really left my state a lot, but

15  I remember seeing a really big high-speed chase, and we don't

16  really -- I'd never seen anything like that in my town.  It

17  was like a 15-police-car chase on the interstate of

18  Farmington.

19  Q.  So you saw this big police chase?

20  A.  The police chase.  That's how I know it was in Farmington.

21  Q.  Did you guys ever stay anywhere on these trips?

22  A.  Yeah, we stayed in the semi, but we wouldn't just, like,

23  park.  We would go to a truck stop.

24  Q.  Okay.  Do you recall something happening on one of these

25  trips between Telluride and Farmington?

Case No. 1:19-cr-00243-CMA-GPG Document 193-154 filed 06/27/2022 USDC Colorado pg 56 of 159

1    A.  Yeah.

2    Q.  Where would you guys park for the night?

3    A.  We would park at a truck stop in Farmington and sleep

4    before we went and picked up the next load in Telluride the

5    next morning.

6    Q.  Where would you sleep?

7    A.  I'd sleep in the back cab of the semi.

8    Q.  On that mattress?

9    A.  On that mattress, yes.

10   Q.  How about Mr. McFadden, where did he sleep?

11   A.  He'd sleep next to me on that mattress.

12   Q.  Can you tell the jury what happened during that incident?

13   A.  Yeah.  After like that high-speed chase and everything

14   went down, I remember getting a message from my mom.  My mom

15   didn't want me to go on that trip for some reason, and I just

16   told her that it was okay.  I had seen a high-speed chase, it

17   was cool, and I'd be home soon.  Then I remember going to bed

18   in the back of the bed, and it was dark out because I remember

19   when the high-speed chase happened it was dark, I could see

20   all the lights clearly.  So I went to bed in the back of the

21   cab of the semi and woke up to Mr. McFadden pulling my pants

22   down, and this was one of those incidents I called a normal

23   incident because I just played asleep and let him do his thing

24   and just kind of suffered through it.  And once it was done

25   and over with, I just stayed remaining like I was sleeping and

                    Sarah K. Mitchell, RPR, CRR

Case No. 1:19-cr-00243-CMA-GPG Document 134 filed 06/27/2022 USDC Colorado   pg 57 of 159

 1   just went on with the trip.

 2   Q.  Did something happen to you after this incident?

 3   A.  As in like?

 4   Q.  Was there a mess that had to be cleaned up?

 5   A.  Yeah.  So after the incident -- like I was stating earlier

 6   when I would have some of like -- I call it poop juice or some

 7   type of fluid, during this specific incident it was worse than

 8   incidents I mentioned before.  It was so worse that he had to

 9   grab a thing of wipies and actually clean up and give me a

10   change of clothes.

11   Q.  And this normal incident, what did that involve?

12   A.  It involved him pulling my pants down, feeling that

13   pressure in my rectum which was him sticking his penis into

14   me.

15   Q.  Into your butt?

16   A.  Into my rectum.  Yeah, into my butt.

17   Q.  Did you talk to him at all --

18   A.  No.

19   Q.  -- during this incident?

20   A.  No.

21   Q.  Did he say anything to you?

22   A.  No.  Even after when he -- when I made a mess and he had

23   to get me a change of clothes I still acted like I was

24   sleeping and I was just out of it, and when I -- at that time

25   I was not out of it.  I was just acting like I was out it.  I

Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1  Testimony of J.W.          11/08/2022   54

1   remember him cleaning me up and giving me a change of clothes.

2   Q.  Why did you act like you were out of it?

3   A.  Because I was afraid.  I didn't want him to know I was

4   fake sleeping.  I didn't want him to know that I was doing

5   that.

6   Q.  What were you afraid of?

7   A.  I was afraid that if I -- because usually I would just

8   toss and turn so I didn't have to say anything physically to

9   him like stop or -- so I would toss and turn, and usually that

10  would get -- be done with it.  I was really afraid to say

11  something after an incident because I just felt my day-to-day

12  life would change, and I would have to go through what I am

13  going through now if I said something, or he would do

14  something that I never saw before, so I was, like, afraid of

15  that.

16  Q.  During these trips, did anything else happen, these trips

17  between Telluride and Farmington?

18  A.  So the night of the police chase, that was the first trip

19  that we did, and then when we went back to Telluride and then

20  picked up another load and went back to Farmington.  That

21  second night there was another instance what I would call as

22  just a same incident, just a normal incident happened.

23  Q.  Was there ever -- during these trips was there ever

24  something unusual that happened?  Different than the normal?

25  A.  Yeah.  So I would say those are normal just because it was

Sarah K. Mitchell, RPR, CRR

Case No. 1:19-cr-00243-CMA-GPG Document 193-154 filed 06/27/2022 USDC Colorado   pg 59 of 159

 1  just the pressure feeling that I had of him inserting and then

 2  me playing it off.  But a time that was what I would consider

 3  a not normal incident was one time when I woke up -- I wasn't

 4  playing sleeping, but I actually woke up to a wet sensation in

 5  my rectum, but it wasn't a wet sensation like the wet

 6  sensations I felt before.  It was like a tongue feeling.

 7  Q.  Where were you at when this happened?

 8  A.  I was at the back of the cab of the semi.

 9  Q.  Do you recall where the semi was parked?

10  A.  Yeah, it was parked down from my house.

11  Q.  Why were you in the semi parked down from your house?

12  A.  It was one of those incidences where my mom didn't want me

13  to go, and so my mom just said whenever you're done for the

14  trip, just come back to the house.  And like I said earlier, I

15  didn't mind going and staying with my mom, but my mom always

16  insisted that I would prefer to stay over at Mike's house, but

17  she wanted me back that day.  So after our trip, instead of

18  him just taking me back to the house and dropping me off, it

19  was early in the morning, none of my parents were even up in

20  the house yet, so he parked down the road from my house and

21  let me finish sleeping and then was going to take me to my

22  house.

23  Q.  And you said you woke up?

24  A.  Yeah, I woke up, and the side of the flap was open, and I

25  could look out, and that's how I could tell I was in my

19-cr-00243-CMA-GPG-1  Testimony of J.W.      11/08/2022   56

1   neighborhood of my house.  And so I kind of peeked out the

2   little slide flap and seen I was in my neighborhood, but I was

3   quick to realize that it was a different feeling than I ever

4   felt before.

5   Q.  You said it felt like a tongue?

6   A.  Yeah, it was, like, a tongue, and the reason I would say

7   it was a tongue is because I felt his mustache, and it was

8   poking me.  And then on the normal incidents I knew it was his

9   penis because his arms would be around me and his waist would

10  be there, but during this incident he wasn't laying next to

11  me.

12  Q.  Where did you feel his tongue?

13  A.  On my rectum.

14  Q.  J.W., I'd like to talk to you about a different trip now.

15          THE COURT:  Mr. Chaffin, we've been sitting for a few

16  hours, so is it okay if we take a break?

17          MR. CHAFFIN:  I think this is probably a perfect

18  point to take a break.

19          THE COURT:  Great.  So, ladies and gentlemen,

20  remember you do not discuss this case among yourselves or with

21  anyone else.  Do not conduct any research.  We will take a

22  15-minute break.  We'll reconvene at approximately 11 o'clock.

23          THE COURTROOM DEPUTY:  All rise for the jury.

24      (Jury left the courtroom at 10:44 a.m.)

25      (Break was taken from 10:45 a.m. to 11:01 a.m.)

                    Sarah K. Mitchell, RPR, CRR

Case No. 19-cr-00243-CMA-GPG Document 193-54 filed 06/27/2022 USA page 57 of 159   pg 61 of 159

```
 1            THE COURT:  You may be seated.  It's been brought to
 2  my attention by Ms. Myhaver that one of the jurors' husbands
 3  texted to indicate that his mother was going into hospice now
 4  and she has 48 hours to live.  So I don't know that she will
 5  be able to concentrate, to even hear anything, and I wish I
 6  picked two alternates, but I didn't.  I didn't think we would
 7  lose somebody this quickly, but my suggestion is that we
 8  excuse her from jury duty.
 9            MR. CHAFFIN:  No objection.
10            MR. MCDERMOTT:  Of course.
11            THE COURT:  All right.  So, Ms. Myhaver, would you
12  tell them that she's excused from jury duty and she can go be
13  with her family.
14            THE COURTROOM DEPUTY:  I will do that, yes, and then
15  I'll bring them in.
16            All rise for the jury.
17       (Jury entered the courtroom at 11:03 a.m.)
18            THE COURT:  Mr. Chaffin, you may proceed.
19  Q.  (By MR. CHAFFIN) J.W., I want to talk to you about another
20  trip that you took to Arizona.  Do you recall that trip?
21  A.  Yeah, the one after the funeral.
22  Q.  In the semi-truck?
23  A.  Yes, in the semi-truck.
24  Q.  About -- well, do you recall how old you were on that
25  trip?
```

Sarah K. Mitchell, RPR, CRR

Case No. 1:19-cr-00243-CMA-GPG Document 193-54 filed 06/27/2022 USDC Colorado   pg 62
of 159

 1    A.  I was like nine, I'd say.  I'd say it was before the trip

 2    to New Mexico.

 3    Q.  Where were you going in Arizona?

 4    A.  I can't remember where we were going in Arizona, but I do

 5    remember it was going to Arizona.

 6    Q.  How do you know that it was to Arizona?

 7    A.  Because when we got past the border and into Arizona we

 8    stopped at a truck stop.

 9    Q.  What do you recall about this truck stop?

10    A.  It was a big truck stop, bigger than the ones we normally

11    stay at, and they had all kinds of cool trucking knickknacks

12    in that truck stop.

13    Q.  What sorts of stuff do you recall in the truck stop?

14    A.  There was, like, toy semi-trucks, and the thing that,

15    like, standed out mainly to me there was a big, huge, probably

16    like this big remote control semi that had a truck and a

17    trailer.

18    Q.  And you're holding your hands about three feet apart?

19    A.  Yeah.

20    Q.  A big remote --

21    A.  Big remote control semi you could drive with a trailer

22    connected to it.

23    Q.  And that was cool to you?

24    A.  Yeah, that was real cool to me.

25    Q.  Did you guys spend the night there at that truck stop?

                        Sarah K. Mitchell, RPR, CRR

Case No. 1:19-cr-00243-CMA-GPG Document 193-54 filed 06/27/2022 USDC Colorado pg 63 of 159

1   A.  Yeah.

2   Q.  Same truck that we've been talking about?

3   A.  Yes.

4   Q.  That green truck in Exhibit 2, right?

5   A.  Yes.  The green semi with Precision Construction on the

6   side.

7   Q.  Did you and Mr. McFadden -- was it you and Mr. McFadden?

8   A.  Yes.

9   Q.  Anybody else?

10  A.  No.

11  Q.  Did you guys sleep in the same places?

12  A.  Yes.  In the cab of the semi on the mattress.

13  Q.  What, if anything, happened that night?

14  A.  That night after looking at that toy semi and all that I

15  remember watching a movie in the cab and going back into the

16  truck stop for a few different times like maybe to use the

17  restroom or to grab another snack or soda and watched a movie

18  and went to sleep that night, and it wasn't until later that

19  night until I woke up to like an incident.

20  Q.  What did you wake up to?

21  A.  I woke up to a wet sensation, kind of one of my normal

22  experiences, but prior to that it was like a wet sensation and

23  pressure.

24  Q.  What was the pressure from?

25  A.  It was Mike McFadden sticking his penis into me.

Sarah K. Mitchell, RPR, CRR

Case No. 1:19-cr-00243-CMA-GPG Document 193-154 filed 06/27/2022 USDC Colorado   pg 64 of 159

 1   Q.  Into your butt?

 2   A.  Yes, into my rectum.

 3   Q.  What made that incident stop, do you recall?

 4   A.  Me tossing and turning made that incident stop earlier

 5   than it would have.

 6   Q.  Did you ever talk to Mr. McFadden during that incident?

 7   A.  No.

 8   Q.  Were there other times that stood out for you?  Let me ask

 9   it this way.  Were there times when something happened that

10   stood out for you thinking back?

11   A.  Like, incidences during the night that stand out?

12   Q.  Yeah, or things that happened afterwards.

13   A.  That tongue incident was one that really stands out, and

14   one time another incident that stood out was instead of like a

15   pressure feeling that I was normally feeling, during one of

16   the incidences I kind of felt maybe a finger instead of a

17   tongue or a penis.  That might have been a strange incident.

18   Q.  Do you recall where that took place?

19   A.  I believe it took place at the Glen Road house.

20   Q.  How would you feel after these incidents?  How would your

21   body feel?

22   A.  I'd, like, feel sick kind of, like almost nauseating.  And

23   I had real troubles using the bathroom.  For instance, I

24   remember one time being at school and going and using the

25   bathroom and wiping, and it was all red, all blood.  And then

Sarah K. Mitchell, RPR, CRR

Case No. 1:19-cr-00243-CMA-GPG Document 193-154 filed 06/27/2022 USDC Colorado pg 65 of 159

 1    I knew it was from that, and I just didn't tell nobody.  And

 2    certain instances afterwards that would happen and on the

 3    worser instances.  So that's the incidences I remember.

 4    Q.   When you say you had trouble going to the bathroom...

 5    A.   I had trouble pooping.  It hurt really bad.

 6    Q.   Would you get diarrhea?

 7    A.   Yeah.

 8    Q.   Do you recall talking to us about a time at school where

 9    you had diarrhea?

10    A.   Uh-huh.

11            MR. MCDERMOTT:  Objection, leading.

12            THE COURT:  He's transitioning.  Overruled.

13            MR. CHAFFIN:  Thank you, Your Honor.

14    Q.   (By MR. CHAFFIN) About how old was that incident?

15    A.   I was around like 9.  9, 10.

16    Q.   Do you remember what grade you were in?

17    A.   I think I was in like 3rd or 4th grade.

18    Q.   Okay.  What school?

19    A.   Dos Rios.

20    Q.   Okay.  That's here in Grand Junction?

21    A.   Yes.

22    Q.   What happened at school at that -- did you have trouble

23    going to the bathroom?

24    A.   Yes.  I was having trouble going to the bathroom, and I

25    was having really bad diarrhea, and in this instance I

                        Sarah K. Mitchell, RPR, CRR

Case No. 1:19-cv-00243-CMA-GPG Document 113154 filed 06/27/2022 USA Page 62 of 66 pg 66 of 159

```
 1    couldn't really make it to the bathroom, and so I needed a
 2    change of clothes at school.
 3    Q.  Okay.  Did you -- how many times did you have to go to the
 4    bathroom that time?
 5    A.  I'd say, like, three times I had to go, like, back to back
 6    to back almost, and because I had to ask so many times, my
 7    teacher was like, Are you okay?  And I told her I was having
 8    trouble going to the bathroom.
 9            MR. CHAFFIN:  Could I have just one moment, Your
10    Honor?
11            THE COURT:  You may.
12    Q.  (By MR. CHAFFIN) J.W., did you ever tell your teachers
13    about what was going on?
14    A.  No.
15    Q.  Did you ever tell your mom?
16    A.  No.
17    Q.  What about your cousins?
18    A.  No.
19    Q.  Your aunts?
20    A.  No.
21    Q.  Your grandma is in the picture, right?
22    A.  Yeah.
23    Q.  Did you tell her?
24    A.  No.
25    Q.  Do you remember telling -- do you recall a time -- well,
```

                        Sarah K. Mitchell, RPR, CRR

Case No.1:19-cr-00243-CMA-GPG Document 193-54 filed 06/27/2022 USDC Colorado pg 67 of 159

 1   do you recall a time meeting with police officers when you

 2   were about seven?

 3   A.  Yeah.

 4   Q.  And they asked you questions, right?

 5   A.  Yeah.

 6   Q.  Did you ever tell them about what was going on during that

 7   incident?

 8   A.  No.

 9   Q.  Why not?

10   A.  I was scared, and I didn't want to be the first person to

11   say something.

12   Q.  Were there times -- was there a time when you felt like

13   something was happening to another boy?

14   A.  Yeah.

15   Q.  K.W., right?

16   A.  Yeah.

17   Q.  Can you tell the jury about what happened that made you

18   feel like something was happening to him?

19   A.  I was at the 2980 D 1/2 Road house, and it was before John

20   and Phyllis moved out.  So we were staying in the utility room

21   next to the laundry room, and it was me, Mike and K.W. who

22   were sleeping in the bed.  And Mike was in the middle of the

23   bed, and K.W. was on the right side, and I was on the left

24   side, and I woke up to K.W. saying, Stop, and K.W. saying, Ew,

25   that's gross.  And because of previous instances with Mike I

Case No. 19-cr-00243-CMA-GPG Document 154 filed 06/27/2022 USDC Colorado pg 68 of 159

1    already knew what was going on, but I continued to play asleep

2    on my side, continued hearing K.W. say, Stop, that's nasty,

3    that's gross, and Mike saying, Quit it, knock it off, you

4    little shit, go to bed.  And I just remained acting like I was

5    asleep.

6    Q.  And you said because of prior instances you knew what was

7    going on.  Are you talking what about was happening with you?

8    A.  With me.  And in this instance when he said that's gross

9    and stop, I put two and two together from my previous

10   instances on myself, yes.

11   Q.  During that incident with K.W. did you feel anything that

12   was going on?

13   A.  I felt like a motion in the bed.  After he was saying

14   stop, he was trying to almost get out of the bed and rolling

15   around in the bed, so I did feel a commotion in the bed.

16   Q.  And did you smell anything?

17   A.  Like a musty smell.

18   Q.  What did that smell remind you of?

19   A.  It reminded me of the previous instances where I would

20   have, like, juices come out of my butt.  It would kind of

21   smell like that.  It was a like musty fart smell.

22   Q.  Did it remind you of the times that Mr. McFadden put his

23   penis in your butt?

24   A.  Yes, it did.

25   Q.  Did you ever say anything to K.W.?

                          Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1  Testimony of J.W.        11/08/2022    65

 1   A.  No.

 2   Q.  Why not?

 3   A.  Again, I was scared to say anything to anyone, and let

 4   alone I really didn't want to be the first person to say

 5   something.

 6   Q.  And when you heard Mr. McFadden speaking to K.W. and

 7   saying you're being a shit, how did that make you feel?

 8   A.  Well, at first I kind of felt kind of good because K.W.

 9   was sticking up for himself.  And then when I seen how Mike

10   reacted to him was kind of my thoughts of why I never really

11   wanted to say something myself, because when K.W. said

12   something, he got angry, and he said, stop, you little shit,

13   and was throwing him back in bed, and that's one of the

14   reasons why I never wanted to say anything during the

15   incidents because I was afraid something like that would

16   happen.

17          MR. CHAFFIN:  Nothing further, Your Honor.

18          THE COURT:  All right.  Cross-examination.

19                    CROSS-EXAMINATION

20   BY MR. MCDERMOTT:

21   Q.  So, J.W., I actually am going to begin where you just left

22   off.  You've spoken with law enforcement a number of times

23   about this case and the allegations against Mr. McFadden; is

24   that right?

25   A.  How many times?

                    Sarah K. Mitchell, RPR, CRR

Case No. 19-cr-00243-CMA-GPG Document 93-154 filed 06/27/2022 USDC Colorado pg 70 of 159

1   Q.  You've spoken with them quite a few times; is that

2   correct?

3   A.  I would say that's not correct.  I'd say I spoke to them a

4   few times.

5   Q.  A few times.  Okay.  Well, I'm going to focus on the last

6   time that you spoke with the prosecutor and Agent Zappe

7   getting ready for trial on October 27th of this year; is that

8   right?

9   A.  Yes.

10  Q.  Okay.  And with respect to what you just testified to with

11  respect to K.W. sticking up for himself, as you put it, that

12  was the first time you ever said you witnessed something with

13  K.W.; is that correct?

14  A.  Yes.

15  Q.  Now, I'm going to now back up, and I want to talk about in

16  more specificity some of the things you previously have said,

17  okay?

18  A.  Yeah.

19  Q.  All right.  You were interviewed in -- on January 21st of

20  2009, correct?

21  A.  Possibly.

22  Q.  Possibly.  It's hard to remember, right?

23  A.  Yeah.

24  Q.  Yeah.  You were, what, nine years old?

25  A.  It was in 2009?

                        Sarah K. Mitchell, RPR, CRR

Case No. 19-cr-00243-CMA-GPG Document 193-4 filed 06/27/2022 USDC Colorado pg 71 of 159

```
 1   Q.  Yeah.

 2   A.  Yes, I would be nine.

 3   Q.  Okay.  And back when you were nine years old, you were

 4   asked whether anyone had ever touched you sexually, correct?

 5   A.  Yes.

 6   Q.  And you answered no, right?

 7   A.  Correct.

 8   Q.  And you were also asked if anyone ever touched you what

 9   would you do, and you answered that, correct?

10   A.  Yes.

11   Q.  And you told them that you would tell your mother?

12   A.  Yeah.

13   Q.  And I know that your mom has had difficulty, but you got

14   along with your mother when you were nine years old; is that

15   fair to say?

16   A.  Yeah.

17   Q.  You loved your mom?

18   A.  Yeah.

19   Q.  She loved you?

20   A.  Yeah.

21   Q.  She was the kind of person who told you if there was

22   something going on you could tell her?

23   A.  No.

24   Q.  No.  Okay.  Now, I want to move on to when you were -- I

25   guess you had just turned 13 because it was December 21, 2012.
```

Sarah K. Mitchell, RPR, CRR

Case No. 1:19-cr-00243-CMA-GPG Document 1935-4 filed 06/27/2022 USDC Colorado pg 72 of 159

 1   You spoke --

 2   A.  So I just turned 12.

 3   Q.  Yes.  Yeah.  You spoke with a woman named Ms. Surad; is

 4   that correct?

 5   A.  I'm not sure.

 6   Q.  You're not sure.  I believe she was with Detective

 7   Prescott back then.  Do you remember the conversation?

 8   A.  Not much.

 9   Q.  Okay.  Well, my understanding is that you told Ms. Surad

10   that you lived with your sister B.W., lived with L.Wr., Cindy,

11   your mom, your uncle Mike, your cousin D.O., your cousin E.S.,

12   your aunt Crystal, and some dogs.  Is all that accurate and

13   correct?

14   A.  Yes.

15   Q.  And in that interview you were asked whether anyone had

16   ever touched you inappropriately; is that correct?

17   A.  Yes.

18   Q.  And you told them no?

19   A.  Correct.

20   Q.  And this is back at the end of 2012.  It's a little bit

21   before the time Mr. McFadden was arrested; is that right?

22   A.  Yes.

23   Q.  And you were living at D 1/2 Road at the time; is that

24   right?

25   A.  Correct.

                     Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1  Testimony of J.W.    11/08/2022    69

1   Q.  And you went through it a bit, but I want to talk about D

2   1/2 Road for just a bit, okay?

3   A.  Yeah.

4   Q.  All right.  Now, in 2012, there were a lot of people

5   living on D 1/2 Road; is that right?

6   A.  Yeah.

7   Q.  And each person was kind of assigned -- I don't want to

8   say assigned, but people had areas where they generally slept;

9   is that fair to say?

10  A.  Yes.

11  Q.  Now, in one bedroom Cindy R. lived in there with D.O.,

12  E.S., and Jade McFadden; is that correct?

13  A.  Yes.

14  Q.  And in another -- actually in the living room, there were

15  four people living in the living room; is that correct?

16  A.  I can't remember if it was four, but I know there was a

17  lot of people staying.

18  Q.  Well, let me name the names, and tell me if this sounds

19  right or not.  Donna Foxx, Tyson Cross, Hailey Cross, and John

20  Foxx?

21  A.  I only remember John, which was our Papa John, staying in

22  the living room.

23  Q.  So you remember John staying in the living room?

24  A.  Yeah.

25  Q.  All right.  Could the others have lived there, or do you

Sarah K. Mitchell, RPR, CRR

Case No. 1:19-cr-00243-CMA-GPG Document 193-154 filed 06/27/2022 USDC Colorado  pg 74
of 159

 1   just not remember?

 2   A.  No, they didn't live there.

 3   Q.  Okay.  In the other bedroom, K.Wr., B.W., and K.Wr. had a

 4   boyfriend who was living there, right?

 5   A.  Correct.

 6   Q.  Okay.  And in another bedroom there was you, Mr. McFadden,

 7   and your brother L.Wr.?

 8   A.  Correct.

 9   Q.  Okay.  And was D.R. living in the house at the time?

10   A.  I wouldn't say living, but he spent the majority of nights

11   over at our house.

12   Q.  The majority of the time over there, but he wasn't there

13   every night?

14   A.  Right.

15   Q.  Okay.  And there were two trailers in the back of the

16   house; is that correct?

17   A.  Correct.

18   Q.  And your mom lived in one; is that right?

19   A.  Yeah.

20   Q.  And she lived there with Trevor, Zach, and a person named

21   Chris Vigil?

22   A.  I wouldn't say lived with her, but they were always

23   around, yes.  My mom was the one that stayed in the trailer,

24   but they did not live there, no.

25   Q.  And in another trailer there was Crystal M.  She was in

Sarah K. Mitchell, RPR, CRR

Case No. 1:19-cr-00243-CMA-GPG Document 1154 filed 06/27/2022 USDC Colorado   pg 75
of 159

  1   another trailer, correct?

  2   A.  Correct.

  3   Q.  Sean Crohn?

  4   A.  Correct.

  5   Q.  Someone named Brandon?

  6   A.  I can't remember.

  7   Q.  Someone named Sean Elm?

  8   A.  Yeah.

  9   Q.  This house had one bathroom, correct?

 10   A.  Correct.

 11   Q.  Now, Mr. McFadden was arrested in January of 2013.  Up to

 12   that point you had never told anyone that he did anything

 13   sexually inappropriate with you, correct?

 14   A.  Correct.

 15   Q.  And to your knowledge, nobody in this house ever saw

 16   Mr. McFadden do anything sexually inappropriate to you?

 17   A.  Can you rephrase that?

 18   Q.  Yes.  Nobody ever came and told you that they saw

 19   Mr. McFadden do anything sexually inappropriate to you,

 20   correct?

 21   A.  Correct.

 22   Q.  And the first time you said that Mr. McFadden did anything

 23   sexually inappropriate to you was in February of 2013; is that

 24   correct?

 25   A.  Is that the incident where they came up to my house on

                      Sarah K. Mitchell, RPR, CRR

Case No.1:19-cr-00243-CMA-GPG Document 193-54 filed 06/27/2022 USDC Colorado pg 76 of 159

1  Glade Park?

2  Q.  Yes.

3  A.  Then yes.

4  Q.  And that was Julie Stogsdill and Detective Prescott,

5  correct?

6  A.  Detective Prescott?

7  Q.  Yes.

8  A.  I don't recall that.

9  Q.  Okay.  Who do you recall, Ms. Stogsdill?

10  A.  Yeah, and Ed.

11  Q.  Ed Prescott?

12  A.  Is that his last name?  I know him by Ed.

13  Q.  Okay.  During the interview they asked you if you knew why

14  you were here, and you answered them, and you told them that

15  they were there because Mike is a bad person; is that correct?

16  A.  Yeah.

17  Q.  You told them that Mike is a bad person because he touches

18  people?

19  A.  Is that all I said?

20  Q.  Yes.

21  A.  I don't think that was all I said.

22  Q.  Okay.  You told them they were there because he was a bad

23  person.  We're in agreement with that?

24  A.  Yeah.

25  Q.  Okay.  And during that interview -- and just to be clear,

Sarah K. Mitchell, RPR, CRR

Case No. 1:19-cr-00243-CMA-GPG Document 193-4 filed 06/27/2022 USDC Colorado pg 77 of 159

 1   as you said, this is the first time you're telling anybody

 2   about --

 3   A.  Anything, yes.  First time I ever spoke out and said Mike

 4   is a bad person, yes.

 5   Q.  And you initially told them that it happened once in a

 6   great while; is that correct?

 7   A.  I can't remember.

 8   Q.  Okay.  There is a notebook down there.

 9           MR. MCDERMOTT:  Your Honor, permission to refresh?

10           THE COURT:  You may.

11   Q.  (By MR. MCDERMOTT) Okay.  I can get it for you if that

12   makes it easier.

13   A.  No.  Which one?

14   Q.  Defendant's exhibits, and it begins with the letter A.

15   It's a larger notebook that should be down there.

16   A.  There's two of them here.

17   Q.  Okay.  If you go to the tab that is labeled B-1, okay, and

18   then can you -- let me grab my book as well.  Okay.  If you

19   look at the bottom, and if you go to page 1177.

20   A.  1177?

21   Q.  Yes.  Okay.  And then if you can just review -- you see

22   where the lines are on the left side?

23   A.  Yeah.

24           THE COURT:  Are we on D-1?

25           MR. MCDERMOTT:  B-1.

                      Sarah K. Mitchell, RPR, CRR

Case No. 1:19-cr-00243-CMA-GPG-1 Document 193-54 filed 06/27/2022 USDC Colorado pg 78 of 159

1           THE COURT:  D?

2           MR. MCDERMOTT:  B, as in boy, Your Honor.  Sorry.

3           THE COURT:  I'm sorry.  Go ahead.

4   Q.  (By MR. MCDERMOTT) If you can just review the top of the

5   page through line number 868.

6   A.  You want me to read that?

7   Q.  Just read it to yourself.  And does that refresh your

8   memory as to the question that was asked?

9   A.  Yeah.

10  Q.  Okay.  And do you recall now that they did ask you how

11  many times this had happened?

12  A.  Yeah.

13  Q.  Okay.  And your answer was, Once in a great while,

14  correct?

15  A.  Yeah.

16  Q.  Now in March of 2013, you went and saw a nurse; is that

17  correct?

18  A.  Yeah.

19  Q.  She asked you questions about this?

20  A.  Yeah.

21  Q.  And you were 13 years old, correct?

22  A.  Correct.

23  Q.  And when you spoke with her, you told her that it happened

24  since you were six, and it happened until December of 2012,

25  correct?

                    Sarah K. Mitchell, RPR, CRR

Case No. 1:19-cr-00243-CMA-GPG Document 3154 filed 06/27/2022 USDC Colorado pg 79 of 159

 1   A.  Yeah, that's correct.

 2   Q.  And we're approximately three months removed from when you

 3   initially said that anybody had ever touched you?

 4   A.  Three months from that point?

 5   Q.  Yes.

 6   A.  I can't remember.  This instance where I'm talking with Ed

 7   is three months after?

 8   Q.  No.  Let me back up.  I confused you.  I apologize.  In

 9   December of 2012, you reported that nobody had touched you

10   inappropriately, correct?

11   A.  Who did I report that to?

12   Q.  Ms. Surad and Mr. Prescott.

13   A.  I believe that is incorrect.  Especially after seeing this

14   and re-jogging my memory, I didn't tell them that nothing

15   happened.  I just said it wasn't a lot, frequently.  That it

16   only happened once in a while is what I said here.

17   Q.  Okay.  Well, and my question is I'm going back to the

18   December 2012 interview that you had with --

19   A.  With Ed and --

20   Q.  Ms. Surad is who I'm talking about.

21   A.  Up at Glade Park?

22   Q.  When they came and asked you in December --

23   A.  Where was this?

24   Q.  We've already gone through it.

25   A.  I'm just confused.

                    Sarah K. Mitchell, RPR, CRR

Case No. 1:19-cr-00243-CMA-GPG Document 154 filed 06/27/2022 USDC Colorado pg 80 of 159

1   Q.  Okay.  I'm backing up to the time before Mr. McFadden was

2   arrested.

3   A.  Okay.  So you're going back to 2009 is when I was

4   interviewed.

5   Q.  Well, you were interviewed when you were nine.

6   A.  Yeah.

7   Q.  That was the first time you said that nobody touched you.

8   A.  Uh-huh.

9   Q.  In that interview you said if someone did, you would tell

10  your mom.

11  A.  Then we went to --

12  Q.  Now I'm going --

13  A.  Forward.

14  Q.  -- to December 2012.

15  A.  When Ed and the female officer came and did an interview

16  with me up at my house?

17  Q.  No.  That is the January one when you finally say that,

18  yes, someone has touched you.

19  A.  So you're talking at the police station before that?

20  Q.  Yes.

21  A.  Okay.  Thank you.  Now I can remember.

22  Q.  Okay.  And just so we're clear with each other, so

23  December 2012, you said no one touched you.  And then in

24  January of 2013, you changed your story, and you said

25  Mr. McFadden had touched you, correct?

                        Sarah K. Mitchell, RPR, CRR

 1   A.  Correct.

 2   Q.  And then in March of 2013, you went and you spoke with

 3   this nurse, correct?

 4   A.  Correct.

 5   Q.  Okay.  Now, I want to go ahead and talk about a few things

 6   that were discussed in this January interview that we're

 7   talking about that's in front of you in the notebook, okay?

 8   A.  Can you give the dates when you say the interviews?  It

 9   helps me to remember.

10   Q.  But it's the one -- yes.  It's the one that's right in

11   front of you.

12   A.  The one at my house in Glade Park?

13   Q.  Yes.  Okay.

14   A.  Yes.

15   Q.  Now, you indicated to them that sometimes you would sleep

16   in your mom's room and sometimes you would sleep in

17   Mr. McFadden's room, correct?

18   A.  What location?

19   Q.  Mr. McFadden's bedroom.

20   A.  And then my mom's bedroom?  Because my mom didn't have a

21   bedroom.  She had a trailer.

22   Q.  Okay.

23   A.  And I don't recall saying that I stayed in the trailer

24   with my mom.

25   Q.  Okay.  Well, you can turn to -- so your belief is that you

                       Sarah K. Mitchell, RPR, CRR

Case No. 1:19-cr-00243-CMA-GPG   Document 193-54   filed 06/27/2022   USDC Colorado   pg 82 of 159

1  never stayed with your mom in her trailer, if I understand
2  correctly?
3  A.  Yeah.  I never stayed in the trailer with my mom.
4  Q.  Okay.  All right.  Well, to give you a date, you were
5  interviewed by a woman named Stephanie Knapp on August 8,
6  2018; is that correct?
7  A.  Yeah.
8  Q.  Okay.  And can you please -- I'll move on to another
9  topic.  J.W., the interview you had on October 26, 2022, you
10 spoke about the Arizona trip that you took with Mr. McFadden;
11 is that correct?
12 A.  Yes.
13 Q.  Okay.  And you told Agent Zappe and Mr. Chaffin that
14 Mr. McFadden did not put anything white in your drink on that
15 trip; is that correct?
16 A.  On the Arizona trip with the semi remote-control trip?
17 Q.  Yes.
18 A.  No.  He didn't put anything into my drink.
19 Q.  Okay.  And in this interview, this is the first time you
20 said anything about Mr. McFadden putting his tongue on your
21 anus; is that correct?
22 A.  In the interview in 2018?
23 Q.  No.  The October 26, 2022, interview.
24 A.  Was the first time I said that he touched my anus with his
25 tongue?

Case No. 1:19-cr-00243-CMA-GPG Document 154 filed 06/27/2022 USDC Colorado   pg 83
of 159

```
 1    Q.  Yes.

 2    A.  Of 2022?

 3    Q.  Yes.

 4    A.  That's incorrect.

 5    Q.  That's incorrect.

 6    A.  Yeah.

 7    Q.  Okay.  You told them that this happened after you returned

 8    from a semi trip, and it happened in the truck while you were

 9    parked in the street, correct?

10    A.  Correct.

11    Q.  And if I heard on direct correctly, you told -- or you

12    just testified that was right before Mr. McFadden brought you

13    to your house?

14    A.  Correct.

15    Q.  And it's your belief that you have told that version to

16    law enforcement before October 26, 2022?

17    A.  Yes.  I recall telling someone when asked about any

18    different instances that happened I do recall saying something

19    about me feeling a tongue on my anus to somebody.

20    Q.  And you think you said that to someone before October 26,

21    2022?

22    A.  I think so.

23    Q.  And the thing about K.W. making painful grunting noises,

24    the first time you said anything about that was October 26,

25    2022, correct?
```

                        Sarah K. Mitchell, RPR, CRR

Case No. 1:19-cr-00243-CMA-GPG Document 193-4 filed 06/27/2022 USDC Colorado   pg 84
of 159

 1   A.  Correct.

 2   Q.  And you said that that is the reason you never reported

 3   abuse before, correct?

 4   A.  That's because I had an incident where I watched another

 5   boy say something?

 6   Q.  Yes.

 7   A.  Correct.

 8   Q.  And this was the first time you said anything about seeing

 9   Mr. McFadden abuse someone else?

10   A.  The first time I said that I heard another boy say verbal

11   words that led me to believe something was going on, yes.

12   Q.  Okay.  And so my question to you is the first time you

13   said that was October 26, 2022, correct?

14   A.  Yeah.

15   Q.  I want to talk about the Arizona trip, okay?

16   A.  Okay.

17   Q.  You have -- you initially indicated that the first time

18   anything happened was at that funeral in Arizona; is that

19   correct?

20   A.  That is correct.

21   Q.  And you initially said that in an August 8th interview

22   with a woman named Stephanie Knapp; is that correct?

23   A.  That's correct.

24   Q.  And you said --

25   A.  My watch.  Sorry.

                        Sarah K. Mitchell, RPR, CRR

Case No. 1:19-cr-00243-CMA-GPG Document 193-54 filed 06/27/2022 USDC Colorado pg 85 of 159

 1   Q.  That's fine.

 2   A.  I accidentally pushed Siri.

 3           THE COURT:  What year on the August date?

 4           MR. MCDERMOTT:  I'm sorry, Your Honor?

 5           THE COURT:  You said an August date, but no year.

 6   Can we have the year?

 7           MR. MCDERMOTT:  Yes, Your Honor.  I said August 8th,

 8   2018.

 9           THE COURT:  Okay.

10   Q.  (By MR. MCDERMOTT) Now, there were other people who were

11   on that trip, correct?

12   A.  On which trip?

13   Q.  On the --

14   A.  That funeral trip?

15   Q.  Yes.

16   A.  Correct.

17   Q.  That was for a family funeral?

18   A.  Correct.

19   Q.  And in your interview with Ms. Knapp you weren't clear as

20   to who all went on that trip, correct?

21   A.  Correct.

22   Q.  I believe your words were it was kind of like a haze?

23   A.  Kind of like a haze?

24   Q.  Yes.

25   A.  I probably listed the people I could remember, but I

                    Sarah K. Mitchell, RPR, CRR

Case No. 1:19-cr-00243-CMA-GPG Document 193-4 filed 06/27/2022 USDC Colorado pg 86 of 159

 1   couldn't remember everybody, correct.

 2   Q.  Okay.  And when you had this interview with Ms. Knapp, you

 3   indicated that actually Mr. McFadden had put drugs in your

 4   drink?

 5   A.  On that trip?

 6   Q.  Yes.

 7   A.  I don't recall that.

 8   Q.  You don't recall that.

 9        MR. MCDERMOTT:  Your Honor, I apologize.  I misplaced

10   my source on that.  May we take our break?

11        THE COURT:  No.

12   Q.  (By MR. MCDERMOTT) With respect to that trip --

13   A.  Which trip?

14   Q.  The Arizona trip for the funeral.

15   A.  Okay.

16   Q.  People were in adjoining rooms.  There was a boys' room

17   and a girls' room, correct?

18   A.  Correct.

19   Q.  And you were in the boys' room; is that correct?

20   A.  Yeah.

21   Q.  And there were -- there was a door that connected the two

22   rooms?

23   A.  Correct.

24   Q.  And that door was open for most of the trip, correct?

25   A.  Incorrect.

                    Sarah K. Mitchell, RPR, CRR

Case No. 1:19-cr-00243-CMA-GPG Document 193-54 filed 06/27/2022 USDC Colorado  pg 87
of 159

```
 1   Q.   Incorrect?

 2   A.   Incorrect.

 3   Q.   Okay.  There were other boys who were in the room and in

 4   the bed with you, correct?

 5   A.   Correct.

 6   Q.   And do you recall which boys were there with you?

 7   A.   E.S. and D.O., my cousins.

 8   Q.   And they slept in the same bed as you, correct?

 9   A.   Correct.

10   Q.   And you didn't report Mr. McFadden doing anything to you

11   to them, correct?

12   A.   To my cousins?

13   Q.   Right.

14   A.   Correct.

15   Q.   J.W., with respect to the smell that you described in your

16   direct testimony, the first time you reported that was in your

17   October 28th interview getting ready for trial; is that

18   correct?

19   A.   Correct.

20   Q.   With respect to the trips that you went to New Mexico, you

21   were not the only person on those trips; is that correct?

22   A.   On the New Mexico trip?

23   Q.   Yes.

24   A.   I was the only person.

25   Q.   You believe you were the only person?
```

Sarah K. Mitchell, RPR, CRR

Case No. 1:19-cr-00243-CMA-GPG Document 93-154 filed 06/27/2022 USDC Colorado pg 88 of 159

 1   A.   Yes.

 2   Q.   Okay.  And how many of those trips do you recall going on?

 3   A.   A lot.

 4   Q.   A lot?

 5   A.   Yeah.

 6   Q.   J.W., how long were you at the D 1/2 address?

 7   A.   For the majority of the incidents that we talked about.

 8   I'd say about five years, six years.

 9   Q.   Five to six years?

10   A.   Maybe even more.

11   Q.   And the entire time at D 1/2 you never told anybody that

12   Mr. McFadden was doing anything to you?

13   A.   At the D 1/2 house?

14   Q.   Right.

15   A.   Correct.  I never told nobody.

16   Q.   And on October 28th, 20 -- excuse me -- on October 28th

17   getting ready for this trial you mentioned an incident that

18   happened at Mr. McFadden's home prior to the Glen Road

19   address, correct?

20   A.   Correct.

21   Q.   And getting ready for trial, that was the first time you

22   mentioned that allegation, correct?

23   A.   Yeah.

24        MR. MCDERMOTT:  Those are my questions, Your Honor.

25        THE COURT:  All right.  Any redirect?

                    Sarah K. Mitchell, RPR, CRR

Case No. 1:19-cr-00243-CMA-GPG Document 193-54 filed 06/27/2022 USDC Colorado pg 89 of 159

```
 1              MR. CHAFFIN:  Yes, please.
 2                      REDIRECT EXAMINATION
 3    BY MR. CHAFFIN:
 4    Q.  J.W., I just want to -- I'm a little confused about the
 5    order of interviews, so I want to clarify.
 6    A.  Okay.
 7    Q.  So there was an interview in 2007.
 8    A.  Yeah.
 9    Q.  Who was that with, do you remember?
10    A.  I believe it was in Arizona when we went to go visit my
11    cousins D.O. and E.S. who lived in Arizona.  I believe the
12    instance happened when police received a phone call.
13    Q.  Okay.  Was there a time here in Grand Junction when you
14    talked to police?
15    A.  Yes.
16    Q.  Okay.  When was that?
17    A.  Right after we were told -- or before, I guess, we were
18    told to go grab a couple things of clothes from the 2980 Road
19    house we were brought to the police station.
20    Q.  Okay.  Do you remember speaking with a Detective Sean
21    Crocker?
22    A.  I'm not good with names.
23    Q.  But you remember talking to a police officer in 2007,
24    2008?
25    A.  Yeah.
```

Case No. 1:19-cr-00243-CMA-GPG Document 193-4 filed 06/27/2022 USDC Colorado  pg 90
of 159

```
1    Q.  Do you remember going to the Western Slope Center For
2    Children?
3    A.  Yes.
4    Q.  You remember that interview?
5    A.  Yes.
6    Q.  And you didn't disclose during that interview?
7    A.  Correct.
8    Q.  Okay.  We talked about why?
9    A.  Yeah.
10   Q.  Do you remember meeting with someone at the Grand Junction
11   Police Department from Child Protective Services?
12   A.  Around when?
13   Q.  Around December of 2012.
14   A.  Yes.
15   Q.  Her name was Niki Surad.  Do you remember her name at all?
16   A.  No.
17   Q.  Do you remember speaking with a woman?
18   A.  Yeah.
19   Q.  Had you met Detective Ed Prescott then?
20   A.  I don't know if I met him, but I know I was told about Ed.
21   Q.  When you met with that woman from Child Protective
22   Services, did you tell her about what was going on?
23   A.  No.
24   Q.  Is that for the same reasons that we've talked about
25   already?
```

Sarah K. Mitchell, RPR, CRR

Case No. 1:19-cr-00243-CMA-GPG Document 194-154 filed 06/27/2022 USDC Colorado pg 91 of 159

 1   A.  Yeah.  I was like kind of like -- because I know something

 2   had already been said because that's why everyone is asking,

 3   but I was kind of just, like, seeing if it was going to be one

 4   of those, like, questions that were asked to me in 2007, if it

 5   was just going to blow over when I said no and everyone said

 6   no, or if it was going to be bigger than it was.

 7   Q.  Okay.  Had you dealt with Child Protective Services during

 8   your life at that point?

 9   A.  Yeah.

10   Q.  What had happened when you've had to deal with them in the

11   past?

12   A.  I used to have them coming to my school and asking me

13   questions because I was -- like, example, I was always hungry,

14   or I remember one time kids saying I smelled, and so child

15   services got called.

16   Q.  Did they ever take you out of your home?

17   A.  No.

18   Q.  Were you worried that might happen?

19   A.  Yeah.

20   Q.  Were you worried they might take you away from Mike's

21   house?

22   A.  Yeah.

23   Q.  And then you meet with Detective Prescott and a female

24   detective at your house?

25   A.  Yes.

Case No. 1:19-cr-00243-CMA-GPG-1 Document 193-154 filed 06/27/2022 USA v. Case 88 of 88  pg 92
of 159

1   Q.  And this is after things had happened?

2   A.  Yes.

3   Q.  Is that after you had been told you can only go into the

4   house and get some clothes?

5   A.  Yes, that was after.

6   Q.  So you had been taken out of Mr. McFadden's house?

7   A.  Yes.

8   Q.  You lost all those things --

9   A.  All those things.

10  Q.  -- that you talked about?

11  A.  Yeah.  I went into my house and grabbed a few articles of

12  clothing that I needed and a toothbrush and just to see if it

13  was going to die over and I could come back and play my Xbox.

14  When it didn't die over, we went to go grab the things I

15  wanted from the house like my airsoft guns, my Xbox, and

16  everything was ransacked.

17  Q.  And when you met with Detective Prescott, is that the

18  first time that you told anybody a little bit of what had been

19  going on?

20  A.  Yeah.  At that moment I realized it wasn't blowing over,

21  and that I wasn't going to be the only one having to do this,

22  and it reassured me a little bit.

23  Q.  Did you tell Detective Prescott everything that had

24  happened to you?

25  A.  Not even close.  I still to this day haven't told

                    Sarah K. Mitchell, RPR, CRR

 1   everybody every single instance because it would take forever.

 2   Like I said, it happened two to three times a week for seven

 3   years, so that would be a hard thing to describe every

 4   incident that happened.

 5   Q.  Can you even remember every single incident that happened?

 6   A.  I remember a majority of it.  There's instances of

 7   blocking.

 8   Q.  Do they sometimes sort of blend together?

 9   A.  Yeah.

10   Q.  But the ones that we talked about on direct, you remember

11   those?

12   A.  Yeah.

13   Q.  Mr. McDermott asked you about talking about the time when

14   you felt licking or a tongue.

15   A.  Uh-huh.

16   Q.  He suggested you had just said that recently.

17   A.  Yeah.  Uh-huh.

18   Q.  But I think you said that was incorrect, right?

19   A.  Yeah, because I think I told in the 2018 interview to the

20   center when I finally was saying things and more things were

21   coming to my mind, I believe when the lady asked me if there

22   was anything strange or out of the picture that you could

23   remember, and I believe I remember saying that.

24   Q.  Could you -- could you look at that defense exhibit

25   binder?  Do you have that in front of you?

                     Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1  Testimony of J.W.      11/08/2022    90

1    A.  Is it the first one we were using?

2    Q.  It's the ones that go A and B and C.

3    A.  Yeah, I have it in front of me.

4    Q.  Can you turn to Defense Exhibit C-1.

5    A.  Okay.

6    Q.  What does it say that is?

7    A.  It says it's an audio transcript interview of J.W. by

8    Stephanie Knapp on the August 8th of 2018.

9    Q.  And it's pretty thick, right?

10   A.  Yeah.

11   Q.  Could you turn to page 88.

12   A.  Page 88.

13   Q.  Could you just read lines 10 through 16, please.

14           THE COURT:  To himself or out loud?

15           MR. CHAFFIN:  Sorry, Your Honor?

16           THE COURT:  To himself or out loud?

17           MR. CHAFFIN:  I would ask that he read them out loud

18   to the jury, Your Honor.

19           THE COURT:  All right.  Well, I think that would be

20   inappropriate.  I think he needs to read it to himself.  Then

21   you can ask him about it.  So read it to yourself, J.W.

22   A.  What lines again?

23   Q.  (By MR. CHAFFIN) 10 through 16.

24   A.  10 through 16?

25   Q.  Yes.  Have you had a chance to read those?

                    Sarah K. Mitchell, RPR, CRR

Case No. 1:19-cr-00243-CMA-GPG Document 154 filed 06/27/2022 USDC Colorado pg 95 of 159

1   A.  Yeah, on page 86.

2   Q.  88.  Sorry.

3   A.  Page 88, sections 10 through 16?

4   Q.  Lines 10 through 16.  Did you get a chance to read those?

5   A.  Yes, I did.

6   Q.  What are you talking about in those lines?

7   A.  In those lines I'm telling Stephanie that I felt a

8   different type of sensation, not something inserting me, but a

9   licking sensation and a mustache sensation.

10  Q.  Okay.  So you talked with Stephanie Knapp about the

11  licking?

12  A.  Yeah.

13  Q.  Way back in 2018?

14  A.  In 2018, yes.  So I knew I had said it before.

15  Q.  Mr. McDermott also asked you about talking about a smell

16  and suggested that you had just recently said that --

17  A.  Yeah.

18  Q.  -- in October.

19  A.  Yeah.

20  Q.  And I think you said that was correct?

21  A.  Yeah.

22  Q.  Would it refresh your recollection to take a look at what

23  you had talked about with Ms. Knapp about whether or not that

24  actually was correct?

25  A.  Yes.  Now that I see especially that I talked to her about

1    the mustache and licking sensation, I might have mentioned a

2    smell somewhere in this interview.

3    Q.  Sure.  Could you turn to page 145, and can you just take a

4    look at line 15.  Does that refresh your recollection about

5    when you talked about a smell?

6    A.  Yeah.

7    Q.  You used the words fecal smell?

8    A.  Yeah.

9    Q.  J.W., have you felt like you've ever had a chance to talk

10   about all of the things that have happened to you?

11   A.  No.

12   Q.  And even after all of those things that were going on, did

13   you prefer staying at Mike's house to your mom's house?

14   A.  Yeah.

15          MR. CHAFFIN:  Nothing further, Your Honor.

16          THE COURT:  Thank you very much.  J.W., you may step

17   down.

18          (This portion of proceedings concluded at 1:43 p.m.)

19

20

21

22

23

24

25

                    Sarah K. Mitchell, RPR, CRR

```
 1                        REPORTER'S CERTIFICATE

 2

 3           I, SARAH K. MITCHELL, Official Court Reporter for the

 4    United States District Court for the District of Colorado, a

 5    Registered Professional Reporter and Certified Realtime

 6    Reporter, do hereby certify that I reported by machine

 7    shorthand the proceedings contained herein at the time and

 8    place aforementioned and that the foregoing pages constitute a

 9    full, true and correct transcript.

10           Dated this 29th day of November, 2022.

11

12

13

14                    _____/s/ Sarah K. Mitchell_____

15                       SARAH K. MITCHELL
                         Official Court Reporter
16                 Registered Professional Reporter
                     Certified Realtime Reporter
17

18

19

20

21

22

23

24

25

                    Sarah K. Mitchell, RPR, CRR
```

```
 1                    IN THE UNITED STATES DISTRICT COURT

 2                       FOR THE DISTRICT OF COLORADO

 3    Criminal Action No. 19-cr-00243-CMA-GPG-1

 4

 5     UNITED STATES OF AMERICA,

 6            Plaintiff,

 7            vs.

 8     MICHAEL TRACY MCFADDEN,

 9            Defendant.

10    ---------------------------------------------------------------

11                    PARTIAL REPORTER'S TRANSCRIPT
                       Jury Trial - Testimony of K.W.
12
      ---------------------------------------------------------------
13
              Proceedings before the HONORABLE CHRISTINE M.
14    ARGUELLO, Senior Judge, United States District Court for the
      District of Colorado, commencing on the 9th day of
15    November, 2022, in United States Courthouse, Grand Junction,
      Colorado.
16
                               APPEARANCES
17
      For the Plaintiff:
18    JEREMY L. CHAFFIN, U.S. Attorney's Office, 205 North 4th St.,
      Ste. 400, Grand Junction, CO 81501
19
      ANDREA L. SURRATT, U.S. Attorney's Office, 1801 California
20    St., Ste. 1600, Denver, CO 80202

21    For the Defendant:
      SEAN M. MCDERMOTT, McDermott Stuart & Ward, LLP, 140 East 19th
22    Ave., Ste. 300, Denver, CO 80203

23    BEN LABRANCHE, Benjamin R. LaBranche PLLC, 1544 Race St.,
      Denver, CO 80206
24

25       Sarah K. Mitchell, RPR, CRR, 901 19th Street, Room A252,
                    Denver, CO 80294, 303-335-2108
           Proceedings reported by mechanical stenography;
                 transcription produced via computer.
```

Case No. 1:19-cr-00243-CMA-GPG Document 155 Filed 06/27/23 USDC Colorado pg 99 of 159

1                          I N D E X

2

GOVERNMENT'S WITNESS                                    PAGE

3

K.W.

4      Direct Examination By Ms. Surratt               3
       Cross-Examination By Mr. McDermott             47

5      Redirect Examination By Ms. Surratt            59

6

7              GOVERNMENT'S
               EXHIBITS                RECEIVED

8
               13-1                        4

9
               13-2                        6

10
               227                        31

11
               228                        31

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                    Sarah K. Mitchell, RPR, CRR

Case No.19-cr-00243-CMA-GPG Document 193-5 filed 06/27/23 USDC Colorado pg 100 of 159

```
  1              *         *         *         *         *

  2           (This portion of proceedings commenced at 9:26 a.m.)

  3           THE COURT:  The Government may call its next witness.

  4           MS. SURRATT:  Your Honor, the Government calls K.W.

  5           THE COURTROOM DEPUTY:  Can you please stand and raise

  6   your right hand.

  7                               K.W.

  8   was called as a witness and, having been duly sworn, was

  9   examined and testified as follows:

 10           THE COURTROOM DEPUTY:  Thank you.  Please be seated,

 11   and then please state your name and spell your first and last

 12   name for the record.

 13           THE WITNESS:  My name is K////////, K-//////////////, last

 14   name W///////////, W-//////////////////////.

 15                       DIRECT EXAMINATION

 16   BY MS. SURRATT:

 17   Q.  Good morning.  Can I call you K.W.?

 18   A.  Yes.

 19   Q.  K.W., how old are you now?

 20   A.  I am 21 years of age.

 21   Q.  What is your date of birth?

 22   A.  April 23rd, 2001.

 23   Q.  April 23rd, 2001?

 24   A.  Yes.

 25   Q.  So in January of 2013, were you 11 years old?
```

Sarah K. Mitchell, RPR, CRR

1   A.  I was, indeed.  No, 2013 of January I would have been --

2   yes, I would have been 11.

3   Q.  Not quite 12 yet?

4   A.  Not quite 12 yet.

5   Q.  K.W., there's a binder in front of you.  Can you look in

6   the binder and find what's marked as Exhibit 13-1.

7   A.  I have it.

8   Q.  What is that?

9   A.  That's going to be my -- me and my two little siblings.

10  Q.  Is that a photograph?

11  A.  It is, indeed.

12  Q.  And you said you recognize the people in that photograph?

13  A.  I do, indeed.

14  Q.  And you said it's you and your siblings?

15  A.  Yes.

16  Q.  Is that a photograph that fairly and accurately represents

17  what you and your siblings looked like around that time?

18  A.  Yes, it does.

19          MS. SURRATT:  The Government offers 13-1.

20          THE COURT:  Any objection?

21          MR. MCDERMOTT:  No objection, Your Honor.

22          THE COURT:  13-1 is admitted.  You may publish.

23      (Government's Exhibit 13-1 received.)

24  Q.  (By MS. SURRATT) K.W., who is the tallest boy on the far

25  left?

                    Sarah K. Mitchell, RPR, CRR

Case No. 1:19-cr-00243-CMA-GPG-1 Document 193-5 Filed 06/27/23 USDC Colorado pg 102 of 159

 1  A.  That would have been me at the time.

 2  Q.  Do you know approximately how old you are in this photo?

 3  A.  I would have been around 11 years old.

 4  Q.  Who is the girl in the middle?

 5  A.  That would be my little sister.

 6  Q.  And what's your sister's name?

 7  A.  S.J.W.

 8  Q.  About how old was S.J.W. in this photograph?

 9  A.  8, 8 years old at the time.  7 or 8 around that time.  I

10  think she would have been 7 at the time because her birthday

11  is in May.

12  Q.  And who is the little boy in the darker blue shirt on the

13  right side of the photograph?

14  A.  That would be my little brother L.We.

15  Q.  And do you know approximately how old L.We. would have

16  been in this photograph?

17  A.  He would have been 3 or 4 years old.

18  Q.  K.W., do you know where this photo was taken?

19  A.  That was taken at the D 1/2 Road house.

20  Q.  Okay.  And we'll talk about the places that you lived in

21  Grand Junction in a moment.

22  A.  Okay.

23  Q.  Could you turn to the next exhibit, which is Government's

24  Exhibit 13-2 in the binder.

25  A.  14-2?

                    Sarah K. Mitchell, RPR, CRR

Case No. 19-cr-00243-CMA-GPG Document 193-55 Filed 06/27/23 USDC Colorado   pg 103
of 159

 1   Q.  13.  Sorry, K.W.  13-2, the very next exhibit.

 2   A.  Got it.

 3   Q.  Do you recognize that?

 4   A.  I do, indeed.

 5   Q.  What is it?

 6   A.  That is me -- that is also me.

 7   Q.  Is it a photograph of you?

 8   A.  It is a photograph of me, yes.

 9   Q.  And is that a photograph that fairly and accurately

10   represents what you looked like around the time it was taken?

11   A.  Yes.

12         MS. SURRATT:  The Government offers Government's

13   Exhibit 13-2.

14         THE COURT:  Any objection?

15         MR. MCDERMOTT:  No objection, Your Honor.

16         THE COURT:  13-2 is admitted.  You may publish.

17      (Government's Exhibit 13-2 received.)

18   Q.  (By MS. SURRATT) About how old were you in this photo,

19   K.W.?

20   A.  So at D 1/2 Road house I was 11, 11 to 12 about the entire

21   time.  So this one I would have been 11.

22   Q.  And where was this photo taken?

23   A.  This was taken inside the home at D 1/2.

24   Q.  You've mentioned two of your siblings.  Do you have any

25   other siblings?

                    Sarah K. Mitchell, RPR, CRR

Case No. 19-cr-00243-CMA-GPG-1 Document 193-5 filed 06/27/23 USDC Colorado pg 104 of 159

 1  A.  Yes.  I do have one step-brother.  He's older than me.

 2  His name is S.W. Jr.

 3  Q.  Your older step-brother is S.W. Jr.?

 4  A.  Yeah.

 5  Q.  About how old is he?

 6  A.  He's almost 30 now.  He's 29.

 7  Q.  Where do you currently live?  Just the city and state.

 8  A.  Cedar City, Utah.

 9  Q.  About how long have you lived in Cedar City, Utah?

10  A.  I moved to Cedar City, Utah, when I was 14 years old.  So

11  from 14 to now, which is roughly eight years.

12  Q.  Who do you live with in Cedar City?

13  A.  I live on my parents' property.

14  Q.  And do you live with anyone on your parents' property?

15  A.  I live with my fiancée and my little daughter.

16  Q.  How old is your daughter?

17  A.  My daughter is a year and two months.

18  Q.  What do you do for work?

19  A.  I am assistant manager at Zaxby's.

20  Q.  What is Zaxby's?

21  A.  Zaxby's is just a chicken place.  It's very similar to

22  Chick-fil-A.

23  Q.  And you said you're an assistant manager there?

24  A.  I am, indeed.

25  Q.  About how long have you worked at Zaxby's?

                    Sarah K. Mitchell, RPR, CRR

Case No. 1:19-cr-00243-CMA-GPG Document 193-5 Filed 06/27/23 USDC Colorado pg 105 of 159

 1   A.  I will be there two years in May.

 2   Q.  K.W., do you have any felony adjudications in your past?

 3   A.  I do, indeed.

 4   Q.  Just very broadly, what are they for?

 5   A.  I have a few for gun theft.  I have a few burglaries.

 6   Q.  And were these all juvenile adjudications?

 7   A.  They were all juvenile adjudications, yes.  In Cedar City,

 8   Utah, Iron County.

 9   Q.  And at this point have all of your juvenile adjudications

10   been resolved?

11   A.  They have been, yes.  I was successfully terminated from

12   juvenile parole.

13   Q.  You were successfully terminated from juvenile parole?

14   A.  Yes.

15   Q.  Do you have any pending cases?

16   A.  I have two.

17   Q.  And are those misdemeanors?

18   A.  They are, indeed.  They're Class 3s.

19   Q.  Do those pending misdemeanors have anything to do with

20   your testimony here today?

21   A.  They do not, no.

22   Q.  And are you expecting any benefit in your misdemeanor case

23   from me or any another representative of the Government here

24   today?

25   A.  I do not, no.  Those are my mistakes.  Those are for me to

                        Sarah K. Mitchell, RPR, CRR

Case No. 1:19-cr-00243-CMA-GPG Document 193-5 Filed 06/27/23 USDC Colorado pg 106 of 159

```
 1   deal with.
 2   Q.  What places did you live before you lived in Cedar City,
 3   Utah?
 4   A.  I've only -- so my entire life I've only lived in Grand
 5   Junction, Colorado; Montrose, Colorado; and Cedar City, Utah.
 6   Q.  So Grand Junction; Montrose, Colorado; and Cedar City,
 7   Utah?
 8   A.  And Enoch, Utah, but they're very closely -- like a mile
 9   apart.
10   Q.  And Enoch, Utah, as well?
11   A.  Yes.
12   Q.  K.W., did you know someone named Michael McFadden?
13   A.  I do, indeed.
14   Q.  What did you call him when you knew him?
15   A.  Mike.
16   Q.  Do you see Mr. McFadden in the courtroom here today?
17   A.  I do, indeed.
18   Q.  Can you identify him by an article of clothing he's
19   wearing?
20   A.  Gray suit jacket.
21   Q.  What color shirt is he wearing?
22   A.  Blue.
23          MS. SURRATT:  Your Honor, may the record please
24   reflect that the witness has identified the defendant?
25          THE COURT:  It will so reflect.
```

Sarah K. Mitchell, RPR, CRR

Case No. 1:19-cr-00243-CMA-GPG Document 293-55 filed 06/27/23 USDC Colorado pg 107 of 159

 1  Q.  (By MS. SURRATT) K.W., how did you first meet

 2  Mr. McFadden?

 3  A.  My mom ran into him at the North Avenue Walmart, I

 4  believe.  As I'm here in Junction, I'm kind of remembering

 5  locations.

 6  Q.  And you said she ran him into at the North Avenue --

 7  A.  Walmart.

 8  Q.  -- Walmart?

 9  A.  Yeah.

10  Q.  And when did you first start spending time around

11  Mr. McFadden?

12  A.  About a couple weeks after that point.

13  Q.  So shortly after your mom ran into him?

14  A.  Yes.

15  Q.  Are you aware of where Mr. McFadden lived when you first

16  met him?

17  A.  I don't know the exact street name, but I do remember

18  mostly the picture of the house.

19          MS. SURRATT:  Your Honor, may we please publish

20  Government's Exhibit 3-1?

21          THE COURT:  You may.

22  Q.  (By MS. SURRATT) K.W., do you recognize this house?

23  A.  I do, indeed.

24  Q.  What is it?

25  A.  It's the house that I first went to.  Mike used to live

Case No. 1:19-cr-00243-CMA-GPG-1 Document 193-55 filed 06/27/23 USDC Colorado pg 108 of 159

1   with two other adults.  One was -- their names were John and

2   Phyllis.  They lived with their son named S.H.

3   Q.  And you said that Mr. McFadden lived with John and

4   Phyllis.  Do you know --

5   A.  So kind of how it worked, they were kind of like

6   downstairs.  Mike was upstairs.  It was a split duplex kind

7   of.

8   Q.  So John and Phyllis lived downstairs.  Do you remember

9   John and Phyllis's last name?

10  A.  Not by heart.

11  Q.  Okay.  And you said they had a son; is that right?

12  A.  Yeah, his name is S.H.

13  Q.  Do you know approximately how old S.H. was at the time?

14  A.  I don't remember.  I lost contact with S.H.  I've

15  forgotten how old he is, so forth and so on.

16  Q.  Was he about your age or older or younger?

17  A.  I believe he's a little bit older than me.  I'm not

18  100 percent sure or certain.

19  Q.  Did you ever go to this house where Mike lived in

20  Government's Exhibit 3-1?

21  A.  I did, indeed.

22  Q.  About how old were you when you started going over there?

23  A.  I think I was around 10 years old at this time.

24  Q.  And how would you get there?

25  A.  Mike would pick me up or my mom would drop me off.

1   Q.  What kinds of things would you do over at this home?

2   A.  Things we would do is just kind of like play around.  At

3   this time -- I don't know how it looks like now, but at the

4   time there was a field across the street.  Me and J.W. would

5   always go over there and play, like, just have some fun.  They

6   would have, like, these little electric crotch rockets that

7   were in the garage.  We would ride around the neighborhood and

8   just stuff like that.

9   Q.  A couple questions.  What is a crotch rocket?

10   A.  A crotch rocket is just like a motorcycle.

11   Q.  And you mentioned someone named J.W.  Who is J.W.?

12   A.  J.W., his name is J.W.  Me and him used to be very close.

13   Q.  Was he a friend of yours?

14   A.  Yeah, he was.

15   Q.  And how old was J.W.?  Was he older than you, about the

16   same age, or younger?

17   A.  He's a year older than I am.

18   Q.  So you occasionally went to this house.  Sometimes J.W.

19   was there.  Was anyone else there when you went over?

20   A.  Yes.  It would be myself, J.W., his brothers, sometimes

21   his little sister, and then S.H.  That's all I can remember.

22   Q.  Do you remember who J.W.'s brother and sister were?

23   A.  I know -- yeah.  L.Wr. and B.W.

24   Q.  L.Wr. and B.W.?

25   A.  Yeah.

Case No. 1:19-cr-00243-CMA-GPG Document 293-5 filed 06/27/23 USDC Colorado pg 110 of 159

1 Q.  Do you remember any other kids going over to this house?

2 A.  Not necessarily.

3 Q.  About how often would you go over to this house?

4 A.  Almost every weekend.

5 Q.  When you were there almost every weekend, did you

6 sometimes spend the night at this house?

7 A.  Yes.  I would stay there during the weekend.

8 Q.  So you'd stay during the weekend and spend the night?

9 A.  Uh-huh.

10 Q.  When you spent the night, where did you sleep?

11 A.  At first I would sleep on like -- kind of like a sleeping

12 bag right next to Mike's bed, and then over time it just

13 turned into me sleeping on the bed with Mike.

14 Q.  And did Mike have a bedroom?

15 A.  He did.

16 Q.  And so when you were sleeping on the sleeping bag next to

17 the bed, was that in Mike's bedroom?

18 A.  Yes, it was.

19 Q.  And then you said eventually you just started sleeping in

20 the bed with him?

21 A.  Uh-huh.

22 Q.  Did anyone else spend the night?

23 A.  Yes.  J.W. lived there, as well as L.Wr. lived there.  So

24 they would kind of stay in the same room.

25 Q.  And where would they sleep?

Sarah K. Mitchell, RPR, CRR

 1   A.  J.W. would sleep on the bed.  Don't remember where L.Wr.

 2   would sleep.

 3   Q.  At some point do you remember if Mr. McFadden moved to a

 4   different house?

 5   A.  He did.  At that time, after this house I think we went a

 6   little bit without contact, and then just kind of met back up

 7   with him after.  I don't remember much after this house until

 8   about right around Clifton time and D 1/2.

 9   Q.  Do you remember where Mr. McFadden moved after this house?

10   A.  No.

11   Q.  Do you remember him moving to a house on D 1/2?

12   A.  That would be it, yes.

13        MS. SURRATT:  Your Honor, may I please publish

14   Government's Exhibit 4-1?

15        THE COURT:  You may.

16   Q.  (By MS. SURRATT) K.W., do you recognize this house?

17   A.  I do, indeed.

18   Q.  What is this?

19   A.  That was the house he lived at on D 1/2.  It's a big old

20   22-acre plot of land at the time.

21   Q.  This is the house where Mr. McFadden lived?

22   A.  Yes.

23   Q.  And at some point did your family also move to a house on

24   D 1/2 Road?

25   A.  Yes.  We moved to the two-story right across the field.

                    Sarah K. Mitchell, RPR, CRR

Case No. 1:19-cr-00243-CMA-GPG Document 193-55 filed 06/27/23 USDC Colorado pg 112 of 159

 1  Q.  You moved to a two-story house across the field?

 2  A.  Yeah, it was like an old brown two-story home right across

 3  the field on D 1/2.

 4  Q.  And just so we're clear, these are both in Grand Junction,

 5  right?

 6  A.  Yes.

 7          THE COURT:  Ms. Surratt, I'm going to ask you to slow

 8  down just a little bit.

 9          MS. SURRATT:  Yes, Your Honor.

10          Your Honor, may I please publish what's marked as

11  Government's Exhibit 4-4?

12          THE COURT:  You may.

13  Q.  (By MS. SURRATT) K.W., do you recognize this aerial view?

14  A.  Yes, I do.

15  Q.  Could you indicate on this where Mr. McFadden lived when

16  he was on D 1/2 Road?

17  A.  On D 1/2 he would be, like, where all these kind of cars

18  and storage containers and trailers were at the time.  And

19  then the house that we moved into is like this little one

20  right down here in the corner.

21  Q.  Let me see if I can verbalize where I believe you were

22  just pointing.  When you described Mr. McFadden's property

23  with cars and other items around it, were you pointing to that

24  cluster of structures in the very middle of the photograph?

25  A.  In the middle of the screen, yeah.

                    Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1   Testimony of K.W.          11/09/2022   16

1   Q.  And when you were describing your two-story home, were you

2   pointing at that small structure in the very lower right-hand

3   corner of the screen?

4   A.  Yes.

5          MS. SURRATT:  Your Honor, may I please publish what's

6   marked as Government's Exhibit 4-2?

7          THE COURT:  You may.

8   Q.  (By MS. SURRATT) What is this, K.W.?

9   A.  That would have been our house at the time.

10  Q.  Where you lived with your family?

11  A.  Yes.

12  Q.  Who lived there with you at the time you lived at this

13  house on D 1/2 Road?

14  A.  Everyone that lived at this home in particular would have

15  been, off the top of my head that I can remember, would be me

16  myself, S.J.W., L.We., my mom, my dad, S.W. Jr., and then one

17  of Ray Fluke's -- I think Ray used to live there.  We've had

18  people come and go from this house, but the main people that

19  lived there was the immediate family.

20  Q.  You mentioned a name Ray Fluke.  Who is that?

21  A.  That's like an adopted uncle of ours.  We just -- he lives

22  in Cedar with us now.  He's been close to our family ever

23  since we met him.

24  Q.  What is your mom's name?

25  A.  My mom's name is Stacy W.

                        Sarah K. Mitchell, RPR, CRR

Case No. 1:19-cr-00243-CMA-GPG Document 193-5 filed 06/27/23 USDC Colorado pg 114 of 159

 1   Q.  And what is your dad's name?

 2   A.  Scott W. Sr.

 3          MS. SURRATT:  Your Honor, may I please publish

 4   Government's Exhibit 4-3?

 5          THE COURT:  You may.

 6   Q.  (By MS. SURRATT) Is this another view of the same house?

 7   A.  It is, indeed.

 8   Q.  K.W., could you describe for the jury what this house was

 9   like when you lived there?

10   A.  At the time of us moving in I was just a little kid, so it

11   was a big house, kind of excited about it.  The more we lived

12   on, like, the more things I noticed such as like holes in the

13   laundry room area, like, through the floor.  The stairs were

14   kind of creaky and loud at times.  And it's just at the time

15   my dad -- because of upstairs, my mom didn't like going up and

16   down the stairs, my dad built -- kind of sectioned off the

17   living room and cut it in half and kind of built a room right

18   there off the living room on the back of the house.  It was

19   ran down when we moved in, and kind of like what you see here,

20   just take off the wood on the windows, that's what we lived

21   in.  Everything else was pretty much the same.

22   Q.  So to be clear, when you lived there the house had

23   windows, not plywood?

24   A.  Yeah, not plywood.

25          MS. SURRATT:  Mr. Graber, you can take that down,

                     Sarah K. Mitchell, RPR, CRR

1    please.

2    Q.   (By MS. SURRATT) Turning back to Mr. McFadden's house on D

3    1/2 Road, do you remember who lived there with him?

4    A.   Yeah.  It would have been John and Phyllis, Mike himself,

5    L.Wr. and J.W.

6    Q.   Do you remember anybody else living there?

7    A.   I believe S.H. lived there as well, but I think that's

8    about -- oh, and someone by the name John Foxx.

9    Q.   Did you ever go to Mr. McFadden's house on D 1/2 Road?

10   A.   I did.  As soon as he moved into D 1/2, I was there almost

11   every day and stayed on the weekend nights.

12   Q.   About how old were you when you started going over to

13   Mr. McFadden's house on D 1/2?

14   A.   About 11 years old.

15   Q.   What kind of things would you do over at that house?

16   A.   He had a lot of stuff to do, so just whatever I could get

17   my hands on at the time.

18   Q.   What kinds of things?

19   A.   He would have, like, airsoft guns, paintball guns.  He

20   would have, like, side-by-side quads, trampolines, video game

21   systems.  He had a lot of stuff to do at that house.

22   Q.   When you went over there, were there other kids to play

23   with?

24   A.   Yeah.  So there was always -- L.Wr. and J.W. were always

25   there.  We would have a couple other kids come over as well.

Sarah K. Mitchell, RPR, CRR

 1   Off the top of my head, one kid was named D.R.  Like, another

 2   kid I keep forgetting the name of, but he would always come

 3   over too.  B.W. would come over.  My little brother would come

 4   over too, L.We. would come over.  So kind of how we distinct

 5   the two would be big L.Wr. and little L.We.  It was just easy

 6   how it was because they have the same name, just different

 7   spellings.

 8   Q.  Let me back up a second.  You mentioned a big --

 9   A.  So L.Wr. --

10   Q.  K.W., I apologize.  I know you want to answer my

11   questions.  Can you try to wait for me to finish my questions?

12   A.  Sorry.

13   Q.  Mostly for the -- so the court reporter can take down what

14   each of us are saying, which is also why I need to slow down.

15   A.  Sorry.

16   Q.  You mentioned a big L.Wr. and a little L.We.

17   A.  Yeah.

18   Q.  Who is big L.Wr.?

19   A.  Big L.Wr. would be L.Wr.

20   Q.  And you said earlier that's J.W.'s brother?

21   A.  J.W.'s brother.

22   Q.  Who is little L.We.?

23   A.  My little brother L.We.

24   Q.  And why were they called big L.Wr. and little L.We.?

25   A.  Because big L.Wr. was a few years older.  He was taller.

                    Sarah K. Mitchell, RPR, CRR

```
 1   My brother was shorter, a lot shorter because he was a lot

 2   younger at the time.  I think my little brother was 3 or 4 at

 3   the time.  L.Wr. was 6 or 7, right around those age periods.

 4   So we would just distinctly call them that so we could easily

 5   just say who we want, because calling L.Wr., they would both

 6   just run over.

 7   Q.  Okay.  You mentioned a moment ago having lots of fun

 8   things to do at Mr. McFadden's, toys and video games and such.

 9   Were those all things that you liked to do?

10   A.  Yes.  Still to this day I am a heavy gamer.

11   Q.  Did you enjoy going to Mr. McFadden's house?

12   A.  At the time, yes.

13   Q.  Who owned all this fun stuff?

14   A.  It was a mix between John and Mike.  They just owned

15   different things together.

16   Q.  Did Mr. McFadden ever buy you anything?

17   A.  Not necessarily bought me personally anything that I could

18   remember, but things he bought I was free to use.

19   Q.  Things he bought you were free to use?

20   A.  Things he bought I was just free to use.

21   Q.  Okay.  You said a moment ago that you -- once you were

22   living next door, you were often over at Mr. McFadden's house,

23   right?

24   A.  Yes.

25   Q.  Did you ever spend the night at the house on D 1/2 Road?
```

Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1    Testimony of K.W.        11/09/2022    21

1    A.  I did quite frequently.

2    Q.  Do you know about how frequently?

3    A.  Almost every weekend.

4    Q.  Where did you sleep when you spent the night at D 1/2

5    Road?

6    A.  At D 1/2 Road I would either sleep on the futon couch they

7    had in the living room or on Mike's bed.

8    Q.  Did you sometimes fall asleep in one place and wake up

9    somewhere else?

10   A.  Yes.

11   Q.  Could you tell the jury about that?

12   A.  So over a course of time Mike starting giving me melatonin

13   in lots of amounts.  At some points when I'd take melatonin

14   I'd fall asleep playing Black Ops II at the time which was the

15   new Call of Duty on PS3.  And then I'd wake up in the bed next

16   to Mike.  It freaked me out every time.  I just ignored it.

17   Q.  You said you would fall asleep somewhere else and then

18   wake up in the bed next to Mike; is that right?

19   A.  I'd fall asleep mainly on the futon, and then I'd end up

20   waking up on the bed.

21   Q.  Okay.  You said some letters and a number.  PS3, what is

22   that?

23   A.  PS3 is the PlayStation 3.  At the time it was like the new

24   PlayStation game they had out.

25   Q.  You mentioned a game you played.  What was that?

                    Sarah K. Mitchell, RPR, CRR

Case No. 1:19-cr-00243-CMA-GPG Document 193-5 filed 06/27/23 USDC Colorado pg 119 of 159

 1  A.  Call of Duty Black Ops II.  Still one of my favorite Call

 2  of Duties of all time.

 3  Q.  Whose PlayStation was that?

 4  A.  That would have -- I don't remember -- actually, I don't

 5  remember exactly whose PS3 that was.

 6  Q.  When you spent the night at Mr. McFadden's, were there

 7  other people also spending the night?

 8  A.  Yeah.  Quite frequently kids would stay at the house.

 9  It'd be, like, the same group of kids, but it would be

10  frequent.

11  Q.  Where would the other kids sleep?

12  A.  J.W., myself, and L.Wr. -- L.Wr. would normally sleep on

13  the bed.  Other kids would just -- there was two other rooms

14  the other kids would sleep in.

15  Q.  And when you said you would sleep on the bed, whose bed

16  was that?

17  A.  Mike's.

18  Q.  And you said that there were also other rooms.  Who would

19  sleep in these other rooms?

20  A.  I know B.W. had her own room, and then John and Phyllis

21  had their own room.

22  Q.  Is this the same John and Phyllis that lived with

23  Mr. McFadden in the first house that we talked about?

24  A.  Yes.

25  Q.  You mentioned a moment ago, K.W., that Mr. McFadden gave

                    Sarah K. Mitchell, RPR, CRR

1    you melatonin.

2    A.  Yes.

3    Q.  Can you tell the jury a little bit more about that?

4    A.  Melatonin is a natural sleep aid that you can take.  It

5    just helps you fall asleep if you can't.  That's pretty much

6    all I can explain about it.  It's just a sleep aid.

7    Q.  Can you describe the circumstances when Mr. McFadden gave

8    you melatonin?

9    A.  It would be in heavy amounts.  It would be five or six

10   capsules at a time.

11   Q.  Were they pills or some other form?

12   A.  Sometimes they'd be pills.  Sometimes they'd be gummies.

13   Like, melatonin comes in all forms really.  Comes in like --

14   well, nowadays they come in drinks.  But at the time it was

15   just pills and gummies.

16   Q.  What time of day generally would Mr. McFadden give you the

17   melatonin pills or gummies?

18   A.  7:30, 8 o'clock at night.

19   Q.  After Mr. McFadden gave you the melatonin, what effect did

20   it have on you?

21   A.  At that time I was kind of little, so it would put -- it

22   would make me fall asleep fairly quickly.  And I don't

23   remember much about that, because when I sleep -- because

24   nowadays -- like, I have insomnia nowadays.  I have to take a

25   medication called Trazodone, which is a heavy sleep aid.  I

Sarah K. Mitchell, RPR, CRR

Case No. 1:19-cr-00243-CMA-GPG Document 293-55 filed 06/27/23 USDC Colorado pg 121 of 159

 1    don't -- when I fall asleep under, like, medications I sleep

 2    hard, so I don't remember much when I'm asleep.

 3    Q.  Did you ever see Mr. McFadden give any of the other kids

 4    anything to help them sleep?

 5    A.  Yes.

 6    Q.  What did you see?

 7    A.  Same bottle of melatonin or pills.  He would just give it

 8    to almost everyone at that house.

 9    Q.  K.W., I want to talk to you now about something that's a

10    little bit uncomfortable, if that's okay?

11    A.  Yeah.

12    Q.  Was there ever a time when Mr. McFadden did anything to

13    you that made you uncomfortable?

14    A.  Yes.

15    Q.  What did he do?

16    A.  It started out kind of like in the D 1/2 Road house.

17    Every so often I'd wake up, and I would just feel him on top

18    of me.  His -- he would be hard.  Like, down low he would be

19    hard.  He would just rub against me, and then -- I was little.

20    I didn't want to deal with it, so I would just fall back

21    asleep.

22    Q.  K.W., when you said he would be hard, are you talking

23    about his penis?

24    A.  Yes.

25    Q.  When is the first time that you remember something like

                    Sarah K. Mitchell, RPR, CRR

Case No. 1:19-cr-00243-CMA-GPG Document 193-55 filed 06/27/23 USDC Colorado pg 122 of 159

 1   this happening?

 2   A.  The first time I remember something happening was the

 3   first house you showed on the screen.

 4   Q.  The house that we looked at, the white house?

 5   A.  Yes.

 6   Q.  What do you remember happening at that house?

 7   A.  The first -- the only thing I remember from that house

 8   happening was when I slept on the floor.  Other than that,

 9   like, that memory is kind of faded as I've tried to push a lot

10   of these memories away, so a lot of my memories kind of -- a

11   lot faded, but I do remember a lot.  I don't remember much

12   about that house specifically.

13   Q.  Why have you tried to push some of these memories out?

14   A.  I just want to move on with my life.  This shit's been

15   going on too long.  Sorry for my language.

16   Q.  How does it make you feel to talk about this today, K.W.?

17   A.  Same way I talked to you in Cedar.  Just I don't want to

18   -- I don't want to.

19   Q.  After you moved to the D 1/2 Road house, and Mr. McFadden

20   was also living on D 1/2, did anything like this happen there?

21   A.  Yes.  That's the -- that's the story about me waking up on

22   the bed was at the D 1/2 Road house.

23   Q.  Did Mr. McFadden ever touch you at the D 1/2 Road house?

24   A.  Yes, he did.

25   Q.  Where did you he touch you?

                         Sarah K. Mitchell, RPR, CRR

```
 1   A.  He would grope me in my joint areas and stuff like that.
 2   Again, I don't like talking about this.
 3   Q.  Did he touch your penis?
 4   A.  Yes.
 5   Q.  Did it happen during the daytime or the nighttime?
 6   A.  It always happened at night.
 7   Q.  It always happened at night?
 8   A.  Uh-huh.
 9   Q.  Do you remember about how many times it happened?
10   A.  No.  It happened frequently -- it didn't happen a lot, but
11   it happened often to where I could remember it.
12   Q.  When did it stop?
13   A.  It stopped after he was picked up in North Platte,
14   Nebraska, from the police there.
15   Q.  So it occurred basically until he was arrested?
16   A.  Yes.
17   Q.  How did it make you feel when Mr. McFadden touched you
18   like that?
19   A.  It made me feel small.  I don't know.  I started to hate
20   myself for a long time.  When I moved to Utah, I kind of
21   didn't know how to handle myself, so that's when I started
22   doing things I did in Utah because I didn't know how to handle
23   it.  After that I started seeking therapy.  Certain types of
24   therapy helped me deal with the trauma.  My -- because at the
25   time when I was younger, no one knew that I was autistic.  I'm
```

1   on the spectrum.  And in Utah I was sent to pretty much

2   juvenile prison, so the JJYS custody Secure Care systems, so

3   pretty much I was in a cell most of the day.  And then at that

4   time they hired a psychiatrist for me, and that's when they

5   found out I'm like a one and a half on the autism spectrum, so

6   I'm extremely high functioning, but I have slight motor

7   dysfunctions.

8   Q.  K.W., in addition to doing things that made you feel

9   uncomfortable at his house, did Mr. McFadden ever take you

10  anywhere in his semi-truck?

11  A.  Yes.  He would take a lot of -- like, he would take me,

12  J.W., and big L.Wr. a lot on trips.

13  Q.  Did he ever do anything on a semi-truck trip that made you

14  feel uncomfortable?

15  A.  Yes.

16  Q.  What happened?

17  A.  I remember one time very specific -- not specifically, but

18  he would start touching me, groping me and stuff like that.

19  That's mostly what happened on the semis is just a lot of

20  touching, but that's about it.  He still made me feel

21  uncomfortable.

22  Q.  K.W., was there a semi-truck trip that ended in Nebraska

23  in 2013?

24  A.  Yes.

25  Q.  Did Mr. McFadden do anything on that trip specifically

 1  that made you uncomfortable?

 2  A.  Yes.

 3  Q.  What did he do?

 4  A.  He tried to stick his thing in me.

 5  Q.  By stick his thing in you, did Mr. McFadden put his penis

 6  in your butt?

 7  A.  He tried to, yes.

 8  Q.  What do you mean he tried to?

 9  A.  It just wouldn't go in necessarily, so he just tried to,

10  and then after a while he just gave up.

11  Q.  Where were your pants at the time?

12  A.  He pulled my pants down, so they just fell on the floor.

13  And then after a while I just got up and picked it back up and

14  put them back on.

15  Q.  When you say he tried to put his penis in you, did he put

16  his penis into your butt?

17  A.  Yes.

18  Q.  How did that feel?

19  A.  It hurt, because I was little at the time.  It hurt a lot.

20  Again, I don't remember a lot.  Again, I've tried to suppress

21  most of these memories, just try to fade them out.

22  Q.  Did you feel pressure against your anus?

23  A.  Yes.

24  Q.  Is that what hurt?

25  A.  Yes.

19-cr-00243-CMA-GPG-1  Testimony of K.W.        11/09/2022    29

 1   Q.  Where did you leave from to go on that truck trip?

 2   A.  Montrose, Colorado, where I was living at the time.

 3   Q.  You left from Montrose, Colorado?

 4   A.  So not like -- so he picked us up in Montrose, Colorado.

 5   We went to get his truck in Junction.  That's where we left.

 6   Q.  When you say he picked you up, do you mean Mr. McFadden?

 7   A.  Mr. McFadden picked me up in Montrose.  He picked me

 8   myself up, S.W. Jr. and L.We.  At that time he came up for

 9   Christmas because he told my mom that he had no one to spend

10   Christmas with, so he came up there.  And then he asked my

11   parents and myself and S.W. Jr. if we wanted to go on a truck

12   trip.

13   Q.  And so he picked up you and your older brother S.W. Jr.?

14   A.  And then my younger brother.

15   Q.  And your younger brother L.We.; is that right?

16   A.  Yes.

17          MS. SURRATT:  And, Your Honor, may we please publish

18   Government's Exhibit 2-1?

19          THE COURT:  You may.

20   Q.  (By MS. SURRATT) K.W., do you recognize this truck?

21   A.  I do, indeed.

22   Q.  And what is it?

23   A.  That is a Kenworth semi.

24   Q.  And whose truck is that?

25   A.  That would have been Mike's at the time.

                    Sarah K. Mitchell, RPR, CRR

Case No. 1:19-cr-00243-CMA-GPG Document 193-5 filed 06/27/23 USDC Colorado pg 127 of 159

 1   Q.  Is that the truck in which you went on that final trip

 2   that you're talking about?

 3   A.  Yes.

 4   Q.  About how old were you on that final trip?

 5   A.  13, 12 or 13 at the time.

 6   Q.  Do you remember when the trip was, K.W.?

 7   A.  It was in December, Montrose, Colorado.  It was two years

 8   before we moved to Utah, so I think I was, yeah, 11 or 12, not

 9   12 or 13.

10   Q.  And where was your family living at the time?

11   A.  It was a small little trailer in the middle of Montrose,

12   Colorado.  I believe the address was 5636 Eider Road, I

13   believe.  I don't remember the exact house name, but it was on

14   Eider Road in Montrose, Colorado.

15   Q.  Do you recall how you got invited to go on this trip with

16   Mr. McFadden?

17   A.  He asked me if I wanted to go after I believe he asked my

18   parents.

19   Q.  You believe Mr. McFadden asked your parents?

20   A.  Yes, I believe he did.  I don't remember.  I was just a

21   little excited little kid to go on a truck trip.

22   Q.  Did you like going on truck trips as a little kid?

23   A.  I did.  Oh, I loved -- I still to this day love seeing the

24   country, and I was excited to go.  I believe it was from Idaho

25   to Florida, so I was excited to take that trip.

                        Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1  Testimony of K.W.            11/09/2022    31

1    Q.  You mentioned -- you just mentioned that the trip was

2    supposed to be from Idaho to Florida.  Do you remember where

3    you went when you left Colorado?

4    A.  After looking at maps a little bit more I do.  We went --

5    so we left, I believe, Junction, right around the Junction

6    area.  We went through Salt Lake to get to Idaho.  That's

7    where we loaded up -- we went through Utah to get to Idaho.

8    That's where we loaded up on potatoes, the company that loaded

9    potatoes.  Then from there we started to go towards the Coast,

10   and we stopped finally in Nebraska at a Love's truck stop.

11         MS. SURRATT:  Your Honor, the Government offers

12   Government's Exhibits 227 and 228 by stipulation.

13         THE COURT:  227 and 228 are stipulated.  They are

14   admitted.  You may publish.

15      (Government's Exhibits 227 and 228 received.)

16         MS. SURRATT:  Mr. Graber, can you publish 228 only.

17   Q.  (By MS. SURRATT) So, K.W., if I understood you correctly,

18   you left from western Colorado, correct?

19   A.  Yes.

20   Q.  And you said you went up through Utah and Salt Lake City?

21   A.  Yeah, we took I-70 -- so we took I-70, and then right at

22   that, like, kind of like where it makes a Y in the crossroad

23   in Utah from I-70 to I-15, that road from Provo to St. George,

24   that's I-15.  We took that exit and went up into Idaho.

25   Q.  So you went up into Idaho, and you said you picked up a

                     Sarah K. Mitchell, RPR, CRR

 1   load of potatoes; is that right?

 2   A.  Yes.  After talking, I think, with you guys yesterday, it

 3   kind of like brought -- sparked more knowledge of what the

 4   trip was about.

 5   Q.  And then you made your way east from Idaho eventually

 6   ending up in Nebraska; is that right?

 7   A.  Yes.

 8   Q.  Do you remember precisely where you stopped for the nights

 9   on this trip?

10   A.  I do not.

11   Q.  Did you stop for the nights?

12   A.  We stopped -- I think we stopped one night in Idaho and

13   then stopped again in Nebraska.

14   Q.  When you stopped in the night, where did you sleep?

15   A.  I slept right next to Mike.

16   Q.  And was this in the truck?

17   A.  This was in the sleeper of the truck, yes.

18          MS. SURRATT:  Your Honor, may we please publish

19   Government's Exhibit 2-6?

20          THE COURT:  You may.

21   Q.  (By MS. SURRATT) What is this?

22   A.  That is the back of the semi.

23   Q.  And is this the area in which -- in which you slept when

24   you spent the night in the semi?

25   A.  Yes.

                     Sarah K. Mitchell, RPR, CRR

Case No. 1:19-cr-00243-CMA-GPG Document 293-55 filed 06/27/23 USDC Colorado pg 130 of 159

1              MS. SURRATT:  Your Honor, may we also publish 2-7?

2              THE COURT:  You may.

3   Q.  (By MS. SURRATT) Is this another view of the sleeper

4   compartment?

5   A.  It is.

6   Q.  And you said that you slept in the sleeper compartment,

7   correct?

8   A.  Yeah, on that bed right there.

9   Q.  On that bed?

10  A.  Yeah.

11  Q.  Who slept in that bed with you?

12  A.  So on this trip specifically it was myself, my little

13  brother L.We., and Mike.  And then up front laid across the

14  seats was my older brother S.W. Jr.

15  Q.  Let me unpack that a little bit.  So in that bed was you

16  and Mr. McFadden and your little brother L.We., correct?

17  A.  Yes.

18  Q.  And then did you also say your older brother S.W. Jr.

19  would sleep across the front seats?

20  A.  Like, he would kind of like lay his head on the passenger

21  -- like his head on the passenger window and have his legs

22  across the seat.

23  Q.  Can you explain the sleeping arrangements between you,

24  your little brother L.We., and Mr. McFadden on that mattress?

25  A.  So Mike would sleep against the wall on that back

                        Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1   Testimony of K.W.          11/09/2022    34

 1   cushioned wall.  I would sleep right in front by the seats,
 2   and L.We. would lay sideways at the very back by our feet.
 3   Q.  So you would sleep right next to Mr. McFadden on that
 4   mattress?
 5   A.  Yes.
 6         MS. SURRATT:  May we please publish, Your Honor,
 7   Government's Exhibit 2-9?
 8         THE COURT:  You may.
 9   Q.  (By MS. SURRATT) Are these the front seats you described
10   that your older brother sort of laid himself across?
11   A.  Yes.
12         MS. SURRATT:  You may take that down, Mr. Graber.
13   Q.  (By MS. SURRATT) K.W., was it on that mattress where
14   Mr. McFadden put his penis right up to your anus as you
15   described earlier?
16   A.  Yes.
17   Q.  K.W., did you ever see Mr. McFadden do anything to anyone
18   else that made you uncomfortable?
19   A.  I did not, no.
20   Q.  What do you remember from the night that Mr. McFadden was
21   arrested in Nebraska?
22   A.  All I remember that night was not a lot necessarily.  I
23   just remember police knocking on the door, him being put into
24   handcuffs, and if it wasn't for my older brother S.W. Jr., we
25   would have been taken somewhere -- me and my little brother

                    Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1   Testimony of K.W.          11/09/2022   35

 1   would have been taken somewhere because there wouldn't have

 2   been an adult.  Because S.W. Jr. was there, we were allowed to

 3   stay with S.W. Jr. in the truck.

 4   Q.  How old was S.W. Jr. during that trip?

 5   A.  18 years old.

 6   Q.  And so because S.W. Jr. was 18, you were allowed to stay

 7   in the truck?

 8   A.  With S.W. Jr., yeah.

 9   Q.  Even after Mr. McFadden was arrested?

10   A.  Uh-huh.

11   Q.  How did you get home to Colorado from Nebraska?

12   A.  So how everything happened, the load of potatoes still

13   needed to be, like, shipped out to Idaho -- or to Florida, not

14   Idaho.  So my mom, Ray Fluke, which finished the drive -- I

15   believe at the time he was driving as well, and I don't

16   remember if it was Ray or someone else, but someone along that

17   lines.  But then someone who used to live with us by the name

18   of Mike Eggers.

19   Q.  So let me unpack that a little bit, K.W.  So somebody, you

20   think maybe Ray Fluke, had --

21   A.  I believe Ray finished the drive.  I believe that's the

22   case.  Don't quote me on that part, but I believe that's who

23   finished the trip, the truck order.  Someone picked up the

24   semi from North Platte.

25   Q.  Someone had to take the semi where it was going with the

                    Sarah K. Mitchell, RPR, CRR

 1  load of potatoes?

 2  A.  Someone picked it up.  I don't remember who exactly it

 3  was.  I believe it was Ray.  I don't remember exactly.

 4  Q.  Okay.

 5  A.  And then Mike Eggers and Stacy W., my mom, and then

 6  someone I looked up to as my grandpa came and got me and L.We.

 7  and S.W. Jr.

 8  Q.  So your mom and a man named Mike Eggers came and got you

 9  and your brothers and brought me home to Colorado?

10  A.  Yes.

11  Q.  K.W., when that police officer came to arrest Mr. McFadden

12  in Nebraska, did you tell him what Mr. McFadden had been doing

13  to you?

14  A.  I don't remember.

15  Q.  As far as you do remember, what was the first time you

16  told anyone about what Mr. McFadden had been doing to you?

17  A.  It was a detective at the Dolphin House, I believe.

18  Q.  Why didn't you tell your mom or dad?

19  A.  I don't know.  I honestly don't.

20  Q.  Why didn't you tell anybody for all those years while it

21  was happening?

22  A.  I didn't know how to -- I was young.  At the time every

23  doctor I went to just -- therapist I went to at the time just

24  diagnosed me with everything, so I wasn't a fully, like,

25  functional child.  I wasn't perfect.  So I don't remember -- I

                    Sarah K. Mitchell, RPR, CRR

Case No. 1:19-cr-00243-CMA-GPG Document 193-55 filed 06/27/23 USDC Colorado pg 134 of 159

1    honestly don't know why I didn't say anything.

2    Q.  Even back then how did talking about this make you feel?

3    A.  It still makes me feel the same way.  It just makes me

4    feel small.

5         MS. SURRATT:  One moment, please, Your Honor.

6    Q.  (By MS. SURRATT) So a few clarifying questions, K.W.  You

7    mentioned someone named John Foxx.  Who is that?

8    A.  Used to be a really good family friend.  My dad still

9    talks to him to this day a little bit here and there.  I don't

10   remember much about him.  I don't remember much about -- oh,

11   John Foxx.  Sorry.  I was thinking of someone else.  John

12   Foxx, he was my -- everyone called him Papa John.

13   Q.  Okay.

14   A.  He was a great, great family friend.  I was thinking -- I

15   forget his name -- S.H.'s dad, I thought you were talking

16   about him.  John Foxx.  So he was a great family friend.  He

17   actually passed away in our home in Cedar.  Everyone loved

18   him.  He was a great guy.  Just he was a great all-around

19   person.

20   Q.  Where did he live during the events we've been talking

21   about?

22   A.  He lived at D 1/2, I believe.

23   Q.  With Mr. McFadden?

24   A.  Yes.

25   Q.  Where did he sleep at the home on D 1/2 Road?

                    Sarah K. Mitchell, RPR, CRR

 1   A.  I don't remember.

 2          MS. SURRATT:  Your Honor, I have no further

 3   questions, but at this time I would move to admit Government's

 4   Exhibit 6 pursuant to Federal Rule of Evidence 807.

 5          THE COURT:  Put on the earphones, please.

 6      (Bench conference on the record and out of the

 7       hearing of the jury:)

 8          THE COURT:  Can you hear me?

 9          MS. SURRATT:  I can hear you, Your Honor.

10          THE COURT:  Can you hear me?  All right.  In light of

11   the fact that the witness testified that he did remember the

12   truck assault, what is the purpose of the video?

13          MS. SURRATT:  Your Honor, the video, nevertheless,

14   remains the most probative evidence on that point.  As the

15   Court saw, K.W., while he did discuss the events in question,

16   did so reluctantly and often after my prompting and after I

17   used the words that he seemingly cannot.  And so I think the

18   video that was taken shortly after his disclosure of the

19   events in question is both relevant because it is closer in

20   time to the events in question, it's probative as to this

21   exact point, and it is the most probative given his extreme

22   reluctance to discuss the events today in court.

23          THE COURT:  All right.  Mr. LaBranche, what's your

24   response?  I'm sorry.  Mr. McDermott.

25          MR. MCDERMOTT:  Your Honor, the witness has testified

                    Sarah K. Mitchell, RPR, CRR

Case No. 1:19-cr-00243-CMA-GPG Document 293-55 filed 06/27/23 USDC Colorado pg 136 of 159

1  he was able to recall the events.  I don't see the purpose of
2  admitting the video.
3          THE COURT:  All right.  Are you going to attempt to
4  impeach him with statements from that video?
5          MR. MCDERMOTT:  Not that video.  I will be impeaching
6  with other statements that he made.
7          THE COURT:  Let me have a moment.
8          MS. SURRATT:  Your Honor, I have one more thing to
9  add, if I may.
10          THE COURT:  All right.
11          MS. SURRATT:  Your Honor, I would also like to add
12  that as the Court noted today on the witness stand, K.W. was
13  pretty equivocal about penetration.  In the video,
14  Government's Exhibit 6, he was not equivocal about the
15  penetration that occurred.  It's clear that today on the stand
16  that was the particular assault that gave him the most
17  difficulties in terms of describing to the jury.  Although on
18  the video he is also clearly uncomfortable, he was unequivocal
19  about what happened to him.
20          THE COURT:  All right.  Federal Rule of Evidence 807
21  provides that a statement that would otherwise be prohibited
22  as hearsay may nevertheless be admitted if, one, the statement
23  is supported by sufficient guarantees of trustworthiness,
24  after considering the totality of the circumstances under
25  which it was made and evidence, if any, corroborating the

1   statement; and, second, it is more probative on the point for

2   which it is offered than any other evidence that the proponent

3   can obtain through reasonable efforts.

4        In this case, the defendant -- I'm sorry -- the

5   victim did respond, but he was reluctant.  It was apparent

6   that he only answered with prompting and he was equivocal

7   about the penetration, which he was not in the video.

8   Therefore, the Court finds that the video evidence is more

9   probative on the point for which it is offered than any other

10  evidence that the Government can obtain through reasonable

11  efforts.

12       At the hearing the Court previously heard -- at the

13  previous hearing the Court heard testimony from Detective

14  Prescott regarding the circumstances of the forensic interview

15  with the witness at the Dolphin House on January 16, 2013.

16  Detective Prescott went through his experience, his training

17  on forensic interview techniques.  It is from the video he

18  attempted to determine that the witness did know the

19  difference between a truth and a lie.  The Court finds that

20  his previous testimony weighs in favor of a finding of

21  trustworthiness.

22       The Court has also carefully reviewed the video in

23  light of relevant facts made under the -- and the statement

24  under Rule 807 and *Idaho vs. Wright*, 497 U.S. 805, a 1990

25  case.  The Court finds that K.W.'s statement is supported by

Sarah K. Mitchell, RPR, CRR

 1  sufficient indicia of reliability such as to be admissible

 2  with respect to the first prong of the Rule 807 inquiry.

 3  Regarding the second prong of the 807 inquiry, the Court finds

 4  that the statement is more probative on the point for which it

 5  is offered than the evidence that the Government was able to

 6  elicit from the witness live on the stand which they attempted

 7  to do so with reasonable effort.

 8          For these reasons the Court finds that this case

 9  presents extraordinary circumstances and the Court is

10  satisfied that the evidence offers guarantees of

11  trustworthiness and is material, probative, and necessary in

12  the interest of justice pursuant to *United States vs. Tome*,

13  T-o-m-e, 61 F.3d 1446, a Tenth Circuit 1995 case.  Therefore,

14  the Court will admit the video.

15          Does the defense wish to make any statements for

16  purposes of appeal?

17          MR. MCDERMOTT:  Yes, Your Honor.  I believe I gave

18  the reasons for my objection.  I am now saying we do object.

19  I would note that the witness is available.  He was able to

20  testify to the events.  The fact that some time has gone by

21  and he may not testify with as much clarity as what occurred

22  with the video I don't think is sufficient for admission.  I

23  would also note that at the hearing there was some testimony

24  elicited about statements that I believe Detective Prescott

25  had made to the parents that I think do impact the reliability

19-cr-00243-CMA-GPG-1  Testimony of K.W.       11/09/2022    42

1  of the statement that he testified to today and the video

2  itself.

3         THE COURT:  Does the Government wish to put anything

4  on the record?

5         MS. SURRATT:  Yes, Your Honor.  Obviously K.W.'s on

6  the stand and can be cross-examined about all these issues.

7  Stacy W., his mother, is expected to testify next and can also

8  be cross-examined as to these issues.  The Government expects

9  that both of them would be cross-examined as to those and

10  other topics whether or not Government's Exhibit 6 is played

11  at this trial.

12         THE COURT:  All right.  I'm going to allow the video.

13  Does the defense have an explanatory instruction to the jury?

14  Or the Government, do you have one that you wish me to give at

15  this time?

16         MS. SURRATT:  Your Honor, although we haven't crafted

17  a particular instruction, given that the proposed Instruction

18  No. 9 that the jury will hear at the conclusion of this trial

19  instructs them that prior statements of witnesses will

20  otherwise be introduced for impeachment purposes and they

21  can't consider them for the truth, I would ask that they be

22  instructed that they can, in fact, consider this video for the

23  truth of the matter.

24         And, Your Honor, one more thing.  We are going to ask

25  that Government's Exhibit 6-1 be passed out to the jury as an

Sarah K. Mitchell, RPR, CRR

1    aid.  There are portions of the video that are somewhat

2    difficult to hear.  6-1 is a transcript to which authenticity

3    has been stipulated.  We do not intend to introduce it as an

4    exhibit, only as an aid to the jury as they're watching the

5    video.

6           THE COURT:  All right.  And how long is this?  I

7    think we should take a break at this point.

8           MS. SURRATT:  Your Honor, it's 33 minutes long.

9           THE COURT:  All right.  I think we're going to go

10   ahead and take a break.  I'll give you time to craft the

11   instruction you want me to give and clear it with the

12   defendant, and then we will reconvene at about 10:30.

13       (The following proceedings were held in open

14       court:)

15          THE COURT:  Ladies and gentlemen, we're going to take

16   a mid-morning break at this time.  We will be in recess until

17   approximately 10:30.  Remember, you're not to discuss the case

18   among yourselves or with anyone else.  You're not to conduct

19   any research.  Court will be in recess until approximately

20   10:30.

21          THE COURTROOM DEPUTY:  All rise.

22       (Jury left the courtroom at 10:18 a.m.)

23       (Break was taken from 10:18 a.m. to 10:32 a.m.)

24

25

                    Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1   Testimony of K.W.        11/09/2022    44

1           THE COURT:  Counsel, would you please put on the

2    headsets.

3        (Bench conference on the record and out of the

4        hearing of the jury:)

5           THE COURT:  Counsel, I have an instruction, but I

6    understand it has not been stipulated; is that correct?

7           MR. MCDERMOTT:  It's not stipulated, Your Honor.

8    That's correct.

9           THE COURT:  Mr. McDermott, do you wish to make your

10   record or objection to this?

11          MR. MCDERMOTT:  Yes, Your Honor.  Just we continue

12   our objection about the admission of this under 807, and we're

13   not going to offer our own instruction.

14          THE COURT:  All right.  And you don't -- you're just

15   blanket objecting?

16          MR. MCDERMOTT:  Blanket objection.

17          THE COURT:  Not necessarily to the instruction, but

18   to admission of the recording under 807.

19          MR. MCDERMOTT:  Correct, Your Honor.

20          THE COURT:  Very good.  I think that the instruction

21   as tendered is appropriate.  However, I do not believe that

22   the video itself should be admitted into evidence.  I think it

23   should be treated the same way that you treat a deposition.

24   So they will hear it.  They will see the transcript, but it

25   will not go back as an exhibit.

                     Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1  Testimony of K.W.        11/09/2022   45

1             MS. SURRATT:  Yes, Your Honor.

2             THE COURT:  All right.  Then are we ready to bring

3     the jury back?

4             MS. SURRATT:  Yes, Your Honor.

5          (The following proceedings were held in open

6          court:)

7             MR. LABRANCHE:  Your Honor, also for clarification,

8     is the transcript going to be allowed to be admitted in

9     evidence?

10            THE COURT:  No.  Neither of them will be admitted

11    into evidence.

12            MS. SURRATT:  So, Your Honor, I believe the last

13    question I asked before we broke was -- I offered Government's

14    Exhibit 6.

15            THE COURT:  Okay.  So I will -- essentially on that

16    offer I am admitting Exhibit 6 for purposes of showing it to

17    the jury.  It will not, however, come into evidence to go back

18    to the jury.  6-1 will be allowed, which is the transcript,

19    but it also will be more demonstrative, so it will not be

20    allowed to go back with the jury.

21            MS. SURRATT:  I'd like to put on the record, Your

22    Honor, prior to trial in this matter we asked defense counsel

23    if they wanted any redactions to the video, and they told us

24    the video was fine as is.  We agree.  But I just wanted that

25    to be on the record.

                    Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1  Testimony of K.W.        11/09/2022    46

         1              THE COURT:  All right.

         2              MR. MCDERMOTT:  Your Honor, just to clarify

    Ms. Surratt's final record, I believe based on the Court's 404

         3    ruling at our hearing, that based on that there's nothing

         4    objectionable in the video.  I'll just leave it at that.

         5

         6              THE COURT:  All right.

         7              MR. MCDERMOTT:  Okay.

         8              THE COURT:  Ms. Myhaver, please bring in the jury.

         9              THE COURTROOM DEPUTY:  All rise.

        10        (Jury entered the courtroom at 10:35 a.m.)

        11              THE COURT:  You may be seated.  Ladies and gentlemen,

        12    you are going to see a video of K.W. when he was interviewed

        13    on January 16, 2013.  You may consider this video and the

        14    statements made by K.W. for any relevant purpose.  It is for

        15    you to decide what weight, if any, to give to these

        16    statements.  You are also given a transcript of this

        17    recording.  Keep in mind that the transcript is not evidence.

        18    It is given to you only as a guide to help you follow what is

        19    being said.  The recording itself is the evidence.  If you

        20    notice any differences between what you heard on the recording

        21    and what you read in the transcript, you must rely on what you

        22    heard, not what you read.  If you cannot hear or understand

        23    certain parts of the recording, then you must ignore the

        24    transcript as far as those parts are concerned.

        25              All right.  The Government may show Exhibit 6.

                         Sarah K. Mitchell, RPR, CRR

 1             MS. SURRATT:  Thank you, Your Honor.

 2             Mr. Graber, can you please play Government's

 3    Exhibit 6.

 4        (Video played.)

 5             THE COURT:  Ms. Myhaver, will you please collect the

 6    transcripts.  If you can all pass them down.

 7             Ms. Surratt.

 8             MS. SURRATT:  Your Honor, may I ask the witness if he

 9    needs a short break?

10             THE WITNESS:  I'm all right.

11             THE COURT:  Do you have anything further,

12    Ms. Surratt?

13             MS. SURRATT:  No, Your Honor.

14             THE COURT:  Cross-examination.

15                         CROSS-EXAMINATION

16    BY MR. MCDERMOTT:

17    Q.  Good morning, K.W.

18    A.  Morning, sir.

19    Q.  The video we just watched, that was taken approximately

20    three weeks after you returned from Nebraska, right?

21    A.  I honestly don't remember, sir.

22    Q.  Okay.  Well, you were picked up in Nebraska on

23    January 2nd, 2013; is that right?

24    A.  Sounds -- I'm not going to answer.  I don't know.  I don't

25    know exactly when we were picked up.  I know it was somewhere

                       Sarah K. Mitchell, RPR, CRR

Case No. 1:19-cr-00243-CMA-GPG Document 293-55 filed 06/27/23 USDC Colorado pg 145 of 159

 1  around that time period.

 2  Q.  Somewhere around that time, okay.  And it was your mother

 3  who picked you up; is that correct?

 4  A.  My mom and Mike Eggers, yes.

 5  Q.  Okay.  And you had a relatively long drive back to

 6  Colorado; is that right?  Eight hours or so?

 7  A.  About, yeah.

 8  Q.  Okay.  And you talked to your mom on the way back from

 9  Colorado, right?

10  A.  I don't remember.

11  Q.  Okay.  Your mom on the ride back asked you if Mr. McFadden

12  had touched you or done anything sexually inappropriate; is

13  that right?

14  A.  She might have asked something like that, yeah.

15  Q.  K.W., when you say she might have asked you something like

16  that, are you telling me that you don't remember whether she

17  asked that?

18  A.  I don't necessarily remember that car trip home.  I had

19  little to no sleep that night.  I stayed up pretty much all

20  that entire ride, and I fell asleep almost as soon as I laid

21  in my bed at home.

22  Q.  Well, you have testified about that car road trip before;

23  is that right?

24  A.  Yes.

25  Q.  Okay.  And that was back on -- it's been a while, but that

19-cr-00243-CMA-GPG-1  Testimony of K.W.          11/09/2022    49

1   was on January 13, 2015; is that right?

2   A.  I believe so.

3   Q.  Okay.  And you should have a notebook up there that says

4   defendant's exhibits.

5           MR. MCDERMOTT:  Can we please get the one that has

6   Defendant's Exhibit E?

7   Q.  (By MR. MCDERMOTT) And, K.W., can you please open that

8   notebook, and can you open what is Exhibit E.  And could you

9   please turn to page 35 of that exhibit, and can you look at

10  lines 1 through 10.  And you were asked if Mike -- you were

11  asked whether your mother asked you whether Mike did anything

12  to you, and you told her that Mike had not done anything to

13  you; is that correct?

14  A.  Not necessarily -- that's not necessarily true.  At the

15  time of 14 years old, I was -- I just got out of a detention

16  facility in Utah.  I wasn't in the right mindset, because if

17  you look at all the other questions, I said yes to those as

18  well.  This one might have actually been a typo because I do

19  remember saying no to this.

20  Q.  Okay.  K.W. --

21  A.  Yes, sir.

22  Q.  -- I understand that back in 2015 you were a juvenile.

23  A.  Yeah, I was a juvenile, yes.

24  Q.  Yes.  But you were in court when you said these -- when

25  you testified, correct?

                    Sarah K. Mitchell, RPR, CRR

Case No. 1:19-cr-00243-CMA-GPG Document 198-5 filed 06/27/23 USDC Colorado pg 147 of 159

1    A.  Yes.

2    Q.  And you took an oath just like you took an oath today?

3    A.  Yes, sir.

4    Q.  And you swore to tell the truth?

5    A.  Yeah, I'm telling the truth now.  I don't remember this

6    question actually.

7    Q.  Okay.  Well, I'm doing to ask you then can you please turn

8    to page 34, the page before, and you were asked -- and I'm

9    going to begin on line 11 -- you were asked, And you drove

10   back with your mom Stacy --

11           MS. SURRATT:  Your Honor, objection.

12           THE COURT:  What's the objection?

13           MS. SURRATT:  To the extent he's trying to impeach

14   with prior inconsistent statements, it's not clear to me what

15   the statement now is that would be inconsistent with what's in

16   this exhibit.

17           THE COURT:  Overruled.  You may proceed.

18   Q.  (By MR. MCDERMOTT) And beginning on line 11 the question

19   is, And you drove back with your mom Stacy?  And your answer

20   on that day was, Yes.  Correct?

21   A.  Yes, sir.

22   Q.  And the next question is, On the way back from the trip,

23   your mom told you about what people were saying Mike did,

24   right?  And you said, Yes.  Correct?

25   A.  Yes, sir .

                        Sarah K. Mitchell, RPR, CRR

Case No. 1:19-cr-00243-CMA-GPG Document 293-5 filed 06/27/23 USDC Colorado pg 148 of 159

1   Q.  And it says, She told you what the allegations were in

2   this case, correct?  And you answered, Yes.

3   A.  Yes.

4   Q.  And it says, And she started asking you questions about

5   it, right?  And you said, Yes.  Is that correct?

6   A.  Yes, sir.

7   Q.  And she started asking questions about whether or not Mike

8   ever did anything to you, right?

9   A.  Yes, sir.

10  Q.  And your answer was, Yes, or yeah.

11  A.  Yes, sir.

12  Q.  And then he asked you, And she asked you a bunch of

13  questions about that?  And your answer was, Yes.  Correct?

14  A.  Yes, sir.

15  Q.  And then the question was, And, in fact, you told her that

16  Mike had not done anything to you, correct?  And your answer

17  was, Yes.  Correct?

18  A.  I may have said yes.

19  Q.  Then the next question is, You never told her that Mike

20  ever stuck anything in your butt, correct?

21  A.  Yeah.

22  Q.  Your answer was, Yes.  And the next question is, And you

23  never told her that he ever touched you before, correct?  And

24  your answer was, Yes.

25  A.  Yes, sir.

Sarah K. Mitchell, RPR, CRR

 1   Q.  Now, K.W., my understanding is that you have said and you

 2   testified on this day that the first time you ever said that

 3   Mike touched you was on January 16th in that interview that we

 4   just watched; is that correct?

 5   A.  Yes, sir.

 6   Q.  Your mom has indicated to Detective Prescott that you --

 7          MS. SURRATT:  Objection.

 8          THE COURT:  Sustained.

 9   Q.  (By MR. MCDERMOTT) Let me ask this.  Did you say anything

10   to a therapist the day before you spoke with Detective

11   Prescott?

12   A.  I don't remember.

13   Q.  You don't remember.

14   A.  I do not remember.

15   Q.  Okay.  K.W., in addition to that interview, you gave a --

16   still been a few years, but a more recent interview, and you

17   spoke with Investigator Zappe and an FBI agent named Amy

18   Howard on May 22nd, 2018; is that right?

19   A.  I believe so, yes, sir.

20   Q.  Okay.  And in that interview you were asked about this

21   incident with Mike in the truck?

22   A.  Yes, sir.

23   Q.  And at that time you told them that you did not remember

24   the incident, to be honest?

25   A.  I did say that, but the reason why I said that is I don't

                    Sarah K. Mitchell, RPR, CRR

Case No. 1:19-cr-00243-CMA-GPG Document 293-55 filed 06/27/23 USDC Colorado pg 150 of 159
Case 1:19-cr-00243-CMA-GPG-1 Document 193-55 Filed 06/27/23 USDC Page 5 of 62   pg 150 of 159

 1   like talking about this, and I'll find every loophole I can

 2   possibly find not to talk about things like this.

 3   Q.  You told them that it was a combination of it being a long

 4   time ago and that it was something you didn't want to talk

 5   about; is that right?

 6   A.  Correct.  Correct, sorry.

 7   Q.  Now, in that particular interview, you did remember things

 8   about this trip; is that correct?

 9   A.  Yes, sir.

10   Q.  You remember details such as Mike going to Grand Junction

11   to pick up his truck?

12   A.  Yes, sir.

13   Q.  You remembered going to Idaho to pick up potatoes?

14   A.  Yes, sir.

15   Q.  You remembered going to -- going to the Love's stop where

16   he was arrested?

17   A.  Yes, sir.

18   Q.  You remembered going to a weigh station because Mike's

19   truck was overweight; is that right?

20   A.  No.  He was trying to avoid it because he was overweight.

21   Q.  So you believe you remember him avoiding the weigh station

22   because he was overweight?

23   A.  Yes.  We never stopped at a weigh station.

24   Q.  You remember your mom calling your brother S.W. Jr., and

25   he was one of the people who was with you, right?

```
 1   A.  Yes, sir.

 2   Q.  And you remember S.W. Jr. getting off the phone and, in

 3   your words, looking pissed off?

 4   A.  Yes, sir.

 5   Q.  You remember that his face had gone from looking happy to

 6   being pissed off?

 7   A.  Yes, sir.

 8   Q.  Now, as of this May 22nd, 2018, interview, you were still

 9   friends with J.W.; is that right?

10   A.  I had stopped talking to J.W. after this incident.  I

11   haven't had contact with J.W. for a while.

12   Q.  Well, as of May 22nd, 2018, were you still friends with

13   J.W.?

14   A.  We contacted each other via Facebook every so often, so

15   more of acquaintances at the time.

16   Q.  Well, on May 22nd, 2018, you were asked when the last time

17   you talked to him was, and your answer was, Before I came in

18   here.  Is that right?

19   A.  I don't remember that.

20   Q.  I want to talk about some of the other trips that you say

21   you went on with Mr. McFadden, okay?

22   A.  Yes, sir.

23   Q.  J.W. would go on the trips with you; is that right?

24   A.  He went on a couple.  J.W. went more often than most.

25   Q.  L.Wr. would go, wouldn't he?
```

                    Sarah K. Mitchell, RPR, CRR

 1   A.  Yes, sir.

 2   Q.  D.R. would go?

 3   A.  Yes, sir.

 4   Q.  S.H. would go?

 5   A.  Don't remember, sir.

 6   Q.  Pardon me?

 7   A.  I don't remember.

 8   Q.  In this interview with Ms. Howard on May 22nd, 2018, did

 9   you tell her that S.H. would go?

10   A.  I may have.

11   Q.  Your older brother would go, correct?

12   A.  S.W. Jr. went once.  That was the Idaho one.

13   Q.  Just this one that we're here in court about today?

14   A.  Yes, sir.

15   Q.  And you told Ms. Howard that when you went on the trips

16   you would make sure that J.W. went; is that right?

17   A.  Every so often I would see if he could go, yeah.

18   Q.  And you told her you didn't want to go on the trips unless

19   J.W. went because you would be bored out of your mind if it

20   was just you and Mike because Mike didn't talk much; is that

21   right?

22   A.  Yes, sir.  I would always like the extra company of

23   another kid.  I was a kid.  I liked the company of other kids.

24        MR. MCDERMOTT:  May we please display United States

25   Exhibit 206?

                    Sarah K. Mitchell, RPR, CRR

Case No. 1:19-cr-00243-CMA-GPG Document 193-5 filed 06/27/23 USDC Colorado pg 153 of 159

         1          THE COURT:  206 is a recording.  It's not been

         2    admitted.

         3          MR. MCDERMOTT:  I apologize, Your Honor.

         4          THE COURT:  You mean 2-6?

         5          MR. MCDERMOTT:  Yeah, that's what I meant.

         6          THE COURT:  Yes, you may.

         7    Q.  (By MR. MCDERMOTT) K.W., this is the cab of the truck from

         8    this trip, correct?

         9    A.  Yes, sir.

        10    Q.  And in the video that we just watched, you said that your

        11    head was close to the cab, correct?

        12    A.  Close to the driver, yes, sir.

        13    Q.  And your brother S.W. Jr. was seated in the front --

        14    A.  Yes, sir.

        15    Q.  -- correct?  And your brother S.W. Jr. at the time was 19?

        16    A.  18, sir.

        17    Q.  18 at the time?

        18    A.  Yes, sir.

        19    Q.  Okay.  And this is the same S.W. Jr. that when he got off

        20    the phone with your mom he looked, in your words, pissed off,

        21    right?

        22    A.  Yes, sir.

        23    Q.  And S.W. Jr. is within approximately three to five feet of

        24    where you were sleeping, correct?

        25    A.  Yes, sir.

                        Sarah K. Mitchell, RPR, CRR

1           MR. MCDERMOTT:  Your Honor, at this time I don't have

2    any more questions, but I would move for the admission of

3    Defendant's Exhibit F, which is the recording of the interview

4    that we just talked about.

5           THE COURT:  Let's put on the headphones, please.

6       (Bench conference on the record and out of the

7       hearing of the jury:)

8           THE COURT:  Mr. McDermott, what is the purpose of the

9    recording?  Can you hear me?  Can you hear me?

10          MR. MCDERMOTT:  I can now, Your Honor.

11          THE COURT:  All right.  What is the purpose of the

12   recording?

13          MR. MCDERMOTT:  Your Honor, the -- can you hear me?

14          THE COURT:  Yeah.

15          MR. MCDERMOTT:  Okay.  The 807 motion was filed

16   because in that recording he says he couldn't remember the

17   events of this trip that had to do with Mr. McFadden touching

18   him.  That video has been admitted.  In fairness, I believe

19   that the recording that gave rise to the video should be

20   admitted.

21          THE COURT:  Response?

22          MS. SURRATT:  Your Honor, to respond to what

23   Mr. McDermott just said, the recording is not the reason that

24   Government's Exhibit 6 was admitted.  We articulated on the

25   record the reasons we asked for the recording to be admitted,

                    Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1  Testimony of K.W.          11/09/2022    58

 1   and we did not rely on the recording in the defense exhibit.

 2   In addition, fairness is not a rule of evidence.  To the

 3   extent Mr. McDermott is relying on Rule 807, there's a reason

 4   we litigated that ahead of time.  It requires notice, and it

 5   also requires that the statement is supported by sufficient

 6   guarantees of trustworthiness and is probative on point.  What

 7   it appears that Mr. McFadden (sic) wants to do is impeach the

 8   witness based on that transcript, which he has already done

 9   and can continue to do if he feels he hasn't done it

10   adequately, but there's no basis to introduce into evidence

11   this recording.

12          THE COURT:  All right.  Mr. McDermott, if you had

13   wanted to have this in evidence, you needed to give prior

14   notice.  You have used it to impeach, and I see no basis for

15   it to come in under 807.  Therefore, I'm going to deny your

16   request.

17          MR. MCDERMOTT:  My position is that the witness was

18   unable to remember.  The witness therefore was unavailable.  I

19   did not plan on asking for the admission of this.  When I read

20   the trial prep materials, I, frankly, assumed that the video

21   was not going to be admitted into evidence since the witness

22   was going to be able to testify.  That is the reason that

23   there was no other pretrial mention of it.  And although I

24   wouldn't usually ask for the admission of something like this,

25   I believe under the circumstances it's proper.

                      Sarah K. Mitchell, RPR, CRR

Case No. 1:19-cr-00243-CMA-GPG Document 193-55 filed 06/27/23 USDC Colorado pg 156 of 159

1              THE COURT:  But you did not follow the steps that

2    needed to be followed in order to have an 807.  I would need

3    to have more of a background on the circumstances that this

4    statement was given, that there were sufficient guarantees of

5    trustworthiness, and that you gave the appropriate notice.

6    You made your record.  I'm not going to enter it.

7         (The following proceedings were held in open

8         court:)

9              THE COURT:  The request is denied.

10             Ms. Surratt, do you have any further cross?  I mean

11   redirect?

12             MS. SURRATT:  Very brief, Your Honor.

13             THE COURT:  You may proceed.

14                       REDIRECT EXAMINATION

15   BY MS. SURRATT:

16   Q.  K.W., I'd just like to clear up a few things you were

17   asked on cross-examination.  I'd like to talk first about the

18   trip home from Nebraska when your mom and Mike Eggers came out

19   to get you and your brothers, if that's okay.

20   A.  Yeah, that's fine.

21   Q.  You were asked on cross-examination what you remember

22   telling your mom on that trip home.  Do you remember telling

23   your mom anything about what Mr. McFadden had done to you?

24   A.  I -- as he -- as the defense lawyer brought it up, I do

25   remember my mom asking questions, but at the time I didn't

                     Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1   Testimony of K.W.        11/09/2022    60

1   want to talk about anything.  I didn't want to talk about it,

2   so I just told her no to pretty much her questions at the

3   time.

4   Q.  Okay.  And in response to one of my questions you recalled

5   that the first time that you told anyone was when you talked

6   to Detective Ed Prescott on the video we just watched.  Do you

7   remember that?

8   A.  Yes.

9   Q.  Is that still what you remember?

10  A.  That is still what I remember, yes.  I don't remember my

11  middle school therapist that I said I talked to in the video.

12  That actually caught me off guard.

13  Q.  So just sitting here today, you don't remember talking to

14  a counselor?

15  A.  I do not, no.

16  Q.  K.W., you were also asked some questions about an

17  interview that you gave in 2018 to Special Agent Zappe and

18  another woman named Amy Howard.  Do you remember that?

19  A.  I remember Zappe.  I don't remember the other girl.

20  Q.  Where were you for that interview in 2018?

21  A.  I believe I was in Secure at the time.

22  Q.  And what is that?

23  A.  That was the juvenile Secure system I was at.

24  Q.  So that's when you were serving time for your juvenile

25  adjudications; is that right?

                    Sarah K. Mitchell, RPR, CRR

19-cr-00243-CMA-GPG-1  Testimony of K.W.     11/09/2022    61

1   A.  Yes.

2   Q.  Was in custody at a juvenile detention facility a good

3   place for you to talk about being sexually assaulted?

4   A.  No, it was not.

5   Q.  K.W., while we played the video just now, I noticed you

6   had your head down on the table for the most part.  How did

7   hearing and seeing this video feel for you today?

8   A.  I didn't want to see it personally.  I don't want to hear

9   it.  So I just try to drown my head out, so just started

10  thinking about other things.

11          MS. SURRATT:  No further questions, Your Honor.

12          THE COURT:  All right.  Thank you very much, sir.

13  You may step down.

14          THE WITNESS:  Thank you.

15          (This portion of proceedings concluded at 11:35 a.m.)

16

17

18

19

20

21

22

23

24

25

                    Sarah K. Mitchell, RPR, CRR

1                          REPORTER'S CERTIFICATE

2

3           I, SARAH K. MITCHELL, Official Court Reporter for the

4    United States District Court for the District of Colorado, a

5    Registered Professional Reporter and Certified Realtime

6    Reporter, do hereby certify that I reported by machine

7    shorthand the proceedings contained herein at the time and

8    place aforementioned and that the foregoing pages constitute a

9    full, true and correct transcript.

10           Dated this 29th day of November, 2022.

11

12

13

14                _____ /s/ Sarah K. Mitchell _____

15                       SARAH K. MITCHELL
                         Official Court Reporter
16                  Registered Professional Reporter
                     Certified Realtime Reporter
17

18

19

20

21

22

23

24

25

                    Sarah K. Mitchell, RPR, CRR